UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

                     Debtor.

Bankruptcy Case No.  15-30125

CHAPTER 11 CASE

**NOTICE OF HEARING AND VERIFIED MOTION OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, FOR EXPEDITED RELIEF AND FOR AN ORDER (A) AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES, AND EMPLOYEE DEDUCTIONS AND EMPLOYEE EXPENSES, (B) AUTHORIZING PAYMENT OF PREPETITION STATUTORY UNEMPLOYMENT COMPENSATION CHARGES, (C) AUTHORIZING THE DEBTOR TO CONTINUE ITS PARTICIPATION IN ITS MEDICAL AND DENTAL HEALTH INSURANCE PROGRAM AND GRANTING OTHER RELIEF WITH RESPECT TO THE PROGRAM, (D) AUTHORIZING PRIEST SUPPORT PAYMENTS AND INTERNATIONAL PRIEST PAYMENTS, (E) AUTHORIZING PAYMENT OF OTHER BENEFIT AND RETIREMENT PLAN OBLIGATIONS, (F) AUTHORIZING CONTINUATION OF THIRD PARTY PAYROLL PROCESSING SERVICES AND DIRECTING BANKS TO HONOR PAYROLL, EXPENSE CHECKS AND FUND TRANSFERS IN CONNECTION WITH THE FOREGOING, (G) FINDING COMPLIANCE WITH THE REQUIREMENTS OF RULE 6003, AND (H) WAIVING PROVISIONS OF RULE 4001(a)(3)**

TO:     All parties-in-interest as specified in Local Rule 9013-3(a)(2)

        The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor")

moves the Court for the expedited relief requests below and gives notice of hearing:

<u>**NOTICE OF MOTION**</u>

        1.     The Court will hold a hearing on this motion at 1:00 p.m. on January 20, 2015,

before the Honorable Robert J. Kressel in Courtroom 8W, United States Courthouse, 300 South

Fourth Street, Minneapolis, Minnesota 55415.

        2.     Local Rule 9006-1(c) provides deadlines for response to this motion.  However,

given the expedited nature of this motion, the Archdiocese will not object to the filing and

service of a response to this motion at any time prior to or at the hearing.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT A HEARING.**

## JURISDICTION

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The above-captioned Chapter 11 case was filed on January 16, 2015 (the "Petition Date"), and is now pending in this Court.

4.      This motion arises under Sections 105(a), 362, 363, 507(a)(4), 507(a)(5), 542, 549, 1107 and 1108 of the Bankruptcy Code.  This motion is filed under Fed. R. Bankr. P. 9013 and 9014, and Local Rules 9013-1 through -3.  Expedited relief is requested pursuant to Fed. R. Bankr. P. 9006(c) and Local Rule 9006-1(e).  Notice of the hearing on this motion is provided pursuant to Local Rules 9013-3 and 2002-1(b).

## RELIEF REQUESTED

5.      The Archdiocese believes that the programs and policies described in this motion represent ordinary course transactions and that the Archdiocese is authorized to continue such programs and policies on a post-Petition Date basis. The Archdiocese also acknowledges, however, that certain relief with respect to these programs and policies, including authorization to pay pre-Petition Date obligations and certain relief with regard to the health and dental plan described below, may require Court authorization.  The Archdiocese has filed this motion to obtain the necessary authority.  This motion is also intended to serve as  a summary for the

benefit of the Court and the other parties in interest of the major employee benefit and insurance programs maintained by the Archdiocese.

6.      An order granting the relief requested herein is necessary (i) to minimize the personal hardship that the Archdiocese's employees, priests, and other participants in the programs described below (including Non-Debtor Catholic Entities and their employees) will suffer if the employee obligations are not paid when due, (ii) to maintain employee and priest morale, and (iii) to maximize the value of the estate and the return to creditors.

7.      By way of summary, the relief requested in this motion falls into six broad categories, as follows:

(a)      The Archdiocese seeks authority to pay any pre-Petition Date wages, salaries, and other compensation payable to its existing employees and to honor any pre-Petition Date claims arising under the Archdiocese vacation and personal time off policies and any pre-Petition Date claims for other employee deductions and withholdings.

(b)      The Archdiocese seeks authority to pay any pre-Petition Date claims under the unemployment compensation trust relationship maintained by the Archdiocese with the State of Minnesota.

(c)      The Archdiocese seeks authority to pay any pre-Petition Date obligations under its non-priest health and dental benefit plan and its priest health and dental benefit plan and to maintain the disbursement account established to handle premiums and disbursements with regard to the non-priest plan pending further order of the Court.

(d)      The Archdiocese seeks authority to pay any pre-Petition Date claims under its layperson and priest pension plans and its other employee benefit plans, including, for example, long term disability, accidental death and dismemberment, and tuition assistance.

(e)      The Archdiocese seeks authority to pay any pre-Petition Date claims that are required to be paid by the Archdiocese under Canon Law to inactive priests not currently qualified for the priest pension plan.

(f)      The Archdiocese seeks authority to make any Pre-Petition Date payments due under its existing program for international priests.

8.      Finally, the Archdiocese seeks an order authorizing its banks to honor checks that were issued on a pre- or post-Petition Date basis for the expenses described in the motion, a finding that the Archdiocese has complied with the requirements of Bankruptcy Rule 6003 (to the extent applicable to this motion), and a waiver of the stay of Bankruptcy Rule 4001(a)(3) to the extent applicable to the relief sought with respect to the non-priest medical and dental plan.

9.      As related to any of the payments sought to be authorized in this motion, the Archdiocese does not request authority to pay any amount in excess of the Bankruptcy Code statutory limits of $12,475 to any individual employee under 11 U.S.C. § 507(a)(4) or (a)(5) for those categories of payments to which those sections apply.

10.     The Archdiocese does not request in this motion that the Court authorize the assumption or rejection of any executory contract.

## **BACKGROUND**

11.     On the date hereof (the "Petition Date"), the Archdiocese caused its attorneys to file a voluntary petition for Chapter 11 bankruptcy relief under Title 11 of the United States Code (the "Bankruptcy Code"). The Archdiocese is continuing in possession of its property and is operating and managing its business, as a debtor in possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner, and no official committee has been established.

12.     To enable the Archdiocese to minimize the adverse effects of the commencement of this Chapter 11 case on its operations, the Archdiocese has requested various types of relief in "first day" motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, facilitating a smooth transition to Chapter 11, maintaining employee compensation, maintaining the goodwill and morale of priests, lay employees and others who rely on the programs and services described below, and preserving and maximizing

-4-

the property available to satisfy the Archdiocese's creditors.  All of the First Day Motions are vital to the Archdiocese's reorganization efforts, and expedited approval of the First Day Motions is important to the Archdiocese's success in this Chapter 11 case.

13.    For a description of the Archdiocese and its operations, the Archdiocese respectfully refers the Court and the parties in interest to the Affidavit of the Very Reverend Father Charles V. Lachowitzer, Vicar General and Moderator of the Curia for the Archdiocese (the "First Day Affidavit") filed contemporaneously herewith.[1]  The First Day Affidavit has been filed in further support of this motion and the other First Day Motions.

## ARCHDIOCESE STRUCTURE

14.    The Archdiocese serves a geographical area consisting of 12 greater Twin Cities metro-area counties in Minnesota, including Ramsey, Hennepin, Anoka, Carver, Chisago, Dakota, Goodhue, Le Sueur, Rice, Scott, Washington, and Wright counties (the "Region").  As of January 1, 2015, approximately 399 priests and 173 deacons serve 187 parishes and approximately 825,000 Catholic individuals in the Region.  As of December 31, 2014, the Archdiocese employed approximately 176  individuals, which includes clergy and laity.

15.    In Canon Law, anyone not ordained a deacon, priest, or bishop is a layperson or "laity."  In this legal sense, women in a religious order (sisters) and men in a religious order (brothers) are laity.  In the documents of the Second Vatican Counsel, however, the laity are those who are neither ordained nor members of a religious order.  That Vatican II sense is the one usually intended in most discussions of laypeople and their role in the Church.

16.    As set forth in its Articles of Incorporation, the Archdiocese's general purpose is to manage the temporal affairs of the Church in the Region, and to promote spiritual, educational

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Affidavit.

and other interests of the Church in the Region, including charitable, benevolent, eleemosynary, and missionary work, and to establish and help support parishes, cemeteries, schools, seminaries, colleges and other educational, benevolent, charitable, religious or missionary work.

17.     The Archdiocese's mission, as set forth on its website, is: "Making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education, and ready outreach to the poor and marginalized."

18.     Along with the 187 parishes, there are 90 Catholic schools in the Region, including 13 Catholic high schools (collectively, the "Schools"), with a total enrollment of over 30,000 students.   Various other Catholic-based social and community service organizations operate in the Region, including nine Catholic nursing homes, four Catholic hospitals, ten retreat centers, and six monastic communities that are maintained by separate religious institutions.

19.     The 187 individual parishes within the Archdiocese are separately incorporated under Minnesota Statutes section 315.15 as parish corporations and are legally distinct from the Archdiocese itself (the "Parish Corporations").   These Parish Corporations are subject to the requirements, and have the rights, powers, and privileges, of a religious corporation.   As such, the Parish Corporations own and manage their own property and assets, and have responsibility for their own corporate actions.   Each Parish Corporation and other entity has its own employees and its own employer identification number.   Each Parish Corporation pays its assigned priests, pays its own employees wages and benefits, files the necessary tax and other reporting forms, and pays its own operating expenses from bank accounts each such entity maintains.   The Parish Corporations are not debtors in this Chapter 11 case and have not otherwise sought bankruptcy relief.

20.     The Archdiocese is one of a number of separate entities created to promote the mission of the Church in the Region.  These other entities include Catholic Finance Corporation, Catholic Services Appeal Foundation, Catholic Charities of Saint Paul and Minneapolis, and many others.  Each of these entities is incorporated as a separate non-profit corporation under Chapter 317(A) of the Minnesota Statutes.  Each of these entities also has its own employees and its own employer identification number and pays its own operating expenses from its individual bank accounts.  These entities are also not debtors in this Chapter 11 case and have not otherwise sought bankruptcy relief.

21.     The Parish Corporations, Schools and other non-Archdiocese entities described in this motion have no corporate relationship with the Archdiocese.  However, for convenience and expense reasons, certain of these entities participate with the Archdiocese in certain jointly administered insurance, medical and dental, and retirement plans.  Certain of these entities also participate with the Archdiocese in a general insurance program described in a separately-filed first day motion.

22.     The Parish Corporations, Schools, and other non-Archdiocese entities that participate in the general insurance fund and other employee benefit plans are collectively referred to herein as the "Non-Debtor Catholic Entities."

## FACTS SUPPORTING MOTION

### A.      Wages, Salaries and other Compensation

23.     The approximately 176 individuals employed by the Archdiocese include approximately  (i) 29 clergy specifically retained by the Archdiocese and not currently assigned to parishes, including the auxiliary bishops and the archbishop of the Archdiocese, (ii) 67 other salaried employees, (iii) 78 hourly employees, and (iv) two commission-based employees (collectively, the "Employees").

24.     Prior to the Petition Date, the Archdiocese reduced its staff by approximately 7% as part of a series of broad budget cuts.  The budget cuts resulted in a 20% reduction in overall operating expenses.  These cuts and reductions were both painful and difficult.  Without these cuts and reductions, however, the Archdiocese's ability to fairly compensate victims and maintain its core functions and missions would have been severely compromised.

25.     The Archdiocese's remaining Employees work in numerous ministries and other operations and provide essential ecclesiastical, managerial, financial, clerical, communications, religious, and pastoral services to individuals and families within the Region.  The Employees are essential to the Archdiocese's continued operations and to the administration of this case, the preservation of the Archdiocese's assets, and the Archdiocese's ability to successfully reorganize.  Without maintaining payment to the Employees, the Archdiocese could not provide resources, spiritual leadership, or other services to individuals, Parish Corporations, and Schools, and could not effectively implement the Archdiocese's reorganization for the benefit of all creditors.

26.     The Employees are paid on a biweekly basis (with respect to lay employees) and on a monthly basis (with respect to clergy).  The Archdiocese's aggregate monthly compensation for its Employees, including wages and salaries, is approximately $750,000.  The Archdiocese has engaged CBIZ Corporation ("CBIZ") as a third-party payroll processor to administer its payroll.  CBIZ provides the Archdiocese with a payroll report prior to each scheduled payday. The Archdiocese uses the CBIZ report as a basis for funding its segregated payroll account maintained by U.S. Bank.  The segregated payroll account is funded one to two business days before payroll is paid out to the Employees.  Funds deposited in the payroll account are either deposited in the appropriate Employee account (for those Employees who have elected direct

deposit) or paid to the Employee by check. CBIZ is responsible for the direct deposits (or the preparation of Employee checks) and for payment of the related withholding obligations described below.

27.    CBIZ's services are crucial to the smooth functioning of the Archdiocese's payroll system. As of the Petition Date, the Archdiocese believes that no amount is owed by the Archdiocese to its payroll service. The last payment to Employees was made on January 15, 2015.

28.    As of the Petition Date, the Archdiocese owes approximately $110,000 in accrued wages, salaries, other contractual compensation, and overtime and holiday pay. No lay Employee is owed more than $3,335 in outstanding wages. No priest is owed more than $3,823 in outstanding wages. The Archdiocese seeks authority to pay all such accrued pre-Petition Date wages, salaries and other contractual compensation, and overtime and holiday pay subject to the statutory cap identified in paragraph 9 above (the "Employee Wages").

**B.    <u>Vacation and Personal Time</u>**

29.    <u>Vacation</u>. Lay Employees are entitled to vacation time of up to 20 working days per year, depending upon years of employment and other factors. As of the Petition Date, the Archdiocese's estimated aggregate amount of accrued vacation liability is $402,000. Lay Employees are not entitled to "cash out" accrued vacation time at any time prior to termination of employment. The Archdiocese in the ordinary course of its business seeks to allow lay Employees to use paid vacation time in the ordinary course of business whether accrued pre- or post-Petition Date. The Archdiocese further seeks to provide lay Employees with any pre-Petition Date accrued vacation time payment upon termination of employment, subject to the statutory cap identified in paragraph 9 above.

30.   <u>PTO</u>.  The Archdiocese also provides its lay Employees with paid time off of 12 days per year.  Paid time off is not cumulative from one fiscal year to the next and may be only taken in kind.  There is no "cash out" option with respect to personal time off days.  Because paid time off is not paid in cash, it is not included as counting toward the compensation cap identified above.  As of the Petition Date, the Archdiocese's estimated aggregate amount of accrued personal time off is $167,000 were it to be valued in dollars.

C.    <u>Wage and Salary Deductions and Withholdings</u>

31.   In the ordinary course of business, the Archdiocese or its payroll provider deducts from Employee paychecks for:  (i) payroll taxes and the Employees' portion of FICA and disability taxes in the total amount of approximately $155,000 per month; (ii) legally ordered deductions such as wage garnishments, child support and tax levies; and (iii) miscellaneous other items (collectively, the "Employee Deductions") to the appropriate third party recipients.  In the ordinary course of business, the Archdiocese also reimburses Employees for certain business-related expenses for meals, travel and other related expenses (collectively, the "Employee Expenses").  The Archdiocese believes that the total of Employee Expenses to be reimbursed under this motion will not exceed $15,000.

32.   By this motion, the Archdiocese seeks authority to continue to utilize its payroll provider and to honor and process pre-Petition Date Employee Deductions and Employee Expenses in the ordinary course of business and to forward such amounts to the appropriate authorities in the ordinary course of business.

D.    <u>Unemployment Compensation</u>

33.   Nonprofit corporations are authorized under Chapter 268 of the Minnesota Statutes to elect between paying quarterly unemployment insurance tax payments, or,

alternatively, to make reimbursements to an unemployment insurance trust fund (the "Chapter 268 Trust"). Minn. Stat. § 268.053, subd. 1(a). The Archdiocese has elected to make payment to the Chapter 268 Trust for actual and anticipated obligations in lieu of submitting quarterly tax payments.

34.      Nonprofit entities electing the reimbursement trust fund payment option are billed quarterly for the amount of unemployment benefits charged to the reimbursable account. Payment to the Chapter 268 Trust is due on or before the last day of the month following the month in which the payment notice is sent. The next payment to the Chapter 268 Trust will be for the quarter ending December 31, 2014 and due on February 28, 2015 in the amount of not more than $15,000.

35.      A nonprofit entity that fails to make prompt payment of its unemployment obligations are subject to interest and other charges. Any amount due from an employer becomes a lien upon all property of the employer within the State of Minnesota, both real and personal, from the date the obligation was due. If any amount is not paid when due, the amount may be collected by direct levy upon all property and rights of property. The State of Minnesota may also bring a civil action to recover amounts due. Section 268.057 of the Minnesota Statutes creates a statutory priority claim for taxes due to the State of Minnesota in the event of a bankruptcy proceeding.

36.      As stated above, the Archdiocese has implemented a number of budget cuts and employee layoffs to ensure that the Archdiocese will have the ability to fairly respond to the claims of abuse victims in this case, and to further ensure that the Archdiocese will be able to continue its ministry and essential services. The Archdiocese has taken steps to pay anticipated unemployment compensation liability. The Archdiocese does not believe that it has any

additional pre-Petition Date obligations to the Chapter 268 Trust, but to the extent that it does, the Archdiocese seeks authority, in its discretion, to continue to honor any and all prepetition statutory unemployment compensation claims in accordance with the procedures outlined in Chapter 268 of the Minnesota Statutes. The Archdiocese will continue to satisfy such post-Petition Date unemployment compensation obligations in the ordinary course of business.

E.       **Non-Priest Medical and Dental Benefit Plan**

37.      The Archdiocese is the sponsoring employer and a participating employer in the Archdiocese of St. Paul and Minneapolis Comprehensive Major Medical Health Care Plan (the "Health Plan") and the Archdiocese of St. Paul and Minneapolis Dental Benefit Plan (the "Dental Plan") (collectively, the "Health and Dental Plans"). In addition, other Non-Debtor Catholic Entities have elected to separately participate in the Health and Dental Plans.

38.      There are currently approximately 3,500 individual participants in the Health and Dental Plans. By covering their non-priest Employees under a single plan, the Archdiocese and the other Non-Debtor Catholic Entities benefit from significant cost savings as a result of the pooled risk and allocation of overhead. The Archdiocese believes that a health and dental insurance plan for each of these entities standing alone would be prohibitively expensive (and possibly unavailable). Historically, premiums collected for the Health and Dental Trust, as described below, from the Non-Debtor Catholic Entities covered the costs of claims made by their employees. The Archdiocese bills the Health and Dental Trust approximately $4,800 per month for its administrative fees and expenses in connection with the Health and Dental Plans. Corporate Health Systems, Inc. ("CHS") administers the Health and Dental Plans and is paid its administrative fees from the Health and Dental Trust. CHS bills the Health and Dental Trust

approximately $30,000 per month for its administration.  These fees are paid from the disbursement account referenced below.

39.      The premium cost of the Health and Dental Plan for non-priest Employees is funded in part by the Archdiocese and in part through non-priest Employee pay check deductions.  Employees who work 25 or more hours per week are eligible to participate in the Health and Dental Plans.

40.      The Health Plan is a partially-insured health plan for the exclusive benefit of the employees of the participating employers, their spouses and dependents, providing medical and prescription insurance benefits to eligible employees.  The Health Plan is administered by Blue Cross and Blue Shield of Minnesota ("Blue Cross"), a third party administrator.

41.      The Dental Plan is a self-insured dental plan for the exclusive benefit of the employees of the participating employers, their spouses and dependents, providing dental insurance benefits to eligible employees.  The Dental Plan is administered by Delta Dental of Minnesota ("Delta Dental"), a third party administrator.

42.      The Archdiocese has established a trust fund  (the "Health and Dental Trust") to receive premium payments from the participating employers and participants in the Plans, and to pay Health Plan and Dental Plan claims, Health Plan stop-loss insurance premiums, and other reasonable expenses associated with the administration of the Health and Dental Plans.  The Health and Dental Trust is governed by a trust agreement (the "Health and Dental Trust Agreement") dated as of March 1, 1991, as amended as of January 28, 1992. Attached hereto as **Exhibit A** is a true and correct copy of the Health and Dental Trust Agreement.

43.      The Health and Dental Trust appears to take the form of a "rabbi trust" in that the terms of the Health and Dental Trust Agreement provide that assets of the Health and Dental

Trust could be made subject to the claims of the Archdiocese's general creditors in the case of the Archdiocese's bankruptcy or insolvency.  The Health and Dental Trust Agreement further provides that the Trustee shall discontinue payments to beneficiaries and hold the assets of the Health and Dental Trust for the benefit of the Archdiocese's general creditors upon the occurrence of an event of bankruptcy or insolvency until such time that the Archdiocese "is no longer bankrupt or insolvent or pursuant to an order of a court of competent jurisdiction."

44.    The assets of the Health and Dental Trust are presently held in two accounts. The first account (the "AMBP Disbursement Account") is held by Wells Fargo Bank as Account No. xxxx-8267.    The balance of the AMBP Disbursement Account equaled approximately $5,937,250  as of the Petition Date. The remaining assets of the Health and Dental Trust are separately held by Catholic Community Foundation as Account No. xxxx-6558a, the balance of which equaled approximately $8,540,187 as of December 31, 2014.

45.    The Archdiocese is seeking relief in this motion only with respect to the AMBP Disbursement Account pursuant to the provision of the Health and Dental Trust Agreement permitting withdrawals "pursuant to an order of a court of competent jurisdiction."   The Archdiocese is not seeking authority to withdraw or disburse any portion of the Catholic Community Foundation account at this time. By separate motion, the Archdiocese has requested authorization to maintain its existing bank accounts, including the AMBP Disbursement Account.  By this motion, the Archdiocese has requested the relief set forth in paragraphs 52 and 53 below with regard with the AMBP Disbursement Account.

46.    Claims for services covered under the Health Plan are submitted to Blue Cross by a Health Plan participant or a treating provider.  If approved, Blue Cross pays the claim out of the AMBP Disbursement Account.  Similarly, claims for services covered under the Dental Plan

are submitted to Delta Dental by a Dental Plan participant or a treating provider.  If approved, Delta Dental pays the claim out of the AMBP Disbursement Account.

47.    The total monthly Health and Dental Plan premium paid by the Archdiocese and the Employees combined is approximately $125,000 (employer and employee contributions). This monthly premium amount covers – in addition to the Health and Dental Plan – life insurance, flexible spending accounts, and other benefits.  Premiums are deposited upon receipt to the AMBP Disbursement Account.

48.    Premiums for the Health and Dental Trust are set by the Archdiocese in consultation with the trustees of the Health and Dental Trust annually based on claims history. Over the years, premiums have been either increased or reduced.   The trust reserve has increased over the last several years as a result of lower losses than expected.  In accordance with prior practices, the Archdiocese determined in January 2014 that it was appropriate to provide participants with a credit of 20% over a period of 18 months to prevent an unnecessary increase in the reserve amount.  Notwithstanding the adjustment, the Health and Dental Trust operated at a slight loss (defined as billed revenues less medical and dental claims paid and administrative costs) of approximately $80,000 for the period from July to December 2014.  The Health and Dental Trust recorded a liability of approximately $860,000 as of June 30, 2014, for incurred, but not reported, claims under the Health and Dental Plans.  This amount is representative of an approximate amount owing at any given time.

49.    The Archdiocese does not anticipate any significant reduction in the balance held in the Health and Dental Trust during the pendency of this Chapter 11 case.  At any given time, approximately 93% of the balance held in the Health and Dental Trust is attributable to funds contributed by participating Non-Debtor Catholic Entities.

-15-

50.     The Archdiocese does not currently seek an adjudication of the relative interest of the Non-Debtor Catholic Entities in the Health and Dental Trust.  The Archdiocese anticipates, however, that certain Non-Debtor Catholic Entities may assert trust or other claims with respect to the balance held in the Health and Dental Trust to the extent of the premiums paid by those entities.

51.     The Health Plan differs from a plan that is fully self-insured in that the Health Plan has a stop-loss which protects the Archdiocese and the participating Non-Debtor Catholic Entities from claims above a certain threshold.  AIG provides the stop-loss coverage for the Health Plan, with stop-loss coverage as to a particular insured individual beginning after the Health Plan has paid $175,000 for claims of a particular individual who is enrolled in the Health Plan and entitled to benefits.  The premium for the stop-loss coverage is paid from the Health and Dental Trust through the AMBP Disbursement Account.

52.     The Archdiocese wishes to (a) continue to provide the Health Plan and Dental Plans, and all other similar insured employee benefit programs currently in effect for the employees of the debtor and the Non-Debtor Catholic Entities, (b) continue making all contributions to such programs, and (c) continue to pay any claims and administrative fees related thereto, all in accordance with the ordinary course of business.  The Archdiocese seeks authority to pay any and all pre-Petition Date obligations to the Health and Dental Trust, to the extent they exist, in an amount not to exceed $15,000.

53.     The Archdiocese has also requested that the Court authorize the Trustees under the Health and Dental Trust and holder of the AMBP Disbursement Account to continue to receive premiums and other distributions to the Health and Dental Trust and to pay, reimburse, or otherwise honor all premium charges, expenses, and administrative fees payable in connection

with the Health and Dental Plans, including the fees and expenses of the holder of the AMBP

Disbursement Account, and all obligations to health plan participants and treating providers to

the extent that such obligations, accounts fees, and administrative expenses (a) were or are due

and payable and relate to the period prior to the Petition Date and (b) are or become due and

payable or relate to the period after the Petition Date, in all cases without further order of the

Court.  The assets in the Health and Dental Trust, including the AMBP Disbursement Account,

in excess of the amounts required to be expended in accordance with this paragraph shall

continue to be held in the Health and Dental Trust pending further order of the Court.  The

Archdiocese further requests that the Court grant the Trustees of the Health and Dental Trust,

and the holder of the AMBP Disbursement Account, relief from the automatic stay of Section

362 of the Bankruptcy Code to the extent necessary to provide such parties with relief from the

obligation to turn over the Health and Dental Trust under Section 542 of the Bankruptcy Code

pending further order of the Bankruptcy Court.

**F.**       **Priest Health and Dental Plan**

54.    Active and retired priests and seminarians obtain medical and dental benefits

under an established plan separate from the Archdiocese's lay Employees (the "Priest Health and

Dental Plan").  The Priest Health and Dental Plan covers priests assigned to the Archdiocese, to

Parish Corporations, and to other Non-Debtor Catholic Entities. Parish Corporations and other

Non-Debtor Catholic Entities are billed for and separately pay their applicable premiums.  This

motion does not seek to pay premiums for any Parish Corporation or Non-Debtor Catholic Entity

priests.  The medical and dental benefits provided to priests under the Priest Health and Dental

Plan are provided on a partially-insured basis.  For those priests who qualify for Medicare, these

benefits supplement that Medicare coverage.  The benefits provided under the Priest Health and

Dental Plan generally mirror the medical and dental benefits provided to non-priest Employees by the Archdiocese. The Archdiocese has stop loss coverage for the Priest Health Plan with Blue Cross in the amount of $125,000. The program is administered by Blue Cross for medical benefits and by Delta Dental for dental benefits. The priest's benefits are provided from the Archdiocese, rather than the rabbi trust that is used for the medical and dental benefits for non-priest Employees. The net assets of Priest Health and Dental Plan as internally accounted-for by the Archdiocese was approximately $1,471,532 as of the Petition Date.

55.     The total quarterly charge in connection with the Priest Health and Dental Plan for priests is approximately $771,020. Approximately $656,000 of that amount is billed by the Archdiocese back to the Parish Corporations and other Non-Debtor Catholic Entities, which means the Archdiocese contributes approximately $115,000 quarterly. The Archdiocese pays its share of the expense of the Priest Health and Dental Plan for the priests employed directly by the Archdiocese.

56.     Premiums for the Priest Health and Dental Plan received are deposited into the Archdiocese's operating account. As expenses and claims are paid by Blue Cross, the Archdiocese transfers funds, on an as-needed basis, into a segregated account that is used to pay the claims under the Priest Health and Dental Plan. The Archdiocese incurs monthly administrative expenses in connection with the Priest Health and Dental Benefit Plan of approximately $4,600, and is reimbursed from the segregated account for such amounts.

57.     Claims for medical benefits and dental benefits under the Priest Health and Dental Plan are submitted to Blue Cross or Delta Dental, respectively, by the priest or a treating provider. If approved, the claim is paid to Blue Cross or Delta Dental from the Archdiocese's segregated account for payment to the priest or treating provider.

58.     The Archdiocese intends to (a) continue to provide the Priest Health and Dental Benefits to the active and retired priests, (b) continue making all contributions to the account for such program, (c) continue to pay any claims and administrative fees related thereto, all in the ordinary course of business.  By this motion, the Archdiocese seeks authority to pay any and all pre-Petition Date amounts due to the Priest Health and Dental Plan, including administrative and service fees, in an amount not to exceed $20,000.

## G.    **Retirement Plans**

59.     The Archdiocese has three retirement plans as described below (collectively, the "Retirement Plans").  Layperson Employees of the Archdiocese and of the Non-Debtor Catholic Entities are eligible to contribute to a Tax Deferred Annuity Plan, which is also known as a 403(b) Plan (the "403(b) Plan").  Contributions to the 403(b) Plan are made by Employees at a rate selected by them and authorized by applicable law. Participating employers make a discretionary contribution at the rate of up to 2.5% percent of eligible earnings.  The 403(b) Plan is administered through Transamerica Retirement Solutions.  The Archdiocese deducts 403(b) Plan contributions from participating lay Employees' paychecks and these amounts, along with the employer contributions, are automatically deducted from the Archdiocese's bank account and forwarded to Transamerica Retirement Solutions to be invested pursuant to the Employees' directions.

60.     The Archdiocese also sponsors a Pension Plan for Lay Employees (the "Layperson's Pension Plan").  The Layperson's Pension Plan is funded entirely by the Archdiocese and Non-Debtor Catholic Entities.  The Layperson's Pension Plan has been frozen since 2011.  However, the Archdiocese and other participating employers continue to make contributions to the Layperson's Pension Plan for the benefit of those legacy obligations.

Monthly contributions of approximately $23,000 are required by the Archdiocese. Other Participating Entities contribute approximately $530,000 per month combined. Contributions are made to a Pension Plan Trust, and are held for the exclusive benefit of Pension Plan participants. Contribution levels were frozen in 2013. The Layperson's Pension Plan is currently subject to an underfunding liability. The Archdiocese believes the underfunding liability will be satisfied in 15 to 20 years by contributions at their current level. Less than 5% of the underfunding liability is attributable to the Archdiocese.

61.     The Archdiocese also sponsors the Pension Plan for Priests (the "Priest's Pension Plan"). The obligations of the Priest's Pension Plan is funded by the Archdiocese and participating parishes. The Archdiocese makes monthly contributions to the Priest's Pension Plan in the amount of approximately $51,000 per month, exclusive of contributions made by other Participating Entities, which monthly amount is approximately $261,000. Contributions are set annually by the Priest's Pension Plan board of trustees. Contributions are made to a Pension Plan Trust, and are held for the exclusive benefit of participants in the Priest's Pension Plan. The Priest's Pension Plan is currently subject to an underfunded liability.

62.     Historically, bishops were not included in the Priest's Pension Plan. As such, the Archdiocese established a reserve for former Archbishop Flynn for this purpose. When Archbishop Nienstedt was installed, an amendment was made to the Priest's Pension Plan on April 17, 2010, to include bishops. Notification was sent to other bishops at that time, but it was decided to have Archbishop Flynn continue to receive that benefit through the payroll system. The Archdiocese has a liability on its books for "Accrued Bishops Retirement Expense" which adjusted each year based on the life expectancy of Archbishop Flynn. Archbishop Flynn's

annual deferred compensation/pension is $23,040, plus insurance and out-of-pocket health care costs of $8,514.

63.     Effective August 1, 2014, the Archdiocese transferred the Layperson's and Priest's Pension Plans from Wells Fargo and U.S. Bank to Transamerica in order to simplify and streamline its Retirement Plan administration.

64.     The Archdiocese intends to continue to make all payments and contributions required to be made on a post-Petition Date basis in connection with the Retirement Plans and Accrued Bishops Retirement Expense and continue to pay administrative fees related to the Retirement Plans in the ordinary course of business.  The Archdiocese seeks authority to pay all pre-Petition Date amounts due to the Retirement Plans in an amount estimated not to exceed $51,500.

**H.     Other Benefit Plans**

65.     In the ordinary course of its business, eligible employees of the Archdiocese and Non-Debtor Catholic Entities are provided with a number of benefits, including, but not limited to, benefit programs described below (collectively, the "Employee Benefits").

66.     Eligible Employees receive long-term disability ("LTD") and accidental death and dismemberment ("AD&D") insurance.  LTD premiums are payable entirely by participating Employees.  The Archdiocese pays Mutual of Omaha Insurance Company approximately $45 per month per Employee for AD&D insurance coverage premiums.  Non-Debtor Catholic Entity employee premiums are paid by the respective Non-Debtor Catholic Entities, not the Archdiocese.  The Archdiocese believes that all incurred obligations related to these insurance premiums billed prior to the Petition Date have been paid in full.  However, out of an abundance

of caution, the Archdiocese requests authority to pay any pre-Petition Date costs related to this insurance coverage in the ordinary course of business in an amount not to exceed $1,000.

67.     The Archdiocese and participating Non-Debtor Catholic Entities also offer eligible employees life insurance in an amount equal to each employee's annual compensation up to a maximum of $50,000 in salary, at a total monthly charge to the Archdiocese of approximately $610, and the option to purchase supplemental life insurance coverage, currently provided by Unum.  Employees participating in such optional insurance plans bear the premium costs associated with such coverage.  This optional coverage costs the Archdiocese little to nothing to provide to eligible Employees.  The Archdiocese believes that all incurred obligations related to these insurance premiums billed prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Archdiocese requests authority to pay any pre-Petition Date costs related to this insurance coverage in the ordinary course of business in an amount not to exceed $1,000.

68.     The Archdiocese also provides tuition assistance to eligible Employees in an amount equal to 60% of tuition for any child enrolled in a Catholic school (grades kindergarten through 12) subject to an aggregate annual limit for all Employees of $75,000. The Archdiocese does not believe it has any current pre-Petition Date unpaid obligation related to tuition reimbursement and intends to continue to pay such amounts in the ordinary course of business.

69.     Eligible Employees of the Archdiocese and of the Non-Debtor Catholic Entities who have out-of-pocket healthcare expenses or dependent care expenses may elect to participate in the Archdiocese Flexible Benefit Plan.  Eligible Employees may make pre-tax payroll deductions to certain maximum amounts to pay for approved expenses.  Employees determine what the total annual out-of-pocket expenses will be and how much they wish to set aside for the

year.  The Archdiocese has contracted with CHS to administer all Flexible Benefit Plan claims. The Archdiocese does not believe it bears any significant financial liability with respect to the Flexible Benefit Plan.

70.     Eligible Employees of the Archdiocese and the Non-Debtor Catholic Entities are also eligible to enroll in long-term care insurance, at their expense.  Such coverage costs the Archdiocese little to nothing to provide to eligible Employees.

71.     The Archdiocese intends to (a) continue to provide the Employee Benefits described in Section H, (b) continue to make all contributions to such programs, and (c) continue to pay administrative fees related to such Employee Benefits, all in the ordinary course of business.  The Archdiocese also seeks authority to pay any and all pre-Petition Date amounts payable by the Archdiocese with respect to the programs described in this Section H above to the extent that they remain unpaid in an amount not to exceed $20,000, subject to the statutory cap identified in paragraph 9 above.

## I.    **Support for Inactive Priests**

72.     As required by Canon Law, the Archdiocese provides payments to 18 priests for a variety of reasons (the "Priest Support Payments").  Those who receive some form of Priest Support Payment include priests who are not assigned to a parish or whose parish or institution is not able to provide full financial support, those who are out of ministry while their suitability is under review, or those who are on a general leave of absence.  This support may include housing, salaries, pension contributions, and other support benefits and payments, including medical, dental, and life insurance.  Not all priests who receive some form of Priest Support Payment receive all of these benefits or payments.  Priest Support Payments average approximately $4,800 per month per priest. Of the 18 priests subject to this motion, three have faced or are

facing claims of what could potentially be characterized as sexual abuse of a minor – one who has a substantiated claim against him and receives medical benefits (at a cost of approximately $800 per month) and two who are out of ministry while under investigation for a claim and receive pay and benefits (at a cost of approximately $5,600 per month per priest).

73.     As of the Petition Date, the Archdiocese owes approximately $85,600 in total unpaid Priest Support Payments, which includes insurance payments.

74.     By this motion, the Archdiocese requests authority to pay all unpaid Priest Support Payments due and owing as of the Petition Date.  The Archdiocese intends to continue its support of inactive priests as required by Canon Law in the ordinary course of business.

**J.      International Priest Payments**

75.     The Archdiocese also makes payments (the "International Priest Payments"), to foreign priests who serve the parishes within the Region who do not otherwise qualify to participate in the Priest's Pension Plan.  The International Priest Payments are funded through collections assessed against Parishes served by the foreign priests, and are remitted to the foreign priest's home diocese or religious order when the priest leaves the parish within the Region.  The amounts of the International Priest Payments is equal to the amount that would otherwise be funded toward the Priest's Pension Plan for those international priests if such priests were a domestic priest who qualified for such pension plan.  All money used for International Priest Payments comes from the Parishes and the Archdiocese does not contribute any money toward such payments, with the exception of one priest assigned directly to the Archdiocese.  The Archdiocese's accrued liability for International Priest Payments on behalf of this international priest as of the Petition Date will not exceed $1,000.  By this motion, the Archdiocese seeks

authority to pay any pre-Petition Date amounts due and owing in regard to the International

Priest Payment Plan.

**K.**    **Pre-Petition Banking Relationship**

76.    As a result of the Archdiocese's filing for relief under Chapter 11 of the

Bankruptcy Code, in the absence of any order of this Court, any payroll checks, or other benefit

checks recently issued by the Archdiocese to its employees that have not previously cleared may

be dishonored by the Archdiocese's banks.  The payroll account for the Archdiocese is with U.S.

Bank National Association number xxx-6066.  To the extent that these checks are dishonored,

each such employee would have an unsecured claim for wages, salaries or commissions.  These

claims would also be entitled to priority treatment under Section 507(a)(4) of the Bankruptcy

Code.

77.    The Archdiocese intends to continue to employee CBIZ as its third-party payroll

provider.  In addition, by this motion, the Archdiocese requests that all applicable banks be

directed to honor checks or fund transfer requests, regardless of whether they were issued before

or after the Petition Date, relating to Employee Wages, Employee Deductions, Employee

Expenses and Withholding Obligations, contributions to the Health and Dental Trust, Priest

Medical and Dental Plan Benefits, Retirement Plans and other Employee Benefits, Priest Support

Payments, and International Priest Payments.

**L.**    **Rule 6003 and 4001**

78.    Pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Court may grant relief regarding a motion to pay all or part of a

pre-petition claim within 21 days after the Petition Date if the relief is necessary to avoid

immediate and irreparable harm.  The Archdiocese submits that the relief requested in this

motion is necessary to avoid immediate and irreparable harm and that the Archdiocese has satisfied the requirements of Bankruptcy Rule 6003.

79.     Bankruptcy Rule 4001(a)(3) also provides for a stay of an order granting relief from the automatic stay. The Archdiocese requests a waiver of this rule to the extent necessary to permit the Trustees of the Health and Dental Trust and the holder the AMBP Disbursement Account to continue to accept deposits and to honor withdrawals from the AMBP Disbursement Account in accordance with the relief in this motion.

## BASIS FOR RELIEF REQUESTED

80.     The Archdiocese's ability to fairly compensate victims of abuse by clergy, to continue to work to prevent future abuse, and to continue its ministry depends on the Archdiocese's ability to retain its Employees.  The Employees are vital to the Archdiocese's business and the Archdiocese's successful reorganization.  The relief sought herein is entirely consistent with the intent of Section 105(a) of the Bankruptcy Code and the rehabilitative purpose of Chapter 11, and represents the exercise of sound business judgment.  In these cases, any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely affect the Archdiocese's relationship with their Employees at a time when the Employees' support is critical to this Chapter 11 case.  At this early stage, the Archdiocese simply cannot risk the substantial damage to their business enterprise that would inevitably result from a rapid decline in Employee morale.

81.     Further, absent the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations.  Likewise, any interruption to the Employee benefits provided by the Archdiocese could have a material,

negative effect on the physical well-being and morale of the Archdiocese's Employees and their families. Without the requested relief, the stability of the existing operations and future prospects of the Archdiocese will be undermined, perhaps irreparably.

82.     Similarly, disruption of the other benefits, programs and services described above have a potentially devastating effect on the Non-Debtor Catholic Entities who participate in the programs described in this motion. Disruption of the other benefits, programs and services described above will also create undue and unnecessary hardship and prejudice to the employees of those entities and their individual families and would greatly disrupt the ability of the Non-Debtor Catholic Entities and Archdiocese to maintain their ministries and other services. Obviously, this is of particular concern with regard to the roughly 3,500 participants in the Health and Dental Plans.

83.     In addition, failure to remit the payments described in this motion would place the Archdiocese in the untenable position of violating the provisions of Canon Law imposing a continuing obligation of priest support.

## EXPEDITED RELIEF

84.     The Archdiocese requests expedited relief in this motion and requests an expedited hearing. Granting this motion on an expedited basis will minimize the disruptions to the Archdiocese's ongoing business operations, minimize the personal hardship of the Employees, maintain morale and good will, and maximize the value of the estate and return to creditors. The Archdiocese submits that it has complied with the requirements of Local Rule 9006-1(e) by providing the notice specified below.

85.     Pursuant to Local Rule 9013-2, this motion is verified and accompanied by a memorandum of law, proposed order, and proof of service.

86.     Pursuant to Local Rule 9013-2, the Archdiocese gives notice that it may, if necessary call Thomas J. Mertens, Chief Financial Officer of the Archdiocese of Saint Paul and Minneapolis, to testify at the hearing on the motion regarding the facts set forth herein.  The witness's business address is 328 Kellogg Blvd W, Saint Paul, MN 55102.

## SERVICE OF MOTION

87.     Notice of this motion has been given to the parties identified on, and in the manner set forth in, the separately-filed certificate of service relating to the First Day Motions. This includes the parties specified in Local Rule 9013-3, all financial institutions with an interest in the accounts referenced in the First Day Motions, the attorneys representing alleged victims of abuse, and all attorneys who have identified themselves as counsel for the parishes or other Non-Debtor Catholic Entities.  In light of the nature of the relief requested, the Archdiocese submits that no further notice is required.

## REQUEST FOR RELIEF

WHEREFORE, for the foregoing reason, The Archdiocese of Saint Paul and Minneapolis respectfully requests the Court to enter an order, subject to the $12,475 limit set forth in 11 U.S.C. § 507(a)(4) and (a)(5), as applicable:

(a)     Authorizing the Archdiocese to pay all pre-Petition Date claims wages (including, but not limited to, salaries, bonuses and other compensation), subject to the cap of Section 507(a)(4) of the Bankruptcy Code;

(b)     Authorizing the Archdiocese in the ordinary course of business to honor any pre-Petition Date obligations for accrued vacation and personal time, sick or other paid leave, subject to the cap of Section 507(a)(4) of the Bankruptcy Code;

(c)     Authorizing the Archdiocese to pay all pre-Petition Date Employee Deductions and Employee Expenses;

(d)     Authorizing the Archdiocese to pay any pre-Petition Date statutory unemployment compensation charges;

(e)     Authorizing the Archdiocese to pay all pre-Petition Date claims, premium charges, and administrative fees payable by the Archdiocese relating to the Health Plan and Dental Plan, including the fees and expenses of the holder of the AMBP Disbursement Account;

(f)     Authorizing  the Trustees under the Health and Dental  Plan and holder of the AMBP Disbursement Account to continue to receive premiums and other distributions to the Health and Dental Trust and to pay, reimburse, or otherwise honor all expenses, premiums, and administrative fees payable in connection with the Health and Dental Plans, including the fees and expenses of the holder of the AMBP Disbursement Account, and all obligations to health plan participants and treating providers to the extent that such obligations, accounts fees, premium charges, and administrative expenses (a) were or are due and payable and relate to the period prior to the Petition Date and (b) are or become due and payable or relate to the period after the Petition Date, in all cases, without further order of the Court, provided, however, that  assets in the Health and Dental Trust, including the AMBP Disbursement Account, in excess of the amounts required to be expended in accordance with this paragraph shall continue to be held in the Health and Dental Trust pending further order of the Court.

(g)     Granting  the Trustees of the Health and Dental Trust, and the holder of the AMBP Disbursement Account, relief from the automatic stay of Section 362 of the Bankruptcy Code to the extent necessary provide such parties with relief from the obligation to turn over the Health and Dental Trust under Section 542 of the Bankruptcy Code pending further order of the Bankruptcy Court.

(h)     Authorizing the Archdiocese to pay all the pre-Petition Date claims and administrative fees relating to the Priest Health and Dental Plan;

(i)     Authorizing the Archdiocese to pay all pre-Petition Date payments and contributions required to be made in connection with the Retirement Plans;

(j)     Authorizing the Archdiocese to pay all pre-Petition Date contributions and other payments required in connection with the other Employee Benefits plans described herein, including the long-term disability, term life, and accidental death and dismemberment insurance, and flexible benefit program;

(k)     Authorizing the Archdiocese to pay all pre-Petition Date payments and contributions required to be made under Canon Law to inactive priests as Priest Support Payments;

(l)      Authorizing the Archdiocese to pay all pre-Petition Date payments and contributions required to be made to international priests in connection with the International Priests Payments;

(m)     Authorizing the Archdiocese to maintain the payroll service herein and authorizing and directing applicable banks and financial institutions at which the Archdiocese maintains disbursement and other accounts, at the Archdiocese's instruction, to receive, honor, process, and pay, to the extent of funds on deposit, any and all checks or electronic funds transfers to the extent such checks or transfers relate to any of the obligations described herein;

(n)     Finding that to the extent that certain relief requested by this motion fits within the requirements of Bankruptcy Rule 6003, such requested relief is necessary to avoid immediate and irreparable harm;

(o)     Waiving application of Bankruptcy Rule 4001(a)(3) and 6004(h) to the extent necessary to provide the Trustees of the Health and Dental Trust and the holder of the AMBP Disbursement Account with the relief sought in sub-paragraph (g) above; and

(p)     Granting such other and further relief as the Court deems just and proper.

Dated:  January 16, 2015                    Respectfully submitted,

*e/ Richard D. Anderson*
_____

BRIGGS & MORGAN, P.A.
Richard D. Anderson (#2306)
randerson@briggs.com
John R. McDonald (#168592)
jmcdonald@briggs.com
Charles B. Rogers (#0130588)
crogers@briggs.com
Benjamin E. Gurstelle (#389968)
bgurstelle@briggs.com
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 977-8400
Facsimile: (612) 977-8650

- and -

LINDQUIST & VENNUM LLP
James A. Lodoen (#173605)
jlodoen@lindquist.com
Jeffrey D. Smith (#0387035)
jsmith@lindquist.com
Charlie E. Nelson (#0392389)
cnelson@lindquist.com
4200 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 371-3211
Facsimile: (612) 371-3207

*Proposed Attorneys for The Archdiocese of Saint
Paul and Minneapolis*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                            CHAPTER 11 CASE

The Archdiocese of Saint Paul and
Minneapolis,

              Debtor.

## VERIFICATION OF THOMAS J. MERTENS

I, Thomas J. Mertens, Treasurer / Chief Financial Officer of the Archdiocese of Saint

Paul and Minneapolis, do hereby declare and certify under penalty of perjury that the

information contained in Notice of Hearing and Verified Motion of the Archdiocese of Saint

Paul and Minneapolis for Expedited Relief and for an Order (A) Authorizing Payment of

Prepetition Wages, Salaries, and Employee Deductions and Employee Expenses, (B)

Authorizing Payment of Prepetition Statutory Unemployment Compensation Charges, (C)

Authorizing the Debtor to Continue its Participation in its Medical and Dental Health Insurance

Program and Granting Other Relief With Respect to the Program, (D) Authorizing Priest Support

Payments and International Priest Payments, (E) Authorizing Payment of Other Benefit and

Retirement Plan Obligations, (F), Authorizing Continuation of Third Party Payroll Processing

Services and Directing Banks to Honor Payroll, Expense Checks and Fund Transfers in

Connection with the Foregoing, (G) Finding Compliance with the Requirements of Rule 6003,

and (H) Waiving the Provisions of Rule 4001(a)(3) is true and correct to the best of my

knowledge, information, and belief.

Dated:  1/16/15                    _____
                                   Thomas J. Mertens

**Exhibit A – Health and Dental Trust**

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
MEDICAL BENEFIT PLAN TRUST AGREEMENT

This agreement is made this 1st day of March, 1991, by and between The Archdiocese of Saint Paul and Minneapolis Incorporated as a religious diocesan corporation pursuant to the laws of the State of Minnesota under the corporate name "The Archdiocese of Saint Paul and Minneapolis", hereinafter called "Archdiocese" or the "Grantor", and Archbishop John R. Roach, as Ordinary of the Archdiocese, Reverend Austin T. Ward, and William G. Umphress as trustees, hereinafter called "Board of Trustees" or "Trustees".

SCOPE OF TRUST AGREEMENT

WHEREAS, the Archdiocese has established The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan underwritten by United of Omaha Insurance Company.  The term "Plan" wherever used herein shall mean the medical insurance plan referred to above entered into between the Archdiocese and United of Omaha Insurance Company or any successor medical insurance plan provided for the employees of the Archdiocese and any Participating Employer, as such medical insurance plan may be amended from time to time.  The Plan provides medical and dental benefits and certain life insurance benefits to participating employees of the Archdiocese and of non-profit corporations affiliated with the Archdiocese who have adopted the Plan (collectively referred to as the "Participating Employers"); and

WHEREAS, in order to hold and administer the funds collected to provide benefits stated in the Plan, it has been determined to

establish a trust to fund all or part of the benefits available under the Plan;

NOW THEREFORE, the Archdiocese and the Trustees agree as follows effective as of the 1st day of January, 1991:

1.    The purpose of this trust is to provide a vehicle to:

a.    Hold assets of the Archdiocese as Grantor as a reserve for the discharge of the Grantor's obligations to the beneficiaries of The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan, and

b.    Disburse and distribute assets as provided hereunder.

2.    The trust shall receive all contributions from the Archdiocese.  The Archdiocese shall, as it determines in its sole discretion, collect funds from Participating Employers to contribute to the Trust.  All amounts so received, together with any earnings thereon (hereinafter called the "Trust Fund") shall be held, managed and administered by the Trustees in accordance with the terms of this agreement. By execution of this agreement, the Trustees hereby accept the trust created hereunder, and agree to perform all of the duties as specified herein.

3.    The trust created by this agreement, as amended from time to time, shall be known as "The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan Trust".

4.    The term "Plan Administrator" wherever used herein shall mean the person or persons responsible for general supervision of the Plan as designated under the terms of the Plan.  At the request

2

of the Trustees, the Plan Administrator shall deliver to the Trustees copies of the Plan and each amendment thereto for the convenience of reference, but the rights, powers, titles, duties and discretions of the Trustees shall be governed solely by this Trust Agreement without reference to the Plan. At the direction of the Archdiocese, the Trustees may serve as the nominal contract holder of one or more forms of group, life or health insurance offered by an insurer authorized to transact business in the domicile state of the Trust created herein for purposes of providing benefits under the Plan.

5.    The direction and management of the Trust Fund shall reside in the Trustees. The Trustees shall have full discretion and authority with regard to the investment of the Trust Fund, except with respect to trust assets under the control or direction of a properly appointed investment manager. Trustees shall coordinate its investment policy with the financial needs of the Plan.

6.    The Trustees shall have all of the powers enumerated in Minnesota Trustees Powers Act, which act is incorporated herein by reference. In addition thereto, but not by way of limitation, the Trustees shall have the following powers, rights and duties:

a.    To discharge the duties hereunder solely in the interest of the participants in the Plan and for the exclusive purpose of providing benefits to participants in the Plan and other persons entitled to benefits under the Plan, and defraying reasonable expenses of administering the Trust and the Plan.

3

b.   To receive and hold all contributions paid to them provided however that the Trustees shall have no duty to require any contributions be paid to them or to determine that the contributions received by them comply with the Plan or with any resolution of the managing body of the Plan Administrator providing therefore, and further provide that the Trustees shall have no responsibility with respect to the operation or administration of the Plan.

c.   To enter into financial agreements with third parties for the purpose of setting up accounts for the payment of benefits under the Plan and the payment of claims under the Plan, and to provide for any such third party to draw on the funds of the Trust Fund for purposes of paying such benefits or claims and for the purpose of paying administrative expenses and group insurance premiums.

d.   To retain in cash (pending investment or payment of benefits) any reasonable portion of the Trust Fund and to deposit cash in any depository selected by them, provided such deposits bear a reasonable rate of interest.

e.   To compromise, contest, arbitrate, settle or abandon claims and demands (exclusive of claims and demands arising under the Plan), and to begin, maintain or defend any litigation necessary in connection with the investment, reinvestment or administration of the Trust.

f.   To hold securities or other properties in the name of the Trustees or their nominee, or nominees, or in such other form

4

as they determine best with or without disclosing the trust relationship, providing the records of the Trustees shall indicate the actual ownership of such securities or other properties.

g.    To retain any funds or property subject to any dispute without liability for the payment of interest, and to decline to make payment or delivery thereof until final adjudication is made by a court of competent jurisdiction.

h.    To pay any tax, charge or assessment attributable to any benefit which, in the Trustees opinion, they shall or may be required to pay out of such benefit; and to require before making any payments such release or other document from any taxing authority and such indemnity from the intended payee as a Trustee shall deem necessary for their protection.

i.    To employ agents, attorneys, investment counsel, accountants or other persons, (who also may be employed by or represent the insurer) for such purposes as the Trustees consider desirable.

j.    To furnish Participating Employers with such information in the Trustees' possession as the Participating Employers may need for tax or other purposes.

k.    To invest and reinvest the principal and income of the Trust in real or personal property of any kind with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matter would use in the conduct of the

5

enterprise of like character and with like aims. The Trustees
shall diversify the investments of the Trust so as to minimize
the risk of large losses unless under the circumstances they
are clearly prudent not to do so.    Trustees shall not be
limited by the laws of any state prescribing or limiting the
investment of trust funds by corporate or individual trustees
or to certain kinds, types or classes of investments or
limiting the value or proportion of trust assets that may be
invested in any one property or kind, type or class of
investment.    Investments and reinvestments shall be subject to
the above standard, and without limiting the generality of the
foregoing, shall also be subject to the following:

    i.    The Trustees may invest and reinvest principal and
income for the trust in common, preferred or other stocks
of any corporation; voting trust certificates, interest
in investment trusts, including but not limited to
participations issued by an investment company as defined
in the Investment Company Act of 1940, as from time to
time amended; bonds, notes and debentures, secured or
unsecured, mortgages on real or personal property;
conditional sales contracts; and real estate and leases.

    ii.    The Trustees may invest and reinvest the principal
and income of the trust through any common or collective
trust fund or pooled investment fund maintained by the
Trustees or a Trustee for the collective investment of
funds held by a Trustee in a fiduciary capacity.    The

6

provisions of the document governing any such common or collective trust fund as it may be amended from time to time shall govern any investment therein and are hereby made a part of this trust agreement.

l.    To have with respect to the Trust all of the rights of an individual owner, including the power to give proxies, to participate in any voting trust, mergers, consolidations or liquidations and to exercise or sell stocks, descriptions or conversion rights.

m.    To value the Trust Fund on such date or dates as directed by the Archdiocese.

n.    To perform any and all other acts in their judgment necessary or appropriate for the proper and advantageous management, investment and distribution of the Trust Fund.

7.    The Trustees may be entitled to reasonable fees for their services hereunder.    However, Trustees who are employees of the Archdiocese or any Participating Employer shall not be entitled to compensation for such services, but may be reimbursed for any other expenses in connection with providing those services.    Such fees and any expenses incurred by the Trustees in connection with the Trust held hereunder shall be charged to the Trust Fund, however, the Archdiocese may elect to pay such fees and expenses.

8.    The Trustees shall maintain accurate and detailed records and accounts of all transactions hereunder.    Within 60 days following the close of each calendar year, the Trustees shall furnish to the Archdiocese an annual statement of account showing

7

the condition of the Trust Fund and all investments, receipts and disbursements and other transactions affected by the Trustees during the calendar year covered by the statement and also stating the assets of the trust held at the end of the calendar year, which accounts shall be conclusive on all persons, including the Archdiocese, the Plan Administrator and the Participating Employers, except as to any act or transaction concerning which the Archdiocese files with the Trustees written exceptions or objections within 90 days after receipt of the accounts. The Trustees, to the extent permitted by law, shall be released and discharged as to all items, matters and things set forth in such written account or report other than matters covered in such written objections as provided herein. Trustees, nevertheless, shall have the right to have their accounts approved by judicial proceedings if they so elect, in which event the Trustees and the Archdiocese shall be the only necessary parties. Further, in the event that the Archdiocese duly delivers to the Trustees written objections to any matter set forth in any such written account or report and such objections are not explained or adjusted to the satisfaction of the Archdiocese each shall likewise have the right to have the Trustees' accounts reviewed by judicial proceedings if they so elect, in which event the Trustees and the Archdiocese shall be the only necessary parties.

9.   In case of disagreement among the Trustees, the decision of a majority of them shall determine the issue and the act of a majority of them shall be the act of the Trustees. The Trustees

8

are authorized to delegate for any period of time to any corporate trustee serving as Trustee under this agreement, the power to act on the behalf of the delegating Trustee, and if such delegation occurs the delegating Trustee shall not be liable to any person for the administration of the Trust during the time such delegation is enforced.

10.  If a corporate trustee is acting, it shall have custody of all the assets, handle receipts and disbursements and prepare accountings.

11.  The Trustees shall at all times be composed of the Ordinary of the Archdiocese and two or more members appointed by the Ordinary of The Archdiocese of Saint Paul and Minneapolis.  A Trustee may resign at any time by giving thirty (30) days advance written notice to the Ordinary or his designate.  The Ordinary or his designate may remove a Trustee at any time with or without cause by giving thirty (30) days advance written notice to the Trustee.  Such resignation or removal, as the case may be, shall take affect at such time as the successor Trustee shall have been appointed and accepted such appointment, as hereinafter provided. If no successor Trustee is to be appointed and if there will be at least three Trustees remaining once such resignation or removal takes affect, such removal or resignation shall take affect on the 30th day after the applicable notice is given.  The Ordinary, or his designate, at his discretion may increase or decrease the number of members of the Board of Trustees provided there shall at all times be three Trustees serving.  All of the rights conferred

9

upon the Trustees named herein shall be exercised by their successors. Whenever in this agreement the word "Trustees" is used or the words "Board of Trustees" are used such words shall be deemed to mean the Trustees named herein and any successor Trustees. The term of the Trustees shall continue until such Trustee resigns or is removed by the Ordinary provided, however, the Ordinary may establish specific terms upon appointment of Trustees.

12. The Board of Trustees shall hold meetings regularly, at least annually, and at such times as shall be determined by time to time by the Board. The Ordinary of the Archdiocese shall be, ex officio, Chairman of the Board of Trustees. The Board of Trustees may make appropriate rules and may appoint a Vicechairperson, a Secretary and/or a Treasurer from among the members of the Board of Trustees and such other officers as it shall deem appropriate. If the Board of Trustees elects, more than one office may be filled by a single member of the Board of Trustees.

13. Investment Advisory Committee: The Board of Trustees may appoint an Investment Advisory Committee which shall consist of not less than three persons who need not be members of the Board of Trustees. The Investment Advisory Committee shall advise the Board of Trustees relative to investments of the Trust Fund and the employment of a fiduciary trustee. Findings and recommendations of the Investment Advisory Committee shall not be binding upon the Board of Trustees.

10

14.   The Archdiocese shall have the right to direct the Trustees with respect to the investment and reinvestment of assets included in the Trust Fund only as the Trustees consent in writing to permit such direction.   If the Trustees do consent to the Archdiocese's direction of investment, the Trustees and the Archdiocese shall execute a letter agreement as a part of this Trust containing such conditions, limitations, or other provisions they deem appropriate before the Trustees shall follow any Archdiocese direction as respect to the investment or reinvestment of any part of the Trust Fund.   On execution of such agreement, the Trustees shall not be liable for any loss to the Trust Fund as the result of an investment in reinvestment of assets as directed by the Archdiocese.

15.   The assets of the Trust shall be subject to the claims of the Grantor's general creditors only in the case of the Grantor's bankruptcy or insolvency.   The Grantor shall be considered "bankrupt" or "insolvent" if the Grantor is either unable to pay its debts when due or files for protection under the United States Bankruptcy Code.   The Board of Directors of the Grantor must give written notice to the Trustee of the Grantor's bankruptcy or insolvency as soon as practicable following the occurrence of such event.   Upon receipt of such notice or other written allegations of the Grantor's bankruptcy or insolvency, or in the case of the Trustee's actual knowledge of or determination of the Grantor's bankruptcy or insolvency, the Trustee shall discontinue payments to Beneficiaries and shall hold the assets of the Trust for the

11

benefit of the Grantor's general creditors.    The Trustee shall resume payments to Beneficiaries only after it has determined that the Grantor is no longer bankrupt or insolvent or pursuant to an order of a court of competent jurisdiction.

16.    The Archdiocese reserves the following powers with respect to this Trust:

a.    The Archdiocese reserves the right to alter, amend, modify, suspend or terminate this Trust Agreement or its obligation under this agreement provided, however, nothing herein contained shall authorize or permit any part of the Trust Fund, principal or income to be used for or diverted to purposes other than the payment of group insurance premiums or providing benefits stated in the Plan or the payment of administration expenses except as provided in the above paragraph 15.

b.    To remove or appoint successor Trustees as provided in the above paragraph 11.

c.    To direct investments if permitted under the above paragraph 14.

17.    No part of the corpus or income of the Trust Fund shall revert to any Participating Employer.    In addition, except as provided under the above paragraph 15, no part of the corpus or income of the Trust Fund shall revert to the Archdiocese unless the Plan has been terminated and the obligation to all insurers or beneficiaries under the Plan have been satisfied.    In the event the Plan is terminated and all obligations to the insurers providing

12

group benefits and to the beneficiary of the Plan have been satisfied any remaining trust fund shall be distributed to the Archdiocese and the Trust shall terminate.

18.    The interest under this Trust Agreement of Participants or other persons entitled to benefits under the Plan may not be voluntary or involuntary assigned or alienated.

19.    The Archdiocese hereby agrees to indemnify the Trustees for, and to hold them harmless against, any and all liabilities, losses, costs or expenses (including legal fees and expenses) of whatsoever kind and nature which may be imposed on, incurred by or served against the Trustees at any time by reason of the Trustees' service under this Trust Agreement, if the Trustees did not act in willful violation of the law or regulation under which such liability, loss, cost or expense arose.  The Trustee shall not be liable for acts or omissions or commissions in connection with the administration of the Trust Fund, except those which are the result of willful misconduct, and in particular shall not be liable for any losses which may be incurred on the making, retention or sale of any investment or reinvestment, or a loss or diminution of the Trust Fund, except as stated above.  Any member of the Board of Trustees, or any Employee or agent to whom any delegation, of any duty or power in connection with the administration of the Trust has been made, shall be entitled to rely conclusively upon, and shall be fully protected in any action taken and reliance upon, any valuation, certificate, opinion, or report that shall have been furnished by any actuary, accountant, administrator, or other

13

expert who shall have been employed or engaged by the Board of Trustees.

20. Any notice required under this Trust Agreement may be waived by a person entitled thereto.

21. The records of the Trustees pertaining to the clients shall be opened to the inspection of the Archdiocese at all reasonable times and may be audited from time to time by any person the Archdiocese may specify in writing. The Trustees shall furnish the Archdiocese with whatever information relating to the Trust Fund as the Archdiocese considers necessary.

22. The fiscal year of the Trust shall be the calendar year ending each December 31.

23. The Trust is intended to be a trust of which the Grantor is treated as the owner for federal income tax purposes in accordance with the provisions of Sections 671 through 679 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Trustee, in its sole discretion, deems it necessary or advisable for the Grantor and/or the Trustee to undertake or refrain from undertaking any actions (including, but not limited to, making or refraining from making any elections or filings) in order to ensure that the Grantor is at all times treated as the owner of the Trust for federal income tax purposes, the Grantor and/or the Trustee will undertake or refrain from undertaking (as the case may be) such actions. The Grantor hereby irrevocably authorizes the Trustee to be its attorney-in-fact for the purpose of performing any act which the Trustee, in its sole discretion, deems necessary

14

or advisable in order to accomplish the purposes and the intent of this paragraph 23. The Trustee shall be fully protected in acting or refraining from acting in accordance with the provisions of this paragraph 23.

24. The Trust Agreement shall be construed and administered according to the laws of the State of Minnesota to the extent that such laws are not preempted by the laws of the United States of America.

IN WITNESS WHEREOF, The Archdiocese of Saint Paul and Minneapolis have caused this Agreement to be signed by its duly authorized officers and the Trustees have signed their names, the day and year first above written.

GRANTOR:

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS

By: _____
John R. Roach
Archbishop of Saint Paul and Minneapolis


TRUSTEES:

_____
John R. Roach

_____
Austin T. Ward

_____
William G. Umphress

15

**FIRST AMENDMENT**
**TO THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**MEDICAL BENEFIT PLAN TRUST AGREEMENT**

This Amendment is made this 28th day of January, 1992, by and between The Archdiocese of Saint Paul and Minneapolis, incorporated as a religious diocesan corporation pursuant to the laws of the State of Minnesota under the corporate name "The Archdiocese of Saint Paul and Minneapolis", hereinafter called "Archdiocese", and the undersigned individuals as Trustees, hereinafter called "Board of Trustees" or "Trustees".

WHEREAS, the Archdiocese and Trustees have entered into a trust agreement dated March 1, 1991 for the purpose of holding and administering funds collected to provide benefits under The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan (referred to as the "Plan"); and

WHEREAS, the Archdiocese and Trustees desire to amend the trust to expand the scope of the purpose of the trust to include payment of claims on Archdiocesan Medical Benefit Plan contracts established prior to 1991;

NOW THEREFORE, the Archdiocese and Trustees agree to amend The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan Trust Agreement dated March 1, 1991 as follows:

1.   Paragraph 1 of the trust is hereby amended by adding the following subparagraph:

"c.  Hold assets of the Archdiocese as grantor as a reserve for discharge of grantor's obligation to beneficiaries of The Archdiocese of Saint Paul and Minneapolis Medical Benefit Plan which existed prior to January 1, 1991, which obligations represent preexisting claim run out.  Such

obligation shall hereinafter be referred to as "pre-1991 AMBP run out".

2.    Paragraph 6.a. is amended by deleting said paragraph in its entirety and substituting in lieu thereof the following:

"a.    To discharge the duties hereunder solely in the interest of the participants in the Plan and for the exclusive purpose of providing benefits to participants in the Plan and other persons entitled to benefits under the Plan, and defraying reasonable expenses of administering the Trust and the Plan, and paying pre-1991 AMBP run out claims."

3.    Paragraph 6.c. is amended by deleting said paragraph in its entirety and substituting in lieu thereof the following:

"c.    To enter into financial agreements with third parties for the purpose of setting up accounts for the payment of benefits under the Plan, and the payment of pre-1991 AMBP run out claims; and to provide for any such third party to draw on funds of the trust fund for purposes of paying any such benefits or claims and for purposes of paying administrative expenses and group insurance premiums."

4.    The above paragraph shall be effective as if included under the original trust agreement dated March 1, 1991.

IN WITNESS WHEREOF, The Archdiocese of Saint Paul and Minneapolis have caused this amendment to the trust agreement to be signed by its duly authorized officers and the trustees have signed their names, as of the day and year first above written.

GRANTOR:

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS

By:  John R. Roach
     Archbishop of Saint Paul and Minneapolis

2

TRUSTEES:

_____
John R. Roach

_____
Austin T. Ward

_____
William G. Umphress

_____
Rodger Bauman

_____
Pat Mohwinkel

_____
Amy Kuspar

_____
Mel Hoagland

_____
William Rose

_____
Charles Wollmering

3

**Exhibit B – Fairbanks Opinion**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

In re:

CATHOLIC BISHOP OF NORTHERN
ALASKA, an Alaska religious corporation
sole,

            Debtor.

Case No. F08-00110-DMD
Chapter 11

Filed On
4/18/08

## MEMORANDUM ON DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO USE RESTRICTED AND UNRESTRICTED FUNDS FOR CERTAIN CONSTRUCTION PROJECTS

The debtor, Catholic Bishop of Northern Alaska ("CBNA"), has filed an emergency motion for authority to use restricted and unrestricted funds for certain construction projects. The Committee of Unsecured Creditors ("UCC") opposes the motion, contending that the use of funds is not within CBNA's ordinary course of business and cannot be otherwise justified. For the reasons stated below, I find that the UCC's objections should be overruled and the motion should be granted.

Case Background

CBNA is an Alaska religious corporation sole. Such entities may be formed in Alaska "for acquiring, holding, or disposing of church or religious society property, for the benefit of religion, for works of charity and education, and for public worship."[1] CBNA

---

[1] AS 10.40.010 (Thomson/West 2008).

conducts the business of the Diocese of Fairbanks.[2] The Diocese, which serves practically the entire northern half of the state of Alaska, is the largest in the United States in geographical terms. There are 46 parishes and missions located within the area served by the Diocese. Only eight of the parishes are self supporting. The remaining 36 parishes are subsidized by donations raised by CBNA. The subsidized parishes are located in remote, rural communities in Alaska, with limited access. Because the substantial majority of the parishes are subsidized, the Diocese is one of the poorest in the nation. It is the only fully missionary Catholic diocese in the United States.

CBNA manages the business and administrative functions of the Diocese and the parishes that operate within its territory. CBNA runs the payroll system for the Diocese and parishes, paying the employees of these entities, withholding payroll taxes and filing the necessary tax returns. CBNA also administers a health insurance program for these employees, as well as liability and property insurance for the Diocese and parishes.

One of CBNA's major functions is to raise funds needed to operate the Diocese and subsidize the 36 parishes which are not self-supporting. CBNA accomplishes this task through its Alaskan Shepherd office. The Alaskan Shepherd publishes an informational newsletter about the Diocese's activities and actively solicits donations to fund the Diocese's

---

[2] This factual background is summarized from the Declarations of Bishop Kettler, filed Mar. 2, 2008 [Docket No. 31] and Mar. 28, 2008 [Docket No. 96], the Declaration of Rev. Bowder, filed Mar. 28. 2008 [Docket No. 94], the Declaration of Sister Radich, filed Mar. 28. 2008 [Docket No. 95], and the testimony these individuals provided April 9, 2008, at the hearing on the instant motion.

2

operations and goals. The newsletter and written solicitations reach a mailing list of over 45,000 donors worldwide.

The Alaskan Shepherd often sends out "special" or "extra" solicitations with its newsletter. This type of solicitation asks potential donors to provide an additional donation, above what that donor may provide for general operational expenses of the Diocese, so that a specific project undertaken by the Diocese can be completed. Such projects range from the building of a new church to the purchase of audio-visual equipment and materials for religious education. The cost of such projects vary depending on their scale. The expense of soliciting the "special" or "extra" donations comes out of CBNA's general operating account.

CBNA also maintains a "Parish Needs" page on its website which solicits donations for specific projects. Like the "special" or "extra" donations solicited through the Alaskan Shepherd, the Parish Needs page requests contributions to fund specific projects. The Parish Needs page allows a donor to make a donation by credit card for a specific item. Alternatively, the donor can mail a check to CBNA to fund a specific parish need; the Parish Needs page asks the donor to note the item for which the contribution is intended either by writing the name of the item in the memo field of the check or by including a letter indicating the purpose for the donation.

The "special" or "extra" solicitations made by Alaskan Shepherd include a coupon that the donor can fill out and return to CBNA with a check. The coupon indicates that the donor would like a contribution to be earmarked for a specific project. Funds

3

submitted by donors in response to the "special" or "extra" solicitations of the Alaskan Shepherd are considered "restricted funds" by CBNA. Funds donated to support the overall mission of the Diocese are considered "unrestricted funds." According to CBNA, donative intent is determined when checks are submitted to it with a coupon or other writing which asks that the funds be used for a special purpose. If intent is unclear, CBNA will ask for written clarification of intent from the donor. CBNA has, in fact, on occasion returned checks to donors in instances where donative intent couldn't be ascertained. CBNA says it is essential that donors know that their charitable contributions are used for the specific purposes intended. If the funds aren't used as specified, CBNA would lose credibility with its donor base.

Through the Alaskan Shepherd office, CBNA raises roughly $4 million annually. CBNA has a detailed system for tracking the donations it receives. Its system can find out how much an individual has donated in a given year. It can also track how much money has been raised for its general operational expenses or any of its special projects. As to funds raised for a specific project, CBNA can pull up all donors who have contributed to a given project, or find out how much was collected for a project in response to a specific fund solicitation. Information regarding any given donation is input into this tracking system at the time a check is received by CBNA, and includes the donor's name, the date and amount of the check and, when specifically indicated by notation on the check or some other form or writing from the donor, the project for which the donation is made.

4

As noted above, the special projects undertaken by CBNA vary in size and scale from the purchase of audio-video equipment to the construction of a new church. The projects are selected after CBNA employees, such as Sister Radich, meet with members of a parish to discuss the needs of the community. The needs are conveyed to the Diocese and then prioritized, with safety and sanitation needs coming first. Once a special project is selected, CBNA raises the needed funds for it by soliciting "special" or "extra" donations through the Alaskan Shepherd or through the "Parish Needs" page on CBNA's website. Once adequate funding has been received, CBNA acts in concert with the parish community to see the project through to completion.

Within the past 30 years, CBNA has assisted in the renovation of 16 churches and the replacement of 28 churches in various parishes located within the area served by the Diocese. CBNA has a small engineering office and employs one construction engineer. CBNA has served as a general contractor on several of these construction projects. Like other special projects, the construction projects undertaken by CBNA are generally funded by restricted donations solicited through the Alaskan Shepherd. CBNA has occasionally been able to obtain grants from the Catholic Extension Society to fund a portion of its construction projects as well.

The good works of CBNA have not insulted it from litigation. Since the fall of 2002, several suits alleging sexual abuse from priests and others affiliated with the Diocese have been filed. CBNA filed a chapter 11 petition on March 1, 2008. At the time of filing, more than 140 lawsuits, naming 150 plaintiffs, had been filed against CBNA. The

Society of Jesus, Oregon Province, and the Society of Jesus, Alaska, were named as co-defendants in these actions. These defendants have reached a settlement with the claimants, but CBNA's liability has not yet been resolved. CBNA's insurer is disputing coverage of these claims. These factors precipitated CBNA's bankruptcy filing.

The Motion to Use Funds for Certain Construction Projects

In the motion at issue, CBNA seeks permission to use approximately $237,000.00 in restricted and unrestricted funds to continue work on four projects which are in various stages of completion, all located in small, remote parishes in Northwest and Interior Alaska. The court has previously authorized CBNA's use of insurance proceeds to complete fire damage repairs to St. Michael Parish church in McGrath.[3]  Only three construction projects, all located in the Yukon-Kuskokwim Delta region of Alaska, remain at issue.

1. Water Improvements in Kalskag

In the smallest of the three projects, CBNA proposes to use restricted funds to install a water treatment system in Immaculate Conception parish at a cost of $10,949.00. Immaculate Conception parish is located in the village of Upper Kalskag. Prior to filing bankruptcy, CBNA spent approximately $8,000.00 for water improvements at this parish.

---

[3] *See* Order Granting, in Part, Emergency Motion for Authority to Use Restricted and Unrestricted Funds for Certain Construction Projects, Pending Ruling on Remainder of Motion, entered April 10, 2008 [Docket No. 120].

6

The parish well is drawing water again, due to the improvements that have been done to date. However, the well water is not potable, nor can it be used for washing or cleaning. The water has an odor and leaves a black film on anything it contacts. The water treatment system would resolve these problems.

### 2. Structural Improvements and Additions in Kotlik

The second project CBNA proposes to fund is for improvements to St. Joseph Parish church in Kotlik. CBNA plans to add a second exit to the church to comply with safety code requirements. It also proposes the addition of a hallway and two small rooms to the church. The hallway would permit church visitors to access the bathroom without going through the small room which is currently used by visiting priests as both an office and bedroom. The two additional rooms would be used to provide visiting priests with a separate bedroom (apart from the existing office), as well as provide additional visitors to the church with a space to use as a combined office and bedroom. According to CBNA, the community of Kotlik is growing and additional visitor accommodations are needed so that counseling, preparations for marriages and other services can be provided.

The total budget for this project is $92,540.00. CBNA spent $46,896.00 to pay for materials and shipping prior to filing. The materials are currently on their way to, or have already arrived in, Kotlik. CBNA has a bid from the local Native Corporation to serve as contractor for completion of the project, and anticipates that the planned improvements could be completed this summer, within budget. It proposes spending $45,554.00 in unrestricted

7

funds to complete the work. If CBNA isn't able to continue with the work during the short Arctic summer, it will need to find a way to secure the materials for the winter. CBNA indicates that if this becomes necessary, there is no way to guarantee that the materials would be safe from theft or weather degradation until next spring.

### 3. New Church in Scammon Bay

The third, and largest, project which CBNA would like to fund at this time is the building of a new church for Blessed Sacrament Parish in Scammon Bay. The former church in this parish, which was built in 1946, had become very unstable. Plans to build a new church started in 1999, and in 2004 a building committee was formed to bring this project to fruition. Through special solicitations made by the Alaskan Shepherd, CBNA has collected $310,000 in restricted donations for the church. The project was delayed, however, because the lot where the old church was located was too small to accommodate the footprint of the new one. The city of Scammon Bay agreed to deed a lot adjacent to the church lot for the new church. A building located on that lot had to be removed and utility lines had to be moved. The old church was torn down and that lot was prepared for building as well. This was accomplished, and permitting for the new church was obtained, last year.

The overall budget for this project is $593,961.91. As of the date the petition was filed, CBNA had spent $130,611.24 on the project. These funds paid for removal of

8

buildings from the lots,[4] moving the utility lines, purchase of building materials for the new structure, and shipping of those materials to Scammon Bay. CBNA says $463,000.00 is needed to complete the church. It currently has approximately $180,000.00 in restricted funds to apply towards construction of the church. CBNA hopes to have the foundation, walls and roof of the new church up by the end of this construction season, so that all that remains to be done is interior work that can be completed over the winter. If the construction cannot be started this summer, CBNA would have to secure the building materials which have already been purchased until next summer. It would probably do this by sending a Connex container to Scammon Bay to hold the materials, at an estimated costs of about $10,000.00 (for the container and shipping). Again, CBNA could not guarantee that the materials, even if secured in this fashion, would be protected from theft or weather degradation.

CBNA plans to raise the additional $284,000.00 needed to complete the Scammon Bay church by making a special appeal for $210,000.00 in restricted donations through the Alaskan Shepherd newsletter and by requesting a grant of $75,000.00 from the Catholic Extension Society. CBNA is optimistic about obtaining this grant; it has obtained such grants in the past in similar instances.

Summary of Projects

---

[4] The City of Scammon Bay also assisted with the building removal, providing an in kind donation valued at $25,000.00.

9

The three projects which CBNA seeks authority to fund can be summarized as follows:

| Project | Location | Amount[5] and Type of Funds | |
|---|---|---|---|
| Water Improvements | Kalskag (Immaculate Conception Parish) | $11,000.00 | Restricted Funds |
| Facilities Improvements | Kotlik (St. Joseph Parish) | $46,000.00 | Unrestricted Funds |
| New Church | Scammon Bay (Blessed Sacrament Parish) | $463,000.00 | Unrestricted Funds: $180,000.00 in hand $210,000.00 prospective<br><br>Grant: $75,000.00 |

At this point in time, CBNA requests authority to use $191,000.00 in restricted funds and $46,000.00 in unrestricted funds, or a total of $237,000.00, to work on these three projects over the 2008 construction season.


The Dispute

CBNA brings its motion under 11 U.S.C. § 363(b), (c) and (d).  It says it is entitled to use these funds because the expenditures for the three projects fall within the ordinary course of its charitable religious operations.  Alternatively, CBNA contends these transactions, if found to be outside of the normal course of its business, should be permitted because there are significant business justifications for them.

The UCC objects to the use of these funds, except to the extent that they are needed for essential health and safety projects.  With regard to these three projects, the UCC

---

[5] Amount is rounded up to nearest thousand.

10

says CBNA hasn't established what portion of the work falls into this category. The UCC

argues that the three projects are "wants," rather than "needs," and are not ordinary course

of business transactions. The UCC also takes issue with CBNA's designation of "restricted

funds," contending that such funds are not the subject of a true trust and therefore reachable

by claims of creditors in this estate.

Ordinary Course of Business

> 11 U.S.C. § 363(c)(1) provides:

>> If the business of the debtor is authorized
>> to be operated under section 721, 1108, 1203,
>> 1204, or 1304 of this title and unless the court
>> orders otherwise, the trustee may enter into
>> transactions, including the sale or lease of
>> property of the estate, in the ordinary course of
>> business, without notice or a hearing, and may use
>> property of the estate in the ordinary course of
>> business without notice or a hearing.[6]

A debtor in possession may operate the business of the debtor, and holds the same powers

as a trustee with respect to the use, sale or lease of property under § 363 in a chapter 11 case.[7]

Notice and hearing, and court approval, is required only when a debtor in possession

contemplates a transaction which is outside its ordinary course of business.[8] Accordingly,

---

[6] 11 U.S.C. § 363(c)(1) (Thomson/West 2008).

[7] 11 U.S.C. §§ 1107(a), 1108; *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 703-04 (9th Cir. 1988), *citing Johnston v. First St. Companies, Inc. (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985).

[8] 11 U.S.C. § 363(b).

CBNA may conduct ordinary business transactions without notice to creditors or court approval. It contends the use of funds to complete the three projects falls within the ordinary course of its business and does not need court approval. I agree.

Two tests have been adopted to determine whether a transaction falls within the ordinary course of business: "(1) vertical dimension or creditor's expectation test and (2) horizontal dimension test."[9] Under the horizontal dimension test, the court looks to "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business."[10] The test is satisfied if the transaction is of the type that would occur in the usual operation of the debtor's business.[11] In this regard, the transaction does not need to be one that occurs on a daily or regular basis; it simply needs to be ordinary when considered in the usual conduct of the debtor's business.[12]

I find the horizontal dimension test is satisfied here. The projects CBNA seeks to fund fall within the scope of its regular business activities. Within the past 30 years, CBNA has renovated 16 churches and built 28 new ones. It has also undertaken other projects throughout the parishes it subsidizes to improve health and safety and to provide better places of worship. These works are all part of CBNA's larger mission, which is "not only to minister to the people in the urban and rural areas of [the] Diocese, but also to

---

[9] *Dant & Russell*, 853 F2d. at 704.

[10] *Id.*

[11] *Id.*

[12] *Id.*

12

minister to the world community."[13]   This mission is consistent with what "similar businesses," i.e., other religious institutions, perform in the scope of their operations. It is also consistent with the provisions of AS 10.40.010, which permit the formation of a corporation sole "for acquiring, holding, or disposing of church or religious society property, for the benefit of religion, for works of charity and education, and for public worship."[14]

The UCC argues that the three projects at issue here aren't within the ordinary course of CBNA's business because CBNA is not a contractor. CBNA admits as much. But construction is not CBNA's business; it is in the business of charitable works. In the scope of this work, it has built and remodeled churches and provided other improvements to the parishes it serves. Under the horizontal dimension test, the three projects are within the ordinary course of CBNA's business.

The vertical dimension test, also called the creditor's expectation test, views the transaction at issue from a hypothetical creditor's viewpoint and "inquires whether the transaction subjects a creditor to economic risks of a nature different than those he accepted when he decided to extend credit."[15]   Under this test, the court looks at whether the transaction is consistent with "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business."[16]   A

[13] *Decl. of Bishop Kettler*, filed Mar. 2, 2008 [Docket No. 31], at p. 6.

[14] AS 10.40.010 (Thomson/West 2008).

[15] *Dant & Russell*, 953 F.2d at 705.

[16] *Id.*, citing *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983).

13

debtor in possession's prepetition business activities are compared to the postpetition

transaction to evaluate whether the transaction falls within that business's day-to-day

operations or is extraordinary.[17]

Applying this test to the three projects CBNA wishes to fund, I find they are

consistent with how CBNA has operated for at least three decades.  CBNA has evaluated the

needs of its parishes and has solicited funds to provide for those needs.  This activity is

consistent with the reasonable expectations of CBNA's creditors.  The size and nature of the

three projects, even the building of a new church in Scammon Bay, fall within the regular

business operations of CBNA, and are not extraordinary.  The projects satisfy the vertical

dimension test.  Because these projects are consistent with a hypothetical creditor's

reasonable expectations, "creditors have no right to notice and a hearing, because their

objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the

particular transactions themselves."[18]

The UCC argues, "What about us?"  They contend CBNA's motion indicates

that it intends to proceed with business as usual, rather than deal with their claims.  The

underlying premise of the UCC's objection is that somehow the debtor's estate should be

frozen in place so the tort claims can be dealt with.  This position fails to recognize the

unique, fragile nature of the assets in this case.  The debtor's most valuable assets are not

tangible real and personal property.  The biggest asset in this case is the goodwill of the

---

[17] *Dant & Russell*, 953 F.2d at 705.

[18] *Id.*

14

thousands of donors throughout the world who contribute $4 million annually to sustain the

debtor. This goodwill must be preserved through both the completion of the projects already

initiated and solicited *and* the confirmation of a chapter 11 plan that recognizes and addresses

the legitimate claims of sexual abuse victims. Throughout the chapter 11 process, there will

be an ebb and flow of donations to CBNA, and ordinary course business expenditures will

continue to accrue. The goodwill of CBNA's donors must be preserved. If the donor base

is lost, CBNA's business cannot function.

> Since the goal in a Chapter 7 case is to "cash out"
> the bankrupt entity, rather than continue its
> operations, Chapter 7 is more concerned with
> maximizing the size of the estate to be distributed
> than with the Chapter 11 goal of inducing third
> parties to contribute towards the continued
> operations of the business.[19]

CBNA is proposing to continue with projects it commenced, prepetition,

consistent with its ordinary course of business. It wishes to apply $237,000.00 in restricted

and unrestricted funds to do this. A water treatment system will provide one parish with

potable water. Improvements to a church in another parish will bring the structure up to code

and provide a very modest living space for visiting priests and other visitors. The parish in

Scammon Bay will receive a small church. None of the projects can be considered lavish or

unusual for CBNA. Under both the horizontal and vertical dimension tests, this conduct is

---

[19] *Dant & Russell*, 853 F.2d at 706-07.

15

in the ordinary course of CBNA's business, authorized under § 363(c). The UCC's objections are therefore overruled, and CBNA's motion will be granted.

Trust Fund Issue is Reserved

CBNA contends that the restricted donations it receives are trust funds which can only be applied to the projects for which they were donated. The UCC objects to this characterization, arguing that no express trust has been created, nor can the funds be deemed restricted on the existing record. The parties also dispute whether the improvements in the parishes funded by CBNA donations are property of the estate or the parishes. These issues do not need to be resolved within the context of this motion. Because the three transactions contemplated by CBNA are within the ordinary course of its business, it may use the $237,000.00 as proposed, consistent with its business practices.

The UCC seems fearful that an allowance of ordinary course of business expenditures will somehow render an ultimate determination of the trust status of real property and funds held in the name of the debtor. I am not making any such determination. All issues regarding the trust status of any real or personal property held in the name of the debtor are expressly reserved. Nor am I determining, for that matter, whether the parishes have a separate legal existence, whether Canon law or civil law governs such determinations, whether the debtor's building activities are protected by the Religious Freedom Reservation Act, or whether the court has jurisdiction over diocesan assets. All of these issues are also

16

expressly reserved, and are more appropriately raised and determined in the context of an adversary proceeding rather than under this motion, which was heard on shortened time.[20]

<u>Hearsay Issue is Reserved</u>

The UCC has objected to certain portions of the declarations filed by Bishop Kettler, Reverend Bowder and Sister Radich, and to some of the exhibits appended to those declarations, on two grounds. First, the UCC contended that selected paragraphs in the declarations were inadmissible because the declarants lacked personal knowledge regarding certain matters, such as the condition of the existing construction projects or the costs projected to complete those projects. The UCC also argued that none of the declarants personally had responsibility for CBNA's general contractor functions or expertise in evaluating projected costs to complete the projects. These objections are overruled. The additional testimony provided at the hearing established that both Sister Radich and Reverend Bowder were personally familiar with the status and condition of the three projects. Reverend Bowder also has extensive familiarity with CBNA's general contractor functions. He personally performed these functions for several years and now supervises CBNA's contracting office, which consists of two employees.

The UCC also objected to Reverend Bowder's testimony regarding the restricted character of funds received by CBNA, and objected to CBNA's summary reports,

---

[20] *See* Fed. R. Bankr. P. 7001(2).

17

admitted at the hearing, because the purported intent of the donors who made the contributions was based on inadmissible hearsay. Although the declarations and exhibits were admitted over this objection, the evidence was not used to determine each individual donor's intent. As noted above, the characterization of the funds being used by CBNA is irrelevant in the context of this motion, which is to use funds in the ordinary course of business. The exhibits and testimony demonstrate how CBNA solicits and applies funds it receives. A conclusive finding as to each donor's intent, however, has not yet been made. To this extent, the UCC's evidentiary objections are reserved so that they can be raised in a more appropriate arena, such as in conjunction with a determination of whether such funds are, in fact, trust funds or property of the estate.

Conclusion

CBNA's motion to use funds in the ordinary course of business will be granted. All issues regarding the trust status of any real or personal property held in the name of the debtor, whether the parishes have a separate legal existence, whether Canon law or civil law governs such determinations, whether the debtor's building activities are protected by the Religious Freedom Restoration Act, or whether the court has jurisdiction over diocesan assets, are expressly reserved. The UCC's evidentiary objections regarding the intent of donors who contribute to CBNA's special and general operations are also reserved for a more appropriate forum. An order will be entered consistent with this memorandum.

DATED: April 18, 2008

18

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  S. Boswell, Esq.
        M. Mills, Esq.
        J. Stang, Esq.
        D. Bundy, Esq.
        F. Elsaesser, Esq.
        U. S. Trustee
            4/18/08

19

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    Bankruptcy Case No.  15-30125

The Archdiocese of Saint Paul and                         CHAPTER 11 CASE
Minneapolis,

                        Debtor.

**MEMORANDUM OF LAW IN SUPPORT OF THE VERIFIED MOTION OF THE
ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, FOR EXPEDITED RELIEF
AND FOR AN ORDER (A) AUTHORIZING PAYMENT OF PREPETITION WAGES,
SALARIES, AND EMPLOYEE DEDUCTIONS AND EMPLOYEE EXPENSES, (B)
AUTHORIZING PAYMENT OF PREPETITION STATUTORY UNEMPLOYMENT
COMPENSATION CHARGES, (C) AUTHORIZING THE DEBTOR TO CONTINUE ITS
PARTICIPATION IN ITS MEDICAL AND DENTAL HEALTH INSURANCE
PROGRAM AND GRANTING OTHER RELIEF WITH RESPECT TO THE
PROGRAM, (D) AUTHORIZING PRIEST SUPPORT PAYMENTS AND
INTERNATIONAL PRIEST PAYMENTS, (E) AUTHORIZING PAYMENT OF OTHER
BENEFIT AND RETIREMENT PLAN OBLIGATIONS, (F) AUTHORIZING
CONTINUATION OF THIRD PARTY PAYROLL PROCESSING SERVICES AND
DIRECTING BANKS TO HONOR PAYROLL, EXPENSE CHECKS AND FUND
TRANSFERS IN CONNECTION WITH THE FOREGOING, (G) FINDING
COMPLIANCE WITH THE REQUIREMENTS OF RULE 6003, AND (H) WAIVING
THE PROVISIONS OF RULE 4001(a)(3)**

## INTRODUCTION

The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese") submits this
memorandum of law in support of its accompanying above-captioned motion regarding payment
of prepetition wages and benefits and continuation of benefit and payment programs.  Terms
defined in the verified motion shall have the same meaning in this memorandum.

## FACTS

The facts relevant to this memorandum are set forth in detail in the verified motion.

As indicated in the verified motion, the Archdiocese has an immediate need to pay the
wages, compensation, and health, dental and other benefits described in the motion in order to

minimize the personal hardship that the lay Employees, Priests and other individuals and families covered by the various programs described in the motion will suffer if such obligations are not paid as and when due. The entry of an order granting the motion is necessary to ensure benefits coverage and earned wages are properly dedicated to Employees, and to maintain the goodwill and morale of the Employees and other individuals covered by the programs described in the motion. The entry of an order granting the motion will minimize interference in the Archdiocese continuing operations and will thus maximize the value of the estate and the return to creditors.

The Archdiocese has not requested in the motion that the Court authorize the assumption or rejection of any executory contract or the payment of any amount in excess of the statutory cap of $12,475 for any individual found in 11 U.S.C. § 507(a)(4) and (a)(5).

## DISCUSSION

I.    **CONTINUATION OF THE PRACTICES AND PROGRAMS DESCRIBED IN THE MOTION FALLS WITHIN THE ORDINARY COURSE OF BUSINESS**

Section  363(c) of the Bankruptcy Code expressly authorizes the Archdiocese to use property of the estate in the ordinary course of business without notice or a hearing unless otherwise ordered by the court. Bankruptcy courts have employed both a vertical and horizontal test to determine whether a particular transaction falls within the ordinary course of business. See Johnston v. First Street Companies (In Re Waterfront Companies, Inc.), 56 B.R. 31 (Bankr. D. Minn. 1985). The horizontal test compares the  debtor's business to other businesses. Id. at 35. Based on the kind of business the debtor is in, the court decides whether a type of transaction is in the ordinary course of that debtor's business or in the course of some other business. Id. "Thus raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." Id.

The vertical test, by contrast, focuses on creditor expectations. Again, as indicated in Waterfront:

> The touchstone of "ordinariness" is thus the interested parties'
> reasonable expectation of what transactions the debtor in
> possession is likely to enter in the course of its business.  So long
> as the transactions conducted are consistent with these
> expectations, creditors have no right to notice and hearing, because
> their objections to such transactions are likely to relate to the
> bankrupt's (sic) chapter 11 status, not the particular transactions
> themselves.

Id. (quoting Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips,

Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983)).

The transactions referenced in the motion are each in the ordinary course of the

Archdiocese's business.  Obviously, the Archdiocese has a compelling and critical need to

maintain the wages and benefits afforded to its existing lay personnel and priests, and to maintain

the morale and good will of its Employees and other participants in the plans described in the

motion.  To be sure, "employee good will and contentment in an asset which is vital to the

continuation of a debtor's operation and its ability to effectively reorganize during the Chapter

11 process."  LTV Corp. v. Aetna Cas. & Sur. Co. (In Re Chateaugay Corp.), 116 B.R.  887, 898

(Bankr. S.D.N.Y. 1990).

As the court noted in In re Tusa-Expo Holdings, Inc., 2008 WL 4857954 (Bankr. N.D.

Tex. 2008):

> Clearly a debtor's employees are among those creditors with
> whom the debtor must deal.  Absent competent personnel, it is
> doubtful that any debtor would be able to operate its business as
> contemplated by Code section 1108 . . . [A]s a practical matter, no
> debtor can afford to lose very many of its employees, especially in
> a chapter 11 case's early days. . . .  Second, continuity of conduct
> of business is important in a newly filed Chapter 11 case . . .
> Employees familiar with the debtor's operations will be essential
> to [all of the early case responsibilities] . . . .  Third, even if
> employees remain with a debtor notwithstanding non-payment of
> prepetition wages and benefits, it is probable that their work would
> be [adversely] affected by their loss of income.

3

The continuation of the programs described in the motion is also consistent with the reasonable expectations of debtor's creditors, to the extent that those creditors are familiar with the Archdiocese's operations and finances.  The practices and policies described in the motion are critical to the Archdiocese's mission to promote the spiritual, educational, and other interests of the Church in the Region.  The continuation of these programs will not subject creditors to unreasonable risks and meets with creditor expectations that Employees would be paid and provided reasonable health and benefit programs.  Thus, the "vertical" test of ordinariness under Section 363(c)(1) is plainly satisfied.

The same reasoning applies with respect to the "horizontal" test of ordinariness, in that the practices and procedures maintained by the Archdiocese are consistent with practices and procedures maintained by other entities within the debtor's "industry" (i.e., Catholic dioceses).  Obviously, the Archdiocese is not the proverbial "widget manufacturer" referenced by Judge Kressel.  Waterfront Companies, Inc., 56 B.R. at 35.  Simply stated, the Archdiocese did not cease to be a Catholic entity upon the filing of this Chapter 11 case.  The Archdiocese's mission and function remains the same.

The nature of the definition of "ordinary course of business" for a diocese has been considered in other cases, including, for example, In re Catholic Bishop of Northern Alaska, Case No. F08-00110-DMD (Bankr. D. Ak. Apr. 18, 2008), a copy of which is attached to the motion as **Exhibit B** ("Fairbanks").

The dispute in Fairbanks centered around the status of various expenditures under the ordinary course of business standard of Section 363(c)(1) of the Bankruptcy Code.  In resolving the issue, the Bankruptcy Court for the District of Alaska considered both the vertical and horizontal test referenced above.  In so doing, the court rejected the underlying premise of the

4

Committee's objection that "the debtor's estate should be frozen in place so that tort claims can

be dealt with." Fairbanks at 14.  As indicated in the Fairbanks decision:

> This position fails to recognize the unique, fragile nature of the
> assets in this case.  The debtor's most valuable assets are not
> tangible real and personal property.  The biggest asset in this case
> is the goodwill of the thousands of donors throughout the world
> who contribute $4 million annually to sustain the debtor.  This
> goodwill must be preserved through both the completion of the
> projects already initiated and solicited and the confirmation of a
> chapter 11 plan that recognizes and addresses the legitimate claims
> of sexual abuse victims.  Throughout the chapter 11 process, there
> will be an ebb and flow of donations to CBNA, and ordinary
> course business expenditures will continue to accrue.    The
> goodwill of CBNA's donors must be preserved.

Id. (emphasis in original).

The considerations set forth in the Fairbanks opinion are fully applicable to this situation.

The Archdiocese has a pressing need to maintain the good will of its constituent groups,

including its donors and the lay and clergy participants in the various plans described in the

motion.

## II.      PAYMENT OF PRE-PETITION OBLIGATIONS

As noted in the motion, the Archdiocese has also requested authority to satisfy certain

prepetition obligations.  There is nothing in the Bankruptcy Code to expressly prohibit a debtor

from making post-petition payments on prepetition claims, as the Archdiocese proposes to do in

the motion.  The Archdiocese also recognizes, however, that some courts have suggested that

satisfaction of such an obligation that accrued prepetition is not in the ordinary course, and

therefore requires court approval.  See In re K-Mart Corp., 359 F.3d 866, 872 (7th Cir. 2004); In

Re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Chapter 11 practice in this

District and, counsel believes, elsewhere, has also generally accepted this understanding, and

debtors frequently request court authorization to pay outstanding wages, salaries, and employee

benefits that accrued prepetition.

There are at least three reasons why the Archdiocese should be permitted to make the prepetition payments specified in the motion:

First,  Section 105(a) grants broad authority to carry out and enforce the provisions of the Bankruptcy Code under the Court's equitable power.

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11. U.S.C. § 105(a).

Pursuant to Section 105(a), bankruptcy courts have invoked the well-established "doctrine of necessity"  to authorize the immediate payment of selected prepetition claims, including wages, salaries, and employee benefits, when such payment is essential to the continued operation of the debtor in a Chapter 11 case.  See, e.g., Miltenberger v. Logansport, 106 U.S. 286 (1882) (first articulating necessity doctrine); In re Penn Central Transp. Co., 467 F.2d 100, 102 and n.1 (3d Cir. 1972) (necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until its pre-organization claims shall have been paid"); In re Eagle-Pitcher Industries, Inc., 124 B.R. 1021 (Bankr. S.D. Ohio 1991); In re Ionosphere Clubs, Inc. and Eastern Airlines, Inc., 98 B.R. 174 (Bankr. S.D.N.Y. 1989); In re Gulf Air, Inc., 112 B.R. 152 (Bankr. W.D. La. 1989); In re Chateauguay Corp., 80 B.R. 279 (S.D.N.Y. 1987). The necessity doctrine recognizes that paying certain prepetition claims is required for a successful reorganization.  See, e.g., In re Just For Feet, 242 B.R. 821, 825-26 (D. Del. 1999). As suggested above, payment of prepetition claims in this instance is necessary to avert a serious threat to the Chapter 11 process.  Eagle-Pitcher, 124 B.R. at 1023.

6

Second, certain of the prepetition claims in this case are entitled to priority under the

Bankruptcy Code.  <u>See</u> 11 U.S.C. § 507.  Sections 507(a)(4) and (a)(5) grant priority to the

following claims:

> (4) Fourth, allowed unsecured claims, but only to the extent of $12,475 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—
>
>> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>>
>> (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.
>
> (5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
>
>> (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>>
>> (B) for each such plan, to the extent of—
>>
>>> (i) the number of employees covered by each such plan multiplied by $12,475; less
>>>
>>> (ii) the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a).

Costs of administering employee benefits programs are also entitled to priority under

section 507(a)(5).  <u>See</u> <u>Allegheny Int'l, Inc. v. Metro. Life Ins. Co.</u>, 145 B.R. 820, 822-23 (W.D.

Pa. 1992).  The prepetition employee wage and benefit obligations referenced in the motion are

priority claims under sections 507(a)(4) and (a)(5).  All of the prepetition wage claims at issue

here were earned by employees within 180 days of the Petition Date.  And all of the individual

claims are believed to be less than $12,475 per employee.  As such, all prepetition wage claims

are entitled to priority under section 507(a)(4).  Likewise, the Archdiocese's other prepetition

employee benefit plan obligations are entitled to priority under section 507(a)(5).  Paying these

priority claims is not detrimental to the Archdiocese's general unsecured creditors because the

priority claims must be paid in full before the unsecured creditors receive any distribution.  This

Court should authorize payment of prepetition Employee Obligations, subject, however, to the

statutory cap of Section 507 (a) (4) and (5) to the extent applicable to any of the requested

payments.

Third, payment of Employee claims accrued prepetition is also appropriate if the debtor

demonstrates a "business justification" for the payments.  Again, as noted in one of the leading

cases in this area:

> Section 363(b) gives the court broad flexibility in tailoring its
> orders to meet a wide variety of circumstances. However, the
> debtor must articulate some business justification, other than mere
> appeasement of major creditors, for using, selling or leasing
> property out of the ordinary course of business, before the court
> may permit such disposition under section 363(b).

In re Ionosphere Clubs, Inc., 98 B.R. at 175 (citations omitted).

Although established in the sale context, the business judgment standard has been applied

in other contexts.  See, e.g., Institutional Creditors of Cont'l Air Lines v. Cont'l Air Lines (In re

Cont'l Airlines), 780 F.2d 1223, 1226 (5th Cir. 1986) (applying business judgment standard in

context of proposed "use" of estate property); In re Bethlehem Steel Corp., 2003 U.S. Dist.

LEXIS 12909, at *37-44 (S.D.N.Y. July 28, 2003) (applying business judgment standard to

proposed reimbursement of employees under a collective bargaining agreement).  "The business

judgment rule is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action was in the best

interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quotation and marks omitted).  Decisions made in the exercise of a debtor's business judgment

ordinarily should not be second-guessed by a reviewing court.  See In re Curlew Valley Assoc.,

14 B.R. 506, 511 (Bankr. D. Utah 1981).

8

The Archdiocese's use of cash to pay Employee wages and benefits and to maintain the other employee and priest benefit program described in the motion represents a sound exercise of business judgment. See, e.g., In re CEI Roofing, Inc., 315 B.R. 50, 52 (Bankr. N.D. Tex. 2004) (authorizing debtor to maintain employee benefits programs in exercise of business judgment); In re Metalsource Corp., 163 B.R. 260, 263 (Bankr. W.D. Pa. 1993) (debtor may continue post-petition to pay vacation and sick pay in ordinary course of business consistent with repetition policies and practices); In re Equalnet Commc'n Corp., 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (continuing to pay employee wages and benefit post-petition to retain employees is matter of "simple common sense").

## III.    RETENTION OF MEDICAL AND DENTAL BENEFIT TRUST

The Archdiocese has also requested certain relief in connection with the Health and Dental Plans.

As indicated in the motion, there are approximately 3,500 individual participants in the Health and Dental Plans. Approximately 93% of the proceeds used to fund the Health and Dental Plans have been contributed by Employees and by a number of participants in the separate Parish Corporations, Schools, and other Non-Debtor Catholic Entities operating in the Region and participating in the Health and Dental Plans. As explained in the motion, by covering their employees under a single plan, the Archdiocese, the Schools, Parish Corporations and other Non-Debtor Catholic Entities benefit from significant cost savings as a result of the pooled risk and allocation of overhead. The Archdiocese believes that obtaining and administering new separate third-party health and dental insurance plans for each of these entities standing alone would be prohibitively expensive (and possibly unavailable).

Premiums are paid to, and payments under the Health and Dental Plans are made through, a trust established by the Archdiocese in 1991 (the "Health and Dental Trust"). Health and

Dental Trust also handles stop-loss insurance premiums, and other reasonable expenses associated with the administration of the Plans. The proceeds of the Health and Dental Trust are held at Catholic Community Foundation and Wells Fargo Bank. The Wells Fargo Bank account (the "AMBP Disbursement Account") presently handles premium payments and disbursements from the Health and Dental Trust.

The Health and Dental Trust takes the form of a "rabbi trust."  As explained in one of the leading cases in the area:

> A rabbi trust, so called because its tax treatment was first addressed in an IRS letter ruling on a trust for the benefit of a rabbi … is a trust created by a corporation or other institution for the benefit of one or more of its executives (the rabbi, in the IRS's original ruling)….The main reason ... for such a trust is that, should the control of the institution change, the new management might reduce the old executives' compensation, or even fire them; the trust, which consistent with this purpose is not funded until the change of control occurs, cushions the fall.

Bank of America, N.A. v. Moglia, 330 F.3d 942, 944 (7th Cir. 2003) (citations omitted).

As noted above, rabbi trusts are typically used as a compensation device for executives. This case appears to represent a fairly unique situation in which an employer has used a rabbi trust to fund an ordinary medical and dental plan for a large group of employees.  It is unclear, for example, that the trust in this case provides the sort of tax benefits that typically accrue from use of a rabbi trust.

As also suggested above, the trust instruments governing a rabbi trust are subject to significant restrictions on use and disposition of the funds, including a provision authorizing use of the proceeds of the trust for payment of the grantor's general creditors.   The operative language in the Health and Dental Trust Agreement in this case is as follows:

> The assets of the Trust shall be subject to the claims of the Grantor's general creditors only in the case of the Grantor's bankruptcy or insolvency.   The Grantor shall be considered "bankrupt" or "insolvent" if the Grantor is either unable to pay its

debts when due or files for protection under the United States
Bankruptcy Code.  The Board of Directors of the Grantor must
give written notice to the Trustee of the Grantor's bankruptcy or
insolvency as soon as practicable following the occurrence of such
event.  Upon receipt of such notice or other written allegations of
the Grantor's bankruptcy or insolvency, or in the case of the
Trustee's actual knowledge of or determination of the Grantor's
bankruptcy or insolvency, the Trustee shall discontinue payments
to Beneficiaries and shall hold the assets of the Trust for the
benefit of the Grantor's general creditors.  The Trustee shall
resume payments to Beneficiaries only after it has determined that
the Grantor is no longer bankrupt or insolvent or pursuant to an
order of a court of competition jurisdiction.

Trust Agreement at p. 11 (copy attached as **Exhibit A** to the motion).

Other courts have construed similar language to mean that "once a grantor files for

bankruptcy, the rabbi trust corpus becomes property of the grantor's bankruptcy estate."  In re

Outboard Marine Corporation, 278 B.R. 778, 785 (citing Goodman v. Resolution Trust Corp., 7

F.3d 1123 (4th Cir. 1992).  This treatment is consistent with other cases in this district.  See, e.g.,

In re The Antioch Company, Case No. 13-41898 (Bankr. D. Minn. May 13, 2013) ECF No. 97

(order directing the trustees of the debtors' rabbi trust to deliver debtors' assets held in trust to

the debtors' estates and authorizing use of such funds in the ordinary course).

The provision cited above does not provide for the automatic termination of the trust in

the event of a bankruptcy proceeding.  To the contrary, paragraph 15 of the Health and Dental

Trust specifically provides that the trustee shall discontinue payments to beneficiaries and shall

hold the assets of the Health and Dental Trust for the benefit of the Archdiocese's general

creditors until such time that the Archdiocese "is no longer bankrupt or insolvent or pursuant to

an order of a court of competent jurisdiction," at which time the trustee of the Health and Dental

Trust may "resume payments to Beneficiaries."

There should be no dispute as to the status of this Court at a "court of competent

jurisdiction" for purposes of the Health and Dental Trust.  The Archdiocese further believes that

this Court should exercise its authority to authorize the Archdiocese, the trustee and the holder of the AMBP Disbursement Account to maintain the Health and Dental Plan, including the Health and Dental Trust, pending further order of the Court. The Archdiocese has also requested that the Court authorize the Archdiocese, the trustees of the Health and Dental Plan and the holder of the AMBP Disbursement Account to continue to pay the administrative and other fees payable in connection with the Health and Dental Plan, including the fees and expenses of the financial institution holding the Health and Dental Trust.

The Archdiocese is not seeking any relief with regard to the Health and Dental Trust assets held by Catholic Community Foundation. Moreover, the relief requested in the motion will not prejudice any of the creditors in this case because the Health and Dental Trust will continue to receive premium payments during the pendency of this case. As stated in the motion, premiums for the Health and Dental Trust are set by the Archdiocese in consultation with the trustees of the Health and Dental Trust on a periodic basis to reflect claim history and to adjust reserves. Over the years, premiums have been either increased or reduced. The trust reserve has increased over the last several years as a result of an unexpectedly low number of claims. In accordance with prior practices, the Archdiocese determined in January 2014 that it was appropriate to provide participants with a credit of 20% over a period of 18 months to prevent an unnecessary increase in the reserve amount. It is true that the Health and Dental Trust operated at a modest loss for the period from July to December 2014. The Archdiocese, however, is not required to maintain the 20% credit and has the ability to adjust the premium from time to time as necessary. The Archdiocese does not anticipate any significant reduction in the balance held in the Health and Dental Trust during the pendency of this Chapter 11 Case. The motion makes it clear that the balance in the Health and Dental Trust not required to pay benefits will be retained pending further order of the court.

12

Finally, as noted, the overwhelming bulk of the proceeds in the Health and Dental Trust have been contributed by Schools, Parishes, and other Non-Debtor Catholic Entities and their employees.  These parties may assert claims against the Health and Dental Trust.  Maintenance of the status quo will also preserve any rights of the participating employers and employees with respect to the proceeds of the Health and Dental Trust.

In sum, the ability of the Archdiocese to fulfill its mission will be severely compromised, and perhaps destroyed, unless it is permitted to continue the Health and Dental Benefit Plan for the benefit of the Employees of the Archdiocese and other participating employees of Non-Debtor Catholic Entities.  Any disruption of the Health and Dental Benefit Plan will create unnecessary, and perhaps catastrophic, risk to these participants and would not provide any benefit to abuse victims or other creditors.

## **CONCLUSION**

The Archdiocese's ability to fairly compensate clergy abuse victims, continue its work to prevent future abuse, continue its ministries, and successfully reorganize depends on its Employees and its ability to maintain good relations with the Schools, Parishes, and other Non-Debtor Catholic Entities.  This cooperation and engagement depends on the ability of the Archdiocese to maintain the practices and programs described in the motion.  The retention of these programs and practices is crucial to the continued operations and reorganization of the Archdiocese and is within the sound business judgment of the Archdiocese.

For the foregoing reasons, the Archdiocese respectfully requests that this Court grant the relief requested in the motion.

Dated:  January 16, 2015                    Respectfully submitted,

                                            *e/ Richard D. Anderson*
_____

                                            BRIGGS & MORGAN, P.A.
                                            Richard D. Anderson (#2306)
                                            randerson@briggs.com
                                            John R. McDonald (#168592)
                                            jmcdonald@briggs.com
                                            Charles B. Rogers (#0130588)
                                            crogers@briggs.com
                                            Benjamin E. Gurstelle (#389968)
                                            bgurstelle@briggs.com
                                            2200 IDS Center
                                            80 South 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: (612) 977-8400
                                            Facsimile: (612) 977-8650

                                                    - and -

                                            LINDQUIST & VENNUM LLP
                                            James A. Lodoen (#173605)
                                            jlodoen@lindquist.com
                                            Jeffrey D. Smith (#0387035)
                                            jsmith@lindquist.com
                                            Charlie E. Nelson (#0392389)
                                            cnelson@lindquist.com
                                            4200 IDS Center
                                            80 South 8th Street
                                            Minneapolis, MN  55402
                                            Telephone: (612) 371-3211
                                            Facsimile: (612) 371-3207

                                            *Proposed Attorneys for The Archdiocese of Saint
                                            Paul and Minneapolis*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Bankruptcy Case No.  15-30125

CHAPTER 11 CASE

### ORDER GRANTING MOTION OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, FOR EXPEDITED RELIEF AND FOR AN ORDER (A) AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES, AND EMPLOYEE DEDUCTIONS AND EMPLOYEE EXPENSES, (B) AUTHORIZING PAYMENT OF PREPETITION STATUTORY UNEMPLOYMENT COMPENSATION CHARGES, (C) AUTHORIZING THE DEBTOR TO CONTINUE ITS PARTICIPATION IN ITS MEDICAL AND DENTAL HEALTH INSURANCE PROGRAM AND GRANTING OTHER RELIEF WITH RESPECT TO THE PROGRAM, (D) AUTHORIZING PRIEST SUPPORT PAYMENTS AND INTERNATIONAL PRIEST PAYMENTS, (E) AUTHORIZING PAYMENT OF OTHER BENEFIT AND RETIREMENT PLAN OBLIGATIONS, (F) AUTHORIZING CONTINUATION OF THIRD PARTY PAYROLL PROCESSING SERVICES AND DIRECTING BANKS TO HONOR PAYROLL, EXPENSE CHECKS AND FUND TRANSFERS IN CONNECTION WITH THE FOREGOING, (G) FINDING COMPLIANCE WITH THE REQUIREMENTS OF RULE 6003, AND (H) WAIVING THE PROVISIONS OF RULE 4001(a)(3)

This case came before the court on the motion of the Archdiocese of Saint Paul and Minneapolis for an order granting expedited relief and (a) authorizing payment of prepetition wages, salaries, and employee deductions and employee expenses, (b) authorizing payment of prepetition statutory unemployment compensation charges, (c) authorizing the Archdiocese to continue its participation in its medical and dental health insurance program and granting other relief with respect to the program, (d) authorizing priest support payments and international priest payments, (e) authorizing payment of other benefit and retirement plan obligations, (f) authorizing continuation of third party payroll processing services and directing banks to honor

payroll, expense checks and fund transfers in connection with the foregoing, (g) finding compliance with the requirements of Rule 6003, and (h) waiving the provisions of Rule 4001(a)(3).  Appearances were noted on the record.  Capitalized terms in this order have the meaning ascribed to them in the motion.

Based on the motion, the arguments of counsel, and all of the files, records and proceedings,

**IT IS ORDERED:**

1.    The Archdiocese's motion for expedited relief is granted.

2.    The Archdiocese is authorized to pay all pre-Petition Date claims for wages (including, but not limited to, salaries, bonuses and other compensation), subject to the cap of Section 507(a)(4) of the Bankruptcy Code.

3.    The Archdiocese is authorized to pay any pre-Petition Date obligations for accrued vacation and personal time, sick or other paid leave, subject to the cap of Section 507(a)(4) of the Bankruptcy Code.

4.    The Archdiocese is authorized to pay all pre-Petition Date Employee Deductions and Employee Expenses.

5.    The Archdiocese is authorized to pay any pre-Petition Date statutory unemployment compensation charges.

6.    The Archdiocese is authorized to pay all pre-Petition Date claims, premium charges, and administrative fees payable by the Archdiocese relating to the Health Plan and Dental Plan, including the fees and expenses of the holder of the AMBP Disbursement Account.

7.    The trustees of the Health and Dental Plan and the holder of the AMBP Disbursement Account are authorized to continue to receive premiums and other distributions to

2

the Health and Dental Trust and to pay, reimburse, or otherwise honor all expenses, premiums, and administrative fees payable in connection with the Health and Dental Plans, including the fees and expenses of the holder of the AMBP Disbursement Account, and all obligations to Health Plan participants and treating providers to the extent that such obligations, accounts fees, premium charges, and administrative expenses (a) were or are due and payable and relate to the period prior to the Petition Date and (b) are or become due and payable or relate to the period after the Petition Date, in all cases, without further order of the Court, provided, however, that assets in the Health and Dental Trust, including the AMBP Disbursement Account, in excess of the amounts required to be expended in accordance with this paragraph shall continue to be held in the Health and Dental Trust pending further order of the Court.

8.      The trustees of the Health and Dental Trust, and the holder of the AMBP Disbursement Account are granted relief from the automatic stay of Section 362 of the Bankruptcy Code to the extent necessary to provide such parties with relief from the obligation to turn over the AMBP Disbursement Account under Section 542 of the Bankruptcy Code pending further order of the Bankruptcy Court.

9.      The Archdiocese is authorized to pay all pre-Petition Date claims and administrative fees relating to the Priest Health and Dental Plan.

10.     The Archdiocese is authorized to pay all pre-Petition Date payments and contributions required to be made in connection with the Retirement Plans.

11.     The Archdiocese is authorized to pay all pre-Petition Date contributions and other payments required in connection with the other Employee Benefits plans described in the motion, including the long-term disability, term life, and accidental death and dismemberment insurance, and flexible benefit program.

12.     The Archdiocese is authorized to pay all pre-Petition Date payments and contributions required to be made under Canon Law to inactive priests.

13.     The Archdiocese is authorized to pay all pre-Petition Date payments and contributions required to be made to international priests in connection with the International Priests Payments program.

14.     The Archdiocese is authorized to maintain the payroll service described in the motion and the applicable banks and financial institutions holding such accounts are authorized at the Archdiocese's instruction, to receive, honor, process, and pay, to the extent of funds on deposit, any and all checks or electronic funds transfers to the extent such checks or transfers relate to any of the obligations described in this order.

15.     To the extent that the relief granted in this order fits within the requirements of Bankruptcy Rule 6003, the requested relief is necessary to avoid immediate and irreparable harm.

16.     Notwithstanding Fed. R. Bankr. P. 4001(a)(3) or 6004(h), this order is effective immediately.


Dated:

_____

United States Bankruptcy Judge