UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>The Archdiocese of Saint Paul and<br>Minneapolis,<br><br>        Debtor. | Bankruptcy Case No. _____<br><br>**AFFIDAVIT OF THE VERY REVEREND<br>FATHER CHARLES V. LACHOWITZER<br>REGARDING STRUCTURE AND PRE-<br>FILING HISTORY OF DEBTOR AND IN<br>SUPPORT OF CHAPTER 11 PETITION<br>AND FIRST DAY PLEADINGS** |

| | |
|---|---|
| STATE OF MINNESOTA | ) |
| | ) ss. |
| COUNTY OF RAMSEY | ) |

Father Charles V. Lachowitzer, being duly sworn, deposes and states:

1.      My name is Father Charles V. Lachowitzer.  I am the Vicar General and Moderator of the Curia for The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case.  I have served as the Vicar General and Moderator of the Curia since November 20, 2013.  Prior to my appointment, I served as associate pastor at the Church of St. Michael in Stillwater, as principal of St. Croix Catholic School, as pastor of the Church of the Presentation of the Blessed Virgin Mary in Maplewood, as pastor of the Church of St. John Neumann in Eagan, and as president of the board of directors and canonical administrator for Faithful Shepherd School in Eagan.  I am familiar with the history, structure and mission of the Archdiocese.  I am also generally familiar with the Archdiocese's day-to-day operations, business affairs and books and records.

2.      I make this Affidavit based upon my personal knowledge of the facts set forth herein, upon information supplied to me by others associated with the Archdiocese, upon my review of relevant documents or upon my opinion based on my experience and knowledge of the

Archdiocese's operations, financial condition and present financial outlook. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Archdiocese to submit this Affidavit.

3.      On the date hereof (the "Petition Date"), the Archdiocese caused its attorneys to file a voluntary petition for Chapter 11 bankruptcy relief under Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Archdiocese continues to operate its business and manage its properties as debtor in possession.

4.      To enable the Archdiocese to minimize the adverse effects of the commencement of this Chapter 11 case on its operations, the Archdiocese has requested various types of relief in "first day" motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, facilitating a smooth transition to this Chapter 11 case, maintaining employee compensation, maintaining the goodwill and morale of priests, lay employees and others who rely on the programs and services provided by the Archdiocese, and preserving and maximizing the property available to satisfy the Archdiocese's creditors. All of the First Day Motions are vital to the Debtor's reorganization efforts, and expedited approval of the First Day Motions is important to the Debtor's success in this Chapter 11 case.

5.      This Affidavit provides background on the Archdiocese's organization and operations relevant to this Chapter 11 case, and further provides factual information relevant to and in support of the First Day Motions.

## A.      Canon Law

6.      The Church and every Catholic entity, including the Archdiocese, is subject to Canon Law. Canon Law was originally codified in 1917 and subsequently amended in 1983. As used herein, the term "Church" means the universal Catholic Church seated in the Vatican and headed by Pope Francis. My references to Canon Law are taken from The Code of Canon Law

Latin-English Edition, New English Translation, prepared under the auspices of the Canon Law Society of America (Washington D.C. Canon Law Society of America, 1999).

7.      Canon Law recognizes the existence of rights and obligations of physical, moral, and juridic persons (c. 113 §2).  A juridic person is a legal entity established by competent authority or by the law itself, and is classified as either public or private.  The Archdiocese and every parish are separate public juridic persons (cc. 373, 515 §3).  The Church claims the innate right to acquire, retain, administer, and alienate property and temporal goods independently from civil power (c. 1254 §1).  Juridic persons in the Church are capable of acquiring, retaining, administering, and alienating temporal goods, in accordance with the requirements of Canon Law (c. 1255).  The administration of property belonging to a juridic person pertains to its administrator, such as the diocesan bishop over the property of a diocese, and the pastor over the property of a parish (cc. 393, 532).  All property acquired, retained, administered or alienated by a public juridic person is governed by the provisions of Canon Law and the statutes of the juridic person (c. 1257).  Among other things, property held by a public juridic person is required to be managed by that person with diligence and care.  Property held by a juridic person must be used for the purposes of the Church, including the organization of divine worship, the care and support of the clergy and other ministers, and the works of the apostolate and of charity.

8.      Canon Law also distinguishes between clerics and lay persons.  As set forth in Canon 207, "By divine institution, there are among the Christian faithful in the Church sacred ministers who in law are also called clerics; the other members of the Christian faithful are called lay persons" (c. 207).  The Church believes that the ordination of an individual as a deacon, priest, or bishop effects a fundamental (or "ontological") change in the essence and condition of the individual.

9.    Clerics and lay persons have distinct rights and obligations.  Canon Law is clear that the rights of a cleric include a right to support from the bishop or superior with responsibility for, and authority over, the cleric.  As set forth in Canon 281:

> § 1.  Since clerics dedicate themselves to ecclesiastical ministry, they deserve remuneration which is consistent with their condition, taking into account the nature of their function and the conditions of places and times, and by which they can provide for the necessities of their life as well as for the equitable payment of those whose services they need.
>
> § 2.  Provision must also be made so that they possess that social assistance which provides for their needs suitably if they suffer from illness, incapacity, or old age.

10.    The church is entitled to regulate the exercise of the priesthood through the grant or removal of "faculties."  A priest who has abandoned or has been permanently removed from ecclesial ministry loses the right to remuneration (essentially, wages or salary) under paragraph one of Canon 281.  However, the priest will remain entitled to "social assistance" under paragraph two of Canon 281.  The term "incapacity," as used in Canon 281, is not limited to physical, emotion or mental disability.  In fact, Canon 1350 states that "Unless it concerns dismissal from the clerical state, when penalties are imposed on a cleric, provision must always [be] made so that he does not lack those things necessary for his decent support" (c. 1350 § 1).  In other words, if a priest has not been dismissed from the clerical state, even if a serious penalty has been imposed or his faculties severely restricted, Canon 1350 makes clear that the bishop has a duty to assure that provision is made that he have what is needed for decent support.

11.    As suggested above, it is possible for a priest to be dismissed from the clerical state.  Even in that circumstance, "In the best manner possible . . . the [Archbishop] is to take care to provide for a person dismissed from the clerical state who is truly in need because of the penalty" (c. 1350 § 2).

12.    The foregoing should not be construed to suggest that the canonical obligations summarized above give rise in all cases to a "claim" for civil law purposes. However, it is important to emphasize that the responsible bishop is duty bound to honor the requirements of Canon Law, including the provisions summarized above, and that a breach may expose the bishop or the diocese to substantial penalties.

**B.    Corporate Structure**

13.    As indicated above, the Archdiocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law. The secular embodiment of the Archdiocese is sometimes referred to as the "Chancery Corporation." The Chancery Corporation, however, is not a separate entity for civil law purposes.

14.    The Archdiocese was originally established by the Vatican in 1850 as the diocese of Minnesota and the Dakotas and was elevated to archdiocese in 1888. The Archdiocese is organized as a religious Diocesan Corporation under Minnesota Statutes Section 315.16. The "Archdiocese" or "Debtor" refers to the Corporation, and for purposes of this Affidavit, the terms of the secular legal embodiment of the juridic person of the Archdiocese under Canon Law.

15.    The Archdiocese serves a geographical area consisting of 12 greater Twin Cities metro-area counties in Minnesota, including Ramsey, Hennepin, Anoka, Carver, Chisago, Dakota, Goodhue, Le Sueur, Rice, Scott, Washington, and Wright counties (the "Region"). There are 187 parishes and approximately 825,000 Catholic individuals in the Region. These individuals and parishes are served by approximately 399 priests and 173 deacons. The Archdiocese currently employs approximately 176 individuals, which includes clergy and laity.[1]

---

[1] In Canon Law, anyone not ordained a deacon, priest or bishop is a layperson or "laity." In this legal sense, women in a religious order (sisters) and men in a religious order (brothers) are laity.

16.    As set forth in its Articles of Incorporation, the Archdiocese's general purpose is to manage the temporal affairs of the Church in the Region, and to promote spiritual, educational and other interests of the Church in the Region, including charitable, benevolent, eleemosynary, and missionary work.

17.    The Archdiocese's mission, as set forth on its website, is: "Making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education, and ready outreach to the poor and marginalized."

18.    Along with the 187 parishes, there are 90 Catholic schools in the Region, including 13 Catholic high schools (collectively, the "Schools"), with a total enrollment of over 30,000 students.   Various other Catholic-based social and community service organizations operate in the Region, including six Catholic nursing homes, four Catholic hospitals and ten retreat centers.   The Region also includes nine monastic communities that are maintained by separate religious institutions.   As indicated above, parishes, the Schools, and other separately incorporated Catholic entities within the Archdiocese's Region are not under the fiscal or operating control of the Archdiocese.

19.    Catholic organizations located within the Region provide millions of dollars in assistance to those in need.   Through various forms of social outreach, these independent Catholic organizations help those in urgent need by providing nearly three million meals a year, over 5,000 places to sleep for the homeless, a home for children from troubled families, and 2,000 low-income housing units.   Archdiocesan support programs serve and provide advocacy

---

In the documents of the Second Vatican Council, however, the laity are those who are neither ordained nor members of a religious order.  That Vatican II sense is the one usually intended in most discussions of laypeople and their role in the Church.

support for the poor, the handicapped, persons with AIDS, the divorced and separated, people in prison, refugees, and others with special needs. The Catholic Church is the largest non-governmental provider of social services in the United States.

20.    The Archbishop of the Archdiocese is the Most Reverend John C. Nienstedt. According to Canon Law, the Archbishop is a teacher of doctrine, priest of sacred worship, and minister of governance.  As Vicar General and Moderator of the Curia, I serve as Archbishop Nienstedt's principal deputy.  The other bishops in the Archdiocese are the Most Reverend Lee A. Piché and the Most Reverend Andrew Cozzens.

21.    The Archdiocese maintains a number of departments, including Administration and Finance (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Catholic Education (responsibilities include leadership development and ensuring Catholic identity in schools), Development and Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage, Family and Life (responsibilities include marriage preparation, family programs, outreach to people with disabilities, youth and young adults, and efforts to promote the dignity of life from conception to death), Office of Parish and Clergy Services (responsibilities include clergy formation, vocations, chaplaincies, parish consultation, planning and leadership development support), Office of Communications (responsibilities include the *Catholic Spirit*, archdiocesan websites, social media and other communications which support local ministries), Office of Latino Ministry and the Office of Evangelization and Catechesis.

22.    I also serve as Moderator of the Curia, in which capacity I am responsible for the administration of the ministries and services of the Archdiocese.

## C.    Budget And Revenue

23.    As a religious organization, the Archdiocese has no significant, ongoing for-profit business activities or business income. Gross revenue for the fiscal year ending on June 30, 2014 was approximately $25,500,000. The Archdiocese's revenue primarily derives from donations and parish assessments.

24.    The Archdiocese was compelled to implement a number of cost saving measures and achieved a budget reduction of approximately 20% prior to the Petition Date in order to balance its budget and to ensure that the Archdiocese would continue to have the ability to fairly compensate alleged victims and to maintain its core functions and missions. These reductions were implemented beginning in November 2014 and are continuing as of the date of this Affidavit. The budget set forth above reflects these anticipated cuts and reductions.

## D.    Non-Debtor Parish Corporations

25.    I am aware of eleven other Chapter 11 bankruptcy cases filed by other dioceses in the United States. Several of these cases, including the bankruptcy cases in Spokane, Washington, Tucson, Arizona, Portland, Oregon, San Diego, California, and Fairbanks, Alaska, were filed by dioceses operating under a "corporation sole" structure. In those cases, the individual parishes existed under civil law as unincorporated associations as a part of the diocese civil corporation.

26.    The Archdiocese does not operate under the corporation sole model. Parish property located in the Region is held by 187 separate parish corporations (each a "Parish Corporation" and collectively, the "Parish Corporations"), each of which has been organized and exists under Section 315.15 of the Minnesota Statutes. Each Parish Corporation in the Region owns the separate property used in the operation of the parish, normally including the church itself, administrative offices, and, in most cases, a rectory that serves as the pastor's residence.

27.    These Parish Corporations are subject to the requirements and possess the rights, powers, and privileges of a religious corporation. Each Parish Corporation maintains its own tax identification number and each corporation owns and manages its own property and assets, and has responsibility for their own corporate actions. The Parish Corporations are not debtors in this Chapter 11 Case and have not otherwise sought bankruptcy relief.

28.    In addition to the civil distinction referenced above, under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

E.    **Other Non-Debtor Catholic Entities**

29.    The Archdiocese is one of a number of separate entities created to promote the mission of the Church in the Region.  These other entities include Catholic Finance Corporation, Catholic Services Appeal Foundation, Catholic Charities of St. Paul and Minneapolis, and many others.  Each of these entities (each a "Non-Debtor Catholic Entity" and, collectively, the "Non-Debtor Catholic Entities") is incorporated as a separate non-profit corporation under Chapter 317(A) of the Minnesota Statutes.

30.    In terms of secular legal structure, the above-listed entities have no corporate relationship with the Archdiocese.  As with the Parish Corporations, these Non-Debtor Catholic Entities have separate tax identification numbers, own their own property and are responsible for their individual corporate actions.

F.    **The Clergy Sexual Abuse Crisis And The Archdiocese's Historical Response**

31.    Over the last several decades, some clergy members in the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of sexual abuse.  This conduct runs contrary to the teaching and traditions of the Church.  The Archdiocese has worked for more than two decades to meet the needs of alleged victims without

filing for Chapter 11 reorganization. Since the 1980s, the Archdiocese has directed substantial resources towards providing financial, psychological, pastoral and spiritual support to victims.

32.     In 1988, the Archdiocese issued one of the first written policies in the nation designed to protect minors from clergy abuse. At that time, the Archdiocese also held workshops for priests and Church personnel on ministry-related sexual misconduct. The Archdiocese continued to develop a more extensive set of policies to promote safety in ministry, and in 1992, Archbishop John Roach established the Advocacy and Victim Assistance Office. By 1993, background checks were required for clergy and employees in the Archdiocese. In 1995, Archbishop Roach established the Clergy Review Board, a panel of primarily laypersons to advise the Archbishop on matters related to clergy misconduct. In 1998, the sexual misconduct policy was updated again in a Clergy Bulletin issued by Archbishop Harry Flynn, who was installed in 1995. In it, victims were encouraged to come forward, procedures for responding to allegations were defined, and background check procedures were enhanced for priests and deacons.

33.     Following a major clergy sex abuse scandal in Boston in early 2002, Archbishop Flynn led the development by the United States Conference of Catholic Bishops (the "USCCB") of a comprehensive national set of policies and procedures for addressing the sexual abuse of minors by clergy. In June 2002, the USCCB approved and adopted the Charter for the Protection of Children and Young People (the "Charter").

34.     In 2005, the Archdiocese implemented the VIRTUS Protecting God's Children Program for adults. The program is described as "a three hour awareness session which better equips adults to protect children in the world around them." It is required of all clergy, Catholic school and parish employees, as well as all volunteers who have regular or unsupervised

-10-

interaction with children under the age of 18.  Since 2005, nearly 80,000 members of the clergy, candidates for ordination, parish employees, teachers, parish and school volunteers and others in service of the local Church have undergone VIRTUS safe environment training.  Likewise, since 2006, more than 100,000 children in Catholic schools and parish faith formation programs have participated in age-appropriate personal safety lessons.

35.    In 2006, the Archdiocese established the Protection of Children and Youth Initiative, now known as the Office for the Protection of Children and Youth ("OPCY").  OPCY is charged with implementing Articles 6, 12 and 13 of the Charter.  OPCY's primary components are background checks, safe environment training and codes of conduct for adults, and age-appropriate, Church-approved personal safety instruction for minors in Schools, faith formation and youth ministry programs.  OPCY also completes annual compliance audits under the terms of the Charter.  In 2007, the Archdiocese released another Clergy Bulletin updating its sexual misconduct policy.  Among other things, it dictates the permanent removal from the religious state of any clergy member who committed a single act of sexual abuse against a minor.

**G.    The Archdiocese's New Policies Aimed At Preventing Sexual Abuse In The Church**

36.    In spite of the efforts described above, beginning in the fall of 2013, media reports began to surface suggesting that claims of sexual abuse of minors by Archdiocesan clergy members had not been properly addressed.  Also, earlier in 2013, the Minnesota legislature enacted the Minnesota Child Victims Act, which reopened otherwise time-barred civil damage claims against institutions that failed to prevent child sexual abuse.

37.    On October 5, 2013, Archbishop John Nienstedt established a new Office of Episcopal Vicar for Ministerial Standards to assume full responsibility for all issues related to clergy sexual misconduct, and appointed Reverend D. Reginald Whitt to that position.  The Archbishop charged the new Episcopal Vicar with the duty to establish an independent Task

Force so that "there can be no question as to the integrity" of the policies and procedures employed by the Archdiocese and its clergy in responding to reports of sexual misconduct.

38.    The Task Force focused on the Archdiocese's organizational structure, and on policies and procedures related to prevention and detection of clergy sexual abuse of minors to determine whether they were adequate, what factors contributed to the breakdowns that allowed alleged instances of abuse to occur, and whether other best practice policies should be adopted in the Archdiocese.    The Task Force submitted its Report and Recommendations to Protect Children from Clergy Sexual Abuse to the Archdiocese in April, 2014 (the "Task Force Report").    The Task Force Report included recommendations in six areas to strengthen and improve the Archdiocese's prevention of, and response to, allegations of sexual misconduct.    The process of implementing the Task Force recommendations is presently underway.    The Archbishop has made a commitment to implement the Task Force recommendations.

39.    In December 2013, the Archdiocese hired Kinsale Management Consulting ("Kinsale"), a leading national expert, to review thousands of clergy files.    Kinsale was founded by Kathleen McChesney, a former top FBI official with more than 30 years of law enforcement experience.    She also served as the head of the USCCB's Office for Child and Youth Protection from its beginning in 2002 until mid-2005, during which time she developed and oversaw a national compliance mechanism to ensure that all Catholic dioceses complied with civil laws and internal policies relative to the prevention, reporting and response to the sexual abuse of minors.

40.    Beginning in December 2013, Kinsale reviewed the personnel files of all clergy assigned to, or ministering in, the Archdiocese at any time from 1970 to the present, regardless of whether they were still in public ministry.    All told, Kinsale reviewed a total of 3,333 clergy files before completing its work in April 2014. The purpose of the review was to determine

whether there were additional cases of sexual abuse or other misconduct that required investigation by law enforcement, public disclosure or other action by the Archdiocese.

41.    In connection with this effort, the Archdiocese has committed to making prudent and ongoing public disclosures of the names, assignment histories, and current status of clergy members against whom "substantiated claims" of sexual abuse of a minor have been asserted. This is not an exacting standard.   Rather, a substantiated claim is one for which sufficient evidence exists to establish reasonable grounds to believe that the alleged abuse occurred.   It is neither a conclusion nor a presumption of guilt.

42.    To date, the Archdiocese has publicly disclosed sixty two (62) priests and two (2) religious brothers against whom substantiated claims of sexual abuse of a minor have been asserted in the past.[2]  Of these men, fifty five (55) have substantiated claims against them of sexual abuse of a minor within this Archdiocese.   The remaining nine (9) men are the subject of substantiated claims of abuse of a minor outside this Archdiocese but traveled here or lived here without faculties or as a lay person.   For each individual against whom a substantiated claim has been made, including priests and brothers from other dioceses and religious orders, the Archdiocese has disclosed certain background and biographical information, including the following: (i) his year of birth and year of ordination; (ii) whether he is alive or deceased; (iii) if deceased, the year of his death; (iv) his prior assignments; (v) the date of his permanent removal from ministry; and (vi) for those who are alive, their present status with the Church (i.e. retired,

---

[2] Most of these incidents of sexual abuse of a minor occurred between the mid-1950s and the mid-1980s, and many of these men have been previously identified in media reports.   All of these men have been permanently removed from ministry, and most of them have been out of ministry for a decade or more.   At least 29 of these men are deceased.   Archdiocesan leaders are not aware of any men with substantiated claims of sexual abuse of a minor against them who are currently in public ministry in the Archdiocese.

prohibited from ministry or dismissed from the clerical state) and the city and state in which they reside.

43.    These disclosures are ongoing.  If a claim is determined to be substantiated, whether from the review of clergy files by outside experts or otherwise, the Archdiocese will add the name of the clergy member to the disclosure section of its website. It will also share this information with the public by issuing and posting a press release on its website.  The Archdiocese believes that appropriate disclosure is critically important if it is to do all that it can to keep children safe, help victims of abuse heal, and regain the trust and confidence of our communities.

44.    In December 2013, the Archdiocese further announced and implemented Archdiocesan-wide processes to ensure that any report of sexual abuse of a minor is promptly reported to law enforcement.  In the event any such claim is not manifestly false or frivolous, the accused clergy member will also be placed on a leave of absence pending an investigation of the claim by police and the Archdiocese.  During the leave of absence, the accused clergy will not engage in any public ministry.  The threshold for placing an accused clergy member on leave is a decidedly low one.  Any accusation that is not, on its face, blatantly and demonstrably false will initiate the leave of absence process.  If, upon investigation, the claim against the accused clergy member is substantiated then this finding initiates a process in order to resolve the claim.  As required by Church law, no priest who is found to have sexually abused a minor can ever return to public ministry.

45.    On August 25, 2014, the Archdiocese announced the appointment of former Superintendent of the Minnesota Bureau of Criminal Apprehension and Deputy Chief Administrative Law Judge Timothy O'Malley to the new position of Director of Ministerial

Standards and Safe Environment for the Archdiocese. Mr. O'Malley began his new role at the Archdiocese on September 15, 2014 and is responsible for ensuring archdiocesan compliance with the USCCB Charter for the Protection of Children and state and federal law. Mr. O'Malley brings to the position unparalleled experience and leadership due to his experience in local law enforcement, the FBI, the BCA and the judiciary.

**H.    Doe 1 Settlement And The Resulting Child Protection Protocols**

46.    Recently, in connection with a confidential settlement agreement in a civil litigation captioned Doe 1 v. Archdiocese of St. Paul and Minneapolis and Diocese of Winona, Court File No. 62-CV-13-4075 (Ramsey County District Court), the Archdiocese and plaintiff's counsel Jeff Anderson and Associates worked hand-in-hand to develop unprecedented child protection protocols and procedures ("the "Child Protection Protocols").

47.    Among other key measures provided in the 17-part Child Protection Protocols:

- The Archdiocese implemented a whistleblower policy concerning the reporting of abuse. This policy was enacted on October 24, 2014.

- The Archdiocese commits to the continued public disclosure of substantiated claims of sexual abuse as well as those clergy deemed unsuitable for ministry under circumstances that arise, in whole or in part, out of accusations or risk of sexual abuse of a minor.

- By March 31, 2015, the Archdiocese shall make a good faith effort to obtain from each clergy member a written statement affirming that he has not sexually abused any minor at any time and has no knowledge of any abuse of a minor by another priest or employee of the archdiocese that has not been reported. To date, over 500 priests and deacons already have submitted signed affirmations to the Archdiocese;

- The Archdiocese will continue a policy prohibiting individuals from being alone with any unrelated minor while serving as an employee or volunteer of the archdiocese or a parish, subject to common-sense exceptions, including emergency situations;

- Priests are prohibited from being alone with any unrelated minor exception when hearing confession in a confessional and exception for common sense exceptions, including emergency situations and incidental, non-extended interactions.

- The Archdiocese will disclose to other church entities or secular employers who inquire about the existence of any accusation of sexual abuse by a past or present clergy member to the extent allowed by federal and state law.

48.    At an October 13, 2014 news conference, Jeff Anderson and Associates and church leaders stood side by side in announcing the Child Protection Protocols.  Pioneer Press columnist Ruben Rosario called the scene in a historic courtroom at Landmark Center an "unprecedented public reconciliation."  See http://www.twincities.com/opinion/ci_26727537/st-paul-archdiocese-toward-trust.  The Start Tribune likewise heralded the "landmark" Child Protection Protocols as "historic" and observed that it "brought church officials and sex abuse victims together for the first time on a public platform."  See http://www.startribune.com/local/279015421. html?page=2&c=y.  Jeff Anderson called the agreement "monumental."

49.    I participated in the October 13 news conference with Mr. Anderson and Auxiliary Bishop Cozzens.  We were joined by the Archdiocese's Director of Ministerial Standards and Safe Environment and survivors of sexual abuse.  Speaking from the podium, Mr. Anderson advised the public that the occasion marked the first time in more than thirty (30) years of filing lawsuits against the Catholic Church across the country that he has entered into a child protection agreement with any diocese or archdiocese.  "This is a new day and a new way for the protection of children, healing of survivors and full transparency and disclosure in a way we've never seen," Mr. Anderson said of the Child Protection Protocols. "These historic measures are invested in by Doe 1, many other courageous survivors and the [Arch]Diocese." See http://www.andersonadvocates.com/Posts/News-or-Event/1911/Media-Advisory-Settlement-of-Doe-1-Civil-Lawsuit-and-Child-Protection-Action-Plan-Announced-Today.aspx.

50.    Bishop Cozzens and I spoke directly to victims and survivors at the news conference, offering our unconditional support and reaffirming the Archdiocese's unwavering commitment to (a) implementing the Child Protection Protocols, (b) doing everything within their power to ensure the safety of children and (b) restoring hope and trust in the community.

51.    The Archdiocese has made additional disclosures in accordance with the Child Protection Protocols. The Archdiocese has also joined with the St. Paul Police Department, and all civil authorities, in continuing to encourage anyone who suspects abuse of a minor or vulnerable adult within Church ministry—or any setting including the home or school—to first contact law enforcement. Any act of abuse against a minor or vulnerable adult is reprehensible and morally repugnant and the Archdiocese will not tolerate it.

52.    The Archdiocese continues to provide outreach through services that address victims' emotional, psychological and spiritual well-being, such as counseling and spiritual direction. Victims are invited to talk with the Archbishop if and when they wish to do so as part of their healing process. The Archbishop is committed to meeting with victims of sexual abuse in order to hear about their experiences and concerns, and to provide solidarity and support.

53.    On December 4, 2014, the Archdiocese announced a partnership with Twin Cities-based Canvas Health to enhance the Archdiocese's victim assistance program and to provide independent victim assistance services for those claimed to have been harmed by clergy sexual abuse or other misconduct in Church ministry. This innovative partnership establishes an independent 24/7 hotline where concerns regarding misconduct can be reported to trained representatives who are always available.

54.    The Archdiocese remains committed to implementing and following all of the Child Protection Protocols and working with Jeff Anderson and Associates and other victims'

counsel to ensure the protection and safety of all children and vulnerable adults in our community.

## I.    Necessity For Commencement Of This Chapter 11 Case

55.     In May 2013, Minnesota enacted the Minnesota Child Victims' Act, Minn. Stat. § 541.073 (the "CVA"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse. The CVA allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages arising from the abuse, regardless of how long ago the abuse occurred. The CVA also provides a three-year window, during which victims whose claims would have been time barred by the previous statute of limitations, may bring civil suits against alleged abusers and the Archdiocese. This window will not expire until May 2016.

56.     The CVA has opened the door to a significant number of additional civil claims against the Archdiocese relating to clergy misconduct spanning a time period of more than half of a century.

57.     As noted in Section H, the Doe 1 litigation was settled by the Archdiocese prior to the Petition Date. The Archdiocese, however, remains subject to 21 pending civil actions. Three trials are scheduled to begin on January 26, 2015.

58.     Verdicts in some sexual abuse cases across the country have ranged into the millions of dollars. The Archdiocese has insurance coverage available for some, but not all, of the amounts sought by the claimants in the CVA cases pending against it. In certain instances, the insurance coverage is also subject to certain coverage disputes. The Archdiocese is defending each of the cases in civil court, but has also attempted to resolve some of the cases through mediation.

59.     Managing civil court litigation and claims has been difficult and costly for the Archdiocese. The pending civil litigation has placed significant strain on the Archdiocese. The Archdiocese anticipates that this strain will only increase during the remaining term of the extended statute of limitations authorized by the CVA. In addition, the Archdiocese is concerned that too large a settlement with a select group of pending cases would leave the Archdiocese with insufficient assets to fairly compensate other claimants and creditors and would result in a disproportionate allocation of the limited funds available to the Archdiocese.

60.     In addition, although the Archdiocese is current on its vendor obligations, it faces other financial issues in addition to claims involving allegations of clergy sexual abuse, including, for example, an underfunding obligation under its pension plans and potential claims of parishes.

**J.     Goals Of This Chapter 11 Case**

61.     The combined circumstances of the civil claims against the Archdiocese, considered in their totality, make clear that reorganization is the only way to fairly and equitably fulfill the Archdiocese's obligations to all victims. The Archdiocese did not seek Chapter 11 relief to shirk any responsibility regarding sexual misconduct by clergy or any mistakes made by the Archdiocese's administration. The Archdiocese is not attempting to deny victims their day in court or hide the truth. Rather, the Archdiocese has been and continues to be committed to pursuing the truth, addressing the wrongs perpetrated against children and other parishioners, and fairly compensating victims.

62.     The Archdiocese is entering into this Chapter 11 Case with three paramount goals in mind, as follows:

- The Archdiocese's primary goal is to compensate, as fairly and equitably as possible, all victims with unresolved claims, including those with claims presently pending against the Archdiocese and those who, with great courage, will come forward as a result of this

-19-

Chapter 11 case.  The Archdiocese hopes to accelerate healing and resolution with victims while making efficient and responsible use of Archdiocesan resources.

- The Archdiocese must continue its essential ministries and functions associated with its mission.  The plan of reorganization will provide a feasible operational structure for the Archdiocese to allow it to continue its ministry in the community and provide the worship, outreach, education, service, and charity that constitutes the critical work of the Church in this Archdiocese.  The importance of this work cannot be overstated.  Among other things, the Archdiocese helps support the work of the Schools which educate over 30,000 students, the equivalent to one of the State's largest school districts and, through the Non-Debtor Catholic Entities, is the second largest provider of social services in Minnesota (second only to the State itself).

- This Chapter 11 case will enable the Archdiocese to use available funds and resources to compensate all victims with unresolved claims in a single process managed and overseen by the Bankruptcy Court to ensure that all are treated equitably.  In addition, this Chapter 11 case will allow the Archdiocese to move forward on stable financial ground so that it may focus on its Gospel mission and serve the hundreds of thousands of people who depend on the Church.

63.    Throughout this Chapter 11 case, the Archdiocese will continue its outreach to victims and others affected by the tragedy of sexual abuse.  The Archdiocese will also continue to implement and build upon the good work of our archdiocesan leadership and staff over the past several months to see that this tragedy is never repeated.

64.    The circumstances described above make it clear that reorganization under Chapter 11 of the Bankruptcy Code is the best and only way for the Archdiocese to fairly and equitably fulfill its obligations to victims, creditors, and other parties in interest, and represents the only method by which the Archdiocese may maintain its worship, outreach, educational and charitable services to the community.

65.    Finally, I wish to emphasize the need to move this reorganization case forward as quickly as possible.  I am aware of the enormous professional and other fees that have been incurred in other diocesan bankruptcy cases across the United States.  The Archdiocese has limited resources and limited financial means and must rely on the support of its parishioners to sustain its existence and to promote a spiritual, religious and charitable mission.  The

Archdiocese will use all best efforts to communicate with the faithful and the other parties who rely on the continued existence and operation of the Archdiocese. Although I am hopeful that the faithful will continue to fund the ongoing work and ministries of the Archdiocese for the benefit of the faithful and the community, the risk to this work and the ministries of the Archdiocese can only increase if the Archdiocese is unable to achieve a prompt resolution of the case.

To that end, for the reasons stated herein and in each of the First Day Motions filed concurrently herewith, I respectfully request that the Court grant each of the First Day Motions in their entirety and award the Archdiocese such other and further relief as is just and proper.

Very Reverend Charles V. Lachowitzer

Subscribed and sworn to before me this 14 day of _____, 2015

_____
Notary Public

JOSEPH F KUEPPERS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2015