## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 |
| Debtor. | |

**NOTICE OF HEARING AND MOTION FOR ORDERS (I) SCHEDULING A HEARING TO APPROVE SALE OF REAL PROPERTY AND APPROVING SALE PROCEDURES; AND (II) APPROVING AND AUTHORIZING THE SALE OF REAL PROPERTY, THE EXECUTION OF A VIEW EASEMENT AGREEMENT, AND THE EXECUTION OF A SHORT TERM LEASE IN FAVOR OF THE DEBTOR (CHANCERY)**

TO:     All parties in interest as specified in Local Rule 9013-3:

1.      The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor"), hereby moves this Court for the relief requested below and gives notice of hearing.

2.      For the initial relief requested related to the establishment of sale procedures, the granting of bid protections and the scheduling of a substantive sale hearing, the Court will hold a hearing on January 28, 2016, at 10:00 a.m. before the Honorable Robert J. Kressel in Courtroom 8 West, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.  Notice of the hearing with respect to substantive approval of the sale will be provided after the initial hearing in the form of Exhibit A attached hereto.

3.      Pursuant to Local Rule 9006-1(c), any response to this motion must be filed and delivered not later than January 22, 2016, which is five (5) days before the time set for hearing (including Saturdays, Sundays, and holidays).  **UNLESS A RESPONSE OPPOSING THE**

**MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 1070-1 and 1073-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of the Archdiocese's Chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Bankruptcy Rule 2002(a)(2) requires a 21-day notice of any proposed use, sale or lease of property outside the ordinary course of business, "unless the court for cause shortens the time or redirects another method of giving notice."   The Archdiocese believes that the requirements of this rule will be satisfied under the terms of the schedule proposed by the Archdiocese.  As set forth below, the parties in interest will have well in excess of 21 days to object to the final sale of the Property.  The Archdiocese has provided notice of this motion in accordance with the provisions of Local Rule 2002-1 concerning a sale of less than substantially all of the debtor's assets.

<u>**RELIEF REQUESTED**</u>

6.      This motion arises under sections 105(a), 363 and 541 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Bankruptcy Rules 2002 and 6004.  This Motion is filed under Local Rules 9013-1 through 3.  Notice of the hearing on this motion is provided pursuant to Bankruptcy Rule 2002 and Local Rules 9013-3 and 2002-1(b).  The Archdiocese requests two separate orders as follows:  (i) approving sale procedures and scheduling a hearing to approve the sale of the Archdiocese's real property identified herein; and (ii) approving the sale of real property known as the Chancery and authorizing the Archdiocese to enter into a short term lease of the real property to be sold under the motion pending the

relocation of the operations currently conducted in the Chancery, and also a view easement agreement intended to protect the existing view from the Cathedral to downtown St. Paul.

## BACKGROUND

7.      The Archdiocese filed its voluntary petition on January 16, 2015, and has been operating as a debtor-in-possession since that time pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      For a description of the Archdiocese and its operations, the Archdiocese respectfully refers the Court and the parties in interest to the Affidavit of the Very Reverend Father Charles V. Lachowitzer, Moderator of the Curia filed on the Petition Date.

9.      By notice dated February 19, 2015 [ECF No. 124], the United States Trustee appointed an official committee of unsecured creditors (the "UCC").  By order dated May 7, 2015 [ECF No. 215], this Court directed the United States Trustee to appoint a separate official parish committee.

10.      By order dated June 4, 2015 [ECF No. 242], this Court approved the retention of NorthMarq Real Estate Services, LLC (d/b/a Cushman Wakefield NorthMarq) ("NorthMarq") to serve as the broker for the Archdiocese in connection with the sale of the Chancery and other real estate owned by the Archdiocese.

11.      This motion is supported by the attached memorandum of law and proposed order and Unsworn Declaration of Paul Donovan (the "Donovan Declaration").

## BASIS FOR RELIEF REQUESTED

**I.    Description of the Assets to be Sold.**

12.    The property to be sold consists of certain real property and improvements located at 226 Summit Avenue and 230 Summit Avenue in St. Paul, Minnesota (the "Chancery" or the "Property").  The Chancery, as defined in this motion, includes both the Chancery building, 226 Summit Avenue, which houses offices for the Archdiocese's operations, and the Archbishop's Residence, 230 Summit Avenue, which is connected to the Chancery building.

13.    The Chancery was valued for purposes of the Archdiocese's schedules at $6,297,100 based upon the Archdiocese's review of Ramsey County public record, which reflects the estimated market value of the Property for tax purposes.  The Archdiocese's schedules also referenced a June 2013 NorthMarq analysis which provided an estimated value of the Property of between $2,500,000 to $3,500,000.  The Archdiocese's schedules also disclosed that the Chancery is subject to significant deferred maintenance costs.

14.    As indicated in more detail below, the Archdiocese has received an initial bid for the Chancery for an amount within the range of value set forth in the NorthMarq analysis, although below the Ramsey County estimated market value for tax purposes.  The Archdiocese believes that the offer referenced in this motion is fair and reasonable.   In addition, the Archdiocese has proposed procedures that will permit other parties to submit bids for the Property and will ultimately maximize the value of the Chancery.

15.    To the best of the Archdiocese's knowledge, the Chancery is not subject to any existing liens or encumbrances.

**II.    Archdiocese's Marketing Efforts.**

16.    The Archdiocese made the decision at an early stage of these proceedings to begin to market the Chancery and other properties including the Hayden Center, property located on

-4-

Dayton Avenue in St. Paul (244 and 250 Dayton Avenue), and certain residential property in Northfield, Minnesota. The Archdiocese believes that the sale of the Chancery will allow the Archdiocese to operate more efficiently by having all of its staff in one location. The sale of the Chancery will also save the Archdiocese money in operating costs, daily maintenance and long-term maintenance. Certain of these long-term maintenance items cannot be delayed much longer.

17.     As noted above, the Archdiocese has retained NorthMarq as its broker for the sale of these properties. The UCC, in turn, has retained CBRE, Inc. to assist the UCC in its analysis of the sale process [ECF Nos. 223 and 224]. The Archdiocese and NorthMarq have consulted with counsel to the UCC and its expert with respect to its marketing efforts.

18.     As set forth in more detail in the Donovan Declaration, NorthMarq engaged in an aggressive and vigorous effort to market the Chancery and the remaining properties to be sold by the Archdiocese. On or about October 20, 2015, NorthMarq received a letter of intent for the purchase of the Chancery from the United Properties Development LLC ("United Properties"). After further arms-length negotiations, the Archdiocese entered into a purchase agreement with United Properties as the stalking horse bidder dated as of November 30, 2015 (the "United Properties Purchase Agreement"), with the objective of utilizing a competitive auction process in order to maximize the sale price of the Chancery.

**III.    Terms of Purchase Agreement.**

19.     The Archdiocese has attached a true and correct copy of the United Properties Purchase Agreement as Exhibit B to this Motion. The United Properties Purchase Agreement contemplates a purchase price of $2,750,000, subject, however, to higher and better bids, with an earnest money deposit requirement of $50,000. The United Properties Purchase Agreement includes a contingency for United Properties' acceptance of the results of an inspection and

report during the 30-day Due Diligence Period (as defined in the United Properties Purchase Agreement). The Due Diligence Period has run and this contingency has been satisfied.

20.    The United Properties Purchase Agreement also includes a contingency for receipt by the Archdiocese of such approvals as may be required under Canon Law.  These approvals have been obtained and the Archdiocese has waived this contingency.

21.    The United Properties Purchase Agreement also includes certain restrictions on the use of the Property to conform with the requirements of Canon Law and to reflect the fact that the Chancery has been identified with the Archdiocese by reason of its long and continued ownership and use by the Archdiocese.  The Archdiocese believes that these restrictions will not detract from the market value of the Chancery.

22.    The United Properties Purchase Agreement also includes an amendment to correct the official entity name of the buyer.  The amendment does not change any other terms of the United Properties Purchase Agreement.

23.    As noted, United Properties has agreed to purchase the Chancery on an "as is" and "where is" basis.

**IV.    Lease Arrangement.**

24.    The Archdiocese will require a certain period of time to secure alternative office space.  For this reason, the United Properties Purchase Agreement contemplates that the Archdiocese and the United Properties, or an alternative bidder for the Property, will enter into a lease for a period ending on June 30, 2016, after which time the lease will continue until termination by either party upon three months' prior written notice.  During the initial term and any extensions thereof the Archdiocese's occupancy shall be on a rent-free basis.  The Archdiocese will pay for utilities, repair, and maintenance at the Property subject to the terms of

7332348v6

the lease agreement.  The Archdiocese has attached a draft of its proposed lease as Exhibit C to the United Properties Purchase Agreement.

**V.      View Easement Agreement.**

25.      The United Properties Purchase Agreement also contemplates a View Easement Agreement to be contemporaneously entered into by and between United Properties and the Archdiocese.  The View Easement Agreement provides that so long as the Cathedral of Saint Paul remains situated on neighboring property located at 239 Selby Avenue, Saint Paul, Minnesota, subject to certain rights, no structure, building, improvement, or construction of any kind shall be erected, constructed, or placed on any part of the Property which rises to an elevation to be agreed upon by the Buyer and Seller that would inhibit the view of or from the Cathedral.  The View Easement Agreement contingency has been resolved by United Properties and the Archdiocese and the maximum elevation of any redevelopment of the Property is 50 feet and five stories.  As explained in more detail below and in the Donovan Declaration, the inclusion of the View Easement Agreement as part of the United Properties Purchase Agreement does not limit or inhibit the value of the Chancery property and is required by the Archdiocese for any sale of the Chancery due to the historical importance of the Cathedral of Saint Paul to the Archdiocese and the City of Saint Paul.  The Archdiocese has attached a substantially final form of the View Easement Agreement as Exhibit C to this motion.

26.      The Cathedral property is leased by The Cathedral of Saint Paul, a separate religious corporation under Minnesota law (the "Cathedral Corporation"), under a lease with a 20 year term ending in 2021.  Rent under the Cathedral lease accrues at a rate of $1.00 per year. The Cathedral Corporation, however, is obligated to pay all operating expenses for the property. These expenses are significant.  The Cathedral Corporation has the right to extend and renew the lease for an additional 20 year period through 2041 under the same terms and conditions as the

-7-

original lease.  The Archdiocese has also subjected its fee interest in the Cathedral property to a mortgage lien obtained to finance improvements and repairs to the property.

27.    The Cathedral lease has not been assumed or rejected in this bankruptcy case. However, as the owner of the real property on which the Cathedral sits, the Archdiocese has an interest in preserving the value of the Cathedral property, which includes the views of and from the Cathedral building.  The Archdiocese's relationship with the Cathedral of Saint Paul is also of vital importance to the core mission of the Archdiocese.

28.    The View Easement Agreement would operate in the event of a rezoning or granted variance to any redevelopment at the Chancery site.  The current zoning district for the Chancery is RT2, which restricts building heights to 40 feet and three stories.  See Donovan Declaration at ¶ 19.  The View Easement Agreement allows for all building heights within this zoning district.  It is possible, however, that a bidder would purchase the Property with the intention of seeking to rezone the Property.  Rezoning to RM2 would allow for larger structures, but such an effort would likely meet some resistance from the City of Saint Paul and would require persuasive argument.  Id.  The Chancery site is within Saint Paul's Historic Hill Heritage Preservation District and any development of the site would be carefully reviewed to fit within the character of the neighborhood.  Id.  If rezoning to RM2 were secured, heights would still be restricted to 50 feet and five stories under those guidelines.  Id.  In addition, as related to zoning, the City of Saint Paul has expressed interest in preserving views of the Cathedral and will likely require what it believes are appropriate height maximums in place for any redevelopment going forward.  Id.  The View Easement Agreement serves to ensure those appropriate height maximums.  It also meets the objectives of the Archdiocese by ensuring that the view access to and from the Cathedral is not inhibited and does not extend far above the tree line.

-8-

29.     In sum, as set forth above, a view easement that restricts future development of the site to five stories and 50 feet does not reduce the ability to develop the property because it still allows a purchaser to redevelop the site in any of the potentially available zoning districts within the Historic Hill Heritage Preservation District.  The Archdiocese is unwilling to convey the Chancery without a view easement due to the unique nature and value of the Cathedral.

## VI.   Proposed Bidding Procedures.

30.     The Archdiocese has developed proposed sale and bidding procedures which will govern the sale of the Property (the "Sale Procedures").  A copy of the Sale Procedures is attached to this motion as Exhibit D.  The Archdiocese believes that a sale of the Chancery pursuant to the Sale Procedures will maximize value of the Chancery for the benefit of the estate.

31.     The Sale Procedures are designed to allow for competing bids. Once approved, the Sale Procedures will govern the submission of all bids and the selection or approval of the highest and best offer for the Chancery.  The Archdiocese believes that it will obtain the maximum recovery for their creditors if the Chancery is sold pursuant to the Sale Procedures.

32.     Pursuant to the Sale Procedures, potential purchasers of the Chancery are required to satisfy certain criteria to become "Qualified Bidders" for the Property.  The Sale Procedures further provide for an overbid process.  The Sale Procedures do not contemplate payment of a break-up fee or any of the fees and expenses of United Properties, as the initial bidder.

33.     The proposed Sale Procedures provide for a longer sale process than the one contemplated under the United Properties Purchase Agreement and longer than the Hayden Center period.  These longer periods reflect comments received by the Archdiocese from counsel for the UCC.  These longer periods have been accepted by United Properties.

34.     The Archdiocese submits that the Sale Procedures are fair and reasonable and are necessary to allow the Archdiocese to evaluate its sale options through a controlled structure

-9-

similar to the procedures used in connection with the sale of the Hayden Center.  The Sale Procedures will also provide purchasers with predictability and orderliness throughout the bidding and sale process.

35.     The Archdiocese elected to proceed with a formal bidding process on the Hayden Center and the Chancery following extensive discussions with the UCC and the brokers for the UCC and the Archdiocese. The procedures adopted by the Archdiocese reflect the value of those properties and the public interest in the sale process, as evidenced by the number of inquiries received by the Archdiocese and its broker on both properties.  Although there are no certainties, the Archdiocese believes that there is a likely possibility that additional bids will be received on the Chancery.  The Archdiocese also believes that it is important that its broker have the ability to direct potential purchasers to a defined and structured process for conducting due diligence and for submitting competing bids. The Archdiocese believes that the Sale Procedures proposed will serve to avoid confusion and future disputes as to the fairness and adequacy of the sale process and will maximize the possibility of competing bids.  Finally, the Archdiocese believes that the expense reimbursement provisions of the United Properties Purchase Agreement (described below) may be approved only as part of a formal bid structure for the Chancery. The other remaining properties to be sold by the Archdiocese are of lesser value and have not generated the same level of interest.  The Archdiocese expects to follow a different procedure for those properties.

**VII.     Form of Asset Purchase Agreement.**

36.     Pursuant to the Sale Procedures, Qualified Bidders will be required to enter into an asset purchase agreement to consummate a sale.  The Sale Procedures contemplate that any party making a bid use the form of the proposed United Properties Purchase Agreement attached to this motion as Exhibit B, including the proposed lease and View Easement Agreement,

-10-

marked to show any changes from the United Properties Purchase Agreement.  It provides for the sale of the Chancery in exchange for cash and provides for execution and delivery of the Archdiocese lease and view easement.  The United Properties Purchase Agreement also contains limited representations and warranties by the Archdiocese.  The Archdiocese believes that the United Properties Purchase Agreement is fair and reasonable.

**VIII.   Archdiocese's Request to Schedule a Sale Hearing.**

37.    The Archdiocese contemplates that other potential bidders may require a due diligence period.  Subject to the Court's schedule, the Archdiocese proposes the following timeline for the sale of the Chancery:

| Event | Deadline |
|---|---|
| Completion of due diligence and submission of bids | 3:00 p.m. on March 18, 2016 |
| Notification to potential bidders | March 23, 2016 |
| Objections to sale | March 25, 2016 |
| Auction | March 29, 2016 |
| Objections to conduct of the auction | 11:59 p.m. on March 30, 2016 |
| Hearing date | March 31, 2016 |

**IX.   Protections for Purchaser.**

38.    As set forth in the attached memorandum of law, the Archdiocese believes that the proposed sale maximizes the value of the Chancery for its estate and creditors and is a sound exercise of its business judgment.  The Chancery has been thoroughly marketed and United Properties' offer is the best available offer in the marketplace, as set forth in more detail in the Donovan Declaration.

39.    The United Properties Purchase Agreement provides that, in the event that (a) the Bankruptcy Court approves a sale offer from a bidder other than United Properties, (b) the sale to that other bidder closes, and (c) United Properties has performed all obligations under the United

Properties Purchase Agreement, has satisfied all closing conditions, and is ready, willing, and able to proceed with closing, then the earnest money shall be returned to United Properties, along with payment to United Properties for out of pocket expenses and costs incurred for survey, inspection and reports (provided that they have been made available to the Archdiocese) up to a total maximum amount of $25,000. These documents would be provided to other bidders who will necessarily benefit from the work. If the Bankruptcy Court approves a sale to a different bidder, but that party fails to close on the acquisition of the property, then United Properties shall be obligated to purchase the Property in accordance with the terms of the United Properties Purchase Agreement.

40.     The Archdiocese does not believe that there are any liens against the Property, so section 363(f) is not applicable.

41.     In any case, the Archdiocese requests that any order approving the sale to United Properties or any other higher and better bidder include the protections above as well as those provided in section 363(m) of the Bankruptcy Code. United Properties is unrelated to the Archdiocese and does not have an interest adverse to the Archdiocese, its estate, or its creditors. As noted in the Donovan Declaration, United Properties and NorthMarq share a parent company. As set forth in the Donovan Declaration, the terms of the purchase agreement were negotiated on an arm's length basis with appropriate precautions taken to avoid the appearance of a conflict of interest. In the event United Properties is not the Successful Bidder, the Archdiocese will demonstrate at or prior to the sale hearing that any higher and better bidder is also unrelated to the Archdiocese and does not have an interest adverse to the Archdiocese, its estate, or its creditors.

7332348v6

## X.     Approval of Replacement Lease and View Easement.

42.     As noted, the Archdiocese will require sufficient time to locate a replacement office facility.   For this reason, it is necessary and appropriate that this Court approve the execution and delivery of the Archdiocese's lease in substantially the form attached to the United Properties Purchase Agreement.

43.     For the reasons set forth above, the Archdiocese also requests that the Court authorize execution and delivery of the View Easement Agreement as part of the final sale order.

## XI.     Request for Relief Under Bankruptcy Rules 6004(h) and 6006(d).

44.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale or lease of a debtor's property is stayed for a period of 14 days after entry of the order unless the Court orders otherwise.   The Archdiocese understands the value of these rules to preserve parties' rights in cases where objections to sales or assumption and assignment are filed and not resolved consensually.   However, the Archdiocese does not believe that a stay pending appeal will be necessary or appropriate under the circumstances of this case in light of the efforts made by the Archdiocese to preserve the rights of potential bidders for the Chancery. For this reason, the Archdiocese requests that any order approving the sale and lease transaction be effective immediately.

45.     Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call the following individuals:

> Mr. Thomas J. Mertens
> Chief Financial Officer
> Archdiocese of Saint Paul & Minneapolis
> Hayden Center
> 328 West Kellogg Blvd.
> Saint Paul, MN 55102

> and

7332348v6

Paul J. Donovan
Executive Director
Cushman & Wakefield NorthMarq
801 Nicollet Mall, Suite 325
Minneapolis, MN  55402

to testify as to the facts set forth in this Motion.

WHEREFORE, the Archdiocese moves this Court for orders:

(a)     Approving the Sale Procedures;

(b)     Scheduling a hearing to approve the sale of the Property;

(c)     Finding that United Properties, or the other Successful Bidder, is a buyer in good faith entitled to the protections of Section 363(m) of the Bankruptcy Code;

(d)     Authorizing the Archdiocese to enter into a replacement lease in substantially the form attached to the United Properties Purchase Agreement with United Properties or other Successful Bidder for the Property;

(e)     Authorizing the Archdiocese to enter into a View Easement Agreement in substantially the form attached to the Motion with United Properties or other Successful Bidder for the Property;

(f)     Authorizing and approving the expense reimbursement contingency provision of the United Properties Purchase Agreement;

(g)     Authorizing the Archdiocese to pay the ordinary and reasonable expenses of the proposed Sale, including any commission payable to NorthMarq in connection with the Sale;

(h)     Waiving the stay provisions of Bankruptcy Rules 6004(h) and 6006(d); and

(i)      Granting such other relief as the Court deems just and appropriate.

Dated:  January 7, 2016                    Respectfully submitted,

                                           BRIGGS AND MORGAN, P.A.

                                           *e/ Richard D. Anderson*
                                           Richard D. Anderson (#2306)
                                           randerson@briggs.com
                                           Charles B. Rogers (#0130588)
                                           crogers@briggs.com
                                           Benjamin E. Gurstelle (#389968)
                                           bgurstelle@briggs.com
                                           2200 IDS Center
                                           80 South 8th Street
                                           Minneapolis, MN 55402
                                           Telephone: (612) 977-8400
                                           Facsimile: (612) 977-8650
                                           Attorneys for The Archdiocese of Saint Paul and
                                           Minneapolis

7332348v6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                              Chapter 11 Case

The Archdiocese of Saint Paul and
Minneapolis,

              Debtor.

## VERIFICATION OF THOMAS J. MERTENS

I, Thomas J. Mertens, Treasurer / Chief Financial Officer of the Archdiocese of Saint Paul and Minneapolis, do hereby certify and declare under the penalty of perjury that the facts contained in the Notice of Hearing and Motion for Orders (I) Scheduling a Hearing to Approve Sale of Real Property and Approving Sale Procedures; and (II) Approving and Authorizing the Sale of Real Property, the Execution of a View Easement Agreement, and the Execution of a Short Term Lease in Favor of the Debtor are true and correct to the best of my knowledge, information, and belief.

Dated: 1/7/16                                    _____
                                                 Thomas J. Mertens

**EXHIBIT A**

**NOTICE OF SALE**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    Bankruptcy Case No.  15-30125

The Archdiocese of Saint Paul and                         Chapter 11 Case
Minneapolis,

                    Debtor.

## NOTICE OF HEARING FOR FINAL APPROVAL OF SALE
### (Chancery)

PLEASE TAKE NOTICE that on January 7, 2016, the Archdiocese of Saint Paul and Minneapolis (the "Debtor") filed a Notice of Hearing and Motion for Orders (I) Scheduling a Hearing to Approve Sale of Real Property and Approving Sale Procedures;  and (II) Approving and Authorizing the Sale of Real Property, the Execution of a View Easement Agreement, and the Execution of a Short Term Lease in Favor of the Debtor (Chancery) (the "Motion") [ECF No. ____].

PLEASE TAKE FURTHER NOTICE that on _____, 2016, the Court entered an order approving the Motion (the "Sale Procedures Order") [ECF No. ____], which governs the bidding process (the "Sale Procedures") for the sale of real property located at 226 Summit Avenue and 230 Summit Avenue in St. Paul, Minnesota (the "Chancery" or the "Property").  A copy of the Sale Procedures Order is attached as Exhibit 1 and a copy of the Sale Procedures is attached to the Sale Procedures Order as Exhibit A.

PLEASE TAKE FURTHER NOTICE that a hearing to approve the sale (the "Sale Hearing") will be held on _____, 2016 at _____ __.m. (Central Time), before the Honorable Robert J. Kressel in Courtroom 8 West, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing.

PLEASE TAKE FURTHER NOTICE that any response to the Motion must be filed and served not later than _____, 2016.  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

7332161v3

Respectfully submitted,

BRIGGS AND MORGAN, P.A.

Dated: _____                     /e/_____
                                            Richard D. Anderson (#2306)
                                            randerson@briggs.com
                                            2200 IDS Center, 80 South 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: (612) 977-8400
                                            Facsimile: (612) 977-8650

                                            Attorneys for the Archdiocese of Saint Paul
                                            and Minneapolis

-2-

**EXHIBIT B**

**FORM OF PURCHASE AGREEMENT**

## PURCHASE AND SALE AGREEMENT
### (The Chancery)

**Agreement Date:  November 30, 2015 ("Effective Date")**

1.      **Parties**.  The parties to this Agreement are:

        a.      THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation, Attention: Thomas J. Mertens, 328 West Kellogg Boulevard, St. Paul, Minnesota 55102 ("Seller"); and

        b.      UNITED PROPERTIES DEVELOPMENT COMPANY, a Minnesota corporation, Attention: Mark W. Nelson, 3600 American Blvd., Suite 750, Minneapolis, Minnesota 55431 ("Buyer").

This Agreement sometimes refers to Seller and Buyer individually as a "Party" and collectively as the "Parties."

2.      **Property**.  The real property that is the subject of this Agreement is located at 226 and 230 Summit Avenue, in the City of St. Paul, Ramsey County, Minnesota and is legally described on the attached Exhibit A ("Property").  The term "Property" as used in this Agreement includes the buildings commonly known as the "The Chancery" and such bishop's residence and all other improvements on the Property, together with all easements, rights, privileges and other hereditaments and appurtenances to the Property.

3.      **Purchase and Sale**.  Seller agrees to sell, and Buyer agrees to purchase, the Property from Seller pursuant to the terms of this Agreement.

4.      **Purchase Price**.  The purchase price for the Property is TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($2,750,000.00) ("Purchase Price").

5.      **Earnest Money**.  Upon even date herewith, Buyer will deposit in the form of cash the sum of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) (together with any interest earned thereon, the "Earnest Money") with Guaranty Commercial Title, Inc. (the "Title" or "Title Company").  The Title Company will hold the Earnest Money in escrow pursuant to the provisions of the Escrow Agreement which is attached as Exhibit B.  The Earnest Money will remain the property of Buyer unless disbursed to Seller pursuant to the provisions of the Escrow Agreement.  Buyer and Seller will each pay one half of the Title Company's fee, if any, for holding and disbursing the Earnest Money.  All interest that the Earnest Money earns will inure to the Party that is entitled to the Earnest Money under the terms of this Agreement.

6.      **Payment Terms**.  At Closing, Buyer will:

        a.      Direct the Title Company to tender the Earnest Money and any interest earned thereon to Seller in certified funds or wire transferred funds; and

b.      Tender the balance of the Purchase Price to Seller in certified funds or wire transferred funds.

7.      **Conveyance Terms**.  At Closing, Seller will execute and deliver to Buyer a Limited Warranty Deed (the "Deed") conveying fee title to the Property to Buyer subject to the following "Permitted Encumbrances":

a.      Building, zoning and subdivision statutes, laws, ordinances and regulations;

b.      Reservations of minerals or of mineral rights in favor of the State of Minnesota, if any;

c.      The lien of real estate taxes, if any, not yet due and payable;

d.      Access restriction to Trunk Highway 35E as evidenced by Final Certificate filed as Document No. 1873479;

e.      As to Parcel 3, minerals and mineral rights reserved by the State of Minnesota, as shown on the Certificate of Title; and

f.      Matters that constitute "Permitted Encumbrances" pursuant to Section 10 below.

Without limiting the generality of Section 12 below, Buyer acknowledges that Buyer will rely on the Title Policy, the Survey and Sale Order (as hereinafter defined) as to all matters of title and will not rely on any representation or warranty of the Seller, except as provided under the terms of the Deed.

8.      **Possession**.  At Closing, Seller will deliver possession of the Property to Buyer, subject, however, to a lease in substantially the form of Exhibit C attached here to be executed between Buyer and Seller at Closing (the "Lease"). Upon closing on the sale contemplated herein, Buyer hereby grants to Seller an easement to protect views from and of the Cathedral of Saint Paul, and further agrees that, so long as the Cathedral of Saint Paul is situated on the property located to the northwest of the Property and across both Summit Avenue and Selby Avenue, but in no event for a period of less than thirty (30) years from the Closing Date, no structure, building, or construction of any kind shall be erected, constructed or placed on any part of the Property that obstructs the view from and of the Cathedral of St. Paul. (the "View Easement"). The height limitation to be imposed by the View Easement shall be negotiated by the Parties in good faith and agreed upon by Seller and Buyer prior to the expiration of the Due Diligence Period (as defined below). If the Parties are unable to reach agreement as to the height limitation prior to the expiration of the Due Diligence Period, either Party may, at its option, elect to terminate this Agreement by written notice given to the other Party prior to the expiration of the Due Diligence Period, in which event the Parties shall proceed in accordance with Section 25 below. The View Easement shall be in substantially the form of Exhibit D attached hereto, shall commence upon the Closing Date and be perpetual in nature, and shall be binding upon each of Buyer's and Seller's successors and assigns.

-2-

9.    **Closing**.  The closing contemplated under this Agreement (the "Closing") will take place at the offices of Seller's counsel, or at such other address as may be designated by Seller, on a date to be designated by the Seller to occur within five (5) business days after issuance of the Sale Order (as defined below) ("Date of Closing").  On the Date of Closing:

a.    Seller will:

(i)    Execute and deliver to Buyer the Deed and a title affidavit reasonably required by Escrow Agent and acceptable to Seller that will enable Buyer to obtain a title policy meeting the terms and conditions of this Agreement (the "Title Policy"), free of any general exception for either mechanics' or materialmen's liens or parties in possession;

(ii)    Deliver a copy of the Sale Order (as hereinafter defined);

(iii)    Execute and deliver to Buyer a non-foreign affidavit in recordable form containing such information as is required under Internal Revenue Code Section 1445(b)(2) and any regulations relating to Internal Revenue Code Section 1445(b)(2);

(iv)    Execute and deliver to the closing agent, Buyer or other appropriate party appropriate Federal Income Tax Reporting Forms;

(v)    Execute and deliver to the closing agent, with a copy to Buyer, a completed Minnesota Department of Health Well Disclosure Certificate or include on the Deed the statement "The Seller certifies that the Seller does not know of any wells on the described real property" or the statement "I am familiar with the property described in this instrument and I certify that the status and number of wells on the described real property have not changed since the last previously filed well disclosure certificate" followed by Seller's signature;

(vi)    Execute and deliver the Lease;

(vii)    Execute and deliver the View Easement Agreement;

(viii)    Deliver to Buyer a copy of the signed settlement statement in the form provided by Title; and

(ix)    Provide Buyer with all information necessary for Buyer to complete a certificate of real estate value.

In the event that Seller is not able to obtain the Sale Order prior to the Closing Date, then such non-event shall not constitute a default by Seller hereunder, but shall constitute a failure of a condition precedent to Seller's and Buyer's obligations to close.  If such condition is not satisfied on or before the Closing, Seller and Buyer each have a right to terminate this Agreement by delivery of written notice to the other in which event the Earnest Money shall be returned to Buyer and neither of the Parties shall have any further rights or

-3-

obligations hereunder except for obligations that specifically survive the termination of this Agreement.

b.     At Closing, Buyer will:

(i)     Tender the Purchase Price to Seller in accordance with Section 6 above;

(ii)     Execute and deliver to closing agent a certificate of real estate value;

(iii)     Execute and deliver the Lease; and

(iv)     Execute and deliver the View Easement and such other documents and instruments as the Seller or Title may require to consummate the transactions contemplated under this Agreement.

10.     **Due Diligence.**

a.     <u>Title Commitment</u>.  Buyer has received  a copy of the title commitment issued by Title Company File No. 61674 dated July 15, 2015 (the "Commitment") for an ALTA Owner's Policy of Title Insurance ("Title Policy") committing to insure title to the Property. Notwithstanding the foregoing, it is understood and agreed by the parties that all mortgages, taxes and special assessments, tax liens, judgments, mechanics' liens and any other monetary lien against the Property shall be satisfied at Seller's expense at or prior to Closing.  All other matters set forth in the Commitment shall constitute Permitted Encumbrances.

b.     <u>Survey</u>.     Buyer shall have the right to obtain, at Buyer's expense, a survey of the Property (the "Survey").  Buyer shall furnish Seller with a copy of the Survey and Seller shall be entitled to share said Survey with other potential purchasers of the Property.  If the Survey discloses any defect, condition or matter unacceptable to Buyer and which renders title unmarketable, Buyer may elect to terminate this Agreement by written notice given to Seller prior to the expiration of the Due Diligence Period, as defined below, in which event the parties shall proceed in accordance with Section 25 below. Seller shall have no obligation to remove any defects or conditions disclosed by the Survey.

c.     <u>Inspections and Reports</u>.  During the period commencing on the Effective Date and expiring at 5:00 p.m. (Minnesota time) on the date that is thirty (30) days after the Effective Date (the "Due Diligence Period") and continuing after the Due Diligence Period through the Executory Period (as defined below), Seller shall permit Buyer and Buyer's representatives to enter the Property for the purpose of conducting inspections and investigations reasonably required by Buyer in order to determine the suitability of the Real Property for Buyer's purposes (collectively, the "Inspections").  Buyer shall promptly repair any damage to the Property attributable to the conduct of the Inspections, and shall return the Property to substantially the same condition as existed prior to the conduct thereof.  No Inspections shall be conducted without Seller's prior approval as to

-4-

the time and manner thereof, which approval shall not be unreasonably withheld, conditioned or delayed and without at least twenty-four (24) hours prior notice from Buyer to Seller.   At Seller's request, any such Inspection shall be performed in the presence of a representative of Seller.   Any such Inspection shall be performed in a manner which does not interfere with the use, operation or enjoyment of the Property and shall be performed or conducted at Buyer's sole cost and expense.   Buyer shall cause copies of the information and written materials obtained or generated in connection with the conduct of the Inspections, including any tests or environmental studies conducted of the Property (collectively, the "Reports"), to be delivered to Seller upon issuance thereof without cost to Seller.

If the results of the Inspections or the Reports are not acceptable to Buyer, Buyer, in its sole discretion, may terminate this Agreement by written notice given to Seller prior to the expiration of the Due Diligence Period, in which event the Parties shall proceed in accordance with Section 25 below.   If Buyer fails to terminate this Agreement prior to the expiration of the Due Diligence Period, Buyer shall be deemed to have waived the contingency set forth in this Section, and elect to proceed with the purchase of the Property.   In addition, the Earnest Money shall become nonrefundable to Buyer, but shall remain applicable to the Purchase Price at Closing.

Buyer hereby agrees to indemnify, defend and hold harmless Seller from and against any losses, liabilities, damages, costs or expenses, including reasonable attorneys' fees, incurred by Seller as a result of (i) Buyer's exercise of the right of inspection granted under this Section, (ii) any negligence or other wrongful act or omission of the Buyer or Buyer's representatives in connection with the Inspections; (ii) failure to maintain adequate liability insurance or provide proof of said insurance if requested by Seller; (iii) failure to keep the Property free and clear of any and all mechanics' liens or similar claims for the payment of amounts due from Buyer in connection with the Inspections; or (iv) any other rights granted under this Agreement, except that Buyer shall have no obligations to Seller hereunder relating to the discovery of pre-existing Property conditions.   Buyer acknowledges and agrees that any such Inspections conducted by Buyer or Buyer's agents and representatives shall be solely at the risk of Buyer.   Buyer shall carry commercial general liability insurance covering all activities conducted by Buyer, its agents, contractors and engineers on the Property.   Such insurance shall have limits of not less than One Million and 00/100 Dollars ($1,000,000.00) for personal injury to or death of any one person, Two Million and 00/100 Dollars ($2,000,000.00) for personal injury to or death of any number of persons in any one accident and One Million and 00/100 Dollars ($1,000.00) for property damage, and shall name Seller as an additional insured.   All of the indemnity and defense obligations of Buyer under this Section shall survive Closing or the termination of this Agreement and are in addition to any other Seller remedy available under this Agreement or under law. If this Agreement is terminated, Buyer shall deliver to Seller any and all Reports that were produced in relation to the Inspections.

11.   **Operation Prior to Closing.**  During the period from the Effective Date of this Agreement to the Date of Closing (the "Executory Period"), Seller shall operate and maintain the Property in the ordinary course of business in accordance with prudent, reasonable business

-5-

standards, including the maintenance of adequate liability insurance and insurance against loss by fire, windstorm and other hazards, casualties and contingencies, including vandalism and malicious mischief, for the full replacement cost thereof and shall promptly notify Buyer of any material change to the Property.  During the Executory Period, Seller will not enter into any lease or contract affecting the Property that will survive the Closing without Buyer's prior written approval.

12.  **Condition of Property**.  **BUYER ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY WRITTEN OR ORAL REPRESENTATIONS, WARRANTIES OR STATEMENTS THAT SELLER OR SELLER'S AGENTS HAVE MADE. SUBJECT TO BUYER'S RIGHTS TO TERMINATE THIS AGREEMENT PURSUANT TO SECTION 10, BUYER IS PURCHASING THE PROPERTY IN "AS IS" AND "WHERE IS" CONDITION.**

Except as specifically set forth in this Agreement, Buyer acknowledges and agrees that it has not (and shall not) rely upon any statement and/or information from whomsoever made or given (including, but not limited to, any broker, attorney, agent, employee or other person representing or purporting to represent Seller) directly or indirectly, verbally or in writing, and Seller is not and shall not be liable or bound by any such statement or information.

Except as specifically set forth in this Agreement, Seller specifically disclaims any representation, warranty or guaranty with respect to the Property, express or implied, including, but not limited to, any representation or warranty as to the Property's condition, fitness for a particular purpose, quality, freedom from defects or contamination (whether or not detectable by inspection), compliance with zoning or other legal requirements or as to the availability or existence of any utility or other governmental or private services or as to the amount of taxes assessed to the Property.

Buyer, on behalf of itself and all future owners and occupants of the Property, hereby waives and releases Seller from any claims for recovery of costs associated with conduct of any voluntary action or any remedial responses, corrective action or closure under any applicable federal, state or local laws, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., as amended from time to time; and any similar federal, state and local laws and ordinances and the regulations and rules implementing such statutes, laws and ordinances. The foregoing waiver and release shall be set forth in the Deed and shall be binding upon all future owners and occupants of the Property.

13.  **Real Estate Taxes and Special Assessments.**  Buyer acknowledges that the Seller is a tax exempt entity and that the Property is currently exempt from base taxation. Notwithstanding the foregoing, the parties agree to pay the real estate taxes (which term, as used in this Agreement, includes service charges assessed against real property on an annual basis pursuant to Minnesota Statutes Section 429.101), if any, and special assessments as follows:

a.  On or before the Date of Closing, Seller shall pay or provide for the payment of the real estate taxes, service charges, special assessments and any penalties and interest due and payable with respect to the Property for all years prior to and

-6-

including the year of Closing (subject to a credit at Closing from Buyer pursuant to Section 13(c) below for Buyer's share of the real estate taxes due and payable in the year of Closing), including all real estate taxes and special assessments and interest which have been deferred pursuant to Minnesota Statutes Section 273.11, commonly known as the "Green Acres" statute;

b.      On or before the Date of Closing, Seller shall pay or provide for the payment of all special assessments levied or pending against the Property as of the Date of Closing, including all levied and pending special assessments and service charges;

c.      Buyer and Seller shall pro-rate the real estate taxes on a per-diem basis, using a calendar year, to the Date of Closing, with Buyer responsible for the Date of Closing and thereafter. The Parties will pro-rate these amounts using current year real estate tax information, if available, and, if current year real estate tax information is not available, using the amount of the Real Estate Taxes, Service Charges and Special Assessments due and payable in the year immediately preceding the year of Closing. Any such pro-rations will be final and no subsequent adjustments, refunds or additional payments will be made; and

d.      Buyer shall pay all real estate taxes due and payable, and all service charges and special assessments levied in the years following the year of Closing.

e.      Without limiting the generality of Section 12 above, Seller makes no representations with respect to the tax status of the Property and shall have no liability for any change in such status, whether occurring before or after the Closing.

14.      **Minnesota Required Statutory Disclosures**.  To the best of Seller's actual knowledge (i) there are no "wells" on the Real Property within the meaning of Minnesota Statute §103I.005, (ii) there are no underground or above ground storage tanks of any size or type located on the Property, (iii) sewage generated at the Property goes to a facility permitted by the Minnesota Pollution Control Agency, (iv) methamphetamine production has not occurred on the Property, and (v) there is no basis for Seller to record with the County Recorder or Registrar of Titles an affidavit described in Minnesota Statutes, § 115B.16, Subd. 2 indicating that there is "extensive contamination" on the Property.

15.      **Expenses**.  Buyer shall pay the following fees and closing expenses: (i) the Title Company closing fees, (ii) one-half of the cost of the Title Commitment, (iii) the cost of the Title Policy issued to Buyer, (iv) the cost of obtaining the Survey, (v) the deed tax imposed as a result of the recording of the Deed, and (vi) the cost to record the deed.  Seller will pay the following fees and closing expenses:  (i) one-half of the cost of the Title Commitment, and (ii) the cost of recording all documents necessary to place record title in the condition warranted by Seller in this Agreement (subject however to Permitted Encumbrances).  Except as otherwise provided in this Agreement, each party shall pay its own expenses associated with this transaction, including professional fees and expenses.

16.      **Bankruptcy Approval**.

7296377v5

a.      Buyer and Seller acknowledge that: (1) on January 16, 2015, the Seller filed a Voluntary Petition for relief under title 11 of the United States Code 11 U.S.C. §§ 101¬1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), (2) Seller's petition commenced a bankruptcy case currently pending in the Bankruptcy Court as Case No. 15-30125 (the "Bankruptcy Case") and (3) Seller is continuing in possession of its property and is operating and managing its business, as a debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

b.      As soon as practicable after expiration of the Due Diligence Period, Seller shall file a motion seeking two (2) orders from the Bankruptcy Court and shall thereafter diligently pursue entry of such orders.

c.      The first order to be sought shall be in form and substance reasonably acceptable to Buyer and Seller and shall approve certain bid and notice procedures related to the sale of the Property, including, without limitation, the following: (1) procedures and dates for Third-Party Purchasers (as hereinafter defined) to submit bids for the purchase of the Property; and (2) overbid procedures, in form and substance satisfactory to Seller (subparagraphs (1) and (2) are collectively defined as the "Bidding Procedures Order"). The second order to be sought shall be in form and substance reasonably acceptable to Buyer and Seller and shall approve Seller's sale of the Property either to Buyer in accordance with the terms and conditions of this Agreement or to a Third-Party Purchaser (the "Sale Order", and together with the Bidding Procedures Order, collectively, the "Orders").

d.      Seller shall propose that the Bidding Procedures Order (i) specify a period of thirty (30) days following entry of the Bidding Procedures Order for Third Party Purchasers (defined below) to submit qualified bids for the Property, (ii) require that any Third Party Purchaser submit a bid of at least $75,000.00 in excess of the Purchase Price on the same or better terms as the terms set forth in this Agreement, and (iii) provide for a final hearing on entry of the Sale Order within fourteen (14) business days following expiration of the deadline for submitting other bids for the Property, it being understood in all cases that the final form of the Bidding Procedures Order is subject to approval of the Bankruptcy Court with such modifications as the Bankruptcy Court may require.

e.      In the event that: (1) Seller is not able to obtain the Bidding Procedures Order within forty-five (45) days after the Effective Date (the "Bidding Procedures Date") or (2) Seller is not able to obtain the Sale Order within ninety (90) days after the Effective Date (the "Sale Order Date"), then, in each case, such non-event shall not constitute a default by Seller hereunder, but shall constitute a failure of a condition precedent to Seller's and Buyer's obligations to close. If either such condition is not satisfied on or before the Bid Procedures Date or Sale Order Date, as applicable, Seller and Buyer shall each have a right to terminate this Agreement by delivery of written notice to the other in which event the Earnest Deposit shall be returned to Buyer and neither of the Parties shall have any further rights or obligations hereunder except for obligations that specifically survive the termination of the Agreement.

-8-

f.      Seller reserves the right to obtain a higher and better bid for the Property pursuant to the Bidding Procedures Order and, if permitted by the Bidding Procedures Order, shall disclose such higher bid to Buyer at or prior to any auction that may be conducted under the Sale Order. In the event that: (1) the Bankruptcy Court approves a higher sale offer of a purchaser other than Buyer (a "Third-Party Purchaser"); (2) such sale to a Third-Party Purchaser closes; and (3) Buyer shall have performed all of Buyer's obligations under this Agreement, all closing conditions have been satisfied by Buyer, and Buyer is ready, willing, and able to proceed with Closing, then: (i) the Earnest Money shall be returned to Buyer, together with payment to Buyer for all out of pocket costs and expenses incurred by Buyer to third parties for the Survey, the Inspections and the Reports (provided the same have been made available to Seller), up to a total maximum amount of $25,000.00; and (ii) neither of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination of the Agreement. Notwithstanding anything contained herein to the contrary, in the event the Bankruptcy Court approves the sale to a Third-Party Purchaser and such Third-Party Purchaser fails to close on the acquisition of the Property in accordance with the terms of such Bankruptcy Court order, Buyer shall be obligated to purchase the Property in accordance with the terms of this Agreement.

17.      **Casualty Loss.**  If the improvements on the Property are substantially damaged prior to Closing, Seller will immediately notify Buyer, in writing of such damage.  Within twenty (20) days of Buyer's receipt of Seller's notice Buyer may, at Buyer's option, terminate this Agreement pursuant to Section 25 below.  If Buyer does not terminate this Agreement within said twenty (20) day period, the Parties will fully perform their obligations under this Agreement, and Seller will assign to Buyer Seller's rights to any and all insurance proceeds which Seller is entitled to receive on account of such casualty loss.  If, prior to the Date of Closing, the improvements on the Property are damaged less than substantially, at Buyer's option, Buyer may (i) proceed to Closing with an assignment of any and all insurance proceeds and payment of any deductible to Buyer or (ii) require Seller to repair such damage, and the Parties will proceed pursuant to the provisions of this Agreement with the Date of Closing extended for a period of time not to exceed one hundred twenty (120) days.  For purposes of this Section 17, the term "substantially damaged" will mean damage that requires repairs which cost more than twenty five percent (25%) of the Purchase Price.  At the request of either Party, the Parties will engage a general contractor licensed in the State of Minnesota to determine the cost of repairing damage to the Property.  Buyer will select the general contractor from a list of three contractors which Seller will prepare and deliver to Buyer within ten (10) days of the occurrence of damage to the improvements located on the Property.  Each Party will pay one-half of the contractor's fee.

18.      **Representations and Warranties By Seller**.  Seller represents and warrants to Buyer that, subject to the requirements of the Orders of the United States Bankruptcy Court.

a.      Seller is the debtor in the Bankruptcy Case and is currently operating as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.

b.      Seller is a duly organized and validly existing religious corporation under the laws of the State of Minnesota.  Subject to the contingency described in Section 20

-9-

below, Seller has the capacity and authority to execute this Agreement and perform the obligations of Seller under this Agreement and the person executing this Agreement on behalf of Seller has been duly authorized to sign and deliver this Agreement on behalf of Seller.  Upon satisfaction of the contingencies set forth in Sections 16 and 20 of this Agreement, this Agreement will be legally binding upon Seller and enforceable against Seller in accordance with all of its provisions.

        c.      Except as described in Section 16 hereof, Seller is not subject to any judgment or decree of a court of competent jurisdiction or governmental agency that would limit or restrict Seller's right to enter into and carry out this Agreement.

        d.      Seller is not a "foreign person," "foreign partnership," "foreign trust," or "foreign estate," as those terms are defined in Section 1445 of the Internal Revenue Code.

        e.      To Seller's knowledge, and except for leases or contracts that may be terminated at or before the Closing or retained by Seller during the term of the Lease, there are no leases or material contracts affecting the Property.

        f.      Neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Seller will constitute a breach under any contract or agreement to which Seller is a party or by which Seller is bound or affected.

        g.      To Seller's knowledge, neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Seller will constitute a breach under any contract or agreement to which Seller is a party or by which Seller is bounded or affected.

        h.      Except as set forth in Sections 16 and 20 of this Agreement below, no consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Seller's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

If Seller becomes aware of any occurrence, change in facts or change in circumstances that render any of the above representations or warranties untrue in any material respect as of the Date of Closing, Seller shall immediately notify Buyer.  Buyer may, as its sole and exclusive remedy, terminate this Agreement by notice to Seller given within ten (10) days after the date Buyer receives Seller's notice.  If Buyer terminates this Agreement, Seller shall cause the Earnest Money to be refunded to Buyer.  If Buyer fails to timely terminate this Agreement, Buyer is deemed to have waived the matter(s) described in Seller's notice to Buyer and the Parties shall fully perform their obligations under this Agreement, with Seller's representations and warranties deemed modified by the matters described in Seller's notice to Buyer.

      19.    **<u>Representations and Warranties By Buyer</u>**.  Buyer represents and warrants to Seller as of the Effective Date that:

        a.      Buyer is duly created and validly existing corporation under the laws of the State of Minnesota.

-10-

b.      Buyer has the capacity and authority to execute this Agreement and perform the obligations of Buyer under this Agreement. All action necessary to authorize the execution, delivery and performance of this Agreement by Buyer has been taken, and such action has not been rescinded or modified. Upon the execution of this Agreement, this Agreement will be legally binding upon Buyer and enforceable against Buyer in accordance with all of its provisions. The person signing this Agreement on behalf of Buyer has been duly authorized to sign and deliver this Agreement on behalf of Buyer.

c.      Buyer is not subject to any judgment or decree of a court of competent jurisdiction or governmental agency that would limit or restrict Buyer's right to enter into and carry out this Agreement.

d.      Neither the execution of this Agreement nor the consummation of the transactions contemplated herein by Buyer will constitute a breach under any contract or agreement to which Buyer is a party or by which Buyer is bound or affected.

e.      No consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Buyer's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

f.      Buyer has sufficient funds to consummate the transactions contemplated under this Agreement.  Buyer acknowledges that this Agreement is not subject to a financing contingency.

g.      To the knowledge of Buyer, none of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "USA Patriot Act").

h.      Buyer is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

i.      Buyer intends to use the Property for a senior housing facility.

Buyer shall fully disclose to Seller, immediately upon Buyer's becoming aware of its occurrence, any change in facts or circumstances of which Buyer becomes aware prior to the Closing Date that may affect the representations and warranties set forth above. In the event that any representation or warranty by Buyer is not accurate as of the Closing Date, Seller, as its sole and exclusive remedy, shall have the right to terminate this Agreement, in which event the Earnest Money shall be delivered and paid to Seller by

-11-

Escrow Agent and neither party hereto shall have any further obligations hereunder except for such obligations and indemnities which expressly survive the termination of this Agreement.

20.   **Seller Contingency.**

a.      In addition to the other contingencies set forth above, Seller's obligations under this Agreement are contingent upon Seller's receipt, within ten (10) days following the Effective Date ("Contingency Date"), of all consents and approvals required in connection with the sale of real property by a diocese or archdiocese of the Catholic Church, including, without limitation, the consent and approval of the Seller's finance counsel and College of Consultors and all other consents and waivers required under Canon Law.

b.      The foregoing Seller contingency shall be deemed satisfied or waived if Seller does not provide written notice to Buyer that one or more of the contingencies have not been satisfied or waived by the Contingency Date.  If for any reason or at any time prior to the Contingency Date Seller's Contingency is not satisfied or waived, in Seller's sole discretion, Seller may terminate this Agreement by written notice to Buyer, the Earnest Money shall be paid to Buyer, and thereafter this Agreement shall thereafter be void and of no further force or effect.

21.   **Restrictions on Use.**

a.      The parties acknowledge that (i) Seller is a religious corporation operated under the auspices of the Roman Catholic Church, (ii) the Property has been identified with the Seller by reason of its long-continued ownership and use by Seller, (iii) it is of the utmost importance to Seller that the Property not be used or altered in any way that would violate any of the covenants set forth below, (iv) Seller would not have entered into this Agreement had Buyer been unwilling to accept a Deed containing the covenants set forth below, and (v) any violation of any of the covenants set forth below will damage and harm the reputation and standing of the Seller as a religious corporation.

b.      Buyer acknowledges and agrees that the Deed will contain the following provisions and covenants which will run with the land, and except as otherwise provided herein will be enforceable for a period of thirty (30) years from the date of the Deed, as said 30 year term may be extended as provided in Minn. Stat. § 500.20 and be binding on the Buyer and its invitees, lessees, successors and assigns:

(i)      Buyer shall not permit any advertising or signs visible to bystanders to be placed on the Property that would disparage the Catholic Church or Seller or bring discredit, ridicule, criticism or scandal upon the Catholic Church or Seller.

(ii)     Buyer shall not use, permit or suffer the Property to be used or occupied for or in connection with the performance of abortions, or for any abortion related services or activities, or for performances of any procedures or any services or activities related to family planning, counseling or advice related

-12-

to or promotion abortions or family planning, sterilization, artificial insemination or euthanasia nor for the prescribed or dispending of an abortifacient, if such conduct violates the moral tenets or beliefs of the Roman Catholic Church or the Archdiocese of Saint Paul and Minneapolis or the rules and regulations thereof as promulgated from time to time, or the "Ethical and Religious Directive for Catholic Healthcare Services," issued by the United States Catholic Conference, as those doctrines and directives are modified, revised or amended from time to time.  The Buyer will not place any signs, literature or advertising relating to or promoting any such prohibited activities on the Property nor distribute the same on the Property.

(iii)    Buyer shall not permit the Property to be used for any obscene or pornographic purposes or activities including, without limitation, the sale or distribution of any obscene or pornographic material, a topless bar, X-rated or NC-rated movie theater, or similar establishment.

(iv)    Buyer shall not use or offer the Property to be used for purposes of astrology or fortune telling, casino or other similar establishment, and any use of the Property as a restaurant or bar shall be a secondary use only that is incidental to the primary use of the Property as, for example, a hotel that includes a restaurant or serves alcohol.

c.    The benefits and burdens referenced in this Section 21 shall each run with the land, benefitting the property set forth on Exhibit E attached hereto and burdening the Property, and shall bind the Buyer and its heirs, distributees, executors, administrators, successors and assigns.

d.    Seller may seek specific performance of any or all of the foregoing restrictions in a court having jurisdiction over the matter and may obtain from the Buyer, its successors or assigns or successors in title, as the case may be, all costs and expenses, including attorney's fees, incurred in the enforcement or defense of any of the foregoing use restrictions, and any other damages that may be suffered by Seller arising or resulting from a breach of the foregoing restrictions, or any of them.

e.    In the event that any of the above separate and distinct restrictions are adjudged invalid or unenforceable, such adjudication shall in no matter affect the other restrictions, which shall remain in full force and effect as if the portion or portions so adjudged invalid or unenforceable were not originally a part thereof.

f.    The foregoing restrictions may be removed in the sole discretion of the Seller or in any case where the Seller is no longer functioning as a diocese of the Roman Catholic Church by any successor corporation to Seller.  Upon application by an interested party, Seller shall provide its opinion of whether a proposed use constitutes a violation hereof to interested parties, including contract vendees, lessees, or potential purchasers at foreclosure sales.

-13-

g.     The Deed (or, if requested by Seller or Buyer, separate recordable instruction) shall contain such other provisions as may be required by Seller to effectuate the intent of this Section.

22.     **Condemnation.**  If a public or private entity with the power of eminent domain commences condemnation proceedings against all of any part of the Property, Seller must immediately notify Buyer, and Buyer may, at Buyer's sole option, terminate this Agreement pursuant to Section 25 below.  Notwithstanding the foregoing, Buyer may not terminate this Agreement if the condemnation is for a right-of-way or utility and such condemnation will not materially affect Buyer's intended use of the Property.  Buyer will have twenty (20) days from Buyer's receipt of Seller's notice to Buyer to exercise Buyer's termination right.  If Buyer does not exercise Buyer's termination right, then the Parties must fully perform their obligations under this Agreement, with no reduction in the Purchase Price, and Seller must assign to Buyer, on the Date of Closing, all of Seller's right, title and interest in any award made or to be made in the condemnation proceedings.  Seller may not designate counsel, appear or otherwise act with respect to any such condemnation proceedings without Buyer's prior written consent unless Buyer fails to respond within five (5) days to a request for written consent.

23.     **Default.**  If either Party defaults in the performance of any of the Party's obligations under this Agreement, then the non-defaulting Party may, after notice to the defaulting Party, suspend performance of its obligations under this Agreement and seek the following remedies as their sole and exclusive remedies:  In the event of Buyer's default or failure close the transaction contemplated by this Agreement, Seller may terminate this Agreement and retain the Earnest Money as liquidated damages.  Notwithstanding the foregoing, Seller does not waive any remedy contained in Section 10 hereof. In the event of Seller's default, Buyer's sole remedies are to (i) terminate this Agreement by notice to Seller and receive a refund of the Earnest Money, or (ii) if Seller's default is Seller's failure to close, commence an action for specific performance, provided Buyer commences such action within six (6) months after the date of Seller's failure to close.

24.     **Brokers**.  Buyer and Seller each represent and warrant that they have not been represented by any broker in connection with the sale of the Property, other than NorthMarq Real Estate Services, LLC (d/b/a Cushman and Wakefield) ("Seller's Broker"), and no commissions or fees are due to any other broker or finder by reason of either party's actions in this matter. Seller shall pay Seller's Broker pursuant to a separate commission agreement. The terms and conditions of this Agreement shall supersede all terms and conditions of any separate commission agreement. Buyer and Seller shall each be responsible for all liability, if any, for any broker or finder fees payable with respect to the sale of the Property that are attributable to its actions. Seller and Buyer shall and do each hereby indemnify, defend and hold harmless the other from and against the claims, demands, actions and judgments of any and all brokers, agents and other persons or entities alleging a commission, fee or other payment to be owing by reason of their respective dealings, negotiations or communications in connection with this Agreement or the purchase and sale of the Property, other than Seller's Broker. The indemnity obligations in this Section shall survive the termination of this Agreement or the Closing.

-14-

25. **Termination of this Agreement.**  Various Sections of this Agreement allow the Parties to terminate this Agreement under certain conditions.  The following procedures govern the Parties' exercise of their termination rights:

      a.      The terminating Party must notify the non-terminating Party of the terminating Party's intent to terminate this Agreement.

      b.      The notice must recite the Section of this Agreement that authorizes the terminating Party's termination of this Agreement and must describe the facts and circumstances which the terminating Party asserts justify termination under the referenced Section.

      c.      If the non-terminating Party disputes the terminating Party's right to terminate this Agreement, the non-terminating Party must so notify the terminating Party within three (3) business days after the non-terminating Party's receipt of the terminating Party's notice of termination.

      d.      If the non-terminating Party does not dispute the terminating Party's right to terminate the Agreement, the Parties shall execute a cancellation of this Agreement in form and substance reasonably acceptable to the Parties and, if requested by Seller, Buyer shall execute a recordable quit claim deed conveying the Property to Seller to evidence the termination of this Agreement.

      e.      If the Parties dispute the validity of an attempted termination of this Agreement, either Party may initiate an appropriate proceeding in the bankruptcy court to determine the status of this Agreement and the Party that prevails in any such action is entitled to recover the costs and reasonable attorneys' fees which such Party incurs in the action from the non-prevailing Party.  Upon a valid termination of this Agreement by Buyer, the Earnest Money shall be returned to Buyer and this Agreement shall become null and void and of no further force or effect, except for obligations that specifically survive the termination of this Agreement.

26. **Assignment.**  Buyer may not assign Buyer's rights and obligations under this Agreement to a third party without the prior written consent of Seller.  Seller may grant or withhold Seller's consent to an Assignment at Seller's sole discretion.

27. **Time.**  Time is of the essence for all provisions of this Agreement.

28. **Survival of Terms.**  The Parties' obligations under this Agreement survive Seller's delivery of a deed to Buyer and the closing of this transaction.

29. **Notices.**  All notices given under this Agreement must be in writing.  The notice will be effective as of the date the Party sending such notice deposits the notice with the United States Postal Service with all necessary postage paid, for delivery to the other Party via certified mail, return receipt requested, at the address set forth in Section 1 above.  If a Party delivers a notice provided for in this Agreement in a different manner than described in the preceding sentence, the notice is effective as of the date the other party actually receives the notice.  The

-15-

Party sending the notice must also mail a copy of the notice to the Parties' respective attorneys via first class United States Mail at the addresses set forth below:

|  |  |
|---|---|
| Attorney for Buyer: | Lindquist & Vennum LLP |
| | 4200 IDS Center |
| | 80 South Eighth Street |
| | Minneapolis, MN 55402 |
| | Attention: James R. Walston |
| | Phone: 612-371-3244 |
| | Fax: 612-371-3207 |
| | Email: jwalston@lindquist.com |
| | |
| Attorney for Seller: | Briggs and Morgan |
| | 2200 IDS Center |
| | 80 South Eighth Street |
| | Minneapolis, MN 55402 |
| | Attention: Richard D. Anderson |
| | Phone: (612) 977-8980 |
| | Fax:    (612) 977-8650 |
| | Email: randerson@briggs.com |

30.    **Full Agreement.**   The Parties acknowledge that this Agreement represents the full and complete agreement of the Parties relating to the purchase and sale of the Property and all matters related to the purchase and sale of the Property.   This Agreement supersedes and replaces any prior agreements, either oral or written, and any amendments or modifications to this Agreement must be in writing and executed by both Parties to be effective.

31.    **Governing Law.**   This Agreement has been made under the laws of the State of Minnesota and such laws control its interpretation.

(Remainder of page intentionally left blank; signatures pages follow)

-16-

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement to be effective as of the day and year first written above:

**SELLER:**

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS,
a Minnesota religious corporation

By: _____
Name: _THOMAS J. MERTENS_
Title: _CHIEF FINANCIAL OFFICER_

**Signature Page to Purchase Agreement - Seller**

S-1

**DRAFT 11/18/2015**

    IN WITNESS WHEREOF, the Parties hereto have executed this Agreement to be effective as of the day and year first written above:

**BUYER:**

UNITED PROPERTIES DEVELOPMENT
COMPANY, a Minnesota corporation

By: _____

Name: _Mark W. Nelson_____

Title: _Sr. Vice President_____

**Signature Page to Purchase Agreement - Buyer**

**EXHIBIT A**

**Legal Description of the Property**

Parcel 1:

Lots One (1) and Two (2) of Otis' Rearrangement of Lots 11, 12, 13, 14, 15, 16, and 17 of Block Sixty-four (64) in Dayton & Irvine's Addition to St. Paul, except those portions of said lots taken by the City of St. Paul for the relocation and widening of Summit Avenue, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof, according to the recorded plat thereof, Ramsey County, Minnesota.

Except all that part which lies southeasterly of the following described line:

> Beginning at the point of intersection of the southwesterly extension of the southeasterly line of Taylor Place with the northeasterly line of Lot 1 Fuller's Subdivision of Block 87, Dayton and Irvine's Addition to St. Paul; thence run southwesterly to the most westerly corner of Lot 7, Block 64 said Dayton and Irvine's Addition and there terminating.

(Abstract Property)

Parcel 2:

The northwesterly 1 foot of Lots Twelve (12), Thirteen (13), Fourteen (14) and Fifteen (15), Block Seventy (70) Dayton & Irvine's Addition to Saint Paul, according to the recorded plat thereof, Ramsey County, Minnesota.

(Abstract Property)

Parcel 3:

Lots 1, 2 and 3, Block 70, Dayton & Irvine's Addition, according to the recorded plat thereof, Ramsey County, Minnesota, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof.

Being Registered land as is evidenced by Certificate of Title No. 127582.

## EXHIBIT B

### Escrow Agreement

FILE NO. _____

## ESCROW AGREEMENT

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation ("Seller"), and United Properties Development Company are parties to the purchase and sale of the real estate described in the attached Purchase Agreement, dated _____ _____ ("Purchase Agreement").  As provided in Section 5 of the Purchase Agreement, Buyer hereby deposits the sum of $50,000.00 (the "Earnest Money") with Guaranty Commercial Title, Inc. (the "Title Company").  The Title Company will hold the Earnest Money in an interest bearing account, if such account is reasonably available, with an institution whose accounts are insured by a governmental agency or instrumentality.  If interest accrues on the Earnest Money it will accrue to Buyer unless Buyer defaults under the terms of the Purchase Agreement and Seller retains the Earnest Money as liquidated damages in which case Seller will be entitled to such interest, if any.

Upon notification by both parties in writing that the transaction has closed, the Title Company will pay the Earnest Money to Seller.  If either party notifies the Title Company that the transaction has not closed, the Title Company will pay the Earnest Money as follows:

1.     Upon receipt of instruments regarding the release of the Earnest Money executed by both parties the Title Company will deliver the Earnest Money pursuant to such instructions;

2.     If Seller delivers a Notice of Cancellation of Purchase Agreement describing the Purchase Agreement and the Property, as defined therein, together with an Affidavit of Service evidencing service of the Notice of Cancellation on Buyer and an Affidavit of Failure to Comply with Notice completed, executed and acknowledged to the Title Company on or before the date sixty (60) days after the Date of Closing as defined in the Purchase Agreement, the Title Company will deliver the Earnest Money to Seller.

3.     If no disposition of the Earnest Money has been made by the date sixty (60) days from the Date of Closing, as defined in the Purchase Agreement, the Title Company will return the Earnest Money to Buyer.

The Title Company will have no responsibility for any decision concerning performance or effectiveness of the Purchase Agreement, and will only be responsible to act pursuant to the procedures set forth above.  Buyer and Seller hereby agree to hold the Title Company harmless from any claims or defenses arising out of this Escrow Agreement and indemnify the Title Company for all costs and expenses in connection with this escrow, including court costs, attorneys' fees, except for claims arising out of the Title Company's failure to account for the funds held and costs and expenses incurred by the parties in connection with such a claim.

B-1

To the extent that the provisions of this Escrow Agreement are inconsistent with the provisions of **Section** _____ of the Purchase Agreement, the provisions of this Escrow Agreement will control.

The Title Company's fee for acting as an escrow agent is $_____.  Buyer and Seller hereby agree to share such cost equally.

| **SELLER:** | **BUYER:** |
|---|---|
| THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation | UNITED PROPERTIES DEVELOPMENT COMPANY, a Minnesota corporation |
| **By:** _____ | **By:** _____ |
| **Its:** _____ | **Its:** _____ |
| **Address:** | **Address:** |
| 328 West Kellogg Boulevard, St. Paul, Minnesota 55102 | 3600 American Boulevard, Suite 750 Minneapolis, MN  55431 |
| Attn: _____ | |
| **Taxpayer Identification Number :** | **Taxpayer Identification Number:** |
| _____ | _____ |

The Title Company hereby acknowledges receipt of this Agreement and the Earnest Money, to hold the Earnest Money as above specified.

Dated this _____ day of _____, 2015.

Guaranty Commercial Title, Inc.

By: _____

Its: _____

B-2

FILE NO. 61674

## ESCROW AGREEMENT

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation ("Seller"), and United Properties Development Company are parties to the purchase and sale of the real estate described in the attached Purchase Agreement, dated November 30, 2015 ("Purchase Agreement"). As provided in Section 5 of the Purchase Agreement, Buyer hereby deposits the sum of $50,000.00 (the "Earnest Money") with Guaranty Commercial Title, Inc. (the "Title Company"). The Title Company will hold the Earnest Money in an interest bearing account, if such account is reasonably available, with an institution whose accounts are insured by a governmental agency or instrumentality. If interest accrues on the Earnest Money it will accrue to Buyer unless Buyer defaults under the terms of the Purchase Agreement and Seller retains the Earnest Money as liquidated damages in which case Seller will be entitled to such interest, if any.

Upon notification by both parties in writing that the transaction has closed, the Title Company will pay the Earnest Money to Seller. If either party notifies the Title Company that the transaction has not closed, the Title Company will pay the Earnest Money as follows:

1.  Upon receipt of instruments regarding the release of the Earnest Money executed by both parties the Title Company will deliver the Earnest Money pursuant to such instructions;

2.  If Seller delivers a Notice of Cancellation of Purchase Agreement describing the Purchase Agreement and the Property, as defined therein, together with an Affidavit of Service evidencing service of the Notice of Cancellation on Buyer and an Affidavit of Failure to Comply with Notice completed, executed and acknowledged to the Title Company on or before the date sixty (60) days after the Date of Closing as defined in the Purchase Agreement, the Title Company will deliver the Earnest Money to Seller.

3.  If no disposition of the Earnest Money has been made by the date sixty (60) days from the Date of Closing, as defined in the Purchase Agreement, the Title Company will return the Earnest Money to Buyer.

The Title Company will have no responsibility for any decision concerning performance or effectiveness of the Purchase Agreement, and will only be responsible to act pursuant to the procedures set forth above. Buyer and Seller hereby agree to hold the Title Company harmless from any claims or defenses arising out of this Escrow Agreement and indemnify the Title Company for all costs and expenses in connection with this escrow, including court costs, attorneys' fees, except for claims arising out of the Title Company's failure to account for the funds held and costs and expenses incurred by the parties in connection with such a claim.

To the extent that the provisions of this Escrow Agreement are inconsistent with the provisions of **Section 23** of the Purchase Agreement, the provisions of this Escrow Agreement will control.

1

7342214v1

The Title Company's fee for acting as an escrow agent is $ _0.00._   . Buyer and Seller hereby agree to share such cost equally.

**SELLER:**

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS, a Minnesota religious
corporation

By: _____

Its: _CHIEF FINANCIAL OFFICER_

**Address:**

328 West Kellogg Boulevard, St. Paul,
Minnesota 55102
Attn: _THOMAS J. MERTENS_
**Taxpayer Identification Number :**
_41-0693908_

**BUYER:**

UNITED PROPERTIES DEVELOPMENT
COMPANY, a Minnesota corporation

By: _____

Its: _____

**Address:**

3600 American Boulevard, Suite 750
Minneapolis, MN  55431

**Taxpayer Identification Number:**
_____

The Title Company hereby acknowledges receipt of this Agreement and the Earnest Money, to hold the Earnest Money as above specified.

Dated this ~~30th~~ 1st day of ~~December,~~ 2015.
                30th    November

Guaranty Commercial Title, Inc.

By: _____

Its: _President._

2

The Title Company's fee for acting as an escrow agent is $_____.  Buyer and Seller hereby agree to share such cost equally.

**SELLER:**

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation

By: _____

Its: _____

**Address:**

328 West Kellogg Boulevard, St. Paul, Minnesota 55102
Attn: _____
**Taxpayer Identification Number :**
_____

**BUYER:**

UNITED PROPERTIES DEVELOPMENT COMPANY, a Minnesota corporation

By: _____

Its: _SR. V.P._

**Address:**

3600 American Boulevard, Suite 750
Minneapolis, MN  55431

**Taxpayer Identification Number:**
_47-2653436_

The Title Company hereby acknowledges receipt of this Agreement and the Earnest Money, to hold the Earnest Money as above specified.

Dated this 30th day of ~~December~~, 2015.
November

Guaranty Commercial Title, Inc.

By: _____

Its: _____

2

**EXHIBIT C**

**Form of Lease**

**[ATTACHED]**

7296377v5

# LEASE

THIS LEASE, made and entered into effective as of the ___ day of _____, 2016 (the "Effective Date"), by and between UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company (the "Landlord") and THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation (the "Tenant").

## W I T N E S S E T H:

1.    **Leased Premises**.  In consideration of the rents, terms, provisions and covenants of this Lease, Landlord hereby leases, lets, and demises to Tenant that certain real estate located at 226 and 230 Summit Avenue, St. Paul, Minnesota (the "Leased Premises").

2.    **Term**.  Subject to and upon the conditions set forth below, the term  of this Lease shall commence on the Effective Date and terminate on June 30, 2016 (the "Initial Term"), and shall thereafter continue until termination of this Lease by either party upon three (3) months' prior written notice. Any written notice given pursuant to the terms of this Section shall be delivered on or before the first day of a calendar month, and the Lease will terminate on the last day of the calendar month which must be at least three (3) months after such notice is given.

3.    **Base Rent**.  During the Initial Term and any extensions thereof, pursuant to Section 2, Landlord and Tenant agree that Tenant's occupancy of the Leased Premises shall be on a Base Rent-free basis. Tenant hereby covenants and agrees to pay for utilities, repair, and maintenance at the Leased Premises, subject to Sections 5 and 6, below.

4.    **Use of Premises**.

(a)    Tenant may use and occupy the Leased Premises for its current purposes, provided that Tenant's use and occupancy shall always be in compliance with all applicable laws, ordinances, rules, regulations, covenants and restrictions affecting the Leased Premises and promulgated by duly constituted governmental authorities affecting the cleanliness, safety and occupation of the Leased Premises.

(b)    Landlord and Tenant acknowledge that the Leased Premises include parking lots (the "Parking Lots") with approximately twenty-five (25) parking spaces. The Tenant shall have exclusive access to the Parking Lots included in the Leased Premises during the term of the Lease.

(c)    Tenant shall keep the Leased Premises in a clean, safe, sanitary and first-class condition (ordinary wear and tear and casualty damage excepted), and clean and free from rubbish and dirt at all times, shall not permit an unreasonable accumulation of snow and ice on the sidewalks, staircases and entrance areas that are part of the Premises and shall store all trash and garbage within the Leased Premises.  Tenant shall not permit an unreasonable accumulation of snow and ice on the parking lot.

5.    **Utilities**.  Tenant agrees to procure and promptly pay directly to the provider all bills for electricity, gas, heat, fuel oil, water, sewer, telephone internet and any and all other

utilities used in the Leased Premises during the term of this Lease.  In no event shall Landlord be responsible or liable for any interruption in the supply of any utilities to the Leased Premises.

6.     **Repairs and Maintenance**.  Tenant shall, at its own cost and expense, maintain the Leased Premises and all improvements thereon in good repair and condition (ordinary wear and tear and casualty damage excepted) throughout the term of this Lease including repair of all doors, windows and glass that may become damaged during the Term of this Lease.  Tenant shall not use the Leased Premises in any way which would constitute waste.  Notwithstanding any contrary language in this Lease, Tenant is not responsible for making any repairs or replacements that would be considered capital repairs or replacements under generally accepted accounting principles, consistently applied. Tenant will maintain the heating, ventilation and air-conditioning systems and all mechanical systems in the Building in good condition and provide Landlord with notice of any required repairs.  Landlord shall make any and all such capital repairs and replacements at its sole cost and expense.

7.     **Installations and Alterations**.

(a)     Tenant shall have the right to install its own trade fixtures and equipment, which shall at all times remain its property, and shall have the right to remove the same immediately upon the expiration or earlier termination of this Lease, provided that Tenant repairs any damage occasioned by the removal thereof.

(b)     Tenant shall not make any structural or non-structural alterations or additions, or make any contracts therefor, without first procuring the Landlord's written consent, which consent Landlord may withhold in its sole discretion.

8.     **Americans with Disabilities Act**.  Landlord makes no representations or warranties that the Leased Premises complies with the Americans with Disabilities Act or the regulations promulgated thereunder ("ADA") or any other governmental regulations regarding accessibility to the Leased Premises ("Regulations").  Landlord shall not be responsible for any alterations or additions to the Leased Premises or other portions of the building of which the Leased Premises are a part which may be required by the ADA or any Regulations because of Tenant's use of the Leased Premises.

9.     **As-Is**.  Tenant accepts the Leased Premises in its present condition, as-is, and without any representation or warranty by Landlord as to the condition of the Leased Premises or its suitability for Tenant's use or occupancy.

10.     **Mutual Release of Claims**.  Each party hereto expressly waives any and all claims which arise or may arise in his or its favor and against the other party hereto, or its respective agents or employees, during the term of this Lease or any extension thereof, for any and all loss of or damage to any of its property located within or upon or constituting a part of the building of which the Leased Premises are a part, resulting from any peril or risk covered by the casualty insurance in effect as of the date of such loss or damage or required by this Lease, notwithstanding said injury or damage is caused by the negligence of either of the parties hereto, their agents, servants or employees.  Each of the parties agrees to look to its own insurance

2

carrier for recovery of any damage sustained to its property, hereby waiving any rights of subrogation against the other.

11. **Insurance**.

(a)    Tenant shall, at all times during the term of this Lease, at its sole cost and expense, maintain a policy or policies of direct damage insurance covering all hazards covered by the so-called "all risk" form of policy on a replacement cost basis in an amount equivalent to the full insurable value of the Leased Premises and improvements thereon, naming Landlord as an additional insured ("Property Insurance"). Full insurable value for purposes of this section shall include the actual replacement cost of the improvements and contents therein, including the fixtures and equipment, architectural, engineering, legal and administrative fees.

(b)    Each party shall, at all times during the term of this Lease, at its sole cost and expense, maintain a policy or policies of comprehensive general liability insurance insuring against liability for injuries to or death of any person or damage to or loss of property arising on, out of, or in any way relating to the Leased Premises, or any part thereof, in a minimum amount equal to $1,000,000, naming the other party as an additional insured.

(c)    All policies of insurance required in the preceding subsections, where appropriate, shall be written in the names of the Landlord, the Tenant and any mortgagee designated by Landlord, as insureds, as their respective interests may appear. Each party agrees that its policy or policies of Property Insurance shall contain a waiver of subrogation clause as to the other party. Each such policy of insurance maintained by a party shall contain a provision that the insurer shall not cancel, refuse to renew or materially modify it without giving written notice to the other party, and any mortgagee named, at least thirty (30) days before a cancellation, non-renewal or modification becomes effective. If requested by a party, the other party shall furnish the party with proof reasonably satisfactory to the party of payment of the premiums due on such insurance from time to time. If either party fails to maintain any of the insurance required by this section, the other party may obtain such insurance and keep the same in full force and effect, and the party failing to maintain the insurance shall reimburse the other party, immediately upon notice of such payment by the party that obtains the insurance.

12. **Damage or Destruction**. If the Leased Premises is damaged by fire or other casualty, either party may terminate this Lease by notice to the other. If this Lease is not terminated, Landlord and Tenant jointly shall utilize the insurance proceeds to the extent available to repair the damage or destruction with reasonable promptness, subject to delays beyond their control, and this Lease shall continue during such repair, and Tenant's payment of rent shall abate during the repair period. Under no circumstances shall Landlord's obligation exceed the insurance proceeds available by reason of such damage or destruction.

7308354v3

13.     **Eminent Domain**.

(a)     If the whole of the Leased Premises or any part thereof is taken by any public authority under the power of eminent domain or taken in any manner for any public or quasi-public use, this Lease will terminate as of the date of the taking.  Any and all damages awarded for such taking under the power of eminent domain or any like proceedings belong to and are solely the property of Landlord.

(b)     Anything in this Section to the contrary notwithstanding, Tenant has the right to prove in any condemnation proceedings and to receive any separate award or allocation which may be made for damages to or condemnation of Tenant's trade fixtures, for moving expenses, and for relocation benefits as provided in federal or Minnesota statutes; provided, however, Tenant has no right to receive any award for its interest in this Lease or for loss of leasehold.

14.     **Assignment and Subletting**. Except as set forth below, Tenant shall not assign or in any manner transfer this Lease or any interest therein, nor sublet the Leased Premises or any part or parts thereof, or permit occupancy by anyone with, through or under it, without the previous written consent of Landlord.

15.     **Access to Leased Premises**.  Landlord shall have the right to enter upon the Leased Premises at any reasonable time during regular business hours (8:00 a.m. to 5:00 p.m., Monday to Friday of each week) and upon reasonable advance notice for the purposes of inspecting the same.

16.     **Default by Tenant and Landlord's Remedies**.

(a)     The following shall be Events of Default by Tenant under this Lease:

(i)     The continued failure by Tenant to comply with any covenant or condition under this Lease after thirty (30) days written notice of such failure to Tenant.

(ii)    The doing, or permitting to be done by Tenant, of any act which creates a mechanic's lien or claim therefor against the land or buildings of which the Leased Premises are a part, which is not discharged within ten (10) days following the filing of a mechanic's lien claim;

(b)     Upon the occurrence of any Event of Default set forth above, Landlord may pursue any and all rights and remedies available to Landlord at law or in equity.  If Landlord defaults in the performance of its obligations under this Lease and has not cured such default within 30 days after notice of such default from Tenant, Tenant may pursue any and all rights and remedies available to Tenant at law or in equity.

17.     **Surrender of Possession.**

(a)     At the expiration of the tenancy created hereunder, whether by lapse of time or otherwise, Tenant shall promptly remove all personal property belonging to

4

Tenant or persons claiming through Tenant and surrender the Leased Premises in good condition and repair, broom-clean, ordinary wear and tear and casualty loss excepted, provided, however, that Tenant surrender and permit Landlord to use and retain the front reception desk located in the Leased Premises.

(b)    If Tenant remains in possession of the Leased Premises after the expiration of the term and without the execution of a new lease, it shall be deemed to be occupying the Leased Premises as a tenant from month-to-month, subject to all of the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

18.    **Notices.**  Wherever under this Lease a provision is made for notice of any kind, such notice shall be in writing and signed by or on behalf of the party giving or making the same, and it shall be deemed sufficient and effective notice on the date it is delivered or deposited in the U.S. Mail, registered or certified mail, postage prepaid, to Tenant at the address of the Leased Premises and to Landlord at the place then fixed for the payment of rent.  By notice in the manner above set forth, either party may designate a different location to which notice shall be sent.

19.    **Quiet Possession**.  Landlord covenants that Tenant, upon performing the covenants and agreements to be performed by it, will have, hold and enjoy quiet possession of the Leased Premises.

20.    **General.**

(a)    The various rights and remedies herein contained and reserved to each of the parties hereto shall not be considered as exclusive of any other right or remedy of such party, but shall be construed as cumulative and shall be in addition to every other remedy now or thereafter existing at law, in equity, or by statute.  No delay or omission of the right to exercise any power by either party shall impair any such right or power or shall be construed as a waiver of any default, or as acquiescence herein.  One or more waivers of any covenant, term or condition or this lease by either party shall not be construed by the other party as a waiver or any subsequent breach of the same covenant, term or condition.  The consent or approval by either party to or of any act by the other party of a nature requiring consent or approval shall not be deemed to waive or render unnecessary consent or approval of a subsequent similar act.

(b)    The headings of the several articles contained herein are for convenience only and do not define, limit or construe the contents of such articles.

(c)    The covenants, agreements and obligations herein contained shall extend to, bind or inure to the benefit not only of the parties herein, but their respective successors and assigns.

(d)    Whenever a period of time is herein provided for the Landlord or Tenant to do or perform any act or thing, Landlord or Tenant, as appropriate, shall not be liable or responsible for any delays due to strikes, riots, acts of God, shortages of labor or materials, national emergency, acts of a public enemy, governmental restrictions, laws or

5

regulations or any other cause or causes whatever, whether similar or dissimilar to those enumerated, beyond its or their control.

(e)    Tenant shall not record this Lease without the written consent of Landlord.

(f)    The laws of the State of Minnesota shall govern the validity, performance and enforcement of this Lease.

(g)    The invalidity or enforceability of any provision of this Lease shall not affect or impair the validity of any other provision.

(h)    This Lease constitutes the entire agreement of the parties in respect of the lease by Tenant of the Leased Premises and there are no understandings or agreements not incorporated in this Lease.  This Lease may not be modified except in writing executed by all parties hereto, or their permitted assignees.

(i)    Landlord and Tenant acknowledge that: (1) on January 16, 2015, Tenant filed a Voluntary Petition for relief under title 11 of the United States Code 11 U.S.C. Sections 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court"), (2) Tenant's petition commenced a bankruptcy case currently pending in the Bankruptcy Court as Case No. 15-30125 (the "Bankruptcy Case") and (3) Tenant is continuing in possession of its property and is operating and managing its business, as a debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The Bankruptcy Court has approved the sale of Tenant's interest in the Leased Premises to Landlord and the lease-back of the Leased Premises from Landlord pursuant to the terms of this Lease.  Tenant represents it has authority to execute this Lease and perform its obligations hereunder.

(j)    Landlord and Tenant represent that neither of them has been represented by a real estate broker or salesperson in connection with this Lease.

[*Remainder of page intentionally left blank; signature page follows*]

6

**IN WITNESS WHEREOF,** Landlord and Tenant have hereunto executed this Lease as of the date and year first above written.

**LANDLORD**:

UNITED   PROPERTIES   DEVELOPMENT
LLC, a Minnesota limited liability company

By: _____
Name: _____
Title: _____

**TENANT**:

THE ARCHDIOCESE OF SAINT PAUL
AND   MINNEAPOLIS,   a   Minnesota   religious
corporation

By: _____
Name: _____
Title: _____

7308354v3

**EXHIBIT D**

**Form of View Easement Agreement**

**[ATTACHED]**

7296377v5

## VIEW EASEMENT AGREEMENT

THIS VIEW EASEMENT AGREEMENT (the "Agreement"), made and entered into this ____ day of _____, 2016, by and between the UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company ("Burdened Party"), and, THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation (the "Benefitted Party;" together, the Burdened Party and Benefitted Party shall be collectively referred to as the "Parties").

### WITNESSETH:

WHEREAS, the Benefitted Party is the owner of The Cathedral of Saint Paul (the "Cathedral"), located at 239 Selby Avenue, St. Paul, Minnesota, and such other neighboring property as is legally described on the attached Exhibit A (the "Benefitted Property"), made a part hereof;

WHEREAS, contemporaneously herewith, the Burdened Party has purchased from the Benefitted Party the real property located at 226 and 230 Summit Avenue, St. Paul, Minnesota, commonly known as The Chancery and such bishop's residence, and legally described on the attached Exhibit B (the "Burdened Property"), made a part hereof;

WHEREAS, as a condition to the sale of the Burdened Property and in order to protect views from and of the Cathedral, the Benefitted Party has required and the Burdened Party has agreed to grant, for the benefit of the Benefitted Property owner an easement for an unobstructed view of and to the Cathedral which limits the height of any structure, building, or construction of any kind on the Burdened Property to the elevation set forth below and subject to the terms and conditions contained herein.

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the covenants herein contained, the said parties for themselves and their respective successors and assigns covenant and agree to and with each other as follows:

1.      Easement Grant.  So long as the Cathedral situated on the Benefitted Property remains thereon, subject to the right to rebuild and/or restore described below, no structure, building, improvement, or construction of any kind shall be erected, constructed, or placed on any part of the Burdened Property which rises above five (5) stories or fifty (50) feet in height, so as to maintain an unobstructed view of and to the Cathedral. Notwithstanding the above, in the event of any damage or destruction to the Cathedral or a portion thereof, such damage or destruction shall not constitute a failure of the Cathedral to remain situated on the Benefitted Property unless the following criteria are met:

    a) Five (5) years after such damage or destruction to the Cathedral have elapsed; and

1

7308493v4

b) No efforts to rebuild or restore the Cathedral have begun during this five (5)-year period.

2.    <u>Duration</u>.  Subject to Section 1 above, this Agreement shall (i) be perpetual in nature, (ii) accrue to and be binding upon the Parties, their respective legal representatives, heirs, successors, assigns, and any and all tenants of the Benefitted Property and Burdened Property, and (iii) create mutual benefits and covenants running with the benefitted and burdened land, as herein set forth.

3.    <u>Default, Remedies and Enforcement</u>. The Parties agree that if the Burdened Party defaults in the performance of any covenant or the observance of any restriction set forth in this Agreement, the Benefitted Party may:

a) Demand, upon written notice to the Burdened Party, that erection, construction or placement of such structure, building, improvement, or construction failing to comply with the requirements of Section 1 (a "Non-conforming Structure"), be immediately halted and the Non-Conforming Structure shall be removed by the Burdened Party at its sole cost and expense; and

b) Commence an action in a court of competent jurisdiction to pursue any and all remedies available in equity including, but not limited to a temporary restraining order, temporary injunction, permanent injunction, specific performance or other equitable relief.  The Parties recognize that there is no adequate remedy for breach of or default under the terms of this Agreement at law and further agree that all criteria related to the issuance of any injunctive relief is hereby waived.

4.    <u>Entire Agreement</u>.  This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed by all Parties to this Agreement, which is recorded in Ramsey County, Minnesota.  This Agreement constitutes the entire agreement between the Parties with respect to the matters set forth herein and supersedes all prior negotiations, discussions, writings and agreements between them in connection therewith.

5.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

6.    <u>Partial Invalidity</u>.  Should any one or more of the provisions of this Agreement be determined to be invalid, unlawful or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby unless as a result the purpose and intent of this Agreement shall thereby be substantially and essentially impaired.  In such event, the Parties shall diligently proceed to revise this Agreement in order to re-memorialize such purpose and intent.

7.    <u>Attorneys' Fees</u>.  In the event of any controversy, claim or dispute relating to this Agreement, the prevailing party in a non-appealable judicial resolution of such controversy, claim or dispute shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

2

8.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally blank; signature pages follow]*

3

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**BURDENED PARTY:**

UNITED PROPERTIES DEVELOPMENT
LLC, a Minnesota limited liability company

By: _____

Name: _____

Title: _____

STATE OF MINNESOTA          )
                            )  SS.
COUNTY OF _____        )

This instrument was acknowledged before me as of the _____ day of _____, 2016, by _____, the _____ of United Properties Development LLC, a Minnesota limited liability company, on behalf of such limited liability company.

WITNESS my hand and official seal this _____ day of _____, 2016.

_____
Notary Public

My Commission Expires _____

7308493v4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**BENEFITTED PARTY:**

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS,
a Minnesota religious corporation

By: _____

Name: _____

Title: _____

STATE OF MINNESOTA      )
                                          )  SS.
COUNTY OF _____    )

This instrument was acknowledged before me as of the _____ day of _____, 2016, by _____, the _____ of The Archdiocese of Saint Paul and Minneapolis, a Minnesota religious corporation, on behalf of such corporation.

WITNESS my hand and official seal this _____ day of _____, 2016.

_____
Notary Public

My Commission Expires _____

Document Drafted By:

Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

7308493v4

**EXHIBIT A**

**Legal Description of the Benefitted Property**

The land referred to is situated in the State of Minnesota, County of Ramsey, and is described as follows:

Parcel A:

Lot 1 of "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota and part of Summit Avenue vacated and adjacent thereto.

(Abstract property)

Parcel B:

Lot 2, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel C:

Lot 3, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel D:

The West 10 feet of Lot 3, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel E:

Lot 5, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel F:

The West 10 feet of Lot 4, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

7308493v4

(Abstract Property)

Parcel G:

Lot 5, except the West 10 feet thereof, and the South 25 feet of Lot 6, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel H:

The South one-half of Lot 7, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel I:

Intentionally omitted.

Parcel J:

Lots 29 and 30, "Auditor's Subdivision No. 52 St. Paul Minn.", Ramsey County, Minnesota.

(Abstract property)

Parcel K:

Lots one (1) and two (2) of Auditor's Subdivision No. 52, St. Paul, Minn., according to the recorded pat thereof on file and of record in the office of the Register of Deeds in and for Ramsey County, Minnesota.

Torrens property – Certificate of Title No. 81052)

A-2

## EXHIBIT B

### Legal Description of the Burdened Property

<u>Parcel 1:</u>

Lots One (1) and Two (2) of Otis' Rearrangement of Lots 11, 12, 13, 14, 15, 16, and 17 of Block Sixty-four (64) in Dayton & Irvine's Addition to St. Paul, except those portions of said lots taken by the City of St. Paul for the relocation and widening of Summit Avenue, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof, according to the recorded plat thereof, Ramsey County, Minnesota.

Except all that part which lies southeasterly of the following described line:

> Beginning at the point of intersection of the southwesterly extension of the southeasterly line of Taylor Place with the northeasterly line of Lot 1 Fuller's Subdivision of Block 87, Dayton and Irvine's Addition to St. Paul; thence run southwesterly to the most westerly corner of Lot 7, Block 64 said Dayton and Irvine's Addition and there terminating.

(Abstract Property)

<u>Parcel 2:</u>

The northwesterly 1 foot of Lots Twelve (12), Thirteen (13), Fourteen (14) and Fifteen (15), Block Seventy (70) Dayton & Irvine's Addition to Saint Paul, according to the recorded plat thereof, Ramsey County, Minnesota.

(Abstract Property)

<u>Parcel 3:</u>

Lots 1, 2 and 3, Block 70, Dayton & Irvine's Addition, according to the recorded plat thereof, Ramsey County, Minnesota, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof.

Being Registered land as is evidenced by Certificate of Title No. 127582.

B-1



November 23, 2015


Mr. Joseph Kueppers
Mr. Thomas Mertens
The Archdiocese of Saint Paul and Minneapolis
226 Summit Avenue
St. Paul, MN 55402


Re: **Proposed Purchase and Sale Agreement for the Chancery Building—Buyer to assume cost for Phase I ESA Tests.**

Dear Messrs. Kueppers and Mertens:

On behalf of United Properties Development Company ("Buyer"), this letter is intended to become part of the November 30, 2015 Purchase Agreement ("Purchase Agreement") between the Archdiocese of St. Paul and Minneapolis ("Seller") and Buyer for the property known as the "Chancery Building" located at 226/230 Summit Avenue, St. Paul, MN, notwithstanding Section 30 of the Purchase Agreement. It is my understanding that this letter will be submitted as part of the Archdiocese's bankruptcy proceeding to authorize the sale of the Chancery Building.

Provided Buyer is the successful party to close on the sale of the Chancery Building per the terms of the Purchase Agreement, Buyer will reimburse Seller for Seller's costs in connection with obtaining the Phase I ESA from Braun Intertec in the amount of $2,200.00.

Please acknowledge the content of this letter, by signing below.

Sincerely,

UNITED PROPERTIES DEVELOPMENT COMPANY


Mark W. Nelson
Senior Vice President / Development



Acknowledged:

_____
Authorized on behalf of the Archdiocese of St. Paul and Minneapolis

## AMENDMENT TO PURCHASE AGREEMENT

**THIS AMENDMENT TO PURCHASE AGREEMENT** (the "Amendment") is made as of January 6th, 2016 ("Effective Date"), by and between THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation ("Seller"), and UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company ("Buyer").

## RECITALS:

A.    Seller and UNITED PROPERTIES DEVELOPMENT COMPANY ("UP"), as buyer, entered into that certain Purchase Agreement dated as of November 30, 2015, as modified by that certain letter agreement between Seller and UP dated November 23, 2015, whereby Seller agreed to sell to UP, and UP agreed to buy from Seller, certain real property located in Ramsey County, Minnesota, as more particularly described, and upon certain terms and conditions set forth, in the Purchase Agreement (together, the "Purchase Agreement"). Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Purchase Agreement.

B.    It has come to the attention of Seller and UP that the correct Buyer entity name for purposes of the sale transaction referenced in Recital A above is UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company.

## AGREEMENTS:

Now, therefore, in consideration of the Recitals and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Buyer-entity Name</u>.    All references to Buyer or UNITED PROPERTIES DEVELOPMENT COMPANY in the Purchase Agreement, Exhibits or attachments to the Purchase Agreement, and in any other accompanying or related documents are hereby changed to and replaced with the following intended entity: UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company.

2.    <u>Miscellaneous</u>.    Except as specifically set forth in this Amendment, all terms and conditions in the Purchase Agreement shall remain in full force and effect.    This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but together shall constitute one agreement.

3.    <u>Electronic Signatures</u>.    This Amendment may be executed and delivered via facsimile or email (.pdf) with the same force and effect as if an original of this Amendment were executed and delivered.

*[Remainder of page intentionally left blank; signature pages follow]*

1

IN WITNESS WHEREOF, Seller and Buyer have executed this Amendment as of the day and year first above written.

**SELLER:**

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS,
a Minnesota religious corporation

By: _____
Name: _THOMAS  J.  MERTENS_
Its: _CFO_

[Signature Page to Amendment to Purchase Agreement - Seller]

IN WITNESS WHEREOF, Seller and Buyer have executed this Amendment as of the day and year first above written.

**BUYER:**

UNITED   PROPERTIES   DEVELOPMENT
LLC, a Minnesota limited liability company

By: _____
Name: _____
Its: _____

[Signature Page to Amendment to Purchase Agreement - Buyer]

**EXHIBIT C**

**FINAL FORM OF VIEW EASEMENT**

# VIEW EASEMENT AGREEMENT

THIS VIEW EASEMENT AGREEMENT (the "Agreement"), made and entered into this ____ day of _____, 2016, by and between the UNITED PROPERTIES DEVELOPMENT LLC, a Minnesota limited liability company ("Burdened Party"), and, THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, a Minnesota religious corporation (the "Benefitted Party;" together, the Burdened Party and Benefitted Party shall be collectively referred to as the "Parties").

## WITNESSETH:

WHEREAS, the Benefitted Party is the owner of The Cathedral of Saint Paul (the "Cathedral"), located at 239 Selby Avenue, St. Paul, Minnesota, and such other neighboring property as is legally described on the attached Exhibit A (the "Benefitted Property"), made a part hereof;

WHEREAS, contemporaneously herewith, the Burdened Party has purchased from the Benefitted Party the real property located at 226 and 230 Summit Avenue, St. Paul, Minnesota, commonly known as The Chancery and such bishop's residence, and legally described on the attached Exhibit B (the "Burdened Property"), made a part hereof;

WHEREAS, as a condition to the sale of the Burdened Property and in order to protect views from and of the Cathedral, the Benefitted Party has required and the Burdened Party has agreed to grant, for the benefit of the Benefitted Property owner an easement for an unobstructed view of and to the Cathedral which limits the height of any structure, building, or construction of any kind on the Burdened Property to the elevation set forth below and subject to the terms and conditions contained herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the covenants herein contained, the said parties for themselves and their respective successors and assigns covenant and agree to and with each other as follows:

1.     Easement Grant.  So long as the Cathedral situated on the Benefitted Property remains thereon, subject to the right to rebuild and/or restore described below, no structure, building, improvement, or construction of any kind shall be erected, constructed, or placed on any part of the Burdened Property which rises above five (5) stories or fifty (50) feet in height, so as to maintain an unobstructed view of and to the Cathedral. Notwithstanding the above, in the event of any damage or destruction to the Cathedral or a portion thereof, such damage or destruction shall not constitute a failure of the Cathedral to remain situated on the Benefitted Property unless the following criteria are met:

a) Five (5) years after such damage or destruction to the Cathedral have elapsed; and

1

7308493v4

    b)  No efforts to rebuild or restore the Cathedral have begun during this five (5)-year period.

2.    <u>Duration</u>.  Subject to Section 1 above, this Agreement shall (i) be perpetual in nature, (ii) accrue to and be binding upon the Parties, their respective legal representatives, heirs, successors, assigns, and any and all tenants of the Benefitted Property and Burdened Property, and (iii) create mutual benefits and covenants running with the benefitted and burdened land, as herein set forth.

3.    <u>Default, Remedies and Enforcement</u>. The Parties agree that if the Burdened Party defaults in the performance of any covenant or the observance of any restriction set forth in this Agreement, the Benefitted Party may:

    a)  Demand, upon written notice to the Burdened Party, that erection, construction or placement of such structure, building, improvement, or construction failing to comply with the requirements of Section 1 (a "Non-conforming Structure"), be immediately halted and the Non-Conforming Structure shall be removed by the Burdened Party at its sole cost and expense; and

    b)  Commence an action in a court of competent jurisdiction to pursue any and all remedies available in equity including, but not limited to a temporary restraining order, temporary injunction, permanent injunction, specific performance or other equitable relief.  The Parties recognize that there is no adequate remedy for breach of or default under the terms of this Agreement at law and further agree that all criteria related to the issuance of any injunctive relief is hereby waived.

4.    <u>Entire Agreement</u>.  This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed by all Parties to this Agreement, which is recorded in Ramsey County, Minnesota.  This Agreement constitutes the entire agreement between the Parties with respect to the matters set forth herein and supersedes all prior negotiations, discussions, writings and agreements between them in connection therewith.

5.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

6.    <u>Partial Invalidity</u>.  Should any one or more of the provisions of this Agreement be determined to be invalid, unlawful or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby unless as a result the purpose and intent of this Agreement shall thereby be substantially and essentially impaired.  In such event, the Parties shall diligently proceed to revise this Agreement in order to re-memorialize such purpose and intent.

7.    <u>Attorneys' Fees</u>.  In the event of any controversy, claim or dispute relating to this Agreement, the prevailing party in a non-appealable judicial resolution of such controversy, claim or dispute shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

2

8.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally blank; signature pages follow]*

3

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**BURDENED PARTY:**

UNITED PROPERTIES DEVELOPMENT
LLC, a Minnesota limited liability company

By: _____

Name: _____

Title: _____

STATE OF MINNESOTA    )
                      )  SS.
COUNTY OF _____    )

This instrument was acknowledged before me as of the _____ day of _____, 2016, by _____, the _____ of United Properties Development LLC, a Minnesota limited liability company, on behalf of such limited liability company.

WITNESS my hand and official seal this _____ day of _____, 2016.

_____
Notary Public

My Commission Expires _____

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**BENEFITTED PARTY:**

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS,
a Minnesota religious corporation

By: _____

Name: _____

Title: _____

STATE OF MINNESOTA      )
                        )  SS.
COUNTY OF _____    )

This instrument was acknowledged before me as of the _____ day of _____, 2016, by _____, the _____ of The Archdiocese of Saint Paul and Minneapolis, a Minnesota religious corporation, on behalf of such corporation.

WITNESS my hand and official seal this _____ day of _____, 2016.

_____
Notary Public

My Commission Expires _____

Document Drafted By:

Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

7308493v4

# EXHIBIT A

## Legal Description of the Benefitted Property

The land referred to is situated in the State of Minnesota, County of Ramsey, and is described as follows:

Parcel A:

Lot 1 of "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota and part of Summit Avenue vacated and adjacent thereto.

(Abstract property)

Parcel B:

Lot 2, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel C:

Lot 3, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel D:

The West 10 feet of Lot 3, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel E:

Lot 5, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel F:

The West 10 feet of Lot 4, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract Property)

Parcel G:

Lot 5, except the West 10 feet thereof, and the South 25 feet of Lot 6, except the West 10 feet thereof, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel H:

The South one-half of Lot 7, "Selby Block St. Paul Minn. being Auditor's Subdivision No. 5", Ramsey County, Minnesota.

(Abstract property)

Parcel I:

Intentionally omitted.

Parcel J:

Lots 29 and 30, "Auditor's Subdivision No. 52 St. Paul Minn.", Ramsey County, Minnesota.

(Abstract property)

Parcel K:

Lots one (1) and two (2) of Auditor's Subdivision No. 52, St. Paul, Minn., according to the recorded pat thereof on file and of record in the office of the Register of Deeds in and for Ramsey County, Minnesota.

Torrens property – Certificate of Title No. 81052)

A-2

## EXHIBIT B

## Legal Description of the Burdened Property

Parcel 1:

Lots One (1) and Two (2) of Otis' Rearrangement of Lots 11, 12, 13, 14, 15, 16, and 17 of Block Sixty-four (64) in Dayton & Irvine's Addition to St. Paul, except those portions of said lots taken by the City of St. Paul for the relocation and widening of Summit Avenue, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof, according to the recorded plat thereof, Ramsey County, Minnesota.

Except all that part which lies southeasterly of the following described line:

> Beginning at the point of intersection of the southwesterly extension of the southeasterly line of Taylor Place with the northeasterly line of Lot 1 Fuller's Subdivision of Block 87, Dayton and Irvine's Addition to St. Paul; thence run southwesterly to the most westerly corner of Lot 7, Block 64 said Dayton and Irvine's Addition and there terminating.

(Abstract Property)

Parcel 2:

The northwesterly 1 foot of Lots Twelve (12), Thirteen (13), Fourteen (14) and Fifteen (15), Block Seventy (70) Dayton & Irvine's Addition to Saint Paul, according to the recorded plat thereof, Ramsey County, Minnesota.

(Abstract Property)

Parcel 3:

Lots 1, 2 and 3, Block 70, Dayton & Irvine's Addition, according to the recorded plat thereof, Ramsey County, Minnesota, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof.

Being Registered land as is evidenced by Certificate of Title No. 127582.

7308493v4

**EXHIBIT D**

**PROPOSED BIDDING PROCEDURES**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Case No. 15-30125

Chapter 11

## SALE PROCEDURES

These sale and bidding procedures shall govern the sale of real property located at 226 Summit Avenue and 230 Summit Avenue, St. Paul, Minnesota 55102 and commonly known as the Chancery Building and Archbishop Residence (referred to collectively, for purposes of these sale procedures, as the "Chancery" or the property), together with all improvements, heredaments and appurtenants.

On _____, 2016, the United States Bankruptcy Court for the District of Minnesota entered an order approving these sale procedures and has scheduled a hearing on **March 31, 2016, at _____ a.m.** (Central Time), to consider the sale of the property.

## I.   Assets To Be Sold.

Any potential bidder for the Chancery may obtain a detailed description of the Chancery through the process described in Section II below entitled "Due Diligence."

United Properties Development LLC has submitted a form of purchase and sale agreement for the property that includes the terms and conditions upon which the Archdiocese expects (subject to reasonable revisions by the qualified bidders) the property to be sold.

The Chancery will be sold without warranty or representation of any kind or nature, whether expressed or implied, and is being purchased by the successful bidder on an "as is / where is" basis.

## II.   Due Diligence.

Until the bid deadline, the Archdiocese will afford to each interested party determined by the Archdiocese and its professionals to be reasonably likely to become a qualified bidder reasonable access to the property during normal business hours. The Archdiocese will furnish (subject to applicable law), as promptly as practicable to such potential bidder, any and all such information in the possession of the Archdiocese as such potential bidder may reasonably request related to the property. The Archdiocese may require any potential bidder to execute a

7333834v4

confidentiality agreement in a form and substance satisfactory to the Archdiocese and agree to indemnify the Archdiocese with respect to any physical inspection of the property. Any such inspection may be otherwise regulated by the Archdiocese.

## III.  <u>Initial Determinations By The Debtor.</u>

The Archdiocese shall: (a) determine with the assistance of NorthMarq Real Estate Services, LLC d/b/a Cushman Wakefield NorthMarq, the Archdiocese's real estate broker, whether any person or entity is a potential bidder; (b) coordinate the efforts of potential bidders in conducting their respective due diligence investigations regarding the property; (c) receive bids from qualified bidders; and (d) negotiate and enter into an asset purchase agreement with the successful bidder.

Except as provided by applicable law or court order, neither the Archdiocese nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Chancery to any person or entity who is not a potential bidder and who does not comply with the participation requirements below.

## IV.  <u>Bid Deadline.</u>

A qualified bidder that desires to make a bid shall deliver written and electronic copies of such bid to counsel for the Archdiocese at the following address:

> Richard D. Anderson
> Briggs and Morgan
> 2200 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota  55402
> Phone:  (612) 977-8400
> Email:  randerson@briggs.com

> and

> Benjamin E. Gurstelle
> Briggs and Morgan
> 2200 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota  55402
> Phone:  (612) 977-8400
> Email:  bgurstelle@briggs.com

so as to be received by no later than **3:00 p.m. (Central Time) on or before March 18, 2016**. The Archdiocese's attorneys will send copies of any bids and information submitted under Section V below to counsel for United Properties and counsel for all appointed committees within 24 hours of receipt of such bid.

Before the sale hearing the Archdiocese's counsel will submit a declaration summarizing the bids received for the property and a declaration of NorthMarq outlining the efforts made by NorthMarq to provide a notice of these sale procedures to the applicable real estate market.

## V.    Requirements Of A Qualified Bidder.

To be deemed a "qualified bidder" a potential bidder's bid must:

a.    Be in writing;

b.    Be in an amount not less than $75,000 greater than the initial bid (as identified below);

c.    Provide that the purchase price shall be paid in full in cash upon closing;

d.    Be accompanied by a cash deposit – presented in the form of a cashier's or certified check or by wire transfer – equal to the earnest money deposit required under the United Properties purchase agreement (such cash deposit will be applied to the purchase price) to be held in escrow by Guaranty Commercial Title, Inc.;

e.    Confirm the potential bidder's completion of all due diligence required by such potential bidder in connection with the proposed transaction;

f.    Be irrevocable until the earlier of (i) the potential bidder being determined by the Archdiocese not to be a qualified bidder, or (ii) another qualified bidder's bid for the property being approved by the Bankruptcy Court;

g.    Be accompanied by a fully executed bidder purchase agreement, including a form of the lease to be executed at the closing under the bidder purchase agreement and demonstrating any modifications to the United Properties purchase agreement as necessary;

h.    Include evidence of authorization and approval from such potential bidder's board of directors (or comparable governing body) demonstrating the authority of the potential bidder to make a binding and irrevocable bid on the terms provided in the bidder purchase agreement; and

i.    Be accompanied by an affirmative statement from such potential bidder that it has and will continue to completely comply with these sale procedures.

Any bidder purchase agreement submitted under the terms of these sale procedures shall include a draft view easement agreement marked to show changes, if any, from the form included in the United Properties purchase agreement and a draft of a lease to be executed by the potential bidder and the Archdiocese at closing, which lease shall be in substantially the form attached to the United Properties purchase agreement.

7333834v4

The Archdiocese, in consultation with the committees and NorthMarq, will make a determination regarding whether a party is a qualified bidder and shall notify all potential bidders making a bid whether the bids deem them to be a qualified bidder by no later than **5:00 p.m. (Central Time) on March 23, 2016**.  Notwithstanding anything contained in this Section V, should a potential bidder submit a bid that fails to meet the qualifications to becoming a qualified bidder, the Archdiocese may allow such potential bidder who has failed to meet the requirements of a qualified bidder an additional 24 hours to cure any such deficiencies.

The Archdiocese reserves the right, subject to consultation with the committees, to waive compliance with any identified requirement for becoming a qualified bidder.

## VI.    **Initial Bidder.**

United Properties is the initial bidder for the property.  United Properties' bid is set forth in the United Properties purchase agreement and is in the amount of $2,750,000.  The initial bid is subject to higher and better bids pursuant to the terms of these sale procedures and applicable law.

## VII.    **Auction Process.**

If the Archdiocese receives more than one qualified bid, the Archdiocese will conduct an auction for the property.  The auction will take place at 10:00 a.m. on **March 29, 2016**, at a place as will be designated in writing by the Archdiocese in a notice to be given to all qualified bidders no later than **March 23, 2016**.

The Archdiocese will have the right to circulate detailed procedures consistent with these sale procedures for the conduct at the auction at any time prior to the start of the auction.  The parties entitled to attend the auction shall include, and shall be limited to, the Archdiocese and its counsel, counsel for the committees, any qualified bidder and United Properties, counsel for any qualified bidder and United Properties, and the brokers retained by any authorized participant. United Properties and each qualified bidder shall appear at the auction in person, or through a representative who provides appropriate evidence of such person's authority.  Only a qualified bidder who has timely submitted a qualified bid, and United Properties, shall be entitled to make bids at the auction.

At the auction, qualified bidders will be permitted to revise, increase or enhance their bids based upon the terms of the initial bid.  All qualified bidders will have the right to make additional modifications to United Properties purchase agreement at the auction.

The auction will be conducted in rounds and in any order the Archdiocese determines.  At the end of every round, the Archdiocese shall declare the highest and best bid or bids at that time for the property.  Each qualified bidder shall have the right to continue to improve its respective bid at the auction.  The initial minimum overbid shall be the initial bid plus $75,000.  Thereafter, qualified bidders may increase their qualified bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum $25,000 in additional consideration.  The Archdiocese reserves the right to approach any qualified bidder and seek clarification to bids at any time including without limitation, inviting qualified bidders to

-4-

communicate with other qualified bidders if such communication would be beneficial to the auction.

The auction will continue with the qualified bidders until the Archdiocese determines, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the property from the qualified bidders or the initial bidder and the next highest and best qualified bid submitted at the auction as a reserve bid.

NorthMarq has agreed to a reduced sales commission in the event of a sale to certain specified potential bidders. In determining the successful bid, the Archdiocese, in consultation with NorthMarq and the committees, may take into account any adjustment in the commission to be paid to NorthMarq at the closing of the sale of the Chancery by reason of any potential bidder's inclusion on a reserve list.

The Archdiocese reserves the right, in their business judgment, to make one or more modification or adjournments to the auction to, among other things: (i) facilitate discussions between the Archdiocese on the one hand, and individual qualified bidders, on the other hand; (ii) allow individual qualified bidders to consider how they wish to proceed; and (iii) give qualified bidders the opportunity to provide the Archdiocese with such additional evidence as the Archdiocese in their business judgment may require.

## VIII.   **The Sale Hearing.**

At the sale hearing, which will be held on **March 31, 2016, 2016, at _____.m.** (Central Time), the Archdiocese will seek entry of an order authorizing and approving the sale to the successful bidder. No later than **11:59 p.m. (Central Time) on March 30, 2016**, all objections arising out of the conduct or result of the auction shall be filed and served in the manner required for objections under Local Rules. Any objection to the final sale must be filed and delivered not later than **March 25, 2016**, which is five days before the time set for hearing (including Saturdays, Sundays and holidays). The sale hearing may be adjourned or rescheduled from time to time. The Archdiocese shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to the committees; (iii) all qualified bidders; and (iv) all parties that have requested notice in the debtor's case.

## IX.   **Failure To Consummate Purchase.**

Following the sale hearing, if the successful bidder fails to consummate the closing of the sale because of a breach or failure to perform on the part of such successful bidder, the Archdiocese will be authorized, but not required, to consummate the sale with the reserve bidder without further order of the Bankruptcy Court. In such case, the defaulting successful bidder's deposit shall be forfeited to the Archdiocese. Additionally, the Archdiocese shall be entitled to seek all available damages from the defaulting successful bidder.

## X.   **Return Of Deposit.**

The deposits of the successful bidder shall be applied to the successful bidder's obligations under the successful bid upon closing of the transaction contemplated thereby. If a

7333834v4

successful bidder fails to close the transaction contemplated by the successful bid, then such successful bidder shall forfeit its deposit to the Archdiocese.

The deposit of the reserve bidder shall be returned to the reserve bidder upon closing of the transaction contemplated by the successful bid; provided, however, that if a successful bidder fails to close the transaction when and as provided in the successful bid, then the deposit of the reserve bidder shall be applied to the reserve bidder's obligations under the reserve bid upon closing of the transaction contemplated thereby.  If a reserve bidder fails to close the transaction contemplated by a reserve bid, then such reserve bidder shall forfeit its deposit to the Archdiocese.

All other deposits of qualified bidders who are not the successful bidder or the reserve bidder shall be returned to the unsuccessful bidder within three business days after the conclusion of the auction.

The debtor reserves all of its rights regarding any return of deposits, and the failure by the debtor to timely return any deposit shall not serve as a claim for breach of any bid or create any default in favor of any bidder.

## XI.    Modification Of Amended Sale Procedures.

The debtor may amend these sale procedures, in its reasonable business judgment upon consultation with the committees, at any time and in any manner that will best promote the goals of the bidding process, including but not limited to extending or modifying any of the dates described herein.

## XII.    Debtor's Consultation With Key Parties.

The Archdiocese shall consult with the committees with respect to all material decisions relating to these sale procedures, including: (i) designating a qualified bidder; (ii) determining whether a bid is a qualified bid; (iii) curing deficiencies to become a qualified bid; (iv) establishing procedures for the auction; (v) choosing the successful bids and reserve bids; and (vi) modifying these sale procedures.

7333834v4

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

Case No. 15-30125

The Archdiocese of Saint Paul and
Minneapolis,

Chapter 11

Debtor.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTIONS FOR ORDERS**
**(I) SCHEDULING A HEARING TO APPROVE SALE OF REAL PROPERTY AND**
**APPROVING SALE PROCEDURES; AND (II) APPROVING AND AUTHORIZING**
**THE SALE OF REAL PROPERTY, THE EXECUTION OF A VIEW EASEMENT**
**AGREEMENT, AND THE EXECUTION OF A SHORT TERM LEASE IN FAVOR OF**
**THE DEBTOR**
**(CHANCERY)**

The Archdiocese seeks entry of two separate orders.  The first order will establish the sale procedures governing the sale of certain real property and improvements located at 226 and 230 Summit Avenue, St. Paul, Minnesota (the "Chancery" or the "Property") and schedule a hearing to approve the sale of the Property.  The second order will authorize the Archdiocese to sell the Property to the bidder that submits what is deemed to be the highest and best bid at an auction pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorize the execution of a View Easement Agreement, and authorize the Archdiocese to enter into a replacement lease for the Property in substantially the form attached to the United Properties Purchase Agreement attached to the motion.

**BACKGROUND**

The facts in support of this memorandum are set forth in the motion.  Capitalized terms used in this memorandum shall have the meaning set forth in the motion.

## <u>LEGAL ANALYSIS</u>

**I.      The Sale Procedures Should Be Approved Because They Are A Valid Exercise Of The Debtor's Business Judgment.**

The Archdiocese believes that the Sale Procedures attached to the Motion as Exhibit D are in the best interest of its estate and all parties in interest.  These procedures are substantially similar to the procedures approved in connection with the sale of the Hayden Center.  As set forth more fully below, a sale of the Property pursuant to the Sale Procedures is essential and will result in a greater value to the Archdiocese's estate than any alternative sale method.

Courts have uniformly held that a sale of property of a bankruptcy estate should be approved when it is justified by a sound business purpose.  See <u>Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 567 n.16 (8th Cir. 1997).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. <u>GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.</u>, 331 B.R. 251, 255 (N.D. Tex. 2005); <u>In re Lajijani</u>, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); <u>In re WPRV-TV, Inc.</u>, 143 B.R. 315, 319 (D. Puerto Rico 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

The rules applicable to sales by a trustee have been applied with equal force to sales proposed by a debtor acting as debtor in possession under Section 1107 of the Bankruptcy Code and to proposals made by a trustee or debtor in possession with respect to the procedures to govern the proposed sale. See, <u>e.g.</u>, <u>Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 656-57 (Bankr.

S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

The Archdiocese has determined that the sale of the Chancery will allow the Archdiocese to operate more efficiently by having all of it staff in one location. The sale of the Chancery will also save the Archdiocese money in operating costs, daily maintenance and deferred maintenance. As indicated in the motion, some of the deferred maintenance items cannot be delayed much longer.

It is clearly in the best interest of the Archdiocese's estate to sell the Property in the best manner to maximize the value for creditors. After consulting with its brokers, NorthMarq, the Archdiocese has determined that holding a competitive auction will garner the highest price for the Property. The Sale Procedures will increase the likelihood that the Archdiocese will receive the highest offers for the Property because they ensure a competitive and fair bidding process. Additionally, the Sale Procedures will enable the Archdiocese, NorthMarq, and the Committees to review, analyze, and compare all bids received to determine which bid or bids, if acceptable, would be in the best interest of the Archdiocese's estate and in the best interests of creditors.

The Sale Procedures are relatively straightforward in their design and application and will serve to place all potential bidders on common footing in making offers for the Property. They are designed to foster an open, competitive and fair sale process, while maximizing the value of the Archdiocese's estate. The Archdiocese respectfully requests the Sale Procedures be approved as fair and reasonable under the circumstances and authorize and direct the Archdiocese to proceed in accordance with them.

II.     **The Sale Should Be Approved And Bidder Protections Should Be Approved.**

The Archdiocese also requests that this Court enter an order approving the sale of the Property and that this Court provide requested bidder protections, including providing the Successful Bidder with the protection given a "good faith purchaser" under section 363(m) of the Bankruptcy Code.

A.     **The Sale Is A Valid Exercise Of The Debtor's Business Judgment.**

As noted, section 363(b) of the Bankruptcy Code specifically authorizes asset sales outside the ordinary course of business so long as the Debtor or Trustee can demonstrate "some articulated business justification for using, selling or leasing the property outside the ordinary course of business." In re Continental Airlines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).  There should be no dispute in this case as to the soundness of the Archdiocese's decision to market the Chancery.

The sale is proposed in good faith.  Potential offers and bids were and will continue to be widely solicited from entities that have already expressed an interest in the property as well as other potential buyers.  The Sale Procedures have been presented to all parties and are designed to create an open bidding process that all parties in interest can monitor to ensure that the highest possible price is received for the Archdiocese's assets.  Among other things, the Sale Procedures permit the attendance of counsel for both committees in this case at the auction and provide for the Archdiocese to conduct an auction in a controlled, fair, and open fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Archdiocese's assets.

B.     **The Stalking Horse Expense Reimbursement Provision Should Be Approved.**

Section 16.f of the United Properties Purchase Agreement provides that in the event that (a) the Bankruptcy Court approves a sale offer from a bidder other than United Properties, (b) the

-4-

sale to that other bidder closes, and (c) United Properties has performed all obligations under the United Properties Purchase Agreement, has satisfied all closing conditions, and is ready, willing, and able to proceed with closing, then the earnest money shall be returned to United Properties, along with payment to United Properties for out of pocket expenses and costs incurred for survey, inspection and reports (provided that they have been made available to the Archdiocese) up to a total maximum amount of $25,000.  If the Bankruptcy Court approves a sale to a different bidder, but that party fails to close on the acquisition of the property, then United Properties shall be obligated to purchase the property in accordance with the terms of the United Properties Purchase Agreement.

The capped expense reimbursement provision is not a break-up fee, but it serves a similar purpose to a break-up fee and provides protection for United Properties as the stalking horse bidder performing obligations and undertakings that benefit all potential bidders. The limited expense reimbursement provision is appropriate to maximize the value of the Property. "[B]reakup fees and other strategies may be 'legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking.'" 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quoting Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 624 (S.D.N.Y. 1987); see also In re Diamonds Plus, Inc., 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999) ("The fee pays the bidder for his time, the risk that the offer will be used as a stalking horse to induce other bids, and the loss of other business and investment opportunities…."); In re Hupp Indus. Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Without such fees, bidders would be reluctant to make an initial bid from another bidder who would capitalize on the initial bidder's … due diligence.").

Courts generally approve bidding incentives under the business judgment rule which prohibits judicial second-guessing of the actions of an entity's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re Tama Beef Packing, Inc., 290 B.R. 90, 96-76 (8th Cir. B.A.P. 2003).  The reimbursement provision here is not even a fee that would be paid to the stalking horse bidder; it simply provides that the out of pocket costs and expenses borne by United Properties in connection with certain due diligence efforts benefitting all bidders would be reimbursed in the event that United Properties was not the winning bidder.  That amount is capped at $25,000 and could be lower.  Given the fact that incremental bids are required under the Sale Procedures to increase at intervals of more than the reimbursement cap, the inclusion of the reimbursement provision is eminently reasonable and within the Archdiocese's sound business judgment to include.  The expenses for which United Properties would be reimbursed will benefit other bidders who will have access to the survey and other documents.

### C.      The Successful Bidder Should Be Entitled To Section 363(m) Protection.

Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  In re Made In Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986).

The United Properties Purchase Agreement was negotiated at arms' length, with both parties represented by their own professionals.  To the Archdiocese's knowledge, United Properties is not related to the Archdiocese in any way.  United Properties does share a parent company with NorthMarq.  The Archdiocese will perform a review of any other bidder to ensure that it does not hold an adverse interest.  The auction will allow the Archdiocese to receive the

-6-

highest best offer for the Property.  The sale will be voluntary, without compulsion or duress, taking place in an open market, with each party acting in its own self-interest.  The Archdiocese believes that providing the Successful Bidder with such protection will ensure that closing of the proposed sale will occur promptly and the maximum price will, therefore, be received by the Archdiocese for the Property.  Accordingly, any order approving the proposed sale will include a provision that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and contain a finding that the sale constitutes an arms' length sale between a willing seller and a willing buyer.

III.     **The View Easement Should Be Included With Any Purchase Agreement.**

The United Properties Purchase Agreement includes a View Easement Agreement that is important to the Archdiocese's core operations and must be included in any purchase agreement in order for the Archdiocese to proceed with the sale of the Chancery.  As noted in the Donovan Declaration, the View Easement Agreement does not negatively affect the salability or value of the Property.  The View Easement Agreement provides that so long as the Cathedral of Saint Paul remains situated on neighboring property located at 239 Selby Avenue, Saint Paul, Minnesota, subject to certain rights, no structure, building, improvement, or construction of any kind shall be erected, constructed, or placed on any part of the Property which rises to a height of more than 50 feet and five stories.  The inclusion of the View Easement Agreement is vital due to the historical importance of the Cathedral of Saint Paul to the Archdiocese and the City of Saint Paul.  Under current zoning restrictions, any redeveloped structure would fit within the parameters of the View Easement Agreement already.  Similarly, rezoning to RM2 (the most plausible possible rezoning) would also restrict building height to within the parameters of the View Easement Agreement.  Therefore, as explained in the Donovan Declaration, the View Easement Agreement does not negatively affect the value of the Property and will not inhibit

-7-

bidding. Protection of the view of and from the Cathedral of Saint Paul is of primary importance to the Archdiocese and the Archdiocese will not enter into a sale agreement that could adversely impact the Cathedral. The Archdiocese also has an interest in the Cathedral property and the View Easement Agreement preserves the value of that important landmark.

## IV.     The Archdiocese Should Be Authorized To Enter Into A Replacement Lease.

The United Properties Purchase Agreement includes a form of replacement lease to be entered into by the Archdiocese pending the relocation of the operations presently conducted at the Chancery. The terms of the proposed lease, along with all of the other provisions of the United Properties Purchase Agreement, were negotiated by the Archdiocese on an arms' length basis and are summarized in the motion. The Archdiocese believes that the form of the replacement lease should be approved by this Court.

The standards for approval of the lease are similar to the standards applicable to a sale of estate property. Again, the court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property. In re Moore, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); In re Canyon P'ship, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

## V.     Waiver Of Bankruptcy Rules 6004(h) And 6006(d).

The Archdiocese further requests that the 14-day stay that would otherwise be imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules be waived to permit the proposed sale to close as soon as possible upon the entry of an order granting this motion. The Archdiocese believes that a waiver of these requirements is appropriate under the circumstances in this case in light of the extensive efforts made by the Archdiocese to conduct a fair bidding and sale process.

7332434v3

## CONCLUSION

For the foregoing reasons, the Archdiocese respectfully requests that this Court enter orders granting the relief sought in the motion.

Dated:  January 7, 2016                    Respectfully submitted,

                                           *e/ Richard D. Anderson*
                                           _____

                                           BRIGGS & MORGAN, P.A.
                                           Richard D. Anderson (#2306)
                                           randerson@briggs.com
                                           Charles B. Rogers (#0130588)
                                           crogers@briggs.com
                                           Benjamin E. Gurstelle (#389968)
                                           bgurstelle@briggs.com
                                           2200 IDS Center, 80 South 8th Street
                                           Minneapolis, MN 55402
                                           Telephone: (612) 977-8400
                                           Facsimile: (612) 977-8650

                                           Attorneys for The Archdiocese of Saint Paul and Minneapolis

7332434v3

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Case No. 15-30125

Chapter 11

---

## ORDER APPROVING SALE PROCEDURES AND SCHEDULING A HEARING TO APPROVE THE SALE OF REAL PROPERTY
## (CHANCERY)

---

This case came before the court on the motion of the Archdiocese of Saint Paul and Minneapolis for an order approving a sale and bidding procedures, and scheduling a hearing to approve the sale of the debtor's property and the execution of a view easement and replacement lease, all relating to property located at 226 Summit Avenue and 230 Summit Avenue, St. Paul, Minnesota.

Based on the motion and the file,

**IT IS ORDERED:**

1.      The motion is granted to the extent set forth herein.

2.      The sale procedures attached to this order are approved.

3.      The expense reimbursement contingency provision described in the motion and set forth in the United Properties purchase agreement is approved, <u>provided</u>, <u>however</u>, that the expense reimbursement shall be due and payable only in accordance with the terms set forth in section 16.f of the United Properties purchase agreement.

4.      In accordance with the terms of the sale procedures, the debtor is authorized to conduct an auction for the sale of the real property and improvements located at 226 Summit

7340498v5

Avenue and 230 Summit Avenue, St. Paul, Minnesota, together with the buildings known as the Chancery Building and Archbishop's Residence and all improvements, and easements, rights, privileges and other hereditaments and appurtenances subject to a further hearing and final court approval following such auction.

5.      If, as of the bid deadline, the debtor has received one or more qualified bids in addition to the United Properties bid, the auction for the property shall take place at **10:00 a.m. (Central Time) on March 29, 2016** at the offices of **Briggs and Morgan, P.A., 2200 IDS Center, 80 South 8th Street, Minneapolis, MN 55402**, or such later time or other place as the debtor shall select.  If, as of the bid deadline, the only qualified bid received by the debtor is the United Properties bid, the debtor shall not be required to hold the auction.

6.      The court will hold a hearing at **_____ a.m. on March 31, 2016** in Courtroom 8 West, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, to approve the sale of the property.  All objections arising out of the conduct or result of the auction shall be filed and served by no later than **11:59 p.m. (Central Time) on March 30,   2016**.  All objections to the final sale of the property shall be filed and delivered not later than **March 25, 2016**, which is five days before the time set for hearing (including Saturdays, Sundays and Holidays).

Dated:                                    _____

                                          Robert J. Kressel
                                          United States Bankruptcy Judge

2

**EXHIBIT A**
**TO**
**ORDER APPROVING SALE PROCEDURES AND SCHEDULING A HEARING TO**
**APPROVE THE SALE OF REAL PROPERTY**
**(CHANCERY)**


**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| In re: | Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 |
| Debtor. | |

---

**SALE PROCEDURES**

---

These sale and bidding procedures shall govern the sale of real property located at 226 Summit Avenue and 230 Summit Avenue, St. Paul, Minnesota 55102 and commonly known as the Chancery Building and Archbishop Residence (referred to collectively, for purposes of these sale procedures, as the "Chancery" or the property), together with all improvements, heredaments and appurtenants.

On _____, 2016, the United States Bankruptcy Court for the District of Minnesota entered an order approving these sale procedures and has scheduled a hearing on **March 31, 2016, at _____ a.m.** (Central Time), to consider the sale of the property.

**I.     Assets To Be Sold.**

Any potential bidder for the Chancery may obtain a detailed description of the Chancery through the process described in Section II below entitled "Due Diligence."

United Properties Development LLC has submitted a form of purchase and sale agreement for the property that includes the terms and conditions upon which the Archdiocese expects (subject to reasonable revisions by the qualified bidders) the property to be sold.

The Chancery will be sold without warranty or representation of any kind or nature, whether expressed or implied, and is being purchased by the successful bidder on an "as is / where is" basis.

A-1

## II.    Due Diligence.

Until the bid deadline, the Archdiocese will afford to each interested party determined by the Archdiocese and its professionals to be reasonably likely to become a qualified bidder reasonable access to the property during normal business hours.  The Archdiocese will furnish (subject to applicable law), as promptly as practicable to such potential bidder, any and all such information in the possession of the Archdiocese as such potential bidder may reasonably request related to the property.  The Archdiocese may require any potential bidder to execute a confidentiality agreement in a form and substance satisfactory to the Archdiocese and agree to indemnify the Archdiocese with respect to any physical inspection of the property.  Any such inspection may be otherwise regulated by the Archdiocese.

## III.    Initial Determinations By The Debtor.

The Archdiocese shall: (a) determine with the assistance of NorthMarq Real Estate Services, LLC d/b/a Cushman Wakefield NorthMarq, the Archdiocese's real estate broker, whether any person or entity is a potential bidder; (b) coordinate the efforts of potential bidders in conducting their respective due diligence investigations regarding the property; (c) receive bids from qualified bidders; and (d) negotiate and enter into an asset purchase agreement with the successful bidder.

Except as provided by applicable law or court order, neither the Archdiocese nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Chancery to any person or entity who is not a potential bidder and who does not comply with the participation requirements below.

## IV.    Bid Deadline.

A qualified bidder that desires to make a bid shall deliver written and electronic copies of such bid to counsel for the  Archdiocese at the following address:

> Richard D. Anderson
> Briggs and Morgan
> 2200 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota  55402
> Phone:  (612) 977-8400
> Email:  randerson@briggs.com

> and

A-2

Benjamin E. Gurstelle
Briggs and Morgan
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
Phone:  (612) 977-8400
Email:  bgurstelle@briggs.com

so as to be received by no later than **3:00 p.m. (Central Time) on or before** **March 18, 2016**. The Archdiocese's attorneys will send copies of any bids and information submitted under Section V below to counsel for United Properties and counsel for all appointed committees within 24 hours of receipt of such bid.

Before the sale hearing the Archdiocese's counsel will submit a declaration summarizing the bids received for the property and a declaration of NorthMarq outlining the efforts made by NorthMarq to provide a notice of these sale procedures to the applicable real estate market.

**V.     Requirements Of A Qualified Bidder.**

To be deemed a "qualified bidder" a potential bidder's bid must:

a.     Be in writing;

b.     Be in an amount not less than $75,000 greater than the initial bid (as identified below);

c.     Provide that the purchase price shall be paid in full in cash upon closing;

d.     Be accompanied by a cash deposit – presented in the form of a cashier's or certified check or by wire transfer – equal to the earnest money deposit required under the United Properties purchase agreement (such cash deposit will be applied to the purchase price) to be held in escrow by Guaranty Commercial Title, Inc.;

e.     Confirm the potential bidder's completion of all due diligence required by such potential bidder in connection with the proposed transaction;

f.     Be irrevocable until the earlier of (i) the potential bidder being determined by the Archdiocese not to be a qualified bidder, or (ii) another qualified bidder's bid for the property being approved by the Bankruptcy Court;

g.     Be accompanied by a fully executed bidder purchase agreement, including a form of the lease to be executed at the closing under the bidder purchase agreement and demonstrating any modifications to the United Properties purchase agreement as necessary;

h.     Include evidence of authorization and approval from such potential bidder's board of directors (or comparable governing body) demonstrating the authority of the

A-3

potential bidder to make a binding and irrevocable bid on the terms provided in the bidder purchase agreement; and

i.    Be accompanied by an affirmative statement from such potential bidder that it has and will continue to completely comply with these sale procedures.

Any bidder purchase agreement submitted under the terms of these sale procedures shall include a draft view easement agreement marked to show changes, in any, from the form included in the United Properties purchase agreement and a draft of a lease to be executed by the potential bidder and the Archdiocese at closing, which lease shall be in substantially the form attached to the United Properties purchase agreement.

The Archdiocese, in consultation with the committees and NorthMarq, will make a determination regarding whether a party is a qualified bidder and shall notify all potential bidders making a bid whether the bids deem them to be a qualified bidder by no later than **5:00 p.m. (Central Time) on March 23, 2016**.  Notwithstanding anything contained in this Section V, should a potential bidder submit a bid that fails to meet the qualifications to becoming a qualified bidder, the Archdiocese may allow such potential bidder who has failed to meet the requirements of a qualified bidder an additional 24 hours to cure any such deficiencies.

The Archdiocese reserves the right, subject to consultation with the committees, to waive compliance with any identified requirement for becoming a qualified bidder.

## VI.    <u>Initial Bidder.</u>

United Properties is the initial bidder for the property.  United Properties' bid is set forth in the United Properties purchase agreement and is in the amount of $2,750,000.  The initial bid is subject to higher and better bids pursuant to the terms of these sale procedures and applicable law.

## VII.    <u>Auction Process.</u>

If the Archdiocese receives more than one qualified bid, the Archdiocese will conduct an auction for the property.  The auction will take place at 10:00 a.m. on **March 29, 2016**, at a place as will be designated in writing by the Archdiocese in a notice to be given to all qualified bidders no later than **March 23, 2016**.

The Archdiocese will have the right to circulate detailed procedures consistent with these sale procedures for the conduct at the auction at any time prior to the start of the auction.  The parties entitled to attend the auction shall include, and shall be limited to, the Archdiocese and its counsel, counsel for the committees, any qualified bidder and United Properties, counsel for any qualified bidder and United Properties, and the brokers retained by any authorized participant.  United Properties and each qualified bidder shall appear at the auction in person, or through a representative who provides appropriate evidence of such person's authority.  Only a qualified bidder who has timely submitted a qualified bid, and United Properties, shall be entitled to make bids at the auction.

A-4

At the auction, qualified bidders will be permitted to revise, increase or enhance their bids based upon the terms of the initial bid. All qualified bidders will have the right to make additional modifications to United Properties purchase agreement at the auction.

The auction will be conducted in rounds and in any order the Archdiocese determines. At the end of every round, the Archdiocese shall declare the highest and best bid or bids at that time for the property. Each qualified bidder shall have the right to continue to improve its respective bid at the auction. The initial minimum overbid shall be the initial bid plus $75,000. Thereafter, qualified bidders may increase their qualified bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum $25,000 in additional consideration. The Archdiocese reserves the right to approach any qualified bidder and seek clarification to bids at any time including without limitation, inviting qualified bidders to communicate with other qualified bidders if such communication would be beneficial to the auction.

The auction will continue with the qualified bidders until the Archdiocese determines, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the property from the qualified bidders or the initial bidder and the next highest and best qualified bid submitted at the auction as a reserve bid.

NorthMarq has agreed to a reduced sales commission in the event of a sale to certain specified potential bidders. In determining the successful bid, the Archdiocese, in consultation with NorthMarq and the committees, may take into account any adjustment in the commission to be paid to NorthMarq at the closing of the sale of the Chancery by reason of any potential bidder's inclusion on a reserve list.

The Archdiocese reserves the right, in their business judgment, to make one or more modification or adjournments to the auction to, among other things: (i) facilitate discussions between the Archdiocese on the one hand, and individual qualified bidders, on the other hand; (ii) allow individual qualified bidders to consider how they wish to proceed; and (iii) give qualified bidders the opportunity to provide the Archdiocese with such additional evidence as the Archdiocese in their business judgment may require.

**VIII.**   **The Sale Hearing.**

At the sale hearing, which will be held on **March 31, 2016, at _____.m**. (Central Time), the Archdiocese will seek entry of an order authorizing and approving the sale to the successful bidder. No later than **11:59 p.m. (Central Time) on March 30, 2016**, all objections arising out of the conduct or result of the auction shall be filed and served in the manner required for objections under Local Rules. Any objection to the final sale must be filed and delivered not later than **March 25, 2016**, which is five days before the time set for hearing (including Saturdays, Sundays and holidays). The sale hearing may be adjourned or rescheduled from time to time. The Archdiocese shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to the committees; (iii) all qualified bidders; and (iv) all parties that have requested notice in the debtor's case.

A-5

## IX.     Failure To Consummate Purchase.

Following the sale hearing, if the successful bidder fails to consummate the closing of the sale because of a breach or failure to perform on the part of such successful bidder, the Archdiocese will be authorized, but not required, to consummate the sale with the reserve bidder without further order of the Bankruptcy Court.  In such case, the defaulting successful bidder's deposit shall be forfeited to the Archdiocese.  Additionally, the Archdiocese shall be entitled to seek all available damages from the defaulting successful bidder.

## X.     Return Of Deposit.

The deposits of the successful bidder shall be applied to the successful bidder's obligations under the successful bid upon closing of the transaction contemplated thereby.  If a successful bidder fails to close the transaction contemplated by the successful bid, then such successful bidder shall forfeit its deposit to the Archdiocese.

The deposit of the reserve bidder shall be returned to the reserve bidder upon closing of the transaction contemplated by the successful bid; provided, however, that if a successful bidder fails to close the transaction when and as provided in the successful bid, then the deposit of the reserve bidder shall be applied to the reserve bidder's obligations under the reserve bid upon closing of the transaction contemplated thereby.  If a reserve bidder fails to close the transaction contemplated by a reserve bid, then such reserve bidder shall forfeit its deposit to the Archdiocese.

All other deposits of qualified bidders who are not the successful bidder or the reserve bidder shall be returned to the unsuccessful bidder within three business days after the conclusion of the auction.

The debtor reserves all of its rights regarding any return of deposits, and the failure by the debtor to timely return any deposit shall not serve as a claim for breach of any bid or create any default in favor of any bidder.

## XI.     Modification Of Amended Sale Procedures.

The debtor may amend these sale procedures, in its reasonable business judgment upon consultation with the committees, at any time and in any manner that will best promote the goals of the bidding process, including but not limited to extending or modifying any of the dates described herein.

## XII.     Debtor's Consultation With Key Parties.

The Archdiocese shall consult with the committees with respect to all material decisions relating to these sale procedures, including: (i) designating a qualified bidder; (ii) determining whether a bid is a qualified bid; (iii) curing deficiencies to become a qualified bid; (iv) establishing procedures for the auction; (v) choosing the successful bids and reserve bids; and (vi) modifying these sale procedures.

7340498v5

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

|  |  |
|---|---|
| | Case No. 15-30125 |

The Archdiocese of Saint Paul and
Minneapolis,

Chapter 11

Debtor.

## ORDER APPROVING SALE OF REAL PROPERTY, AUTHORIZING THE EXECUTION OF A VIEW EASEMENT AGREEMENT, AND AUTHORIZING THE EXECUTION AND DELIVERY OF A REPLACEMENT LEASE

This case came before the court on the motion of the Archdiocese of Saint Paul and Minneapolis for an order approving the sale of the real property located in Ramsey County, Minnesota pursuant to 11 U.S.C. § 363(b), the execution of a view easement agreement, and the execution and delivery of a lease covering the property.

Based on the motion and the file,

**IT IS FOUND AND DETERMINED THAT:**

A.    The court has jurisdiction over the motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The court entered an order on _____, 2016, which approved the sale procedures and scheduled the sale hearing.

C.    The property subject to this order, together with all improvements and easements, rights, privileges and other hereditaments and appurtenances, is legally described as:

Parcel 1:

Lots One (1) and Two (2) of Otis' Rearrangement of Lots 11, 12, 13, 14, 15, 16, and 17 of Block Sixty-four (64) in Dayton & Irvine's Addition to St. Paul, except those portions of

7340496v4

said lots taken by the City of St. Paul for the relocation and widening of Summit Avenue, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof, according to the recorded plat thereof, Ramsey County, Minnesota.

Except all that part which lies southeasterly of the following described line:

Beginning at the point of intersection of the southwesterly extension of the southeasterly line of Taylor Place with the northeasterly line of Lot 1 Fuller's Subdivision of Block 87, Dayton and Irvine's Addition to St. Paul; thence run southwesterly to the most westerly corner of Lot 7, Block 64 said Dayton and Irvine's Addition and there terminating.

(Abstract Property)

Parcel 2:

The northwesterly 1 foot of Lots Twelve (12), Thirteen (13), Fourteen (14) and Fifteen (15), Block Seventy (70) Dayton & Irvine's Addition to Saint Paul, according to the recorded plat thereof, Ramsey County, Minnesota.

(Abstract Property)

Parcel 3:

Lots 1, 2 and 3, Block 70, Dayton & Irvine's Addition, according to the recorded plat thereof, Ramsey County, Minnesota, together with that part of vacated Chestnut Street which accrued thereto by reason of the vacation thereof.

Being Registered land as is evidenced by Certificate of Title No. 127582.

D.      The debtor has articulated good and sufficient reasons for approving the sale of the property. The sale procedures afforded a full, fair and reasonable opportunity for any entity who qualified as a qualified bidder to make a qualified bid to purchase the property and no higher or better offer was made.

E.      Due and proper notice of the motion was provided and no other or further notice need be provided.

F.      The entry of this order is in the best interests of the debtor and its estate, creditors, and interest holders and all other parties in interest.

2

7340496v4

G.      The debtor has advanced good and sufficient business justifications supporting the sale to _____ pursuant to section 363(b) of the Bankruptcy Code. It is a reasonable exercise of the debtor's business judgment to consummate the sale on the terms and conditions set forth in the purchase agreement between the debtor and _____.

H.      The purchase agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States.

I.      The transfer of the property as contemplated by the purchase agreement:  (i) is or will be a legal, valid, and effective transfer of all right, title and interest of the debtor in and to the property to _____; and (ii) vests or will vest in _____ all right, title and interest of the debtor in and to the property.

J.      The purchase agreement was negotiated, proposed and entered into without collusion and in good faith, from arms' length bargaining positions by the debtor and _____. _____ is not an "insider" of the debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Accordingly, the sale approved by this order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  _____ is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**IT IS ORDERED:**

1.      The motion is granted and the transactions contemplated in the motion are authorized to the extent set forth in this order.

2.      All objections, if any, filed in response to the motion are resolved as set forth in this order or on the record at the hearing on the motion, and to the extent not resolved, are overruled.

3

7340496v4

3.      All of the terms and conditions of the purchase agreement, including the contemplation of the view easement, are approved and the sale of the property pursuant to the purchase agreement is authorized under sections 363(b) and (f) of the Bankruptcy Code.  The omission in this order of specific reference to any provision of the purchase agreement shall not impair or diminish the efficacy, propriety, or approval of such provision.

4.      All of the terms of the view easement agreement are approved and the debtor is authorized to enter into the view easement agreement with _____ on the terms described therein with such non-material modifications as may be agreed to by the parties.

5.      The debtor is authorized to enter into a lease with _____ for the property on the terms described in the lease attached as Exhibit C to the purchase agreement, with such nonmaterial modifications as may be agreed to by the parties, and to perform under the lease.

6.      The debtor and _____ are authorized to take all actions and execute and deliver all documents, instruments and agreements consistent with the purchase agreement that the debtor and _____ deem necessary or appropriate to implement and effect the transactions contemplated by the purchase agreement as such may be amended by the parties, including but not limited to the view easement agreement, bills of sale, assignment documents, and deeds.

7.      The debtor is authorized to pay from the proceeds of sale any and all customary closing or title fees and expenses and all other expenses required to be paid under the terms of the purchase agreement and to pay any and all commissions due from the debtor in connection with the sale.

8.      _____ is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

4

9.      The provisions of this order shall survive the entry of any order confirming any Chapter 11 plan of the debtor, or converting the debtor's case to a case under Chapter 7 of the Bankruptcy Code, or dismissing the debtor's Chapter 11 case.

10.     The terms and provisions of the purchase agreement, together with the terms and provisions of this order, shall be binding in all respects upon, and shall inure to the benefit of, the debtor, its estates, its creditors, the successful bidder and its respective affiliates, successors and assigns, and any affected third parties, including but not limited to, any and all persons asserting an interest in, or claim against the debtor's estate or with respect to the property.

11.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this order shall be effective immediately upon entry.


Dated:                                  _____
                                        Robert J. Kressel
                                        United States Bankruptcy Judge

5

7340496v4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Bankruptcy Case No.  15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | CHAPTER 11 CASE |
| Debtor. | |

## CERTIFICATE OF SERVICE

Benjamin E. Gurstelle, under penalty of perjury, states that on January 7, 2016, he caused to be served foregoing documents by sending true and correct copies via ECF, email, or U.S. Mail to the parties on the attached service list.


Dated: January 7, 2016                    */e/ Benjamin E. Gurstelle*
                                          Benjamin E. Gurstelle

7388165v1

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
SERVICE LIST

**VIA U.S. MAIL:**

IRS District Counsel
380 Jackson Street, Ste 650
St. Paul, MN 55101-4804

Internal Revenue Service
Wells Fargo Place
30 E 7th Street
Mail Stop 5700
St. Paul, MN 55101

MN Department of Revenue
Collection Enforcement
551 Bankruptcy Section
600 North Robert Street
St. Paul, MN 55101-2228

Office of the U.S. Attorney
600 US Courthouse
300 S Fourth Street
Minneapolis, MN 55415

Ramsey County Assessor's Office
90 Plato Boulevard W.
Saint Paul, MN 55107

Hennepin County Treasurer
A600 Government Center
Minneapolis, MN 55487

Dakota County
1590 Hwy 55
Hastings, MN 55033

Ramsey County
PO Box 64097
Saint Paul, MN 55164

Social Security Administration
CBIZ Payroll
2797 Frontage Road, Suite 2000
Roanoke, VA 24017

US Dept of HHS – Medicare
CBIZ Payroll
2797 Frontage Road, Suite 2000
Roanoke, VA 24017

MN Dept of Labor and Industry
PO Box 64219
Saint Paul, MN 55164

The Archdiocese of Saint Paul and
Minneapolis
c/o Joseph F. Kueppers
226 Summit Avenue
Saint Paul, MN 55102

Premier Bank
2866 White Bear Ave
Maplewood, MN 55109

North American Banking Company
2230 Albert Street
Roseville, MN 55113

GE Information Technology
Solutions, Inc.
1738 Bass Rd
PO Box 13708
Macon, GA 31208

Jeff Kahane
Duane Morris LLP
865 S Figueroa St, Ste 3100
Los Angeles, CA 90017-5450

Russell Roten
Duane Morris LLP
865 S Figueroa St, Ste 3100
Los Angeles, CA 90017-5450

John Philip Borger
Faegre Baker Daniels
90 S 7th Street
Minneapolis MN 55402-3901

Eric E. Caugh
Zelle Hoffman Voelbel & Mason
500 Washington Ave S, Suite 4000
Minneapolis, MN 55415

Michael Bazley
SBN 2257467
652 I Street
Sacramento, CA 95814

United Properties Development
LLC
c/o Mark W. Nelson
3600 American Blvd. West, Ste 750
Minneapolis, MN 55431

**VIA ECF:**

United States Trustee
U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis, MN 55415
ustpregion12.mn.ecf@usdoj.gov

Sarah J. Wencil
U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Sarah.J.Wencil@usdoj.gov

Committee of Unsecured Creditors
c/o Robert Kugler
    Edwin Caldie
Stinson Leonard Street LLP
150 S Fifth Street, Suite 2300
Minneapolis, MN 55402
Robert.kugler@stinsonleonard.com
Ed.caldie@stinsonleonard.com

Committee of Parish Creditors
c/o Nauni Manty
    Dennis O'Brien
Manty & Associates, P.A.
401 Second Avenue North
Suite 400
Minneapolis, MN 55401
Nauni@mantylaw.com
Dennis@mantylaw.com

All other persons or entities
receiving ECF notices in this case.