## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 |
| Debtor. | Judge Robert J. Kressel |

**RESPONSE OF CERTAIN ABUSE CLAIMANTS
IN SUPPORT OF THE APPLICATION TO EMPLOY
DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP AS
FINANCIAL ADVISOR FOR THE COMMITTEE OF UNSECURED CREDITORS**

## INTRODUCTION

The Committee cannot serve its constituency or its statutory function without the immediate retention of sophisticated, experienced financial professionals. After consultation with the Debtor, the retention of a Committee financial advisor was delayed to save costs while mediation efforts played out. The Debtor and its parishes are in the process of drafting a plan that will almost certainly be contested. If it is contested, the Debtor will seek to cram the plan down and force unjustified parish channeling injunctions and other unacceptable terms on abuse survivors and the Committee. In such an adversarial process, the Committee's efforts will be opposed by the Debtor and its parishes. Any further delay of the Committee's retention of sophisticated financial professionals will materially undercut the Committee's ability to fulfill its statutory duties at a critical time in the case.

The Debtor, the Parish Committee, and Certain Parishes have objected to the proposed retention. The Court should not permit the Debtor and its parishes to substitute their judgment for the judgment of a Committee tasked with protecting the interests of sexual abuse survivors. The Committee has made its decision, its decision is entitled to deference, and the Committee's need for financial professionals is urgent and clear. The United States Trustee has expressed no

concerns with the proposed retention and it is uncontested that Deloitte Transactions and Business

Analytics LLP ("DTBA") is highly qualified and uniquely positioned to bring important

efficiencies to bear in this case.  The objections should be overruled and the Application to retain

DTBA should be approved without further delay.

## **RELEVANT FACTS**

At the outset of this case, the Court ordered the commencement of a mediation.  Although

that effort was expected to focus on insurance coverage issues, at the urging of the Debtor, both

the abuse survivors and the Official Committee of Unsecured Creditors (the "Committee")

attempted to use the mediation as a vehicle to resolve global issues in the case as well.  In deference

to those efforts, to preserve estate assets, and again at the urging of the Debtor, abuse survivors

and the Committee postponed the pursuit of certain legal and investigatory strategies.

Additionally, the Committee also postponed its retention of a financial advisor.

The Committee and the abuse survivors then spent many months seeking a resolution in

the mediation and, along the way, the Committee agreed to two extensions of the Debtor's

exclusivity period.  In connection with the second extension of exclusivity, the Debtor stated and

agreed as follows:

> 11.  The parties also acknowledge that the committees have not
> engaged to date in an independent analysis of potential avoidance
> and other causes of the estate in an effort to reduce fees and expenses
> in this case. In the event that this motion is granted, the Archdiocese
> agrees to provide the committees at least 90 days advance notice of
> its intention to file a plan of reorganization at any time prior to May
> 31, 2016 *so that the committees may engage in any investigation*
> *that may be necessary or appropriate in connection with any plan*
> that may be proposed by the Archdiocese. If the Archdiocese gives
> a 90 day notice under this paragraph, it will also give notice of any
> change in its intentions with regard to filing a plan.
>
> 12. The Archdiocese believes that its commitment, as set forth
> above, will serve to limit administrative expenses in this case by

> permitting the parties to continue to focus on the mediation process,
> as opposed to a potentially contentious and expensive confirmation
> process. The Archdiocese continues to believe the mediation
> process provides the best path forward to a plan that best addresses
> the interests of all parties.

(Docket No. 450) (emphasis added).

To date, the mediation efforts have been unsuccessful. On February 8, 2016, the Debtor

provided the Committee notice that it intended to file a plan before May 31, 2016. (Affidavit of

Jeffrey R. Anderson, ¶ 2, Ex. A.) Abuse Claimants and the Committee are concerned that the

Debtor intends to propose a non-consensual plan that will include terms unacceptable to abuse

survivors. Among other things, the Committee anticipates that the Debtor will propose to transfer

claims against insurers into a trust for survivors. Doing so would force abuse survivors to wait for

the resolution of such claims, and to deal with such claims – at their cost – through a trust vehicle

while the Debtor receives the benefit of exiting the bankruptcy process. Abuse Claimants and the

Committee also anticipate that, if creditors object to the Debtor's proposed plan, the Debtor will

seek to cram it down.

Abuse Claimants and the Committee believe that the Debtor has drafted much of its plan

already and it appears that the parishes are participating directly in the drafting process. (*Id*. at

¶3.) The Committee and abuse survivors have not been invited into the plan drafting process in

earnest, and neither the Committee nor the abuse survivors have seen a copy of any draft plan, or

a copy of any draft plan provisions. Time is now very tight.

The Debtor has acknowledged that it intends to seek channeling injunctions for its parishes.

The channeling injunction issue is of tremendous importance and concern to the survivors of clergy

sexual abuse. Before abuse survivors could consent to a channeling injunction in favor of the

parishes, and thus give up separate claims that they (and possibly others) hold against the parishes,

they would necessarily need to understand what assets the parishes have, and what the parishes propose to contribute in exchange for such sweeping, third-party relief.  Unfortunately the parishes have refused to provide the Committee with any information regarding their assets despite multiple requests . (*Id*. at ¶ 4, Exs. B, C.)

Starting in 2015, the Committee, its counsel, and counsel for abuse survivors began discussing the retention of a financial advisor.  (Affidavit of James Keenan, ¶ 2.)  The parties collectively explored several options and carefully considered factors such as, among other things, the tasks that a Committee financial advisor would need to perform, the likely timeline for such tasks, the compelling need for a high level of subject matter sophistication, the benefits of prior experience and, of course, related fees and costs.  (*Id*. at ¶ 3.)  The parties explored and considered several options other than DTBA, including smaller firms that could ultimately prove less costly. (*Id*. at ¶ 4.)  After analyzing all relevant factors, the Committee voted in its discretion to retain DTBA.  (*Id*. at ¶ 5.)

I.    **THE COURT SHOULD DEFER TO THE COMMITTEE'S CAREFULLY-CONSIDERED DECISION REGARDING ITS FINANCIAL ADVISOR SO THE COMMITTEE CAN PERFORM ITS STATUTORY DUTIES**

"The function of a creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents."  *In re AKF Foods, Inc.*, 36 B.R. 288, 289 (Bankr. E.D.N.Y. 1984). Without the meaningful participation of a creditors' committee, a Chapter 11 bankruptcy case can become "a unilateral proceeding proposed by a debtor and approved by an uninformed creditor group."  *Id*. (quoting *Creditor Committee Functions and Expenses under Chapter XI of the Bankruptcy Act,* H.R.Rep. No. 121, 90th Cong. 1st Session at 3 (1967).  Report of the Commission on the Bankruptcy Laws of the United States, Part II, p. 218 (1973)).

> When a power granted under section 1103 is needed for the committee to fulfill its overriding duty of protecting the creditors'

4

interest, the committee is obliged to employ the power. ... A "creditors' committee not only has, with the court's approval, the power to employ attorneys, accountants, and other agents to represent or perform services for the committee, ***it has the duty to determine what assistance it requires in order to perform its duties, when such assistance is required, and to select those <u>best qualified</u> to render such assistance</u>*."

*Matter of Advisory Comm. of Major Funding Corp.*, 109 F.3d 219, 224 (5th Cir. 1997) (citations omitted) (emphasis added).

The robust involvement of "watchdog" committees in Chapter 11 cases enhances the legitimacy of the process.  In this case, the Committee's meaningful participation is particularly important due to the long-term victimization, marginalization, and disenfranchisement of the constituency it represents.  The Committee is bound, of course, to act primarily through the professionals it retains as a conduit to the process.  The Committee's fundamental ability to participate in the case, and to fulfill its statutory role and duties is therefore very much defined, and could very much be constrained, by the professionals that it is allowed (or not allowed) to retain.

Given these considerations, it is not surprising that courts defer to a committee's choice of professionals absent a highly-compelling justification to do otherwise.  "Public policy favors permitting parties to retain professionals of their choice." *In re Caldor, Inc.,* 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996); *see also In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982) (parties should be deprived of the privilege of selecting their own counsel "only in the rarest cases."). The Committee should be allowed to retain the financial professionals that it has determined, after careful consideration of all relevant factors, will do the most efficient and effective job at helping the Committee fulfill its duty as "watchdog."  The Application to employ DTBA should be approved.

## II.      THE COMMITTEE HAS AN IMMEDIATE NEED TO RETAIN EXPERIENCED, SOPHISTICATED FINANCIAL PROFESSIONALS

The Debtor has indicated that it has drafted much of its plan already and that it intends to propose a plan – regardless of the status of the mediation process – before May 31, 2016.  Counsel for the abuse survivors has reason to believe that the Archdiocese's parishes are participating actively in the crafting of plan terms.  (*See* Anderson Aff., ¶ 3.)  Regrettably, the Committee and abuse survivors have not been invited into the plan drafting process in any meaningful way, and the Debtor has not provided a copy of any draft plan, or a copy of any draft plan provisions.

Time is now very tight.  Particularly given the Debtor's shift in focus – from the cooperative mediation and efforts at a consensual plan to forcing a unilateral plan that will almost certainly lead to a large-scale confirmation dispute – each day that the Committee is left without the assistance of a financial advisor necessarily impacts its ability to fulfill its statutory functions.  The Committee urgently requires DTBA's assistance to provide the services described in the engagement letter, including, without limitation, the following:

- Analyze Debtor financial statements;

- Analyze the scope of estate assets;

- Assist and advise the Committee in its analysis of the Debtor's hypothetical liquidation analyses;

- Complete a comparative analysis of the Debtor's schedules and other financial data;

- Analyze financial interactions between the Debtor and its parishes;

- Assist the Committee in its evaluation of personal property owned by the Debtor's parishes, including providing valuation services to the Committee;

- Analyze parish financial data to assist in determining the propriety of channeling injunctions;[1]

- Analyze "trial balances" spreadsheets and complete a comparative analysis of related data to other information provided by the Debtor, including but not limited to information on the bankruptcy schedules;

- Assist in the analysis of potential avoidance and other causes of action of the estate; and

- Analyze structural, implementation, and other issues relating to the creation of a trust for unsecured creditors (as anticipated by the Debtor).

It now appears that each of the above topics and tasks could have a very large impact on the rights of abuse survivors in this case. If it is not authorized to retain financial professionals in the very near future, the Committee will be hamstrung and left with no meaningful opportunity to protect the rights of its constituency through the plan confirmation process (and possibly beyond), and this case would be at risk of becoming "a unilateral proceeding proposed by a debtor" and

---

[1]United States Courts of Appeals for the Fifth, Ninth, and Tenth Circuits have all interpreted 11 U.S.C. § 524(e)—which states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"—as prohibiting non-consensual third-party releases because such releases implicate the liability of an entity other than the debtor. *In re Zale Corp.* 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401–02 n. 6 (9th Cir. 1995); *In re W. Real Estate Fund, Inc.* 922 F.2d 592, 601 (10th Cir. 1990). Courts that do allow channeling injunctions typically consider five factors: (1) the existence of an identity of interest between the debtor and the third party; (2) whether the non-debtor contributed substantial assets to the reorganization; (3) whether the injunction is essential to reorganization; (4) whether a substantial majority of the creditors agree to such injunction; (5) whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class affected by the injunction. *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994). The agreement of a substantial majority of creditors is considered "the single most important factor," and courts have rejected releases without affirmative assent from affected creditors. *Id.*; *see also, e.g., In re Quincy Med. Ctr., Inc.,* 11-16394-MSH, 2011 WL 5592907, at *4 (Bankr. D. Mass. Nov. 16, 2011) (considering a third-party release binding only on those creditors who voted in favor of the plan). Courts have held that full payment of claims is necessary to obtain a release, *see, e.g., In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007), and others have refused to rule that non-debtors substantially contributed without an analysis of the non-debtor's ability to pay. *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002).

opposed only by "an uninformed creditor group." *AKF Foods, Inc.*, 36 B.R. at 289 (citations omitted). The principled administration of this case and the rights of the Committee's constituency are too important to allow the plan confirmation process to go forward in such an obviously unbalanced way.

## III.   DTBA'S FEES ARE REASONABLE AND FEASIBLE FOR THE ESTATE, AND DTBA'S SOPHISTICATION CREATES SIGNIFICANT EFFICIENCIES

The primary basis for objection appears to be the anticipated cost of DTBA's retention. This line of argument should be given no weight for several independent reasons:

- The United States Trustee has not objected to the Committee's Application on this, or any other grounds.

- No one has argued that DTBA's fees are outside the range of fees charged by, and approved for comparable professionals in this District or in this case. In fact, the Debtor acknowledges that the rates proposed are within the range of rates charged by other professionals in the case, albeit at the high end. (Docket No. 564 at p. 4.)[2]

- DTBA has agreed to bill exclusively on an hourly basis to ensure the United States Trustee's ability to review its fee applications on a detailed basis.

- The Debtor acknowledges that there is no risk of administrative insolvency in this case. (Docket No. 564 at p. 4.)

- Most importantly, DTBA was, after due deliberation, selected by the Committee that represents the interests of sexual abuse claimants in this case. Sexual abuse claimants are the only parties in interest likely to be impacted by the purportedly "high cost" of DTBA's retention (a premise that is very questionable for reasons set forth below). The last parties that should be allowed to substitute their judgment for that of the Committee are the parties that will necessarily be the focus of DTBA's analytical and investigatory efforts.

Moreover, DTBA's undeniable sophistication in all relevant areas is certain to create efficiencies that could actually lead to a comparative *reduction* in costs. There are very few

---

[2]The Application to retain Alliance Management as the Debtor's financial advisor was approved without objection and Alliance has twice had its fees approved in this case without objection. (*See* Docket Nos. 119, 322, and 495.)

financial advisory firms nationwide that can measure up to DTBA's experience and knowledge. The notion that the Committee could retain a smaller, purely-local firm and receive comparable services at a significantly-reduced price is simply not based in fact. Regardless of raw talent and ability, any firm lacking DTBA's broad background and deep bench would face a steep learning curve that would (i) cost the estate additional funds as its professionals got "up to speed," and (ii) expend additional time that the Committee simply does not have.

The Debtor and its parishes also objected to the Application to employ DTBA on grounds that:  (i) the Debtor has provided financial information to the Committee voluntarily; (ii) DTBA has not agreed to cap its fees; and (iii) the Application suggests that DTBA will analyze parish-related information and, because the parishes will likely refuse to provide such information, DTBA's proposed analysis will not be necessary. Addressing the last argument first, if the parishes continue to refuse to provide financial information, DTBA will not analyze such information and corresponding costs will never be incurred. Instead DTBA will focus on the many other tasks falling within the scope of its anticipated employment (as detailed above).

It would be inappropriate to limit DTBA's work by capping its fees at the current time because neither the Committee nor counsel for the abuse survivors can reliably predict the scope of work that DTBA will be asked to perform.[3] The Debtor has not shared the details of its draft plan with the Committee or counsel for the abuse survivors, the possibility remains that the parishes will stop refusing to provide financial information to the Committee, or that the Debtor

---

[3]In its Objection, the Debtor references an "initial" cap that applied to DTBA's fees in the Milwaukee Diocese case. DTBA did not act as financial advisor to the Official Committee of Unsecured Creditors in the Milwaukee Diocese case, but instead one of its directors served as the Future Claimants' Representative there. DTBA's director's role was thus limited to two primary tasks in that case – estimating future claims and making sure that such claims were provided for. DTBA's proposed role in this case is much broader and the scope of its services is much more difficult to predict.

will ultimately provide such information, and the Committee has reportedly not yet received all documents (including several years of account information) requested from the Debtor.  Given these significant unknowns, it is not reasonable to expect or require DTBA to cap its fees.

Finally, although the Debtor has provided some financial information to the Committee voluntarily, the sharing of such information has nothing at all to do with DTBA's proposed retention.  The Committee does not propose to retain DTBA to collect information, but to analyze the information once it is collected.  There is nothing about the Debtor's voluntary production of data that makes DTBA's retention less necessary.

**CONCLUSION**

The objections filed by the Debtor and its parishes have already caused unjustified and harmful delay.  There is no reasonable basis to imperil the rights of the abuse survivors further by substituting the thoughtful judgment of the Committee with the judgment of parties clearly motivated to limit the Committee's role in the upcoming, crucial stages of this case.  The Application to employ DTBA should be granted.

Dated:  March 18, 2016                    Respectfully submitted,

                                          JEFF ANDERSON & ASSOCIATES, P.A.

                                          /e/ Jeffrey R. Anderson
                                          Jeffrey R. Anderson, #2057
                                          Michael G. Finnegan, #033649X
                                          Elin M. Lindstrom, #0392927
                                          366 Jackson Street, Suite 100
                                          St. Paul, MN 55101
                                          Telephone: 651-227-9990
                                          Facsimile:  651-297-6543
                                          Email: jeff@andersonadvocates.com
                                          Email: mike@andersonadvocates.com
                                          Email: elin@andersonadvocates.com

                                          Attorneys for Certain Abuse Survivor Claimants

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 |
| Debtor. | Judge Robert J. Kressel |

## AFFIDAVIT OF JEFFREY R. ANDERSON

| | |
|---|---|
| STATE OF MINNESOTA | ) |
| | ) ss. |
| COUNTY OF RAMSEY | ) |

Jeffrey R. Anderson, being duly sworn, deposes and states as follows:

1.      My name is Jeffrey R. Anderson.  I am an attorney in the law firm of Jeff Anderson & Associates, P.A., counsel for certain personal injury creditors in the case captioned above.

2.      On February 8, 2016, Richard D. Anderson, counsel for the Debtor, sent an email to Mr. Robert Kugler and Mr. Dennis O'Brien providing 90 days' notice of the Debtor's intent to file a plan of reorganization.  I received a copy of the email from counsel for the Official Committee of Unsecured Creditors.  A true and accurate copy of the email is attached to this Affidavit as Exhibit A.

3.      On February 22, 2016, a local canon lawyer with a blog reporting on Archdiocese-related topics published an email from Mary Jo Jensen-Carter, counsel to the "Parish Group."  The blog entry was available as of the date of this Affidavit at the following link:  http://canonicalconsultation.com/1/post/2016/02/update-on-the-chapter-11-plan.html.  The blog post at issue explains that Ms. Jensen-Carter's email was "sent to parish representatives by the attorney representing the parish group," and that the blogger at issue received the email "via

a circuitous route" that she did not elect to detail.  Among other things, the email from Ms.

Jensen-Carter states:  "I will be meeting with the attorneys for the Archdiocese and other parish

attorneys to work on the Chapter 11 plan language in the next couple of weeks.  We are hoping

to get a plan filed in the next 30-60 days."

    4.      True and accurate copies of correspondence sent by counsel for the Committee

to parish attorneys are attached to this Affidavit as Exhibit B and Exhibit C.

    Further your affiant sayeth not.

                          Jeffrey R. Anderson

Subscribed and sworn to before me
this 18th day of March, 2016



Notary Public

**THERESE A. GAHLER**
Notary Public-Minnesota
My Commission Expires Jan 31, 2020

# EXHIBIT A

**From:** Anderson, Richard D. [mailto:RAnderson@Briggs.com]
**Sent:** Monday, February 08, 2016 1:16 PM
**To:** Kugler, Robert; Dennis@mantylaw.com
**Cc:** Caldie, Ed; Rogers, Charles
**Subject:** Exclusivity/ Plan Process


Rob and Dennis:

This is a follow up to the motion filed by the Archdiocese on October 14 to extend its exclusivity period (Docket No. 450). As you will recall, the Archdiocese agreed as part of its motion to provide the committees with at least 90 days advance notice of its intention to file a plan of reorganization prior to May 31.

This will constitute notice of the Archdiocese's intention to file a plan prior to May 31 (but not prior to 90 days from the date of this notice). As stated in its exclusivity motion, we will provide the committees with notice of any change in the Archdiocese's intentions with respect to plan filing.

Of course, we hope to reach agreement on plan terms with either or both of the committees prior to filing.

Thank you.


**Richard D. Anderson**
**Shareholder**

BRIGGS AND MORGAN

Briggs and Morgan, P.A.
Direct 612.977.8640
Cell 651.214.8980
Fax 612.977.8650
randerson@briggs.com
2200 IDS Center  |  80 South 8th Street  |  Minneapolis, MN 55402  |  briggs.com

1

CONFIDENTIALITY NOTICE: The information contained in this e-mail communication and any attached documentation may be privileged, confidential or otherwise protected from disclosure and is intended only for the use of the designated recipient(s). It is not intended for transmission to, or receipt by, any unauthorized person. The use, distribution, transmittal or re-transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing or by e-mail. If you are not the intended recipient of this e-mail, please delete it from your system without copying it and notify the above sender so that our e-mail address may be corrected. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

2

EXHIBIT B

**Caldie, Ed**

| | |
|---|---|
| **From:** | Caldie, Ed |
| **Sent:** | Wednesday, January 06, 2016 2:50 PM |
| **To:** | Dennis@mantylaw.com; 'maryjo@buckleyjensen.com' |
| **Cc:** | Kugler, Robert; randerson@briggs.com; Rogers, Charles; Gurstelle, Benjamin (BGurstelle@Briggs.com) |
| **Subject:** | RE: Archdiocese of Saint Paul and Minneapolis |

Good afternoon,

Rob is unavailable, so he asked me to communicate a couple of points regarding our document requests in hopes that we can approach the production process efficiently and cooperatively.

First, the Committee is not aware of any privilege that would inhibit the Archdiocese from responding fully and efficiently to our requests for information. The information we are seeking is in the possession of the Archdiocese and, in each instance, the requested information will bear on the Archdiocese's ability to confirm a plan acceptable to all major constituencies (a goal that everyone on this e-mail chain shares).

Second, and relatedly, Parish-related financial information will have to be understood for the UCC to properly evaluate any channeling injunction in favor of any parish. If a specific parish does not seek the protection of a channeling injunction, financial information regarding that specific parish may be somewhat less critical, but it will still be relevant for the UCC's analysis of plan feasibility and possibly other issues. While we understand that our requests may generate some discussion, or requests for clarity, the UCC would obviously take a very dim view of any parish that impeded its attempt to establish a cooperative information-sharing process only to seek the protections of a channeling injunction later on.

We believe the Archdiocese (at least largely) shares the UCC's view of the above issues, but we invite Rich and/or Charlie to chime in if we are mistaken.

Best,

-Ed

Begin forwarded message:

> **From:** "Anderson, Richard D." <RAnderson@Briggs.com>
> **Date:** January 6, 2016 at 6:00:59 AM MST
> **To:** "Dennis@mantylaw.com" <Dennis@mantylaw.com>, "Mary Jo A. Jensen-Carter (maryjo@buckleyjensen.com)"
> <maryjo@buckleyjensen.com>

1

**Cc:** "Kugler, Robert" <robert.kugler@stinson.com>, "Gurstelle, Benjamin" <BGurstelle@Briggs.com>, "Rogers, Charles" <CRogers@Briggs.com>
**Subject: FW: Archdiocese of Saint Paul and Minneapolis**

Mary Jo/ Dennis:

I have attached a copy of the correspondence and informal information and document request I received last week from counsel to the Official Committee of Unsecured Creditors (copied on this email).  We are in the process of responding to the requests dealing directly with the Archdiocese's books and records. A number of the requested items, however,  pertain to parishes. I have advised Rob Kugler of the correspondence we received from Mary Jo Jensen-Carter in February 2015.

We are willing to participate in a conference call on the matter if you believe that a call would be helpful.


**Richard D. Anderson**
**Shareholder**

Robert T. Kugler
Partner
Minneapolis
612.335.1645
x51645

Edwin H. Caldie
Partner
Minneapolis
612.335.1404
x51404

2

# EXHIBIT C



STINSON
LEONARD
STREET

Robert T. Kugler
612.335.1645 **DIRECT**
612.335.1657 **DIRECT FAX**
robert.kugler@stinson.com

March 3, 2016

*Sent via E-mail*

| | |
|---|---|
| Mary Jo Jensen-Carter<br>Buckley & Jensen<br>1257 Gun Club Road<br>White Bear Lake, MN 55110<br>E-mail: maryjo@buckleyjensen.com | Dennis O' Brien<br>Manty & Associates, P.A.<br>401 Second Avenue North, Suite 400<br>Minneapolis, MN 55401<br>E-mail: dennis@mantylaw.com |

RE:   In re The Archdiocese of Saint Paul and Minneapolis
         Case No.: 15-30125

Dear Mary Jo and Dennis:

In an e-mail sent to both of you on January 6, 2016, we informed you that Parish-related financial information will have to be understood for the Official Committee of Unsecured Creditors (the "Committee") to evaluate properly any channeling injunction in favor of any Parish. We also noted that, even if a specific Parish does not ultimately seek the protection of a channeling injunction, financial information regarding such Parish will still be relevant for our Committee's analysis of plan feasibility and other issues. Our e-mail further made clear that our Committee will take a very dim view of any Parish that impedes its attempt to establish a cooperative information-sharing process only to seek the protections of a channeling injunction later on. In the nearly two months following our e-mail, we have received literally nothing in the way of data that would allow our Committee to analyze the propriety of a channeling injunction in favor of any Parish. On the contrary, we received written communications stating an express refusal to share such information.

I write to you today to memorialize the Committee's position again. ***Our Committee will oppose by all means at its disposal the extension of a channeling injunction to any Parish that fails to provide the information listed in the enclosure to this letter within a timeframe that will allow the Committee's professionals a meaningful opportunity to digest and verify such information.*** To be clear, all information listed should be provided 120 days in advance of any confirmation hearing to permit the Committee's professionals a meaningful opportunity to understand and verify it.

You have expressed concerns regarding the confidentiality of Parish information given the likelihood that lawsuits will be filed against the Parishes in the near term. The possibility of lawsuits against the Parishes does not alter our Committee's need to verify Parish asset information, just as the possibility of such lawsuits will not alter the Parishes' efforts to obtain channeling injunctions through the confirmation of a plan. Nevertheless, we remain willing to discuss accommodations that would ensure the careful and confidential treatment of Parish financial data.

www.stinsonleonard.com                150 SOUTH FIFTH STREET, SUITE 2300 • MINNEAPOLIS, MN 55402
                                                   612.335.1500 MAIN • 612.335.1657 FAX

118836511.1

Please contact me to discuss a plan for executing on the sharing of Parish information.

Sincerely,

STINSON LEONARD STREET LLP

Robert T. Kugler

cc:    Richard D. Anderson (via e-mail: randerson@briggs.com)
       Charles Rogers (via e-mail: crogers@briggs.com)
       Benjamin Gurstelle (via e-mail: bgurstelle@briggs.com)

## DEFINITIONS

A.    "And" and "or" shall be construed either in the disjunctive or conjunctive as necessary to bring within the scope of this discovery request all responses that might otherwise be construed to be outside of its scope.

B.    "Archdiocese" refers to The Archdiocese of Saint Paul and Minneapolis.

C.    "Document" means any written, printed, typed, electronic, or other graphic or photographic matter of any nature, any audio or video recordings, computer data, as well as disks or other devices storing such data, and other data compilations from which information can be obtained, and translated if necessary by you through detection devices into reasonable usable form. A draft or non-identical copy is a separate document within the meaning of this term. These terms include all revisions, modifications, mark-ups, addenda, memoranda of understanding, attachments and exhibits. These terms shall include all attachments to and enclosures with any requested item, to which they are attached or with which they are enclosed, and each draft thereof. "Document" shall include the category of things enumerated by Federal Rules of Civil Procedure 34(a)(1).

D.    Financial Information refers to any information that tends to show the finances, financial condition or assets and liabilities of a Parish or the Archdiocese. Financial Information includes, but is not limited to, profit and loss statements, balance sheets, general ledgers, accounts receivable, accounts payable, assets and liabilities, statements of cash flow, investments, beneficial interests in trusts, and any Documents containing summaries, discussions, descriptions or analysis of the same.

1

E.     "Parish" shall refer to every parish that has operated or currently operates in the Archdiocese, including without limitation, the 187 parishes represented by the Parish Creditors' Committee in the Archdiocese's bankruptcy case (Minn. Bankr. Case No. 15-30125).

F.     "Parish Financial Reports," which are also referred to as "green sheets," means the annual financial reports prepared by Parishes.

G.     "Parish Financial Reviews," which are also referred to as "Parish reviews," means the financial review or summaries prepared by each Parish for the Archdiocese every five (5) years and every time there is a pastor change within a Parish.

H.     "Relating to" or "Reflecting" means to consist of, refer to, pertain to, reflect, evidence, constitute or be in any way logically or factually connected with the matter discussed.

## Request for Production of Documents from the Archdiocese

1.     All Financial Information for each Parish.

2.     All Parish Financial Reports for each Parish.

3.     All Parish Financial Reviews for each Parish.

4.     All annual reports for each Parish.

5.     All Documents, audits, financial reviews, or reports prepared or reviewed by an auditor or third party Relating To a Parish's Financial Information.

6.     All Documents illustrating each Parish's Financial Information.

7.     All Documents prepared by any Parish reflecting consolidated financial information of a Parish.

8.     To the extent not already disclosed pursuant to another request herein, a listing of, and all Documents reflecting any personalty or real property in the possession of a Parish regardless of whether the Parish views itself to be the title or beneficial owner of such personalty or real property.

9.     A list of all real property interests held by each Parish.

10.    Documents reflecting or illustrating any one or more real property interests held by each Parish.

2

11.   The following categories of information for each interest in real property held by a Parish:

  - All floor plans and drawings relating to the real property and its improvements
  - Building square footage breakdowns
  - List of Year built and subsequent building expansion years and what was added to the building (size, building component), if any
  - Site surveys
  - Site plans
  - Title work or information on any existing easements
  - List of capital expenditures over the past 5-10 years
  - List of any deferred maintenance and the estimated cost of repair/replacement (if known, or if they have construction bids)
  - Information on any use restrictions, zoning overlays, historical designations
  - Operating income and expense information over the past 3 years (plus YTD 2016)
  - Enrollment data over the past 10 years, if any
  - License or certificate indicating enrollment capacity for the building, if any
  - Any appraisals relating to the real property or its improvements
  - Information on any previous offerings for sale or offers to purchase

3

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

---

In re:

The Archdiocese of Saint Paul and Minneapolis,

Debtor.

Case No. 15-30125

Chapter 11

Judge Robert J. Kressel

---

### <u>AFFIDAVIT OF JAMES KEENAN</u>

STATE OF MINNESOTA    )
                           ) ss.
COUNTY OF HENNEPIN    )

James Keenan, being duly sworn, deposes and states as follows:

1.      My name is James Keenan. I serve as Chair of the Official Committee of Unsecured Creditors (the "Committee") in the case captioned above.

2.      Starting in 2015, the Committee, its counsel, and counsel for abuse survivors began discussing the retention of a financial advisor.

3.      The parties collectively explored several options and carefully considered factors such as, among other things, the tasks that a Committee financial advisor would need to perform, the likely timeline for such tasks, the compelling need for a high level of subject matter sophistication, the benefits of prior experience and, of course, related fees and costs.

4.      The parties explored and considered several options other than DTBA, including smaller firms that could ultimately prove less costly.

5.      After analyzing all relevant factors, the Committee voted in its discretion to retain DTBA.

Further your affiant sayeth not.

3/18/16

James Keenan

Subscribed and sworn to before me
this 18th day of March 2016

Notary Public

ROCHELLE GARCIA
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/17

2