# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Case No. 15-30125

The Archdiocese of Saint Paul and
Minneapolis,

Chapter 11

Debtor.

## AFFIDAVIT OF THOMAS P. DOYLE

STATE OF VIRGINIA    )
                          ) ss.
COUNTY OF FAIRFAX    )

1.     My name is Thomas Patrick Doyle. I was ordained a Catholic priest in the Dominican Order on May 16, 1970. I also served as an officer in the United States Air Force from 1986 until 2004. I currently reside in Vienna, Virginia. My *curriculum vitae* is attached.

2.     I have earned the following degrees: B.A. in Philosophy, Aquinas Institute of Philosophy, River Forest, Illinois granted in 1966; M.A. in Philosophy, Aquinas Institute of Philosophy, 1968; M.A. in political science, University of Wisconsin, 1971; M.A. in theology, Aquinas Institute of Theology, Dubuque, Iowa, 1971; M.Ch.A., Catholic University of America, Washington, D.C., 1976; M.A. in Canon Law, University of Ottawa, Ottawa, Ontario, 1977; J.C.L. (Pontifical Licentiate in Canon Law) St. Paul University in Ottawa, Canada, 1977 and a J.C.D. (Pontifical Doctorate in Canon Law), Catholic University of America, 1978. I am also a fully certified addictions counselor. I graduated from the Naval School of Health Sciences in San Diego.

1

3.    I have held several part-time academic positions from 1974 through 1995. These have included Visiting Lecturer in Canon Law at Catholic Theological Union in Chicago, Illinois from 1979-1981; Visiting Lecturer in Canon Law, Catholic University of America, Washington, D.C. from 1981-1986; and faculty member, Midwestern Tribunal Institute, Mundelein Seminary, Mundelein, Illinois from 1979-1986. In addition, I have served as a part-time Tribunal Judge for the Diocese of Scranton, Pennsylvania from 1986-1990, for the Diocese of Pensacola/Tallahassee and the Archdiocese of Military Services from 1993¬1995, and the Diocese of Lafayette in Indiana from 1991-1993.

4.    I have extensive experience serving in various administrative and judicial posts in the Catholic Church in the United States. These have included appointments as an advocate and later a judge in the Tribunal of the Archdiocese of Chicago and appointments as a judge in the tribunals of the dioceses of Scranton, PA, Pensacola, FL and Lafayette, IN. I have also carried out various administrative duties in the Archdiocese of Chicago due to my training as a canon lawyer.

5.    In addition to teaching and administrative work, I have written several books and articles on a variety of subjects related to theology and Canon Law. Included are one book, several articles and contributions to several books on subjects directly related to clergy sexual molestation of minors and vulnerable adults. A complete list of my publications can be found in my curriculum vitae which is attached.

6.      I continued to do parish work on weekends until I entered the military in 1986. I served as a reserve chaplain with several active duty assignments until 1990 when I became a full-time active duty officer and chaplain. I have held the following permanent assignments: 1990-1993, Grissom Air Force Base, Indiana; 1993-1995, Hurlburt Field, Florida; 1995-1997, Lajes Field, Azores; 1997-2001, Tinker Air Force Base, Oklahoma; 2001-2003, Ramstein Air Base, Germany; and 2003 to 2004, Seymour Johnson Air Force Base, North Carolina. I have also been deployed to Operation Joint Forge, Operation Southern Watch and Operation Iraqi Freedom.

7.      From the fall of 1981-1986 I served as secretary and Canon Lawyer on the staff of the Vatican Embassy in Washington, D.C. During my tenure at the Vatican Embassy, accusations of child abuse by Catholic priests and bishops as well as members of religious communities of men and women were reported to the Vatican Embassy by the local bishops. In these cases, I was given responsibility for preparing files, following correspondence and preparing responses to letters received by the Vatican Ambassador. I first became involved with sexual abuse by Catholic clergy in 1982 in the course of fulfilling my duties at the embassy. Since that time I have been consistently involved with this issue in a variety of ways throughout the United States and in other countries as well.

8.      I have testified as a qualified expert witness and consultant in criminal and civil cases involving clergy sexual abuse since 1988 and have studied documentation in cases from approximately 190 of the 195 Catholic dioceses in the United States. I have also served as an expert witness in civil and criminal cases in Canada, Belgium, The U.K., Ireland,

Australia, New Zealand and Israel. I have been directly involved with and studied documentation and personnel files from several religious orders with foundations in the U.S., Canada, Ireland, the United Kingdom, Belgium, Mexico, Italy, Germany and Austria. The religious orders and congregations I have studied have included the following, among others: Jesuits, Dominicans, Order of Friars Minor, Capuchin Franciscans, Carmelite Fathers, Maryknoll Fathers and Brothers, Basilians, Pallottine Fathers, Christian Brothers of Ireland, DeLaSalle Christian Brothers, Clerics of St. Viator, Redemptorists, Oblates of Mary Immaculate, Oblates of St. Francis de Sales, Benedictines, Missionaries of the Sacred Heart, Franciscans Third Order Regular, Legionnaires of Christ, Vincentians, Congregation of the Sacred Hearts of Jesus and Mary and Franciscan Brothers of Mount Bellow, Ireland.

9.      The Archdiocese of St. Paul and Minneapolis is a geographic division of the Roman Catholic Church.  It was created as a diocese in 1850 and raised to the dignity of an archdiocese in 1888.  Its formal name was the diocese (or archdiocese) of St. Paul until 1966 when it was changed to the Archdiocese of St. Paul and Minneapolis.   The archdiocese is headed by an archbishop (presently Bernard Hebda) who is personally appointed by the pope.

10.     The Catholic Church is a world-wide entity defined by its own highest authority as the "People of God."   This authority is the General or Ecumenical Council which, together with the Pope, has the authority to determine and define all matters pertaining to the Church. The Church is essentially people, not buildings, property or material wealth in any

4

degree.  The Church can function, in keeping with its essential meaning, without owning anything.

The Governmental Structure of the Catholic Church

11.     The Catholic Church is also a socio-political entity, organized and constituted as a society existing in the midst of the secular society in this world.  It has its own governmental system which is characterized as "hierarchical" in nature.  The concept has its roots in early history and refers to a government wherein authority is entrusted to *hieros* or "holy men."  A hierarchical governmental structure is one in which there is one source of power at the top with every other source of power subordinate to the entity above it.  In the Catholic Church the authority in the governmental structure is hierarchical.  All governmental and religious power needed for the governance of the Church is vested in individual office holders. The supreme authority figure in the Church is the pope.  The pope has absolute power and answers to no other human power. Although the Ecumenical or General Council is described as a gathering of all the world's bishops in which they exercise supreme and full power over the entire Church, this can only be done in union with the pope.  The decrees of an Ecumenical Council take effect only if they are approved of by the pope.  In the office of the papacy are joined the three main governmental functions:  judicial, legislative and executive. The pope is also the supreme pastor of the entire Church as well as the supreme teacher.  His authority is absolute and complete in that it reaches to each individual member of the Church.  The pope is assisted in the governance of the Church by a number of congregations, commissions, tribunals and other offices which make up the Vatican Curia.

125046442.1

All function under authority delegated by the pope and none can exercise any authority on their own.

12.     The papacy is one of two essential seats of authority in the Church. The other is the episcopacy or the office of Bishop. Each diocese or archdiocese is headed by a bishop. An archdiocese is a diocese that has been granted the title "archdiocese" because it has historic significance and is the primary diocese among others that are part of a grouping known as an ecclesiastical province. The head of an archdiocese is known as an archbishop. Every diocese is distinct. The offices of archbishop and bishop are essentially the same and differ only in the degree of prestige or honor. An archbishop does not have authority over other bishops of dioceses in the ecclesiastical province.

The Diocese or Archdiocese

13.     A diocese is the name of the major entity into which the entire church is divided. A diocese is defined by the Church as "...*a portion of the people of God which is entrusted for pastoral care to a bishop with the cooperation of the presbyterate so that, adhering to its pastor and gathered by him in the Holy Spirit through the gospel and the Eucharist, it constitutes a particular Church in which the one, holy, catholic and apostolic Church of Christ is truly present and operative."* (canon 369). Dioceses can only be created by the pope. They are generally created along geographic lines often following secular divisions such as counties or states. The Archdiocese of St. Paul and Minneapolis was originally created on July 19, 1850 from territory that had formerly been part of the Diocese of Dubuque and the Diocese of Milwaukee.

125046442.1

14.    The *"presbyterate"* refers to the priests of the diocese.  The word comes from *presbyter"* which in its Greek origins referred to an elder of a Christian community.  In Catholic usage it is synonymous with "priest" with the emphasis being on the pastoral dimension of the priesthood.

15.    Dioceses and archdioceses are now officially described as "particular churches."  This means that the diocese is a smaller version of the universal church and not an ecclesiastical "suburb" of the Vatican.  Prior to the Vatican Council the powers of the bishops were significantly limited to the point where some described bishops as "Vicars" or delegates of the pope.  The Council attempted to change this by restoring many of the powers to the bishop that previously had to be requested and delegated by the pope.  In spite of the description of the diocese as a particular church and in spite of the rhetoric that often speaks of the independence of the local bishop and of his supremacy as the representative of Christ in his own diocese, this is, to a significant extent, rhetorical because the pope still exercises absolute authority over every bishop.

The Office of Bishop

16.    All bishops are personally appointed by the pope. The governmental structure of a diocese is part of the overall hierarchical structure of the universal Church.  The bishop is the supreme authority in the diocese and is subject only to the authority of the pope and to any restrictions on his authority that are set forth in the Church's legal system.   The bishop's power is known as "ordinary" which means that it is power or authority that rooted in the

bishop's office and is not delegated by anyone or anything else. The bishop's ordinary power is not subject to the authority or power of any corporate or collegiate body such as the senate of priests, the diocesan consultors or any other body. The term "ordinary" is often used synonymously with "diocesan bishop" to distinguish him from auxiliary or retired bishops. Like the office of the papacy, the three main governmental powers, legislator, executive and judicial, are joined in the office of the bishop of a diocese. There is no separation of powers in the government of the Catholic Church. There are positions established in Church law that assist the bishop (or the pope) in carrying out certain of his executive, legislative and judicial duties. For examples, Church laws are generally drafted by staff and officials subordinate to the pope and then promulgated or officially published, by the pope. In a diocese the office of chief judge is carried out by the "Judicial Vicar", a title which means the Vicar or representative of the Chief judge.

17.     The nature and limits of a diocesan bishop's power are described in the Code of Canon Law. The bishop is the official representative of the diocese in all its juridic affairs. He is assisted in the administration of the diocese by the diocesan "curia." The curia consists of institutions and offices that assist in the governance of the diocese and in the pastoral care of the people. All office-holders are appointed by the bishop. Some of these are provided for in Canon Law such as the Vicar General, the chancellor, the Finance Officer and the judicial vicar. The bishop may appoint others to fulfill other duties. The bishop also is the sole authority to appoint pastors and assistant pastors. Conversely, only the bishop can remove a pastor, assistant pastor or incumbent in any of the diocesan offices.

125046442.1

18.     There are three collegiate bodies required for every diocese:  the Finance Council, the

Presbyteral Council (Priests' Council) and the College of Consulters.


19.     The bishop appoints the members of the finance council and presides over it either

directly or through a delegate. The presbyteral council is made up of both diocesan and

religious order priests who reside and work in the diocese.  Half are freely elected by the

priests themselves, some are members ex officio because of an office held and the

remaining are appointed by the bishop.  Only the bishop can convoke meetings of the

presbyteral council.  The bishop presides over the meetings of the Presbyteral Council.

The College of Consulters is made up of priests of the diocese chosen by the bishop.


20.     The collegial bodies mentioned in the foregoing paragraph and any others created by the

bishop or by the Holy See can have deliberative power and none of them have any authority

over the bishop.  In some few instances the bishop is required to hear the opinion of a

collegiate body such as in the erection, alteration or suppression of a parish when he must

hear the opinion of the presbyteral council.  No matter what their opinion, the final decision

rests with the bishop.  The final authority in all matters except those reserved to the Holy

See or to other offices by reason of Church law, is the archbishop.


21.     If the bishop wants to alienate (cf par. 40 in *alienation)* ecclesiastical goods of the diocese

he must receive the consent of the finance council, the college of consulters and any

concerned parties (canon 1292).   In the event that the bishop wishes to alienate

ecclesiastical goods that either exceed the value amount allowed for U.S. bishops or are

goods that are reserved to the Holy See (canon 1292, 2), he must also obtain the consent of the finance council and college of consultors. It is important to note that no one else in the diocese can initiate the process for alienation except the bishop. If a group of members from a parish, or the parish board of trustees or the pastor, want to sell property that belongs to the parish including securities, they *must* obtain the permission of the bishop who in turn must go through the process of obtaining the consent of the finance council and college consultors.

The Parish

22.    The fundamental structural entity of the diocese is the parish which is a community of the People of God whose pastoral care is entrusted to a pastor. The pastor must be a priest and can be appointed, replaced or removed only by the bishop. In making the appointments of pastors and associate pastors, the bishop is guided and bound by the norms of the Church's law. To be appointed to a parochial position the candidate "*should also be distinguished for his sound doctrine and integrity of morals and endowed with a zeal for souls and other virtues; he should also possess those qualities which are required by the universal and particular law to care for the parish in question.*" (Canon 521). The canon goes on to say that before the bishop confers the office on a priest "*his suitability must be clearly evident by means of some method determined by the diocesan bishop even by means of an examination.*" (Canon 521, par. 2)

23.    Parishes are usually created along determined geographic lines. The official definition of a parish is this: "*a parish is a definite community of the Christian faithful established on*

*a stable basis within a particular Church: the pastoral care of a parish is entrusted to a pastor as its own shepherd under the authority of the diocesan bishop."* (Canon 515, 1). A parish cannot be founded or created by a group of interested lay persons even if they are led by a priest. Since Vatican II (1962-1965) most parishes have initiated parish councils which are made up of elected and appointed lay persons, members of religious communities working in the parish and clergy. The council is consultative only and has no deliberative authority over the parish as a canonical or civil entity.

<u>What Is Canon Law</u>

24.    The Catholic Church's internal legal system, known as "Canon Law." This system describes the nature and various essential aspects of the Church as a political reality. The word "canon" is derived from the Greek word *kanon* which meant a rule or a straight line. Canon Law is the oldest continuously functioning legal system in the world. Its roots reach back to the 4th century when a group of bishops in Spain met to enact rules in response to various problems encountered by Church communities in their region. The meeting is known as the Synod of Elvira. The bishops enacted legislation in the form of eighty-one canons which included prohibitions of illicit sexual activity by clerics. From that time and for several ensuing centuries Canon Law consisted of laws or decrees issued by individual bishops, by synods or councils of bishops, by general councils of the Church and by the popes.

25.    The Church's internal regulatory system is not a theological treatise nor is it an article of faith that is part of the body of doctrine that Catholics are expected to believe. It is a

collection of internal rules, regulations and norms that give concrete shape to the institutional Church. It is a regulatory system that serves a religious body known as the Roman Catholic Church. It is true that certain of the individual laws or "canons" are directly or indirectly related to theological or religious concepts. This is not unusual since the constitutions of several secular states refer in some way to a higher power. This does not mean that the legal system itself is a catalogue of the religious beliefs of Catholics. The Code describes the various offices, bodies and internal political structures of the Catholic Church. It presents the duties, responsibilities and qualifications for the various offices and positions in the Church. It contains a section on procedural laws for settling disputes and providing due process. It contains a section of criminal behavior which lists certain actions that are considered church crimes.

26.   The Code of Canon Law is not a substitute for the civil law systems of the various countries where the Church is established. It does not "trump" civil law. There are canons that stipulate that civil laws are to be obeyed in all things that are not immoral or contrary to God's law. Canon Law is used in cases being tried before a secular court to explain and clarify the various aspects about the Catholic Church. When it is presented in civil court the purpose is not to expect the civil judges to interpret, apply, critique or explain canon law. Rather, the purpose is to assist in understanding how the institutional Church works. For example, Canon Law contains specific mandatory procedures for the investigation of reports of possible canonical crimes such as sexual abuse of minors by clergy. It also contains the basic requirements that bishops should look for in assigning priests to various posts. When the facts of a case are examined in civil court, Canon Law

can be helpful to determine what the Church's own internal expectations were of an office-holder in a given situation. The separation of Church and State, which is a constitutional fact in the United States and other countries, does not prevent a civil court from asking questions about the Church's internal regulations any more than it prevents a civil court from asking questions about the internal norms for a secular corporation. If a civil court expresses interest in how the internal workings of a Church impact the behavior of clerics, including bishops, such an interest, though often erroneously labeled an *intrusion* into Church doctrinal or authority matters by some, is nothing more than a justifiable inquiry.

## The Concept of a Juridic Person in Canon Law

27.     Canon Law was greatly influenced by the ancient Roman Law (The Law of the Christian emperor Justinian) and by the laws and legal concepts of some of the Germanic tribes that invaded and became established in what was once the Roman empire. One of the principles of Roman Law was that everything in law was divided into *persons, actions* and *things*. Concepts or entities included in Canon Law had to be somehow classified under one of these headings. Consequently, there entered into Canon Law and artificial construct that allowed groups of physical persons or things to function and be treated under the law as a single entity with its own rights and obligations. These entities were known as "*moral persons*" in the 1917 Code of Canon Law. The revised Code of 1983 gave the name of the concept more precision by changing it to "*juridic person.*"

125046442.1

28.   Juridic persons are aggregates of persons or things.  Juridic persons are classified as *public* juridic persons if they act officially on behalf of the authority by whom they were constituted.  These are juridic persons that exist and function for the good of the Church and are under competent Church authority.  *Private* juridic persons are those which are not created by or under the authority of official church authority.  For example, a religious institute such as the Jesuits is a public juridic person but an organization such as the Knights of Columbus is a private juridic person.

29.   The canonical concept of the juridic person and the civil law concept or the *corporation* have their roots in ancient Roman Law and with more precision, in medieval Canon Law.  Roman Law developed the concept of treating several individual things which were joined together such as the parts of a building or a ship, as if it were one legal entity.  This was known as *Corpus ex cohaerentibus.*  Related to this was the concept of *corpus ex distantibus* whereby a collection of things, though not physically united, were treated as a whole and thus could be the object of legal transactions and claims.  It appears that the concept of a juridical person actually originated in Canon Law in the mid twelfth century.  Pope Innocent IV appears to have been the first to develop the idea that a group of persons, formed together as a collegiate group, could have the juridical identity of a single person or *personae fictae* and thus be subject to rights and duties as well as penalties.

30.   According to Catholic teaching and Canon Law the Catholic Church itself and the Papacy are both moral or juridic persons and are constituted as such by Divine action which means that each was created by God.  All inferior moral or juridic persons are instituted by

competent Church authority or by the law itself. When the pope erects a diocese it automatically becomes a juridic person by virtue of its creation. The same is true of parishes. The bishop is the agent or legal representative of a diocese and the pastor is the agent of a parish. Conglomerates of persons or things are given juridic personhood if their purpose is to somehow promote the mission of the Church.

31.　　A parish or diocese is, in essence, a group of people. Membership in either depends upon, among other things, domicile in the diocese or parish. The person or persons do not have to be physically present within the boundaries of the diocese or parish at all times to sustain membership.

Attaining Identity in Civil Law

32.　　Catholic dioceses and parishes in the U.S. have attained recognition in the civil law in one form or another since the very early 19th century. This is in keeping with the Church's self-stated right to "*acquire, retain, administer and alienate temporal goods in pursuit of its proper ends independently of civil power*" (canon 124). The purpose of civilly incorporating Catholic Church entities such as dioceses, parishes, colleges, schools etc. is the protection of the entity's property. This is to reflect the canonical concept that all property acquired by the Church is for the accomplishment of its ends. Church property was originally incorporated by John Carroll, the first bishop in the U.S. (Bishop of Baltimore, 1790-1815). He first did so by vesting title of church property in a board of trustees.

15

33.     When the Holy Father creates a diocese he does not (and cannot) create it as a civil corporation in the country or state wherein it exists. He has no power to incorporate anything anywhere with the exception of entities in the Vatican City State.

34.     A diocese can exist without being incorporated in the civil law of the country in which it exists. The concept of civil incorporation is relatively new when viewed in the context of the Church's two-thousand-year history. Civil incorporation came into being as a way of distinguishing between the goods and property of the Church as a collective and the members as individuals. The earliest indications of property tenure in church legislation indicate that the Church's leaders realized that certain goods and property was set aside for the work of the Church but were not owned as such by individual bishops or other Church leaders but by the community. This created a serious conflict because according to church law the bishop has the absolute right and authority of administration of ecclesiastical property and goods.

35.     The original method of ownership was the creation of a board of lay trustees who formed the body that owned the ecclesiastical property. In a short time, this led to very serious problems for the Church authorities, namely the bishops. The controversy, commonly known as "Trusteeism" amounted to the trustees in various dioceses, all lay members of the Church, attempting to control the assignment of priests and even bishops. This obviously clashed with the official governmental model of the universal Church. The hierarchical model had no room for authority vested in lay persons or for ownership of ecclesiastical property in the hands of anyone but official church authorities.

125046442.1

36. The Catholic bishops met in plenary council in Baltimore in 1829 and the issue of property tenure was the pressing issue. Therein began a protracted battle against trusteeism which saw the beginnings of the use of the civil concept of *Corporation Sole* as the means of property tenure which most closely responded to the Church's governmental structure. Thus the bishop was the sole member of the corporation of any entity that was to be incorporated according to the civil law of the area. The Holy See at first favored this concept because of its proximity to the canonical method of property tenure.

37. There were problems with the concept of Corporation Sole which resulted in a decree from the Holy See in 1911 concerning property tenure in the United States. These problems concerned bishops who comingled Church property with their own. The decree said that tenure by "fee simple" was to be abandoned. Corporation Sole was to be discouraged as the preferred method of tenure. The decree went on to state that the preferred method of incorporation was the model in use in the State of New York at that time. Cardinal Hayes, the Archbishop of New York, addressed this issue in 1909 in an Instruction to the archdiocese. In it he re-stated Church law that no property could be bought or sold for the Church without the consent of the archbishop. The membership of Church corporations was to consist of the archbishop, the vicar general, the pastor and two lay trustees. Consequently, the ownership remained in the hands of the institutional Church's canonical governing structure and was not radically separated from it. Had the majority of the membership consisted of lay persons the ownership of the property would have effectively been transferred to them. This would have amounted to an illegal and invalid alienation.

125046442.1

38.     Since that time all civil incorporation of any Church property is to follow the fundamental norm laid out by Cardinal Hayes and ratified by the Holy See in 1911. The authority over the property remained in the hands of official church authority figures. Moreover, the issues that necessitated the change from trusteeism were eliminated.

39.     In each and every case of incorporation of a diocese or parish according to civil law, the corporate structure must be such that radical ownership and control remain with the duly appointed officials of the Catholic Church. The bishop or archbishop has been vested with complete authority and responsibility by the pope in his appointment. He cannot divest himself of any of this authority by turning over ownership of church goods or property to a lay board.

40.     *Alienation* is the canonical term that refers to any act or preparation for an act whereby ownership of ecclesiastical property is transferred to another such as by sale, gift or exchange. Alienation also includes any act whereby the use and control of church property is transferred to another such as by lease. Ecclesiastical property or goods cannot be alienation without the permission of the competent Church authority.

Ecclesiastical Property

41.     Ecclesiastical property which belongs to the Holy See or to a public juridic person are considered *ecclesiastical goods or property* and are regulated by canon law and by any particular statutes approved for the juridic person that owns the property. Ecclesiastical

125046442.1

goods are not owned by any individual nor are they owned by the superior or administrator of the entity that acquired them.

42.  Money as such is not considered to be official ecclesiastical property unless it is set aside or created into a fund by competent Church authorities.  It must have a purpose even if the purpose is only to generate income.  When money is "fixed" it becomes ecclesiastical property and is subject to the canons and other statutes that are applicable.  The disposal or conveyance of fixed funds for a purpose other than that officially designated is considered an alienation and is subject to the rules for alienation.

43.  Any juridic person in the Church is capable of acquiring, retaining, administering and alienating temporal goods in accord with the norms of canon law (canon 1255).  The right of ownership belongs to the juridic person that validly and licitly acquired them.  At this point it is essential to understand the distinction between ownership of ecclesiastical property and *dominium* which means the legitimate power to use, alter, destroy or dispose of ecclesiastical property.  Perfect *dominium"* exists when the entity that owns the property also has the right of complete control over it.  This is not the case with any juridic persons in the Catholic Church.

44.  Church law assigns ownership of the ecclesiastical goods to the juridic person that rightly acquired them for its use, e.g., buildings, property, furnishings, fixed monetary funds.  However, the people who make up the parish do not have the power or the right to *dominium* over the parish goods.  Nor does the pastor who is the agent of the parish.

125046442.1

45.     A parish may be separately incorporated in civil law but the method of incorporation must conform to the manner allowed by ecclesiastical authority.  As we have seen in the brief mention of the Vatican Decree of 1911, the Holy See has stated that incorporation should follow the model initiated in New York State whereby the membership of the corporate board consisted of five persons:  the archbishop, the vicar general, the pastor and two lay persons.  Consequently, the civil corporation remained owned by the institutional Church.

46.     There never was a question as to whether the bishop actually owned the property of the various juridic persons.  As bishop of the diocese he does not and cannot hold title to the parish property.  In truth the question of actual ownership is irrelevant because ownership resides with the Church.  The issue is control.  According to canon 1273, the pope is the "*supreme administrator and steward of all ecclesiastical goods.*"  By this canon the pope is the real trustee of all ecclesiastical property in the entire Church.  Since the pope has pre-eminent ordinary power over every diocese and every parish, he can choose to exercise this power how and when he pleases.  In some dioceses the bishop claims that he holds all parish property "in trust" for the parishes but that he does not own it.  This statement is both inaccurate and irrelevant.  It means nothing to say the bishop "holds" property.  Similarly the concept of ownership by the juridic person which is the parish is of little practical consequence.  The bishop has control over the parish in all essential ways:  he controls the appointment and change of leadership; he controls by necessity approval the salaries of the clergy;  he controls whether or not capital improvements can be made; he controls the existence of the parish in that he alone can issue the decree of erection or suppression.  The bishop also has a significant degree of control over all parish finances.

125046442.1

Any investments of free cash must be approved by the bishop. If the parish is incorporated in civil law, with the exception of corporation sole, the majority of the membership must be controlled by the bishop.

47. The administration of the ecclesiastical goods belonging to any juridic person is the responsibility of the person who immediately governs the juridic person. In a parish the canonical administrator is the pastor. The bishop is to supervise the administration of all juridic persons subject to his authority which includes the parishes of the diocese. He is to issue norms and instructions for the administration of all ecclesiastical goods in the diocese. These norms cover a number of matters that pertain to parishes such as major improvements to the buildings, sale of parish owned properties or conversion of parish owned buildings from one use to another.

48. The bishop's permission is required to perform what are known as "acts of administration" in a parish if these exceed the value or parameters set by the bishop for the diocese. This further illustrates the bishop's ultimate control over ecclesiastical goods.

49. In some instances, the sale or alteration of ecclesiastical goods owned by a parish juridic person is even beyond the authority of the bishop of the diocese. If the value exceeds that set by the Conference of Bishops, permission of the Holy See is required. If the ecclesiastical goods to be disposed of are goods donated through a vow or goods with a special artistic or historical value, permission of the Holy See is required. This illustrates

that the property in question belongs to the Church and is ultimately controlled by Church authority.

50.     Although parishes are separate juridic persons in canon law and may be separate corporations in civil law, the bishop's authority and control over the parish remains the same. Radical ownership of the parish by the juridic person has little meaning in terms of the control the bishop has over the parish, its finances and its ecclesiastical goods. The bishop alone has the authority to merge a parish with another parish. He alone has the authority to close parish facilities and then officially suppress the parish (the two are different). If a parish is suppressed and the juridic person extinguished according to the norms of law, the ownership of the ecclesiastical goods owned by that parish is transferred to the juridic person immediately superior which would be the diocese (canon 123). The bishop cannot fully suppress a parish with the consequent extinction of the juridic person unless the norms o canon law have been properly followed but the fact remains that he alone has the authority to do this. A parish may be separately incorporated in civil law but this has no bearing on the bishop's rights and obligations as outlined in canon law.

51.     All parishes in a diocese share in the same mission which is the spiritual and moral support and guidance of the people entrusted to the bishop. These people are members of the parishes of a diocese and receive their sacramental services and other spiritual nourishment primarily through the priests assigned to the parish and in some instances they receive this directly from the bishop or one of his auxiliary bishops. The direction of the parish must follow the norms found in Church law and teaching as pertains to liturgy, preaching,

teaching and spiritual guidance.  If there is a diversion from any of these to the extent that it could harm the parishioners, the authority to intervene and take whatever corrective actions is required, rests with the bishop alone.  The bishop, following the norms set forth by the general law of the Church and in keeping with the official church teaching, oversees the pastoral mission of the parish.  To repeat, he is also the supervisor of the administrator of the parish ecclesiastical goods, namely, the pastor.

52.     In most parishes pastors and assistant pastors receive their monthly remuneration and other benefits directly from the parish.  The funds are generally drawn from the overall parish income which comes from various types of donations of the parishioners.  The amount of remuneration and other benefits is not determined by the pastor, the parish council or any other entity at the parish. It is determined by the bishop.

53.     Some parishes have bank accounts where unused money, or "free capital" is placed.  These funds can be used to pay expenses incurred by the parish.  Since it is free capital it is not considered ecclesiastical goods.  If the pastor decides to invest some or all of the funds he must receive the permission of the bishop because this is considered to be an act of "extraordinary administration" (canon 1284, 2, 6).

54.     In some dioceses the individual parishes have been separately incorporated for decades if not longer as this was the practice for the diocese or the state.  The separate civil identity did not mean the parishes were independent from the diocese nor did it mean they were joined to the diocese in a kind of loose federation whereby each retained independence

23

from the diocese in all essential matters similar to the relationship of suffragan dioceses in an ecclesiastical province to the archdiocese.  This has never been the case for the parishes, though separately incorporated are still joined to the diocese with the bishop retaining direct control over most aspects and all key aspects of their existence. Parishes are an essential part of a diocese.  The bishop of the diocese exercises his ministry to the members through the parishes.  This is explained in canon 519 which includes an explanation of the meaning of the pastor's ministry:  "*The pastor is the proper shepherd of the parish entrusted to him, exercising pastoral care in the community entrusted to him **under the authority of the diocesan bishop in whose ministry of Christ he has been called to share**…*"(emphasis mine).

55.     Parishes are directly linked as the essential social and religious structures of the diocese. A diocese without the parishes is an empty shell with no real meaning.  Bishops often refer to "my diocese" and in doing so they are not referring to the Cathedral or the diocesan administrative offices but to the parishes that make up the diocese.  A number of analogies have been used to try to describe the relationship of parishes to the diocese.  One compares the parish to a branch of a company and another compares the parish to a "slice" of the archdiocese.  Neither analogy adequately describes the relationship because it is a unique relationship unlike any found in secular socio-political or economic structures.  Some have claimed that the bishop "holds ecclesiastical property in trust for the parishes."  A trust relationship would require a written trust agreement yet such do not exist in dioceses or parishes.  When a parish is formally erected by the decree of the bishop there is no mention of any form of trust between the bishop and the juridic person.

56.     Although parishes are recognized as separate canonical entities, as has already been mentioned above, the bishop has *dominium* over the ecclesiastical goods of the parish and control over the very existence of the parish.  In the 1960's there was a theory advanced called the "McGrath Theory of Property Ownership" by Father John J. McGrath.  Father McGrath was a civil and canon lawyer and a professor of comparative law at Catholic University of America.

57.     Although the McGrath theory had its practical application at the time with Catholic hospitals and Catholic schools owned by religious communities, the Holy See repudiated the concept precisely because if applied it would alienate the property from legitimate church authority.  The theory could easily have been applied to parishes.

58.     In the United States several bishops and archbishops have closed or attempted to close parishes over the past several years.  In many instances these closures have been challenged by lay people because the decision to close was made unilaterally by the bishop.  The Vatican has backed the bishops on the grounds that the bishop, to put it simply, has control over the parishes.

59.     Several years ago a Polish parish in St. Louis was engaged in a protracted struggle with the archbishop of St. Louis.  In 1891 a former archbishop had turned over the title to the parish property to the parishioners.  They formed a board that actually held legal title.  Over a century later the sitting Archbishop insisted the board turn over title to the archdiocese claiming that it had to be in conformity with Canon Law and with every other parish.  The

125046442.1

total ownership of the parish by the parishioners was a complete anomaly in both Church law and in the Catholic Church in general. The board refused and the archbishop excommunicated them, suppressed the parish, had the priest laicized and informed the members of the archdiocese that they could not attend services at the parish. In the process the Holy See responded with a decree that stated that the archdiocese was the rightful owner of the property.

60.     In conclusion it is erroneous to assert that parishes or other juridic persons in a diocese that are under the control of the local bishop such as diocesan high schools or colleges (not controlled by religious institutes) are not part of the diocesan patrimony. The concept of juridic personhood and its ownership of the ecclesiastical goods and properties associated with the juridic person has little if any practical meaning because the bishop had sole control over all essential aspects of the juridic person itself and over its ecclesiastical goods.

125046442.1

FURTHER AFFIANT SAYETH NOT.

Dated: _May 22, 2016_

_Thomas P. Doyle_
Thomas P. Doyle

Subscribed and sworn to before me
this ___22___ day of May 2016

_Susan A Rogers_
Notary Public

**Susan Alexis Rogers**
**NOTARY PUBLIC**
**Commonwealth of Virginia**
**Reg. #7189167**
**My Commission Expires**
**September 30, 2018**

# CURRICULUM VITAE

## Thomas Patrick Michael Doyle

Thomas Doyle was born August 3, 1944 in Sheboygan WI, the son of Michael Doyle and Doris Mellenthien. He is the eldest of three children. He attended primary and secondary school in Ogdensburg NY and Cornwall, Ontario. In August, 1964 he entered the Dominican novitiate at Winona MN and was given the religious name of Thomas. He pronounced simple vows in 1965 and solemn vows on August 16, 1968.

Graduate studies in philosophy and theology took place at Aquinas Institute of Philosophy, River Forest IL and Aquinas Institute of Theology, Dubuque IA respectively. He pursued graduate studies in Political Science at the University of Wisconsin and graduate studies in Canon Law at the Gregorian University, Rome, Catholic University of America, the University of Ottawa and St. Paul's University, Ottawa. He was ordained a Catholic priest in the Dominican Order on May 16, 1970 in Dubuque, IA.

After completing graduate work in theology and several months of clinical pastoral training, he was assigned as an associate pastor in River Forest IL in 1971. In 1974 he was appointed an advocate for the Metropolitan Tribunal of the Archdiocese of Chicago. In 1978 he was appointed a judge in the same tribunal. In 1981 he was asked to serve as secretary-canonist at the Vatican embassy in Washington D.C., a post which he held until early, 1986. On June 16, 1986 he was commissioned a reserve officer in the U.S. Air Force. He was on active duty until August, 2004. His Air Force assignments were at Dover AFB, Dover DE and Andrews AFB, Maryland. Air Force training took place at Lackland AFB, Texas and Maxwell AFB in Alabama. His active duty assignments have been at Grissom AFB, IN, Hurlburt Field, FL, Lajes Field, Azores, Tinker AFB, OK and Ramstein AB, Germany and Seymour Johnson AFB, North Carolina.

While serving in the United States Air Force, he was given the opportunity to receive training in addictions counseling. He took courses at the University of Oklahoma while stationed at Tinker AFB in Oklahoma City between 1997 and 1999. In 2000 he attended the Navy School of Health Sciences, Department of Alcohol and Drug Counseling and graduated in August 2000. In 2001 he was qualified as a Certified Alcohol and Drug Counselor.

He has had extensive teaching experience in Canon law as a visiting lecturer at Catholic University of America and the Chicago Theological Union. He has also been a lecturer at the Matrimonial tribunal Institutes of Catholic University of America and Mundelein Seminary as well as at the Institute for Spirituality in River Forest IL.

As a member of the Canon Law Society of America he served one term as member of the board of governors and three terms as chairman of the Marriage Research Committee. He was asked by the society to be the author of the section on marriage in the commentary prepared on the revised Code of Canon Law. He was also asked by the Commission for the Authentic Interpretation of the Code of Canon Law of the Holy See to prepare the footnotes on marriage for the annotated edition of the Code of Canon Law.

Fr. Doyle has given lectures and seminars on various aspects of Church Law throughout the United States, Canada, England, Ireland, the Netherlands, Australia and New Zealand. These

1

have included topics in the areas of matrimonial jurisprudence, procedural law, penal law, religious law, property law and the theology and canonical history of marriage.  In 1986 he was the featured lecturer at the annual convention of the Canon Law Society of Australia and New Zealand.

In late 1984 he became involved with the issue of sexual abuse of children by Catholic clergy while serving at the Vatican Embassy.  Since that time he has developed an expertise in the canonical and pastoral dimensions of this problem.  He has worked with victims of abuse and their families, priests accused of abuse, bishops and superiors of religious institutes on this issue.

He has also been asked to assist entities of the institutional Church. He has developed policies and procedures for dealing with cases of sexual abuse by the clergy for dioceses and religious orders in the United States, Canada, Australia and New Zealand.  The manual he wrote in 1985 together with Dr. Michael Peterson and Mr. Ray Mouton was used as an essential resource by the Canadian Bishops in the creation of their protocol for responding to clergy sex abuse, "From Pain to Hope," in 1992.  He has also conducted research and has published articles on the spiritual damage caused by sexual abuse by clerics.

In the capacity as an expert in this area, he has delivered lectures and seminars for clergy and lay groups in the U.S., Canada, England, Belgium, the Netherlands, Northern Ireland, the Irish Republic, Australia and New Zealand.  He has spoken to the State legislatures of Pennsylvania, Ohio, Illinois, Colorado, California, Delaware, Maryland and the City Council of the District of Columbia on child protective legislation.  He has also served and continues to serve as a consultant/court expert in cases of alleged sexual abuse by the clergy throughout the United States, Canada, Ireland, Israel and the United Kingdom.  He has served as a consultant and expert witness to grand juries in several jurisdictions in the U.S.  He has been a consultant to State and Federal legislative officials concerning changes in the law that would benefit victims of sexual abuse.  He has also served as a consultant or expert witness to the investigative commissions established in the Republic of Ireland since 2002.  He was an expert witness before the Cornwall Commission in Ontario in 2007.  In 2010 he was asked to address the special commission of the Belgian Parliament investigating clergy sexual abuse.  In 2013 he was asked to submit expert testimony to the Royal Commission of Inquiry in Australia.  He has appeared in numerous documentaries on clergy sexual abuse produced in the U.S., Canada, Ireland, the U.K., Germany and France.

In 2013 he was asked by the Capuchin Franciscan Fathers of the Midwest Province in the United States to take an active role in conducting a complete review of the province's personnel files, past and present as well as a review of the manner with which the Capuchin Fathers had responded to every report of sexual abuse in the province's history.  He and the other two reviewers completed their work and published an extensive and historic report in 2013.  In April 2015 Father Doyle was asked to serve as a consultant to the Pontifical Commission for the Protection of Children.  He accepted the invitation and has taken an active role as a consultant.

In recognition of his advocacy work for the victims of Catholic clergy sexual abuse Father Doyle received the *Cavallo Award for Moral Courage* in 1992, the *Priest of Integrity* Award from Voice of the Faithful in 2002 and the *Isaac Hecker Award* from the Paulist Fathers in 2003.  In June of 2003 he was issued an official commendation from the Dominican Fathers for his "*prophetic work in drawing attention to clergy sexual abuse and for advocating the rights of victims and abusers.*"  In July 2005 he was awarded the "*Community Champion Award*" by

the Civil Justice Foundation of the Association of Trial Lawyers of America. In July 2007 SNAP awarded him the Red Badge of Courage Award. In March 2013 he received the *Salem Award* from the Salem Foundation for Social Justice and Human Rights.

## ACADEMIC CREDENTIALS

**B.A.**  **Philosophy,** Aquinas Institute of Philosophy, River Forest, IL , 1966

**M.A.**  **Philosophy**, Aquinas Institute of Philosophy, River Forest, IL, 1968
Dissertation: "Organized Religion in Marxist-Leninist Philosophy."

**M.A.**  **Political Science,** University of Wisconsin, Madison, 1971,
Dissertation: "Vladimir Lenin's Theory of Social Revolution."

**M.A.**  **Theology**, Aquinas Institute of Theology, Dubuque, Iowa, 1971, Dissertation: "Liberation Theology in the Context of Social Needs in South America."

**M. Ch.A.**  **Administration**, Catholic University of America, Washington, D.C., 1976

**M.A.**  **Canon Law,** University **of Ottawa, Ottawa, Ontario, 1977**
Dissertation: "The Canonical and Legal Foundation of the Dominican Order in Canada**."**

**J.C.L.**  **Pontifical Licentiate in Canon Law.** St. Paul University, Ottawa, 1977**.**

**J.C.D.**  **Pontifical Doctorate in Canon Law.** Catholic University of America**, Washington, D.C., 1978. Dissertation: "Marital Fidelity in the Canonical Tradition of the Catholic Church."**

**Diploma:**  Squadron officers School, Air University, May, 1996

**Diploma**:  United States Navy Drug and Alcohol Counselor School, October, 2000

**Diploma:**  Air Command and Staff College, Air University, July 5, 2002

**Diploma:**  Navy School of Health Sciences, Drug and Alcohol Counselor, September 2000.

## ASSIGNMENTS AND POSITIONS HELD

2003-04    USAF, Seymour Johnson AFB, North Carolina

2001-03    USAF, Ramstein AB, Germany

1997 -01    USAF, Tinker AFB, Oklahoma

1995 -97    USAF, Lajes Field, Azores

| 1993 -95 | USAF, Hurlburt Field, Florida |
|----------|-------------------------------|
| 1990 -93 | USAF, Grissom AFB, Indiana |
| 1991-93 | Tribunal Judge, Diocese of Lafayette in Indiana |
| 1993-95 | Tribunal Judge, Diocese of Pensacola-Tallahassee and Archdiocese for the Military Services, U.S.A. |
| 1986-90 | Tribunal Judge and Special Assistant to the Archbishop, Archdiocese for the Military Services, U.S.A. |
| 1986-90 | Tribunal Judge, Diocese of Scranton, PA. |
| 1981-86 | Secretary-Canonist, Vatican Embassy, Washington, D.C. |
| 1981-86 | Visiting Lecturer in Canon Law, Catholic University of America, Washington, D.C. |
| 1979-86 | Faculty Member, Midwest tribunal Institute, Mundelein Seminary, Mundelein, IL. |
| 1978-86 | Faculty Member, Tribunal Institute of the Catholic University of America, Washington, D.C. |
| 1979-81 | Visiting Lecturer in Canon Law, Catholic Theological Union, Chicago IL. |
| 1978-81 | Tribunal Judge, Archdiocese of Chicago, IL. |
| 1974-78 | Advocate and Defender of the Bond, Tribunal, Archdiocese of Chicago, IL. |
| 1978-85 | Faculty member, Institute of Spirituality, River Forest IL |
| 1971-74 | Associate Pastor, St. Vincent Ferrer Parish, River Forest IL. |
| 1970-71 | Graduate Student , Aquinas Institute of Theology, Dubuque, Iowa. |
| 1966-70 | Theological studies, Aquinas Institute of Theology |

## OTHER POSITIONS HELD

| 1983-85 | Consultant to the Canonical Affairs Committee of the National Conference of Catholic Bishops |
|---------|---------------------------------------------------------------------------------------------|
| 1978-81 | Member, Board of Governors, Canon Law Society of America |

| 1979-86 | Chairman, Marriage research Committee, Canon law Society of America |
| 1979-86 | Editor, <u>Marriage Studies</u>, Washington D.C. |
| 1982-88 | Weekly columnist, <u>Arlington Catholic Herald</u> |
| 1988-90 | Consultant to the Canonical Affairs Committee of the National Conference of Catholic Bishops |
| 1986 | Director of the Institute of Spirituality, River Forest, IL |
| 1971 | Clinical Pastoral Training, Minnesota State Prison |

## PUBLICATIONS: BOOKS

1. <u>Comrades in Revolution</u>. Dayton: Pflaum Press, 1969.

2. <u>The Understanding of the "Bonum Fidei" in the Church's Canonical Tradition</u>. Washington, D.C.: Catholic University of America, 1978.

3. <u>Rights and Responsibilities in the Church</u>. New York: Pueblo Press, 1983.

4. <u>The Homilist's Guide to Scripture, Theology and Canon Law</u>. (With John Burke, O.P.), New York: Pueblo Press, 1987.

5. <u>The Code of Canon Law: A Commentary</u>. Leesburg VA: Catholic Home Study Institute, 1988.

6. <u>Christian Marriage</u>. Leesburg VA: Catholic Home Study Institute, 1989.

7. <u>Meeting the Problem of Sexual Abuse Among the Clergy in a Responsible Way</u>. (With Michael Peterson, M.D. and F. Ray Mouton, J.D.), Suitland MD: St. Luke Institute, 1985.

8. <u>Sex, Priests and Secret Codes</u>. With A.W.R. Sipe and Patrick Wall. Los Angeles. Bonus Books. 2006.


## PUBLICATIONS: ARTICLES

1. "A New Look at the 'Bonum Fidei'," <u>Studia Canonica</u> 12(1978), 6-40.

2. "The Individual's Right to marry in the Context of the Common Good." <u>Studia Canonica</u> 13(1979), 245-302.

3. "Marital Breakdown: The Experience of the Tribunal." <u>The Priest</u>, September 1981.

4,    "The Obligation of the Divine Office." The Priest, February, 1980.

5.    "The Contemporary Challenge to Christian Marriage."  The Priest, November and December, 1981.

6.    "Why Some Catholics Get Divorced." U.S. Catholic, August, 1980.

7.    "The Effects of Marital Disintegration on Children." The Priest, June, 1981.

8.    "The Relationship of Canon law to the Catholic Family." The Priest, February, 1983.

9.    "Sacramental Theology:  Where We Are Today." The Priest, November, 1983.

10.    "The Sacraments in the New Code." The Priest, November and December, 1984.

11.    "The Contemporary Challenge to the Christian Family." The Exchange, Winter, 1980.

12.    "The Internal Forum Solution." Phoenix, Summer, 1982.

13.    "The Roman Catholic Church and Mixed Marriages." Ecumenical Trends, June, 1985.

14.    "The Moral Inseparability of the Unitive and Procreative Aspects of Human Sexual Intercourse." Monitor Ecclesiasticus, 109(1984), 447-469.

15.    "The Canonical Status of Religious Institutes:  Additional Considerations." Studia Canonica  18(1984), 347-364.

16.    "The Church and Marital Breakdown." Listening 15(1980), 54-64.

17.    "The Canonical Foundations for Pre-Marital Preparation." Marriage Studies, Vol. 1, Washington D.C.:  Canon law Society of America, 1980, 65-77.

18.    "Select Bibliography on the Sacrament of Marriage." Marriage Studies, Vol. 1, Washington D.C.: Canon law Society of America, 1980, 78-101.

19.    "The Competent Forum, Matrimonial Trials and Norm 7 of the American procedural Norms," Marriage Studies, Vol. 1, Washington D.C., Canon Law Society of America, 1980, 102-143.

20.    "Matrimonial Jurisprudence in the United States." Marriage Studies, Vol. 2, Washington D.C.: Canon law Society of America, 1982, 111-158.

21.    "The Moral Inseparability of the Unitive and procreative Aspects of Sexual Intercourse in the Thought of Pope John Paul II." Marriage Studies, Vol. 3, Washington, D.C.: Canon Law Society of America, 1985.

22.    "The Catholic Church and Marital Breakdown." The New Catholic World, February, 1986.

23. "The Canonical Status of Religious Institutes." <u>Monitor Ecclesiasticus</u> 110(1985), 227-245.

24. "The Theology of Marriage." <u>Studia Canonica</u>, 20(1986).

25. "More on the Canonical Status of Religious Institutes." <u>Angelicum</u>, 1987.

26. "The Dignity of the Human Person in the Thought of John Paul II." <u>Social Thought</u>, 1987.

27. "The Clergy in Court:  Clergy Malpractice." <u>The Priest</u>, January and February, 1987.

28. "Faith and the Sacrament of Marriage." <u>Proceedings of the Australian Canon law Society</u>, 1987.

29. "Marriage."  in <u>The Code of Canon law:  A Text and Commentary</u>. New York:  Paulist Press, 1985.  P. 737-834.

30. "Ministry to the Military:  Valid or Not." <u>The Priest</u>, June, 1987.

31. "Military Marriages:  Some Special problems." <u>Studia Canonica</u> 21(1987).

32. "Military Marriages." <u>Military Chaplain's Review</u>, Spring, 1988.

33. "The Christian Vocation of Marriage." <u>Handbook on Critical Sexual Issues</u>.  St. Louis: Pope John XXIII Center. 1983.

34. "The Clergy in Court:  recent Developments." <u>The Priest</u>, July and August, 1990.

35. "Canon Law."  336 entries on Canon Law topics in <u>The Concise Catholic Encyclopedia</u>, Huntington IN:  Our Sunday Visitor Press, 1990.

36. "The Rights of Priests Accused of Sexual Misconduct." <u>Studia Canonica</u> 24(1990).

37. "Canon Law."  274 entries in <u>The Concise Catholic Dictionary</u>, Huntington IN: Our Sunday Visitor Press, 1993.

38. "Healing the Pain."   <u>The Blue Book</u>.  Annual Proceedings of the National Catholic Council on Alcohol and Drug Related Problems, 1994.

39. "Privileged Communications in the Military."  Hurlburt Field, FL, Chaplain Resource Board.

40. "Privileged Communications and Military Chaplains."  USAF Chaplain Resource Board

41. "Roman Catholic Clericalism, Religious Duress and Clergy Sexual Abuse." <u>Pastoral Psychology</u>, 51(2003).

42. "Catholic Clergy Sexual Abuse Meets the Civil Law." <u>Fordham Urban Law Journal</u> Jan. 2004.

43. "Canon Law: Failure from Above," in <u>Sin Against the Innocents</u>, Thomas Plante, editor, Greenwood Publishing Group, March 2004.

44. "Clericalism-Enabler of Clergy Sexual Abuse." <u>Pastoral Psychology</u> 54(2006). 189-213.

45. "The Darkest of the Dark Side." <u>Conscience</u> 28(2007). 34-37.

46. "Sexual Abuse by Clerics:  Historical Awareness of the Problem."  In Tim Leedom and Maria Murdy, editors, <u>the Book Your Church Doesn't Want You to Read</u>.  2nd edition. New York.  Cambridge House Press.  2007.

47. "Clericalism and Catholic Clergy Sexual Abuse."  In Mary Gail Frawley-O'Dea and Virginia Goldner, editors. <u>Predatory priests, Silenced Victims</u>. Mahwah, NJ.  Analytic Press.  2007.

48. "Clericalism, Religious Duress and Its Psychological Impact on Victims of Clergy Abuse." <u>Pastoral Psychology</u>.  58(2009): 223-238. (With Marianne Benkert, M.D.)

49. "The Spiritual Trauma experienced by Victims of Sexual Abuse by Catholic Clergy." <u>Pastoral Psychology</u>.  58(2009).

50. "Fundamentalism in the Roman Catholic Legal Tradition."  Hamilton, Marci and Rozell, Mark. Editors.  <u>Fundamentalism, Politics And The Law</u>.  London.  Palgrave MacMillan. 2011.

51. "Sexual Abuse of the Vulnerable by Catholic Clergy."  <u>Les Cahiers de Plaidoyer-Victimes Antenne sur la Victimologie</u>.  7(Mars 2011).  (Montreal, Quebec.)

52. "Canon Law and an Essential Enabling Factor in Child Abuse."  Holohan, Carole, Editor. <u>In Plain Sight:  Responding to the Ferns, Ryan, Murphy and Cloyne Reports</u>. Dublin. Amnesty International Ireland.  2011.

53. "Sexual Abuse by Catholic Clergy:  The Spiritual Damage."  Plante, Thomas and McChesney, Kathleen, Editors.  Westport CT.  Praeger.  2011.

- The list of publications includes only those which have appeared in scholarly journals.  In addition to the articles listed the author has published numerous others in various news media, popular journals and magazines and on internet web sites.


## PROFESSIONAL MEMBERSHIPS

Canon Law Society of Great Britain and Ireland

Canon Law Society of Australia and New Zealand

Canadian Canon Law Society

Societe Internationale de Droit Canonique

Professional Association of Dive Instructors

National Association of Alcohol and Drug Counselors


## MILITARY AWARDS AND DECORATIONS

National Defense Medal (2x)

NATO Service Medal

Kosovo Campaign Medal

Armed Forces Service Medal (2x)

Armed Forces Expeditionary Medal (2x)

Humanitarian Service Medal

Military Outstanding Volunteer Service Medal

Air Force Achievement Medal (2x)

US Army Achievement Medal

US Army Commendation Medal

Air Force Commendation Medal (3x)

Meritorious Service Medal (3x)

"Most Distinguished Graduate," US Navy Drug and Alcohol Counselor School


## AWARDS

1992:    Cavallo Award for Moral Courage in Government and Business

2002:    "Priest of Integrity Award," Voice of the Faithful

2003:    Isaac Hecker Award for Achievements in Social Justice

2005:    Community Champion Award, Civil Justice Foundation of the Association of Trial Lawyer of America.

2007:   Red Badge of Courage Award, SNAP. July 21, 2007

2013:   Salem Award from the Salem Foundation for Social Justice and Human Rights

**MISCELLANEOUS**

Member, Order of the Desert Legion (US Army)

FAA licensed pilot, multi-engine, commercial and instrument rated, FAA certified advanced and Instrument ground instructor

P.A.D.I. certified Master Scuba Diver, Divemaster, Rescue Diver

Certified Alcohol and Drug Abuse Counselor (CADAC)

Thomas P. Doyle

May 3, 2016