## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Bankruptcy Case No.  15-30125

Chapter 11 Case

## SECOND AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS

BRIGGS AND MORGAN, P.A.
Richard D. Anderson
Charles B. Rogers
Lauren E. Lonergan
Benjamin E. Gurstelle
2200 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: (612) 977-8400
Facsimile: (612) 977-8650
Attorneys for The Archdiocese of Saint Paul and Minneapolis

Dated: December 19, 2016

## DISCLOSURE STATEMENT

On January 16, 2015 (the "Petition Date"), the Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").  Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtor seeks confirmation of its Chapter 11 Plan of Reorganization (as it may be amended or modified, including as amended in the Debtor's Second Amended Chapter 11 Plan of Reorganization submitted on December 19, 2016, the "Plan").

Pursuant to section 1125 of the Bankruptcy Code, the Archdiocese submits this First Amended Disclosure Statement (the "Disclosure Statement") in connection with the Plan. Section 1125 of the Bankruptcy Code requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable stake holder, typical of the Debtor's creditors, to make an informed judgment whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above, and use of this Disclosure Statement for any other purpose is not authorized.

**THIS DISCLOSURE STATEMENT AND THE PLAN MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED.**

**NO REPRESENTATIONS CONCERNING THE ARCHDIOCESE, INCLUDING THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE ARCHDIOCESE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PLAN.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED THEREIN.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE ARCHDIOCESE AND OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AUDIT OR INDEPENDENT REVIEW EXCEPT AS SPECIFICALLY SET FORTH HEREIN. ACCORDINGLY, ALTHOUGH EVERY EFFORT HAS BEEN MADE TO BE ACCURATE, THE ARCHDIOCESE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE ARCHDIOCESE OR ITS FINANCIAL CONDITION IS ACCURATE OR COMPLETE.**

BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE ARCHDIOCESE'S ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN. THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, PROVIDED THAT HISTORICAL FINANCIAL INFORMATION IS REPORTED AS OF MARCH 31, 2016, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

THE FACTUAL AND FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT IS FROM THE DEBTOR AND FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF, INCLUDING FROM THE 2014 AUDIT AND 2015 UNAUDITED REPORT ATTACHED TO THIS DISCLOSURE STATEMENT. HOWEVER, THE DEBTOR AND PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR FREE FROM ANY INACCURACY OR OMISSION.  THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT.

ALTHOUGH THE DEBTOR'S PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.  SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL

NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLAN, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ALLOWED CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND RECOVERIES UNDER INSURANCE POLICIES. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, NOR CAN THE IMPACT OF ANY SUCH FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting.  To obtain, at your cost, additional copies of this Disclosure Statement please contact:

Benjamin Gurstelle
Briggs and Morgan, P.A.
2200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402

Table of Contents

Page

I.    INTRODUCTION .................................................................................................. 1
II.   PLAN OVERVIEW AND SUMMARY OF TREATMENT OF CLAIMS ...................... 2
      A.   Executive Summary ................................................................................. 2
      B.   Alternatives to Plan ................................................................................. 5
III.  BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE .......................... 6
      A.   Brief overview of Chapter 11 bankruptcy ............................................ 6
      B.   History and legal structure of the Archdiocese .................................... 7
      C.   Non-Debtor Parish corporations ........................................................... 8
      D.   Other non-Debtor Catholic entities ....................................................... 9
      E.   The clergy sexual abuse crisis and the Archdiocese's response ........... 9
      F.   Events leading to the Chapter 11 filing ............................................... 12
      G.   Purpose and goals of this Chapter 11 case ........................................... 13
IV.   DEBTOR'S OPERATIONS ................................................................................. 14
      A.   Sources of revenue ............................................................................... 14
           1.   Parish assessments ..................................................................... 14
           2.   Catholic Services Appeal Foundation program revenue ......... 15
           3.   Program revenues ....................................................................... 15
           4.   Contributions .............................................................................. 15
           5.   Administrative revenue .............................................................. 15
           6.   Investment income ..................................................................... 16
      B.   Ongoing operations and expenditures .................................................. 16
           1.   Archdiocese Operational Programs ........................................... 16
           2.   General Insurance Fund .............................................................. 17
           3.   Archdiocese Medical and Dental Benefit Plan ......................... 19
           4.   Priest Health and Dental Plan .................................................... 21
           5.   Retirement and pension plans ..................................................... 22
           6.   Other benefit programs ............................................................... 23
           7.   Interparish Loan Fund ................................................................ 24
      C.   Budget summary ................................................................................... 24
V.    DEBTOR'S ASSETS .......................................................................................... 25
      A.   Real property ........................................................................................ 25
           1.   Property sold during this Chapter 11 case – converted to cash ... 26
           2.   Property in use for religious purposes ....................................... 26
           3.   Property leased to others ............................................................ 26
           4.   Leasehold interests ..................................................................... 28
      B.   Personal property .................................................................................. 28
           1.   Insurance claims and settlements ............................................... 28
           2.   Cash ............................................................................................. 28
           3.   Accounts receivable .................................................................... 31
           4.   Miscellaneous personal property ............................................... 31
      C.   Other interests and assets ..................................................................... 32

Table of Contents
(continued)

Page

    1.    Residual Ward Estate .................................................................. 32
    2.    Clarey Oil Rights ....................................................................... 32
    3.    Ausmar Development Co., LLC ................................................ 32
D.    Avoidable Transfers ............................................................................. 32

VI.    THE CHAPTER 11 CASE ............................................................................ 34
    A.    Commencement of the Chapter 11 case ............................................... 34
    B.    Retention of professionals .................................................................... 34
        1.    Debtor's professionals ............................................................... 34
        2.    Official Committee of Unsecured Creditors' professionals..................... 35
        3.    Parish Committee's professionals ............................................. 35
    C.    Significant events in the bankruptcy case ........................................... 35
        1.    First-day motions ..................................................................... 35
        2.    Debtor's schedules and statements and monthly operating reports ........ 36
        3.    Claim Filing Deadline and notice publication ......................... 36
        4.    Future claims representative ..................................................... 37
        5.    Property sales ........................................................................... 37
        6.    New lease for Archdiocese offices .......................................... 39
        7.    Ramsey County lawsuits and settlement .................................. 39
        8.    Rejection of Infor contract and settlement of claim................. 40
        9.    Assumption of Byrne Residence lease...................................... 40
        10.    Competing plans filed ............................................................. 40
        11.    UCC motion for substantive consolidation................................ 41
    D.    Insurance adversary proceeding and mediation ................................... 41
        1.    The Insurance Declaratory Judgment Action ......................... 41
        2.    Confidential mediation process................................................ 42
        3.    Claims determinations .............................................................. 44
        4.    Insurance coverage issues ........................................................ 45
        5.    Insurance settlements ............................................................... 48
    E.    Lawsuits against Parishes .................................................................... 51
    F.    Professional expenditures in the Chapter 11 case................................ 51
        1.    Professional expenditures so far .............................................. 51
        2.    Expenditures if a Plan is not confirmed .................................. 52

VII.    DEBTOR'S NON-MONETARY UNDERTAKINGS FOR THE PROTECTION
OF CHILDREN ........................................................................................... 52

VIII.    SUMMARY OF THE PLAN ....................................................................... 53
    A.    Classification of Claims....................................................................... 53
    B.    Definition of Claims and Claim treatment........................................... 55
        1.    Priority Claims (Class 1) .......................................................... 55
        2.    Governmental Unit Claims (Class 2)........................................ 55
        3.    General Insurance Fund and Archdiocese Medical and Dental
Benefit Plan Claims (Class 3) ................................................. 55

Table of Contents
(continued)

4.    Archdiocese Priests' Pension Plan Claims (Class 4) ............................... 57
5.    Archdiocese Lay Employees' Pension Plan Claims (Class 5)................. 57
6.    Pending Tort Claims (Class 6).................................................................. 57
7.    Future Tort Claims (Class 7).................................................................... 59
8.    Inter-Parish Loan Fund and Assessment Overpayment Claims
(Class 8) ................................................................................................. 59
9.    Trade Vendor Claims (Classes 9A and 9B)............................................ 60
10.   Secured Claim of Premier Bank (Class 10) ............................................ 60
11.   Guaranty Claims (Class 11) .................................................................... 60
12.   Other Tort Claims and Unsecured Claims (Class 12).............................. 60
13.   Catholic Entity Abuse-related Contingent Claims (Class 13) ................. 61
14.   Other Abuse-related Contingent Contribution and Indemnity
Claims (Class 14) .................................................................................. 61
15.   Penalty Claims (Class 15)....................................................................... 61
16.   Priest Support Payments (Class 16)......................................................... 62
C.      Treatment of Administrative Claims, Priority Tax Claims, and
Professional Fee Claims................................................................................... 62
1.    Administrative and Priority Tax Claims in general ................................. 62
2.    Treatment of Administrative Claims ....................................................... 62
3.    Treatment of Priority Tax Claims ............................................................ 62
4.    Statutory Fees.......................................................................................... 62
5.    Treatment of Professional Fee Claims .................................................... 63
D.      Settlements embodied in the Plan .................................................................... 63
E.      Resolution of Tort Claims; Formation of Trust ............................................... 63
1.    Purpose and formation of Plan Trust ...................................................... 63
2.    Funding the Plan Trust............................................................................. 64
3.    Trust treatment of Class 6 and Class 7 Claims; treatment election ......... 69
4.    Trust powers with respect to Tort Claims and Non-Settling
Insurers................................................................................................... 73
5.    Non-Settling Insurers rights and obligations ........................................... 74
6.    Settling Insurers' rights and obligations ................................................. 75
7.    Catholic entity/other insured entity waiver/consent/fees....................... 77
F.      General Trust provisions .................................................................................. 78
1.    Trust allocations, distributions, and payments........................................ 78
2.    Trustee..................................................................................................... 79
3.    Termination.............................................................................................. 80
4.    Immunity; liability; indemnification....................................................... 80
G.      Plan implementation ........................................................................................ 81
1.    Plan funding ............................................................................................ 81
2.    Continuation of future claims representative ........................................... 82
3.    Retention of jurisdiction .......................................................................... 82
4.    Unclaimed property ................................................................................. 82

Table of Contents
(continued)

Page

    H.    Continuation of Insurance Policies ................................................................. 82
    I.    Procedures for Claims administration other than Tort Claims ............................ 83
        1.    Objection to Claims ................................................................................ 83
        2.    Determination of Claims ......................................................................... 83
        3.    Claim estimation for claims other than Tort Claims ................................ 83
    J.    Distributions under the Plan ............................................................................ 84

IX.    PLAN EFFECTIVENESS ............................................................................... 84
    A.    Conditions to occurrence of Effective Date ..................................................... 84
    B.    Non-occurrence of Effective Date .................................................................. 85

X.    EFFECTS OF CONFIRMATION .................................................................... 85
    A.    Dissolution of the Committees ........................................................................ 85
    B.    Discharge Injunction ...................................................................................... 85
    C.    Channeling Injunction .................................................................................... 86
    D.    Exculpation; limitation of liability .................................................................. 88
    E.    Settling Insurer Supplemental Injunction ....................................................... 88
    F.    Insurance Settlement Agreement Injunction .................................................... 90
    G.    Timing .......................................................................................................... 90

XI.    THE REORGANIZED DEBTOR .................................................................... 90
    A.    Continued Existence ...................................................................................... 90
    B.    Vesting of Assets .......................................................................................... 90
    C.    Management of Reorganized Debtor ................................................................ 91

XII.    MISCELLANEOUS PLAN PROVISIONS ...................................................... 91
    A.    Rejection of Unassumed Executory Contracts ................................................. 91
    B.    Executory contract rejection claims ................................................................ 92
    C.    Indemnification of members, managers, officers, and employees ...................... 92
    D.    Lease claim indemnity ................................................................................... 92
    E.    Indemnity for uninsured non-tort claims ......................................................... 92
    F.    Reservation of right ....................................................................................... 92
    G.    Final order .................................................................................................... 93
    H.    Amendments and modifications ...................................................................... 93
    I.    U.S. Trustee reports ...................................................................................... 93
    J.    No waiver ..................................................................................................... 93
    K.    Tax exemption .............................................................................................. 93
    L.    Non-severability ........................................................................................... 94
    M.    Revocation ................................................................................................... 94
    N.    Controlling documents ................................................................................... 94
    O.    Governing law .............................................................................................. 94
    P.    Notices ......................................................................................................... 95
    Q.    Filing of additional documents ....................................................................... 95
    R.    Powers of officers ......................................................................................... 95

Table of Contents
(continued)

Page

S.    Direction to a party ..................................................................................... 95
T.    Successors and assigns................................................................................. 95
U.    Certain actions ............................................................................................ 95
V.    Final decree ................................................................................................. 96
W.    Plan as settlement communication............................................................... 96
X.    Other rights ................................................................................................. 96
Y.    Rule 9019 Request;  1129(b) Confirmation Request.......................................... 96

XIII.    ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING
         REQUIREMENTS.......................................................................................... 96
    A.    Best Interests Test........................................................................................ 96
        1.    Legal standard for the Best Interests Test................................... 97
        2.    Hypothetical Chapter 7 liquidation scenario.............................. 98
    B.    Financial Feasibility.................................................................................. 100
    C.    Acceptance by Impaired Class; 1129(b) confirmation .................................... 100
    D.    Certain Risk Factors .................................................................................. 102
        1.    Failure to satisfy vote requirement ........................................... 102
        2.    Risk of non-confirmation.......................................................... 102
        3.    Non-consensual confirmation .................................................... 103
        4.    Appeal risk ............................................................................... 103
        5.    Uncertainty of value................................................................. 103
    E.    Certain federal income tax considerations.................................................... 103
        1.    Tax consequences to Creditors .................................................. 104
        2.    Tax consequences to the Debtor ................................................ 105
        3.    Tax consequences to the Plan Trust........................................... 105
    F.    Solicitation of Votes ................................................................................. 105
    G.    Voting Procedures ..................................................................................... 106
        1.    Ballots ...................................................................................... 106
        2.    Importance of your vote............................................................ 107

XIV.    RECOMMENDATION AND CONCLUSION....................................................... 107

## I.     <u>INTRODUCTION</u>

The Debtor provides this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan.  All holders of Claims are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

**THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR SUCH APPLICABLE DOCUMENT SHALL GOVERN.**

A copy of the Plan is attached to this Disclosure Statement as **<u>Exhibit A</u>**.[1]

This Disclosure Statement was filed on December 19, 2016.  The Bankruptcy Court held a hearing on the adequacy of the information set forth in this Disclosure Statement on December 15, 2016.  By order dated _____, 2016, the Bankruptcy Court approved the Disclosure Statement.  A copy of the order approving the Disclosure Statement is attached as **<u>Exhibit B</u>**. The Bankruptcy Court will hold a hearing on confirmation of the Plan on _____, 2017 at ____ in Courtroom 8 West, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415.  At that time the Bankruptcy Court will review a ballot report concerning votes cast for accepting or rejecting the Plan, any objections to the confirmation of the Plan, and other evidence and arguments from parties in interest.

The Debtor believes that the Plan is in the best interests of and provides the highest and most expeditious recoveries to holders of all Claims against the Debtor.  All holders of Claims entitled to vote to accept or reject the Plan are urged to vote in favor of the Plan.

Voting instructions are contained in the solicitation package accompanying each ballot.

**THE DEBTOR RECOMMENDS THAT HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THIS PLAN.**

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

## II. PLAN OVERVIEW AND SUMMARY OF TREATMENT OF CLAIMS

### A. Executive Summary

THE FOLLOWING EXECUTIVE SUMMARY IS INTENDED TO PROVIDE AN OVERVIEW OF THE BASIC STRUCTURE OF CERTAIN PROVISIONS OF THE PLAN DEALING WITH THE TREATMENT OF TORT CLAIMANTS AND SUMMARY OF CERTAIN ALTERNATIVES TO THE PLAN. THE SUMMARY SET FORTH BELOW IS FURTHER QUALIFIED BY THE SPECIFIC PROVISIONS OF THIS DISCLOSURE STATEMENT BELOW. PARTIES IN INTEREST ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT IN ITS ENTIRETY. THE SPECIFIC PROVISIONS OF THIS DISCLOSURE STATEMENT WILL CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS SUMMARY AND ANY SPECIFIC PROVISIONS OF THE DISCLOSURE STATEMENT. THE PLAN WILL CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN.

The Plan divides the different creditors into classes as more fully described below. The Plan addresses the concerns of sexual abuse claimants, referred to as "Tort Claimants," in three ways. First, the Plan incorporates protocols previously negotiated by the Archdiocese, including rigorous standards relating to conduct and reporting and strict, independent oversight. These protocols are intended to ensure that the Archdiocese is doing all that it reasonably can to protect children. Second, the Plan establishes a $500,000 Counseling Fund for victims of sexual abuse. Third, the Plan provides that a minimum of $155 million and as much as $162 million in cash will be available to fund a plan trust within a short time after court approval. The sources of such funds are described below. A portion of such amounts will be needed to pay administrative claims and case expenses. The remainder will promptly be delivered to the independent Trust created under the Plan to administer and pay Tort Claims.

The sources of the $155-162 million in immediate and near term cash described above include:

Archdiocese Insurance Carrier Contributions

- Cash from Archdiocese settling insurers                $115,400,000

- Liquidation Value of Home Claim (Est. Minimum)     $   7,200,000

    Total                                                             $122,600,000

Archdiocese Direct Contributions

- Archdiocese Cash Contributions                         $ 11,883,243

- Riley Fund settlement                                       $  1,292,282

- Value of AUSMAR Development (Est.)          $    365,775

- Value of ring and other available property     $    280,000

  Total                                          $ 13,821,300

Contributions from General Insurance Fund     $5,000,000-6,000,000

Parish contributions (from parish insurers)     $ 13,732,500

**GRAND TOTAL**                              $155,153,800-$156,153,800

**Contributions by the Archdiocese Carriers**.  The Archdiocese has negotiated settlements all 14 insurance carrier groups. Thirteen of the settlements will result in cash payments by the carriers totaling $115,400,000 to be made within a few weeks after the Plan receives final court approval. In addition to the over $115 million in cash, the Archdiocese has negotiated a settlement with the liquidator of the Home Indemnity Company ("Home") which provides the Archdiocese with a $14.2 million approved claim in the Home liquidation proceeding.  This claim will be assigned to the Trust.  The Archdiocese has received an unsolicited offer to purchase the approved Home claim for $7.2 million.  The Trustee can choose to sell the claim immediately or wait for payments over time if he or she concludes that the payment directly from the Home liquidator will net a greater amount over the long run.  Should the Trustee chose to liquidate the claim immediately, the Archdiocese believes that he or she should be able to negotiate a purchase price of $7.2 million or more.

The Archdiocese has spent almost two years negotiating with the 14 settling carriers.  In the opinion of the Archdiocese, the settlements with these carriers resulting over $122 million of value represent the most favorable resolutions that could be achieved with these carriers under the circumstances. This represents the largest reported insurance settlement achieved in any diocesan or archdiocesan bankruptcy to date.  The Unsecured Creditors Committee has agreed that the amount of settlements with 6 of the 14 carriers are reasonable.

The insurance settlements, however, are contingent on final court approval of the current Plan.  This protects both the Archdiocese and its insurers (and other insureds under these policies) from paying any more for the Tort Claims than provided by the settlements (and the Plan).  As the Archdiocese understands their reasoning, the carriers are not willing to agree to pay millions of dollars knowing that they can be asked to pay millions more for the same claims in the future.  If the Archdiocese cannot be assured of protection from further Tort Claims it likewise cannot forego its coverage by settling with its insurers when according to Parishes, religious orders and possibly others, the Archdiocese remains liable to them for contribution as to Tort Claims despite plan confirmation.

**Contributions by the Archdiocese**.  The Archdiocese will dedicate $13.8 million in immediate cash and assets to fund the Plan.  In the view of the Archdiocese, these amounts represent all of the Archdiocese's available cash and assets that is not needed for its core

missions or that otherwise cannot be contributed because such funds are subject to restrictive donative intent.  This includes cash generated from the sale of real estate as described in more detail below.  Above and beyond the $13.8 million, the Archdiocese will pay an additional $500,000 to provide counseling services to Tort Claimants.

**Contribution from the GIF**.  The General Insurance Fund ("GIF") will also contribute $5 million to $6 million to the Plan.  Payment by the GIF assumes that all GIF participants, which include all Parishes and a number of other Catholic Entities entitled to payment of defense costs and settlements or judgments incurred in connection with the Tort Claims, are protected by the Plan from further Tort Claims.  The GIF is a trust for the benefit of all participants.  As a result, if the plan does not protect all GIF participants from Tort Claims, a significant but presently unknown share of the GIF would need to be set aside to pay defense costs, settlements and judgments, if any, for GIF participants other than the Archdiocese. The overwhelming majority of funds in the GIF have been contributed by non-debtor Catholic entities. As noted below, these non-debtor Catholic entities take the position that the contribution to be made from the GIF constitutes additional consideration for the releases and channeling  injunction set forth in the Plan.

**Contributions by Parishes**.  The parishes, through settlements negotiated with their own insurance carriers, will contribute approximately $13.7 million in immediate cash to the Plan. These settlements  and the related contributions to the Plan are contingent on confirmation of the current Plan, including the Channeling Injunction, which protects Parishes and their insurers from any potential obligation to pay more to resolve or satisfy the Tort Claims beyond the $13.7 million.  The Parishes also make other contributions under the Plan that increase the amounts that will be available to Tort Claimants under the Plan.  These contributions include waiving all claims against the Archdiocese, including claims related to the GIF and contribution and indemnity claims against the Archdiocese.  If the Parishes did not waive these claims, they would likely argue they are entitled to satisfy these claims by sharing in the Plan funds on an equal footing with the Tort Claimants.

**Retained Tort Claims**.  Finally, under the Plan, Tort Claimants will retain their recovery rights against religious orders that are not Protected Parties.  In certain cases, Tort Claimants allege the abuse was committed by clergy members, brothers or sisters who belong to religious orders.  Tort Claimants will remain free to pursue such claims against such religious orders. While the Archdiocese cannot quantify the likely recovery against these other entities, the Archdiocese believes the total of these recoveries could be significant – and in addition to amounts Tort Claimants are to receive under the Plan.

B.    **Alternatives to Plan**

Section XIII of this Disclosure Statement includes a summary of the potential alternative to confirmation of a Chapter 11 plan, i.e. dismissal of the case. The Archdiocese believes that this Plan represents the best currently achievable result for all constituencies. If creditors do not vote in favor of this Plan, however, the Archdiocese may, for example, be compelled to propose an alternative plan without a channeling injunction for the benefit of Parishes.  The Archdiocese

believes that such a "go-it-alone" plan would provide relatively little cash to the Trust to distribute to Tort Claimants.  The alternative plan would assign to the Trust claims against 13 of 14 of the Archdiocese carriers.   The sole exception is the Home settlement which is not contingent on approval of the current Plan under consideration.  Also, the alternative plan would not include any monies from Parishes and include only a small portion of the GIF, if any. It is likely immediate cash would consist only of $13.8 million in cash and interests from the Archdiocese and, at the election of the Trustee, the liquidation value of the Home claim.  Much of these funds would be consumed by additional professional fees incurred by the Archdiocese, the Unsecured Creditors Committee and the Parish Committee to draft, consider and potentially contest approval of the alternative plan as well as professional fees incurred by the Trust to pursue claims against 13 insurance carriers.  Funds available for distribution to the trust could be further diminished by any allowed claims of Parishes that would not be voluntarily released.  Although insurance policies could be assigned to a trust under an alternative plan, the alternative plan would not include approximately $115 million in settlement proceeds negotiated between the Archdiocese and these carriers. An alternative plan would also be required to address the contribution and indemnity claims asserted by the Parishes. There is no certainty the Trust will achieve a better result than provided for in the Plan under consideration.  In the opinion of the Archdiocese, it could cost millions of dollars in professional fees to pursue these claims, potentially over many years.

In addition, under the alternative plan, Parishes would not contribute the approximately $13.7 million obtained in settlements with their own insurers for two reasons.  First, without an injunction against Tort Claimants' pursuit of their claims against the Parishes, the Parishes will need their insurance to defend, and if necessary settle or pay judgments, as to such Tort Claims. For the same reason, their carriers have made their settlements contingent on the ultimate plan containing injunctions protecting their Parish insureds as well as themselves.

Finally, the Archdiocese believes that the GIF is a trust that funds a portion of the coverage for not only the Archdiocese, but also the Parishes and certain other non-debtor Catholic entities. If the Parishes and other Catholic entities do not receive the benefit of a channeling injunction, they will claim that the GIF cannot be used solely to benefit the Archdiocese.  As a result, an  alternative plan would be required to leave  substantial sums in place to defend and indemnify Parishes or other Catholic entities.

In sum, at best the alternative plan would retain a provision for payment to a counseling fund and would provide for immediate cash to fund the Plan consisting of approximately $13.8 million in cash and interests from the Archdiocese and, assuming the Trustee decides to liquidate the Home settlement, the liquidation value of the Home claim, estimated at $7.2 million.  It may also include a small portion of the GIF but that amount cannot be quantified.  From these amounts, the professional fees of all parties incurred through the date of plan confirmation would need to be paid and, thereafter, millions of dollars may be paid by the Trust for professional fees to pursue the insurance claims.

## III.    BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE

### A.    Brief overview of Chapter 11 bankruptcy

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon filing a petition for reorganization under Chapter 11, section 362 of the Bankruptcy Code generally provides that all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business are stayed. The primary objective of a Chapter 11 reorganization is confirmation of a plan of reorganization or liquidation. A bankruptcy "plan" sets forth the means for satisfying the claims of creditors of the debtor. The plan and a "disclosure statement" that contains information necessary to allow creditors, shareholders and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each impaired class has voted to accept the plan. Votes will be counted only with respect to claims: (1) that are listed on the Debtor's Schedules other than as disputed, contingent, or unliquidated; or (2) for which a proof of claim was filed on or before the deadline set by the court for the filing of proofs of claim. A vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order from the Court allowing such a claim for voting purposes.

A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan. If an impaired class votes to reject the plan, the plan proponent may seek to confirm the plan under section 1129(b) of the Bankruptcy Code. A plan proponent may confirm a plan over the vote of a rejecting class only if another impaired class has voted to accept the plan, and the plan does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by sending a written request to the Clerk of Bankruptcy Court, at the address below.

Section 1129(a) of the Bankruptcy Code establishes the conditions for confirming a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. If the Plan is confirmed by the court, its terms are binding on the Debtor, all creditors, equity holders, and other parties in interest, regardless of whether they have voted to accept the Plan.

**B.        History and legal structure of the Archdiocese**

The Archdiocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law. Canon Law obligations, however, do not give rise to claims under civil law. The secular embodiment of the Archdiocese is sometimes referred to as the Chancery Corporation. References to the "Archdiocese" or the "Debtor" are intended to refer to that secular embodiment of the Archdiocese. The Archdiocese is organized as a religious Diocesan Corporation under Minnesota Statutes Section 315.16.

The Archdiocese serves a geographical area consisting of 12 greater Twin Cities metro-area counties in Minnesota, including Ramsey, Hennepin, Anoka, Carver, Chisago, Dakota, Goodhue, Le Sueur, Rice, Scott, Washington, and Wright counties (the "Region"). Today, 428 priests and 182 deacons serve 187 parishes and approximately 825,000 individuals in the Region. The Archdiocese also currently employs approximately 140 fulltime equivalent employees, 25 of which are priests.

As set forth in its Articles of Incorporation, the Archdiocese's general purpose is to manage the temporal affairs of the Church in the Region, and to promote spiritual, educational and other interests of the Church in the Region, including charitable, benevolent, eleemosynary, and missionary work. The Archdiocese's mission, as set forth on its website, is: "Making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education, and ready outreach to the poor and marginalized."

Each Sunday, Mass is celebrated in eight different languages within the Archdiocese's Region. Currently, nearly 400 priests, 200 deacons, as well as hundreds of religious sisters and brothers, and tens of thousands of lay personnel and volunteers serve in parishes, Catholic schools and in many other ministries.

The Archdiocese supports and serves 22 Catholic health care centers for the elderly or disabled, three Catholic hospitals and two Catholic hospices. The Region is also home to two Catholic universities, a major seminary as well as a college seminary, and numerous vibrant ministry groups.

The Archdiocese also supports 90 Catholic schools in the Region, including 13 Catholic high schools (collectively, the "Schools"), with a total enrollment of over 30,000 students, 15% of which are not Catholic.

-7-

The Archdiocese also assists and serves charities and Catholic organizations located within the Region.  Archdiocesan support programs serve and provide advocacy support for the poor, the handicapped, persons with AIDS, the divorced and separated, people in prison, refugees, and others with special needs. The Catholic Church is the largest non-governmental provider of social services in the United States.

The Archbishop of the Archdiocese is the Most Reverend Bernard A. Hebda.

The Archdiocese maintains a number of departments, including Administration and Finance (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Catholic Education (responsibilities include leadership development and ensuring Catholic identity in schools), Development and Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage, Family and Life (responsibilities include marriage preparation, family programs, outreach to people with disabilities, youth and young adults, and efforts to promote the dignity of life from conception to death), Moderator of the Curia (responsibilities include administration of the ministries and services of the central corporation of the Archdiocese), Office of Parish and Clergy Services (responsibilities include clergy formation, vocations, chaplaincies, parish consultation, planning and leadership development support and Latino ministry), Office of Communications (responsibilities include the Catholic Spirit, archdiocesan websites, social media and other communications which support local ministries), and the Office of Evangelization and Catechesis.

The Region also includes six monastic communities that are maintained by separate religious institutions.  The parishes, schools, and other separately incorporated Catholic entities within the Archdiocese's Region are not under the fiscal or operating control of the Archdiocese.

## C.    <u>Non-Debtor Parish corporations</u>

Unlike several other dioceses, parish property located in the area served by the Archdiocese is held by 187 separate parish corporations, each of which is organized and exists under Minnesota Statutes section 315.15.  Each Parish located in this jurisdiction owns the separate property used in its operation, including the church itself, a rectory which serves as the pastor's residence and the Parish's administrative offices, and, in many cases, any related schools, cemeteries, social halls, convents and missions.

These Parishes are distinct corporations subject to the requirements and with the rights, powers, and privileges of a religious corporation.  Each Parish maintains its own tax identification number and each corporation owns and manages its own property and assets, and has responsibility for their own corporate actions. The Parishes are not debtors in this Chapter 11 case and have not otherwise sought bankruptcy relief.

### D.        Other non-Debtor Catholic entities

The Archdiocese is one of a number of separate entities created to promote the mission of the Church in the Region.   These separate non-debtor entities include Catholic Finance Corporation, Catholic Services Appeal Foundation, Catholic Charities of St. Paul and Minneapolis, and many others.   Each of these entities is incorporated as a separate non-profit corporation under Chapter 317(A) of the Minnesota Statutes.   In terms of secular legal structure, the above-listed entities have no corporate relationship with the Archdiocese.   As with the Parishes, these non-Debtor Catholic Entities have separate tax identification numbers, own their own property and are responsible for their individual corporate actions.

### E.        The clergy sexual abuse crisis and the Archdiocese's response

Over the last several decades, some clergy members in the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of sexual abuse.   This conduct runs contrary to the teaching and traditions of the Church.   Since the 1980s, the Archdiocese has directed substantial resources towards providing financial, psychological, pastoral and spiritual support.

In 1988, the Archdiocese issued one of the first written policies in the nation designed to protect minors from clergy abuse.   At that time, the Archdiocese also held workshops for priests and Church personnel on ministry-related sexual misconduct.   The Archdiocese continued to develop a more extensive set of policies to promote safety in ministry, and in 1992, Archbishop John Roach established the Advocacy and Victim Assistance Office.   By 1993, background checks were required for clergy and employees in the Archdiocese.   In 1995, Archbishop Roach established the Clergy Review Board, a panel of primarily laypersons to advise the Archbishop on matters related to clergy misconduct.   In 1998, the sexual misconduct policy was updated again in a Clergy Bulletin issued by Archbishop Harry Flynn, who was installed in 1995.   In it, victims were encouraged to come forward, procedures for responding to allegations were defined, and background check procedures were enhanced for priests and deacons.

Following a major clergy sex abuse scandal in Boston in early 2002, Archbishop Flynn led the development by the United States Conference of Catholic Bishops (the "USCCB") of a comprehensive national set of policies and procedures for addressing the sexual abuse of minors by clergy.   In June 2002, the USCCB approved and adopted the Charter for the Protection of Children and Young People (the "Charter").

In 2005, the Archdiocese implemented the VIRTUS Protecting God's Children Program for adults.   The program is described as "a three hour awareness session which better equips adults to protect children in the world around them."   It is required of all clergy, Catholic school and parish employees, as well as all volunteers who have regular or unsupervised interaction with children under the age of 18.   Since 2005, nearly 80,000 members of the clergy, candidates for ordination, parish employees, teachers, parish and school volunteers and others in service of the local Church have undergone VIRTUS safe environment training.   Likewise, since 2006,

more than 100,000 children in Catholic schools and parish faith formation programs have participated in age-appropriate personal safety lessons.

In 2006, the Archdiocese established the Protection of Children and Youth Initiative, now known as the Office for the Protection of Children and Youth ("OPCY"). OPCY is charged with implementing Articles 6, 12 and 13 of the Charter. OPCY's primary components are background checks, safe environment training and codes of conduct for adults, and age-appropriate, Church-approved personal safety instruction for minors in Schools, faith formation and youth ministry programs. OPCY also completes annual compliance audits under the terms of the Charter. In 2007, the Archdiocese released another Clergy Bulletin updating its sexual misconduct policy. Among other things, it dictates the permanent removal from the religious state of any clergy member who committed a single act of sexual abuse against a minor.

Despite the efforts described above, beginning in the fall of 2013, media reports began to surface suggesting that claims of sexual abuse of minors by Archdiocesan clergy members had not been properly addressed. Also, earlier in 2013, the Minnesota legislature enacted the Minnesota Child Victims Act, which reopened otherwise time-barred civil damage claims against institutions that failed to prevent child sexual abuse.

On October 5, 2013, then-Archbishop John Nienstedt established a new Office of Episcopal Vicar for Ministerial Standards to assume full responsibility for all issues related to clergy sexual misconduct, and appointed Reverend D. Reginald Whitt to that position. The Archbishop charged the new Episcopal Vicar with the duty to establish an independent Task Force to review the policies and procedures employed by the Archdiocese and its clergy in responding to reports of sexual misconduct.

The Task Force focused on the Archdiocese's organizational structure, and on policies and procedures related to prevention and detection of clergy sexual abuse of minors to determine whether they were adequate, what factors contributed to the breakdowns that allowed alleged instances of abuse to occur, and whether other best practice policies should be adopted in the Archdiocese. The Task Force submitted its Report and Recommendations to Protect Children from Clergy Sexual Abuse to the Archdiocese in April, 2014 (the "Task Force Report"). The Task Force Report included recommendations in six areas to strengthen and improve the Archdiocese's prevention of, and response to, allegations of sexual misconduct. The process of implementing the Task Force recommendations is presently underway.

In December 2013, the Archdiocese hired Kinsale Management Consulting ("Kinsale"), a leading national expert, to review thousands of clergy files. Beginning in December 2013, Kinsale reviewed the personnel files of all clergy assigned to, or ministering in, the Archdiocese at any time from 1970 to the present, regardless of whether they were still in public ministry. The purpose of the review was to determine whether there were additional cases of sexual abuse or other misconduct that required investigation by law enforcement, public disclosure or other action by the Archdiocese.

In connection with this effort, the Archdiocese committed to making prudent and ongoing public disclosures of the names, assignment histories, and current status of clergy members against whom "substantiated claims" of sexual abuse of a minor have been asserted.  A substantiated claim is one for which sufficient evidence exists to establish reasonable grounds to believe that the alleged abuse occurred.  It is neither a conclusion nor a presumption of guilt.

In December 2013, the Archdiocese further announced and implemented Archdiocesan-wide processes to ensure that any report of sexual abuse of a minor was promptly reported to law enforcement.  In the event any such claim was not manifestly false or frivolous, the accused clergy member would also be placed on a leave of absence pending an investigation of the claim by police and the Archdiocese.  During the leave of absence, the accused clergy would not engage in any public ministry.  The threshold for placing an accused clergy member on leave was a decidedly low one.  Any accusation that was not, on its face, blatantly and demonstrably false would initiate the leave of absence process.  If, upon investigation, the claim against the accused clergy member was substantiated then this finding would initiate a process in order to resolve the claim.  As required by Church law, no priest found to have sexually abused a minor can ever return to public ministry.

On August 25, 2014, the Archdiocese announced the appointment of former Superintendent of the Minnesota Bureau of Criminal Apprehension and Deputy Chief Administrative Law Judge Timothy O'Malley to the new position of Director of Ministerial Standards and Safe Environment for the Archdiocese.  Mr. O'Malley is responsible for ensuring compliance with the USCCB Charter for the Protection of Children and state and federal law.

In connection with a confidential settlement agreement in a civil litigation captioned *Doe 1 v. Archdiocese of St. Paul and Minneapolis and Diocese of Winona*, Court File No. 62-CV-13-4075 (Ramsey County District Court), the Archdiocese and plaintiff's counsel Jeff Anderson and Associates developed and implemented child protection protocols and procedures ("the "Child Protection Protocols").

The Archdiocese has made additional disclosures in accordance with the Child Protection Protocols.  The Archdiocese has also joined with the St. Paul Police Department, and all civil authorities, in continuing to encourage anyone who suspects abuse of a minor or vulnerable adult within Church ministry—or any setting including the home or school—to first contact law enforcement. Any act of abuse against a minor or vulnerable adult is reprehensible and morally repugnant and the Archdiocese will not tolerate it.

The Archdiocese continues to provide outreach through services that address victims' emotional, psychological and spiritual well-being, such as counseling and spiritual direction.  Victims are invited to talk with the Archbishop if and when they wish to do so as part of their healing process.  The Archbishop is committed to meeting with victims of sexual abuse in order to hear about their experiences and concerns, and to provide solidarity and support.

On December 4, 2014, the Archdiocese announced a partnership with Twin Cities-based Canvas Health to enhance the Archdiocese's victim assistance program and to provide

independent victim assistance services for those claimed to have been harmed by clergy sexual abuse or other misconduct in Church ministry.  This partnership established an independent 24/7 hotline where concerns regarding misconduct can be reported to trained representatives who are always available.

During the pendency of the chapter 11 case, on June 3, 2015, the Ramsey County Attorney's Office ("RCAO") initiated a civil action against the Archdiocese petitioning the Ramsey County district court for an order that the Archdiocese show cause why it should not be subject to the jurisdiction of the Court for contributing to a child's need for protection or services.  The RCAO simultaneously initiated a criminal action against the Archdiocese based on the same alleged facts.  The criminal complaint alleged three gross misdemeanor counts each of "contributing to the status as juvenile petty offender or delinquency" and "contributing to the need for protection or services."

On December 17, 2015, the Archdiocese entered into a settlement agreement with the RCAO that resolved civil claims brought by the RCAO relating to the protection of children. That agreement was approved by the Bankruptcy Court on January 28, 2016 and the protocols enacted under that agreement are incorporated into the Archdiocese's bankruptcy plan.  The Ramsey County settlement agreement includes best practices from around the country and provides for the implemented policies and procedures to be independently monitored and validated.

On July 20, 2016, The RCAO dismissed the criminal suit "in the best interests of justice". In connection with the dismissal, the civil settlement was amended to have the record reflect that "Curtis Wehmeyer was a priest in this Archdiocese. The Archdiocese admits that it failed to adequately respond and prevent the sexual abuse of Victim 1, Victim 2, and Victim 3. The Archdiocese failed to keep the safety and wellbeing of these three children ahead of protecting the interests of Curtis Wehmeyer and the Archdiocese. The actions and omissions of the Archdiocese failed to prevent the abuse that resulted in the need for protection and services for these three children."  In addition, the audit and oversight period was extended by an additional year, the Ramsey County Attorney designates a seat on the Ministerial Review Board (filled by Patty Wetterling),  Archbishop Hebda will participate directly in three restorative justice sessions as convened and determined by RCAO, the Director of Safe Environments role was strengthened, and ongoing counseling resources for Victim 1, Victim 2, and Victim 3 and immediate family, if necessary. A six-month compliance review hearing date is set for December 20, 2016.

**F.**      **Events leading to the Chapter 11 filing**

In May 2013, Minnesota enacted the Minnesota Child Victims' Act, Minn. Stat. § 541.073 (the "CVA"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse.  The CVA allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages arising from the abuse, regardless of how long ago the abuse occurred.

The CVA also provides a three-year window during which victims whose claims would have been time barred by the previous statute of limitations may bring civil suits against alleged abusers and the Archdiocese. This window expired May 25, 2016.

The CVA opened the door to a significant number of additional civil claims against the Archdiocese relating to clergy misconduct spanning a time period of more than half of a century.

Although the *Doe 1* litigation was settled by the Archdiocese prior to the Petition Date, the Archdiocese remained subject to 21 pending civil actions and had received notices of claim for dozens of additional claims relating to alleged sexual abuse. Ultimately, more than 400 sexual abuse claims have been asserted against the Archdiocese.

Verdicts in some sexual abuse cases across the country have ranged into the millions of dollars. The Archdiocese has insurance coverage available for some, but not all, of the amounts sought by the claimants in the CVA cases pending against it. In certain instances, the insurance coverage is also subject to certain coverage disputes.

Managing civil court litigation and coverage claims is a difficult and costly process. The pending civil litigation placed significant strain on the Archdiocese. The Archdiocese anticipated that this strain would only increase during the remaining term of the extended statute of limitations authorized by the CVA. In addition, the Archdiocese was concerned that too large a settlement with a select group of pending cases would leave the Archdiocese with insufficient assets to fairly compensate other claimants and creditors and would result in a disproportionate allocation of the limited funds available to the Archdiocese.

Moreover, although the Archdiocese was current on its vendor obligations, it faced other financial issues in addition to claims involving allegations of clergy sexual abuse, including, for example, an underfunding obligation under its pension plans and the potential claims of parishes related to contribution and indemnity as well as claims related to the insurance programs described herein.

In addition, the Archdiocese has claims against it from non-Debtor Catholic entities related to various insurance programs, as well as potential contribution and indemnity claims related to allegations of sexual abuse.

### G.     Purpose and goals of this Chapter 11 case

The combined circumstances of the existing and anticipated civil claims against the Archdiocese made clear to the Archdiocese that reorganization was the only way to fairly and equitably fulfill the Archdiocese's obligations to all stakeholders.

Resolution of this case requires that the interests of all affected parties be recognized and balanced. Sexual abuse claimants must be heard and possess fair avenues for resolution of their claims and healing. In some circumstances, insurance carriers must be allowed to defend claims

-13-

of their choosing in a manner that preserves their legal rights potentially including the cooperation of their insureds in defense of claims.

Catholic faithful and the community at large are entitled to a reorganized Archdiocese that is fully capable of furthering its core missions in providing worship, inspiration, outreach, education, social services and charity. Parishes are the primary source of revenue for the Archdiocese and the platform for many of the good works of the Church. They are entitled to have their claims recognized and fairly resolved. Further, the ability of Parishes to financially and otherwise support the work of a reorganized Archdiocese will be substantially compromised unless sexual abuse claims against them are fairly resolved.

The Archdiocese seeks confirmation of its Plan and resolution of these interests so it may focus on its Gospel mission and serve the hundreds of thousands of people who depend on the Church.

## IV.    DEBTOR'S OPERATIONS

### A.    Sources of revenue

As a religious non-profit organization, the Archdiocese has no significant ongoing for-profit business activities or business income. Instead, the Archdiocese's primary sources of revenue are from Parish assessments. Healthy Parishes are vital to the continued ability of the Archdiocese to carry out its mission. Prior to the commencement of this Chapter 11 case, the Archdiocese implemented a number of cost-saving measures and achieved a budget reduction of approximately 20%. This reduction was undertaken to balance the Archdiocese's budget and to further the ability of the Archdiocese to compensate abuse claimants and also maintain its core functions and missions. The Archdiocese's reduced annual expenditures are approximately $16.9 million, exclusive of "special issues," i.e. attorney and professional fees, and depreciation.

1.    Parish assessments

The primary source of Archdiocese revenue is Parish assessments. Indeed, almost 75% of the support for the Archdiocese's missions comes from Parish assessments. The annual dollar amount of assessment revenue, however, fluctuates. Parish assessments are derived primarily from plate and envelope collections at the Parishes. Assessments are calculated and billed on a two-year lag which means that Parish financial results for two-years prior to the collection year form the basis for Parish assessment revenue. Parish assessments have been a relatively reliable source of income for the Archdiocese, but have declined or plateaued in recent years, reflecting the Parishes' own challenges to raise operating funds. Nevertheless, projections for the Plan assume collections and assessments will remain stable and the Archdiocese does not contemplate any drastic changes to assessment practices.

2.      Catholic Services Appeal Foundation program revenue

Approximately 9% of Archdiocese revenue is generated annually in the form of donations from the annual Catholic Services Appeal. These donations are collected, held and distributed by the Catholic Services Appeal Foundation (CSAF), an independent non-profit organization. Donations are distributed for the benefit of a prescribed group of Catholic organizations and Archdiocese ministries as outlined in the CSAF bylaws. As such, the money contributed by CSAF is donor-restricted and may only be used for specific charitable purposes outlined in the bylaws and in the designated fiscal year. The funds are not a general asset of the Archdiocese that may be put toward funding a Plan. In the last fiscal year, the Archdiocese received CSAF contributions to provide for these specific ministries including the Latino, Indian, and deaf ministries, Evangelization and Catechesis, hospital and prison chaplains, support of the Marriage Family & Life programs, and the Venezuelan mission.

Like with Parish assessments, income from the annual appeal fluctuates and may decline as the Church encounters declining or flat attendance. For purposes of this disclosure statement, however, CSAF contributions have been projected to increase slightly post-confirmation.

3.      Program revenues

Various Archdiocese departments generate revenue based on services provided to individuals, Parishes, priests, and other entities. These revenue-generating services include publication of the Catholic Spirit, which receives revenue through subscriptions and advertising, rent received from the residents at the Byrne residence, services performed by various Archdiocese program offices, and accounting services provided to Parishes. These services make up approximately 14% of the Archdiocese's annual revenue.

4.      Contributions

The Archdiocese is sometimes the recipient of contributions from individuals as gifts or as part of their wills or estates. These contributions may be either restricted to specific purposes or unrestricted donations to the Archdiocese depending on the language of the bequest. Contributions make up on average less than 1% of Archdiocese annual revenue. Contributions are completely at the discretion of those making donations. For purposes of the Plan, contributions are projected to increase slightly after confirmation.

5.      Administrative revenue

The Archdiocese performs accounting and other services for certain separate entities including the AMBP, General Insurance Program, and pension plans. The Archdiocese bills those entities for such services. Revenue from those services is approximately $300,000 per year. These administrative revenue funds go into the Archdiocese's general operating account and are used to pay for the cost of providing such services which are included in general Archdiocese operations and programs.

-15-

6.      Investment income

The remainder of Archdiocese income comes historically from miscellaneous sources including investment income.  All Archdiocese-owned investment accounts were converted to cash upon the filing of the Chapter 11 case and the Archdiocese is not currently earning income on investments it holds.  The Archdiocese receives a distribution from certain investment funds that are held by Catholic Community Foundation.  These funds, however, are donor restricted and the money received must only be used by the Archdiocese for the purpose set forth by the donor.  This means that such money is not a general asset of the Archdiocese and may not be used to fund the Plan.

B.      **Ongoing operations and expenditures**

As noted above, in an effort to cut costs and prioritize money for payments to Tort Claimants, the Archdiocese reduced its staff and program operations in November 2014, resulting in an annual operating expense budget reduction of approximately 20% or nearly $5 million.  Since that time, the Archdiocese has been operating at reduced levels which has adversely impacted the scope of the religious and charitable work the Archdiocese is able to accomplish.  In 2015, the Archdiocesan budget for operating expenses, including programs and charitable services but excluding bankruptcy-related expenses, was $22.9 million. In 2014, that same budget was $30.5 million.  Thus, total operating expenses, excluding bankruptcy expenses, have been reduced by 25%.

1.      Archdiocese Operational Programs

The Archdiocese advances its mission by engaging in various programs and activities including through:

- the Office of Mission of Catholic Education – promoting Catholic education and developing strong partnerships between home and school that infuse Catholic teaching and values into students' education experience and fostering academic excellence;
- the Office of Clergy Services – supporting clergy assignments at Parishes and other institutions, as well as hospice and correctional facility chaplaincies, supporting the Saint Paul Seminary and the Byrne Residence for retired priests, providing oversight of victim advocacy and assistance, abuse prevention efforts, intervention on clergy misconduct, and providing clergy appropriate support for their spiritual, physical and mental well-being;
- the Office of Communications – communicating the spiritual messages and theological teachings of the Church as articulated through the Archbishop and his auxiliary bishops, including through the publication of *The Catholic Spirit* newspaper and electronic newsletters and management of websites, blogs and social media sites;
- support of community services through the Chancery Corporation;

- the Office of Marriage, Family and Life – providing services, counseling and advocacy for marriage enrichment and preparation, early Catholic family life and other family outreach, respect life and pro-life groups, outreach for persons with disabilities, and coordination of over 50 youth events annually including Archdiocesan Youth Day and the National Catholic Youth Conference, as well as World Youth Day;
- the Office of Ministerial Standards – providing support to the Clergy Review Board to ensure prompt and thorough review of clergy misconduct allegations, and promoting ministerial standards to ensure all priests and deacons uphold the standard expected of Catholic clergy;
- the Office of Parish Services – providing  outreach programs including through the Office of Latino Ministry, and the Office of Worship; and
- central services provided by the Archdiocese staff such as accounting, records and archives, human resources, benefits administration and printing services.

The Archdiocese also has incurred special issues expenses which are predominately payments to third-party professionals for services related to the Archdiocese's reorganization, including payments to counsel and advisors for the Archdiocese, counsel and advisors for the Committee and counsel for the Parish Committee.  In addition to the programs and operations identified above, the Archdiocese has pursued its mission through the continued maintenance of various insurance and benefit programs described in more detail below.

2.      General Insurance Fund

The Archdiocese administers an Insurance Program for the benefit of participants at the Archdiocese and participating non-Debtor Catholic entities.  A schedule of participating entities may be found at schedule 1 to the Plan.  The purpose of the Insurance Program is to allow participating entities to obtain coverage at a lower cost.  The Insurance Program has operated continuously since 1980 and currently obtains and provides various insurance coverages for the participating entities including liability insurance, property insurance, and workers' compensation insurance.  Monies collected from participating entities for the Insurance Program are deposited into a General Insurance Fund Account (the "GIF Account").  GIF Account amounts are held in trust for the benefit of the participating entities with the Archdiocese acting as the administrator of the fund. The fund is referred to as the General Insurance Fund or "GIF." The GIF is not subject to a formal trust agreement, but has been treated in a manner similar to a trust fund.

The property and liability portion of the Insurance Program extends to general liability, employment practices, building and contents, burglary, personal property, student accident, auto, public library, and boilers.  The GIF has in the past been used to resolve sexual abuse claims and is generally available to meet retentions that need to be paid as part of the various insurance programs for the Archdiocese and parishes from September 1, 1980 forward.  This insurance is separate and distinct from other insurance policies that may provide coverage for abuse claims prior to 1980.

The GIF Account also pays certain workers' compensation claims. SFM Risk Solutions administers the claims subject to the Archdiocese workers' compensation program. The workers' compensation program has a retention of $500,000. Above such amounts, workers' compensation insurance coverage is provided by Workers' Compensation Reinsurance Association. Premiums for such insurance are paid from the GIF Account.

In addition to the GIF Account, in order to comply with Minnesota law, the Insurance Program's obligations with respect to the workers' compensation retention are backed by a deposit established by the Archdiocese with Bremer Bank as custodian for the benefit of the State of Minnesota Department of Commerce. The deposit was made by the Archdiocese under the terms of a Custodial Agreement entered into between the Bremer Bank, the Archdiocese and the Commissioner of Commerce for the State of Minnesota on or about August 20, 2014. The December 31, 2014, balance of the deposit was approximately $3,854,395 and has remained roughly equal to that amount during this case. The Custodial Agreement provides that the deposit is subject to turnover to the Commissioner upon certain specified events, including insolvency or a default by the Archdiocese in the payment and performance of its workers' compensation obligations. By its terms, the Custodial Agreement states that the Archdiocese shall have no right, title or interest in the deposit. The Archdiocese has maintained the Custodial Agreement and deposit during the pendency of this bankruptcy case.

The Archdiocese and the GIF engaged in various transactions between 1998 and 2012 consisting of advances and repayments of funds for operating expenses in lieu of additional premiums to the Parishes. Advances from the GIF to the Archdiocese do not appear on the financial statements attached to the disclosure statement because such advances are evidenced by a corresponding account payable. *See* 2014 and 2015 Annual Report [Exhibit E] at Note 7.

The Archdiocese's Plan contemplates that certain monies from the GIF will be put toward the Trust to satisfy creditor claims and retentions. As explained further in section VIII.B.3 of this disclosure statement, the Archdiocese anticipates that a contribution of between $5,000,000 and $6,000,000 can be made over time without invading the necessary reserve for the Insurance Program. The chart below estimates the amount that may be contributed to the Plan Implementation Account and Trust while maintaining an adequate reserve balance of $1 million without increases in premiums.

| GIF | |
|---|---|
| Cash Balances at 3-31-16 | $3,876,961 |
| 4th QTR FY 2016 Forecasted | 757,622 |
| FY 2017 Budget | 2,104,400 |
| Projected Cash at 6-30-17 | 6,738,984 |
| Reserve Estimate | (1,000,000) |
| Cash Available at 6-30-17 | 5,738,984 |

Based on the above projection, the cash balance at June 30, 2017 would be approximately $1 million which will enable the plan to continue to operate with adequate cash to pay claims.  A $1 million reserve is consistent with past practices and historical losses. The Archdiocese intends to continue the Insurance Program for the foreseeable future.

3.      Archdiocese Medical and Dental Benefit Plan

The Archdiocese is the sponsoring employer and a participating employer in the Archdiocese of St. Paul and Minneapolis Comprehensive Major Medical Health Care Plan and the Archdiocese of St. Paul and Minneapolis Dental Benefit Plan (collectively, the "Health and Dental Plans"). Other non-Debtor Catholic entities have also elected to separately participate in the Health and Dental Plans.  The Archdiocese has established a trust fund (the "AMBP") to receive premium payments from the participating employers and participants in the Health and Dental Plans, and to pay Health and Dental Plan claims, Health Plan stop-loss insurance premiums, and other reasonable expenses associated with the administration of the Health and Dental Plans.  The Health Plan stop-loss coverage protects the Archdiocese and the participating non-Debtor Catholic entities from claims above a certain threshold.  The premium for the stop-loss coverage is paid from the AMBP.

The AMBP was initially drafted in 1991 as a purported "rabbi trust" in that the terms of the AMBP provide that assets of the AMBP could be made subject to the claims of the Archdiocese's general creditors in the case of the Archdiocese's bankruptcy or insolvency. However, as stated in the trust agreement, the exclusive purpose of the AMBP trust is to provide benefits to participants.  To date, the Court  has not been asked to determine whether funds contributed to the AMBP by individual parishes, parish employees and non-Debtor Catholic entities as premium payments for health and dental coverages are property of the bankruptcy estate. Only approximately 5-7% of the funds held in the AMBP were contributed by the Archdiocese as a participant in the AMBP.

The AMBP is administered as an independent trust by a board of trustees. The current board includes Parish representatives, a Catholic School representative, one lay representative, the Archbishop, and two or more members appointed by the Archbishop.  Although he has authority under the trust agreement to remove trustees and to increase the number of trustees, the Archbishop has not exercised any of his rights with regard to the AMBP during the course of this case. The membership of the board of trustees has not changed since the Petition Date. The board of trustees has been represented in this case by independent legal counsel.

Historically, premiums for the Health and Dental Plan have been set by the board of trustees  based on claims history.  In January 2014, the board of trustees  provided participating employers with a 20% billing credit due to a large reserve fund which had accumulated over time, which resulted in a return to participating employers of approximately $7,800,000. Upon expiration of the credit in June 2015, the board of trustees authorized a reduction in  premiums of 15%, resulting in a net increase in premiums of 5%.  Premiums have remained constant since

June 2015, and the AMBP notified participants in the Health and Dental Plans that there would be no premium increase throughout calendar year 2016.

AMBP assets were held in two accounts as of the Petition Date—a disbursing account with a balance of $5,937,250 as of the Petition Date and a reserve account with a balance of $8,540,187 as of the Petition Date. The AMBP experienced a significant increase in the balance of the reserve account in the years prior to the Petition Date as a result of lower than expected losses.

At the request of the United States Trustee, the reserve fund was transferred following the Petition Date from Catholic Community Foundation to an account maintained by the Archdiocese. The balance of the reserve account equaled $8,464,365 as of the date of transfer of the account, which amount reflects market activities prior to the transfer of the account and administrative fees of the prior account holder.

Shortly after the Petition Date, the Debtor sought and was granted an order authorizing the AMBP trustees and the holder of the disbursing account to continue to collect premiums and to pay claims and expenses associated with the Health and Dental Plans from the disbursement account. The Court directed that the balance of the assets in the AMBP not required to be expended in connection for such purposes be held pending further order of the Court.

The loss experience under the Health and Dental Plans changed dramatically following the Petition Date. The Archdiocese believes that this change, which was not fully anticipated as of the Petition Date, is attributable, at least in part, to general economic and market conditions, including general trends relating to healthcare costs.

The increased loss experience under the Health and Dental Plans has resulted in a loss under the program of approximately $1,323,114 for the period from June 2015 to the end of March 2016. As a result of these losses, the balance of the disbursing account was approximately $939,731 as of the end of March 2016.

On September 22, 2016, the trustees of the Archdiocese medical benefits plan trust moved for Court authorization to use a portion of the reserve account to pay losses and expenses under the Health and Dental Plans which was the intended purpose of the reserve account. The UCC initially objected to the motion, but the parties ultimately settled the dispute prior to the hearing on the motion. In accordance with the order entered by the bankruptcy court, all premiums paid to the AMBP after November 1, 2016 shall be deposited into a new segregated account to which neither the Debtor nor its creditors shall have any claim. The new account shall be deemed subject to the AMBP trust agreement except for paragraph 15 and the funds in the account shall be used first to pay the ongoing claims and expenses of the AMBP. The bankruptcy court further ordered that if the funds in the new account are insufficient to pay the claims and expenses of the AMBP, the trust may use up to $3 million of the funds in the AMBP Disbursement and Investment Accounts to pay the claims and expenses of the AMBP arising before December 31, 2016. Claims arising before December 31, 2016, may be paid from that

available $3 million available only if paid on or before April 1, 2017. To the extent that any of the $3 million is not used, it shall remain in the AMBP Investment or Disbursement Account until their disposition is determined in a plan of reorganization or further order.  In 2017, the trust may use up to $3.6 million of the funds in the Investment and Disbursement Account to pay claims and expenses of the AMBP.

The bankruptcy court further ordered, in accordance with the settlement, that the premium for the same benefits provided under the health plan offered by the AMBP in 2016 shall be increased in 2017 by no less than 15%. This notwithstanding, the AMBP may offer other plan options with lower premium increases if the benefits are varied, for example the deductible is increased or the provider network is more limited, so long as the options do not increase the total cost of the AMBP in 2017.  The administrator of the AMBP will provide a monthly report to counsel for the UCC of claims and expenses paid by the trust. Reports shall be due on the 20th of the month following the end of a month. The first report is due on or before November 20, 2017.

The Archdiocese believes that all, or a substantial portion, of the balance of the reserve account will be required on a post-confirmation basis to fund future losses under the Health and Dental Plan and to fund the conversion of the plan to a VEBA trust as outlined below.

It is important to emphasize that the Health and Dental Plan currently provides insurance coverage to approximately 3,500 individuals. The individual beneficiaries of the Health and Dental Plan include clerical and maintenance personnel, teachers and other support staff, and the dependents of these employees. Few, if any, of the individuals employed by the participants in the Health and Dental Plans have received any significant increase in compensation in recent years.  Compensation to most of these employees remains modest by comparison to employees of for-profit companies.

The Archdiocese has determined, after consultation with the AMBP board of trustees, representative Parishes and others, that the failure to transfer amounts from the reserve account to the trust, particularly if coupled with a significant increase in premiums, would create a potentially unsustainable level of financial hardship and adversity among the employees whose services are vital to the maintenance of the  core missions of the Archdiocese and Church.

Based on the foregoing, the Archdiocese does not contemplate funding the Plan with any portion of AMBP assets.

4.     Priest Health and Dental Plan

Active and retired priests and seminarians obtain medical and dental benefits under a separate plan from the Archdiocese's lay Employees (the "Priest Health and Dental Plan"). The Priest Health and Dental Plan covers priests assigned to the Archdiocese, to Parishes, and to other non-Debtor Catholic entities. Parishes and other non-Debtor Catholic entities separately pay their applicable premiums. The benefits provided under the Priest Health and Dental Plan

-21-

generally mirror the benefits provided under the Health and Dental Plans. The priest's benefits are provided from the Archdiocese, rather than the AMBP used for the medical and dental benefits for non-priest employees. In the ordinary course of its business, the Archdiocese increased medical rates for priests covered by the plan effective July 1, 2016. The Archdiocese does not contemplate any changes in the funding or contribution levels for the Priest Health and Dental Plan as a part of the Plan of Reorganization. No priests credibly accused of sexual abuse currently receive benefits under this plan.

5.    Retirement and pension plans

The Archdiocese maintains three retirement plans. Layperson employees of the Archdiocese and of participating non-Debtor Catholic entities are eligible to contribute to a tax-deferred annuity plan, which is also known as a 403(b) plan. Contributions to the 403(b) plan are made by employees at a rate selected by them and authorized by applicable law. Participating employers, including Parishes, make a discretionary contribution at the rate of up to 2.5% percent of eligible earnings. The Archdiocese deducts 403(b) plan contributions from participating lay employees' paychecks and these amounts, along with the employer contributions, are automatically deducted from the Archdiocese's bank account and forwarded to the plan administrator to be invested pursuant to the employees' directions. The Plan does not contemplate any changes in the funding levels or contributions for the 403(b) plan.

The Archdiocese also sponsors a pension plan for lay employees (the "Lay Employees' Pension Plan"). The Lay Employees' Pension Plan is funded entirely by the Archdiocese and participating non-Debtor Catholic entities. The Lay Employees' Pension Plan has been frozen since 2011. However, the Archdiocese and other participating non-debtor employers continue to make contributions to the Lay Employees' Pension Plan for the benefit of those legacy obligations. The Archdiocese makes monthly contributions of approximately $23,000 to the Lay Employees' Pension Plan. Other participating entities contribute approximately $530,000 per month combined. A fixed level of contribution was established in 2013 and has not changed. Contributions are made to a pension plan trust, and are held for the exclusive benefit of pension plan participants. As such, the Lay Employees' Pension Plan trust is not estate property available for distribution to unsecured creditors. The Lay Employees' Pension Plan is currently subject to an underfunding liability. The Archdiocese believes the underfunding liability will be satisfied in 15 to 20 years by contributions at their current level. The trustees of the Lay Employees' Pension Plan contend that the Archdiocese and other participating non-Debtor Catholic entities may be jointly and severally liable for the underfunding of the Lay Employees' Pension Plan. The Plan does not contemplate any changes to the funding levels or contributions for the Lay Employees' Pension Plan.

The Archdiocese also sponsors a pension plan for priests (the "Priests' Pension Plan"). The obligations of the Priest's Pension Plan are funded by the Archdiocese and participating parishes. The Archdiocese makes contributions to the Priests' Pension Plan of approximately $51,000 per month. The Archdiocese is not currently making contributions into the Priests' Pension Plan for any priests credibly accused of sexual abuse. Other participating non-debtor

-22-

entities contribute approximately $261,000 per month.  Contributions are set annually by the Priests' Pension Plan board of trustees, are made to a pension plan trust, and are held for the exclusive benefit of participants in the Priest's Pension Plan.  As such, the Priests' Pension Plan trust is not estate property available for distribution to unsecured creditors.  The Priests' Pension Plan is currently subject to an underfunded liability.  The trustees of the Priests' Pension Plan contend that the Archdiocese and other participating non-Debtor Catholic entities may be jointly and severally liable for the underfunding of the Priests' Pension Plan.

Historically, bishops were not included in the Priests' Pension Plan.  As such, the Archdiocese established a reserve for former Archbishop Flynn for this purpose.  The Archdiocese has a liability on its books for "Accrued Bishops Retirement Expense" which adjusted each year based on the life expectancy of Archbishop Flynn.  Archbishop Flynn's annual deferred compensation/pension is $27,360, plus insurance and out-of-pocket health care costs of $8,514.  The Priests' Pension Plan was amended on April 17, 2010 to include bishops.  The Plan does not contemplates any changes to the funding levels or contributions for the Priests' Pension Plan.

During the course of this case, the Archdiocese has continued to make all payments and contributions required to be made in connection with the retirement plans and Accrued Bishops Retirement Expense in the ordinary course of business.

      6.      Other benefit programs

Eligible employees of the Archdiocese and non-Debtor Catholic entities also utilize benefit programs described as follows. Eligible employees receive long-term disability ("LTD") and accidental death and dismemberment ("AD&D") insurance.  LTD premiums are payable entirely by participating employees.  The Archdiocese pays Mutual of Omaha Insurance Company approximately $45 per month per employee for AD&D insurance coverage premiums.  Non-Debtor Catholic entity employee premiums are paid by the respective non-Debtor Catholic entities, not the Archdiocese.

The Archdiocese and participating non-Debtor Catholic entities also offer eligible employees life insurance, at a total monthly charge to the Archdiocese of approximately $610, and the option to purchase supplemental life insurance coverage, currently provided by Unum.  Employees participating in such optional insurance plans bear the premium costs associated with such coverage.  This optional coverage costs the Archdiocese little to nothing to provide to eligible employees.

The Archdiocese also provides tuition assistance to eligible employees in an amount equal to 50% of tuition for any child enrolled in a Catholic school (grades kindergarten through 12) subject to an aggregate annual limit for all employees of $75,000.

Finally, as required by Canon Law, the Archdiocese provides payments to 18 priests for a

variety of reasons (the "Priest Support Payments"). Those who receive some form of Priest Support Payment include priests who are not assigned to a parish or whose parish or institution is not able to provide full financial support, those who are out of ministry while their suitability is under review, or those who are on a general leave of absence. This support may include housing, salaries, pension contributions, and other support benefits and payments, including medical, dental, and life insurance. Not all priests who receive some form of Priest Support Payment receive all of these benefits or payments. Priest Support Payments average approximately $4,800 per month per priest. The Archdiocese is not currently making any such payments to priests credibly accused of sexual abuse.

The Plan does not contemplate any changes to the Archdiocese's participation in these other benefit programs or obligations.

### 7.    Interparish Loan Fund

The Interparish Loan Fund was originally funded by parishes that had excess cash and were willing to deposit that cash for use by other parishes.  The Interparish Loan Fund is listed as a separate liability and is tracked in a separate general ledger account in the Archdiocese's records and is being treated as an estate asset as part of the Archdiocese's general cash. The Plan contemplates addressing the claims of the participants with amounts owed from the Interparish Loan Fund through a system of offsets and credits as outlined in the Plan summary below.  The Archdiocese does not contemplate any changes to the operation of the Interparish Loan Fund as part of the Plan.

### C.    **Budget summary**

During the course of this case the Archdiocese has continued to provide the employee benefits described above, continued to make all contributions to such programs, and continued to pay administrative fees related to such employee benefits, all in the ordinary course of business.

The Archdiocese believes that it has reduced expenses as much as possible while still maintaining its essential missions. For the fiscal year ending June 30, 2016, the Archdiocese's annual program expenses, including payroll, insurance and other program premiums, operational costs, and related liabilities for each facet of its operations (exclusive of "special issues," i.e., attorney fees and professional fees, and depreciation) are estimated to be:

| Clergy Services | $2,020,915 |
| Community Services | $750 |
| Catholic Education | $523,883 |
| Parish Services & Outreach | $1,145,158 |
| Central Services | $2,570,276 |
| Marriage & Family Life | $707,508 |
| Development & Stewardship | $424,907 |
| Moderator of the Curia | $3,388,645 |

| Communications | $2,085,420 |
|---|---|
| Finance | $2,540,066 |
| Evangelization | $334,582 |
| Priest and Parish Support | $1,154,519 |
| **Total** | **$16,896,629** |

The Archdiocese does not believe that it can effectively eliminate any additional expenses and fulfill its missions and obligations.  The projections of the Archdiocese's expected operating expenditures for the first five years after confirmation of the Plan, attached as **Exhibit D**, reflect the Archdiocese's belief that it will still be able to fulfill its educational, spiritual, and charitable mission by operating on a balanced budget supported by the continued generosity of the Catholic faithful and benefactors.

The Archdiocese's most recent audited financial statements from 2014 along with 2015 unaudited financial report are attached as **Exhibit E.**  In addition, the Archdiocese's operating results from the Petition Date through April 2016 are attached as **Exhibit F**.  The Archdiocese has also filed monthly operating reports with the Bankruptcy Court throughout the Chapter 11 case.  These reports chart the Archdiocese's financial condition and performance during the course of the case.  The Committee and its counsel have also had the opportunity to review the Archdiocese's financial reporting during the Chapter 11 case and for the six years prior to the commencement of the Chapter 11 case.  During the course of this Chapter 11 case, the Archdiocese has continued to operate within its identified budget and has continued to support the central mission of the Catholic Church.

## V.    **DEBTOR'S ASSETS**

Many of the Archdiocese's assets are subject to use restrictions or leases that limit, in whole or in part, their value for use under the Plan.  The Archdiocese's property is generally comprised of: (1) real property, (2) personal property (including insurance policies), (3) beneficial interests, and (4) other unavailable assets.  The Archdiocese has valued assets based on public records, independent appraisals and assumptions and analysis provided by its financial advisor.  Because of its nature, much of the Debtor's property is unavailable for distribution to creditors or to pay Chapter 11 expenses. Such property has limited resale or liquidation value, is necessary for the effective reorganization of the Debtor, or has restrictions that make realizing any value from the sale of the property nearly impossible.  Nonetheless, the Debtor has made significant efforts to monetize the assets that can realistically be sold to fund the Plan, including its unrestricted real property interests.

### A.     **Real property**

Much of the real property owned by the Archdiocese that was available to use to pay Chapter 11 expenses or make distributions to creditors has already been sold by the Archdiocese during the course of this case.  The proceeds from those sales are being held in a separate interest-bearing account.  Other real property interests in use for religious purposes or leased to

other parties cannot be sold by the Archdiocese because they have limited value, are necessary for the Debtor's effective reorganization, or have use restrictions, long-term leases, and other encumbrances that make it nearly impossible for the Archdiocese to realize any net value in connection with the sale of these properties.

1.      Property sold during this Chapter 11 case – converted to cash

The majority of the Archdiocese's saleable real property, i.e., the Hayden Center, the Chancery, Hazelwood and the Dayton property have been sold during the pendency of this Chapter 11 case.  The details of the sales of each of these properties are discussed further in section VI.C.5 of this disclosure statement, below.  For purposes of describing the Debtor's assets, however, these properties have been converted to cash.  Total net cash proceeds of approximately $8.7 million from the sales of these real property assets are currently being held in a segregated interest-bearing account pursuant to order of the Bankruptcy Court.

2.      Property in use for religious purposes

The Archdiocese owns real property located at 3045 Park Avenue in Minneapolis, Minnesota that houses the Church of Gitchitiwaa Kateri.  For purposes of its bankruptcy schedules, the Archdiocese stated the value of this property in accordance with the Hennepin county tax records estimate of $442,500.  However, due to several issues with the property, the Archdiocese estimates that the actual salable or liquidation value of the property is much less.  Based on a broker opinion of value prepared by Cushman & Wakefield NorthMarq on April 19, 2016, the Archdiocese estimates that the market value of this property is $185,000.  The UCC has obtained a separate appraisal listing an estimated value of $460,000.  Despite the issues with the physical structure, the property is nonetheless important to the Archdiocese's central mission.  The Church of Gitchitiwaa Kateri is the only direct Native American outreach ministry within the Archdiocese's region and the property's best use is for its intended religious purpose.  This religious use is important for the Archdiocese's central mission to promote the Church within the otherwise underserved Native American community.

3.      Property leased to others

The Archdiocese also owns four parcels of real property that are currently leased to others.  Each of these properties is subject to a long-term ground lease.  The leases on the four parcels are respectively with the Cathedral of Saint Paul, Benilde-St. Margaret High School, Grace High School d/b/a Totino-Grace High School, and DeLaSalle High School.

The schools at issue provide high quality Catholic education to the faithful and disadvantaged.  And, of course, the Cathedral is the central icon of Catholicism in Minnesota.  The Mission Statement of the Archdiocese underscores the critical importance of Catholic education and the Cathedral to its mission:

"Making the name of Jesus Christ known and loved by promoting
and proclaiming the Gospel in word and deed through vibrant

-26-

parish communities, quality Catholic education, and ready outreach to the poor and marginalized."

The economic value of the Archdiocese's interest in these properties is very limited. Among other reasons, the long-term leases on the properties prevent the Archdiocese from selling them. While the cash consideration for each lease is nominal--$1.00, the leases obligate lessees to construct and maintain all buildings, improvements, and fixtures at a combined cost in the tens if not hundreds of millions of dollars. If the Archdiocese were to reject the leases, Bankruptcy Code §365(h)(1)(A) would nonetheless allow the lessees to treat those leases as terminated or retain their rights under the leases for the remaining terms on each lease, subject to the right of each lessee to seek damages for any losses caused by the Archdiocese's nonperformance. Those potential damage claims would be very large, ranging into tens if not hundreds of millions of dollars. Because the lessees would either be entitled to stay in the properties following sale or would be entitled to compensation for the value of the leasehold interests, no meaningful benefit would be provided to the estate by the sale of such properties because any income received from the sale would be eclipsed by the claims of the lessees. Moreover, it is unlikely that any potential buyer would emerge for these properties due to the lessees rights and claims under their respective leases.

In addition to being subject to long-term leases, the Cathedral, Benilde-St. Margaret, and Totino Grace are subject to mortgages in favor of third parties. The Archdiocese joined in each of these mortgages thereby subordinating its interest in these properties to the interests of the third party lenders. As a result, the mortgages would have to be satisfied before the Archdiocese would be entitled to any proceeds derived from the sale of these properties. The leased properties are also each subject to deferred maintenance costs. The Cathedral has further been designated as a national and local historic site with use, construction and renovation restrictions that limit the site's use to what it was constructed for—spreading the Gospel of Jesus Christ.

As noted above, significant improvements to these properties, including the buildings themselves, have been paid for by the lessees rather than the Archdiocese. The DeLaSalle property is subject to several use restrictions in zoning, overlay districts, historic designations, conditional use permits, covenants and restrictive use agreements. The Benilde-St. Margaret property also is subject to a use restriction that limits it use to a Catholic high school.

These properties and leases must be maintained by the Archdiocese if it is to maintain the ability to fulfill its core missions. Because of the long-term leases on the properties, the use restrictions, the fact that the lessees will claim ownership of the majority of the improvements on the properties, including in most cases the buildings themselves, the unique nature of some of the properties, and the debt encumbering these properties, the Debtor could not freely sell any of these properties in the open market and is unlikely to realize any value or proceeds from making such an attempt in light of the enormous claims it would convey to the lessees.

    4.      Leasehold interests

The Archdiocese entered into a lease agreement as tenant with IAF Beacon I LLC on February 29, 2016 for the lease of office space to house the Archdiocese's staff and business operations. The Bankruptcy Court approved the lease on April 7, 2016. The Archdiocese has not yet moved into the leased premises but anticipates doing so in the fall of 2016. The lease may result in a net decrease in annual occupancy costs for the Archdiocese.

**B.**    <u>**Personal property**</u>

The Archdiocese has miscellaneous personal property. Besides cash proceeds from real estate sales, the primary personal property available to pay Chapter 11 expenses and make distributions to creditors are the Debtor's insurance settlements, insurance policies, other unrestricted cash assets, and cash in excess of reserves in the GIF.

    1.      Insurance claims and settlements

As a result of extensive negotiations during the course of mediations, the Debtor and the Archdiocesan Settling Insurers agreed to settlement of claims against the Archdiocesan Settling Insurer Policies. As described below, the settlements total $115,400,000 in cash and an estimated minimum value of $7,200,000 in a claim in Home's liquidation. This total value of over $122 million will be contributed to the Plan. The Archdiocese's rights to recovery related to Tort Claims under those insurance policies with Non-Settling Insurers will be assigned to the Trust under the Plan. A more detailed account of the Debtor's insurance settlements and applicable policies is provided below.

    2.      Cash

The Archdiocese attempts to maintain minimum operating cash on hand of approximately $2 million. The Archdiocese's cash receipts vary. The Archdiocese had operating cash on hand of approximately $3.3 million at the end of the fiscal year on June 30, 2016, and operating cash on hand of $3,194,584 as of September 30, 2016.

The Archdiocese's savings were largely depleted during the pendency of the Chapter 11 case to pay operational and administrative expenses, including legal and other professional fees associated with the Chapter 11 process. At the beginning of the Chapter 11 case, the Archdiocese converted its investment savings into cash in compliance with U.S. Trustee requirements. Some of that cash has been used by the Archdiocese to pay ongoing operating expenses during the pendency of this case. The current cash on hand is necessary for the effective reorganization of the Debtor to pay administrative expenses and maintain the minimum amount necessary to provide a minimum safety margin for operations. The operating cash on hand identified in this section is exclusive of the cash proceeds from the sale of certain Archdiocese real property being held in the segregated account.

    a.      International Priest Fund and Board Designated Funds

-28-

The Archdiocese has reviewed documentation involving the International Priest Fund ($1,613,370.26 as of September 30, 2016) and other board-designated funds ($1,532,517.27 as of September 30, 2016) and determined that such funds should be available to general creditors as an asset of the estate.  These funds had been used for specific purposes designated only by the Archdiocese's board.  The Plan provides for distribution of these funds to the Trust.

b.       Donor Restricted Cash and Investments

Certain funds held by the Archdiocese are donor-restricted.  This means that these funds were given to the Archdiocese by a donor with specific donative intent that the funds be used only for a specific purpose outlined in the documents transferring the funds or assets to the Archdiocese.  Under applicable law, these funds cannot be used for purposes other than those outlined in the applicable documents and are therefore unavailable for distribution in this case.

c.       Perpetual Trusts

The Archdiocese is the beneficiary of certain perpetual trusts and bequests from individual wills.  The bequests in these wills and trusts contain provisions restricting the use of the gifted assets for specific stated purposes.  For that reason, although the Archdiocese is the named beneficiary of these certain trusts and wills, the assets are held by the Archdiocese for the benefit of others and may not be used by the Archdiocese for its own purposes, including for purposes of funding a bankruptcy plan of reorganization.

d.       Riley Fund

The Archdiocese holds a trust fund (the "Riley Fund") under a Will executed by William C. Riley on September 16, 1929.  The balance of the Riley Fund equaled $2,584,564.42 as of the September 30, 2016.

The Plan includes a provision resolving a dispute between the Cathedral Corporation and the Archdiocese concerning ownership and entitlement to the Riley Fund. The settlement reached with the Cathedral Corporation regarding the Riley Fund will be incorporated into the Plan to be approved in accordance with Rule 9019 and as a part of confirmation. The Archdiocese believes that the resolution of this dispute is a reasonable and sound exercise of its business judgment. The facts relevant to the dispute include the following:

The operative language of the Will provides:

It is my wish that the gift to the Diocese of Saint Paul, which is made as a memorial to my father, and any and all sums which may be paid to the Diocese of Saint Paul under the conditions of my said will, as amended by this codicil, shall be held for the benefit of the Cathedral of Saint Paul and used and devoted for such purpose in connection with the said Cathedral of Saint Paul, as the

-29-

> Diocese of Saint Paul may deem best, but this expression of my
> wishes is in no respect to restrict or limit the character of the gift
> which is absolute to the Diocese of Saint Paul.

When the Will was executed there was no existing legal entity known as "the Cathedral of Saint Paul of the Roman Catholic Diocese of Saint Paul." The Cathedral Corporation became a separate corporate entity in 1995.

At the November 22, 1982, meeting of the corporate board of the Archdiocese, the Debtor authorized the placement of the Riley Trust "in an endowment fund at the Chancery for the benefit of the Cathedral, the income of which would be paid periodically to the Cathedral." The board determined that this "endowment in favor of the Cathedral will also satisfy any obligations to the Cathedral parish for the Cathedral School which was appropriated by the Archdiocese in 1977 for an Archdiocesan office building. At that time no other payments for the school were made to the Cathedral parish by the Archdiocese."

In accordance with this intent, the Archdiocese continued to make monthly distributions from the Riley Fund to the Cathedral Corporation, which has relied on the distributions to pay costs of improvements and other expenses in connection with the Cathedral. This practice was maintained by the Archdiocese on a continuous basis from at least 1995 to the Petition Date. On average, the monthly distribution from the Riley Fund to the Cathedral Corporation equaled $9,710.00 per month. The Riley Fund was designated as "board designated funds" on the Archdiocese's financial statements and its schedules and statement of financial affairs in this bankruptcy case.

The Archdiocese ceased making distributions from the Riley Fund to the Cathedral Corporation following the Petition Date. Prior to that time, payments from the Riley Fund has been made for the exclusive benefit of the Cathedral for approximately 90 years. The Cathedral Corporation objected to the termination of payments from the Riley Fund and demanded the return of the Riley Fund as property held by the Archdiocese in trust for the Cathedral Corporation. The Archdiocese disputed this contention on the basis of the language of the Will and the fact that the Cathedral Corporation did not exist as a legal entity until 1995.

After negotiation, the Archdiocese and the Cathedral Corporation have agreed to resolve the dispute upon payment by the Archdiocese to the Cathedral Corporation of an amount equal to one-half of the balance of the Riley Fund held by the Archdiocese as of the Effective Date (estimated at $1,292,282.21 as of September 30, 2016), which payment shall be free and clear of any interest of the Archdiocese. The payment will be made directly by the Archdiocese to the Cathedral Corporation and will not be made from the Plan Implementation Account. Payment under the settlement will be made as soon as practical following the Effective Date. The remaining balance of the Riley Fund will be paid by the Archdiocese to the Plan Implementation Account as a component of the distribution contemplated under Section 5.1 of the Plan, which payment shall be free and clear of any interest of the Cathedral Corporation.

-30-

The Cathedral Corporation's agreement to this settlement is conditioned on the waiver of any and all claims and causes of action against the Cathedral Corporation. The Archdiocese believes that the proposed settlement is in the best interests of creditors in light of the legal uncertainty concerning ownership of the property.

3.      Accounts receivable

a.      Parish assessments receivable

As of September 30, 2016, the Archdiocese has accounts receivable from Parish assessments with a booked value of approximately $8.35 million. The Archdiocese believes that these assets are worth substantially less than as scheduled due to receivables that are uncollectable. The Archdiocese further believes that assessments receivable would be uncollectable in a liquidation. Notably, while Parishes are obligated under Canon Law to pay assessments to the Archdiocese, Parishes may not have an obligation under Minnesota civil law to do so. Certain parishes have entered into agreements to pay down past-due assessments but to the extent any obligations on such agreements remain, recovery in a liquidation remains speculative due to those parishes' lack of resources. Parish assessments will continue to be collected and will be better utilized in the Debtor's reorganization as they will provide the primary means for the Debtor to continue its operations going forward. If accounts receivable are not used to continue to fund Archdiocesan operations, it is unlikely that current accounts receivable will be collectable.

b.      Other accounts receivable

The Archdiocese has accounts receivable based on subscriptions and advertisements in the Catholic Sprit, accounting services, priest benefit fund for medical and dental coverage, and CSAF funds. The Archdiocese also has loans receivable from four loans to separate Parishes. Similar to the assessment receivables, the Archdiocese believes that these assets are worth less than as scheduled due to collectability issues.

4.      Miscellaneous personal property

The Archdiocese has in its possession miscellaneous personal property that is of minimal value, is difficult to market for sale, or is necessary for the continued operations of the Archdiocese. This personal property consists primarily of miscellaneous religious vestments, jewelry, home furnishings, garage and print shop equipment, lawn care equipment, office equipment, and vehicles, as described in the Debtor's Schedules and Statement of Financial Affairs. The equipment and vehicles are used primarily for the Archdiocese's operations including publication of the Catholic Spirit, maintenance of Archdiocese grounds, general office use, and travel to sites within the Archdiocese's region. The equipment and vehicles are necessary for the Debtor's reorganization and continued operations. Further, such equipment and vehicles have limited resale value because such equipment and vehicles may be outdated. The appraised value of the jewelry owned by the Archdiocese is $265,400. Of that total amount, approximately $230,000 is attributable to a single sapphire and diamond ring donated to the

-31-

Archdiocese.  The Archdiocese is in the process of selling that ring and other personal property not necessary for the Archdiocese's operations and missions and with minimal historical or liturgical value.  These proceeds will be contributed to the Plan Implementation Account.

### C.    Other interests and assets

1.    Residual Ward Estate

The Archdiocese is one of several beneficiaries of the estate of Austin T. Ward.  The Archdiocese's beneficial interest is the residuary of the estate after other administration, i.e., the assets left over after all other specific gifts and bequests have been made and all other claims and obligations of the estate have been satisfied.  The value of the Archdiocese's interest in that estate is currently unknown because the estate remains unsettled, but counsel for the Ward estate estimates a value of less than $25,000.  The Archdiocese will contribute its beneficial interest in the Residual Ward Estate to the plan Trust.

2.    Clarey Oil Rights

The Archdiocese is the beneficiary of a will providing the Archdiocese a nominal fractional share interest in certain mineral rights in Colorado.  The mineral rights are unexplored and the cost of doing so is prohibitive.  The value of this asset is believed to be negligible and the Archdiocese has a booked value for this asset at $340.

3.    Ausmar Development Co., LLC

The Archdiocese was included as a beneficiary in a will and received a 25% interest in Ausmar Development Co, LLC (Ausmar), which owns certain real property in Chanhassen, Minnesota.  Prior to the Petition Date, Ausmar subdivided the property and marketed the lots for sale.  All but two lots were sold prior to the chapter 11 case.  Property taxes have risen dramatically on the two remaining lots.  Based on the estimated taxable market value of the property, the value of the Archdiocese's interest is estimated to be $365,775.  The Archdiocese does not hold a controlling interest in Ausmar and the other owners are unable to buy out the Archdiocese.  However, the property owned by Ausmar continues to be marketed for sale.  The Archdiocese will contribute its beneficial interest and rights to any income from the sale of the Ausmar property to the plan Trust.

### D.    Avoidable Transfers

The Debtor has investigated and does not believe that it has any colorable avoidable transfer claims worthy of pursuit, especially in light of litigation risks and costs.

As part of this effort, the Debtor has investigated potential avoidable transfer claims relating to lease transactions involving the property leased to others described above, and has determined that no viable avoidable transfer claims exist.  The leases entered into with the Cathedral and Benilde-St. Margaret High School are well outside the lookback period for

avoidable transfers.  The Archdiocese extended the existing leases with De La Salle High School and Totino Grace High School prior to the petition date within the avoidable transfer lookback period.  However, these extensions were made in good faith and in furtherance of the Archdiocese's mission of promoting Catholic education. The Debtor strongly believes that it cannot reasonably pursue an avoidable transfer claim related to any of the leases or lease extensions because it would be unable to prove necessary elements of such a claim including insolvency at the time of the transfers, lack of reasonably equivalent value, and lack of good faith on the part of the transferees.  With respect to reasonably equivalent value provided to the Archdiocese, despite paying nominal rent to the Archdiocese, each of the lessees is responsible under the leases for all costs and expenses related to the use, occupancy or operation of the premises.  The combined annual operations costs for these properties paid by the lessees is in the millions of dollars.  The lessees also pay for all improvements and repairs to the properties. Those costs are in the tens of millions of dollars.  The payment of these costs by the lessees provides enormous value to the Archdiocese and is critical in the furtherance of the Archdiocese's core missions.

On August 7, 2014, the Cathedral of Saint Paul parish recorded a memorandum of lease for the Cathedral property.  The Cathedral of Saint Paul parish has been in continuous possession of the leased property for many years and the Archdiocese believes that this recording does not represent a transfer to the extent the Cathedral of Saint Paul parish had previously perfected its interest by possession of said property.

Moreover, even if potential avoidable transfer claims existed as related to the properties leased to others, the counterparties to those leases would have enforceable rights and defenses that would negate any potential recovery to the estate based on such claims.  Importantly, the Bankruptcy Code provides that even if a transfer may be avoided, a transferee that takes in good faith and for value is entitled to a lien on the property transferred or may retain any interest transfer to the extent that such transferee gave value in exchange for such transfer, including any obligation incurred.  As a result, even if these leases could be avoided, the counterparties would be entitled to a lien on the land for the value of all improvements made to the land by the counterparties, and, for those properties encumbered by mortgages, the unpaid balance of indebtedness secured by mortgages for such improvements.  Were any of the lease transactions to be avoided, the claims of the lease counterparties could be enormous and could eclipse other claims filed in this case.

Therefore, the Debtor believes that pursuing avoidance claims would ultimately be fruitless and would actually dissipate estate assets because the cost of litigating such claims would be an enormous expense to the estate and would not result in meaningful assets coming into the estate.

## VI.     THE CHAPTER 11 CASE

### A.     Commencement of the Chapter 11 case

The Debtor commenced its case on January 16, 2015 (the "Petition Date").  The Debtor's case was assigned to the Honorable Robert J. Kressel, United States Bankruptcy Judge.  Upon commencement of the Chapter 11 case, the automatic stay of section 362 of the Bankruptcy Code enjoined the commencement or continuation of (a) collection efforts by creditors against the Debtor or to recover a claim against the Debtor by seeking to avoid a transfer of the Debtor's property, (b) enforcement of liens, if any, against assets of the Debtor, and (c) continued and additional claims against the Debtor.

After the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.     Retention of professionals

#### 1.     Debtor's professionals

By order of the court, Briggs and Morgan, P.A. was authorized to act as bankruptcy counsel to the Debtor in this case.  The Debtor retained additional professionals during the course of the Chapter 11 case, each for a specific purpose:

- BGA Management LLC d/b/a Alliance Management was retained as the Debtor's financial consultant during the course of the Chapter 11 case;

- NorthMarq Real Estate Services, LLC d/b/a Cushman & Wakefield NorthMarq was retained as the Debtor's real estate broker and real estate leasing representative in connection with the sales of Archdiocese real property and the leasing of new office space;

- the law firm of Meier Kennedy and Quinn, Chartered was retained as the Debtor's ongoing ordinary course counsel;

- the law firm of Fredrikson and Byron, P.A. was retained as special criminal defense counsel related to charges asserted against the Archdiocese by the Ramsey County Attorney during the pendency of the Chapter 11 case;

- CliftonLarsonAllen LLP was retained to perform agreed-upon procedures for the Debtor to evaluate the status of financial and corporate records and to monitor internal controls; and

- Regnier Consulting Group, Inc. was retained to complete a loss reserve analysis of the workers' compensation program maintained by the Archdiocese through its General Insurance Fund.

The retention of each of these professionals was approved by the Bankruptcy Court.

2.      Official Committee of Unsecured Creditors' professionals

Pursuant to sections 1102(a) and 1102(b) of the Bankruptcy Code, the United States trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in the Debtor's case.  The Committee consists of five individuals who hold Tort Claims against the Debtor.  The Committee retained Stinson Leonard Street to represent it throughout this case. Since its appointment, the Committee has taken an active role in the Debtor's case.  The Committee has also performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its preliminary investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors.  The Committee also retained CB Richard Ellis as its real estate advisor, which has also been active in reviewing real estate issues in this case including the real property sales and lease transactions entered into by the Debtor during the course of this Chapter 11 case. These retentions were approved by the Bankruptcy Court.  The Committee also moved to retain Deloitte Transactions and Business Analytics LLP.  That retention was denied by the Bankruptcy Court.

3.      Parish Committee's professionals

Pursuant to sections 1102(a) and 1102(b) of the Bankruptcy Code, the United States trustee also appointed an Official Committee of Unsecured Parish Creditors (the "Parish Committee") to serve in the Debtor's case.   The Parish Committee consists of five representatives of Parishes who hold claims against the Debtor.  The Parish Committee retained the law firm of Manty & Associates to represent it throughout this case.  Since its appointment, the Parish Committee has taken an active role in the Debtor's case.  The Parish Committee also retained the law firm of Maslon LLP to act as its special insurance counsel.

C.      **Significant events in the bankruptcy case**

The Bankruptcy Court has entered several orders in this case, each of which is available from the clerk of the Bankruptcy Court.

1.      First-day motions

To administer the Archdiocese's bankruptcy estate and to prevent a significant interruption in the Archdiocese's business operations, the Debtor filed the following motions on the Petition Date, each of which was granted by the Bankruptcy Court.  These "first day" motions were aimed at allowing the Archdiocese to continue operating with minimal business interruption and to provide certain confidentiality protections to sexual abuse creditors who wished to remain anonymous.

- A motion to authorize the maintenance of the Archdiocese's protected insurance program (GIF);
- A motion to authorize the Archdiocese to file portions of Schedule F, the master mailing matrix, and other pleadings and documents under seal;
- A motion for modification of claim procedures;
- A motion to (a) authorize payment of prepetition wages, salaries, and employee deductions and expenses, (b) authorize payment of prepetition statutory unemployment compensation charges, (c) authorize continuation of participation in medical and dental health insurance programs (AMBP), (d) authorize priest support payments and international priest payments, (e) authorize payment of other benefit and retirement plan obligations, (f) authorize continuation of third party payroll, expense checks and fund transfers, and (g) finding compliance with the requirements of Rule 6003 and waiving the provisions of Rule 4001(a)(3); and
- A motion to authorize maintenance of existing bank accounts and business forms.

2.      Debtor's schedules and statements and monthly operating reports

The Archdiocese filed its schedules and statement of financial affairs on January 30, 2015. The Archdiocese's schedules were based on information compiled from several sources, including the Archdiocese's books and records. Because of the undetermined nature of the Tort Claims and the claims of the Parishes against the Archdiocese, the Archdiocese scheduled every known Tort Claimant and Parish claimant as contingent, disputed, and unliquidated.

The Archdiocese has also timely filed all monthly operating reports and other reports as required by the Bankruptcy Code, Bankruptcy Rules, and in compliance with U.S. Trustee guidelines. Each of these reports is available on the docket for this Chapter 11 case.

3.      Claim Filing Deadline and notice publication

The Bankruptcy Code provides a procedure for each Creditor who believes it has a Claim against the Debtor to assert such a Claim so that the Creditor can receive distributions from the Debtor's estate. In this case, the last date to timely file claims was extended to August 3, 2015, nearly seven months after this Chapter 11 case was initially filed. After the claims filing due date was established, the Archdiocese undertook substantial efforts to widely publicize the due date, including publication in several newspapers, posting of the deadline notice at Parishes, and notices on the Archdiocese's and Bankruptcy Court's websites. Several months after these initial publication efforts, on July 16, 2015, the Committee moved to extend the time to timely file proofs of claim and argued that the claims filing due date should be extended through May 25, 2016 (which is the date that the statute of limitations window under the CVA closes). The Bankruptcy Court denied the Committee's motion and the claims filing due date was not extended.

No order has been entered establishing an Administrative Claims due date. The Debtor has generally been paying undisputed Administrative Claims in the ordinary course of business postpetition. However, upon establishment of an Administrative Claims due date, it is possible that additional Administrative Claims may be filed.

### 4.    Future claims representative

In certain other Diocesan bankruptcy cases around the country, a legal representative for the interests of future abuse claimants has been appointed. The Committee filed a motion to appoint such a legal representative on June 25, 2015 but later withdrew that motion on July 13, 2015. The Archdiocese then moved to appoint such a legal representative on September 17, 2015. At an initial hearing on October 1, 2015, the Bankruptcy Court expressed concern about whether the Bankruptcy Code provided the ability to appoint such a representative and whether such a representative was needed under the circumstances. After a continued hearing, the Bankruptcy Court entered an order on October 30, 2015, denying the motion to appoint a legal representative for interests of future claimants and stating that "the constituency represented by the creditors committee includes and extends to, among others, those individuals who, on the confirmation date under any plan of reorganization in this case, (a) had a claim for sexual abuse (as defined in the order establishing the filing deadline [Docket No. 188]) against the debtor; (b) were under a disability recognized by Minn. Stat. § 541.15 (or other applicable law suspending the running of the limitation period, if any); and (c) did not file a claim or have a claim filed on their behalf."

### 5.    Property sales

As identified in section V.A.1 above, the Archdiocese sold most of its real property interests during the course of this Chapter 11 case. The proceeds from the closed sales of the Hayden Center, the Chancery, Hazelwood, and Dayton property are held in a segregated interest-bearing account pending further court order. The proceedings related to each of the individual sales are described below.

### a.    The Hayden Center

During the course of this Chapter 11 case, the Archdiocese sold certain real property located at 328 Kellogg Boulevard West in Saint Paul, Minnesota known as the "Hayden Center." The Hayden Center was utilized by the Archdiocese as office space for its ongoing operations. The Archdiocese solicited multiple offers for the Hayden Center and received a purchase offer from the Minnesota Historical Society. No other offers were received for the property. The Bankruptcy Court entered an order approving the sale on January 7, 2016. On February 16, 2016, the Archdiocese closed on the Hayden Center sale, selling the property to the Minnesota Historical Society for a purchase price of $4,500,000.00. As part of the sale of the Hayden Center, the Archdiocese entered into a short-term lease with the Historical Society to allow the Archdiocese to retain its office space on the property until it moves into its new office space in

fall 2016. Net sale proceeds of $4,317,295.67 were deposited into a separate interest-bearing account maintained by Premier Bank to be held pending further court order.

### b.      The Chancery

The Archdiocese also sold certain real property located at 226 Summit Avenue and 230 Summit Avenue known as the "Chancery." The Chancery consists of the Chancery building on Summit Avenue used as office space for the Archdiocese's ongoing operations and the Archbishop's residence adjacent to the Chancery. The Archdiocese obtained a stalking horse bid from United Properties in the amount of $2,750,000. Additional bids were also received for the Chancery property. After receiving the competing qualified bids, the Archdiocese, with the participation of the Committee, conducted as an auction for the property on April 4, 2016. Four entities participated in the auction and the Archdiocese and the Committee jointly determined which bid yielded the highest and best offer. The Bankruptcy Court entered an order approving the sale of the Chancery on April 7, 2016. On April 14, 2016, the Archdiocese closed on the sale of the Chancery, selling the property to 1777 Bunker Lake Blvd NW LLC for a purchase price of $3,275,000. As part of the sale of the Chancery, the Archdiocese entered into a short-term lease with 1777 Bunker Lake Blvd to allow the Archdiocese to retain its office space on the property until it moves into its new office space in fall 2016. The parties also entered into a view easement agreement which limited the height of any structure built on the property in order to protect the views to and from the Cathedral of Saint Paul. Net sale proceeds of $3,181,855.44 were deposited into a separate interest-bearing account maintained by Premier Bank to be held pending further court order.

### c.      Hazelwood

The Archdiocese also sold certain residential real property located at 10310 295th Street West, Greenvale Township, Minnesota known as "Hazelwood." Hazelwood was donated to the Archdiocese and had been historically used as a retreat location. Hazelwood was placed on the residential real estate market for several months before a buyer emerged and a purchase agreement was negotiated. The Bankruptcy Court entered an order approving the Hazelwood sale on February 25, 2016. The Archdiocese closed on the sale on March 4, 2016. Net sale proceeds of $349,804.00 were deposited into a separate interest-bearing account maintained by Premier Bank to be held pending further court order.

### d.      The Dayton Property

The Archdiocese also sold certain commercial real property located at 244 and 250 Dayton Avenue in Saint Paul, Minnesota known as the "Dayton Property." The Bankruptcy Court entered an order approving the Dayton property sale on July 14, 2016. The Archdiocese closed on the sale on August 11, 2016. Net sale proceeds of $876,109.57 were deposited into a separate interest-bearing account maintained by Premier Bank to be held pending further court order.

6.    New lease for Archdiocese offices

Because the Archdiocese sold the real property where it housed its offices, including the Chancery, the Hayden Center, and the Dayton Property, the Archdiocese was required to make arrangements to lease new space to house its operations. After an extensive search, the Archdiocese settled on a building located at 777 Forest Street, Saint Paul, Minnesota. The Archdiocese entered into a lease agreement as tenant with IAF Beacon I, LLC as landlord on February 29, 2016 with an initial term of 127 months commencing upon the Archdiocese moving into the premises following initial construction and fit out work performed on the building. The Archdiocese anticipates moving into the new premises in mid-February 2017. The Bankruptcy Court authorized the Archdiocese to enter into the lease agreement on April 7, 2016. The Archdiocese anticipates a possible net savings in occupancy costs under the new lease.

7.    Ramsey County lawsuits and settlement

During the pendency of the chapter 11 case, on June 3, 2015, the Ramsey County Attorney's Office ("RCAO") initiated a civil action against the Archdiocese petitioning the Ramsey County district court for an order that the Archdiocese show cause why it should not be subject to the jurisdiction of the Court for contributing to a child's need for protection or services. As discussed above, this civil claim was resolved through a settlement. The Archdiocese seeks to incorporate the civil settlement agreement into its Plan. The Bankruptcy Court approved the civil settlement on January 28, 2016.

The RCAO simultaneously initiated a criminal action against the Archdiocese based on the same alleged facts. The criminal complaint alleged three gross misdemeanor counts each of "contributing to the status as juvenile petty offender or delinquency" and "contributing to the need for protection or services." The RCAO dismissed that suit "in the best interests of justice" on July 20, 2016. In connection with the dismissal, the civil settlement was amended to have the record reflect that "Curtis Wehmeyer was a priest in this Archdiocese. The Archdiocese admits that it failed to adequately respond and prevent the sexual abuse of Victim 1, Victim 2, and Victim 3. The Archdiocese failed to keep the safety and wellbeing of these three children ahead of protecting the interests of Curtis Wehmeyer and the Archdiocese. The actions and omissions of the Archdiocese failed to prevent the abuse that resulted in the need for protection and services for these three children." In addition, the audit and oversight period was extended by an additional year, the Ramsey County Attorney designates a seat on the Ministerial Review Board (filled by Patty Wetterling), Archbishop Hebda will participate directly in three restorative justice sessions as convened and determined by RCAO, the Director of Safe Environments role was strengthened, and ongoing counseling resources for Victim 1, Victim 2, and Victim 3 and immediate family, if necessary. A six-month compliance review hearing date is set for December 20, 2016.

8.      Rejection of Infor contract and settlement of claim

Prior to the Petition Date, the Archdiocese had entered into a contract with Lawson Software, Inc. n/k/a Infor (US), Inc.  Under the contract, Infor was to provide human resources management software and hosting services.  Early in the course of this case, the Archdiocese made the determination to reject the Infor contract and did so by motion.  On February 19, 2015, the bankruptcy court granted the Archdiocese's motion.  Following the contract rejection, the Archdiocese entered into negotiations with Infor to settle Infor's contract rejection damages claim.  The bankruptcy court approved the Archdiocese's settlement with Infor by order dated December 3, 2015.

9.      Assumption of Byrne Residence lease

Prior to the Petition Date, the Archdiocese was a tenant under a lease with the Saint Paul Seminary for a property known as the Byrne Residence.  The Byrne Residence is used by the Archdiocese as a home for retired priests.  The Byrne Residence represents a critical part of the Archdiocese's mission in that, among other things, it is obligated under Canon Law to provide reasonable support to retired priests.  The Archdiocese pays no rent under the lease, but does pay operating expenses for the property.  The Bankruptcy Court approved the assumption of the Byrne Residence lease on July 30, 2015.

10.      Competing plans filed

By orders dated April 9, 2015 and October 29, 2015, the Bankruptcy Court extended (i) through an including May 31, 2016, the period within which the Debtor has the exclusive right to file a chapter 11 plan, and (ii) through and including July 29, 2016, the period during which the Debtor has the exclusive right to solicit acceptances of a chapter 11 plan.  The Debtor's plan and disclosure statement were originally filed on May 26, 2016.

After the expiration of the plan filing exclusivity period, on July 22, 2016, the UCC filed a competing proposed plan (the "UCC Plan") and accompanying disclosure statement.  The Archdiocese does not believe that the UCC Plan is in the best interest of the estate and its creditors.  The Archdiocese believes that the UCC Plan is not confirmable for several reasons, including that it does not provide adequate means for implementation, it is not feasible, it improperly classifies certain claims as unimpaired, it violates the United States Constitution, it would create new classes of creditors that are unaccounted for under the UCC Plan, the disclosure statement accompanying the UCC Plan is misleading and lacks adequate or accurate information, and the UCC Plan would materially impair or impede the settlements reached with insurance carriers that total over $115 million dollars that would otherwise go toward the Trust established in the Debtor's Plan.  As such, the Archdiocese does not believe that the UCC Plan can be confirmed.

11.     UCC motion for substantive consolidation

On May 24, 2016, the UCC filed a motion on its own behalf seeking to substantively consolidate the Archdiocese with numerous non-debtor entities including (i) all Parishes, (ii) all consolidated schools, (iii) the Catholic Community Foundation, (iv) the Francophone African Chaplaincy, (v) Segrado Corazon de Jesus, (vi) the Chaplaincy of Gitchitwaa Kateri, (vii) Newman Center and Chapel, (viii) the Catholic Finance Corporation, (ix) the Catholic Cemeteries, (x) Totino Grace High School, (xi) De La Salle High School, and (xii) Benilde-St. Margaret High School.    The Archdiocese and other targeted non-Debtor Catholic entities opposed the motion and filed motions to dismiss.    The bankruptcy court dismissed the UCC's substantive consolidation motion by order dated July 28, 2016 for lack of authority under the Bankruptcy Code to order the relief requested and failure by the UCC to state a plausible claim for relief.    The United States District Court for the District of Minnesota affirmed the bankruptcy court's ruling on appeal.

## D.    **Insurance adversary proceeding and mediation**

1.     The Insurance Declaratory Judgment Action

On November 24, 2014, prior to the Petition Date, the Archdiocese initiated a civil lawsuit (the "Insurance Declaratory Judgment Action") in the Minnesota District Court against several insurance carriers, *i.e.*, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York ("CIC"), Fireman's Fund Insurance Company, as successor to Fireman's Fund Indemnity Company ("FFIC"), National Fire Insurance Company of Hartford ("National Fire"), TIG Insurance Company, as successor to International Insurance Company ("TIG"), Continental Casualty Company ("CCC"), Hartford Accident and Indemnity Company ("Hartford"), American Home Assurance Company ("American Home"), The Aetna Casualty and Surety Company, n/k/a Travelers Casualty and Surety Company, State Farm Fire and Casualty Company ("State Farm") Certain Underwriters at Lloyd's, London subscribing to Policies SL3721, SL3722, SL3723, ISL3115, ISL3116, ISL3117, ISL3675, ISL3613, ISL3614, and ISL3615, Bellefonte Insurance Company ("Bellefonte") and Northwestern National Insurance Company of Milwaukee, Wisconsin for its liability under SLC 5742 ("Northwestern National"), Excess Insurance Company a/k/a Excess Insurance Company Limited, Terra Nova Insurance Company Limited, Dominion Insurance Company, Sovereign Marine & General Insurance Company Limited a/k/a Sovereign Marine & General Insurance Company Limited, Stronghold Insurance Company Limited, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Sphere Drake Insurance PLC, CNA Reinsurance of London, Limited, Interstate Fire and Casualty Company ("Interstate"), 21st Century Centennial Insurance Company f/k/a Colonial Penn Insurance Company ("Colonial Penn"), seeking a declaration, *inter alia*, that with respect to each claim of clergy abuse that triggers one or more of the carriers' policy periods, that as to such claim of clergy abuse, each carrier has or will have upon satisfaction of any retained limit, a duty to indemnify the Archdiocese for damages paid in the form of verdicts, judgments or settlement, and defense costs incurred in connection with the claims of clergy abuse, and that each primary carrier has a duty to defend and indemnify the Archdiocese in connection with such

claims.  The Archdiocese also asserted specific allegations as to several insurers and sought additional declaratory relief, as well as injunctive and other ancillary relief.  The complaint was amended on January 16, 2015 to add The Catholic Mutual Relief Society of America ("Catholic Mutual") as a defendant.  The Archdiocese also filed and pursued a claim in the Home's liquidation proceeding.

On January 16, 2015, the Insurance Declaratory Judgment Action was referred by United States District Court Judge Richard H. Kyle to the Bankruptcy Court for the District of Minnesota under 28 U.S.C. §§ 157 and 1334 for appropriate disposition as an adversary proceeding.   The adversary proceeding was opened in the Bankruptcy Court for the District of Minnesota as case number 15-03013.

On January 21, 2015, the Bankruptcy Court ordered that the Insurance Declaratory Judgment Action as well as the Tort Claimants participate in confidential mediation conducted by former Magistrate Judge Arthur J. Boylan.  The Bankruptcy Court further ordered that all deadlines and proceedings in the adversary were suspended indefinitely.

2.      Confidential mediation process

The Debtor, counsel for sexual abuse claimants and some insurers for the Archdiocese and parishes have differing views regarding the viability and settlement value of certain sexual abuse claims.  Counsel for claimants and the Archdiocese and various parishes also differ on the value or availability of assets that should be dedicated towards resolution of these claims.

Taking into account the numerous substantive issues addressed in various mediations and negotiations, the Archdiocese reached settlements and agreements with multiple insurers and other entities.   The settlements negotiated and plan contributions contemplated include the following:

- Dedication of Archdiocese real property sale proceeds totaling at least $8.7 million to the Plan Implementation Account;

- Dedication of approximately $3.1 million from the International Priest Fund and other Archdiocese board-designated funds to the Plan Implementation Account;

- Settlement of the Riley Fund dispute and contribution of approximately $1.2 million to the Plan Implementation Account;

- Parish, Archdiocese and other GIF participants' contribution of $5 million to $6 million of funds from the General Insurance Fund towards resolution of sexual abuse claims;

- Settlement with Home in the amount of $14.2 million recognized as an allowed claim in Home's liquidation. The final distribution on this claim is unknown, though the Archdiocese estimates a minimum value of at least $7.2 million should the claim be sold by the Trustee. Funds distributed over time will be made available to resolve Tort Claims;

- Settlement with State Farm in the amount of $5 million;

- Settlement with Catholic Mutual in the amount of $14 million;

- Settlement with Lamorak Insurance Company, for Employers Liability Assurance Corporation ("ELAC") (under a policy for which evidence was uncovered after the filing of the Insurance Declaratory Judgment Action) in the amount of $750,000;

- Settlement with CNA (for the Fidelity and Casualty Company of New York, National Fire Insurance Company of Hartford, American Casualty Company of Reading, Pa., and Continental Casualty Company) ("CNA") in the amount of $7.975 million;

- Settlement with FFIC in the amount of $7.75 million;

- Settlement with TIG in the amount of $7 million;

- Settlement with Hartford in the amount of $7.775 million;

- Settlement with American Home in the amount of $15.7 million;

- Settlement with Travelers Casualty and Surety Company (formerly known as Aetna Casualty and Surety Company), Northfield Insurance Company, St. Paul Surplus Lines Insurance Company, and St. Katherine Insurance Company PLC, (now known as Travelers Insurance Company Limited) (collectively, "Travelers") in the amount of $26 million;

- Settlement with Certain Underwriters at Lloyd's, London subscribing to Policies SL3721, SL3722, SL3723, ISL3115, ISL3116, ISL3117, ISL3675, ISL3613, ISL3614, and ISL3615, Excess Insurance Company a/k/a Excess Insurance Company Limited, Terra Nova Insurance Company Limited, Dominion Insurance Company, Sovereign Marine & General Insurance Company Limited a/k/a Sovereign Marine & General Insurance Company Limited, Stronghold Insurance Company Limited, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Sphere Drake Insurance PLC, CNA Reinsurance of London, Limited in the amount of $5.9 million;

- Settlement with Interstate in the amount of $17 million;

-43-

- Settlement with Colonial Penn in the amount of $500,000;

- Settlement with Northwestern National Insurance Company in the amount of $50,000;

- Contribution of $13,732,500 from Settling Parish Insurers to the Plan Implementation Account;

- The transfer of rights of recovery under non-settling Archdiocese insurance policies to the Trust;

- Establishment of a Counseling Fund with contribution of $500,000 from the Archdiocese;

- The Archdiocese will sell jewelry and other personal property that is not essential to its operations and lacks liturgical or historical significance and will dedicate the proceeds from such sales to the Plan Implementation Account, in addition to the assignment of any beneficial interest of the Archdiocese in Ausmar; and

- Discharge or waiver of all Parish claims against the Archdiocese.

Based on these settlements in principle, the Trust will initially collect approximately $148 million in cash, plus allowed claims in the Home liquidation. Counsel for claimants and the UCC approved the amount of the settlements with Home, State Farm, Catholic Mutual, and ELAC, FFIC, and TIG.

In the event the court disapproves any of the settlements with the forgoing insurers, such insurers shall be treated as Non-Settling Insurers. The rights to proceeds under insurance policies written by such Non-Settling Insurers for the Archdiocese will also be tendered to the Trust in a manner that preserves all rights the insurance carriers and abuse claimants presently possess.

Without confirmation of a plan in the near future, the Archdiocese's cash available to resolve Tort Claims will be further eroded by administrative costs. Lifting the stay imposed on the Archdiocese's coverage litigation will significantly increase costs without providing for near term resolution of any coverage issue that is anticipated to move settlement discussions forward. Discovery, motion practice, and trial of these complex issues will take years and cost millions. Unfortunately, judicial resolution of any particular coverage issue is not anticipated to substantially bridge gaps in settlement positions. After confirmation, the Archdiocese will continue to cooperate with claimants and insurers to ensure a fair and joint resolution of Tort Claims.

3.      Claims determinations

By virtue of its Plan, the Archdiocese proposes to have a trustee accept, reject and value claims as proposed in the Trust Distribution Plan. The Tort Claims submitted to date vary

-44-

widely in terms of cognizability and value.  Counsel for claimants, the Debtor, Parishes and insurance carriers have exchanged detailed information regarding the merits and value of each Claim.

The Archdiocese does not recognize substantial value in spending valuable resources objecting to and contesting individual Tort Claims.  If one claim is dismissed, claimants may merely ascribe a higher settlement value to a more meritorious claim thereby maintaining their global settlement position.  Further, such proceedings may cause undue pain and suffering to those with valid claims.

In the end, time is on no one's side.  If this case continues indefinitely without a confirmed plan, valuable resources that could be directed towards claimants will be spent on legal fees, and claimants will be deprived of the benefit of settlements and trust distributions. Neither carriers nor counsel for Tort Claimants can reasonably envision proceeding with over 400 costly, complex trials and coverage actions over many years.  The Archdiocese must be allowed to reorganize and obtain a fresh start, and Tort Claimants must move on with their lives with treatment, respect, restitution and hope.

4.      Insurance coverage issues

Coverage for Tort Claims.  Because the most important asset available to the Archdiocese to satisfy Tort Claims is its insurance, an expansive explanation is provided to allow an understanding both as to the extent of the coverage and its limitations. The Archdiocesan policies implicated by these claims span the period from 1943 through 2016.  The policies fall into two categories.  The first consists of policies covering liability for bodily injury that takes place during the policy period and caused by an "accident."  Even if the claim is made years after the policy terminates, this type of policy covers the insured's liability so long as the claimant's bodily injury took place during the policy period.  Policies of this type are commonly referred to as "occurrence-based" policies.  The policies from 1943 to 1986 and 1987 to 1990 are all in this category.

The second category is comprised of policies that provide coverage if a claim is made during the policy period.  This type of policy is referred to as "claims made" coverage.  The Archdiocese has "claims-made" coverage for the period 1986-1987 and 1990 onward.  "Claims made" policies differ from "occurrence-based" policies in that, unlike "occurrence-based" policies, "claims made" policies cover claims made during the policy period even if the injury took place years before the policy incepted.  Because the claim must be made during the policy period to trigger coverage, the only "claims made" policies covering revived claims against the Archdiocese are those in effect since the Child Victim Act was enacted.  In other words, only the "claim made" policies in effect since May, 2013 could be expected to respond to revived claims. However, the "claims made" policies in effect from May 2013 to date provide no coverage if the alleged abuse first began prior to September 1, 1990.  Few claims fall in this coverage gap.

Another important feature of all of the policies that must not be forgotten is that the carriers will not pay amounts in excess of their policy limits. Finally, as explained below, the policies contain exclusions that are said to bar coverage.

A chart of the Archdiocese's general liability insurance policies, including coverage dates and limits, is attached as Exhibit G. The policies are discussed in more detail below.

<u>Policies During the Period 1943 to 1986</u>.  As explained above, the policies during the period 1945 to 1986 were all "occurrence-based" policies. For the early years, 1943 to 1952, the Archdiocese lacks copies of the policies themselves, but the Archdiocese has a ledger showing the name of the carrier, the policy period, the type of coverage and the policy limits. For the period 1952 onward, the Archdiocese has copies of policies, with one notable exception described below.

During this period, a number of the policies were issued for 3 years at a time. None of the policies during this period had aggregate limits. For the period 1943 to 1946 the primary limits were $25,000 "per person" and $50,000 "per accident". From 1946 to 1964 the limits were $100,000 "per person" and $300,000 "per accident". From 1964 to 1967, the primary policy limits were $250,000 "per person" and $500,000 "per accident". Beginning in 1966 the Archdiocese carried not only primary insurance policies but also umbrella or excess policies. Generally, these upper layer policies provide coverage for bodily injury once the insured's liability (and in one case defense costs) exceeds the primary limits. Defense costs are paid by umbrella and excess carriers if the underlying policy's limits are exhausted, which occurs usually by payment of those limits for settlements or judgments.

The Archdiocese's umbrella or excess coverage for the period 1966 to 1986 varied from $3 million "per occurrence" to as much as $20 million in total for a given year.

The Archdiocese's position is that each claimant's injuries constitute an "occurrence". This means that the "per occurrence" limits are the same as the "per person" limits. During the early phase of the mediation, some carriers, though not all, disagreed and contended either that each perpetrator's abuse constitutes a single occurrence, regardless of the number of individuals he is alleged to have abused, or that there is a single occurrence consisting of the Archdiocese' generalized failure to protect claimants. According to the carriers who asserted that each perpetrator's conduct constitutes a separate occurrence, if the policy limits are $100,000 "per occurrence" and two individuals were abused by the same person during one policy year and were adjudged entitled to $100,000 each, then the most the carrier would owe is $100,000 in total. Under the Archdiocese's view, the carrier would owe $200,000. According to the carriers who asserted there is a single occurrence regardless of the number of perpetrators or victims, under the foregoing example, even if there were 10 claimants adjudged to be entitled to $100,000 each, the carrier would still owe only $100,000. The Archdiocese's position is that under this scenario, the carrier would owe $1 million.

Certain carriers also contended that the "per person" and "per occurrence" limits for their three-year policies are the most that is available for all three years. In other words, if a person is

abused in three different policy years and the limits are $100,000 "per person", the carrier would owe only $100,000 in total for the entire three-year policy. The Archdiocese's view is that the carrier must pay the "per person" limits for each year, i.e., it must pay $300,000.

Another issue raised by "occurrence-based" carriers is that many of the claims do not involve an "occurrence" and so there is no coverage at all. They base this on their contention that there is no "occurrence" (or in earlier policies an "accident") if the Archdiocese expected or intended the injury. The Archdiocese believes that Minnesota law requires that it have had "specific intent" to injure before coverage is barred. Some carriers have denied coverage on this basis for some claims. But, in most cases, carriers have only reserved their rights to deny coverage and agreed to defend.

Finally, another important facet of the Archdiocese insurance program is that beginning September 1, 1980 the Archdiocese as well as numerous other Catholic Entities, *i.e.*, those participating in the General Insurance Fund ("GIF") explained below, were covered under the so-called Bishop's Plan. For the period September 1, 1980 to September 1, 1986 the Bishop's Plan consisted of a first layer of coverage issued by certain London market insurers ("LMI") whose policies contain a retention of $100,000 "per occurrence" per year including defense costs. The retention means that LMI was not responsible to pay either defense or settlements or judgments until the total of such amounts paid for an individual claim exceeded $100,000 per policy year. (Rather, the GIF is obligated to pay such retained amount.) Multiple insurers subscribed to each LMI policy and were only liable for their own shares. Insurers representing between 10 and 20% of each year are insolvent. Except for potentially Bellafonte, who was severally liable for .543% of one policy year, the time to submit claims to these insolvent carriers' liquidators has passed. The Archdiocese submitted the claim to Northwestern National on the ground that it is a successor to Bellafonte. Northwestern National denied it is a successor to Bellafonte.

Also, the primary carrier for the period 1961 to 1967, Home, is insolvent and is the subject of a liquidation proceeding pending in New Hampshire state court. Home initially took the position that the time for the Archdiocese to file claims in the liquidation proceeding expired long ago (before the enactment of the Child Victim Act). The Archdiocese has been able to negotiate a settlement with Home under which Home will accept the Archdiocese' claims as timely filed subject to various terms and conditions described below.

Although the New Hampshire liquidator has been willing to work with the Archdiocese and treat the claims as timely filed, the Minnesota Insurance Guaranty Association ("MIGA") has not. MIGA is a quasi-Minnesota state agency set up to ensure that Minnesota insureds whose insurers become insolvent can still recover up to $300,000 per claimant. In addition to contending that the claims are untimely (despite New Hampshire's position), MIGA has contended that the Archdiocese had "net worth" in excess of the statutory maximum in the year before Home became insolvent, prohibiting MIGA from paying. Of course, the Archdiocese is a non-profit whose assets are used for charitable purposes and include donated funds dedicated to specific purposes. It is significantly different from a for-profit entity where the difference between assets and liabilities represents amounts owners or shareholders can use for their own personal benefit.

Finally, for the period 1974 to 1978 or 1979, the Archdiocese had two primary carriers, Aetna Casualty and Surety Company and State Farm Insurance Company.  Both carriers' policies had limits of $500,000 "per occurrence".  The Archdiocese has been unable to locate copies of the State Farm policies.  The only evidence of the policy is a reference to it in the umbrella policies for the same years.  State Farm has denied any responsibility based on various contentions.  Nonetheless, the Archdiocese has achieved a settlement with State Farm.

Policies after September 1, 1986.  The September 1, 1986-September 1, 1987 policies were "claims made" and cover only claims made during the policy period.  In addition, the policies arguably include an exclusion for insureds' liability for sex abuse by employees.  The Archdiocese contends that Archdiocesan priests are not its employees for purposes of this exclusion.  The carriers who issued these policies disagree.

The only coverage available for Tort Claims where the abuse is alleged to have taken place during the period 1987 to 1990 were occurrence based but are exhausted.

Beginning on September 1, 1990 the Archdiocese was insured for certain liability for sexual misconduct under "claims-made" policies issued by Catholic Mutual Relief Society.  Catholic Mutual's post-September 1, 1990 policies, however, do not cover sexual abuse which began before September 1, 1990.

Catholic Mutual has raised various coverage defenses and limitations including lack of notice, certain exclusions and various sub-limits that apply depending on when the abuse is alleged to have occurred.  Despite these coverage defenses, the Archdiocese has negotiated a settlement with Catholic Mutual.

Exhibit L(1) to the Plan identifies the Archdiocesan Settling Insurers.  Exhibit L(2) identifies Parish Settling Insurers.  Exhibit L(3) identifies the Non-Settling Insurers.

5.    Insurance settlements

So far the Archdiocese has signed formal settlement agreements with two insurance companies, Home, and State Farm, and has reached settlements in principle with Catholic Mutual, ELAC, CNA (for CIC, National Fire, and CCC) ("CNA"), FFIC, TIG, Hartford, American Home, Travelers, Colonial Penn, LMI, Interstate and Northwestern National which remain to be reduced to formal written agreements.  Most of these settlements require a "policy buyback."  A "policy buyback" is a transaction in which an insurance carrier pays the insured to purchase the policy and all rights of any kind flowing from the policy. The purpose of  a buyback is to ensure that neither insureds, nor anyone else who may have or claim to have rights arising from the policy, can assert such rights in the future.  The transaction is made pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code.

The Home settlement provides the Archdiocese with an allowed claim in the Home New Hampshire state court liquidation proceeding in the amount of $14.2 million in exchange for a policy buy-back and a release of coverage for all claims under the Home policies.  In addition to

requiring bankruptcy court approval of the settlement and the Plan, the settlement is not effective until approved by the court in Home's state liquidation proceeding. Once the Plan and the Home settlement agreement are finally approved by the bankruptcy court, the allowed claim in the Home liquidation proceeding will be paid through distributions as ordered by the presiding state court. Such payments will be made to the Trust. The total amount that will ultimately be paid on the allowed claim is currently unknown. However, based on solicitations received by entities that purchase allowed claims in liquidation proceedings, the Archdiocese anticipates that the amount the Trust will ultimately receive will be a substantial portion of the face value of the allowed claim. After all contingencies are met and if the Trust so decides, the approved claim against the Home's liquidation estate may be sold to entities who buy such claims. The Archdiocese has received an unsolicited offer totaling 51% of the Home claim. Such an offer would be subject to various terms and conditions.

State Farm has agreed to a $5 million settlement. Under the settlement State Farm will buy back of its policies and receive a full and complete release of any obligation to pay any and all claims under its policies during the period 1975 to 1977 or 1978. The settlement is contingent on Court approval of the settlement and the Plan.

The Catholic Mutual settlement in principle provides for the payment by Catholic Mutual of $14 million to the estate, in exchange for releases and injunctive relief (including the Channeling Injunction and Settling Insurer Supplemental Injunction) of Tort Claims against the Archdiocese and certain Catholic Entities, certain non-Tort Claims against the Archdiocese as well as claims against two parishes covered under policies Catholic Mutual issued to those parishes (Guardian Angels and Assumption)(the "CM Parish Policies"). Catholic Mutual will be buying-back the CM Parish Policies under the settlement (that includes the Archdiocese, Guardian Angels and Assumption), but it will not be buying back the Archdiocese policies, with coverage under those policies continuing as applicable. The Catholic Mutual settlement is contingent on bankruptcy court approval of the settlement and Plan by Final Order.

The ELAC settlement in principle provides for payment of $750,000 in exchange for a buy back of its policies issued to the Archdiocese as the named insured and a full and complete release of any obligation to pay any and all claims under its policies during the period 1943 to 1949. The settlement is contingent on Court approval of the settlement and the Plan. The settlement with ELAC does not include the sale of any of the Archdiocese's interest in any policies issued to another named insured, such as an order, in which the Archdiocese is an additional or other insured.

The CNA settlement in principle provides for payment of $7.975 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1949 to 1955, 1966-1969, and 1974 (June 1-August 1). The settlement is contingent on Court approval of the settlement and the Plan.

The FFIC settlement in principle provides for payment of $7.75 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1955 to 1961.  The settlement is contingent on Court approval of the settlement and the Plan.

The TIG settlement in principle provides for payment of $7 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1967 to 1970.  The settlement is contingent on Court approval of the settlement and the Plan.

The Hartford settlement in principle provides for payment of $7.775 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1970 to 1973.  The settlement is contingent on Court approval of the settlement and the Plan.

The American Home settlement in principle provides for payment of $15.7 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1969 to 1975. The settlement is contingent on Court approval of the settlement and the Plan.

The Travelers settlement in principle provides for payment of $26 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods those policies were in effect, including the period of 1973 to 1980.  The settlement is contingent on, among other things, Court approval of the settlement and the Plan.

The LMI settlement in principle provides for payment of $5.9 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1980 to 1987.  The settlement is contingent on Court approval of the settlement and the Plan.

The Interstate settlement in principle provides for payment of $17 million in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1980 to 1986.  The settlement is contingent on Court approval of the settlement and the Plan.

The Colonial Penn settlement in principle provides for payment of $500,000 in exchange for a buy back of its policies issued to the Archdiocese and a full and complete release of any obligation to pay any and all claims under its policies during the periods 1985 to 1987.  The settlement is contingent on Court approval of the settlement and the Plan.

The Northwestern National settlement in principle provides for payment of $50,000 in exchange for which Northwestern National will receive a release of its own liability, if any,

under SLC 5742.  The settlement is also contingent on Court approval of the settlement and the Plan.

### E.      Lawsuits against Parishes

Prior to expiration of the CVA on May 25, 2016, numerous claimants against the Archdiocese and some other claimants filed state court civil lawsuits against Parishes where alleged abuse occurred.  Many of these actions have been stayed by agreement of the parties pending outcome of this bankruptcy case.  The Plan proposes that, as part of the global resolution of abuse claims, such claims shall be channeled, along with the claims against the Archdiocese, to the Trust to which the Plan proposes both the Archdiocese and Parishes contribute rights to insurance policy recoveries.

### F.      Professional expenditures in the Chapter 11 case

As of October 31, 2016, the Bankruptcy Court had approved total professional fees and expenses of approximately $8,190,109.55 incurred from the Petition Date through February 29, 2016.   After accounting for amounts paid from retainers to professionals, which those professionals have drawn upon, the total amount of professional fees and expenses paid by the Debtor postpetition is $7,285,272.00 as of October 31, 2016.  The Archdiocese estimates that the additional unpaid outstanding amounts owed to professionals for the time period March 1, 2016 through October 31, 2016 total approximately $4,212,186.61

#### 1.      Professional expenditures so far

The table below lists the paid and estimated outstanding professional fees and expenses through October 31, 2016 incurred during this Chapter 11 case.  Certain professionals received retainers prior to the Petition Date, which have been utilized to pay down professional fees incurred to date.

| Professional | Total Fees & Expenses Paid as of October 2016 | Estimated Fees & Expenses Outstanding |
|---|---|---|
|  |  |  |
| **Debtor's Professionals** |  |  |
| Briggs and Morgan | $3,955,173.25 | $1,766,736.96 |
| Alliance Management | $144,876.38 | $3,822.00 |
| Meier Kennedy & Quinn | $165,255.81 | $71,861.85 |
| Fredrikson & Byron | $436,710.22 | $323,249.27 |
| Cushman Wakefield NorthMarq | $274,221.64* | $0 |
| Regnier | $3,500.00 | $0 |
| CliftonLarsonAllen | $16,148.75 | $0 |
| *Subtotal* | $4,995,886.05 | $2,165,670.08 |
|  |  |  |

| Committee's Professionals | | |
|---|---:|---:|
| Stinson Leonard Street | $1,136,367.47 | $1,414,389.18 |
| CBRE | $13,575.00 | $109,829.17 |
| *Subtotal* | $1,149,942.47 | $1,524,218.35 |
| | | |
| **Parish Committee's Professionals** | | |
| Manty & Associates | $150,757.04 | $119,313.33 |
| Maslon | $1,893,523.99 | $470,884.90 |
| *Subtotal* | $2,044,281.03 | $590,198.23 |
| | | |
| **Total** | $8,190,109.55 | $4,280,086.66 |
| Less retainers | ($904,837.55) | (67,900.05) |
| **Total** | **$7,285,272.00** | **$4,212,186.61** |

\* Cushman Wakefield NorthMarq fees paid as commission on property sales. Includes $44,776.64 paid for project management of new office construction.

> 2.      Expenditures if a Plan is not confirmed

If a plan is not confirmed, the Archdiocese expects continuing protracted litigation on several fronts, and the contingencies in almost all of the settlement agreements would not be met and the immediate cash available under those settlements to fund the Plan would not be available.

If the Plan is not confirmed and trials on each individual Tort Claim are required, in the opinion of the Archdiocese, tens of millions of dollars in additional costs will be incurred. The Archdiocese believes that resolution of these trials will take well over 10 years if the court system can accommodate 40 trials per year, with inevitable appeals and coverage lawsuits.

## VII.   DEBTOR'S NON-MONETARY UNDERTAKINGS FOR THE PROTECTION OF CHILDREN

As described in section III.D above, the Archdiocese has undertaken significant efforts to implement protocols and procedures for the protection of children. In addition, as part of the Archdiocese's settlement with the Ramsey County Attorney's Office the Archdiocese has agreed to implement and has already begun implementing additional protocols and procedures for the protection of children and to ensure additional oversight. The Archdiocese incorporates those additional protocols and transparency covenants and obligations into the Plan as Exhibit K thereto. In addition, the Archdiocese has established as part of the Plan a counseling fund for the benefit of Tort Claimants dedicating $500,000 for counseling as outlined in the Counseling Fund Process attached as Exhibit F to the Plan. The Unsecured Creditors Committee recently suggested additional protocols which are under review. The Plan and Disclosure Statement will be amended if additional protocols are agreed upon.

As set forth in the Plan, the Archbishop and the Reorganized Debtor agree to adhere to the non-monetary undertakings set forth in Exhibit K to the Plan for the time periods set forth therein.

## VIII.   SUMMARY OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN. THE SUMMARY BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN ITSELF, THE TERMS OF WHICH CONTROL. THE SUMMARY OF THE PLAN IN THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE COMPLETE. CONSIDERATION OF THIS SUMMARY IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY, INCLUDING ALL EXHIBITS.**

### A.     Classification of Claims

Bankruptcy Code section 101(5) defines a claim as (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code section 1123 requires a plan of reorganization to designate classes of claims against a debtor. Bankruptcy Code section 1122 requires that each class of claims contain only claims that are "substantially similar" to each other. The Plan divides the different Claims against the Debtor into separate classes based upon the legal nature and the Debtor believes that all Claims have been classified in accordance with the requirements of sections 1122 and 1123.

The Claims categories listed below classify Claims (except Administrative Expense Claims and Priority Tax Claims) for all purposes, including voting, confirmation, and distribution pursuant to the Plan. A chapter 11 plan must designate each separate class of claims either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired" under the Bankruptcy Code, the holders of claims in that class are entitled to vote on the plan (unless the plan provides for no distribution to the class, in which case the class is not entitled to vote to accept or reject the plan and is deemed to reject the plan). If a class of claims is unimpaired, the holders of claims in that class are not entitled to vote to accept or reject the plan and are deemed to accept the plan.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Tax Priority Claims are not classified for the purposes of voting or receiving distributions under the Plan. Instead, all such Claims are treated separately as unclassified Claims on the terms set forth in Article II of the Plan.

| Class | Description | Impairment | Voting Rights |
|-------|-------------|------------|---------------|
| 1 | Priority Claims | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | General Insurance Fund and Archdiocese Medical and Dental Benefit Plan Claims | Impaired | Yes |
| 4 | Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan Claims | Unimpaired | No |
| 5 | Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan Claims | Unimpaired | No |
| 6 | Pending Tort Claims | Impaired | Yes |
| 7 | Future Tort Claims | Impaired | Yes |
| 8 | Inter-Parish Loan Fund and Assessment Overpayment Claims | Impaired | Yes |
| 9 | Trade Vendor Claims<br><br>-   Class 9A<br>-   Class 9B | <br><br>Impaired<br>Impaired | <br><br>Yes<br>Yes |
| 10 | Secured Claim of Premier Bank | Unimpaired | No |
| 11 | Guaranty Claims | Unimpaired | No |
| 12 | Other Tort Claims and Unsecured Claims | Impaired | Yes |
| 13 | Catholic Entity Abuse Related Contingent Claims | Impaired | Yes |
| 14 | Other Abuse Related Contingent Contribution and Indemnity Claims | Impaired | No; deemed to reject |
| 15 | Penalty Claims | Impaired | No; deemed to reject |
| 16 | Priest Support Payments | Unimpaired | No |

Consistent with section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular Class only to the extent the Claim is within the description of the Class, and a Claim is classified in a different Class to the extent it is within the description of that different Class.

-54-

## B.   Definition of Claims and Claim treatment

The treatment of Claims in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each holder of an Allowed Claim may have in or against the Archdiocese or its property.  This treatment supersedes and replaces any agreements or rights those persons have in or against the Archdiocese or its property.  All distributions under the Plan will be tendered to the person holding the Allowed Claim in accordance with the terms of the Plan.

The treatment of each class of Allowed Claims, and the reasons for that treatment, is set forth below:

1.     Priority Claims (Class 1)

Class 1 consists of the holders of Priority Claims.  These are claims entitled to priority under sections 507(a) and 503(b)(9) of the Bankruptcy Code other than Administrative Claims or Priority Tax Claims.  These are claims for unpaid wages, employee benefit plan contributions and similar items identified in the Bankruptcy Code.  The Plan provides that all holders of allowed Class 1 Claims will be paid in full, in cash, without interest on the later of the Effective Date of the Plan or the date the Class 1 Claim becomes an Allowed Claim (or as soon thereafter as is practicable), unless the holder of the Class 1 Claim and the Archdiocese agree to different treatment.  The Archdiocese does not believe that there will be significant priority claims if the Plan is approved.

2.     Governmental Unit Claims (Class 2)

Class 2 consists of holders of Governmental Unit Claims that are not Priority Claims, Administrative Claims, or Priority Tax Claims.   The Plan provides that all holders of allowed Class 2 Claims will be paid in full, in cash, without interest on the later of the Effective Date of the Plan or the date the Class 2 Claim becomes an Allowed Claim (or as soon thereafter as is practicable), unless the holder of the Class 2 Claim and the Archdiocese agree to different treatment.

3.     General Insurance Fund and Archdiocese Medical and Dental Benefit Plan Claims (Class 3)

Class 3 consists of the holders of Claims against the Archdiocese held by Parishes and Non-debtor Catholic entities identified on schedule 1 to the Plan arising from or related in any way to the collection and use of contributions and premium and other payments made by such Claimants to the Archdiocese under the General Insurance Fund ("GIF") and the Archdiocese Medical and Dental Benefit Plan ("AMBP"), including any claims arising from the Archdiocese's administration of the GIF and AMBP.  The Plan provides that the Archdiocese will assume its participation in the GIF and AMBP, will continue to sponsor the GIF and AMBP, and will cause to be paid claims and administrative expenses under the GIF and AMBP to the extent of available funds in the GIF and AMBP in accordance with prior practices.

-55-

GIF Treatment.

The Archdiocese has set participant premiums for the GIF for the period through July 1, 2017. The Archdiocese anticipates that premiums will be sufficient to pay all known claims and incurred but not reported claims (other than Tort Claims), plus administrative expenses, expenses related to maintaining workers compensation reserves and deposits and premiums for reinsurance and participating employer rebates ("GIF Claims and Expenses") and the minimum GIF Contribution Amount (as defined below). The Archdiocese, however, will adjust GIF premiums to the extent necessary to pay GIF Claims and Expenses and the minimum GIF Contribution Amount as set forth below. The Archdiocese will not reduce premiums to the GIF prior to July 1, 2017 and will not increase premiums prior to June 30, 2017 except to the extent necessary to pay GIF Claims and Expenses and the minimum GIF Contribution Amount provided for in the Plan.

Funds in the GIF not required to pay GIF Claims and Expenses will be held in reserve and will be paid to the Plan Implementation Account (if paid on the Effective Date) or the Trust (if paid after the Effective Date) in satisfaction of claims of participants related to Tort Claims and as additional consideration for the channeling injunction set forth in this Plan ("GIF Contribution Amount"). The Plan provides that the GIF Contribution Amount will be at least $5,000,000 and shall not exceed $6,000,000. The exact total of this amount will be reasonably determined by the Archdiocese to reflect incurred and unpaid non-abuse claims and appropriate reserves. The Archdiocese projects that the GIF Contribution Amount is attainable in the timeframe outlined without an increase in premiums and will allow for sufficient reserves.

The reason for this contribution is to provide additional funds to claimants and because of the nature of the GIF. The GIF, among other things, insures the Archdiocese and Parishes for defense costs and amounts directed towards settlement of sexual abuse claims that are not covered by other carriers. Insurers contend that the first $100,000 of such costs per claim from 1980 forward must be paid by Parishes or the Archdiocese before certain insurers are obliged to provide coverage.

As of the petition date, approximately $3.5 million was available in the GIF to pay for defense costs or settlement of such claims while maintaining sufficient reserves to meet the other purposes of the GIF. If there are no unexpected, insured losses, the Archdiocese projects that between $5 million and $6 million will be available to address Tort Claims on July 1, 2017. This is largely the result of the stay of litigation with no funds being directed towards defense or settlement of alleged sexual abuse claims.

As such, the Plan provides that on the Effective Date, the Archdiocese will pay to the Plan Implementation Fund for contribution to the Trust an amount equal to the available balance of the GIF Contribution Amount held by the Archdiocese as of the Effective Date, taking into account the need for appropriate reserves. As soon as practical on or before June 30, 2017, the Archdiocese will pay to the Trust the balance of the GIF Contribution Amount up to the maximum total amount of $6,000,000. Any amount not required to be paid to the Trust will be

held in the GIF for administration in accordance with prior practices. Any other claims related to the GIF, including any claims arising from prior contribution to the GIF, will be disallowed and receive no distribution.

AMBP Treatment.

The AMBP is administered by a separate board of trustees.  The Plan provides that to the extent permitted under applicable law, the Archdiocese shall cooperate with the trustees of the AMBP following the Effective Date to convert the AMBP to a VEBA Trust (or similar trust mechanism). Notwithstanding anything to the contrary in the Plan, neither the Archdiocese nor the trustees of the AMBP shall be required to enter into any trust or other arrangement that will require that the AMBP, or any successor trust mechanism, provide coverage for services or procedures contrary to the teachings of the Catholic Church. The Archdiocese, again in cooperation with the trustees of the AMBP, reserves the right to seek the termination of the AMBP if the conversion of the AMBP is impossible or proves to be unreasonably expensive or impractical or in the event that it becomes impossible or impractical to maintain rates for the AMBP in an amount sufficient to pay future claims.  The Archdiocese does not propose to contribute AMBP funds to the Plan because all AMBP funds are currently projected to be necessary for continuation of the AMBP itself. *See* discussion at Section IV.B.3 above.

4.      Archdiocese Priests' Pension Plan Claims (Class 4)

Class 4 consists of the holders of Claims against the Archdiocese for liability arising under the Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan.  The Plan provides that the Archdiocese will assume its participation in the Priest Plan and will continue to meet its obligations under the Priest Plan as they become due. The Archdiocese will not make any payment with respect to any Claim filed in this Chapter 11 case with respect to Class 4 Claims.

5.      Archdiocese Lay Employees' Pension Plan Claims (Class 5)

Class 5 consists of the holders of Claims against the Archdiocese for liability arising under the Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan.  The Plan provides that the Archdiocese will assume its participation in the Lay Employees' Plan,  and will continue to meet its obligations under the Lay Plan as they become due. The Archdiocese will not make any payment with respect to any Claim filed in this Chapter 11 case with respect to Class 5 Claims.

6.      Pending Tort Claims (Class 6)

Class 6 consists of the holders of Pending Tort Claims.  As described in greater detail below, the Plan creates a Trust to fund any payments to Class 6 and Class 7 Claimants entitled to such payments under the Plan, Trust Agreement and Trust Distribution Plan.  The Plan provides that liability for Class 6 Claims shall be assigned to and assumed by the Trust and assessed by the Trust through the Trust Agreement and the Trust Distribution Plan.

-57-

Each Class 6 Claim will be estimated solely for the purpose of voting on the Plan.

The Plan seeks to ensure that similarly situated Class 6 Claimants and similarly situated Class 7 Claimants are treated similarly.  **Thus, Class 6 and Class 7 Claimants' share of the Trust Assets as provided by the Trust Distribution Plan is the only amount, if any, they will be entitled to receive from Protected Parties, Archdiocesan Settling Insurer Entities, and Parish Settling Insurer Entities under the Plan**.  See the discussion of Trust treatment of Class 6 and 7 Claims in section VIII.E.3 below for further detail.

Nonetheless, Class 6 and Class 7 Claimants may elect to obtain a judicial determination, through a jury trial if they choose, of any Protected Party's liability and Claimants' damages.  In addition, they will be allowed to retain their right of direct action against Non-Settling Insurers as provided under Minn. Stat. §60A.08, subd. 6 or other applicable law.  However, even if a Class 6 or Class 7 Claimant obtains a judgment for damages against a Protected Party or a Non-Settling Insurer, the Class 6 or Class 7 Claimant's recovery is limited as described in the Plan and the balance of such recovery must be turned over to the Trust as described in the Plan.  Distribution from the Trust does not preclude claims or recoveries by Class 6 or Class 7 Claimants against Persons who are not Protected Parties, Archdiocesan Settling Insurer Entities or Parish Settling Insurer Entities; claims and recoveries against Non-Settling Insurers shall be limited as described in the description of Trust treatment of Class 6 and 7 Claims below.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 6 and Class 7 Claims, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of distributions claimants receive or are entitled to receive based on the Trust Distribution Plan.  Determinations by the Tort Claims Reviewer as to the points assigned to Class 6 and 7 Claimants and any distributions Distribution Plan Claimants are entitled to receive from the Trust shall not be a determination of the liability of or damages, if any, that any Protected Party is obligated to pay for Tort Claims within the meaning of any Insurance Policy.  As described below, the Plan provides that the Protected Parties will assign to the Trust their Transferred Insurance Interests (as defined in the Plan).  The Trust may continue efforts to obtain recoveries from any Non-Settling Insurers related to the Class 6 and Class 7 Claims.  Any such recoveries by the Trust from Non-Settling Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan.  To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the transfer of the Archdiocese's or other Protected Party's rights to the Trust, results in a forfeit of coverage, the Plan preserves the Non-Settling Insurers' rights to the extent required under the Non-Settling Insurer Policies and applicable law.  The UCC believes that the Plan's provisions transferring the Archdiocese's interest against the Non-Settling Insurers arising out of or relating to Tort Claims may result in forfeiture of coverage.  The Archdiocese believes that, in light of the case law and other Plan provisions, any such risk is minimal.

7.      Future Tort Claims (Class 7)

Class 7 consists of the holders of Future Tort Claims.  The Plan provides that liability for Class 7 Claims shall be assumed by the Trust and assessed by the Trust through the Trust Agreement and the Trust Distribution Plan as described with respect to Class 6 Claims above and in the summary of the Trust below.  Class 7 Claimants shall file Proofs of Claim substantially in the form attached as Exhibit B to the Plan and shall include information sufficient for the Tort Claims Reviewer to make an evaluation of the Claim pursuant to the factors set forth in the Trust Distribution Plan.

8.      Inter-Parish Loan Fund and Assessment Overpayment Claims (Class 8)

Class 8 consists of holders of claims against the Archdiocese (a) for unpaid deposits made to the Inter-Parish Loan Fund (the "IPLF") prior to the Petition Date and (b) for Parish assessment overpayments made by any Parish, each as set forth on schedule 2 to the Plan.  The Plan provides that, as to both types of claims in Class 8, unless otherwise agreed by an individual claimant and the Archdiocese, a Parish that owes assessments to the Archdiocese as of the Effective Date in an amount in excess of the claim of such Parish in Class 8 will be entitled to a reduction in the balance of past due assessments payable by such Parish in an amount equal to the amount of such Parish's Class 8 Claim. These Parishes will receive no other distribution in connection with such Class 8 Claim and will remain liable for the full amount of assessments due from and after the Effective Date and the balance of unpaid assessments as of the Effective Date, as reduced in accordance with the Plan.  The claims of the Parishes who hold Class 8 Claims in excess of the balance of assessments payable by such Parish as of the Effective Date will be reduced by the amount of the unpaid assessment due by such Parish, if any. The remaining balance of the Class 8 Claim will be satisfied by a credit against the assessments that would otherwise be due from such Parish from and after the Effective Date.  This credit will be applied on a quarterly  basis against future assessments, as determined by the Archdiocese in accordance with its general practice in calculating assessments, until such time as the Class 8 Claim of such Parish has been satisfied in full, without interest.  By way of example, a Parish with a Class 8 Claim (net of any past due assessments) in the amount of $500,000 will not be required to pay post-Effective Date assessments to the Archdiocese until the Class 8 Claim has been satisfied in full through the credit and reduction contemplated in the Plan.  The credit and reductions contemplated under the Plan will be noted by the Archdiocese in its assessment notice to Class 8 Claimants, which calculation shall be conclusive absent manifest error.

The Plan further provides that holders of Class 8 Claims shall have no interest in amounts payable to the Archdiocese by Parishes obligated pursuant to deposits made under the IPLF and shall have no interest in amounts payable to the Archdiocese by Archdiocesan Parishes who are liable to the Archdiocese for advances previously made under the IPLF.  The Archdiocese shall be entitled to deduct from any distribution to any holder of a Class 8 Claim any amounts payable by such Parish to the Archdiocese.

9.      Trade Vendor Claims (Classes 9A and 9B)

Class 9A consists of holders of claims against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date as set forth on schedule 3 to the Plan in the amount of $1,000 or less or reduced by the holder to $1,000 on the ballot.  Class 9A Claims will be treated as a "Class 9 Convenience Claim" meaning that holders of such claims will receive payment in full of such allowed claim without interest within 30 days following the Effective Date.  The Archdiocese estimates that the total payment to creditors in Class 9A will be approximately $50,000.

Holders of Claims in amounts in excess of $1,000 may elect to be treated under either Class 9B as described below or Class 9A by voluntarily reducing a claim in excess of $1,000 to equal $1,000 by so marking the claim amount on the ballot.  Class 9B consists of holders of claims against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date as set forth on schedule 3 to the Plan in an amount in excess of $1,000 and not reduced to $1,000 by election on the ballot.  Holders of Class 9B Claims will receive payment in full of such allowed Claims in Class 9B, without interest, in two equal installments.  The first installment will due be within ninety days following the Effective Date and the second will be due within 180 days following the Effective Date.

Claims in Class 9A and Class 9B shall not include any claims classified and treated under any other Class under the Plan.

10.      Secured Claim of Premier Bank (Class 10)

Class 10 consists of the secured claim of Premier Bank under the mortgage executed by the Archdiocese in favor of Premier Bank, as renewed on May 16, 2011, describing and encumbering the Cathedral of Saint Paul.  The Plan provides that Premier Bank's mortgage interest shall remain undisturbed and that Premier Bank may exercise any and all rights and remedies against the collateral referenced in such mortgage, available to the holder.

11.      Guaranty Claims (Class 11)

Class 11 consists of holders of guaranty claims arising out of prepetition guaranties as described in Exhibit C to the Plan.  The Plan provides that the guaranty obligations in Class 11 shall remain undisturbed and the holders of such guaranties shall be entitled to exercise all legal rights and remedies available to such holders, and that holders of claims in Class 11 shall be deemed to have waived any right to accelerate the underlying debt secured by such guaranty agreement solely as a result of the Archdiocese's financial condition or at the commencement of this Chapter 11 case.

12.      Other Tort Claims and Unsecured Claims (Class 12)

Class 12 Claims mean (1) to the extent allowed, claims of Michael Schaefer (Claim No. 502) and MP Schaffer, LLC (Claim No. 503), and Jennifer Haselberger (Claim No. 668), (2) any

-60-

claim arising out of the rejection of an executory contract, or (3) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case or as to which the holder of such claim timely filed a claim as to which the Archdiocese has no legal basis for objection. The Archdiocese does not believe that the Parishes hold claims in Class 12. The Plan provides that the holders of Class 12 Claims shall receive payment of their pro rata share of the sum of up to $50,000 to be paid from the non-restricted assets of the Archdiocese as soon as practicable after all Class 12 Claims have been allowed or disallowed.  This figure was reached in consideration of the Archdiocese's projected valuation of Class 12 Claims and in light of the Archdiocese's resources.  In the event that the Class 12 Claims are less than $50,000, such excess amount shall be paid to the Trust for distribution to the holders of Class 6 Claims.

13.    Catholic Entity Abuse-related Contingent Claims (Class 13)

Class 13 Claims mean (i) the claims of Catholic Entities for contribution, indemnity or reimbursement arising out of or related to the Archdiocese's liability to pay or defend any Class 6 or Class 7 Claim, (ii) the claims of Other Insured Entities for contribution, indemnity, or reimbursement arising out of or related to the Archdiocese's liability to pay or defend any Class 6 or Class 7 Claim; and (iii) the claims of any insurers or other Persons who are subrogated to such claims as set forth in the Plan.  The Plan provides that Class 13 Claims constitute Channeled Claims and shall be channeled to the Trust.  The Plan contemplates that Class 13 Claims will be extinguished as a result of the Plan terms and the Claim Resolution Agreements provided to the Trust under section 5.2(k).

14.    Other Abuse-related Contingent Contribution and Indemnity Claims (Class 14)

Class 14 consists of holders of claims for contribution, indemnity or reimbursement not included in Class 13 arising out of the Archdiocese's liability to pay or defend any Class 6 or Class 7 Claim, including the claims of any insurers or other Persons to the extent subrogated to the foregoing claims.  In other words, holders of claims of the type identified in Class 13 but held by entities or persons other than Catholic Entities, Other Insured Entities or insurers or other Persons who are subrogated to such claims as set forth in the Plan.  The Plan provides that, in accordance with section 502(e)(1) of the Bankruptcy Code, the Claims in Class 14 shall be disallowed and will receive no distribution under the Plan.

15.    Penalty Claims (Class 15)

Class 15 consists of holders of Claims, other than Tort Claims, against the Archdiocese, whether secured or unsecured, for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim.  The Plan provides that holders of Class 15 Claims shall not receive or retain any property under the Plan on account of such Claims.

16.        Priest Support Payments (Class 16)

Class 16 consists of holders of Claims for inactive Archdiocesan Priest support or maintenance. As set forth in the Plan, the Archdiocese disclaims any liability under civil law for the Claims in Class 16 and such Claims shall receive no distribution under the Plan. However, in the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest. Notwithstanding the fact that the Plan calls for no distribution as part of the Plan, the Archdiocese intends to honor its post-Effective Date obligations under Canon Law with respect to inactive priests in accordance with prior practices.

**C.        Treatment of Administrative Claims, Priority Tax Claims, and Professional Fee Claims**

1.        Administrative and Priority Tax Claims in general

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified for the purposes of voting or receiving distributions under the Plan. Instead, all such Claims are treated separately as unclassified Claims on the terms set forth in Article II of the Plan.

2.        Treatment of Administrative Claims

The Plan provides that each holder of an Allowed Administrative Claim against the Archdiocese shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, cash equal to the Allowed amount of such Administrative Claim, unless the holder agrees to other treatment of such Claim no less favorable to the Archdiocese. Deadlines for filing and objecting to Administrative Claims will be separately established by the Bankruptcy Court.

3.        Treatment of Priority Tax Claims

The Plan provides that with respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, the Archdiocese shall (i) pay such Claim in cash as soon as practicable after the Effective Date, or (ii) provide such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Archdiocese, as applicable, in writing, provided such treatment is no less favorable to the Archdiocese.

4.        Statutory Fees

The Plan provides that all fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in cash as soon as practicable after the Effective Date. After the Effective Date, the Archdiocese shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered. In addition, the Archdiocese shall file post-Confirmation Date quarterly reports in conformance with the U.S. Trustee

guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate.

5.    Treatment of Professional Fee Claims

The Plan provides that all Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) must file and serve an application for final allowance of compensation and reimbursement of expenses in accordance with the schedule to be separately established by the Bankruptcy Court.

**D.    Settlements embodied in the Plan**

One of the primary sources for funding payments to creditors under the Plan is insurance settlements. The Plan contemplates and incorporates settlements reached with Archdiocese insurance carriers described in section VI.D.5 above. In addition, the Riley Fund settlement detailed in section V.B.2.e above is incorporated into the Plan. The RCAO settlement detailed in sections III.E and VI.C.7 above is also incorporated into the Plan.

Under the Plan, the Archdiocese also reserves the right to sell estate property or compromise causes of action on behalf of the estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan will be filed as a Supplemental Plan Document, and approval of such sale or settlement will be considered at the Confirmation Hearing or as soon thereafter as is practicable.

**E.    Resolution of Tort Claims; Formation of Trust**

Under the Plan, a Trust will be created to fund payments to Class 6 and Class 7 Claimants. The Plan aims to ensure that Claimants in Class 6 are treated equitably as between each other, and Claimants in Class 7 are treated equitably as between each other, i.e., substantially similar Claimants within each class receive substantially similar amounts. This will be achieved through a distribution protocol embodied in the Trust agreement and described below.

1.    Purpose and formation of Plan Trust

The Trust will be the successor to the Archdiocese and other Protected Parties for all purposes with respect to Class 6 and Class 7 Claims and the Transferred Insurance Interests as defined in the Plan. The Trust will be established for the sole purposes of assuming the liabilities of the Debtor, Protected Parties, Archdiocesan Settling Insurer Entities, and Parish Settling Insurer Entities arising from or relating to the Class 6 and Class 7 Claims as described in the Plan, and receiving, liquidating and distributing the Trust Assets in accordance with the Trust Distribution Plan, as well as funding the Trust's costs and expenses.

The proposed Trust Agreement is attached to the Plan as Exhibit D. **THE TRUST WILL CONTAIN A CORPUS (GENERAL FUND) FOR THE PAYMENT OF CLASS 6 CLAIM DISTRIBUTIONS AND OTHER EXPENSES AND A SEPARATE FUTURE TORT CLAIMS RESERVE, WHICH SHALL BE THE SOLE SOURCE OF PAYMENT TO CLASS 7 CLAIMANTS ON ACCOUNT OF CLASS 7 CLAIMS.**

2.      Funding the Plan Trust

After the Effective Date, the Archdiocese's ordinary course operations will continue to be funded from ordinary operating income of the Archdiocese. As noted above, Class 6 and Class 7 Claimants will be paid from the Trust created under the Plan in accordance with the Trust provisions described below. The Trust will be funded from the following sources:

a.      Plan Implementation Account

A Plan Implementation Account will be established before the Effective Date. The Plan Implementation Account will be funded with the "Contributions" identified below. The Archdiocese will pay from the Plan Implementation Account, as soon as practical following the Effective Date and final allowance of Professional Fees and Administrative Claims, all allowed Professional Fees and Administrative Claims and all other amounts required to be paid under this Plan upon confirmation or upon the Effective Date. The amount remaining in the Plan Implementation Account following such payments shall be promptly paid to the Trust, less (i) a reserve for disputed claims (other than Tort Claims) in an amount determined by the Archdiocese in consultation with the Committees; and (ii) an amount estimated by the Archdiocese in consultation with the Committees to be necessary to pay statutory fees payable to the United States Trustee through the date on which the Chapter 11 case is closed.

Additional payments shall be paid to the Trust as disputed items are resolved in reduction of the reserve for such disputed items. Upon resolution of all disputed items and payment of all statutory fees to the United States Trustee, the remaining balance in the Plan Implementation Account shall be transferred to the Trust and the Plan Implementation Account closed.

b.      Contributions

The following amounts will be paid to the Plan Implementation Account or the Trust in accordance with the timing set forth in the Plan:

(1)      Debtor cash contribution

The sum of approximately $13,175,526.20 in cash will be paid by the Archdiocese to the Plan Implementation Account on or before the Effective Date from (a) non-restricted cash accounts held by the Archdiocese, (b) the account established to hold the proceeds derived from the sale of Archdiocese properties during the course of this Chapter 11 case, and (c) the proceeds of the settlement of the Riley Fund dispute. In addition to the foregoing, the Archdiocese will

make a deposit in the amount of $500,000 to a separate bank account to establish the Counseling Fund, as set forth in section 5.2(o) of the Plan.

(2)      Sale of jewelry and other items

As noted above, the Archdiocese owns a ring with an estimated appraised value of approximately $230,000. The ring will be sold as soon as reasonably practicable.  Any sale prior to confirmation will require Court approval. Any sale following the Effective Date will be made with the approval of the Trustee. The net sale proceeds of the ring will be contributed to the Plan Implementation Account or the Trust, as appropriate, as an additional source of Plan funding. The Archdiocese also intends to attempt to sell such other items of personal property that (a) are not necessary for continued operations of the Archdiocese or (b) lack liturgical or historical value. The Archdiocese will make such determinations in either case in consultation with the Unsecured Creditors Committee and will set forth those items in a plan supplement to be filed within 14 days prior to the confirmation hearing.  The Archdiocese anticipates that the sale of these additional items may generate approximately $50,000.

(3)      Assignment of Ausmar interest and residual Ward estate interest

The Archdiocese will also assign its beneficial interest in Ausmar to the Trust.  As noted above, the Archdiocese estimates this interest in the property held by Ausmar as $365,775 based on Carver County property tax records.  The property held by Ausmar has not been sold but is being marketed for sale by the controlling Ausmar members.  The Archdiocese will also assign its beneficial interest in the residual Ward estate to the Trust.

(4)      Archdiocesan Settling Insurer contribution

Each Archdiocesan Settling Insurer shall contribute the amounts set forth in its respective Insurance Settlement Agreement in accordance with the timing set forth in each respective Insurance Settlement Agreement, some of which remain to be reduced to a final written agreement.  The contributions provided in each Insurance Settlement Agreement are as follows:

- $14 million in cash from Catholic Mutual
- $5 million in cash from State Farm
- $14.2 million as an allowed claim in the Home liquidation proceeding.  The total amount that will ultimately be paid on the Home claim is unknown, though it is anticipated to be a substantial portion of the face value.
- $750,000 in cash from ELAC
- $7.75 million in cash from FFIC
- $7.975 million in cash from CNA
- $7 million in cash from TIG
- $7.775 million in cash from Hartford
- $15.7 million in cash from American Home

- $26 million in cash from Travelers
- $500,000 in cash from Colonial Penn
- $5.9 million in cash from LMI
- $17 million in cash from Interstate
- $50,000 in cash from Northwestern National

(5)    GIF contribution

The Plan proposes that the Protected Parties will contribute between $5 million and $6 million from the GIF to the Trust to pay participants' claims under the GIF related to Tort Claims, in accordance with the timing, treatment and description of the GIF and the GIF Contribution outlined in section VIII.B.3 above.

(6)    Catholic Entities and other Insured Entities contributions

The Plan provides that Catholic Entities, although not debtors, would make substantial contributions to the Plan. Those contemplated contributions include:

- Catholic Entities' substantial portion of the GIF contribution;
- The Parishes' contribution of insurance settlements reached with Parish insurers as set forth below;
- Catholic Entities' waiver of all claims against the Archdiocese, including claims for contribution and indemnity and breach of fiduciary duty; and
- Catholic Entities' consent to the Catholic Mutual settlement.

The Plan provides that, within 30 days of the Effective Date, non-Debtor Catholic entities will contribute $13,732,500 in settlement proceeds from Parish Settling Insurers. *See* November 14, 2016 Affidavit of Margo S. Brownell. The Plan also specifies the contribution of waiving, as of the Effective Date, all breach of fiduciary duty, contribution and indemnity claims filed by such non-Debtor Catholic Entities and Other Insured Entities in this Chapter 11 case, and all Class 3 Claims and any other claims against the Archdiocese and all Related Insurance Claims, and all the Catholic Entities' and Other Insured Entities' Transferred Insurance Interests pursuant to the Plan.

c.    Additional Trust assets; Rights and recoveries against Non-Settling Insurers

The Plan provides that rights and recoveries against Non-Settling Insurers are also assets transferred to the Trust in addition to the funds transferred to the Trust from the Plan Implementation Account, as follows:

- All Interests of the Archdiocese, including all claims, rights of any kind, entitlements to proceeds, and recoveries against the Non-Settling Insurers arising out of or related to the Tort Claims or the handling thereof. Such interests are

-66-

automatically and without further act or deed assigned and transferred to the Trust; and

- All Interests, including claims, rights of any kind, entitlement to proceeds, and recoveries of the other Protected Parties, against the Non-Settling Insurers arising out of or related to the Tort Claims or the handling thereof. Each of the other Protected Parties shall assign and transfer all such Interests to the Trust.

The Plan provides that the Trustee shall have full access to coverage issued by the Non-Settling Insurers to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Protected Parties prior to the confirmation of the Plan and the transfer of the Protected Parties' Interests to the Trust; subject to the assertion of any coverage defenses except any defense (1) regarding the assignment and transfer of the Transferred Insurance Interests; (2) effected by operation of law because of confirmation of this Plan; or (3) based on res judicata or collateral estoppel related to facts determined by the Bankruptcy Court. The Trustee shall also have the right to pursue judgment against Non-Settling Insurers to determine the amount of coverage available for Protected Parties' liability for Tort Claims. The Plan provides that this transfer shall not be construed: (a) as an assignment of the Non-Settling Insurer Policies identified in the Plan, or (b) to entitle any person or entity to insurance coverage other than those persons or entities entitled to such coverage from Non-Settling Insurers. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact that the Archdiocese is in bankruptcy or by any distribution from the Trust to any Tort Claimant. The Trust shall be fully authorized to act in its own name, or in the name of any Protected Party, to enforce any right, title or interest of any Protected Party in the Transferred Insurance Rights. Any recovery by the Trustee on an action against a Non-Settling Insurer for a determination of coverage for Protected Parties' liability for Tort Claims shall become a Trust Asset and shall be distributed as provided in the Trust Distribution Plan.

The Plan provides that the Bankruptcy Court shall determine at the Confirmation Hearing (i) whether the assignment of the Transferred Insurance Interests provided for in this Section is valid, and (ii) whether such transfer or the Discharge and Injunctions set forth in Sections 13.2, 13.3, 13.5 and 13.6 or any other term of the Plan void, defeat or impair the insurance coverage issued by the Non-Settling Insurers. If a party in interest (which, for this purpose, shall include Non-Settling Insurers) fails to timely file an objection to the proposed assignment of the Transferred Insurance Interests to the Trust, or other terms of the Plan related to the Non-Settling Insurers, by the date set to file such objections, that party in interest shall be deemed to have irrevocably consented to the assignment of Transferred Insurance Interests and other Plan terms related to such insurance policies and will be forever barred from asserting that the assignment of the Transferred Insurance Interests or other Plan terms affect the ability of the Trust or Tort Claimants to pursue the Non-Settling Insurers, or any of them, for insurance coverage. In the event that a Final Order is entered determining that the assignment of the Transferred Insurance Interests is valid and does not defeat or impair coverage Non-Settling Insurers are responsible for under the Non-Settling Insurer Policies, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and Protected

-67-

Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Protected Parties shall not be relieved of any obligations such entities may have under Non-Settling Insurer Policies, though in no event shall the Protected Parties be liable for any failure by the Trust to cooperate with Non-Settling Insurers in the defense of the Tort Claims, to the extent such duty exists under applicable law.

Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.  If the Bankruptcy Court in its ruling on Plan confirmation determines that an assignment of the Transferred Insurance Interests as contemplated by the Plan is invalid or would defeat or impair coverage, then pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, the Plan appoints the Trustee as the representative of the Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's Interests against the Non-Settling Insurers with respect to the Tort Claims. Any recoveries on such Interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trust as the Archdiocese's and the Estate's representative provided for in the Plan is valid and does not defeat or impair the insurance coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue Non-Settling Insurers or any of them, for insurance coverage.

In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair coverage for which the Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, then, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and Protected Parties under Non-Settling Insurer Policies as are necessary to act as the representative of the Archdiocese and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trust's appointment shall not relieve the Archdiocese, the Reorganized Debtor or the Protected Parties from any obligation that such entities may have under the Non-Settling Insurer Policies. This Plan provision shall not affect the rights and remedies, as against a Non-Settling Insurer, of a Person who is not a Protected Party but is a co-insured with the Archdiocese or is asserting rights against a Non-Settling Insurer.

In the event that a final order is entered holding that (a) the assignment of the Transferred Insurance Interests or (b) the appointment of the Trust as the Archdiocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then, with respect to the insurance policy issued by such Non-Settling Insurer, the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Archdiocese, the Reorganized Debtor, and each of the Protected Parties will retain their Interests with respect to Non-Settling Insurers.

At the request of the Trust, the Reorganized Debtor and the Protected Parties will assert their Interests against a Non-Settling Insurer. All recoveries by the Reorganized Debtor and the Protected Parties will be paid to the Trust. The Reorganized Debtor and Protected Parties will select and retain counsel to pursue their Interests against Non-Settling Insurers, subject to the Trustee's approval, which approval shall not be unreasonably withheld.

The Trust shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court that are incurred by the Reorganized Debtor and the Protected Parties in pursuing its Interests in Non-Settling Insurers' Policies pursuant to the Plan. The Trust shall also reimburse the Reorganized Debtor and Protected Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing its Interests against Non-Settling Insurers, but will not compensate the Reorganized Debtor or Protected Party for any time any of its employees expend. Upon receipt by the Reorganized Debtor or a Protected Party, all recoveries received by the Reorganized Debtor from Non-Settling Insurers shall be deemed to be held in trust for the benefit of the Trust and shall be remitted by the Reorganized Debtor or a Protected Party to the Trust as soon as practicable following the Reorganized Debtor's or a Protected Party's receipt of such recoveries.

> d.      Vesting

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor or any other Protected Party, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets, the Protected Parties shall have no further interest in or with respect to the Trust Assets.

> 3.      Trust treatment of Class 6 and Class 7 Claims; treatment election

The Trust will assume the liability for Class 6 and Class 7 Claims. The Plan provides that, on the Effective Date, the Trust will automatically assume all liability of the Protected Parties, Archdiocesan Settling Insurer Entities, and Parish Settling Insurer Entities for Class 6 and Class 7 Claims. The Trust will also have the right and obligation to defend, resolve and satisfy the Tort Claims with respect to any liability of the Protected Parties, the Archdiocesan Settling Insurer Entities, and the Parish Settling Insurer Entities. The Trust will also have the right and obligation to pursue and resolve insurance coverage from the Non-Settling Insurers for the Tort Claims and will assume any obligations relating to Medicare, as further outlined in the Plan. As provided in the Plan, the Debtor shall receive a bankruptcy discharge and Tort Claimants shall be barred from recovering for Tort Claims from the Reorganized Debtor or its assets.

Tort Claimants will also be barred from recovering from the Archdiocesan Settling Insurer Entities, the Parish Insurer Entities, or the assets of Protected Parties. Tort Claimants will not be barred from recovering for Tort Claims from any Person who is not a Protected Party,

an Archdiocesan Insurer Entity, or a Parish Insurer Entity.  As more fully described in the Plan, the Trust and Tort Claimants will not be barred from recovering from Non-Settling Insurers.  The rights of the Debtor, Reorganized Debtor, Trustee, Protected Parties, and Tort Claimants to obtain coverage for the Tort Claims from Non-Settling Insurers shall be fully preserved.  Except as provided herein, the rights of Non-Settling Insurers shall be fully preserved.

### *How will the Trust treat Pending Tort Claims?*

-1-   Tort Claims will be reviewed by the Tort Claims Reviewer.   The Trust incorporates a Trust Distribution Plan that sets forth how Class 6 and Class 7 Claims will be assessed for purposes of receiving Trust distributions.  Each Tort Claim will be assessed by an independent Tort Claims Reviewer to be designated in accordance with the Plan and Trust Agreement.  The Tort Claims Reviewer will determine whether a Tort Claimant is entitled to a Trust distribution in accordance with the Trust Distribution Plan.  The Tort Claims Reviewer will consider various factors using a methodology that assigns points based on the nature and type of abuse that occurred, the frequency of the abuse, and any aggravating factors or other factors that affect causation, cognizability, and the liability of a Protected Party and damages.   The methodology and factors considered by the Tort Claims Reviewer are set forth in detail in the Trust Distribution Plan included as Exhibit 1 to the Trust Agreement.  *See* Plan Exhibit D.  Tort Claimants and the Archdiocese must provide information as requested to the Tort Claims Reviewer.

-2-   Tort Claimants may elect to be treated as a "Convenience Claim".   Any Tort Claimant may elect to have his or her Tort Claim treated as a Convenience Claim.  Each holder of a Convenience Claim shall receive a distribution of $10,000 if the Tort Claims Reviewer determines that the proof of claim filed by the holder of such a claim establishes a prima facie case that the Tort Claimant suffered sexual abuse for which the Archdiocese could be held civilly liable under applicable non-bankruptcy law. Each such distribution shall be made within 60 days of the Tort Claims Reviewer's determination. Treatment and payment, if any, under the Convenience Claim treatment shall be the only treatment and payment (if any) to which a holder of a Convenience Claim shall be entitled.

-3-   Tort Claim treatment other than Convenience Claims.  Within 10 business days of being notified of the final award determined by the Tort Claims Reviewer, a Tort Claimant must elect in writing one of the following two alternatives:

Option #1:
- ***Treatment as a Distribution Plan Claim***. A Tort Claimant who elects treatment as a Distribution Plan Claimant will receive payment from the Trust in the award amount determined by the Tort Claims Reviewer if such claimant is determined to be entitled to a distribution.  Such a claimant waives his or her right to pursue a direct action against a Non-Settling Insurer.  Any recovery by a Claimant on a Class 6 or Class 7 Claim is limited to the distributions from the Trust that the Tort Claims Reviewer determines the claimant is entitled to under the Trust provisions and such claimant is

not entitled to collect personally or otherwise any additional amounts from any Protected Party, or from any Settling Insurer even if denied a distribution from the Trust.

- o The Trust, however, may elect to pursue insurance coverage for a Distribution Plan Claimant's claim, including amounts in excess of the payment to be provided as a Distribution Plan Claim, and recover amounts on such claim that should have been paid by Non-Settling Insurers. To do so, the Trustee may object and require litigation of such claim as well as litigate insurance coverage for such claim.

Option #2:

- **Treatment as a Litigation Claim**. A Tort Claimant who elects treatment as a Litigation Claimant retains the right to pursue (a) a monetary judgment against any Protected Party for such Tort Claim, and (b) a direct action against any Non-Settling Insurer to the extent allowed by applicable law. The Trustee may also pursue a recovery from a Non-Settling Insurer if the Tort Claimant obtains a monetary judgment against a Protected Party. As explained above, the Trustee may object to a claim and litigate such claim. Regardless, a Litigation Claimant's recovery on a Litigation Claim is limited as set forth in the Plan and Trust Agreement, which may be summarized as follows:
  - o The Settling Insurer Entities shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurer Entities shall not have any other duties or obligations to any Person in connection with a Litigation Claim.
  - o The Trustee will establish a reserve for payment of a claim held by a Litigation Claimant in the amount that would have been awarded if such claimant had proceeded as a Trust Distribution Claimant. This reserve is the exclusive source of payment of a Litigation Claim against Protected Parties and the Settling Insurer Entities.
  - o If the claimant obtains a judgment against a Protected Party and no Non-Settling Insurer is implicated, it will be satisfied by this reserve up to the reserve amount plus $1,000.
  - o If a Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is reached with such Non-Settling Insurer or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer as to that judgment, then the recovery will be turned over to the Trust for handling pursuant to the Plan. The recovery will first go to paying reasonable and agreed upon costs (including attorneys' fees) incurred in connection with pursuing such recovery. Any remaining amount will be divided 85% to the Trust and 15% to the Litigation Claimant if a settlement was obtained but before any judgment was obtained; or if a judgment is obtain or the resolution is obtained after the judgment on the Litigation Claim, 70% to the Trust and 30% to the Litigation Claimant.

    o  If the claimant fails to prosecute the claim to a final judgment or settlement or a final judgment is entered finding no liability by a Protected Party, the reserve amount will revert to the Trust and the Litigation Claimant shall have no recourse against the Trust, the Trustee, or any Protected Party or Settling Insurer.

    o  As of the Effective Date, all Litigation Claimants shall have the right to intervene into the Insurance Coverage Adversary Proceeding with respect to their interest in insurance policies issued by any Non-Settling Insurer.

If a Tort Claimant does not make the election to be treated as a Distribution Plan Claimant or a Litigation Claimant, he or she will be treated as a Distribution Plan Claimant. A Tort Claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant by providing written notice to the Trustee. The Trustee has discretion to accept such rescission except that the Trustee shall consent to rescission if notice is given prior to entry of an order of dismissal or final judgment on the Litigation Claim in favor of the Debtor.

The Plan does not impose any obligation on a Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, in connection with a Tort Claim or any Insurance Policy. All such rights with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

Before any distribution is made to a Tort Claimant, the Trustee will determine whether any payment made pursuant to the Medicare Secondary Payer Act (MSPA) has been made to or on behalf of the Tort Claimant. If such a payment has been made, the Trustee shall reimburse the appropriate Medicare trust fund and submit any required information as set forth in detail in section 5.2(i) of the Plan.

The Trust will resolve, and to the extent required by contract or applicable law, pay all Channeled Claims.

**_Claim Resolution Agreement_****_. Before receiving a payment from the Trust, the Tort Claimant must sign a claim resolution agreement under which the claimant agrees to accept payment under the Trust Distribution Plan, agrees not to seek recovery of any kind for the claimant's Tort Claim from the Settling Insurer Entities or the assets of the Protected Parties except as provided in the Claim Resolution Agreement, and agrees to be bound by the Channeling Injunction set forth in the Plan, including the injunctive relief for the benefit of non-Debtor parties. A copy of the Claim Resolution Agreement form is attached as Exhibit E to the Plan._**

***How will the Trust treat Future Tort Claims?***

Class 7 Future Tort Claims Reserve Fund. Distributions on allowed Class 7 Claims are to be paid solely from the Future Tort Claims Reserve Fund (as opposed to the Trust res from which Class 6 Claim distributions are to be paid) in accordance with the timing and amounts set forth in the Trust Distribution Plan. The Future Tort Claim Reserve Fund will be dissolved on the seventh anniversary of the Effective Date and all such remaining funds shall be distributed to Class 7 Claimants based on the assessed value of their claim in accordance with the general assessment procedures. Any remaining funds will be distributed to all Tort Claimants based on the assessed value of claims unless there are insufficient funds to pay at least $50 to each claimant, in which case the Trustee will donate such funds to a non-profit organization dedicated to helping survivors of childhood sexual abuse.

***How are objections to Tort Claims handled and how are claims withdrawn?***

Objections to Tort Claims. The Plan provides that any objection by the Debtor to a Class 6 Claim pending as of the Effective Date is deemed withdrawn without prejudice. Whether and the extent to which any Non-Settling Insurer who filed an objection prior to the Effective Date is entitled to have filed such objection and to continue to assert such objection after the Effective Date shall be determined by the Bankruptcy Court in accordance with applicable procedures. As of the Effective Date, the Trustee will have the exclusive right to object to a Class 6 or Class 7 Claim. The Reorganized Debtor shall have no right to object to a Class 6 or Class 7 Claim after approval of the Plan. Nothing in the Plan shall be intended to suggest that any Insurer has the right to require any Protected Party or the Trust to object to a claim.

Claim withdrawal. A Tort Claimant may withdraw his or her claim at any time on written notice to the Trustee. If withdrawn, the claim may not be reasserted and such claimant will still be subject to the discharge and channeling injunctions provided in the Plan. Any funds distributed to the claimant must be returned to the Trust and any reserve maintained by the Trust for such claim will revert to the Trust.

***How is counseling handled?***

Counseling Fund. As noted above, the Archdiocese will establish a Counseling Fund of $500,000 to pay for counseling requested and approved pursuant to the Counseling Fund Process attached as Exhibit F to the Plan. Any funds remaining in the Counseling Fund at the end of seven years after Plan confirmation will be paid to the Trust.

4.      Trust powers with respect to Tort Claims and Non-Settling Insurers

In furtherance of the Trust's purpose, the Trust, through an objection or other applicable procedure, may seek a binding determination of any Tort Claim, enter into a settlement of a Tort Claim allowed by applicable non-bankruptcy law including but not limited to settlements consistent with *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) or *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994). The Trustee may use the Trust Assets, other than the Future Tort Claim Reserve and Counseling Fund, to prosecute litigation against the Non-Settling Insurers. If the

-73-

Trust successfully resolves an insurance coverage dispute or otherwise receives a recovery of insurance proceeds relating to a Tort Claim, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Tort Claims, pursuant to the Trust Distribution Plan. In such event, and on a periodic basis accumulating all such recoveries, the Trust shall make supplemental payments to Tort Claimants in accordance with the Trust Agreement and Trust Distribution Plan.

5.      Non-Settling Insurers rights and obligations

If a claim is pursued by a Tort Claimant under the litigation option against a Protected Party or Non-Settling Insurer, or if the Trust asserts an objection to or otherwise seeks a judicial determination of liability as to a Tort Claim, then the Protected Parties, the Trust and each Non-Settling Insurer will retain all legal and factual defenses with respect to such claim and, except as set forth in the Plan, all coverage defenses and rights as further detailed in the Plan. A Person may become a Settling Insurer after the Effective Date upon consent of the Trustee if the Bankruptcy Court approves the agreement between the Trustee and that Person as further detailed in the Plan.

The Plan provides that, solely the purpose of determining amounts payable by a Non-Settling Insurer and not for any other purpose, each Tort Claimant shall be deemed to have partially satisfied his or her Tort Claim(s) against each Protected Party against whom the Tort Claim(s) is (are) asserted, and to have agreed to credit as payment of any judgment on such Tort Claim(s) as to such Protected Party:  (i) amounts payable by such Protected Party that would not be payable by any Settling Insurer Entity in the absence of an Insurance Settlement Agreement and the Plan or Non-Settling Insurer, including any retention(s); and (ii) amounts that would be payable by an Archdiocesan Settling Insurer Entity or Parish Settling Insurance Entity in the absence of an Insurance Settlement Agreement and the Plan.  Such Tort Claimant shall not seek recovery of any kind for his Tort Claim(s) from the assets of any Protected Party or the Settling Insurer Entities.  Notwithstanding the foregoing, the Tort Claimant retains the right to recover from any Non-Settling Insurer for the liability of a Protected Party for his Tort Claim(s); but only for the share of causal fault of a Protected Party covered by a Non-Settling Insurer and then only to the extent such share is allocable to such insurance policy issued by a Non-Settling Insurer and only up to the limits of such insurance policy.

Estimations of Class 6 Claims for purposes of voting, and the determination of qualification, assignment of points and payment distributions of Class 6 and Class 7 Claims under the Trust Distribution Plan, shall not constitute an admission of liability by any Protected Party or the Trust with respect to such Claims; have any res judicata or collateral estoppel effect on any Protected Party, the Trust, Non-Settling Insurer or Tort Claimant; constitute a settlement, release, accord, satisfaction or novation of such Claims; be used by any third-party as a defense to any alleged joint liability; or otherwise  prejudice any rights of the Trust, Protected Parties, the Non-Settling Insurers and Claimants in all other contexts or forums; and shall not be deemed to constitute a determination of liability of any Protected Party for the purposes of determining whether or the extent to which such Protected Party is liable for the purposes of implicating

-74-

insurance coverage for the Tort Claims from Non-Settling Insurers, or the extent to which such claim is covered under any insurance policy of a Non-Settling Insurer, or violate any "no action" provisions contained in any insurance policy issued by a Non-Settling Insurer to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable non-bankruptcy law. Rather, the liability of any Protected Party for the purpose of determining the Protected Party's liability, and the amount owed by any Non-Settling Insurer on any Tort Claim, shall be determined: (x) by the amount of any court judgment obtained by the Tort Claimant; or (y) through a settlement agreement to which such Non-Settling Insurer has consented, or if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trustee, Debtor, or the Reorganized Debtor to the Non-Settling Insurer under the respective Insurance Policy or applicable law.

Solely with respect to the Non-Settling Insurers, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, any confirmation order, or any other order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer, any Protected Party, the Trust, or any other insureds under Non-Settling Insurer Policies in any manner, including any defenses to any claim for insurance; (ii) shall constitute a settlement or resolution of any Protected Party's liability to a Tort Claimant; (iii) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or contractual rights or obligations under any insurance policy issued by a Non-Settling Insurer in any respect; or (iv) shall otherwise determine the applicability or nonapplicability of any provision of any insurance policy issued by a Non-Settling Insurer and any such rights and obligations shall be determined under the insurance policy issued by a Non-Settling Insurer and applicable law.

Notwithstanding the revesting of the Transferred Insurance Interests to the Trust, the Archdiocese will not be relieved of its continuing duties, if any, under any insurance policy issued by a Non-Settling Insurer (except as otherwise provided in any Insurance Settlement Agreement), and shall continue to perform such duties as required by applicable law. The Trust will perform such duties to the extent it is able and shall compensate the Archdiocese for all costs incurred by the Archdiocese in performing such duties.

6.      Settling Insurers' rights and obligations

The rights of the parties under the Insurance Settlement Agreements shall be determined exclusively under the Insurance Settlement Agreement and those provisions of the approval orders and confirmation order implementing such agreements. The Insurance Settlement Agreements that have been executed to date are attached to the Plan as Exhibits G-1 through G-2 and are incorporated into the Plan by reference. The remaining Archdiocesan Settling Insurers are finalizing their agreements with the Archdiocese, which shall also be incorporated into the Plan by reference. The terms of the Settlement Agreements are binding on the Trust, the Debtor, the Reorganized Debtor, and all committees and parties in interest, and each of their successors.

The Plan states that the confirmation order will provide that within 10 days of the Effective Date, the Archdiocese and its Settling Insurers shall dismiss with prejudice their claims against each other in the Insurance Coverage Adversary Proceeding.  Except to the extent that claims between Settling Insurers and Non-Settling Insurers are not rendered moot as a result of Confirmation of the Plan and Insurance Settlement Agreements, the Settling Insurers and Non-Settling Insurers shall also dismiss and release the claims between them in the Insurance Coverage Adversary Proceeding with prejudice.  The Archdiocese shall not be required to dismiss the Insurance Coverage Adversary Proceeding as against any Non-Settling Insurers.

Each Settling Insurer will pay its Insurance Settlement Amount to the Trust within the time set forth in each such Insurance Settlement Agreement.

**Judgment Reduction.  The Plan provides that in any proceeding, suit, or action to recover or obtain insurance coverage or proceeds from a Non-Settling Insurer for a Tort Claim, if a Non-Settling Insurer has asserted, asserts, or could assert any Related Insurance Claim against an Archdiocesan Settling Insurer Entity or Parish Settling Insurer Entity, then any judgment obtained against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Archdiocesan Settling Insurer Entity or Parish Settling Insurer Entity would have been liable to pay such Non-Settling Insurer as a result of that insurer's Related Insurance Claim.  To effectuate this clause in any action against a Non-Settling Insurer, the Trust, Protected Party, or Tort Claimant, as applicable, shall obtain a finding from the court in which such proceeding, suit, or action is pending of the amount, if any, such Archdiocesan Settling Insurer Entity or Parish Settling Insurer Entity would have been required to pay such Non-Settling Insurer under its Related Insurance Claim, before entry of judgment against such Non-Settling Insurer. Upon entry of the judgment, the Trust, Protected Party, or Tort Claimant shall reduce the amount of the judgment accordingly immediately.  The foregoing shall be the Non-Settling Insurer's sole remedy.  If, notwithstanding the foregoing, a court refuses to reduce the liability of the Non-Settling Insurer, then once the order establishing the Archdiocesan Settling Insurer Entity's or Parish Settling Insurer Entity's liability for the Related Insurance Claim is a Final Order, the Trust shall promptly indemnify and hold harmless the Archdiocesan Settling Insurer Entity or Parish Settling Insurer Entity for such amount of such Related Insurance Claim.**

**As provided in the Insurance Settlement Agreements, each Settling Insurer agrees that it will not pursue any Related Insurance Claim that it might have against any Non-Settling Insurer that does not assert a Related Insurance Claim against a corresponding Archdiocesan Settling Insurer Entity or Parish Settling Insurer Entity.**

**As provided in the Insurance Settlement Agreements, the Trustee shall use its best efforts to obtain, from all Non-Settling Insurers with which he/she executes a settlement after the Effective Date, agreements similar to those contained in this Section.**

The Plan outlines additional terms regarding additional documentation and non-material modifications to the settlements as well as the Trust's obligation after the Effective Date to defend, indemnify and hold harmless the Archdiocesan Settling Insurer Entities and Parish Settling Insurer Entities with respect to claims relating to insurance policies issued by such parties.

7.     Catholic entity/other insured entity waiver/consent/fees.

**The Plan provides that, in consideration of the releases and Channeling Injunction and other covenants set forth in the Plan, subject to the occurrence of the Effective Date, each of the Catholic Entities:**

**(1)     Except as otherwise provided in the Plan, irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests they have or might have now or in the future against the other Protected Parties, the Reorganized Debtor, the Settling Insurer Entities, and each other with respect to any and all Related Insurance Claims, any contribution and indemnity claims arising from or relating to Class 6 and Class 7 Claims, and any Parish Settling Insurer Entity Policies and any Archdiocesan Settling Insurer Entity Policies; and**

**(2)     Consents to the sale of such Catholic Entity's interests, if any, in the Parish Settling Insurer Entity Policies and the Archdiocesan Settling Insurer Entity Policies in accordance with the applicable Insurance Settlement Agreement and to the contribution of the proceeds from such sales and settlements to the Plan Implementation Account or the Trust, as provided in the Plan.**

**In addition, in consideration of the releases and Channeling Injunction and other covenants set forth herein, subject to the occurrence of the Effective Date, each of the Other Insured Entities:**

**(1)     Irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests they have or might have now or in the future against the other Protected Parties, the Reorganized Debtor, the Archdiocesan Settling Insurer Entities with respect to the Archdiocesan Settling Insurer Entity Policies, the Parish Settling Insurer Entities with respect to the Parish Settling Insurer Entity Policies, and each other with respect to any and all Related Insurance Claims, any contribution and indemnity claims arising from or relating to Tort Claims; and**

**(2)     Consents to the sale of such Other Insured Entity's interests, if any, in the Archdiocesan Settling Insurer Entity Policies in accordance with the applicable Insurance Settlement Agreement and to the contribution of the proceeds from such sales and settlements to the Plan Implementation Account or the Trust, as provided in the Plan.**

**The Trust will indemnify any Catholic Entity or Other Insured Entity for all reasonable attorneys' fees and costs (pre-approved by the Trust) incurred by such Catholic**

Entity or Other Insured Entity in upholding, defending or enforcing the protection of the Channeling Injunction.

In addition, the Plan provides that in consideration of the payments to be made by the Archdiocesan Settling Insurers and other consideration provided by each Archdiocesan Settling Insurer, upon payment by each Archdiocesan Settling Insurer of its respective settlement amount, the Archdiocese Parties irrevocably and unconditionally, without limitation, release, acquit, forever discharge, and waive any Interests they have or might have now or in the future (a) under the Archdiocesan Settling Insurer Entity Policies or Parish Settling Insurer Entity Policies; (b) against the Settling Insurer Entities with respect to any Channeled Claim; and (c) against the Catholic Entities and Other Insured Entities with respect to any Channeled Claim.

F.    **General Trust provisions**

The Trust shall not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets and liabilities of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt.

1.    Trust allocations, distributions, and payments

The following distributions and payments will be made from the general corpus of the Trust:

- Distributions on Class 6 Claims as determined by the Tort Claims Reviewer in accordance with the Plan, the Trust Agreement, and the Trust Distribution Plan -- The Trustee shall use the GIF Contribution Amount to pay defense and indemnity as contemplated under the General Insurance Fund Program for Tort Claims where the Abuse took place or is alleged to have taken place after September 1, 1980. Such obligation shall not diminish or relieve any Non-Settling Insurer which issued Insurance Policies effective on or after September 1, 1980 from any obligations under such Insurance Policies;
- Fees payable to the Tort Claims Reviewer for review of Class 6 Claims;
- All fees, costs and expenses of administering the Trust as provided in the Plan and the Trust Agreement including (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professionals' fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement; and
- Any indemnity to Settling Insurers for any liability for Related Contribution and Insurance Claims, as provided under the terms of the Plan.

The Trust shall also establish a Future Tort Claim Reserve Fund, funded with 5% of the initial deposit of assets into the Trust, for payment of Future Tort Claim amounts in accordance with the Trust provisions.  Fees payable to the Tort Claims Reviewer for review of Class 7 Claims shall be paid from the Future Tort Claims Reserve Fund.

2.    Trustee

Trustee selection.    The initial Trustee shall be appointed by the Archdiocese in consultation with the UCC and identified in a supplement to the Plan to be filed by the Archdiocese fourteen days prior to the confirmation hearing.  The Trustee shall commence serving as the Trustee on the Effective Date; provided, however, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date as authorized by the Archdiocese, through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

Trustee rights and responsibilities. The Plan provides that the Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including the powers of a trustee under Sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges). If there is any inconsistency or ambiguity between the confirmation order and the Trust Agreement with respect to the Trustee's authority to act, the provisions of the Trust Agreement shall control. Among other things, the Trustee: (1) shall liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as necessary or desirable to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

Notwithstanding the foregoing, the Archdiocese, the Reorganized Debtor and the Trust acting for itself and on behalf the Estate, shall be deemed to have waived, effective upon the Effective Date: (1) any and all claims under Sections 547, 548, 549 and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Archdiocese in the ordinary course of business prior to the Effective Date; (2) any and all claims and Causes of Action against any Protected Parties (i) seeking the substantive consolidation of the Archdiocese and any such Protected Party or an order deeming any such Protected Party and the Archdiocese to be an "alter-ego" of the other or any other similar claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Protected Party under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Protected Party in property under Section 544 of the Bankruptcy Code.

All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

To evidence the beneficial interest in the Trust of each holder of such an interest, the Trustee shall maintain a registry of Beneficiaries.

Any transfer of an interest in the Trust shall not be effective until and unless the Trustee receives written notice of such transfer.

Medicare reporting.  It is the Archdiocese's position that neither the Protected Parties, the Trust, nor the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the Trust, under the reporting provisions of the MSPA or the Medicare, Medicaid, and SCHIP Extension Act of 2007.  As set forth in detail in the Plan, if such lack of obligation is not confirmed, the Trust shall act as a reporting agent for the Protected Parties and Settling Insurers in accordance with the provisions of the Plan.  The Trust shall also defend, indemnify and hold harmless the Protected Parties and Settling Insurers from any claims in respect of Medicare Claims reporting and payment obligations in connection with Tort Claims and any claims related to the Trust's reporting obligations, if any.

      3.      Termination

The Plan provides that the Trust shall terminate after its liquidation, administration and distribution of the Trust Assets and its full performance of all other duties and functions. The Trust shall terminate no later than the later of: (i) 12 months after the termination of the Insurance Litigation, or (ii) the seventh anniversary of the Effective Date.

      4.      Immunity; liability; indemnification.

Immunity.  The Plan provides that neither the Reorganized Debtor or its respective member, designees, or professionals, nor the Trustee or any duly designated agent or representative of the Trustee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of such Trustee, except that the Trustee shall be liable for its specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty.

Liability. The Plan provides that no recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of this Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of this Trust Agreement or the Plan, or by

reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by this Trust Agreement or the Plan.  All such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had against (a) the Trustee's bond or applicable insurance coverage, and, (b) to the extent not covered by such bond, directly against the Trustee.

Indemnification.  The Plan provides that the Trust shall defend, indemnify and hold harmless the Trustee, its officers, directors, agents, representatives, and employees to the fullest extent allowed against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties under the Plan, provided that the Trustee shall not be indemnified or defended in any way for any liability, expense, claim, damage or loss for which they are ultimately liable based on specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. Additionally, the Debtor, the Reorganized Debtor, and each of their respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative or arbitrative action, by reason of any act or omission of the Debtor or Reorganized Debtor, or respective agents, with respect to (i) the Reorganization Case and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 6 and Class 7 Claims, (iii) the administration of the Trust and the implementation of the Trust Distribution Plan, or (iv) any and all activities in connection with the Trust Agreement, shall be indemnified and defended by the Trust, to the fullest extent allowed, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor or Reorganized Debtor, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, if he or she acted in good faith and in a manner he or she believed to be in, or not opposed to, the best interests of the holders of Class 6 and Class 7 Claims.

## G.   **Plan implementation**

The Archdiocese proposes that the Plan be implemented and consummated pursuant to Section 1123 of the Bankruptcy Code on and after the Effective Date.

### 1.    Plan funding

Ordinary course post-Effective Date Archdiocese operations will continue to be paid from ordinary operating income of the Archdiocese.  Class 6 and Class 7 Claim distributions will be funded by the Trust pursuant to the terms of the Plan and the Trust Agreement. All other claims will be addressed in accordance with the terms of the Plan from non-restricted Archdiocese assets.

2.      Continuation of future claims representative

Notwithstanding the entry of the confirmation order or the occurrence of the Effective Date, the Future Claimant Representative shall continue until the funds in the Future Claimant Reserve Fund are completely distributed as provided in Section 4.7 of the Plan, the Trust Distribution Plan, or as directed by a future order of the Court, or otherwise.  In the absence of a Future Claimant Representative, the Trustee shall act on behalf of Class 7 Claimants in accordance with the Plan and Trust Agreement.

3.      Retention of jurisdiction

The Plan provides that the Bankruptcy Court will retain jurisdiction over the Chapter 11 case, including matters concerning the interpretation, implementation, consummation, execution or administration of the Plan.  The Plan also provides that the Archdiocese, Reorganized Debtor or Trustee may commence adversary proceedings to collect amounts owed pursuant to the Plan. The continued operation of the Trust will not prevent the Bankruptcy Court from closing the Chapter 11 case.

4.      Unclaimed property

The Plan provides that property distributed by the Debtor or the Trust that remains unclaimed for ninety days after distribution shall vest in and be transferred and delivered to the party making such distribution.  In that event, the person's claim to the unclaimed distribution will no longer be deemed an allowed claim and such person will be deemed to have waived any right to such payment or distribution under the Plan and shall not participate in further distributions with respect to that claim.

### H.      **Continuation of Insurance Policies**

All known Archdiocese Entity Insurance Policies are listed on Exhibit I to the Plan. Except for the Archdiocesan Insurer Entity Policies and Parish Insurer Entity Policies which are bought back as set forth in and pursuant to the Insurance Settlement Agreements, or as otherwise set forth in the other terms of this Plan all Archdiocese Entity Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Archdiocese Entity Insurance Policy is or was an executory contract of the Archdiocese, or continued in accordance with its terms pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Archdiocese, such that each of the parties' contractual, legal, and equitable rights under each such Archdiocese Entity Insurance Policy shall remain unaltered. To the extent that any or all of the Archdiocese Entity Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Archdiocese Entity Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the confirmation order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy

Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in this Chapter 11 case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Archdiocese existing as of the Effective Date with respect to any Archdiocese Entity Insurance Policy.  The Archdiocese reserves the right to seek rejection of any Archdiocese Entity Insurance Policy or other available relief prior to the Effective Date.

## I.    Procedures for Claims administration other than Tort Claims

### 1.    Objection to Claims

Prior to the Effective Date, the Archdiocese shall be responsible for pursuing any objection to the allowance of any claim. From and after the Effective Date, the Reorganized Debtor or the Trustee, as applicable, will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all claims (including those claims that are subject to objection by the Archdiocese as of the Effective Date), provided, however, that nothing in this Section shall affect the right of any party in interest (including the Reorganized Debtor and the Trustee) to object to any claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Plan. Further, nothing in this Section shall prohibit the Trustee from objecting to or establishing procedures for the allowance or treatment of Tort Claims.

### 2.    Determination of Claims

Claims other than Tort Claims for which a timely proof of claim or request for payment motion was filed may be determined and liquidated in one or more of the ways listed in the Plan. Any claim so determined and liquidated shall be deemed an allowed claim for such liquidated amount and shall be satisfied in accordance with the Plan.  Nothing in this section constitutes a waiver of any claims, rights, interests or causes of action that the Debtor, the Reorganized Debtor or the Trust may have against any Person in connection with any claim.

No payment or distribution will be made with respect to a Disputed Claim unless and until all objections to such claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim has become an allowed claim.

### 3.    Claim estimation for claims other than Tort Claims

To effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 case, with respect to Disputed Claims, the Archdiocese (if prior to the Effective Date) and the Reorganized Debtor or the Trustee (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such claim for allowance or disallowance purposes; or (iii) such claim for any other

purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.  The Debtor intends to file such a motion in this case.

### J.        Distributions under the Plan

The Reorganized Debtor will make the cash payment required by the Plan to the Trust outlined above.  As soon as practicable after the Effective Date, the Reorganized Debtor will make the payments required by the Plan to the holders of the claims to be paid directly by the Archdiocese under the Plan.

The Reorganized Debtor or the Trustee, as applicable, may, to the extent permitted under applicable law, set off against any allowed claim and the distributions to be made pursuant to the Plan on account of such allowed claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Trustee, as applicable, may hold against the holder of such allowed claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Trustee, as applicable, of any such claims, rights, and Causes of Action that the Reorganized Debtor or the Trustee, as applicable, possesses against such holder.

With very limited exceptions identified in the Plan, post-petition interest does not accrue on any claim and no claimant shall be entitled to such interest.  In addition, no interest shall accrue or be paid on any Disputed Claim for the period from the Plan Effective Date to the date of a final distribution on such claim, if any.

### IX.    PLAN EFFECTIVENESS

The Plan can be confirmed under section 1129(a) of the Bankruptcy Code, or in a non-consensual manner under section 1129(b) of the Bankruptcy Code.

### A.        Conditions to occurrence of Effective Date

The Plan will not become effective unless and until the following conditions have been satisfied or waived by the Debtor: (1) a final Confirmation Order shall have been entered, (2) the Archdiocese, the Catholic Entities and the Other Insured entities, as applicable, and the Settling Insurers shall have executed their respective Insurance Settlement Agreements and the Bankruptcy Court shall have issued a final order(s) approving the Insurance Settlement Agreements between the Archdiocese and the Archdiocesan Settling Insurers; (3) the Trust shall have been formed; (4) the Trustee shall have been appointed.

The Reorganized Debtor shall file a notice of Effective Date with the Bankruptcy Court within seven days after the occurrence of the Effective Date.

The Debtor, with the Committee's consent, may waive any of the conditions to the Effective Date other than the following two conditions: (1) entry of a final Confirmation Order by the Bankruptcy Court and (2) the Archdiocese, the Catholic Entities and the Other Insured entities, as applicable, and the Settling Insurers shall have executed their respective Insurance Settlement Agreements and the Bankruptcy Court shall have issued a final order(s) approving the Insurance Settlement Agreements between the Archdiocese and the Archdiocesan Settling Insurers.

### B.    Non-occurrence of Effective Date

If the Plan is not substantially consummated, the Plan will be null and void and nothing contained in the Plan or Disclosure Statement will (i) constitute a waiver or release of any Claims by or against the Archdiocese; (ii) prejudice in any way the rights of the Archdiocese, the Trust or settling insurers; (iii) constitute an admission, acknowledgement, offer or undertaking by the Archdiocese or settling insurers; or (iv) be admissible in any action, proceeding or case against the Archdiocese.

## X.    EFFECTS OF CONFIRMATION

Confirmation of the Plan will have the following effects, including the discharge of the Debtor, and the institution of various injunctions as described below.

### A.    Dissolution of the Committees

On the Effective Date, the Committees shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that all committee members and professionals shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case.

### B.    Discharge Injunction

The plan provides the following discharge injunction for the debtor:  **Except as otherwise expressly provided in the Plan or in the confirmation order, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Archdiocese shall be discharged from any and all claims that arose prior to the Effective Date, including interest, if any, regardless of whether it is alleged to have accrued before or after the Petition Date (each "Discharged Claim").  For the avoidance of doubt, "Discharged Claim" includes any disallowed claim.  All Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting,**

enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff right of contribution, indemnity, subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any action, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. Tort Claimants and the Trust shall be permitted to name the Archdiocese in any proceeding to resolve whether the Archdiocese has liability for Tort Claims and the amount of any such liability, solely for the purpose of obtaining Insurance Coverage from Non-settling Insurers. But the foregoing injunction on enforcement, attachment, collection and recovery shall nonetheless apply except as to the Insurance Policies issued by Non-Settling Insurers identified in the plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, the Plan or confirmation order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Plan. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.  The discharge hereunder shall not limit in any way the obligations of Non-Settling Insurers to defend and pay the Archdiocese's liability for Tort Claims under Insurance Policies issued to the Archdiocese by Non-Settling Insurers.

### C.    Channeling Injunction

The Plan provides the following channeling injunction preventing prosecution of claims against Protected Parties and Settling Insurer Entities:  **In consideration of the undertakings of the Protected Parties, the Archdiocesan Settling Insurer Entities, and the Parish Settling Insurer Entities under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Archdiocese, the Archdiocesan Settling Insurer Entities, and the Parish Settling Insurer Entities, and pursuant to section 105 of the Bankruptcy Code:**

**(a)      any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in**

the amounts as established under the Plan and the Trust agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

(b)      all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, including:

(1)      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities;

(2)      enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, or the property of any of the Protected Parties or Settling Insurer Entities, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, or any other Person;

(3)      creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties, the Archdiocesan Settling Insurer Entities, or the Parish Settling Insurer Entities, or the property of the Protected Parties or the Settling Insurer Entities; and

(4)      asserting, implementing or effectuating any Channeled Claim of any kind against:

(i)      any obligation due any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities;

(ii)     any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities; or

(iii)    the property of any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities.

For the avoidance of doubt, Tort Claimants can proceed under the Plan, solely to the extent provided therein.  Tort Claimants and the Trust shall be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, solely for the purpose of obtaining Insurance Coverage from Non-Settling Insurers under the Non-Settling Insurer Policies. The foregoing injunction on enforcement, attachment, collection and recovery shall apply except as to the Non-Settling Insurers.  In the event a Tort Claimant obtains a judgment against the Archdiocese, which by statute becomes a lien against real estate, the Tort Claimant shall, immediately upon request of the Reorganized Debtor, execute a release of such lien.

The foregoing channeling injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the

**Channeled Claims as provided in the Plan shall inure to the benefit of the Protected Parties, Archdiocesan Settling Insurer Entities, and Parish Settling Insurer Entities. In a successful action to enforce the channeling injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

### D.    Exculpation; limitation of liability

From and after the Effective Date, none of the Exculpated Parties, as defined in the Plan, shall have or incur any liability for, and each Exculpated Party shall be released from, any claim, Cause of Action or liability to any other Exculpated Party, to any holder of a claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and Filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Archdiocese and its officers, members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the channeling injunction.

### E.    Settling Insurer Supplemental Injunction

The Plan provides the following supplement injunctions preventing prosecution of claims against Archdiocesan settling insurer entities, parish settling insurer entities, and protected parties: **Pursuant to sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies from the Archdiocese, Other Insured Entities, and Catholic Entities pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, other insurers, and all others holding Interests of any kind or nature whatsoever, including those claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, the Archdiocesan Settling Insurer Entities, and the Parish Settling Insurer Entities, or any Person insured by any of the Archdiocesan Settling Insurer Entities or Parish Setting Insurer Entities under the Archdiocesan Settling Insurer Entity Policies or Parish Settling Insurer Entity Policies to the extent such Interests arise from the same injury or damages asserted in connection with a Tort Claim, that directly or indirectly arise from, relate to or are in connection with any of the Archdiocesan Settling**

**Insurer Entity Policies and Parish Settling Entity Policies, any Tort Claim, Claim Nos. 502, 503, and 668, Class 3 Claims, Class 13 Claims, Class 14 Claims, or any Related Insurance Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, any Person insured by any of the Archdiocesan Settling Insurer Entities or Parish Settling Insurer Entities to the extent such Interests arise from the same injury or damages asserted in connection with a Tort Claim, the Archdiocesan Settling Insurer Entity Policies, Parish Settling Insurer Entity Policies, or the Protected Parties, including:**

> **(a) Commencing or continuing in any manner any action or other proceeding against the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties or the property of the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties;**
>
> **(b) Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties or the property of the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties;**
>
> **(c) Creating, perfecting, or enforcing any lien of any kind against the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties or the property of the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties;**
>
> **(d) Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties or the property of the Archdiocesan Settling Insurer Entities, Parish Settling Insurer Entities, or the Protected Parties; and**
>
> **(e) Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

**Notwithstanding the foregoing, nothing in this Section 13.5 shall be construed to include either (a) any Claim alleging Abuse against any Person who is not a Protected Party or a Settling Insurer Entity, or (b) any Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy other than the Archdiocesan Settling Insurer Entity Policies or Parish Settling Insurer Entity Policies.**

**All such claims shall be channeled to the Trust. This injunction shall not apply to: (i) claims for insurance from the Catholic Mutual Relief Society ("Catholic Mutual") under policies issued by Catholic Mutual to the Archdiocese as the Named Insured on or after September 1, 1986, except as provided in the Insurance Settlement Agreement with Catholic Mutual; or (ii) any reinsurance claim.**

**F.**  **Insurance Settlement Agreement Injunction**

**The Plan provides that any injunction, discharge, or release contained in an Insurance Settlement Agreement is (a) incorporated in all respects into the Plan, (b) deemed fully set forth in the Plan, (c) approved, and (d) in addition to the injunctions, discharges and releases expressly set forth in the Plan.**

**G.**  **Timing**

The injunctions, releases, and discharges to which any Settling Insurer Entity is entitled pursuant to such Insurance Settlement Agreement, the Plan, the confirmation order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer Entity pursuant to the terms of that Settling Insurer Entity's Insurance Settlement Agreement, and the other provisions set forth in Article XII of the Plan are fully met.

**XI.**  **THE REORGANIZED DEBTOR**

**A.**  **Continued Existence**

The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with the applicable laws of the State of Minnesota, having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

**B.**  **Vesting of Assets**

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, except as otherwise provided in the Plan or Confirmation Order, the Reorganization Assets will vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person and without supervision or approval by the Bankruptcy Court and free of any bankruptcy restrictions other than those expressly imposed by the Plan or Confirmation Order.

### C.      Management of Reorganized Debtor

The Reorganized Debtor will continue to be managed by current management as set forth below.  These individuals are familiar with the Debtor's affairs and operations and are well suited to continue the Debtor's mission.  The persons proposed to serve as directors and officers of the Reorganized Debtor are identified in Exhibit J to the Plan and are as follows:

| Name | Title |
|------|-------|
| Most Reverend Bernard A. Hebda | Archbishop |
| Most Reverend Andrew Cozzens | Auxiliary Bishop |
| Very Reverend Charles V. Lachowitzer | Moderator of the Curia |
| Joseph Kueppers | Chancellor for Civil Affairs |
| Thomas Mertens | Chief Financial Officer |
| John F. Bierbaum | Board of Directors - member |
| Peter Daly, M.D. | Board of Directors - member |
| Karen Rauenhorst | Board of Directors - member |
| Rev. Stephen Ulrick | Board of Directors - member |
| Brian Short | Board of Directors - member |

Compensation of officers will be in accordance with prepetition practices.  Board members do not receive monetary compensation from the Archdiocese.

### XII.    MISCELLANEOUS PLAN PROVISIONS

The Plan contains several other provisions consistent with the requirements of Chapter 11 of the Bankruptcy Code.  Miscellaneous Plan provisions not already addressed are as set forth below.

### A.      Rejection of Unassumed Executory Contracts

Confirmation of the Plan will constitute assumption of the executory contracts and unexpired leases listed on Exhibit H to the Plan.  Except for any executory contract (i) that was previously assumed or rejected by an order of the Bankruptcy Court (including the confirmation order) or otherwise pursuant to section 365 of the Bankruptcy Code; (ii) that is subject to a pending motion to assume or reject before the Bankruptcy Court, (iii) that is expressly assumed in the Plan; or (iv) that is listed on Exhibit H to the Plan, each pre-Petition Date executory contract that has not previously expired or terminated, shall be rejected, effective as of the confirmation date.  Except as otherwise provided, no cure payment shall be required by the Archdiocese in connection with the assumption and assignment of any contract assumed and assigned.

B.      **Executory contract rejection claims**

Claims asserted by a creditor arising from the rejection of an executory contract must be filed in accordance with the deadline to be established by the Bankruptcy Court as set forth in the Plan.  Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated under Class 12 of the Plan.  Every such Claim not timely filed by the deadline will be forever barred, unenforceable, and discharged, and the creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

C.      **Indemnification of members, managers, officers, and employees**

The obligation of the Archdiocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Archdiocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Minnesota pertaining to the Archdiocese, will be deemed and treated as Executory Contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code section 365 as of the Effective Date.  Notwithstanding the foregoing, under no circumstances will the Archdiocese or the Reorganized Debtor assume or be responsible for any alleged indemnification of any party against whom the Archdiocese has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such entity or such entity has or may have engaged in come other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Entity.

D.      **Lease claim indemnity**

The Reorganized Debtor will fully indemnify the Debtor's estate, and any successor to the Debtor's estate, including but not limited to any trust formed for the benefit of creditors, from and for any claims arising out of the breach of the Debtor's lease for new office space asserted after confirmation, regardless of whether such claims arise before or after the confirmation of a plan by the Debtor.

E.      **Indemnity for uninsured non-tort claims**

The Reorganized Debtor will fully indemnify any Catholic Entity for any claims, other than Tort Claims, asserted against such Catholic Entity after the Effective Date for which the Catholic Entity would otherwise have, but as a result of the sale, transfer, or release by the Debtor or the Catholic Entity of or with respect to a Settling Insurer Entity policy in connection with this Chapter 11 case, does not have, insurance coverage for such non-Tort Claims.

F.      **Reservation of right**

The Archdiocese reserves the right to sell estate property or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be filed

as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the confirmation hearing or as soon thereafter as is practicable.

### G.    Final order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Archdiocese (if prior to the Effective Date) or by the Reorganized Debtor (on or after the Effective Date) upon written notice to the Bankruptcy Court, provided that the Archdiocese or the Reorganized Debtor, as the case may be, first obtains consent of all Archdiocesan Settling Insurers.

### H.    Amendments and modifications

The Archdiocese may modify the Plan at any time prior to the confirmation hearing in accordance with section 1127(a) of the Bankruptcy Code. After the confirmation date and prior to substantial consummation of the Plan, the Reorganized Debtor, or the Trustee, as appropriate, may modify the Plan in accordance with section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.

### I.    U.S. Trustee reports

From the Effective Date until a Final Decree is entered, the Reorganized Debtor shall, within 30 days of the end of its fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines. The Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

### J.    No waiver

The failure of the Archdiocese to object to any claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Trustee's right to object to such claim, in whole or in part.

### K.    Tax exemption

Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the confirmation date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the confirmation order and the Plan, be

-93-

ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### L.   Non-severability

Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Archdiocese.

### M.   Revocation

The Archdiocese reserves the right to revoke and withdraw the Plan prior to the confirmation date, provided it first obtains the consent of all Archdiocesan Settling Insurers, in which case the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Archdiocese, the Committee, or any other Person or to prejudice in any manner the rights of the Archdiocese, the Committee, or any other Person in any further proceedings involving the Archdiocese, or be deemed an admission by the Archdiocese, including with respect to the amount or allowance of any claim or the value of any property of the Estate.

### N.   Controlling documents

In the event and to the extent that any provision of the Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of the Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the confirmation order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the confirmation order shall control and take precedence. To the extent that any provision of the Plan, the Trust Agreement, or the confirmation order is inconsistent with the Insurance Settlement Agreements, the Insurance Settlement Agreements shall control.

### O.   Governing law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) shall be governed by, and construed and enforced in accordance with, the laws of the State of Minnesota, without giving effect to conflicts of law principles.

**P.**   **Notices**

Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the parties identified in section 15.16 of the Plan.

**Q.**   **Filing of additional documents**

At any time before substantial consummation of the Plan, the Archdiocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**R.**   **Powers of officers**

The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**S.**   **Direction to a party**

On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**T.**   **Successors and assigns**

The Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**U.**   **Certain actions**

By reason of entry of the confirmation order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Archdiocese under the Plan shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

## V.  Final decree

Once the Estate has been fully administered, the Reorganized Debtor or such other party as the Bankruptcy Court may designate in the confirmation order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case.

## W.  Plan as settlement communication

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise claims and Causes of Action that are disputed as to validity or amount (including Tort Claims and the Insurance Litigation). Accordingly, the Plan, the disclosure statement, and any communications regarding the Plan or the disclosure statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provisions of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any disputed claim or Cause of Action.

## X.  Other rights

Except as expressly set forth in this Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Minnesota law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims.

## Y.  Rule 9019 Request;  1129(b) Confirmation Request

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Archdiocese requests approval of all compromises and settlements included in the Plan, including the compromises and settlements set forth in Article V and VIII.  In addition, through the Plan, the Archdiocese requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan.

# XIII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN;  VOTING REQUIREMENTS

In order for the Plan to be confirmed, all of the applicable requirements of Bankruptcy Code § 1129 must be met.  This includes, among other things, that the Plan: (i) is accepted by all impaired Classes, or if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of holders of Claims in each impaired Class.

## A.  Best Interests Test

The liquidation analysis attached as **Exhibit C** will show that if this case were converted to a Chapter 7 liquidation, unsecured creditors, including Tort Claimants, would receive payment

far less than the payment currently provided for under the Plan.  Further, to the extent Insurance Settlements are lost without a Plan or to the extent a Chapter 7 trustee disavows the Insurance Settlements and continues litigation on claims objections the recovery may be even lower.

### 1.    Legal standard for the Best Interests Test

Confirmation of a Plan generally requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

This analysis does not apply in this Chapter 11 case, because under 11 U.S.C. § 1112(c), as a non-profit entity, the Debtor's case cannot be converted from a Chapter 11 case to a Chapter 7 case without the Debtor's consent.  Similarly, under 11 U.S.C. § 303, an involuntary petition cannot be filed against the Archdiocese.  Accordingly, the Archdiocese believes that the best interests of creditors test in this Chapter 11 case, if it applies at all, is more analogous to the test in a Chapter 9 case.

In a Chapter 9 case, the best interests of creditors test is interpreted to mean that:

> [T]he plan must be better than the alternative that creditors have. In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds. Clearly, such a result is chaos . . .. [The courts] must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.

6 COLLIER ON BANKRUPTCY, ¶ 943.03[7] [a] (16th ed. 2013).

The Archdiocese believes that a Chapter 7 liquidation is impossible under the circumstances.  Therefore, the only true alternative to a confirmed Chapter 11 Plan (the various scenarios of which are discussed in Sections I.A and I.B, above) is dismissal of this Chapter 11 case and a race to the courthouse to try individual claimant cases one at a time.  Such a scenario generally benefits the first to sue and obtain judgments and delays resolution of the vast majority of tort claims, while at the same time severely eroding the Debtor's value through continuing litigation costs. As of the Petition Date, there were 22 Tort Claimants with lawsuits pending against the Archdiocese, and an additional 151 Tort Claimants who made formal demand on the Archdiocese through a notice of claim prior to the Petition Date. The Claimants with lawsuits pending would be in a favorable position compared to the remaining Claimants who asserted claims in the bankruptcy.  Further, the cost of Chapter 11 proceedings and the litigation costs associated with the litigation of the Tort Claims in state court proceedings would deplete the Archdiocese's assets to a point that would likely eliminate any cash contributions from the Archdiocese, thwart the Archdiocese's ability to provide for ongoing therapy or counseling, and

compromise if not eliminate the ability of the Archdiocese to defend coverage litigation, leaving claimants with unattachable assets, years of fruitless litigation, and no foreseeable resolution.

### 2.    Hypothetical Chapter 7 liquidation scenario

Because the Archdiocese, as a non-profit entity, cannot be legally forced to liquidate, a liquidation analysis is not a necessary component of this Plan.  It is nonetheless a potentially useful exercise in evaluating the Plan.  As discussed in the Liquidation Analysis attached as **Exhibit C**, the Archdiocese estimates that recoveries under the Plan for holders of Allowed Claims in impaired classes will be greater than in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.  This is because the total property available for distribution is greater under the Plan than in a liquidation under Chapter 7 and the expenses of administration would be lower than in Chapter 7.  The Archdiocese also believes that more parties would assert claims in a Chapter 7 and many more issues would need to be litigated.  In addition, the Archdiocese believes that distributions in a Chapter 7 case would be delayed due to the time taken by a Chapter 7 trustee to assess the Debtor's assets, review and analyze claims, and evaluate and litigate claims against third parties, if any.  Holders of Allowed Claims entitled to vote should review the Liquidation Analysis in assessing whether to vote to accept or reject the Plan.

Although the Archdiocese does not believe that a Chapter 7 liquidation is possible, it believes that the Plan presents a superior alternative in any case.  In a hypothetical Chapter 7 liquidation, creditors would also receive less than they will likely receive under the Plan.  As explained below, the liquidation value available for satisfaction of Claims against the Debtor would be reduced by the costs arising from the conversion of the case from Chapter 11 to Chapter 7, and costs, fees, and expenses of the liquidation itself, which would include disposition expenses, the costs and fees of a trustee and his or her counsel, and the costs and fees of other retained professionals.  In addition, the shortened time available in a Chapter 7 case to sell certain assets would further compromise the already untenable situation involving any sale of land leased to the Cathedral and schools.  Finally, a liquidation would likely result in several million dollars' worth of additional claims that would dilute the assets available to creditors receiving distributions under the Plan.

A Chapter 7 liquidation would also very likely result in a significant delay in payments being made to creditors.  The trustee would be duty bound to review each claim and likely object to many claims involving a costly, time-consuming process.  Litigating over 400 claims of abuse would take over a decade even if the court system and parties could accommodate 40 trials per year. With inevitable appeals and coverage actions, complete resolution may take longer.

A hypothetical Chapter 7 liquidation would include the following probable outcomes:

- Parish accounts receivable would very likely become uncollectable by the Debtor.
  - Parishes would likely immediately stop paying assessments to the Archdiocese were the Archdiocese to liquidate.  Assessments receivable and past due assessments would likely become completely uncollectable.

- The immediate cash available to fund the Plan under the Insurance Settlements (other than Home), totaling over $115 million, would be lost without a Plan.
  - The Settling Insurers would not settle because they could not obtain a policy buy-back with a channeling injunction.
  - The Chapter 7 trustee could decide to pursue recoveries from Insurers. However, such litigation will be extremely expensive, and the Trustee would lack the resources necessary to meaningfully pursue these cases.

- The Parish Insurance Settlements, totaling approximately $13,732,500, would be lost without a Plan.
  - The Settling Parish Insurers would not settle because they could not obtain a policy buy-back with a channeling injunction.
  - The Parishes, as separate legal entities, could not be compelled to contribute in the Archdiocese's liquidation.

- Rights to pursue claims against Parish insurance policies would be lost without a Plan.
  - The Parishes, as separate legal entities, could not be compelled to contribute in the Archdiocese's liquidation.

- There would be no Trust Distribution Plan as provided in the Plan and Trust Agreement
  - In a Chapter 7 liquidation, the Chapter 7 trustee would likely need to object to many Tort Claims. Without a process such as the Trust Distribution Plan to classify and compensate Tort Claims, the Chapter 7 trustee may be required to liquidate each Tort Claim, likely through individual trials. At the very least, substantial estate resources would likely be expended adjudicating or analyzing Tort Claims. As a result, significant resources, conservatively estimated to be $250,000 per litigated claim, would be expended adjudicating Tort Claims in a Chapter 7 case. There are more than 400 Tort Claims in this case, which could equal total litigation costs of over $100 million.

- The only potential source of funds readily available for distribution in liquidation would be available unrestricted cash assets and marketable property as of the liquidation date. Unpaid Chapter 7 and Chapter 11 administrative expenses could eclipse the Debtor's liquid assets.
  - As noted above, insurance settlement proceeds would not be available for immediate distribution and a Chapter 7 trustee would likely have to litigate individual Tort Claims in order to obtain insurance money for distribution on an claim-by-claim basis. This process would take years to complete and the recoveries that could be obtained are speculative.

- Under 11 U.S.C. § 326, the Chapter 7 trustee would be entitled to compensation based on a percentage of all funds distributed to parties in interest, which would further reduce the amount of funds available to pay unsecured creditors.

- The contributing non-Debtor Catholic entities would not get the benefit of the channeling injunctions and releases provided in the Plan, nor would they make the substantial contributions they are making under the Plan without such injunctions or releases.

- The GIF and AMBP would terminate, which would result in significant claims by participants and likely protracted litigation over the ownership and proper distribution of those assets.

- The Archdiocese would terminate and breach its lease with IAF Beacon I, LLC for its new office space, which would result in a significant administrative expense priority claim on behalf of the landlord. Under the Bankruptcy Code, such an administrative expense claim would be paid before any unsecured creditors and would further dilute estate assets.

- The Chapter 7 trustee would not be able to provide for ongoing therapy for Tort Claimants, and the Counseling Fund will not exist.

As evidenced by the liquidation analysis, the Debtor believes that creditors will clearly benefit from the confirmation of the Plan. In a liquidation, there will be many more claims and in greater amounts that would share in the assets available to creditors, the pool of available assets would be diluted, and the rights related to insurance policies would not be improved. The Debtor believes that the Plan provides a superior and faster recovery for the holders of Claims and meets the requirements of the best interests test.

## B.  **Financial Feasibility**

In order to confirm a plan, the Bankruptcy Code requires that a Bankruptcy Court find that confirmation of the plan is not likely to be followed by liquidation or the need to further financially reorganize the Debtor (the "Feasibility Test"). For a plan to meet this test, the Bankruptcy Court must determine there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to meet its obligations under the Plan. Based upon the Financial Projections attached as **Exhibit D** and the assumptions set forth therein, the Archdiocese believes that it will be able to make all distributions required pursuant to the Plan and to fund its operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## C.  **Acceptance by Impaired Class; 1129(b) confirmation**

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a number of findings concerning the Plan and the Debtor, including that (a) the Plan classifies Claims in a permissible manner; (b) the Plan complies with applicable provisions of the Bankruptcy Code; (c) the Debtor complied with applicable provisions of the Bankruptcy Code; (d) the Debtor proposed the Plan in good faith and not by any means forbidden by law; (e) the

-100-

disclosure required by § 1125 of the Bankruptcy Code has been made; (f) the Plan has been accepted by the requisite votes of Creditors in each Class (except to the extent that confirmation may still be available under § 1129(b) of the Bankruptcy Code); (g) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtor; (h) the Plan is in the "best interests" of all holders of Claims in an Impaired Class; and (i) all fees and expenses payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

The Debtor believes that the Plan satisfies all the requirements of confirmation.

Section 1129(a) of the Bankruptcy Code requires that a class of Claims that is impaired under the Plan accept the Plan, subject to the exception contained in section 1129(b) of the Bankruptcy Code.

A class of claims under a plan "accepts" the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the classes that actually vote on the plan. A claim that is not "impaired" under a plan is conclusively presumed to accept the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights of the holders of claims in that class are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Plan, Classes 1, 2, 4, 5, 10, 11, and 16 are not impaired and are deemed to accept the Plan. Class 14 will not receive or retain any property under the Plan on account of Claims and is presumed to have rejected the Plan. All other classes of Claims under the Plan are impaired (or potentially impaired) under the Plan. As such, holders of Claims in those classes, i.e., Class 3, 6, 7, 8, 9, 12, 13, 14 and 15 are entitled to vote to accept or reject the Plan.

The Bankruptcy Code allows for a plan to be confirmed even if rejected by an impaired class of claims. Under the provisions of section 1129(b) of the Bankruptcy Code, the proponent of the plan may request that the plan be confirmed despite its rejection by an impaired class. The court will confirm the plan if it (a) does not discriminate unfairly against a dissenting impaired class and (b) is fair and equitable with respect to that class.

The Bankruptcy Code identifies guidelines for determining whether a plan is fair and equitable to a given class of claims. For unsecured claims (such as the Claims in Classes 3, 6, 7, 8, 9, 12, 13, 14 and 15) a plan must provide that the creditors in the dissenting class receive or retain property of a value equal to the allowed amount of their claims or, failing that, no creditor of lesser priority, or shareholder, receives any distribution under the plan. In other words, equity interest holders would not receive or retain any property on account of their interest. The Debtor believes that this test, normally applied to traditional corporations, is inapplicable to the Debtor because as a non-profit corporation there are no equity interests or junior creditors, or the junior creditors of a non-accepting class are not receiving any property under the Plan.

For secured claims (such the Claim in Class 10), a plan must provide that the holders of such secured Claim retain the liens securing such claims to the extent of the allowed amount of such claims and that the holders of such claims receive on account of such claims a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property securing the lien.  Under the Plan, the secured creditor in Class 10 will retain its liens to secure the full amount of its allowed secured claim and its interest and rights against its collateral will remain undisturbed.

In the event that the Bankruptcy Court refuses to impose a 1129(b) confirmation unless certain modifications are made to the terms and conditions of such non-consenting class's treatment under the Plan, the Debtor reserves the right, without re-solicitation, to propose such modifications to such non-consenting class's treatment and to confirm the Plan, provided such modification does not result in complete extinguishment of the non-consenting class's Claim.

**D.**      **Certain Risk Factors**

**ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND EXHIBITS) PRIOR TO DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN.**

**BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND, IN PARTICULAR, THE RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, CREDITOR RECOVERIES COULD BE LOWER THAN OTHERWISE DESCRIBED HEREIN. THE RISKS AND UNCERTAINTIES BELOW ARE NOT EXHAUSTIVE, BUT REPRESENT THE RISKS THAT THE DEBTOR BELIEVES ARE MATERIAL. THERE MAY BE ADDITIONAL RISKS THAT THE DEBTOR CURRENTLY CONSIDERS NOT TO BE MATERIAL OR WHICH THE DEBTOR IS CURRENTLY UNAWARE.**

1.      Failure to satisfy vote requirement

In the event that sufficient votes are not received to confirm the Plan, the Debtor may be forced to pursue an alternative Plan or dismissal of the case.

2.      Risk of non-confirmation

Even if all impaired classes accept or could be deemed to have accepted the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code lists requirements for confirmation, including (a) that the confirmation of the Plan not be followed by the need for a further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtor were

liquidated under Chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtor otherwise comply with applicable provisions of the Bankruptcy Code.  Although the Debtor believes the Plan will meet all applicable tests, there is no assurance that the Bankruptcy Court will reach the same conclusion.

3.      Non-consensual confirmation

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan if at least one Impaired Class of Claims against the Debtor has accepted the Plan and, as to each Impaired Class of Claims that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

The Debtor reserves the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all Impaired Classes.  Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided in the Plan.

4.      Appeal risk

If the Plan is confirmed, it is possible that one or more parties may appeal the order confirming the Plan and object to all or a part of the Plan, including the channeling injunctions and Trust Agreement contemplated in the Plan.  This risk is higher in a non-consensual confirmation.

5.      Uncertainty of value

The value of Tort Claimants' rights to distributions from the Trust will depend in part on the risks outlined above and to the extent those risks materialize. In addition, the resolution of causes of action held by the Trust and the reconciliation, liquidation and allowance of Claims may require a substantial amount of time, during which time interest will not accrue on allowed Claims in the subject Classes.  These delays could affect or reduce the ultimate value of any recovery. The ultimate realized value of insurance assets may be different than the values assigned to such policies.

E.      **Certain federal income tax considerations**

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPT ESTATE ARE COMPLEX.  THE SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.**

**THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR HAS THE ARCHDIOCESE OBTAINED AN OPINION OF**

**COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR ANY OTHER ENTITY OR PERSON.  EACH HOLDER OF A CLAIM SHOULD CONSULT ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE AND LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following summary is a general discussion of certain of the potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The Federal income tax consequences to any particular Creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

1.      Tax consequences to Creditors

A creditor that receives cash in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim.

The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE

REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

2.      Tax consequences to the Debtor

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to the Debtor.

3.      Tax consequences to the Plan Trust

The Plan Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Plan Trust as a designated settlement fund or a qualified settlement fund.

The Debtor expresses no opinion regarding whether the Plan Trust is a designated settlement fund or a qualified settlement fund. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Plan Trust is a designated settlement fund or a qualified settlement fund. Accordingly, each Creditor is urged to consult its own tax advisor regarding the characterization of the Plan Trust and the tax consequences of such characterization.

F.      **Solicitation of Votes**

The Debtor is soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and receiving distributions. Using this criteria, only holders of Claims in Classes 3, 6, 7, 8, 9, 12, 13, 14 and 15 are entitled to vote on the Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Solicitation Packages will include copies of (i) the Disclosure Statement and exhibits thereto, including the Plan (ii) the Disclosure Statement approval order, (iii) the notice of Disclosure Statement approval and confirmation hearing, and (iv) the form of ballot.

Solicitation Packages will be sent to creditors by the Debtor. Procedures and deadlines for submitting the ballot shall be included in the Solicitation Package.

**G.      Voting Procedures**

1.      Ballots

If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the reverse side of the ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DEBTOR AT (651) 251-7732. THE ARCHDIOCESE AND COUNSEL FOR THE ARCHDIOCESE CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class.

**FACSIMILE, E-MAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

A ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.  You may not change your vote after the voting deadline passes.

To be counted, completed ballots must be mailed to the clerk of the bankruptcy court at the following address:

Office of the Clerk of Court
Attention: B. Montez
U.S. Bankruptcy Court District of Minnesota
200 Warren E. Burger Federal Building and United States Courthouse
316 North Robert Street
Saint Paul, Minnesota 55101

2.      Importance of your vote

Your vote is important.  The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that Vote.

Only those Creditors who actually vote are counted for purposes of determining whether a class voted to accept the Plan.  Your failure to vote will leave to others the decision to accept or reject the Plan.

## XIV.   RECOMMENDATION AND CONCLUSION

**THE ARCHDIOCESE HAS EXPLORED VARIOUS ALTERNATIVE SCENARIOS AND BELIEVES THAT THE PLAN ENABLES THE HOLDERS OF CLAIMS TO REALIZE THE MAXIMUM RECOVERY UNDER THE CIRCUMSTANCES.  THE ARCHDIOCESE BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND THAT THE PLAN SHOULD BE CONFIRMED.  THE ARCHDIOCESE STRONGLY RECOMMENDS THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN BY SO INDICATING IN THEIR BALLOTS AND RETURNING THEM AS SPECIFIED IN THE INSTRUCTIONS SET FORTH IN THE SOLICITATION PACKAGES.**

[Remainder of page intentionally left blank]

Signature Page to the First Amended Disclosure Statement for the First Amended Chapter 11
Plan of Reorganization of the Archdiocese of Saint Paul and Minneapolis

Respectfully submitted,

**The Archdiocese of Saint Paul and Minneapolis**

Dated: December 19, 2016

By: /_____
Most Reverend Bernard A. Hebda
Archbishop of Saint Paul and Minneapolis

By: /_____
Thomas J. Mertens
Chief Financial Officer

**Briggs and Morgan, P.A.**

/e/ Richard D. Anderson
Richard D. Anderson (#2306)
Charles B. Rogers (#130588)
Benjamin E. Gurstelle (#0389968)
2200 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 977-8400
Facsimile: (612) 977-8650

Attorneys for the Archdiocese of Saint Paul
and Minneapolis

**LIST OF EXHIBITS**

EXHIBIT A – THE PLAN AND PLAN EXHIBITS [FILED SEPARATELY ON DOCKET]
EXHIBIT B – [PROPOSED] ORDER APPROVING DISCLOSURE STATEMENT [TO BE
SEPARATELY FILED ON DOCKET]
EXHIBIT C – LIQUIDATION ANALYSIS
EXHIBIT D – FINANCIAL PROJECTIONS
EXHIBIT E – 2014 AUDIT AND 2015 UNAUDITED REPORT FOR THE ARCHDIOCESE
EXHIBIT F – POSTPETITION OPERATING RESULTS
EXHIBIT G – ARCHDIOCESE GENERAL LIABILITY INSURANCE POLICIES

**EXHIBIT A
TO
DISCLOSURE STATEMENT**

**Plan of Reorganization**

**[Filed separately on the docket]**

**EXHIBIT B**
**TO**
**DISCLOSURE STATEMENT**

**Order Approving Disclosure Statement**

**[To be filed separately on the docket]**

**EXHIBIT C**
**TO**
**DISCLOSURE STATEMENT**

**Hypothetical Liquidation Analysis**

**NOTES TO LIQUIDATION ANALYSIS**
Archdiocese of Saint Paul and Minneapolis
Estimated Realizable Value Upon Liquidation as of August 31, 2016

**GLOBAL NOTES**

The Debtor, with the assistance of its restructuring professionals, has prepared this hypothetical liquidation analysis in connection with the Disclosure Statement. Section XIII.A of the Disclosure Statement is incorporated herein.

The Debtor believes that the "best interest of creditors" test set forth in § 1129(a)(7) of the Bankruptcy Code does not apply in this Chapter 11 case because the Debtor, as a non-profit organization, cannot be forced into a Chapter 7 liquidation under section 1112(c) of the Bankruptcy Code, nor can creditors file an involuntary petition under section 303 of the Bankruptcy Code. These prohibitions on forcing a nonprofit to liquidate its assets preclude application of the usual best interests of creditors test. Nonetheless, the Debtor believes that the Plan satisfies the "best interest of creditors" test with respect to each impaired class of creditors under the Plan. The Debtor believes that these classes will receive at least as much under the Plan as they would if the Debtor's assets were liquidated in a case under Chapter 7 of the Bankruptcy Code. The Debtor further believes that this liquidation analysis and the conclusions set forth are fair and reasonable and represent management's best judgment regarding the results of a hypothetical liquidation.

The determination of the hypothetical costs and proceeds from the liquidation of assets is an uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtor and its advisors, are inherently subject to significant business, economic, and other uncertainties and contingencies beyond the control of the Debtor. Accordingly, neither the Debtor nor its advisors make any representation or warranty that the actual results of a liquidation of the Archdiocese would approximate the assumptions represented herein. Actual results could vary materially.

The liquidation analysis is based on the Debtor's unaudited and preliminary balance sheet as of March 31, 2016, projections based on the Archdiocese's records, appraisals of the Debtor's real estate and certain personal property, and other information as disclosed in its Schedules and Statement of Financial Affairs, and assumes a hypothetical conversion of the Chapter 11 case to a case under Chapter 7 on August 31, 2016 (the "liquidation date"). It further assumes that all Parishes would stop paying assessments or otherwise providing financial support to the Debtor immediately upon conversion to Chapter 7 and the GIF and AMBP would likewise cease.

The liquidation analysis also assumes an orderly liquidation and wind-down of operations after the liquidation date. During this time the Debtor's remaining assets would be sold, its programs would be terminated and run out, and its operations would be wound-down. While liquidation of some assets may not take much time, other assets are difficult to sell or collect, which may necessitate a much longer liquidation period. Notably, any potential value from the Debtor's

1

liability insurance policies would take an enormous amount of time to realize because individual Tort Claims would have to be litigated and reduced to judgment before coverage issues could then also be litigated in order to obtain funds from insurance carriers. This process could take many years given the number of individual Tort Claims at issue in this case.

The liquidation analysis reflects the estimated cash proceeds, net of estimated liquidation-related costs, that would be realized if the Debtor were to be liquidated through a Chapter 7 process. The liquidation analysis assumes that proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. In a Chapter 7 liquidation, the amount available to unsecured creditors would be reduced by (i) the costs of liquidation, including Chapter 7 trustee fees and expenses, the fees and expenses of other professionals retained by the trustee to assist with liquidation, and asset disposition expenses; and (ii) priority and administrative claims against the bankruptcy estate, including unpaid operating expenses and any accrued and unpaid professional fees allowed in the Chapter 11 case.

The liquidation analysis assumes that proceeds realized from the liquidation of the Debtor's unrestricted assets would be aggregated into a common distribution pool. For purposes of the analysis, each unsecured and non-priority Claim is presumed to be entitled to a distribution from the common pool. The Debtor and its advisors have not evaluated the validity of every Claim. Certain claims may be objected to by the Chapter 7 trustee.

Liquidation under Chapter 7 would trigger certain other events, including the establishment of a new deadline for asserting claims, the termination of the Debtor's participation in benefit and pension plans, and the rejection of remaining executory contracts and unexpired leases. In addition, third-party indemnity and contribution claims relating to sexual abuse litigation may be asserted against the Debtor by certain non-Debtor Catholic entities. If the Plan is confirmed, these third-party indemnity and contribution claims are waived and insurance proceeds and other assets are contributed by third-parties to the Trust solely for the benefit of holders of Tort Claims. In a Chapter 7 liquidation, however, these contribution and indemnity claims are not waived. As such, a hypothetical Chapter 7 estate would likely be subject to considerably more claims than would the Trust under the Plan if confirmed.

## 1. Basis of presentation

To the extent possible, the liquidation analysis reflects the assets and liabilities of the Debtor as shown in its financial statements and books and records. Neither the financial statements, nor the liquidation analysis, purport to represent financial information prepared in accordance with United States Generally Accepted Accounting Principles.

## 2. Causes of action

The liquidation analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing such actions.

The Debtor has investigated and does not believe that it has any colorable avoidable transfer claims worthy of pursuit, especially in light of litigation risks and costs. As part this effort, the

Debtor has investigated potential avoidable transfer claims relating to lease transactions involving the property leased to others described above, and has determined that no viable avoidable transfer claims exist.  The leases entered into with the Cathedral and Benilde-St. Margaret High School are well outside the lookback period for avoidable transfers.  The Archdiocese extended the existing leases with De La Salle High School and Totino Grace High School prior to the petition date within the avoidable transfer lookback period. However, these extensions were made in good faith and in furtherance of the Archdiocese's mission of promoting Catholic education. The Debtor strongly believes that it cannot reasonably pursue an avoidable transfer claim related to any of the leases or lease extensions because it would be unable to prove necessary elements of such a claim including insolvency at the time of the transfers, lack of reasonably equivalent value, and lack of good faith on the part of the transferees.  With respect to reasonably equivalent value provided to the Archdiocese, despite paying nominal rent to the Archdiocese, each of the lessees is responsible under the leases for all costs and expenses related to the use, occupancy or operation of the premises.  The combined annual operations costs for these properties paid by the lessees is in the millions of dollars.  The lessees also pay for all improvements and repairs to the properties. Those costs are in the tens of millions of dollars.  The payment of these costs by the lessees provides enormous value to the Archdiocese and is critical in the furtherance of the Archdiocese's core missions.

Moreover, even if potential avoidable transfer claims existed as related to the properties leased to others, the counterparties to those leases would have enforceable rights and defenses that would negate any potential recovery to the estate based on such claims.  Importantly, the Bankruptcy Code provides that even if a transfer may be avoided, a transferee that takes in good faith and for value is entitled to a lien on the property transferred or may retain any interest transfer to the extent that such transferee gave value in exchange for such transfer, including any obligation incurred.  As a result, even if these leases could be avoided, the counterparties would be entitled to a lien on the land for the value of all improvements made to the land by the counterparties, and, for those properties encumbered by mortgages, the unpaid balance of indebtedness secured by mortgages for such improvements.  Were any of the lease transactions to be avoided, the claims of the lease counterparties could be enormous and could eclipse other claims filed in this case.

Therefore, the Debtor believes that pursuing avoidance claims would ultimately be fruitless and would actually dissipate estate assets because the cost of litigating such claims would be an enormous expense to the estate and would not result in meaningful assets coming into the estate.

### 3.  Asset valuation

Prior to the Petition Date, the Debtor obtained appraisals on certain items of personal property including jewelry, Archbishop's residence furnishings, office equipment and other property in use by the Archdiocese.  The Debtor valued vehicles using the Kelley Blue Book.  The Debtor also obtained a statement of value from its real estate advisor on the remaining unsold parcel of real property not leased to others.

### 4.   Restricted assets

Many of the Debtor's assets are subject to donor-imposed restrictions on use or disposition. The Debtor believes that these restrictions preclude the use of such assets, or proceeds thereof, to satisfy the claims of general creditors of the Debtor. The liquidation analysis assumes that, consistent with section 363(d)(1) of the Bankruptcy Code, the Chapter 7 trustee would abide by any legally enforceable restrictions to which such restricted assets are subject, and would not use restricted assets for general administrative or corporate purposes, or to satisfy the claims of general creditors.

### 5.   Reservation of rights

Estimation of claims in this liquidation analysis is not intended, nor should it be construed, as an admission or acknowledgment of the validity or amount of any Claim or asset. Except as expressly provided in, and further expressly subject to confirmation of, the Plan, the Debtor reserves all rights with respect to all Claims asserted against the Debtor's estate.

## LINE ITEM NOTES

A.      **Unrestricted Cash**.    This amount represents forecasted cash held in Archdiocese accounts as of the hypothetical liquidation date based on the Debtor's latest financial projections. This amount includes all funds held in board-designated accounts as well as the International Priest Fund. This amount does not include the real property sales proceeds ordered to be kept in a segregated account or the projected proceeds from the expected Dayton Property sale. Projected cash balances are valued at 100% for purposes of the liquidation analysis.

B.      **Donor-Restricted Funds**.   The Debtor holds certain restricted cash funds in separate accounts. Donor-restricted funds have been assigned a liquidation value of $0.00 because, as discussed in the global notes, specific donative intent provides that these funds may only be used by the Archdiocese for the purposes outlined by the donors and the Archdiocese is unable to freely dispose of such assets.

C.      **Riley Fund**.   The Plan incorporates a settlement of the dispute concerning ownership of the Riley Fund. Without a Plan, that dispute would likely need to be litigated. The liquidation analysis assumes the same recovery of 50% of the Riley Fund that is achieved in the Plan. The cost of litigation is assumed and included in the section on Chapter 7 professional fees.

D.      **Beneficial Interest In Donor-Restricted Trusts**.   The Debtor receives annual distributions from certain trusts pursuant to trust documents that specify the purposes for which the Archdiocese may use those funds. Like with the Donor-Restricted Funds, the Debtor has assigned a liquidation value of $0.00 to these interests because that donative intent does not permit the Archdiocese to use the funds for any purpose other than set forth in the operative trusts.

E.      **Proceeds From Property Sales**.   The proceeds from the sales of the Archdiocese's real property during the pendency of this case have been maintained in a segregated account pursuant to an order of the Bankruptcy Court. Such funds are inaccessible until further order of the

Bankruptcy Court.  The liquidation analysis assumes that the Bankruptcy Court will allow the liquidation of this account.  The total amount listed also includes the projected net proceeds from the expected sale of the Dayton Property.

F.      **Archdiocese Medical Benefit Plan**.  If the Archdiocese were to liquidate, it would cease to administer the Archdiocese Medical Benefit Plan (AMBP), which would likely result in termination of the AMBP.  Upon termination, a significant amount would be required to pay claims through the effective date of termination, estimated to be 10% of the fund amount. The balance would be the subject of dispute between participants and the Chapter 7 trustee.  In addition, termination likely would give rise to various claims for damages arising out of termination and claims for refunds of premiums previously paid and not used to pay medical and dental expenses.  These claims would not exist in the Chapter 11 case.

G.      **General Insurance Fund**.  If the Archdiocese were to liquidate, it would cease to administer the General Insurance Program, which would likely result in the termination of the GIF.  Upon termination, a significant amount would be required to pay claims through the effective date of termination, estimated to be $900,000. The balance would be the subject of dispute between participants and the Chapter 7 trustee. In addition, termination likely would give rise to various claims for damages arising out of termination and claims for refunds of premiums previously paid and not used to pay claims.  These claims would not exist in the Chapter 11 case. Any amounts remaining in the fund will be used to pay retention requirements for sexual abuse claims.

H.      **Accounts and Loans Receivable**.  The Debtor's accounts receivable comprise outstanding parish assessments, parish loans receivable and other receivables from the priest benefit fund for medical and dental insurance, parish accounting services provided, Catholic Spirit subscriptions and advertising, loans to employees, and program support from the CSAF. The liquidation analysis assumes that receivables for parish assessments would be uncollectable by the chapter 7 trustee because there is no secular legal basis for payment or collection of these amounts.   The other receivables, including the loan receivables, are also assumed to be uncollectable.  With respect to the parish loan receivables, these accounts are very aged and the borrowers are generally assumed to be unable to pay during the liquidation period.  As such, for purposes of this liquidation analysis, accounts receivable are assigned a liquidation value of 0% of their book value.

I.      **Church Of Gitchitwaa Kateri**.  Value based on analysis performed by the Debtor's real estate advisor.  Liquidation value is discounted based on the issues with the property identified in the Disclosure Statement and the quick sale required in a liquidation.

J.      **Property Leased To Others**. As discussed in more detail in the Disclosure Statement, certain real properties owned by the Archdiocese are subject to long-term leases with the Cathedral of Saint Paul, Benilde-Saint Margaret high School, Totino-Grace High School, and De La Salle High School.   These leases, among other reasons, prevent the Archdiocese from realizing any meaningful value from the sale of the properties.  Accordingly, the value of the Archdiocese's interest in such leased real property is estimated to be $0 for purposes of this liquidation analysis.

K.      **Personal Property**. As discussed in more detail in the Disclosure Statement, certain personal property may not realize significant value in a liquidation due to its unique religious nature, its age, or its difficulty to sell.   Office equipment, jewelry, Archbishop residence furnishings, print shop and lawn and garage equipment are valued based on appraisals obtained by the Archdiocese.  Vehicle values are based on the Kelley Blue Book.

L.      **Ausmar, LLC Interest**.  The Archdiocese was included as a beneficiary in a will and received a 25% interest in Ausmar Development Co, LLC, which owns certain real property in Chanhassen, Minnesota.  Based on the estimated taxable market value of the property, the value of the Archdiocese's interest is estimated to be $365,775.  The Archdiocese does not hold a controlling share in Ausmar and the other owners of Ausmar are unable to buy-out the Archdiocese's stake.   As such, the Archdiocese does not believe that this asset has any liquidation value.   However, the Archdiocese has included a liquidation value of 25% in a projected best-case scenario.

M.      **Clarey Mineral Rights**.  The Archdiocese is the beneficiary of a will providing the Archdiocese a nominal interest in certain mineral rights.  The mineral rights are unexplored and the cost of doing so is prohibitive.  The value of this asset is believed to be negligible and the Archdiocese has a booked value for this asset at $340.

N.      **Domeier Restituion**.  The Debtor is the intended recipient of court-ordered restitution from Mr. Domeier.  However, since being ordered the restitution has been wholly uncollectable.  As such, the Debtor assumes a liquidation value of $0 for this item.

O.      **Insurance Settlements**.  The settlements negotiated with Home Insurance, State Farm, and Catholic Mutual Insurance Company are valued for the purpose of the Plan at $33.2 million. In a liquidation, the settlements reached with these insurers would disappear because the settlements are contingent on a confirmed plan of reorganization.  Therefore, the liquidation value of these settlements is $0.  Any recovery under these policies would have to be pursued through litigation in a foreign court, at significant costs, and with speculative prospects of recovery.

P.      **Rights to Insurance Policies**.  The value of the Debtor's interest in liability insurance policies is dependent upon the outcome of negotiations or litigation with the insurance carriers. These issues are discussed at length in the Disclosure Statement.   The precise value of the Debtor's insurance policies vis-a-vis paying Tort Claims is for purposes of this liquidation analysis very difficult to establish and is further subject to debate in the mediation process. Therefore, for the purpose of this liquidation analysis, the Debtor assumes that the potential recovery from insurance policies is the same if such policies are pursued either through the Plan Trust or by a Chapter 7 trustee in a liquidation.

The existence or potential limits of insurance coverage available to pay claims should be the same in a liquidation or non-liquidation context.  The value of the coverage, however, could be significantly diminished in the absence of a viable entity contesting carrier defenses that diminish or void coverage.  Additionally, it would be difficult, if not impossible, to negotiate

6

buy-out settlements with insurance carriers without issuance of the channeling injunction envisioned in the Plan. Thus, all claims and coverage actions would need to be litigated at a cost of millions, if not tens of millions, of dollars over many years. The Chapter 7 trustee would have little or no funding available to pay counsel to defend coverage litigation. This will require retention of coverage counsel on a contingency fee basis. Normal contingency fees in such scenarios may range from 30% to 40% of any recovery plus all expenses incurred.

All of these issues severely diminish the value of coverage for sexual abuse claimants in a liquidation as opposed to a reorganization. Additionally, most sexual abuse claimants will be required to wait many years before receiving insurance recoveries. Litigating over 400 Tort Claims in this manner could take over a decade even assuming that the parties and the court could accommodate 40 claims per year. In the meantime, many claimants may pass away and lose their claims for the benefit of heirs.

Therefore, the net realizable value of the insurance proceeds for creditors is much lower in a Chapter 7 liquidation than if pursued through the Plan Trust.

Q.      **Unpaid Chapter 11 Professional Fees**.  Chapter 11 professional fees include legal, financial advisory, real estate advisory, and accounting fees, for firms retained or expected to be retained, that have been incurred or are projected to be incurred through the assumed liquidation date of August 31, 2016.

R.      **Shutdown Costs And Litigation Support**.  Certain minimum staff would be required and certain corporate functions would need to be retained to oversee the liquidation process. In addition, Archdiocese staff would be necessary to provide testimony and discovery support in litigation, address disputed claims, and assist in insurance and other negotiations.   In the Plan, these services are provided by the Reorganized Debtor without employee cost to the Plan Trust.

S.      **Chapter 7 Trustee Fees**.  Includes those fees associated with the appointment of a chapter 7 trustee in accordance with section 326 of the Bankruptcy Code.  Trustee fees are subject to caps depending on the amount of distributions made, generally at rates between 3% and 5% of the total liquidation value of the Debtor.

T.      **Chapter 7 Professional Fees**.  Includes legal, appraisal, broker, accounting, and auction fees estimated to be incurred during the liquidation period not already deducted from liquidation values.  Up front professional fees are estimated to be $5 million to $10 million for legal and financial professionals and other expenses because significant issues remain and additional significant legal issues would be created by liquidation that would require litigation.  Such issues include litigating individual Tort Claims and insurance coverage disputes, potential litigation relating to the GIF, AMBP, and pension plans, litigation relating to the Riley Fund, and litigation relating to potential claims of the Archdiocese's landlord for breach of its lease.  These issues would not need to be litigated by the Debtor under the Plan.  Liquid assets of the estate would likely be depleted early in the liquidation process for payment of administrative expenses and professional fees.  Trustee professionals will also need to spend a significant amount of time getting up to speed on the myriad difficult issues presented in this case.  Without any settlement agreements or non-Debtor contributions, liquid assets will likely be depleted by the time

insurance coverage litigation could commence. Chapter 7 professionals would thus likely pursue coverage claims on a contingency fee basis. Given the risks involved in such litigation, a contingency fee of 30% to 40%, plus expenses, would be likely. This will further dilute the assets available to unsecured creditors. Counsel for sexual abuse claimants will also receive a contingent fee estimated at 30% to 40% of any ultimate recovery. Thus, in a liquidation scenario, contingent fees related to Tort Claims could be between 60% to 80% of any recovery amount for an individual claimant.

U.    **Landlord Administrative Expense Claim**.  If the Archdiocese liquidated it would be forced to breach its new lease. The landlord would likely assert an administrative expense claim for two years rent. The landlord may also assert additional claims based on the build out undertaken to prepare the office space for the Archdiocese.

V.    **General Insurance Fund and AMBP Claims**.  Many non-Debtor Catholic entities have asserted claims against the General Insurance Fund and the AMBP for over-funding. In the Plan, these are resolved without any monetary payment made to those creditors. In a liquidation, however, those claims would need to be valued and may share in the unsecured asset pool.

W.    **Inter-Parish Loan Fund Claims**.  Certain Parishes have claims against the Archdiocese for amounts contributed to the Archdiocese Inter-Parish Loan Fund. In the Plan, these claims are resolved without any monetary payment made to those creditors through the Plan but with a system of credits to offset the deposits. In a liquidation, however, those claims may share in the unsecured asset pool.

X.    **Pension Claims**.  The Priests' and Lay Employees' pension plans are each underfunded. The trustees of the pension plans have filed claims in the Archdiocese bankruptcy for the full amount of the underfunding in the following amounts: $51,667,612 for the Lay Employees' Pension Plan and $31,611,781 for the Priests' Pension Plan. The trustees of the pension plans assert that the Archdiocese and the other participating non-Debtor Catholic entities are jointly and severally liable for the underfunding of such plans.

Y.    **Trade Vendor and Other Unsecured Claims**.  For purposes of the liquidation analysis, these claims consist of the Debtor's accounts payable as of the Petition Date, less amounts entitled to priority under sections 503(b)(9) and 507(a)(4) of the Bankruptcy Code. Additional claims may be expected due to cessation of operations, but these are not expected to be substantial.

Z.    **Tort Claims**.  Determining the precise value of unsecured Tort Claims is impossible due to the unliquidated nature of sexual abuse claims. As discussed in Line Item Notes O and P the Debtor believes that the value of insurance coverage would be significantly diminished in a liquidation. In any event, the value of uninsured or under insured claims may be an appropriate starting point because the limits of potential coverage does not vary in a reorganization as opposed to a liquidation.

The value of any particular sexual abuse claim varies widely from case to case based on cognizability, the level of abuse, and damages and the Debtor's ability to pay. The lowest per

claim settlement in a bankruptcy setting appears to have occurred in Alaska with a per claim settlement of approximately $35,000.  Nationwide, claimants have sought damages of $1 million to $2 million or far more per claim.

If we apply the Alaska per claim settlement average to the claims in this case, and assume full recovery from carriers based on the Debtor's best case scenario where all coverage defense are determined in the Debtor's favor, the Debtor estimates that underinsured or uninsured claims could be valued at between $2 million to $3 million.  If valuations of $1 million, $2 million or more per claim applied, underinsured or uninsured claims could exceed $100 million.

Under any claim valuation scenario, more value will be available to creditors with a plan of reorganization as opposed to liquidation.

AA.   **Parish Indemnity and Contribution Claims**.  In a hypothetical liquidation, third-party indemnity and contribution claims relating to sexual abuse litigation may be asserted against the Debtor by certain non-Debtor Catholic entities.  If the Plan is confirmed in Chapter 11, these third-party indemnity and contribution claims are waived and insurance proceeds and cash are contributed to the Trust solely for the benefit of holders of Tort Claims.  In a Chapter 7 liquidation, however, these claims are not waived.  Therefore, the Debtor believes that these unsecured claims in a Chapter 7 would be materially greater than the unsecured claims under the Plan.

**Archdiocese of Saint Paul and Minneapolis**
**Exhibit C**
**Liquidation Analysis - Estimated Proceeds, Claims & Distributions**

| | Note | Projected Value at August 31, 2016 | Est. Liquidation Value % | Est. Liquidation Value $ |
|---|---|---|---|---|
| Unrestricted Cash | A | $6,291,394 | 100% | $6,291,394 |
| Donor-Restricted Funds | B | $2,060,285 | 0% | $0 |
| Riley Fund | C | $2,579,461 | 50% | $1,289,731 |
| Beneficial Interest in Donor-Restricted Trusts | D | $1,352,742 | 0% | $0 |
| Proceeds from Property Sales | E | $8,704,720 | 100% | $8,704,720 |
| Archdiocese Medical Benefit Plan | F | $7,794,899 | 74% | $5,801,899 |
| General Insurance Fund | G | $4,056,173 | 78% | $3,156,173 |
| **A. Subtotal - Cash & Investments** | | **$32,839,675** | **77%** | **$25,243,917** |
| Loans Receivable, Net | H | $1,034,217 | 0% | $0 |
| Accounts and Other Receivables, Net | H | $5,768,024 | 0% | $0 |
| **B. Subtotal - Receivables** | | **$6,802,241** | **0%** | **$0** |
| Church of Gichitiwaa Kateri | I | $442,500 | 42% | $185,000 |
| **C. Subtotal - Real Estate** | | **$442,500** | **42%** | **$185,000** |
| Benilde-Saint Margaret High School | J | $0 | 0% | $0 |
| De La Salle High School | J | $0 | 0% | $0 |
| Totino-Grace High School | J | $0 | 0% | $0 |
| Cathedral of Saint Paul | J | $0 | 0% | $0 |
| **D. Subtotal - Property Leased To Others** | | **$0** | **0%** | **$0** |
| Office Equipment | K | $88,095 | 26% | $23,095 |
| Religious Vestments, Jewelry & Relics | K | $363,938 | 100% | $363,938 |
| Other Personal Property | K | $70,735 | 100% | $70,735 |
| Vehicles | K | $54,781 | 100% | $54,781 |
| Ausmar, LLC interest | L | $365,775 | 25% | $91,444 |
| Inventory - Print | K | $27,771 | 10% | $2,777 |
| Mineral Rights | M | $340 | 10% | $34 |
| Prepaids | | 191,570.47 | 50% | 95,877.46 |
| Domeier Restitution | N | $350,525 | 0% | $0 |
| **E. Subtotal - Other Personal Property** | | **$1,513,531** | **46%** | **$702,681** |
| Insurance Settlements | O | $33,200,000 | 0% | $0 |
| Rights to Insurance Policies | P | Unknown | | See note P |
| **F. Subtotal - Insurance** | | **$33,200,000** | **0%** | **$0** |
| Avoidance Actions | 2 | $0 | 0% | $0 |
| **G. Subtotal - Other** | | **$0** | **0%** | **$0** |
| **H. Estimated Cash and Proceeds (F = A+B+C+D+E+F+G)** | | **$74,797,947** | **35%** | **$26,131,598** |
| Unpaid Chapter 11 Professional Fees | Q | $4,200,000 | 100% | $4,200,000 |
| Shutdown costs and litigation support | R | $0 | | $500,000 |
| US Trustee fees | | $14,000 | | $44,000 |
| Chapter 7 Trustee fees | S | $0 | | $3,500,000 |
| Chapter 7 Professional fees | T | $0 | | $10,000,000 |
| I. Subtotal - Chapter 7 Expenses | | $4,214,000 | 433% | $18,244,000 |
| **J. Liquidation Proceeds From Assets (J= H-I)** | | **$70,583,947** | **11%** | **$7,887,598** |
| Premier Bank (Class 10) | | $0 | 0% | $0 |
| **K. Subtotal - Secured Debt Claims** | | **$0** | **0%** | **$0** |
| Administrative Post Petition Accounts Payable Claims | | $570,515 | 100% | $570,515 |
| Other Administrative Claims | | $10,000 | 100% | $10,000 |
| Chancery Corporation Office Landlord Administrative Claim | U | $800,000 | 100% | $800,000 |
| Governmental Unit Claims (Class 2) | | $4,792 | 100% | $4,792 |
| Other Priority Claims (Class 1) | | $0 | 0% | $0 |
| L. Subtotal - Administrative & Priority Claims | | $1,385,307 | 100% | $1,385,307 |
| **M. Funds Available for Unsecured Claims (M= J-K-L)** | | **$69,198,639** | **9%** | **$6,502,291** |

| *Allocaton of Funds Available for Unsecured Claims:* | | Estiamted Claims | Distribution Amount % | Distribution Amount $ |
|---|---|---|---|---|
| General Insurance Fund Claims (Class 3) | G, V | Unknown | | See note V |
| Archdiocese Medical Benefit Plan Claims (Class 3) | F, V | Unknown | | See note V |
| Priest's Pension Plan Claims (Class 4) | X | Unknown | | See note X |
| Layperson's Pension Plan Claims (Class 5) | X | Unknown | | See note X |
| Pending Tort Claims (Class 6) | Z | Unknown | | See note Z |
| Future Tort Claims (Class 7) | Z | Unknown | | See note Z |
| Inter-Parish Loan Fund Claims (Class 8) | W | $679,304 | | See note W |
| Trade Vendors and General Unsecured Creditors Claims (Class 9) | Y | $260,481 | | See note Y |
| Contingent Guaranty Claims (Class 11) | | $0 | | $0 |
| Other Tort Claims and Unsecured Claims (Class 12) | | Unknown | | Unknown |
| Parish Indemnity/Contribution Claims (Class 13) | AA | Unknown | | See note AA |
| Penalty Claims (Class 14) | | $0 | | $0 |
| Priest Support Payment Claims (Class 15) | | $0 | | $0 |
| N. Subtotal - General Unsecured Claims | | $939,785 | 0% | $0 |
| **O. Recovery % on General Unsecured Claims (O = N/M)** | | **Unknown** | | |

**EXHIBIT D**
**TO**
**DISCLOSURE STATEMENT**

**Financial Projections**

**ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**FY 2017-21 NET INCOME FROM OPEATIONS FORECAST**

| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST |
| **OPERATING ACTIVITIES:** | | | | | |
| **REVENUE** | | | | | |
| Assessment Revenue | 14,498,612 | 14,500,000 | 14,500,000 | 14,500,000 | 14,500,000 |
| Gift Income/Restricted Contributions | 50,000 | 75,000 | 100,000 | 125,000 | 150,000 |
| **Total Revenue** | 14,548,611 | 14,575,000 | 14,600,000 | 14,625,000 | 14,650,000 |
| **ADMINISTRATIVE REVENUE** | | | | | |
| Finance | 320,193 | 324,996 | 329,871 | 334,819 | 339,841 |
| Moderator | 14,801 | 15,023 | 15,248 | 15,477 | 15,709 |
| **Total Administrative Revenue** | 334,992 | 340,019 | 345,120 | 350,296 | 355,551 |
| **PROGRAM REVENUE FROM CSAF** | | | | | |
| Clergy Services | 727,142 | 738,049 | 749,120 | 764,102 | 783,205 |
| Parish Services & Outreach | 589,733 | 598,579 | 607,558 | 619,709 | 635,202 |
| Marriage, Family & Life | 381,265 | 386,984 | 392,789 | 400,645 | 410,661 |
| Moderator | 204,163 | 207,225 | 210,334 | 214,541 | 219,904 |
| Evangelzation | 150,000 | 152,250 | 154,534 | 157,624 | 161,565 |
| **Total Program Revenue** | 2,052,303 | 2,083,088 | 2,114,334 | 2,156,621 | 2,210,536 |
| **DEPARTMENTAL REVENUE** | | | | | |
| Clergy Services | 576,360 | 585,005 | 593,780 | 602,687 | 611,727 |
| Catholic Education | 10,700 | 10,861 | 11,023 | 11,189 | 11,357 |
| Parish Services & Outreach | 57,200 | 58,058 | 58,929 | 59,813 | 60,710 |
| Central Services | 1,000 | - | - | - | - |
| Marriage, Family & Life | 459,845 | 466,743 | 473,744 | 480,850 | 488,063 |
| Moderator of the Curia | 109,621 | 111,265 | 112,934 | 114,628 | 116,348 |
| Communications | 726,800 | 737,702 | 748,768 | 759,999 | 771,399 |
| Finance | 522,177 | 530,010 | 537,960 | 546,029 | 554,220 |
| **Total Departmental Revenue** | 2,463,703 | 2,499,644 | 2,537,138 | 2,575,195 | 2,613,823 |
| **Total Revenue** | 19,399,610 | 19,497,750 | 19,596,592 | 19,707,112 | 19,829,910 |
| **PROGRAM EXPENSE** | | | | | |
| Clergy Services | 2,343,812 | 2,378,969 | 2,414,654 | 2,438,800 | 2,463,188 |
| Catholic Education | 613,463 | 622,665 | 632,005 | 638,325 | 644,708 |
| Parish Services & Outreach | 1,438,880 | 1,460,463 | 1,482,370 | 1,497,194 | 1,512,166 |
| Central Services | 3,267,266 | 3,316,275 | 3,366,019 | 3,399,679 | 3,433,676 |
| Marriage & Family Life | 851,022 | 863,787 | 876,744 | 885,512 | 894,367 |
| Development & Stewardship | 440,388 | 446,994 | 453,699 | 458,236 | 462,818 |
| Moderator of the Curia | 3,388,425 | 3,439,251 | 3,490,840 | 3,525,749 | 3,561,006 |
| Communications | 2,069,389 | 2,100,430 | 2,131,936 | 2,153,256 | 2,174,788 |
| Finance and Administration | 2,607,669 | 2,646,784 | 2,686,486 | 2,713,351 | 2,740,484 |
| Evangelzation | 202,151 | 275,183 | 279,311 | 282,104 | 284,925 |
| Priest and Parish Support | 1,105,087 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Total Program Expense** | 18,327,552 | 18,550,802 | 18,814,064 | 18,992,205 | 19,172,127 |
| **OTHER EXPENSE** | | | | | |
| Depreciation | 471,007 | 475,000 | 475,000 | 475,000 | 475,000 |
| **Total Other Expense** | 471,007 | 475,000 | 475,000 | 475,000 | 475,000 |
| **Total Expense** | 18,798,559 | 19,025,802 | 19,289,064 | 19,467,205 | 19,647,127 |
| **Net Income (Loss) From Operations** | 601,051 | 471,948 | 307,528 | 239,908 | 182,783 |

Notes: 1) Excludes professoal fees and other expenses related to Chapter 11 Reorganization estimated at $7.7M for FY 2017.
   2) Assumes that capital expenditures will approximate depreciation expense.
   3) Parish plate and envelope revenue is the key driver of assessment revenue at the Archdiocse. Plate and envelope revenue at the parishes were flat
   from FY 2014 to FY 2015. There is a two year lag in the assessment billing from the financial results at the parishes. FY 2017 assessment revenue
   is based on the parish financials from FY 2015. For purposes of the above five year forecast, we have assume plate and envelpe revenue at the parishes
   to remain flat for the fiscal years 2016 - 2019.

**EXHIBIT E**
**TO**
**DISCLOSURE STATEMENT**

**2015 Unaudited Report and 2014 Audit**

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
SAINT PAUL, MINNESOTA**

**MANAGEMENT DISCUSSION AND ANALYSIS
AND
FINANCIAL STATEMENTS - UNAUDITED**

**YEARS ENDED JUNE 30, 2015 AND 2014**

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**(DEBTOR IN POSSESSION)**
**TABLE OF CONTENTS**
**FINANCIAL STATEMENTS - UNAUDITED**
**YEARS ENDED JUNE 30, 2015 AND 2014**

MANAGEMENT DISCUSSION AND ANALYSIS (MD&A)          3

FINANCIAL STATEMENTS - UNAUDITED

  STATEMENTS OF FINANCIAL POSITION          8

  STATEMENTS OF ACTIVITIES          9

  NOTES TO FINANCIAL STATEMENTS          10

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### (DEBTOR IN POSSESSION)
### M D & A
### JUNE 30, 2015 AND 2014

**Introduction**

At the time of release of financial statements last year, the Archdiocese was facing an unknown number of claims due to the lifting of the civil statute of limitations for sexual abuse of minors until May 2016.   The Archdiocese was considering all options to address this situation and Archdiocesan leaders sought the best path to ensure fairness for victims of clergy sexual abuse and fairness for the faithful whose stewardship has made archdiocesan ministry possible.  Archdiocesan leaders consulted with various representative clergy and lay leadership groups and outside professionals with this decision regarding Reorganization.  Archdiocesan leaders concluded that Reorganization was and is a way to respond to all victims by allowing the available funds to be equitably distributed to all who have made claims, not just those who have the earliest trial dates or settlements.  The process is bringing together the victims, the Archdiocese, parishes, and insurers, to come up with a fair and just settlement for all who have been abused and made claims. In comparison to other diocesan bankruptcies nationally, it's an unprecedented comprehensive process that has all sides working towards the same goal of healing and hope for a better tomorrow.  Further, Reorganization would allow the Archdiocese a fresh start to adhere to reforms made to minimize the threat of this circumstance ever happening again and to continue its service and support of the faithful and the stewardship which makes archdiocesan ministry possible.

Before the Archdiocese filed for Reorganization in January of this year, efforts had already begun to significantly reduce operating expenses and be better stewards of the monies parishes contribute through assessments and other contributions received directly by the Archdiocese every year.  In addition, in order to weather the Reorganization process, conservation of resources would be necessary because much would be consumed as legal and other professionals were engaged in preparing for Reorganization and to assist with negotiating with insurance carriers and plaintiffs counsels.  In November of 2014, the painful and necessary decision to reduce the workforce and non-personnel expenses was made.  These reductions resulted in almost $5 million in expense reductions, which was 20% of the entire annual operating expense budget.  Total Operating Expenses, without Special Issues expenses, decreased from $30.5 million in 2014 to $22.9 million in 2015, a 25% reduction.

After much analysis and consultation, the Archdiocese also made the difficult, but necessary decision to place the Chancery, Archbishop's Residence, Hayden Center, Dayton Building and the Hazelwood property on the market for sale.  These buildings, which are located across from and behind the Cathedral of Saint Paul and in Northfield, are being aggressively marketed for sale by Cushman & Wakefield and a purchase agreement for $4.5 million on the Hayden Center has been signed.  The proceeds from their eventual sales will generate cash with the hope of and desire to help move through Reorganization efficiently.

Due to the fact that the buildings have not yet sold, a new facility, which would be leased, has not been selected. The Archdiocese is committed to find property in an area where the Church's presence can be an integral part of a neighborhood revitalization and renewal effort.  It is anticipated that the annual expenses of leasing office space will be neutral to the current costs of maintaining the existing facilities.

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
## (DEBTOR IN POSSESSION)
## M D & A
## JUNE 30, 2015 AND 2014

It is important to understand that this financial report does not cover parishes, schools, or other Catholic entities within the 12-county area that comprises the Archdiocese of Saint Paul and Minneapolis. All of those organizations are separate legal entities and prepare their own financial accounting reports.

It has been the practice since the year ended June 30, 2013 to release full audited financial report to be transparent and accountable to the many stakeholders among the Catholic faithful. Indeed, almost 65% of the support for the valuable missions comes from parish assessments which are the result of contributions to the local church by parishioners. It is for this reason that Archbishop Hebda, the Archdiocesan Finance Council and staff continue to support full transparency and timely reporting of financial results.

Fiscal Year 2014, which ended June 30, 2014, was the first year the Archdiocese did not receive an unqualified opinion from its CPA firm. The CPA firm issued a disclaimer of opinion and a going concern qualification as a result of the inability of the Archdiocese to provide an estimate of the liability related to ongoing litigation and claims of sexual abuse. At that time, there were pending claims and a significant number of notices of claims, with each claim being unique and requiring factual development to determine the liability, if any, that existed.

As a result of the continued inability to estimate the liability related to sexual abuse claims at June 30, 2015, of which 416 sexual abuse claims were filed by the August 3, 2015 timely filing deadline, the Archdiocese was not able to have an audit of the financial statements for the year ended June 30, 2015. In consultation with the Archdiocesan Finance Council and Corporate Board of Directors, a motion was filed with the Bankruptcy Court, and approval granted, to allow the CPA firm to perform Agreed Upon Procedures on the Fiscal Year 2015. These procedures do not represent an audit and as a result you will not see an Independent Auditor's Report attached to the financial statements. The Agreed Upon Procedures were developed by management in consultation with the CPA firm and will assist in governance of the Archdiocese by requiring attestation procedures on key balance sheet accounts and internal controls. The financial records are submitted on a monthly basis to the Bankruptcy Court and United States Trustee and are subject to their review. When the Archdiocese emerges from Reorganization, it intends to return to the standard practice of annual independent audits and will continue the practice of release promptly after completion of the financial statements and auditor's report.

**Financial Condition**

For the year ended June 30, 2015 (our Fiscal Year 2015), the Archdiocese incurred a loss from operations before Special Issues expenses of $516,542 as compared to a loss from operations before Special Issues expenses of $4,940,448 in FY 2014. The loss from operations in FY 2015 was $5,750,086 and compares favorably to a loss of $9,120,676 for FY 2014. Special Issues expenses were $5,233,544 and $4,180,228 in FY 2015 and FY 2014, respectively. In addition, in Fiscal Year 2014 there was a $4.7 million negative impact to operating activities as a result of two unusual items, of which $1 million was a write-off that did not negatively impact our cash. After adjusting for these two unusual items, the deficits, before Special Issues expense, in FY 2015 and FY 2014 were comparable.

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### (DEBTOR IN POSSESSION)
### M D & A
### JUNE 30, 2015 AND 2014

The Special Issues expense of $5,233,544 incurred by the Archdiocese during FY 2015 related predominately to both legal fees incurred by attorney's representing the Archdiocese in the Reorganization and the Ramsey County charges, as well as legal counsel representing the unsecured creditors committee and the parish committee. Within Reorganization, the Archdiocese is referred to as the "Debtor in Possession" and as such, is responsible for paying all legal fees incurred both by their legal counsel and the legal counsel representing the plaintiffs or victims of sexual abuse. This is generally not the case with the defense of claims in civil law and is unique to Reorganization.

Archdiocesan legal counsel and staff have spent thousands of hours going through clergy files, conducting investigations, and reviewing claims and financial records to assist in the goal of a fair, just and expedient Reorganization. Resources were also spent on working with numerous insurance carriers who issued policies to the Archdiocese over the past seven decades dating back to the late 1940's. Legal counsel and staff are working closely with the insurance carriers to determine coverage for claims and to find equitable settlements for those who were abused. Reviewing and investigating sexual abuse claims against the Archdiocese, which now total 416, is expensive as are the costs of legal notifications in national, regional, state and local publications. Special Issues expenses are substantial, but necessary in order to achieve the goal of obtaining the most resources for those sexually abused by clergy. The Archdiocese clearly recognizes that it cannot sustain this level of spending for Special Issues indefinitely and that is why it is imperative that a fair and just resolution to this Reorganization is negotiated in the near term.

## Revenue

Total Operating Revenue in 2015 was $22,430,660 as compared to $25,525,732 in 2014. The major reason for this decline is a decrease in Investment Income and Contributions, offset by a slight increase in Parish Assessments. The decline in Investment Income is the result of the Archdiocese selling investments prior to filing for Reorganization. U.S. Bankruptcy Court rules required the Archdiocese to sell investments and convert them to cash or low-risk investments such as government backed securities and the decision was made to convert most of the investments to cash.

Parish Assessments, the primary source of revenue, is generated from the 187 parishes within the Archdiocese, increased by 3.4% to $14,246,426 in 2015 from $13,776,682 in 2014. Assessments are calculated and billed on a two-year lag which means the parish financial results for the years ended June 30, 2013 and 2012 formed the basis for the Parish Assessment revenue for the years ended June 30, 2015 and 2014, respectively. Sunday collection revenue at the parishes is the most significant driver of the assessment calculation and increased from2012 to 2013.

## THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
## (DEBTOR IN POSSESSION)
## M D & A
## JUNE 30, 2015 AND 2014

**Operating Expense**

Operating Expense, without Special Issues in 2015 totaled $22,947,202 as compared to $30,466,180 in 2014, a 25% decrease. After adjusting the 2014 Operating Expense for the two unusual items mentioned earlier, Operating Expenses in 2014 were $25,772,538. That almost $2.8 million or 11% decrease is due to the significant expense reductions in program expenses including personnel reductions implemented in November of 2014. On an annual basis, those reductions will equate to almost $5 million and highlights the willingness to make the tough decisions to operate going forward (post-Reorganization) with some surplus which will allow the Archdiocese to build reserves as it is anticipated that little to no liquid assets will be available after emerging from Reorganization.

**Non-Operating Activity - General Insurance Program**

The General Insurance Program of the Archdiocese of Saint Paul and Minneapolis provides comprehensive, uniform coverage to all of the parishes, Catholic schools and certain other Catholic entities within the Archdiocese, as well as the Chancery Corporation. The coverage provided by the General Insurance Program includes commercial general liability and workers' compensation. The General Insurance Program is maintained for the benefit of the participants who have contributed those funds in exchange for obtaining insurance coverage.

The General Insurance Program had a deficit from operations of $972,739 in 2015 as compared to a deficit from operations of $131,124 in 2014. The decrease year over year was due to billing credits effective from January 1, 2014 through June 30, 2014 and a reduction of premiums charged to participating parishes, schools and other Catholic entities from July 1, 2014 through June 30, 2015 because the reserves were larger than required by professionals engaged to determine the appropriate reserve for outstanding and incurred claims.

**Non-Operating Activity - Priest Benefits**

The Archdiocese coordinates a self-insured health and dental benefit fund for active priests and seminarians within the archdiocese. The Archdiocese invoices parishes, Catholic Schools and other Catholic entities based on clergy assignments and pays benefit providers directly for any claims. Priest Benefits generated a slight income in both 2015 and 2014.

**Financial Position**

Net Assets of the Archdiocese were $26,056,959 on June 30, 2015 as compared to $32,540,508 in 2014, a $6,483,549 or 20% decrease as result of the Statement of Activities deficit in 2015. The increase in Cash to $15,304,260 in 2015 from $3,861,917 in 2014 is the result of converting Investments to Cash as required by the U.S. Bankruptcy Court. Of the total Cash on June 30, 2015 of $15,304,260, $8,726,282 represents Unrestricted Cash. The remaining Cash is Board Designated and Restricted. The categories of Board Designated and Restricted and their availability for operations will be determined at a future date by the U.S. Bankruptcy Court.

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
## (DEBTOR IN POSSESSION)
## M D & A
## JUNE 30, 2015 AND 2014

Total Cash and Investments on June 30, 2015 were $16,367,039 compared to a balance on June 30, 2014 of $19,172,616, and decreased by $2,805,577 or 15%, mainly as a result of the cash outlay for Special Issues expenses.

The Litigation Reserve of $4,600,000 did not change from 2014 to 2015 as a result of management's inability to estimate the liability related to ongoing litigation and claims of sexual abuse as each of the 416 claims are unique and require factual development to determine financial exposure.

It is important to understand that the value of the assets and liabilities on the Condensed Statements of Financial Position are not necessarily reflective of the outcome of Reorganization. With the exception of the Litigation Reserve, they are based on Generally Accepted Accounting Principles. Assets, particularly Land, Property and Equipment, are recorded at their net book value which may not reflect their fair market value. Final determination of the value of the assets and liabilities will be at the discretion of the U.S. Bankruptcy Court.

## Looking Forward

Shortly after filing for Reorganization in January of 2015, Judge Robert Kressel ordered the parties into mediation. It is the Archdiocese's plan to continue to work with insurance carriers, victim's counsel, creditors, parishes, and other Catholic entities to obtain a fair and just settlement of victim claims. At that time, the next step would be to file a Plan and Disclosure Statement and obtain Confirmation of a Plan with the U.S. Bankruptcy Court.

Archdiocesan leadership is taking the necessary steps to ensure that the financial situation is resolved fairly and just compensation is received for victims of clergy abuse while honoring the gifts of stewardship of past and present faithful in pursuit of the mission of the Church. This has not changed and has been the goal since this chapter of the Church's history began a few years ago. The focus has been and will continue to be fairness to victims of clergy abuse and adherence to reforms.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
STATEMENTS OF FINANCIAL POSITION - UNAUDITED
JUNE 30, 2015 AND 2014**

|  | 2015 | 2014 |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 15,304,260 | $ 3,861,917 |
| Contributions Receivable | 597,553 | 714,516 |
| Accounts Receivable, Net of Allowances of $4,399,698 and $4,566,032, Respectively | 4,972,445 | 5,542,489 |
| Loans and Notes Receivable, Net of Allowances of $3,486,214 and $3,486,214, Respectively | 1,037,286 | 1,245,775 |
| Investments | 1,062,779 | 15,310,699 |
| Beneficial Interest in Perpetual Trusts | 1,485,029 | 1,551,285 |
| General Insurance Program Assets | 8,963,083 | 10,220,349 |
| Prepaid Expenses and Other Assets | 1,170,449 | 740,954 |
| Land, Property and Equipment, NET | 8,207,566 | 8,978,417 |
| Total Assets | $ 42,800,450 | $ 48,166,401 |
| | | |
| **LIABILITIES AND NET ASSETS** | | |
| Liabilities: | | |
| Accounts Payable and Accrued Liabilities, Pre-Petition | $ 628,257 | $ 4,387,768 |
| Accounts Payable and Accrued Liabilities, Post-Petition | 5,615,681 | - |
| Litigation Claims Payable, Net of Insurance Recovery of $700,000 | 4,600,000 | 4,600,000 |
| General Insurance Program Claims Payable and Other Liabilities | 5,035,301 | 5,240,134 |
| Amounts Held for Others Under Agency Transactions | 122,032 | 119,786 |
| Parish Demand Deposits | 679,304 | 1,209,075 |
| Deferred Revenue | 62,916 | 69,130 |
| Total Liabilities | 16,743,491 | 15,625,893 |
| | | |
| Net Assets: | | |
| Unrestricted | | |
| General Insurance Program | 16,679,871 | 17,651,756 |
| Undesignated | 4,729,647 | 10,219,907 |
| Total Unrestricted | 21,409,518 | 27,871,663 |
| Temporarily Restricted | 2,642,520 | 2,597,668 |
| Permanently Restricted | 2,004,921 | 2,071,177 |
| Total Net Assets | 26,056,959 | 32,540,508 |
| Total Liabilities and Net Assets | $ 42,800,450 | $ 48,166,401 |

*See accompanying Notes to Financial Statements*

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### (DEBTOR IN POSSESSION)
### STATEMENTS OF ACTIVITIES - UNAUDITED
### YEARS ENDED JUNE 30, 2015 AND 2014

|  | 2015 | 2014 |
|---|---|---|
| **Operating Revenues and Gains** | | |
| Contributions | $ 3,117,446 | $ 3,895,992 |
| Parish Assessments | 14,246,426 | 13,776,682 |
| Fees and Program Revenues | 4,465,142 | 4,957,004 |
| Investment Income, Net | 37,233 | 1,607,862 |
| Other Income | 563,561 | 1,288,192 |
| **Total Operating Revenues, Gains and Other Support** | **22,429,808** | **25,525,732** |
| | | |
| **Operating Expenses** | | |
| Program Services | | |
| Catholic Education | 2,393,136 | 4,753,327 |
| Central Services | 5,665,950 | 7,247,153 |
| Clergy Services | 4,984,442 | 5,685,981 |
| Communications | 2,238,271 | 2,676,251 |
| Community Services | 225,000 | 1,534,072 |
| Evangelization & Catechesis | 535,580 | 328,686 |
| Marriage, Family and Life | 888,429 | 1,054,818 |
| Parish Service and Outreach | 1,990,116 | 2,337,966 |
| Total Program Services | 18,920,924 | 25,618,254 |
| | | |
| Support Services | | |
| General and Administrative | 3,415,148 | 3,183,337 |
| Development and Stewardship | 611,132 | 1,664,589 |
| Total Support Services | 4,026,280 | 4,847,926 |
| **Total Operating Expense before Special Issues Expense** | **22,947,204** | **30,466,180** |
| | | |
| **Change In Net Assets from Operations before Special Issues Expense** | (517,396) | (4,940,448) |
| | | |
| **Special Issues Expense** | **5,233,544** | **4,180,228** |
| | | |
| **Change in Net Assets from Operations** | (5,750,940) | (9,120,676) |
| | | |
| **Non-operating Changes in Net Assets** | | |
| General Insurance Program Revenue | 5,674,873 | 6,700,775 |
| General Insurance Program Expenses | (6,646,758) | (6,831,899) |
| Priest Benefits Revenue | 3,050,633 | 3,058,037 |
| Priest Benefits Expense | (2,811,357) | (2,755,324) |
| **Non-operating Change in Net Assets** | (732,609) | 171,589 |
| | | |
| **Change In Net Assets** | $ (6,483,549) | $ (8,949,087) |

*See accompanying Notes to Financial Statements*

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014

## NOTE 1   PETITION FOR RELIEF UNDER CHAPTER 11

On January 16, 2015, the Archdiocese of St Paul and Minneapolis (the "Debtor-in-Possession") (the "Debtor") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court (the "Court") for the District of Minnesota.   Under Chapter 11, certain claims against the Debtor in existence prior to the filing are stayed while the Debtor continues business operations as a Debtor-in-Possession. These claims are reflected on the June 30, 2015 Statement of Financial Position as "Pre-Petition Accounts Payable and Accrued Liabilities" within the liabilities section of the statement.  Additional claims may arise subsequent to the filing date resulting from rejection of executory contracts and a determination by the Court of allowed claims.   A timely filing deadline for the filing of claims of sexual abuse and general creditor claims has been set at August 3, 2015.

The Debtor received permission from the Court to pay or otherwise honor certain of its pre-petition obligations, including the costs of employee wages, benefits and expense reimbursements.

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### The Archdiocese

The Archdiocese of Saint Paul and Minneapolis (the Archdiocese) was first established as a diocese by the Holy See in 1850 (originally Minnesota and the Dakotas), and elevated to archdiocese 38 years later. Now comprising a 12-county area, there are 187 parishes and 90 Catholic schools (including elementary and high schools) within the Archdiocese. The Archdiocese is home to over 825,000 Catholics, including hundreds of clergy and religious sisters and brothers as well as thousands of lay personnel and volunteers who serve in parishes, Catholic schools and in many other ministries within the Archdiocese. The mission of The Archdiocese of Saint Paul and Minneapolis is making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education and ready outreach to the poor and marginalized.

### Nature of Organization

The financial statements include all administrative and program offices and departments of the Chancery Corporation, which serves as the secular arm of the Archdiocese. Under the laws of the State of Minnesota, parishes, their related schools and other separately incorporated and operated Roman Catholic entities within the 12 county area of the Archdiocese are not under the fiscal or operating control of the Chancery Corporation and, therefore, in accordance with accounting principles generally accepted in the United States of America, are not included in the Chancery Corporation's financial statements.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**(DEBTOR IN POSSESSION)**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2015 AND 2014**

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Catholic Services Appeal Foundation

Effective January 1, 2014, an independent 501(c)(3) organization called the Catholic Services Appeal Foundation (CSAF) was established to solicit, collect, hold and distribute all Catholic Services Appeal (CSA) donations for the benefit of a prescribed group of Catholic organizations and Chancery Corporation ministries as outlined in the CSAF by-laws. The Chancery Corporation received contributions from the CSAF to provide for these ministries, including but not limited to Latino Ministry, Evangelization and Catechesis and tuition assistance for students with family need attending Catholic schools within the Archdiocese. See further impact of this within contributions receivable in Note 2.

### Basis of Presentation – Accounting for Net Assets

The financial statements of the Chancery Corporation have been prepared on the accrual basis of accounting.

The Chancery Corporation reports information regarding its financial position and activities according to three classes of net assets: unrestricted net assets, temporarily restricted net assets, and permanently restricted net assets, based on the existence or absence of donor-imposed restrictions. These classes of net assets are summarized as follows:

Unrestricted Net Assets – Accounts for resources that the board has discretion and intention to use in carrying out the Chancery Corporation's operations. The General Insurance Program is maintained for the benefit of parishes and other Catholic entities as well as the Chancery Corporation (the Participants).

Temporarily Restricted Net Assets – Accounts for resources that are limited by donor restrictions as to either time restrictions or purpose restrictions to support certain program activities.

Permanently Restricted Net Assets – Those resources that are limited by donor-imposed stipulations to invest the principal in perpetuity and to expend the income for program activities.

### Programs and Other Activities

The Chancery Corporation accomplishes its mission in the following program areas:

### Catholic Education

The mission of the Office of Catholic Schools is to develop strong partnerships between home and school that fully infuse Catholic teaching and values into every element of the student's educational experience and foster academic excellence. Students are formed to live out the Gospel message, achieve academic excellence, and lead by faith, virtue, and reason. The support provided to the 90 Catholic schools within the Archdiocese includes Catholic identity review and support, leadership development, and programmatic oversight to promote innovation and excellence in local urban Catholic schools. Major responsibilities include identification of the strategic needs of Catholic schools and continuing to serve families in the tradition of excellence Catholic schools have cultivated for more than 160 years.

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Programs and Other Activities (Continued)

#### Catholic Education (Continued)

Effective July 1, 2015, the Office of Catholic Schools has been transformed to the new Office of Mission of Catholic Education. The office has been re-orientated with a view towards the critical questions of Catholic formation and vision. The office works to center Catholic schools in the Archdiocese on what makes them different in the marketplace of school choice: the Catholic formation of the whole person.

#### Central Services

Central Services provides support and services to the Chancery Corporation staff and the parishes. The Department includes: Parish Accounting Service Center; Parish Standards; Metropolitan Tribunal; Records and Archives; Chancellor's Office; IT/Computer Services; Human Resources and Benefits Administration and Printing Services.

#### Clergy Services

Various offices and programs of the Chancery Corporation work to provide personal and ministerial resources as well as formation and ongoing clergy education for priests and deacons to enhance the fruitfulness of their ministries. The Office of Clergy Services helps support clergy assignment at parishes and other institutions, as well as hospital and correctional facility chaplaincies. The Office of Vocations encourages prayerful discernment of call to ordained or religious life. The Saint Paul Seminary provides formation for men preparing for ordination to the priesthood. The Byrne Residence offers housing for retired priests. The Office of Clergy Services also provides oversight of victim advocacy and assistance; abuse prevention efforts, intervention on clergy misconduct, support of the work of the Clergy Review Board to ensure prompt and thorough review of clergy misconduct allegations, the Promotion of Ministerial Standards program to ensure that all priests and deacons uphold the standards expected of Catholic clergy, and are provided appropriate support for their spiritual, physical, and mental well-being.

#### Communications

The mission of the Office of Communications is to communicate the spiritual messages and theological teachings of the Church as articulated through the Archbishop and his auxiliary bishops. The Office of Communications is also charged with ensuring effective ongoing two-way communications between the Chancery Corporation offices and the many audiences they serve. Office of Communications staff produce *The Catholic Spirit* newspaper every other week, assist with other diocese's newspapers, send the bi-weekly Archdiocesan Update electronic newsletter to 1,500 parish and Catholic school leaders, and manage nearly 20 web sites, blogs and social media sites.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Programs and Other Activities (Continued)

#### Community Services

Through the work of offices of the Chancery Corporation and our support of community partners, we help men, women, and children most in need, including the hungry and homeless, as well as immigrants, the elderly, those with disabilities and others with special needs.

#### Marriage, Family and Life

The mission of the Office of Marriage, Family and Life is to assist and encourage all Christians to fulfill their call to holiness. This office promotes a culture of life through programs that support the vocation of marriage, the single state and outreach to youth and young adults. Programs and advocacy efforts include marriage enrichment, marriage preparation, Early Catholic Family Life and other family outreach, respect life and prolife groups, bio-medical ethics and outreach for persons with disabilities. In addition, Archdiocesan Youth Day, World Youth Day, National Catholic Youth Conference and other youth events are coordinated through the staffing and support of the department. In all, the office sponsors or collaborates on over 50 events and programs annually.

#### Parish Services and Outreach

Several offices and programs offer services to parishes within the Archdiocese, including the Office of Parish Services which encourages a community of sharing and collaboration in parishes and helps parishes learn from one another.

The Office of Latino Ministry serves the large number of Latino Catholics in our community at more than 20 parishes with Spanish language Masses, catechetical offerings and pastoral care. Indian ministry for members of the local Native American community and Deaf Ministry are also supported. Through the generosity of Catholics in the Archdiocese, 65,000 people in Ciudad Guayana, Venezuela are offered access to the sacraments, food and essential services at the Jesucristo Resucitado mission parish. The important work of the Archdiocesan Council of Catholic Women is also supported in this parish service program area.

The Office of Worship supports the liturgical life of the local Church and serves as a resource on liturgical law and practice for pastors and parishes serving within the Archdiocese. The Office coordinates major Archdiocesan liturgical celebrations, and provides catechetical and practical support for the full, conscious and active participation of God's Holy People in the Church's sacramental and liturgical life.

## THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
## (DEBTOR IN POSSESSION)
## NOTES TO FINANCIAL STATEMENTS
## JUNE 30, 2015 AND 2014

### NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

#### Programs and Other Activities (Continued)

##### Special Issues

Special Issues represent expenses incurred by the Chancery Corporation through third party professionals during the year ending June 30, 2015 related predominantly to both fees incurred for attorneys representing the Archdiocese in the reorganization and the Ramsey County charges, as well as attorneys representing the unsecured creditors committee and the parish committee. The Debtor-in-Possession is responsible for paying all legal fees incurred for its own legal counsel as well as for legal counsel representing the plaintiffs or victims of sexual abuse, the parish committee, and in connection with the pending mediation and proceedings and activities as required under the bankruptcy code and rules. These professionals have expertise in the areas of legal, investigative, insurance, financial and communications matters. For the fiscal year ended June 30, 2014, the majority of these expenses relate to expenses incurred to review clergy files, investigate insurance coverage and analyze financial options.

##### General Insurance

The Chancery Corporation, both for itself and as the agent for parishes and various other Catholic entities operating within the boundaries of the Archdiocese, participates in the General Insurance Program (the Program). The Program provides comprehensive, uniform coverage for all of the Participants. The coverage includes general liability, employment practices, building and contents, burglary, personal property, student accident, auto, public library, boilers and workers' compensation. The Program pays a premium to the Workers' Compensation Reinsurance Association for stop loss coverage and has a self-insured retention policy for its property and general liability insurance. The Program also participates in the Catholic Umbrella Pool (CUP), which provides extended coverage for liability claims.

##### Priest Benefits

The Archdiocese of St. Paul and Minneapolis coordinates a self-insured health and dental benefit fund for active and retired clergy members and seminarians within the Archdiocese. The Archdiocese invoices other Catholic entities based on clergy assignments and pay benefit providers directly for any claims.

#### Cash

At times throughout the year, cash balances may exceed amounts insured by the Federal Deposit Insurance Corporation.

#### Contributions Receivable

Unconditional promises to give that are expected to be collected within one year are recorded as contributions receivable at net realizable value. Unconditional promises to give that are expected to be collected in future years are recorded at the present value of their estimated future cash flows. Conditional promises to give are not included as support until the conditions are substantially met.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

### NOTE 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**Contributions Receivable (Continued)**

Included within support receivables at June 30, 2015 and 2014 are contributions and reimbursable expenses receivable from Catholic Services Appeal Foundation of $231,778 and $348,741, respectively.

**Accounts Receivable**

Accounts receivable are due from parishes and other Catholic entities and are non-interest bearing, unsecured and due currently. Credit terms for payment of assessments, insurance and other billings are extended to the borrowers in the normal course of operations, and no collateral is required. Approximately 66% and 59% of the outstanding receivables from parishes and other related entities is attributable to eleven parishes at June 30, 2015 and 2014, respectively. A portion of the parish assessments will be repaid over a period of several years. The aging of these receivables, as well as any extended payment terms, are factored into the allowance for doubtful accounts. Accounts receivable are written off and charged to the allowance only under extraordinary circumstances and write-offs must be approved by the Archbishop or Apostolic Administrator. Because of the inherent uncertainties in estimating the allowance for doubtful accounts, it is at least reasonably possible that the estimates used will change within the near term. Approximately 68% and 58% of total accounts receivable is due from parish assessments at June 30, 2015 and 2014, respectively.

**Loans and Notes Receivable**

Loans are due from parishes and other Catholic entities and represent outstanding demand notes (although, generally paid on a long-term basis). Loans receivable are recorded at their net realizable values, net of an allowance for doubtful accounts, where applicable. The Chancery Corporation also grants loans to related Catholic entities operating within the boundaries of the Archdiocese either directly or through its loan fund. Interest is charged on these loans at variable rates. For certain loans, the Chancery Corporation imputes interest and recognizes that interest as contributed income and expense. Interest on impaired loans is generally recognized according to the terms of the notes and the provision for doubtful loans may be increased each year by the amount of the interest income recognized. No collateral is available for these loans.

The Chancery Corporation provides for an allowance for doubtful loans, and bases its estimate of the allowance on a variety of factors including the current status of the receivables, collection experience and the financial condition of the borrower. Loans and notes receivable are written off and charged to the allowance only under extraordinary circumstances and write-offs must be approved by the Archbishop or Apostolic Administrator.

Notes receivable are recorded at their net realizable value. Based on the historical collection experience and the current status of these receivables, the Chancery Corporation is of the belief that these accounts are fully collectible and, therefore, an allowance for doubtful accounts for these receivables is not necessary.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

## NOTE 2  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Investments

Investments are measured at fair value. Investments in perpetual trust assets held at The Catholic Community Foundation of Minnesota (CCF), are pooled with other organizations' funds and invested in diversified portfolios of marketable equity and fixed income securities, as well as limited marketability investments. Such assets held at CCF are reported at fair value/estimated fair value as reported to the Chancery Corporation by CCF. The Chancery Corporation's remaining interest in perpetual trust assets held at a bank is reported based on the fair value of the underlying trust assets.

Realized and unrealized gains and losses on investments are recorded in the statement of activities based upon the existence or absence of donor-imposed restrictions.

In general, investments are exposed to various risks, such as interest rate, credit, and overall market volatility risk. Due to the level of risk associated with certain investments, it is reasonably possible that changes in the values of the investments will occur in the near term and that such changes could materially affect the amounts reported in the statement of financial position.

### Land, Property and Equipment

Land, property and equipment are recorded at their net book value and are not necessarily reflective of an outcome of bankruptcy. Depreciation is recorded over the estimated useful lives of the assets using the straight-line method. Maintenance and repairs are expensed as incurred; major improvements and betterments are capitalized according to the Archdiocesan capitalization policy.

### Parish Demand Deposits

The Chancery Corporation serves as a fiduciary to a fund for the benefit of parishes with excess funds. The purpose of the fund is to allow these parishes to deposit such excess funds for the administrative ease of these parishes. Participation in the fund is at the complete discretion of each parish. Parish demand deposits represent amounts held on deposit with the Chancery Corporation. No interest accrues on the balances. The deposit balances are unsecured claims within the bankruptcy.

### Contributions and Revenue Recognition

The Chancery Corporation reports gifts of cash and other assets as restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported as net assets released from restrictions in the statement of activities.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**(DEBTOR IN POSSESSION)**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2015 AND 2014**

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Contributions and Revenue Recognition (Continued)

The Chancery Corporation reports gifts of land, buildings, and equipment as unrestricted support unless explicit donor stipulations specify how the donated assets must be used. Gifts of long-lived assets with explicit restrictions that specify how the assets are to be used and gifts of cash or other assets that must be used to acquire long-lived assets are reported as restricted support. Absent explicit donor stipulations about how long those long-lived assets must be maintained, the Chancery Corporation reports expirations of donor restrictions when the donated or acquired long-lived assets are placed in service.

Assessments, fees and program revenue are recognized throughout the year as earned. These revenues are treated as earned when billed. Program revenue received for services to be provided in a future period are recorded as deferred revenue at the time of receipt and earned when the services are delivered.

### Expense Allocation

Occupancy expenses are charged to programs and supporting services on the basis of estimated space used in each building. Certain general and administrative costs are allocated to programs based on an analysis of time.

### Accounting Estimates

Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles. Those estimates and assumptions affect the reported amounts of assets, liabilities and net assets, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. Significant management estimates include the allowance for uncollectible loans and accounts receivable, the estimate of depreciable lives of property and equipment, workers' compensation claims payable, other contingency losses, such as the estimates for litigation and environmental remediation and guarantees on debt contingencies, and the allocation of expenses on a functional basis. Actual results could differ from those estimates and estimates may change during the near term.

### Pension and Medical Benefit Plans

The Chancery Corporation contributes to the Pension Plan for Priests and to the Pension Plan for Lay Employees of the Chancery Corporation, parishes and Catholic schools, and certain other Catholic entities within the Archdiocese. These contributions include normal costs, and an amount to amortize the unfunded past service liabilities of the plans. The actuarial present values of accumulated plan benefits and net assets available for benefits are not available at the individual organization level. The plans are multiple-employer, defined benefit plans and cover substantially all priests and most full-time lay employees of participating employers operating within the boundaries of the Archdiocese.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

## NOTE 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Pension and Medical Benefit Plans (Continued)

Benefits for full-time lay employees under the Pension Plan for Lay Employees were frozen January 31, 2011.   The Chancery Corporation contributes to the Archdiocesan Medical Benefit Plan, which is a multiple-employer plan providing medical, dental and other flexible benefits to the participating employer's participating employees. The Plan is a self-insured plan with stop-loss protection. In the event the Plan is terminated and all obligations to the insurers providing group benefits and to the beneficiaries of the Plan have been satisfied any remaining trust funds shall be distributed to the Chancery Corporation and the Trust shall terminate. The Plan's Trustees have no plans to terminate the Plan.

### Income Taxes

The Chancery Corporation is exempt from Federal and state income taxes under provisions of Section 501(c)(3) of the Internal Revenue Code, and similar state statutes.

The Chancery Corporation has evaluated whether it has any significant tax uncertainties that would require recognition or disclosure. Primarily due to the exempt status, the Chancery Corporation does not have any significant tax uncertainties that would require recognition or disclosure.

### Reclassifications

Certain reclassifications have been made to the prior year financial statements to conform to the current year presentation. These reclassifications had no effects on the change in net assets or total net assets as previously reported.

## NOTE 3   LOANS RECEIVABLE

Loans receivable consist of loans and interest receivable from parishes net of an allowance for doubtful loans.   Net loans receivable balances were $1,015,047 and $1,057,415 as of June 30, 2015 and 2014, respectively. Approximately 90% and 86% of the total principal and interest outstanding balance was due from three related organizations for the years ended June 30, 2015 and 2014, respectively.

## NOTE 4   INVESTMENTS

Unrestricted investments were liquidated in January 2015 as required by the United States Trustee as a part of the reorganization process.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

## NOTE 5   BENEFICIAL INTEREST IN PERPETUAL TRUSTS

The Chancery Corporation is the sole income beneficiary in three irrevocable perpetual trusts, the assets of which are not in the possession of the Chancery Corporation and for which the Chancery Corporation is not the trustee. The values of these trusts totaled $1,485,029 and $1,551,285 at June 30, 2015 and 2014, respectively. These trusts were established with specific donor intent for restricted purposes. The assets recorded on the statement of financial position represent the estimated present values of future cash flows from the trusts, which are assumed to equal the fair value of the underlying trust investments. The Chancery Corporation has legally enforceable rights and claims to distributions from the trusts but not to the underlying assets themselves and receives income distributions based on the funds' income after certain trust expenses. These income distributions are restricted for specific purposes: the Saint Paul Seminary support, support for physically disabled priests, and housing for elderly members of the Christian Brothers religious order.

## NOTE 6   LAND, PROPERTY AND EQUIPMENT

Land, property and equipment consisted of the following at June 30:

| | Life in Years | 2015 | 2014 |
|---|---|---|---|
| Land | | $            - | $      16,701 |
| Building | 20 - 400 | 18,817,811 | 18,724,472 |
| Furniture, Equipment and Software | 3 - 10 | 5,622,277 | 5,423,057 |
| Vehicles | 3 - 5 | 151,458 | 151,458 |
| Leasehold Imporvements | *See Below | 848,532 | 848,532 |
| Right to Use Asset | *See Below | 1,721,613 | 1,721,613 |
| | | 27,161,691 | 26,885,833 |
| Less: Accumulated Depreciation | | (18,954,125) | (17,907,416) |
| Net Land, Property and Equipment | | $   8,207,566 | $   8,978,417 |

Certain facilities owned by the Chancery Corporation are utilized and subject to third-party mortgages.  The Chancery Corporation has a lease agreement with the Cathedral of Saint Paul Parish with a base rent of $1 per year. The lease agreement matures in May 2021 and has a renewal option for an additional 20 years.

The Chancery Corporation has a long-term lease agreement with the University of St. Thomas for the rent free use of the Byrne Residence property. The lease agreement matures in 2094 and automatically renews for 25-year terms unless the Chancery Corporation provides a cancellation notice 2 year prior to the expiration of the lease.

In addition, the Chancery Corporation leases land to three Catholic high schools within the Archdiocese for $1 per year.  The leases have terms of 20-30 years which expire on December 31, 2025, June 30, 2030 and June 30, 2038.

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### (DEBTOR IN POSSESSION)
### NOTES TO FINANCIAL STATEMENTS
### JUNE 30, 2015 AND 2014

## NOTE 7    GENERAL INSURANCE PROGRAM

Summary financial information for the General Insurance Program for the fiscal years ended June 30 is as follows:

|  | | 2015 | | 2014 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Cash & Equivalents | $ | 2,941,726 | $ | 7,985,279 |
| Investment - Work Comp Pledge | | 3,871,158 | | - |
| Premiums Receivable, Net of Allowance of $2,137,801 | | | | |
| and $2,151,056 in 2015 and 2014, Respectively | | 1,256,473 | | 1,113,881 |
| CUP Capital Contribution | | 587,230 | | 1,015,847 |
| Other Assets | | 306,496 | | 105,342 |
| Subtotal | | 8,963,083 | | 10,220,349 |
| Funds Provided to Chancery Corporation General | | | | |
| Operating Funds | | 12,819,175 | | 12,819,175 |
| Total Assets | $ | 21,782,258 | $ | 23,039,524 |
| | | | | |
| **LIABILITIES AND NET ASSETS** | | | | |
| Accounts Payable, Pre-Petition | $ | - | $ | 147,067 |
| Accounts Payable, Post-Petition | | 262,111 | | - |
| Deferred Revenues | | - | | 156,326 |
| Insurance Claims Payable | | 4,773,190 | | 4,936,741 |
| Subtotal | | 5,035,301 | | 5,240,134 |
| Due to the Chancery Corporation | | 67,086 | | 147,634 |
| Total Liabilities | | 5,102,387 | | 5,387,768 |
| | | | | |
| Unrestricted Net Assets of the Participants | | 16,679,871 | | 17,651,756 |
| | | | | |
| Total Liabilities and Net Assets | $ | 21,782,258 | $ | 23,039,524 |
| | | | | |
| **CHANGE IN NET ASSETS** | | | | |
| Total Premium and Other Revenue | | 5,674,873 | | 6,700,775 |
| Total Claims Expense and Operating Costs | | (6,646,758) | | (6,831,899) |
| Increase/(Decrease) in General Insurance Program | | | | |
| Net Assets | $ | (971,885) | $ | (131,124) |

The Funds Provided to Chancery Corporation General Operating Funds does not appear on the statements of financial position because it is eliminated against the corresponding payable by the Chancery Corporation.

Insurance claims payable includes unpaid estimated property claim costs up to the general insurance program's aggregate retention, unpaid estimated workers' compensation claim costs up to the stop loss limit, and an estimate for claims incurred but not reported. Claims liability estimates and assumptions are periodically reviewed and updated with any resulting adjustments to claim liabilities reflected in current operating results.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
(DEBTOR IN POSSESSION)
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2015 AND 2014**

## NOTE 7   GENERAL INSURANCE PROGRAM (CONTINUED)

The Chancery Corporation had a letter of credit of $3,846,684 for the self-insured workers' compensation program for the year ended June 30, 2014. The letter of credit was secured by marketable securities. On September 30, 2014, the Chancery Corporation entered into a custodial agreement with the Minnesota Department of Commerce, directly, pledging general insurance fund assets for the self-insured workers' compensation program. At June 30, 2015 the balance of the investment was $3,871,158.  At June 30, 2015 and 2014, approximately 81% and 77% of the General Insurance Program's gross premiums receivable was due from six participants, respectively.

Total expenses paid to Catholic Mutual, which processed claims on a contractual basis during the years ended June 30, 2015 and 2014 for the program premiums were $2,713,714 and $2,652,285, respectively.

## NOTE 8   AMOUNTS HELD FOR OTHERS UNDER AGENCY TRANSACTIONS

Amounts held for others under agency transactions consist of charitable collection accounts and funds held for others totaling $122,032 and 119,786 as of June 30, 2015 and 2014, respectively.

## NOTE 9   NET ASSETS

Temporarily restricted net assets are available for the following purposes at June 30:

|  | | 2015 | | 2014 |
|---|---|---|---|---|
| Clergy Services | $ | 2,110,730 | $ | 2,087,356 |
| Catholic Education | | 270,530 | | 291,992 |
| Parish Services | | 14,298 | | 11,769 |
| Marriage, Family and Life | | 246,962 | | 206,551 |
| Total | $ | 2,642,520 | $ | 2,597,668 |

Permanently restricted net assets are available for the following purposes at June 30:

|  | | 2015 | | 2014 |
|---|---|---|---|---|
| Clergy Services | $ | 1,999,621 | $ | 2,065,877 |
| Other | | 5,300 | | 5,300 |
|  | $ | 2,004,921 | $ | 2,071,177 |

## NOTE 10   ENDOWMENT FUNDS

The Chancery Corporation's endowment consists of donor-restricted endowment funds established for a variety of purposes. As required by generally accepted accounting principles, net assets associated with endowment funds, are classified and reported based on the existence or absence of donor imposed restrictions.  The Chancery Corporation receives distributions from these endowments each year based on the spending policies of the financial institution where these endowment funds are held.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**(DEBTOR IN POSSESSION)**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2015 AND 2014**

## NOTE 11   PENSION AND MEDICAL BENEFIT PLANS

Chancery Corporation contributions to benefit plans were as follows for the years ended June 30:

|  | 2015 | 2014 |
|---|---|---|
| Pension Plan for Lay Employees | 269,013 | 273,072 |
| Pension Plan for Priests | 777,984 | 702,119 |
| Archdiocesan Medical Benefit Plan | 1,385,462 | 1,482,788 |
| Total | 2,432,459 | 2,457,979 |

**Pension Plans**

Effective January 31, 2011, the Pension Plan for Lay Employees (Lay Pension Plan) was frozen. Due to the frozen status of the plan, active plan participants are no longer earning benefits, are no longer accruing additional credited years of service, and pension benefits upon participant retirement will be based upon the participant's credited years of service and salary history as of January 31, 2011. Participants in the plan who were not vested as of the freeze date will continue to earn vesting service after January 31, 2011, for each year in which they work in a full time capacity until these participants become fully vested by reaching five years of full time service. Employees who terminate with five or more years of credited service are generally entitled to annual pension benefits as defined by the Lay Employee Plan. Pension benefits are based primarily on years of service and final average earnings calculated as the average of the employee's five highest earning years.

The Pension Plan for Priests (Priest Pension Plan) covers substantially all incardinated priests, or those beginning the process of incardination established by the Chancery Corporation or one of the participating employers. Priest retirement benefits are computed in accordance with the plan document which can be changed by the trustees of the plan. Pension benefits are calculated primarily based on age at the date of retirement through 65 and years of service, not to exceed 40. Active participants who become totally and permanently disabled receive disability benefits computed as though they had been employed to normal retirement age. The board of trustees has the discretionary authority to pay the cost of medical and dental insurance for participants who retire or become disabled.

The risks of participating in these multiple-employer plans are shared with the other employers participating in the plans. Because this is a multiple-employer plan, valuation information is not available specific to each individual or participating employer. The Chancery Corporation's contribution to the Lay Pension Plan is a fixed amount based on a percentage of qualified salaries and the contribution to the Priest Pension Plan are a fixed amount per priest established by the trustees of the Priest Pension Plan.  The Chancery Corporation is authorized to continue programs during pendency of bankruptcy case.

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### (DEBTOR IN POSSESSION)
### NOTES TO FINANCIAL STATEMENTS
### JUNE 30, 2015 AND 2014

## NOTE 12  CONTINGENCIES AND COMMITMENTS

### Cathedral of Saint Paul

In 2001, the Cathedral of Saint Paul Parish (the Parish) took out a loan for improvements to the Cathedral property that the Parish leases and which the Chancery Corporation owns. The Chancery Corporation allowed the property to be mortgaged at that time. In August 2011, the Parish loan was refinanced to an interest only loan with principal due at maturity in August 2016. The amount outstanding on this loan was approximately $4,516,396 and $4,771,000 at June 30, 2015 and 2014, respectively.

### Asbestos Containing Materials

A survey of Chancery Corporation buildings was done in 2007 by an environment consulting firm which identified the presence of asbestos containing materials (ACM's). Management's current obligation with respect to the presence of the ACMs is primarily that of monitoring and maintenance. If there is renovation or repair work necessary that disturbs the asbestos, then special removal techniques must be utilized.

Management has determined that an asset retirement obligation related to the presence of ACMs cannot be reasonably determined at this time because insufficient information is available in that both the method of retirement and the expected dates of such retirement cannot be estimated.

## NOTE 13  LITIGATION CONTINGENCIES

As of June 30, 2013 litigation claims payable related to sexual abuse was $4,600,000, net of insurance recovery. The amount of the litigation claims payable was based on the minimum amount of the range as no amount within the range was a better estimate of an outcome. The Chancery Corporation had no practical means to determine the likelihood of outcome for amounts above that which would be more likely than any other outcome. No amounts were accrued for unknown claims as losses were not able to be reasonably determined. The amounts recorded were management's estimates and were not intended to be indicative of the actual legal outcomes of the individual cases.

Subsequent to June 30, 2013, the number of claims increased and formal Notices of Claims tendered were substantial. Management believed that additional claims would be filed prior to the closing of the statute of limitations in May of 2016. At that time, it was not possible to predict the likely outcome or disposition of the prior year, current year and unknown future claims. Due to the uniqueness of each claim, the degrees of sexual abuse, and the age of some of the claims, an estimate of the financial exposure of the Chancery Corporation could not be made. For that reason, management did not increase the litigation claims payable at June 30, 2014 and 2015.

Subsequent to June 30, 2015, the timely claims filing deadline of August 3, 2015 resulted in the filing of 416 claims of sexual abuse.  Discussion and negotiation of the claims are a part of the mediation process and it is impossible to predict the likely outcome or disposition of the claims.  It is management's opinion that in the aggregate they will be material.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**SAINT PAUL, MINNESOTA**

**FINANCIAL STATEMENTS**

**YEARS ENDED JUNE 30, 2014 AND 2013**

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**TABLE OF CONTENTS**
**YEARS ENDED JUNE 30, 2014 AND 2013**

**INDEPENDENT AUDITORS' REPORT**                                    **1**

**FINANCIAL STATEMENTS**

   **STATEMENTS OF FINANCIAL POSITION**                          **3**

   **STATEMENTS OF ACTIVITIES**                                  **4**

   **STATEMENTS OF CASH FLOWS**                                  **5**

   **NOTES TO FINANCIAL STATEMENTS**                             **6**



CliftonLarsonAllen LLP
CLAconnect.com

## INDEPENDENT AUDITORS' REPORT

Board of Directors
The Archdiocese of Saint Paul and Minneapolis
Chancery Corporation
Saint Paul, Minnesota

We were engaged to audit the accompanying financial statements of The Archdiocese of Saint Paul and Minneapolis, Chancery Corporation (Chancery Corporation), which comprise the statements of financial position as of June 30, 2014 and 2013, and the related statements of activities and cash flows for the years then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. Because of the matter described in the Basis for Disclaimer of Opinion paragraph, however, we were not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion.

### Basis for Disclaimer of Opinion

The Chancery Corporation, as discussed in Note 13 to the financial statements is involved in several lawsuits and is also aware of a significant number of unfiled claims relating to sexual misconduct by certain members of the clergy. Due to the significant number and varying degrees of severity of the claims, management is unable to establish a reasonable estimate of their potential financial impact. This uncertainty overshadows the financial statements taken as a whole and the probable effect on the financial statements is expected to be material.

### Disclaimer of Opinion

Because of the significance of the litigation matters described in the Basis for Disclaimer of Opinion paragraph, we were unable to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion. Accordingly, we do not express an opinion on the financial statements referred to in the first paragraph.



Board of Directors
The Archdiocese of Saint Paul and Minneapolis
Chancery Corporation

### *Emphasis-of-a-Matter*

*Going Concern and Litigation*

The accompanying financial statements have been prepared assuming that the Chancery Corporation will continue as a going concern. As discussed in Note 13 to the financial statements, the Chancery Corporation has suffered a significant decrease in net assets and there is substantial doubt as to the eventual outcome related to claims and litigation. These conditions raise substantial doubt about the Chancery Corporation's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*CliftonLarsonAllen LLP*

**CliftonLarsonAllen LLP**

Minneapolis, Minnesota
November 17, 2014

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**STATEMENTS OF FINANCIAL POSITION**
**JUNE 30, 2014 AND 2013**

|  | 2014 | 2013 |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 3,861,917 | $ 9,510,724 |
| Contributions Receivable, Net of Allowances of $-0- and | | |
| $227,097, Respectively | 714,516 | 1,824,513 |
| Accounts Receivable, Net of Allowances of $4,566,032 and | | |
| $4,950,999, Respectively | 5,542,489 | 6,918,664 |
| Loans and Notes Receivable, Net of Allowances of $3,486,214 and | | |
| $3,773,672, Respectively | 1,245,775 | 1,387,600 |
| Litigation Insurance Claims Receivable | 700,000 | 700,000 |
| Investments | 15,310,699 | 17,380,741 |
| Beneficial Interest in Perpetual Trusts | 1,551,285 | 1,363,754 |
| General Insurance Program Assets | 10,220,349 | 9,531,198 |
| Prepaid Expenses and Other Assets | 740,954 | 163,003 |
| Land, Property and Equipment, Net | 8,978,417 | 10,521,188 |
| Total Assets | $ 48,866,401 | $ 59,301,385 |
| **LIABILITIES AND NET ASSETS** | | |
| Liabilities: | | |
| Accounts Payable and Accrued Liabilities | $ 4,387,768 | $ 3,059,393 |
| Litigation Claims Payable | 5,300,000 | 5,300,000 |
| General Insurance Program Claims Payable and Other Liabilities | 5,240,134 | 4,567,492 |
| Amounts Held for Others Under Agency Transactions | 119,786 | 1,575,656 |
| Parish Demand Deposits | 1,209,075 | 3,177,535 |
| Deferred Revenue | 69,130 | 131,714 |
| Total Liabilities | 16,325,893 | 17,811,790 |
| Net Assets: | | |
| Unrestricted: | | |
| General Insurance Program | 17,651,756 | 17,782,881 |
| Board Designated | 5,181,047 | 5,181,047 |
| Undesignated | 5,038,860 | 13,813,768 |
| Total Unrestricted | 27,871,663 | 36,777,696 |
| Temporarily Restricted | 2,597,668 | 2,828,253 |
| Permanently Restricted | 2,071,177 | 1,883,646 |
| Total Net Assets | 32,540,508 | 41,489,595 |
| Total Liabilities and Net Assets | $ 48,866,401 | $ 59,301,385 |

*See accompanying Notes to Financial Statements.*

(3)

# THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## CHANCERY CORPORATION
### STATEMENTS OF ACTIVITIES
### YEARS ENDED JUNE 30, 2014 AND 2013

| | June 30, 2014 | | | | June 30, 2013 | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| **OPERATING REVENUE** | | | | | | | | |
| Contributions | $ 2,753,957 | $ 773,985 | $ - | $ 3,527,942 | $ 1,230,369 | $ 2,555,801 | $ - | $ 3,786,170 |
| Catholic Services Appeal, Net of Parish Rebates of $-0- and $2,009,212, Respectively | 368,050 | - | - | 368,050 | 8,109,237 | - | - | 8,109,237 |
| Parish Assessments | 13,776,682 | - | - | 13,776,682 | 14,093,473 | - | - | 14,093,473 |
| Fees and Program Revenues | 4,957,004 | - | - | 4,957,004 | 4,587,813 | - | - | 4,587,813 |
| Investment Income, Net | 1,156,604 | 263,727 | - | 1,420,331 | 184,158 | 166,077 | - | 350,235 |
| Change in Value of Perpetual Trust | - | - | 187,531 | 187,531 | - | - | 109,564 | 109,564 |
| Other Income | 1,288,192 | - | - | 1,288,192 | 1,700,981 | - | - | 1,700,981 |
| Total Operating Revenue | 24,300,489 | 1,037,712 | 187,531 | 25,525,732 | 29,906,031 | 2,721,878 | 109,564 | 32,737,473 |
| Net Assets Released from Restrictions | 1,268,297 | (1,268,297) | | | 2,232,195 | (2,232,195) | | |
| Net Operating Revenue | 25,568,786 | (230,585) | 187,531 | 25,525,732 | 32,138,226 | 489,683 | 109,564 | 32,737,473 |
| **OPERATING EXPENSE** | | | | | | | | |
| Program Services: | | | | | | | | |
| Catholic Education | 4,753,327 | - | - | 4,753,327 | 6,546,710 | - | - | 6,546,710 |
| Central Services | 7,419,381 | - | - | 7,419,381 | 6,155,693 | - | - | 6,155,693 |
| Clergy Services | 5,513,753 | - | - | 5,513,753 | 5,603,961 | - | - | 5,603,961 |
| Communications | 3,004,937 | - | - | 3,004,937 | 3,607,854 | - | - | 3,607,854 |
| Community Services | 1,534,072 | - | - | 1,534,072 | 2,437,927 | - | - | 2,437,927 |
| Marriage, Family and Life | 1,054,818 | - | - | 1,054,818 | 1,249,532 | - | - | 1,249,532 |
| Parish Services and Outreach | 2,337,966 | - | - | 2,337,966 | 2,237,508 | - | - | 2,237,508 |
| Total Program Services | 25,618,254 | - | - | 25,618,254 | 27,839,185 | - | - | 27,839,185 |
| Support Services: | | | | | | | | |
| Litigation Reserve Expense | - | | | - | 3,950,000 | | | 3,950,000 |
| Special Issues | 4,180,228 | | | 4,180,228 | - | | | - |
| General and Administrative | 3,183,337 | | | 3,183,337 | 3,236,200 | | | 3,236,200 |
| Development and Stewardship | 1,664,589 | | | 1,664,589 | 1,580,929 | | | 1,580,929 |
| Total Support Services | 9,028,154 | | | 9,028,154 | 8,767,129 | | | 8,767,129 |
| Total Operating Expense | 34,646,408 | | | 34,646,408 | 36,606,314 | | | 36,606,314 |
| Changes in Net Assets from Operating Activities | (9,077,622) | (230,585) | 187,531 | (9,120,676) | (4,468,088) | 489,683 | 109,564 | (3,868,841) |
| **CHANGES IN NET ASSETS FROM NON-OPERATING ACTIVITIES** | | | | | | | | |
| General Insurance Program Revenue | 6,700,775 | | | 6,700,775 | 8,272,436 | | | 8,272,436 |
| General Insurance Program Expense | (6,831,899) | | | (6,831,899) | (5,844,483) | | | (5,844,483) |
| Priest Benefits Revenue | 3,058,037 | | | 3,058,037 | 2,813,619 | | | 2,813,619 |
| Priest Benefits Expense | (2,755,324) | | | (2,755,324) | (2,816,666) | | | (2,816,666) |
| Changes in Net Assets from Non-Operating Activities | 171,589 | - | - | 171,589 | 2,424,906 | - | - | 2,424,906 |
| **CHANGES IN NET ASSETS** | (8,906,033) | (230,585) | 187,531 | (8,949,087) | (2,043,182) | 489,683 | 109,564 | (1,443,935) |
| Net Assets - Beginning of Year | 36,777,696 | 2,828,253 | 1,883,646 | 41,489,595 | 38,820,878 | 2,338,570 | 1,774,082 | 42,933,530 |
| **NET ASSETS - END OF YEAR** | $ 27,871,663 | $ 2,597,668 | $ 2,071,177 | $ 32,540,508 | $ 36,777,696 | $ 2,828,253 | $ 1,883,646 | $ 41,489,595 |

(4)

*See accompanying Notes to Financial Statements.*

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**STATEMENTS OF CASH FLOWS**
**YEARS ENDED JUNE 30, 2014 AND 2013**

|  | 2014 | 2013 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |
| Change in Net Assets | $ (8,949,087) | $ (1,443,935) |
| Adjustments to Reconcile Change in Net Assets to Net Cash |  |  |
| Provided (Used) by Operating Activities: |  |  |
| Depreciation | 1,197,642 | 1,038,208 |
| Debt Forgiveness and Change in Allowance |  |  |
| for Doubtful Loans and Accounts | (544,043) | (553,262) |
| Loss on Disposal of Equipment | 628,074 | - |
| Net Appreciation on Investments and Reinvested Earnings | (1,543,299) | (334,448) |
| Interest Income Accrued in Loans and Notes Receivable | (56,684) | (149,125) |
| Change in Assets and Liabilities: |  |  |
| Contributions Receivable | 1,337,094 | (333,902) |
| Accounts Receivable | 1,716,085 | 864,323 |
| Litigation Insurance Claims Receivable | - | (700,000) |
| General Insurance Program Assets | (689,151) | (380,729) |
| Prepaid Expenses | (577,951) | 256,058 |
| Accounts Payable and Accrued Liabilities | 1,328,375 | 495,963 |
| Litigation Claims Payable | - | 4,650,000 |
| General Insurance Program Claims Payable and Other Liabilities | 672,642 | 30,360 |
| Amounts Held for Others Under Agency Transactions | (1,455,870) | (35,693) |
| Deferred Revenue | (62,584) | 129,079 |
| Net Cash Provided (Used) by Operating Activities | (6,998,757) | 3,532,897 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |
| Repayment of Loans and Notes Receivable | 175,545 | 977,329 |
| Disbursements for Loans and Notes Receivable | - | (27,250) |
| Proceeds from Sale of Investments | 3,425,810 | 108,810 |
| Purchase of Property and Equipment | (282,945) | (1,254,420) |
| Net Cash Provided (Used) by Investing Activities | 3,318,410 | (195,531) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |
| Net Withdrawals of Parish Demand Deposits | (1,968,460) | (493,428) |
| **NET INCREASE (DECREASE) IN CASH** | (5,648,807) | 2,843,938 |
| Cash - Beginning of Year | 9,510,724 | 6,666,786 |
| **CASH - END OF YEAR** | $ 3,861,917 | $ 9,510,724 |

*See accompanying Notes to Financial Statements.*

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013

NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### The Archdiocese

The Archdiocese of Saint Paul and Minneapolis (the Archdiocese) was first established as a diocese by the Holy See in 1850 (originally Minnesota and the Dakotas), and elevated to archdiocese 38 years later. Now comprising a 12 county area, there are 187 parishes and 90 Catholic schools (including elementary and high schools) within the Archdiocese. The Archdiocese is home to over 825,000 Catholics, including hundreds of clergy and religious sisters and brothers as well as thousands of lay personnel and volunteers who serve in parishes, Catholic schools and in many other ministries within the Archdiocese. The mission of The Archdiocese of Saint Paul and Minneapolis is making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education and ready outreach to the poor and marginalized.

### Nature of Organization

The financial statements include all administrative and program offices and departments of the Corporation named The Archdiocese of Saint Paul and Minneapolis Chancery Corporation (Chancery Corporation). Under the laws of the State of Minnesota, parishes, their related schools and other separately incorporated and operated Roman Catholic entities within the 12 county area of the Archdiocese are not under the fiscal or operating control of the Chancery Corporation and, therefore, in accordance with accounting principles generally accepted in the United States of America, are not included in the Chancery Corporation's financial statements.

### Related Parties

The Chancery Corporation shares some common directors who serve as a minority on many other Catholic organization boards within the Archdiocese. Given these interrelationships, the majority of transactions with Catholic organizations including parishes, seminaries and other religious organizations are with related parties.

### Catholic Services Appeal Foundation

Effective January 1, 2014, an independent 501(c)(3) organization called the Catholic Services Appeal Foundation (CSAF) was established to solicit, collect, hold and distribute all Catholic Services Appeal (CSA) donations for the benefit of a prescribed group of Catholic organizations and Chancery Corporation ministries as outlined in the CSAF by-laws. For this reason, contributions received for the 2014 CSA campaign are not included in the Chancery Corporation statements for the year ended June 30, 2014. Reductions in revenue and expenses related to this change resulted in a net overall negative financial impact of approximately $3.7 million for the year ended June 30, 2014 compared to the year ended June 30, 2013. The Chancery Corporation received contributions from the CSAF to provide for these ministries, including but not limited to Latino Ministry, Evangelization and Catechesis and tuition assistance for students with family need attending Catholic schools within the Archdiocese. See further impact of this within contributions receivable in Note 1.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Basis of Presentation – Accounting for Net Assets**

The financial statements of the Chancery Corporation have been prepared on the accrual basis of accounting.

The Chancery Corporation reports information regarding its financial position and activities according to three classes of net assets: unrestricted net assets, temporarily restricted net assets, and permanently restricted net assets, based on the existence or absence of donor-imposed restrictions. These classes of net assets are summarized as follows:

Unrestricted Net Assets – Accounts for resources that the board has discretion and intention to use in carrying out the Chancery Corporation's operations. The General Insurance Program is a trust consisting of funds that are held for parishes and other Catholic entities as well as the Chancery Corporation (the Participants).

Temporarily Restricted Net Assets – Accounts for resources that are limited by donor restrictions as to either time restrictions or purpose restrictions to support certain program activities.

Permanently Restricted Net Assets – Those resources that are limited by donor-imposed stipulations to invest the principal in perpetuity and to expend the income for program activities.

**Programs and Other Activities**

The Chancery Corporation accomplishes its mission in the following program areas:

**Catholic Education**

The mission of the Office of Catholic Schools is to develop strong partnerships between home and school that fully infuse Catholic teaching and values into every element of the student's educational experience and foster academic excellence. Students are formed to live out the Gospel message, achieve academic excellence, and lead by faith, virtue, and reason. The support provided to the 90 Catholic schools within the Archdiocese includes Catholic identity review and support, leadership development, and programmatic oversight to promote innovation and excellence in local urban Catholic schools. Major responsibilities include identification of the strategic needs of Catholic schools and continuing to serve families in the tradition of excellence Catholic schools have cultivated for more than 160 years.

**Central Services**

Central Services provides support and services to the Chancery Corporation staff and the parishes. The Department includes: Victim Advocacy and Assistance; Parish Accounting Service Center; Parish Standards; Metropolitan Tribunal; Records and Archives; Chancellor's Office; IT/Computer Services; Human Resources and Benefits Administration and Printing Services.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

### Programs and Other Activities (Continued)

#### Clergy Services

Various offices and programs of the Chancery Corporation work to provide personal and ministerial resources for priests and deacons to enhance the fruitfulness of their ministries. The Center for Clergy Formation provides an integrated approach to priestly and diaconal formation and ongoing clergy education. The Office of Clergy Services helps support clergy assignment at parishes and other institutions, as well as hospital and correctional facility chaplaincies. The Office of Vocations encourages prayerful discernment of call to ordained or religious life. The Saint Paul Seminary provides formation for men preparing for ordination to the priesthood. The Byrne Residence offers housing for retired priests. This program area also provides oversight of abuse prevention efforts, intervention on clergy misconduct, support of the work of the Clergy Review Board to ensure prompt and thorough review of clergy misconduct allegations, the Promotion of Ministerial Standards program to ensure that all priests and deacons uphold the standards expected of Catholic clergy, and are provided appropriate support for their spiritual, physical, and mental well-being.

#### Communications

The mission of the Office of Communications is to communicate the spiritual messages and theological teachings of the Church as articulated through the Archbishop and his auxiliary bishops. The Office of Communications is also charged with ensuring effective ongoing two-way communications between the Chancery Corporation offices and the many audiences they serve. Office of Communications staff produce *The Catholic Spirit* newspaper every other week, assist with other diocese's newspapers, send the bi-weekly Archdiocesan Update electronic newsletter to 1,500 parish and Catholic school leaders, and manage nearly 20 web sites, blogs and social media sites. *The Catholic Spirit* became a program of the Chancery Corporation effective July 1, 2013.

#### Community Services

Through the work of offices of the Chancery Corporation and our support of community partners, we help men, women, and children most in need, including the hungry and homeless, as well as immigrants, the elderly, those with disabilities and others with special needs.

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

### Programs and Other Activities (Continued)

#### Marriage, Family and Life

The mission of the Office of Marriage, Family and Life is to assist and encourage all Christians to fulfill their call to holiness. Pope John Paul II and the documents of Second Vatican Council call the laity to transform the world where they live. Our office promotes a culture of life through programs that support the vocation of marriage, the single state and outreach to youth and young adults. Programs and advocacy efforts include marriage enrichment, marriage preparation, Early Catholic Family Life and other family outreach, respect life and prolife groups, bio-medical ethics and outreach for persons with disabilities. In addition, Archdiocesan Youth Day, World Youth Day, National Catholic Youth Conference and other youth events are coordinated through the staffing and support of the department. In all, the office sponsors or collaborates on over 50 events and programs annually.

#### Parish Services and Outreach

Several offices and programs offer services to parishes within the Archdiocese, including the Office of Parish Services which encourages a community of sharing and collaboration in parishes and helps parishes learn from one another.

The Office of Latino Ministry serves the large number of Latino Catholics in our community at more than 20 parishes with Spanish language Masses, catechetical offerings and pastoral care. Indian ministry for members of the local Native American community and Deaf Ministry are also supported. Through the generosity of Catholics in the Archdiocese, 65,000 people in Ciudad Guayana, Venezuela are offered access to the sacraments, food and essential services at the Jesucristo Resucitado mission parish. The important work of the Archdiocesan Council of Catholic Women is also supported in this parish service program area.

The Office of Worship supports the liturgical life of the local Church and serves as a resource on liturgical law and practice for pastors and parishes serving within the Archdiocese. The Office coordinates major Archdiocesan liturgical celebrations, and provides catechetical and practical support for the full, conscious and active participation of God's Holy People in the Church's sacramental and liturgical life.

#### Special Issues

Special Issues represent expenses incurred by the Chancery Corporation through third party professionals during the year ending June 30, 2014 related specifically to addressing issues from the lifting of the statute of limitations on sexual misconduct. These professionals had expertise in the areas of legal, investigative, insurance, and financial and communications matters. The majority of these expenses relate to expenses incurred to review priest files, investigate insurance coverage and analyze financial options.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

### Programs and Other Activities (Continued)

#### General Insurance

The Chancery Corporation, both for itself and as the agent for parishes and various other Catholic entities operating within the boundaries of the Archdiocese, participates in the General Insurance Program (the Program). The Program is a trust, of which the Chancery Corporation is the Trustee and provides comprehensive, uniform coverage for all of the Participants. The net assets of the Program are held for the benefit of the Participants as the Participants have contributed such funds in exchange for obtaining insurance coverage. The coverage includes general liability, employment practices, building and contents, burglary, personal property, student accident, auto, public library, boilers and workers' compensation. The Program pays a premium to the Workers' Compensation Reinsurance Association for stop loss coverage and has a self-insured retention policy for its property and general liability insurance. The Program also participates in the Catholic Umbrella Pool (CUP), which provides extended coverage for liability claims.

#### Priest Benefits

The Archdiocese of St. Paul and Minneapolis coordinates a self-insured health and dental benefit fund for active and retired clergy members and seminarians within the Archdiocese. The Archdiocese invoices other Catholic entities based on clergy assignments and pay benefit providers directly for any claims.

### Cash

At times throughout the year, cash balances may exceed amounts insured by the Federal Deposit Insurance Corporation.

### Contributions Receivable

Unconditional promises to give that are expected to be collected within one year are recorded as contributions receivable at net realizable value. Unconditional promises to give that are expected to be collected in future years are recorded at the present value of their estimated future cash flows. Conditional promises to give are not included as support until the conditions are substantially met. The Chancery Corporation provides an allowance for estimated uncollectible contributions.

Prior to January 1, 2014, The Chancery Corporation managed the annual Catholic Services Appeal and revenue was recognized when a CSA pledge was received, net of a rebate allocated to parishes. CSA contributions were raised for the benefit of a prescribed group of Catholic organizations and Chancery Corporation ministries as outlined in campaign materials. Effective January 1, 2014 the Catholic Services Appeal Foundation was established as a separately governed and managed corporation to collect, hold, and distribute all Catholic Services Appeal (CSA) donations for the benefit of the prescribed group of Catholic organizations and Chancery Corporation ministries.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Contributions Receivable (Continued)**

At June 30, 2013, contributions receivable and amounts held for others under agency transactions included net activity of the Catholic Services Appeal which are no longer applicable at June 30, 2014. Included within support receivables at June 30, 2014 are contributions and reimbursable expenses receivable from CSAF of $348,741.

**Accounts Receivable**

Accounts receivable are due from parishes and other Catholic entities and are non-interest bearing, unsecured and due currently. Approximately 59% and 63% of the outstanding receivables from parishes and other related entities is attributable to eleven and thirteen parishes at June 30, 2014 and 2013, respectively. A portion of the parish assessments will be repaid over a period of several years. The aging of these receivables, as well as any extended payment terms, are factored into the allowance for doubtful accounts. Because of the inherent uncertainties in estimating the allowance for doubtful accounts, it is at least reasonably possible that the estimates used will change within the near term. Approximately 58% and 64% of total accounts receivable is due from parish assessments at June 30, 2014 and 2013, respectively.

**Loans and Notes Receivable**

Loans receivable are due from parishes and other Catholic entities and represent outstanding demand notes (although, generally paid on a long-term basis). Loans receivable are recorded at their net realizable values, net of an allowance for doubtful accounts, where applicable. Credit terms for payment of assessments, insurance and other billings are extended to the borrowers in the normal course of operations, and no collateral is required. The Chancery Corporation also grants loans to related Catholic entities operating within the boundaries of the Archdiocese either directly or through its loan fund. Interest is charged on these loans at variable rates. For certain loans, the Chancery Corporation imputes interest and recognizes that interest as contributed income and expense. Interest on impaired loans is generally recognized according to the terms of the notes and the provision for doubtful loans and accounts may be increased each year by the amount of the interest income recognized. No collateral is available for these loans.

The Chancery Corporation provides for an allowance for doubtful loans and accounts receivable, and bases its estimate of the allowance on a variety of factors including the current status of the receivables, collection experience and the financial condition of the borrower. Loans and other receivables are written off and charged to the allowance only under extraordinary circumstances and write-offs must be approved by the Archbishop.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Loans and Notes Receivable (Continued)**

Notes receivable are recorded at their net realizable value. Based on the historical collection experience and the current status of these receivables, the Chancery Corporation is of the belief that these accounts are fully collectible and, therefore, an allowance for doubtful accounts for these receivables is not necessary.

**Investments**

Investments are measured at fair value on a recurring basis using the lowest level input available in the fair value hierarchy except money market funds which are carried at deposit value. Marketable securities and mutual funds are recorded at fair value, based on quoted values. Some investments and perpetual trust assets held at The Catholic Community Foundation of Minnesota (CCF), are pooled with other organizations' funds and invested in diversified portfolios of marketable equity and fixed income securities, as well as limited marketability investments. Such assets held at CCF are reported at fair value/estimated fair value as reported to the Chancery Corporation by CCF. The Chancery Corporation's remaining interest in perpetual trust assets held at a bank is reported based on the fair value of the underlying trust assets.

Realized and unrealized gains and losses on investments are recorded in the statement of activities based upon the existence or absence of donor-imposed restrictions.

In general, investments are exposed to various risks, such as interest rate, credit, and overall market volatility risk. Due to the level of risk associated with certain investments, it is reasonably possible that changes in the values of the investments will occur in the near term and that such changes could materially affect the amounts reported in the statement of financial position.

**Fair Value**

The Chancery Corporation's accounting for fair value measurements of assets and liabilities that are recognized or disclosed at fair value in the financial statements on a recurring or nonrecurring basis adhere to the Financial Accounting Standards Board (FASB) fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to measurements involving significant unobservable inputs (Level 3 measurements).

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013

NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**Fair Value (Continued)**

The three levels of the fair value hierarchy are as follows:

*Level 1* – Inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the Chancery Corporation has the ability to access at the measurement date.

*Level 2* – Inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly.

*Level 3* – Inputs are unobservable inputs for the asset or liability.

The level in the fair value hierarchy within which a fair measurement in its entirety falls is based on the lowest level input that is significant to the fair value measurement in its entirety. The Chancery Corporation uses valuation techniques in a consistent manner from year-to-year.

**Land, Property and Equipment**

Land, property and equipment are stated at cost for purchased items or at fair value at the date of receipt, in the case of donated items. Depreciation is recorded over the estimated useful lives of the assets using the straight-line method. Maintenance and repairs are expensed as incurred; major improvements and betterments are capitalized according to the Archdiocesan capitalization policy.

**Parish Demand Deposits**

The Chancery Corporation serves as a fiduciary to a fund for the benefit of parishes with excess funds. The purpose of the fund is to allow these parishes to deposit such excess funds for the administrative ease of these parishes. Participation in the fund is at the complete discretion of each parish. Parish demand deposits represent amounts held on deposit with the Chancery Corporation. Interest accrues on the balances at an annual rate of 0.8% at the beginning of each quarter. The deposit balances are payable on demand and are unsecured.

**Contributions and Revenue Recognition**

The Chancery Corporation reports gifts of cash and other assets as restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported as net assets released from restrictions in the statement of activities.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Contributions and Revenue Recognition (Continued)

The Chancery Corporation reports gifts of land, buildings, and equipment as unrestricted support unless explicit donor stipulations specify how the donated assets must be used. Gifts of long-lived assets with explicit restrictions that specify how the assets are to be used and gifts of cash or other assets that must be used to acquire long-lived assets are reported as restricted support. Absent explicit donor stipulations about how long those long-lived assets must be maintained, the Chancery Corporation reports expirations of donor restrictions when the donated or acquired long-lived assets are placed in service.

Assessments, fees and program revenue are recognized throughout the year as earned. These revenues are treated as earned when billed. Program revenue received for services to be provided in a future period are recorded as deferred revenue at the time of receipt and earned when the services are delivered.

### Contributed Services

The Chancery Corporation recognizes contributed services at their estimated fair value if the services have value to the Chancery Corporation and require specialized skills that would have been purchased if not provided by contributors. No contributed services were recognized during fiscal years 2014 or 2013.

### Expense Allocation

Occupancy expenses are charged to programs and supporting services on the basis of estimated space used in each building. Certain general and administrative costs are allocated to programs based on an analysis of time.

### Accounting Estimates

Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles. Those estimates and assumptions affect the reported amounts of assets, liabilities and net assets, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. Significant management estimates include the allowance for uncollectible Catholic Services Appeal pledges, the allowance for uncollectible loans and accounts receivable, the estimate of depreciable lives of property and equipment, workers' compensation claims payable, other contingency losses, such as the estimates for litigation and environmental remediation and guarantees on debt contingencies, and the allocation of expenses on a functional basis. Actual results could differ from those estimates and estimates may change during the near term.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Pension and Medical Benefit Plans**

The Chancery Corporation contributes to the Pension Plan for Priests and to the Pension Plan for Lay Employees of the Chancery Corporation, parishes and Catholic schools, and certain other Catholic entities within the Archdiocese. These contributions include normal costs, and an amount to amortize the unfunded past service liabilities of the plans. The actuarial present values of accumulated plan benefits and net assets available for benefits are not available at the individual organization level. The plans are multiple-employer, defined benefit plans and cover substantially all priests and most full-time lay employees of participating employers operating within the boundaries of the Archdiocese. Benefits for full-time lay employees under the Pension Plan for Lay Employees were frozen January 31, 2011.

The Chancery Corporation contributes to the Archdiocesan Medical Benefit Plan, which is a multiple-employer plan providing medical, dental and other flexible benefits to the participating employer's participating employees. The Plan is a self-insured plan with stop-loss protection. In the event the Plan is terminated and all obligations to the insurers providing group benefits and to the beneficiaries of the Plan have been satisfied any remaining trust funds shall be distributed to the Chancery Corporation and the Trust shall terminate. The Plan's Trustees have no plans to terminate the Plan.

**Income Taxes**

The Chancery Corporation is exempt from Federal and state income taxes under provisions of Section 501(c)(3) of the Internal Revenue Code, and similar state statutes.

The Chancery Corporation has evaluated whether it has any significant tax uncertainties that would require recognition or disclosure. Primarily due to the exempt status, the Chancery Corporation does not have any significant tax uncertainties that would require recognition or disclosure.

**Reclassifications**

Certain reclassifications have been made to the prior year financial statements to conform to the current year presentation. These reclassifications had no effects on the change in net assets or total net assets as previously reported. The reclassification within Note 6 separated a right to use asset from leasehold improvements.

**Subsequent Events**

The Chancery Corporation has evaluated subsequent events through November 17, 2014, the date which the financial statements were available to be issued.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013**

**NOTE 2    LOANS AND NOTES RECEIVABLE**

Loans receivable are summarized as follows as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Loans and Interest from Parishes | $    4,543,629 | $    4,803,444 |
| Other Loans Receivable | 147,973 | 147,973 |
| Notes Receivable | 40,387 | 209,855 |
|  | 4,731,989 | 5,161,272 |
| Less: Allowance for Doubtful Loans | (3,486,214) | (3,773,672) |
| Total Loans, Net | $    1,245,775 | $    1,387,600 |

Approximately 86% and 81% of the total principal and interest outstanding balance was due from three related organizations for the years ended June 30, 2014 and 2013, respectively.

**NOTE 3    INVESTMENTS**

The fair value and composition of investments at June 30 are as follows:

|  | 2014 | 2013 |
|---|---|---|
| Mutual Funds - Fixed Income | $    12,137,627 | $    14,678,199 |
| Mutual Funds - Large Cap | 77,531 | 61,723 |
| Money Market Mutual Funds | 34,689 | 11,279 |
| Investments held at CCF | 3,060,852 | 2,629,540 |
| Total | $    15,310,699 | $    17,380,741 |

Investments are used as follows as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Donor Restricted Endowment Investments | $    1,367,058 | $    1,229,282 |
| Board Designated Endowment Investments | 3,808,419 | 3,596,923 |
| Other Investments | 10,135,222 | 12,554,536 |
| Total | $    15,310,699 | $    17,380,741 |

At June 30, 2014 and 2013, investments totaling $5,900,000 and $4,118,612, respectively, were pledged as collateral for a letter of credit (Note 7).

Investment returns on all investments of the Chancery Corporation were as follows for the years ended June 30:

|  | 2014 | 2013 |
|---|---|---|
| Interest Income and Dividends | $    480,566 | $    407,020 |
| Unrealized and Realized Gains (Losses) | 939,765 | (56,785) |
| Investment Income, Net | $    1,420,331 | $    350,235 |

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 3    INVESTMENTS (CONTINUED)**

The Chancery Corporation is the beneficiary of certain General Seminary Endowment and Catholic Services Appeal funds owned by CCF which are restricted solely for the purpose of seminary education and Catholic Services Appeal approved ministries and operations. CCF retains variance power over these funds and can redirect the distribution of these assets at the discretion of its board.

Additionally, the Chancery Corporation owns and invests funds that are managed by CCF which are restricted for the benefit of Catholic school tuition assistance and other Catholic school support.

Investments held at CCF are carried at fair value and consisted of the following at June 30:

|  | 2014 | 2013 |
|---|---|---|
| General Seminary Endowment | $ 1,036,429 | $ 901,360 |
| Catholic Services Appeal | 547,638 | 475,928 |
| Scholarships and Other | 1,476,785 | 1,252,252 |
| Total | $ 3,060,852 | $ 2,629,540 |

The following is the approximate fund allocation at June 30 of investments held at CCF:

|  | 2014 | 2013 |
|---|---|---|
| Cash and Cash Equivalents | 3 % | 8 % |
| Corporate Bonds | 16 | 13 |
| Corporate Stocks | 64 | 56 |
| Alternative Investments | 17 | 23 |
| Total | 100 % | 100 % |

**NOTE 4    BENEFICIAL INTEREST IN PERPETUAL TRUSTS**

The Chancery Corporation is the sole income beneficiary in three irrevocable perpetual trusts, the assets of which are not in the possession of the Chancery Corporation and for which the Chancery Corporation is not the trustee. The values of these trusts totaled $1,551,285 and $1,363,754 at June 30, 2014 and 2013, respectively. These trusts were established with specific donor intent for restricted purposes. The assets recorded on the statement of financial position represent the estimated present value of future cash flows from the trusts, which is assumed to equal the fair value of the underlying trust investments. The Chancery Corporation has legally enforceable rights and claims to distributions from the trusts but not to the underlying assets themselves and receives income distributions based on the funds' income after certain trust expenses. These income distributions are restricted for specific purposes: the Saint Paul Seminary support, support for physically disabled priests, and housing for elderly members of the Christian Brothers religious order.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 5   FAIR VALUE**

The following table sets forth the balances of assets by level, within the fair value hierarchy, carried at fair value as of June 30, 2014:

| | June 30, 2014 | | | |
| | Fair Value Measurement Using | | | Fair Value |
| | Level 1 | Level 2 | Level 3 | Amount |
|---|---|---|---|---|
| Assets: | | | | |
| Investments: | | | | |
| Mutual Funds - Fixed Income | $ 12,137,627 | $        - | $        - | $ 12,137,627 |
| Mutual Funds - Large Cap | 77,531 | - | - | 77,531 |
| Investments Held at CCF | - | - | 3,060,852 | 3,060,852 |
| Beneficial Interest in Perpetual Trusts | - | - | 1,551,285 | 1,551,285 |
| Total | $ 12,215,158 | $        - | $ 4,612,137 | $ 16,827,295 |

The following table sets forth the balances of assets by level, within the fair value hierarchy, carried at fair value as of June 30, 2013:

| | June 30, 2013 | | | |
| | Fair Value Measurement Using | | | Fair Value |
| | Level 1 | Level 2 | Level 3 | Amount |
|---|---|---|---|---|
| Assets: | | | | |
| Investments: | | | | |
| Core Plus Bond Fund, LLC | $ 14,678,199 | $        - | $        - | $ 14,678,199 |
| Mutual Funds - Large Cap | 61,723 | - | - | 61,723 |
| Investments Held at CCF | - | - | 2,629,540 | 2,629,540 |
| Beneficial Interest in Perpetual Trusts | - | - | 1,363,754 | 1,363,754 |
| Total | $ 14,739,922 | $        - | $ 3,993,294 | $ 18,733,216 |

Money market mutual funds of $34,689 and $11,279 at June 30, 2014 and 2013, respectively, are carried at deposit value and are excluded from the fair value hierarchy presented above.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 5    FAIR VALUE (CONTINUED)**

The reconciliation of beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3) are as follows:

|  | Investments Held at CCF | Beneficial Interest in Perpetual Trusts |
|---|---|---|
| Beginning Balance, July 1, 2012 | $ 2,376,783 | $ 1,254,190 |
| Realized Gains | 99,231 | 39,243 |
| Unrealized Losses | 205,675 | 126,665 |
| Investment Income | 33,263 | 18,217 |
| Commissions and Fees | (26,686) | (18,919) |
| Distributions | (58,726) | (55,642) |
| Ending Balance, June 30, 2013 | 2,629,540 | 1,363,754 |
| Realized Gains | 114,934 | 87,971 |
| Unrealized Gains | 366,501 | 159,478 |
| Investment Income | 32,433 | 19,391 |
| Commissions and Fees | (26,616) | (24,278) |
| Contributions | - | - |
| Distributions | (55,940) | (55,031) |
| Ending Balance, June 30, 2014 | $ 3,060,852 | $ 1,551,285 |

The fair values of investments held at or managed by CCF, perpetual trusts held at CCF, and remainder trusts are based on the Chancery Corporation's interest in the fair value/estimated fair value of the underlying assets as reported to the Chancery Corporation by CCF or the trustee and are reported as Level 3 investments. A substantial portion of the underlying assets of CCF are measured at fair value using Level 1 and 2 inputs. The fair value of the Chancery Corporation's beneficial interest in the perpetual trust held by the bank is based on the underlying trust assets held by the perpetual trust. A substantial portion of these underlying trust assets are measured using Level 1 inputs.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 6    LAND, PROPERTY AND EQUIPMENT**

Land, property and equipment consisted of the following at June 30:

| | Life in Years | 2014 | 2013 |
|---|---|---|---|
| Land | | $        16,701 | $        16,701 |
| Building | 20 - 400 | 18,724,472 | 18,651,454 |
| Furniture, Equipment and Software | 3 - 10 | 5,423,057 | 5,967,867 |
| Vehicles | 3 - 5 | 151,458 | 188,179 |
| Leasehold Improvements | *See Below | 848,532 | 848,532 |
| Right to Use Asset | *See Below | 1,721,613 | 1,721,613 |
| | | 26,885,833 | 27,394,346 |
| Less: Accumulated Depreciation | | (17,907,416) | (16,873,158) |
| Net Land, Property and Equipment | | $   8,978,417 | $  10,521,188 |

Certain facilities owned by the Chancery Corporation are utilized and subject to third-party mortgages. The Chancery Corporation has a lease agreement with the Cathedral of Saint Paul Parish with a base rent of $1 per year. The lease agreement matures in May 2021 and has a renewal option for an additional 20 years.

The Chancery Corporation has a long-term lease agreement with the University of St. Thomas for the rent free use of the Byrne Residence property. The lease agreement matures in 2094 and automatically renews for 25-year terms unless the Chancery Corporation provides a cancellation notice 2 year prior to the expiration of the lease.

In addition, the Chancery Corporation leases land to three Catholic high schools within the Archdiocese for $1 per year. These leases have terms of 20-30 years which expire on December 31, 2025, June 30, 2030 and June 30, 2038.  The Chancery Corporation has imputed a fair value rent subsidy of $540,000 in both 2014 and 2013. These amounts are included in other income and Catholic education expenses in the statement of activities.

The organizations utilizing these facilities directly incur all costs of utilities, insurance, repairs, maintenance, and improvements and pay no further lease payments to the Chancery Corporation. In addition, these leases are contingent upon the organizations continual use of the property for their respective intended purposes as Catholic institutions. The Chancery Corporation continues support of such lease agreements because they assist in fulfillment of our mission to make the name of Jesus Christ known and loved.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 7    GENERAL INSURANCE PROGRAM**

Summary financial information for the General Insurance Program for the fiscal years ended June 30 is as follows:

|  | 2014 | 2013 |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 7,985,279 | $ 7,470,722 |
| Premiums Receivable, Net of Allowance of $2,151,056 and $2,196,113 in 2014 and 2013, Respectively | 1,113,881 | 1,129,909 |
| Catholic Umbrella Pool Deposits | 1,015,847 | 857,661 |
| Other Assets | 105,342 | 72,906 |
| Subtotal | 10,220,349 | 9,531,198 |
| Funds Provided to Chancery Corporation General Operating Funds | 12,819,175 | 12,819,175 |
| Total Assets | $ 23,039,524 | $ 22,350,373 |
| **LIABILITIES AND NET ASSETS** | | |
| Accounts Payable | $ 147,067 | $ 82,727 |
| Deferred Revenue | 156,326 | - |
| Insurance Claims Payable | 4,936,741 | 4,484,765 |
| Subtotal | 5,240,134 | 4,567,492 |
| Due to the Chancery Corporation | 147,634 | - |
| Total Liabilities | 5,387,768 | 4,567,492 |
| Unrestricted Net Assets of the Participants | 17,651,756 | 17,782,881 |
| Total Liabilities and Net Assets | $ 23,039,524 | $ 22,350,373 |
| **CHANGE IN NET ASSETS** | | |
| Total Premium and Other Revenue | $ 6,700,775 | $ 8,272,436 |
| Total Claims Expense and Operating Costs | (6,831,899) | (5,844,483) |
| Increase in General Insurance Program Net Assets | $ (131,124) | $ 2,427,953 |

The Funds Provided to Chancery Corporation General Operating Funds does not appear on the statements of financial position because it is eliminated against the corresponding payable by the Chancery Corporation. As of July 1, 2014 a corporate resolution was passed establishing a repayment plan.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 7    GENERAL INSURANCE PROGRAM (CONTINUED)**

Insurance claims payable includes unpaid estimated property claim costs up to the general insurance program's aggregate retention, unpaid estimated workers' compensation claim costs up to the stop loss limit, and an estimate for claims incurred but not reported. Claims liability estimates and assumptions are periodically reviewed and updated with any resulting adjustments to claim liabilities reflected in current operating results.

The activity within insurance claims payable for the years ended June 30, 2014 and 2013 were as follows:

|                            | 2014        | 2013        |
|----------------------------|------------:|------------:|
| Balance at Beginning of Year | $  4,484,765 | $  4,537,132 |
| Claims Incurred            | 2,650,890   | 2,317,088   |
| Claims Paid                | (2,198,914) | (2,369,455) |
| Balance at End of Year     | $  4,936,741 | $  4,484,765 |

The Chancery Corporation had a letter of credit of $4,118,612 for the self-insured workers' compensation program for the year ended June 30, 2013. The letter of credit were secured by marketable securities. In August 2013, the Chancery Corporation extended the letter of credit of $4,118,612 until November 2013. In November 2013 the Chancery Corporation reduced the letter of credit to $3,846,684 and extended it until August 2014 but pledged $5,900,000 of collateral with investments (See Note 3). Subsequent to year-end, the letter of credit was extended to September 30, 2014.

As of September 30, 2014, the letter of credit expired and the Chancery Corporation entered into a custodial agreement with the Minnesota Department of Commerce, directly, pledging $3,846,684 of general insurance fund assets for the self insured workers' compensation program.

At June 30, 2014 and 2013, approximately 81% and 77% of the General Insurance Program's gross premiums receivable was due from six participants, respectively.

Total expenses paid to Catholic Mutual, a related party, which processed claims on a contractual basis during the years ended June 30, 2014 and 2013 for the program premiums were $2,713,714 and $2,652,285, respectively.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 8    AMOUNTS HELD FOR OTHERS UNDER AGENCY TRANSACTIONS**

Amounts held for others under agency transactions consist of the following as of June 30:

|  | 2014 | 2013 |
|---|---|---|
| Catholic Services Appeal Rebates to Parishes | $         - | $   1,513,102 |
| Charitable Collection Accounts and Funds Held | | |
| for Others | 119,786 | 62,554 |
| Total | $   119,786 | $   1,575,656 |

Catholic Services Appeal rebates to parishes are discussed in Note 1 with contributions receivable. See Note 1 for further discussion on CSA activity subsequent to January 1, 2014.

**NOTE 9    NET ASSETS**

Temporarily restricted net assets are available for the following purposes at June 30:

|  | 2014 | 2013 |
|---|---|---|
| Clergy Services | $   2,087,356 | $   1,823,655 |
| Catholic Education | 291,992 | 712,732 |
| Parish Services | 11,769 | 12,485 |
| Marriage, Family and Life | 206,551 | 207,145 |
| Other | - | 72,236 |
| Total | $   2,597,668 | $   2,828,253 |

Net assets were released from donor restrictions by incurring expenses satisfying the restricted purposes, by the occurrence of other events specified by donors, or by the passage of time. Net assets released from restrictions are as follows for the years ended June 30:

|  | 2014 | 2013 |
|---|---|---|
| Clergy Services | $   165,047 | $   336,784 |
| Catholic Education | 966,696 | 1,238,502 |
| Parish Services | 2,167 | 511,848 |
| Marriage, Family and Life | 62,151 | 59,491 |
| Other | 72,236 | 85,570 |
| Total | $   1,268,297 | $   2,232,195 |

Permanently restricted net assets are available for the following purposes at June 30:

|  | 2014 | 2013 |
|---|---|---|
| Endowments | $   519,892 | $   519,892 |
| Perpetual Trusts | 1,551,285 | 1,363,754 |
| Total | $   2,071,177 | $   1,883,646 |

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013

**NOTE 10  ENDOWMENT FUNDS**

The Chancery Corporation's endowment consists of funds established for a variety of purposes, and includes both donor-restricted endowment funds and funds designated by the Corporate Board of the Chancery Corporation to function as endowments. As required by generally accepted accounting principles, net assets associated with endowment funds, including funds designated by the Corporate Board to function as endowments, are classified and reported based on the existence or absence of donor imposed restrictions.

**Interpretation of Relevant Law**

The Archdiocesan Corporate Board has interpreted the Minnesota Uniform Prudent Management of Institutional Funds Act (UPMIFA) as requiring the preservation of the fair value of the original gift as of the gift date of the donor-restricted endowment funds absent explicit donor stipulations to the contrary. As a result of this interpretation, the Chancery Corporation classifies as permanently restricted net assets (a) the original value of gifts donated to the permanent endowment, (b) the original value of subsequent gifts to the permanent endowment, and (c) accumulations to the permanent endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund.

The remaining portion of the donor-restricted endowment fund that is not classified in permanently restricted net assets is classified as temporarily restricted net assets until those amounts are appropriated for expenditure by the Chancery Corporation in a manner consistent with the standard of prudence prescribed by UPMIFA.

**Return Objectives and Risk Parameters**

As approved by the Corporate Board, a majority of the Chancery Corporation's endowment funds are held at CCF. Those funds are managed according to CCF's investment and spending policies. These policies attempt to provide a consistent return on assets, preserve capital and the purchasing power of the endowment assets, while providing a predictable funding stream to support programs. Endowment assets held at CCF include those assets of donor-restricted funds that the Chancery Corporation must hold in perpetuity as well as certain board-designated funds. Under these policies, these assets are invested by CCF in a manner to achieve a return over a rolling 10-year period which exceeds the rate of inflation by 5% to 7%, while outperforming a passive market index portfolio consisting of similar asset allocations over a rolling 5-year period.

The endowment funds held and managed by the Chancery Corporation are subject to similar policies as directed by the Chancery Corporation Corporate Board.

THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
CHANCERY CORPORATION
NOTES TO FINANCIAL STATEMENTS
JUNE 30, 2014 AND 2013

**NOTE 10  ENDOWMENT FUNDS (CONTINUED)**

**Return Objectives and Risk Parameters (Continued)**

To satisfy its long-term rate-of-return objectives, the Chancery Corporation rely on a total return strategy in which investment returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The Chancery Corporation targets diversified asset allocations that seek to achieve its long-term return objectives within prudent risk constraints. CCF targets a diversified asset allocation that places a greater emphasis on equity-based investments to achieve its long-term objectives within prudent risk constraints.

**Spending Policy and How the Investment Objectives Relate to Spending Policy**

As approved by the Chancery Corporation Corporate Board, the endowment assets invested by CCF are managed according to CCF's investment and spending policies. The Chancery Corporation receives distributions from these endowments each year based on CCF's spending policies. CCF has a policy of appropriating for distribution each year a board-determined percentage of its endowment fund's average fair value over a designated measurement period. CCF's board-determined distribution percentages ranged from 4% to 5% in 2014 and 2013. In establishing this policy, CCF considered the long-term expected return on its endowment.

With respect to endowment funds held and managed by the Chancery Corporation, the board has an informal policy of appropriating for distribution sufficient funds to achieve program objectives while considering the long-term expected return on its investment assets, considering the nature and duration of the individual endowment funds, and the possible effects of inflation.

These spending policies are consistent with the Chancery Corporation's objective to maintain the purchasing power of endowment assets held in perpetuity, to provide a consistent and predictable funding stream to support the endowment purposes specified, as well as to provide additional growth through investment return.

*Endowment Net Assets – Composition of Type of Fund*

| | June 30, 2014 | | | |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|
| Donor-Restricted Endowment Funds | $          - | $     847,166 | $     519,892 | $   1,367,058 |
| Board-Designated Endowment Funds | 3,808,419 | - | - | 3,808,419 |
| Total Endowment Funds | $   3,808,419 | $     847,166 | $     519,892 | $   5,175,477 |

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

## NOTE 10   ENDOWMENT FUNDS (CONTINUED)

### Spending Policy and How the Investment Objectives Relate to Spending Policy (Continued)

*Endowment Net Assets – Composition of Type of Fund (Continued)*

| | June 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Donor-Restricted Endowment Funds | $          - | $    709,390 | $    519,892 | $  1,229,282 |
| Board-Designated Endowment Funds | 3,596,923 | - | - | 3,596,923 |
| Total Endowment Funds | $  3,596,923 | $    709,390 | $    519,892 | $  4,826,205 |

*Changes in Endowment Net Assets:*

| | June 30, 2014 | | | |
| --- | --- | --- | --- | --- |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Endowment Net Assets, Beginning of Year | $  3,596,923 | $    709,390 | $    519,892 | $  4,826,205 |
| Investment Return: | | | | |
| Investment Income, Net of Fees | 49,013 | 4,211 | - | 53,224 |
| Net Appreciation (Realized and Unrealized) | 279,003 | 166,562 | - | 445,565 |
| Total Investment Income | 328,016 | 170,773 | - | 498,789 |
| Appropriations of Funds | (116,520) | (32,997) | - | (149,517) |
| Endowment Net Assets, End of Year | $  3,808,419 | $    847,166 | $    519,892 | $  5,175,477 |

| | June 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Endowment Net Assets, Beginning of Year | $  3,621,822 | $    634,533 | $    519,892 | $  4,776,247 |
| Investment Return: | | | | |
| Investment Income, Net of Fees | 51,423 | 3,863 | - | 55,286 |
| Net Appreciation (Realized and Unrealized) | 49,908 | 102,791 | - | 152,699 |
| Total Investment Income | 101,331 | 106,654 | - | 207,985 |
| Appropriations of Funds | (126,230) | (31,797) | - | (158,027) |
| Endowment Net Assets, End of Year | $  3,596,923 | $    709,390 | $    519,892 | $  4,826,205 |

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 11    PENSION AND MEDICAL BENEFIT PLANS**

Chancery Corporation contributions to benefit plans were as follows for the years ended June 30:

|                                   | 2014         | 2013         |
|-----------------------------------|--------------|--------------|
| Pension Plan for Lay Employees    | $ 273,072    | $ 273,072    |
| Pension Plan for Priests          | 702,119      | 548,564      |
| Archdiocesan Medical Benefit Plan | 1,482,788    | 1,602,387    |
| Total                             | $ 2,457,979  | $ 2,424,023  |

**<u>Pension Plans</u>**

Effective January 31, 2011, the Pension Plan for Lay Employees (Lay Pension Plan) was frozen. Due to the frozen status of the plan, active plan participants are no longer earning benefits, are no longer accruing additional credited years of service, and pension benefits upon participant retirement will be based upon the participant's credited years of service and salary history as of January 31, 2011. Participants in the plan who were not vested as of the freeze date will continue to earn vesting service after January 31, 2011, for each year in which they work in a full time capacity until these participants become fully vested by reaching five years of full time service. Employees who terminate with five or more years of credited service are generally entitled to annual pension benefits as defined by the Lay Employee Plan. Pension benefits are based primarily on years of service and final average earnings calculated as the average of the employee's five highest earning years.

The Pension Plan for Priests (Priest Pension Plan) covers substantially all incardinated priests, or those beginning the process of incardination established by the Chancery Corporation or one of the participating employers. Priest retirement benefits are computed in accordance with the plan document which can be changed by the trustees of the plan. Pension benefits are calculated primarily based on age at the date of retirement through 65 and years of service, not to exceed 40. Active participants who become totally and permanently disabled receive disability benefits computed as though they had been employed to normal retirement age. The board of trustees has the discretionary authority to pay the cost of medical and dental insurance for participants who retire or become disabled.

The risks of participating in these multiple-employer plans are shared with the other employers participating in the plans. Because this is a multiple-employer plan, valuation information is not available specific to each individual or participating employer. The Chancery Corporation's contribution to the Lay Pension Plan is a fixed amount based on a percentage of qualified salaries and the contribution to the Priest Pension Plan are a fixed amount per priest established by the trustees of the Priest Pension Plan.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 11   PENSION AND MEDICAL BENEFIT PLANS (CONTINUED)**

### Deferred Compensation Plan

The Chancery Corporation has a deferred compensation agreement with an Archbishop who retired in fiscal 2008. The agreement requires monthly benefit payments for life plus health and medical insurance and allowances for other living expenses. The present value of the estimated future obligation under this agreement is estimated to be approximately $230,000 and $239,000 at June 30, 2014 and 2013, respectively, based on the expected annual cost of approximately $61,000.

**NOTE 12   CONTINGENCIES AND COMMITMENTS**

### Loan Guarantees

At June 30, 2014 and 2013, the Chancery Corporation was contingently liable as guarantor for approximately $43,000,000 and $47,300,000, respectively, on 21 and 22 loans, respectively, and approximately $6,200,000 for one letter of credit for both years for Catholic institutions operating within the boundaries of the Archdiocese. Of this, the Chancery Corporations guaranteed approximately $6,600,000 lent by a related financial institution. These guarantees are typically given to enable Parishes and schools to finance property additions or refinance existing debt. The terms of the loans being guaranteed range from 1 to 30 years. One institution makes up 46% of the guaranteed loan balances. Included in this amount are Chancery Corporation guaranteed loans from a certain organization for seven institutions at June 30, 2014 for a maximum of $1,000,000 in total. Although generally not specifically limited, the maximum potential amount of future payments (undiscounted) the Chancery Corporation could be required to make under these guarantees would be the outstanding amount plus stated interest. Also included in this amount are guarantees in which the Chancery Corporation is liable under replenishment agreements. Those replenishment agreements have no stated length for covering the payment; therefore, the entire value of the loan is included. The Chancery Corporation would be required to perform under a guarantee only in the event of default, which is generally non-payment of installments when due. In certain cases the requirements of the guarantee call for the Chancery Corporation to continue making debt payments while others become due on demand. Management believes the fair value of such assets are in excess of any guaranteed amounts and that material payments will not be required under these guarantees.

### Cathedral of Saint Paul

In 2001, the Cathedral of Saint Paul Parish (the Parish) took out a loan for improvements to the Cathedral property that the Parish leases and which the Chancery Corporation owns. The Chancery Corporation allowed the property to be mortgaged at that time. In August 2011, the Parish loan was refinanced to an interest only loan with principal due at maturity in August 2016. The amount outstanding on this loan was approximately $4,771,000 and $5,300,000 at June 30, 2014 and 2013, respectively.

**THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**
**CHANCERY CORPORATION**
**NOTES TO FINANCIAL STATEMENTS**
**JUNE 30, 2014 AND 2013**

**NOTE 12   CONTINGENCIES AND COMMITMENTS (CONTINUED)**

### Asbestos Containing Materials

A survey of Chancery Corporation buildings was done in 2007 by an environment consulting firm which identified the presence of asbestos containing materials (ACM's). Management's current obligation with respect to the presence of the ACMs is primarily that of monitoring and maintenance. If there is renovation or repair work necessary that disturbs the asbestos, then special removal techniques must be utilized.

Management has determined that an asset retirement obligation related to the presence of ACMs cannot be reasonably determined at this time because insufficient information is available in that both the method of retirement and the expected dates of such retirement cannot be estimated.

**NOTE 13   GOING CONCERN AND LITIGATION CONTINGENCIES**

The Chancery Corporation is involved in several lawsuits relating to claims of sexual misconduct by certain members of the clergy. The Chancery Corporation and its leadership are currently engaged in litigation to resolve these claims.

As of June 30, 2013 litigation claims payable was $5,300,000 related to sexual abuse. The amount of the litigation claims payable was based on the minimum amount of the range as no amount within the range was a better estimate of an outcome. The Chancery Corporation had no practical means to determine the likelihood of outcome for amounts above that which would be more likely than any other outcome. No amounts were accrued for unknown claims as losses were not able to be reasonably determined. The amounts recorded were management's estimates and were not intended to be indicative of the actual legal outcomes of the individual cases. Losses from unknown future claims could also be substantial.

Subsequent to June 30, 2013, the number of claims increased and formal Notices of Claims tendered are substantial. Management believes that additional claims will be filed prior to the closing of the statute of limitations in May of 2016. At this time, it is not possible to predict the likely outcome or disposition of the prior year, current year and unknown future claims. Due to the uniqueness of each claim, the degrees of sexual abuse, and the age of some of the claims, an estimate of the financial exposure of the Chancery Corporation cannot be made. For that reason, management has not increased the litigation claims payable at June 30, 2014.

It is management's opinion that the above claims, Notices of Claims tendered and unknown future claims in aggregate will be material.

Due to the above there is substantial doubt regarding the Chancery Corporation's being able to continue as a going concern.

**EXHIBIT F**
**TO**
**DISCLOSURE STATEMENT**

**Post-petition Statement of Activities**

**The Archdiocese of Saint Paul and Minneapolis**
Statement of Activities
UNAUDITED
For the Period January 16, 2015 through April 30, 2016

|  | POST PETITION ACTUALS |
|---|---|
| **OPERATING ACTIVITIES:** | |
| | |
| REVENUE | |
| Assessment Revenue | 18,873,389 |
| Restricted Contributions | 323,048 |
| Gift Income | 182,564 |
| Investment Income | 2,302 |
| Other Income | 314,739 |
| Total Revenue | 19,696,041 |
| | |
| ADMINISTRATIVE REVENUE | |
| Finance | 433,333 |
| Moderator | 18,056 |
| Total Administrative Revenue | 451,389 |
| | |
| PROGRAM REVENUE FROM CSAF | |
| Clergy Services | 739,895 |
| Parish Services & Outreach | 689,384 |
| Marriage, Family & Life | 415,796 |
| Moderator | 251,328 |
| Evangelzation | 210,743 |
| Total Program Revenue | 2,307,146 |
| | |
| DEPARTMENTAL REVENUE | |
| Clergy Services | 605,991 |
| Community Services | 25,167 |
| Mission for Catholic Education | 565,815 |
| Parish Services & Outreach | 111,655 |
| Central Services | 78,362 |
| Marriage, Family & Life | 468,012 |
| Development & Stewardship | 76,606 |
| Moderator | 404,463 |
| Communications | 1,881,204 |
| Finance | 637,129 |
| Evangelization | 56,572 |
| Special Issues | 4,269 |
| Parish and Priest Support | 1,700 |
| Total Departmental Revenue | 4,916,946 |
| | |
| Total Revenue | 27,371,522 |
| | |
| PROGRAM EXPENSE | |
| Clergy Services | 3,176,957 |
| Community Services | 47,464 |
| Mission for Catholic Education | 1,548,732 |
| Parish Services & Outreach | 1,517,235 |
| Central Services | 3,506,418 |
| Marriage & Family Life | 873,108 |
| Development & Stewardship | 555,518 |
| Moderator | 4,037,394 |
| Communications | 2,612,260 |
| Finance | 3,563,444 |
| Evangelization | 408,905 |
| Special Issues | 9,861,268 |
| Total Program Expense | 31,708,704 |
| | |
| OTHER EXPENSE | |
| Depreciation | 1,132,356 |
| Parish and Priest Support | 1,451,757 |
| Other | (1,831) |
| Total Other Expense | 2,582,282 |
| | |
| Total Expense | 34,290,986 |
| | |
| Net Income (Loss) From Operations | **(6,919,464)** |
| | |
| | |
| NON-OPERATING ACTIVITIES: | |
| | |
| Gain on Sale of Assets | 4,267,286 |
| General Insurance | 1,504,459 |
| Priest Benefits | (209,442) |
| Total Non-Operating Activities | 5,562,303 |
| | |
| NET INCOME (LOSS) | **(1,357,161)** |

**EXHIBIT G**
**TO**
**DISCLOSURE STATEMENT**

**Archdiocese general liability insurance policies**

## ARCHDIOCESE GENERAL LIABILITY INSURANCE POLICIES

| Dates | Limits | Insurer |
|---|---|---|
| 8/1/43 - 8/1/46<br>8/1/46 - 8/1/49 | $25K per pers./$50K per occ.<br>$100K per pers./$300K per occ. | Employers' Liability Assurance Corp. |
| 8/1/49 - 8/1/52<br>8/1/52 - 8/1/55 | $100K per pers./$300K per accident<br>$100K per pers./$300K per accident | The Fidelity and Casualty Co. of New York |
| 8/1/55 - 8/1/58<br>8/1/58 - 8/1/61 | $100K per pers./$300K per occ.<br>$100K per pers./$300K per occ. | Fireman's Fund Ins. Co. |
| 8/1/61 - 8/1/64<br>8/1/64 - 8/1/67 | $100K per pers./$300K per accident<br>$250K per pers./$500K per accident | The Home Insurance Company in Liquidation |
| 8/16/63 - 8/16/66 | $500K per occ. | National Fire and Ins. Co. |
| 8/17/66 - 8/17/69 | $3M excess $250 per pers./ $300K per accident for 8/17/66-8/1/67 and $3M excess $100K per pers./$300K per occ. For 8/1/67-8/17/69 | Continental Casualty Co. |
| 8/1/67 - 8/1/70 | $100K per pers./$300K per occ. | International Ins. Co. |
| 8/17/69 - 8/17/72 | $3M excess $100K per pers./$300K per occ. | American Home Assurance Co. |
| 8/1/70 - 8/1/73 | $100K per pers./$300K per occ. | The Hartford Accident and Indemnity Co. |
| 8/17/72 - 8/17/75 | $3M excess $100K per pers./$300K per occ. for 8/17/72-8/17/74 and $5M excess $500K per occ. for 8/17/74-8/17/75 | American Home Assurance Co. |
| 6/18/74 - 8/1/74 | $300K per occ. | American Casualty Co. of Reading, Pa. |
| 8/1/73 - 8/1/74<br>8/1/74 - 8/1/77<br>8/1/77 - 8/1/78<br>8/1/78 - 8/1/79<br>8/1/79 - 9/1/80<br>8/17/75 - 8/17/76<br>8/17/76 - 8/17/77<br>8/17/77 - 8/17/78<br>8/17/78 - 7/1/79<br>7/1/79 - 9/1/80 | $300K per occ.<br>$500K per occ.<br>$500K per occ.<br>$500K per occ.<br>$500K per occ.<br>$5M per occ. excess $500K per occ.<br>$5M per occ. excess $500K per occ.<br>$3M per occ. excess $500K per occ.<br>$3M per occ. excess $500K per occ.<br>$3M per occ. excess $500K per occ. | Aetna Casualty & Surety Ins. Co. |
| 8/75 - 8/77<br>8/77 - 8/78 | $500K per occ.<br>$500K per occ. | State Farm Fire and Casualty |

| Dates | Limits | Insurer |
|---|---|---|
| 9/1/80 - 9/1/81 | 90% of $100K after $100K retention | Certain Underwriters at Lloyd's and related carriers |
| 9/1/80 - 9/1/81 | $5M per occ. excess $5M per occ. | |
| 9/1/81 - 9/1/83 | 80% of $100K after $100K retention | |
| 9/1/81 - 9/1/83 | $10M per occ. excess $5M per occ. | |
| 9/1/83 - 9/1/86 | 80% of $100K after $100K retention | |
| 9/1/83 - 9/1/84 | $15M per occ. excess $5M per occ. | |
| 9/1/84 - 9/1/85 | $10M per occ. excess $5M per occ. | |
| 9/1/85 - 9/1/86 | $4M per occ. excess $6M per occ. | |
| 9/1/86 - 9/1/87 | 80% of $100K after $100K retention | |
| 9/1/86 - 9/1/87 | $5M per occ. excess $5M per occ. | |
| 9/1/80 - 9/1/81 | 10% of $100K after $100K retention | Centennial Ins. Co. in Liquidation |
| 9/1/81 - 9/1/83 | 20% of $100K after $100K retention | |
| 9/1/83 - 9/1/86 | 20% of $100K after $100K retention | |
| 9/1/86 - 9/1/87 | 20% of $100K after $100K retention | |
| 9/1/80 - 9/1/84 | $4.8M per occ. excess $200K per occ. | Interstate Fire & Casualty Co. |
| 9/1/84 - 9/1/85 | $4.8M per occ. excess $200K per occ. | |
| 9/1/85 - 9/1/86 | $1M per occ. excess $200K per occ. | |
| 9/1/84 - 9/1/85 | $5M per occ. excess $15M per occ. | National Surety Corp. |
| 9/1/85 - 9/1/86 | $4M per occ. excess $1M per occ. | Colonial Penn Ins. Co. |
| 9/1/86 - 9/1/87 | $4M per occ. excess $1M per occ. | |
| 9/1/85 - 9/1/86 | $1M per occ. excess $4M per occ. | Northfield Ins. Co. |
| 9/1/86 - 9/1/87 | $750K per occ. excess $250K per occ. | St. Paul Surplus |
| 9/1/87 - present | Various limits and sub-limits | The Catholic Mutual Relief Society of America |