UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

---------------------------------------------------

In Re:

The Archdiocese of Saint Paul and Minneapolis,

File No. 15-30125

---------------------------------------------------

BEFORE THE HONORABLE

ROBERT J. KRESSEL

United States Bankruptcy Judge

* * *

TRANSCRIPT OF PROCEEDINGS

February 23, 2017

* * *

Proceedings recorded by digitally recording, transcript prepared by Court Reporting service.

NEIL K. JOHNSON REPORTING AGENCY
Suite 2625
322 Minnesota Street
Saint Paul, Minnesota 55101

NEIL K. JOHNSON

**APPEARANCES**

**MR. BENJAMIN E. GURSTELLE, and MR. CHARLES B. ROGERS, Attorneys at Law, Suite 2200, 80 South Eighth Street, Minneapolis, Minnesota 55402 appeared on behalf of Debtor.**

**MR. ROBERT T. KUGLER, Attorney at Law, Suite 2300, 150 South Fifth Street, Minneapolis, Minnesota 55402, appeared on behalf of Unsecured Creditors Committee.**

**MS. ELIN M. LINDSTROM, Attorney at Law, Suite 100, 366 Jackson Street, Saint Paul, Minnesota 55101, appeared on behalf of Creditors.**

**MR. DENNIS D. O'BRIEN, Attorney at Law, Suite 400, 401 Second Avenue North, Minneapolis, Minnesota 55401, appeared on behalf of Creditors.**

APPEARANCES (Cont'd)

MS. MARY JO JENSEN CARTER, Attorney at Law, 1257 Gun Club Road, White Bear Lake, Minnesota 55110, appeared on behalf of Certain Parishes.

MR. JOSHUA WEINBERG, Attorney at Law, Suite 600, 1875 K Street NW, Washington, DC 20006, appeared via telephone on behalf of Hartford Insurance.

MR. JEFF D. KAHANE, Attorney at Law, Suite 3100, 865 Figueroa Street, Los Angeles, California 90017, appeared via telephone on behalf of London Market.

MR. JAMES A. LODOEN, Attorney at Law, Suite 4200, 80 South Eighth Street, Minneapolis, Minnesota 55402 appeared on behalf of Our Lady of Grace.

APPEARANCES (Cont'd)

MS. CONNIE A. LAHN, Attorney at Law, Suite 2800, 225 South Sixth Street, Minneapolis, Minnesota 55402, appeared on behalf of Catholic Mutual Relief Society.

MR. MARK J. KALLA, Attorney at Law, Suite 2500, 120 South Sixth Street, Minneapolis, Minnesota 55402, appeared on behalf of St. Dominic and certain other parishes.

MS. PAMELA J. TILLMAN, Attorney at Law, 19th Floor, 111 East Kilbourn Avenue, Milwaukee, Wisconsin 53202 appeared via telephone on behalf of TIG Insurance.

REPORTER'S DISCLAIMER

The proceedings contained herein were transcribed via stenographic means from the official court audio file.

There was no court reporter present in order to capture the proceedings live and obtain clarifications, etc.

The spellings of case names and citations contained herein are taken from the official court docket produced in the matter to be utilized for transcription purposes and may not be the correct spellings and/or citations.

Any portions of the transcript identified as "UNINTELLIGIBLE" are proceedings where the audio file is not clear enough to understand the actual spoken words, which may be due to distance from a microphone, or other audio interference.

Every attempt has been made to produce the most accurate transcript possible considering the above limitations.

P R O C E E D I N G S

THE COURT: Why is everybody sitting down there? Are we actually choosing up teams? Is that what we're doing?

There are a couple motions this morning in the case of the Archdiocese of Saint Paul and Minneapolis.

I guess I'm going to keep with my custom of rather than have you pop up and give appearances, going down my list, will the attorneys for the Debtor?

(Counsel present noted their appearance)

THE COURT: Good morning.

Creditors committee?

(Counsel present noted their appearance)

THE COURT: Personal injury creditors.

(Counsel present noted their appearance)

THE COURT: Parish committee?
Parish group.

(Counsel present noted their appearance)

THE COURT: Okay. Is anyone appearing here or on the phone for Hartford insurance?
MR. WEINBERG: Good morning, Your Honor.
Joshua Weinberg on behalf of Hartford.
THE COURT: And London Market Insurers?
MR. KAHANE: Good morning, Your Honor.
Jeff Kahane on behalf of London Market Insurers.
THE COURT: Thank you.
Is there someone appearing for the Catholic Finance Corp, Church of St. Thomas Becket?
Mr. Iannacone?
Anybody appearing for Our Lady of

Grace?

Okay. Catholic Mutual Relief Society, anybody appearing for them?

(Counsel present noted their appearance)

THE COURT: The old St. Margaret's and others?

I've got another page here.

Catholic Services Appeal?

Archdiocese Medical Benefits Plan? North American Banking? Saint Charles Borromeo? Saint Patrick? Saint Dominic and Saint Stevens? De LaSalle?

Travelers? Anybody appearing for Travelers this morning?

Or for TIG Insurance?

MS. TILLMAN: On the phone, Pamela Tillman on behalf of TIG.

THE COURT: How about Liberty Mutual? Anybody appearing for Liberty Mutual?

Anybody I've missed. Anybody appearing on behalf of somebody who isn't on my list?

Okay. Let's take up first the motion by the Debtor dealing with the solicitation procedures and the ballot.

MR. GURSTELLE: Good morning, Your Honor. Ben Gurstelle on behalf of the Debtor.

We brought this motion in an effort to try to kick start the solicitation process.

A good deal of the proposed order that we attached to the motion was negotiated with the UCC and run by the clerk of court prior to filing the motion.

We filed the motion after negotiations on some of the remaining issues kind of stalled out.

We have made actually since filing the motion a couple more changes to the proposed order after further discussions with the UCC.

Those changes are --

Do you have the other copy of the order?

Paragraph seven of the order, we have deleted the first sentence which said,

counsel for holders of class six claims will converse separately with each client regarding --

THE COURT: I'm sorry. You're really mumbling and talking very fast.

MR. GURSTELLE: We have deleted the first sentence which says, counsel for holders of class six claims will confer separately with each client regarding the plans and the client's ballot.

We have deleted that. We don't think it's necessary because we believe that it's an obligation of counsel to do anyway.

Then also in Paragraph 7 we have changed the power of attorney being executed by a lawyer to being executed by any individual with capacity to execute and be a power of attorney.

So with those changes, we believe the order is agreeable to the UCC with two exceptions: Those are in paragraph two the 30-day timeline to get the solicitation packages up -- deadline rather, to get the solicitation packages out the door.

The UCC wants it to be a 20-day

deadline.

We plan, the Archdiocese plans, to do this process as quickly as possible.

We want to get the solicitation packages out the door very, very quickly so our motivation and intention is to get these out within 20 days, and hopefully even sooner, but there are certain aspects of the process that we do not control entirely.

We just don't want to set ourselves up for failure in the event that the packages get out the door on day 21 rather than day 20.

As the Court knows, this is -- the solicitation package is going to include both the Debtor's plan and the Committee's plan and so we just don't want to set ourselves up so that all plan proponents are in violation of the court order so that's why we have the 20 day -- or 30 day rather outside deadline rather than 20 days.

One of the issues that we foresee as being an issue that may require us to take more time to do it is that we haven't ordered the flash drives that we plan to put

the plan that's in the disclosure statements on yet because we haven't gotten an order from the Court to do it.

I know that at the last hearing you indicated that a flash drive would be a good idea, but this is a very large purchase. We have to buy in bulk several hundred flash drives and it's going to cost approximately $5,000 to get these flash drives and we just didn't want to make the purchase until we had a court order okaying it. We have been on shifting sand in this case before.

And also we have as a provision in the order that we're authorized to serve the disclosure statement and plans on counsel for the tort claimants just one flash drive and then that would be distributed by counsel for tort claimants to their respective clients.

If we had to do an individual flash drive for each claimant that would up our order significantly by several hundred drives and so we haven't placed the order until we have clearance from the Court in a court order.

We're going to do that order immediately upon entry, the order for the drives immediately upon entry of an order by this Court and we've taken -- we've already gotten votes and we have an express delivery with the drives being preloaded with the documents that should take approximately ten days, is what the vendor says, although, you know, we don't control that and I don't want to be caught in a situation where we're rushing and we miss something because we have a 20-day deadline and we haven't gotten the drives yet.

The second issue, probably the more pressing issue as expressed by the committee, is the inclusion of a convenience claim election on the ballot.

We think that is the only remaining issue with the ballot, is whether that convenience claim is in there.

We acknowledge that Your Honor wants the ballot to be simple and that the inclusion of this option adds something extra to the ballot, but we believe the inclusion of the convenience option makes

sense, is efficient and is important for how this case goes forward.

So why do we think it's necessary?

First we want people to know that this option for a $10,000 payment pretty much immediately after confirmation is there and that they consider that in making their decision to vote on the plans, and under the Debtor's plan, making that election now is how it would work best under our process.

The UCC plan has a different process for making a convenience election that takes place later in the process of the tort reviewing -- tort reviewer in the trust.

Second, we believe strongly that this --

THE COURT: I'm sorry. If there are two different processes, how can you put it on the ballot?

Are you going to put both processes on, yours and the committee's on the ballot?

MR. GURSTELLE: Well, Your Honor, in reviewing the committee's plan, it's unclear to us how the convenience election works for them.

Our process is that we make the election as part of your vote and then you would be entitled to that $10,000 payment after a really initial cursory review of the claim and see if there is a prima facie case.

With the UCC's plan, if they don't need to have that election made so that that process can take place and those payments can be made out, then it doesn't need to be on the ballot.

If they want to put that on the ballot as well, I suppose that would be fine and we would include both elections on the ballot and both elections would probably affect how each plan plays out through confirmation.

We do think it has an affect on confirmation because it will help in calculating the amount of money that will go into the convenience class versus the amount of money that would go into the full review part of the class six claimants.

That would affect the per claimant value.

So we think it's important and it's material and it's likely to be important to many members of the class.

We assume from the UCC --

THE COURT: Of course, this is all in the disclosure statement?

MR. GURSTELLE: That's right.

THE COURT: You just want to bring out one little bit of the disclosure statement and put it on the ballot?

MR. GURSTELLE: We do think it is a material part of how voting would work, and although it isn't electing into a separate sub class, it is electing a separate type of treatment for that claimant and we think it's important that those claimants be allowed to make that decision at the outset and we think that it is material and we assume from the UCC's opposition to it that they think it is too.

This is about fairness and openness in the process, and at a minimum we think that if that election was included, that the ballot should include at least a sentence alerting creditors to the fact they will

have the option to make that convenience election.

Ultimately we believe that the inclusion of this election makes sense. It will speed up the process in terms of both initial distribution and will help the Court assess the relative merits of the game plans.

And so why does the UCC oppose it? They say it will cause confusion and prejudice.

With respect, we believe it would be more confusing to have class six claimants make a determination on voting for the plan and have to make a second determination later.

We think that doing it in one place makes the most sense. We don't think that the language in the election is confusing and we think it will be efficient.

As to alleged prejudice, the UCC states that making an election would give insight to Debtor and other parties into the propensity for settlement in the event that one of the plans is not confirmed.

First, the Archdiocese' goal, as it has always been, is to confirm this plan, which we believe is fair and achieves a great result for creditors.

And again with respect, this case has been in settlement talks for two years and the parties are vigorously represented. The creditors want closure and are willing to elect a convenience payment to get that closure. It's exactly the type of information that would help get this case across the finish line.

That's why we want the convenience election in the ballot. We think it makes sense. It does make sense for at least the Debtor's plan. We don't think it's confusing and we don't think it's prejudicial.

Other than that, I think the proposed order has, like I said earlier, been agreed to by the committee, and if you have any questions I'll answer them.

THE COURT: Mr. Kugler?

MR. KUGLER: Thank you, Your Honor.

To the ballot issue first, I think that we all should want a clear and unambiguous ballot and I think that the inclusion of the convenience claim election has the potential to make the ballots confusing, particularly at the ballot tabulation stage.

I can envision scenarios where a party might accept both plans, not check a box regarding preference and then elect to have their claim treated as a convenience claim.

I'm not quite sure how that ballot would be interpreted. I'm sure that the Archdiocese might have an interpretation that is different than the interpretation that the committee might have and that's going to lead to further fights, further expense, further delay.

Similarly, I could envision a situation where a claimant rejects both plans and then does not execute on the box with a preference but then elects to have their convenience claim treated as a convenience claim, the claim treated as a

convenience claim.

Again, I'm not quite sure what that would mean, but I know that there would be multiple interpretations.

I think for that reason alone it ought to be left off the ballot. There will be plenty of time after confirmation for a convenience claim treatment to be afforded, folks who want to have their claim treated in that fashion, and so I think that that ought to be excluded from the ballot.

With respect to the timing, it seems like a small nit, Your Honor, but the committee wants to move forward in this case quickly.

We didn't ask for 20 days, we asked for ten days. We agreed to resolve it at the 20 days and that was rejected by the Archdiocese.

I can tell you that the counsel for the survivors has ordered 500 flash drives. They ordered them, and for an $80 charge they got them the next day.

This doesn't take weeks and weeks and weeks. They can have the flash drives

tomorrow and they can load the stuff on. It can be ready to go in ten days.

So I'm not sure why there is interest in delay. I'm kind of surprised we're here today. I thought that after the last go-round we would have had ballots out by now and I would urge the Court to require that the Archdiocese get this stuff out in the next ten days.

Thank you.

THE COURT: Anyone else that's want's to be heard on this motion?

Did you want to respond at all?

Mr. Gurstelle.

MR. GURSTELLE: Thank you, Your Honor.

Ben Gurstelle again for the Debtor.

Again, we don't think the convenience class election is confusing.

With respect to the scenario Mr. Kugler just mentioned, I don't think a convenience claim election would affect the situation where no preference is checked on the two plans.

The convenience claim election is

about treatment under the Debtor's plan, so if they had accepted the Debtor's plan, they accepted treatment as a convenience claimant, then that's sort of the end of that story. I don't think it would be confusing in tabulation.

With respect to an allegation we're trying to delay the process, it's just the opposite. We brought this motion to jump start the process and to try to get the solicitation process lined up and under way.

And again I want to stress that we do want to do this as quickly as possible.

The only reason we're asking for the 30-day outside deadline is we don't want to be in violation of the court order on some technicality.

Thank you.

THE COURT: Well, let's turn to the last one first, the ten or 20 or 30 days.

To describe it as a nit is an understatement. I can't believe you're here either, Mr. Kugler, arguing about that. You've been working at this for months and months and the case is over two years old,

and whether we lose either another ten or 20 days in this process, because after balloting it's going to go on for months besides so this little period of time, this arguing over is beyond silly.

I'll allow the 30 days.

And I understand it might not just be the drives. There is a lot of stuff that can go wrong and a lot of technicalities and a lot of things to do and I think we need to allow the Debtor plenty of time to get all those things done.

So I'll keep the 30 days in.

On the ballot, my view on the ballot is a ballot is a ballot. It's not a place to put disclosure, it's not a place to solicit. The solicitation is in the disclosure statement itself.

It is explained in the disclosure statement, but the part about the plan is explained in the plan, their opportunity to make the election.

Unlike many plans which have a convenience class, so you need to make the election as part of the balloting because

you need to know which class to count the ballot in, that is not this situation. You're all in the -- all the victims are in one class.

So putting that election at that point it has the potential for confusion and with no real upside that I can see so I'm going to deny that part of the Debtor's motion.

And you can redo the ballot and the order and submit it, but with that language taken out of the ballot.

Let's turn to the Debtor's motion, the area where compliance with bankruptcy Rule 2019.

MR. GURSTELLE: Thank you, Your Honor.

Ben Gurstelle again for the Debtor.

This is a motion to compel Jeff Anderson & Associates to comply with Rule 2019 in full.

This motion is all about fairness. Transparency equates with fairness and the rule requires it.

Rule 2019 requires that certain

disclosures are made when an entity such as a law firm --

THE COURT: You're talking louder, but you're still talking really fast. Please slow down a little bit.

MR. GURSTELLE: I'll slow down.

Rule 2019 requires that an entity such as a law firm that represents multiple non-insider creditors who are acting in concert to advance their common interest make certain disclosures.

The disclosures are laid out in the rule and our motion is to have the Anderson firm comply with that rule.

We don't think that the Anderson firm has complied with the rule and so we don't think our motion is moot.

First, the Anderson firm has argued that the rule does not apply do it because although it represents 383 tort claimants, or approximately 85 percent of the class six claimants, the firm has not represented these claimants acting in concert.

That assertion, Your Honor, frankly I think, is impossible to square with reality.

Since the very beginning of this case the Anderson firm has appeared at almost every single hearing on behalf of certain abuse survivors, never on behalf of any individual survivor, and they have also filed many, many motions in this case, responses, filed an appeal, the subcon order, all on behalf of certain abuse survivors, always acting selectively to advance their common interests.

The only thing that the Anderson firm has done on behalf of any individual claimant is file proofs of claim.

So to say that they are not acting on behalf of creditors in concert to advance their common interests is just not true. Clearly the rule applies to the Anderson firm.

Second, the Anderson firm has argued that it's met its obligations under Rule 2019 by its submission of a document last Friday purporting to be a Rule 2019 disclosure.

With respect, this document is not a proper 2019 disclosure and it doesn't comply

with the rule.

First, the disclosure does not explain the facts and circumstances concerning the formation of the abuse survivor group as required by Rule 2019(c)(1)(A), so the questions we would have are was the group as a result of solicitations by the firm, did it come together through specific referrals or did the entire group simply form organically and then seek to have the entity, the firm, represent it.

We don't know because it's not disclosed.

Second, the document does not disclose the nature or amount of the Anderson firm's own economic interest in the outcome of this bankruptcy case as required by Rule 2019(c)(2)(B).

Now, we assume, but we do not know for certain because it hasn't been disclosed, that the Anderson firm may have various contingency fee arrangements with its clients, but not all of the Anderson firm's clients are similarly situated. Some

are strong claims, some are weak claims, some have multiple claims and some are claims that are just not cognizable.

How does the Anderson firm's own economic interest in this case affect how its counsel -- how it will counsel its clients regarding voting.

Have the Anderson firm's clients been given informed consent as to possible conflicts that these differences could lead to?

We don't know because it hasn't been disclosed.

And this brings us to the third major deficiency, which is that Rule 2019 requires that the disclosure include a copy of any instruments authorizing that entity to act on behalf of its client creditors.

Or its creditor clients.

This is very important to us. It's very important to the case.

While the Archdiocese is not seeking the disclosure, we're not seeking the disclosure of any personally-identifying information of any of the clients, we don't

want their names, we don't want their addresses, we're looking for the information about the firm's economic interest and the other information required by Rule 2019.

There is no exception to the rule for any other part of the disclosure for the Anderson firm.

It's important that this grievance be public so that the Court and all parties in interest may review them in light of the competing plans and the impending votes to be passed.

Now, this is especially true because one of the plans is currently being promoted and championed by the Anderson firm.

Finally, the Anderson firm has argued that it's unfair for the Archdiocese to demand that the Anderson firm make the disclosure when it hasn't made the same demands of other firms representing multiple creditors.

First, the Archdiocese believes that the rule is the rule and it applies across the board and that anyone appearing in this case on behalf of multiple creditors ought

to comply with it. The rule is self-effecting.

So we don't believe that we should have to make any motion for disclosure in the first place, but we have made this motion with respect to the Anderson firm because, frankly, we think that the Anderson firm's disclosure is more important.

The Anderson firm has a different type of interest in this case than other firms do.

The Anderson firm has its own disclosable economic interest as defined under the rule that will be determined by the outcome of this case.

The term "disclosable economic interest" includes any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition or disposition of a claim or interest.

Because its fee arrangements, or we assume its fee arrangements, the Anderson firm, unlike other firms, has that interest and that we believe that it is important to

know how that will affect the process going forward.

We think it's appropriate right now before the solicitation stage to get that disclosure.

In at least two other diocese cases that disclosure has been made at or about the solicitation stage.

And in the Delaware case, the Wilmington case in Delaware, it was specifically tied to solicitation.

Your Honor, we're not after the survivors, we're not after Jeff Anderson. We are trying to get to transparency and fairness so that the process can move forward in a way that is fair to everyone and that's why we want the disclosure.

Thank you.

THE COURT: Okay.

Ms. Lindstrom?

MS. LINDSTROM: Good morning, Your Honor.

Elin Lindstrom on behalf of Jeff Anderson & Associates.

Mr. Finnegan and Mr. Anderson are

noticeably absent today. This is an important issue to our firm and they were, unavoidably, out of the state so they apologize for their absence.

I'm not going to belabor the points raised in our response memorandum, but there are a few points raised in the Archdiocese reply brief that I would like to touch on today.

Bringing this rule up now can only be viewed as an attempt to call into question the integrity of both the voting process and of our firm's representation of these survivors.

By focusing on this 2019 disclosure now, the Archdiocese seems to be setting up for some potential argument they may have about our firm's participation in the voting process if the survivors opt to rejection the Archdiocese' plan.

The way the Archdiocese has framed their argument makes it seem like our firm is voting for our clients on their behalf, and that is simply not the case.

Our firm is not participating in the

vote.

We will, as their attorneys, advise these clients individually based on their individual circumstances of the risks and benefits of each plan, and we have a duty and obligation under the rules of ethics and under this court to do that.

Based on that advice, it will be our client who cast the vote, not us.

It is unclear what our retainer agreement or information in that agreement has to do with this voting process or what we would advise our clients about the vote and the plans.

The Archdiocese seems to even be going beyond the Rule 19 requirements under the rule by requesting our fee agreement and seemingly trying to step into the attorney/ client relationship that we have with our clients and almost possibly interfering with our privileged information and privileged conversations that we have with our clients.

There was a provision in the ballot order that was stricken by the Archdiocese regarding us having an obligation to talk to

our clients.

We know we have that obligation. We don't need to be told by the Archdiocese what to do in this voting process.

We think this is inappropriate. We are aware of the rules of ethics and will continue to comply with those rules.

Further, Your Honor, while we disagree that this rule applies to our firm, we have filed a Rule 2019 disclosure, but the Archdiocese is requesting two additional requirements under the rule that we just do not think are applicable here: First, regarding a copy of the instrument required under Rule 2019(c)(4), the type of document contemplated by this provision in this rule is not our retainer agreement.

It would be an agreement made between the claimants to coordinate their actions and act in concert.

In some cases this may be a power of attorney. In some cases it may be a power of attorney allowing the firm to cast a proxy vote on behalf of an entire group of claimants.

This just does not exist in this case.

And the Archdiocese has called the group of survivors exactly that, a group, that we formed a group of creditors.

As I said of about, each of these people and survivors is voting individually and there simply is no group here and there is no documents giving authority or giving rise to such a group.

In terms of appearing on the case on behalf of all the claimants, so far all the motions in this case, Your Honor, have applied to all of our claimants.

It simply did not make sense for us to come up here to the microphone 383 times or to file 383 pleadings.

Further, Your Honor, the Archdiocese' contention that Jeff Anderson & Associates needs to comply and provide its own economic interests under the 2019 rule is simply -- it's not a requirement under the rule.

The rule actually states that it is a disclosable economic interest as it relates to the Debtor.

Jeff Anderson & Associates has no economic interest in the Debtor. We are not a creditor in this case and we are not a claimant.

We represent individuals who are creditors and have economic interests in the Debtor.

THE COURT: You have a huge economic interest in the case, however, probably the biggest one.

No one has a bigger economic interest in the case than you.

"You" being the Anderson firm, not you personally.

MS. LINDSTROM: The Anderson firm may get paid. There are other attorneys in this room that will get paid in this case and have gotten paid.

THE COURT: Well, depending on what your fee arrangement is, which we don't know but many of us have speculated is a contingency, the firm, depending on what plan is confirmed, stands to collect 20, $30 million in fees.

MS. LINDSTROM: We would

collect fees, Your Honor. It is a contingency basis.

But the Archdiocese --

THE COURT: Well, it's a huge economic interest in the case, like I said, bigger than anyone else.

No one has a bigger interest than Anderson & Associates.

MS. LINDSTROM: I would respectfully disagree with Your Honor or with the Archdiocese that that rule requires us to disclose our economic interest because, as again, it says it's as it relates to the Debtor.

And to insinuate, or the Archdiocese' insinuation that we will somehow influence our clients votes in order to up our fees or our payment is absolutely insulting.

Your Honor, for these reasons, we would ask to find that Jeff Anderson & Associates has complied with the Rule 2019 motion.

If, however, the Court is inclined to grant the Archdiocese further request for further compliance, we would ask the Court

to allow us to do it in a way that does not disclose any of our clients' identifying information.

I know there are some asbestos cases where even when exemplars or fee agreements --

Sorry. Excuse me, not fee agreements, but where documents were filed under seal in court, those were later unsealed and the identities of those individuals made public.

So if we are to comply with this rule, that we can do so in a way that protects the identities of the survivors, and also that all the professionals in this case that fall under this rule also have to comply.

Thank you.

THE COURT: Anyone else want to be heard on the motion?

Mr. O'Brien.

MR. O'BRIEN: Thank you, Your Honor.

The parish committee did put in a response simply supporting the 2019 motion

brought by the Debtor.

I'm not going to argue what the rule requires. I have never been faced with having to deal with this rule when I was on the bench, not a single time.

I read the rule once and then I put it down and I picked it up and I read it again and I read it again and I'm still is not sure exactly what it means, but I'm sure you know what it means and I'm sure you're going to tell us all what it means.

What I want to just briefly talk about here is the unique nature of this case and perhaps the way the rule fits in to the unique nature of this case.

I was some what surprised when I read the initial response by Mr. Jeff Anderson to the motion by claiming that this was motivated by an attempt to intimidate Mr. Anderson and his firm.

I don't know Mr. Anderson very well, but in getting to know him in this case, he impresses me as somebody who is not intimidated by anything.

And then when the response, the 2019

was filed, you look at it and there is absolutely nothing in there that would intimidate anybody about anything.

So I wonder what else is going on here.

You know, this is a rather unique situation in that, as you pointed out and as has been pointed out by others here, Mr. Anderson and his firm are the -- they have a unique position in this case that no other professional has, and that is that they have a substantial personal financial interest in the outcome of this case, a substantial stake.

Now, if their compliance with the rule by filing that document that they filed, if that's the compliance with the rule, then there needs to be some other, in my view, transparency here that will satisfy the integrity of the voting process.

This is not an attempt to interfere with or to call into question the integrity of the voting process.

This is an extremely unique situation where this firm, which has a financial stake

in this case that is very substantial, is going to take control and possession of the ballots of the overwhelming number of clients that it has and the overwhelming number of people who make up the unsecured creditors class.

There is nothing wrong with that, but under those circumstances it seems to me that in order to protect, rather than call into question, the integrity of the process, there has got to be some sort of perhaps maybe extraordinary, then, if the rule has been complied with, some other extraordinary transparency.

It's not a matter of, well, we don't trust you or we think you're being evil. It's the old situation of trust but verify.

You know, there has got to be some process here that will make up for what is otherwise not a normal process in a Chapter 11 case.

I would suggest that if other financial disclosures cannot be or will not be made in this case, that the ballots of the unsecured claimants be turned over not

to Mr. Anderson but to the unsecured creditors committee.

The unsecured creditors committee represents these people, as well as Mr. Anderson does individually, and they have got a fiduciary responsibility that is much broader than Mr. Anderson's and there is no reason in my mind why they can't, why Mr. Kugler's office cannot fulfill the responsibility to the unsecured creditors through the committee by doing the same kind of handling and securing the votes of these members that could be done by Mr. Jeff Anderson.

Again, it's not a matter of disparaging Mr. Jeff Anderson. You know, it's a matter of either recognizing what are the required procedures and processes in a situation like this or to come up with some alternative that protects the integrity of the voting process.

Thank you.

THE COURT: Thank you.

Anyone else? Anybody else want to be heard on the motion?

Mr. Gurstelle.

MR. GURSTELLE: Thank you, Your Honor.

Ben Gurstelle again for the Debtors.

Just a couple of responses.

Number one, I think the rule is clear and it requires the information that we laid out in our brief.

Next, the retainer agreement is --

THE COURT: Well, let me stop you there.

Assuming that's true, is there some reason to require them to disclose how many clients they have?

I lost track of the number, 200 and --

MR. GURSTELLE: How many claimants?

THE COURT: That they represent.

MR. GURSTELLE: 383.

We think --

THE COURT: You need 383 copies of the retainer agreement?

MR. GURSTELLE: Your Honor, I

don't think we need every single retainer agreement if there is a form agreement.

We would want to see, and I think the rule would require, disclosure of any different types of retainer agreements that Mr. Anderson's firm may have.

For example, some of his clients were retained before this case started and they had ongoing litigation and some clients signed up well into the course of this case.

There may be different retainer agreements for those types of clients with different fee arrangements.

We think the retainer agreement is absolutely contemplated by the rule and has set out in the Baron & Budd case that we cited.

It's not a confidential document, it's a document that is required to be disclosed by the rule and there is a discussion of that in Baron & Budd.

And it is important for the Court to know the fee arrangement for the Anderson firm because, as the Court pointed out, the Anderson firm does have a distinct economic

interest in the outcome of the case and it is a disclosable economic interest as defined in Part A of the rule and it is dependent on how these claims turn out.

You know, I can envision a situation where the Anderson firm may believe that it can get more money for the firm in a situation where the case is dismissed or where litigation ensues and that certain claimants may do better in that situation but certain claimants may not and that gives rise to potential conflicts of interest.

Can those conflicts be waived? Perhaps. But it's important that the Court and other parties in interest who are invested in the solicitation process know that.

So we believe that it's very important that the rule be complied with.

Then as to Mr. O'Brien's comments, I don't think we have a position on that, but I do think that whether or not the ballots go to the committee or to the Anderson firm, the rule requires disclosure and it should be complied with.

Thank you.

THE COURT: Ms. Lindstrom?

Well, actually I would like you to step up. I just have a question or two to ask you.

Just generically, without talking about any individual client, how many different forms of retainer agreements would you have?

I'm guessing they are virtually identical for most of them.

MS. LINDSTROM: Most of them are virtually identical. I can't say for certain how many different examples we have to date. I think most of them are the same, though.

THE COURT: Thank you.

Well, as to the why this is here now, I mean we've nibbled around the edge of this for two years. I mean this is not a new issue and the rule, to use the word of the Debtor, is self-effectuating.

We don't need an order. The Anderson firm should have complied with it two years ago and they should have complied with it a

year ago and six months ago.

The fact that we're here now on the motion doesn't mean they no longer have to comply with the rule, so I think they have to comply, it has to comply with the rule.

If there is some sort of insult there or distrust there, it's a distrust by the Supreme Court who promulgated the rule, not by the parties here or me. The rule is the rule is the rule.

And you might speculate that there is some cynicism, if not distrust, behind the rule of disclosure.

I really dislike the current trendy word "transparency", but it's sort of applicable here.

Bankruptcy sort of operates on everybody knowing what's going on, me in particular, but everybody knowing what's going on, and this is one of those elements that people, at least the Supreme Court thought everyone should know.

So I think the Anderson firm must comply with the rule.

One, it needs to be verified. That's

easily taken care of.

It wasn't. The thing that you filed wasn't verified. The rule certainly requires that.

I'm sorry. I just give no credence to the suggestion that they are not acting in concert. Clearly you are.

I mean you may not have set out to create a group, but you have a group. You have a group of clients who are acting in concert through you, and the Anderson firm is the representative of 383 people and the rule, this is exactly the situation it's designed to -- or one of the many situations the rule is designed to tend to.

And I read the rule clearly as well, and I think one of the important points of the rule is to disclose the economic interest in the case, what does the representative have to gain. That's the point of the rule here.

So for whatever reasons we can understand that there are different interests or different motivations or just different things going on, and so we need to

know that. That's something the entire body of people, the court and lawyers need to understand.

So I'm going to order among the things that I think you --

And I think sort of one of the other things of the group and one of the unique dynamics of this case from the beginning has been the Anderson firm represents a majority of the members of the creditors committee, so it's certainly my perspective of this case that Jeff Anderson has been the creditors committee.

That's sort of the dynamic here that's at work here and so it makes it all the more important, it seems to me, that this rule be complied with.

So I think you need to go back and comply with the rule.

Obviously no one has asked for and I'm certainly not going to include the requirement to disclose any names.

I think the list that you've done with the name by claimant number is perfect, but I think you also have to disclose the

fee arrangement with each of those clients, whether it's hourly or contingent, includes costs and expenses, whatever, so that we can know what it is for each one of those clients.

And that would include --

And the reason I ask, I was hoping this wasn't going to be too onerous, but I don't want you to -- clearly don't want to file the actual retainer agreements with anybody's name in them, but somehow it seems to me you should be able to have exemplars that say here is the retainer agreement exactly in this form that was signed with claimants number one, two, three, four, 16, 18, 20, whatever, and if there is another one, these five people signed this different retainer agreement, so that at least we can look at them and figure out what the fee arrangement is and other arrangements for representation are with each one of your clients.

Did I cover what we're looking for here?

I mean you need a little bit of time.

I'll give you about maybe a week from tomorrow as the deadline to comply with the order.

[UNINTELLIGIBLE]

I can pick Friday because then you can't make your staff work on weekends.

[UNINTELLIGIBLE]

Sure. Now it's gotten longer. It's not the following Monday, it's the following Thursday?

[UNINTELLIGIBLE]

Okay. Two weeks from today.

* * *

STATE OF MINNESOTA)
ss.
COUNTY OF DAKOTA )

BE IT KNOWN, that I transcribed the digitally recorded proceedings held at the time and place set forth herein;

That the proceedings were recorded electronically and stenographically transcribed into typewriting, that the transcript is a true record of the proceedings, to the best of my ability;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

IN EVIDENCE HEREOF, WITNESS MY HAND AND SEAL.

______________________

NEIL K. JOHNSON