## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Case No. 15-30125

Chapter 11

## LEGAL OBJECTION TO CONFIRMATION OF THE
## DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

The Official Committee of Unsecured Creditors (the "Committee"), by and through its undersigned counsel, hereby submits the following legal objections ("Objections") to the Debtor's *Second Amended Chapter 11 Plan of Reorganization* [ECF 887] (the "Plan"), filed by the Archdiocese of Saint Paul and Minneapolis (the "Debtor" or the "Archdiocese") in the matter captioned above. In support of its Objections, the Committee states as follows:

**Objection 1:    The Debtor's Plan fails to meet the legal requirements for the inclusion of a third-party release**

The Archdiocese seeks to protect non-debtor Catholic entities, including the 187 parishes within its jurisdiction, from clergy sexual abuse litigation through a third-party release (the "Channeling Injunction"). Many courts do not allow non-debtor releases at all. Courts that do allow such releases require a plan proponent to satisfy several independent requirements before granting such extraordinary relief:   (i) affected creditors must overwhelmingly support the proponent's plan; (ii) the released claims must be paid in full; (iii) the released parties must make a substantial contribution towards the plan; and (iv) the relationship between the debtor and the released parties must *necessitate* a release for a successful reorganization. In this case, affected creditors have overwhelmingly *rejected* the Archdiocese's Plan, the released claims will *not* be

paid in full, the released parties have *not* been required to make a substantial contribution, and

the relationship between the debtor and the released parties does *not* necessitate a release for a

successful reorganization. Because the Archdiocese's Plan does not satisfy even one of the

factors necessary to obtain third-party releases, the Plan cannot be confirmed as a matter of law.

## A.  The Channeling Injunction

The Archdiocese filed for bankruptcy to rid itself of liability it created by failing to

address (or by covering up) the persistent, widespread sexual abuse of hundreds of its most

vulnerable parishioners. In addition to filing claims against the Archdiocese, many survivors of

clergy sexual abuse initiated lawsuits against the parishes and schools that employed the priests

who abused them. In addition to extinguishing the Archdiocese's liability, the Archdiocese's

Plan seeks to permanently resolve the rights and claims that survivors have against over 200 non-

debtor parties under state tort law. Specifically the Debtor's Plan imposes a Channeling

Injunction that releases the claims of abuse survivors against any "Catholic Entity," a term that

includes over 200 Catholic parishes, schools, and other related-entities (collectively, the

"Released Parties"), by channeling all abuse-related claims against Catholic Entities to a

creditors' trust.[1] [ECF 887, 65–66.]

---

[1]    Section 13.3 of the Debtor's Plan states:
    **13.3    CHANNELING INJUNCTION**
        Channeling Injunction Preventing Prosecution of Channeled Claims Against
    Protected Parties and Settling Insurer Entities. In consideration of the undertakings of the
    Protected Parties, the Archdiocesan Settling Insurer Entities, and the Parish Settling
    Insurer Entities under the Plan, their contributions to the Trust, and other consideration,
    and pursuant to their respective settlements with the Debtor and to further preserve and
    promote the agreements between and among the Archdiocese, the Archdiocesan Settling
    Insurer Entities, and the Parish Settling Insurer Entities, and pursuant to section 105 of
    the Bankruptcy Code:
        (a) any and all Channeled Claims are channeled into the Trust and shall be treated,
            administered, determined, and resolved under the procedures and protocols and in
            the amounts as established under the Plan and the Trust agreement as the sole and
            exclusive remedy for all holders of Channeled Claims; and
        (b) all Persons who have held or asserted, hold or assert, or may in the future hold or
            assert any Channeled Claims are hereby permanently stayed, enjoined, barred and

## B.  The release of third-party liability is prohibited in several circuits

11 U.S.C. § 524(e) states that "discharge of a debt of the debtor does not affect the

liability of any other entity on, or the property of any other entity for, such debt." The United

---

restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, including:

(1) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities;

(2) enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, or the property of any of the Protected Parties or Settling Insurer Entities, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities, or any other Person;

(3) creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties, the Archdiocesan Settling Insurer Entities, or the Parish Settling Insurer Entities, or the property of the Protected Parties or the Settling Insurer Entities; and

(4) asserting, implementing or effectuating any Channeled Claim of any kind against:

(i)  any obligation due any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities;

(ii) any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities; or

(iii) the property of any of the Protected Parties, Archdiocesan Settling Insurer Entities, or Parish Settling Insurer Entities.

For the avoidance of doubt, Tort Claimants can proceed under Section 5.2, solely to the extent provided therein. Tort Claimants and the Trust shall be permitted to name the Archdiocese and any other Protected Party in any proceeding to resolve whether the Archdiocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies. The foregoing injunction on enforcement, attachment, collection and recovery shall apply except as to the Non-Settling Insurers. In the event a Tort Claimant obtains a judgment against the Archdiocese, which by statute becomes a lien against real estate, the Tort Claimant shall, immediately upon request of the Reorganized Debtor, execute a release of such lien.

The foregoing channeling injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section 13 shall inure to the benefit of the Protected Parties, Archdiocesan Settling Insurer Entities, and Parish Settling Insurer Entities. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing. [ECF 887 at 65–66.]

States Courts of Appeals for the Fifth, Ninth, and Tenth Circuits have all interpreted Section 524(e) to prohibit non-consensual third-party releases like the one that would be imposed by the Archdiocese's Plan. *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401–02 n.6 (9th Cir. 1995); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir. 1990). All three Circuits agree that bankruptcy courts lack authority under 11 U.S.C. § 105 to affect the liabilities of third parties. *Zale Corp.*, 62 F.3d at 760; *Lowenschuss*, 67 F.3d at 1401–02 n.6; *W. Real Estate Fund, Inc.*, 922 F.2d at 601. The Fifth Circuit also held that bankruptcy courts lack subject matter jurisdiction to release claims against non-debtors where, as here, the claims to be released are not property of the estate. *Zale,* 62 F.3d at 760.

The Eighth Circuit Court of Appeals has not ruled on this issue and the Committee does not advocate the position that a channeling injunction should be unavailable under any circumstances. In fact, the Committee believes that reaching the issue is unnecessary because the Debtor's Plan does not meet the requirements for a channeling injunction (as set forth in the next section) in any event. If this Court, however, is inclined to follow the Fifth, Ninth, and Tenth Circuits, the Debtor's proposed Channeling Injunction renders its Plan legally unconfirmable.

### C. The Archdiocese cannot satisfy the legal standard established by courts that allow third-party releases

Courts that permit third-party releases require parties to satisfy an exceptionally high standard before such extreme relief can be obtained. Such courts have acknowledged that third-party releases are "a rare thing . . . and only upon a showing of exceptional circumstances" should a bankruptcy court "even entertain the possibility of a permanent injunction." *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

To determine whether exceptional circumstances exist to justify a third-party release, bankruptcy courts analyze the following five factors:

- The identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate.
- Whether the non-debtor has contributed substantial assets to the reorganization.
- Whether the injunction is essential to reorganization.
- Whether impacted creditors have "overwhelmingly" voted to accept the proposed plan treatment.
- Whether the plan provides a mechanism for the payment of all, or substantially all of the claims of the creditors affected by the injunction.

*See id.* at 935.  The last two factors are the most significant in assessing third-party releases.  *See, e.g.*, *In re Riverbend Leasing, LLC*, 458 B.R. 520 (Bankr. N.D. Iowa 2011); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768 (Bankr. N.D. Tex. 2007). The Debtor's Plan fails to satisfy any of the *Master Mortgage* factors, much less the most significant factors of overwhelming creditor support and payment in full of the abuse survivors' claims.

### 1. The only creditors impacted by the Channeling Injunction (i.e., survivors of clergy sexual abuse) overwhelmingly *rejected* the Archdiocese's Plan

No court has imposed third-party releases after affected creditors rejected the plan that contained them. In fact, creditor support for proposed releases is considered the "single most important factor" of those outlined in the *Master Mortgage* decision. *See, e.g.*, *Master Mortg.*, 168 B.R. at 938. Consistent with this view, many courts have expressly premised their approval of third-party releases on the affirmative acceptance of affected creditors. *See, e.g., Matter of Specialty Equip. Co., Inc.*, 3 F.3d 1043, (7th Cir. 1993) (allowing release if those creditors who rejected the plan or abstained from voting could still pursue claims against third-parties); *In re Washington Mutual, Inc.*, 442 B.R. 314, 354–55 (D. Del. 2011) ("[T]he court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *In re Digital Impact, Inc.*, 223 B.R. 1 (Bankr. N.D. Okla. 1998) (ruling that plan could not be confirmed if any party

5

who would be bound by the release did not vote in favor of the plan); *In re W. Coast Video Enters., Inc.,* 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the release must individually affirm same . . . ."); *see also  Ocean Carriers Ltd.*, 251 B.R. 31, 43 (D. Del. 2000) (requiring that the affected class accept the plan by *at least* the percentages required by section 1126 of the Bankruptcy Code); *In re Flintkote Co.*, 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted in favor of the Plan).

In this case, only the survivors of clergy sexual abuse are impacted negatively by the proposed Channeling Injunction. Four hundred and forty-three survivors of clergy abuse filed claims against the Archdiocese and such claims provide prima facie evidence of a collective liability that exceeds $1.5 billion. More than 91% of survivors cast a vote on the Archdiocese's Plan and, of those survivors who voted, more than 93% rejected the Archdiocese's Plan. [ECF 1041, at 1.] If the Court were to confirm the Archdiocese's Plan and impose the Channeling Injunction it proposes in the face of such a clear repudiation by affected creditors, it would be the first bankruptcy court in the country to do anything of the kind. Based solely on the survivors' overwhelming rejection of the Archdiocese's Plan and the Channeling Injunction it contains, the Court should deny confirmation of the Debtor's Plan as a matter of law.

## 2.  The Debtor's Plan pays abuse survivors only a small percentage of their claims

The *Master Mortgage* factors also require that affected creditors receive payment in full for their released claims or that, at a minimum, the proposed plan include a mechanism for creditors to pursue payment in full. *See, e.g.*, *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014); *Wool Growers*, 371 B.R. at 778. In this case, abuse survivors are neither paid in full nor provided a mechanism to pursue full payment of their claims. In the

aggregate, the claims of abuse survivors exceed $1.5 billion on their face and the only jury

verdict issued after passage of the Minnesota Child Victims Act awarded a single victim $8.1

million.[2] Based on the prima facie evidence on the record, $155 million does not represent

payment in full for the 443 abuse claimants.

Further, the proposed Channeling Injunction does not provide for any additional funds to

be made available to the trust in order to provide for payment in full of survivor claims at any

time after the Effective Date. *See, e.g.*, *Specialty Equip. Co.*, 3 F.3d at 1044–45 (noting that plan

provided for payment in full of priority and general unsecured claims); *In re Drexel Burnham*

*Lambert Grp., Inc.*, 960 F.2d 285, 288 (2d Cir. 1992) (stating that impaired parties received a pro

rata share in a fund established to satisfy their claims and estimated by the court to satisfy them

in full); *In re A.H. Robbins Co.*, 880 F.2d 694, 697 (4th Cir. 1989) (discussing that plan created

claimant fund estimated to pay in full all tort claimants affected by injunction); *Wool Growers*,

371 B.R. at 777 ("As for the fifth factor, most courts have held that full payment is necessary.").

The *Wool Growers* decision is particularly instructive on this point. In *Wool Growers*, the

court held it could not confirm a debtor's plan despite the debtor's satisfaction of the first four

*Master Mortgage* factors because the fifth factor, payment in full, would not be satisfied. *Wool*

*Growers*, 371 B.R. at 777 ("[T]he Court is of the opinion that the fifth factor is critical for

approval."). Acknowledging that nonconsenting creditors would only receive payment in the

amount of, at most, sixty to seventy percent of the face value of their claims, the court held that

the release would "override vested state law rights without explicit authority under the

Bankruptcy Code to justify such a position." *Id.* at 778. Under the Debtor's Plan, the abuse

---

[2]        Chao Xiong, *Jury Finds Diocese of Duluth and Catholic Order Responsible for Sex Abuse*, Star
Trib. (Nov. 4, 2015), http://www.startribune.com/jury-finds-diocese-of-duluth-and-catholic-order-
responsible-for-child-sex-abuse/ 340388931/.

survivors in this case will not recover anywhere near sixty to seventy percent of their claims against the Released Parties and, if confirmed, the Debtor's Plan would thoroughly and permanently override the vested state tort law rights of hundreds of survivors of childhood sexual abuse without any explicit authority for doing so under the Bankruptcy Code. The Debtor's Plan fails to provide for payment in full, or a mechanism for creditors to achieve payment in full, and confirmation should thus also be denied as a matter of law because the Debtor's Plan fails to satisfy the fifth *Master Mortgage* factor.

### 3.  The Released Parties do not make a substantial contribution

Each recipient of a third-party release must also contribute substantial assets to the estate in exchange for such a release. *Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935. "Courts evaluating this factor have found a contribution to be 'substantial' where the contribution consists of most of the assets of the contributing party." *In re HWA Props., Inc.*, 544 B.R. 231 (Bankr. M.D. Fla. 2016); *see also In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the contribution is significant in terms of what the partners are able to pay."). In exchange for the full release of their liability for over 400 sexual abuse personal injury claims, the Released Parties would contribute $0 of their own assets under the Debtor's Plan. [ECF 888, at 12–13.] The parishes would contribute only proceeds from their insurance policies in the amount of $13,732,500.[3] [*Id.*] The Released Parties would also waive

---

[3]      The Committee has not been provided any meaningful explanation of the basis for the liquidation of all parish insurance coverage for $13,732,500, and no justification for this dollar figure has been presented to the Court. Accordingly, the Committee is not satisfied that the figure at issue represents a reasonable value for the effective liquidation of the parishes' insurance contracts, and the Committee is confident that the $13,732,500 figure does *not* represent a substantial contribution of the liquidation value of *all* of the parishes' assets, as it should.

claims against the bankruptcy estate, but the vast majority of such claims are statutorily disallowed under Section 502(e)(1)(B). [*Id.*]

These proposed contributions represent an insubstantial portion of the assets held by the Released Parties and are woefully inadequate to justify depriving hundreds of objecting survivors of the right to pursue more than $1 billion in state law tort claims against non-debtor third parties. Documents already in the record reflect that the parishes alone held more than $1.4 billion in *net* assets as of 2010, and nothing in the record suggests that parish holdings have diminished since that time. [ECF 631, at 56.] Even if evidence of parish holdings is finally provided at some later point, and such evidence shows that parish holdings have diminished, there is no reasonable basis to believe that zero dollars represents "most of the assets of the contributing part[ies]."

The contribution that would be made by the Released Parties under the Debtor's Plan is not substantial. The second *Master Mortgage* factor is thus not satisfied and the Debtor's Plan should be deemed unconfirmable as a matter of law.

### 4. The Debtor and the Released Parties have not shown the requisite identity of interest and the channeling injunction is not necessary to the Debtor's successful reorganization

To release creditor claims against non-debtors, courts require an identity of interest between the debtor and third-party "such that a suit against the non-debtor is, in essence, a suit against the debtor." *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002). Courts additionally require that "the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." *Id.*

The Released Parties, in particular the parishes, have emphasized throughout this case that they are legally and operationally distinct from the Archdiocese. [*See, e.g.*, ECF 231 at 15;

654; 694–707.] Based on these assertions, and over the strenuous objection of the Committee, the parishes fought to form their own committee and retained bankruptcy and insurance coverage counsel to protect their independent rights, who have since charged very substantial sums to the estate in legal fees and related costs. [ECF 215; 209; 464; 475; 492; 602; 610; 822; 831.] The Debtor has, at various points in the case, advocated diametrically opposed positions on the issue of its identity of interest with the Released Parties when it has served its purposes to do so and the Released Parties have done the same thing. At this point, any identity of interest between the Debtor, the parishes, and the other Released Parties must be considered theoretical at best, and a theoretical identity of interest is inadequate to justify the extreme relief sought in the form of the Channeling Injunction. *In re Cont'l Airlines*, 203 F.3d 203, 217 (3d Cir. 2000) ("[T]o protect non-debtor parties on the basis of theoretical identity of interest alone would turn bankruptcy principles on their head. Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.").

The Debtor and Released Parties will argue that potential indemnity and contribution claims provide the requisite identity of interest between the parties and make the Channeling Injunction necessary to the Debtor's successful reorganization. The Released Parties have yet to provide any viable legal basis for their alleged indemnity and contributions claims, however, and any contingent indemnity and contribution claims held by the Released Parties are statutorily disallowed under Section 502(e)(1)(B) of the Bankruptcy Code in any event. *See Dow Corning Corp.*, 280 F.3d at 658 (requiring the bankruptcy court make specific findings relating to each individual released party, rather than sweeping statements regarding the parties collectively).

### 5. Each proposed release must meet all of the applicable requirements

The Debtor's Plan would provide third-party releases to more than 200 non-debtor entities. The fact that a large volume of releases is being proposed does not diminish the

Debtor's obligation to satisfy each of the requirements for a third-party release *for each of the proposed recipients of such a release*. This means that the Debtor would be required to justify *each* third-party release separately by demonstrating that: (i) each releasee will make a substantial contribution to the estate, and (ii) each proposed release is necessary to the Debtor's successful reorganization.

Affected creditors have overwhelmingly rejected the Debtor's Plan, the claims to be released will not be paid in full, the proposed releasees are not being required to make a substantial contribution, and the proposed releases are not necessary to the Debtor's successful reorganization. For these reasons, and others above, the Debtor's Plan cannot be confirmed as a matter of law.

**Objection 2: Confirming the Debtor's Plan would constitute a final disposition of the survivors' claims against non-debtor parties in contravention of Article III of the United States Constitution**

Even assuming that (i) third-party releases are allowed in this District, (ii) federal subject matter jurisdiction exists to release third-party claims against non-debtors, and (iii) the Debtor's failure to satisfy any of the *Master Mortgage* factors is somehow overcome, this Court cannot confirm the Debtor's Plan as a matter of law because it lacks the power under Article III of the United States Constitution to adjudicate or enter a final judgment on the state law claims of abuse survivors against non-debtor parties.

The scope of a bankruptcy court's adjudicatory authority depends upon the type of proceeding before it and is subject to constitutional limitations. Bankruptcy courts may "enter appropriate orders and judgments" only in "cases under title 11" and "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1); *see Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932, 1945 (2015). A proceeding solely between non-debtor

parties based on non-bankruptcy law is not a case under title 11, nor does it fall within a bankruptcy court's "arising under" jurisdiction. *See, e.g.*, *Digital Impact, Inc.*, 223 B.R. at 11. The survivor claims released by the Debtor's Plan are claims "'between two private parties' based on state common law or statutes that are not closely intertwined with federal regulatory program." *In re Millennium Lab Holdings II, LLC*, BR 15-12284-LSS, 2017 WL 1032992, at *13 (D. Del. Mar. 17, 2017), *as amended* (Mar. 20, 2017) (quoting *Stern v. Marshall,* 131 S. Ct. 2594, 2614 (2011)). Accordingly, the survivors of abuse are entitled to Article III or state court adjudication of their claims, and *Stern* dictates that "no final order could be entered on such claims by an Article I court, barring consent of the parties." 131 S. Ct. at 2614. Confirmation of the Debtor's Plan, due to the Channeling Injunction it contains, would constitute a final order on the survivors' claims against non-debtors and would thus exceed the bankruptcy court's jurisdictional reach.

The fact that bankruptcy courts routinely confirm plans of reorganization does not cure this jurisdictional problem. The Supreme Court has held that even proceedings that are clearly "core" under the Bankruptcy Code are still covered by *Stern*'s constitutional prohibition when they involve the final disposition of state law claims against non-debtors. *Stern*, 131 S.Ct. at 2618 ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."); *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172 (2014) ("*Stern* made clear that some claims labeled by Congress as 'core' may not be adjudicated by a bankruptcy court in the manner designated by § 157(b)."). In this case, the abuse survivors' state law claims against the non-debtor Released Parties did not arise in the Debtor's bankruptcy proceedings, nor could they be resolved in the

12

claims allowance process, because they are not claims asserted against the Debtor. *Millennium Lab Holdings*, 2017 WL 1032992, at \*13 ("If Article III prevents the bankruptcy court from entering a final order disposing of a non-bankruptcy claim against a nondebtor outside of the proof of claim process, it follows that this prohibition should be applied regardless of the proceeding (*i.e.* adversary proceeding, contested matter, plan confirmation)."). Thus, while bankruptcy courts have constitutional authority to confirm bankruptcy plans of reorganization *as a general matter*, they nevertheless lack the constitutional authority to enter final judgments disposing of *Stern* claims through a plan confirmation order.[4]

This Court's submission of a report and recommendation on confirmation to the District Court would not remedy the constitutional issue either because the survivors are entitled to an actual *adjudication* of their claims against non-debtor parties. The District Court's approval of a report and recommendation relating to the Debtor's Plan as a whole would not satisfy the survivors' rights. Abuse survivors are constitutionally entitled to *adjudicate* their claims against non-debtors before an Article III or state tribunal and the Debtor's Plan would deprive survivors of that constitutional right. As a result, the Debtor's Plan cannot be confirmed as a matter of law.

---

[4]        Moreover, a bankruptcy court cannot do indirectly what it cannot do directly. Releasing, discharging, and permanently extinguishing claims, irrespective of and without permitting any hearing on their merits, is not different from entering a final order on the merits. If anything, discharging the claims exacerbates the constitutional concerns. *Millennium Lab Holdings*, 2017 WL 1032992, at \*13 (ruling that a release contained in a plan is "tantamount to resolution of those claims on the merits"); *Digital Impact, Inc.*, 223 B.R. at 13 n.6 ("A release, or permanent injunction, contained in a confirmed plan . . . has the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have *an opportunity* to present their claims or defenses to the court for determination . . . ."); *see also CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir. 1999) ("The principle of claim preclusion applies to final orders overruling objections to a reorganization plan in bankruptcy proceedings just as it does to any other final judgment on a claim.").

**Objection 3:   The Debtor's Plan improperly allows and channels all Class 13 claims (i.e., Parish contribution and indemnity claims) to a creditor trust**

As a threshold issue, no parish has asserted a quantifiable contribution or indemnity claim against the Debtor and no parish has provided a legal or contractual basis for such alleged claims. Even assuming that such claims have a basis, the claims are nevertheless disallowed as a matter of law by the express terms of Section 502(e)(1)(B).[5] The Debtor's treatment of Class 13 claims therefore directly contradicts the plain language of 11 U.S.C. § 502(e)(1)(B).

The Section 4.13 of the Debtor's Plan relating to treatment of Class 13 claims states: "Class 13 Claims constitute Channeled Claims and shall be channeled to the Trust. For the avoidance of doubt, it is anticipated that Class 13 Claims shall be extinguished as a result of the terms of this Plan and Claim Resolution Agreements provided to the Trust under Section 5.2(k)." [ECF 887, at 29.] Section 502(e)(1)(B) of the Bankruptcy Code states:

> (e)(1) Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that …
>         (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution ….

11 U.S.C. § 502(e)(1)(B) (2017).

Section 502(e)(1)(B) requires disallowance of a claim when three elements are established: (i) the claim is for reimbursement or contribution; (ii) the claimant is "liable with the debtor" on the claim; and (iii) the claim is contingent at the time of the allowance or disallowance. *See, e.g., Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 94 (S.D.N.Y. 2012), *aff'd sub nom. In re Lyondell Chem. Co*., 542 Fed. Appx. 41 (2d Cir. 2013). All

---

[5]    Counsel for the Parish Committee has conceded that contribution and indemnity claims are statutorily disallowed. [ECF 821, at 26.]

Case 15-30125   Doc 1112   Filed 07/07/17   Entered 07/07/17 14:31:26   Desc Main
Document     Page 15 of 35

three of these requirements are satisfied with respect to the parishes' alleged contribution and indemnity claims.

### A.  Parish claims are for reimbursement or contribution

The plain language of the parish claims makes clear that they are claims for reimbursement or contribution. Each parish claim contains the following statement (or a statement that is substantively identical in relevant respects):

> To the extent claims have been, or will in the future be, asserted against [the parish] for damages related to sexual abuse claims against clergy assigned to the [parish] by the Debtor, [the parish] asserts claims for contribution and indemnification against the Debtor. Said claims will include reimbursement for the full amount of any damages incurred by the [parish] as a result of such claims, as well as any costs and attorneys' fees incurred by it in defending against said claims.

[*See, e.g.*, Claim 458.] The parishes have expressly asserted claims for contribution or, in the alternative, for reimbursement for liability and legal expenses. *See, e.g.*, *Route 21*, 486 B.R. at 94–95 (finding that "indemnification" is synonymous with "reimbursement"). Accordingly, the first requirement for disallowance under Section 502(e)(1)(B) is satisfied.

### B.  The parishes are liable with the Archdiocese

The contribution and indemnity claims of the parishes also satisfy the second requirement for disallowance under Section 502(e)(1)(B). The term "liable with the debtor" has "been determined to be extremely inclusive and do[es] not have to be based on a specific co-obligor theory, or on an adjudication of joint liability." *In re Celotex Corp.*, 289 B.R. 460, 466 (Bankr. M.D. Fla. 2003). "[T]he weight of the judicial authority concludes that joint tortfeasors' contingent claims must be disallowed." *In re Wedtech Corp.*, 87 B.R. 279, 283 (Bankr. S.D.N.Y. 1988). The parishes' claims "arise out of" the abuse survivors' lawsuits, which are "grounded on allegations of joint wrongdoing. This is sufficient to constitute a claim by an 'entity that is liable

15

with the debtor' within the meaning of section 502(e)(1)(B)." *In re Am. Cont'l Corp.*, 119 B.R. 216, 219 (D. Ariz. 1990).

### C.  The parishes' claims are contingent

Finally, the parishes' claims satisfy the third requirement for disallowance under Section 502(e)(1)(B) because they are contingent, and they will remain contingent at such time as they are allowed or disallowed. "[A] claim is contingent 'if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.'" *Route 21*, 486 B.R. at 97 (citations omitted). The parishes have not identified any actual amounts owed, and, regardless of their theory of the Debtor's liability, they cannot do so at this point. Instead, the parishes' claims refer to a *potential* obligation on the part of the Debtor to reimburse them *in the event that* they are found liable in future abuse litigation. Until that future event occurs, the parishes' claims against the Archdiocese remain contingent as a matter of law and must be disallowed under Section 502(e)(1)(B).

### Objection 4:  The Parishes and other related Catholic entities are insiders of the Archdiocese

Section 1129(a)(10) requires that, for the Debtor's Plan to be confirmed, at least one *non-insider* class of creditors must have voted in favor of it. Members of Classes 3, 8, and 13 in this case are all insiders of the Debtor, and thus Classes 3, 8, and 13 cannot qualify as the requisite accepting class for the purposes of Section 1129(a)(10).

### A.  All Parishes are "insiders" of the Debtor

Section 101(31) defines "insider" as including an "(E) affiliate, or insider of an affiliate as if such affiliate were the debtor," and Section 101(49)(A) defines "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor." 11 U.S.C. §§ 101(31), (49)(A). Although

other sections of the Bankruptcy Code carve out exceptions for non-profit corporations, the definitions contained in Section 101 refer to *all* corporations. *Id*. Courts have, therefore, deemed entities to be insiders if "one entity holds 20 percent or more of the voting position on the board of directors of another entity." *In re Locke Mill Partners*, 178 B.R. 697, 701 (Bankr. M.D.N.C. 1995).

Each parish board consists of five members – the Archbishop, the Vicar General, the parish pastor, and two lay members. [ECF 231 at 15.] Two of those five members – the Archbishop and Vicar General – are employees of the Archdiocese. *Id.* Additionally, the parish pastor is selected and placed at the parish by the Archdiocese. *Id*. The Archdiocese thus controls 60 percent of the parish boards, which is significantly more than the 20 percent threshold for an entity to be considered an insider. Class 8 contains only parishes, and therefore should be classified as an insider class, and all parish claimants in Classes 3 and 13 must be classified as insiders as well.

**B. All voting members of Classes 3, 8, and 13 are sufficiently "close" to the Debtor to be classified as insiders**

In addition to statutorily-defined classes of insiders, courts also note that, "[b]y virtue of the nonlimiting term 'includes,' the [] definition [of the term insider] is intended to be illustrative rather than exhaustive." *Matter of Krehl,* 86 F.3d 737, 741 (7th Cir. 1996); *see also In re Newcomb*, 744 F.2d 621, 625 n. 4 (8th Cir. 1984). The legislative history of the definition of "insider" clarifies that "an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." S. Rep. No. 95–989, at 25 (1978), H.R. Rep. No. 95–595, at 312 (1977). "In ascertaining insider status, then, courts have looked to the closeness of the relationship between the parties

and to whether any transactions between them were conducted at arm's length." *Krehl*, 86 F.3d at 742.

All voting members of Classes 3, 8, and 13 (the "Insiders") have a sufficiently close relationship with the Archdiocese to merit insider classification. In the words of Debtor's counsel, they are "members of the Catholic family" and "will continue to be part of the Archdiocese" after this case concludes. [ECF 821 at 58.] Positions taken by the Debtor, as well as the Debtor's actions throughout this case have demonstrated such closeness. The Debtor's Plan, as described above, provides most of the Insiders with broad releases of liability, and such protection is provided despite the estates receiving no contribution of assets in exchange.

The Debtor also protected many of the Insiders from exposure to avoidance actions. When the Committee presented the Debtor with a list of potential avoidance defendants, the Debtor failed to work cooperatively with the Committee and, instead, immediately shared the Committee's communication with the parishes and other Catholic institutions. [ECF 907 at 16.] The Debtor then collaborated with those entities and, in fact, led the effort to resist the Committee's motion for derivative standing. *Id.* The Debtor's reaction was inconsistent with its obligation under 11 U.S.C. 1129(a)(3) to maximize assets available to creditors and further illustrated the closeness of the Debtor's relationship with the Insiders.

In determining whether an entity is an insider of a debtor, another "controlling consideration[] is the relative degree of control which either has over the other." *In re Locke Mill Partners*, 178 B.R. at 702 (citing *In re Gilbert*, 104 B.R. 206 (Bankr. W.D. Mo. 1989)).

> For the purposes of deciding whether an entity is an insider of the debtor it is not necessary that the debtor have actual control in the sense of legal decision making power. Instead, it is sufficient if the debtor exercises *significant* influence over the business and decisions of the entity in question. If so, such entity is an 'insider' of the debtor.

18

*Id.* at 701 (citations omitted).

The Committee provided evidence of dozens of transactions between the Archdiocese and most of the Insiders in its Motion for Substantive Consolidation that illustrate the closeness between such entities and that illustrate the actual and *de facto* control that the Debtor routinely exercises over the Insiders.[6] [ECF 631.] Among other things, the Committee provided evidence for the Archdiocese's ability to merge or close parishes and other Catholic entities, control legal and financial decisions, and unilaterally impose employment policies and benefit plans. *Id.* The Debtor even certifies its control over nearly all of the Insiders to the Internal Revenue Service. *Id.* at 21–25. These examples, and others pleaded in the Committee's Motion, show that the Debtor exercises "significant influence over the business and decisions" of the Insiders.

In the event that the information currently available in the record is not sufficient to demonstrate the close relationship between the Debtor and the voting members of Classes 3, 8, and 13, and the need to treat voting members of those classes as insiders, the Committee respectfully requests the opportunity to conduct discovery and further develop the factual record before the Court rules on this objection.

**Objection 5: The Debtor's Plan artificially impairs trade vendor claims**

A plan that contains a manufactured impairment "must be regarded as having circumvented the purpose of the statute, namely, consensual reorganization." *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993). In *Windsor*, the Eighth Circuit ruled that delayed payment to trade creditors for 60 days after the plan effective date was an example of a manufactured impairment. *Id.*

---

[6]     While the standard and level of scrutiny are significantly lower in an insider analysis than in the context of a motion for substantive consolidation, the facts pleaded in the Committee's Motion remain highly relevant to the analysis of the Catholic Entities' status as insiders.

Courts in the District of Minnesota have applied *Windsor* to deem claims unimpaired "if the alteration of rights in question *arises solely from the debtor's exercise of discretion*." *In re Kellogg Square P'ship*, 160 B.R. 343, 360 (Bankr. D. Minn. 1993) (citations omitted). To determine if an impairment arises from the debtor's discretion, courts must perform "a searching examination into the financial defensibility of the impairment. . . . giv[ing] virtually no deference to the debtor's rationale." *Id.* at 361.

The Debtor's Plan pays trade vendors in full 180 days following the Effective Date.[7] The Debtor provides no legitimate explanation for this delay. The Debtor's Plan, if confirmed, would pay millions in administrative expenses on its Effective Date and still transfer well in excess of $100 million into a trust.

There is no logical justification—other than artificial impairment—for the proposed 180-day delay in payment of $260,481 to trade vendors under the Debtor's Plan. [ECF 887 at 131.] The Debtor's ability to pay trade vendors on the Effective Date is established by information already on the record in this case and, thus, the Committee believes this issue to be ripe for

---

[7]      Section 4.9 of the Debtor's Plan states:
  **(a) Definition**. A Class 9A Claim (a "Class 9A Convenience Claim") means an allowed claim against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date, as set forth on Schedule 3, that is: (i) in the amount of $1,000 or less, or (ii) reduced by the holder to $1,000 on the ballot. Class 9A Convenience Claims shall not include any claims classified and treated under any other class under the Plan.
  **(b) Treatment**. The holders of Class 9A Convenience Claims shall receive, directly from the Reorganized Debtor, payment in full of such allowed claim, without interest, within 30 days following the Effective Date. The Archdiocese estimates that the total payment to creditors in Class 9A will equal approximately $50,000.
  **(c) Definition**. A Class 9B Claim means any allowed claim against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date, as set forth on Schedule 3, that is: (i) in the amount in excess of $1,000, and (ii) has not been reduced to $1,000 by election on the ballot. Class 9B claims shall not include any claims classified and treated under any other class under the Plan.
  **(d) Treatment.** The holders of Class 9B Claims shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 9 Claim, without interest, in two equal installments. The first installment shall be due within 90 days following the Effective Date. The second installment shall be due and payable within 180 days following the Effective Date. [ECF 887 at 27–28.]

resolution by the Court as a matter of law. If, however, the Court construes the Debtor's ability to pay its trade vendors on the Effective Date to be an open, factual question, the Committee intends to conduct discovery on the issue. If such discovery reveals that the Debtor did, in fact, artificially impair trade vendors in an underhanded attempt to secure "cram down" rights against survivors of clergy abuse, the Committee intends to argue that such actions constitute an additional violation of the Bankruptcy Code's good faith requirement under Section 1129(a)(3).[8]

**Objection 6:  The Debtor has not complied with the applicable provisions of the Bankruptcy Code**

The proponent of a plan must comply with the provisions of the Bankruptcy Code. 11 U.S.C. §1129(a)(2). The Archdiocese has failed to comply with all applicable provisions of the Bankruptcy Code throughout the course of the bankruptcy proceeding.

Section 1107 of the Bankruptcy Code requires a debtor-in-possession, such as the Archdiocese, to "perform all the functions and duties . . . of a trustee serving in" a Chapter 11 case, with a few specified exceptions. 11 U.S.C. § 1107. A Chapter 11 trustee is required, among other tasks, to "perform the duties of the trustee, as specified in paragraphs (2), (5), (7), (8), (9), (10), (11), and (12) of section 704(a)." 11 U.S.C. § 1106(a)(1). Section 704(a)(7) requires a trustee, and thus a debtor-in-possession, to "furnish such information concerning the estate and the estate's administration as is requested by a party in interest." 11 U.S.C. § 704(a)(7).

The Archdiocese failed to comply with Section 704(a)(7) by repeatedly refusing to provide the Committee with important information regarding the estate and its administration. As discussed above, the Archdiocese made parish financial information relevant to the estate's administration by insisting on the inclusion of the Channeling Injunctions in its Plan. *See supra* Objection 1. The Committee has made multiple formal and informal requests for parish financial

---

[8]     For an overview of other arguments relating to good faith, see *infra* Objection 7.

information throughout the case and the Debtor has consistently refused to provide such information. In fact, the Debtor invested material time and financial resources into blocking the Committee's access to such information. [*See, e.g.*, ECF 796.] The Debtor's unjustified, persistent, and improper refusals to provide parish financial data materially delayed the administration of this case, caused the accrual of unnecessary fees and costs, and violated Section 704(a)(7).

The Debtor also violated Section 704(a)(7) by failing to provide the Committee with information regarding potential avoidance actions or the Debtor's purported analysis of such actions. On May 26, 2016, the Debtor filed its disclosure statement and plan of reorganization. [ECF 655; 656.] The Debtor states in its disclosure statement that it has "investigated and does not believe that it has any colorable avoidable transfer claims worthy of pursuit." [ECF 888, at 32.]  At that point in time, the Committee had not seen any avoidable transfer analysis conducted by the Debtor, but trusted that such an analysis had been completed based on the Debtor's explicit representations.

On September 28, 2016, the Committee requested the results of the Debtor's avoidance action analysis along with any supporting documents and data. [*See* ECF 907.] The Debtor refused to provide any further information to the Committee. [*Id.*] Instead, the Debtor provided only a blanket statement that it believed "the *overwhelming majority* of" avoidance claims to be "subject to various preference defenses, including the new value defense and the defense for payments made in the ordinary course of business." [*Id.*] (emphasis added). In addition to providing the Committee no reasonable insight into the basis for the Debtor's conclusions, the Debtor's representation was materially inconsistent with the representation in its disclosure

statement it did not have "*any* colorable avoidable transfer claims worthy of pursuit." [ECF 888, at 32.]

Because the Debtor would not share sufficient information voluntarily, the Committee was forced to seek authorization from the Court to conduct a 2004 examination of the Debtor to investigate potential avoidance claims. [ECF 790.] The Debtor objected to the Committee's motion. [ECF800.] On November 10, 2016, the Court granted the Committee's motion over the Debtor's objection. [ECF 809.]

During its 2004 examination, counsel for the Debtor admitted that it had not reviewed any invoice data in the course of its purported analysis of preferential transfer defenses. [*See* ECF 908]. A detailed factual analysis, including the review of invoices, is critical in assessing whether payments made by a debtor were made in the ordinary course. *See In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 137 (Bankr. Del. 2012) (holding that the Court must compare historical transfers against transfers made during the preferential transfer period as "[c]ourts place particular importance on the timing of payment" in assessing whether payments were made in the ordinary course) (citations omitted); *In re Affiliated Foods Sw. Inc.*, 750 F.3d 714, 719 (8th Cir. 2014) (analysis of the ordinary course of business defense "focuses on the time within which the debtor ordinarily paid the creditor's *invoices*, and whether the timing of the payments during the 90-day [preference] period reflected 'some consistency' with that practice") (emphasis added). The assessment requires a "peculiarly factual analysis." *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991).

Pursuant to the 2004 Order, the Committee reviewed the Debtor's general ledger, bank account statements, credit card statements, check register, and thousands of invoices. Based on the Committee's review of these documents, and based on additional, contextual information

provided by the Debtor, the Committee determined that the Debtor held a significant number of viable claims for preferential and fraudulent transfers. With the statute of limitations approaching, the Committee filed a motion seeking derivative standing to pursue the preferential and fraudulent transfers. [*See* ECF 906.] The Debtor responded by objecting to the Committee's motion in an apparent attempt to protect the related Catholic entities.

The Debtor failed to comply with Section 704(a)(7) by refusing to provide the Committee with information it requested relating to avoidance actions and by actively obstructing the Committee's ability to obtain access to such information. The Committee also has reason to believe that the Debtor failed to conduct an analysis of all potential avoidance actions despite making contrary representations to both creditors and the Court. In the event that the Debtor's Plan survives legal objections, the Committee intends to take factual discovery to determine the scope and extent of the Debtor's analysis of potential avoidance actions. If discovery reveals that the Debtor did not, in fact, undertake such an analysis, the Committee also intends to argue that the Debtor's failure to pursue avoidance actions, and the Debtor's issuance of misleading statements regarding its analysis of potential avoidance actions, should be considered evidence of the Debtor's lack of good faith under Section 1129(a)(3).

**Objection 7:   The Debtor did not propose its plan in good faith**

Section 1129(a)(3) requires that a plan be proposed in good faith. To determine whether a debtor proposed its plan in good faith, courts consider "the totality of the circumstances," including the content of the proposed plan, the bankruptcy filing itself, and pre-filing conduct. *In re Reuter*, 427 B.R. 727, 770 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427 (B.A.P. 8th Cir. 2011), *aff'd,* 686 F.3d 511 (8th Cir. 2012); *see also In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000). "In essence, the good faith inquiry looks at the debtor's fairness in dealing

24

with creditors." *Reuter*, 427 B.R. at 772. Factors relevant to good faith include "'preserving going concerns and maximizing property available to satisfy creditors, giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice.'" *In re Peabody Energy Corp.*, 4:17-CV-01053-AGF, 2017 WL 1177911, at *5 (E.D. Mo. Mar. 30, 2017) (quoting *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013)). A debtor's failure to use "the full reach of its disposable resources" to pay creditor claims "is evidence that a plan is not proposed in good faith." *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994). Filing for bankruptcy to avoid paying creditor claims to the maximum extent possible is "the antithesis of good faith and not consistent with the spirit and purpose of Chapter 11." *Reuter*, 427 B.R. at 772.

Based on documentary evidence, a long-term pattern of prepetition conduct, and statements made by former employees of the Archdiocese, former officers of the Archdiocese, former priests within the Archdiocese, the Archdiocese itself, Ramsey County prosecutors, other third parties, and survivors of clergy sexual abuse, the Committee has a reasonable basis to conclude that the Archdiocese did not file bankruptcy to satisfy creditor claims to "the greatest extent possible, but with the intention of *avoiding* payment of those claims to the greatest extent possible." *Reuter*, 427 B.R. at 772. The Committee further believes that the Archdiocese has failed to use "the full reach of its disposable resources" to pay creditor claims, maximize the assets available to pay creditor claims, or exercise fairness in dealing with its creditors.

Pursuant to the Court's request during the recent hearing on June 15, 2017, the Committee provides the following overview of currently-known facts in support of its legal argument that the Debtor has failed to comply with Section 1129(a)(3). The Committee expects

and intends to pursue additional discovery on issues relevant to good faith should the Archdiocese's Plan survive legal challenges.

### A. The Debtor's bankruptcy filing was part of a decades-long strategy designed to avoid payment of clergy abuse claims to the maximum extent possible

Pre-petition conduct is relevant to an analysis of a debtor's good faith. *Reuter*, 427 B.R. at 770; *In re LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990). The Archdiocese has admitted in public statements that it placed the interests of the Archdiocese ahead of protecting the safety and wellbeing of survivors of clergy sexual abuse.[9] The Archdiocese has also engaged in a decades-long effort to avoid payment of survivor claims to the greatest extent possible, and, based on the Debtor's post-petition actions, the Committee believes that the Archdiocese's bankruptcy filing was merely the most recent step in furtherance of that same long-term effort.

Prior to filing for bankruptcy, the Archdiocese spent more than twenty years moving and sheltering assets in order to hide them from potential creditors, a process that culminated in the Archdiocese's bankruptcy petition in 2015. In 1992, a jury awarded a sexual abuse survivor $3.5 million in a case against the Archdiocese. [ECF 631, at 48.] That same year, the Archdiocese founded The Archdiocese of Saint Paul and Minneapolis Catholic Community Foundation and transferred $11.5 million with the acknowledged intent of preventing sexual abuse survivors from accessing those funds. [*Id.* at 44.] Eight years later, the Archdiocese also created the Catholic Finance Corporation, paying its $28 million start-up costs. [*Id.*]

Based on statements provided in initial interviews, the Committee anticipates that one or more former officers or employees of the Archdiocese and/or affiliated entities would testify that for more than a decade prior to its bankruptcy filing, the Debtor engaged in a wide array of

---

[9]     News Release, *Archdiocese Admits Wrongdoing in its Failure to Protect Three Children Abused by Priest*, Office of Ramsey Cty. Attorney, at 1 (July 20, 2016), https://www.ramseycounty.us/your-government/leadership/county-attorneys-office/news-updates/case-updates/state-v-archdiocese-saint-paul-minneapolis.

actions designed to minimize assets available to pay its known creditors. Based on the same interviews, the Committee understands that, beginning in the year 2000, and possibly earlier, the Archdiocese was specifically focused on ensuring that its assets would be *bankruptcy remote* to the greatest extent possible.

In 2013, the Minnesota state legislature temporarily lifted the statute of limitations on older clergy abuse cases, opening the door to a significant increase in the Archdiocese's potential liability to abuse survivors. [*Id.* at 45.] That same year, the Catholic Services Appeal Foundation was created to assume control over the annual fundraiser previously conducted by the Archdiocese. [*Id.*] The Debtor acknowledges that the Catholic Services Appeal Foundation was created to ensure that funds collected from donors would remain outside the reach of the Archdiocese's primary creditors—i.e., survivors of clergy sexual abuse. [Transcript of Meeting of Creditors at 51:2-22, 53:3-18 (taken Feb. 24, 2015).] Over the course of the following two years, leading up to and following the Archdiocese's bankruptcy petition, the articles of incorporation and names of various affiliated entities were altered, the Debtor unilaterally compelled one or more lessees of valuable Archdiocesan real property to enter into long-term "dollar" leases, multiple affiliated entities were removed from the umbrella of the Debtor's tax exempt organization number, and the internal status of one or more affiliated entities were unilaterally changed by the Debtor. The Committee has a reasonable, factual basis to believe that all of these acts were undertaken to create the perception that such entities (and their respective assets) were detached from the Archdiocese. [*Id.*] The Archdiocese's name was also painted over on signs of various cemeteries in the months following the Archdiocese's bankruptcy filing. *Id.*

The Debtor also, in the months just prior to its bankruptcy filing, took steps to reduce dramatically the cash balance of a fund that would have been available to pay creditor claims.

The Debtor established the Archdiocese Medical Benefit Plan (the "AMBP") to, among other things, receive premium payments from the participating employers and participants in its health and dental plans. The AMBP's governing document states that assets of the AMBP can be used to pay the claims of the Debtor's general creditors in the event of the Debtor's bankruptcy or insolvency. Approximately one year before the Debtor filed for bankruptcy, the board of trustees for the AMBP provided participating employers with a 20% billing credit due to a large reserve fund that had accumulated over time. [ECF 888, at 19–20.] This resulted in a return to participating employers of approximately $7,800,000. [*Id.*] Upon expiration of the credit in June 2015 (approximately six months after the Debtor filed for bankruptcy), the board of trustees for the AMBP authorized a permanent reduction in premiums of 15%. [*Id.*] This action further materially minimized funds that would have been available to pay creditor claims and the action was taken without notice to creditors and without Bankruptcy Court approval.

The Debtor also allowed an ostensibly-separate entity, the Catholic Community Foundation, to hold a reserve fund relating to the AMBP that contained approximately $8,400,000 as of the date of the Debtor's filing. After the Debtor's bankruptcy filing, the United States Trustee required the Debtor to transfer this AMBP reserve fund from the Catholic Community Foundation to an account maintained by the Debtor.

In June 2015, nearly six months after the Debtor's bankruptcy filing and following a twenty-month investigation by the Ramsey County Attorneys' Office, the State of Minnesota filed a criminal complaint against the Debtor.[10] Ten days later, former-Archbishop John Nienstedt resigned. Just over a year after the criminal complaint was filed, the Debtor and

---

[10]     *State v. Archdiocese of Saint Paul & Minneapolis*, Ramsey Cty. Attn'y's Off., https://www.ramseycounty.us/sites/default/files/County%20Attorney/Archdiocese%20of%20Saint%20Pa ul%20and%20Minneapolis%206.5.15%20%281%29.pdf.

Ramsey County amended a civil settlement and the related criminal charges were dismissed.[11] In connection with the civil settlement, the Debtor admitted that it contributed to children being sexually abused by putting the interests of the Archdiocese and its former priest above its duty to protect children.[12] Archbishop Nienstedt had served as Archbishop since May 2008 and thus oversaw the filing of the Debtor's bankruptcy and made major decisions relating to the Debtor's legal and financial strategies in the years preceding the Debtor's filing. Moreover, to the best of the Committee's understanding, many officers and employees who were in a position to influence or direct the Debtor's legal and financial strategies in 2013 and 2014 have remained in influential positions since that time and, in fact, still remain in such positions today.

After expending years of effort to make its assets bankruptcy remote, the Debtor filed for bankruptcy and proposed a plan for its reorganization. Pursuant to its Plan, the Debtor would pay approximately $155 million (comprised of $13 million of its own assets) into a creditors' trust to address more than $1.5 billion in claims held by survivors of clergy sexual abuse. The Debtor's Plan would also impose a Channeling Injunction to provide third-party releases to more than 200 Released Parties. In the aggregate, claims against the non-debtor, Released Parties likely have a value of hundreds of millions of dollars. According to self-reports and other information, the Released Parties hold more than $1.4 billion in assets – and this is after their liabilities are deducted. [*See* ECF 631, at 56.] A former officer of the Archdiocese has provided affidavit testimony stating that the Archdiocese exercises ultimate control over the substantial assets held by the Released Parties and significant documentary evidence supports such testimony. [ECF 634.] Nevertheless, under the Debtor's Plan, the Released Parties would not contribute any of their own funds in exchange for releases.

---

[11]      News Release, *supra* note 9.
[12]      News Release, *supra* note 9.

**B.  The Debtor has failed to maximize property available to pay creditors or to use "the full reach of its disposable resources" to pay creditor claims**

The Debtor has continued in its failure to maximize assets available to pay creditor claims in the course of its bankruptcy case.

- Based on information from a third party, the Committee believes that the Debtor, during the pendency of this case, directed organizers of the Red Bull Crashed Ice event to make a material "donation" to the Cathedral Corporation in lieu of compensating the Debtor for use of its real property.

- Information from third parties suggests that, in connection with at least two transactions, the Debtor negotiated with potential purchasers of real property in a manner that undermined competitive bidding and prioritized the Debtor's ongoing control of such properties over obtaining full market value for their sale.

- It appears likely that the Debtor failed to conduct an analysis of all potential avoidance actions despite contrary representations to the Court and its creditors. [ECF 906; 907; 908.]

- Documentation and statements and filings by a third party suggest that the Debtor either failed to disclose, or understated the value of more than $200,000 in personal property (or both), and that the Debtor may have removed portions of documents provided to the Committee in connection with the Committee's initial investigation into such issues.[13]

---

[13]     This relates to the so-called "box of loot" discussed in [ECF 687]. Documents provided to the Committee indicate that items valued at $68,776.69 in 1993 were, in a later appraisal conducted in 2014, valued at just $20,450.00, despite the fact that market value of precious metals increased dramatically in that same period. In addition, 48 items of personal property that were collectively valued at $213,153.19 in the 1993 appraisal do not appear at all on reports relating to appraisals conducted in 2014 and 2015 and, based on witness statements, the Committee believes that even the 1993 appraisal report (provided

- The Debtor failed to use "the full reach of its disposable resources" and maximize assets available for the payment of creditor claims by disregarding the Court's mediation order and negotiating collusive, under-market settlements with its insurance companies.[14]

The pre-petition and post-petition actions of the Debtor evidence a willingness to continue placing the Debtor's interests before the interests of clergy abuse survivors and the Committee believes that sufficient undisputed facts exist to deny confirmation of the Debtor's Plan as a matter of law, without further investigation, on grounds that the Debtor has failed to satisfy Section 1129(a)(3). Many of the facts supporting denial of the Debtor's Plan for failure to comply with Section 1129(a)(3) are undisputed. Actions taken by the Debtor to shield assets and ensure they were placed outside the reach of creditors (i.e., survivors of clergy abuse) are a matter of public record and agents of the Debtor have acknowledged: (1) that the Catholic Services Appeal and the Catholic Community Foundation were, in fact, created with such an intent in mind, [ECF 631, at 44; Transcript of Meeting of Creditors at 51:2-22, 53:3-18 (taken Feb. 24, 2015)]; (2) that the Debtor divested nearly $8,000,000 in cash that could have been used to pay creditor claims in the months immediately preceding its bankruptcy case, [ECF 888, at 29–30]; (3) that the Debtor violated this Court's mediation order to enter settlements with its insurers without creditor participation, [ECF 54]; and (4) that the Debtor placed its interests

---

by the Debtor) did not memorialize all of the relevant personal property because, again according to third party statements, the 1993 appraisal report was missing pages.

[14] On January 21, 2015, the Court ordered the Archdiocese, the Committee, and the insurance companies to participate in mediation. [ECF 54.] The Court's order has never been terminated and the mediator, Judge Arthur J. Boylan, has never stated that the mediation was complete. Nevertheless, the Debtor separately approached the insurance companies and entered into settlement agreements, without the participation or knowledge of the Committee. The Debtor disregarded this Court's explicit orders and entered into settlement agreements significantly below the value of the Debtor's insurance plans. These actions were not taken to maximize return for creditors and, in fact, the Debtor intentionally cut the creditors out of a process designed and intended to ensure their direct participation.

ahead of the safety and wellbeing of clergy abuse survivors.[15] It is also a matter of record in this case that the Debtor has caused the accrual of hundreds of thousands of dollars in legal fees and costs *fighting to keep assets out of its bankruptcy estate* while simultaneously seeking legally-unjustified third-party injunctions for more than 200 of its affiliates. [ECF 640; 696; 800; 928.] The Debtor's actions indicate strongly that the Debtor filed for bankruptcy, and has administered this case, with the specific goal of *avoiding* payment of sexual abuse claims to the greatest extent possible. Using the bankruptcy process to accomplish such a goal is the "antithesis of good faith" and is "not consistent with the spirit and purpose of Chapter 11."

If the Court determines that the current factual record is not sufficient to deny confirmation of the Debtor's Plan under Section 1129(a)(3), the Committee would investigate issues of good faith thoroughly before the Debtor's Plan proceeds to a final confirmation hearing. Survivors of clergy abuse have endured decades of stonewalling and obfuscation at the hands of the Debtor. It is critically important—both to preserve the integrity of this process and to protect the rights of survivors—that the Debtor's bankruptcy be transparent and not used as a final act consummating the Debtor's long-term strategy to diminish survivors claims and minimize payments to survivors.

**Objection 8:   The Debtor's Plan does not satisfy the requirements for a "cram down"**

Survivors of clergy sexual abuse voted overwhelmingly to support the Committee's proposed plan of reorganization and to reject the Debtor's Plan. Of the 443 survivors of clergy abuse who filed claims in this case, more than 91% of them cast a vote on the Archdiocese's Plan. Of those survivors who voted, more than 93% rejected the Archdiocese's Plan. [ECF 1041, at 1.] Despite this dramatic repudiation of the Debtor's Plan by its primary group of creditors,

---

[15]     News Release, *supra* note 9.

and if its Plan survives legal challenges, the Debtor will seek to "cram down" on survivors of clergy abuse under 11 U.S.C. §1129(b).

Section 1129(b) sets forth the specific requirements that must be met before a plan's proponent may cram down on non-accepting impaired classes. 11 U.S.C. §1129(b). Those requirements, however, merely "establish a floor" and "technical compliance . . . does not ensure that a plan is 'fair and equitable.'" *In re 20 Bayard Views, LLC*, 445 B.R. 83, 105 (Bankr. E.D.N.Y. 2011) (citing *In re Matter of D & F Constr. Inc.,* 865 F.2d 673, 675 (5th Cir. 1989); *In re N. Outer Banks Assocs.,* No. 10–01292–8–RDD, 2010 WL 4630348, at *8 (Bankr. E.D.N.C. Nov.8, 2010); *In re Cellular Info. Sys.,* 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994)).

Based on the legislative history of Section 1129(b), and its use of the word "includes" with respect to the fair and equitable requirement contained in subsection 1129(b)(2), courts have ruled that "the statute sets only minimum standards for what is fair and equitable." *In re Sunflower Racing, Inc.*, 219 B.R. 587, 603 (Bankr. D. Kan. 1998), *aff'd,* 226 B.R. 673 (D. Kan. 1998). As a result, courts "must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is fair and equitable." *Matter of D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989); *see also In re Cottonwood Corners Phase V, LLC*, 11-11-12663 JA, 2012 WL 566426, at *22 (Bankr. D.N.M. Feb. 17, 2012) ("[T]he court should consider several factors . . . Whether the proposed payment demonstrates a good faith effort to pay the debt . . . Whether the risks are unduly shifted to the creditor . . . Whether there is any special prejudice to the dissenting class arising from its particular circumstances.").

The Debtor's Plan cannot satisfy the fair and equitable standard as a matter of law with respect to the claims of clergy abuse survivors. Most fundamentally, as detailed in previous

sections, the Debtor's Plan does not represent a good faith effort to pay creditor claims, but instead memorializes and manifests the Debtor's decades-long effort to undermine the rights of clergy abuse survivors and minimize assets available to them. If confirmed, the Debtor's Plan would permanently terminate the Debtor's liability for approximately $1.5 billion in clergy abuse claims and the Debtor's Plan does not even require the Debtor to contribute the liquidation value of its assets—as required by 11 U.S.C. § 1129(a)(7)—in exchange for such sweeping relief. In addition, confirmation of the Debtor's Plan would ratify collusive, under-market insurance settlements obtained in violation of this Court's mediation order and, most dramatically, nullify hundreds of millions of dollars in claims held against third parties, with virtually no corresponding contribution, and it would simultaneously vitiate substantial constitutional and state-law rights to pursue such claims held by hundreds of survivors of sexual abuse.

The Debtor's Plan does not treat survivors of clergy abuse fairly and equitably, and, as a result, the Debtor's Plan cannot satisfy the requirements of Section 1129(b). For this reason, and others articulated above, the Debtor's Plan should be deemed unconfirmable as a matter of law.


Dated: July 7, 2017                      *e/Robert T. Kugler*
                                         Robert T. Kugler (#194116)
                                         Edwin H. Caldie (#0388930)
                                         Brittany M. Michael (#0397592)
                                         **STINSON LEONARD STREET LLP**
                                         150 South Fifth Street, Suite 2300
                                         Minneapolis, MN 55402
                                         Telephone:  (612) 335-1500
                                         Facsimile:  (612) 335-1657
                                         Email:  robert.kugler@stinson.com
                                         Email:  edwin.caldie@stinson.com
                                         Email:  brittany.michael@stinson.com

                                         COUNSEL FOR THE OFFICIAL
                                         COMMITTEE OF UNSECURED
                                         CREDITORS

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 |
| Debtor. | |

---

## CERTIFICATE OF SERVICE

---

I, Jessica Rehbein, declare under penalty of perjury that on July 7, 2017, I caused the foregoing document to be filed electronically with the Clerk of Court, and that a copy of the above-referenced document was delivered to all parties who are Filing Users, by automatic e-mail notification pursuant to the Electronic Case Filing System, including all parties required to receive service under Local Rule 9013-3(b), and this notice constitutes service pursuant to Local Rule 9006-1(a).

July 7, 2017                    *s/Jessica Rehbein*
                                Jessica Rehbein