## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

_____

In re:                                      Chapter 11
                                            BKY 15-30125
The Archdiocese of St. Paul and
Minneapolis,

                        Debtor.
_____

**MEMORANDUM IN SUPPORT OF LEGAL OBJECTIONS TO THE OFFICIAL
COMMITTEE OF PARISH CREDITORS TO CONFIRMATION OF THE CHAPTER 11
PLAN OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
_____

The Official Committee of Parish Creditors (the "Parish Committee") submits this memorandum of law briefing its objections (filed as D.E. 1057) to the confirmation of the Official Committee of Unsecured Creditors' (the "UCC") chapter 11 plan of reorganization (the "UCC Plan") (D.E. 890). The order of argument below aligns with the order of objections stated in the Parish Committee's objections to the UCC Plan, except that the Parish Committee briefs objections 7 and 8 in combined § 7, *infra*.

1.    **The UCC Plan Fails as a Matter of Law Because it Seeks and Relies upon Collection of the GIF and AMBP Accounts.**

The UCC Plan seeks surrender of parish assets to the UCC Plan Trust (the "Trust"), including the General Insurance Fund (the "GIF") and the Archdiocese Medical Benefits Plan (the "AMBP"). While the provisions of the UCC Plan do not expressly provide for collection of the AMBP and GIF, the accompanying liquidation analysis and disclosure statement (the "UCC Disclosure Statement") (D.E. 891) plainly contemplate the Trust collecting these accounts to distribute to claimants under the Plan.

Under the Plan, the UCC proposes to have the bankruptcy court value the assets of the Debtor and require contribution of this value to the Trust. *UCC Plan*, § 5.2. The Plan incorporates Exhibit C from the Disclosure Statement as listing the assets included in the Liquidation Analysis. *Id*. Exhibit C includes the following accounts and values: (1) Archdiocese Medical Benefit Plan ($8,464,365); (2) AMBP Disbursing Account ($4,600,000); (3) Workers' Compensation Deposit ($3,871,158); and (4) General Insurance Fund ($5,000,000). *Disclosure Statement Ex. C*. The Liquidation Analysis also references $3.9 million for collection of premium rebates. *Id*.

The Disclosure Statement also states the intent for the Trust to collect these accounts. *UCC Disclosure Statement* §§ IV.B.1 (stating "that the liquidation value of the GIF…will be transferred to the Trust"); IV.B.2 (stating that "the Plan provides for the transfer of the value" of the AMBP).

There is no plausible basis under state or federal law to require contribution of the AMBP and the GIF to the Trust under the circumstances involving those accounts as acknowledged by the UCC. It does not save the UCC Plan by conditioning the contributions on the outcome of future litigation as to the status of the GIF and AMBP. Such litigation is without merit, based on the acknowledged circumstances surrounding the GIF and the AMBP and the controlling law governing such accounts. As such, the proposal to fund the Trust with funds from the GIF and AMBP accounts, even if qualified or conditional on the outcome of future litigation, violates 11 U.S.C. §§ 1129(a)(1) and (a)(2), because the proposal plainly under these circumstances does not comply with the Code and non-bankruptcy law.

The AMBP and the GIF are not assets of the bankruptcy estate available for contribution to the Trust. The UCC Disclosure Statement acknowledges that parishes have an interest in these assets. As to the GIF, the UCC Disclosure Statement describes its operation as follows:

> The Debtor administers an insurance program for the benefit of participating Catholic entities. The insurance program has operated

continuously since 1980, providing various insurance coverages for the participating entities including liability insurance, property insurance, and workers' compensation insurance. Monies collected from participating entities for the insurance program are deposited into a General Insurance Fund Account (the "GIF Account")…Contributions by participating entities are generally set annually based on historical claims and claims liability estimates and assumptions with consultation of a general insurance committee. The GIF has in the past been used to resolve sexual abuse claims and is generally available to meet retentions that need to be paid as part of the various insurance programs for the Debtor and its parishes from September 1, 1980 forward.

*UCC Disclosure Statement* at 7-8.

As to the AMBP, the UCC Disclosure Statement provides as follows:

The Debtor is the sponsoring employer and a participating employer in the Archdiocese of St. Paul and Minneapolis Comprehensive Major Medical Health Care Plan and the Archdiocese of St. Paul and Minneapolis Dental Benefit Plan (collectively, the "Health and Dental Plans"). Other Catholic entities also participate in the Health and Dental Plans – in fact, Catholic entities represent more than 90% of participation in the Health and Dental Plans. The Debtor has established a fund (the "AMBP") to receive premium payments from the participating employers and participants in the Health and Dental Plan, and to pay claims, stop-loss insurance premiums, and other reasonable expenses associated with the administration of the Health and Dental Plans.

*Id.* at 8-9.

Under state law, Parishes hold the equitable interest in the accounts, and the Debtor holds mere legal title as trustee. Thus, the AMBP and GIF deposits are not property of the estate, and not properly includable in the UCC Plan. 11 U.S.C. § 541(d) (providing that where the debtor holds only bare legal title in property subject to a beneficial or equitable interest, the bankruptcy estate holds such title equally restricted by the beneficial or equitable interest holder). A plan proponent cannot fund a chapter 11 plan with the property of a non-consenting third-party. *In re Irving Tanning Co.*, 496 B.R. 644, 664 (BAP 1st Cir. 2013) (stating that the Court cannot appropriate the property rights of third-parties to fund a plan).

Although bankruptcy law defines what is property of the estate, "property interests are created and defined by state law." *Butner v. U.S.*, 440 U.S. 48, 55 (1919). Minnesota law recognizes three types of trusts: express, resulting and constructive.[1] Primarily applicable here, an express trust under Minnesota arises where there is: (1) a trustee; (2) a beneficiary and (3) a definite trust *res*. *In re LGI Solutions, Inc. (II)*, 482 B.R. 809, 815 (BAP 8th Cir. 2012), *citing In re Bush's Trust*, 81 N.W.2d 615, 620 (Minn. 1957). Relatedly, a resulting trust arises "'when one party makes a disposition of property under circumstances which raise[] a presumption that the party making the disposition does not intend the other party holding the interest in the property to have the remaining beneficial interest." *In re Web2B Payment Solutions, Inc.*, 515 N.R. 716, 722 (Bankr. D. Minn. 2014), *quoting In re BMC Indus., Inc.*, 328 N.R. 792, 797 (Bankr. D. Minn. 2005) (citation omitted), *rev'd on other grounds by* 2006 WL 250254 (D. Minn. Aug. 29, 2006). Essentially, "a resulting trust is recognized when parties indicate an intent to establish a trust relationship but fail to reflect that intent in writing.'" *Id., quoting Dollar Fed. Sav. Bank v. Green Tree Acceptance, Inc.*, 1991 WL 40398, *3 (D. Minn. Mar. 21, 1991).

Here, the GIF and AMBP meet the elements of an express and resulting trust in favor of non-debtor, participating Catholic entities, such as the parishes. The UCC acknowledges that: (1) the Debtor is a trustee as to these accounts; (2) that there are numerous non-debtor Catholic entities as beneficiaries in the funds; and (3) that the overwhelming majority of funds contributed to these accounts derive from such non-debtor Catholic entities. Further, the UCC makes no claim that any commingling occurred with these accounts that would suggest any lack of a definite trust

---

[1]    This brief only addresses the related concepts of express and resulting trusts, which the Parish Committee believes apply in this case based on the acknowledged and undisputed facts. The circumstances may also call for the imposition of a constructive trust, but that doctrine involves a more intensive factual inquiry ill-suited for this stage of briefing.

*res*. Compare *In re LGI Energy Solutions, Inc. (I)*, 460 B.R. 720, 729 (BAP 8th Cir. 2011) (providing that commingling destroys any trust claim by the depositor of such funds). Nor is there any allegation that the Debtor has failed to preserve trust funds so that there is no identifiable trust. *BMC Indus.* 328 B.R. at 797. The undisputed facts and circumstances demonstrate that parishes hold the equitable interest in the substantial of funds in these accounts, and that these funds are not properly included in the Debtor's bankruptcy estate.

The UCC's sole argument to the contrary relies on alleged documentary deficiencies as to the trust. As to the GIF, the UCC states that it "is not subject to a formal trust agreement." *UCC Disclosure Statement* at 8. Further, the UCC states that the AMBP trust agreement provides that "the assets of the AMBP can be used to pay the claims of the Debtor's general creditors in the event of the Debtor's bankruptcy or insolvency." *Id.* at 9. These drafting deficiencies and peculiarities, however, do not outweigh the decades-long operation of these insurance programs or disregard the funded interests of the beneficiaries nor do they invalidate applicable state law regarding trust formation. Under Minnesota law, "no particular form and no specific words are necessary to create a trust. Even though the settlor's language be inept, clumsy, or even unsuitable, it is adequate if it reveals an intent to create the incidence of a trust relationship." *LGI (II)*, 482 B.R. at 815, *quoting Bush's Trust*, 81 N.W.2d at 620. Thus, technical deficiencies in the documents cannot and should not divest beneficiary interests.

To date, the UCC has commenced no litigation in this bankruptcy case to set aside the beneficiary claims to the AMBP and the GIF. Most, if not all, parishes filed claims as to these assets. The UCC Plan's inclusion of the AMBP and GIF (even as qualified and conditional on the outcome of future litigation) violates state law, violates the Code (i.e., § 541(d)), and is not

proposed in good faith. Based on this deficiency, the Court must deny confirmation of the UCC

Plan.

**2.  The UCC Plan Fails as a Matter of Law Because it Improperly Seeks Collection of Delinquent Parish Assessments.**

The UCC Plan proposes to collect delinquent parish assessments to fund the UCC Plan

Trust. This is another improper attempt to fund the plan with third-party assets.

Under the Plan, the UCC proposes to have the bankruptcy court value the assets of the

Debtor and require contribution of this value to the Trust. *UCC Plan*, § 5.2. The Plan incorporates

Exhibit C from the Disclosure Statement as listing the assets included in the Liquidation Analysis.

*Id*. The liquidation analysis lists combined accounts and loans receivable of $8,527,119 based on

an estimated 50% collectability. *See UCC Disclosure Statement*, Ex. C.

The UCC Disclosure Statement confirms that that Debtor's accounts receivable is a

reference to assessments on parishes, stating that "as of March 31, 2016, the Debtor had accounts

receivable based on unpaid assessments from its parishes in the amount of approximately $8.4

million." *UCC Disclosure Statement* §§ V.B.6

The proposed collection of delinquent parish assessments again violates § 541(d) and non-

bankruptcy law. Further, § 1129(a)(16) requires that:

> All transfers of property under the plan shall be made in accordance with
> any applicable provisions of nonbankruptcy law that govern the transfer of
> property by a corporation or trust that is not a moneyed, business, or
> commercial corporation or trust.

In the substantive consolidation litigation, this Court found that the Debtor and parishes

are religious and eleemosynary entities who fall outside of the categories of "moneyed, business

or commercial" entities. 11 U.S.C. § 303(a). The Court has also found that MINN. STAT. § 315

governs the establishment of separate parish corporations and provides a civil source of law regarding parish property. MINN. STAT. §§ 315.09, 315.12, and 315.15.

Chapter 315, however, does not provide any substantive rights regarding the collection of assessments as between the parishes and the Debtor as a civil obligation. There is no civil obligation for the parishes to pay assessments to the Debtor. Rather, the authority by the Debtor to impose assessments upon parishes does not arise from contract, statute, equity or common law.

Rather, the Code of Canon Law governs the assessment and taxation of Catholic entities as related religious organizations. Canon Law permits the bishop of a diocese "the right to impose a moderate tax for the needs of the diocese upon public juridic persons subject to this governance; this tax is to be proportionate to their income." Can. 1263.[2] Moreover, Canon Law imposes the duty upon Catholic governance to observe the purpose of designated funds donated by parishioners, stating that "offerings given by the faithful for a certain purpose can be applied only for that same purpose." Can. 1267, § 3. Assessments solely support the religious function and mission of the Catholic Church.

By seeking to transfer a Canonical obligation to the Trust, a non-Catholic entity, the UCC Plan proposes a transfer not contemplated nor permitted by non-bankruptcy law. The Trust would not use assessments to support the religious mission of the Catholic Church. Further, the UCC has not (because none exists) identified any source of civil law that would permit a civil suit between Catholic entities as to the collection of canon law assessments. The UCC cites no statute or case law recognizing the transfer of a Canonical obligation to a non-Canonical entity. Minnesota Statutes Chapter 315 provides no authority for transferring assessment income to a non-Catholic entity.

---

[2]        The Code of Canon Law is at: http://www.vatican.va/archive/ENG1104/_INDEX.HTM.

Section 1129(a)(16) applies in this case and bars confirmation of the UCC Plan. No source of law supports the payment of delinquent assessments to a non-Catholic entity such as the Trust, or to the Debtor for that matter. As a result, the plan provision violates non-bankruptcy law regarding the Debtor and its parishes.

By requiring the collection of delinquent assessments or their equivalent value, the UCC Plan also violates the First Amendment of the U.S. Constitution and the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, *et. seq.*). On this point, the Parish Committee joins The Church of St. Patrick of Edina, who thoroughly addresses this argument in its brief supporting its objection to the UCC Plan.

In violating the First Amendment and RFRA, the plan and its proponent do not comply with the Code, do not propose plan terms in good faith, and propose actions forbidden by law. 11 U.S.C. §§ 1129(a)(1), (2) and (3).

The UCC is expected to argue that the Plan does not actually require the transfer of delinquent assessments to the Trust but rather only requires that the Debtor contribute an equivalent value to the Trust. *See UCC Plan* § 5.2 (stating that the Debtor need not contribute actual assets to the Trust but can fund the liquidation value through "increases in Parish assessments, fundraising, loan financing and/or the sale of selected assets"). This is a meritless distinction. In the circumstances of this case involving a non-moneyed eleemosynary entity, the proposed substitute contribution is not a meaningful work-around to the non-bankruptcy and Constitutional defects of collecting delinquent assessments. *See* § 7, *infra* (discussing why the Plan cannot proceed on the hope of achieving funding through charitable and voluntary contributions).

3.      **The UCC Plan Fails as a Matter of Law Because it Improperly Discharges Parish Contribution and Indemnity Claims.**

The UCC Plan improperly seeks to extinguish and discharge parish claims for contribution, indemnity or reimbursement (and discharge claims of any entity subrogated to those parish claims) against the Debtor, arising out of Parishes' payment of the Debtor's share of liability for the tort claims. Under Minnesota law, parishes hold the right of contribution against the Debtor "when there is common liability of two or more joint tortfeasors and one joint tortfeasor has paid more than his share of the common obligation." *Grothe v. Shaffer*, 232 N.W.2d 227, 232 (Minn. 1975), *citing Radmacher v. Cardinal*, 117 N.W.2d 738 (Minn. 1962).

Section 4.13 of the UCC Plan treats parish contribution and indemnity claims related to abuse claims and provides that "Class 13 claims shall not receive or retain any property under this Plan in accordance with 11 U.S.C. § 502(e)." As noted below, § 502(e) disallows contribution and reimbursement claims against the debtor that remain contingent as of the claim determination date.

Section 14.2 of the UCC Plan provides for the discharge of all claims "that arose prior to the Effective Date, other than claims held by Class 6 and Class 7 claimants." Further, the UCC Plan states that any "'Discharged Claim' includes any disallowed claim" including, presumptively, a disallowed claim under § 502(e). *Id*. The UCC Plan provides that Class 6 and Class 7 abuse claims are not discharged, and provides under Section 4.6 that "the Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 6 Claims."

The proposed discharge of parish contribution claims violates §§ 502(e) and 1141(d), and discriminates unfairly against parishes (Class 13 claimants) in violation of § 1129(b)(1).

### a. The Proposed Discharge of Parish Contribution Claims Violates 11 U.S.C. §§ 502(e) and 1141(d).

Sections 502(e) and 1141(d)(1) of the Code do not permit the discharge of disallowed contribution claims. Even if those sections permitted both the disallowance and discharge of such claims, the Court retains flexibility to waive such a discharge where necessary to facilitate reorganization which it should exercise here.

### i. Sections 502(e) and 1141(d)(1) Do Not Permit the Discharge of Disallowed Contribution Claims.

Section 502(e)(1)(B) disallows claims for "reimbursement or contribution" that are "contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." Under Minnesota law, contribution claims do not "accrue or mature until the person entitled to the contribution has sustained damage by paying more than his fair share of the joint obligation." *Grothe*, 232 N.W.2d at 232, *citing Gustafson v. Johnson*, 51 N.W.2d 108 (Minn. 1952). [3]

If a claim is disallowed under § 502(e), it is not discharged by the plain language of 11 U.S.C. § 1141(d) which omits a § 502(e) claim from discharge in a chapter 11 case. As stated in § 1141(d)(1):

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of the plan (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not – (i) a proof of claim based on such debt is filed or deemed filed under section 501 of this title; (ii) such claim is allowed under section 502 of this title; or (iii) the holder of such claim has accepted the plan.

---

[3]    It appears that the UCC Plan treats the contingent claims as disallowed under § 502(e) based on the assumption that parishes under Minnesota law have yet suffered no damage and therefore have no accrued right of contribution under state law. Should the UCC's assumption be incorrect or if a parish suffers any actual damage before closing of this case, it still retains the right to seek an allowance of its claim under §§ 502(e)(2), and (j).

In interpreting the plain language of § 1141(d)(1), it is important to recognize that § 502(e) through § 502(i) all deal with claims that first arise after or remain undetermined as of the petition date. *See* 11 U.S.C. § 502(e) (regarding reimbursement and contribution claims that are contingent as of the commencement of the case); § 502(f) (regarding claims arising in the ordinary course of business after the commencement of an involuntary case); § 502(g) (regarding claims arising from rejection of an executory contract or unexpired lease); § 502(h) (regarding claims arising from a recovery of an avoidable transfer); and § 502(i) (regarding tax claims that arise after the commencement of the case).

Among these provisions, § 1141(d)(1) does not include claims under § 502(e) as discharged claims in a chapter 11 case.

Historically, contingent claims that were "incapable of reasonable estimation or liquidation" were disallowed but also survived discharge. *In re Johns-Manville Corp.*, 57 B.R. 680, 686 (Bankr. S.D. N.Y. 1986), *citing In re Cartridge Television, Inc.*, 535 F.2d 1388, 1390 (2d Cir. 1976).

To depart from a pre-Code practice, Congress should expressly determine to revise that practice. *Dewsnup v. Timm*, 502 U.S. 410, 419-20 (1992) (stating "this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"); *See also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 244 (1989).

The legislative history of §§ 502(e) and 1141(d) provides no direct reference to altering pre-Code practice specifically regarding contingent contribution and indemnity claims. The

legislative history regarding § 502(e) instead affirms Congressional intent to maintain the

historical treatment of § 502(e) claims stating:

> Subsection (e), also derived from present law, requires disallowance of the claim for reimbursement or contribution of a codebtor, surety or guarantor of an obligation of the debtor, unless the claim of the creditor on such obligation has been paid in full. The provision prevents competition between a creditor and his guaranty for the limited proceeds in the estate.

H.R. Rep. 95-595, 354, 1978 U.S.C.C.A.N. 5963, 6310; S. Rep. 95-989, 65, 1978 U.S.C.C.A.N. 5787, 5851.

As to § 1141(d)(1), the legislative history restates the terms of the statute, without making

any specific reference to contribution claims under § 502(e), stating:

> Subsection (d) contains the discharge for a reorganized debtor. Paragraph (1) specifies that the confirmation of a plan discharges the debtor from any debt that arose before the date of the order for relief unless the plan or the order confirming the plan provides otherwise. The discharge is effective against those claims whether or not proof of the claim is filed (or deemed filed), and whether or not the claim is allowed.

H.R. Rep. 95-595, 418, 1978 U.S.C.C.A.N. 5963, 6374; S. Rep. 95-989, 129, 1978 U.S.C.C.A.N.

5787, 5915.

The plain language and legislative history retained the qualification that only "arisen"

claims qualify for discharge. The omission of § 502(e) contribution and reimbursement claims

from the list of discharged post-petition § 502 claims under § 1141(d) reinforces the interpretation

that § 502(e) claims pass-through the bankruptcy if disallowed in the case.

Some courts have argued that Congress sought to expand the definition of a "claim" to its

"broadest possible definition" so that "'all legal obligations of the debtor, no matter how remote

or contingent will be able to be dealt with in the bankruptcy case,'" *Johns-Manville Corp*, 57 B.R.

at 686-87 (citations omitted), *quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 309 (1977),

*reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6266; S. Rep. No. 989, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5808.

But even if the parish contribution claims fall within the definition of a "claim," [4] §§ 502(e) and 1141(d) specifically prohibit both their disallowance and discharge, consistent with historical practice that Congress indicated would continue as to contribution claims under § 502(e). In other words, while the Code may generally submit contingent claims to a claims process and eventual discharge, Congress carved-out and retained the "ride-through" protection specifically for contingent contribution and reimbursement claims under §§ 502(e) and 1141(d)(1). Specific provisions of the Code must control over more general provisions. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, ___, 132 S.Ct. 2065, 2070-71 (2012).

Courts that argue that Congress intended to eliminate any potential "threat of lingering claims 'riding through' the bankruptcy," *Baldwin-United Corp.*, 55 B.R. at 898, also ignore the qualification that only "claims" that "arose" before confirmation are subject to discharge under § 1141(d)(1). Congress continued to specify under § 1141(d)(1) that only those claims that had

---

[4] There are two lines of cases based on the definition of a "claim" under § 101(5) that the UCC may cite in support of discharging parish contribution claims, but they are distinguishable. First, some cases have held that contingent contribution claims are "claims" to impose the automatic stay or disallow such claims under § 502(e) as part of the claims allowance process. *See e.g., In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 98, 102-103 (Bankr. S.D.N.Y 1992); *In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007). These cases, however, did not analyze in detail whether such claims are discharged through an analysis of §§ 502(e) and 1141(d). *But see, In re Baldwin-United Corp.*, 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985) (stating in dicta that § 502(e) claims are subject to discharge without any analysis of the text of § 1141(d)).

Second, there are cases holding that contingent contractual indemnification claims are discharged. *See, e.g., In re Manville Forest Products, Corp.*, 225 B.R. 862, 865-67 (Bankr. S.D. N.Y. 1998); *In re Rainbows United, Inc.*, 547 B.R. 430, 438-39 (Bankr. D. Kan. 2016). Such cases, however, acknowledge that contractual indemnities are distinct from contribution claims arising from tort because such claims arose from pre-petition contracts contemplating the events creating the indemnification. *Manville*, 225 B.R. at 867; *See also Baldwin-United*, 55 B.R. at 903, fn. 18 (discussing difference between contractual indemnification and contribution).

"arose" as of the confirmation date qualify for the discharge. In other words, § 1141(d)(1) provides that some claims that qualify as a "claim" under § 101(5) may not have yet arisen, and therefore are not discharged.  Discharging contribution and indemnity claims under a hyper-broad definition of "claim" without regard to when a claim "arises" under state law would render the "arose" qualification in § 1141(d)(1) superfluous, and Congress could not have intended such a result. *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 70 (2011); *In re Windsor on the River Associates Ltd.*, 7 F.3d 127, 130 (8th Cir. 1993) (stating "'we must avoid statutory interpretation that renders any section superfluous and does not give effect to all the words used by Congress'" (citation omitted)).

It does not appear that the Eighth Circuit has directly ruled on the dischargeability of contribution claims disallowed under § 502(e), but it has cited and referenced a Third Circuit case that endorsed the non-discharge of such claims. Within a few years after adoption of the Code, the Third Circuit held that contingent contribution claims arising after the Petition Date under state law were not subject to the automatic stay, as they were not yet "claims" under 11 U.S.C. § 101(5). *In re M. Frenville Co., Inc.*, 744 F.2d 332, 337-38 (3d Cir. 1984), *cert. denied*, 469 U.S. 1160 (1985). The Court also found that such claims would not be discharged. *Id*. at 338.[5] Other courts have found that contribution or reimbursement claims arising from post-bankruptcy court judgments were not discharged. *In re Water Valley Finishing, Inc.*, 139 F.3d 325, 326 (2d Cir.

---

[5]    As noted above, *Frenville* found that contribution claims were not even claims under 11 U.S.C. § 101(5), and thus did not consider the narrower argument emphasized here that §§ 502(e) and 1141(d)(1) preserve contribution claims from discharge, notwithstanding the broad definition of a "claim." *Frenville* has received substantial criticism and the Third Circuit has since overruled *Frenville*, though not in a case involving a § 502(e) contribution claim. *See In re Grossman's, Inc.*, 607 F.3d 114, 119-122 (3d Cir. 2010) (holding that plan discharged a tort claimant's claim arising from asbestos exposure that did not arise until after confirmation).

1998) (finding that insurer's post-confirmation award for attorneys' fees for defeating pre-petition

contract litigation initiated by the debtor was not discharged by chapter 11 plan).

The Eighth Circuit has not to date adopted *Frenville*, nor its competing authority, though

has cited *Frenville*. *In re Sullivan*, 2006 WL 1686168, *4 (Bankr. N.D. Iowa 2006), *citing*

*McSherry v. Trans World Airlines*, 81 F.3d 739, 740-41 (8th Cir. 1996). As recently as 2011, the

Eighth Circuit stated, without significant discussion, that only a "cause of action that *accrues* prior

to confirmation" is subject to a chapter 11 discharge, a statement that appears supportive of

*Frenville*. *See Sanchez v. Northwest Airlines, Inc.*, 659 F.3d 671, 675 (8th Cir. 2011) (emphasis

added).

In addition to *Frenville's* broad holding that contingent contribution claims are not even

"claims" under § 101(5), §§ 502(e) and 1141(d)(1) provide specific protection to contribution

claimants from having their claims outright disallowed and discharged, as primarily argued above.

The UCC Plan cannot proceed in both disallowing and discharging such claims.

>    **ii.    Even if the Court Could Disallow and Discharge Such
>           Claims, It Should Exercise Discretion to Reject Such an
>           Outcome Given the Circumstances in this Case.**

Section 1141(d)(1) provides the bankruptcy court with flexibility to modify the

presumptive scope of a chapter 11 discharge. Section 1141(d)(1) begins with the qualification

"except as otherwise provided in this subsection, in the plan, or in the order confirming the plan…"

prior to listing the scope of a chapter 11 discharge. If discharge of a claim would constitute a

significant harm to a creditor or impede an efficient reorganization, a court can waive or further

qualify such a discharge. *In re Borne Chem. Co.*, 16 B.R. 509, 514 (Bankr. D. N.J. 1980), *aff'd*,

*Bittner v. Borne Chem. Co. Inc.*, 691 F.2d 134, 135 (3rd Cir. 1982).

In *Borne Chem. Co.*, the Third Circuit endorsed the temporary disallowance of contingency claims until further resolved in a non-bankruptcy proceeding. 691 F.2d at 135.[6] This effectively waived the discharge of such claims until a future determination in a non-bankruptcy forum. *Id.* In so holding, the Third Circuit found that while estimation was usually the correct method of dealing with contingent claims, "it is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate evaluation of the claims." *Id.* The Third Circuit affirmed that the bankruptcy court's temporary disallowance in favor of further non-bankruptcy litigation was not an abuse of discretion, and that the outcome conceivably balanced the need to proceed in reorganization without requiring significant litigation in the bankruptcy court, yet protected the holders of contingent claims to have the opportunity for some recovery. *Id.* at 136-38.

Even if § 1141(d)(1) permitted the discharge of a disallowed contribution claim in the first instance, this case presents circumstances warranting the waiver of any discharge as to contribution and indemnity claims. The UCC Plan permits its constituency to undertake and continue substantial tort litigation after the confirmation date that will continue to burden the Debtor and the parishes holding contribution claims the UCC seeks to discharge. The typical rationale of promoting discharge of contingent claims such as the parish contribution claims is to bolster a "fresh start." But the UCC tramples this principle by proposing years of litigation for the Debtor (*see e.g.,* UCC Plan § 4.6(b), 6.2(a), (d)(1) and (d)(2)), its insurers, and the parishes that provide the primary financial support to the Debtor. If the UCC Plan proceeded, the parishes may spend

---

[6]        *Borne Chem. Co.* did not involve unaccrued contribution claims such as in *Frenville* that the Third Circuit found were not subject to discharge. The claims in *Borne Chem. Co.* involved a suit alleging that the debtor tortiously interfered with a failed merger.  691 F.2d at 135. The claimant had sued the debtor before the bankruptcy, and there was no dispute that such claim arose pre-petition. *Id.*

millions in defense costs that would likely result in the successful defeat of such claims. Or a non-bankruptcy court could order an excessive recovery against a parish that the parish could potentially no longer recoup through a contribution claim. Under the UCC Plan, the parishes would have no recourse.

The UCC's proposal to encourage contingent tort claim holders to proceed with further non-bankruptcy litigation eliminates any possible reorganization benefit to counterbalance the harm to parishes in discharging their contribution claims. Therefore, this case is on par with *Borne Chem. Co.*, and if the UCC Plan proceeded with the door wide open for tort claim litigation, it would serve greater fairness and equity to deny the discharge of parish contribution claims so they can defend imminent litigation bearing their full rights and remedies under state law.

In addition, some courts argue that the bankruptcy court must estimate contingent claims under 11 U.S.C. § 502(c), and that "estimated claims are covered by the debtor's discharge." *Baldwin-United Corp*, 55 B.R at 898; *see also Acevedo v. Van Dorn Plastic Machinery Co.*, 68 B.R. 497, 499, n.1 (Bankr. E.D. NY. 1986) (stating that contribution and indemnity claims are covered by claims estimation under § 502(c)). Under this view, "by mandating the estimation of *all* contingent claims" Congress balanced the need to broaden the debtor's discharge to include all claims, but not completely bar creditors holding contingent claims from receiving any recovery on their claim. *Baldwin-United Corp*, 55 B.R at 898.

The UCC Plan does not propose to estimate any contribution claims in the bankruptcy case, including the tort claims that it would first need to estimate before estimating any contribution claims of the parishes. Thus, under the view of those courts that hold that such claims should be estimated under § 502(c), the UCC Plan does not comply.

In summary, §§ 502(e) and 1141(d)(1) by their plain terms do not permit the Court to disallow and discharge the parish claims as the UCC Plan proposes. But even if this was a permissible outcome under the Code, § 1141(d)(1) gives the Court discretion to waive such discharge in circumstances like here, where doing so would not impair the Debtor's reorganization. It would be inequitable to confirm the UCC Plan without such a waiver, but none is offered by the UCC.

The proposed disallowance and discharge of parish contribution violates the historical treatment of such claims, as reaffirmed in the Code under §§ 502(e) and 1141(d). As a result, the UCC violates the Code and should be denied confirmation.

### b. The Proposed Discharge of Parish Contribution Claims Also Discriminates Unfairly.

In addition, the UCC Plan is discriminatory, unfair, inequitable, and proposed in bad faith, as it permits other contingent claims to "ride through" the bankruptcy, but not the parish contribution claims. These include the Class 6 and Class 7 tort claims, but also the Class 11 contingent guaranty claims, for which the UCC Plan provides "shall be undisturbed and the holders of such guaranties shall be entitled to exercise all available legal rights and remedies against the Reorganized Debtor." *See* UCC Plan at § 4.11.

The more favorable treatment of other contingent claims discriminates unfairly against Class 13 contribution claimants. *See* 11 U.S.C. § 1129(b)(1) (providing that a plan must not "discriminate unfairly").

In assessing whether discrimination is unfair and impermissible, the Court must consider four factors: (1) whether the discrimination is supported by a reasonable basis; (2) whether the proponent can confirm and consummate a plan without the discrimination; (3) whether the

discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against. *In re 11, 111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

Here, there is no reasonable basis for the discrimination and the UCC provides no rationale for discriminating against parishes by completely discharging their claims. The UCC as the plan proponent represents the very litigants who intend to pursue the litigation against parishes that may create such contribution claims. The parishes then will face state court litigation potentially without the ability to join the primary tortfeasor as a third party into the case, a result that very well may lead to excessive judgments against the parishes that they could not then recoup against the reorganized Debtor.[7]

Further, a feasible plan can likely proceed without discharging parish contribution claims as no present plan assets are yet needed to pay such claims. As a reorganized debtor when any future claims arise, the Debtor will have assets and earnings in the future not contributed to the UCC Plan that may be available to satisfy any future contribution claims. Thus, the Debtor's continuing liability on a contribution claim will not necessarily have any impact on the assets available to the Trust.

Finally, the discrimination does not simply provide a lesser recovery to parishes as opposed to other holders of contingent claims – the UCC Plan provides no recovery, now or in the future. Moreover, in weighing the discrimination, this Court cannot ignore the animus expressed by the UCC towards parishes in the original disclosure statement, culminating in several unfounded and

---

[7]    It is believed that in the litigation against the parishes, the tort claimants will seek to apply Minnesota's law of joint and several liability that pre-date allocation rules in MINN. STAT. § 604.02, so they can recover the full amount of any judgment from the parishes, regardless of whether the judgment apportions the majority of the liability to the Debtor. If this approach were to prevail, the parishes' claims of contribution against the Debtor would be their means of protection from paying more than their share of the liability.

incendiary statements. On pages 20 and 21 of the UCC Disclosure Statement, the UCC inaccurately states that "in the decades preceding its bankruptcy filing, the Debtor alienated more than a billion dollars in assets as a matter of civil law by incorporating hundreds of parishes." The UCC also states that these "assets are being intentionally sheltered from the scrutiny of the Debtor's bankruptcy process while the Debtor simultaneously plans to seek broad and unqualified releases for the entities holding such assets." *Id*. at 21. The UCC knew well that these statements were not accurate, yet sought to advertise such as part of solicitation of this plan. They demonstrate the intent to discriminate unfairly against parishes in the UCC plan.

The unfair discrimination resulting from the proposed discharge of parish contributions claims further requires denial of the UCC Plan as a matter of law under § 1129(b)(1).

### 4. **The UCC Plan Fails as a Matter of Law Because it Appears Intended to Defeat Parish Recourse to Debtor Insurance Policies for its Contribution Claims.**

As noted above, parishes have a right of contribution under state law should they overpay their liability, if any. The Debtor's insurance policies would normally provide coverage to the Debtor for such claims.

As thoroughly discussed by other objecting parties, the UCC Plan proposes to transfer the Debtor's rights in its insurance policies to the Trust. *See* UCC Plan, § 6.1. The UCC Plan is not entirely clear as to whether it seeks to impair parishes' rights to the Debtor's insurance for their contribution claims. In several instances, the UCC Plan states that it is neutral to insurance policies and that any obligations under insurance policies survive the confirmation of the plan and transfer of policy rights to the Trust. *See e.g., UCC Plan* §§ 6.1(c) (stating that the transfer "does not defeat or impair the insurance coverage otherwise provided by Non-Settling Insurers" and the assignment of rights "does not affect any Non-Settling Insurers' rights, obligation or duties under applicable Insurance Policies or applicable law"); 6.3(d) (providing that plan is neutral as to insurance rights).

But the UCC Plan also broadly and vaguely provides that the "Trustee is hereby appointed as the representative of the Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's interest under the Non-Settling Insurers' Insurance Policies against the Non-Settling Insurers with respect to the Class 6 Claims." *UCC Plan* §§ 6.1(c). Further, the UCC Plan also vaguely provides that "[a]ny recoveries on such interests by the Trustee will be paid to the Trust." *Id*. Finally, in its numerous "neutrality" clauses, the UCC Plan does not expressly recognize the rights of any Class 13 claimant (parishes) in such policies for a contribution claim. These provisions arguably impair the parishes as they place the administration of the Debtor's insurance rights with the Trustee, who may take actions that impairs the Debtor's insurance rights as to parish claims.

In addition, the UCC Plan provides that the Trust may in the future settle claims with insurers, and that at that time such insurers become Settling Insurers who will receive the benefit of a Settling Insurer Supplemental Injunction. *Id.* § 6.3(a)(3). The plan definitions reference a Settling Insurer Supplemental Injunction at § 13.5, *see Id.* § 1.1(nnn), but there is no such provision found in the UCC Plan. The Parish Committee believes that any settling insurer will require the buy-back of its policies resulting in the complete release of those insurers from further liability for any claim arising from a tort claim. Moreover, any related injunction will seek to bar any parish contribution claims that could reach such policies. The parishes object to such a release without their consent, and the Court cannot grant the same.

The bottom line is that under Minnesota law, so long as potential contribution claims by the parishes exist, the insurers cannot settle the tort claim liability of the Debtor and buy back their insurance policies if it means leaving the parishes uncompensated for their derivative liability. According to MINN. STAT. § 60A.08, subd. 14, insurers cannot agree to rescind, or directly or

indirectly transfer an insurance policy "if the insurer has knowledge of any claims against the insured that would remain unsatisfied due to the financial condition of the insured." Any agreement made in violation of this provision "is void and unenforceable." *Id*. Here, the UCC Plan would leave parish contribution claims unsatisfied, a fact that would be clearly known to each settling insured. As a result, the settling insurers cannot legally agree to such buybacks absent consent of the parishes. *See also In re Mathews,* 207 B.R. 631 (Bankr. D. Minn. 1997) (stating that under MINN. STAT. § 60A.08, subd. 14: "insurers may not induce their insureds to back out of their relationship entirely, and may not otherwise knowingly buy their way out of situations where they will have to bear the duties of defense and indemnification to contractual limits").

The UCC Plan that appears intended to lead to an assignment or surrender of insurance policies to the prejudice of parishes holding contribution claims that violates state law, and is therefore non-confirmable under 11 U.S.C. § 1129(a)(1).

**5.    The UCC Plan Fails as a Matter of Law Because it Improperly Misclassifies and Disenfranchises Parishes.**

The UCC Plan classifies claimants of Classes 3 and 14 as unimpaired because the plan obligates the Debtor to continue funding the AMBP and the GIF for future obligations. But the plan seeks to transfer all existing deposits to the Trust, thereby discharging parish claims to such funds for no present plan payment. The plan also classifies Class 13 claimants as unimpaired despite disallowing and discharging their contribution and indemnity claims for no consideration. These plan provisions alter the legal and equitable rights of the parishes and the parishes are impaired. *See* 11 U.S.C. § 1124(1).

As a requirement of confirmation, each impaired class must vote to accept the plan. 11 U.S.C. § 1129(a)(8). The parishes holding claims in Classes 3, 13 and 14 have not voted to accept the Plan.

The UCC may argue that it need not meet the requirement of § 1129(a)(8) because it can cram down its plan under § 1129(b)(1). This, however, requires the UCC to show that its plan is fair, equitable, and does not discriminate unfairly. Due to the reasons set forth above in § 3(b), *supra*, the UCC Plan unfairly discriminates, and is not fair nor equitable as to parishes. As a result, the UCC cannot rely on § 1129(b)(1) to overrule objections to confirmation by Classes 3, 13, and 14.

**6.      The UCC Plan Proposes the Improper Transfer of Barred Avoidance Actions.**

The UCC Plan requires the transfer of all avoidance actions to the Trust. Filing a claim as to such actions is no longer timely under the two-year limitations period of 11 U.S.C. § 546(a). The Parish Committee joins the objection of Catholic Finance Corporation on this issue.

**7.      The UCC Plan in Relying on Future Financial Support of Parish Entities Fails as a Matter of Law Since Parishes Will Not Make Such Contributions.**

The UCC Plan suggests that the Debtor may fund the UCC Plan through an increase to parish assessments. *UCC Plan* § 5.2(b). Parishes will not agree to fund the UCC Plan through paying increased assessments.

Normally this may be an issue of feasibility, but the non-profit status of the Debtor mandates prompt consideration of this point. A chapter 11 plan may be confirmed only if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11).   The purpose of this section is "to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than a debtor can possible attain after confirmation."  *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir. 1985).  To be feasible, a chapter 11 plan must offer a reasonable prospect of success and be workable.  *United Properties, Inc. v. Emporium Dep't Stores, Inc.*, 379 F.3d 55, 64 (8th Cir. 1967).

Feasibility is a particularly potent issue with non-profits, and a vague hope of fund-raising revenue to facilitate a plan is too speculative to make the UCC Plan feasible. *See In re Save Our Springs (S.O.S.) Alliance, Inc.*, 362 F.3d 168, 172-73 (5th Cir. 2011) (nonprofit debtor reorganization plan was not feasible when debtor secured pledges from donors, but presented no evidence of firm commitments, and pledges were too speculative).

The UCC Plan's illusory dependence on future parish financial support is even more incredulous when considering the abuse claimants' apparent intent to undertake years of costly litigation against the parishes. The UCC Plan provides no complete nor final resolution of tort claims. Parishes and their insurers will have to defend and litigate such claims, as well as related coverage litigation. Parishes bearing financial costs related to such litigation will more likely withhold assessments from the Debtor. Thus, the failure to completely resolve tort claims will burden the Debtor beyond its own future costs of litigation. The costs related to unresolved tort claims will likely cause further financial reorganization once the Debtor is unable to pay its future expenses. As a result, the UCC Plan is not confirmable under 11 U.S.C. § 1129(a)(11).

Nor is the plan proposed in good faith. While "good faith" is not defined in the Bankruptcy Code, "courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995). The UCC Plan will bring forth more litigation, and no lasting resolution. The Court should deny its confirmation.

## <u>CONCLUSION</u>

The UCC Plan is not confirmable and this is the only possible conclusion this Court can draw from the many deficiencies highlighted in this objection and elsewhere. The Parish

Committee joins those objections of the Debtor, its insurers, and other Catholic entities. This Court

should deny confirmation and proceed with a prompt confirmation hearing of the Debtor's plan.


Dated:  July 7, 2017.                          MANTY & ASSOCIATES, P.A.

                                    By:    /e/ Dennis D. O'Brien
                                           Nauni Jo Manty (#230352)
                                           Dennis D. O'Brien (#0080469)
                                           Mychal A. Bruggeman (#345489)
                                           401 Second Avenue North, Suite 400
                                           Minneapolis, MN 55401

                                           Attorneys for Official Committee of Parish
                                           Creditors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:

The Archdiocese of St. Paul and
Minneapolis,

Debtor.

Chapter 11
BKY 15-30125

---

**<u>UNSWORN CERTIFICATE OF SERVICE</u>**

---

I, Amanda Hoffman, declare under penalty of perjury that on July 7, 2017, I caused the following document(s):

1.   Memorandum in Support of Legal Objections of The Official Committee pf Parish Creditors to Confirmation of the Chapter 11 Plan of the Official Committee of Unsecured Creditors

to be filed electronically with the Clerk of Court, and that a copy of the above-referenced document(s) was delivered to the parties who are Filing Users, by automatic e-mail notification pursuant to the Electronic Case Filing System and this notice constitutes service pursuant to Local Rule 9006-1(a).   The following parties required to receive service under Local Rule 9013-3(b) have received service by ECF:

<u>The Plan Proponent and Attorneys for Official Committee of Unsecured Creditors</u>:

Phillip J. Ashfield - phillip.ashfield@stinsonleonard.com
Edwin H. Caldie - edwin.caldie@stinsonleonard.com
Robert T. Kugler – robert.kugler@stinsonleonard.com

<u>Attorneys for the Debtor</u>:

Richard D. Anderson - randerson@briggs.com
Benjamin Gurstelle - bgurstelle@briggs.com
John R. McDonald – jmcdonald@briggs.com
Aaron G. Thomas - athomas@briggs.com

<u>The United States Trustee</u>:

Robert Raschke – robert.raschke@usdoj.gov
Sarah J. Wencil - sarah.j.wencil@usdoj.gov

Executed on: July 7, 2017           Signed: _/e/ Amanda Hoffman_ _____

                                             Amanda Hoffman, Legal Assistant
                                           Manty & Associates, P.A.
                                           401 Second Avenue North, Suite 400
                                           Minneapolis, MN  55401
                                           Phone: 612-465-0990