## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:

The Archdiocese of Saint
Paul and Minneapolis,

      Debtor

Chapter 11
Bankruptcy No. 15-30125

## MEMORANDUM IN SUPPORT OF THE OBJECTION AND JOINDER OF THE CHURCH OF ST. PATRICK OF EDINA, MINNESOTA TO THE OBJECTIONS OF THE OFFICIAL COMMITTEE OF PARISH CREDITORS AND THE DEBTOR TO THE CHAPTER 11 PLAN  OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

The Church of St. Patrick of Edina, Minnesota ("**St. Patrick**") submits this memorandum in support of its objections to and joinder with other objections (ECF No. 1078) to the confirmation of the Second Amended Chapter 11 Plan of Reorganization of the Official Committee of Unsecured Creditors of the Archdiocese of Saint Paul and Minneapolis (the "**UCC Plan**"; ECF No. 890).

In its prior objection and joinder, St. Patrick joined in the Objection of the Official Parish Committee of Parish Creditors (the "**Committee Objection** "; ECF No. 1057) and the separate Objection of the Debtor Archdiocese of Saint Paul and Minneapolis (the "**Debtor Objection**"; ECF No. 1072) to UCC Plan.  In addition to its joinder in these objections, St. Patrick identified additional objections which pursuant to this Court's Scheduling Order of May 18, 2017 (ECF No. 1046).  These additional objections included the following: (i) the UCC Plan improperly seeks to compel the archbishop to assess parishes an increased rate as a means of funding the plan; and (ii) the UCC Plan improperly seeks attachment of unpaid parish assessments.  This

memorandum in support of these objections is submitted pursuant to the Court's Scheduling

Order dated June 15, 2017 (ECF No. 1090).

      1.      <u>The UCC Plan Improperly Seeks to Compel the Archbishop to Assess Parishes an</u>

<u>Increased Rate as a Means of Funding the Plan.</u>

As a means proposed by the UCC to fund the "Trust" established under the UCC Plan

(the "Plan Trust"), the UCC Plan identifies an increase in parish assessments by the Archbishop.

*UCC Plan* § 5.2.  The authority of a bishop to levy assessments against parishes is governed by

Code of Canon Law and, as such, cannot be compelled by order of the Court pursuant to the

UCC Plan without violating the Religion Clauses of the First Amendment of the United States

Constitution.

The United States Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church and*

*School v. EEOC*, 565 U. S. 171, 132 S.Ct. 694, 702, 181 L.Ed.2d 650 (2012), described the

"Religion Clauses" to the First Amendment of the United States Constitution as follows:

> The First Amendment provides, in part, that "Congress shall make no law
> respecting an establishment of religion, or prohibiting the free exercise thereof."
> We have said that these two Clauses "often exert conflicting pressures," *Cutter v.*
> *Wilkinson*, 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), and that
> there can be "internal tension ... between the *Establishment Clause* and the *Free*
> *Exercise Clause*," *Tilton v. Richardson*, 403 U.S. 672, 677, 91 S.Ct. 2091, 29
> L.Ed.2d 790 (1971) (plurality opinion). Not so here. Both *Religion Clauses* bar
> the government from interfering with the decision of a religious group to fire one
> of its ministers.

(Emphasis added.)  As regards the provision in the UCC plan that provides for plan funding

based upon compelling the Archbishop to increase assessments, St. Patrick submits that usch a

provision is barred by both Religion Clauses.

In *Hosanna-Tabor*, the Supreme Court discussed the history of First Amendment

jurisprudence touching upon internal church governance:

In *Watson v. Jones*, 13 Wall. 679, 20 L.Ed. 666 (1872), the Court considered a dispute between antislavery and proslavery factions over who controlled the property of the Walnut Street Presbyterian Church in Louisville, Kentucky. The General Assembly of the Presbyterian Church had recognized the antislavery faction, and this Court—applying not the Constitution but a "broad and sound view of the relations of church and state under our system of laws"—declined to question that determination. *Id*., at 727. We explained that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Ibid*. As we would put it later, our opinion in Watson "radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U. S. 171, 132 S.Ct. 694, 704.

In addition, the Supreme Court has recognized that "[t]o permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine . . . the use of the *Watson* approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy." *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg*, 396 U.S. 367, 369, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring), cited with approval, *Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *see also Watson v. Jones*, 13 Wall. 679, 20 L.Ed. 666, 728-9 ("The right to organize voluntary religious associations. . . and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned . . . It is of the essence

of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.")

A decision by a bishop concerning the assessment of parishes in his diocese is a "juridic act" under Code of Canon Law[1] and parishes are considered "juridic persons."[2]  The bishop's rights and authority to assess parishes are also governed by the Code of Canon Law. The general rule that defines this authority is Canon 1263, which states that

> After the diocesan bishop has heard the finance council and the presbyteral council, he has the right to impose a moderate tax for the needs of the diocese upon public juridic persons subject to his governance; this tax is to be proportionate to their income. He is permitted only to impose an extraordinary and moderate exaction upon other physical and juridic persons in case of grave necessity and under the same conditions, without prejudice to particular laws and customs which attribute greater rights to him.

According to this canon, a bishop's authority to assess parishes is not unfettered. Instead, the bishop shares this authority with the diocesan finance and presbyteral councils with which he must consult before he proceeds with any assessment of parish income. This authority is one of a bishop's "legislative powers," as described in Canon 135, and as such "cannot be validly delegated unless the law explicitly provides otherwise." (Code of Canon Law, 135 §2.)

Under no circumstances does canon law allow a bishop to share this authority to assess parishes within his diocese with a third party, even a judicial body. The nature of this authority is further illustrated in Canon 125 §1, which provides that any such act on the part of a bishop "placed out of force inflicted on a person from without, which the person was not able to resist in

---

[1] Huels, John M. *Juridic Acts in Canon Law,* unpublished commentary on cc. 124-128, Ottawa, Saint Paul University, Faculty of Canon Law, 2012.  A copy of this commentary is attached hereto with the permission of the author.

[2] Code of Canon Law 515 §3

any way, is considered as never to have taken place." In other words, a bishop cannot be compelled or ordered to exercise his authority to assess the parishes within his diocese without invalidating the assessment.  Canon Law is explicit on the subject: for such powers are the bishop's alone to exercise, free from any external pressure or compulsion. Any such invalid exercise of the bishop's juridic power to assess the parishes within his diocese would create a cause of action under Canons 1400 and 1401, which define a parish's canonically recognized right to be heard by an ecclesiastical congregation or tribunal concerning any improperly exercised juridic act by a bishop including the assessment of parishes and the collection of assessments.[3]

Additionally, Canon 1263 explicitly provides that a bishop can only assess the parish's *income*, not its assets.  ("[T]his tax is to be proportionate to their income." Canon 1263.)  Canon Law explicitly excludes gifts and offerings made by the faithful with explicit donative intent from being considered income for the purposes of the assessment, for such offerings with a stated purpose "can be applied only for that same purpose." (Code of Canon Law, 1267 §3). Likewise, assets received by a given parish by will or bequest are also excluded from the assessment (Code of Canon Law, 1300). And therefore, "any tax imposed by the diocesan bishop cannot take a portion of the stable patrimony of a juridic person, nor donations made to the juridic persons for a particular intention specified by the donors."[4]

Any validly imposed tax must also be moderate, even in extraordinary circumstances, that is, "reasonable in relation to the economic situation of the juridic persons and not so extreme

---

[3] "The object of a trial is the pursuit or vindication of the rights of physical or juridic persons, or the declaration of juridic rights," Code of Canon Law 1400 §1. "By proper and exclusive right the Church adjudicates the violation of ecclesiastical laws…," Code of Canon Law, 1401 §2.
[4] Rev. Msgr. Renken, John A. *Church Property: A Commentary on Canon Law Governing the Temporal Goods in the United States and Canada*, 79-80. 2009.

as to deprive those taxed from their means of livelihood.[5]" As previously discussed, the shared authority of the ability to assess parishes by the diocesan finance and presbyteral councils is required here, as it is up to them to aid in the determination "whether or not a proposed taxation formula is 'moderate'" under the standard imposed by Canon 1263.[6]

In contravention of the freedoms protected by the Religion Clauses of the First Amendment, which assure religious organization independence "from secular control or manipulation," the confirmation of the UCC Plan would directly interfere with the internal governance of the Debtor established by the Code of Canon Law concerning the assessments of the non-debtor parishes as a means of funding payments under the UCC Plan.  In addition, the matter of Debtor's assessment of non-debtor parishes cannot can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy, as discussed above.  As the UCC Plan contravenes the freedoms protected by the Religion Clauses of the First Amendment, the UCC Plan does not satisfy 11 U.S.C. §§ 1129(a)(1), (2), and (3) and, accordingly, cannot be confirmed.

2.      The UCC Plan Improperly Seeks Attachment of Unpaid Parish Assessments and the Assignment of Rights Relative Thereto.

The UCC plan attempts to turn over to the Plan Trust "any and all rights and powers and agreements necessary to permit the Trust to collect past-due assessments owed by Archdiocesan Parishes."  *UCC Plan* § 8.4(b)(1).  As discussed above, the payment of assessments by a Parish to the Archdiocese and the collection thereof by the Archdiocese are a governed by the Code of Canon Law.  This includes the collection of delinquent assessments still owed by the parishes to

---

[5] *Ibid.* 87-88.
[6] *Ibid.* 88.

the archdiocese, all of which are strictly canonical duties described in Canon 1263.  In addition, the proper remedy for the validation of canonical rights is set forth Canons 1400 and 1401.

In contravention of the freedoms protected by the Religion Clauses of the First Amendment, discussed above, the UCC Plan concerning the collection of assessments and assignment of rights relative thereto directly interferes with the internal governance of the Debtor established by the Code of Canon Law.   In addition, the matter of Debtor's collection of assessments from non-debtor parishes and rights relative thereto cannot be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy, discussed above.  As the UCC Plan contravenes the freedoms protected by the Religion Clauses of the First Amendment by assigning to the Plan Trust/Trustee "any and all rights and powers and agreements necessary to permit the Trust to collect past-due assessments owed by Archdiocesan Parishes," the UCC Plan cannot satisfy 11 U.S.C. §§ 1129(a)(1), (2), and (3).  In addition, the proposed assignment and collection of assessments under the UCC Plan effects a transfer of property by the parish corporations, which are not "moneyed, business or commercial" corporations, contrary to nonbankruptcy law, namely the Religion Clauses of the First Amendment.  For this reason, the UCC Plan violates 11 U.S.C. § 1129(a)(16).

## <u>CONCLUSION</u>

For the reasons discussed above as well as additional reasons discussed in the separate Memoranda of Law in support of the Debtor Objection and the Committee Objection, the UCC Plan is not confirmable.  Accordingly, St. Patrick asks this Court to deny confirmation of the UCC Plan and set a confirmation hearing of the Debtor's plan.

Dated: July 7, 2017                    **FABYANSKE, WESTRA, HART & THOMSON, P.A.**

        By:  /e/ Paul L. Ratelle
             Paul L. Ratelle (#127632)
             Andrew J. Ratelle (#398018)
             333 South Seventh Street
             Suite 2600
             Minneapolis, MN  55402
             612-359-7600
             612-359-7602 (f)

             ***ATTORNEYS FOR THE CHURCH OF
ST. PATRICK OF EDINA, MINNESOTA***

8

# JURIDIC ACTS IN CANON LAW

DCA 6363 / DCA 8101

## © John M. Huels (2012)

*This commentary is offered solely for the private use of the students of the Faculty of Canon Law of Saint Paul University. It may be cited and quoted in student works but may not be used for other purposes without permission of the author.*[1]

## *Code of Canon Law*, Book I, Title VII

## Juridic Acts (cc. 124-128)

The precise term "juridic act" was not found in the prior legislation, but the notion was implicit in what were simply called "acts."[2] Canons 124-128 are very important because they provide the fundamental rules for every kind of juridic act in the canonical system.[3] Some examples of juridic acts are marriage consent, religious profession, transfer to another Church *sui iuris*, vows and oaths, promulgation of laws, singular decrees (e.g., assignment to and removal from an office, canonical erection of a sacred place, erection of a parish, establishment of an association of the faithful, establishment of a juridic person, suppression or division of a juridic person, infliction or declaration of a penalty, etc.), granting a rescript (dispensation, privilege, other favours), permission, consent, a vote, an election, judicial decrees and sentences, a *libellus*, a complaint of nullity, an appeal, recourse, alienation of ecclesiastical goods, contracts, wills and donations, and many more.

**Notion**

A juridic act may be defined as *a human act, lawfully placed by a capable person, which has one or more juridic effects*. This definition has four key elements.

---

[1] It may appropriately be cited: John M. HUELS, "Juridic Acts in Canon Law," unpublished commentary on cc. 124-128, Ottawa, Saint Paul University, Faculty of Canon Law, 2012.

[2] Twentieth century canonists largely borrowed the notion and doctrine of the juridic act from the European civil law. The juridic act is found in every legal system, including Roman law and early canon law, but its systematic study is relatively recent.

[3] The comparable canons of the Eastern Code are *CCEO* cc. 931-935. *Codex canonum Ecclesiarum orientalium auctoritate Ioannis Pauli Pp. II promulgatus, fontium annotatione auctus*, Libreria editrice Vaticana, 1995, English translation *Code of Canons of the Eastern Churches: Latin-English Edition, New English Translation*, prepared under the auspices of the CLSA, Washington, CLSA, 2001. This translation is used for all subsequent citations of this Code.

1) A juridic act is a *human act*. It must be done knowingly and willingly. A human act depends on the faculties of the intellect and the will. The mind must understand what the act is, and the will must freely choose to place this act.[4]

2) The person who places a juridic act must not only be capable of a human act but must also be *capable* in law.

3) The human act must be *lawfully placed*. Most fundamentally, it must be *externally manifested* in observance of the requirements and formalities of law that are necessary for the validity of the act.[5]

4) A juridic act lawfully placed by a capable person results in *one or more juridic effects*. The law determines the juridic effects of the act. The effects may bring about new legal rights and/or obligations. By placing the act, a person takes on any legal obligations resulting from that act. Any rights acquired by the act must be respected by all subjects of the law, and they can be vindicated in accord with the procedures of law. A juridic act of power can bestow rights and impose obligations on others (e.g., a rescript, law, singular decree, precept).

**Distinctions**

1.      Juridic acts are public or private. *Public* juridic acts are done *in nomine Ecclesiae*, specifically in the name of a juridic person in the Church. For the most part, these are acts of the power of governance. They are placed by the competent authorities and organs of juridic persons. Some juridic acts are public but are not acts of the power of governance, for example, certain notifications and declarations (e.g., c. 186, *CCEO* c. 965, §3; c. 694 §2, *CCEO* c. 497, §2); reception of religious profession (c. 656, 3°, 5°, *CCEO* c. 464, 2°); or juridic acts of the defender of the bond.[6] The effects of public juridic acts pertain to the common good, even if directed to single persons. *Private* juridic acts are placed by persons acting in their own name or on behalf of another private party. Examples include a will, a contract, a vow, an oath, the acts of a party and advocate in a canonical process, a mandate to a procurator, etc.

2.      Juridic acts may be *unilateral*, *bilateral*, or *multilateral*, placed by one, two, or several persons. Some unilateral acts involve the cooperation of others (e.g., by obtaining permission, approval, *recognitio*, previous vote of a council, etc). Contracts are generally bilateral, but they may also be multilateral.

---

[4] Canon law uses the verb *ponere*: to "place" an act. It means "to perform" an act, that is, to do what is required by law to bring about the intended juridic effects.

[5] Certain acts may be in the internal forum (c. 130, *CCEO* c. 980), but they still must be externally manifested according to law, for example, a dispensation granted by the confessor (c. 1079, §2, *CCEO* c. 796, §2).

[6] Canon 1626 §1, *CCEO* c. 1307, §1; c. 1628, *CCEO* c. 1309; c. 1687 §1, *CCEO* c. 1373, §1.

3.      Juridic acts may be *individual* or *collegial*. An individual act is placed by one person or by several persons acting in his or her own name (e.g. several parishioners signing a petition of recourse against a decision of their pastor). A collegial act is placed by a group by means of a ballot. Each vote is an individual juridic act but the collective result is a collegial act (e.g. the consent of the college of consultors, or a general decree of the conference of bishops).

4.      The juridic act is distinct from the *object* of the act. Promulgation is a juridic act by which a law is established (c. 7, *CCEO* c. 1488); the object of the act is one or more laws. The pope declares that a doctrine is to be held definitively by the faithful; the declaration is the juridic act, not the doctrine (c. 750, §2, *CCEO* c. 598, §2). Marriage consent is a juridic act (c. 1057, *CCEO* c. 817); the object of the act is the marriage itself with its essential elements and properties.[7] The grant of a privilege is a juridic act (c. 76, §1, *CCEO* c. 1531, §1); the privilege is the right acquired by this grant.

5.      A juridic act must be distinguished from a *juridic fact*. A juridic fact is an effect that the law attaches to an act without the need for a declaration of a person's intention and even if it is contrary to the person's intention. For example, a twelve-year-old girl, who is the daughter of Ukrainian Catholic parents, is baptized in the Latin Church with the intention of being a Latin Catholic. Despite her intention, the law recognizes the fact that baptism has brought about her adscription in the Ukrainian Church *sui iuris* (*CCEO* c. 29). Later, she marries and declares in writing to her pastor that she is transferring to the Latin Church, the Church of her husband. This declaration is a true juridic act (c. 112, §1, 2°, *CCEO* cc. 33, 36). Or, a person stays in a place for five years, without having intended to stay there that long; the person acquires domicile (a juridic fact) irrespective of his/her intention to acquire it (c. 102, §1, *CCEO* c. 912, §1).

6.      Juridic acts must be distinguished from *liturgical acts*. A liturgical celebration is an act of the whole Church (c. 840, *CCEO* c. 667), not of any single person. Some sacraments and sacramentals have juridic effects, and the minister must intend to celebrate them, but they cannot be reduced to a juridic act placed solely by the minister or recipient.

## CANON 124

*For the validity of a juridic act it is required that the act is placed by a qualified person and includes those things which essentially constitute the act itself as well as the formalities and requirements imposed by law for the validity of the act.*[8]

---

[7] Canons 1055, 1056, 1134, *CCEO* c. 776; c. 1135, *CCEO* c. 777; c. 1101, §2, *CCEO* c. 824, §2.

[8] *Codex iuris canonici auctoritate Ioannis Pauli PP. II promulgatus, fontium annotatione et indice analytico-alphabetico auctus, Libreria editrice Vaticana*, 1989; *Code of Canon Law: Latin-English Edition*, new English translation prepared under the auspices of the CANON LAW SOCIETY OF AMERICA, Washington, CLSA, 1999. This translation is used for all subsequent citations of the canons from this Code.

**The capable person**

To place a juridic act validly, a person must be capable (*habilis*).[9] Natural capacity is the capacity to intend and to will. A juridic act is a human act–free, conscious, and responsible. Those who lack the use of reason cannot place juridic acts. The capable person may also be a juridic person, that is, the act is placed by a lawfully designated representative of the juridic person.

*Habilitas* also refers to some specific quality in a person necessary by the ecclesiastical law for validly placing some act. A law that is incapacitating (disqualifying) renders a person incapable of placing some act validly (c. 10, *CCEO* c. 1495). For example, a priest has the natural capacity to marry, but he is incapable of marrying validly in canon law since holy orders is an impediment to marriage (c. 1087, *CCEO* c. 804). To make religious profession validly, the novice must be free of grave fear or fraud (c. 656, §4, *CCEO* c. 464, 3°), even though grave fear or fraud do not normally disqualify a person from placing a juridic act. The capable person is, therefore, one who not only has the natural capacity to act but also is not disqualified from acting validly by any incapacitating laws.[10] To place certain acts validly, moreover, a specific legal *competence* may also be required, for example, a specific ecclesiastical status (cleric or religious) or a certain office, mandate, faculty or power.[11]

**Essential elements**

The essential elements of a juridic act have their origin in the divine or ecclesiastical law. An element that essentially constitutes a juridic act is one without which the attempted act would not exist. If an essential element is lacking, some authors prefer to say that the act is not simply invalid but really is inexistent.[12] Thus, the essential elements may often be determined by asking

---

[9] In canon law, *habilis* sometimes refers only to a general capacity for something other than placing a juridic act (e.g. c. 229, §3, *CCEO* c. 404, §3). In this canon, however, it refers to the capacity to act validly.

[10] Andrea D'Auria, "Alcune considerazioni sul problema delle leggi irritanti ed inabilitante nella prospettiva del rapporto tra i canoni 10 e 124 del CIC," in Arcisodalizio della Curia Romana (ed.), *L'atto giuridico nel diritto canonico*, Studi Giuridici 59, Libreria Editrice Vaticana, 2002, pp. 155-184.

[11] Cf. *Nuntia*, 18 (1984), p. 22, c. 21, §2. Competence pertains to public, not private, juridic acts. See *Communicationes*, 21 (1989), p. 171.

[12] "The validity of a juridic act presupposes that there are present those elements that pertain to *the essence of the act*, which by the very nature of the act must be considered its *constitutive elements*. Lacking them, the act is invalid because it is *inexistent*." See *Communicationes*, 6 (1974), p. 101.
Labandeira critiques the notion of the "inexistent" act since something exists even if an essential element is lacking. He refers to these "acts" as a category of acts that are specifically declared null by *CIC* c. 124, §1. Eduardo Labandeira, *Tratado de derecho administrativo canónico*, 2nd ed., Pamplona, EUNSA, 1993, p. 398.

whether that act could exist without them.[13] For example, a contract could not exist unless there was an agreement to exchange rights and obligations between two or more parties. Or, one could not make religious profession without vowing obedience, chastity, and poverty (c. 654, *CCEO* c. 462, §1).

For every juridic act in the external forum,[14] it is essential that the person make a *declaration of intention* of bringing about the juridic effects in accord with the law.[15] The agent must act knowingly and willingly. If an act is forceably placed against the will of the acting person, it is null. The primary essential element of every juridic act, therefore, is the intention of the subject that is manifested legitimately. In the case of many juridic acts, the external manifestation of intention must be explicit, but sometimes the law only requires that it be express (e.g., c. 1111, §2, *CCEO* c. 830, §3), in which case it may be explicit or implicit. An example of an explicit manifestation is the pastor telling a visiting priest: "I delegate you the faculty to assist at this marriage." An example of an implicit manifestation is the pastor who, knowing the identity of the visiting priest, prepares everything for the wedding in the sacristy and the church. He does not even have to meet the priest, as his delegation is implicit by his actions that are verifiable in the external forum.

Generally, a tacit declaration does not suffice for a valid juridic act; keeping silent produces no juridic effect. However, there are a few exceptions to the rule when the law specifically attributes an effect to keeping silent, such as prescription, non-response to a request for a decree, or presumed permission.[16] Also, if the legislator is present when a practice contrary to or apart from the law is observed by a community, and he does nothing to eradicate the practice but keeps silent about it, he is presumed to approve it (cf. c. 26; *CCEO* c. 1507, §4).

Besides the declaration of intention, there may be other essential elements that pertain to the nature of the act. For example, some form of canonical provision is necessary for the acquisition of an ecclesiastical office (c. 146, *CCEO* c. 938). Without canonical provision, attempting to take office would amount to an empty gesture because it would be juridically non-existent. The essential elements of an act may not be dispensed since they are constitutive of the act itself (cc. 86, 87, §1, *CCEO* c. 1537). They are of the essence of the act. Nor is it possible to

---

[13] Michel THÉRIAULT, *Commentary* in A. MARZOA, J. MIRAS, R. RODRÍGUEZ-OCAÑA (eds.) and E. CAPARROS (gen. ed. of English translation), *Exegetical Commentary on the Code of Canon Law*, Montréal, Wilson & LaFleur, 2004, vol. I, p. 801.

[14] Canon law may also recognize juridic effects of an act placed solely in the internal forum (e.g. c. 1158, §2, *CCEO* c. 845, §2), although proof of such an act would be needed in the external forum.

[15] The intention must be actual or virtual. Habitual, presumptive, or interpretive intentions are insufficient. See Helmut PREE, "On Juridic Acts and Liability in Canon Law," in *The Jurist*, 58 (1998), p. 53.

[16] See c. 165, *CCEO* c. 947, §1; c. 1630, §1, *CCEO* c. 1311, §1; c. 1635, *CCEO* c. 1316; c. 57, §1, §2, *CCEO* c. 1518; and cc. 197-199, *CCEO* cc. 1540-1542.

sanate an act if a constituent element is lacking. Without an essential element, the act is null and the juridic effects are not produced.[17]

**Formalities and requirements for validity**

The *inner content* of a juridic act is the intention of the agent. The *outer structure* is the manifestation of that intention in some form required by law. Canon 124 is concerned with the legal formalities (*sollemnia*) and requirements (*requisita*) necessary for the validity of the juridic act. If any such formality or requirement is lacking, the act is invalid.[18]

*Legal formalities* pertain to the external form of the act, for example, that it be put in writing, that it be placed before witnesses and/or a certain official, that a certain formula be uttered, etc. Some specific examples include: (1) religious profession which, for validity, must be received by the competent superior (c. 656, nn. 2-5, *CCEO* c. 464, 2°); (2) institution of a law, which must be put in writing, signed by the legislator or his delegate, and promulgated in accord with c. 8, *CCEO* c. 1489; (3) consent to marry, which must be given at least implicitly by the celebration of the marriage in a sacred rite before a priest who has the faculty to bless marriages and at least two witnesses (c. 1108, *CCEO* c. 828).

*Requirements* are stipulations of law that are extrinsic to the act itself or the manner of placing it, for example, the prior consent of the college of diocesan consultors, the permission of the diocesan bishop, the confirmation of the Holy See, etc. There are numerous requirements of the law for liceity only, but this canon is only concerned with those necessary for validity. If a requirement for liceity is not observed, the act is still valid and the juridic effects are brought about, but if a requirement for validity is not observed, there are no juridic effects.

**CANON 124, §2**

*§2. A juridic act placed correctly with respect to its external elements is presumed valid.*

If the subject is capable and competent and the external elements are observed (declaration of will, formalities, requirements), the act is presumed valid. This is a *praesumptio iuris*, a presumption of law which admits contrary proof, not a *praesumptio iuris et de iure*, which does not. Thus, this presumption of validity can be overturned by contrary proof.[19] For example, a man and woman marry before the pastor and two witnesses in a sacred rite. The law presumes that they are married validly because all the external elements have been observed.

---

[17] Regarding an inexistent act, PREE adds: "there is no possibility of dispensation, suppletion, or ratification; prescription cannot be applied to the rights or duties of a non-existent juridic act. Not even the pope could convalidate a non-existent act by means of a confirmation *in forma specifica*." In *The Jurist*, 58 (1998), pp. 50-51.

[18] See *Communicationes*, 6 (1974), p. 102.

[19] Antonio S. SÁNCHEZ-GIL, *La presunzione di validità dell'atto giuridico nel diritto canonico*, Pontificia Università della Santa Croce Monografie Giuridiche 30, Milan, Giuffrè, 2006.

There must be evidence to prove the contrary, for example, that the marriage was null because a party's intention was defective due to simulation, force or fear, error, etc, or that a party was incapable of acting (e.g., cc. 1084, 1095, *CCEO* cc. 801, 818). An invalid juridic act, apart from an act of administrative power,[20] can be declared null by a competent judicial tribunal (c. 1400, *CCEO* c. 1055).

It is debated in the doctrine whether the juridic effects of acts are directly the result of the person's internal will (the theory of the will) or whether they are produced by the law itself as a result of the act being properly placed as to its external elements (the theory of the declaration).[21] The canonical tradition and the majority view of authors favour the former position, the theory of the will, at least for private juridic acts. In support of the theory of the declaration, one may note that the law does not state that simulation is, in general, a ground for declaring an act null, as it does with respect to external force (c. 125, *CCEO* c. 932, §1).[22] This may simply mean that simulation is possible but that the law does not generally admit it as a ground for nullity.[23] However, if simulation renders an act null but this is not recognised in the law, juridical certainty is lacking and there is a troubling disconnection between the internal forum and the external

---

[20] In a case of recourse, the competent administrative authority may declare a decree invalid, rescind it, or revoke it (c. 1739, *CCEO* c. 1004). An act of administrative power, in this sense, is a singular decree or precept.

[21] Michiels explains that the theory of the declaration holds that it is not the internal will but its external declaration that brings about the juridic effects. In contrast, the theory of the will upholds the primacy of the internal act of the will over its external declaration. Michiels himself holds the theory of the will. Although the law presumes that the internal will is in conformity with the external declaration, he says that, in an individual case, discordance between the two could be proven. See Gommar MICHIELS, *Principia generalia de personis in Ecclesia: Commentarius Libri II Codici iuris canonici, canones praeliminares 87-106*, Paris, Desclée, 1955, pp. 593-594.

This question remains unsettled today. Esposito, e.g., says: "Detti effetti si producono in forza della stessa legge, a prescindere dall'intenzionalità del soggetto interessato." Bruno ESPOSITO, "La participazione del superiore religioso alle votazioni con il suo consiglio quando il diritto richiede il consenso: questione risolta?" in *Periodica*, 95 (2006), p. 44. Fornes, however, takes the opposite position: "... en caso de eventual discordancia entre voluntad y declaración, prevalecerá siempre la voluntad interna, que no puede ser suplida por el ordenamiento." See Juan FORNES, "El acto jurídico-canónico (sugerencias para una teoría general)," in *Ius Canonicum*, 25 (1985), p. 80.

[22] The Pontifical Commission for the Revision of the Code of Canon Law (PCRCIC) discussed this issue and even drafted a canon on simulation in contracts, but the idea was dropped for various reasons. See *Communicationes*, 21 (1989), pp. 155-157; 174-175. Note that sacraments may be simulated, but sacraments are not juridic acts even if some of them may have juridic effects.

[23] PREE, *The Jurist*, 58 (1998), p. 66, states: "Simulation is irrelevant unless the rejection of the fulfillment would be equivalent to a sine qua non condition in an individual case." He adds that this accords with the principle, "no one is to be heard who alleges his own wrongdoing" (*nemo auditur propriam turpitudinem allegans*). See also Pree's commentary in Klaus LÜDICKE (ed.), *Münsterischer Kommentar zum Codex Iuris Canonici*, Essen, Ludgerus Verlag, 2003, c. 126, pp. 2-3, where Pree discusses both mental reservation and simulation.

forum with potentially numerous juridic acts, which are inexistent in the internal forum, being recognised as effective in the external forum. This conflict is avoided if the declaration theory is adopted. Accordingly, when a person properly places an act knowingly and freely, the juridic effects are realised. The act presupposes intention and deliberation, but the person's internal intention does not bring about the juridic effects, which are realised *ipso iure*. Consequently, a simulated act does not prevent the juridic effects from being realised unless the law provides otherwise, as it does with respect to marital consent (c. 1101, *CCEO* c. 824, §2).

## CANON 125

*§1. An act placed out of force inflicted on a person from without, which the person was not able to resist in any way, is considered as never to have taken place.*

*§2. An act placed out of grave fear, unjustly inflicted, or out of deceit is valid unless the law provides otherwise. It can be rescinded, however, through the sentence of a judge, either at the instance of the injured party or of the party's successors in law, or ex officio.*

If an act is done against one's will due to external force that cannot at all be resisted, it is manifestly null and is considered in law as if it had not been done. The force must come from an external source (*ab extrinseco*), that is, brought about by another person; it is not some subjectively perceived threat that does not really exist nor some purely internal pressure. The force must be so strong that the person here and now is absolutely unable to resist it, even if the same force might be resisted by other persons.[24] For example, a father, holding a machete, tells a man to marry his pregnant daughter or he will face the consequences. An act thus forced is null. Even if the man later on decides that he loves the woman and wants to stay married, the marriage is still null because it was contracted by force. A convalidation would be necessary, but sanation would be impossible because the consent was inexistent.

Certain juridic acts are explicitly nullified in the law because of force: admission to the novitiate (c. 643, §1, 4°, *CCEO* c. 450, §1, 5°); religious profession (c. 656, 4°, *CCEO* c. 464, 4°; c. 658, *CCEO* c. 532); marriage (c. 1103, *CCEO* c. 825); a judicial sentence (cc. 1620, 3°, *CCEO* c. 1303, §1, 3°). These are specific reminders of the general principle expressed here: *all* juridic acts are null if they are forced. Also, many non-juridic acts are invalid if they are forced, including the celebration of the sacraments and also of sacramentals that have juridic effects.

§2. The rule for juridic acts, in general, is that grave fear, inflicted unjustly, or fraud (deceit = *dolus*) does **not** invalidate the act. However, in a number of cases the law does state that fear or fraud invalidates a juridic act, for example, religious profession (cc. 656, 4°, *CCEO* c. 464, 4°; c. 658, *CCEO* c. 532) and marriage (c. 1103, *CCEO* c. 825; c. 1098, *CCEO* c. 821).[25] In

---

[24] See *Communicationes*, 21 (1989), p. 152.

[25] See also cc. 643, §1, nn. 1-4, *CCEO* c. 450, 5°; 643, §1, 1°, *CCEO* c. 517, §1; cc. 1101, 1192, §1, *CCEO* c. 889, §3; c. 172, *CCEO* c. 954, §1, 1°; c. 188, *CCEO* c. 968; c. 1538, *CCEO* c. 1219; c. 1631, *CCEO* c. 1313, §1, 3°; c. 1360, *CCEO* c. 1421.

other cases, the person who places a juridic act due to grave fear, unjustly inflicted, or deceit may petition the competent tribunal to rescind the act (or take recourse to the hierarchical superior for a rescission if it is an act of administrative power).[26] This petition may also be made by the injured party's successor, or *ex officio* by the promoter of justice or the hierarchical superior of the person.

Fear is induced by threat of "moral force" as opposed to physical force.[27] Only grave fear has any consequences on a juridic act. For fear to be grave, the threatened evil must exist objectively and not merely in the imagination, and the threatened evil must be important, for example, loss of property, reputation, social position, family alienation, threat of suicide by another, etc. The gravity and importance of the matter occasioning the fear are relative: what is grave and important to one person might not be to another. What matters is that the gravity and importance be demonstrated with respect to the person who feels compelled to place the juridic act in order to prevent the feared consequences. Moreover, the fear must be unjustly inflicted for there to be any juridic consequences; if the fear is justly inflicted, a petition to rescind the act must be denied.

Fear would be unjust if it were caused by someone who lacks the authority. For example, if the pope asks a diocesan bishop to resign or he will remove him from office, the juridic act of resignation is valid, though placed under fear. Nor could the bishop lawfully claim it was invalid, since the pope has the authority to make such a demand. It would be unjust if the demand came from the Congregation for Bishops, since it lacks such authority without an express mandate from the pope.

Fear is also unjust when there is no proportion between the gravity of the evil threatened and the reason for which it is threatened. For example, a man tells his son that he will disinherit him if he does not marry the woman his father wants him to marry. The evil (the loss of inheritance) is disproportionate to the cause. On the other hand, if the father tells his son that he, the father, will be unhappy if his son does not marry a certain woman, this would not be unjust, since it is proportionate to the cause. The fear of his father's displeasure would not be sufficient to induce most men to marry someone they did not want to marry (although this may vary according to one's culture).

Even if the cause is just, the fear induced is unjust if the means used are unjust. Sometimes the cause may be just but the means unjust, with the result that the fear induced is also unjust. For example, a diocesan bishop asks an offending priest to resign from office or else he will notify the media of the offense. Due to grave fear of loss of reputation, the priest resigns,

---

[26] The Code uses the word "rescission" (to rescind), not the more commonly known equivalent, "annulment," which is not found in canon law. Unlike a declaration of nullity, which declares that an act was invalid from the beginning, a rescission nullifies a valid act by means of a judicial sentence or an administrative decree. This is why it is not correct to speak of a marriage "annulment;" it is, rather, "a declaration of invalidity" or of "nullity."

[27] PREE, in *Münsterischer Kommentar*, 125/10.

but the means used was unjust (c. 220, *CCEO* c. 23) with the result that the fear is unjustly inflicted. The resignation is invalid by the law itself (c. 188, *CCEO* c. 968).

*Dolus* (deceit, fraud) is the deliberate concealment of facts or deliberate assertion of what is untrue done precisely to persuade someone to place a juridic act. Thus, it can be caused by hiding the truth, by telling a lie, or by misleading one to believe something is true when it is not. The person deceived places the juridic act precisely because of the erroneous knowledge perpetrated by the deceit. Without the deceit, the act would not have been placed.

*Dolus* is *substantial* if it results in an error concerning an element that constitutes the substance of the act or if it amounts to a condition *sine qua non*. Such error always invalidates the juridic act in keeping with c. 126. Canon 125, however, is dealing with *accidental dolus*. Accidental *dolus* does not pertain to a substantial element of the juridic act. For example, a pastor is buying what he thinks to be a solid gold chalice; the purchase of the chalice is a juridic act, a contract. The one selling it knows it to be merely gold plated, but he allows the priest to think it is really solid gold. This is no accidental *dolus* because the property of being solid gold is the substance of what the priest wants to buy; he does not want to pay so much money merely for a gold plated chalice. Such *dolus* is invalidating. The *dolus* would be merely accidental if the priest really loved the chalice, and he would have bought it anyway even if he knew it was only gold plated. Here the *dolus* would not have affected the substance of the contract; he wanted to purchase the chalice whether or not it was solid gold.

Grave and unjust fear and accidental *dolus* do not invalidate a juridic act unless the law provides otherwise. Nevertheless, the juridic act in question may be rescinded by the sentence of a judge, that is, by means of a judicial proceeding (or by the superior authority in an administrative recourse if it was an administrative act [c. 1739, *CCEO* c. 1004]). Unlike a declaration of nullity, the effects of a rescission are not retroactive. Nevertheless, a party who placed an act due to grave fear or fraud may be awarded damages by the judge if the case warrants it (c. 128, *CCEO* c. 935).

## CANON 126

*An act placed out of ignorance or out of error concerning something which constitutes its substance or which amounts to a condition sine qua non is invalid. Otherwise it is valid unless the law makes other provision. An act entered into out of ignorance or error, however, can give rise to a rescissory action according to the norm of law.*

Ignorance is lack of knowledge. Error is mistaken judgement. A person who is ignorant simply does not know the facts. A person who errs thinks he knows the facts, but the facts he knows are not true. Ignorance or error is substantial if it pertains to an essential element of the act, its essential nature or essential objects.[28] An act placed in substantial ignorance or error is

---

[28] PREE, in *Münsterischer Kommentar*, 126/3.

invalid.[29] The priest thought he was buying a solid gold chalice, but he got a gold plated chalice instead (substantial error). Ignorance or error is accidental if it pertains to elements that are not substantial. A person bought a house (the substance) but did not know that the heating and plumbing (the accidental elements) do not function properly (accidental ignorance).

An act placed in ignorance or error that amounts to a condition *sine qua non* also is invalid. A condition *sine qua non* pertains to some accidental element of a thing that the person wants such that, if that element were not present, the person would not want that thing at all. For example, Sarah wants to marry a man (the substance) who is a doctor (an accidental element), and she thinks Samuel is a doctor; she is in error because he is not. She only wants to marry him because she believes him to be a doctor. When she discovers after the marriage that he is not really a doctor, she leaves him and petitions for a declaration of invalidity. She did not want to marry Sam, the person as he is, but the Sam who must be a doctor (the condition *sine qua non*). What objectively is an accidental property is subjectively subtantial for her.[30] In reality, it is not the ignorance or error that gives rise to the invalidity but rather the non-fulfillment of the *sine qua non* condition.

If the ignorance or error is not substantial but only accidental, or if there was no condition *sine qua non*, the juridic act is valid, but the act can be rescinded by a judge, in accord with the norm of law. If a valid act is rescinded, the effects are not retroactive. It once was valid but is now annulled.

A judicial tribunal is also competent to declare a juridic act null on the basis of substantial ignorance or error (c. 1400, *CCEO* c. 1055, §1, 1° = declaration of a juridic fact). The same may be done on recourse by administrative decree if the juridic act in question is a singular administrative decree (c. 1739, *CCEO* c. 1004). For example, a pastor sends a letter to the diocesan bishop telling him of his desire to resign at age 75 and speaking about his plans when he retires from office (cf. c. 538 §§ 1, 3, *CCEO* c. 297, §2). The bishop, in response, notifies the pastor in writing that his resignation is accepted and assigns him to take up residence in another parish. On recourse, the bishop's act can be declared invalid as he was in substantial factual error about its motivating cause since the pastor had not yet resigned from office.[31]

## CANON 127

*§1. When it is established by law that in order to place acts a superior needs the consent or counsel of some college or group of persons, the college or group must be convoked*

---

[29] For specific applications of the effects of ignorance and/or error, see c. 1096, §1, *CCEO* c. 819; c. 1097, *CCEO* c. 820; c. 188, *CCEO* c. 968; c. 1538, *CCEO* c. 1219.

[30] Antoni STANKIEWICZ, "I vizi della volontà: la violenza (can. 125, §§ 1-2 CIC) e la 'condicio sine qua non' (can. 126 CIC)," in ARCISODALIZIO DELLA CURIA ROMANA (ed.), *L'atto giuridico nel diritto canonico*, Studi Giuridici 59, Libreria Editrice Vaticana, 2002, p. 188.

[31] MICHIELS lists seven species of substantial error, one of which is an error of fact concerning the cause of the act. *Principia generalia*, pp. 653-655.

*according to the norm of can. 166 unless, when it concerns seeking counsel only, particular or proper law provides otherwise. For such acts to be valid, however, it is required that the consent of an absolute majority of those present is obtained or that the counsel of all is sought.*

Canon 127 treats requirements for the validity of certain juridic acts, namely, the consent or counsel required, in §1, of a group of persons (*coetus personarum*) and, in §2 below, of one or more individuals. The law requires a superior to have such consent or counsel so as to be well informed and avoid arbitrariness when placing an important juridic act. Consent, which itself is a juridic act,[32] is indicated in the law by the word *consensus*. It should be noted, however, that *consensus* may refer to other acts, such as permission or marital consent. The context determines how it should be understood. Counsel (*consilium*) is indicated by the words to *consult* or to *hear* (a group or a person). If a superior attempts a juridic act without the required consent or counsel, it must be placed anew in accord with the law unless a sanation of the invalid act is granted by the Holy See.

A *coetus personarum* is different from the *college* of c. 119 in which all members of the group have an equal vote, even if one of them is the hierarchical superior of the others. This canon presupposes a competent authority who is not part of the group but who is required by law to have the consent or advice of the group.

This first paragraph of the canon treats the consent or counsel needed by a superior from a group when this is required by law (*ius* = universal or particular law, custom, statutes). In the context of this canon, the "superior" may be understood as any officeholder who is obliged to seek the consent or counsel of a group of persons or of individuals subject to his authority, at least to the extent that he has the power to urge them to fulfill their obligation under §3 of this canon (given below).[33] For consent, the competent authority must convoke the group, for example, the presbyteral council, financial council, a religious superior's council.[34] Unlike the rule of c. 119, a quorum is not needed for a valid vote,[35] whether for consent or counsel,

---

[32] In contrast, counsel is not a declaration of the will but an expression of opinion, which is a voluntary juridic fact. See PREE, *Münsterischer Kommentar*, 127/11.

[33] The Eastern Code uses "authority" instead of "superior." This is more fitting, because not everyone with canonical authority is a superior. For example, particular law might establish a parish financial council (cf. c. 295) whose consent would be necessary for the pastor to place certain acts of extraordinary administration, but the pastor is not, strictly speaking, a superior. For further discussion, see Salvatore BERLINGÒ, "*Consensus, consilium* (c. 127/934 *CCEO*) e l'exercizio della potestà ecclesiastica," in *Ius Canonicum*, 38 (1998), pp. 97-99.

[34] Canon 500, *CCEO* c. 269, §2; c. 1263, *CCEO* c. 1012, §1; *CCEO* c. 482. If the group is a collegiate juridic person, a majority (more than 50%) must be present for the vote to be valid in accord with c. 119, *CCEO* c. 924, 1°.

[35] This point is disputed in the doctrine. In any case, if there is a doubt of law, the requirement of a quorum would not bind.

provided the members are duly convoked in keeping with c. 166.[36] For counsel, the competent authority must convoke the group unless particular law provides otherwise.

When *consent* is required, an absolute majority (more than 50%) of those present must vote in favour of the proposed juridic act being placed by the superior. If the vote is tied, the proposal fails and the superior may not perform the juridic act. For example, a diocesan bishop wants to spend one million dollars on a new building (= a contract, the juridic act), and particular law requires that he have the consent of the diocesan financial council to spend that amount. The six members of the council vote three in favour, one against, and two abstentions. The vote fails, and the bishop cannot buy the building.

The superior him/herself is not a member of the group and may not vote, not even to break a tie. This was confirmed by an authentic interpretation of canon 127.[37] In some religious institutes, however, particular law approved by the Holy See says that the superior is a member of the council, or that he/she may vote with the council or vote to break a tie.[38] Such institutes are, in fact, much commoner in the Eastern Churches than in the Latin Church.[39] These institutes are the exception to the rule of this canon that the superior does not vote with the group whose consent is required to act.

When only *counsel* is required, everyone present must have the opportunity to express an opinion, even if a formal vote is not taken. However, it is better to take a secret vote, even if not required, so that those who do not want to oppose the superior openly may have an opportunity to register their true opinion. The superior is not bound by the results of the consultation. For example, the bishop wants to suppress a parish, and he consults the presbyteral council in accord with cc. 512, §§ 2-3, 518, *CCEO* c. 280, §2. The presbyteral council votes 5 in favour, 10 opposed, and 5 abstentions. The bishop is free to suppress the parish, since he is not bound by a

---

[36] Contra THÉRIAULT, *Exegetical Commentary*, vol. I, p. 810, the whole of c. 166 is applicable, not just the first paragraph.

[37] PONTIFICAL COMMISSION FOR THE AUTHENTIC INTERPRETATION OF THE CODE OF CANON LAW, reply, 14 May 1985, in *AAS*, 77 (1985), p. 771; *Code of Canon Law Annotated*, p. 1619.

[38] CONGREGATION FOR RELIGIOUS AND SECULAR INSTITUTES, letter of Cardinal Jerome Hamer, Prefect of CRIS, to Cardinal Jozef Tomko, Prefect of the Congregation for the Evangelization of Peoples, 5 May 1987, Prot. no. SpR 686/87, quoted in Bruno ESPOSITO, "La participazione del superiore religioso alle votazioni con il suo consiglio quando il diritto richiede il consenso: questione risolta?" in *Periodica*, 95 (2006), p. 60. See also John M. HUELS, "Classifying Authentic Interpretations of Canon Law," in *The Jurist*, 72 (2012).

[39] The Eastern discipline "has always recognized the right of the superior to vote with the council whose consent is required to place a juridic act. While the Latin discipline, especially after the authentic interpretation of *CIC* canon 127, §1, would consider the superior separate from the council, Eastern tradition regards the superior as a member of the council." Jobe ABBASS, *The Consecrated Life: A Comparative Commentary of the Eastern and Latin Codes*, Ottawa, Faculty of Canon Law, Saint Paul University, 2008, p. 266.

merely consultative vote. However, had he not sought this counsel, the suppression would have been invalid.

When the law requires consent or consultation, the superior must obtain the consent or counsel for the *validity* of the juridic act. However, a group cannot *compel* the superior to act. For example, the presbyteral council voted unanimously to erect a new parish, but the bishop later changes his mind. He is not required by this vote to place the act.[40]

If it is a question only of consultation, and if allowed by particular law (including statutes and customs) or proper law,[41] the group does not have to be convoked. In that case, the opinion of each member must be sought, preferably by a conference call so that all can hear each other's views before deciding what to advise.

*§2. When it is established by law that in order to place acts a superior needs the consent or counsel of certain persons as individuals:*

*1° if consent is required, the act of a superior who does not seek the consent of those persons or who acts contrary to the opinion of all or any of them is invalid;*

*2° if counsel is required, the act of a superior who does not hear those persons is invalid; although not obliged to accept their opinion even if unanimous, a superior is nonetheless not to act contrary to that opinion, especially if unanimous, without a reason which is overriding in the superior's judgment.*

Unlike §1, which deals with the consent or counsel of a group, §2 treats the consent or counsel of individuals. The term "superior" must be strictly interpreted as defined above.[42] Thus, it does not refer to the consent required of a higher authority, which is equivalent to a permission (e.g., c. 609, §1, *CCEO* c. 436, §2), or to the consent or counsel of someone not subject to his/her authority (e.g., the consent required of the judicial vicar of the respondent's domicile in c. 1673, *CCEO* c. 1359, 3°).

When consent is required, the superior does not act validly if he does not seek the consent of each individual required, or if he acts despite the negative vote of any of them. For example, c. 1222, *CCEO* c. 873, §2 requires that the diocesan bishop, before he issues a decree reducing a church for profane but not sordid use, must have the consent of those who lawfully claim rights

---

[40] If a juridic act is required by *law*, however, the authority must place it (e.g. c. 57, §§ 1-2, *CCEO* c. 1518).

[41] Proper law consists of the constitutions and other internal laws of institutes of consecrated life and societies of apostolic life, which are included in the meaning of *ius particulare* in the broad sense that includes statutes.

[42] See Andrea D'AURIA, "Il concetto di *superior* del can. 127: questioni problematiche aperte," in *Ius Ecclesiae*, 18 (2006), pp. 614-615.

over the church (e.g., the religious institute that owns the church or the property under it).[43] Such persons must give their consent, or the bishop may not validly issue the decree.

If counsel is required, the superior may not act validly without first hearing the advice of every individual whose counsel must be sought. The superior is not bound by their advice, even if it is unanimous against him. However, he may not act against their advice, especially if it is unanimous, unless he has an overriding reason for doing so. If he acts against their advice without an overriding reason, he acts validly but illicitly. For example, in a certain religious institute, the superior general has the power to assign members from one province to another, but she may not do so without consulting the provincial superiors involved. In such a case, an assignment of a member to a community of another province is invalid if either of the provincials is not first consulted.

*CCEO* c. 934 §3 states: *The authority which requires consent or counsel has the duty to provide those whose consent or counsel is required with the necessary information and to see that in every way they have freedom to speak their mind.*

This norm is not in the Latin Code, but it should be taken as a supplementary norm (*CIC* c. 19). With respect to consent, the vote would be invalid if the group lacks the necessary information that pertains to the substance of the act (c. 126, *CCEO* c. 933), for example, if the authority wants to approve a major building project but conceals the financial risks involved (cf. c. 1292, §§ 3-4, *CCEO* c. 1038). The authority also should promote an atmosphere in which all feel free to express their mind and vote their conscience.

*§3. All whose consent or counsel is required are obliged to offer their opinion sincerely and, if the gravity of the affair requires it, to observe secrecy diligently; moreover, the superior can insist upon this obligation.*

Those from whom consent or advice is required are obliged to offer their opinion sincerely. This is no pious exhortation but is a strict legal obligation (*obligatione tenentur*). They must vote the way they believe in conscience to be right and not vote just to please the superior. Those who give consent or counsel are free to vote yes, no, or abstain, but an abstention should not be used to conceal one's opposition to the proposed act.[44]

Those who give counsel or consent are obliged to secrecy. Secrecy needs to be observed only "if the gravity of the affair requires it." Although this qualifier is not in the *CCEO*, one

---

[43] Although the bishop would not be the immediate authority over the religious if they belong to an institute of pontifical right, he is the competent authority with respect to churches in his diocese, even those of religious (cf. c. 1214, *CCEO* c. 869; c. 1215, §1, *CCEO* c. 879; cc. 1207, 1208, 1217, §2, *CCEO* cc. 871; cc. 1210, 1220, *CCEO* c. 872; c. 1222, *CCEO* c. 873).

[44] Some authors hold that, since those who give counsel or consent are obliged to offer their opinion sincerely, they cannot abstain. However, abstaining may be a true expression of their sincere opinion when they are undecided. Besides, abstentions are certainly permitted by customary law, which is "the best interpreter of law" (c. 27, *CCEO* c. 1508).

cannot conclude that the legislator for the Eastern Code demands complete secrecy about everything related to the consent or counsel. Certainly, some things should never be divulged outside the group: when the matter by nature is confidential; if the superior has a legitimate reason for maintaining secrecy; if discussing the matter would risk violating the privacy of others in the group; etc. Secrecy is certainly a value in the law, but it is not absolute. The enforcement of secrecy should not become a means for the superior to circumvent accountability and transparency in administration. A prudential judgement often will be needed concerning what may or should be disclosed to interested persons.

The obligation sincerely to offer one's opinion and to maintain secrecy may be insisted upon, or urged (*urgeri potest*), by the superior. This would normally be done by a reminder of the importance of the obligation, or even by an oral rebuke if need be. If the violation of the obligation is grave or prolonged, more formal canonical means may be employed by the competent ordinary.[45]

## CANON 128

*Whoever illegitimately inflicts damage upon someone by a juridic act or by any other act placed with malice or negligence is obliged to repair the damage inflicted.*

This canon is an application of the divine natural law. If harm has been wrongfully caused, there is an obligation in justice to make reparation. Two kinds of acts are treated in the canon: juridic acts placed unlawfully and all acts, both juridic acts and any other act, which are done with *dolus* (malice) or *culpa* (negligence). The reparation is owed to whoever is harmed, be it a physical person, baptised or not, or a juridic person.

1) If a *juridic act placed illegitimately* harms someone, the damage must be repaired. This applies to both public and private juridic acts.[46] The word *illegitime* means "unlawfully." The unlawfulness of the juridic act arises from acting contrary to a legal duty arising from laws, statutes, or another juridic act (such as a contract), a singular administrative act, or a right of a third party. The term "illegitimately" includes acts involving the misuse of rights, such as the abuse of power by an ecclesiastical authority.[47] The juridic act itself need not be invalid or illicit; it is the person who *acts* illegitimately who brings about the harm. Juridic acts, even if valid and licit according to the positive law, are placed illegitimately whenever the actor violates the natural law.

---

[45] Canon 1318, *CCEO* c. 1406; c. 1343, *CCEO* c. 1426; and c. 1340, *CCEO* c. 1427.

[46] *Communicationes*, 21 (1989), p. 175. According to the Adjunct Secretary of the PCRCIC, "adverbium 'illegitime' respiciat sive substantiam actus iuridici, sive modum et valeat pro actibus iuridicis privatis et publicis."

[47] See PREE, in *The Jurist*, 58 (1998), p. 505.

Harm may be categorised as *tangible* (harm to property or to the body) or *intangible* (harm to one's rights, good reputation, well being, etc). The harm suffered could thus be financial, physical, moral, material, or emotional.[48]

In general, a juridic person is responsible for harmful acts caused by a physical person acting as its representative. If the act was invalid, the juridic person is not liable except to the extent that the juridic person benefited from the act (c. 1281, *CCEO* c. 1024, §3). Instead, the physical person who attempted the invalid act is liable for the harm caused. If the act was valid but illicit, the juridic person is liable, provided the person was acting in the name of the juridic person and not on his/her own (cf. *CIC* c. 1281, §3). For example, a pastor sells the parish convent to a charitable organization without telling the buyer that the roof leaks. The party who bought the building can demand that the parish pay for the financial loss suffered (money for roof repair or a return of some of the purchase price). Here, the pastor was acting in the name of the juridic person–the parish–which benefited from the juridic act (the contract of sale).

2) *A juridic act or any other act done with dolus* or *culpa* that causes harm must also be repaired.[49] In this context, *dolus* (malice) means the act is done deliberately and knowingly; "it means that the actor knowingly engaged in an action that was intended to cause harm to another through the violation of a law, a duty, or a person's rights."[50] The word *culpa* in this canon means that the act was done negligently.[51] "Any other act" refers to any act, other than a juridic act, which causes harm to another.[52]

In canon law, harm can be repaired in four ways: an out-of-court settlement (cc. 1714-1715, *CCEO* cc. 1164-1167), arbitration (cc. 1715, §1, 1716, *CCEO* cc. 1168-1184), a judicial action before the competent tribunal (cc. 1729-1731, *CCEO* cc. 1483-1485), and administrative recourse (cc. 1732-1734, 1736-1739, *CCEO* cc. 996-1006, esp. c. 1005). The latter must be used,

---

[48] THÉRIAULT, in *Exegetical Commentary*, vol. I, p. 814.

[49] Canon 128 can be interpreted to mean that *dolus* and *culpa* apply only to "any other act" but not to a juridic act because the phrase, "immo quovis alio actu dolo vel culpa posito," is set off in commas. The commas are removed from *CCEO* c. 135, so there is no question that *dolus* and *culpa* apply also to juridic acts.

[50] Margaret POLL CHALMERS, "The Remedy of Harm in accord with Canon 128," in *Studia canonica*, 38 (2004), p. 126.

[51] Four elements must be present for an act to be deemed negligent. (1) The person must have a duty of care. (2) The person must have breached that duty. (3) The act must have been the proximate cause of the harm. (4) Actual harm must have been inflicted that is provable. Ibid., pp. 126-127.

[52] The treatment of "any other act" really does not belong in this section of the Code, which is devoted to juridic acts. More logically, it might be included among the rights and obligations of the faithful (circa c. 221), established in terms of an obligation to make amends for harm caused and a right to seek redress for harm suffered.

and may only be used, in cases involving alleged harm caused by an administrative act, namely, a decree or precept.[53]

One juridic person, e.g., a diocese, is not canonically responsible for acts performed by representatives of other juridic persons located within its territory. Parishes, for example, are juridic persons distinct from the diocese (c. 515, §§ 2-3, 518, *CCEO* c. 280, §3), so the diocese is not responsible for repairing harm caused by the pastor or other person acting on behalf of the parish; the parish itself is liable. For the juridic person to be liable, moreover, the act must be placed within the ambit of the official's canonical duties (acts of temporal administration, ministry, etc). If harm is caused by an official or a minister who acts in a private capacity or who exceeds his canonical authority, the person him or herself is liable, not the juridic person.

**[See next page for the bibliography.]**

---

[53] Canons 36, 48, 59, §1, *CCEO* c. 1510, §2, nn. 1, 2; cf. cc. 50, 51, 55, 56, 57, §§ 1, 2, *CCEO* cc. 1517-1520.

## BIBLIOGRAPHY

**Sources**

*Codex canonum Ecclesiarum orientalium auctoritate Ioannis Pauli Pp. II promulgatus, fontium annotatione auctus*, Libreria editrice Vaticana, 1995, English Translation *Code of Canons of the Eastern Churches: Latin-English Edition, New English Translation*, prepared under the auspices of the CANON LAW SOCIETY OF AMERICA, Washington, Canon Law Society of America, 2001.

*Codex iuris canonici auctoritate Ioannis Pauli PP. II promulgatus, fontium annotatione et indice analytico-alphabetico auctus, Libreria editrice Vaticana*, 1989, Code of Canon Law: Latin-English Edition, New English Translation, prepared under the auspices of the CANON LAW SOCIETY OF AMERICA, Washington, Canon Law Society of America, 1999.

**Books**

ARCISODALIZIO DELLA CURIA ROMANA (ed.), *L'atto giuridico nel diritto canonico*, Studi Giuridici 59, Libreria Editrice Vaticana, 2002.

GÜTHOFF, E., *Consensus et consilium ad normam canonis 127 Codicis iuris canonici et canonis 934 Codicis canonum Ecclesiarum Orientalium*, Rome, Pontificia Università Lateranense, 1992.

HEINZMANN, M.C., *Le leggi irritanti e inabilitanti: natura e applicazione secondo il CIC 1983*, Tesi Gregoriana Serie Diritto Canonico 59, Rome, Editrice Pontificia Università Gregoriana, 2002.

LÜDICKE, K. (ed.), *Münsterischer Kommentar zum Codex Iuris Canonici*, Essen, Ludgerus Verlag, 2003.

MARZOA, A., J. MIRAS, R. RODRÍGUEZ-OCAÑA (eds.) and E. CAPARROS (gen. ed. of English translation), *Exegetical Commentary on the Code of Canon Law*, Montréal, Wilson & LaFleur, 2004.

MICHIELS, G., *Principia generalia de personis in Ecclesia: Commentarius Libri II Codici iuris canonici canones praeliminares, cc. 87-106*, Paris, Desclée, 1955.

ROBLEDA, O., *La nulidad del acto jurídico*, 2nd ed., Rome, Università Gregoriana, 1964.

_____, *Quaestiones disputatae iuridico-canonicae*, Rome, Libreria Editrice Università Gregoriana, 1969.

SANCHEZ-GIL, A.S., *La presunzione di validità dell'atto giuridico nel diritto canonico*, Pontificia Università della Santa Croce Monografie Giuridiche 30, Millan, Giuffrè Editore, 2006.

WALSER, M., *Die Rechtshandlung im kanonischen Recht: Ihre Gültigkeit und Ungültigkeit gemäss dem Codex Iuris Canonici*, Göttingen, Cuvillier Verlag, 1994.


**Articles**

BERLINGÒ, S., "*Consensus, consilium* (c. 127/934 *CCEO*) e l'exercizio della potestà ecclesiastica," in *Ius Canonicum*, 38 (1998), pp. 87-118.

DANIEL, W.L, "Juridic Acts in Book VII of the *Codex Iuris Canonici*," in *Studia canonica*, 40 (2006), pp. 433-486.

DE PAOLIS, V., "An possit superior religiosus suffragium ferre cum suo consilio, vel suo voto dirimere paritatem sui consilii," in *Periodica*, 76 (1987), pp. 413-446.

_____, "L'atto giuridico," in *Periodica*, 90 (2001), pp. 185-223.

DUBROWSKY, S., "El consentimiento de un personarum coetus y el acto de un superior," in *Ius Canonicum*, 26 (1986), pp. 287-297.

ESPOSITO, B., "La partecipazione del superiore religioso alle votazioni con il suo consiglio quando il diritto richiede il consenso: questione risolta," in *Periodica*, 95 (2006), pp. 37-68.

FORNÉS, J., "El acto jurídico-canónico: sugerencias para una teoría general," in *Ius Canonicum*, 25 (1985), pp. 57-89.

GARCÍA FAÍLDE, J.J., "Acto jurídico,' in *Memorias*, 25 (2001), pp. 153-218.

GAUDEMET, J., "Reflexions sur le livre I 'De normis generalibus' du Code de droit canonique de 1983," in *Revue de droit canonique*, 34 (1984), pp. 81-117.

GHIRLANDA, G., "Atto giuridico e corresponsabilità ecclesiale (can. 127 CIC)," in *Periodica*, 90 (2001), pp. 225-272.

HENDRIKS, J., "Canone 128: riparazione del danno. Obblighi e responsabilità del vescovo diocesano," in *Ius Ecclesiae*, 15 (2003), pp. 427-457.

HUGHES, S.M., "A New Title in the Code: On Juridical Acts," in *Studia Canonica*, 14 (1982), pp. 391-403.

KRUKOWSKI, J., "Responsibility for Damage Resulting from Illegal Administrative Acts in the Code of Canon Law of 1983," in M. THÉRIAULT and J. THORN (eds.), *Le nouveau Code de droit canonique*, Ottawa, Saint Paul University, (1984), pp. 231-242.

LABANDEIRA, E., "Gli atti giuridici dell'amministrazione ecclesiastica," in *Ius Ecclesiae*, 2 (1990), pp. 225-260. Also in Spanish in *Cuestiones de derecho administrativo canónico*, Colección Canónica, Pamplona, EUNSA, (1992), pp. 431-465.

MOSCARIELLO, G., "L'*error qui versetur circa id quod substantiam actus constituit* (can. 126) e le sue applicazioni nel diritto matrimoniale canonico," in *Periodica*, 91 (2002), pp. 87-129.

ONCLIN, W., "De requisitis ad actus iuridici exsistentiam et validitatem," in *Studi in onore di Pietro Agostino d'Avack*, Milan, Giuffrè, 1976, vol. 3, pp. 397-419.

PALOMBI, R., "Aspetti dell'invalidità dell'atto giuridico nella vigente legislazione canonica," in *Apollinaris*, 66 (1993), pp. 219-250.

PERLASCA, A., "L'obbligo di esprimere sinceramente la propria opinione e di mantenere il segreto: can. 127 §3," in *Quaderni di diritto ecclesiale*, 16 (2003), pp. 388-402.

POLL CHALMERS, M., "The Remedy of Harm in accord with Canon 128," in *Studia canonica*, 38 (2004), pp. 111-154.

PREE, H., "On Juridic Acts and Liability in Canon Law," in *The Jurist*, 58 (1998), pp. 41-83, 479-514.

ROBLEDA, O., "De conceptu actus iuridici," in *Periodica*, 51 (1962), pp. 413-446.

_____, "Nullitas actus iuridici in Codice I.C.," in *Periodica*, 35 (1946), pp. 29-50.

SERRES LÓPEZ DE GUEREÑO, R., "'Error recidens in condicionem sine qua non' (Can. 126): Studio storico-giuridico," in *Periodica*, 87 (1998), pp. 329-349.