## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                    Case No. 15-30125

The Archdiocese of Saint Paul and                         Chapter 11
Minneapolis,

        Debtor.

---

### MEMORANDUM IN SUPPORT OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS' OBJECTION TO SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

### <u>INTRODUCTION</u>

The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor")

submits this memorandum of law in support of its objection [ECF No. 1072] to the

> Second Amended Chapter 11 Plan of Reorganization of the
> Official Committee of Unsecured Creditors of the Archdiocese of
> Saint Paul and Minneapolis

(the "UCC Plan") [ECF No. 890]. The disclosure statement supporting the UCC Plan was filed

by the Official Committee of Unsecured Creditors (the "UCC") on December 19, 2016 (the

"UCC Disclosure Statement") [ECF No. 891].

This memorandum is filed under Section 1128 of the Bankruptcy Code and this Court's

May 18 and June 15, 2017 orders. Terms not otherwise defined in this memorandum are defined

in accordance with the UCC Plan or UCC Disclosure Statement, as appropriate.

This memorandum sets forth legal argument on the objections in the order presented by

the Archdiocese in its original objection dated June 7, 2017. For the Court's convenience, the

discussion is organized in the following order: <u>First</u>, each objection is repeated in full. <u>Second</u>,

the provisions of the UCC Plan applicable to the objection are quoted.  <u>Third</u>, the legal basis for the Archdiocese's stated objection is discussed.

In accordance with the Court's direction, the Archdiocese has addressed the legal issues raised in its previously filed objection.  *See* ECF No. 1072. Where appropriate, the Archdiocese has identified relevant facts not in dispute.  In cases involving mixed issues of law and fact, where issues of material fact are in dispute, the Archdiocese has attempted to set forth the applicable legal standard without an extensive consideration of the underlying facts.

The UCC Plan is legally and fatally defective. Among other things, the plan (a) relies on funding mechanisms not authorized by the Bankruptcy Code, (b) fails to provide adequate means for implementation as a matter of law, (c) improperly designates claims and disenfranchises impaired creditors, (d) requires the de facto liquidation of the Archdiocese, (e) improperly assigns claims and non-estate property, (f) results in the improper separation of rights and liabilities, and (g) fails to comply with laws applicable to religious corporations. Finally, feasibility, typically treated as a fact issue, may be decided in this case as a matter of law based on the four corners of the UCC Plan. Similarly, many of the undisputed facts in this case bear directly on the issue of good faith, which is typically treated as a mixed issue of law and fact.

The Archdiocese's objection list included a joinder in certain objections filed by the non-debtor Catholic entities and carriers in this case. The Archdiocese restates its earlier joinder and joins in the supporting memoranda filed by such parties to the extent that such memoranda are consistent with the Archdiocese's objection, this memorandum, and its plan of reorganization, and are not otherwise inconsistent with or contrary to applicable law.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................................ i

OBJECTIONS TO UCC PLAN CONFIRMATION ................................................................. 1

1.  Improper funding mechanism ................................................................................. 1

2.  Failure to provide adequate means for implementation ......................................... 4

3.  UCC Plan not feasible ............................................................................................ 8

4.  Improper liquidation ............................................................................................. 18

5.  False and misleading liquidation analysis ............................................................ 23

6.  Improper assignment of claims ............................................................................ 23

7.  Improper assignment of Home settlement ........................................................... 25

8.  Improper designation of Class 3 Claims as unimpaired ...................................... 26

9.  Improper assignment of workers' compensation funds ........................................ 28

10. Improper designation of Class 14 Claims as unimpaired .................................... 29

11. Improper designation of Class 8 Claims as unimpaired ...................................... 31

12. Improper designation of Class 13 Claims as unimpaired .................................... 32

13. Disenfranchisement of impaired creditors ........................................................... 33

14. Improper treatment of Class 12 Claims ............................................................... 33

15. Unfair discrimination between Class 6 Claims and Class 7 Claims .................... 34

16. Likely administrative insolvency under the UCC Plan ........................................ 36

17. Failure to comply with applicable non-bankruptcy law concerning religious
    corporations .......................................................................................................... 36

18. Acceptances obtained through improper solicitation ........................................... 38

19. Improper separation of rights and liability .......................................................... 41

20. Proposed turnover of confidential reports ........................................................... 46

21. The UCC Plan was not proposed in good faith ................................................... 47

CONCLUSION ......................................................................................................................... 49

## OBJECTIONS TO UCC PLAN CONFIRMATION

**1.**     **Improper funding mechanism**

Objection

The UCC Plan rests on a funding mechanism not authorized by the Bankruptcy Code. This mechanism contemplates that "…the Bankruptcy Court will determine the value of the Debtor's assets and the Debtor will then pay that value into the Trust." Plan § 5.2(b). The Bankruptcy Code, however, does not authorize a bankruptcy court to value assets for purposes of fixing the amount of the contribution to be made by the debtor to the plan following confirmation. This Court cannot be required to "supplement" a plan at confirmation to include a material term such as the amount of the contribution to be made by the debtor under the plan. The UCC has failed to comply with the Bankruptcy Code, as required by Section 1129(a)(1), as a result of its inclusion of an unauthorized funding mechanism.

This objection presents a threshold legal issue.

Plan provisions

"Under this Plan, the Bankruptcy Court will determine the value of the Debtor's assets and the Debtor will then pay that value into the Trust…."

UCC Plan § 5.2(b).

Discussion

The UCC Plan's inclusion of an unauthorized funding mechanism violates Section 1129(a)(1).

While valuation issues may arise in certain circumstances under the Bankruptcy Code,[1] the UCC Plan's proposed court-led valuation and plan funding scheme falls well outside any Code-permitted situation. The UCC Plan requires that "the Bankruptcy Court will determine the value of the Debtor's assets and the Debtor will then pay that value into the Trust." UCC Plan §

---

[1] *See, e.g.*, 11 U.S.C. §§ 362(d)(2) (determining value for relief from stay), 506 (value of secured claim); 364(d) (determining value in connection with grant of lien to secure post-petition loan). Similarly, a court may be asked to determine whether a party has made a "substantial" contribution of the value of assets for purposes of the new value exception to the absolute priority rule where applicable, *see In re Abeinsa Holding, Inc.*, 562 B.R. 265, 277 (Bankr. D. Del. 2016), or by third parties in connection with a channeling injunction of the type referenced in the Archdiocese's plan of reorganization, *see In re Master Mtg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).

5.2(b).  The Bankruptcy Code does not authorize or require a bankruptcy court to "value" all of

the assets of a debtor for the purpose of determining the amount to be contributed by the debtor

under a proposed reorganization plan (at least in the absence of consent).   Nor does the

Bankruptcy Code provide guidance with respect to the process contemplated under the UCC

Plan.  The UCC has not even outlined a mechanism to resolve the valuation issues.

This issue is undisputed and may be decided as a matter of law.  As part of the "value" to

be transferred to the Trust by the Archdiocese, UCC Plan Exhibit D includes amounts that

simply do not exist, cannot be recovered under the UCC Plan's terms, or are not estate assets as a

matter of law.[2]  There is also no dispute that the UCC's valuation analysis is dependent on

factual determinations as to the Archdiocese's interest in GIF and AMBP accounts, the value

ascribed to "revested assets," and other hypothetical fact scenarios.  The Trust Agreement simply

assumes that these dollars exist and will be made available without explaining how this could be

accomplished, other than offering blatant speculation. UCC Plan § 5.2(b).  The Bankruptcy Code

does not contemplate that a court could or should fill in indeterminable blanks in the UCC Plan.

The provisions of the UCC Plan are inconsistent with the best interest test.  In cases

where the best interest test applies, the Court may be required to determine whether a class of

claims  "will receive or retain under the plan on account of such claim or interest property of a

value, as of the effective date of the plan, that is not less than the amount that such holder would

so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11

---

[2] For example, the UCC incorrectly included as estate assets the workers' compensation deposit
(*see* Objection 9 *infra*), donor-restricted monies held in trust (*see* 11 U.S.C. § 541), and
delinquent church assessment receivables under canon law that are cannot be collected under
civil law (*see* Can. 1263, 1267 (concerning assessment and taxation of Catholic entities for needs
of diocese and for specific purposes); *see also Maffei v. Roman Catholic Archbishop of Boston*,
867 N.E.2d 300, 310 (Mass. 2007) (First Amendment "places beyond [civil courts'] jurisdiction
disputes involving church 'doctrine, canon law, polity, discipline, and ministerial
relationships.'")).

2

U.S.C. § 1129(a)(7).  Section 1129 contemplates that the Court will determine in the appropriate situation whether a proposed plan provides unsecured creditors with a value greater than the liquidation value of the debtor's assets as of the effective date of the plan.  *Id.* § 1129(a)(7)(A)(ii).  The Bankruptcy Code does not provide that a bankruptcy court could or would make an independent estimation of the liquidation value and require that such value be affirmatively contributed to the plan in order to meet that test.  The best interests question is answered on a yes or no basis.

The UCC may claim that the language of Section 1123(b)(6) permits a plan proponent to include in a proposed plan "any other appropriate provision not inconsistent with the applicable provisions of this title."  Although broad, this provision does not "authorize plan provisions that override, undermine, or rewrite relevant Bankruptcy Code provisions." *In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 288 (S.D.N.Y. 2014).

The UCC Plan's funding mechanism undermines the basic structure of the Bankruptcy Code.  Chapter 11 contemplates that a party propose a plan, that the plan be put to a yes or no vote, and that the Bankruptcy Court determine following the vote whether the plan as presented complies with Section 1129 of the Bankruptcy Code.  Nothing in the Bankruptcy Code authorizes or requires a bankruptcy court to become a co-author of a plan or to fill in the most important number in the plan (*i.e.*, the amount to be contributed by the Debtor).  *See In re Baltimore Emergency Servs. II, LLC*, 334 B.R. 164, 171 (Bankr. D. Md. 2005) (observing in the context of a plan "based on faulty assumptions as to funding" that "the court does not have jurisdiction to rewrite Debtor's plan of reorganization"); *In re Lockard*, 234 B.R. 484, 496 (Bankr. W.D. Mo. 1999) (finding that it is "not the duty of the court to write (or rewrite) a plan" and observing  that, instead, "[i]t is incumbent on the [plan proponent] to propose a plan that

complies with all of the requirements of the Bankruptcy Code"); *In re Kain*, 86 B.R. 506, 520

Bankr. W.D. Mich. 1988) (finding that "[t]his court does not have the power to rewrite a Chapter

11 plan; the burden is upon the proponent … to propose a confirmable plan" and clarifying that

"[t]he court's obligation is merely to determine whether any proposed plan complies with all

confirmation standards set forth in 11 U.S.C. § 1129(a) and (b)").

Therefore, the UCC Plan violates Section 1129(a)(1) as a matter of law.

**2.    <u>Failure to provide adequate means for implementation</u>**

<u>Objection</u>

The UCC Plan requires that the "value" of all Archdiocese assets be turned over to the
Trust, either at confirmation or three years thereafter (with interest). The Archdiocese believes
that this provision would, by definition, render the Archdiocese insolvent as of the date of
confirmation.

The UCC Plan contemplates that the Archdiocese will obtain funding for the required
Trust payment through "increases in Parish assessments, fundraising, loan financing, and/or the
sale of selected assets." UCC Plan § 5.2(b).  The financing mechanism outlined in the UCC Plan
is illusory in that, among other things, the Archdiocese cannot compel third parties to make loans
or donations. Certain of the funding mechanisms, including, for example, the proposal that the
Archdiocese increase parish assessments by some unspecified amount, represent a violation of
Canon Law, the First Amendment and the Religious Freedom Restoration Act ("RFRA").  Parish
assessments do not represent a civil legal obligation of the parish.

The UCC Plan fails to provide adequate means for implementation, as required by
Section 1123(a)(5). This represents a threshold legal issue.

<u>Plan provisions</u>

Under this Plan, the Bankruptcy Court will determine the value of the Debtor's
assets and the Debtor will then pay that value into the Trust.  <u>The Debtor may
fund the Plan as it deems appropriate, whether through increases in Parish
assessments, fundraising, loan financing and/or the sale of selected assets.  The
Debtor's assets need not be sold or otherwise liquidated through this Plan.</u>
Instead, those assets may be revested into the Reorganized Debtor (i.e., title to the
assets will be maintained by the reorganized Archdiocese after the Effective
Date).  Detail regarding the value of the Debtor's assets, including assets that will
revest in Reorganized Debtor upon the Effective Date, is included in the
liquidation analysis attached to this Plan's Disclosure Statement as Exhibit C.
Among other things, the Reorganized Debtor may elect to keep the Cathedral and
real property interests in the Benilde-St. Margaret High School, Grace High

4

School d/b/a Totino-Grace High School, and DeLaSalle High School.  Creditor
claims will not be paid in full by the Plan.  Thus, to permit the Debtor to
contribute the liquidation value of all of its assets, in conformance with Section
1129(a)(7) of the Bankruptcy Code.

UCC Plan § 5.2(b) (emphasis added).

*See also* UCC Plan §§ 5.2(d), 5.2(e); Ex. D (Trust Agreement) §§ 1.3, 2.1.

<u>Discussion</u>

The UCC Plan fails to provide adequate means for implementation.  Section 1129(a)(1)

provides that a court "shall confirm a plan only if … [t]he plan complies with the applicable

provisions of" the Bankruptcy Code, including Section 1123(a)(5).  Section 1123(a)(5) of the

Bankruptcy Code mandates that "[n]otwithstanding any otherwise applicable nonbankruptcy law,

a plan … provide adequate means for the plan's implementation."  A plan that fails to provide

adequate means for its implementation cannot be confirmed.  *See In re Irving Tanning Co.*, 496

B.R. 644, 666 (B.A.P. 1st Cir. 2013).

The UCC Plan is dependent on funds being contributed by the Archdiocese to the Trust

following confirmation.  But the UCC Plan does not provide any means to implement the

proposed funding scheme, as evidenced by Section 5.2's vague language that "[t]he Debtor may

fund the Plan as it deems appropriate, whether through increases in Parish assessments,

fundraising, loan financing and/or the sale of selected assets.  The Debtor's assets need not be

sold or otherwise liquidated through this Plan."  UCC Plan § 5.2(b).

Rather than explain how it will actually be funded, the UCC Plan gives a series of

potential, speculative options for funding.  The list is merely illustrative.  *See id.*  In other words,

the UCC Plan fails to specify any source for financing.  It is apparent that the UCC does not

know how the Archdiocese will fund its obligations, whether to the Trust or for its ongoing

business.  This cannot be "adequate" as a matter of law.  The term "adequate" requires

5

something more than a list of speculative options that may or may not be available at some point

in the future.  11 U.S.C. § 1123(a)(5).  *See also In re Am. Capital Equip., LLC*, 688 F.3d 145,

156 (3d Cir. 2012).

The UCC cannot solve its dilemma by requiring that the Archdiocese pay the "value" of

its assets either within 30 days of the effective date of the UCC Plan, or "if the Debtor prefers,"

with interest, in three equal annual installments beginning one year after the effective date.  *See*

UCC Plan § 5.2(d). Without identification of a specific non-hypothetical source of funding, the

UCC Plan, remains, at best, "a visionary scheme that does not provide adequate means for

implementation pursuant to Code §1123(a)(5)."  *In re Valley Park Grp., Inc*., 96 B.R. 16, 23

(Bankr. N.D.N.Y. 1989).

Moreover, a plan that proposes to appropriate third parties' property rights cannot be

confirmed under Sections 1123(a)(5) and 1129(a)(1).  *See Irving Tanning*, 496 B.R. at 664 ("by

appropriation of the Self-Insurance Funds, the Plan undisputedly would transgress the state-law

property rights of Acstar and the Maine authorities" and could not be confirmed); *see also In re*

*Jason Realty, L.P.*, 59 F.3d 423, 430 (3d Cir. 1995) (proposed plan could not use rents that were

not property of the estate as source of plan funding); *In re Union Meeting Partners*, 160 B.R.

757, 767 (Bankr. E.D. Pa. 1993) (plan was not confirmable where it would be funded by rents

owned by secured party).  The Bankruptcy Court does not have the power to force a third party

to provide exit financing for a plan.  *See In re Manchester Oaks Homeowners Assoc.*, Case No.

11-10179-BFK, 2014 WL 961167, at *11 n.9 (Bankr. E.D. Va. March 12, 2014) (stating that the

court "[cannot] compel a financial institution to provide exit financing for a Chapter 11 debtor or

compel the shareholders of an insolvent debtor to advance new value in order to save the

enterprise….").  The Archdiocese cannot compel third parties to make loans or donations to fund

a plan of reorganization.  Any attempt to do so would violate the property rights of those third parties.

The suggestion that the Archdiocese may compel parishes to fund the UCC Plan is particularly problematic.  *See* UCC Plan § 5.2(b).  To begin with, parish assessments are a canonical, as opposed to a civil, obligation of the parishes.  *See* Can. 1263; *see also* discussion in Parish Committee Objection.  Moreover, as discussed in more detail in connection with Objection No. 17, any requirement that the Archdiocese increase parish assessments to fund the UCC Plan would, by necessity, require that the court interfere with core questions of a church internal governance.  Such action would violate the First Amendment, U.S. Const. Amend. I, and would interfere with the religious practices of both the Archdiocese and its parishes and parishioners in clear violation of RFRA, 42 U.S.C. §§ 2000bb to 2000bb-4.

The UCC may claim a compelling interest in paying abuse claimants or creditors generally.  Ultimately, however, the "compelling governmental interest" allegedly advanced by the UCC Plan is no stronger than the governmental interest alleged in *In re Young*, 82 F.3d 1407 (8th Cir. 1996), *vacated*, 521 U.S. 114 (1997), *reinstated*, 141 F.3d 854 (8th Cir. 1998), *cert. denied*, 525 U.S. 811 (1998).[3]

The absurdity of the UCC's funding scheme, finally, is illustrated by the fact that the UCC has not clearly identified any remedy that could be invoked in the event that the Archdiocese is unable to obtain the necessary funds from the speculative sources suggested in

---

[3] The Archdiocese acknowledges that the Seventh Circuit in *Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 741 (7th Cir. 2015), determined that RFRA is applicable only to suits to which the "government" is a party.  However, that determination is contrary to *Young*, which involved a claim asserted by a private party acting as a bankruptcy trustee.  *See* 82 F.3d at 1410.  *Young* is also consistent with the expansive approach to RFRA adopted by the Supreme Court in *Burwell v. Hobby Lobby Stores, Inc.*, --- U.S. ---, 134 S. Ct. 2751 (2014) (applying RFRA to closely held for-profit corporations).  *Young* controls in the Eighth Circuit.

the UCC Plan or otherwise.  Presumably, the UCC recognized that any potential remedy for such

failure would create an insurmountable problem: It would require that control of the Archdiocese

be turned over to a third party or that the assets of the Archdiocese be liquidated in contravention

of the prohibition on liquidation of non-profit entities (as discussed in more detail below) and in

violation of the First Amendment and RFRA.

For the foregoing reasons, this Court should determine that the UCC Plan cannot be

confirmed as a matter of law because it fails to provide adequate means for implementation.

**3.**     **UCC Plan not feasible**

Objection

As stated, the UCC Plan cannot be implemented as drafted.

However, if confirmed, the UCC Plan would require further reorganization of the
Archdiocese in violation of Section 1129(a)(11) in that, among other things, the balance to be
contributed to the Trust at confirmation likely will be exhausted to pay administrative expenses,
leaving little, if anything, available to fund litigation against the carriers.

Additionally, the Archdiocese will not be able to pay operating expenses, the non-Tort
Claims payable by the Archdiocese under the UCC Plan, including any contribution or indemnity
claims not discharged at confirmation, and fund the GIF.  The Archdiocese is unlikely to have
access to insurance monies to pay Tort Claim defense costs or judgments.  The UCC Plan
expressly allows Tort Claimants to obtain judgments and to execute on Archdiocese property
during the appeal process following the entry of judgment on any individual Tort Claim and
insurance claim as to such Tort Claim.

The operation of the UCC Plan presents a question of law. Other feasibility issues may
present both legal and factual issues to the extent that the UCC Plan does not contemplate the
liquidation of the Archdiocese.

Plan provisions

'Transferred Insurance Interests' means all rights … of the Debtor … in Insurance
Policies in respect of actual or potential coverage for any Class 6 Claim … : (i)
the proceeds of such Insurance Policies, and (ii) all claims and causes of action
that currently exist or may arise in the future against Non-Settling Insurers … .
UCC Plan §  1.1(sss).

The Reorganized Debtor will assume the Archdiocese's participation in the GIF
and all liabilities to the Class 3 claimants on the Effective Date.  The Reorganized
Debtor will continue to sponsor the GIF and will cause to be paid claims and

administrative expenses under the GIF in accordance with the Archdiocese's prior practices." UCC Plan § 4.3(b).

Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 6 claimants against the Archdiocese [or] the Reorganized Debtor. UCC Plan § 4.6(b).

The Trust shall advance funding or indemnify the Archdiocese and the Reorganized Debtor with respect to any judgments or settlements of any Litigation Claims brought by Class 6 claimants, but only to the extent that such judgments or settlements are not funded, or the Archdiocese or the Reorganized Debtor is not indemnified by them, by any Insurer. *Id.*

The Class 6 Claims will not be released or discharged against the Archdiocese or Reorganized Debtor until such claims are settled with the Archdiocese or Reorganized Debtor and its Insurers or are fully adjudicated, resolved and subject to Final Order. *Id.*

Ordinary course post-Effective Date operations of the Archdiocese shall continue to be paid from ordinary operating income of the Reorganized Debtor. UCC Plan § 5.2(a).

The Reorganized Debtor will fund all retentions for ongoing insurance coverage after the Effective Date. UCC Plan § 5.2(c).

The Transferred Insurance Interests are hereby assigned and transferred to the Trust. UCC Plan § 6.1(b)(1).

The assignment and transfer shall not affect any duty to defend under the Insurance Policies, but to the extent that a failure to defend … gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trustee shall be entitled to the benefit of such monetary obligation or policy proceeds. The Trustee shall be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 6 Claim. UCC Plan § 6.1(b)(2).

The Trust does not assume any liabilities of the Archdiocese or Reorganized Debtor. UCC Plan § 6.2(a).

The Trust's payment of Class 6 Claims is not a release of the Debtor … The Archdiocese will not be entitled to the discharge provided by 11 U.S.C. § 1141(d) with respect to any Class 6 Claim until such time as all Class 6 Claims are settled with the Archdiocese or Reorganized Debtor and the Non-Settling Insurers or such Class 6 Claims are fully adjudicated and determined subject to a Final Order. Until such time, the Archdiocese and Reorganized Debtor will continue to have all liability for the Class 6 Claims. *Id.*

9

If any Non-Settling Insurer fails or refuses to comply with any obligation it has to defend the Archdiocese or Reorganized Debtor against a Class 6 Claim, the Archdiocese or Reorganized Debtor will be entitled to advancement or reimbursement by the Trust for reasonable attorney's fees incurred in defending the Class 6 Claims. *Id.*

The Tort Claims Reviewer shall determine whether a Class 6 Claimant is entitled to a distribution under the Trust Distribution Plan ("Qualified Claimant"). … In order to receive any distribution from the Trust, the Qualified Claimant must execute the Claim Resolution Agreement and mail it back to the Tort Claims Reviewer. … [T]he Qualified Claimant expressly retains and reserves all rights and claims against the Archdiocese. UCC Plan § 6.2(c).

[T]he Qualified Claimant shall elect … one of the following treatment alternatives: (1) … as a "Distribution Plan Claim"…. A Class 6 Claimant electing treatment as a Distribution Plan Claimant retains the right to pursue (a) a monetary judgment against the Archdiocese … for his or her Class 6 Claim for its full amount according to proof …; or (2) … as a litigation claim ("Litigation Claimant") … A Litigation Claimant retains the right to pursue (a) a monetary judgment against the Archdiocese … for his or her Class 6 Claim for its full amount according to proof. UCC Plan §6.2(d).

In the event a Litigation Claimant obtains a judgment against the Archdiocese … or achieves a settlement with the Archdiocese …, then such recovery will be turned over to the Trust for distribution pursuant to this Plan. UCC Plan § 6.2(i).

If a Non-Settling Insurer has refused to defend the Archdiocese or Reorganized Debtor with respect to any Litigation Claim, the Trust will advance or reimburse the Archdiocese … for reasonable attorneys' fees and other expenses incurred in defending the Litigation Claim…. If any Non-Settling Insurer has refused to indemnify the Archdiocese … with respect to any settlement or judgment of a Litigation Claim, the Trust will advance or reimburse the Archdiocese … for any judgment or settlement … on such Litigation Claim…. UCC Plan § 6.2(i)(4).

[T]he Trustee may object to … Class 6 … Claims or initiate court proceedings … to obtain a judicial determination as to whether the Archdiocese … is liable, and the amount of such liability, for the purpose of insurance coverage under such Non-Settling Insurer's Insurance Policies. UCC Plan § 6.2(l)(1).

*See also* UCC Plan § 5.2(b), quoted in Objection No. 2 above; UCC Plan Exs. D, E; UCC Disclosure Statement.

<u>Discussion</u>

A.      <u>Introduction</u>

The Archdiocese acknowledges that feasibility is ordinarily a fact issue to be resolved after a confirmation hearing. The Archdiocese also recognizes that the Court declined to address feasibility issues at the disclosure statement stage. However, the Archdiocese did not interpret the Court's comments to preclude consideration of the issues raised by the face of the UCC Plan and the UCC Disclosure Statement.  Consideration at this stage of whether the UCC Plan meets Section 1129(a)(11)'s feasibility standard would advance the interests of judicial economy and efficiency by eliminating the need for additional proceedings regarding a facially unconfirmable plan.

      B.    <u>Legal Standard</u>

Plan confirmation is allowed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor …, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11); *see also In re Consul Rest. Corp.,* 146 B.R. 979, 984 (Bankr. D. Minn. 1992).  Where the face of the plan and uncontested facts demonstrate that a plan is not reasonably likely to succeed, courts may summarily determine that such plans are not feasible and not confirmable. *E.g., In re Am. Capital Equip*., 688 F.3d at 155-56 (bankruptcy court could properly find a plan was not feasible without a confirmation hearing where the face of the plan and undisputed facts showed it had no reasonable prospect for success); *In re Dakota Rail, Inc.,*104 B.R. 138, 143 (Bankr. D. Minn. 1989) (court found that plan could not succeed where it depended on a capital infusion, the plan proposed that capital would come from the State of Minnesota and it was clear that the conditions the State required to provide financing could not be met); *see also In re Haas*, 162 F. 3d 1087, 1090 (11th Cir. 1998) (plan did not offer a reasonable prospect of success where, on its face, it contemplates that a 68 year-old attorney would continue to actively practice law for 30

years); *In re Surma*, 504 B.R. 770 (Bankr. D. N.J.) (plan not confirmable on its face as a matter of law).

The Third Circuit's *American Capital Equipment* decision is instructive.  In that case, the court, refused to allow the plan to be submitted to a vote because, based on the face of the plan and undisputed facts, it failed to meet Section 1129(a)(11)'s feasibility test.  688 F.3d at 156-57. The Court reasoned that the plan was not feasible because the plan and undisputed facts showed its success depended on two speculative assumptions: (a) the tort claimants would choose to participate in the claims process proposed by the plan under which they would turn over a portion of any recovery from litigation; and (b) they would succeed in such litigation.  *Id.*

The UCC Plan is not feasible because the Archdiocese will require further reorganization if the UCC Plan is confirmed.  This conclusion does not require any factual inquiry by the Court. Rather, as explained below, it can be reached based on the face of the UCC Plan, the UCC Disclosure Statement and undisputed facts.

C.    Unworkable Indemnity And Insurance Provisions

To begin with, the UCC Plan strips the Archdiocese of all cash shortly after confirmation, UCC Plan § 5.2(b) and Ex. D; provides that the Archdiocese's ongoing expenses are to be funded from future revenues, UCC Plan § 5.2(a); and, as discussed below, imposes substantial post-confirmation cash obligations on the Archdiocese, including the requirement that the Archdiocese pay all retentions otherwise payable by the GIF and all of the AMBP's obligations. On top of the foregoing, the UCC Plan requires that the Archdiocese front all defense costs for, and subject its assets to execution as to, Class 6 Claims with no reimbursement from its carriers, no indemnification from the Trust before the Archdiocese must pay, and in some cases, no indemnification by the Trust at all.

12

For purposes of this discussion, the Archdiocese will focus on the UCC Plan insurance provisions, which were not considered in detail in earlier proceedings.   Careful scrutiny shows that the UCC Plan provisions concerning post-confirmation indemnity and insurance for Class 6 Claims will necessitate further reorganization.

(1)    The Archdiocese Must Front Defense Costs

The UCC Plan expressly contemplates that the Trust will commence litigation as to Class 6 Claims to establish the fact and amount of the Archdiocese's liability for the purpose of recovering from non-settling insurers.   UCC Plan § 6.2(l)(1).   The UCC Plan also explicitly states that the Archdiocese remains liable on Class 6 Claims and allows all such Claimants to pursue judgments against the Archdiocese and execute on its assets as to any judgment obtained. UCC Plan § 6.2(a), (c), (d), (i) and (l).   Conjecture that the Trust could reach settlements with all carriers without the need to commence any litigation or that no Class 6 Claimants would pursue judgments is exactly the kind of speculation about litigation not permitted when assessing feasibility.  *In re Am. Capital Equip.*, 688 F.3d at 156-57.

Regarding defense of Class 6 Claims, the Trust assumes no liabilities, including the obligation to defend, UCC Plan §§ 4.6, 6.2(a)(c) and (d), and requires only that the Trust either "advance <u>or</u> reimburse" defense costs.  *Id.* § 6.2(i)(4) (emphasis added). In other words, the UCC Plan does not require that the Trust advance defense costs, much less reimburse the Archdiocese before it must pay such costs.   *Id.*   Again, speculation that the Trustee might save the Archdiocese by advancing defense costs, which it has no legal obligation to do, simply does not suffice. *See, e.g., Am. Capital Equip.*, 688 F.3d at 155-56.

13

The UCC Plan seems to assume that this is not a problem because the Archdiocese's non-settling carriers will directly pay all defense costs.[4]  UCC Plan §§ 6.1(b)(2) (Transferred Insurance Interests does not include the duty to defend); 6.2(a) (describing what happens if non-settling insurers fail to defend the Archdiocese). However, the assumption that the Archdiocese carriers will pay all defense costs for the Archdiocese is unworkable for a number of reasons.

First, a large portion of the defense costs are not insured at all.  For example, it is undisputed that the first layer policies covering claims alleging abuse in the period 1980 to 1986, issued by London Market Insurers ("LMI"), contain $100,000 "per occurrence" retentions under which LMI has no obligation to pay until after the first $100,000 of defense costs, settlement and judgments per claim/per policy year are paid.  ECF No. 891 (UCC Disclosure Statement) at 24. Over 50 Class 6 claims fall within this coverage.  This retention also applies to claims brought against Parishes by Class 6 Claimants.  It is the GIF's responsibility to pay the entire amount of these retentions.  UCC Disclosure Statement at 15.

Under the UCC Plan, however, the entire corpus of the GIF (except a small reserve) must be turned over to the Trust. UCC Plan § 4.3(b); Trust Agreement § 2.1. The Archdiocese has no legal right to insist that other participants replenish the GIF.  But more importantly, the UCC Plan expressly provides that the Archdiocese must pay insurance retentions post-confirmation, which necessarily includes the retentions otherwise payable by the GIF.  UCC Plan § 5.2(c).  In other words, the UCC Plan provides that the Archdiocese must pay the $100,000 per occurrence retention otherwise payable by the GIF, including defense costs as to the 50 plus claims falling in the 1980 to 1986 policy years.

---

[4] Normally, a carrier who has a duty to defend selects and pays defense counsel for the policyholder.  *See, e.g., Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390 (Minn. 1979). *But see* discussion below.

14

Likewise, it is indisputable that between September, 1986 and September, 1990 the Archdiocese's policies are either "Claims Made" or exhausted. UCC Disclosure Statement at 24. As a result, there is no coverage at all under these policies for defense costs alleging abuse during this time frame. There are five POCs alleging abuse between September, 1986 and September 1990.[5]

Second, the Archdiocese is not entitled to receive any monies from LMI to reimburse it for defense costs once the $100,000 "per occurrence" retention is satisfied. It is undisputed that the 1980 to 1986 LMI policies do not contain a duty to defend the Archdiocese. So LMI's obligation is only to reimburse defense costs. However, under the UCC Plan, LMI must pay any reimbursement due under any policy directly to the Trust, including reimbursement for defense costs. UCC Plan § 6.2(a). Again, the Trust has no duty to immediately pay over any recovery from LMI to the Archdiocese. UCC Plan § 6.2(a) (Trust only obligated to "advance or reimburse" defense costs. (emphasis added)).

Finally, it cannot be contested that virtually all of the reservations of rights asserted by the Archdiocese's carriers as to the Class 6 Claims include the right to later deny coverage because the Archdiocese expected or intended harm to Class 6 Claimants. *See* UCC Disclosure Statement at 23. Minnesota law is clear that when a carrier reserves its rights to deny coverage on this ground, the policyholder must be allowed to select its own counsel and control the defense. *E.g.*, *Select Comfort Corp. v. Arrowood Indem. Co.*, Case No. 13-cv-02975-JNE-FLN, 2014 WL 4232334, at *5 (D. Minn. August 26, 2014) (citing *Prahm*, 277 N.W. 2d at 391). In this situation, the insurers' duty to defend is converted into a duty to reimburse the insured for

---

[5] As outlined in Objection 7, the Home settlement is not effective under the UCC Plan. It is speculative to assume that the liquidator for the insolvent Home insurance company will advance defense costs for the 100 claims falling within its coverage period.

15

defense costs.  *Id.* at 9-10. Again, any such reimbursement by the carriers must be paid directly to the Trust, not the Archdiocese.

The rationale underlying this rule is that counsel selected by the insurer could be tempted to develop facts in the underlying case that the insurer could use to deny coverage, and as a result, the insured must be allowed to control the defense through counsel of its own choosing. *Id.* at 10.  Under the UCC Plan, as outlined below, the Archdiocese is subject to execution on its assets prior to entry of a final non-appealable judgement on any Class 6 Claim.  The Archdiocese is not entitled to receive reimbursement from its carriers for amounts due on a judgment. [6] Again, insurers must pay such amounts to the Trust.  UCC Plan § 6.2(a) ("advance funding or indemnify" (emphasis added)).  Finally, the Trust is not obligated to indemnify the Archdiocese before execution takes place.  And, as explained below, in some cases the Trust appears to have no indemnification obligation whatsoever.  As a matter of Minnesota law, the Archdiocese cannot be forced to accept the carriers' appointment of defense counsel especially when, as here, the Archdiocese remains fully exposed to execution on its assets with no right to receive reimbursement from its carriers or indemnification from the Trust prior to execution.

(2)     The Archdiocese Is Subject To Execution On Its Assets By Class 6 Claimants

As explained above, the Archdiocese will be subject to post-confirmation execution after trial court judgments on Class 6 Claims are docketed and prior to entry of final judgment.  UCC Plan § 6.2(a); *see also* UCC Plan Ex. E (Claim Resolution Agreement). While the UCC Plan contains a provision requiring that the Trust indemnify the Archdiocese, UCC Plan § 6.2(a), this provision does not protect the Archdiocese from execution on its assets for three reasons.

---

[6] It is pure speculation that the Archdiocese, stripped of all assets and with significant other cash obligations under the Plan, will be able to obtain a supersedeas bond to forestall execution during any appeal and it is indisputable that the carriers' obligations, if any, are to pay bond premiums, not provide the bond itself.

16

First, the Trust has no obligation to ensure indemnification of the Archdiocese before execution. UCC Plan § 6.2(a). To the extent a judgment is insured, the carrier must pay the Trust, not the Archdiocese. UCC Plan § 6.1(b)(1).

Second, the Trust's obligation to "advance or indemnify" is limited to judgments or settlements as to Litigation Claimants. There are two other categories of Class 6 Claimants: (1) Distribution Claimants, and (2) those Class 6 Claimants not deemed entitled to any distribution. UCC Plan § 6.2(a)-(d). Both are entitled to sue the Archdiocese and execute on the Archdiocese's assets, UCC Plan § 6.2(a)–(d), and the Trust has no obligation to indemnify the Archdiocese as to these claims under the provision set forth above.

Third, as set out above, to the extent any judgment is within the retention otherwise payable by the GIF, the UCC Plan provides that the Archdiocese must fund such retention. UCC Plan § 5.2(c). In other words, the Trust need not indemnify amounts within the retention.

In short, the insurance provisions of the UCC Plan simply do not work at any level.

D.    <u>Speculative Financing and Unfunded Mandates</u>

As noted above, the UCC Plan strips the Archdiocese of its assets, requires post-confirmation operations be funded from future revenues and imposes significant demands on the Archdiocese as to handling of the Class 6 Claims themselves. At the same time, the UCC Plan also imposes enormous additional financial burdens on the Archdiocese post-confirmation.

For example:

- As explained above, the UCC Plan requires turnover to the Trust of all but a small amount of the GIF corpus. At the same time, it requires that the Archdiocese fulfill all ongoing financial obligations of the GIF, including payment of premiums for ongoing insurance and, as discussed above, millions of dollars to satisfy the $100,000 "per occurrence" retention payable as to Class 6 Claims against both the Archdiocese and Parishes. UCC Plan § 4.3(b); Trust Agreement § 2.1; UCC Disclosure Statement at 14-15.

17

- The UCC Plan's provisions related to the AMBP, UCC Plan § 4.8(b), create similar significant post-confirmation cash demands on the Archdiocese. As noted in Objection 10 below, it appears to be the intent of the stipulation entered into between the UCC and the AMBP Trustees to retain the balances in the AMBP accounts but to require that the Archdiocese pay an amount equal to those balances in cash at confirmation.

- The UCC Plan requires that the Archdiocese "assume" and pay a variety of other obligations, including trade vendor debts and other obligations under Class 12 of the UCC Plan.

As noted elsewhere, the funding sources identified in the UCC Plan are not available as a matter of law or are completely speculative.

E.      Conclusion

It should not be necessary for the Court to reach the feasibility issue in light of the other legal issues discussed in this memorandum. However, the Court may, and should, determine that the UCC Plan fails as a matter of law to meet the requirements of 1129(a)(11).

**4.      Improper liquidation**

Objection

The Archdiocese objects to the UCC Plan on the grounds that that the UCC Plan represents a thinly disguised improper liquidation of a non-profit religious entity in violation of the Bankruptcy Code, including Section 1112(c) of the Bankruptcy Code.

The Archdiocese further objects to the proposed liquidation of the Archdiocese as a violation of the First Amendment and RFRA.  The UCC Plan does not comply with applicable non-bankruptcy law, as required by Section 1129(a)(3) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan Provisions

UCC Plan § 5.2 (quoted in objection 2 above).  *See also* UCC Plan Ex. D.

Discussion

The UCC Plan requires the Archdiocese to submit the "liquidation value" of all of its assets to the Trust for the benefit of Class 6 claimants.  UCC Plan § 5.2.  As discussed above, to the extent the UCC Plan does not contemplate that the Archdiocese would liquidate its assets to

18

fund the Trust, the UCC Plan wholly fails to provide any means for its implementation.  To the

extent that the UCC Plan would require the liquidation of all Archdiocese assets as a means to

fund the Trust, such liquidation is improper and would violate the Bankruptcy Code.

A.      Liquidation of a religious non-profit is not permitted under the Bankruptcy Code

The UCC, of course, will argue that its plan does not require the liquidation of all

Archdiocese estate assets, but merely requires that the "liquidation value" of those assets be

contributed to the Trust.  UCC Plan § 5.2(b).  To be blunt, the UCC's suggestion that this

"value" will be contributed to the Archdiocese by unidentified lenders and donors and parishes is

a sham.  There is no other plausible source for the required contribution,  however determined,

other than from the liquidation of assets.  Simply put, although not specifically proposing

liquidation of the Archdiocese, the UCC Plan calls for a de facto liquidation.[7]

Under section 1112(c) of the Bankruptcy Code, the court may not convert a chapter 11

reorganization case to a chapter 7 liquidation case unless requested by the debtor if the debtor is

a farmer or a corporation that is not a moneyed, business or commercial corporation.  11 U.S.C.

§ 1112(c).  The Archdiocese is a non-moneyed  charitable  corporation and, as such, this

reorganization case cannot be converted into a liquidation.  *See, e.g., In re Church With The

Good News, Inc*., No. 06-10582-JF, 2008 WL 1932313, at *1 (Bankr. D. Mass. Apr. 28, 2008)

(denying creditors' request to covert a religious corporation's bankruptcy case into a chapter 7

liquidation).   Similarly, section 303(a) provides that a chapter 7 liquidation cannot be

involuntarily commenced against a non-moneyed charitable corporation such as the Archdiocese.

11 U.S.C. § 303(a).  Because the UCC's plan amounts to a forced liquidation of a non-moneyed

---

[7]  Section  1141(d)(3)  is  not  implicated  here  because  the  UCC  Plan  contemplates  that  the
Archdiocese will continue to operate after the plan is consummated.

19

charitable corporation's assets in violation of the Bankruptcy Code, it is not confirmable as a matter of law.

Notwithstanding the clear language of the Bankruptcy Code, relying on *In re Button Hook Cattle Co., Inc.*, 747 F.2d 483, 486 (8th Cir. 1984), the UCC may attempt to argue that its de facto liquidation of the Archdiocese is permissible because the Eighth Circuit has, in narrow circumstances, countenanced liquidating plans in chapter 11 cases. Any such argument advanced by the UCC fails as a matter of law for at least two independent and dispositive reasons.

First, the creditor's liquidating Chapter 11 plan was approved in *Button Hook* over the objection of the debtor farmer only because the farmer failed to propose its own plan within the exclusivity period. But *Button Hook* has no application here because it is uncontroverted that the Archdiocese timely filed a plan of reorganization within the exclusivity period. As indicated in *Button Hook*, "[u]nder section 1121(c)(2), if the farmer fails to propose a plan within the first 120 days, [then] any party in interest may file a plan, including a liquidation plan, that may be confirmed over the farmer's objection." *Id.* at 486; *see also In re Cassidy Land & Cattle Co., Inc.*, 747 F.2d 487, 488 (8th Cir. 1984) (allowing competing liquidating plan where "farmer fails to propose a plan within [the exclusivity period]"). Where the debtor has actively pursued a plan, as the Archdiocese has done here, other courts have determined that a creditor's chapter 11 liquidation plan may not be confirmed over the objection of the debtor. *See, e.g., In re Kehn Ranch, Inc.*, 41 B.R. 832, 833 (Bankr. D.S.D. 1984) (court was "convinced that 11 U.S.C. §§ 1112(c) and 1129(a)(1) preclude[d] [non-debtor]'s proposed liquidation plan from ever being confirmed"). It is clear that *Button Hook* distinguished the general rule of *In re Lange*, 39 B.R.

20

483, 486-87 (Bankr. D. Kan. 1984), based on the unique circumstances presented in the case. Those facts are not present in the situation before this Court.

Second, based on the Archdiocese's review of applicable case law, no bankruptcy or circuit court in any jurisdiction has countenanced or permitted an involuntary Chapter 11 liquidation of a non-profit religious organization. It is no coincidence that there is a fundamental absence of any case law permitting the involuntary Chapter 11 liquidation of a religious corporation. Unlike the circumstances presented in the context of a farmer debtor, a forced liquidation of archdiocesan assets would impose a substantial burden on the exercise of religion by compromising Catholics' and schoolchildren's ability to worship and study, the cornerstones of religious doctrine. As detailed below, these resulting substantial burdens would violate the First Amendment and RFRA.

B.     Liquidation of the Archdiocese would violate the First Amendment and RFRA

With respect to a liquidating plan, a crucial difference between a farmer and a religious corporation such as the Archdiocese is that liquidation of the Archdiocese would materially impair its religious freedom (and the religious freedom of all Catholics within the Archdiocese's region) in violation of the United States Constitution and RFRA.

Under RFRA, the Bankruptcy Court cannot approve a plan that substantially burdens a debtor's free exercise of religion. *See In re Young*, 82 F.3d at 1418. Similarly, under the First Amendment's Free Exercise Clause, religious beliefs may generally not be regulated. *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). Regulation is permitted only if "it is justified by a compelling interest and is narrowly tailored to advance that interest," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), and may be used only to protect against "the gravest abuses, endangering paramount interests," *Thomas v. Collins*, 323 U.S. 516,

21

530 (1945). A regulation will only overcome this strict scrutiny analysis "in rare cases." *Lukumi Babalu*, 508 U.S. at 546.

The contribution of all of the Archdiocese's assets or their equivalent value to a Trust will leave the Archdiocese without funds to operate. Consequently, the UCC Plan meaningfully curtails "a religious practice of more than minimal significance in a way that it not merely incidental." *Young*, 82 F.3d at 1418-19; *see also In re Roman Catholic Archbishop of Portland in Or.*, 335 B.R. 842, 864 (Bankr. D. Or. 2005) (concluding that avoiding parishioners' unrecorded beneficial interests in property under 11 U.S.C. § 544(a)(3) could potentially impose a substantial burden on the free exercise of religion, because the requisite sale of churches and schools could "leave[] the parishioners and school children with no place to worship and study"). There is no Code provision that would allow a creditor group to force the Archdiocese to take specific actions without its consent if such actions would inhibit established religious practices.

In addition, the Establishment Clause and Free Exercise Clause protect the action of religious organizations from governmental interference. This restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs. *See, e.g., Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143 (1952) (explaining that the Free Exercise Clause protects the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"); *see also Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037 (1960) (per curiam) (forbidding the courts as well as the legislature from interfering with Free Exercise rights). This is particularly important here where such interference would directly implicate the rights of non-debtors.

22

Here, confirmation of the UCC Plan would constitute an interference with church governance and with the exercise of religious practice.  The Archdiocese cannot be forced to submit the value of all assets to a Trust because doing so would completely curtail the Archdiocese's ability to fund any of its core missions.  This substantial burden is not justified by any compelling governmental interest.  Ultimately, the UCC's goal of providing monetary compensation for Tort Claimants is better accomplished by the Archdiocese's plan which both provides more money and certainty, and is more narrowly tailored to avoid the intrusion into religious practice as required by the First Amendment and RFRA.

**5.      False and misleading liquidation analysis**

Objection

The Archdiocese objects to the UCC Plan's incorporation of or reliance on alleged liquidation values set forth on Exhibit C to the UCC Disclosure Statement as a basis for valuation.  The valuations set forth on Exhibit C are inaccurate and grossly misleading.  Among other things, the alleged liquidation analysis does not take into account mortgage liens, the interests of tenants under leased property or the fact that certain property carries restrictive donative intent and may not be considered estate property.  This is improper under, among other provisions, Sections 541 and 1129(a)(1) of the Bankruptcy Code.

This objection represents mixed questions of law and fact.

Discussion

As indicated above, this Court cannot engage in the valuation exercise proposed by the UCC.  Were the Court to do so, however, the liquidation analysis provided by the UCC is wildly inflated, includes non-estate assets, and is internally inconsistent with the UCC Plan and associated exhibits.

The Archdiocese reserves its argument on this objection pending discovery if other legal objections to the UCC Plan are not sustained.

**6.      Improper assignment of claims**

Objection

23

The UCC Plan provides for an assignment of various rights and "causes of action" to the Trust, including the transfer of avoidance actions and other time-barred claims under Section 546 in violation of Sections 1129(a)(1), (2) and (3) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

(e) Non-Cash Assets Transferred Directly to the Trust. Upon establishment of the Trust, the following will be automatically and without further act or deed be assigned and transferred directly to the Trust for administration in accordance with the Trust Agreement and the Trust Distribution Plan:

…

(3) Any and all claims or Causes of Action against any Party: (i) to avoid, set aside, or recover any payment or other transfer made to any party under Section 547, 548, 549, and/or 550 of the Bankruptcy Code, (ii) to avoid, set aside, or recover any payment or other transfer made to any party under any applicable State law(s), and (ii) any proceeding to avoid or set aside any Interest of a party in property under Section 544 of the Bankruptcy Code; and ….

UCC Plan § 5.2(e)(3).

*See also* UCC Plan Ex. D § 2.1

Discussion

The UCC Plan is premised on the assignment of alleged estate assets to the Trust. However, many of the alleged assets to be assigned do not exist.  This includes the proposed assignment of Chapter 5 causes of action and other state law fraudulent conveyance claims. UCC Plan § 5.2(e)(3).

As the UCC is well aware, the statute of limitations has passed on Chapter 5 claims. Moreover, in connection with its order denying the UCC's motion for derivative standing to pursue fraudulent transfer claims, this Court determined that prosecution of state-law fraudulent transfer claims was not warranted.  ECF No. 948.  Assigning time-barred claims violates the Bankruptcy Code by attempting to take and convey rights that have been extinguished by the

24

terms of the Code itself.  *See, e.g.*, 11 U.S.C. § 1129(a)(1) (requiring compliance with Bankruptcy Code provisions).

**7.**     **Improper assignment of Home settlement**

Objection

The UCC Plan requires the assignment of the Archdiocese Claim in the liquidation proceeding of Home Insurance Company.  UCC Plan §5.2(e).  The UCC Plan, however, does not provide for the channeling injunction required under the proposed settlement agreement with Home.  Plan at Exhibit G.  For this reason, the UCC Plan fails to provide adequate means for its implementation under Section 1123(a)(5) and fails to comply with the applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(1) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

(e) Non-Cash Assets Transferred Directly to the Trust. Upon establishment of the Trust, the following will be automatically and without further act or deed be assigned and transferred directly to the Trust for administration in accordance with the Trust Agreement and the Trust Distribution Plan:

…

(2) The Archdiocese's claim in the liquidation proceeding of Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $14,200,000;….

UCC Plan § 5.2(e)(2).

*See also* UCC Plan Ex. G.

Discussion

The UCC Plan Trust relies on funding from the assignment of an agreed claim in the Home liquidating proceeding based upon the settlement agreement negotiated between the Archdiocese and Home.  UCC Plan §5.2(e)(2) (providing that "[t]he Archdiocese's claim in the liquidation proceeding of Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $14,200,000" will be "automatically … assigned and transferred directly to the Trust.").  The Home settlement

25

agreement, however, expressly provides that it is not effective until this Court enters a channeling injunction that protects Home and its liquidator from further liability related to the Home policies.. UCC Plan Ex. G at ¶ 2.B(3). The UCC Plan does not include such a channeling injunction. For this reason, if the UCC Plan is approved, the Home settlement agreement will never become effective and the Archdiocese will never have an allowed claim in the Home case to assign. Because the UCC Plan relies on the assignment of this non-existent claim to at least partially fund the Trust, the UCC Plan fails to provide adequate means for its implementation. *See* 11 U.S.C. § 1123(a)(5).

**8.    Improper designation of Class 3 Claims as unimpaired**

Objection

The UCC Plan contemplates that the GIF Plan will be transferred to the Trust (less a $1 million reserve). This proposed treatment does not take into account the claims of GIF participants with regard to past contributions and does not preserve the legal, equitable or contractual rights of the GIF participants to the GIF fund and has effectively stripped the creditors in Class 3 of security for payment of the claims dealt with in Class 3. The UCC's treatment of the creditors in Class 3 as unimpaired does not comply with the applicable provisions of the Bankruptcy Code, including Sections 1123(a)(2), 1123(a)(3), 1124, 1129(a)(1), 1129(a)(7), 1129(a)(8), and 1129(b)(1) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

(a) Definition. A "Class 3 Claim" means an allowed claim against the Archdiocese held by Catholic Entities arising from or related in any way to the collection and use of payments made by such claimant to the Archdiocese under the GIF, including any claims arising from the administration by the Archdiocese of the GIF.

(b) Treatment. The Reorganized Debtor will assume the Archdiocese's participation in the GIF and all liabilities to Class 3 claimants on the Effective Date. The Reorganized Debtor will continue to sponsor the GIF and will cause to be paid claims and administrative expenses under the GIF in accordance with the Archdiocese's prior practices.

UCC Plan § 4.3.

26

*See also* UCC Plan §§ 3.1, 5.2.

<u>Discussion</u>

Under the UCC Plan, monies held in the GIF for the benefit of participants would be taken from GIF participants and transferred to the Trust for the benefit of Class 6 creditors.  UCC Plan § 5.2(d).  Class 3 creditors would not be able to draw upon those funds and, while the Archdiocese would "maintain" the program, the GIF funds would still need to be replenished.  *See* UCC Plan §§ 4.3, 5.2(b).  This treatment clearly negatively changes the terms of Class 3 creditors' rights because existing monies that those creditors could access will be stripped.

Section 1124 of the Bankruptcy Code provides that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan … leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder such claim or interest…."  11 U.S.C. § 1124.  Under section 1124, "[a]ny alteration of a creditor's legal rights or privileges constitutes impairment."  *In re Club Assocs.*, 107 B.R. 385, 401 (Bankr. N.D. Ga. 1989), *aff'd*, 956 F.2d 1065 (11th Cir. 1992).  Generally, impairment exists when the plan alters rights to which the creditor or interest holder is entitled in some way, even slightly.  *See, e.g., In re Valley Park Group, Inc.*, 96 B.R. at 22; *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989).  Even if such alteration enhances or has no impact on the value of the claims, the change constitutes impairment.  *See In re L & J Anaheim Associates*, 995 F.2d 940, 942 (9th Cir. 1993).

In the absence of a plan, the Class 3 creditors would have the benefit of the GIF account to which they contributed to cover any claims under the GIF.  The UCC Plan changes those rights by requiring the majority of the cash in the GIF account to be contributed to the Trust and leaving only a smaller reserve.  UCC Plan § 5.2; Ex. D § 2.1.  Because the legal, equitable, and contractual rights of Class 3 creditors are altered by the UCC Plan, their claims are impaired as a

27

matter of law.  Consequently, the UCC improperly treated those claimants and the UCC Plan does not comply with the Bankruptcy Code.

**9.**     **Improper assignment of workers' compensation funds**

Objection

The GIF includes a workers' compensation deposit required to be maintained with the State of Minnesota.  The UCC Plan, however, also provides for the assignment of this deposit in the amount of approximately $3,871,158.  Plan at Exhibit D.  The underlying agreements between the Archdiocese and the Commissioner of Commerce provides that the Archdiocese shall have no right, title or interest in the deposit.  The provisions of the UCC Plan violate applicable non-bankruptcy law and the provisions of Section 1129(a)(3) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

UCC Plan § 5.2 (quoted in objections 1 and 2, above). *See also* UCC Plan Ex. D § 2.1.

Discussion

The UCC Plan provides for the assignment of the Archdiocese's deposit maintained by the State of Minnesota to cover workers' compensation claims under the Archdiocese's self-insurance program.  UCC Plan Ex. D § 2.1.  Such an assignment is impossible because the deposit is not an estate asset and the failure to maintain the deposit would cause the Archdiocese to be in violation of Minnesota law.

State law requires that the Archdiocese's insurance program obligations with respect to the workers' compensation retention be backed by a deposit.  Minn. Stat. § 79A.04.  To comply with this requirement, the Archdiocese established a deposit with Bremer Bank as custodian for the benefit of the State of Minnesota Department of Commerce.  *See* ECF No. 11 at 7.  The deposit is maintained pursuant to a Custodial Agreement with the Minnesota Commissioner of Commerce.  *See id.* at 8-9.

28

The custodial agreement provides that the Archdiocese shall have no right, title or interest in the deposit.  *Id.*  Minnesota state law provides the same.  *See* Minn. Stat. § 79A.04, subd. 7 ("The private self-insured employer loses all right, title, and interest in and any right to control all assets or obligations posted or left on deposit as security.").  As such, the deposit cannot constitute estate property.

Even if the deposit could be considered an estate asset, the Archdiocese is required by Minnesota law to maintain the deposit in the amount of 110% of its estimated future liability.  *Id.* subd. 2.  If that minimum amount is not maintained, then the Archdiocese would immediately be in violation of the statute and would also be unable to self-insure workers' compensation claims.

The UCC provides no basis for its assertion that the deposit is an estate asset or could be taken.  Because the UCC Plan requires the assignment of the deposit in violation of applicable non-bankruptcy law, it cannot be confirmed.

**10.    Improper designation of Class 14 Claims as unimpaired**

Objection

By its terms, the UCC Plan required that  the Archdiocese "assume" its  participation in the AMBP and transfer the entire balance in the AMBP accounts to the Trust.

Class 14 creditors are clearly impaired under the terms of the UCC Plan as currently drafted.  The UCC Plan violates Sections 1123(a)(2), 1123(a)(3), 1124, 1129(a)(1), 1129(a)(7), 1129(a)(8), and 1129(b)(1) of the Bankruptcy Code.

The Archdiocese is aware of a stipulation regarding the AMBP filed today  [Docket No. 1059] purporting to "clarify" provisions of the UCC Plan.  The Archdiocese assumes that the timing of the filing was not accidental.  The Archdiocese reserves its original objection as to the improper characterization of the creditors in Class 14.  The Archdiocese also gives notice that it may seek to supplement this objection in light of this last-minute filing.  As a threshold matter, the UCC's assertion that amounts in the AMBP "must be included in any valuation of the Archdiocese's assets" creates additional issues as to the proposed means for implementation of the UCC Plan and may raise other confirmation issues.

This objection may represent a mixed question of law of fact.

Plan provisions

(a) Definition. A "Class 4 Claim" means a claim against the Archdiocese held by Catholic Entities arising from or related in any way to the collection and use of payments made by such claimant to the Archdiocese under the AMBP, including any claim arising from the administration by the Archdiocese of the AMBP.

(b) Treatment. The Reorganized Debtor will assume the Archdiocese's participation in the AMBP and all liabilities to Class 4 claimants on the Effective Date. The Reorganized Debtor will continue to sponsor the AMBP and will cause to be paid claims and administrative expenses under the AMBP in accordance with the Archdiocese's prior practices.

UCC Plan § 4.14.

*See also* UCC Plan §§ 3.1, 5.2.

<u>Discussion</u>

There has been no effective amendment to the UCC Plan with respect to AMBP claims. *See* 11 U.S.C. § 1127. In the absence of an effective amendment, the UCC Plan must be considered as drafted.[8] As drafted, the UCC Plan requires that the Archdiocese transfer balances to the Trust. UCC Plan § 5.2. The UCC Plan does not preserve AMBP participants' claims regarding past AMBP contributions or their legal, equitable or contractual rights to the amounts held in the AMBP. UCC Plan § 4.14. The Trust Agreement contemplates the assignment of amounts "representing the value of" the AMBP Reserve Account and the AMBP Disbursing Account to the Trust. UCC Plan Ex. D § 2.1. This treatment does not leave Class 14 creditors' rights unaffected, especially to the extent that the UCC intends to litigate whether AMBP monies may or must be paid over to the Trust. *See* ECF No. 1059 (stipulation). Because the legal, equitable, and contractual rights of Class 14 creditors are altered by the UCC Plan, their claims are impaired as a matter of law. 11 U.S.C. § 1124. The UCC's improper treatment of Class 14 claims as unimpaired precludes confirmation of the UCC Plan.

---

[8] To the extent the stipulation could be considered an effective amendment of the UCC Plan, the amendment raises additional implementation and feasibility issues because the UCC would require the Archdiocese to fund the Trust with the "liquidation value" of the AMBP accounts from unknown sources.

11.     **Improper designation of Class 8 Claims as unimpaired**

Objection

Class 8 claims are defined in the UCC Plan to include outstanding deposits made to the Inter-Parish Loan Fund and claims for assessment overpayments.  The UCC Plan provides for payment of these claims through a credit against future assessments.  The UCC Plan does not leave unaltered the legal, equitable and contractual rights of claimants in Class 8 and does not reinstate or cure any existing defaults and payment of Class 8 claims as required under Section 1124 of the Bankruptcy Code.  Consequently, the UCC Plan does not comply with the applicable provisions of the Bankruptcy Code, including Sections 1123(a)(2), 1123(a)(3), 1124, 1129(a)(1), 1129(a)(7), 1129(a)(8), and 1129(b)(1) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

(a) Definition. A "Class 8 Claim" means a claim against the Archdiocese for (i) outstanding deposits made to the Inter-Parish Loan Fund or (ii) for assessment overpayments made by any Archdiocesan Parish prior to the Petition Date as set forth on Schedule 2.

(b) Treatment. Unless otherwise agreed by an individual claimant and the Archdiocese, Archdiocesan Parishes who hold Class 8 Claims will be satisfied by a credit against the future assessments that would otherwise be due by such parish after the Effective Date. The credit contemplated in this paragraph will be applied as determined by the Reorganized Debtor in accordance with its general practice in calculating assessments, until such time as the Class 8 Claim of such parish has been satisfied in full, without interest.

UCC Plan § 4.8.

*See also* UCC Plan §§ 3.1, 3.2, 5.2.

Discussion

Absent treatment under the UCC Plan, Class 8 creditors would be entitled to collect their loan repayments in cash and upon request.  Under the UCC Plan, however, Class 8 creditors cannot receive repayment of their loans or overcharges in cash but are entitled only to a credit against future assessments, presumably as determined by the Archdiocese.  UCC Plan § 4.8.

8347692v12

The UCC's proposed treatment of Class 8 creditors plainly alters the rights of those

creditors.  *See* 11 U.S.C. § 1124.  The UCC's  improper designation of those claimants means

that its plan does not comply with the Bankruptcy Code.

**12.    Improper designation of Class 13 Claims as unimpaired**

Objection

The UCC Plan provides that the creditors in Class 13 will not receive any property "in
accordance with 11 U.S.C. § 502(e)." UCC Plan § 4.13.  However, to the extent that claims in
Class 13 are not disallowed, such claims are clearly impaired and should be deemed to reject the
plan.

Plan provisions

(a) Definition. A "Class 13 Claim" means a claim for contribution, indemnity or
reimbursement arising out of the Archdiocese's liability to pay or defend against
any Class 6 or Class 7 Claim and any entity subrogated to such claims.

(b) Treatment. Class 13 Claims shall not receive or retain any property under this
Plan in accordance with 11 U.S.C. §502(e).

UCC Plan § 4.13.

*See also* UCC Plan §§ 3.1, 3.2.

Discussion

Claims  may  be  impaired  even  if  later  disallowed  under  the  provisions  of  a  plan.

Impairment and allowance are addressed by separate Code provisions and no Class 13 claim has

been disallowed by the Court to date.  When a class of claims is designated to receive nothing

under a plan, the proper mechanism is to deem that class to have rejected the plan.  11 U.S.C. §

1126(g).  The UCC failed to properly designate Class 13 claims as impaired and deemed to

reject; instead, the UCC Plan incorrectly classified these claims as unimpaired.  UCC Plan § 3.1.

This violates sections 1123(a)(2) and 1124 of the Bankruptcy Code.

32

13.    **Disenfranchisement of impaired creditors**

Objection

The UCC Plan is intended to prevent impaired creditors in Class 3, Class 8, and Class 14 from voting on the UCC Plan.  In so doing, the UCC has attempted to prevent this Court from considering the preferences of creditors when examining competing bankruptcy plans, as contemplated by Section 1129(c) of the Bankruptcy Code and has violated Sections 1129(a)(7) and (8) of the Bankruptcy Code.

This objection presents a threshold legal issue.

Plan provisions

UCC Plan §§ 3.1, 3.2, 4.3, 4.8, 4.13, 4.14, each identified in objections set forth above.

Discussion

The Archdiocese joins in and incorporates the Parish Committee's objection concerning disenfranchisement of Class 3, Class 8 and Class 14 creditors.  The improper treatment of Class 3, Class 8 and Class 14 creditors, by design, prevented those creditors from voting on the UCC Plan.  Besides preventing a fair vote on the UCC Plan and potentially changing the requirements for confirmation of the same (*i.e.*, votes may have triggered a cram-down analysis), the improper treatment of these classes of claims prevents this Court from accurately considering the preferences of creditors as contemplated by section 1129(c).

14.    **Improper treatment of Class 12 Claims**

Objection

The UCC Plan purports to provide for the treatment of certain claims in accordance with the Trust Distribution Plan.  UCC Plan § 4.12(b).  The Archdiocese objects to the treatment of claims in Class 12 to the extent that the Trust Distribution Plan does not specify the treatment of such claims.  For this reason, the UCC has failed to comply with the provisions of Section 1123(a)(3) of the Bankruptcy Code.

In addition, the UCC has proposed that liability for other claims in Class 12 "be assumed and paid in full by the Reorganized Debtor."  UCC Plan §4.12(b).  The UCC Plan violates Section 1123(a)(4) of the Bankruptcy Code by providing for different treatment of certain Class 12 claims.

This objection presents a threshold legal issue.

8347692v12

Plan provisions

(a) Definition. A "Class 12 Claim" means (1) to the extent allowed, claims of
Michael Schaefer (Claim No. 502) and MP Schaefer, LLC (Claim No. 503), and
Jennifer Haselberger (Claim No. 668), (2) any claim arising out of the rejection of
an executory contract, or (3) any unsecured claim that is not included in another
class under this Plan. No claims held by Archdiocesan Parishes will be treated
under Class 12.

(b) Treatment. Liability for preserving and managing Trust Assets and
distributing Trust Assets to Class 12 Claimants under Subsection 4.13(a)(1) and
4.13(a)(2) shall be assigned to, assumed, and treated by the Trust as further
provided in Article VI of this Plan, the Trust Agreement, and the Trust
Distribution Plan. Liability for Class 12 Claims under Subsection 4.13(a)(3) shall
be assumed and paid in full by the Reorganized Debtor.

UCC Plan § 4.12.

Discussion

A plan is not confirmable if it provides for more favorable treatment of some claims over

others in the same class. *In re Lumber Exch., Ltd. P'ship*, 125 B.R. 1000, 1010 (Bankr. D. Minn.

1991) (citing 11 U.S.C. § 1123(a)(4)). The UCC Plan, although unclear, appears to provide for

different treatment among certain Class 12 claims. While liability for some claims appears to be

assigned to and treated by the Trust, liability for other claims is to be assumed and paid in full by

the Reorganized Debtor. Neither the UCC Plan nor the Trust Agreement articulate how claims

would be treated or paid by the Trust. Consequently, the UCC Plan also violates section

1123(a)(3), which requires that a plan specify the treatment of impaired claims. *See* 11 U.S.C. §

1123(a)(3).

**15. Unfair discrimination between Class 6 Claims and Class 7 Claims**

Objection

Under the UCC Plan, Class 6 Claims (Pending Tort Claims) will be paid through Trust

proceeds and will be administered under the distribution procedures outlined in the UCC Plan.

These claims will receive the benefit of settlements with insurers. Class 7 Claims (Future Tort

Claims) receive none of these benefits. The UCC Plan, as drafted, violates the unfair

discrimination provisions of §§1122 and 1123(a)(4) of the Bankruptcy Code.

34

Plan provisions

(a) Definition. A Class 7 Claim means a Future Tort Claim ("Class 7 Claim").

(b) Treatment. Liability for Class 7 Claims shall be assumed by the Reorganized Debtor. To preserve coverage under Insurance Policies issued by Non- Settling Insurers, Class 7 claimants specifically reserve any and all claims which Class 7 claimants may have against the Archdiocese or Reorganized Debtor. The Class 7 Claims will not be released against the Archdiocese or Reorganized Debtor until such Class 7 Claims are settled with the Archdiocese or Reorganized Debtor and its Insurers, or until such Class 7 Claims are fully adjudicated and determined and subject to Final Order. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 7 Claims. The eventual release of these Class 7 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). Regardless of this eventual release of the Archdiocese and Reorganized Debtor, the Class 7 Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 7 Claims.

UCC Plan § 4.7.

*See also* UCC Plan § 4.6.

Discussion

Holders of Class 6 and Class 7 Claims are all holders of tort claims who should be treated similarly under the UCC Plan. *Compare* UCC Plan § 4.6(a) *with* UCC Plan § 4.7(a). While both the UCC Plan and Archdiocese's plan separately classify present and future tort claimants, the Archdiocese's plan provides for non-discriminatory treatment of both classes, while the UCC Plan shuts Class 7 claimants out of the Trust and denies them access to Trust funds. *See* UCC Plan § 4.7(b). This unfair discrimination against and treatment of Class 7 claimants is improper. *See In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999) (discrimination in treatment must have a rational or legitimate basis and must be necessary for reorganization).

16.  **Likely administrative insolvency under the UCC Plan**

Objection

The UCC has failed to establish that the funds available at the effective date will be sufficient to pay all administrative expenses as required by Section 1129(a)(9)(A) of the Bankruptcy Code.

This objection may represent a mixed question of law and fact.

Discussion

As detailed above, the UCC Plan requires the payment of $10,000,000 to the Trust on or before the effective date.  UCC Plan § 5.2.  As also detailed above, the UCC Plan does not specify any source for plan funding.  *See id.*  The Archdiocese's liquid assets, without the benefit of any insurance settlement contributions, may be inadequate to pay all administrative expense claims as of the UCC Plan effective date.  The Archdiocese reserves further argument on this objection pending discovery if the UCC Plan is not determined to be unconfirmable as a matter of law.

17.  **Failure to comply with applicable non-bankruptcy law concerning religious corporations**

Objection

Chapter 315 of the Minnesota Statutes includes various provisions relating to the management of religious societies and the use, disposition or encumbrance of property by a church or religious society.  The UCC Plan disregards these provisions.  The UCC Plan further violates RFRA and the First Amendment through, among other things, provisions dealing with the appointment of officers and directors (UCC Plan §15.3) the collection of parish assessments (UCC Plan §8.4(b)) and the appointment of the Trustee as representative of the Archdiocese (UCC Plan §6.1(c)). These provisions render the UCC Plan unconfirmable under various provisions of the Bankruptcy Code, including Section 1129(a)(3) and 1129(a)(16) of the Bankruptcy Code.

This objection may represent a mixed question of law and fact.

Plan provisions

[Trust receives] Any and all rights and powers and agreements necessary to permit the Trust to collect past-due assessments owed by Archdiocesan Parishes;

36

UCC Plan § 8.4(b).

> If the Bankruptcy Court does not enter a Final Order approving the assignment
> and transfer of the Transferred Insurance Interests to the Trust, then pursuant to
> the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is
> hereby appointed as the representative of the Archdiocese's Estate for the purpose
> of retaining and enforcing all of the Archdiocese's and the Estate's interests under
> the Non-Settling Insurers' Insurance Policies against the Non-Settling Insurers
> with respect to the Class 6 Claims.

UCC Plan § 6.1(c).

*See also* UCC Plan § 5.2 (quoted in objections 1 and 2, above).

<u>Discussion</u>

For the reasons described above, the UCC Plan violates the First Amendment and RFRA. This in turn violates 11 U.S.C. § 1129(a)(16) for failure to comply with applicable non-bankruptcy laws concerning religious corporations.

In addition to the issues identified above, neither the UCC nor this Court may, through the operation of a bankruptcy plan, direct or influence the appointment of church officials as required by UCC Plan sections 6.1(c) and 15.3. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89, 132 S.Ct. 694 (2012) ("According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.").

The UCC Plan's transfer to the Trust of rights to collect past-due assessments from parishes also violates canon law and the First Amendment. *See* UCC Plan §§ 5.2(e), 8.4(b). The Archbishop can only assess parishes under specific conditions and for specific needs. Can. 1263. There is no basis in canon law that would allow a bishop to hand over any right to collect past-due assessments or allow a third party to tax a parish. And as discussed elsewhere, there is no civil law obligation for parishes to make assessment payments.

37

Moreover, the UCC Plan's proposed treatment of credibly accused priests (Class 16) requires that future payments that would otherwise be made to such priests be made to the Trust. As pointed out by the Insurers, there is no authority for a plan to deprive priests of agreed compensation, at least where there has been no finding that the priest is an actual abuser. Requiring the Archdiocese to redistribute to the Trust funds paid under canon law obligations violates the First Amendment and RFRA. *See Hosanna-Tabor Evangelical Church & Sch.*, 565 U.S. 171, 132 S.Ct. at 704 (First Amendment provides religious organizations "independence from secular control and manipulation" with respect to matters of church governance and doctrine).

The UCC Plan's obvious infringement upon religious practice and internal governance renders it unconstitutional as a matter of law.

**18.      Acceptances obtained through improper solicitation**

Objection

The Archdiocese objects to the UCC Plan to the extent that the UCC has relied on acceptances of the UCC Plan or expressions of preference for the UCC Plan obtained or procured through improper solicitation.  Such solicitations include, but are not limited to, publication of false and misleading statements concerning the amounts available under the UCC Plan and statements to the effect that (a) the alternative plan of reorganization filed by the Debtor called for the Archdiocese to contribute only a small fraction of its assets (or less than one percent of its assets), and (b) the Debtor's plan represents an attempt to shield its assets.  This violates, among others, Sections 1125, 1126(b), 1129(a)(1), and 1129(a)(2) of the Bankruptcy Code.  The UCC Plan is also replete with undefined terms and inconsistencies that may have affected the solicitation, balloting and feasibility of the plan in violations of Sections 1125(a)(1), and 1129(a)(8), (10) and (11) of the Bankruptcy Code.

This objection may represent a mixed question of law and fact.

Discussion

This objection is directed to the solicitation and voting process employed by the UCC and counsel for the majority of members of Class 6 creditors to obtain acceptance of the UCC Plan by tort claimants.  Obviously, the solicitation process raises fact issues with respect to the good

faith standard.  *See In re Quigley Co., Inc.*, 437 B.R. 102, 130 (Bankr. S.D.N.Y. 2010).  The

solicitation issue also implicates Section 1126(e), which provides as follows:

> On request of a party in interest, and after notice and a hearing, the
> court may designate any entity whose acceptance or rejection of
> such plan was not in good faith, or was not solicited or procured in
> good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e).

As indicated in *Quigley*, Section 1126(e) "grants the bankruptcy court discretion to

sanction any conduct that taints the voting process, whether it violates a specific provision or is

in 'bad faith.'"  *Id.* (quoting *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 97 (3d

Cir. 1988)).

The requirements of Section 1126(e) were considered in *In re Kellogg Square

Partnership*, 160 B.R. 336, 341 (Bankr. D. Minn. 1993), in connection with a challenge to

unauthorized solicitation materials provided by a plan proponent.  The Bankruptcy Court noted

that "[s]ome courts have held that a solicitee 'may not be given information outside of …

approved documents,' those 'documents' to consist of 'the contents of the plan, the disclosure

statement, and any other court-approved solicitation material.'"  *Id.* (citing *In re Century Glove,

Inc.*, 74 B.R. 952, 955 (Bankr. D. Del. 1987), *rev'd in this regard*, 860 F.2d at 102); *see also In

re Temple Ret. Cmty., Inc.*, 80 B.R. 367, 368-69 (Bankr. W.D. Tex. 1987)).  While rejecting a

blanket prohibition on the transmission of secondary material, Judge Kishel noted that such

communications could be permitted only "so long as such extrajudicial material and solicitation

<u>does not contradict the court-approved disclosure statement, or contain mischaracterizations or</u>

<u>misstatements of material fact that might unfairly influence solicitees</u> …." *Kellogg Square*, 160

B.R. at 341 (emphasis added).

39

The objection summarizes some of the extrajudicial communications in this case. The statements referenced in the objection are derived in large part from a press release issued by counsel for the UCC. Although issued shortly following filing of the ballot report, these statements represent only part of a pattern of misrepresentation concerning the Archdiocese's assets, pre- and post-petition conduct, and motivations, including the misleading valuations set forth in the UCC's liquidation analysis. Without a doubt, many representations made by the UCC and certain claimants' counsel in this case are mischaracterizations or misstatements of material fact.[9]

Discovery will be required to determine the extent and precise content of the communications made during the pendency of the case by the UCC and counsel for certain members of the UCC. At a minimum, however, these mischaracterizations and misstatements are sufficient to taint the entire solicitation process and to preclude a finding of good faith on the part of the UCC.

In addition to the pattern of misrepresentations referenced above, the UCC Plan is replete with undefined terms and inconsistencies that may have affected the solicitation, balloting and feasibility of the plan in violation of §1125(a)(1) and §1129(a)(8), (10) and (11). Other inconsistences are set forth in the separate objection filed by Catholic Mutual Relief Society of

---

[9] Despite admonishments from the Court to refrain from spreading falsehoods, counsel for tort claimants and UCC counsel have continually represented to claimants, the Court and the public that the Archdiocese is "hiding" over $1 billion in assets. Relying on these falsehoods, the StarTribune published an article on June 15, 2017 stating that "[t]he victims' plan would tap what attorneys say is $1 billion in archdiocese property and assets not accounted for in the archdiocese's settlement plan." Jean Hopfensperger, *Objections to Twin Cities Archdiocese bankruptcy plans aired in court*, StarTribune, June 15, 2017, http://www.startribune.com/objections-to-twin-cities-archdiocese-bankruptcy-plans-aired-in-court/428709053/. This Court has previously commented on the "inflammatory" nature of certain statements made in this case. *See* ECF No. 1095 (6/15/17 Hearing Transcript) at 27:12.

America [ECF No. 1070], and in the additional objections filed by the Archdiocese, including

Objection No. 20.

The Archdiocese reserves further argument pending discovery. The Archdiocese also

reserves the right to file an appropriate motion to designate votes under Section 1126(e) of the

Bankruptcy Code.

**19.** **Improper separation of rights and liability**

Objection

The UCC Plan violates Section 1129(a)(3) by proposing a means forbidden by law, as it
assigns to the Trust the right to pursue Archdiocese's interests in insurance policies but does not
assign the Archdiocese's liability.   The proposed separation of rights and liabilities violates
public policy.

Plan provisions

UCC Plan §§ 6.1(b), 6.2(a) (quotations omitted here for length).

Discussion

A central purpose of the Bankruptcy Code "is to give debtors 'a new opportunity in life

and a clear field for future effort, unhampered by the pressure and discouragement of pre-

existing debt." *Perez v. Campbell*, 402 U.S. 637, 648 (1971) (internal quotation omitted).  In a

Chapter 11 case, the "fresh start" is obtained through the discharge of pre-confirmation claims.

*U.S. v. Union Scrap Iron & Metal*, 123 B.R. 831, 835 (D. Minn. 1990).  *See also Owaski v. Jet*

*Florida Sys., Inc. (In re Jet Florida Sys., Inc.)*, 883 F.2d 970, 972 (11th Cir. 1989) (corporate

Chapter 11 reorganization) ("A bankruptcy discharge and the concomitant injunction against

subsequent actions are designed to give the debtor a financial 'fresh start.'"); *In re Coho*

*Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003) (same); *In re Alison Corp.*, 9 B.R. 827, 829

(Bankr. S.D. Cal. 1981) ("In a chapter 11 context, this fresh start can be characterized as

41

rehabilitation through the implementation of a plan of reorganization whereby the debtor will emerge as a functioning unit in the economy.").

Relatedly, "[t]he Bankruptcy Code embodies a strong policy in favor of reorganization." *In re Nw. Airlines Corp.*, 349 B.R. 338, 380 (S.D.N.Y. 2006); *see also Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 45 (1st Cir. 2003) (goal of chapter 11 is "the successful rehabilitation of the business for the benefit of both the debtor and all its creditors"); *In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996) (noting the "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization" in bankruptcy.); *In re Mirant Corp.*, 318 B.R. 377, 383 (Bankr. N.D. Tex. 2004), *aff'd*, 331 B.R. 693 (N.D. Tex. 2005) (same).

A "fresh start" has particular importance where the debtor is a religious organization. *See, e.g.*, Christina M. Davitt, *Whose Steeple Is It? Defining the Limits of the Debtor's Estate in the Religious Bankruptcy Contex*t, 29 SETON HALL LEGIS. J. 531, 533 (2005) (goal of providing the debtor a "fresh start" has particular importance in religious nonprofit bankruptcies given the reality that "there are important stakeholders, including parishioners and arguably the needy community, who would be damaged if the Archdiocese were to actually go out of business"); Felicia Anne Nadborny, *"Leap of Faith" into Bankruptcy: An Examination of the Issues Surrounding the Valuation of A Catholic Diocese's Bankruptcy Estate*, 13 AM. BANKR. INST. L. REV. 839, 839–40 (2005) (analyzing Chapter 11 bankruptcies in the context of non-profit religious entities and observing that one of the purposes of the Bankruptcy Code is to grant such debtors a fresh start); Allison Walsh Smith, *Chapter 11 Bankruptcy: A New Battleground in the Ongoing Conflict Between Catholic Dioceses and Sex-Abuse Claimants*, 84 N.C. L. REV.

42

282, 331 (2005) (observing that a primary goal in diocesan bankruptcy cases is to give the debtor a "fresh start").

The UCC Plan purportedly provides the Archdiocese with a discharge of certain claims. As with the UCC's funding proposal, the discharge is a sham in that the UCC Plan also requires that the Archdiocese "assume" the bulk of the obligations to be discharged. *See, e.g.,* UCC Plan §§ 4.3, 4.7, 4.12, 4.14.

More importantly, disregarding the fundamental objectives of a reorganization, the UCC Plan withholds a discharge for all Class 6 Claims until the last Class 6 Claim is finally resolved. UCC Plan § 6.2(a) ("The Archdiocese will not be entitled to the discharge provided by 11 U.S.C. § 1141(d) with respect to any Class 6 Claim until such time as all Class 6 Claims are settled with the Archdiocese or Reorganized Debtor and the Non-Settling Insurers or such class 6 Claims are fully adjudicated and determined subject to a Final Order.").  That process will take years.

In addition, the Archdiocese is never discharged from Future Tort Claims.  UCC Plan § 14.2(a) ("the Archdiocese shall be discharged from any and all claims that arose prior to the Effective Date, other than the claims held by Class 6 and Class 7 claimants (each "Discharged Claim") (emphasis added)).  Moreover, the Archdiocese is never discharged for "any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations under the Insurance Policies thereby causing the Trust to suffer damages, including the amount of the insurance coverage lost as a result of the breach …."  UCC Plan § 6.2(a).  In other words, the Archdiocese remains liable post-confirmation for damages due to Tort Claims in any amount an insurer refuses to pay due to an alleged pre-petition breach by the Archdiocese of an insurance agreement.  The end result is that the Archdiocese is improperly deprived of a "fresh start" in contravention of one of the fundamental purposes of the Bankruptcy Code.

43

The deprivation of a discharge is particularly problematic in light of the fact that the UCC Plan strips the non-discharged Archdiocese of its insurance coverage interests by assigning them to the Trust.  This outcome is contrary to the public policy delineated in *Gopher Oil Co. v. Amer. Hardware Mut. Ins. Co.* that the entity that has the liability is entitled to the insurance coverage. 588 N.W.2d 756, 763 (Minn. Ct. App. 1999).

In *Gopher Oil*, a successor corporation was found liable for cleanup costs due to the activities of its predecessor.  The court held that the predecessor's insurance coverage was included in an assignment of "all the assets" of the predecessor, and that the successor was entitled to the insurance coverage of its predecessor.  *Id.*  This was true even despite an anti-assignment clause.  *Id.*  The court reasoned that the assignment did "not expand the risk to cover other activities; it only allows a change in the identity of the insured to reconnect the policy's coverage to the insured loss."  *Id.* at 763 (emphasis added).  "This transfer of liability [of the insurer to the successor] addresses the problem created when an insurer becomes liable at the time there is an accident or occurrence covered under the policy but the loss in enforced against a successor owner."  *Id.*  In other words, it is appropriate for the entity with the liability to maintain the benefit of the insurance coverage.  *Id.*

Similarly, in *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. Civ. 06-167, 2006 WL 1473004, at *3 (D. Minn. May 25, 2006), the court approved a transfer of insurance interests to a trust established for payment of claims when it was coupled with the assumption of liability by the trust.  "By assuming API's liability for asbestos claims and succeeding to API's rights in asbestos insurance, the trust unites API's insurance coverage with the insured loss."  *Id.* (emphasis added).

44

Further, under the UCC Plan, the right to pursue the insurance coverage is separated from the liability for the underlying claim.  The Trust, which has the rights to insurance coverage, is not facing the exposure from the underlying claims, as these remain with the Archdiocese and the Archdiocese remains subject to execution with no guaranty of timely indemnification or, in some cases, indemnification at all.  *Cf. Maslowski v. Prospect Funding Partners*, 890 N.W. 2d 756, 763 (Minn. App. 2017) (public policy is not served by arrangements which distort settlement incentives).

The UCC may assert, as it has in the past, that the no-discharge provisions of its plan are somehow necessary to preserve insurance coverage.  This is not the law.  "It has been said, as regards the effect of section 524(e) on an insurance companies' liability for the acts of its insured who obtains a discharge in bankruptcy, that the injunction does not affect a personal injury claimant's efforts to recover from the debtor's insurer so long as the insurer covers all defense costs and all potential liability."  *In re Lembke*, 93 B.R. 701, 702 (Bankr. D.N.D. 1988). Accordingly, courts are in 'near unanimous agreement' that Section 524 "permits a creditor to bring, and proceed in, an action nominally directed against a discharged debtor for the sole purpose of proving liability on its part as a prerequisite to recovering from its insurer."  *In re Coho Res., Inc.*, 345 F.3d at 342 (quoting *In re Jason Pharm., Inc.*, 224 B.R. 315, 321 (Bankr. D. Md. 1998) (collecting cases)).  "The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured."  *Owaski*, 883 F.2d at 975.  "Where a claim is discharged, the debt is recognized in bankruptcy—that is, allowed—but the debtor is relieved of responsibility for it.  Because this relief is limited to the debtor, a party derivatively liable for the debt, such as insurer, remains responsible."  *Bursch v. Beardsley & Piper*, 971 F.2d 108, 114 (8th Cir. 1992).  *See also* Minn.

45

Stat. § 60A.08 subd. 6 (Every policy of insurance issued in Minnesota is deemed to contain the

following provision: "The bankruptcy, insolvency, or dissolution of the insured shall not relieve

the insurer of any of its obligations under this policy …"); *Nat'l Union Fire of Pittsburgh, Pa v.

Porter-Hayden Co.*, 408 B.R. 66 (D. Md. 2009) (provision in policy that insured must be "legally

obligated to pay" is triggered at time of insured's negligence and not affected by bankruptcy

discharge); *Gopher Oil*, 588 N.W.2d at 763 (successor was entitled to insurance for liability of

predecessor).

The UCC Plan deprives the Archdiocese of a fresh start and hampers reorganization,

disconnects, rather than unites, the coverage with the insured loss, and distorts settlement

incentives.  This result directly contravenes public policy.  This public policy violation, in turn,

is one of the many obstacles to a finding that the UCC Plan has been proposed in good faith and

not by any means forbidden by law, as required by Section 1129(a)(3).

## 20.   **Proposed turnover of confidential reports**

Objection

The press release issued by counsel for the UCC on or about May 11, 2017 states that
"[t]he Committee's plan also calls for the immediate release of the investigative report
concerning former Archbishop John Nienstedt, and requires an immediate end to all payments
being made to priests credibly accused of sexually abusing children."  To the extent that the
UCC Plan is consistent with this press release, such provisions violate applicable attorney-client
and work-product doctrines and represent a violation of Section 1129(a)(3) of the Bankruptcy
Code.

This objection may represent a mixed question of law and fact.

Discussion

The UCC Plan includes a reference to the "Nienstedt Investigation Report" as a defined

term. UCC Plan § 1.1(uu).  The Archdiocese, however, has not been able to find a reference to

this defined term in the text of the UCC Plan.  As suggested in Objection 18 above, the

46

Archdiocese has faced a similar issue with other defined terms, including, for example, "Channeled Claim" and "Channeling Injunction," UCC Plan § 1.1 (s) and (t).

On its face, the UCC Plan does not require that the Archdiocese take any action with respect to the Nienstedt Investigation Report. As such, the Archdiocese reserves its argument on this issue.

**21.    The UCC Plan was not proposed in good faith**

Objection

The UCC Plan is tainted by the false and misleading representations referenced above, violates several provisions of the Bankruptcy Code and other applicable law and is premised on a unreasonable, illogical and inappropriate funding mechanism not contemplated or permitted under the Bankruptcy Code. At the same time, the UCC Plan leaves the Archdiocese destitute and without important rights, provides the Archdiocese essentially no relief, delays (and potentially eliminates) the Archdiocese's discharge for Tort Claims (UCC Plan §6.2) and improperly divests the Archdiocese and its carriers of the right to control the Archdiocese's defense of Tort Claims. (UCC Plan §6.2(l)). The UCC Plan, when considered in its entirety, fails to comply with the good faith requirement of Section 1129(a)(3).

This objection may represent a mixed question of law and fact.

Discussion

The question of good faith represents a mixed issue of law and fact. Good faith objections are typically resolved at confirmation. If necessary, the Archdiocese respectfully reserves argument on certain factors relevant to good faith, including, for example, the false and misleading liquidation analysis and pattern of improper solicitation referenced above, pending discovery. Other factors relevant to good faith, however, may be determined as a matter of law because they arise from the language of the UCC Plan and the other undisputed facts in this case.

Any consideration of the factors relevant to the Archdiocese's good faith objection should begin with the recognition that, although 11 U.S.C. § 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law," the term "good faith" is undefined by the Bankruptcy Code. In the context of a Chapter 11 reorganization, however,

the Eighth Circuit has observed that a plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987), *abrogated on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 387 (1993). Several other federal courts of appeals have applied this same definition or some variation of it. *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) ("For purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (internal quotation marks omitted)); *Koelbl v. Glessing*, 751 F.2d 137, 139 (2d Cir. 1984) ("This court has defined the good faith standard in the bankruptcy context as requiring a showing that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." (internal quotation marks omitted)).

In assessing whether a plan complies with § 1129(a)(3)'s good faith standard, a bankruptcy court must examine the "totality of the circumstances." *Platinum Capital, Inc. v. Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start"). The good faith requirement of 1129(a)(3) is satisfied "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

48

Applying these decisions, the court must determine whether the UCC Plan, given the totality of the circumstances, satisfies the purposes underlying Chapter 11. As noted, one of these primary purposes is to preserve the debtor as a going concern when such preservation is consistent with the interest of creditors. The uncontroverted facts in this case establish that this primary purpose cannot plausibly be achieved through the UCC Plan.

The UCC Plan violates several provisions of the Bankruptcy Code and other applicable law and is premised on an unduly speculative and unenforceable funding mechanism not contemplated or permitted under the Bankruptcy Code. At the same time, the UCC Plan leaves the Archdiocese destitute and without important rights and benefits, including the benefit of a discharge. UCC Plan § 6.2(l). It is clear that the UCC intends to leave the Archdiocese with over 400 lawsuits to defend without adequate recourse against the Trust to fund defense costs or obtain indemnification for retained liability. The UCC appears to be indifferent to the fact that the assets of the Reorganized Debtor will be at risk during the litigation process.

In sum, when considered in its entirety, and under the totality of the circumstances, the UCC Plan fails to comply with the good faith requirement of Section 1129(a)(3).

## CONCLUSION

The UCC Plan requires a court-conducted valuation process that is not authorized by the Bankruptcy Code. Plan funding is further based on speculation and mechanisms that cannot be legally enforced (*i.e.*, increased parish assessments, donations and third-party loans). In addition, the one insurance settlement embraced by the UCC Plan will be breached at confirmation and cannot be assigned to the trust as a matter of law. The UCC Plan also proposes to strip the Archdiocese of cash necessary for operations and allows sexual abuse claimants to proceed with hundreds of lawsuits against the Archdiocese and parishes, requiring the de facto liquidation of

49

the Archdiocese following confirmation.   And it is clear from carrier objections that the Archdiocese insurance carriers will take the position that the UCC Plan, if confirmed, will vitiate coverage.

The UCC has proposed to deprive the Archdiocese of all, or almost all of the benefits of Chapter 11, including a discharge of the claims that prompted the filing.  The harsh and punitive provisions of the UCC Plan fail to comply with laws applicable to religious corporations and do not comply with the letter and spirit of Chapter 11.  The alleged benefits of these provisions are dubious at best, given that the UCC Plan does not provide a mechanism for negotiating or achieving global resolution of claims.  Post-confirmation, the mechanisms necessary to facilitate insurance buy-outs (*i.e.*, channeling injunctions), will not be available.

The parties in this case should not be required to proceed to a confirmation hearing on a plan that is unconfirmable as a matter of law. The Court should deny confirmation of the UCC Plan.

Respectfully submitted,

BRIGGS AND MORGAN

Dated:  July 7, 2017            BY:    */e/ Richard D. Anderson*
                                       Richard D. Anderson (#2306)
                                       randerson@briggs.com
                                       Charles B. Rogers (#0130588)
                                       crogers@briggs.com
                                       Benjamin E. Gurstelle (#0389968)
                                       bgurstelle@briggs.com
                                       2200 IDS Center, 80 South 8th Street
                                       Minneapolis, MN 55402
                                       Telephone: (612) 977-8400
                                       Facsimile: (612) 977-8650

                                       Attorneys for the Archdiocese of Saint Paul
                                       and Minneapolis

50