IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

THE ARCHDIOCESE OF SAINT PAUL
AND MINNEAPOLIS

Debtor.

Case No. 15-30125

Chapter 11

**MODIFIED SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**

STINSON LEONARD STREET
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Phillip J. Ashfield (#388990)
Brittany M. Michael (#397592)
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
phillip.ashfield@stinson.com
brittany.michael@stinson.com
Telephone: 612-335-1500
Facsimile: 612-335-1657

Attorneys for the Official Committee of Unsecured Creditors for the Archdiocese of Saint Paul
and Minneapolis

Dated: August 1, 2017

# TABLE OF CONTENTS

Page

Article I DEFINITIONS AND INTERPRETATION.................................................................1
 **1.1 DEFINED TERMS** ..............................................................................................1
 **1.2 INTERPRETATION** ............................................................................................8
 **1.3 TIME PERIODS**.................................................................................................9
 **1.4 EXHIBITS AND SCHEDULES** ......................................................................10
Article II TREATMENT OF UNCLASSIFIED CLAIMS ........................................................10
 **2.1 ADMINISTRATIVE CLAIMS** .......................................................................10
 **2.2 STATUTORY FEES**.........................................................................................11
 **2.3 PRIORITY TAX CLAIMS** ..............................................................................12
Article III CLASSIFICATION OF CLAIMS ..........................................................................12
 **3.1 SUMMARY**.......................................................................................................12
 **3.2 CLASSIFICATION AND VOTING** ................................................................13
Article IV TREATMENT OF CLASSIFIED CLAIMS ............................................................13
 **4.1 PRIORITY CLAIMS (CLASS 1)**.....................................................................13
 **4.2 GOVERNMENTAL UNIT CLAIMS (CLASS 2)**.............................................13
 **4.3 GENERAL INSURANCE FUND (CLASS 3)**..................................................13
 **4.4 ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS PRIESTS' PENSION PLAN CLAIMS (CLASS 4)** ..........................................................14
 **4.5 ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS LAY EMPLOYEES' PENSION PLAN CLAIMS (CLASS 5)** ..................................14
 **4.6 PENDING TORT CLAIMS (CLASS 6)** ..........................................................14
 **4.7 FUTURE TORT CLAIMS (CLASS 7)** ............................................................15
 **4.8 INTER-PARISH LOAN FUND AND ASSESSMENT OVERPAYMENT CLAIMS (CLASS 8)** ........................................................................................16
 **4.9 TRADE VENDOR CLAIMS (CLASS 9)**.........................................................16
 **4.10 SECURED CLAIM OF PREMIER BANK (CLASS 10)** .................................16
 **4.11 GUARANTY CLAIMS (CLASS 11)**...............................................................17
 **4.12 OTHER TORT CLAIMS AND UNSECURED CLAIMS (CLASS 12)**.................17
 **4.13 ABUSE RELATED CONTINGENT CLAIMS (CLASS 13)** ................................17
 **4.14 ARCHDIOCESE MEDICAL AND DENTAL PLAN (CLASS 14)** ......................17
 **4.15 PRIEST SUPPORT PAYMENTS (CLASS 15)**.................................................18
Article V MEANS OF IMPLEMENTATION OF THE PLAN ....................................................18

i

**5.1    IMPLEMENTATION** ...................................................................................18

**5.2    FUNDING THIS PLAN** ............................................................................18

Article VI CREDITOR TRUST ...............................................................................20

**6.1    THE TRUST** .............................................................................................20

**6.2    TREATMENT OF CLASS 6 AND CLASS 7 CLAIMS** .......................24

**6.3    NON-SETTLING INSURERS** .................................................................31

**6.4    TRUST POWERS WITH RESPECT TO CLASS 6 AND CLASS 7 CLAIMS AND NON-SETTLING INSURERS** ...................................33

Article VII [RESERVED] ........................................................................................34

Article VIII GENERAL TRUST PROVISIONS.......................................................34

**8.1    ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST**...................................................34

**8.2    TAX MATTERS** .......................................................................................34

**8.3    APPOINTMENT OF THE TRUSTEE** ...................................................34

**8.4    RIGHTS AND RESPONSIBILITIES OF TRUSTEE**...........................35

**8.5    INVESTMENT POWERS; PERMITTED CASH EXPENDITURES** .................36

**8.6    REGISTRY OF BENEFICIAL INTERESTS** .......................................36

**8.7    NON-TRANSFERABILITY OF INTERESTS** .....................................36

**8.8    TERMINATION** .......................................................................................36

**8.9    IMMUNITY; LIABILITY; INDEMNIFICATION** ...............................36

**8.10   NO WAIVER OR RELEASE** ..................................................................37

Article IX [RESERVED] ..........................................................................................37

Article X INSURANCE POLICIES .........................................................................37

**10.1    CONTINUATION OF INSURANCE POLICIES**................................37

**10.2    NON-DEBTOR'S RIGHTS IN INSURANCE POLICIES NOT AFFECTED**......38

Article XI ADMINISTRATION OF NON-TORT CLAIMS ....................................38

**11.1    RESERVATION OF RIGHTS TO OBJECT TO CLAIMS OTHER THAN CLASS 6 AND CLASS 7 CLAIMS** ....................................38

**11.2    OBJECTIONS TO CLAIMS OTHER THAN TORT CLAIMS** .........38

**11.3    DETERMINATION OF OTHER CLAIMS** ..........................................39

**11.4    NO DISTRIBUTIONS PENDING ALLOWANCE**..............................39

Article XII DISTRIBUTIONS UNDER THE PLAN .................................................39

**12.1    TIMING OF DISTRIBUTIONS** ............................................................39

**12.2    PAYMENT DATE** ....................................................................................39

**12.3    UNDELIVERABLE DISTRIBUTIONS** ...............................................39

**12.4    SETOFFS** ........................................................................................40

**12.5    NO INTEREST ON CLAIMS** ..................................................................40

**12.6    WITHHOLDING TAXES** ......................................................................40

Article XIII EFFECTIVENESS OF THE PLAN ...................................................40

**13.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE** ...........................40

**13.2    NOTICE OF EFFECTIVE DATE** ............................................................41

**13.3    WAIVER OF CONDITIONS** ..................................................................41

**13.4    EFFECT OF NON-OCCURRENCE OF CONDITIONS** ..................................41

Article XIV EFFECTS OF CONFIRMATION .......................................................41

**14.1    DISSOLUTION OF COMMITTEES** ........................................................41

**14.2    DISCHARGE AND INJUNCTION** ..........................................................41

**14.3    EXCULPATION; LIMITATION OF LIABILITY** .........................................43

**14.4    RESERVATION OF RIGHTS FOR CATHOLIC ENTITIES** ...........................43

Article XV THE REORGANIZED DEBTOR ........................................................43

**15.1    CONTINUED CORPORATE EXISTENCE** ................................................43

**15.2    VESTING OF ASSETS** .......................................................................43

**15.3    IDENTITY OF OFFICERS OF REORGANIZED DEBTOR** ............................44

**15.4    FURTHER AUTHORIZATION** ..............................................................44

Article XVI MISCELLANEOUS PROVISIONS ....................................................44

**16.1    OPERATING LEASES AND REAL ESTATE LEASES** .................................44

**16.2    BANK MORTGAGES AND LIENS** ........................................................44

**16.3    ASSUMPTION OF EXECUTORY CONTRACTS** ........................................44

**16.4    CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS** ...............45

**16.5    INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND
          EMPLOYEES** ..................................................................................45

**16.6    LEASE CLAIM INDEMNITY** ...............................................................45

**16.7    FINAL ORDER** ...............................................................................45

**16.8    AMENDMENTS AND MODIFICATIONS** .................................................45

**16.9    RETENTION OF JURISDICTION** .........................................................46

**16.10   TRUSTEE REPORTS** ........................................................................48

**16.11   NO WAIVER** ..................................................................................48

**16.12   TAX EXEMPTION** ...........................................................................48

**16.13   NON-SEVERABILITY** ......................................................................48

**16.14   REVOCATION** ................................................................................49

**16.15   CONTROLLING DOCUMENTS** ............................................................49

iii

**16.16  GOVERNING LAW** ................................................................................49

**16.17  NOTICES** .................................................................................................49

**16.18  FILING OF ADDITIONAL DOCUMENTS** ..........................................50

**16.19  POWERS OF OFFICERS** ......................................................................50

**16.20  DIRECTION TO A PARTY** ...................................................................50

**16.21  SUCCESSORS AND ASSIGNS** .............................................................50

**16.22  CERTAIN ACTIONS** .............................................................................50

**16.23  FINAL DECREE** ....................................................................................50

**16.24  PLAN AS SETTLEMENT COMMUNICATION** ..................................51

**16.25  OTHER RIGHTS** ...................................................................................51

Article XVII BANKRUPTCY RULE 9019 REQUEST ............................................51

Article XVIII CONFIRMATION REQUEST .........................................................51

CORE/3003233.0002/134357790.2

## INTRODUCTION

The Official Committee of Unsecured Creditors in the bankruptcy case of the Archdiocese of Saint Paul and Minneapolis, proposes this Chapter 11 Plan of Reorganization (the "Plan") pursuant to the provisions of the Bankruptcy Code.

All creditors are encouraged to consult the disclosure statement for the Chapter 11 Plan of Reorganization dated August 22, 2016 (the "Disclosure Statement"), proposed by the Committee, before voting to accept or reject this Plan. Among other information, the disclosure statement contains discussions of the Archdiocese of St. Paul and Minneapolis (the "Archdiocese" or "Debtor"), events prior to and during this Chapter 11 case, and a summary and analysis of this Plan. No solicitation materials, other than the disclosure statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of this Plan.

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**1.1    DEFINED TERMS**. For the purposes of this Plan, all capitalized terms not otherwise defined herein have the meanings assigned to them below:

**(a)**    "Abuse" means actual or alleged sexual abuse as that term is defined in Minnesota Statutes § 541.073(1), as well as from molestation, rape, undue familiarity, sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a non-consenting adult and another adult for which the Debtor and/or a Catholic Entity is, was or may be liable or alleged to be liable.

**(b)**    "Administrative Claim" means a claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503, 507(a)(2) or 507(b) of the Bankruptcy Code, including any post-petition tax claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

**(c)**    "Administrative Claim Reserve" means the reserve to be established to pay administrative and priority claims as provided for in Section 5.2 of this Plan.

**(d)**    "AMBP" or "Archdiocese Medical and Dental Plan" means that Archdiocese medical and dental benefit plan described in the motion filed by the Archdiocese with the Court on or about January 16, 2015 (Docket No. 15).

**(e)**    "AMBP Disbursing Account" means the AMBP disbursing account described at p. 23 of the Archdiocese's Disclosure Statement filed on May 26, 2016 (Docket No. 656).

**(f)**    "AMBP Reserve Account" means the AMBP Reserve Account described at p. 23 of the Archdiocese's Disclosure Statement filed on May 26, 2016 (Docket No. 656).

- 1 -

**(g)**     "Approval Order" means an order of the Bankruptcy Court approving the Insurance Settlement Agreements as such order may be awarded, modified, or supplemented.

**(h)**     "Archdiocese" and "Archdiocesan" refers to the Debtor diocesan corporation.

**(i)**     "Archdiocesan Parish" means a parish maintained in the Archdiocese.

**(j)**     "Archdiocesan Priest" means a priest ordained by the Archdiocese.

**(k)**     "Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan" or "Lay Employees' Pension Plan" means the noncontributory multiple employer defined benefit pension plan for the benefit of the Archdiocese's full-time lay employees, together with the employees of those participating employers located within the boundaries of the Archdiocese that chose to adopt the pension plan.

**(l)**     "Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan" or "Priests' Pension Plan" means the contributory multiple employer defined benefit pension plan for the benefit of priests incardinated in the Archdiocese.

**(m)**     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, and, where applicable, the Federal Rules of Bankruptcy Procedure.

**(n)**     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Minnesota.

**(o)**     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as currently promulgated.

**(p)**     "Beneficiary" or "Qualified Claimant" means a Class 6 or Class 7 claimant whose claims are payable under the Trust Distribution Agreement.

**(q)**     "Catholic Entities" means those Persons listed on <u>Exhibit M</u> and their respective predecessors and successors, and all of the foregoing, past, present, and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, professionals, volunteers, attorneys, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns.

**(r)**     "Cause of Action" or "Causes of Action" means, except as provided otherwise in the Plan, the confirmation order or any document, instrument, release or other agreement entered into in connection with the Plan, all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims of the Archdiocese or its Estate, the Committees, or the Trust (as successor to the Archdiocese or its Estate), including an action that is or maybe

CORE/3003233.0002/134357790.2

pending on the Effective Date or instituted by the Trust after the Effective Date against any Person based on law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, including any action brought pursuant to Sections 522, 541-545, 547 -51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or cross-claim asserted with respect to a claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such claim.

**(s)**     "Claim Filing Date" means August 3, 2015.

**(t)**     "Committees" means the UCC and Parish Committee.

**(u)**     "Confirmation Date" means the date on which a Final Order confirming the Plan is entered by the Court pursuant to Section 1129 of the Code.

**(v)**     "Confirmation Order" means the Final Order entered by the Court confirming the Plan pursuant to Section 1129 of the Code.

**(w)**     "Credibly Accused Person" means a Person who committed or is alleged to have committed an act of Abuse upon a Tort Claimant. Exhibit N includes a partial list of Persons considered Credibly Accused Persons.

**(x)**     "Disputed" when used with respect to a claim against the Archdiocese or property of the Archdiocese, means a claim: (i) designated as disputed, contingent or unliquidated in the Debtor's Schedules; (ii) which is the subject of an objection, appeal or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order; or (iii) which during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such claim, is in excess of the amount scheduled as other than disputed, unliquidated or contingent. Processes for handling "Disputed Claims" do not apply to Class 6 Claims. In the event that any part of a claim is Disputed, such claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Reorganized Debtor, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified class of claims or an unclassified category of claims (i.e., "Disputed [class designation/unclassified claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified class or unclassified category of claims.

**(y)**     "District Court" means the United States District Court for the District of Minnesota.

**(z)**     "Effective Date" means the date upon which the conditions in Article XIII of the Plan have been satisfied.

**(aa)**     "Estate" means the estate created in this Chapter 11 case pursuant to Section 541 of the Bankruptcy Code.

**(bb)** "Exculpated Parties" means, collectively, (i) the Archdiocese, the Estate, and the Committees and (ii) the respective officers, directors, employees, members, attorneys, financial advisors, and professionals of a Person identified in the preceding clause (i).

**(cc)** "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

**(dd)** "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

**(ee)** "Final Order" means an order, judgment or other decree (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, review, reargue, or rehear shall have been waived in writing, or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order."

**(ff)** "Future Tort Claim" means any Tort Claim that is neither filed, nor deemed filed, by the Claim Filing Date and is held by an individual who was continuously between the Claim Filing Date and the Effective Date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4).

**(gg)** "Future Tort Claimant" means the holder of a Future Tort Claim, the estate of a deceased individual who held a Future Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Future Tort Claim, as the case may be.

**(hh)** "Future Tort Claim Reserve Fund" means the reserve established for the benefit of Class 7 claimants pursuant to Section 8.1(b) of the Plan.

**(ii)** "GIF" or "General Insurance Fund" means the General Insurance Fund Program maintained by the Archdiocese for hazard and liability claims and workers' compensation claims, as described in the motion filed by the Archdiocese with the bankruptcy court on January 16, 2015 as (Docket No. 11).

- 4 -

**(jj)** "Home Insurance Company Supplemental Injunction" means the injunction imposed pursuant to Section 14.2(c) of the Plan.

**(kk)** "Insurance Company" or "Insurer" means (a) any Person or entity that during any period of time issued or allegedly issued an Insurance Policy to the Archdiocese or any of its predecessors, successors or assigns; or (b) any Person or Entity owing or allegedly owing, under any Insurance Policy, a duty to defend and/or indemnify the Archdiocese or any of its predecessors, successors or assigns.

**(ll)** "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Insurer or any Insurance Policy issued by an Insurer and/or rights thereunder.

**(mm)** "Insurance Policy(ies)" means any contract, binder, certificate, or policy of insurance in effect on or before the Effective Date issued to, allegedly issued to, or for the benefit of the Archdiocese, or any of its predecessors in interest, successors or assigns, under which coverage exists or may exist for a Tort Claim. A non-exhaustive list of the Insurance Policies are listed at Exhibit L.

**(nn)** "Insurance Settlement" means, individually, a settlement between the Archdiocese and a Settling Insurer.

**(oo)** "Insurance Settlement Agreements" means the settlement agreements between the Archdiocese and the Settling Insurers, as approved by Final Order of the Bankruptcy Court.

**(pp)** "Inter-Parish Loan Fund" means the deposit and loan program established by the Archdiocese to fund loans to participating parishes.

**(qq)** "Interest" means all liens, claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

**(rr)** "Lease" means the lease agreement entered into between the Archdiocese and IAF Beacon I, LLC dated as of February 29, 2016, under which the Archdiocese will lease certain office space located at 777 Forest Street, Saint Paul, Minnesota, including all exhibits thereto.

**(ss)** "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Debtor as contemplated by Section 101(37) of the Bankruptcy Code.

**(tt)** "Non-Settling Insurers" means the Persons listed as "Non-Settling Insurers" on Exhibit L.

**(uu)** "Pending Tort Claim" means any Tort Claim, other than a Future Tort Claim, including any Sexual Abuse Proof of Claim filed in this Chapter 11 case (form at Docket No. 188).

- 5 -

(vv)    "Pending Tort Claimant" means the holder of a Pending Tort Claim, the estate of a deceased individual who held a Pending Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Pending Tort Claim, as the case may be.

(ww)    "Person" means any individual, partnership or corporation, as contemplated by Section 101(41) of the Bankruptcy Code.

(xx)    "Petition Date" means January 16, 2015, the date on which the Archdiocese commenced this Chapter 11 case.

(yy)    "Plan" means this modified second amended Chapter 11 plan of reorganization proposed by the UCC, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

(zz)    "Plan Implementation Account" means the account to be established by the Archdiocese or the Reorganized Debtor on or after the Confirmation Date at a financial institution acceptable to the UCC and the Settling Insurers into which all funds will be deposited, including all amounts to be paid by the Settling Insurers pursuant to the respective settlement agreements. The remaining proceeds of the Plan Implementation Account shall be transferred by the Reorganized Debtor into such account or accounts established by the Trustee pursuant to the Trust Agreement and pursuant to written instructions from the Trustee.

(aaa)    "Priority Tax Claim" means a claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

(bbb)    "Pro Rata" means, with respect to any Distribution on account of any allowed claim in any class, the ratio of (i) the amount of such allowed claim to (ii) the sum of (a) all allowed claims in such class and (b) the aggregate maximum allowable amount of all Disputed Claims in such class.

(ccc)    "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

(ddd)    "Professional Claim" means a claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in this Chapter 11 case.

(eee)    "Proof of Claim" means a proof of claim filed in this Chapter 11 case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

(fff)    "Related Insurance Claim" means any claim by any Person for i) defense, indemnity, contribution, subrogation, or similar relief that directly or indirectly arises from, relates to, or is in connection with any Tort Claim, including any insurance claim

CORE/3003233.0002/134357790.2

and any direct action or claim under Minn. Stat. § 60A.08, subd. 8; and ii) any extra-contractual claim.

(ggg)   "Reorganized Debtor" means Archdiocese of Saint Paul and Minneapolis, on and after the Effective Date.

(hhh)   "Secured Claim" means a claim that is secured by a Lien on, or security interest in, property of the Debtor, or that has the benefit of rights of setoff under § 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined by the Bankruptcy Court pursuant to Sections 506(a), 553, or 1129(b)(2)(A )(i)(II) of the Bankruptcy Code, as applicable.

(iii)   "Settling Insurer" means the Persons listed as "Settling Insurers" on Exhibit L, to the extent of liabilities (or alleged liabilities) compromised in each respective settlement agreement between the Archdiocese and such Settling Insurer (and Roger A. Sevigny, Insurance Commissioner of the State of New Hampshire, solely in his capacity as Liquidator), and any Non-Settling Insurer who enters into a final and binding Insurance Settlement Agreement with the Trust after the Effective Date, all in their capacity as such.

(jjj)   "Settling Insurer Entities" means Settling Insurers and, in the capacity as such, their respective predecessors and successors, and their respective past, present and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, volunteers, attorneys, and professionals.

(kkk)   "Settling Insurer Policies" means all Insurance Policies issued by a Settling Insurer.

(lll)   "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan will be filed with the Bankruptcy Court at least fourteen (14) days prior to the confirmation hearing.

(mmm)   "Tort Claim" means any claim arising from Abuse where the Abuse took place or is alleged to have taken place in whole or in part prior to the Effective Date.

(nnn)   "Tort Claimant" means the holder of a Tort Claim. A "Pending Tort Claimant" or a "Class 6 Claimant" is a holder of a Pending Tort Claim, and a "Future Tort Claimant" is a holder of a Future Tort Claim.

(ooo)   "Tort Claims Reviewer" means the Person, including the designee of such person or entity, who will assess Class 6 and Class 7 Claims under the Trust Distribution Plan.

(ppp)   "Transferred Insurance Interests" means all rights and interests of the Debtor and the Reorganized Debtor in Insurance Policies in respect of actual or potential

- 7 -

coverage for any Class 6 Claim or Class 7 claim, including: (i) the proceeds of such Insurance Policies and all claims for such proceeds, and (ii) all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 6 Claim or Class 7 Claim, including but not limited to all claims and causes of action for breach of the Insurance Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs.

(**qqq**)   "Trust" means the trust created for the benefit of holders of Class 6 Claims in accordance with the Plan and confirmation order and the Trust Agreement.

(**rrr**)   "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as may be amended, together with such additional documents as may be executed in connection with the Trust Agreement.

(**sss**)   "Trust Assets" means the cash and other assets to be transferred to the Trust under Article V of the Plan.

(**ttt**)   "Trust Beneficiary" means a beneficiary under the Trust Agreement, as defined in the Trust Agreement.

(**uuu**)   "Trust Distribution Plan" or "TDP" means the Trust Distribution Plan established under the Trust Agreement that will be identified in a supplement to this Plan to be filed by the UCC within 30 days prior to the hearing on the adequacy of the disclosure statement filed with the Plan.

(**vvv**)   "Trust Protector" means the Person appointed as Trust Protector in accordance with the terms of the Plan, the Confirmation Order, and Section 7.3 of the Trust Agreement.

(**www**) "Trustee" means, the Person appointed as Trustee of the Trust in accordance with the terms of the Plan, the confirmation order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, confirmation order, and the Trust Agreement.

(**xxx**)   "UCC" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 case, as such committee maybe constituted from time to time.

(**yyy**)   "U.S. Trustee" means the Office of the United States Trustee for the District of Minnesota.

**1.2    INTERPRETATION**. For purposes of the Plan:

(**a**)   any term that is not defined herein, but that is used in the Bankruptcy Code and/or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code and/or the Bankruptcy Rules, as applicable;

CORE/3003233.0002/134357790.2

**(b)**      the terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

**(c)**      whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

**(d)**      the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

**(e)**      unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with Bankruptcy Code and the Bankruptcy Rules;

**(f)**      any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

**(g)**      any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

**(h)**      unless otherwise specified, all references in this Plan to "Articles," "Sections," "Schedules" and "Exhibits" are references to Articles, Sections, Schedules and Exhibits of or to the Plan;

**(i)**      the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan;

**(j)**      captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of this Plan or otherwise affect the interpretation of this Plan; and

**(k)**      this Plan supersedes all prior drafts of this Plan, and all prior negotiations, agreements, and understandings with respect to this Plan, evidence of which shall not affect the interpretation of any provision of this Plan.

**1.3      TIME PERIODS**. In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by this Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

CORE/3003233.0002/134357790.2

**1.4**   **EXHIBITS AND SCHEDULES**.

(a)   All Exhibits and Schedules to this Plan (with this Plan, the "Plan Documents") are hereby incorporated by reference and made part of this Plan as if set forth fully herein.

(b)   The Exhibits to this Plan include the following:

Exhibit A:   [RESERVED]
Exhibit B:   Guaranty Obligations
Exhibit C:   Assets to be Valued by Bankruptcy Court
Exhibit D:   Trust Agreement and Trust Distribution Plan
Exhibit E:   Claim Resolution Agreement
Exhibit F:   [RESERVED]
Exhibit G:   Insurance Settlement Agreements
Exhibit H:   List of Leases and Executory Contracts to be Assumed
Exhibit I:   [RESERVED]
Exhibit J:   Officers and Directors of Reorganized Debtor
Exhibit K:   Settlement Agreement with Ramsey County Attorney's Office
Exhibit L:   List of Archdiocese Insurance Policies: Settling Insurers and Non-Settling Insurers
Exhibit M:   List of Catholic Entities
Exhibit N:   Partial List of Credibly Accused Persons
Exhibit O:   [RESERVED]

(c)   The Schedules to this Plan include the following:

Schedule 1: [RESERVED]
Schedule 2: List of Class 8 claimants
Schedule 3: List of Trade Vendor Claims

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

**2.1**   **ADMINISTRATIVE CLAIMS**. As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under this Plan. Rather, all such claims shall be treated separately as unclassified claims on the terms set forth in this Article.

(a)   **Treatment**. Each holder of an allowed Administrative Claim against the Archdiocese shall receive, in full satisfaction, settlement, release, and extinguishment of such claim, an amount from the Plan Implementation Account equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such claim.

CORE/3003233.0002/134357790.2

(b)     **Administrative Filing Deadline**.

(1)     Except as otherwise set forth in this Section, requests for payment of Administrative Claims must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court (the "Administrative Claims Filing Deadline"). Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such claims against the Archdiocese, the Reorganized Debtor, the Trust or any of their property.

(2)     All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than sixty (60) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). The Administrative Claim Objection Deadline may be initially extended for an additional sixty (60) days at the reasonable discretion of the Reorganized Debtor after consultation with the Trustee upon the filing of a notice extending the Administrative Claim Objection Deadline. Thereafter, the Administrative Claim Objection Deadline may only be further extended by an order of the Bankruptcy Court. If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, as may be extended, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph, as may be extended, shall control over any contrary deadline set forth in any requests for payment of Administrative Claims.

(c)     **Professional Claim Filing Deadline**.

(1)     All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than sixty (60) days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

(2)     Objections to Professional Claims must be filed and served no later than thirty (30) days after the Professional Claim Filing Deadline (the "Professional Claim Objection Deadline"). Thereafter, the Professional Claim Objection Deadline may only be extended by an order of the Bankruptcy Court.

2.2     **STATUTORY FEES**. All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid by the Reorganized Debtor from ongoing operations as soon as practicable after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee from its ongoing operations until the Chapter 11 case is closed and a Final Decree is entered. In addition, the Reorganized Debtor

shall file post-Confirmation Date quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate.

**2.3    PRIORITY TAX CLAIMS**. With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such claim in cash as soon as practicable after the Effective Date from its ongoing operations, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Archdiocese or Reorganized Debtor.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS**

**3.1    SUMMARY**. The categories of claims listed below classify claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of this Plan, and distribution pursuant to this Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | General Insurance Fund | Unimpaired | No |
| 4 | Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan Claims | Unimpaired | No |
| 5 | Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan Claims | Unimpaired | No |
| 6 | Pending Tort Claims | Impaired | Yes |
| 7 | Future Tort Claims | Impaired | Yes |
| 8 | Inter-Parish Loan Fund and Assessment Overpayment Claims | Unimpaired | No |
| 9 | Trade Vendors and General Unsecured Creditors | Unimpaired | No |
| 10 | Secured Claim of Premier Bank | Unimpaired | No |
| 11 | Guaranty Claims | Unimpaired | No |
| 12 | Other Tort Claims and Unsecured Claims | Impaired | Yes |
| 13 | Abuse Related Contingent Claims | Unimpaired | No |

- 12 -

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 14 | Archdiocese Medical and Dental Plan | Unimpaired | No |
| 15 | Priest Support Payments | Unimpaired | No |

**3.2     CLASSIFICATION AND VOTING**. The claims against the Archdiocese shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Article II). Consistent with Section 1122 of the Bankruptcy Code, a claim is classified by the Plan in a particular class only to the extent the claim is within the description of the class, and a claim is classified in a different class to the extent it is within the description of that different class.

**ARTICLE IV**
**TREATMENT OF CLASSIFIED CLAIMS**

**4.1     PRIORITY CLAIMS (CLASS 1)**.

**(a)     Definition**. A "Class 1 Claim" means an allowed claim described in, and entitled to priority under Sections 507(a) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

**(b)     Treatment**. Unless the holder of an allowed Class 1 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) or the date a Class 1 Claim becomes an allowed claim (or as soon thereafter as is practicable).

**4.2     GOVERNMENTAL UNIT CLAIMS (CLASS 2)**.

**(a)     Definition**. A "Class 2 Claim" means an allowed claim of a Governmental Unit not otherwise included in Article II or Section 4.1 above.

**(b)     Treatment**. Unless the holder of an allowed Class 2 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) or the date a Class 2 Claim becomes an allowed claim (or as soon thereafter as is practicable).

**4.3     GENERAL INSURANCE FUND (CLASS 3)**.

**(a)     Definition**. A "Class 3 Claim" means an allowed claim against the Archdiocese held by Catholic Entities arising from or related in any way to the collection

CORE/3003233.0002/134357790.2

and use of payments made by such claimant to the Archdiocese under the GIF, including any claims arising from the administration by the Archdiocese of the GIF.

**(b)    Treatment**. The Reorganized Debtor will assume the Archdiocese's participation in the GIF and all liabilities to Class 3 claimants on the Effective Date. The Reorganized Debtor will continue to sponsor the GIF and will cause to be paid claims and administrative expenses under the GIF in accordance with the Archdiocese's prior practices.

**4.4    ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS PRIESTS' PENSION PLAN CLAIMS (CLASS 4)**.

**(a)    Definition**. A "Class 4 Claim" means a claim against the Archdiocese for liability arising under the Priests' Pension Plan.

**(b)    Treatment**. The Reorganized Debtor will assume the Archdiocese's participation in the Priests' Pension Plan and all liabilities associated therewith (including, but not limited to, any underfunding liabilities) and will continue to meet its obligations under the Priest Plan as they become due.

**4.5    ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS LAY EMPLOYEES' PENSION PLAN CLAIMS (CLASS 5)**.

**(a)    Definition**. A "Class 5 Claim" means a claim against the Archdiocese for liability arising under the Lay Employees' Pension Plan.

**(b)    Treatment**. The Reorganized Debtor will assume the Archdiocese's participation in the Lay Employees' Pension Plan and all liabilities associated therewith (including, but not limited to, any underfunding liabilities) and will meet its obligations under the Lay Employees' Pension Plan as they become due.

**4.6    PENDING TORT CLAIMS (CLASS 6)**.

**(a)    Definition**. A "Class 6 Claim" means a Pending Tort Claim.

**(b)    Summary**. A trust shall be created to serve multiple purposes under this Plan associated with Class 6 Claims. The Trust shall be funded as provided in Articles V and VI, including by contributions from the Archdiocese and others and the assignment of the Transferred Insurance Interests. The Trust shall make distributions to the Class 6 claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which shall represent the sole recovery available to Class 6 claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 6 claimants against the Archdiocese, the Reorganized Debtor or Non-Settling Insurers. The Trust shall fund the defense of the Archdiocese and the Reorganized Debtor as against any Litigation Claims brought by Class 6 Claimants, but only to the extent that the Archdiocese or Reorganized Debtor is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust shall advance funding to the Archdiocese and the Reorganized

Debtor with respect to any judgments or settlements of any Litigation Claims brought by Class 6 claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

To preserve coverage under Insurance Policies issued by Non-Settling Insurers, Class 6 and Class 7 claimants specifically reserve, and do not release, any and all claims that they may have against the Archdiocese or Reorganized Debtor that implicate coverage under Insurance Policies issued by Non-Settling Insurers. The Class 6 and Class 7 Claims will not be released or discharged against the Archdiocese or Reorganized Debtor until such claims are settled with the Archdiocese or Reorganized Debtor and its Insurers or are fully adjudicated, resolved and subject to Final Order. The eventual release of these Class 6  and Class 7Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). Regardless of this eventual release of the Archdiocese and Reorganized Debtor, the Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 6 and Class 7 Claims.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 6 and Class 7 Claims, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of distributions Class 6 and Class 7 claimants receive, or are entitled to receive, based on the Trust Distribution Plan. For the avoidance of doubt, determinations by the Tort Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Archdiocese's liability or damages for Class 6 or Class 7 Claims. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 6 and Class 7 Claims. Any such recoveries by the Trust from Non-Settling Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan. To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the assignment and transfer of the Transferred Insurance Interests to the Trust, results in a forfeiture of coverage, this Plan preserves the Non-Settling Insurers' rights to the extent required under their respective Insurance Policies and applicable law.

(c)    **Treatment**. Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 6 Claimants shall be assigned to, assumed and treated by the Trust as further provided in Article V, the Trust Agreement, and the Trust Distribution Plan. Class 6 Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan.

## 4.7    FUTURE TORT CLAIMS (CLASS 7).

(a)    **Definition**. A Class 7 Claim means a Future Tort Claim ("Class 7 Claim").

(b)    **Treatment**. Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 7 Claimants shall be assigned to, assumed and treated

CORE/3003233.0002/134357790.2

by the Trust as further provided in Article V, the Trust Agreement, and the Trust Distribution Plan. Class 7 Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan.  Class 7 claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 7 Claim pursuant to the factors in the Trust Distribution Plan. To preserve coverage under Insurance Policies issued by Non-Settling Insurers, Class 7 claimants specifically reserve any and all claims which Class 7 claimants may have against the Archdiocese or Reorganized Debtor. The Class 7 Claims will not be released against the Archdiocese or Reorganized Debtor until such Class 7 Claims are settled with the Archdiocese or Reorganized Debtor and its Insurers, or until such Class 7 Claims are fully adjudicated and determined and subject to Final Order. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 7 Claims. The eventual release of these Class 7 Claims will be pursuant to the principles set forth in Pierringer v. Hoger, 124 N.W.2d 106 (Wis. 1963) and Frey v. Snelgrove, 269 N.W.2d 918 (Minn. 1978). Regardless of this eventual release of the Archdiocese and Reorganized Debtor, the Class 7 Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 7 Claims.

**4.8    INTER-PARISH LOAN FUND AND ASSESSMENT OVERPAYMENT CLAIMS (CLASS 8)**.

(a)    **Definition**. A "Class 8 Claim" means a claim against the Archdiocese for (i) outstanding deposits made to the Inter-Parish Loan Fund or (ii) for assessment overpayments made by any Archdiocesan Parish prior to the Petition Date as set forth on Schedule 2.

(b)    **Treatment**. The Reorganized Debtor will assume the Archdiocese's participation in the Inter-Parish Loan Fund and all liabilities to Class 8 claimants on the Effective date. The Reorganized Debtor will cause to be paid Class 8 claims in accordance with the Archdiocese prior practices.

**4.9    TRADE VENDOR CLAIMS (CLASS 9)**.

(a)    **Definition**. A "Class 9 Claim" means an allowed claim against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date, as set forth on Schedule 3.

(b)    **Treatment**. Class 9 Claim holders shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 9 Claims, on the Effective Date.

**4.10    SECURED CLAIM OF PREMIER BANK (CLASS 10)**.

(a)    **Definition**. "Class 10 Claim" means the claim of Premier Bank under the mortgage executed by the Archdiocese in favor of Premier Bank, as renewed on May 16, 2011, describing and encumbering the Cathedral of Saint Paul ("Premier Mortgage") which secures the indebtedness arising under promissory note dated May 16, 2001 by and between the Cathedral of St. Paul and Premier Bank, as amended, (the "Premier Note").

**(b)    Treatment**. The Premier Mortgage shall remain undisturbed and the mortgagee may exercise any and all rights and remedies against the collateral referenced in such mortgage.

## 4.11   GUARANTY CLAIMS (CLASS 11).

**(a)    Definition**. A "Class 11 Claim" means a guaranty claim arising out of the prepetition guaranties executed by the Archdiocese listed on Exhibit B to this Plan.

**(b)    Treatment**. The Class 11 Claims shall remain undisturbed and the holders of such guaranties shall be entitled to exercise all available legal rights and remedies against the Reorganized Debtor.

## 4.12   OTHER TORT CLAIMS AND UNSECURED CLAIMS (CLASS 12).

**(a)    Definition**. A "Class 12 Claim" means (1) to the extent allowed, claims of Michael Schaefer (Claim No. 502) and MP Schaefer, LLC (Claim No. 503), and Jennifer Haselberger (Claim No. 668), (2) any claim arising out of the rejection of an executory contract, or (3) any unsecured claim that is not included in another class under this Plan. No claims held by Archdiocesan Parishes will be treated under Class 12.

**(b)    Treatment**. The holders of Class 12 Claims shall receive payment of their Pro Rata share of the sum of up to $50,000 to be paid from the Plan Implementation Account as soon as practicable after all Class 12 Claims have been allowed or disallowed.  In the event that the Class 12 Claims are less than $50,000, such excess amount shall be paid to the Trust for distribution to the holders of Class 6 and Class 7 Claims.

## 4.13   ABUSE RELATED CONTINGENT CLAIMS (CLASS 13).

**(a)    Definition**. A "Class 13 Claim" means a claim for contribution, indemnity or reimbursement arising out of the Archdiocese's liability to pay or defend against any Class 6 or Class 7 Claim and any entity subrogated to such claims.

**(b)    Treatment**. Class 13 Claims shall not receive or retain any property under this Plan in accordance with 11 U.S.C. §502(e).

## 4.14   ARCHDIOCESE MEDICAL AND DENTAL PLAN (CLASS 14)

**(a)    Definition**. A "Class 4 Claim" means a claim against the Archdiocese held by Catholic Entities arising from or related in any way to the collection and use of payments made by such claimant to the Archdiocese under the AMBP, including any claim arising from the administration by the Archdiocese of the AMBP.

**(b)    Treatment**. The Reorganized Debtor will assume the Archdiocese's participation in the AMBP and all liabilities to Class 14 claimants on the Effective Date. The Reorganized Debtor will continue to sponsor the AMBP and will cause to be paid

- 17 -

claims and administrative expenses under the AMBP in accordance with the Archdiocese's prior practices.

**4.15    PRIEST SUPPORT PAYMENTS (CLASS 15)**.

(a)    **Definition**. A "Class 15 Claim" means a claim for support or maintenance by any inactive Archdiocesan Priest.

(b)    **Treatment**. The Archdiocese has disclaimed any liability under civil law for Class 15 Claims and holders of Class 15 Claims shall receive no distribution under this Plan on account of such claims. Notwithstanding the fact that Class 15 Claims receive no distribution, the Reorganized Debtor may honor its post-Effective Date obligations with respect to inactive priests in accordance with the Archdiocese's prior practices.

**ARTICLE V**
**MEANS OF IMPLEMENTATION OF THE PLAN**

**5.1    IMPLEMENTATION**. On and after the Effective Date, this Plan will be implemented and consummated through the means contemplated by Section 1123 of the Bankruptcy Code.

**5.2    FUNDING THIS PLAN**.

(a)    **Reorganized Debtor Operations**. Ordinary course post-Effective Date operations of the Archdiocese shall continue to be paid from ordinary operating income of the Reorganized Debtor.

(b)    **Funding Options**.    Under this Plan and in accordance with Section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court will determine the liquidation value of the Debtor's interest in those assets identified on Exhibit C to this Plan at a valuation hearing prior to confirmation.  The Debtor will then transfer its assets or an amount equal to the liquidation value of those assets into the Trust. The Debtor may fund the Plan as it deems appropriate.  For the avoidance of doubt, the Debtor's assets need not be sold or otherwise liquidated through this Plan. Instead those assets may be revested into the Reorganized Debtor (i.e., title to the assets can be maintained by the reorganized Archdiocese after the Effective Date).  Among other things, the Reorganized Debtor may elect to keep the Cathedral and real property interests in the Benilde-St. Margaret High School, Grace High School d/b/a Totino-Grace High School, and DeLaSalle High School. Creditor claims will not be paid in full by this Plan.

(c)    **Retentions for Insurance Coverage**. The Reorganized Debtor will fund all retentions for ongoing insurance coverage after the Effective Date.

(d)    **Trust Assets and The Plan Implementation Account**. On or before the Effective Date, the Reorganized Debtor will establish the Plan Implementation Account,

CORE/3003233.0002/134357790.2

which account will be held and administered in accordance with the Plan, the Insurance Settlement Agreements, and the Confirmation Order.

Upon establishment of the Plan Implementation Account, the Debtor will deposit a minimum of $10,000,000 into the Plan Implementation Account via wire transfer.

Additionally, the Debtor will transfer its assets or an amount equal to the liquidation value of its assets (excluding items identified in § 5.2(e) below and less the $10,000,000 deposit referenced in the preceding paragraph) to the Trust (i) within 30 days after the Effective Date; or (ii) if the Debtor prefers, in three equal, annual installments beginning one year after the Effective Date.  If the Debtor elects option (ii) above, the amount owing by the Reorganized Debtor to the Trust shall bear interest at the Prime rate as reported by The Wall Street Journal until the entire amount is paid in full. There will be no penalty assessed for prepayment of any amounts due.  The liquidation value of the Debtor's assets shall be the total liquidation value as determined by the Bankruptcy Court at the valuation hearing prior to confirmation as indicated above in § 5.2(b).

The Reorganized Debtor or Archdiocese (as applicable) shall deposit sufficient funds —the amount to be determined in consultation with the Trustee — from the Plan Implementation Account to create a reserve to be held in a banking institution designated as an authorized depository under the U.S. Trustee guidelines, in an amount sufficient to pay all Allowed Administrative Claims, Priority Claims, Disputed Administrative Claims and Disputed Priority Claims (the "Administrative Claim Reserve"). Any amounts remaining in the Administrative Claim Reserve after resolution of all Administrative and Priority Claims will be immediately transferred to the Trust.

The Reorganized Debtor or Archdiocese (as applicable) shall also deposit sufficient funds from the Plan Implementation Account to create a reserve to be held in a banking institution designated as an authorized depository under the U.S. Trustee guidelines, in the amount of $50,000 to pay holders of Class 12 Claims in accordance with § 4.12(b) of this Plan (the "Class 12 Reserve"). Any amounts remaining in the Class 12 Reserve after all Class 12 Claims have been allowed or disallowed will be immediately transferred to the Trust.

All funds other than the Administrative Claim Reserve and the Class 12 Reserve remaining in the Plan Implementation Account following the establishment of the Administrative Claim Reserve and Class 12 Reserve shall be promptly paid to the Trust, less another reserve for Disputed claims (other than Tort Claims) in an amount determined by the Reorganized Debtor in consultation with the Trustee.

Any amounts remaining in the Plan Implementation Account after resolution of all Disputed Claims will be immediately transferred to the Trust, and the Plan Implementation Account will be closed as soon as practicable thereafter.

**(e)     Non-Cash Assets Transferred Directly to the Trust**. Upon establishment of the Trust, the following will be automatically and without further act or

deed be assigned and transferred directly to the Trust for administration in accordance with the Trust Agreement and the Trust Distribution Plan:

(1)     The Transferred Insurance Interests in accordance with Section 6.1;

(2)     The Archdiocese's claim in the liquidation proceeding of Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $14,200,000;

(3)     To the extent they exist, any and all claims or Causes of Action against any Party: (i) to avoid, set aside, or recover any payment or other transfer made to any party under Section 547, 548, 549, and/or 550 of the Bankruptcy Code, (ii) to avoid, set aside, or recover any payment or other transfer made to any party under any applicable State law(s), and (ii) any proceeding to avoid or set aside any Interest of a party in property under Section 544 of the Bankruptcy Code; and

(4)     Cash held by the Debtor in the Riley Fund account, and any and all claims between the Archdiocese and the Cathedral of St. Paul regarding competing claims to the Riley Fund.

**(f)     Worker's Compensation Cash Deposit.**   As part of the liquidation valuation of the Debtor's assets as provided for in § 5.2(b) above, the Bankruptcy Court will determine the liquidation value of the Debtor's interest in the deposit held by the Minnesota Department of Commerce for worker's compensation liability including, without limitation, the $254,920 in accrued interest and excess funds the Debtor received permission to withdraw from the deposit in October 2015.

**(g)     Other Claims.** This Plan preserves the rights of all creditors against third parties including parishes.  For the avoidance of doubt, this Plan is not intended to, and does not, affect any rights of any creditor against any parish.

## ARTICLE VI
## CREDITOR TRUST

**6.1     THE TRUST**.

**(a)     Purpose, Formation and Assets**. The Trust shall be established for the purposes described in this paragraph. The Trust shall receive the transfer and assignment of assets as provided in Articles V and VI, including from amounts transferred from the Plan Implementation Account, Settling Insurer Contributions, and the Transferred Insurance Interests, of which the Trust is, and shall be deemed to be, the sole assignee. The Trust shall make distributions to the Class 6 and Class 7 claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust shall fund the defense of the Archdiocese and Reorganized Debtor as against any Litigation Claims brought by Class 6 and Class 7 claimants, but only to the extent that the Archdiocese or Reorganized Debtor is not defended or otherwise reimbursed for its defense expenses by

- 20 -

any Insurer. The Trust shall advance funding to the Archdiocese and Reorganized Debtor with respect to any judgments or settlements of any Litigation Claims brought by Class 6 and Class 7 claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. The Trust shall fund the costs and expenses in executing these functions, all such functions to be executed in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan, with the aim of preserving, managing and maximizing Trust Assets to pay Class 6 and Class 7 claimants and with no objective to continue or engage in the conduct of a trade or business. The proposed Trust Agreement is attached hereto as <u>Exhibit D</u>.

(b) **Transferred Insurance Interests**. In addition to the funds transferred to the Trust from the Plan Implementation Account and the assets transferred directly to the Trust pursuant to Article V, the Interests delineated in Section 6.1(b)(2) and defined as <u>Transferred Insurance Interests</u> are additional Trust Assets.

(1) The Transferred Insurance Interests are hereby assigned and transferred to the Trust automatically and without further act or deed. The foregoing assignment and transfer shall not be construed as an assignment and transfer of the Insurance Policies.

(2) The Archdiocese's and Reorganized Debtor's interests in and rights to proceeds under the Insurance Policies are vested in the Trust notwithstanding any state law or private contractual provisions to the contrary, and such vesting of rights shall not diminish nor impair the coverage provided under any of the Insurance Policies. The assignment and transfer shall not affect any duty to defend under the Insurance Policies, but to the extent that a failure to defend or a separate agreement between the Archdiocese or Reorganized Debtor gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trustee shall be entitled to the benefit of such monetary obligation or policy proceeds. The Trustee shall be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 6 Claim. The Trust shall be fully authorized to act in its own name, or in the name of the Archdiocese or Reorganized Debtor, to enforce any right, title or interest of the Archdiocese and the Reorganized Debtor in the Transferred Insurance Interests. The Trust shall have the right to pursue judgment against Non-Settling Insurers to determine the existence and amount of coverage available for the Archdiocese's liability for Class 6 Claims. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact that the Archdiocese is in bankruptcy or by any distribution from the Trust to any Class 6 claimant. Any recovery by the Trustee on an action against a Non-Settling Insurer for a determination of coverage for the Archdiocese's liability for Class 6 Claims shall become a Trust Asset and shall be distributed as provided in this Plan, the Trust Agreement, and the Trust Distribution Plan.

(3) The foregoing assignment and transfer of the Transferred Insurance Interests does not affect the Archdiocese's, the Reorganized Debtor's or

CORE/3003233.0002/134357790.2

any Non-Settling Insurer's right to contest the Archdiocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the assignment and transfer of the Transferred Insurance Interests, the Archdiocese and Reorganized Debtor shall not be relieved of any obligations or duties under any Insurance Policy (including without limitation any duty to cooperate) and shall continue to honor such duties and obligations as required by such applicable Insurance Policies and applicable law. The transfer and assignment of the Transferred Insurance Interests does not affect any insurers' rights, obligations or duties under applicable Insurance Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Tort Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Archdiocese or the Reorganized Debtor.

(4)      The determination of whether the assignment and transfer of the Transferred Insurance Interests provided for in this Section is valid, and does not void, defeat or impair the insurance coverage issued by the Non-Settling Insurers, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include Non-Settling Insurers) fails to timely file an objection to the proposed assignment and transfer of the Transferred Insurance Interests or other terms of the Plan related to the Insurance Policies by the date set to file such objections, that party in interest shall be deemed to have irrevocably consented to the assignment and transfer of Transferred Insurance Interests and other Plan terms related to the Insurance Policies and will be forever barred from asserting that the assignment and transfer of the Transferred Insurance Interests or other Plan terms affect the ability of the Trust or Class 6 claimants to pursue the Non-Settling Insurers, or any of them, for insurance coverage. In the event that the Bankruptcy Court enters a Final Order that the assignment and transfer of the Transferred Insurance Interests is valid and does not defeat or impair coverage of the Non-Settling Insurers, following the Effective Date, the Archdiocese and Reorganized Debtor shall not be relieved of any obligations under the Non-Settling Insurers' Insurance Policies. In order to ensure that the Archdiocese and Reorganized Debtor will abide by applicable obligations under the Insurance Policies, any release, discharge and/or injunction issued as a result of this Plan or in connection with this bankruptcy shall not encompass any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations under the Insurance Policies thereby causing the Trust to suffer damages, including in the amount of the insurance coverage lost as a result of the breach, and such a claim shall be an allowed claim for breach of contract against the Reorganized Debtor.

(c)      **Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries**. If the Bankruptcy Court does not enter a Final Order approving the assignment and transfer of the Transferred Insurance Interests to the Trust, then pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is hereby appointed as the representative of the

- 22 -

Archdiocese's Estate for the purpose of retaining and enforcing all of the Archdiocese's and the Estate's interests under the Non-Settling Insurers' Insurance Policies against the Non-Settling Insurers with respect to the Class 6 Claims. Any recoveries on such interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trust as the Archdiocese's and the Estate's representative is valid, and does not defeat or impair the insurance coverage otherwise provided by Non-Settling Insurers, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue Non-Settling Insurers, or any of them, for insurance coverage. The foregoing appointment does not affect the Archdiocese's, the Reorganized Debtor's or any Non-Settling Insurer's right to contest the Archdiocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the appointment, the Archdiocese and Reorganized Debtor shall not be relieved of any obligations or duties under any Insurance Policy and shall continue to honor such duties and obligations as required by such applicable Insurance Policies and applicable law. The appointment does not affect any Non-Settling Insurers' rights, obligations or duties under applicable Insurance Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Class 6 or Class 7 Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Archdiocese or the Reorganized Debtor. In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair coverage issued by the Non-Settling Insurers, then, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Archdiocese and Reorganized Debtor under the Non-Settling Insurers' Insurance Policies as are necessary to act as the representative of the Archdiocese, Reorganized Debtor and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trust's appointment shall not relieve the Archdiocese or the Reorganized Debtor from any obligation that such entities may have under the Non-Settling Insurers' Insurance Policies. Nothing contained in this section shall affect the rights and remedies of a Person who also is an insured or additional insured with the Archdiocese or is asserting rights under an Insurance Policy.

(1)   In the event that a Final Order is entered holding that: (a) the assignment of the Transferred Insurance Interests, or (b) the appointment of the Trust as the Archdiocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Archdiocese and the Reorganized Debtor will retain their Interests under each Insurance Policy.

(i)   At the reasonable request of the Trust, the Reorganized Debtor will assert its Interests against a Non-Settling Insurer, including, but not limited to, by filing a lawsuit for recovery of policy proceeds. The

- 23 -

Reorganized Debtor will cooperate and assist the Trust in enforcing any right or prosecuting any claim based on the Transferred Insurance Interests. This cooperation includes, but is not limited to, providing access to documents and electronic information and providing clergy, employees, agents, and volunteers to testify in depositions and at trial. If the Reorganized Debtor fails to cooperate and assist the Trust as set forth herein, then any release, discharge and/or injunction issued as a result of this Reorganization Plan or in connection with this bankruptcy shall not encompass any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations owed to the Trustee hereunder thereby causing the Trust to suffer damages, including in the amount of the insurance coverage lost as a result of the breach, and such a claim shall be an allowed claim for breach of contract against the Reorganized Debtor.

(ii)     Notwithstanding the terms of this section, the division of recoveries under Section 6.2(g)(2) are binding on the Trust.

(iii)     The Reorganized Debtor shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court that are incurred by the Reorganized Debtor in pursuing its Interests in Non-Settling Insurers' Insurance Policies pursuant to this Section 6.1(c)(1).

(iv)     Upon receipt by the Reorganized Debtor, all recoveries received by the Reorganized Debtor from Non-Settling Insurers shall be deemed to be held in trust for the benefit of the Trust and shall be remitted by the Reorganized Debtor to the Trust as soon as practicable following the Reorganized Debtor's receipt of such recoveries.

(d)     **Vesting**. On the Effective Date, all Trust Assets shall vest in the Trust, and the Archdiocese shall be deemed for all purposes to have transferred all Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets, the Reorganized Debtor shall have no further interest in or with respect to the Trust Assets.

## 6.2     TREATMENT OF CLASS 6 AND CLASS 7 CLAIMS.

(a)     **Trust Liability**. On the Effective Date, the Trust shall automatically and without further act or deed assume all liability for preserving, managing and distributing Trust Assets to Class 6 and Class 7 claimants pursuant to the Trust Distribution Plan. The Trust does not assume any liabilities of the Archdiocese or Reorganized Debtor, nor does it assume liabilities of the Settling Insurers with respect to any potential claims of Non-Settling Insurers, including claims for contribution, subrogation or indemnity The Trust's payment of Class 6 and Class 7 Claims is not a release of the Debtor consistent with the provisions of Section 14.2 of this Plan, nor an accord or novation of the Debtor's liability on account of the Class 6 Claims. The Archdiocese will not be entitled to the discharge

CORE/3003233.0002/134357790.2

provided by 11 U.S.C. § 1141(d) with respect to any Class 6 or Class 7 Claim until such time as all Class 6 and Class 7 Claims are settled with the Archdiocese or Reorganized Debtor and the Non-Settling Insurers or such Class 6 and Class 7 Claims are fully adjudicated and determined subject to a Final Order. Until such time, the Archdiocese and Reorganized Debtor will continue to have all liability for the Class 6 and Class 7 Claims and shall not be relieved of any obligations under the Non-Settling Insurers' Insurance Policies. In order to ensure that the Archdiocese and Reorganized Debtor will abide by applicable obligations under the Insurance Policies, any release, discharge and/or injunction issued as a result of this Reorganization Plan or in connection with this bankruptcy shall not encompass any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations under the Insurance Policies thereby causing the Trust to suffer damages, including in the amount of the insurance coverage lost as a result of the breach, and such a claim shall be an allowed claim for breach of contract against the Reorganized Debtor. With respect to all other claims, except as otherwise provided in the Plan, Debtor's liability on account of such claims shall be discharged pursuant to the provisions of 1141(d). The eventual release of these Class 6 and Class 7 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). Regardless of this eventual release of the Archdiocese and Reorganized Debtor, the Class 6 and Class 7 claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 6 and Class 7 Claims.

(b)    **Payment of Class 6 and Class 7 Claims**. The Trust shall pay Class 6 and Class 7 Claims in accordance with the terms of the Plan, the Confirmation Order, the Trust Agreement and the Trust Distribution Plan. The Archdiocese or the Reorganized Debtor shall reasonably cooperate with the Tort Claims Reviewer and the Trustee as requested by the Tort Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Trust Distribution Plan, but shall not be required to act in any way that violates any contractual duty to cooperate with a Non-Settling Insurer. Under no circumstance shall the Tort Claims Reviewer's review of a Class 6 or Class 7 Claim or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer.

(c)    **Distributions to Qualified Claimants**. The Tort Claims Reviewer shall determine whether a Class 6 or Class 7 claimant is entitled to a distribution under the Trust Distribution Plan ("Qualified Claimant"). For all Qualified Claimants, the Tort Claims Reviewer will determine the number of points to be assigned to the Qualified Claimant pursuant to the Trust Distribution Plan. The Trust will notify every Qualified Claimant of his or her assigned number of points and will mail every Qualified Claimant a Claim Resolution Agreement, attached as <u>Exhibit E</u>. In order to receive any distribution from the Trust, the Qualified Claimant must execute the Claim Resolution Agreement and mail it back to the Tort Claims Reviewer by First Class Mail, Postage Paid. In the Claim Resolution Agreement, the Class 6 or Class 7 claimant shall release any Settling Insurer from further liability on the Class 6 or Class 7 Claim and waive any right to pursue a direct action under Minn. Stat. § 60A.08, subd. 6 or other applicable law against any Settling Insurer. Once the Tort Claims Reviewer receives the executed Claim Resolution Agreement, the Trust will make an immediate partial distribution to such

Qualified Claimant pursuant to the terms of the Trust Distribution Plan. The amount of initial distribution each Qualified Claimant receives will be based on his or her assigned points, with each Qualified Claimant sharing pro rata in the Trust Assets to be distributed to Qualified Claimants. The Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Archdiocese's or Reorganized Debtor's liability for, or damages with respect to, any Class 6 or Class 7 Claim. By accepting a distribution, a Qualified Claimant does not release the Archdiocese, Reorganized Debtor or any third party from liability for the Class 6 or Class 7 Claims. In executing a Claim Resolution Agreement, the Qualified Claimant releases all Settling Insurers from further liability on such Qualified Claimant's Class 6 or Class 7 Claims, but the Qualified Claimant expressly retains and reserves all rights and claims against the Archdiocese, Reorganized Debtor, third parties and Non-Settling Insurers. The Qualified Claimant is entitled to future distributions from the Trust if additional Trust Proceeds become available as a result of settlements with a Non-Settling Insurer or any judgment awarded and collected by the Trust or a Litigation Claimant. The Trust will make any such supplemental payments to Class 6 and Class 7 claimants on a periodic basis accumulating such recoveries and in accordance with the Trust Agreement and Trust Distribution Plan.

(d)    **Election**. No later than thirty (30) business days after a Class 6 or Class 7 claimant is notified of his or her status as a Qualified Claimant and the number of his or her assigned points under the Trust Distribution Plan, the Qualified Claimant shall elect in writing one of the following treatment alternatives:

(1)    **Treatment of a Qualified Claimant Pursuant to Trust Distribution Plan**. A Qualified Claimant may elect to have his or her Class 6 or Class 7 Claim be treated as a "Distribution Plan Claim". By accepting a partial distribution, a Distribution Plan Claimant does not waive any rights against the Archdiocese or Reorganized Debtor and other parties with respect to the Class 6 or Class 7 Claim(s) and will be entitled to future distributions if additional Trust Proceeds become available from settlements with Non-Settling Insurers or from judgments awarded and collected by the Trust or Litigation Claimants, until such Distribution Plan Claimant has received the full amount of damages awardable to such Distribution Plan Claimant under the terms of the Trust Distribution Plan. A Class 6 or Class 7 claimant electing treatment as a Distribution Plan Claimant retains the right to pursue (a) a monetary judgment against the Archdiocese or Reorganized Debtor, as well as any third person, for his or her Class 6 or Class 7 Claim for its full amount according to proof; and (b) a direct action against any Non-Settling Insurer to the extent allowed by applicable law, including Minn. Stat. § 60A.08, subd. 6. A Distribution Plan Claimant, however, is not entitled to recover the additional amounts potentially awardable by the Trust to a Litigation Claimant in the event of a judgment or settlement on his or her Tort Claim(s), as set forth in Section 6.2(g) below.

or

(2)      **Treatment of a Qualified Claimant as a Litigation Claimant**. A Qualified Claimant that elects treatment as a litigation claim ("Litigation Claimant") will have the same rights as Distribution Plan Claimants to initial and future distributions from the Trust up to the full damages awardable to such Distribution Plan Claimant under the terms of the Trust Distribution Plan. A Litigation Claimant that recovers a judgment or settlement will also be entitled to an additional award as set forth in Section 6.2(i) below. A Litigation Claimant retains the right to pursue (a) a monetary judgment against the Archdiocese or Reorganized Debtor, as well as any third person, for his or her Class 6 or Class 7 Claim for its full amount according to proof; and (b) a direct action against any Non-Settling Insurer to the extent allowed by applicable law, including Minn. Stat. § 60A.08, subd. 6 (each a "Litigation Claim"). A Litigation Claimant's recovery on a Litigation Claim is limited as provided herein.

(e)      **Modification of Treatment Election.**

(1)      If a Qualified Claimant does not make one of the elections the claimant irrevocably will be treated as a Distribution Plan Claimant.

(2)      Upon written notice to the Trustee, subject to the Trustee's sole and absolute discretion, a Class 6 or Class 7 claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant. Notwithstanding the foregoing, the Trustee shall consent to a Class 6 or Class 7 claimant's rescission if such written notice of rescission is given prior to entry of an order of dismissal or a final judgment on the Litigation Claim in favor of the Archdiocese or Reorganized Debtor.

(3)      No later than ten (10) days after the date of his or her initial election to be a Distribution Plan Claimant, a Class 6 or Class 7 claimant may rescind the election to be treated as a Distribution Plan Claimant in favor of being treated as a Litigation Claimant.

(f)      The Trust retains the right to pursue Non-Settling Insurers for the Archdiocese's and Reorganized Debtor's liability to Class 6 and Class 7 claimants regardless of whether the Class 6 or Class 7 claimants elect treatment as Distribution Plan Claimants or Litigation Claimants.

(g)      **Legal Effect of Estimation of Claims and Distributions under Trust Distribution Plan**. The Tort Claims Reviewer shall review Class 6 and Class 7 Claims and determine whether the claimant is a Qualified Claimant. For each Qualified Claimant, the Tort Claims Reviewer will determine number of points to be assigned. The Tort Claims Reviewer's determinations are for estimation purposes only and shall not be a finding or fixing of the fact or liability or the amount payable for any Class 6 or Class 7 Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan. The determination of qualification, estimation of claims, assignment of points, and payment of distributions is not an admission of liability by the Archdiocese, the Reorganized Debtor or the Trust with respect to any Class 6 or

- 27 -

Class 7 Claims and has no res judicata or collateral estoppel effect on the Archdiocese, the Reorganized Debtor, the Trust or any Non-Settling Insurer. The determination of qualification, estimation of claims, assignment of points and payment of distributions is not a settlement, release, accord or novation of Class 6 or Class 7 Claims and cannot be used by any third party as a defense to any alleged joint liability. The estimation of claims, assignment of points and payment of partial distributions does not impair a Litigation Claimant's rights to collect a judgment, including a judgment based on joint and several liability, against the Archdiocese, Reorganized Debtor, any Non-Settling Insurer or other Person, but any such judgment awarded to a Litigation Claimant will be reduced by the amount of distributions already paid by the Trust to such Litigation Claimant on his or her Class 6 or Class 7 Claim(s). Neither the Tort Claims Reviewer's review of a Class 6 or Class 7 Claim and determination of qualification, nor the Trust's estimation of claims, assignment of points or payment of distributions shall (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Archdiocese, Reorganized Debtor, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Class 6 or Class 7 Claim, either individually or in the aggregate with other Class 6 or Class 7 Claims, in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of claims, assignment of points and payment of distributions does not constitute a triggering event for liability under any Insurance Policy nor does it create an admission of the fact of liability or the extent of damages on behalf of the Archdiocese or Reorganized Debtor.

      **(h)**     Each Class 6 and Class 7 claimant may elect, in lieu of assessment by the Tort Claims Reviewer, to have his Tort Claim treated pursuant to the convenience claim process as provided by the Trust Distribution Plan ("Convenience Claim").

      **(i)**     **Litigation Claims**. In the event a Litigation Claimant obtains a judgment against the Archdiocese or Reorganized Debtor or achieves a settlement with the Archdiocese, Reorganized Debtor and/or any Non-Settling Insurer on his or her Class 6 or Class 7 Claim, then such recovery will be turned over to the Trust for distribution pursuant to this Plan.

      (1)     In the event that a Litigation Claimant obtains a judgment against the Archdiocese or Reorganized Debtor and no Non-Settling Insurer is implicated by the Litigation Claim, then the judgment will be satisfied by the Trust in the amount of such judgment against the Archdiocese or Reorganized Debtor, up to the total amount awardable to such Litigation Claimant under the Trust Distribution Plan plus reasonable attorney's fees and costs and $500.

      (2)     In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and (a) either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or (b) the Litigation Claimant obtains a judgment against the Archdiocese or Reorganized Debtor and either (i) the Trust or (ii) the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust for distribution pursuant to this Plan. Such recovery shall first go to

reimburse the Trust or the Litigation Claimant, as the case may be, for all reasonable attorneys' fees and costs incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim. Any remaining amount of any such recovery shall be divided as follows:

(i)     If a settlement is obtained with the Archdiocese, Reorganized Debtor, or Non-Settling Insurer(s) on the Litigation Claim before any judgment was obtained in the Litigation Claim, then the Litigation Claimant is entitled to receive a portion of such settlement up to a maximum amount of: the total amount awardable for that Litigation Claimant's Litigation Claim under the Trust Distribution Plan plus 15% of the total settlement, with the remainder to go to the Trust. The 15% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the total amount awardable under the Trust Distribution Plan for that Litigation Claimant's Claim plus the 15%.

(ii)    If a judgment is obtained on the Litigation Claim and the resolution with or judgment against the Archdiocese, Reorganized Debtor, or Non-Settling Insurer is obtained thereafter, then the Litigation Claimant is entitled to receive a portion of such judgment or settlement up to a maximum amount of: the total amount awardable for that Litigation Claimant's Litigation Claim under the Trust Distribution Plan plus 30% of the total settlement or judgment, with the remainder to go to the Trust. The 30% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the total amount awardable under the Trust Distribution Plan for that Litigation Claimant's Claim plus the 30%.

(3)     The Trust's payment to a Litigation Claimant that has recovered a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds respecting such Class 6 or Class 7 Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

(4)     If a Non-Settling Insurer has failed or refused to defend the Archdiocese or Reorganized Debtor with respect to any Tort Claim, the Trust will advance reasonable attorneys' fees and other expenses incurred in defending the Tort Claim. If any Non-Settling Insurer has refused to indemnify the Archdiocese or Reorganized Debtor with respect to any settlement or judgment of a Tort Claim that is litigated, the Trust will advance the Archdiocese or Reorganized Debtor for any judgment or settlement incurred by the Archdiocese or Reorganized Debtor on such Tort Claim, provided the Trust has consented in advance to any such settlement, such consent not to be withheld unreasonably.  If all insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, the Tort Claimant will sign a covenant not to execute against the Archdiocese's and/or Reorganized Debtor's assets (other than insurance policies or proceeds), under which the Tort Claimant will agree to seek

recovery only from Non-Settling Insurers for any judgment the Tort Claimant obtains against the Archdiocese and/or Reorganized Debtor. If any judgment on any Tort Claim is within the retention of any Insurance Policy, and all insurers have denied indemnity for such judgment, then the Trust will fund the judgment. The Trust's advancement to the Archdiocese or Reorganized Debtor for such defense costs and/or judgment or settlement payments, and any distributions made by the Trust to any Qualified Claimant will not affect, diminish or impair the Trust's right to bring any claims against any Non-Settling Insurer for refusing to defend and/or indemnify the Archdiocese or Reorganized Debtor, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law.

**(j)**     Nothing in the Plan, Confirmation Order or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Class 6 or Class 7 Claim, or grant to any Person any right to sue any Insurer directly, in connection with a Class 6 or Class 7 Claim or any Insurance Policy. Such rights shall be determined by and in accordance with the terms of the Insurance Policies and applicable law. Nothing provided for in this Plan, the Trust Agreement, or the Trust Distribution Plan constitutes an endorsement of a Class 6 or Class 7 claimant's right to pursue their remedies under Minn. Stat. § 60A.08.

**(k)**     If the Litigation Claimant fails to prosecute his Litigation Claim to final judgment or settlement of the claim, or a Final Order is entered finding that the Archdiocese or Reorganized Debtor has no liability to such Class 6 or Class 7 claimant on account of his or her Class 6 or Class 7 Claim, the Litigation Claimant will not be entitled to any further distributions from the Trust and the Litigation Claimant shall have no recourse against the Trustee, the Trust, the Archdiocese, the Reorganized Debtor, or any Settling Insurer.

**(l)**     **Objections and Litigation After the Effective Date.**

(1)     Regardless of whether a Class 6 or Class 7 claimant elects treatment as a Distribution Plan Claimant or a Litigation Claimant, the Trustee may object to that Class 6 or Class 7 claimant's Claim. The Trustee's right to object to a Class 6 or Class 7 claimant's Claim after the Effective Date will not affect or impair any right the Archdiocese, Reorganized Debtor and/or Non-Settling Insurers may have under the Insurance Policies or applicable law to object to such Class 6 and Class 7 Claims.

(2)     The Archdiocese or Reorganized Debtor will continue to comply with all obligations under the Non-Settling Insurers' Insurance Policies and applicable law. In order to ensure that the Archdiocese and Reorganized Debtor will abide by applicable obligations under the Insurance Policies, any release, discharge and/or injunction issued as a result of this Reorganization Plan or in connection with this bankruptcy shall not encompass any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations under the Insurance Policies thereby causing the Trust to suffer damages, including in the

- 30 -

amount of the insurance coverage lost as a result of the breach, and such a claim shall be an allowed claim for breach of contract against the Reorganized Debtor.

**(m)    Claim Withdrawal**. A Class 6 or Class 7 claimant may withdraw his or her Class 6 or Class 7 Claim at any time on written notice to the Trustee. If withdrawn, (a) the Class 6 or Class 7 Claim will be withdrawn with prejudice and may not be reasserted; and (b) as a condition to withdrawal of the Class 6 or Class 7 Claim, any funds distributed to the Class 6 or Class 7 claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust. The Archdiocese, the Reorganized Debtor, any Insurer and the Trust shall retain any and all defenses that may exist in respect to such Class 6 or Class 7 Claim.

## 6.3    NON-SETTLING INSURERS.

### (a)    Preservation of Rights and Obligations.

(1)    In the event: (i) a Class 6 or Class 7 Claim is pursued in state or federal court by a Class 6 or Class 7 claimant against the Archdiocese or Reorganized Debtor, or (ii) the Trust asserts an objection to or otherwise seeks a determination of liability as to a Class 6 or Class 7 Claim, then the Archdiocese, Reorganized Debtor, the Trust and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist in respect of such Class 6 or Class 7 Claim and all coverage defenses. The rights, duties and obligations of each Non-Settling Insurer and the Archdiocese or Reorganized Debtor under the Insurance Policies with respect to such Class 6 or Class 7 Claim are not impaired, altered, reduced, or diminished by: (a) any distribution to Class 6 or Class 7 claimants pursuant to this Plan, the Trust Agreement, and the Trust Distribution Plan; (b) the transfer and assignment of the Archdiocese's Transferred Insurance Interests in the Insurance Policies issued by the Non-Settling Insurers; (c) releases granted to Settling Insurers under the Plan; or (d) any other provision of this Plan, the Trust Agreement, or the Trust Distribution Plan. Non-Settling Insurers retain any defenses that they would be able to raise if the claim for coverage were brought by the Archdiocese or Reorganized Debtor, except any defense (1) related to the transfer of Transferred Insurance Interests to the Trust; (2) effected by operation of bankruptcy law as a result of confirmation; or (3) based on facts determined by the Bankruptcy Court in connection with the confirmation.

(2)    The rights and obligations of the Archdiocese, the Reorganized Debtor, and other insureds and every Non-Settling Insurer under the terms of the Non-Settling Insurers' Insurance Policies and at law shall not be affected by the assessment of any Class 6 or Class 7 Claim (including without limitation any duty of an insured to cooperate), and shall be treated as if the Class 6 or Class 7 Claim had never been assessed for distribution purposes by the Trust.

(3)    Upon consent of the Trustee, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves a settlement agreement between the Person and the Trustee. After the Effective Date, the

CORE/3003233.0002/134357790.2

Trustee shall have the exclusive authority to seek approval of such agreement. Upon the Bankruptcy Court's entry of a Final Order approving such agreement, Exhibit L shall be amended by the Trustee to include such Person. Any such Person shall have all of the rights, remedies and duties of a Settling Insurer notwithstanding that such Person originally may have been excluded as a Non-Settling Insurer under any provision of the Plan. The Bankruptcy Court's retained jurisdiction to approve an agreement under this Article shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

(b)     **Estimations/Assessments Are Not Binding**. Assessment of Class 6 and Class 7 Claims by the Tort Claim Reviewer under the Trust Distribution Plan, the Trust's assignment of points to Class 6 and Class 7 Claimants, and the Trust's payment of distributions shall be without prejudice to any and all rights of the Trust, the Archdiocese, the Reorganized Debtor, the Non-Settling Insurers and Class 6 and Class 7 claimants in all other contexts and forums and shall not be deemed to be a determination of liability of the Archdiocese or a determination of whether, or the extent to which, such claim is covered under any Insurance Policy. The fact a claim has been estimated for distribution purposes has no res judicata or collateral estoppel effect and is not a binding determination on any issue or the creation of a liquidated non-bankruptcy claim. The assessment by the Tort Claims Reviewer under the Trust Distribution Plan shall have no effect upon any "no action" provisions contained in any Insurance Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law. Rather, the liability of the Archdiocese or Reorganized Debtor and the amount owed by the Archdiocese, Reorganized Debtor and any Non-Settling Insurer on any Class 6 or Class 7 Claim, shall be determined by: (i) the amount of any court judgment obtained by the Class 6 or Class 7 claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Archdiocese, or the Reorganized Debtor to the Non-Settling Insurer under the respective Insurance Policy or applicable law.

(c)     The rights of the parties under the Insurance Settlement Agreements shall be determined exclusively under the Insurance Settlement Agreements and those provisions of the Approval Orders and the Confirmation Order implementing the Insurance Settlement Agreements.

(d)     **This Plan is Neutral as to Insurance Policies**. For the avoidance of doubt, and solely with respect to the Non-Settling Insurers, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, the Confirmation Order, or any other order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer, the Archdiocese, the Reorganized Debtor, the Trust, or any other insureds under any Insurance Policy in any manner, including any defenses to any claim for insurance; (ii) shall constitute a settlement or resolution of the Archdiocese's or Reorganized Debtor's liability to a claimant; (iii) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or

CORE/3003233.0002/134357790.2

contractual rights or obligations under any Insurance Policy in any respect; or (iv) shall otherwise determine the application or non-application of any provision of any Insurance Policy and any such rights and obligations shall be determined under the Insurance Policy and applicable law.

(e)    **The Archdiocese's Obligations Survive**. Notwithstanding the assignment and transfer of the Transferred Insurance Interests to the Trust, the Archdiocese and Reorganized Debtor shall not be relieved of any duties or obligations under any Insurance Policies (except as provided to the contrary in any Insurance Settlement Agreement), and shall continue to perform such duties as required by such Insurance Policies and applicable law. In order to ensure that the Archdiocese and Reorganized Debtor will abide by applicable duties and obligations under the Insurance Policies, any release, discharge and/or injunction issued as a result of this Reorganization Plan or in connection with this bankruptcy shall not encompass any claim by the Trust that the Archdiocese and/or Reorganized Debtor breached obligations under the Insurance Policies thereby causing the Trust to suffer damages, including in the amount of the insurance coverage lost as a result of the breach, and such a claim shall be an allowed claim for breach of contract against the Reorganized Debtor.

## 6.4    TRUST POWERS WITH RESPECT TO CLASS 6 AND CLASS 7 CLAIMS AND NON-SETTLING INSURERS.

(a)    With the consent of the Trustee, the Archdiocese or Reorganized Debtor may enter into a settlement of a Class 6 or Class 7 Claim allowed by applicable non-bankruptcy law including but not limited to settlements consistent with *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) or *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994), and may enter into an arrangement with Class 6 or Class 7 claimant's counsel providing such counsel will receive reasonable compensation from any recovery from the Archdiocese, the Reorganized Debtor or a Non-Settling Insurer as provided in Section 6.2.

(b)    The Trustee may use the Trust Assets, to prosecute litigation against the Non-Settling Insurers.

(c)    If the Trust successfully resolves an insurance coverage dispute or otherwise receives a recovery of insurance proceeds relating to any Class 6 or Class 7 Claim(s), such proceeds shall become Trust Assets, and shall increase the amount available to pay Class 6 and Class 7 Claims, pursuant to the Trust Distribution Plan. In such event, and on a periodic basis accumulating all such recoveries, the Trust shall make supplemental payments to Class 6 and Class 7 claimants in accordance with the Trust Agreement and Trust Distribution Plan.

CORE/3003233.0002/134357790.2

# ARTICLE VII
# [RESERVED]

# ARTICLE VIII
# GENERAL TRUST PROVISIONS

**8.1   ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST**.

    **(a)   General Corpus**. The following distributions and payments will be made from the Trust Assets:

        (1)   **Distributions**. Distributions on Class 6 and Class 7 Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

        (2)   **Tort Claims Reviewer**. The Trustee shall hire the Tort Claims Reviewer. Fees payable to the Tort Claims Reviewer for review of Class 6 and Class 7 Claims shall be paid from the Trust.

        (3)   **Administrative Fees**. All fees, costs and expenses of administering the Trust as provided in this Plan and the Trust Agreement including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Trust Assets; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with this Plan or the Trust Agreement.

    **(b)   Future Tort Claim Reserve Fund.**  The Trust shall establish a "Future Tort Claim Reserve Fund," as detailed in § 2.7 of the Trust Agreement.

**8.2   TAX MATTERS**. The Trust shall not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Minnesota law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**8.3   APPOINTMENT OF THE TRUSTEE**. The initial Trustee has been identified in Exhibit D to this Plan and shall commence serving as the Trustee on the Effective Date; provided, however, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Archdiocese and the UCC, through the Effective Date, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and this Plan.

CORE/3003233.0002/134357790.2

**8.4     RIGHTS AND RESPONSIBILITIES OF TRUSTEE**.

(a)     The Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in this Plan and the Trust Agreement, including the powers of a trustee under Sections 704, 1108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges). If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to Trustee's authority to act, the provisions of the Trust Agreement shall control. Among other things, the Trustee: (1) shall liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, at the Trust's sole expense, as necessary or desirable to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

(b)     Any and all rights to the following shall be transferred to the Trust upon the Effective Date, and shall be preserved prior to the Effective Date by the Debtor for the benefit of the Trust:

(1)     The Transferred Insurance Interests in accordance with Section 6.1;

(2)     The Archdiocese's claim in the liquidation proceeding of Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $14,200,000;

(3)     To the extent they exist, any and all claims or Causes of Action against any Party: (i) to avoid, set aside, or recover any payment or other transfer made to any party under Section 547, 548, 549, and/or 550 of the Bankruptcy Code, (ii) to avoid, set aside, or recover any payment or other transfer made to any party under any applicable State law(s), and (ii) any proceeding to avoid or set aside any Interest of a party in property under Section 544 of the Bankruptcy Code; and

(4)     Cash held by the Debtor in the Riley Fund account, and any and all claims between the Archdiocese and the Cathedral of St. Paul regarding competing claims to the proceeds of the trust fund known as the Riley Fund.

(c)     The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Trustee in their official capacity, with respect to their status, duties, powers, acts, or omissions as Trustee.

- 35 -

**8.5    INVESTMENT POWERS; PERMITTED CASH EXPENDITURES**. All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

**8.6    REGISTRY OF BENEFICIAL INTERESTS**. To evidence the beneficial interest in the Trust of each holder of such an Interest, the Trustee shall maintain a registry of beneficiaries.

**8.7    NON-TRANSFERABILITY OF INTERESTS**. Any transfer of an Interest in the Trust shall not be effective until and unless the Trustee receives written notice of such transfer.

**8.8    TERMINATION**. The Trust shall terminate after its liquidation, administration and distribution of the Trust Assets in accordance with this Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement. The Trust shall, unless extended by further order of the Bankruptcy Court upon a motion by the Trust, terminate no later than the later of: (i) twelve (12) months after the termination of the Insurance Litigation, whether such termination is by a Final Order or a settlement between the parties to the Insurance Litigation, or (ii) the seventh (7th) anniversary of the Effective Date.

**8.9    IMMUNITY; LIABILITY; INDEMNIFICATION**.

**(a)**    The Trustee, his employees or any duly designated agent or representative of the Trustee, shall not be liable for any act or omission of any other employee, member, designee, agent, or representative of such Trustee, other than for specific acts or omissions resulting from such Trustee's willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Trustee may, in connection with the performance of their functions and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall not be under any obligation to consult with their attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the Trustee unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, or fraud.

**(b)**    No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of the Trust Agreement or this Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or this Plan, or by reason of the creation of any indebtedness by the Trustee under this Plan for any purpose authorized by the Trust Agreement or this Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only

against and be satisfied only out of the Trust Assets or such part thereof as shall under the terms of the Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for their recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had against: (a) the Trustee's bond or applicable insurance coverage, and, (b) to the extent not covered by such bond, directly against the Trustee.

**(c)**    The Trust shall defend, indemnify and hold the Trustee, their officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Minnesota entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder, provided that the Trustee shall not be indemnified or defended in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 8.9(a).

**8.10    NO WAIVER OR RELEASE**. Nothing in this Plan, Trust Agreement, or Trust Distribution Plan shall constitute a waiver or release of any Tort Claims against any Person or entity not specifically released or discharged under this Plan including, but not limited, to a release or discharge of any Catholic Entities. Any distribution made pursuant to this Plan, Trust Agreement, or Trust Distribution Plan is not intended as full compensation of damages claimed by any Class 6 or Class 7 claimant. It is intended that the provisions of this Section 8.10 be interpreted in accord with *Pierringer v. Hoger*, 21 Wis. 2d 182, 124 NW 2d 106 (1963) and *Frey v. Snelgrove*, 269 NW2d 919 (1978).

**ARTICLE IX**
**[RESERVED]**

**ARTICLE X**
**INSURANCE POLICIES**

**10.1    CONTINUATION OF INSURANCE POLICIES**. All known Archdiocese Insurance Policies are listed on Exhibit L. Subject to the Insurance Settlement Agreements, if any, all Archdiocese Insurance Policies shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code, to the extent such Archdiocese Insurance Policy is or was an executory contract of the Archdiocese, or continued in accordance with its terms pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Archdiocese, such that each of the parties' contractual, legal, and equitable rights under each such Archdiocese Insurance Policy shall remain unaltered, excepting the Archdiocese's transfer to the Trust of the Transferred Insurance Interests. To the extent that any or all of the Archdiocese Insurance Policies are considered to be executory contracts, then this Plan shall constitute a motion to assume such Archdiocese Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to Sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of

the Debtor, the Estate, and all parties-in-interest in this Chapter 11 case. Unless otherwise
determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto
prior to the Effective Date, no payments are required to cure any defaults of the Archdiocese
existing as of the Effective Date with respect to any Archdiocese Insurance Policy.

**10.2   NON-DEBTOR'S RIGHTS IN INSURANCE POLICIES NOT AFFECTED.**
The rights of any non-Debtor in any Archdiocese Insurance Policies will not be transferred to the
Trust. Except as otherwise provided in any Insurance Settlement Agreements or resulting from
operation of law, nothing in the Plan, Confirmation Order, or any Plan Document will affect the
rights of any non-Debtor insureds with respect to the Archdiocese Insurance Policies.

**ARTICLE XI**
**ADMINISTRATION OF NON-TORT CLAIMS**

**11.1   RESERVATION OF RIGHTS TO OBJECT TO CLAIMS OTHER THAN
CLASS 6 AND CLASS 7 CLAIMS**. Unless a claim is expressly described as an allowed claim
pursuant to or under this Plan, or otherwise becomes an allowed claim prior to the Effective
Date, upon the Effective Date, the Reorganized Debtor or the Trustee, as applicable, shall be
deemed to have a reservation of any and all rights, Interests and objections of the Archdiocese,
the UCC, or the Estate to any and all claims and motions or requests for the payment of or on
account of claims, whether administrative expense, priority, secured or unsecured, including any
and all rights, Interests and objections to the validity or amount of any and all alleged claims,
Liens, and security interests, whether under the Bankruptcy Code, other applicable law or
contract. The failure to object to any claim in this Chapter 11 case shall be without prejudice to
the Reorganized Debtor's or the Trustee's, as applicable, right to contest or otherwise defend
against such claim in the Bankruptcy Court as set forth in this Section when and if such claim is
sought to be enforced by the holder of such claim.

**11.2   OBJECTIONS TO CLAIMS OTHER THAN TORT CLAIMS**. Prior to the
Effective Date, the Archdiocese and the UCC shall have the authority to pursue any objections to
the allowance of any claim that is not a Class 6 or Class 7 Claim. From and after the Effective
Date, the Reorganized Debtor or the Trustee, as applicable, will retain responsibility for
administering, disputing, objecting to, compromising, or otherwise resolving and making
distributions, if any, with respect to non-Tort Claims (including those claims that are subject to
objection by the Archdiocese as of the Effective Date); provided, however, that nothing in this
Section shall affect the right of any party-in-interest (including the Reorganized Debtor and the
Trustee) to object to any non-Tort Claim to the extent such objection is otherwise permitted by
the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Further, nothing in this Section shall
prohibit the Trustee from objecting to or establishing procedures for the allowance or treatment
of claims other than Class 6 and Class 7 Claims. Unless otherwise provided in this Plan or by
order of the Bankruptcy Court, any objections by the Reorganized Debtor or the Trustee to
claims that are not Class 6 or Class 7 Claims will be filed and served not later than one-hundred
and eighty (180) days after the later of: (i) the Effective Date, or (ii) the date such claim is filed.
Such deadline or any Bankruptcy Court approved extension thereof, may be extended upon
request by the Reorganized Debtor or the Trustee by filing a motion without any requirement to
provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's or

- 38 -

the Trustee's business judgment. A motion seeking to extend the deadline to object to any claim shall not be deemed an amendment to this Plan.

**11.3   DETERMINATION OF OTHER CLAIMS**. From and after the Effective Date, any claim that is not a Class 6 or Class 7 Claim, and as to which a Proof of Claim or motion or request for payment was timely filed in this Chapter 11 case, or deemed timely filed by order of the Bankruptcy Court, may be determined and—so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) — liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such claim, (b) an application to equitably subordinate such claim, and (c) an application to otherwise limit recovery with respect to such claim, filed by the Archdiocese, the Reorganized Debtor, the Trustee or any other party-in-interest on or prior to any applicable deadline for filing such objection or application with respect to such claim. Any such claim so determined and liquidated shall be deemed an allowed claim for such liquidated amount and shall be satisfied in accordance with this Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any claims, rights, Interests, or Causes of Action that the Debtor, the Reorganized Debtor or the Trust may have against any Person in connection with or arising out of any claim or claims, including any rights under 28 U.S.C. § 157.

**11.4   NO DISTRIBUTIONS PENDING ALLOWANCE**. Except as provided herein or in the Trust Agreement or TDP, no payments or distributions will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an allowed claim.

**ARTICLE XII**
**DISTRIBUTIONS UNDER THE PLAN**

**12.1   TIMING OF DISTRIBUTIONS**. As soon as practicable after the Effective Date, the Reorganized Debtor shall make the payments required by this Plan to the holders of the claims to be paid from the Plan Implementation Account. Distributions on Class 6 and Class 7 Claims will be made in accordance with the timing and procedures set forth in this Plan, the Trust Agreement, and the TDP.

**12.2   PAYMENT DATE**. Whenever any payment or distribution to be made under this Plan shall be due on a non-business day, such payment or distribution shall instead be made, without interest, on the next preceding business day.

**12.3   UNDELIVERABLE DISTRIBUTIONS**. If payment or distribution to an allowed claim holder under this Plan is returned for lack of a current address, the Reorganized Debtor or the Trustee, as applicable, shall file with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment. All allowed claims paid as provided in this Section shall be deemed addressed to the same extent as if payment or distribution had been made to the holder of the allowed claim with no recourse to

CORE/3003233.0002/134357790.2

the Reorganized Debtor or the Trustee, as applicable, or property of the Reorganized Debtor or the Trustee. If, after the passage of six (6) months, the payment or distribution still cannot be made, the Reorganized Debtor or the Trustee, as applicable, shall make the payment to the Trust. All allowed claims paid as provided in this Section shall be deemed satisfied and released, with no recourse to the Reorganized Debtor or the Trustee, as applicable, or property of the Reorganized Debtor or the Trustee, as applicable, upon payment to the Trust, to the same extent as if payment or distribution had been made to the holder of the allowed claim.

**12.4    SETOFFS**. The Reorganized Debtor or the Trustee, as applicable, may, to the extent permitted under applicable law, set off against any allowed claim and the distributions to be made pursuant to the Plan on account of such allowed claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Trustee, as applicable, may hold against the holder of such allowed claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Trustee, as applicable, of any such claims, rights, and Causes of Action that the Reorganized Debtor or the Trustee, as applicable, possesses against such holder. For the avoidance of doubt, except as provided for in 6.2(g), the Reorganized Debtor shall have no setoff rights against any Class 6 or Class 7 claimants.

**12.5    NO INTEREST ON CLAIMS**. Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a post-petition agreement in writing between the Archdiocese or Reorganized Debtor or the Trust and a claimant and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any claim, and the claimant shall not be entitled to interest accruing on or after the Petition Date on any claim. In addition, and without limiting the foregoing or any other provision of this Plan, Confirmation Order, or Trust Agreement, interest shall not accrue on or be paid on any Disputed claim for the period from the Effective Date to the date a final distribution is made.

**12.6    WITHHOLDING TAXES**. The Reorganized Debtor and the Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under this Plan, the Reorganized Debtor and the Trust may require that the holder of an allowed claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**ARTICLE XIII**
**EFFECTIVENESS OF THE PLAN**

**13.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**. This Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below or, in the alternative, waived by the Debtor:

**(a)    Entry of Confirmation Order**. Subject fully to Sections 13.3 and 13.4 of this Plan, the Confirmation Order is a Final Order;

- 40 -

(b)     **Trust**. The Trust shall have been formed; and

(c)     **Appointment of Trustee**. The appointment of the Trustee shall have been approved by order of the Bankruptcy Court.

**13.2   NOTICE OF EFFECTIVE DATE**. The Reorganized Debtor shall file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date.

**13.3   WAIVER OF CONDITIONS**. The Debtor, with the UCC's consent, may waive any of the conditions to the occurrence of the Effective Date other than Section 13.1(a).

**13.4   EFFECT OF NON-OCCURRENCE OF CONDITIONS**. If Substantial Consummation of this Plan does not occur, this Plan will be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (i) constitute a waiver or release of any claims by or against the Archdiocese; (ii) prejudice in any manner the rights of the Archdiocese or the Trust; (iii) constitute an admission, acknowledgement, offer, or undertaking by the Archdiocese in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Archdiocese in any court or other forum.

**ARTICLE XIV**
**EFFECTS OF CONFIRMATION**

**14.1   DISSOLUTION OF COMMITTEES**.

On the Effective Date, the Committees shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediator, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

**14.2   DISCHARGE AND INJUNCTION**.

(a)     **Non-Tort Claims**. Except as otherwise expressly provided in this Plan or in the Confirmation Order, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Archdiocese shall be discharged from any and all claims that arose prior to the Effective Date, other than the claims held by Class 6 and Class 7 claimants (each "Discharged Claim"). For the avoidance of doubt, "Discharged Claim" includes any disallowed claim. All Persons other than Class 6 claimants and Class 7 claimants who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner,

any action or any other proceeding of any kind with respect to any Discharged Claim against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or Lien of any kind against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) except as provided in Section 4.9, asserting any setoff right of contribution, indemnity, subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any action, in any manner and in any place whatsoever, that does not conform to or comply with provisions of this Plan. In the event any Person other than a Class 6 and Class 7 claimant takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, this Plan or Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of this Plan.

(b)     **Class 6 and Class 7 Tort Claims**. With respect to Class 6 and Class 7 Claims, the Archdiocese and the Reorganized Debtor shall not receive a discharge on account of a Class 6 or Class 7 Claim until such Class 6 or Class 7 Claim is settled with the Archdiocese, Reorganized Debtor and the Non-Settling Insurers or such Class 6 or class 7 Claim is fully adjudicated and determined and subject to Final Order. The discharge hereunder shall not limit in any way the obligations of Non-Settling Insurers to defend and pay the Archdiocese's or Reorganized Debtor's liability for Class 6 and Class 7 Claims under the Insurance Policies.

(c)     **Home Insurance Company Supplemental Injunction.**

Pursuant to sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Home Insurance Company pursuant to that certain Settlement Agreement and Mutual Release, Exhibit G and pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Interests against Home Insurance Company  with respect to a Class 6 Tort Claim or a Class 7 Tort Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Home Insurance Company, its successors and assigns, with respect to such Interests with respect to the Class 6 Tort Claim or Class 7 Tort Claim, including:

(1)     Commencing or continuing in any manner any action or other proceeding against Home Insurance Company;

(2)     Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against Home Insurance Company;

(3)     Creating, perfecting, or enforcing any lien of any kind against Home Insurance Company;

- 42 -

(4)    Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Home Insurance Company; and

(5)    Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

**14.3    EXCULPATION; LIMITATION OF LIABILITY**. From and after the Effective Date, none of the Exculpated Parties, as defined in the Plan, shall have or incur any liability for, and each Exculpated Party shall be released from, any claim, Cause of Action or liability to any other Exculpated Party, to any holder of a claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and Filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and its members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code.

**14.4    Reservation of Rights for Catholic Entities.**  Unless specifically stated in the Plan, nothing in this Plan, the Trust Agreement, the Trust Distribution Plan, or the Confirmation Order shall be construed to prejudice the rights, actions, or claims of the Parishes and their respective insurers, against the Non-Settling Insurers and other entities potentially liable for Tort Claims.

## ARTICLE XV
## THE REORGANIZED DEBTOR

**15.1    CONTINUED CORPORATE EXISTENCE**. The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Minn. Stat. § 315.16 having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by this Plan and the documents and instruments executed and delivered in connection therewith.

**15.2    VESTING OF ASSETS**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in this Plan or the Confirmation Order, the Reorganization Assets shall revest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all Liens, claims, and Interests of creditors, including successor liability claims. On and after the Effective

Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**15.3    IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**. In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on <u>Exhibit J</u>; provided, however, that the Archdiocese may unilaterally change Exhibit J by providing written notice to counsel for the Committee at least ten (10) days prior to the confirmation hearing, and the Committee shall submit a supplement to this Plan at least seven (7) days prior to the confirmation hearing evidencing the change to Exhibit J.

**15.4    FURTHER AUTHORIZATION**. The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

### ARTICLE XVI
### <u>MISCELLANEOUS PROVISIONS</u>

**16.1    OPERATING LEASES AND REAL ESTATE LEASES**. Confirmation of this Plan will constitute an assumption of the executory contracts and unexpired leases listed on <u>Exhibit H</u>, in accordance with Section 365 of the Bankruptcy Code.

**16.2    BANK MORTGAGES AND LIENS**

    **(a)    North American Banking Company**. Notwithstanding anything to the contrary in this Plan, all liens and security interests granted by the Debtor in favor of North American Banking Company, including without limitation the lien evidenced by that certain Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated April 10, 2014, executed and delivered by the Debtor in favor of North American Banking Company, shall remain in full force and effect.

    **(b)    Bremer Bank**. Notwithstanding anything to the contrary in this Plan, all liens and security interests granted by the Debtor in favor of Bremer Bank, including without limitation the lien evidenced by that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement dated June 23, 2011, executed and delivered by the Debtor in favor of Bremer Bank, shall remain in full force and effect.

**16.3    ASSUMPTION OF EXECUTORY CONTRACTS**. On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its

CORE/3003233.0002/134357790.2

own terms, shall be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any cure payment shall be promptly paid by the Reorganized Debtor.

**16.4   CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS**. Every claim asserted by a creditor arising from the rejection of an executory contract pursuant to this Plan must be filed with the Bankruptcy Court no later than the first business day, which is thirty (30) days after the Confirmation Date or the first business day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection, if such Final Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and when it becomes an allowed Claim, will be treated under Class 12 of the Plan. Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged, and the creditor holding the claim will not receive or be entitled to any distribution under this Plan on account of such claim.

**16.5   INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES**. The obligation of the Archdiocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Archdiocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Minnesota pertaining to the Archdiocese, will be deemed and treated as Executory Contracts that are assumed by the Reorganized Debtor, pursuant to this Plan and Bankruptcy Code Section 365 as of the Effective Date. Notwithstanding the foregoing, under no circumstances will the Archdiocese or the Reorganized Debtor assume or be responsible for any alleged indemnification of any Person against whom the Archdiocese has determined or may, in the future, determine, is a Credibly Accused Person or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

**16.6   LEASE CLAIM INDEMNITY**. The Reorganized Debtor will fully indemnify the Debtor's estate, and any successor to the Debtor's estate, including but not limited to the Trust, from and for any claim(s) arising out of the breach of the Lease asserted after confirmation, regardless of whether such claim(s) arise(s) before or after the confirmation of a plan by the Debtor.

**16.7   FINAL ORDER**. Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the UCC (if prior to the Effective Date) or by the Trust (on or after the Effective Date) upon written notice to the Bankruptcy Court. Any party-in-interest may, on its own behalf, waive a requirement for a Final Order that results in favor of such party-in-interest without notice to the Bankruptcy Court or other parties-in-interest. No such waiver shall prejudice the right of any party-in-interest to seek a stay pending appeal of any order that is not a Final Order.

**16.8   AMENDMENTS AND MODIFICATIONS**. The UCC may modify this Plan at any time prior to the confirmation hearing in accordance with Section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to Substantial Consummation, the Trustee, may

- 45 -

modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties-in-interest shall not be required unless directed by the Bankruptcy Court. The UCC specifically reserves the right to modify this Plan based upon a Final Order resolving its motion seeking substantive consolidation of the Archdiocese and certain related entities (Docket No. 654).

**16.9    RETENTION OF JURISDICTION.**

(a)    **By the Bankruptcy Court**. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and this Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of this Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

(1)    over disputes concerning the ownership of claims;

(2)    over disputes concerning the distribution or retention of assets under this Plan;

(3)    over objections to claims, motions to allow late-filed claims, and motions to estimate claims;

(4)    over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Archdiocese, the Estate, or Trust, or property abandoned or transferred by the Archdiocese, the Estate, or the Trust;

(5)    over motions to approve insurance settlement agreements entered into after the Effective Date by the Trustee;

(6)    over matters related to the assets of the Estate or of the Trust, including the terms of the Trust or the recovery, liquidation, or abandonment of Trust Assets;

(7)    the removal of the Trustee and the appointment of a successor Trustee;

(8)    over matters relating to the subordination of claims;

(9)    to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

CORE/3003233.0002/134357790.2

(10)    to consider and approve modifications of or amendments to this Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

(11)    to issue orders in aid of execution, implementation, or consummation of this Plan;

(12)    over disputes arising from or relating to this Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

(13)    over requests for allowance of payment of claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

(14)    over all Fee Applications;

(15)    over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(16)    over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of claims, including holders of Class 6 and Class 7 Claims;

(17)    over disputes concerning the existence, nature, or scope of the Archdiocese's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(18)    over disputes regarding the Archdiocese's, the Trustee's, or any Insurer's rights and duties in connection with the defense of Litigation Claims under Section 6.2(f);

(19)    to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with this Plan, the Archdiocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

(20)    to enter a Final Decree closing the Chapter 11 case;

(21)    to enforce all orders previously entered by the Bankruptcy Court; and

(22)    over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or this Plan.

- 47 -

**(b)** **By the District Court**. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

**(c)** **Actions to Collect Amounts Owed Pursuant to the Plan**. Notwithstanding anything to the contrary in this Section, the Archdiocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to this Plan for any settlements embodied in this Plan or later approved by the Bankruptcy Court, which are not paid in accordance with this Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

**(d)** **Case Closure**. The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

**16.10 TRUSTEE REPORTS**. From the Effective Date until a Final Decree is entered, the Reorganized Debtor shall, within thirty (30) days of the end of the fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines. The Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

**16.11 NO WAIVER**. The failure of the UCC to object to any claim for purposes of voting shall not be deemed a waiver of the Archdiocese's, the Reorganized Debtor's, or the Trustee's right to object to such claim, in whole or in part.

**16.12 TAX EXEMPTION**. Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under this Plan, including any such acts by the Archdiocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, and shall not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and this Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**16.13 NON-SEVERABILITY**. Except as specifically provided herein, the terms of this Plan constitute interrelated compromises and are not severable, and no provision of this Plan may be stricken, altered, or invalidated, except by amendment of this Plan by the UCC.

**16.14   REVOCATION.** The UCC reserves the right to revoke and withdraw this Plan prior to the Confirmation Date, in which case this Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Archdiocese, the UCC, or any other Person or to prejudice in any manner the rights of the Archdiocese, the UCC, or any other Person in any further proceedings involving the Archdiocese, or be deemed an admission by any party, including with respect to the amount or allowance of any claim or the value of any property of the Estate.

**16.15   CONTROLLING DOCUMENTS.** In the event and to the extent that any provision of this Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of this Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of this Plan, this Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Trust Agreement same, the provisions of the Confirmation Order shall control and take precedence.

**16.16   GOVERNING LAW.** Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure), and unless specifically stated, the rights, duties, and obligations arising under this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) shall be governed by, and construed and enforced in accordance with, the laws of the State of Minnesota, without giving effect to conflicts of law principles.

**16.17   NOTICES.** Any notices or requests by parties-in-interest under or in connection with this Plan shall be in writing and served either by: (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Archdiocese or the Reorganized Debtor:

> Chancellor for Civil Affairs
> Office of the Chancellor for Civil Affairs
> Archdiocese of Saint Paul and Minneapolis
> 222 Summit Avenue
> Saint Paul, MN 55102
> Telephone No.: (651) 291-4400
> Facsimile No.: (651) 290-1629

with a copy to:

> Briggs and Morgan
> 2200 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota 55402-2157
> Attn:   Richard D. Anderson

- 49 -

Charles B. Rogers
Telephone No.: 612-977-8400
Facsimile No.: 612-977-8650

If to the Trust or the Trustee:

The parties identified in the Trust Agreement to receive notices.

**16.18   FILING OF ADDITIONAL DOCUMENTS**. At any time before Substantial Consummation, the Archdiocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or otherwise to comply with applicable law.

**16.19   POWERS OF OFFICERS**. The officers of the Archdiocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of this Plan.

**16.20   DIRECTION TO A PARTY**. On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Plan.

**16.21   SUCCESSORS AND ASSIGNS**. This Plan shall be binding upon and inure to the benefit of the Archdiocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**16.22   CERTAIN ACTIONS**. By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under this Plan that would otherwise require approval of the officers of the Archdiocese under this Plan, including: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to this Plan, and (b) the adoption, execution, and implementation of other matters provided for under this Plan involving the Archdiocese or organizational structure of the Archdiocese shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant applicable non-bankruptcy law, without any requirement of further action by the officers of the Archdiocese.

**16.23   FINAL DECREE**. Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 case.

- 50 -

**16.24   PLAN AS SETTLEMENT COMMUNICATION**. This Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise claims and Causes of Action that are Disputed as to validity or amount (including Tort Claims and the Insurance Litigation), except as otherwise provided above. Accordingly, this Plan, the disclosure statement, and any communications regarding this Plan or the disclosure statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed claim or Cause of Action. Nothing herein or in any Confirmed Plan is intended to constitute a compromise of Tort Claims.

**16.25   OTHER RIGHTS**. Except as expressly set forth in this Plan, nothing in this Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Minnesota law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims.

**ARTICLE XVII**
**BANKRUPTCY RULE 9019 REQUEST**

Pursuant to Bankruptcy Rule 9019 and through this Plan, the UCC requests approval of all compromises and settlements included in this Plan, including but not limited to the compromises and settlements set forth in Article V.

**ARTICLE XVIII**
**CONFIRMATION REQUEST**

The UCC hereby requests confirmation of this Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired class that does not accept this Plan or is deemed to have rejected this Plan.

[Remainder of page intentionally left blank]

CORE/3003233.0002/134357790.2

[Signature page for Plan of Reorganization]

Respectfully submitted,

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

_____

By: James Keenan
Its: Chairperson

**EXHIBIT A**

**[RESERVED]**

## EXHIBIT B

## GUARANTY OBLIGATIONS

| NAME AND ADDRESS OF CREDITOR | CO-DEBTOR(S) |
| --- | --- |
| Premier Bank<br>2866 White Bear Ave<br>Maplewood MN 55109 | The Cathedral of St.<br>Paul 239 Selby Ave<br>St. Paul MN 55102<br><br>Blessed Sacrament Catholic<br>Church 2119 Stillwater Ave St.<br>Paul MN 55119 |
| North American Banking<br>Company 2230 Albert Street<br>Roseville MN 55113 | Totino Grace High School<br>1350 Gardena Ave NE<br>Fridley MN 55432 |
| Wells Fargo Bank, N.A.<br>7900 Xerxes Avenue South<br>Bloomington MN 55413 | Catholic Eldercare on Main<br>817 Main Street NE<br>Minneapolis MN 55413 |
| Catholic United Financial<br>3499 Lexington Ave N St<br>Paul MN 55126 | Church of St. Andrew, Elysian<br>PO Box 261<br>Elysian MN 56028-0261<br><br>Immaculate Heart of Mary, Minnetonka<br>13505 Excelsior Blvd.<br>Minnetonka MN 55345-4999<br><br>Sacred Heart Church<br>4087 W Broadway Ave<br>Minneapolis MN 55422<br><br>St. Gregory the Great Church<br>PO Box 609<br>North Branch MN 55056-0609<br><br>St. John the Baptist Ch, Excelsior (7/15/93)<br>680 Mill Street<br>Excelsior MN 55331-3243<br><br>St. John Vianney Church<br>789 17th Ave N<br>South St. Paul MN 55075-1497 |

| | St. Joseph the Worker, Maple Grove 7180 Hemlock Lane Maple Grove MN 55369-5597<br><br>St. Jude of the Lake, Mahtomedi 700 Mahtomedi Ave Mahtomedi MN 55115-1698 |
|---|---|
| U.S. Bank National Association EP-MN-WS3C 60 Livingston Avenue St Paul MN 55107 | Holy Family High School 8101 Kochia Lane Victoria MN 55386 |
| Catholic Order of Foresters 355 West Shuman Boulevard Naperville IL 60566 | Our Lady of the Lake Church 2385 Commerce Blvd. Mound MN 55364-1496<br><br>St. Gerard Majella Church 9600 Regent Ave N Brooklyn Park MN 55443 |
| Knights of Columbus 261 8th St E St Paul MN 55101 | St. Alphonsus Church, Brooklyn Center 7025 Halifax Ave N Brooklyn Center MN 55429-1394<br><br>St. Michael Church, Prior Lake 16311 Duluth Ave SE Prior Lake MN 55372 |
| US Bank Mail Station BC-MN-H030 800 Nicollet Mall Minneapolis MN 55402 | St. Ambrose of Woodbury 4125 Woodbury Drive Woodbury MN 55129 |
| Catholic Finance Corp 5826 Blackshire Path Inver Grove Heights MN 55076 | St. Peter Church, Mendota PO Box 50679 Mendota MN 55150-0679<br><br>Risen Christ School 1120 East 37th St Minneapolis MN 55407 |

B-2

# EXHIBIT C

## ASSETS TO BE VALUED BY BANKRUPTCY COURT

**Cash:**

Unrestricted

Board Designated

Temp Restricted

Donor-Restricted Funds

Bishop Reserve Account

Beneficial Interest in Donor-Restricted Funds

Court-Restricted Funds

Archdiocese Medical Benefit Plan

Workers' Compensation Deposit

General Insurance Fund

**Accounts / Loans Receivable:**

Loans Receivable, Net

AMBP Premium Rebates

Accounts and Other Receivables, Net

**Real Estate:**

Church of Gichitiwaa Kateri

**Property Leased to Others:**

Benilde-Saint Margaret High School

De La Salle High School

Cathedral of St. Paul

**Other Personal Property:**

Office Equipment

Religious Vestments, Jewelry & Relics

Other Personal Property

Vehicles

Ausmar, LLC Interest

Inventory-Print

Mineral Rights

Prepaids

Domeier Restitution

C-1

128482969.1

## EXHIBIT D

## THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS
## TRUST AGREEMENT

This TRUST AGREEMENT is made and entered into as of the Effective Date of the Plan in *In re The Archdiocese of Saint Paul and Minneapolis* ("Archdiocese") (Bankr. D. Minn.), Case No. 15-30125, by and between the Archdiocese of Saint Paul and Minneapolis, and \_\_\_\_\_ ("Trustee").  This Trust Agreement is entered into pursuant to the Modified Second Amended Chapter 11 Plan of Reorganization filed by the Official Committee of Unsecured Creditors dated July [\_\_\_] 2017.  Unless otherwise stated herein, capitalized terms used in this Trust Agreement shall have the meanings assigned to them in § 1.1 of the Plan.  Terms defined in the Bankruptcy Code, and not otherwise specifically defined in the Plan or herein, when used herein, have the meanings attributed to them in the Bankruptcy Code.

## RECITALS

A.     On the Petition Date, the Archdiocese filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The Archdiocese continued in possession of its property and has continued to operate and manage its business as debtor in possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

B.     On _____, 2017, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order").

C.     The Plan provides for the creation of The Archdiocese of Saint Paul and Minneapolis Settlement Trust and the transfer and assignment to the Trust of the Trust Assets.

D.     Pursuant to the Plan, the Trust is to use the Trust Assets to pay the Class 6 and Class 7 Claims.

E.     The Trust is established for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d).

F.     Pursuant to the Plan and the Confirmation Order, the Trustee was duly appointed as a representative of the Estate pursuant to Sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

G.     The Trust is intended to qualify as a "grantor trust" for federal income tax purposes and the Trustee shall administer and maintain the Trust in compliance with all relevant guidelines regarding liquidating trusts issued by the Internal Revenue Service (the "IRS").

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the premises and the provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

# ARTICLE I

## AGREEMENT OF TRUST

1.1     <u>Creation and Name</u>.   The Debtor hereby creates a trust known as "The Archdiocese of Saint Paul and Minneapolis Settlement Trust," which is the Trust provided for in the Plan.

1.2     <u>Purpose</u>.   The purpose of the Trust is to assume responsibility for preserving, managing and distributing Trust Assets to Class 6 and Class 7 Claimants in accordance with the Trust Agreement and in such a way that all holders of similar Class 6 and Class 7 Claims are treated in a substantially equivalent manner, to receive assignment of the Transferred Insurance Interests from the Archdiocese, and to pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests..

1.3     <u>Transfer of Assets</u>.   Pursuant to the Plan and the Confirmation Order, the Archdiocese irrevocably transfers, absolutely grants, assigns, conveys, sets over and delivers to the Trustee, and at such times as set forth in the Plan, all of its right, title and interest in and to the Trust Assets to be held in trust and for the uses and purposes stated herein and in the Plan. The Trustee hereby agrees to accept and hold the Trust Assets in trust for the Beneficiaries subject to the terms of this Trust Agreement and the Plan.   The Trustee is hereby authorized to file with governmental authorities any documents necessary or helpful to establish the Trust.

1.4     <u>Irrevocability</u>.   The Trust shall be irrevocable.   The Reorganized Debtor shall not alter, amend, revoke or terminate the Trust.   The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor.

1.5     <u>Beneficiaries</u>.   The beneficiaries of the Trust ("Beneficiaries") are:

1.5.1   Class 6 claimants whose claims are not disallowed by the Bankruptcy Court and who are Qualified Claimants who (1) elect treatment as Distribution Plan Claimants; or (2) who elect treatment as Litigation Claimants; and

1.5.2   Class 7 claimants, as and when such claimants assert their Class 7 Claims and whose claims are not disallowed by the Bankruptcy Court and who are Qualified Claimants who (1) elect treatment as Distribution Plan Claimants; or (2) who elect treatment as Litigation Claimants.

1.6     <u>Acceptance of Assets and Assumption of Liabilities</u>.

1.6.1   In furtherance of the purposes of the Trust, the Trustee hereby accepts the trusteeship of the Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery of assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan and the Confirmation Order.

1.6.2   In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing and distributing Trust Assets to Class 6 and Class 7 Claimants. The Class 6 and Class 7

Claims will be evaluated by the Tort Claims Reviewer in accordance with the TDP, attached as Exhibit 1. Except as otherwise provided in this Trust Agreement, the TDP or the Plan, the Trustee shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Class 6 and Class 7 Claims that the Archdiocese has or would have had under applicable law.

1.6.3    The Trustee shall have all the rights, powers and duties set forth in this Trust Agreement, the TDP and the Plan, and available under applicable law, for accomplishing the purposes of the Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Trust and in accordance with applicable law. The Trustee shall have the authority to bind the Trust within the limitations set forth herein but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6.4    In furtherance of the purposes of the Trust, the Trustee assumes responsibility for: (a) making payments to Beneficiaries; (b) receiving, collecting, liquidating, maintaining and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement and the Plan. The Trust will be administered consistent with the liquidating purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the liquidation value of the Trust Assets or as otherwise provided in the Plan.

1.6.5    Source of Payments. All Trust expenses and all liabilities of the Trust with respect to Class 6 and Class 7 Claims shall be payable solely by the Trustee out of the Trust Assets, including any recoveries from Non-Settling Insurers. The Settling Insurers shall not be liable for the payment of any Trust expense or any other liability of the Trust.

## ARTICLE II

## CORPUS OF THE TRUST

2.1    Trust Composition. The Trust Assets shall include all property transferred to the Trust pursuant to the Plan and future orders of the Bankruptcy Court, including (but not limited to) all rights of every kind, nature and description transferred to the Trust pursuant to Section 5.2 of the Plan, future orders of the Bankruptcy Court, or otherwise belonging to the Trust.

- 

2.2    Transfer to Trustee. From and after the Effective Date of the Plan, pursuant to, and at such times set forth in the Plan, title to and all rights and interests in the Trust Assets shall be transferred to the Trustee free and clear of all Liens, claims, encumbrances or Interests of any kind in such property of any other Person (including all Liens, claims, encumbrances or Interests of creditors of or holders of claims against or Interests in the Archdiocese) in accordance with Sections 1123, 1141 and 1146(a) of the Bankruptcy Code, except as otherwise expressly

provided for in the Plan.  The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3   <u>Trustee's Right to and Title and Interest in Trust Assets</u>.  Upon the transfer of the Trust Assets, the Trustee succeeds to all of the Archdiocese's and the Estate's right to and title and Interest in the Trust Assets, and the Archdiocese and the Estate will have no further right to or title or Interest in or with respect to the Trust Assets or this Trust, except as provided herein, in the Plan or the Confirmation Order.

2.4   <u>No Tax on Transfers to Trust</u>.  Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale or assignments executed in connection with any transfer to the Trust, or receipt, or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

2.5   <u>Spendthrift Provision</u>.  To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court.

2.6   <u>Trust Corpus</u>.  The entirety of the Trust's corpus shall be available to pay eligible Class 6 and Class 7 Claims and authorized expenses.  The Trust Corpus shall be allocated, administered, and distributed as provided in the TDP.

2.7   <u>Future Tort Claim Reserve Fund</u>.  Five percent (5%) of the Trust's initial corpus shall be allocated to the Future Tort Claim Reserve Fund.  The balance of the initial funding shall be available to pay eligible Class 6 Claims and authorized expenses.  Any subsequent recoveries from Non-Settling Insurers shall be allocated between the general corpus of the Trust and the Future Tort Claim Reserve Fund based on the percentage in section 2.6 above, and, after that, distributed to Beneficiaries on a pro rata basis based on points as detailed in section 4.1 of the TDP.

2.8   <u>Counsel Fees</u>.  Each claimant's counsel fees will be deducted and paid from the claimant's individual recovery and shall not be paid from the gross amount available for distribution among multiple claimants occupying a given class or category.

**ARTICLE III**

**POWERS AND DUTIES OF TRUSTEE**

3.1   <u>Powers and Duties</u>.  The Trustee shall have, in addition to any other powers and discretions conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable Bankruptcy law and/or the Plan), the Plan and other provisions in this instrument, the following powers and discretions:

3.1.1   To act as custodian of, receive, control, manage, liquidate, monetize and dispose of all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order;

3.1.2   To abandon any property, including any chose in action, which it determines in its reasonable discretion to be of *de minimis* value or of more burden than value to the Trust;

3.1.3   To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on the Insurance Litigation;

3.1.4   To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan;

3.1.5   To open and maintain bank accounts on behalf of the Trust, deposit funds therein and draw checks thereon, as appropriate under this Trust Agreement, the Plan and the Confirmation Order;

3.1.6   To obtain all reasonably necessary insurance coverage with respect to any property that is or may in the future become a Trust Asset;

3.1.7   To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs and expenses of administering the Trust as provided in this Trust Agreement and the Plan.  These fees, costs and expenses include:  (a) the fees of bankruptcy management companies; (b) the fees and costs of Professionals employed by the Trustee, such as the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries or auditors; and (c) the premiums charged by insurers, including, but not limited to, professional liability insurers;

3.1.8   In accordance with the evaluation of the Tort Claims Reviewer pursuant to the TDP, to make distributions to Beneficiaries in accordance with the TDP;

3.1.9   In its discretion, to rely on the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the TDP and assessment of the Class 6 and Class 7 Claims without any verification or confirmation;

3.1.10 In its discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust;

3.1.11 To retain any attorney-at-law, Tort Claims Reviewer, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents

and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence;

3.1.12  To make, sign, execute, acknowledge and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan and/or the Trust or to maintain and administer the Trust;

3.1.13  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including Bankruptcy Rule 2004;

3.1.14  To file a motion with the Bankruptcy Court, with notice to the parties in interest, for a modification of the provisions of this Trust Agreement if the Trustee determines that such modification is necessary to conform to legal and/or administrative requirements and to the purpose of the Trust;

3.1.15  Upon any event terminating the Trust, to defer distribution of property from the Trust for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although Beneficiaries' rights to distributions shall vest immediately;

3.1.16  To comply with Bankruptcy Code Section 345 with regard to the investment of Trust Assets.  The Trustee is relieved of any obligation to diversify;

3.1.17  To establish such accounts, funds and reserves, as required by the Plan, for ease of administration.  Nothing in this provision shall restrict the Trustee's authority to pool such accounts, funds or reserves for investment purposes or require separate bank accounts for such accounts, funds or reserves;

3.1.18  To be responsible for only that property delivered to it and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.2    Limitations on the Trustee.  Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

3.2.1    To guaranty any debt;

3.2.2    To loan Trust Assets;

3.2.3    To make any transfer or distribution of Trust Assets other than those authorized by this Trust Agreement, the Plan or the Confirmation Order;

3.2.4    To engage in any trade or business;

3.2.5    To engage in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

## ARTICLE IV

## TERMINATION OF THE TRUST

4.1     <u>When Termination Shall Occur</u>.  The Trustee shall terminate the Trust after its liquidation and the administration and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan.  The Trust shall terminate no later than the later of: (a) twelve (12) months after the termination of the Insurance Litigation, whether such termination is by a Final Order or a settlement among the parties to the Insurance Litigation; or (b) the seventh (7th) anniversary of the Effective Date.

4.2     <u>Termination Procedures</u>.  After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed.  The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until distribution of all the Trust Assets.  For purposes of this provision Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $50,000.  At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of:  (a) the first anniversary of the final distribution of the Trust Assets; and (b) the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice thereof.

4.3     <u>Termination Distribution</u>.  Upon termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments remaining in the Trust, if any, including any investment earnings thereon to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order.

4.4     <u>Discharge, Exculpation and Exoneration</u>.  Upon termination of the Trust and accomplishing of all activities described in this Article, the Trustee and its professionals shall be discharged and exculpated from liability, and the Trustee's bond shall be exonerated (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his designated agents or representatives). The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

## ARTICLE V

## IMMUNITY, LIABILITY AND INDEMNIFICATION OF TRUSTEE

5.1     <u>Limitations on Liability</u>.  Neither the Trustee nor any of its duly designated agents or representatives or Professionals shall be liable for any act or omission taken or omitted to be taken by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the

Trustee or its designated agents or representatives. The Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys-at-law, accountants, financial advisors and agents and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall be under no obligation to consult with its attorneys-at-law, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Trustee, unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2    <u>No Recourse Against Trustee Personally</u>. No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney-at-law, accountant or other Professional retained in accordance with the terms of this Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or trust agreement whatsoever executed by the Trustee in implementation of this Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any such promise, contract, instrument, undertaking, obligation, covenant or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had against:  (a) the Trustee's bond or applicable insurance coverage and; (b) to the extent not covered by such bond, directly against the Trustee.

5.3    <u>Indemnification</u>. The Trustee, using Trust Assets, shall defend, indemnify and hold harmless the Trustee, its officers, directors, agents, representatives and employees to the fullest extent that a corporation or trust organized under the laws of Minnesota is entitled to defend, indemnify and hold harmless its trustees, officers, directors, agents, representatives and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder; provided that neither the Trustee nor its officers, directors, agents, representatives or employees shall be defended, indemnified or held harmless in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 5.1.

## ARTICLE VI

## <u>COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS</u>

6.1    <u>Trustee Compensation</u>. The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in <u>Exhibit 2</u>.

6.2     Compensation of Trustee's Agents.  Any Person retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered.

6.3     Reimbursement of Expenses.  Any and all reasonable and necessary costs and expenses incurred by the Trustee and any Person retained by the Trustee, in performing its respective duties under this Trust Agreement, will be reimbursed by the Trustee from the Trust Assets.

# ARTICLE VII

## SUCCESSOR TRUSTEES

7.1     Vacancy Caused by Trustee Resignation or Removal.

    7.1.1     The Trustee may resign at any time upon thirty (30) days' written notice to be filed with the Bankruptcy Court and delivered to the Trust Protector (if any).  The Trustee shall, within thirty (30) days after such resignation takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Trustee while serving as such.

    7.1.2     The Bankruptcy Court or the Trust Protector (if any) may remove a Trustee upon finding that the Trustee has engaged in a serious breach of fiduciary duty.  The removal will take effect upon the date the Bankruptcy Court or the Trust Protector (if any), as the case may be, specifies.  In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

7.2     Outgoing Trustee Obligations.  In the event of the resignation or removal of the Trustee, the outgoing Trustee shall:

    7.2.1     Execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

    7.2.2     Deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee; and

    7.2.3     Otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee.

The resigning, removed or departed Trustee hereby irrevocably appoints the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it

and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

7.3    Appointment of Successor Trustee. Any vacancy in the office of Trustee shall be filled by the nomination of the Trust Protector, subject to the approval of the Bankruptcy Court, after notice and a hearing, or, if there is no Trust Protector, by the nomination of the Bankruptcy Court, after notice and a hearing.

7.4    Acceptance of Appointment of Successor Trustee. Any successor Trustee's acceptance of appointment as a successor Trustee shall be in writing and shall be filed with the Bankruptcy Court. The acceptance shall become effective when filed with the Bankruptcy Court. The Trustee shall thereupon be considered the Trustee of the Trust without the necessity of any conveyance or instrument. Any successor Trustee shall have all of the rights, powers, duties, authority and privileges as if initially named as a Trustee hereunder. Any successor Trustee shall be exempt from any liability related to the acts or omissions of the Trustee prior to the appointment of the successor Trustee.

7.5    Preservation of Record of Changes in Trustees. A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

7.6    Trust Protector. The initial Trust Protector, referenced in Section 7.1 and Section 7.3, shall be _____. The Trust Protector may resign at any time upon thirty (30) days' written notice to be filed with the Bankruptcy Court. The Bankruptcy Court may designate a successor Trust Protector. A Trust Protector shall be entitled to receive reasonable compensation for, and reimbursement for reasonable expenses incurred in, acting as such. No Trust Protector shall have any duty to inquire into, nor shall any Trust Protector incur liability for, the acts or omissions of any predecessor Trust Protector. No Trust Protector shall have any duty to inquire into, nor shall any Trust Protector incur liability for, the acts or omissions of any Trustee. The Trust Protector shall have no duties whatsoever other than those specified in Section 7.1 and Section 7.3. Specifically, but not by way of limitation, the Trust Protector shall have no duty to monitor in any way the performance by the Trustee of any of its duties. Subject to the above provisions of this Section 7.6, the Trust Protector shall be considered a fiduciary.

## ARTICLE VIII

## TRUSTEE REPORTING AND DISCHARGE

8.1    Annual Accountings. The Trustee shall prepare, at least annually, and upon termination of the Trust, a written accounting of the administration of the Trust listing the current assets (with fair market values) and detailing all transactions that occurred during the period covered by such accounting. Each such accounting shall be filed with the Bankruptcy Court. Copies of such accounting shall be available to Beneficiaries upon request.

8.2     Approval of Accountings and Discharge of the Trustee.  The Trustee may file
with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1.
Upon the entry of an order of the Bankruptcy Court approving any such accounting, the Trustee
shall be discharged from all liability, with respect to all assets listed and transactions detailed in
such accounting, to the Trust, any Beneficiary or any Person who or which has had or may then
or thereafter have a claim against the Trust for acts or omissions in the Trustee's capacity as the
Trustee or in any other capacity contemplated by this Trust Agreement or the Plan.

## ARTICLE IX

### SECTION 468B SETTLEMENT FUND

9.1     Generally.

        9.1.1   In accordance with the Plan, the Trustee will take all reasonable steps to
ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified"
settlement fund within the meaning of § 468B of the Internal Revenue Code of 1986, as
amended (the "Tax Code"), and the regulations promulgated pursuant thereto.  The
Archdiocese is the "transferor" within the meaning of Treasury Regulation
Section 1.468B-1(d)(1).  The Trustee shall be classified as the "administrator" within the
meaning of Treasury Regulation Section 1.468B-2(k)(3).

        9.1.2   It is further intended that the transfers to the Trust will satisfy the "all
events test" and the "economic performance" requirement of Section 461(h)(1) of the Tax
Code and Treasury Regulation Section 1.461- 1 (a)(2).

9.2     Employer Identification Number.  Upon establishment of the Trust, the Trustee
shall apply for an employer identification number for the Trust in accordance with Treasury
Regulation Section 1.468B-2(k)(4).

9.3     Relation-Back Election.  If applicable, the Trustee and the Archdiocese shall fully
cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to
treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

9.4     Filing Requirements.  The Trustee shall cause to be filed, on behalf of the Trust,
all required federal, state, and local tax returns in accordance with the provisions of Treasury
Regulation Section 1.468B-2(k)(1).  The Archdiocese or Reorganized Debtor shall file an
election statement(s) satisfying the requirements of Treasury Regulation Section 1.468B-
1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and
the regulations promulgated thereunder.  The election statement shall be included with the
Trust's first timely filed trust income tax return.  The Archdiocese or Reorganized Debtor shall
supply to the Trustee and to the Internal Revenue Service the statement described in Treasury
Regulation Section 1.468B-3(e)(2) no later than February 15th of the year following each
calendar year in which the Archdiocese or Reorganized Debtor makes a transfer to the Trust.

9.5     Broad Powers of the Trustee.  The Trustee is empowered to take all actions,
including such actions as may be consistent with those expressly set forth above, as the Trustee
deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified"

settlement fund under Section 468B of the Tax Code and the regulations promulgated pursuant thereto.  Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

## ARTICLE X

## BENEFICIARIES

10.1    Names and Addresses.  The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Plan.  The Trustee may rely upon this Register for the purposes of delivering distributions or notices.  In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trustee.

10.2    Rights of Beneficiaries.  The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of such Beneficiary.  A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets.  Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to such Persons under this Trust Agreement and the Plan.

10.3    Tax Identification Numbers.  The Trustee may require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and such other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status).  The Trustee may condition the payment of any distribution to any Beneficiary upon receipt of such number and records or documents.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1    Plan Incorporation.  The Plan and the Confirmation Order, including the Plan's Miscellaneous Provisions, are incorporated into this Trust Agreement.

11.2    Notices.  All notices or deliveries required or permitted hereunder shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

[TRUSTEE ADDRESS]

If to the Trust Protector:

[TRUST PROTECTOR ADDRESS]

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented claimant, to the address for the claimant provided in the Proof of Claim.

11.3     Waiver.  No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.4     Reimbursement of Costs.  If the Trustee or the Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement thereof, the Trustee or the Trust, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

11.5     Entirety of Trust Agreement.  This Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter hereof.  This Trust Agreement, together with the Exhibits hereto, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed therein.

11.6     Counterparts.   This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.7     Captions.  The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

11.8     Independent Legal and Tax Counsel.

All parties to this Trust Agreement have been represented by counsel and advisors (collectively referred to as "Counsel") of their own selection in this matter.  Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against any party.  It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America.

11.9     This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Minnesota applicable to contracts and trust agreements made and to be performed therein, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and Treasury Regulations thereunder shall be governed by federal tax law, and all matters of federal bankruptcy law shall be governed by federal bankruptcy law.

IN WITNESS WHEREOF, the Archdiocese and the Trustee execute this Trust Agreement as of the date set forth in the opening paragraph.

**Trustee**:

_____

By: _____

Printed Name: _____

Title: _____

**The Archdiocese of Saint Paul and Minneapolis**

By: _____

Printed Name: _____

Title: _____

# TRUST AGREEMENT – EXHIBIT 1

# TRUST DISTRIBUTION PLAN

## 1.   DEFINITIONS

**1.1   Capitalized Terms.** Capitalized terms used in this Distribution Plan shall have the meanings given them in the Plan, the Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Distribution Plan by reference.

## 2.   PURPOSE, INTERPRETATION

**2.1   Purpose**. This Distribution Plan is designed to provide guidance to the Tort Claim Reviewer in determining the amount of each Tort Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

**2.2   General Principles**. As a general principle, this Distribution Plan intends to set out a procedure that provides substantially the same treatment to holders of similar Tort Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claim Reviewer to determine and to adjust the value to be assigned to a particular Tort Claim are intended to reflect the relative values of Tort Claims.

**2.3   Sole and Exclusive Method**. The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Tort Claim may seek allowance and distribution of such Claim. Although the factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claim Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

**2.4   Interpretation**. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Matrix Protocol.

## 3.   PROCEDURE

**3.1   Allowance of a Tort Claim**. A Tort Claim shall be allowed if the Tort Claim Reviewer determines the Tort Claimant proved his or her claim by a preponderance of the evidence. If necessary, the Tort Claim Reviewer can ask for additional information to make this determination. The Tort Claimant may refuse such a request at his or her own risk. If a Tort Claim is allowed, the Tort Claim Reviewer shall determine the amount of such Tort Claim by assigning such Tort Claim a value pursuant to the Evaluation Factors. The Tort Claim Reviewer may consider the credibility of the Tort Claimant and the facts alleged in support of the Claim and, in the Tort Claim Reviewer's sole discretion, reduce or deny the Tort Claim.

**3.2   Proof of Abuse**. The Tort Claim Reviewer shall consider all of the facts and evidence presented by the Tort Claimant in the Tort Claimant's filed proof of claim. Within 30 days after confirmation of the Plan, Tort Claimants may submit supplemental information to the Tort Claim Reviewer in support of their Tort Claims.

**3.3**      Tort Claimants, or their counsel, may request an interview with the Tort Claim Reviewer.  Such interview is for the purpose of supplementing information or otherwise assisting the Tort Claim Reviewer.

**3.4**      Tort Claimants or their counsel may request an interview with the Tort Claim Reviewer. The costs and expense of the Tort Claim Reviewer in connection with any such interview (including the Tort Claim Reviewer's fees incurred for travel time) shall be paid by the Tort Claimant. A minimum of one hundred dollars ($100) must be advanced by the Claimant if an interview is to take place. The remainder of expenses incurred in connection with any interview(s) may be set off from the Claimant's award. The Tort Claim Reviewer may limit the duration of any interview(s) to a reasonable period.

**3.5**      **Determinations by the Tort Claim Reviewer**. The Tort Claim Reviewer shall notify each Tort Claimant in writing of the monetary distribution with respect to the Tort Claimant's claim, which distribution may be greater or smaller than the actual distribution to be received based on the outcome of any reconsideration claims. The Tort Claim Reviewer's determination shall be final unless the Tort Claimant makes a timely request for the point award to be reconsidered by the Tort Claim Reviewer. The Tort Claimant shall not have a right to any other appeal of the Tort Claim Reviewer's point award.

**3.6**      **Requests for Reconsideration**. The Tort Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claim Reviewer within twenty (20) calendar days after the date of mailing of the notice of the preliminary monetary distribution. Each written request must be accompanied by a check for the reconsideration fee, four hundred dollars ($400). The Tort Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Tort Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claim Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Tort Claim Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

## 4.      <u>GUIDELINES FOR ALLOCATION FOR ABUSE SURVIVOR CLAIMS</u>

**4.1**      **Evaluation Factors**. Each Tort Claim will be evaluated by the Tort Claim Reviewer. Each Claim will be assigned points according to the following system.

   **4.1.1**      **Abuser Profile**. Point values should be assigned in

   **(i)**      15 points should be assigned if the abuser is on the Archdiocese's "Credibly Accused" list;

   **(ii)**      10 points should be assigned if the abuser is on any list of credibly accused besides the Archdiocese's list; and

   **(iii)**      5 points should be assigned if the abuser was accused by other Tort Claimants but is not on any list.

**4.1.2   Nature of Abuse & Circumstances**. A point value ranging from 0 to 35 should be allocated for this section. Considerations should include, but are not limited to, the following factors:

**(i)**     The duration and/or frequency of the abuse;

**(ii)**     Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk;

**(iii)**     Circumstances of abuse:

**(A)**     grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

**(B)**     coercion or threat or use of force or violence, stalking;

**(C)**     relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator;

**(D)**     multiple priests involved in sexual misconduct;

**(E)**     location of abuse, including but not limited to isolated location, Tort Claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

**4.1.3   Impact of the Abuse**. Overall, this category looks to how the abuse impacted the claimant. This includes how the abuse impacted the claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive. A point value ranging from 0 to 40 should be allocated for this section.

The Tort Claim Review should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

**(A)     Mental Health Issues**. This includes but is not limited to anxiety, depression,   post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep

disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

**(B)  Physical Health Issues**. This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

**(C)  Spiritual Wellbeing**. This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

**(D)  Interpersonal Relationships**. This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting;

**(E)  Vocational Capacity**. This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

**(F)  Academic Capacity**. This includes but is not limited to school behavior problems.

**(G)  Legal difficulties**. This includes but is not limited to criminal difficulties, bankruptcy, fraud.

**4.1.4  Claimant Involvement**. The Tort Claim Reviewer shall consider that all Claimants have benefited from the work and cost incurred by those Claimants who have previously asserted claims against the Archdiocese and have participated in the legal and factual development of claims against the Archdiocese. A point value ranging from 0 to 10 should be allocated for this section.

The Tort Claim Review should consider factors including but not limited to whether the Claimant has filed a lawsuit; whether the Claimant and/or the Claimant's family has been subject to a deposition, mediation or interview; whether the Claimant has participated on the committee representing survivors; and whether the Claimant participated in publicizing the issue of clergy sex abuse which has benefitted all claimants.

# 5     **ADDITIONAL PROVISIONS**

**5.1     Distribution Offset or Reduction**. Any compensation on account of the Abuse shall be set off by one hundred percent (100%) of the amounts previously paid to the survivor by any entity. If the Tort Claimant has a pending lawsuit against any non-Released Party, the Tort Claimant's final monetary distribution shall be reduced by twenty-five percent (25%).

**5.2     Prior Investments in Pursuit of Claims**. As explained in Section 4(d) above, all Claimants have benefited from investments made by those Claimants who have previously asserted claims against the Archdiocese and/or participated in the legal and factual development of claims against the Archdiocese. In light of the collective benefits derived from such investments of time, energy, and/or personal funds by Tort Claimants, any out-of-pocket amounts formerly expended by a Tort Claimant in pursuit of his or her Claim, and any amounts paid to, or owed to legal counsel and other professional advisors in pursuit of the Claim, shall be paid by the Trust such that all Tort Claimants with equivalent point values receive the same net distribution from the Trust after the payment of fees and costs incurred in pursuit of Claims.

**5.3     Minimum Payment**. Notwithstanding anything to the contrary herein or in the Plan, every holder of an allowed Tort Claim shall receive a distribution of at least $3,000, unless the Claim is disallowed in its entirety by an Order of the Bankruptcy Court or a decision by the Tort Claim Reviewer.

**TRUST AGREEMENT – EXHIBIT 2**

**TRUSTEE COMPENSATION**

The initial Trustee shall be John Esposito, Berkeley Research Group, LLC. The initial Trustee shall charge a blended rate of no more than $550 per hour.

## EXHIBIT E

## CLAIM RESOLUTION AGREEMENT

**To be entitled to receive any compensation under the Plan, you must execute and deliver this Claim Resolution Agreement Claims and the Medicare Certification.**

In consideration of a promise of the Trust to make me a distribution, I agree as of the Effective Date of the Plan of Reorganization as follows:

1.      All Capitalized terms have the meaning ascribed to the Plan.

2.      I hereby accept the amount payable to me under the Trust Distribution Plan as a partial satisfaction of my Tort Claim(s) against the Archdiocese. I do not intend that payment by the Trust constitutes full consideration for my Tort Claim(s) and I expressly reserve and retain the full extent of my Tort Claim(s) against, and my damages recoverable from, the Archdiocese, the Reorganized Debtor, any other Person and any Non-Settling Insurer. I understand and agree that the fact of payment to me under the Trust Distribution Plan does not constitute an admission by the Archdiocese, the Reorganized Debtor, any other Person or any Non-Settling Insurer of liability or any amount of damages.

3.      I understand and agree that I may be entitled to future additional payments from the Trust for my Tort Claim(s), but only if and when additional Trust Proceeds become available from settlements with Non-Settling Insurers or from judgments awarded to the Trust or other tort claimants, and then only up to the maximum amount of damages awardable to me under the terms of the Trust Distribution Plan. I understand and agree that the Trust will make any such supplemental distributions on a periodic basis accumulating such recoveries and in accordance with the Trust Agreement and Trust Distribution Plan.

4.      I agree that this distribution made to me is the only amount I will be entitled to receive from any Settling Insurer. I agree not to seek recovery of any kind for my Tort Claim(s) from the assets of any Settling Insurer, regardless of whether the injuries or damages I alleged to have suffered are known or unknown, suspected or unsuspected, fixed or contingent, sounding in law or equity. I agree to waive any right of action I may have against any Settling Insurer under Minn. Stat. § 60A.08, subd. 6 or other applicable law, but I expressly retain such rights as against any Non-Settling Insurer.

5.      I intend the foregoing releases to be in accordance with the principles set forth in Drake v. Ryan, 514 N.W.2d 785 (Minn. 1994).

6.      My claims will not be released against the Archdiocese or the Reorganized Debtor until my claims are settled with the Archdiocese or Reorganized Debtor and its Insurers, or until my claims are fully adjudicated and determined and subject to Final Order.  When my claims against the Archdiocese or Reorganized Debtor are so released, the release shall be construed in accordance with the principles set forth in Pierringer v. Hoger, 124 N.W.2d 106 (Wis. 1963) and Frey v. Snelgrove, 269 N.W.2d 918 (Minn. 1978), such that I expressly preserve my rights

against all other Persons, including joint tort-feasors who will remain severally liable on my claims pursuant to Pierringer and Frey.

7.      I approve of the Insurance Settlements embodied in the Plan between the Archdiocese and Settling Insurers.

8.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

9.      This Agreement shall be binding upon my successors, heirs, agents and representatives.


Name of Creditor: _____

Claim Number: _____

Signature: _____

Dated: _____

**EXHIBIT F**

**[RESERVED]**

CORE/3003233.0002/130695805.1

**EXHIBIT G**

**INSURANCE SETTLEMENT AGREEMENTS**

CORE/3003233.0002/130695805.1

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Settlement Agreement") is made by and between the Archdiocese of Saint Paul and Minneapolis, on its own behalf and as successor to the Diocese of Saint Paul (collectively "Claimant" or "the Archdiocese"), on the one hand, and Roger A. Sevigny, Insurance Commissioner of the State of New Hampshire, solely in his capacity as Liquidator ("Liquidator") of The Home Insurance Company ("Home"), on the other hand (the Claimant and the Liquidator are hereinafter referred to collectively as the "Parties").

**WHEREAS,** Home issued the following insurance policies to the Diocese of Saint Paul, under which Claimant is insured:

| Policy Number | Policy Period |
|---------------|---------------|
| CGL 54010 | 8/1/61 to 8/1/64 |
| CGL 63810 | 8/1/64 to 8/1/67 |

which together with all other insurance policies that Home may have issued to Claimant are defined collectively as the "Policies";

**WHEREAS,** Home is being liquidated pursuant to the June 13, 2003 Order of the Merrimack County Superior Court (the "Liquidation Court"), pursuant to which the Liquidator was appointed as the Liquidator of Home;

**WHEREAS,** Claimant submitted a claim in the Home liquidation estate with respect to insurance coverage for bodily injury liabilities that has been assigned the following proof of claim number:

INSU713669

which, together with any other proofs of claim hereinbefore or hereinafter filed by Claimant in the Home liquidation are defined collectively as the "Proofs of Claim";

**WHEREAS,** Claimant has filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota ("the

1

Bankruptcy Court"), and its petition remains pending under the caption *In re Archdiocese of Saint Paul and Minneapolis*, No. 15-bk-30125-RJK (Bankr. D. Minn.);

**WHEREAS,** the Parties are desirous of resolving all claims that were asserted, or could have been or could be asserted, between them and of resolving all matters as between them concerning the Proofs of Claim and concerning all rights and obligations as between them with respect to the Policies;

**NOW, THEREFORE,** in consideration of all the respective transactions contemplated by this Settlement Agreement, and the mutual covenants and representations herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      All definitions contained in the recitals above are incorporated in this Agreement as if fully set forth herein.

2.      <u>Effectiveness</u>.   This Settlement Agreement is conditioned and shall become effective only upon the occurrence of all of the following events

A.      A final order (that is, an order from which no appeal lies, or which has been affirmed on all available appeals) ("Final Order") from the Liquidation Court approving the Settlement Agreement and a Class II priority allowance in the full Recommended Amount ("Final Liquidation Court Approval Order").   The Liquidator shall move at his expense to obtain a Final Liquidation Court Approval Order.

B.      Final Orders  in the Archdiocese's bankruptcy proceeding (collectively "Final Bankruptcy Court Orders") approving each of:

(1)      The Settlement Agreement.  Claimant shall move at its expense for approval of this Settlement Agreement by the Bankruptcy Court.

2

(2)    A buyback of the Policies pursuant to Section 363 of the Bankruptcy Code in return for a Class II priority allowance in the amount of the Allowed Amount; and

(3)    A Plan of Reorganization ("Plan"),    providing a channeling injunction, similar in substance to such provisions approved in other diocesan Plans, with such variations as may be required or appropriate in light of local rules or standards of practice, in favor of the Liquidator and Home, such that any and all claims relating to the Policies are channeled to a trust established pursuant to the Plan.  The channeling injunctions shall channel claims by third-party claimants and by other insurers alleging they are entitled to contribution, indemnification, or subrogation with respect to the Policies, as well as claims by persons or entities alleging that they are insured under the Policies.

The "Effective Date" of this Settlement Agreement is the date upon which both a Final Liquidation Court Approval Order and all Final Bankruptcy Court Orders are entered.  In the event that a Final Liquidation Court Approval Order or any Final Bankruptcy Court Orders are not entered , this Settlement Agreement shall be null and void and without any force or effect, and the Parties shall return to their positions status quo ante this Settlement Agreement as if no such agreement ever was reached, with this Settlement Agreement thereafter being inadmissible for any purpose in any dispute between the Parties.

3.    Review of Plan by Liquidator.  The Archdiocese will provide the Liquidator with the draft of the initial Plan in the form it exists as of that point in time no later than ten days prior to filing.  Liquidator shall review those portions of the Plan which he deems pertinent to this Settlement Agreement prior to the date on which Claimant intends to file the Plan.  The Liquidator may withdraw from this Agreement within five days of receipt of the initial Plan by the Liquidator if the Liquidator determines that the Plan does not adequately protect the interests of the Liquidator and Home.

4.    <u>Recommendation, Allowance, and Classification of Claims.</u>

A.    Subject to all the terms of this Settlement Agreement, and with the agreement of Claimant, which by Claimant's execution hereof is hereby granted, the Liquidator shall recommend pursuant to N.H. RSA 402-C:45 that the Proofs of Claim be allowed in the amount of $14,200,000 (the "Recommended Amount") as a Class II priority claim under N.H. RSA 402-C:44. The Liquidator shall seek allowance of the Recommended Amount as a Class II priority claim by the Liquidation Court in the Liquidator's motion for approval of this Settlement Agreement.

B.    Upon the Effective Date, allowance of the Recommended Amount as a Class II claim by the Liquidation Court ("Allowed Amount") shall fully and finally resolve the Proofs of Claim and any and all other claims of whatever nature that Claimant has against Home under the Policies.

C.    Upon the Effective Date, Claimant will become a Class II creditor in the Home liquidation estate pursuant to N.H. RSA 402-C:44, and Claimant shall, subject to this Settlement Agreement, receive distributions on the Allowed Amount at the same intervals and at the same percentages as other Class II creditors of Home.

D.    Neither the Liquidator nor Home shall seek reimbursement of the Allowed Amount or any part thereof, directly or indirectly, from any person or entity, whether by way of a claim for contribution, indemnification, subrogation, retrospective premium, deductible, or otherwise; provided that nothing in this Paragraph 4D shall preclude the Liquidator from seeking reimbursement of such amounts from Home's reinsurers, solely in their capacities as such, nor shall anything in this Paragraph 4D preclude the Liquidator from raising the Settlement Agreement and the Allowed Amount as a defense

4

to any claim for contribution, indemnification, subrogation, retrospective premium, deductible, or otherwise made by another insured under the Policies. Further, in the event any insurer (a "Plaintiff Insurer") first asserts against the Liquidator or Home a claim for contribution, indemnification, or subrogation in connection with the Policies, the Liquidator may assert such claim against that Plaintiff Insurer. In the event that the Claimant reduces the judgment against such Plaintiff Insurer in accordance with paragraph 9, or otherwise obtains waiver or a release from the Plaintiff Insurer for its claim against Home or the Liquidator, the Liquidator and Home shall dismiss its claim against Plaintiff Insurer so long as Plaintiff Insurer also releases, dismisses or waives its claim against the Liquidator and Home. In the event that the Liquidator or Home successfully prosecutes a claim for contribution, indemnification, or subrogation against any Plaintiff Insurer, and the Liquidator or Home's recovery exceeds the recovery of the Plaintiff Insurer, the Liquidator shall transfer to Claimant the difference between the Liquidator or Home's recovery from the Plaintiff Insurer and the Plaintiff Insurer's recovery from the Liquidator or Home, less any litigation expenses incurred by the Liquidator or Home.

5.    Release by Claimant. Subject to the terms of this Settlement Agreement, upon the Effective Date, Claimant for itself and on behalf of its Archbishop and auxiliary bishops, trustees, officers, directors, employees, personnel, agents, attorneys, subsidiaries, affiliates, predecessors, successors and assigns, and any other insureds under the Policies, solely in their capacities as such, irrevocably and unconditionally releases and discharges the Liquidator and Home and each of their respective officers, directors, employees, agents, attorneys, subsidiaries, affiliates, predecessors, successors, and assigns (including any trustee or other statutory

successor), solely in their capacities as such (collectively, the "Liquidator Released Parties"),

from any and all actions, causes of action, liabilities, adjustments, obligations, offsets, suits,

debts, dues, sums of money, accounts, reckonings, bonds, bills, premiums, losses, salvage,

specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses,

damages, judgments, extents, executions, claims, and/or demands, whether known or unknown,

suspected or unsuspected, fixed or contingent, in law, admiralty or equity, arising from or related

to the Proofs of Claim or to the Policies, which the Claimant or its subsidiaries, affiliates,

predecessors, successors, and assigns, solely in their capacities as such, ever had, now have, or

hereafter may have against the Liquidator Released Parties, arising from or related to the Proofs

of Claim or to the Policies.  For the avoidance of doubt (and without admitting that parishes are

subsidiaries, affiliates, predecessors or successors of the Archdiocese), this release does not

apply to any parishes insured under insurance policies other than the Policies.

     6.     Release by Liquidator.  Subject to the terms of this Settlement Agreement, upon

the Effective Date, the Liquidator, in his capacity as such, and on behalf of Home and each of

their respective officers, directors, employees, agents, attorneys, subsidiaries, affiliates,

predecessors, successors and assigns, solely in their capacities as such, irrevocably and

unconditionally releases and discharges Claimant, its Archbishop and auxiliary bishops, and each

of Claimant's trustees, officers, directors, employees, personnel, agents, attorneys, subsidiaries,

affiliates, predecessors, successors, assigns and any other insureds under the Policies, solely in

their capacities as such (collectively, the "Claimant Released Parties"), from any and all actions,

causes of action, liabilities, adjustments, obligations, offsets, suits, debts, dues, sums of money,

accounts, reckonings, bonds, bills, premiums, losses, salvage, specialties, covenants, contracts,

controversies, agreements, promises, variances, trespasses, damages, judgments, extents,

6

executions, claims, and demands, whether known or unknown, suspected or unsuspected, fixed

or contingent, in law, admiralty, or equity, arising from or related to the Proofs of Claim or to the

Policies, which the Liquidator, Home, or their subsidiaries, affiliates, predecessors, successors,

and assigns, solely in their capacities as such, ever had, now have, or hereafter may have against

Claimant Released Parties arising from or related to the Proofs of Claim or to the Policies.  (For

the avoidance of doubt, the Claimant Released Parties includes parishes only to the extent they

are insureds under the Policies.)

     7.    <u>Resolution of Matters</u>.  The Parties acknowledge that this Settlement Agreement

is intended to resolve all matters as between them arising out of or relating to any rights or

obligations the Parties ever had, now have, or hereafter may have under the Policies or the Proofs

of Claim.  Claimant agrees that it will not look to Home for any further payment relating to any

claims of third-party claimants against Claimant.  Claims against Claimant will be addressed by

Claimant or its assignee as if there had been no liquidation proceeding against Home and as if

Claimant had no insurance coverage from Home by virtue of the Policies, except that Claimant

can take into account the fact of this Settlement Agreement, the Allowed Amount, and the

parties' evaluations of the third party claims encompassed by the Proofs of Claim in establishing

exhaustion of all of Claimant's applicable primary layers of insurance and analyzing the assets

available to Claimant for payment of third-party claims.  The Liquidator is aware of a proof of

claim submitted by the Church of the Nativity of Our Lord in St. Paul, Minnesota, in which the

claimant asserts an entitlement to coverage under the Policies.  The Archdiocese represents that

it has the authority to release the claim of this claimant as set forth in Paragraph 5 of this

Agreement.

8.    <u>Mutual Release of Settling Carriers</u>.    Claimant agrees to use reasonable commercial efforts to cause any settlement agreement it enters into after the effective date of this Settlement Agreement with any other insurance company (or liquidator thereof) regarding insurance coverage for bodily injury claims to include a waiver by that other insurance company (or liquidator) of any claim, including contribution, apportionment, indemnification, subrogation, equitable subrogation, allocation, or recoupment, against Home regarding insurance coverage for bodily injury claims.  Without need for further action, the Liquidator agrees to waive, relinquish, and release any claim, including contribution, apportionment, indemnification, subrogation, equitable subrogation, allocation, or recoupment, regarding insurance coverage for bodily injury claims or sexual misconduct against any other insurance company which executes a settlement with Claimant that includes a provision that is materially the same as this Paragraph 8.

9.    <u>Multiple Claims</u>.  New Hampshire RSA 402 C:40 (IV) provides that in the event multiple claims against the same policy limit are filed, and the aggregate allowed amount of all claims to which the same limit of liability in the policy is applicable exceeds that limit, then each claim as allowed shall be reduced in the same proportion so that the total equals the policy limit. The Liquidator will be unable to determine whether, or the extent to which the Recommended Amount may be subject to proration until all claims against the Policies are identified and evaluated.  If the aggregate allowed amount of claims exceeds the applicable limit such that Claimant's claim is subject to proration, the Liquidator will inform Claimant accordingly.

10.    <u>Judgment Reduction</u>.  In the event that Claimant obtains a judgment against any insurer, Claimant shall reduce or return the amount of any judgment, including any associated interest or costs, to which Claimant would be entitled in connection with any cause of action against any such insurer to the extent necessary to extinguish any liability of the Liquidator and

8

Home for any claim by such insurer against the Liquidator or Home with respect to such judgment.

11.    <u>No Assignments</u>.   Solely to the extent of matters released under this Settlement Agreement:  (a) Claimant warrants and represents that, as of the date on which it executed this Agreement, Claimant has not assigned, conveyed, or otherwise transferred any claims, demands, causes of action, rights, or obligations related in any way to the Policies, or any proceeds thereof, or the Proofs of Claim, or the claims, losses, and expenses released herein, to any person or entity; and (b) Claimant shall not assign or otherwise transfer this Settlement Agreement or any rights or obligations thereunder without the written consent of the Liquidator, which consent shall not be unreasonably withheld, except that Claimant's rights and obligations under this Settlement Agreement may without further consent of the Liquidator be assigned to a trust created pursuant to a Plan for the benefit of Tort Abuse Claimants within the meaning of the Plan upon the fulfillment of all conditions set forth in paragraph 2, provided that, as a condition of the assignment, the trustee accepts the obligations of Claimant under Paragraph 12 of this Agreement.

12.    <u>Further Assurances.</u>    The Parties shall take all further actions as may be necessary to carry out the intent and purpose of this Settlement Agreement and to consummate the transactions contemplated herein.   If Claimant becomes obligated under the Medicare Secondary Payer Act and the Medicare, Medicaid and SCHIP Extension Act of 2007 (the "Acts"), Claimant agrees to provide claims data to the Centers for Medicare and Medicaid Services.  Claimant also agrees to provide claims data to the Liquidator, if and when requested, in the event that the Liquidator becomes obligated under the Acts in connection with any funds distributed pursuant to this Agreement.   The Liquidator shall keep any information and

9

documents received from the Claimant pursuant to this Section 7 confidential and shall not use such information for any purpose other than meeting obligations under the Acts.

13.    <u>Governing Law and Venue</u>.  This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire without regard to the conflicts of law provisions thereof.  However, any interpretation of the Policies shall be governed by the laws of Minnesota without regard to the conflicts of law provisions thereof.  The Parties agree that the exclusive venue for any dispute between the Parties arising out of the Proofs of Claim, the Policies, or this Settlement Agreement shall be the Liquidation Court, except for matters over which the Bankruptcy Court has exclusive jurisdiction.

14.    <u>Due Diligence</u>.  The Parties acknowledge and agree that, in negotiating and executing this Settlement Agreement, they have relied upon their own judgment and upon the recommendations of their own legal counsel, that they have read this Settlement Agreement and have had the opportunity to consider its terms and effects, and that they have executed this Settlement Agreement voluntarily and with full understanding of its terms and effects.  This Settlement Agreement is the product of negotiations between the Parties.  No Party shall be charged with having promulgated this Settlement Agreement, and the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement.

15.    <u>No Third Party Rights</u>.  This Settlement Agreement is entered into solely for the benefit of the Liquidator, Home and Claimant, and is not intended to, and does not give or create any right to or in any person or entity other than the Parties.

16.    <u>Counterparts</u>.    This Settlement Agreement may be executed in multiple counterparts, each of which, when so delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.  The Parties agree that a signature sent by

10

facsimile or electronic mail to the other Party shall have the same force and effect as an original signature.

17.    Power and Authority to Execute.  Subject to the approvals of the Liquidation Court and the Bankruptcy Court as set forth in Paragraph 2, each Party hereto represents and warrants that it has the full power and authority to execute, deliver, and perform this Settlement Agreement; that all requisite and necessary approvals have been obtained to consummate the transactions contemplated by this Settlement Agreement; that there are no other agreements or transactions to which it is a party that would render this Settlement Agreement or any part thereof, void, voidable or unenforceable; that each individual signing on behalf of a Party has been duly authorized by that Party to execute this Settlement Agreement on its behalf; and that no claims being released under the terms of this Settlement Agreement have been assigned, sold, or otherwise transferred to any other entity.

18.    Successor-in-Interest Bound.  This Settlement Agreement shall be binding upon, and shall inure to the benefit of the Parties and their respective trustees, officers, directors, employees, liquidators, receivers, administrators, agents, representatives, successors, and assigns.

19.    Entire Agreement.  This Settlement Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter thereof.  This Settlement Agreement supersedes all prior agreements and understandings, whether written or oral, concerning such matters.

20.    Survival of Warranties and Representations.  The warranties and representations made herein shall survive the execution of this Settlement Agreement.

21.    Validity of Settlement Agreement.  Subject to approval of this Settlement Agreement by the Liquidation Court and Bankruptcy Court as required by Paragraph 2, each

Party represents and warrants that this Settlement Agreement is a legal, valid, and binding obligation, enforceable in accordance with its terms.

    22.   <u>No Waiver</u>.  No waiver of any right under this Settlement Agreement shall be deemed effective unless contained in a writing signed by the Party or an authorized representative of the Party charged with such waiver, and no waiver of any breach or failure to perform shall be deemed to be a waiver of any future breach or failure to perform or of any other provision of this Settlement Agreement.  This Settlement Agreement may not be amended except in a document signed by authorized officials of both Parties.

    23.   <u>Notice</u>.  All notices to be given under this Settlement Agreement shall be given by facsimile and first class U.S. mail directed to:

> If to Claimant, to:
>
> Joseph F. Kueppers
> Chancellor for Civil Affairs
> Office of the Chancellor for Civil Affairs
> Archdiocese of Saint Paul and Minneapolis
> 222 Summit Avenue
> Saint Paul, MN 55102
> Telephone No.:  (651) 291-4400
> Facsimile No.:  (651) 290-1629
>
> and
>
> Lauren E. Lonergan
> Charles B. Rogers
> Briggs and Morgan
> 2200 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota  55402-2157
> Telephone No.:  612-977-8400
> Facsimile No.:  612-977-8650

12

If to the Liquidator, to:

Thomas W. Kober, Chief Claims Officer
The Home Insurance Company in Liquidation
61 Broadway 6th Floor
New York, New York 10006
Fax: 212-299-3824

and

J. Christopher Marshall
Civil Bureau
New Hampshire Department of Justice
33 Capitol Street
Concord, New Hampshire 03301-6397
Fax: 603-271-2110

and

J. David Leslie, Esq.
Rackemann, Sawyer & Brewster, P.C.
160 Federal Street
Boston, MA 02110-1700
Fax: 617-542-7437

24.    Severability.    If any provision of this Settlement Agreement is invalid, unenforceable, or illegal under the law of any applicable jurisdiction, the validity and enforceability of such provision in any other jurisdiction shall not be affected thereby and the remaining provisions of this Settlement Agreement shall remain valid and enforceable. However, in the event of such invalidity, unenforceability, or illegality, the Parties shall negotiate in good faith to amend this Settlement Agreement through the insertion of additional provisions which are valid, enforceable, and legal and which reflect, to the extent possible, the purposes contained in the invalid, unenforceable, or illegal provision.

WHEREFORE, the Parties have caused this Settlement Agreement to be executed on their respective behalves as of the date below the signatures of their duly authorized representatives.

13

**ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**

By: _+ Bernard A. Hebda_

Name: _Archbishop Bernard A. Hebda_

Title: _President_

Date: _5/24/16_


**ROGER A. SEVIGNY, INSURANCE COMMISSIONER OF THE STATE OF NEW HAMPSHIRE, SOLELY IN HIS CAPACITY AS LIQUIDATOR OF THE HOME INSURANCE COMPANY**


By: _____

Name: _____

Title: _____

Date: _____

**ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**

By: _____

Name: _____

Title: _____

Date: _____


**ROGER A. SEVIGNY, INSURANCE COMMISSIONER OF THE STATE OF NEW HAMPSHIRE, SOLELY IN HIS CAPACITY AS LIQUIDATOR OF THE HOME INSURANCE COMPANY**

By: _Thomas W. Kober_

Name: _Thomas W. Kober_

Title: _Chief Claims Officer_

Date: _May 2, 2016_

14

**EXHIBIT H**

**LIST OF LEASES AND EXECUTORY CONTRACTS TO BE ASSUMED**

| Counterparty | Description of Contract or Lease |
|---|---|
| Cathedral of Saint Paul | Lease Agreement |
| Benilde Saint Margaret High School | Lease Agreement |
| De La Salle High School | Lease Agreement |
| Totino Grace High School | Lease Agreement |
| St. Paul Seminary | Byrne Residence agreement |
| University of Saint Thomas | Byrne Residence agreement |
| 226&230 Summit, LLC | Chancery lease agreement & view easement agreement |
| Minnesota Historical Society | Hayden Center lease agreement |
| IAF Beacon I, LLC | Lease Agreement |
| Church of St. Peter | Townhome lease agreement |
|  |  |
| ADP Payroll Services | Payroll services agreement |
| Blauckbaud | Software services agreement |
| Blue Cross Blue Shield of MN | Medical benefits administration |
| Canvas Health Inc. | Victim assistance telephone triage agreement |
| CenturyLink | Data network agreement |
| Cushman & Wakefield NorthMarq | Project management agreement |
| Cybersource Corporation | Payment processing services contract |
| Daikin Applied | Maintenance services agreement |
| Delta Dental | Dental benefits administration |
| Digital Innovation Inc. | Software agreement |
| G&K Services | Laundry services contract |
| GE Capital | Lease of computers under master agreement |
| GreatAmerica Financial Services Corp | Loffler copier lease |
| Integra Solutions | Internet connectivity agreement |
| HShilling | CRM implementation and support |
| J Braun Consulting LLC | Consulting services agreement – Archdiocese Victim Assistance Program |
| Kolbe Media | Web design and hosting agreement |
| LaSallian SRS Lady Guadalupe | Housekeeping services agreement |
| Loffler | Copy machine lease |
| Logmein, Inc. | Email hosting agreement |
| Logos fka Parishsoft | Hosting services agreement |
| MacNeil Environmental, Inc. | Environmental/Occupations Health & Safety Services agreement |
| Mail Finance | Postage meter lease |

| Counterparty | Description of Contract or Lease |
|---|---|
| Metro Sales, Inc. | Equipment lease and security and service agreement |
| Paycor | Payroll services agreement |
| Penserv | Common remitting services agreement |
| Plunkett Pest Control, Inc. | Pest control services agreement |
| Premier Locating Inc. | Utility-related services agreement |
| Saint Catherine University | Event hosting |
| Select Commercial Services | Storage agreement |
| Shred Right | Recycling services agreement |
| SFM Risk Solutions | Claims administration services agreement |
| Stanley Convergent Security | Security services agreement |
| Teamworks International Inc. | Consulting services agreement |
| US Internet | IT services agreement |
| Vanguard Parking System | Management services agreement |

**EXHIBIT I**

**[RESERVED]**

CORE/3003233.0002/130695805.1

**EXHIBIT J**

**OFFICERS AND DIRECTORS OF REORGANIZED DEBTOR**

| Name | Title |
|------|-------|
| Most Reverend Bernard A. Hebda | Archbishop |
| Most Reverend Andrew Cozzens | Auxiliary Bishop |
| Very Reverend Charles V. Lachowitzer | Moderator of the Curia |
| Joseph Kueppers | Chancellor for Civil Affairs |
| Thomas Mertens | Chief Financial Officer |
| John F. Bierbaum | Board of Directors - member |
| Peter Daly, M.D. | Board of Directors - member |
| Karen Rauenhorst | Board of Directors - member |
| Rev. Stephen Ulrick | Board of Directors - member |
| Brian Short | Board of Directors - member |

**EXHIBIT K**

**SETTLEMENT AGREEMENT WITH RAMSEY COUNTY ATTORNEY'S OFFICE**

CORE/3003233.0002/130695805.1

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT
JUVENILE COURT DIVISION

---------------------------------------------------------------

In the Matter of the Welfare of:

    VICTIM-1, a child identified in police reports;

    VICTIM-2, a child identified in police reports; and

    VICTIM-3, a child identified in police reports.

Respondent:
    The Archdiocese of Saint Paul and Minneapolis,
             a Minnesota corporation,
    226 Summit Avenue
    St. Paul, MN 55102
    651-291-4400

MNCIS Group:
Court File No.: 62-JV-15-1674
CA File No.: 2138749

**STIPULATION TO
STAY PROCEEDINGS**

---------------------------------------------------------------

    The parties, having reached settlement in the above-captioned matter to further their respective and mutual interests in protecting minors from sexual abuse, and recognizing the complexity of the captioned matter, and without any admission of liability,

    IT IS HEREBY STIPULATED by and between the parties, through their respective undersigned counsel, as follows:

    1.    that the parties have entered into a Settlement Agreement ("Agreement"), which is contingent upon approval of the United States Bankruptcy Court;

    2.    that the Agreement is intended to further the statutory goals of Minn. Stat. § 260C.335;

    3.    that further proceedings in the above-captioned matter be stayed for thirty-six (36)

months, the agreed-upon term of the Agreement, from the date of approval by the United States

Bankruptcy Court;

    4.    that the Court retain jurisdiction of the above-captioned matter during the pending

thirty-six (36) month period;

    5.    that the parties appear before the Court at approximately six-month (6 month)

intervals over the term of the Agreement to report to the Court on the ongoing status,

implementation and progress of the Agreement;

    6.    that the parties agree that no other or further claims or crossclaims shall be brought

by any party in the above-captioned matter, except for litigation to enforce the Agreement should

that become necessary;

    7.    that the Agreement is attached to this stipulation; and

    8.    that the parties agree this stipulation and the Agreement are public documents.

Respectfully submitted,

FREDRIKSON AND BYRON, P.A.

Dated: _12/12/15_        By: _____

        Joseph T. Dixon (#0283903)
        Andrew F. Johnson (#0390783)
        200 South Sixth Street, Suite 4000
        Minneapolis, MN 55402
        612-492-7000
        Facsimile: 612-492-7077
        jdixon@fredlaw.com
        ajohnson@fredlaw.com

2

Dated: 12/17/15

JOHN J. CHOI
RAMSEY COUNTY ATTORNEY

By: _____

    John J. Choi (#257175)
      Ramsey County Attorney
    John T. Kelly (#214098)
      First Assistant County Attorney
    Thomas E. Ring (#25082X)
      Assistant County Attorney
    Stephanie L. Wiersma (#395741)
      Assistant County Attorney
Office of the Ramsey County Attorney
345 Wabasha Street North, Suite 120
St. Paul, MN  55102
651-266-3222

3

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered by and between The Archdiocese of St. Paul and Minneapolis, a Minnesota corporation, and the Ramsey County Attorney ("RCAO").

## RECITALS

WHEREAS, the Parties agree that the Archdiocese shall seek to create and foster an organizational culture in which everyone becomes and remains vigilant about achieving an overall aspirational goal that no child ever again be the victim of clergy sexual abuse.

WHEREAS, the RCAO initiated the Civil Action on June 3, 2015 petitioning the Court for an order that the Archdiocese show cause why it should not be subject to the jurisdiction of the Court for contributing to a child's need for protection or services; and

WHEREAS, the Court found probable cause to support issuance of the order requested by the RCAO; and

WHEREAS, the Archdiocese has taken and is taking steps to substantially enhance its Safe Environment Program; and

WHEREAS, the Archdiocese denies that it is contributing to a child's need for protection or services; and

WHEREAS, the Archdiocese initiated Bankruptcy Proceedings before the Civil Action was brought, and now seeks to pursue resolution of the Civil Action in a prudent manner consistent with the protection of assets available for creditors; and

WHEREAS, the RCAO seeks to protect the community and hold individuals and organizations accountable for injurious conduct as required by law and the interests of justice; and

WHEREAS, the Parties agree that this Agreement will advance their mutual interests in the protection of minors beyond what may otherwise be obtained through further litigation; and

NOW, THEREFORE, the Parties, in consideration of the promises and mutual undertakings contained in this Agreement, here promise their respective best efforts to achieve with deliberate speed the following terms and conditions of settlement:

1

## AGREEMENT

A. **Definitions.**   The Parties have defined certain terms used within this Agreement that are provided below:

"Adult Volunteer" means an adult volunteer for the Archdiocese or a Parish or School who has regular or unsupervised contact with unrelated minors.

"Archbishop" means the sitting Archbishop of St. Paul and Minneapolis (or the appointed Apostolic Administrator).

"Archdiocese" means that certain corporate entity formed, maintained and existing under Minnesota Section 315.16 with Minnesota Business Name: "The Archdiocese of St. Paul and Minneapolis".

"Archdiocese Territory" means the twelve (12) counties of the greater Twin Cities metropolitan area: Ramsey, Hennepin, Washington, Dakota, Anoka, Carver, Wright, Scott, Chisago, LeSueur, Rice, and Goodhue; and those persons outside the geographical territory over whom the Archdiocese has the ability to direct or control.

"Auxiliary Bishop(s)" means the Most Rev. Andrew H. Cozzens and any other titular bishop assigned to and serving the Archdiocese.

"Bankruptcy Proceedings" means the Chapter 11 Bankruptcy case captioned *In re: The Archdiocese of Saint Paul and Minneapolis, Debtor* before the United States Bankruptcy Court for the District of Minnesota, Bankruptcy Case No.: 15-30125.

"Board" means the duly constituted serving Board of Directors of the Archdiocese.

"Civil Action" means that certain civil proceeding initiated by the RCAO on June 3, 2015 that has been assigned case file number 62-JV-15-1674 by the Ramsey County District Court.

"Clergy" means any persons ordained – bishops, priests, and deacons – who administer the rites of the Catholic Church.

"Cleric" means a member of the Clergy.

"Code of Conduct" means the Code of Conduct for Clergy, the Code of Conduct for Church Personnel, the Code of Conduct for Adult Volunteers, and the Code of Conduct for Youth Volunteers, as applicable.

"Court" means the Ramsey County (Minnesota) District Court.

"Director" means the Archdiocese employee responsible for managing Archdiocese processes for handling allegations of clergy misconduct and for leading the Office of Ministerial Standards and Safe Environment.

"Ministerial Review Board" means the advisory, consultative body assembled to advise the Archbishop and his staff regarding clergy misconduct. The Ministerial Review Board may also review and offer recommendations regarding Archdiocese policies and processes relating to misconduct.

"Parish" means a parish within the Archdiocese Territory that is Archdiocese-recognized as Catholic.

"Parties" means the Archdiocese and the Ramsey County Attorney.

"Pastor" means a Parish pastor or a parochial administrator, as the case may be.

"Policies" means Archdiocese policies relating to the sexual abuse of minors, including the Codes of Conduct for Catholic Church clergy, employees, and volunteers.

"POMS Program" (or its equivalent) means the Archdiocese's internal program for clergy the Archdiocese desires to have supervised.

"RCAO" means the Ramsey County Attorney or the Office of the Ramsey County Attorney.

"Safe Environment Program" means all policies, procedures, and programming that contributes to the protection of minors.

"School" means a primary school or a secondary school within the Archdiocese Territory that is Archdiocese-recognized as Catholic.

"Seminary" or "Seminaries" means the St. Paul Seminary, St. John Vianney Seminary, or both.

B. **Basis for Civil Action.**    The factual basis for the Civil Action as alleged by the RCAO is contained in the Petition for Order to Show Cause.

C. **Statement of the Archdiocese.**    The Archdiocese may choose to issue a public statement relating to entering this Agreement, both in writing and through public statements of its representatives. The RCAO agrees that such statements, if made by the Archdiocese, would not be admissible as evidence in any proceeding between the RCAO and Archdiocese.

D. **Letter of Apology; Meeting with Victims.**    The Archbishop shall send a private letter of apology to the victims and family of this action through their respective counsel. In that letter, he will offer to meet with the victims and their family. The RCAO agrees that this letter would not be admissible as evidence in any proceeding between the RCAO and Archdiocese.

3

E.  **Conference for Restorative Justice and Reconciliation**.   Within eighteen (18) months of confirmation of a plan of reorganization, or dismissal of the Bankruptcy Proceedings, the Archdiocese will convene and participate in a one-day "Conference for Restorative Justice and Reconciliation" (the "Conference") at an appropriate location to be determined. The invitees shall include, at a minimum, victims of sexual abuse, those interested and relevant stakeholders of the Archdiocese, as well as those interested and relevant stakeholders within those dioceses that constitute the Ecclesiastical Province of St. Paul and Minneapolis. A planning committee will include representatives of the Archdiocese and the RCAO, and the hosting institution as applicable. The Conference will be funded by the Archdiocese.

F.  **Restorative Justice Sessions.**   The Archbishop and the Auxiliary Bishop also agree to participate in mutually agreed upon restorative justice sessions to be convened by the Parties during a two-year period following the last date of execution of this Agreement. These sessions are contemplated to include meetings with victims and their families, as a victim or his/her family may request

G.  **Safe Environment Compliance Standards**.   The Archdiocese agrees to continue its ongoing efforts to improve its Safe Environment Program and, as may be required by this Agreement, to enhance its program to meet each of these standards within the timeframes specified below:

   1.  **Continuance of Efforts**

      1.1.   The Archdiocese agrees that the compliance standards provided herein are intended by the Parties to enhance and to improve its Safe Environment Program.

      1.2.   The Archdiocese shall continue to implement those recommendations made by the Safe Environment and Ministerial Standards Task Force in its "Report and Recommendations to Protect Children from Clergy Sexual Abuse" as submitted to the Episcopal Vicar for Ministerial Standards on March 31, 2014, that are incorporated herein.

   2.  **Oversight**

      2.1.   Board of Directors.  The Board shall be knowledgeable about the content of the Policies and operation of the Safe Environment Program and shall exercise reasonable oversight with respect to the effectiveness of said program.

         a.   The Board's Audit Committee (or the Board as a whole) shall meet with the Director as often as it determines necessary to assess and evaluate the Safe Environment Program at the highest level of the Archdiocese, but in any event, no less than once every six months.  Formal written agendas and minutes of this committee shall be maintained as part of the corporate records.

      2.2.   Archbishop.  The Archbishop shall be knowledgeable about the content of the Policies and operation of the Safe Environment Program and shall exercise reasonable oversight with respect to implementation, operation, and assessed effectiveness of said program.

4

2.3. <u>Ministerial Review Board</u>. The Ministerial Review Board shall be knowledgeable about the content of the Policies and operation of the Safe Environment Program and shall provide consultation, guidance, and support to the program.

2.4. <u>Director of Ministerial Standards and Safe Environment</u>. The Director has the duties and responsibilities and that authority that is defined in the Job Description as presently maintained by the Archdiocese. Among other things:

    a. the Director is responsible for continuing to develop, implement, and revise as necessary the policies and procedures for preventing, responding to, and ensuring the reporting of allegations of child abuse; and

    b. the Director shall support and coordinate the activities of the Ministerial Review Board, the POMS Program, the Victim Advocacy Office, and the Office for the Protection of Children and Youth.

## 3. Policies and Procedures

3.1. The Archdiocese shall create a comprehensive set of documents encompassing all Policies relating to the protection of minors. This comprehensive set of documents shall be organized and readily available on its website.

    a. The Policies shall be written and formatted so they are easy to read and understand.

    b. The Policies shall define key terms.

        i. The Policies shall define what behavior constitutes misconduct involving minors, including, without limitation, sexual exploitation of minors and sexual harassment of minors.

        ii. The Policies shall define what constitutes child abuse. The definitions shall include at a minimum the definitions of sexual and physical abuse as defined in Minn. Stat. § 626.556.

        iii. The Policies shall define what constitutes a "credible allegation" and "substantiated claim."

    c. Among any other instructional formats it may choose to employ, the Archdiocese shall also provide in written form examples of what constitutes misconduct involving a minor as part of training or training-related materials, including what is considered "appropriate" vs. "inappropriate" physical contact.

3.2. The Archdiocese shall include guidelines for the acceptable use of technology within its policies:

    a. The policy will grant the Archdiocese the ability to inspect, review, audit, intercept, or access all matters on systems of the Archdiocese, including employee e-mail, voicemail, and computer systems at any time, with or without notice.

    b. Guidelines shall include how to properly use social media and cellular phones, including text messaging.

5

3.3.   The Policies shall continue to prohibit Archdiocese employees and Adult Volunteers from being alone (*i.e.*, out of sight of at least one other adult) with any unrelated minor while serving as an employee or volunteer of the Archdiocese or a Parish, subject to common sense exceptions, such as emergency situations, interactions with a minor that are incidental and not extended, parents transporting their children or other related individuals, and employees or volunteers transporting the children of friends and neighbors. This paragraph does not apply to employees and volunteers providing services in or for Schools or providing Catholic education.

3.4.   The Policies shall continue to prohibit clergy from being alone with any unrelated minor except when a cleric is hearing confession in a confessional, and except for common sense exceptions such as emergency situations or circumstances where interaction is incidental and not extended.

3.5.   The Policies shall continue to prohibit: (a) clergy from traveling alone with or taking overnight trips alone with any unrelated minor; and (b) clergy from sleeping in the same private space (*e.g.*, room, tent, bed, etc.) with any unrelated minor.

4. **Acknowledgement of Policies**

4.1.   Within thirty (30) days of assignment of a cleric to continuing ministry within the Archdiocese Territory, the Archdiocese shall collect and maintain an acknowledgment form (or electronic record) certifying that such cleric has received the Policies, understands the Policies, and will comply with the Policies.

4.2.   Within thirty (30) days of the commencement of any employment or continuing volunteer service, the Archdiocese shall collect and maintain an acknowledgment form (or electronic record) from all Archdiocese employees and Archdiocese Adult Volunteers certifying that he/she has received the Policies, understands the Policies, and will comply with the Policies.

4.3.   The Policies shall include the Code of Conduct acknowledgement forms for clergy, employees, and Adult Volunteers. Those required to acknowledge the Code of Conduct must acknowledge receipt of the Code, their understanding of the Code, and their agreement to comply with the Code. The acknowledgement forms will refer to the reporting requirements under the Policies. The acknowledgement may be completed electronically.

4.4.   The Archbishop shall request that within thirty (30) days of a seminarian's commencement of study, each Seminary will collect and maintain an acknowledgment form (or electronic record) from each seminarian certifying that he has received the Policies, understands the Policies, and will comply with the Policies. The Office of the Director shall request no less than annually that each Seminary will furnish the Director with records demonstrating compliance with this requirement. If the Seminary fails to provide such records as requested, the Director shall within a reasonable time notify the Archbishop and the Board of Trustees of the Seminary in writing.

6

4.5.   The Archbishop shall request that within thirty (30) days of the commencement of any employment or volunteer service, all Parishes and Schools will collect and maintain an acknowledgement form (or electronic record) from each of their respective employees, and Adult Volunteers certifying that he/she has received the Policies, understands the Policies, and will comply with the Policies. The Office of the Director shall request no less than annually that each Parish and School furnish the Director with records demonstrating compliance with this requirement. If a Parish or School fails to provide such records as requested, the Director shall within a reasonable time notify the Archbishop and the Board of Trustees of such Parish or School in writing.

4.6.   The Office of the Director shall maintain the acknowledgement forms (or records) for each cleric. Such files may be kept electronically.

4.7.   The Archbishop shall request that each Parish, School, and Seminary maintain the acknowledgement forms (or records) for each employee, Adult Volunteer, or seminarian, and that said forms (or records) be subject to review by the Director. Such files may be kept electronically.

## 5.   Safe Environment: Essential 3 Requirements

5.1.   The Policies shall define who is required to complete the Essential 3 requirements.

   a.   The Essential 3 requirements are: (1) Acknowledgement of the Code of Conduct; (2) specialized child protection training (such as VIRTUS or its equivalent); and (3) a criminal background check.

   b.   In accordance with the Policies, those required to complete the Essential 3 requirements include, but are not limited to:

      i.   clergy (active or retired) who have been granted permission by the Archbishop to conduct continuing ministry within the Archdiocese Territory for more than thirty (30) days;

      ii.   employees and Adult Volunteers providing service to the Archdiocese or a School or Parish (including, but not limited to principals, assistant principals, teachers, school counselors, librarians, coaches, school nurses, staff of preschools, youth religious programs and youth activities, directors of youth religious education programs, or maintenance employees);

      iii.   seminarians who have commenced their study at a Seminary; and

      iv.   seminarians who are working for a School or Parish.

   c.   Parents who volunteer with their child's programs or activities, such that they have regular or unsupervised contact with unrelated minors, must fulfill Essential 3 requirements.

5.2.   Where reasonably feasible, the Archdiocese shall provide Safe Environment training and materials to Parishes and Schools in the principal languages of those who attend such School or Parish.

7

5.3.   The Archdiocese shall provide Parishes and Schools with a volunteer application form for Adult Volunteers. Unless prohibited by law, these forms shall include questions regarding: (1) whether the applicant has a criminal history; (2) whether the applicant has ever been the subject of a criminal investigation involving an allegation of sexual abuse; (3) whether a civil or criminal complaint has ever been filed against the applicant alleging physical abuse or sexual abuse by the applicant; (4) whether the applicant has ever failed to report sexual abuse as required by law or policy; (5) whether the applicant has ever had employment terminated or has otherwise been disciplined for reasons relating to allegations of inappropriate conduct with minors, child abuse, or sexual misconduct of any kind; and (6) the applicant's history of volunteering with minors within the previous five (5) years.

   a.   The Archdiocese shall request that Adult Volunteers do not begin volunteer services within a Parish or School until the volunteer application has been completed.

5.4.   The Director shall have the authority to refer employees or Adult Volunteers of the Archdiocese to attend any additional Safe Environment program(s) or training(s).

5.5.   The Director shall request that each Seminary, Parish, and School that utilizes the services of a third-party person or entity under circumstances where that third-party has regular or unsupervised contact with minors be made aware of the existence of the Policies and the option to attend Safe Environment training.

5.6.   The Office of the Director of Safe Environment shall maintain an electronic registry of clergy compliance with the Essential 3 requirements.

   a.   The Office of the Director shall continue its development of an electronic database to monitor compliance with the Essential 3 requirements and shall maintain a registry of compliance in such electronic database.

   b.   The Office of the Director shall request an annual certification from each Parish pastor and a member of the Parish or School board of trustees that each respective Parish or School is in compliance with the Essential 3 requirements for each employee and Adult Volunteer at the Parish or School. If the Parish or School fails to provide the requested certification, the Director shall within a reasonable time notify the Archbishop and send a letter of notice to both the full Parish or School board of trustees and the Parish council.

   c.   For each Parish and School, the Office of the Director shall annually review clergy compliance with the Essential 3 and shall within a reasonable time send a letter of clergy non-compliance, if applicable, to the relevant board of trustees.

   d.   The Director shall request an annual certification from the rector and a member of the board of trustees of each Seminary that the Seminary is in compliance with the Essential 3 requirements for all seminarians, affiliated clergy members, employees, and Adult Volunteers. If the Seminary fails to provide the requested certification, the Director shall within a reasonable time notify the Archbishop and send a letter of notice to the Seminary's full board of trustees.

8

### Essential 3:  Code of Conduct

5.7.  The Code of Conduct shall define key terms.

5.8.  The Code of Conduct shall contain a provision prohibiting the viewing of pornographic materials on, or taking pornographic materials onto, the property of the Archdiocese, a Parish or a School.

5.9.  The Code of Conduct shall contain a provision prohibiting the showing of pornographic material to minors and prohibiting the illegal provision of alcohol, tobacco, or drugs to minors.

5.10.  The Code of Conduct shall contain a provision for pastoral counselors and spiritual directors that addresses and defines proper boundaries and improper conduct, including physical contact, with the persons they counsel.

    a.  The Code of Conduct shall contain a provision stating that clergy are responsible for establishing and maintaining clear, appropriate boundaries in counseling relationships.

5.11.  The Code of Conduct shall contain provisions on how to report unethical or unprofessional conduct.

5.12.  The Archdiocese shall develop and distribute appropriate training relating to the Code of Conduct for use at the start of employment or volunteer service, or within sixty (60) days of a material revision of the Code of Conduct.

### Essential 3:  Background Checks

5.13.  The Archdiocese shall develop an enhanced background check policy.

5.14.  The policy shall state that all members of the clergy, employees, and Adult Volunteers within the Archdiocese Territory are subject to the background check policy as follows:

    a.  Clergy shall be subject to background checks upon their initial assignment within the Archdiocese Territory, and no less than every five (5) years thereafter.

    b.  A Cleric's service in excess of thirty (30) days may only continue after such cleric has successfully completed a criminal background check.

    c.  Clergy shall be required to report to the Director any arrest or citation involving conduct that violates the Archdiocese Policies and the Director shall gather available, relevant documentation and assess whether the particular matter should be forwarded to the Archbishop or the Ministerial Review Board, or both.

    d.  If a prospective employee will have regular or unsupervised contact with minors, such employment may only start after an individual has successfully completed a criminal background check.

    e.  An Adult Volunteer may only start his/her service after having completed a criminal background check.

9

5.15. In recognition of developing technological advancements that can improve the accuracy of background checks, the Archdiocese will meet and confer with the RCAO to explore the feasibility of a background check results policy that requires fingerprinting as a component of the background check process.

5.16. The background check policy shall provide criteria for evaluating the results of a background check and provide guidance for determining what constitutes disqualifying offenses for employment and volunteer positions.

   a. If the background check reveals a criminal history, the applicant may be given the opportunity to provide an explanation, submit additional information, or challenge its accuracy.

   b. The following factors should be considered before deciding whether or not to offer or deny employment or acceptance as a volunteer: (1) the length of time since conviction; (2) the nature of the crime; (3) the relationship of the crime to the duties to be performed; (4) the number and kind of convictions; (5) rehabilitation efforts; and (6) history of other employment or volunteer activity.

5.17. The Archdiocese shall request that its third-party vendor that provides background checks to the Archdiocese, Parishes, and Schools inform the requesting entity of any prior background checks performed on the same individual.

5.18. The Archdiocese shall request that Parishes, Schools, and Seminaries follow the recommended Archdiocese background check policy. If the Parish, School, or Seminary refuses to follow the Archdiocese background check policy, the Director shall within a reasonable time notify the Archbishop and the board of trustees of the respective Parish, Seminary, or School in writing.

5.19. Background checks for clergy, Archdiocese employees, and Archdiocese Adult Volunteers shall be maintained by the Director.

5.20. The Archbishop shall request that each Seminary, Parish, and School maintain background check files for Seminarians, their respective employees and Adult Volunteers.

**Essential 3: VIRTUS Training**

5.21. The Archdiocese shall continue its policy that all those required to comply with the Essential 3 shall complete VIRTUS training within thirty (30) days of the start of service.

5.22. The Archdiocese shall continue to provide VIRTUS training (or its equivalent) no less than every three years to all clergy, all employees, and all Adult Volunteers.

5.23. The Archdiocese shall evaluate periodically the VIRTUS training materials (or its equivalent) to provide updated training to all clergy, employees, and Adult Volunteers.

10

6. **Reporting Abuse**

6.1.    The Policies shall clearly state that a report to the Archdiocese does not relieve the individual from reporting known or suspected abuse as is required under Minnesota law.

   a.    The Policy shall contain a section dedicated to civil mandatory reporting requirements, including the following guidance: (1) who must report; (2) what must be reported; (3) to whom the report must be made.

   b.    The Archdiocese shall continue its policy that clerics, employees, and Adult Volunteers shall be trained on mandatory reporting obligations within thirty (30) days of their hire and shall receive refresher updates at least every three (3) years thereafter.

6.2.    The Policies shall also require an employee or an Adult Volunteer serving within the Archdiocese Territory who has reason to suspect sexual abuse of a minor that would be subject to mandatory reporting under Minn. Stat. § 626.556 shall immediately notify civil authorities as defined therein (within 24 hours).

6.3.    The Policies shall clearly define the proper reporting channels for reports made under ¶¶ 6.1 and 6.2. The policies shall state:

   a.    the first report of suspected abuse of a minor shall be to civil authorities as defined in Minn. Stat. § 626.556;

   b.    any person, other than the victim, who makes a report to civil authorities shall be required to report the same information without undue delay to the Director. The Director shall then promptly notify the Archbishop or his designee;

      i.    The Director shall notify or confirm that law enforcement has been notified as required by law and the Policies. The Director shall complete written documentation relating to the report.

   c.    if authorized by law enforcement, and the suspected abuse occurred at or during a Parish/School activity or involves Parish/School personnel or volunteers, the Director shall notify the principal or pastor of the Parish/School, unless the suspected abuse involves the pastor or principal, in which case the Director shall notify the Parish or School board of trustees;

      i.    The pastor, school principal, agency director, or other person in charge of the location should complete written documentation of the report and the actions taken.

   d.    if the abuse involves a cleric, the Director shall request all relating written reports from the Seminary, Parish, or School.

6.4.    When the Archdiocese receives a report of child sexual abuse and makes a mandated report to law enforcement pursuant to Minnesota statute, the Archdiocese shall not conduct an internal investigation, and will not interfere in any way with law enforcement until law enforcement concludes its investigation, closes its file without investigation, or authorizes the Archdiocese to take action.

11

6.5. The Policies shall include the rights of the person who makes an allegation. This policy shall ensure that the person making the allegation is provided with: (1) an adequate explanation of the Archdiocese's overall process and procedures for dealing with allegations of child sexual abuse, including its policy on reporting to civil authorities; (2) advice that the Archdiocese shall endeavor to conduct its investigation with appropriate discretion and, to the extent possible, protect the privacy and reputations of both the person reporting as well as the person about whom the report was made; and (3) a timely response to inquiries and, as necessary, periodic update(s) as to the status or resolution of the report.

6.6. The Archdiocese shall provide Parishes and Schools materials for making a complaint, including print materials in the principal language in which the liturgy is celebrated.

6.7. The Archdiocese shall establish a policy that prohibits retaliation against any cleric, employee, Adult Volunteer, parishioner, or other individual who in good faith reports sexual abuse of a minor or suspicions of sexual misconduct.

6.8. The Archdiocese shall publish in the Catholic Spirit no less than four (4) times per year for the term of this Agreement a statement urging those subject to sexual abuse of a minor to contact law enforcement to make a report of the abuse.

6.9. The Archdiocese shall continue to provide information in writing to Seminaries, Parishes, and Schools regarding the prevention of abuse, training to identify signs of abuse, statements that the abused are not at fault and encouraging the reporting of abuse.

6.10. If there is an allegation of sexual abuse of a minor involving the Archbishop or any Auxiliary Bishop, in addition to the notifications set forth above, the Director shall within a reasonable time notify the Board.

## 7. Clergy and other Employees

7.1. The Archdiocese shall use reasonable efforts not to include among personnel of the Archdiocese having substantial authority any individual whom the organization knew, or should have known through the exercise of due diligence, has engaged in sexual misconduct with minors.

7.2. In each case where a cleric has been found not guilty of criminal conduct by civil authorities, or has been investigated by civil authorities without prosecution, the Archdiocese shall make an independent inquiry into and determination of the given cleric's fitness for ministry.

7.3. The Archdiocese shall not assign a cleric for a position in public ministry or a position that provides access to minors, who has a substantiated claim or pending credible allegation of sexual abuse of a minor against him, or who is otherwise deemed unsuitable for ministry.

    a. Where there have been allegations of sexual abuse of a minor by a cleric, fitness for ministry determinations are to be made by the Archbishop upon

12

recommendations from the Director and the Ministerial Review Board. If the Archbishop, after considering these recommendations, determines a cleric is unfit for ministry based on a substantiated claim of sexual abuse of a minor, the Archdiocese shall not recommend such cleric to another religious organization, and shall notify an inquiring organization of the determination regarding fitness for ministry.

7.4.   If a cleric seeks assignment, transfer, or residence outside of the Archdiocese Territory, the Archdiocese shall seek permission from the cleric to make available for review by the receiving diocese, religious community, or organization a complete copy of his clergy file and any other Archdiocese files materially related to the cleric. If the cleric permits review, the Archdiocese shall provide such receiving entity access to the complete clergy file and any other Archdiocese files materially related to the cleric. If the cleric refuses review or limits review of the complete file or any other Archdiocese files materially related to the cleric, the Archdiocese shall notify the receiving entity that the cleric refused access or is limiting access.

  a.   The Archdiocese shall disclose any credible allegation of sexual abuse of a minor to any diocese, Catholic entity, or secular employer that inquires about the existence of any allegation of sexual abuse of a minor with respect to any past or present cleric of the Archdiocese to the extent that such disclosure is allowed by federal and state law. The Archdiocese shall also disclose the status or resolution of that allegation as reflected in its records to the extent allowed by federal and state law.

7.5.   The Archdiocese shall not recommend, and shall have a policy that prohibits a cleric or Archdiocese employee from recommending, an employee for a position that provides access to minors if the employee has a substantiated claim or pending credible allegation of sexual abuse of a minor against him or her.

7.6.   The Archdiocese shall continue to work with the Seminaries to prevent clergy sexual abuse of minors.

  a.   The Archdiocese shall provide Safe Environment resources and training no less than annually to seminarians at the St. Paul Seminary.

  b.   The Office of the Director of Safe Environment shall be a resource for each Seminary regarding selection, evaluation, and formation of seminary candidates.

7.7.   The Archbishop shall request that each Parish, School, and Seminary designate a Safe Environment Coordinator to oversee the Parish, School, or Seminary program for screening, selecting, and supervising those working in the Parish, School, or Seminary who will have regular or unsupervised contact with minors. The Office of the Director of Safe Environment shall provide training to such coordinators upon their assumption of those responsibilities and then no less than every three years thereafter.

  a.   The Director shall request confirmation that a Safe Environment Coordinator has been designated in each Parish, School, and Seminary.

13

b.  If a Parish, School, or Seminary fails to confirm the designation of a Safe
Environment Coordinator, the Director shall within a reasonable time notify the
Archbishop and the board of trustees of the particular Parish, School, or
Seminary in writing that a local Safe Environment Coordinator has not been
designated.

## 8.  Website

8.1.    After bankruptcy plan confirmation, or dismissal from the Bankruptcy Proceedings,
or by December 31, 2016, whichever comes first, the Archdiocese shall consult with
web developers to improve the Safe Environment resources on its website.

8.2.    The Safe Environment website shall prominently display how to report an incident of
sexual abuse.

8.3.    To the extent reasonably feasible, the Archdiocese web page shall provide contact
information or links to law enforcement agencies within the Archdiocese Territory.

8.4.    The Archdiocese Sexual Abuse Policy shall be easily accessible through a link on the
Safe Environment website.

8.5.    The Safe Environment website shall contain all Policies. The Policies shall be easily
accessible.

8.6.    The Archdiocese Safe Environment website shall be periodically updated as needed
to remain current.

## 9.  Communications

9.1.    The Archdiocese shall provide assistance to Pastors and principals so that they may
appropriately respond to media inquiries and provide media response designed to
reassure the community that abuse allegations are taken seriously and that the
Archdiocese cooperates fully with civil authorities.

9.2.    The Archdiocese shall make public disclosures of any future credible allegations of
clergy sexual abuse of a minor that occurred in the Archdiocese Territory involving a
cleric who is still living. The Archdiocese will encourage all potential victims to
come forward.

9.3.    The Policies shall require that all Archdiocese employees use their Archdiocese-
issued e-mail account when sending any communication related to their job functions.

9.4.    The Archdiocese shall continue to make public disclosures of substantiated claims of
sexual abuse of minors by clerics and pending credible allegations of sexual abuse of
minors by clerics that are under investigation. In each case of a substantiated claim,
the Archdiocese will add the name of the cleric to the disclosure section of its
website. Public disclosures under this paragraph shall be made as soon as reasonably
practicable but, in any event, no later than forty-five (45) days after the relevant
determination. The Archdiocese will also share this information with the public by
issuing and posting a press release on its website.

14

9.5. With regard to a substantiated claim of sexual abuse of a minor by a cleric, at the conclusion of the canonical process for determination of clerical status, documents pertaining to the accusation of sexual abuse of a minor and the Archdiocese's response to the claim shall be made accessible to the public.

## 10. Ministerial Review Board

10.1. The Director shall consider recommendations by the RCAO in the appointment of members to the Ministerial Review Board.

10.2. The Ministerial Review Board shall abide by written policies governing its conduct.

   a. The policies shall define what types of issues are to be reviewed by the Ministerial Review Board.

   b. The policies shall include guidelines the Ministerial Review Board will follow when making recommendations in each case. These policies shall be made available to the public.

   c. The policies shall provide that the Director will advise the members of the Ministerial Review Board of the final action by the Archdiocese in each case after the board's review and recommendation.

10.3. Minutes shall be taken at each Ministerial Review Board Meeting. Minutes shall be retained and filed by the Director and shall include: (1) date and times of meetings; (2) identification of all attendees; (3) a listing of agenda items; (4) a brief summary of any advisory assessments on clergy; and (5) a brief summary of consultation by the board on any other matter.

10.4. The Ministerial Review Board shall provide its expertise and assist as requested with developing policies and appropriate mechanisms to further ensure the protection of minors.

10.5. In addition to ¶ 10.1, the Director shall consult with members of the Ministerial Review Board and the Victim Assistance Coordinator to identify candidates for a vacancy on the Ministerial Review Board. The Director shall recommend candidates to the Archbishop, who shall appoint board members in consultation with the Director.

10.6. The names and credentials of the Ministerial Review Board members shall be provided to the RCAO.

## 11. POMS Program

11.1. In accordance with the zero-tolerance policy set forth in the Charter for the Protection of Children and Young People established by the United States Conference of Catholic Bishops, the Archdiocese shall not use the POMS Program to mitigate risk to minors, but instead shall rely on an assessment of fitness for ministry involving the Director, the Ministerial Review Board, and the Archbishop.

15

a. In all cases regarding an assessment of fitness for ministry, the Ministerial Review Board may seek additional information or may recommend limits on ministry service as necessary to promote a safe environment for minors.

11.2. If the Archdiocese has determined that the POMS Program is or remains appropriate for a clergy member with allegations of sexual misconduct involving minor(s), the Archdiocese shall notify the RCAO of that determination, providing the name and address of the cleric in question and providing such further information and other cooperation as the RCAO may reasonably request.

11.3. Before a recommendation is made to discharge a cleric from the POMS Program, the Ministerial Review Board shall undertake a full review of the cleric's file.

a. The Ministerial Review Board shall document its recommendation regarding discharge from the POMS Program, and that recommendation shall be placed in the cleric's file.

b. If the cleric was the subject of a substantiated claim of sexual abuse of a minor, the Director shall advise the RCAO if such cleric is discharged from the POMS Program.

## 12. Record Keeping

12.1. By December 31, 2016, the Archdiocese shall formulate policies for the acceptable use of Archdiocese computers and electronic devices, the screening of electronic devices, and the retention of documents and electronically stored information. The policies shall address the following:

a. The Archdiocese shall maintain a record of electronic devices (computers, laptops, tablets, etc.) that are Archdiocese property in the possession of clergy, employees, or Adult Volunteers.

b. When the Archdiocese has reasonable cause to believe that a cleric, an Archdiocese employee or volunteer has violated policies relating to electronic devices or their usage in a manner that involves sexual misconduct with a minor, the Archdiocese shall secure the electronic device for evidentiary value.

c. If the Archdiocese learns of the existence of a computer or other electronic communications device that may have relevance to, or possible evidentiary value in, a law enforcement investigation of clergy sexual abuse of a minor, the Director shall promptly notify the appropriate law enforcement agency having jurisdiction.

d. The Archdiocese shall develop a written policy regarding the handling of evidence, including computers or electronic devices that relates to any internal Archdiocese Safe Environment investigation.

12.2. The Office of the Director shall maintain records relating to clergy and the Safe Environment Program.

12.3. The Office of the Director shall maintain records of the training sessions and educational requirements required under the Policies.

16

12.4. The Archdiocese shall maintain files for all clergy.

12.5. The Archdiocese shall have a policy to not destroy clergy files.

12.6. Files may be maintained electronically.

12.7. Clergy files shall contain the following records:

    a. signed documents as required under the Policies;

    b. copies of all returned background checks;

    c. internal memoranda or documentation regarding clergy misconduct;

    d. records of any allegation of sexual abuse of a minor;

    e. records of any mandatory report made to law enforcement about the cleric;

    f. records of any internal investigation;

    g. records relating to review by the Ministerial Review Board; and

    h. information pertaining to the POMS Program, if applicable.

## 13. Other

13.1. The Archdiocese shall support and encourage the reporting of abuse both on its website and in print documents posted in Parishes and Schools. The website or documents shall seek to educate the general public on the reporting of clergy misconduct and the protection afforded those who make good-faith reports.

13.2. In instances where a claim of sexual abuse of a minor is substantiated, if requested, Archdiocese leadership shall meet with the victim/survivor or his or her support person(s) as may be reasonably arranged, with due respect for the needs of the victim/survivor.

13.3. In instances where a claim of sexual abuse of a minor is substantiated, if requested by the victim/survivor, the Archbishop shall, on behalf of the Archdiocese, send a personally signed letter of apology to the victim/survivor in the context of a Minnesota Rule of Civil Procedure 408 settlement communication.

13.4. The Archdiocese shall continue to maintain an independent mechanism where concerns regarding misconduct or suspected misconduct can be reported. The mechanism should provide for 24/7 access and allow reports to be made by phone or through a confidential web-based reporting mechanism.

13.5. The Archdiocese shall explore the need for and feasibility of a "Clergy Assistance Plan" that provides clerics with an ability to seek help in times of need or personal crisis, including from an outside provider and in a manner that provides anonymity if desired.

13.6. The Archdiocese shall not enter into confidentiality agreements regarding allegations of sexual abuse of minors unless requested by the victim and noted in the text of the agreement.

17

13.7.  The Archdiocese shall request removal of photos and any visible honors (such as a plaque honoring that cleric individually or naming of a building or hall in that cleric's honor) from public display for each cleric with a substantiated claim of sexual abuse of a minor. This does not prevent the Archdiocese from displaying photos of a cleric with a substantiated claim of abuse if that photo or the words accompanying it clearly indicate that the cleric had a substantiated claim of sexual abuse of a minor asserted against him.

13.8.  The Archdiocese agrees to have in place at a point no later than expiration of this Agreement an ombudsperson to provide an outside resource for victims of sexual abuse.

13.9.  The Archdiocese shall have a policy to provide law enforcement in the appropriate jurisdiction with the known residential address of each cleric having a substantiated claim or pending credible allegation of sexual abuse of a minor.

13.10. Within one hundred twenty (120) days of the effective date of this Agreement, the Archdiocese shall develop a model policy for use by Parishes requiring notification to the board of trustees of a Parish where clergy are permitting long-term residents in rectories. The Archbishop shall request that the Parish board of trustees adopt the model policy.

13.11. The Director shall have an adequate budget so that the Director unilaterally or the Ministerial Review Board as a body may retain outside legal counsel solely regarding the matters of ministerial standards and safe environment. Under this exclusive defined authority, the Director and the Ministerial Review Board shall not be required to confer with or rely only upon internal legal services of the Archdiocese. To the extent legal fees will exceed the Director's budget, financial expenditures are subject to approval by the Board and the Archdiocese Finance Council (and the Bankruptcy Court during the pendency of the Bankruptcy Proceedings) if necessary.

13.12. In the event the position of Director becomes vacant, the Archbishop will consult with the Ministerial Review Board and the Board regarding candidates to fill the position of Director.

   a.  If practicable, the current Director shall provide notice to the Ministerial Review Board and the Archbishop of his or her intent to separate from employment as early as practicable to permit a comprehensive, effective search for his or her replacement.

## 14. Compliance

14.1.  The Archdiocese shall institute a reasonable timeline for compliance with the Policies and shall define the corrective and disciplinary measures to be used where clergy, seminarians, employees, or volunteers of the Archdiocese fail to adhere to policy requirements.

   a.  Clergy members who are non-compliant with the requirements of the Essential 3 as set forth above shall, at a minimum, be removed from service involving

18

regular or unsupervised contact with minors until they have completed all requirements.

   b. The Archdiocese shall request that Parishes, Seminaries, and Schools remove Parish/Seminary/School employees and Adult Volunteers who are non-compliant with the requirements of the Essential 3 from service involving regular or unsupervised contact with minors until they have completed all requirements.

      i. Upon learning of non-compliance, the Director shall promptly notify the Archbishop and the Parish, Seminary or School board of trustees if an employee or Adult Volunteer has not been removed from his or her job or position.

14.2. Outside Audit. The Archdiocese shall on an annual basis for the term of this Agreement retain an independent firm with demonstrated competencies to conduct an annual compliance audit of the Safe Environment Program and this Agreement. The Archdiocese shall select the audit firm subject to the approval of the RCAO, which shall not unreasonably withhold approval. During pendency of the Bankruptcy Proceedings, the retention of the audit firm will be subject to Bankruptcy Court approval.

   a. A written retention agreement with the audit firm shall explicitly state that the audit report will be provided to the RCAO. The Archdiocese shall consent to the RCAO having unrestricted access to the auditing personnel, both during and for a reasonable period after each audit, as well as access to work papers and underlying supporting documents the RCAO may request to review.

   b. The first annual outside audit will cover the period from the last date of execution of this Agreement through June 30, 2017. Fiscal-year auditing shall occur thereafter. This Agreement contemplates two (2) fiscal year outside compliance audits.

   c. The results of each audit shall be provided to the Archbishop, other members of the Board, the Director, members of the Archdiocese Finance Council, the Chairman of the Presbyteral Council, members of the Ministerial Review Board, Chancellor for Civil Affairs, Chancellor for Canonical Affairs, the RCAO, and any other persons who in the Director's judgment should receive the report.

   d. Within sixty (60) days of the completion of each required annual audit, the Director shall cause the audit report to be made available on the Archdiocese Safe Environment website and, concurrently, arrange to have a fair executive summary of the report published in the Catholic Spirit publication (with information on how the readership may access or obtain the entire report). The Archdiocese shall issue a public statement each year at the time the audit report is available for review and may otherwise distribute the report in any other manner.

19

     e.  Beyond demonstrating compliance with this Agreement, the annual audit report is to be considered by the Parties as a means to further evaluate and continuously improve the Safe Environment Program within the Archdiocese.

14.3.  <u>Internal Audit</u>. The Archdiocese shall conduct periodic internal reviews to evaluate its Safe Environment Program.

     a.  After confirmation of a plan of reorganization or dismissal from the Bankruptcy Proceedings, the Director shall engage an external consultant to assess its effectiveness.

14.4.  The Director shall request to conduct periodic audits of Parishes, Seminaries, and Schools. A request to audit shall be made of each Parish, Seminary, or School at least once every seven (7) years. During each year of the term of this Agreement, the Director shall request to audit no less than fifteen percent (15%) of the total Parishes of the Archdiocese Territory. If a Parish, Seminary, or School refuses the audit request, the Director shall notify within a reasonable time the Archbishop and the applicable board of trustees in writing.

14.5.  The Archbishop shall request that the Parish, Seminary, or School conduct an external review of procedures for both Safe Environment and finance compliance each time there is a change of pastor or other leader, in the case of Seminary or School, and request that the results of that review be provided to the Director.

**H. <u>Victims Fund</u>**.   The Archdiocese shall seek as part of its bankruptcy plan to establish a fund for the ongoing and future counseling for victims of clergy sexual abuse that occurred at any time within the Archdiocese Territory, including Victim 1, Victim 2, and Victim 3, such that they might have access to ongoing reasonable and appropriate counseling. In this regard, the Parties specifically contemplate and agree that Victim 1, Victim 2, Victim 3 (as referred to in the Petition for Order to Show Cause) and their immediate family, to the extent they have a cognizable claim, will benefit from any fund established as part of the bankruptcy process.

**I. <u>Bankruptcy Proceedings</u>**.   The Archdiocese is subject to certain limits and restrictions as a debtor-in-possession in the Bankruptcy Proceedings. As part of this Agreement, the Archdiocese shall move for Bankruptcy Court approval of this Agreement at the earliest practicable time, but no later than January 31, 2016. This Agreement shall not be effective until such time as it is approved by the United States Bankruptcy Court. To the extent the Archdiocese is required to expend funds outside the ordinary course of business as a result of this Agreement, the Archdiocese shall seek approval for such expenditures from the bankruptcy court.

**J. <u>Obligations Survive Bankruptcy</u>**.   The parties specifically agree that the terms and conditions specified herein shall be described in the Archdiocese's Chapter 11 disclosure statement and be fully incorporated into its Chapter 11 plan, and if approved in the Bankruptcy Proceedings shall survive on and after the date the Archdiocese is discharged from the Bankruptcy Proceedings.

Settlement Agreement between The Archdiocese of St. Paul and Minneapolis and Ramsey County Attorney
Ramsey County District Court File No.: 62-JV-15-1674
County Attorney File No.: 2138749

K. **Non-solicitation**.   Nothing in this Agreement shall be construed as a solicitation of a plan of reorganization in violation of the Bankruptcy Code.

L. **Breach of this Agreement; Opportunity to Cure; Attorney's Fees**.   If the RCAO determines in its reasonable judgment at any time during the term of this Agreement that the Archdiocese is in material breach of this Agreement, the RCAO will serve (as "serve" is defined under the Minnesota Rules of Civil Procedure) a Notice of Breach upon the Archdiocese, with copies mailed to the Archbishop, Secretary of the Board, and Director. The Archdiocese shall then have a period of twenty-eight (28) calendar days after service in which to cure.

If after the twenty-eight (28) calendar days the RCAO continues to have cause to believe the Archdiocese has materially breached this Agreement, the RCAO may initiate legal proceedings in the Court to enforce this Agreement by any legal or equitable means it deems available, including, without limitation, contempt of court, specific performance, or breach of contract.

If the Court determines the Archdiocese breached this Agreement, it shall enter an appropriate order against the Archdiocese and, as part of that order, may award the RCAO the value of its reasonable attorney's fees incurred in litigating the breach.

In the event the RCAO is required to enforce this Agreement, its exercise of remedies for breach of this Agreement is agreed by the Parties to be an exercise of its police and regulatory powers.

M. **Term of Agreement**.   This Agreement begins upon its approval by the United States Bankruptcy Court and runs for thirty-six (36) months following such approval. The Parties agree, however, that the protection of minors from sexual abuse is a core need, expectation and operational function of the Archdiocese such that, irrespective of the Bankruptcy Proceedings but subject to the specific exceptions noted herein, each will begin work to achieve the terms and conditions of this Agreement with deliberate speed using their respective best efforts upon execution of this Agreement. Except as otherwise provided herein, the Archdiocese further agrees that to the extent it has/had not already done so, it will come into substantial compliance with the Safe Environment Compliance Standards defined herein within twelve (12) months of the last date of execution below.

N. **Changes to Agreement**.   This agreement may be amended by the Parties in writing. In the event either the Archdiocese or the RCAO desire to change any term, condition or requirement of this Agreement, the Parties agree to meet and confer in good faith over the changes one or the other may propose.

O. **Invalidity**.   If any one or more of the terms, conditions or requirements of this Agreement are deemed unenforceable or invalid by the Court, the enforceability, validity and legality of the remaining provisions shall not in any way be affected or impaired thereby.

P. **Dismissal of Civil Action**.   Upon expiration of this Agreement, the RCAO agrees to move to dismiss the Civil Action with prejudice.

21

Q. **Governing Law; Venue**.    This Agreement shall be governed by, construed and interpreted consistent with Minnesota law. Any litigation between the Parties relating to this Agreement shall be before the Court.

R. **No use**.    This Agreement is to be considered independent in all respects from any other matter, and shall not be admissible into evidence in any proceeding except the above-referenced juvenile case and Bankruptcy Proceedings for purposes of its approval.

S. **Counterparts**.    This Agreement may be signed in counterparts, any of which shall be deemed an original but all of which shall constitute the same Agreement.

T. **Statement of Authority**.    The Board of Directors of the Archdiocese has approved this Agreement as reflected in the attached Board Resolution, which therein authorizes the Archbishop as President of the Board of the Archdiocese or the Apostolic Administrator, as well as the Secretary of the Corporation to enter into and execute this Agreement for and on behalf of the Archdiocese. The Archdiocese further represents that this Agreement has been entered into after appropriate consultation with the Archdiocese Finance Council and the Archdiocese College of the Consultors.

22

IN WITNESS WHEREOF, the Archdiocese and the RCAO execute this Agreement on and as of the date(s) indicated below:

Dated: _12/17/2015_

THE ARCHDIOCESE OF ST. PAUL AND
MINNEAPOLIS, a Minnesota corporation

By: _Bernard A. Hebda_

Its _PRESIDENT_

BARBARA ANN DAWSON
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES 01/31/2018

Subscribed and sworn to before me
this _17th_ day of December, 2015.

_Barbara Ann Dawson_
Notary Public

By: _[signature]_

Its _Secretary_

BARBARA ANN DAWSON
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES 01/31/2018

Subscribed and sworn to before me
this _17th_ day of December, 2015.

_Barbara Ann Dawson_
Notary Public

Registered Office:
    226 Summit Avenue
    St. Paul, Minnesota  55102

APPROVED:

FREDRIKSON AND BYRON, P.A.

Dated: _12/17/15_

By: _[signature]_
    Joseph T. Dixon (#0283903)
    Andrew F. Johnson (#0390783)
    200 South Sixth Street, Suite 4000
    Minneapolis, MN 55402
    612-492-7000
    Facsimile:  612-492-7077
    jdixon@fredlaw.com
    ajohnson@fredlaw.com

23

Dated: **12 · 17 · 15**

JOHN J. CHOI
RAMSEY COUNTY ATTORNEY

By: _____

John J. Choi (#257175)
Ramsey County Attorney
John T. Kelly (#214098)
First Assistant County Attorney
Thomas E. Ring (#25082X)
Assistant County Attorney
Stephanie L. Wiersma (#395741)
Assistant County Attorney
Office of the Ramsey County Attorney
345 Wabasha Street North, Suite 120
St. Paul, MN  55102
651-266-3222

24

## RESOLUTION OF THE BOARD OF DIRECTORS OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS

The Board of Directors of the Archdiocese of Saint Paul and Minneapolis, by majority vote, adopted the following resolution on the 16th day of December, 2015 at a special meeting of the Board of Directors of the Archdiocese of Saint Paul and Minneapolis that (a) was properly organized by Archbishop Bernard A. Hebda, Apostolic Administrator of the Archdiocese, pursuant to Article 6 of the bylaws, and (b) where a quorum was present.

WHEREAS, on or about June 5, 2015 the Ramsey County Attorney's office (RCAO) commenced a Civil Action against the Archdiocese focused on protecting children; and

WHEREAS, the Archdiocese has taken and is taking steps to substantially enhance its Safe Environment Program; and

WHEREAS, the Archdiocese and RCAO desire to resolve all matters with respect to said Civil Action by entering into the attached Agreement which is incorporated herein by reference and made a part hereof.

NOW THEREFORE BE IT RESOLVED THAT the Board of Directors, having reviewed discussed and considered a proposed Settlement Agreement dated December 11, 2015 does hereby

1.  Authorize Archbishop Hebda and his designees to complete any final negotiations of the Settlement Agreement, and

2.  Authorize and direct the President and the Secretary of this Corporation to execute a final Settlement Agreement, and

3.  Direct the Archbishop and the Archdiocese bankruptcy counsel to seek approval of the Settlement Agreement by the United States Bankruptcy Court.

## CERTIFICATION OF CORPORATE SECRETARY

The undersigned Corporate Secretary of the Archdiocese of Saint Paul and Minneapolis does hereby certify that the above Resolution was duly adopted and approved by the Board of Directors of the Archdiocese on 16th day of December, 2015.

Mr. Joseph F. Kueppers
Corporate Secretary of the Archdiocese of Saint Paul and Minneapolis

**EXHIBIT L**
**LIST OF ARCHDIOCESE INSURANCE POLICIES:**
**SETTLING AND NON-SETTLING INSURERS**

**SETTLING ARCHDIOCESE OF ST. PAUL AND MINNEAPOLIS INSURERS**

| Insurer | Settlement as to Policy No. | Dates |
|---|---|---|
| The Home Insurance Company in Liquidation<br>6th Floor<br>61 Broadway<br>New York, NY 10006-2504 | 54010<br>63810<br><br>Policy buy-backs for claims<br>in liquidation | 8/1/61 - 8/1/64<br>8/1/64 - 8/1/67 |

**NON-SETTLING ARCHDIOCESE OF ST. PAUL AND MINNEAPOLIS INSURERS**

| Insurer | Policy No. | Dates |
|---|---|---|
| The Catholic Mutual Relief Society of America<br>10843 Old Mill Road<br>Omaha, NE 68154-2600 | 7922<br>8140<br><br>8140<br>8589 | 9/1/87-9/1/89<br>9/1/89-9/1/90<br><br>9/1/90 - 9/1/92<br>9/1/92 - present |
| Fireman's Fund Insurance Company<br>777 San Marin Drive<br>Novato, CA 94998 | GAC312672<br>CL33193 | 8/1/55 - 8/1/58<br>8/1/58 - 8/1/61 |
| State Farm Fire and Casualty Company<br>One State Farm Plaza<br>Bloomington, IL 61710 | SM23839120<br><br><br>93-010482 | 8/75 - 8/77 (upon information and belief)<br>8/77 - 8/78 (upon information and belief) |
| TIG Insurance Company<br>(for International Insurance Company)<br>250 Commercial Street, Suite 5000<br>Manchester, NH 03101 | GA114938 | 8/1/67 - 8/1/70 |
| AIG Property Casualty<br>(for American Home Assurance Company)<br>175 Water Street, 18th Floor<br>New York, NY 10038 | CE2598055<br>BE3374208 | 8/17/69 - 8/17/72<br>8/17/72 - 8/17/75 |
| Appalachian Insurance Company<br>Attn: Norma Newell<br>FM Global Corporate Offices<br>270 Central Avenue<br>Johnston, RI 02919 | 70008 | 7/1/68 - 7/1/71 |
| Arrowood Indemnity Company as successor to Royal Indemnity Company | RTI 114937<br>RTY 114998 | 7 /1/67 - 7/1/68<br>7/1/68 - 7/1/71 |
| Centennial Insurance Company in Liquidation<br>New York Liquidation Bureau<br>110 William Street<br>New York, NY 10038 | 291696527<br>291713899 | 9/1/80 - 9/1/83<br>9/1/83 - 9/1/86 |

L-2

| Insurer | Policy No. | Dates |
|---|---|---|
| CNA | | |
| (for The Fidelity and Casualty Company of New York) | 174758<br>XP128258/74084 | 1943-1946<br>8/1/52 - 8/1/55 |
| (for National Fire and Insurance Company) | HO4527587 | 8/16/63 - 8/16/66 |
| (for Continental Casualty Company)<br>333 South Wabash Avenue<br>Chicago, IL 60604 | RDU9799786<br>1861803<br>9797772 | 8/17/66 - 8/17/69<br>6/18/74-8/1/74 |
| The Hartford Accident and Indemnity Company<br>One Hartford Plaza<br>Hartford, CT 06155-0001 | 41C549216 | 8/1/70 - 8/1/73 |
| Interstate Fire & Casualty Co.<br>33 West Monroe Street<br>Chicago, IL 60603 | 183152670<br>830170075<br>830172570 | 9/1/80 - 9/1/84<br>9/1/84 - 9/1/85<br>9/1/85 - 9/1/86 |
| London Market Insurers:<br>Certain Underwriters at Lloyd's, London subscribing to Policies SL3721, SL3722, SL3723, ISL3115, ISL3116, ISL3117, ISL3675, ISL3613, ISL3614, and ISL3615; Excess Insurance Company, a/k/a Excess Insurance Company Limited; Markel International Insurance Company, f/k/a Terra Nova Insurance Company, a/k/a Terra Nova Insurance Company Limited; Dominion Insurance Company Ltd.; Stronghold Insurance Company Limited; Tenecom Ltd., f/k/a The Yasuda Fire & Marine Insurance Company of Europe Ltd., a/k/a Yasuda Fire & Marine Insurance Company (U.K.) Limited; RiverStone Insurance (UK) Limited, on its own behalf and as successor in interest to Sphere Drake Limited (formerly named Odyssey Re (London) Limited, Sphere Drake Insurance plc and Sphere Insurance Company Limited); CX Reinsurance Company Ltd., f/k/a CNA Reinsurance of London, Ltd.; those insurers subscribing to Insurance Policy Nos. SLC5743, ICO4076, ICO5200, ICO5402<br>c/o Catalina J. Sugayan<br>Sedgwick LLP<br>Suite 4200<br>One North Wacker Drive<br>Chicago, IL 60606 | SL3721 / SLC5742<br>SL3722 / SLC5743<br>SL3723 / SLC5744<br>ISL3115 / ICO4074<br>ISL3116 / ICO4075<br>ISL3117 / ICO4076<br>ISL3675 / ICO5200<br>ISL3613 / ICO5387<br>ISL3614<br>ISL3615 / ICO5402 | 9/1/80 - 9/1/83<br>"<br>"<br>9/1/83 - 9/1/86<br>"<br>9/1/83-9/1/85<br>9/1/85 - 9/1/86<br>9/1/86 - 9/1/87<br>"<br>" |

| Insurer | Policy No. | Dates |
|---|---|---|
| Northwestern National<br>(for Bellefonte Insurance Company)<br>9277 Centre Pointe Drive, Suite 140<br>West Chester, OH 45069 | SLC5742 | 9/1/80 - 9/1/83 |
| National Surety Corporation<br>777 San Martin Drive<br>Novato, CA 94945 | XLX1488368 | 9/1/84-9/1/85 |
| Lamorak Ins. Co., f/k/a OneBeacon America<br>Ins. Co., and various of its predecessor and<br>affiliated underwriting entities, including<br>Commercial Union Ins. Co., American<br>Employers' Ins. Co., and Employers' Liability<br>Assurance Corp.<br>Resolute Management, Inc.<br>1000 Washington St., 4th Floor<br>Boston, MA 02188 | 618657<br>769213<br>E22-8501-032 | 1946 -1949<br>1949 - 1952<br>3/15/67-7/1/68 |
| Swiss Re America Corp as administrator for<br>21st Century Centennial Insurance Company<br>(for Colonial Penn Insurance Company)<br>3 Beaver Valley Road<br>Wilmington, DE 19803-1115 | XL150030<br>XL150079 | 9/1/85 - 9/1/86<br>9/1/86 - 9/1/87 |
| Travelers Casualty and Surety Company<br>(for Aetna Casualty & Surety Insurance<br>Company)<br>One Tower Square<br>Hartford, CT 06183 | 37AL188420<br>37SM802875FCA<br>37SM802875FCA7<br>37SM10285FCA<br>37SM15868FCA<br>37XS1768WCA<br>37XS2046WCA<br>37XS2401WCA<br>37XS2831WCA<br>37XS3399WCA | 8/1/73 - 8/1/74<br>8/1/74 - 8/1/77<br>8/1/77 - 8/1/78<br>8/1/78 - 8/1/79<br>8/1/79 - 7/1/80<br>8/17/75 - 8/17/76<br>8/17/76 - 8/17/77<br>8/17/77 - 8/17/78<br>8/17/78 - 7/1/79<br>7/1/79 - 7/1/80 |
| Travelers<br>(for Northfield Insurance Company)<br>385 Washington Street<br>St. Paul, MN 55101 | EL85004 | 9/1/85 - 9/1/86 |
| Travelers<br>(for St. Paul Surplus) | SUO5500535 | 9/1/86-9/1/87 |

# EXHIBIT M

## LIST OF CATHOLIC ENTITIES

| Catholic Entity | Address |
|---|---|
| The Church of All Saints of Lakeville, Minnesota, including the parish school | 19795 Holyoke Ave<br>Lakeville, MN 55044 |
| The Church of the Annunciation of Hazelwood, Minnesota | 4996 Hazelwood Ave<br>Northfield, MN 55057-4255 |
| The Church of the Annunciation of Minneapolis, including the parish school | 509 54th St W<br>Minneapolis, MN 55419 |
| The Church of the Ascension of Norwood, Minnesota | 323 Reform St N<br>Norwood Young America, MN 55368 |
| The Church of the Ascension of Minneapolis, Minnesota, including the parish school | 1723 Bryant Ave N<br>Minneapolis, MN 55411 |
| The Church of the Assumption | 51 7th St W<br>St. Paul, MN 55102 |
| The Church of the Assumption of Richfield, Minnesota | 305 East 77th St<br>Richfield, MN 55423-4312 |
| Basilica of St. Mary of Minneapolis | 88 17th St. N.<br>P.O. Box 50010<br>Minneapolis, MN 55405 |
| The Church of the Blessed Sacrament of St. Paul | 2119 Stillwater Ave<br>St. Paul, MN 55119 |
| Blessed Trinity Catholic School of Richfield, Minnesota | 6720 Nicollet Ave S<br>Richfield, MN 55423-3629 |
| Carondelet Catholic School | 3210 51st St W<br>Minneapolis, MN 55410-2110 |
| The Cathedral of Saint Paul | 239 Selby Ave<br>St. Paul, MN 55102 |
| The Catholic Cemeteries | 2105 Lexington Ave. South<br>Mendota<br> Heights, MN 55120 |
| The Church of Christ the King of Minneapolis | 5029 Zenith Ave S<br>Minneapolis, MN 55410 |
| The Church of All Saints of Minneapolis | 435 4th St NE<br>Minneapolis, MN 55413-2037 |
| Community of Saints Regional Catholic School | 335 East Hurley Ave<br>West St. Paul, MN 55118 |
| The Church of Corpus Christi of Saint Paul | 2131 Fairview Ave N<br>Roseville, MN 55113 |
| The Catholic Church of Divine Mercy of Faribault, including the parish school | 139 Mercy Drive<br>Faribault, MN 55021 |

| Catholic Entity | Address |
| --- | --- |
| The Church of The Epiphany of Coon Rapids, Minnesota, including the parish school | 1900 111th Ave NW Coon Rapids, MN 55433-3728 |
| Faithful Shepherd Catholic School | 3355 Columbia Dr. Eagan, MN 55121-4202 |
| Frassati Catholic Academy | 4690 Bald Eagle Ave. White Bear Lake, MN 55110 |
| The Church of Gichitwaa Kateri | 3045 Park Ave Minneapolis, MN 55407-1517 |
| The Church of the Good Shepherd, of Minneapolis, Minnesota, including the parish school | 145 Jersey Ave S Golden Valley, MN 55426-1527 |
| The Church of the Guardian Angels of Oakdale, Minnesota | 8260 Hudson Blvd Lake Elmo, MN 55042 |
| Church of the Guardian Angels of Chaska, Minn including the parish school | 218 Second St W Chaska, MN 55318-1813 |
| Highland Catholic School | 2017 Bohland Ave St. Paul, MN 55116-1911 |
| The Church of the Holy Childhood, St. Paul, Minnesota | 1435 Midway Pkwy St. Paul, MN 55108-2419 |
| The Church of the Holy Cross of Minneapolis, Minnesota | 1621 University Ave NE Minneapolis, MN 55413-1231 |
| Holy Cross Catholic School | 6100 37th St. W. Webster, MN 55088 |
| The Church of the Holy Family of St. Louis Park, including the parish school | 5900 Lake St W Saint Louis Park, MN 55416-2033 |
| The Church of the Holy Name of Minneapolis | 3637 11th Ave S Minneapolis, MN 55407-2625 |
| The Church of the Holy Name of Jesus of Medina, Minnesota, including the parish school | 155 County Rd 24 Wayzata, MN 55391-9614 |
| Dominican  Fathers Holy Rosary Church & School | 2424 - 18th Ave S Minneapolis, MN 55404 |
| The Church of the Holy Spirit of St. Paul, Minnesota, including the parish school | 515 Albert St S St. Paul, MN 55116-1611 |
| The Church of the Holy Trinity | 308 4th St N Goodhue, MN 55027 |
| The Church of the Holy Trinity of Waterville, Minnesota | 506 Common St Waterville, MN 56096-1513 |
| The Church of the Holy Trinity of South St. Paul, including the parish school | 749 6th Ave S South St. Paul, MN 55075-3034 |
| The Church of the Immaculate Conception | 116 Alabama St SE Lonsdale, MN 55046-0169 |
| The Church of the Immaculate Conception of Watertown, Minnesota | 109 Angel Ave NW Watertown, MN 55388-0548 |

| Catholic Entity | Address |
|---|---|
| The Church of the Immaculate Conception of Columbia Heights, including the parish school | 4030 Jackson St NE<br>Columbia Heights, MN 55421-2929 |
| The Church of the Immaculate Conception of Marysburg, Minnesota | 27528 Patrick St<br>Madison Lake, MN 56063-4117 |
| The Church of the Immaculate Heart of Mary of Glen Lake, Minnesota | 13505 Excelsior Blvd<br>Minnetonka, MN 55345-4913 |
| The Church of the Incarnation of Minneapolis | 3817 Pleasant Ave<br>Minneapolis, MN 55409-1228 |
| The Church of Lumen Christi | 2055 Bohland Ave<br>St. Paul, MN 55116 |
| The Church of Mary, Mother of the Church of Burnsville, Minnesota | 3333 East Cliff Rd<br>Burnsville, MN 55337-3306 |
| The Catholic Church of Mary Queen of Peace, including the parish school | 21304 Church Ave<br>Rogers (Hassan Township), MN 55374-9189 |
| The Church of the Maternity of the Blessed Virgin, Saint Paul, Minnesota, including parish school | 1414 Dale St N<br>St. Paul, MN 55117-4153 |
| The Church of the Most Holy Redeemer of Montgomery, Minnesota, including the parish school | 206 Vine Ave W<br>Montgomery, MN 56069-1063 |
| The Church of the Most Holy Trinity of Wesely, Minnesota | 4939 Washington St<br>Veseli, MN 55046-4007 |
| The Church of The Nativity, of Cleveland, Minnesota, including the parish school | 200 West Main St<br>Cleveland, MN 56017-0187 |
| The Church of the Nativity of Our Lord, including the parish school | 1900 Wellesley Ave<br>St. Paul, MN 55105-1617 |
| The Church of the Nativity of the Blessed Virgin, Oxboro, Minnesota, including parish school | 9900 Lyndale Ave S<br>Bloomington, MN 55420-4733 |
| Notre Dame Academy | 13505 Excelsior Blvd<br>Minnetonka, MN 55345-4913 |
| The Church of Our Lady of Grace, in Edina, Minnesota, including the parish school | 5071 Eden Ave<br>Edina, MN 55436 |
| The Church of Our Lady of Guadalupe of Saint Paul, Minnesota | 401 Concord St<br>St. Paul, MN 55107-2475 |
| The Church of Our Lady of Lourdes of St. Anthony, Minnesota | 1 Lourdes Place<br>Minneapolis, MN 55414-1018 |
| The Church of Our Lady of Mount Carmel of Minneapolis | 701 Fillmore St NE<br>Minneapolis, MN 55413-2525 |
| The Church of Our Lady of Peace, including the parish school | 5426 12th Ave S<br>Minneapolis, MN 55417-2505 |
| The Church of Our Lady of the Lake of Mound, Minn., including the parish school | 2385 Commerce Blvd<br>Mound, MN 55364-1427 |

| Catholic Entity | Address |
|---|---|
| The Church of Our Lady of the Prairie, Belle Plaine, including the parish school | 212 N Chestnut St Belle Plaine, MN 56011 |
| The Church of Our Lady of Victory of Minneapolis | 5155 Emerson Ave N Minneapolis, MN 55430-3414 |
| The Church of Pax Christi of Eden Prairie | 12100 Pioneer Trail Eden Prairie, MN 55347-4208 |
| St. John Paul II Catholic Preparatory School | 1630 4th St. NE Minneapolis, MN 55413 |
| The Church of the Presentation of the Blessed Virgin Mary of Saint Paul, including the parish school | 1725 Kennard St Maplewood, MN 55109-4603 |
| Risen Christ Catholic School | 1120 37th St East Minneapolis, MN 55407-2759 |
| The Church of the Risen Savior, of Apple Valley | 1501 County Rd 42 E Burnsville, MN 55306-4723 |
| The Church of the Sacred Heart in St. Paul | 840 6th St E St. Paul, MN 55106-4543 |
| The Church of the Sacred Heart of Rush City Minnesota | 425 Field Ave PO Box 45 Rush City, MN 55069 |
| The Church of the Sacred Heart, including the parish school | 4087 West Broadway Ave Robbinsdale, MN 55422-2232 |
| The Society for the Propagation of the Faith, Incorporated (a/k/a Center for Mission) | 328 Kellogg Blvd West St. Paul, MN 55102 |
| The Church of St. Cyril of Minneapolis, Minnesota (also known as the Church of Ss. Cyril and Methodius) | 1315 2nd St NE Minneapolis, MN 55413-1131 |
| Parish of Saints Joachim and Anne of Shakopee, Minnesota, including parish school | 2700 17th Ave E Shakopee, MN 55379-4443 |
| The Church of. SS. Peter and Paul of Medina, Minnesota | 145 Railway St E, P.O. Box 96 Loretto, MN 55357-0096 |
| The Church of St. Adalbert, of St. Paul, Minnesota | 265 Charles Ave St. Paul, MN 55103-2005 |
| The Church of St. Agatha of Vermillion, Minnesota | 3700 160th St E Rosemount, MN 55068-2007 |
| The Church of St. Agnes of St. Paul, Minnesota, including the parish school | 535 Thomas Ave St. Paul, MN 55103 |
| The Church of Saint Albert | 11400 57th St NE, P.O. Box 127 Albertville, MN 55301-0127 |
| The Church of Saint Albert the Great, of Minneapolis, Minn. | 2836 33rd Ave S Minneapolis, MN 55406-1626 |

| Catholic Entity | Address |
|---|---|
| The Church of St. Alphonsus, of Brooklyn Center, Minnesota, including the parish school | 7025 Halifax Ave N<br>Brooklyn Center, MN 55429-1375 |
| The Church of Saint Ambrose of Woodbury, including the parish school | 4125 Woodbury Dr.<br>Woodbury, MN 55129-9627 |
| The Church of St. Andrew of Elysian, Minnesota | 305 Park Ave NE<br>Elysian, MN 56028-0261 |
| The Church of St. Andrew Kim | 1850 Mississippi River Blvd<br>St. Paul, MN 55116-2644 |
| The Church of Saint Anne – Saint Joseph Hien | 2627 Queen Ave N<br>Minneapolis, MN 55411-1792 |
| The Church of St. Anne of Hamel, Minnesota | 200 Hamel Rd, P.O. Box 256<br>Hamel, MN 55340-0256 |
| The Church of StAnne of LeSueur, Minnesota, including the parish school | 217 N 3rd St<br>Le Sueur, MN 56058-1808 |
| The Church of Saint Bartholomew of Wayzata, including the parish school | 630 Wayzata Blvd E<br>Wayzata, MN 55391-1704 |
| The Church of Saint Bernard of St Paul Minnesota | 1160 Woodbridge St.<br>St. Paul, MN 55117-4491 |
| The Church of St. Bernard, of Benton, Minnesota, including the parish school | 212 Church St E<br>Cologne, MN 55322-9552 |
| The Church of St. Bonaventure, of Bloomington, Minnesota | 901 90th St E<br>Bloomington, MN 55420-3801 |
| The Church of St. Boniface | 629 2nd St NE<br>Minneapolis, MN 55413-1905 |
| The Church of St. Boniface of St. Bonifacius, Minn. | 4025 Main St<br>Saint Bonifacius, MN 55375-0068 |
| The Church of Saint Bridget of Minneapolis | 3811 Emerson Ave N<br>Minneapolis, MN 55412-2038 |
| The Church of St. Bridget of Sweden, of Lindstrom, Minnesota | 13060 Lake Blvd, P.O. Box 754<br>Lindstrom, MN 55045-0754 |
| The Church of St. Casimir of St. Paul, Minnesota | 934 Geranium Ave E<br>St. Paul, MN 55106-2610 |
| The Church of St. Catherine of Spring Lake, Minnesota | 24425 Old Highway 13 Blvd<br>Jordan, MN 55352 |
| The Church of St. Cecilia of St. Paul | 2357 Bayless Place<br>St. Paul, MN 55114-1105 |
| The Church of St. Charles Borromeo of Minneapolis, Minnesota, including the parish school | 2739 Stinson Blvd NE<br>Saint Anthony, MN 55418-3124 |
| The Church of Saint Charles, Bayport, Minnesota | 409 3rd St N<br>Bayport, MN 55003-1044 |

| Catholic Entity | Address |
|---|---|
| The Church of Saint Columba of St. Paul, Minn. | 1327 LaFond Ave<br>St. Paul, MN 55104-2035 |
| St. Croix Catholic School | 621 3rd St. S.<br>Stillwater, MN 55082-4908 |
| The Church of St Dominic of Northfield Minnesota, including the parish school | 216 Spring St N<br>Northfield, MN 55057-1431 |
| The Church of St. Edward, of Bloomington, Minnesota | 9401 Nesbitt Ave S<br>Bloomington, MN 55437-1943 |
| The Church of St. Elizabeth Ann Seton, Hastings, Minnesota, including the parish school | 2035 15th St W<br>Hastings, MN 55033-9294 |
| The Church of Saint Frances Xavier Cabrini of Minneapolis, Minnesota | 1500 Franklin Ave SE<br>Minneapolis, MN 55414-3649 |
| The Church of St. Francis de Sales of St. Paul, Minnesota including Child Care Center & Preschool | 650 Palace Ave<br>St. Paul, MN 55102-3540 |
| The Church of St. Francis of Assisi | 16770 13th St S<br>Lake St Croix Beach, MN 55043-9756 |
| The Church of Saint Francis Xavier of Franconia, Minnesota | 25267 Redwing Ave<br>Shafer, MN 55074 |
| The Church of St. Francis of Buffalo, Minnesota, including the parish school | 300 First Ave NW<br>Buffalo, MN 55313-5042 |
| The Parish of Saint Gabriel the Archangel of Hopkins, Minnesota | 6 Interlochen Rd<br>Hopkins, MN 55343-8548 |
| The Church of St. Genevieve of Centerville, Minnesota | 7087 Goiffon Rd<br>Centerville, MN 55038-9125 |
| The Church of Saint George of Long Lake | 133 Brown Rd N<br>Long Lake, MN 55356-9560 |
| The Church of St. Gerard | 9600 Regent Ave N<br>Brooklyn Park, MN 55443-1401 |
| The Church of Saint Gregory | 38725 Forest Blvd<br>North Branch, MN 55056-0609 |
| The Church of Saint Hedwig of Minneapolis | 129 29th Ave. NE<br>Minneapolis, MN 55418 |
| The Church of St. Helena of Minneapolis, including parish school | 3204 43rd St E<br>Minneapolis, MN 55406-3858 |
| The Church of St. Henry of Monticello, Minn | 1001 7th St E<br>Monticello, MN 55362-8805 |
| The Church of Saint Henry of Sharon, Minnesota | 165 N. Waterville Ave.<br>Le Center, MN 56057 |
| The Church of Saint Hubert of Chanhassen Minn, including parish school | 8201 Main St<br>Chanhassen, MN 55317-9647 |

| Catholic Entity | Address |
|---|---|
| The Church of St. Ignatius of French Lake, Minnesota | 35 Birch St E<br>Annandale, MN 55302-0126 |
| The Church of St. Jerome, Maplewood, Minnesota including parish school | 380 Roselawn Ave E<br>Maplewood, MN 55117-2033 |
| The Church of Saint Joan of Arc in Minneapolis | 4537 3rd Ave S<br>Minneapolis, MN 55419-5111 |
| The Church of St. John Neumann | 4030 Pilot Knob Rd<br>Eagan, MN 55122-1814 |
| The Church of St. John the Baptist of Dayton Minnesota | 18380 Columbus St, P.O. Box 201<br>Dayton, MN 55327-0201 |
| The Church of St. John the Baptist of Byrnesville, Minnesota, including parish school | 4625 West 125th St<br>Savage, MN 55378-1357 |
| The Church of St. John Baptist, including parish school | 835 2nd Ave NW<br>New Brighton, MN 55112-6842 |
| The Church of Saint John the Baptist of Jordan Minn., including parish school | 313 East 2nd St<br>Jordan, MN 55352-1447 |
| Church of St. John the Baptist of Excelsior, Minnesota, including parish school | 680 Mill St<br>Excelsior, MN 55331-3272 |
| The Church of St. John of Vermillion Minnesota, including parish school | 106 Main St W<br>Vermillion, MN 55085-0008 |
| St. John's Church of Little Canada, Minnesota, including parish school | 380 Little Canada Rd E<br>Little Canada, MN 55117-1627 |
| The Church of Saint John Vianney in South Saint Paul, Minnesota | 789 17th Ave North<br>South St. Paul, MN 55075 |
| The Church of St. Joseph | 8701 36th Ave N<br>New Hope, MN 55427-1769 |
| The Church of Saint Joseph of West Saint Paul, Minnesota | 1154 Seminole Ave<br>West St. Paul, MN 55118-2020 |
| The Church of St. Joseph, of Red Wing Minnesota | 426 8th St W<br>Red Wing, MN 55066-3410 |
| The Church of Saint Joseph of Taylors Falls | 490 Bench St<br>Taylors Falls, MN 55084-0234 |
| The Church of Saint Joseph of Waconia, Minn., including parish school | 41 1st St E<br>Waconia, MN 55387-1526 |
| The Church of St. Joseph, of Rosemount Minnesota, including parish school | 13900 Biscayne Ave W<br>Rosemount, MN 55068-3451 |
| The Church of St. Joseph, of Miesville, Minnesota, in the Township of Douglas, including parish school | 23955 Nicolai Ave E<br>Hastings, MN 55033-9650 |
| Church of St. Joseph of Rice Lake, Minnesota | 171 Elm St<br>Lino Lakes, MN 55014-1271 |

| Catholic Entity | Address |
|---|---|
| The Church of St. Joseph the Worker, Maple Grove, Minnesota | 7180 Hemlock Lane N<br>Maple Grove, MN 55369-5569 |
| The Church of St. Jude of the Lake in the Town of Lincoln, including parish school | 700 Mahtomedi Ave<br>Mahtomedi, MN 55115-1673 |
| The Church of Saint Katharine Drexel, Ramsey, Minnesota | 7101 143rd Ave NW<br>Ramsey, MN 55303-6001 |
| The Church of St. Lawrence of Minneapolis, Minnesota | 1203 5th St SE<br>Minneapolis, MN 55414-2030 |
| The Newman Center and Chapel | 1203 5th St SE<br>Minneapolis, MN 55414-2030 |
| The Church of St. Leonard of Port Maurice, of Minneapolis, Minnesota | 3949 Clinton Ave S<br>Minneapolis, MN 55409-1635 |
| The Church of St. Louis, of St. Paul Minnesota | 506 Cedar St<br>St. Paul, MN 55101-2245 |
| The Church of St. Luke of Clearwater, Minnesota | 17545 Huber Ave NW<br>Clearwater, MN 55320-0249 |
| The Church of Saint Margaret Mary, of Minneapolis, Minnesota | 2323 Zenith Ave N<br>Golden Valley, MN 55422-3853 |
| The Church of St. Mark of St. Paul, Minnesota, including parish school | 2001 Dayton Ave<br>St. Paul, MN 55104-5804 |
| The Church of St. Mary, of St. Paul Minnesota | 261 8th St E<br>St. Paul, MN 55101-2307 |
| The Church of St. Mary of Le Center, Minnesota | 165 Waterville Ave N<br>Le Center, MN 56057-1524 |
| The Church of St. Mary, of New Trier, Minnesota | 8433 239th St E<br>Hampton, MN 55031-9766 |
| The Church of St. Mary of Stillwater | 423 5th St S<br>Stillwater, MN 55082-4982 |
| The Church of St Mary of Waverly Minnesota | 606 Elm Ave<br>Waverly, MN 55390-0278 |
| The Church of St. Mary, Minnesota (also known as the Church of St. Mary of Czestochowa) | 1867 95th St SE<br>Delano, MN 55328-8208 |
| The Church of St. Mary of the Lake, of Medicine Lake, Minnesota | 105 Forestview Ln N<br>Plymouth, MN 55441-5910 |
| The Church of St. Mary of the Lake, of White Bear, Minnesota | 4690 Bald Eagle Ave<br>White Bear Lake, MN 55110-3441 |
| The Church of St. Matthew of St. Paul, Minnesota | 490 Hall Ave<br>St. Paul, MN 55107-2845 |
| The Church of St. Mathias of Hampton, Minnesota | 23315 Northfield Blvd<br>Hampton, MN 55031-9667 |

| Catholic Entity | Address |
|---|---|
| The Church of Saint Maximilian Kolbe, including parish school | 204 South River St.<br>PO Box 470<br>Delano, MN 55328 |
| The Church of St. Michael of Farmington, Minnesota | 22120 Denmark Ave<br>Farmington, MN 55024 |
| The Church of Saint Michael of Kenyon, Minnesota | 108 Bullis St<br>Kenyon, MN 55946-1156 |
| The Church of St. Michael, of Pine Island Minnesota | 451 5th St SW<br>Pine Island, MN 55963-6761 |
| The Church of St. Michael of St. Paul Minnesota | 337 Hurley St E<br>West St. Paul, MN 55118-1605 |
| The Church of St. Michael, of Stillwater Minnesota | 611 3rd St S<br>Stillwater, MN 55082-4908 |
| The Church of St. Michael, of Frankfort, Minnesota, including parish school | 11300 Frankfurt Pkwy NE<br>Saint Michael, MN 55376-4550 |
| The Church of St. Michael of Prior Lake, including parish school | 16311 Duluth Ave SE<br>Prior Lake, MN 55372-2423 |
| The Church of Saint Nicholas of Carver Minn. | 412 4th St W<br>Carver, MN 55315-0133 |
| St. Nickolaus Church of New Market Scott County Minnesota | 51 Church St<br>New Market, MN 55054-0009 |
| The Church of St. Odilia, of Shoreview, Minnesota, including parish school | 3495 Victoria St N<br>Shoreview, MN 55126-3813 |
| St. Olaf's Catholic Church of Minneapolis, Minnesota | 215 South 8th St<br>Minneapolis, MN 55402-2803 |
| The Church of Saint Pascal Baylon, St. Paul, Minnesota, including parish school | 1757 Conway St<br>St. Paul, MN 55106-5929 |
| The Church of St. Patrick of Inver Grove, Minnesota | 3535 72nd St E<br>Inver Grove Heights, MN 55076-2627 |
| The Church of St. Patrick of Edina, Minnesota | 6820 St. Patrick's Lane<br>Edina, MN 55439-1631 |
| The Church of, St. Patrick, of Shieldsville Minnesota | 7525 Dodd Rd<br>Faribault, MN 55021-7431 |
| The Church of St. Patrick of Cedar Lake, Minnesota | 24425 Old Highway 13 Blvd<br>Jordan, MN 55352-9604 |
| The Church of St. Patrick of Cedar Creek, Minnesota | 19921 Nightingale St NW<br>Oak Grove, MN 55011-9243 |
| The Church of St. Patrick of St. Paul Minnesota | 1095 DeSoto St<br>St. Paul, MN 55130-3704 |
| The Church of Saint Paul of Zumbrota, Minnesota | 749 Main St S<br>Zumbrota, MN 55992-1608 |

| Catholic Entity | Address |
|---|---|
| The Church of Saint Paul | 1740 Bunker Lake Blvd NE<br>Ham Lake, MN 55304-7040 |
| The Church of Saint Peter of Richfield, Minnesota, including parish school of Blessed Trinity | 6730 Nicollet Ave<br>Richfield, MN 55423-2464 |
| The Church of St. Peter, of Mendota, Minnesota | 1405 Hwy 13<br>Mendota, MN 55150-0679 |
| The Church of Saint Peter, including parish school | 1250 Shore Dr. S<br>Forest Lake, MN 55025-1933 |
| The Church of St. Peter of North St. Paul, including parish school | 2600 Margaret St N<br>North St. Paul, MN 55109-2361 |
| The Church of St. Peter Claver Minnesota, including parish school | 375 Oxford St N<br>St. Paul, MN 55104-4734 |
| The Church of St. Pius of Cannon Falls, Minnesota | 410 Colvill St W<br>Cannon Falls, MN 55009-2441 |
| The Church of St. Pius X of White Bear, Minnesota | 3878 Highland Ave<br>White Bear Lake, MN 55110-4240 |
| The Church of Saint Raphael in Crystal, Minnesota, including parish school | 7301 Bass Lake Rd<br>Crystal, MN 55428-3826 |
| The Church of Saint Richard, of Richfield, Minnesota | 7540 Penn Ave S<br>Richfield, MN 55423-3629 |
| The Church of St. Rita of Cottage Grove, Minnesota | 8694 80th St S<br>Cottage Grove, MN 55016-2012 |
| The Church of Saint Rose of Lima of Rosetown, Minnesota, including parish school | 2048 Hamline Ave N<br>Roseville, MN 55113-5855 |
| The Church of St. Stanislaus of Saint Paul, Minnesota | 398 Superior St<br>St. Paul, MN 55102-2925 |
| The Church of St. Stephen of Minneapolis, Minnesota | 2211 Clinton Ave<br>Minneapolis, MN 55404-3656 |
| The Church of St. Stephen, of Anoka, Minnesota, including parish school | 525 Jackson St<br>Anoka, MN 55303-2353 |
| The Church of Saint Therese of Deephaven, including parish school | 18323 Minnetonka Blvd<br>Deephaven, MN 55391-3231 |
| St. Thomas Academy | 949 Mendota Heights Rd.<br>Mendota Heights, MN 55118 |
| The Church of St. Thomas Aquinas in St. Paul Park, Minnesota | 920 Holly Ave<br>St. Paul Park, MN 55071-1418 |
| The Church of St. Thomas Becket | 4455 S Robert Trail<br>Eagan, MN 55123-2038 |
| The Church of Saint Thomas More, including parish school | 1079 Summit Ave<br>St. Paul, MN 55105-3004 |
| The Church of St. Thomas of Minneapolis | 2914 W 44th St<br>Minneapolis, MN 55410-1551 |

| Catholic Entity | Address |
|---|---|
| The Church of St. Thomas, of Corcoran, Minnesota | 20000 County Rd 10<br>Corcoran, MN 55340-9501 |
| The Church of Saint Timothy of Blaine | 707 89th Ave NE<br>Blaine, MN 55434-2304 |
| The Church of St. Timothy of Maple Lake, Minnesota, including parish school | 8 Oak Ave N<br>Maple Lake, MN 55358-2457 |
| The Church of Saint Victoria of Victoria, Minn. | 8228 Victoria Dr.<br>Victoria, MN 55386-9692 |
| The Church of St. Vincent de Paul, of Osseo, Minnesota, including parish school | 9100 93rd Ave N<br>Brooklyn Park, MN 55445-1407 |
| The Church of St. Wenceslaus, of New Prague, Minnesota, including parish school | 215 Main St E<br>New Prague, MN 56071-1832 |
| The Church of Saint William of Fridley, Minnesota | 6120 5th St NE<br>Fridley, MN 55432-5033 |
| Transfiguration Church of Oakdale, Minnesota, including parish school | 6133 15th St N<br>Oakdale, MN 55128-4201 |
| Any Person not listed above who is an insured under any Insurance Policy in which the Archdiocese is a named insured to the extent such policy is bought back under this Plan and only as to any Tort Claim covered or alleged to be covered under the Insurance Policy. | |

**EXHIBIT N**

**PARTIAL LIST OF CREDIBLY ACCUSED PERSONS**

Thomas Adamson
Stephen Baker
Edward Beutner
Michael Bik
Robert Blumeyer
John Brown
Robert Clark
Eugene Corica
Cosmas Dahlheimer
Gilbert DeSutter
Donald Dummer
Thomas Ericksen
Ambrose Filbin
Jerry Foley
Edmund Frost
Gerald Funcheon
Kenneth Gansmann
Thomas Gillespie
Ralph Goniea
Gilbert Gustafson
Louis Heitzer
Rudolph Henrich
Francis Hoefgen
Richard Jeub
Dennis Kampa
Robert Kapoun
Jerome Kern
Michael Kolar
Lee Krautkremer
Reginald Krakovsky
Kenneth LaVan
Ronan Charles Liles
Robert Loftus
Alfred Longley
Brennan Maiers
Harry Majerus
William Marks
Timothy McCarthy
John McGrath
Wendell Mohs
Francisco (Fredy) Montero
James Robert Murphy

James Namie
James Nickel
John Owens
Paul Palmitessa
Joseph Pinkosh
James Porter
Charles Potocki
Francis Reynolds
Raimond Rose
Robert Ruglovsky
Richard Skluzacek
James P. Stark
Michael Stevens
Thomas Stitts
Robert Thurner
Roger Vaughn
Clarence Vavra
James Vedro
Joseph Wajda
Harold Walsh
Raymond Walter
Justin Weger
Curtis Wehmeyer
Adalbert Wolski
Francis Zachman
Robert Zasacki

**EXHIBIT O**

**[RESERVED]**

O-1

**Schedule 1:**

**[RESERVED]**

Schedule 1-1

CORE/3003233.0002/130695805.1

**SCHEDULE 2**

**LIST OF CLASS 8 CLAIMANTS**

| **PARISH** | **CLAIM AMOUNT** |
|---|---|
| All Saints Lakeville | $6,981.00 |
| St. Therese Church Deephaven | $50,502.83 |
| St. Francis Cabrini Church | $52,956.10 |
| St. Anne/St. Joseph Hein Minneapolis | $496,459.89 |
| SS Cyril and Methodious Church in Minneapolis | $72,404.19 |
| St. Pius X Catholic Church | $107,211.45 |

# SCHEDULE 3

# TRADE VENDOR CLAIMS

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|---|---|
| A P GRAPH INC<br>9605 GIRARD AVE S<br>BLOOMINGTON MN 55431 | 28.22 | BEERY NOBLE, EILEEN<br>20 EAST ELMWOOD PLACE<br>MINNEAPOLIS MN 55419 | 100.00 |
| ABP HARRY FLYNN CATECHETICAL<br>2260 SUMMIT AVE<br>ST PAUL MN 55105 | 250.00 | BELIAN, JOHN<br>1635 CHATHAM AVE<br>ARDEN HILLS MN 55112 | 300.00 |
| ACRE<br>1757 CONWAY STREET<br>ST PAUL  MN 55106 | 3,846.62 | BERRY COFFEE CO<br>14825 MARTIN DRIVE<br>EDEN PRAIRIE MN 55344-2009 | 153.29 |
| ACUMEN PSYCHOLOGY<br>821 RAYMOND AVE #130C<br>ST PAUL  MN  55114 | 850.00 | BEST WESTERN PLUS KELLY IN ST PAUL<br>161 SAINT ANTHONY AVE<br>SAINT PAUL MN 55103-2397 | 505.65 |
| ADVANCED FILING CONCEPTS<br>3761 DUNLAP ST N<br>ARDEN HILLS MN 55112 | 140.00 | BLACKBAUD<br>PO BOX 930256<br>ATLANTA GA 31193-0256 | 359.70 |
| ALL SAINTS CHURCH<br>435 4TH ST NE<br>MINNEAPOLIS  MN  55413-2037 | 680.00 | BOCA CHICA RESTAURANT<br>11 CESAR CHAVEZ<br>ST PAUL MN 55107 | 85.02 |
| ALPHA SERVICES INDUSTRIES INC<br>2712 FREMONT AVE S<br>MINNEAPOLIS  MN  55408-1122 | 3,472.59 | BODY & SOUL INC<br>5408 MORGAN AVENUE SOUTH<br>MINNEAPOLIS MN 55419 | 50.00 |
| AMOS PALMER, SUSAN<br>1717 GRAMSIE RD<br>ARDEN HILLS  MN  55112-2863 | 150.00 | BORN-SELLY, PATRICIA<br>4445 ALDRICH AVE S<br>MINNEAPOLIS MN 55419 | 400.00 |
| AMSAN<br>13924 COLLECTION CENTER DR<br>CHICAGO IL 60693-3924 | 381.12 | BRAUN, JANE<br>202 THOMPSON AVENUE EAST<br>SAINT PAUL MN 55118 | 900.00 |
| ANCHOR PAPER CO<br>480 BROADWAY ST<br>SAINT PAUL MN 55101 | 744.30 | BURI, JOHN<br>2285 STEWART AVE #1308<br>SAINT PAUL MN 55116-3154 | 100.00 |
| ARCASEARCH<br>PO BOX 59<br>PAYNESVILLE MN 56352 | 694.30 | BURKE, EUGENE E<br>599 PORTLAND AVE<br>ST PAUL MN 55102 | 450.00 |
| ARCIENEGA DOMINGUEZ, SILVIA<br>1272 MAGNOLIA - #1<br>SAINT PAUL MN 55106 | 393.91 | CANON LAW PROFESSIONALS LLC<br>29 LOWER COPELAND HILL RD<br>FEURA BUSH NY 12067 | 850.00 |
| ARROW PONTIAC<br>1111 EAST HWY 110<br>INVER GROVE HEIGHTS MN 55077 | 40.12 | CANON LAW SOCIETY UK IRELAND<br>CANON LAW ABSTRACTS<br>GALLOWAY<br>AYR SCOTLAND KA7 2ST<br>GREAT BRITAIN | 205.00 |
| BASILICA OF ST MARY<br>PO BOX 50010<br>MINNEAPOLIS MN 55405 | 1,921.89 | | |
| BAUER, JOHN<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 45.00 | CARONDELET CENTER<br>1890 RANDOLPH AVENUE<br>ST PAUL MN 55105 | 70.00 |
| BAUER, RANDALL<br>14600 IODINE CT NW<br>RAMSEY  MN  55303 | 214.65 | CATHOLIC DEFENSE LEAGUE<br>3499 LEXINGTON AVE N<br>ST PAUL MN 55126 | 200.00 |
| BEAUDET, CHRISTOPHER<br>609 MAPLE PARK DR<br>MENDOTA HEIGHTS MN 55118 | 1,600.00 | CATHOLIC NEWS SERVICE<br>PO BOX 96428<br>WASHINGTON DC  20090-6428 | 9,695.48 |
| BEAULIEU, SIMON<br>PO BOX 6973<br>MINNEAPOLIS MN 55406 | 100.00 | CATHOLIC UNIVERSIT OF AMERICA<br>OFFICE OF ENROLLMENT, MCMAHON HALL #10<br>WASHINGTON DC 20064 | 88.92 |
| BECKER, JASON<br>224 22ND AVENUE SOUTH<br>SAINT PAUL MN 55075 | 100.00 | | |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|---|---|
| CENTERPOINT ENERGY<br>PO BOX 4671<br>HOUSTON TX 77210-4671 | 454.61 | DEXON COMPUTER INC<br>9201 E BLOOMINGTON FRWY - STE BB<br>MINNEAPOLIS MN 55420 | 204.00 |
| CENTURYLINK<br>P O BOX 91154<br>SEATTLE WA 98111-9254 | 42.40 | DILL, TIFFANY<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 20.00 |
| CHLEBECK, DENNIS<br>1773 ASHLAND AVE<br>SAINT PAUL MN 55104-6036 | 690.52 | DIOCESE BISMARCK<br>520 NORTH WASHINGTON STREET<br>BISMARCK ND 58502-1137 | 1,272.33 |
| CHRIST KING RETREAT CENTER<br>621 S FIRST AVENUE<br>BUFFALO MN 55313 | 1,037.50 | DIOCESE FARGO<br>5201 BISHOPS BLVD STE A<br>FARGO, ND 58104 | 300.00 |
| CITY OF SAINT PAUL<br>375 JACKSON ST, SUITE 220<br>SAINT PAUL MN 55101-1806 | 700.00 | DIOCESE OF WINONA<br>55 W SANBORN<br>PO BOX 588<br>WINONA MN 55987 | 300.00 |
| COBORN'S INC<br>DBA COBORNSDELIVERS<br>SAINT CLOUD MN 56302-1502 | 1,561.75 | DISANTO'S FORT ROAD FLORIST<br>262 FORT ROAD<br>ST PAUL MN 55102 | 435.67 |
| COMMERS CONDITIONED WATER<br>9150 W 35W SERVICE DR NE<br>BLAINE MN 55449-6745 | 29.95 | DOMINICAN COMM ST ALBERT GREAT<br>2836 33rd AVE S<br>MINNEAPOLIS MN 55406 | 800.00 |
| CONLEY, PATRICK<br>239 SELBY AVE<br>ST PAUL MN 55102 | 100.00 | DUFNER, THOMAS<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 100.00 |
| CONNECTNOW FORMS<br>P O BOX 681<br>TARRYTOWN NY 10591-0681 | 874.92 | ECM PUBLISHERS INC<br>4095 COON RAPIDS BLVD<br>COON RAPIDS MN 55433-2523 | 6,544.57 |
| CONWAY, KRISTA<br>7106 BOVEY AVE<br>INVER GROVE HEIGHTS MN 55076 | 40.00 | EVERT, JASON<br>2257 S JUNIPER ST<br>LAKEWOOD CO 80228 | 12.00 |
| CRM VERTEX<br>1405 PRAIRIE PKWY SUITE A<br>WEST FARGO ND 58078 | 750.00 | EVOLVING SOLUTIONS<br>3989 COUNTY RD 116<br>HAMEL, MN 55340 | 787.50 |
| CROSSTOWN MECHANICAL INC.<br>3115 LONG LAKE ROAD<br>ST. PAUL, MN 55113 | 301.00 | EXPONENTS INC<br>946 FAIRMOUNT AVE<br>ST PAUL MN 55105 | 393.75 |
| CULLIGAN BOTTLED WATER<br>DEPT 8511<br>MINNEAPOLIS MN 55480-7743 | 61.95 | FAITHFUL & TRUE MINISTRIES INC<br>15798 VENTURE LN<br>EDEN PRAIRIE MN 55344 | 495.00 |
| CYBER ADVISORS INC<br>11324 86TH AVENUE NORTH<br>MAPLE GROVE MN 55369 | 750.00 | FATHER J ERICH RUTTEN<br>2115 SUMMIT AVE # 4042<br>ST PAUL MN 55105 | 100.00 |
| CYBERSOURCE CORPORATION<br>PO BOX 742842<br>LOS ANGELES CA 90074-2842 | 375.00 | FEDEX<br>PO BOX 94515<br>PALATINE IL 60094-4515 | 672.95 |
| DAIKIN APPLIED<br>24827 NETWORK PL<br>CHICAGO IL 60673 | 538.45 | FELHABER LARSON FENLON VOGT P.A.<br>PO BOX 860034<br>MINNEAPOLIS MN 55486-0034 | 5,224.50 |
| DANIELLE ALEXANDER DESIGN LLC<br>276 LAKEVIEW TERRACE BLVD<br>WACONIA, MN 55387 | 150.00 | FILTRATION SYSTEM INC<br>3943 MEADOWBROOK RD<br>ST LOUIS PARK MN 55426 | 202.68 |
| DESHANE, JAMES<br>4321 BROOK LANE<br>ST LOUIS PARK MN 55416 | 75.00 | FITZGERALD, THOMAS P<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 190.00 |
| DESIGN A BUNCH<br>8400 NORMANDALE LAKE BLVD - #12<br>BLOOMINGTON MN 55437-1078 | 400.00 | | |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|---|---|
| FLEUR DE LIS<br>516 SELBY AVENUE<br>ST PAUL MN 55102 | 1,379.65 | IDAHO CATHOLIC REGISTER<br>1501 FEDERAL WAY STE 400<br>BOISE ID 83705 | 350.00 |
| FLOEDER, JOHN<br>2260 SUMMIT AVE<br>ST PAUL MN 55105 | 200.00 | IMHP BURNSVILLE<br>P O BOX 64317<br>SAINT PAUL MN 55164-0317 | 1,650.00 |
| FOLEY CONSULTING INC<br>2405 ESSINGTON RD #98<br>JOLIET IL 60435-1200 | 3,590.12 | IMMACULATE CONCEPTION<br>CHURCH<br>PO BOX 169<br>LONSDALE MN 55046-0169 | 258.43 |
| FRATTALLONE'S HARDWARE INC<br>3527 LEXINGTON AVE N<br>ARDEN HILLS MN 55126 | 94.17 | IND SCHOOL DIST 279<br>11200 93RD AVE N<br>MAPLE GROVE MN 55369 | 50.00 |
| FRONT LINE SYSTEMS INC<br>P O BOX 337<br>EXCELSIOR MN 55331-0337 | 481.25 | INSTITUTE FOR DIACONATE<br>FORMATION<br>2260 SUMMIT AVE<br>SAINT PAUL MN 55105 | 500.00 |
| FSSP<br>ST PETER'S HOUSE<br>ELMHURST TOWNSHIP PA 18444 | 2,000.00 | INTEGRA TELECOM<br>PO BOX 2966<br>MILWAUKEE WI 53201 | 692.50 |
| G & K SERVICES ST PAUL<br>PO BOX 842385<br>BOSTON MA 02284-2385 | 394.80 | J S BURKE & ASSOCIATES LLC<br>947 EAST COUNTY RD D #102<br>ST PAUL MN 55109 | 42.38 |
| GATICA, VIVIANA V<br>328 KELLOGG BLVD W<br>SAINT PAUL MN 55102 | 310.00 | JANZ, JONATHAN<br>PROVIDENCE ACADEMY<br>15100 SCHMIDT LK RD<br>PLYMOUTH MN 55446 | 100.00 |
| GE CAPITAL<br>PO BOX 31001-0273<br>PASADENA CA 91110-0273 | 351.45 | JESUIT NOVITIATE<br>1035 SUMMIT AVE<br>ST PAUL MN 55105 | 708.22 |
| GEMOLOGICAL RESOURCE INC<br>224 DEERPATH CT<br>STILLWATER, MN 55082 | 1,575.00 | JOHNSON, AMY M<br>32024 CTY RD 13<br>SALOL MN 56756 | 20.00 |
| GERLACH, MICHELLE<br>328 KELLOGG BLVD<br>ST PAUL MN 55102 | 1,050.00 | JOHNSON, JOSEPH<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 160.00 |
| GJENGDAHL, NELS<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 50.00 | KAT-KEY'S LOCK & SAFE CO<br>249 E 7TH STREET<br>ST PAUL MN 55101-2346 | 89.80 |
| GOPHER STATE ONE CALL<br>18946 LAKE DR E<br>CHANHASSEN MN 55317 | 2.90 | KELLY, JONATHAN<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 45.00 |
| GREATAMERICA FINANCIAL SVCS<br>CORP (formerly Loffler Companies, Inc.)<br>PO BOX 660831<br>DALLAS, TX 75266-0831 | 228.97 | KENNEY, WILLIAM<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 190.00 |
| HD SUPPLY FACILITIES<br>MAINTENANCE<br>PO BOX 509058<br>SAN DIEGO CA 92150-9058 | 447.60 | KLEMOND, SUSAN K<br>527 MANOMIN AVE<br>SAINT PAUL MN 55107 | 600.00 |
| HEALING HOUSE OF SAINT PAUL<br>338 SNELLING AVE S<br>SAINT PAUL MN 55105 | 405.00 | KOSTELC, CHRISTOPHER G<br>HOLY NAME OF JESUS<br>155 CTY RD 24<br>WAYZATA MN 55391 | 100.00 |
| HOREJSI, DEBRA JOY<br>DBA GINGKO GARDENS AND<br>LAWNS<br>4283 DENT AVE<br>WEBSTER MN 55088 | 250.00 | KOWALSKI GRAND MARKET INC<br>33 S. SYNDICATE AVE<br>SAINT PAUL MN 55105 | 15,417.06 |
|  |  | KRATOCHVIL, MICHAEL<br>554 SPRINGHILL RD<br>VADNAIS HEIGHTS MN 55127 | 975.72 |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|
| KUETTEL, MATTHEW<br>200 N MISSISSIPPI RIVER<br>SAINT PAUL MN 55104 | 137.50 |
| LACANNE, STEVEN<br>ST LEONARD PORT MAURICE<br>3949 CLINTON AVE S<br>MINNEAPOLIS MN  55409-1635 | 85.00 |
| LARAMIE COUNTY<br>ADMINISTRATION<br>510 W 29TH ST<br>CHEYENNE, WY 82001 | 870.00 |
| LARKIN HOFFMAN<br>8300 NORMAN CENTER DR - #1000<br>BLOOMINGTON MN 55437-1060 | 152.00 |
| LOCKWOOD SALES<br>16401 ARGON ST NW<br>ANDOVER MN 55304 | 1,486.25 |
| LOFFLER<br>1101 EAST 78TH ST STE 200<br>BLOOMINGTON MN 55420 | 4,307.26 |
| LOFFLER COMPANIES INC<br>PO BOX 660831<br>DALLAS TX 75266-0831 | 562.27 |
| LOGOS MANAGEMENT SOFTWARE INC<br>825 VICTORS WAY - STE 200<br>ANN ARBOR MI 48108-2830 | 692.00 |
| LUND, KRISTINA<br>FIRE STATION #14 PROF BLDG<br>ST PAUL MN 55104 | 1,325.00 |
| MARTIN, MICHAEL<br>19655  325TH ST<br>SHAFER MN 55074 | 600.00 |
| MCDONOUGH, THOMAS<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 360.00 |
| MCDOWELL AGENCY INC<br>1101 N SNELLING AVE<br>ST PAUL MN 55108 | 113.00 |
| MCQUILLAN, PATRICIA A<br>512 MONTCALM PL<br>SAINT PAUL MN 55116 | 149.36 |
| MDWST CNTR PERSONAL FAMILY DEV<br>2854 HIGHWAY 55 STE 130<br>EAGAN MN 55121 | 1,185.00 |
| MEJIA, ALICIA<br>7791 HEMINGWAY AVE S<br>COTTAGE GROVE, MN 55016 | 200.00 |
| METRO SALES INC<br>1620 E 78TH STREET<br>MINNEAPOLIS, MN  55423-4637 | 6,485.09 |
| MEYERS, NATHANIEL R<br>OUR LADY OF GRACE<br>EDINA MN 55436-2308 | 20.00 |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|
| MICHAUD, THOMAS<br>DIVINE MERCY CATHOLIC CHURCH<br>139 MERCY DR<br>FARIBAULT MN 55021 | 200.00 |
| MIDWEST ARCHIVES CONFERENCE<br>4440 PGA BOULEVARD STE 600<br>PALM BEACH GARDENS FL 33410 | 89.00 |
| MINNEAPOLIS FINANCE DEPARTMENT<br>PO BOX 77028<br>MINNEAPOLIS MN 55480 | 136.78 |
| MINNESOTA COACHES INC<br>101 E 10TH ST  SUITE 300<br>HASTINGS MN 55033 | 3,971.91 |
| MINNESOTA SEASONS<br>7111 STILLWATER BLVD N<br>OAKDALE MN 55128 | 2,529.00 |
| MN AEYC-MN SACA<br>1000 WESTGATE DR #252<br>ST PAUL  MN  55114 | 800.00 |
| MOLLNER, CATHERINE<br>2550 UNIV AVE W STE 435<br>ST PAUL MN 55114 | 1,012.50 |
| MOORE, ELIZABETH<br>4049 10TH AVE S<br>MINNEAPOLIS MN 55407 | 100.00 |
| MSGR ALOYSIUS CALLAGHAN<br>ST PAUL SEMINARY SCHOOL OF DIVINITY<br>2260 SUMMIT AVE<br>ST PAUL  MN 55105 | 150.00 |
| NCDVD<br>440 W NECK RD<br>HUNTINGTON NY 11743 | 1,228.00 |
| NEVIN, MICHAEL<br>14670 55TH ST NE<br>SAINT MICHAEL MN 55376 | 300.00 |
| NFOCUS CONSULTING<br>1594 HUBBARD DR<br>LANCASTER OH 43130-8124 | 975.85 |
| NORTHWESTERN FRUIT COMPANY<br>616 PINE STREET<br>ST PAUL MN 55130 | 650.95 |
| NORTON, SARAH<br>1136 JACKSON ST<br>SAINT PAUL MN 55117 | 26.73 |
| NYGAARD, ROBERT<br>6451 207TH AVE NE<br>WYOMING  MN  55092 | 560.80 |
| OFFICEMAX INCORPORATED<br>75 REMITTANCE DR  #2698<br>CHICAGO IL 60675-2698 | 3,069.10 |
| O'GRADY, KELLEN E<br>2115 SUMMIT AVE<br>SAINT PAUL MN 55105 | 80.00 |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|---|---|
| O'KEEFE, WILLIAM<br>247 THIRD AVE S<br>MINNEAPOLIS  MN  55415 | 737.50 | REV MARK WEHMANN<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 100.00 |
| OPPENHEIMER WOLFF DONNELLY<br>222 S 9TH ST - STE 2000<br>MINNEAPOLIS MN 55402-3362 | 418.95 | REV MICHAEL JOHNSON<br>ATTN HOLY REDEEMER COLLEGE<br>3112 7TH STREET NE<br>WASHINGTON DC 20017 | 65.12 |
| ORGAN, DEBORAH A.<br>224 HOWELL ST N<br>ST PAUL MN 55104 | 400.00 | REV MICHAEL STEVENS<br>328 KELLOGG BLVD W<br>ST PAUL MN  55102 | 100.00 |
| ORTEGA, AMANDA<br>8012 SCOTT BLVD<br>COTTAGE GROVE MN 55016 | 116.50 | REV PETER A LAIRD<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 100.00 |
| OUR LADY GRACE CHURCH<br>5071 EDEN AVE<br>EDINA  MN  55436 | 160.32 | REV TROY PRZYBILLA<br>226 SUMMIT AVE<br>ST PAUL MN  55102 | 100.00 |
| PALEN/KIMBALL COMPANY<br>MI-98<br>MINNEAPOLIS MN 55480-1414 | 210.00 | RICE, RICHARD M<br>8717 BAXTER WY<br>INVER GROVE HEIGHTS MN 55076 | 140.00 |
| PARISHSOFT<br>825 VICTORS WAY - STE 200<br>ANN ARBOR MI 48108-2830 | 253.00 | RODRIGUEZ RUIZ, LEAH<br>1425 LONE OAK RD<br>EAGAN MN 55121 | 1,028.76 |
| PAUL DAVID PRODUCTIONS, LLC<br>7365 WEST SHORELINE DR<br>WACONIA MN 55387 | 2,538.60 | RODRIGUEZ, MARTA<br>328 KELLOGG BLVD W<br>ST PAUL MN 55102 | 104.79 |
| PAUL J LANE PH D<br>24445 HAWTHORNE BLVD - STE 100<br>TORRANCE CA 90505 | 1,000.00 | RON KELLER & ASSOCIATES<br>2550 E MEDICINE LAKE BLVD<br>PLYMOUTH  MN  55441 | 900.00 |
| PEOPLES ELECTRICAL COMPANY<br>277 E FILLMORE AVE<br>ST PAUL MN 55107 | 2,073.23 | RUMJUNGLE MEDIA INC<br>5295 EDEN RD<br>MOUND  MN  55364 | 5,205.87 |
| PHOENIX PROCESS CONSULTANTS<br>5912 WEST 25TH STREET<br>SAINT LOUIS PARK MN 55416 | 785.00 | SALINAS, HILDA<br>246 E PAGE ST<br>ST PAUL  MN  55107 | 200.00 |
| PREMIER LOCATING INC<br>2034 COUNTY ROAD 35 WEST<br>BUFFALO MN 55313 | 113.75 | SAMS CLUB<br>PO BOX 530981<br>ATLANTA GA 30353-0981 | 1,051.47 |
| PREMIUM WATERS INC<br>P O BOX 9128<br>MINNEAPOLIS MN 55480-9128 | 102.69 | SANTER, LEAH<br>1401 HIGHLAND PKWY<br>SAINT PAUL MN 55116 | 100.00 |
| PRICE, KRISTINA<br>1647 EDGEWOOD ROAD<br>WINONA MN 55987 | 2,040.00 | SCHMIDT, MARY-CATHERINE<br>140 BELVIDERE ST W<br>WEST ST PAUL MN 55118 | 20.00 |
| PRINTASTIK<br>5249 W 73RD ST - STE C<br>EDINA MN 55439-2214 | 393.29 | SCHNEIDER, LEO<br>226 SUMMIT AVE<br>ST PAUL MN 55102 | 360.00 |
| PROFORMA<br>PO BOX 640814<br>CINCINNATI OH 45264 | 3,562.54 | SHILLING, HAROLD<br>HSHILLING<br>BLANCHARDVILLE WI 53516 | 165.00 |
| QUIGLEY, MARY<br>13225 CROCUS ST NW<br>COON RAPIDS  MN  55448-1221 | 625.00 | SHYPKOWSKI, KRISTI<br>4696 47TH ST S UNIT C<br>FARGO, ND 58104 | 65.00 |
| RAPP, JACQUELINE<br>17050TOP HILL RD<br>FAIRDALE, KY 40118-9428 | 150.00 | SILENT KNIGHT SECURITY GROUP<br>9057 LYNDALE AVENUE SOUTH<br>BLOOMINGTON MN 55420 | 285.00 |
| REV KEVIN MCDONOUGH<br>226 SUMMIT AVE<br>ST PAUL MN  55102 | 140.00 | | |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|---|---|
| SIOUX FALLS MARRIAGE TRIBUNAL 523 NORTH DULUTH AVENUE SIOUX FALLS SD 57104 | 400.00 | SWEEZO, SUSAN SLS INTERPRETING SERVICES 2342 BENJAMIN ST NE MINNEAPOLIS  MN  55418 | 160.00 |
| SLUSSER, MICHAEL 226 SUMMIT AVE ST PAUL MN 55102 | 25.30 | SYSCO MINNESOTA INC PO BOX 49730 BLAINE MN 55449-0730 | 774.36 |
| SRS ST FRANCIS 6832 CONVENT BLVD SYLVANIA  OH  43560 | 1,175.00 | TEAMWORKS INTL INC 7037 20TH AVE S CENTERVILLE MN  55038 | 8,175.02 |
| ST AGNES CHURCH 535 THOMAS AVENUE SAINT PAUL MN 55103 | 2,133.67 | THE LAUNDRY DOCTOR 662 SELBY AVE ST PAUL, MN 55104 | 46.40 |
| ST CROIX CLEANERS 5843 NEAL AVE N STILLWATER MN 55082 | 16.38 | THE VISITOR ST CLOUD CHANCERY SAINT CLOUD MN 56302-1068 | 905.00 |
| ST FRANCIS DE SALES 650 PALACE AVE SAINT PAUL MN 55102-3540 | 250.00 | THOMAS LIQUOR STORE 1941 GRAND AVE AT PRIOR ST PAUL MN 55105 | 99.00 |
| ST JOSEPH CHURCH 171 ELM STREET LINO LAKES MN 55014 | 438.26 | TIBESAR, LEO J 226 SUMMIT AVE ST PAUL MN 55102 | 300.00 |
| ST MICHAEL CHURCH 22120 DENMARK AVENUE FARMINGTON MN 55024-0227 | 6,017.00 | TOP 20 TRAINING 1873 STANFORD AVE SAINT PAUL MN 55105 | 5,200.00 |
| ST PATRICKS GUILD 1554 RANDOLPH AVE ST PAUL MN 55105 | 189.85 | TWIN CITY TREE SERVICE INC 981 LYDIA DR W ROSEVILLE  MN  55113 | 225.00 |
| ST PAUL SEMINARY SCHOOL OF DIVINITY 2260 SUMMIT AVE ST PAUL  MN  55105 | 27,053.90 | UNIVERSITY ST THOMAS MAIL 5002 ST PAUL MN 55105-1078 | 4,214.37 |
| ST PAUL STAMP WORKS INC 87 EMPIRE DRIVE SAINT PAUL MN 55103-1856 | 34.75 | VECTOR DELIVERY SERVICE 5747 GLENWOOD AVE #5 GOLDEN VALLEY MN 55422 | 1,972.90 |
| ST PAUL TRAINING LLP P O BOX 17311 SAINT PAUL MN 55117-0311 | 450.00 | VERNON COMPANY DEPT C  ONE PROMOTION PLACE NEWTON IA 50208-2065 | 61.32 |
| ST PETER CHURCH 1405 HIGHWAY 13 MENDOTA MN 55150-0679 | 353.90 | WABASHA DELI 32 E FILLMORE ST PAUL  MN  55107 | 1,558.72 |
| ST PETER'S PONTIFICAL INSTITUTE STUDIES IN CHURCH LAW BANGALORE  560 055 INDIA | 95.00 | WAGENBACH, ANDREW 2503 16TH AVE E NORTH ST PAUL  MN  55109 | 95.22 |
| | | WALKER, THOMAS 226 SUMMIT AVE ST PAUL MN 55102 | 240.00 |
| ST STEPHEN CHURCH 525 JACKSON ST ANOKA MN 55303 | 800.00 | WALL STREET JOURNAL PO BOX 7007 CHICOPEE MA 01021-9985 | 12.00 |
| STANLEY CONVERGENT SECURITY DEPT CH 10651 PALATINE IL 60055 | 84.84 | WAY POINT INC 4760 WHITE BEAR PKWY STE 201 WHITE BEAR LAKE MN 55110 | 4,195.53 |
| STAPLES ADVANTAGE DEPT DET CHICAGO IL 60696-3689 | 185.04 | WEHRLY, JOHN 2812 ANTHONY LANE SOUTH - #200 ST ANTHONY MN 55418 | 82.50 |
| SWANFELD, PAULINE M 1810 BERWICK CIR DULUTH MN 55811 | 648.00 | WESTERN  STATES  ENVELOPE & LABEL PO BOX 205216 DALLAS TX 75320-5216 | 907.65 |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|
| WINTRHOP WEINSTINE PA<br>225 S 6TH ST STE 3500<br>MINNEAPOLIS MN 55402 | 1,086.80 |
| WISC PROVINCE SOCIETY JESUS<br>2900 11TH AVE S #1017-19<br>MINNEAPOLIS MN 55407-5171 | 50.00 |
| WOLD MORRISON PA<br>247 THIRD AVE S<br>MINNEAPOLIS MN 55415 | 22,575.00 |

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM |
|---|---|
| XCEL ENERGY<br>PO BOX 9477<br>MINNEAPOLIS MN 55484 | 34.56 |
| XDD MN LLC<br>WORKSOURCE #164<br>KANSAS CITY MO 64141-4378 | 835.00 |

Schedule 3-8