**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                                    Case No. 15-30125

The Archdiocese of Saint Paul and                          Chapter 11
Minneapolis,

        Debtor.

---

**OMNIBUS RESPONSE TO LEGAL OBJECTIONS TO THE DEBTOR'S SECOND
AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

---

## INTRODUCTION

The Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor")
submits this omnibus response to the five pleadings asserting legal objections to the
Archdiocese's Second Amended Plan of Reorganization [ECF No. 887 (the "Archdiocese
Plan")].

This memorandum is filed under Section 1128 of the Bankruptcy Code and this Court's
May 18 and June 15, 2017 orders.  Terms not otherwise defined in this memorandum are defined
in accordance with the Archdiocese Plan or disclosure statement in support of the Archdiocese
Plan [ECF No. 888 (the "Archdiocese Disclosure Statement")], as appropriate.

This response first addresses the objections raised in the memorandum submitted by the
Official Committee of Unsecured Creditors (the "UCC") [ECF No. 1112 (the "UCC Memo")]
and then addresses the separate objections raised by North American Banking Company and
Bremer Bank National Association (collectively, the "Mortgage Lenders") [ECF Nos. 1101,
1103], the Estate of Nancy J. Galatowitsch, [ECF No. 1105] and the Crosier entities [ECF No.
1120].

None of the objections preclude confirmation of the Archdiocese Plan.  Instead, all of the objections either fail as a matter of law or implicate fact issues that cannot be resolved at this time.[1]

This response focuses solely on the objections to the Archdiocese Plan.  It does not address the UCC Plan or the "Modified Second Amended Chapter 11 Plan of Reorganization of the Official Committee of Unsecured Creditors of the Archdiocese of Saint Paul and Minneapolis." *See* ECF No. 1129.  By this late filing, the UCC attempts to address some, but not all, of the more obvious legal defects in the UCC Plan.  This course of action appears to be contrary to the Court's order which clearly indicated that no exhibits, affidavits, or other evidence in support of a response to a plan objection would be permitted.  ECF No. 1090.  In fact, the Court clearly indicated at the hearing on June 15 that it did not "want to turn this into a moving target.  I am going to rule on the plans that have been filed."  ECF No. 1095 (Hr'g Transcript, June 15, 2017) at 20.

Moreover, the further amendment of the UCC Plan has not resolved several fatal legal objections to the UCC Plan and has, in fact, created new legal challenges that preclude confirmation.  Certain material changes to the UCC Plan may also necessitate re-solicitation in that, among other things, the UCC Plan now includes a limited supplemental injunction in favor of one of the carriers in the case.  The Archdiocese respectfully requests an opportunity to separately address the new legal issues raised by the UCC's amendment.

---

[1] Many relevant facts are self-evident, established on the record or admitted. For all other factual assertions included in this Response, the Archdiocese is prepared to provide evidentiary support at the appropriate time and as directed by the Court.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. i

UCC OBJECTIONS ........................................................................................................... 1

I.    UCC OBJECTION NO. 1 FAILS:  THE ARCHDIOCESE PLAN SATISFIES
      THE LEGAL REQUIREMENTS FOR THE INCLUSION OF A CHANNELING
      INJUNCTION ................................................................................................................ 1
      A.    Courts within the Eighth Circuit have universally rejected the minority
            view that non-consensual, non-debtor injunctions are prohibited ........................ 1
      B.    Eighth Circuit courts consider the non-conjunctive Master Mortgage
            factors when determining whether to approve non-debtor releases ..................... 3
      C.    The Archdiocese Plan satisfies the Master Mortgage factors ............................... 4
            1.    FACTOR 1:  The Archdiocese and the parishes share an identity of
                  interest ........................................................................................................ 4
            2.    FACTOR 2:  The parishes will contribute substantial assets to the
                  reorganization under the Archdiocese Plan ............................................... 7
            3.    FACTOR 3:  The channeling injunction is essential to a successful
                  reorganization ........................................................................................... 13
            4.    FACTOR 4:  A lack of consent from affected creditors does not
                  defeat the channeling injunction ............................................................... 18
            5.    FACTOR 5:  The Archdiocese Plan provides a mechanism to pay
                  all or substantially all of the classes affected by the channeling
                  injunction ................................................................................................... 24
            6.    FAIRNESS AND PUBLIC INTEREST:  The channeling
                  injunction promotes fairness and serves the public interest.................... 30

II.   UCC OBJECTION NO. 2 FAILS:  THE ARCHDIOCESE PLAN DOES NOT
      CONSTITUTE A FINAL ORDER ON ABUSE CLAIMS AGAINST NON-
      DEBTORS ................................................................................................................... 32
      A.    The Archdiocese Plan preserves Tort Claimants' right to litigate ...................... 32
      B.    Stern and its progeny are inapposite .................................................................. 33
      C.    Even if the Archdiocese Plan did not preserve Tort Claimants' right to
            litigate (which it does), this Court possesses constitutional authority to
            resolve claims that are "integral" to a Debtor's restructuring............................. 34

III.  UCC OBJECTION NO. 3 FAILS:  THE ARCHDIOCESE PLAN
      APPROPRIATELY TREATS CLASS 13 CLAIMS....................................................... 38
      A.    The Archdiocese Plan does not determine whether Class 13 Claims are
            "allowed" .............................................................................................................. 38
      B.    Channeling the Class 13 Claims is necessary to preserve insurance
            coverage ............................................................................................................... 38

IV.   UCC OBJECTION NO. 4 FAILS: PARISHES CANNOT BE TREATED AS
      INSIDERS FOR VOTING PURPOSES......................................................................... 39
      A.    The parishes are not statutory insiders of the Archdiocese as a matter of
            law......................................................................................................................... 40

# TABLE OF CONTENTS
(continued)

**Page**

B.    The parishes and other non-debtor Catholic entities are not non-statutory
insiders of the Archdiocese .................................................................. 42

V.    UCC OBJECTION NO. 5 FAILS: TRADE DEBT WAS APPROPRIATELY
CLASSIFIED AS IMPAIRED ........................................................................ 45

VI.   UCC OBJECTION NO. 6 FAILS:  THE UCC HAS FAILED TO SHOW NON-
COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE
BANKRUPTCY CODE ................................................................................... 48
A.    The Archdiocese's actions with respect to avoidance claims were
appropriate ........................................................................................... 48
B.    The Archdiocese did not obstruct the UCC ........................................ 50
C.    The Archdiocese acted appropriately with respect to non-debtor parish
financial information ............................................................................ 50

VII.  UCC OBJECTION NO. 7 FAILS: THE UCC HAS FAILED TO SHOW A
COLORABLE BASIS FOR ATTACKING THE ARCHDIOCESE'S GOOD
FAITH IN FORMULATING AND PROPOSING ITS PLAN ....................... 51
A.    Introduction ......................................................................................... 51
B.    Prepetition Conduct ............................................................................ 51
1.    The alleged prepetition conduct is irrelevant to the good faith
analysis under Section 1129(a)(3) ........................................... 51
2.    The UCC's allegations do not support a lack of good faith in filing
the Archdiocese Plan................................................................ 52
C.    Postpetition Conduct ........................................................................... 55
1.    Red Bull Crashed Ice ............................................................... 56
2.    "Box of Loot" ........................................................................... 56
1.    Sale of Property........................................................................ 57
2.    Insurance Settlements ............................................................... 57
3.    Disposable Resources ............................................................... 60
D.    Conclusion ........................................................................................... 60

VIII. UCC OBJECTION NO. 8 FAILS:  THE ARCHDIOCESE IS ENTITLED TO
UTILIZE 11 U.S.C. § 1129(B) TO CONFIRM A PLAN OVER AN NON-
CONSENTING CLASS'S OBJECTION ......................................................... 60
A.    The Archdiocese Plan is fair and equitable and the Archdiocese has
complied with all requirements under Section 1129(b)(2) .................. 60
B.    The best interest test does not require that the Archdiocese "contribute the
liquidation value of its assets" as a condition to confirmation ........... 64

OTHER PLAN OBJECTIONS ..................................................................................... 68
A.    Mortgage Lenders ................................................................................ 68
B.    Deceased Claimant .............................................................................. 69
C.    Crosier Entities.................................................................................... 70

CONCLUSION............................................................................................................. 71

-ii-

## UCC OBJECTIONS

I.  **UCC OBJECTION NO. 1 FAILS:  THE ARCHDIOCESE PLAN SATISFIES THE LEGAL REQUIREMENTS FOR THE INCLUSION OF A CHANNELING INJUNCTION**

A.  **Courts within the Eighth Circuit have universally rejected the minority view that non-consensual, non-debtor injunctions are prohibited**

In its lead objection to the Archdiocese Plan, the UCC expressly acknowledges that channeling injunctions are permissible in appropriate circumstances.  UCC Memo at 4.  Indeed, in its otherwise ill-conceived and late-filed "Modified Second Amended Chapter 11 Plan of Reorganization of the Official Committee of Unsecured Creditors of the Archdiocese of Saint Paul and Minneapolis," the UCC admits that a channeling injunction is proper.  *See* ECF No. 1129 at § 14.2(c) (including a limited supplemental injunction in favor of one of the insurance carriers).  Put simply, a channeling injunction represents the best and only vehicle for a fair and just global resolution of the claims in this case.  As detailed below, no global resolution of this case can be achieved and no Archdiocese insurance monies will be made available to Tort Claimants in the absence of a channeling injunction.  A channeling injunction is necessary and integral to any plan of reorganization in this case.

The vast majority of federal circuits, including the First, Second, Third, Fourth Sixth, Seventh and Eleventh Circuits[2] have determined that non-debtor releases are permissible under appropriate circumstances and uniformly reject the minority view, represented by decisions from the Fifth, Ninth and Tenth Circuits (the so-called "Prohibition Circuits"), that "11 U.S.C. § 524(e) prohibits non-consensual third-party releases."  UCC Memo at 3-4.  While the Eighth

---

[2] *See, e.g.*, *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070 (11th Cir. 2015); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344 (4th Cir. 2014) *cert. denied*, 135 S.Ct. 961 (2015); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640 (7th Cir. 2008); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *In re Cont'l Airlines*, 203 F.3d 203 (3d Cir. 2000); *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995).

Circuit Court of Appeals has not yet ruled on the permissibility of non-debtor releases, the leading test adopted by the majority of federal circuits was first articulated in *Master Mortgage*, a 1994 bankruptcy decision from the Western District of Missouri.  *In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

In *Master Mortgage*, a federal bankruptcy court within the Eighth Circuit declined to follow the interpretations of the Prohibition Circuits, and in doing so, adopted the majority view that Section 524 "'does not purport to limit or restrain the power of a bankruptcy court to otherwise grant a release of third parties.'"  *Id.* at 933 (quoting *In re Specialty Equip. Co.*, 3 F.3d 1043, 1047 (7th Cir.1993)); *see also In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 825 (S.D. Ohio 1998) ("This leap of legal reasoning is unwarranted.").  The *Master Mortgage* court further observed that Section 105 "is broadly written allowing all orders that are necessary and proper to effectuate a reorganization which may, at times, require the issuance of an injunction or release."  *Master Mortg.*, 168 B.R. at 934 (citing *MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89, 93 (2d Cir.1988)).

Subsequent to the *Master Mortgage* decision, <u>every</u> bankruptcy court within the Eighth Circuit that has addressed the permissibility of non-debtor releases has rejected the flawed reasoning of the Prohibition Circuits and has, instead, applied the "*Master Mortgage* factors" when assessing the permissibility of third-party releases.  *See In re Riverbend Leasing LLC*, 458 B.R. 520 (Bankr. S.D. Iowa 2011); *In re U.S. Fidelis, Inc*., 481 B.R. 503 (Bankr. E.D. Mo. 2012); *In re Hoffinger Industries*, Inc. 321 B.R. 498 (Bankr. E.D. Ark. 2005).

As the UCC impliedly acknowledges through its own analysis of *Master Mortgage*, there is no basis for this Court to deviate from the universal, well-reasoned approach of its sister courts within the Eighth Circuit.

2

**B.**    **Eighth Circuit courts consider the non-conjunctive *Master Mortgage* factors when determining whether to approve non-debtor releases**

Recognizing that non-debtor releases are heavily dependent upon the unique "factual contexts" of each case, the "*Master Mortgage*" test looks to five factors:

(1)    There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2)    The non-debtor has contributed substantial assets to the reorganization.

(3)    The injunction is essential to reorganization. Without [] it, there is little likelihood of success.

(4)    A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5)    The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*In re Master Mortg.*, 168 B.R. at 935.

Contrary to the UCC's erroneous contention that the Archdiocese "must meet all of the applicable requirements," UCC Memo at 1, 10-11, these factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the court's determination of fairness. *Id.* (finding that there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive).  Because the plan proponent need not prove the existence of all five *Master Mortgage* factors, they have been described as a "useful starting point."  *In re Charles St. African Methodist Episcopal Church of Boston,* 499 B.R. 66, 100 (Bankr. D. Mass. 2013).

As detailed below, when the *Master Mortgage* factors are applied to the unique circumstances of this bankruptcy case, they overwhelmingly support the issuance of a channeling injunction as embodied in the Archdiocese Plan.  The UCC's contrary argument with respect to

3

each *Master Mortgage* factor, in addition to resting on faulty legal propositions, relies principally, if not entirely, on innuendo, speculation and a tortured interpretation of the applicable facts.   At a very minimum, the UCC's objection implicates a myriad of material, disputed fact issues that cannot give rise to an order sustaining this purported "legal" objection as a matter of law.

C.      <strong><u>The Archdiocese Plan satisfies the *Master Mortgage* factors</u></strong>

1.      <strong><u>FACTOR 1</u></strong>:  <strong>The Archdiocese and the parishes share an identity of interest</strong>

The first consideration, whether there is an identity of interest between the debtor and the non-debtor, is satisfied where suits against the non-debtor may deplete assets of the estate or give rise to indemnity or contribution claims against the debtor.  *In re Master Mortg.*, 168 B.R. at 937.   The UCC contends that the Archdiocese cannot show an identity of interests with the Protected Parties, in particular the parishes, because these entities have emphasized that they are "legally and operationally distinct from the Archdiocese."   UCC Memo at 9.  This contention is baseless because it conflates legal separateness with identity of interest.  <u>All</u> non-debtor releases, by definition, concern entities that are legally separate and distinct from the debtor.  If they were legally and operationally <u>indistinct</u> from the debtor, then these entities would already be part of the debtor's bankruptcy estate and there would be no need to consider the merits and utility of non-debtor releases.

Consistent with this distinction, *Master Mortgage* counsels that the hallmark "identity of interest" between a debtor and non-debtor exists where a post-petition action against the non-debtor may result in an indemnity or contribution claim against the debtor.  In *Master Mortgage*, the court determined that an identity of interest existed between the debtor and non-debtor where a settlement agreement created a right of contribution between the parties.  168 B.R. at 937.  The

4

court noted that "any post-petition action against [the non-debtor] would result in a right of contribution against [the debtor] Master Mortgage. Such action would seriously affect Master Mortgage's ability to successfully reorganize." *Id.*; *see also In re Tribune Co.,* 464 B.R. 126, 187, *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the [ ] Plan and implementing the [ ] Plan Settlement").

That is precisely the case here. Because the parishes have asserted contribution claims against the Archdiocese arising out of Tort Claims involving clergy assigned by the Archdiocese, the Archdiocese undoubtedly shares an identity of interest with the parishes. Contrary to the UCC's suggestion, there is nothing "theoretical" about this interest. It is undisputed that counsel for certain of the Tort Claimants have initiated state court litigations against a majority of the Archdiocese's parishes (the "Parish Lawsuits"). These Parish Lawsuits, on their face, assert claims arising from misconduct by clergy who were assigned to the parishes by the Archbishop. Each of these pending Parish Lawsuits concern the <u>same</u> Tort Claimants, the <u>same</u> alleged perpetrators, the <u>same</u> facts and the <u>same</u> allegations asserted against the Archdiocese in the Tort Proofs of Claim. The parishes have asserted contribution and indemnity claims against the Archdiocese arising out of these Parish Lawsuits such that they are, in effect, indirect claims against the debtor.[3]

The UCC's only retort – *i.e.*, that these contribution and indemnity claims are "contingent" and thus statutorily disallowed under Section 502(e)(1)(B) – is without merit.[4] *See*

---

[3] These parishes also have claims against the Archdiocese carriers, including pursuant to Minn. Stat. § 60A.08, subd. 6.

[4] The Parish Committee has consistently taken the position that parish contribution and indemnity claims will not be discharged under Section 1141. The Parish Committee has also

UCC Memo at 10.  This same argument was advanced and rejected in *In re Charles St. African Methodist Episcopal Church*, 499 B.R. at 100-01.  In that case, like the UCC, the largest creditor of the debtor invoked Section 502(e)(1)(B) to argue that there was no identity of interest under *Master Mortgage* where a third party's purported right of indemnification or contribution against the debtor remained contingent.  *Id*. at 100-01.  The court flatly rejected the creditor's argument and concluded that the contingent contribution claim sufficiently supported an identity of interest between the debtor and the third party.  The court reasoned:

> The present contingency of [third party's] claim is of no moment: a claim disallowed for contingency under § 502(e)(1)(B) can be reconsidered when it becomes fixed, see 11 U.S.C. § 502(j) ("[a] claim that has been ... disallowed may be reconsidered for cause"), and, upon reconsideration, would be determined and allowed or disallowed "the same as if such claim had become fixed before the filing of the petition." 11 U.S.C. § 502(e)(2).

*Id.* at 101.

This Court should reach the same conclusion here.

But even if this Court were to conclude that the contribution claims, on their own, are insufficient to create an identity of interest, the Archdiocese would still satisfy this factor for reasons the UCC wholly ignores.  For instance, the Parish Lawsuits involve priests assigned by the Archdiocese.  Thus, these suits – which implicate the very same Tort Claims at issue in this bankruptcy case – will necessarily involve the Archdiocese in discovery and litigation.

Equally important, the pending sexual abuse claims against the parishes will deplete assets of the estate.

- First, each Catholic within the Archdiocese is a member of a parish.  The Archdiocese's revenues primarily derive from parish assessments and donations from Catholics within its reach who are also members of specific parishes.

---

argued that, even if the court rejects this view, Minnesota law allows the parishes to pursue a claim against the debtor's insurers.

- Second, the Archdiocese and the parishes share an insurance fund, the GIF. Parishes will seek to fund their defense/indemnity out of the GIF (for claims after September 1, 1980), thereby depleting monies that could be used for resolution of this case or Archdiocese defense/indemnity.

- Third, parishes are co-insureds under numerous insurance policies, including all parishes under the 1980-1987 policies and Catholic Mutual policies 1987-present. Limits are shared on a per-occurrence basis (1980-1987 and pre-1980 policies) and in the aggregate (Catholic Mutual). The majority rule is that an insurer may resolve the liability of one insured, in good faith, even if the result is that another insured is left without a defense and without remaining limits to pay a judgment." Duana J. Grage & Suzanne L. Jones, *Settling with Limited Funds* (Aug. 1, 2012), http://apps.americanbar.org/litigation/committees/insurance/articles/mayjune2012-competing-files.html. The minority view is that an insurer can be liable for bad faith if it pays indemnity to one insured to the detriment of another. *Id.* Regardless of whether the majority or minority rule applies, failure to include the parishes in the channeling injunction will reduce the policy limits available to the Archdiocese for Tort Claims.

Finally, while parishes are separate and distinct corporate entities from the Archdiocese, from a religious and canonical perspective, they act in communion in carrying out the core missions of the Catholic Church. The Archdiocese could not exist without viable parishes and the Catholic Church finds its most immediate and visible expression in its parishes. It is in and through parishes that the Catholic Church lives locally in the home of the Faithful by acting as the center for worship, formation, spiritual growth and the pursuit of the Gospel and social Catholic missions.

In light of the unique relationship between the Archdiocese and the parishes, and because the pending Parish Lawsuits arise out of the same facts and circumstances as the Tort Claims against the Archdiocese and will undoubtedly deplete assets of the estate, the identity of interest factor supports the issuance of a channeling injunction.

2. **FACTOR 2**:  **The parishes will contribute substantial assets to the reorganization under the Archdiocese Plan**

The second *Master Mortgage* factor looks to whether the non-debtor has contributed substantial assets to the reorganization.  *In re Master Mortg.*, 168 B.R. at 937.  Citing an

inapposite decision from the Middle District of Florida, the UCC erroneously contends that "each recipient of a third-party" release must contribute substantial assets and that courts "have found a contribution to be 'substantial' where the contribution consists of most of the assets of the contributing party." UCC Memo at 8. That is simply not the law in the Eighth Circuit.

First, neither *Master Mortgage*, nor any court from the Eighth Circuit has ever required that each individual recipient of a non-debtor release separately contribute substantial assets in exchange for the channeling injunction. While a few courts in other jurisdictions may have historically required separate or proportional contributions by each person or entity seeking a non-debtor release (*see, e.g., In re AOV Indus., Inc.*, 792 F.2d 1140, 1151-54 (D.C. Cir. 1986)), the better-reasoned and majority approach appears to analyze the proposed consideration in the aggregate. For example, in *In re Am. Family Enters.*, 256 B.R. 377, 390 (D.N.J. 2000), the court upheld a release covering a laundry list of third parties based on the contribution of a single party, explaining "this court must determine only that sufficient compensation is being paid to the class, and need not speculate as to the appropriate contribution of each defendant. The release of noncontributing defendants through a settlement agreement is no reason for disapproving the compromise." *Id.* at 428.[5] The court added that "such injunctions and releases are customary and ordinary in large Chapter 11 cases." *Id.* at 406.

Second, neither *Master Mortgage*, nor any other court within the Eighth Circuit, has defined "substantial" consideration to require an analysis of a non-debtor's ability to pay, let alone direct that the contribution "consist of most of the [non-debtor's] assets." UCC Memo at 8. Instead, bankruptcy courts within the Eighth Circuit assess contributions on a case-by-case

---

[5] While this release was technically decided in the settlement context, the funding agreement releasing the parties was "the essential vehicle by which the Debtors c[ould] obtain the funds needed to perform their monetary obligations under the Plan" and is thus substantially similar to the plan context. *Id.* at 390.

basis and, in doing so, have found contributions to be substantial without any analysis of the non-debtors' respective assets or ability to pay. *See In re U.S. Fidelis, Inc.*, 481 B.R. at 520 (finding that the non-debtors "will substantially contribute to the orderly liquidation of the Debtor," without describing what determines a "substantial contribution").

At least one recent decision has approved a non-debtor release without <u>any</u> monetary contribution by the released non-debtors. Specifically, in *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1079 (11th Cir. 2015), the Eleventh Circuit affirmed confirmation of a plan of reorganization containing non-debtor releases in favor of former principals of the debtor who acted as key employees of the reorganized debtor. The releases were approved even though the only contribution offered by the principals was their labor. *Id*. at 1080.[6]

Importantly, "the substantial contribution inquiry does not turn on whether the holders of the released claims receive consideration; [rather] it turns on whether the <u>Debtors' estates</u> have received consideration." *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 292 (Bankr. S.D.N.Y.

---

[6] In a similar case, the court determined that the services of third-party officers constituted insufficient consideration to justify a release, especially where the plan provides only for "minimal payment of claims of the class affected by the injunction." *In re Exide Techs*., 303 B.R. 48, 73-74 (Bankr. D. Del. 2003). At the same time, the court noted that the contribution of tangible "assets" is not a requirement for this factor to be satisfied:

> I do not hold here that the price of a release of officers, directors and others must always involve the contribution of tangible "assets" or that efforts alone of officers and directors are never sufficient to warrant such a release. In this matter, the unsecured creditors' overwhelming opposition to the proposed settlement, combined with the Debtors' undervaluation of its worth and the minimal distribution to unsecured creditors, all make the proposed releases inappropriate. I note also that upon presentation of a consensual plan, in the absence of objection to the release/injunction provisions, or upon a more meaningful distribution to unsecured creditors, the Court may, appropriately, view such provisions in a different light.

*Id.* at 74 n. 3 (emphasis added).

9

2016) (emphasis added). In analyzing the sufficiency of the consideration, some courts have also considered whether the non-debtor's contribution will "provide for certain distributions that would not have been made available but for these nondebtor parties' contributions." *In re XO Commc'ns, Inc.*, 330 B.R. 394, 437-38 (Bankr. S.D.N.Y. 2005). Here, the contributions being provided by the Protected Parties – including insurance proceeds and their relinquishment of contribution claims and claims relating to the GIF – benefit the estate and would not be available "but for" the Protected Parties' contributions.

In addition to relying on an erroneous legal standard, the UCC's contention that the parishes will not contribute substantial assets under the Archdiocese Plan is built upon an erroneous accounting of the contributions to be provided by the Protected Parties under the Archdiocese Plan. Contrary to the UCC's representation that the parishes will contribute "$0 of their own assets" and "only proceeds from their insurance policies" [UCC Memo at 8] the parishes will, in reality, provide the following substantial consideration in exchange for the channeling injunction:

- Parishes are compromising all claims they have asserted against the Archdiocese, including: (i) their numerous contribution claims relating to the Tort Claims (which the parishes assert are viable post-discharged [ECF No. 1113]); (ii) claims relating to the GIF "loan of $12.9 million"; and (iii) breach of fiduciary duty claims relating to administration of the AMBP and GIF.

- Under the Archdiocese Plan, the parishes are contributing $13.7 million in insurance proceeds. Every parish with an insurance policy which may provide coverage for Tort Claims will sell such policy and contribute all proceeds from that sale to the Trust. The result is that, going forward, the parishes will not have insurance coverage for those periods.

- All parishes are giving up their coverage for any type of claim under the 1980-1987 policies and releasing Catholic Mutual for liability for Tort Claims. Every parish that is an insured under other insurance policies issued to the Archdiocese is likewise giving up any claims it has under such policy. Archdiocese Plan § 5.6(b)(2); Ex. N.

- $5-6 million of the GIF is being used to fund the Trust. The parishes will make contributions to the GIF so as to ensure that this amount of money is available to fund

the Trust.  Additionally, parishes are giving up claims they may have to a share of the GIF that is being used to fund the Archdiocese Plan.

Collectively, the millions of dollars of consideration provided by the parishes in exchange for the channeling injunction is more than substantial.  This is especially true in light of the parishes' realistic limited exposure and likely prospects that they will obtain a dismissal of the Parish Lawsuits seeking to impose liability for negligent hiring, retention or supervision of clergy.  Importantly, respondeat superior claims are barred by the statute of limitations and were specifically not included within the scope of claims revived by the Minnesota Child Victims Act.  Minn. Stat. § 541.73 (2013).  As for negligence-based claims, no Minnesota court has <u>ever</u> adjudicated liability against a parish corporation for alleged abuse by a clergy member.  And it is uncontested that Roman Catholic parish corporations are not responsible for placing, training, hiring, retaining, supervising or terminating clergy or their faculties.[7]  This is solely the responsibility of the Archbishop or applicable religious order.  *Id*.

Because parishes do not have the right or ability to control or dictate critical facets of the clergy's work – including but not limited to, formation, admission, ordination, supervision, assignment, removal, faculties and duration of service – parishes will argue that they should not be held liable under any negligent employment theories recognized in Minnesota.

In light of the tenuous and likely nominal negligence claims against the parishes and Tort Claimants' and the UCC's failed efforts pursuing substantive consolidation and avoidance claims, the only alternative basis to pursue parish liability is through a theory of imputation of Archdiocesan knowledge and liability to parish corporations.  By statute, the Archbishop and the

---

[7] Can. 241 §1, 242 §1, 259 (parishes have no authority for formation and admission); Can. 392; 396 (parishes have no authority to approve and supervise); Can. 519, 523, 547, 274 §2, 523, 547, 557 (parishes have no authority over clergy assignments); Can. 523, 524 (parishes have no right to remove clergy); *Christus Dominus* 19, *Christus Dominus* 28, Can. 273 (parishes cannot dictate/impair faculties).

Vicar General are members of each parish governance board. Minn. Stat. § 315.15. The general rule is that a director's prior knowledge <u>cannot</u> be imputed to the corporation. There is, however, one caveat to this rule: A director's knowledge <u>may</u> be imputed to the corporation in the narrow circumstance where that knowledge was acquired within the scope of the director's activities on the board. *See, e.g., Weintraub v. Texasgulf, Inc.,* 564 F. Supp. 1466, 1470 (S.D.N.Y. 1983) (it is clear that a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation); *Fidelity Bank, Nat'l Ass'n v. Avrutick,* 740 F. Supp. 222, 237 (S.D.N.Y. 1990) (same); *Etshokin v. Texasgulf, Inc.,* 612 F. Supp. 1212, 1218 (N.D. Ill. 1984) (same). Here, this lone caveat does not apply.

To succeed on any imputation-of-knowledge theory, Tort Claimants must prove that the Archbishop's or the Vicar General's knowledge of a particular Tort Claim was acquired in connection with their service as directors or trustees of a parish. Archdiocesan records and clergy files do not evidence any situation where such knowledge was obtained in the course of the Archbishop's or the Vicar General's service as a parish director or trustee <u>and no such</u> <u>allegation has been made by the UCC</u>. And, as a practical matter, neither the Vicar General nor the Archbishop normally attends parish board meetings. Parishes will vigorously pursue, and likely prevail on, this defense.

On balance, the consideration being provided by the parishes in exchange for the channeling injunction is substantial, and even more so when considered relative to these non-debtors' nominal exposure and potential liability for Tort Claims.

12

3. __FACTOR 3__:  The channeling injunction is essential to a successful reorganization

The third *Master Mortgage* factor considers whether the injunction is essential to reorganization, such that, without it, there would be little likelihood of success.  *In re Master Mortg.*, 168 B.R. at 937-38.  Tellingly, the UCC makes no attempt to address this critical factor in its memorandum in support of its objection.  *See* UCC Memo at 1-11.

Where other factors may be absent, courts have observed that this "Factor 3" becomes a critical consideration in assessing the practical realities and stakes in the event that the Plan incorporating the channeling injunction is not accepted by the impaired class.  For instance, in *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014), the court approved non-debtor injunctions in favor of owners and managers of the debtor even where affected classes voted against a plan that provided for the recovery of a small fraction of certain contingent and unliquidated claims.  *Id*. at *15-16. Relative to Factor 3, the court noted that the reorganization could not be achieved without the non-debtor releases.  *Id.*  Among other things, the released parties had agreed to waive, via the plan, $31 million in general unsecured claims against the debtor.  *Id*. at *5.  According to testimony offered in the case, and absent approval of the plan, the debtors (several nursing homes) would be forced to close their doors, liquidate, and provide minimal recovery to the various classes of creditors.  Balancing these considerations, the court found that the "proposed releases are necessary, essential, and fair under the circumstances."  *Id*. at *16.

Likewise, in *In re U.S. Fidelis*, the court found it persuasive that, absent the proposed non-debtor releases, the consideration to be paid to the creditors "evaporates" and the parties would likely spend "years litigating, resulting in a significant loss to the estate.  Meanwhile, the

consumer creditors most likely would end up with little return, and no return in the near future (further devaluing whatever return they may receive, if any)." 481 B.R. at 519.

Here, the proposed channeling injunction is essential to the Archdiocese Plan for at least seven independent reasons.

First, $156 million available under the Archdiocese Plan (including $13 million from parish carriers, $5-6 million in the GIF and more than $120 million of Archdiocese insurance settlements) will not be available absent the channeling injunction. Settlement agreements with Archdiocese insurance carriers forming the foundation for the consideration to be paid into the Trust are expressly contingent upon the channeling injunction. Indeed, as detailed in recently-filed objections to the UCC's plan, _each_ of the settling insurers has represented that the necessary global insurance settlements cannot, and will not, be effectuated in the absence of a channeling injunction. *See* ECF No.1121 (Certain Insurers Objection) at 14; ECF No. 1110 (Travelers Objection) at 17. A channeling injunction is necessary and integral to any plan of reorganization in this case.

Second, the Archdiocese's future economic viability depends upon revenues from financially viable parishes. As the foundation of giving for Catholics within the Archdiocese, it cannot be denied that parishes are uniquely situated to affect the Archdiocese's financial condition. For example, nearly 75% of the support for the Archdiocese's missions comes from parish assessments. Archdiocese Disclosure Statement at 14.

Third, parish revenue streams and donations will no doubt decline if parishes face further financial exposure for Tort Claims. Counsel for certain of the Tort Claimants have sued the majority of parishes in connection with the same sexual abuse accusations necessitating this bankruptcy case. Regardless of the liability and damages determinations in these Parish

14

Lawsuits, parishes will incur, over the course of many years, substantial attorneys' fees and costs to defend the suits, including likely coverage litigation. These are monies that would otherwise help support the Archdiocese and its public service and social Catholic missions.

Fourth, the channeling injunction is necessary to free the Archdiocese from indirect suits in the form of contribution claims. Separate and apart from the inevitable, continued depletion of assets from the estate through Parish Lawsuits, the absence of a channeling injunction will expose the Archdiocese to financial strain by creating potential liability for contribution and indemnity claims by the parishes.

Fifth, the channeling injunction is a necessary tool to halt the "death struggle" into which this case will devolve if a plan is not confirmed soon. *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d at 1079–81. Without the channeling injunction, litigation will continue for many years and drain substantial resources from the Archdiocese. The Archdiocese cannot and will not liquidate. And the absence of a channeling injunction will likely cause any plan of reorganization to fail, necessitating years of litigation that will result in the affected creditor classes receiving far less than they would recover under the Archdiocese Plan.

Sixth, the Archbishop is charged with caring for and safeguarding the Catholic community, including the parishes. The Archbishop cannot – from a practical, canonical, and moral position – abandon them. *See* Canon 369. Thus, parishes must be part of any plan of reorganization. Put simply, the Archdiocese cannot receive a "fresh start" and the Catholic Church cannot function and maintain its core mission without viable parishes unburdened by litigation largely caused by decisions made at the diocesan level.

Seventh, under RFRA, government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except … [g]overnment

may substantially burden a person's exercise of religion only if it demonstrates that application

of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2)

is the least restrictive means of furthering that governmental interest."  42 U.S.C. § 2000bb-1 (a)-

(b).  In 2000, Congress redefined "exercise of religion" under RFRA as "any exercise of religion,

whether or not compelled by, or central to, a system of religious belief".  *Burwell v. Hobby*

*Lobby Stores, Inc.*, 134 S. Ct. 2751, 2762 (2014) (citing 42 U.S.C. § 2000cc-5(7)(A)).

The Archdiocese broadly describes its religious mission on its website: 'Making the name

of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed

through vibrant parish communities, quality Catholic education, and ready outreach to the poor

and marginalized."  ECF No. 22 ¶17.  The parishes help carry out this mission by, among many

other things, offering the liturgy, supporting liturgical and music ministries, offering sacramental

preparation, offering faith formation for children and adults, offering vacation bible school,

sponsoring mission trips, ministering to the sick, elderly, dying, and at-risk, and providing meals

and fellowship after funerals.[8]  Many parishes also support  parish schools.  Such activities

undoubtedly constitute the "exercise of religion" within the meaning of RFRA.  *See, e.g.*, *W.*

*Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 849 F. Supp. 77, 78 (D. D.C. 1994)

(granting a preliminary injunction in favor of church because refusal to issue permit to allow

church to feed the poor and homeless constituted "exercise of religion" under RFRA.)  The

Archdiocese and the parishes, of course, are vehicles through which the Archbishop, other clergy

members and parishioners exercise their religious beliefs by, among other things, providing them

the opportunity to participate in and support such activities.  *Cf. Hobby Lobby*, 134 S. Ct. at 2768

---

[8] *See also* Can. 1247 ("On Sundays and other holy days of obligation, the faithful are obliged to
participate in the Mass.  Moreover, they are to abstain from those works and affairs which hinder
the worship to be rendered to God, the joy proper to the Lord's day, or the suitable relaxation of
mind and body.").

16

("[P]rotecting the free-exercise rights of corporations . . . protects the religious liberty of the humans who own and control those companies.").

The simple truth is that many parishes' fulfillment of their mission will be substantially burdened (and, some, irrevocably crippled) if left with the burden of defending hundreds of lawsuits, and, potentially, execution on their funds and properties. *See, e.g.*, *Campos v. Coughlin*, 854 F. Supp. 194, 214 (S.D.N.Y. 1994) (granting a preliminary injunction where a prison regulation preventing the wearing of Santeria beads constituted a substantial burden under older version of RFRA). Likewise, as discussed elsewhere, if parishes are left to defend these cases, the Archdiocese's ability to reorganize and thereby pursue its mission will also be severely hampered. The result will be to substantially burden the exercise of religion not only by the Archdiocese and parishes, but over 800,000 Catholics served by the Archdiocese and parishes.

As noted, the *Master Mortgage* factors are neither exclusive nor conjunctive. 168 B.R. at 935. Given this and RFRA, it is appropriate to consider the effect on the Archdiocese, parishes and thousands of Catholics when assessing the applications of the channeling injunction factors. To disregard all of the *Master Mortgage* factors in favor of a single consent factor that serves no compelling governmental interest, but instead effectively gives veto power to the creditors represented by one attorney, would ignore RFRA and other laws protecting the free exercise of religion.[9]

---

[9] For example, RLUIPA, 42 U.S.C.A. § 2000cc, prohibits the government from implementing or imposing a land use regulation in a manner that substantially burdens religious exercise absent a compelling government interest and through the least restrictive means possible. Likewise, the Minnesota Constitution places paramount importance on religious liberty. *See Edina Community Lutheran Church v. State*, 745 N.W.2d 194, 203 (Minn. Ct. App. 2008) ("The people of this state have always cherished religious liberty and the high importance of protecting this right is demonstrated by its treatment in our constitution, where it appears even before any reference to the formation of a government.") (citing *State by Cooper v. French*, 460 N.W.2d 2, 8-9 (Minn. 1990)).

On balance, the $156 million in the Archdiocese's Plan will not be available absent the channeling injunction and, regardless of the ultimate "validity" or merits of the parish contribution claims, the parishes' continued exposure to sexual abuse claims post-confirmation would – given the unique canonical relationship between parishes and the Archdiocese – compromise any effective reorganization. The future economic viability of the Archdiocese depends upon revenues from financially viable parishes. If parishes are forced to defend, post-confirmation, hundreds of sexual abuse claims, then the effectiveness of the Archdiocese's discharge will be materially impaired: The Archdiocese's resources will still continue to be drained and depleted for years to come. As applicable case law instructs, these are <u>precisely</u> the "unique" circumstances warranting third-party injunctions. *In re U.S. Fidelis*, 481 B.R. at 520 (Factor 3 satisfied where absent the releases, the parties would likely spend "years litigating, resulting in a significant loss to the estate"); *In re 710 Long Ridge Rd.*, 2014 WL 886433, at *16 (same).

4.     <u>**FACTOR 4**</u>**: A lack of consent from affected creditors does not defeat the channeling injunction**

The fourth *Master Mortgage* factor considers whether a substantial majority of the creditors, and especially the affected classes, agree to the release and have voted to accept the proposed plan treatment. *Master Mortgage,* 168 B.R. at 938. Relying on the minority view that a third-party release cannot be approved absent approval of the affected creditors (*see In re Wash. Mut. Inc.*, 442 B.R. 314 (D. Del. 2011)), the UCC argues that the Archdiocese Plan should be rejected because "[n]o court has imposed third-party releases after affected creditors rejected the plan that contained them." UCC Memo at 5-6. That is simply false. As detailed below, several courts have imposed third-party releases after affected creditors rejected the plan that

18

contained them.   Further, this Court cannot and should not allow these proceedings to be ultimately controlled and dictated by the demands of claimants' counsel.

In *In re Sabine*, for example, a non-consensual non-debtor third-party release was approved over the objection of both the creditors' committee and holders of unsecured notes, even though the claims were extinguished rather than channeled to a trust.  555 B.R. at 291-94. The court was persuaded that the non-debtor's contribution to the estate coupled with the reality that the proposed releases were "integral, important and necessary to the success of the Plan" militated in favor of the injunction. *Id.*

Likewise, in *In re 710 Long Ridge Rd.*, the bankruptcy court approved certain third-party releases even though an impaired non-consenting class rejected the plan and the court expressly found that "the Third-Party Releases have <u>not</u> met the fourth Master Mortgage Factor."  2014 WL 886433, at *15.  Even though this "impacted class" voted against the plan, the court was satisfied that *Master Mortgage* factors two and three were satisfied:  "the proposed releases [were] necessary, essential, and fair under the circumstances." *Id.* at 16.

And in *In re Genco Shipping & Trading Ltd. et al.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014), the court approved nonconsensual third-party releases for claims that would, like the instant case, trigger indemnification or contribution claims against the debtors.   The court explained:

> [T]he Court will permit Third Party Releases for claims that would trigger indemnification or contribution claims against the Debtor and thus impact the Debtors' reorganization.  As Judge Gerber of this Court has cogently explained, 'Some people and entities (e.g., by employment contracts, corporate bylaws, or retention or loan agreements) must be indemnified by the estate with respect to their services.  To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, third-party releases are acceptable.  That is so even if they involve professionals for, or lenders to, the estate.' *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007).  Thus, the Court

will approve third party releases to align with indemnification obligations of the Debtors that existed before the filing of these bankruptcy cases by virtue of employment agreements, bylaws, retentions, or other loan agreements.

*Id*. at 271.

The court reached a similar conclusion in *In re Gawker Media, LLC*.  *See* Findings of Fact, Conclusions of Law & Order at 10-11, *In re Gawker Media, LLC*, No. 16-11700 (Bankr. S.D.N.Y.), ECF No. 638 (approving non-consensual third-party releases where there was at least one class that was deemed to reject the plan and did not get to vote but was nevertheless subject to the third-party injunction and release).  In *In re Gawker Media*, the court found that the claims "covered by the third-party releases are based on conduct for which a Debtor might be liable for Debtor Indemnification Obligations" since the released parties "have filed Claims against the Debtors for Debtor Indemnification Obligations for potential and threatened litigation."  *Id.*  The court found that these releases were "necessary based on the unique circumstances here," explaining that:

> [The non-debtor released parties] have voted in favor of the Plan and are waiving and releasing all claims against the Debtors for Debtor Indemnification Obligations, unless otherwise agreed to by the Debtors or their insurance carriers. Each holder of a Claim or Equity Interest that has received or is deemed to have received distributions made under the Plan in turn benefits from an immediate distribution.  Absent the Third-Party Releases in favor of the [non-debtor released parties], the Debtors might have been required to set aside additional reserves in respect of Debtor Indemnification Obligations, the Plan Settlements may not have been agreed to, and are therefore important to the Plan.  Furthermore, the Debtors would be subject to substantial Claims for Debtor Indemnification Obligations in respect of claims or causes of action brought against the [non-debtor released parties].

*Id*.

The same result is appropriate here.  While a majority of the affected creditors may have voted against the Archdiocese Plan, this lone factor should not be permitted to subsume the

20

balance of the *Master Mortgage* analysis, especially where, as is the case here, the proposed channeling injunction is necessary, essential and fair under the circumstances.

Additionally, the UCC's reliance on this factor is particularly unavailing in the instant case where the record reveals that counsel representing a majority of the Tort Claimants likely secured the subject votes through the broad dissemination of inflammatory and materially false and misleading information, as is evidenced by: (1) the stark voting discrepancies between Tort Claimants represented by Jeff Anderson & Associates ("Anderson Claimants"), on the one hand, and *pro se* Tort Claimants and Tort Claimants represented by counsel with the second largest number of Tort Claims (the "Non-Anderson Claimant Group"), on the other hand; as well as (2) the UCC's facially and demonstrably false statements published in press releases and news articles.

With respect to voting discrepancies, 97% of the Anderson Claimants who returned ballots  (362 of 373 claimants) voted to reject the Archdiocese Plan.  In sharp contrast, a majority of the Non-Anderson Claimant Group (61.54%, i.e., 8 of 13 claimants) voted in favor of the Archdiocese Plan.   Likewise, a majority of the *pro se* claimants (57.69%, i.e., 15 of 26 claimants) voted either in favor of the Archdiocese Plan or expressed no preference.  Given the false and misleading information disseminated by the UCC and Jeff Anderson & Associates ("JAA") concerning the Archdiocese Plan, it is not a coincidence that the Anderson Claimants ultimately voted very differently from their Class 6 peers.[10]  Among other things:

- Counsel for Tort Claimants and the UCC have continually represented to the Court and the public that the Archdiocese is "hiding" over $1 billion of assets. The UCC attempted to retract its most recent false statement on June 14, 2017, effectively attesting to its falsity.  *See* ECF Nos. 1074, 1086, 1088, 1092.

---

[10] And, of course, absent this false and misleading information, the percentage of *pro se* claimants and the Non-Anderson Claimant Group voting in favor of the Archdiocese Plan would have likely been even higher.

- Counsel for the Anderson Claimants has issued a deluge of press releases and held multiple press conferences where, among other demonstrably false representations, it has accused the Archdiocese of: (i) "multiple, deceptive actions taken … to divert and shelter funds from sexual abuse survivors"; (ii) "contributing less than 1% of its assets" under its Plan; (iii) "hid[ing] assets that could and should be available to survivors the same way they did sexual offenders and their misconduct for years"; (iv) letting the "insurance companies off-the-hook" for "deceptive practices" and stating that "these insurance contracts require them to pay close to $1 billion"; and (v) proposing, under its Plan, that it only "contribute $20 million of its own funds, that all insurance issues are settled for unreasonable amounts, and that all parishes will be released from the case without contributing a penny".

- During a June 2, 2016 hearing, the Court admonished JAA for promoting this false narrative to the public and media and directed that these activities cease:

    …When I read in the [newspaper] that the Archdiocese is hiding assets or that it's misleading the court, that is not at all helpful to proceeding forward on this, and not true.  The motion that the Archdiocese made nowhere mentioned anything about hiding assets or misleading the court.  These are assets.  Of course, the whole premise [of the] motion made by the Committee is that these aren't the Archdiocese's assets, that they're someone else's and you want them consolidated, but making accusations like that in public, which are not supported by the motion, are not helpful to proceeding forward in this, and I hope that that stops as well….

    ECF No. 1086, Ex. B (partial transcript of hearing).

- Notwithstanding the Court's admonition and directive, the false narrative continued. By way of example, the UCC recently represented in a May 11, 2017 press release that the Archdiocese Plan called for the Archdiocese to contribute less than 1 percent of its assets (over $1 billion).  *See* Stinson Leonard Street, *Archdiocese's Bankruptcy Plan Voted Down by Clergy Abuse Survivors*, News Release (May 11, 2017).

- Relying on these falsehoods, the Star Tribune published an article dated June 15, 2017, stating that "the victims' plan would tap what attorneys say is $1 billion in Archdiocese property and assets not accounted for in the Archdiocese settlement plan." Jean Hopfensperger, *Objections to Twin Cities Archdiocese Bankruptcy Plans Aired in Court*, Star Trib. June 15, 2017, http://www.startribune.com/objections-to-twin-cities-archdiocese-bankruptcy-plans-aired-in-court/428709053/.

- The UCC also falsely claimed that the Archdiocese pled guilty to criminal activity and then later the UCC attempted to retract its false statement on June 14, 2017, thereby attesting to its falsity. *See* ECF Nos. 1074, 1086, 1088, 1092.

If the UCC and JAA made the effort to communicate these false statements to the press and the public, then they undoubtedly made these same representations to their constituents and clients.  The non-viability of a plan that purports to "hide" over $1 billion of Archdiocesan assets is self-evident and these materially false statements undoubtedly contributed to, and provided a basis for, the Anderson Claimants' overwhelming rejection of the Archdiocese Plan.  As noted in another objection, the UCC plan is also replete with other inaccuracies that likely affected the solicitation.  The UCC improperly continues to push these false narratives in its objection to the Archdiocese Plan.

In the end, the importance and necessity of the channeling injunction to the reorganization (per Factors 2 and 3 above) is sufficient to satisfy *Master Mortgage* regardless of the voting results.  But to the extent the Court is otherwise inclined to consider the voting results, the UCC should not be permitted to rely on this factor alone to support its objection to the Archdiocese Plan where it disseminated materially false and misleading information in an apparent effort to stonewall the Archdiocese's reasonable efforts to obtain consent from the affected creditors. *See, e.g., In re Walnut Equip. Leasing Co., Inc.*, No. 97-19699DWS, 1999 WL 1068448, at *2 (Bankr. E.D. Pa. Nov. 23, 1999) (holding that an attorneys' dissemination of a letter to creditors with misleading information "sufficiently tainted the vote in Class 5 to justify ignoring that Class' acceptance of the Plan for the purpose of §1129(b)"); *In re Gulph Woods Corp.*, 83 B.R. 339, 342-43 (Bankr. E.D. Pa. 1988) (reasoning that vote solicitation which contained falsehoods or mischaracterizations would violate § 1125(b) because it would tend to unfairly influence voting on the plan).

5. **FACTOR 5**: **The Archdiocese Plan provides a mechanism to pay all or substantially all of the classes affected by the channeling injunction**

The fifth *Master Mortgage* factor considers whether the Plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction. *In re Master Mortg.*, 168 B.R. at 938. The UCC argues that the Archdiocese cannot satisfy this factor because the Tort Claimants have demanded, on the face of their Tort Proofs of Claim, an amount that exceeds $1.5 billion. UCC Memo at 6-7. This argument fails for at least five independent reasons.

First, the UCC should not be permitted to rely on a willful violation of this Court's directive and now assert that the Tort Proofs of Claims constitute *prima facie* evidence of the amount of the Tort Claims. During an April 17, 2015 hearing, the Court expressly advised the parties that the Tort Proofs of Claims should <u>not</u> include the amount of the Tort Claimants' alleged damages:

> THE COURT**:** I thought it was kind of irrelevant because the proof of claim form doesn't ask for an amount, does it, as I recall?
>
> MR. BORGER**:** I believe the single page form does. The longer form I don't think there's anything on there, but there is a single page form that –
>
> THE COURT**:** Well, the official form like anyone else, of course, is in some ways anomalous not to require a claimed amount, but I think it's intentional, so if I overlooked it -- I didn't overlook it. I thought about it and rejected it. I guess I didn't say it exclusively. I saw no reason to do it because there aren't going to be any  numbers on the claim forms for sexual abuse victims. If they are, frankly they are going to be meaningless, right.
>
> I mean these people rightly feel hugely damaged and they are going to put huge numbers in their claim forms, in their -- uninformed and not maybe -- what I said is what I meant, which is a goal I always strive  for.

ECF No. 206 (Hr'g Transcript, April 16, 2015) at 80:9-81:8.

Contrary to the claim form approved by the Court, and notwithstanding the Court's expressed desire that Tort Claims not include the amount of alleged damages, many Tort

Claimants, all represented by JAA, amended their Tort Proof of Claim forms to include the amount of their alleged damages. As the Court anticipated, the amounts alleged are "huge," in excess of $1.6 billion.

Second, the evidentiary presumption that the UCC relies upon to advance its position does not apply to this proceeding. Specifically, the Archdiocese is not seeking to allow, disallow, or liquidate Tort Claims in moving for approval of the settlements or seeking plan confirmation. Nor is it seeking to preclude any party from introducing admissible evidence for the Court to consider and weigh. Instead, the Archdiocese, as previously noted in filings with the court, will seek an order barring application of an evidentiary presumption that the Tort Claims are valid and worth over $1.6 billion.[11] The evidentiary presumption under Rule 3001(f) only applies for the purposes of distributing the estate's assets. *See In re SRC Holding Corp.*, No. 02-40284, 2007 WL 1464385, at *1-2 (D. Minn. May 15, 2007) (collecting cases and stating that "the collateral or preclusive effect of a filed proof of claim is limited to the bankruptcy court's distribution"); *see also In re Beckham*, No. 03-10499, 2004 WL 2201264, at *1 (Bankr. S.D. Ga. Sept. 15, 2004) ("A proof of claim establishes prima facie evidence of a valid debt for purposes of distribution from estate assets."). Thus, the evidentiary presumption for non-objected-to proofs of claims under Rule 3001(f) simply does not apply in the context of the proceedings anticipated in this case.

---

[11] Specifically, in its May 4, 2017 motion for entry of an order setting status and scheduling conference, the Archdiocese advised the Court and the parties that it disputes that the proofs of claim constitute *prima facie* evidence of the value of the claims in the absence of an objection and believes that this Court should enter an order ensuring that the amounts asserted by counsel in the proofs of claim have no evidentiary value by themselves and the unproven facts set forth therein are not *prima facie* evidence of the factual basis for the claim. ECF No. 1039 at 6. In the absence of appropriate relief, the Archdiocese may have no choice but to file multiple objections to Class 6 Tort Claims. The Archdiocese has attempted from the beginning of this case to avoid the need to take this divisive, expensive and time-consuming step.

Third, in assessing the value of claims under a *Master Mortgage* analysis, courts may look beyond the face value of the claim. In *In re 710 Long Ridge Rd.*, for example, the court determined that Factor 5 was satisfied where, over the objection of the affected creditors, the "Plan provides for payments to all classes of claims in excess of the <u>liquidation value of those claims</u>" as opposed to their face value. 2014 WL 886433, at *16 (emphasis added).

Fourth, the UCC's position also ignores the reality that, unlike the cases upon which it relies, the Archdiocese Plan is not a blanket release of any claims against the Protected Parties. Rather, the Plan channels a specific and limited group of claims to a dedicated fund to pay Tort Claims of those affected by the injunction. The Archdiocese Plan provides for efficient payment of claims without years of extensive litigation, and preserves claimants' rights to participate in a recovery. This important fact has been a core consideration by courts in assessing whether a plan provides a mechanism for substantial payment. *Nat'l Heritage Found. Inc. v. Highbourne Found.*, 760 F. 3d 344, 349 (4th Cir. 2014); *Behrmann v. Nat'l Heritage Found.*, No. 1:12-cv-1329, 2013 WL 1390822, at *8 ("this [Factor 5] consideration has typically been used to justify release provisions where the reorganization plan includes a mechanism such as a dedicated settlement fund to pay the claims"); *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Courts have approved nondebtor releases when . . . the enjoined claims were 'channeled' to a settlement fund rather than extinguished"). As noted above, the parishes will contribute significant consideration to the Trust.

Fifth, the Archdiocese will establish that the fund of $156 million provided in the Archdiocese Plan, including the largest insurance settlement of any reported diocesan bankruptcy case, represents an amount that meets the reasonable value of the Tort Claims given the many dispositive liability and cognizability issues summarized below. The Archdiocese will further

26

show that the average payout per Tort Claimant under the Archdiocese Plan is over $350,000 (even assuming that every Tort Claim is cognizable) and that this number represents a per-claim average that is larger than those achieved in a majority of other reported bankruptcy cases.[12] And to the extent those claimants with facially invalid Tort Claims are disregarded in the analysis, then this per-claim average will increase significantly.  Additionally, under the Trust Distribution Plan, more serious claims will receive a significantly higher amount than the average payout per Tort Claimant.

The Archdiocese recognizes the circumstances giving rise to this case, and for this reason it did all it could to maximize the value of its estate and provide certainty for the immediate benefit of claimants.   Under the Archdiocese plan, all living claimants are eligible for compensation that will be determined by parties other than the Archdiocese.  Throughout these proceedings, the Archdiocese has attempted to avoid contentious litigation regarding the viability of sexual abuse claims so that the healing process can be accelerated.

However, legal defenses to liability must be considered in determining whether claimants are "substantially" compensated on their claims.  Since the inception of this bankruptcy case, the Archdiocese has dedicated substantial time and resources to reviewing, investigating and assessing the legal merits of all Tort Claims.  Based on this work, which continues today, the Archdiocese can demonstrate that the majority of Tort Claims filed in this bankruptcy case would likely be subject to dismissal on one or more of the six grounds identified below.  In accordance with this Court's order on the procedures for reviewing and submitting proofs of claim [ECF No. 188], and in an effort to protect the confidentiality of Tort Claimants, the Archdiocese has attempted only to briefly summarize these bases for dismissal along with the

---

[12] Of course, net returns will vary depending on allowed administrative costs and the allowed fees of claimants' counsel which vary from 0% for one claimant to 40% for others.

total, aggregate number of claims falling within each defense category.  At the Court's direction,

the Archdiocese is prepared to provide additional facts, detail and argument to support the

following defenses and grounds for disallowance of certain claims.

- Tort Claims that are not cognizable as a matter of law.  At least 165 Tort Claims are potentially subject to dismissal because they fall within one or more of the following twelve categories:   (1) the claim is time barred under the applicable statute of limitations because the claimant was an adult at the time of the alleged abuse and thus not revived pursuant to Minn. Stat. § 541.073 (2013); (2) the claim was previously adjudicated to conclusion in a prior court action; (3) the claim was previously settled with the Archdiocese or under express terms that extend the release to the Archdiocese; (4) the alleged abuse was committed by an unknown individual or a non-Archdiocesan clergy member outside of the Archdiocese; (5) the claim includes no allegation of sexual touch or misconduct; (6) the alleged abuse was committed by a non-clergy member solely through his/her employment at a State or Religious Order-run facility, school or retreat; (7) the alleged abuse did not occur in connection with any faculties conferred upon the accused or through any priestly function (*e.g.*, the accused did not represent himself as a priest or did not come into contact with the Claimant through any assignment in the Archdiocese); (8) the claim, on its face, demonstrates that it is not viable or solely implicates alleged misconduct by persons who are not agents of the Church; (9) the claim asserts abuse by a lay teacher, administrator or employee of a non-debtor entity for whom the Archdiocese neither employed nor supervised; (10) the claim asserts abuse by a religious order brother or sister assigned to a non-debtor entity; (11) the claimant is a deceased individual or the claim has been withdrawn; and (12) the claim cannot be supported or corroborated by any available information.

- Sexual abuse claims that are untimely.  41 Tort Claims were filed after the August 3, 2015 claim filing deadline.  Under applicable bankruptcy rules, these claims will be disallowed unless and until the subject Tort Claimants satisfy their burden of demonstrating, through motion practice, that their failure to timely file the claim "was the result of excusable neglect."  Fed. R. Bankr. P. 9006(b)(1).  While this standard is an "elastic concept," the Supreme Court has observed that "inadvertence, ignorance of the rules, or mistakes construing the rules" will not generally constitute "excusable" neglect.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993).  Those unable to meet this burden will be barred from recovering any amount on their claims. *See, e.g., Gretchen's of Minneapolis v. Highland House, Inc. (In re Interco, Inc.)*, 186 F.3d 1032, 1034 (8th Cir. 1999) (finding no excusable neglect where the notice was not "obscure" and the claimant had four weeks' notice of the date on which the claim would be barred).

- Sexual abuse claimants who lack standing to assert their claims.  In addition to the foregoing, and separate and apart from the other legal  issues detailed below, 136 of the Class 6 claims were filed by Tort Claimants sought bankruptcy protection on one or more occasions and, in doing so, failed to identify their then existing Tort Claims.

Debtors  who fail to disclose their Tort Claims in prior or pending bankruptcies may
not have standing to pursue these nondisclosed claims following the conclusion of the
bankruptcy case. Under certain circumstances, this conclusion may be applicable even
if his or her Tort Claim was time barred as of the time of his or her bankruptcy filing.
*See Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir. 2001) ("[A]
statute of limitations does not eliminate the debt; it merely limits the judicial remedies
available.").   Section 554 of the Bankruptcy Code provides for the automatic
abandonment to the debtor of "property scheduled" at the closing of the case. 11 U.S.C.
§ 554(c). Because the claims asserted in this case were not disclosed on the schedules
in the prior cases, they may remain the property of the bankruptcy estate (subject to any
valid claim of exemption asserted in the reopened case).   To the knowledge of counsel,
none of the relevant prior bankruptcy cases have been reopened to administer the
claims that were not originally scheduled.   The Archdiocese fully appreciates the
sensitive and confidential nature of the claims in this case. The fact remains, however,
that a  number of  the 136 claims at issue in this paragraph may be subject to
disallowance for lack of standing.[13]

- Sexual abuse claims involving situations where the Archdiocese had no prior
knowledge.  Minnesota courts have held that three causes of action are available to a
claimant who sues an employer for injuries caused by an employee:  negligent hiring,
negligent retention and negligent supervision.  *M.L. v. Magnuson*, 531 N.W.2d 849,
856 (Minn. Ct. App. 1955).  Since the inception of this bankruptcy case, all parties have
acknowledged that the first two theories (negligent hiring and negligent retention)
require a showing that the Archdiocese had specific, prior knowledge of the specific
perpetrator's dangerous propensities.  With respect to at least 415 of the Tort Claims
asserted in this bankruptcy case, there is no evidence to indicate or suggest that the
Archdiocese was on notice of any alleged dangerous propensity on the part of the
accused individual(s).  In each of these cases, the Archdiocese did not receive a report
of alleged sexual misconduct by the accused individual (if at all) until after the alleged
incident(s) of abuse occurred.  Regardless of whether negligent supervision claims
impose direct or vicarious liability (or something in between), claimants' "well-known
hazard" theory of negligent supervision – which attempts to ignore actor-specific
conduct – faces dismissal as a matter of law if asserted in the context of the existing
bankruptcy case.  Minnesota federal courts that have considered this issue routinely and
uniformly require actor-specific knowledge to prove foreseeability in negligent
supervision cases decided under Minnesota law.  *See Damgaard v. Avera Health*, No.
CIV. 13-2192 RHK/JSM, 2015 WL 3561336, at *4 (D. Minn. June 3, 2015); *Halsne v.
Avera Health*, No. 12-CV-2409 SRN/JJG, 2014 WL 1153504, at *7 (D. Minn. Mar. 21,
2014); *Phillips v. Speedway SuperAmerica LLC*, No. CIV 09-2447 RHK/FLN, 2010
WL 4323069, at *5 (D. Minn. Oct. 22, 2010); *Hudson v. City of Minneapolis*, No.
CIV.04-3313(JNE/FLN), 2006 WL 752935, at *7 (D. Minn. Mar. 23, 2006); *Jones v.
James*, No. CIV.02-4131 JNE/RLE, 2005 WL 459652, at *7 (D. Minn. Feb. 24, 2005);
*Lumsden v. Reichert*, No. CIV.00-2463(JEL/JGL), 2003 WL 1610782, at *8 (D. Minn.

---

[13] 129 of the 136 claims subject to this defense are also subject to one or more other defenses.

Mar. 11, 2003).  Because most Tort Claimants cannot make this showing, their claims
are likely subject to dismissal.

- Sexual abuse claims with causation or credibility issues.  In addition to the claims
  identified above as potentially not cognizable, at least 59 Tort Claims have causation or
  credibility issues that must be considered in assessing the value of these claims.  They
  fall into one or more of the following six categories: (1) the alleged abuse was
  committed by a family member or close family friend/guest or occurred under
  circumstances where the Archdiocese did not have the authority, right or opportunity to
  exercise control over the accused; (2) the accusation may have been settled or
  previously adjudicated/resolved but further facts and evaluation are required; (3) the
  claim as alleged does not appear to constitute sexual abuse/touch and thus does not
  implicate a cause of action revived by the Minnesota Child Victims Act; (4) the claim
  contains the only accusation of sexual misconduct of a minor against the clergy
  member and there are no facts or documents that corroborate or lend support to the
  allegation; (5) the accusation provides insufficient information to assess the credibility
  of the claim; and (6) the facts alleged are inconsistent with known dates, prior accounts,
  assignment histories, patterns of conduct, and other verifiable data.

- Sexual abuse claims implicating religious orders or non-debtor entities.  Finally, at least
  128 Tort Claims implicate religious orders that are primarily, if not solely, liable for the
  alleged abuse.  Fault allocations to the Archdiocese in these cases will be either
  eliminated or diminished.  Additionally, several Tort Claims implicate other non-debtor
  entities that are primarily, if not solely responsible for the alleged abuse.  They include
  independent schools, other dioceses and wholly-unrelated and secular entities.

On balance, the Archdiocese's proposed fund of $156 million, coupled with the numerous
meritorious defenses to liability on the applicable Tort Claims, provides more than a sufficient
foundation for the Court to conclude that the Archdiocese Plan provides for payment of
substantially all of the relevant claims.

> ## 6. **FAIRNESS AND PUBLIC INTEREST**:  The channeling injunction promotes fairness and serves the public interest

In addition to application of the five *Master Mortgage* factors, one notable bankruptcy
decision from within the Eighth Circuit has analyzed and applied two additional relevant
considerations:  (i) "fairness in general" and (ii) "public interest." *In re U.S. Fidelis*, 481 B.R. at
520-21.  Although ignored by the UCC, these additional factors also weigh strongly in favor of a
channeling injunction for several reasons.

As an initial matter, in the absence of a channeling injunction, the Tort Claimants will not be treated equally.  Unequal treatment is inconsistent with principle of 11 U.S.C. § 1123(a)(4) to "provide the same treatment for each claim or interest of a particular class" unless such unequally-treated claimant agrees to unequal treatment.[14]  Outside of a bankruptcy plan, it is likely that claimants would encounter a vast divergence of recovery that would result from collectability, insurance coverage disputes, and timing of litigation.  Moreover, litigating all Tort Claims will be time-consuming.  This would be particularly harmful to older claimants who may receive nothing if they pass away before final a determination.  *See* argument at p.69 *infra*.  A distribution under the Trust, by contrast, will result in much earlier payment.

In addition to ensuring that Tort Claimants are treated fairly, a channeling injunction will serve the public interest.  As noted in Section I(C)(3) above, a channeling injunction is necessary here to preserve the missions of the Church, which include outreach to the poor and marginalized.  Excluding the State, the Archdiocese is the largest provider of social services in Minnesota.  Hundreds of thousands of Minnesotans, including the poor and the marginalized, depend upon the viability of the Archdiocese and its parishes.  *See* ECF No. 22 at 5-7.  In the absence of a channeling injunction, any plan of reorganization cannot succeed and years of protracted litigation will follow.  Many parishes may be forced into bankruptcy. This will not only harm Tort Claimants (resulting in less recovery than what is provided in the Archdiocese Plan), but it will further deplete the assets and strain the resources of the Archdiocese.  These protracted proceedings and the attendant cost will only continue to impair the Archdiocese's ability to serve the community that depends upon its financial viability.

---

[14] Similarly, the "cram down" statute, 11 U.S.C. § 1129, requires that the plan not discriminate unfairly and that it is fair and equitable with respect to each class.

Accordingly, the unique circumstances of this case will result in harm to the public interest and the unfair and disparate treatment of affected Tort Claimants in the absence of a channeling injunction.

## II.    UCC OBJECTION NO. 2 FAILS:  THE ARCHDIOCESE PLAN DOES NOT CONSTITUTE A FINAL ORDER ON ABUSE CLAIMS AGAINST NON-DEBTORS

### A.    The Archdiocese Plan preserves Tort Claimants' right to litigate

The UCC's second objection, which challenges this Court's jurisdiction to issue a channeling injunction, is dead on arrival because it relies entirely upon the false premise that confirmation of "the Debtor's Plan would constitute a final disposition of the survivors' claims against non-debtors." UCC Memo at 11. That is simply not the case. As this Court previously noted: "I am not going to determine anything other than confirming the plan or not confirming the plan, so I am not determining – I am not determining any claims." ECF No. 1095 (Hr'g Transcript, June 15, 2017) at 34:3-7.

This Court's June 15, 2017 statements are absolutely correct. The Archdiocese Plan does not release or extinguish any Tort Claims against any non-debtor. Rather Tort Claims against a limited group of non-debtors, the Protected Parties, are "channeled" to the Trust, to be prosecuted against the Trust instead of the Protected Parties. Archdiocese Plan §§ 4.6(b), 5.2(c)(2). The Tort Claimants' right to a jury trial in the district court is fully preserved and Tort Claimants may pursue their Tort Claims against the Protected Parties in district court, should they wish. *Id*. [15] Confirmation of the Archdiocese Plan does not constitute a final order on any Tort Claims against non-debtors.

---

[15] A potential limitation (*see* Archdiocese Plan § 5.2(f)(2)) on the amount a Litigation Claimant can recover passes constitutional muster and does not offend notions of due process where all rights to a jury trial are preserved. *See in re W.R. Grace & Co.*, 475 B.R. 34, 169-70 and n. 146 (D. Del. 2012) (quoting *Pierre v. E. Air Lines Inc.,* 152 F. Supp. 486, 488 (D.N.J.1957) ("The

### B.      *Stern* and its progeny are inapposite

The UCC contends that the Supreme Court's decisions in *Stern v. Marshall*, 564 U.S. 462 (2011), and *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932 (2015), somehow limit this court's jurisdiction to approve a channeling injunction.  UCC Memo at 11-12.  But, consistent with the fatal flaw addressed in Section II(A) above, those cases addressed a bankruptcy court's constitutional authority to enter a final order <u>adjudicating</u> a state law claim.  Again, with respect to the Archdiocese Plan, in contrast, the Bankruptcy Court is not adjudicating any claims.  Rather, it is exercising its undisputed constitutional authority to confirm a plan.  *Stern* and its progeny, as interpreted by the UCC, simply do not apply.

The UCC's reliance on *In re Millennium Lab Holdings II, LLC*, No. BR 15-12284-LSS, 2017 WL 1032992 (D. Del. Mar. 17, 2017) is equally unavailing.  Unlike the Archdiocese Plan, the *Millennium Labs* plan provided non-debtors with full releases and discharges, and thereby, according to the court, completely extinguished, among other things, common law fraud and RICO claims held by the appellants.  The *Millennium Labs* court concluded that the complete extinguishment of these claims, with no opportunity for litigation, potentially implicated *Stern*'s constitutional concern.  *Id.* at *12-13.

Because the channeled claims are neither adjudicated, nor extinguished, via the Archdiocese Plan, the cases upon which the UCC relies are inapposite.

---

Seventh Amendment only requires that a jury make the factual findings regarding a plaintiff's particular grievance"; thus, "'there is no violation of the constitutional guarantee of a jury trial in the limitation of the amount of damages.'").  In fact, the UCC's Plan also limits the amount some claimants can personally recover after a jury trial.  ECF No. 890 § 6.2(i).

**C.      Even if the Archdiocese Plan did not preserve Tort Claimants' right to litigate (which it does), this Court possesses constitutional authority to resolve claims that are "integral" to a Debtor's restructuring**

Even if *Stern* were relevant, it should be construed narrowly.  The *Stern* court itself stated that the question presented there, relating to core jurisdiction to enter final orders on certain state law counterclaims, was "a 'narrow' one."  *Stern*, 564 U.S. at 502 (internal citations omitted).

For more than a quarter century, the Supreme Court has consistently held that bankruptcy courts have constitutional authority to resolve matters that are integral to the bankruptcy proceeding itself.  *See, e.g., Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 71 (1982).  The UCC seeks to upend this well-established principle based on a contrived reading of *Stern*.  Specifically, the UCC contends that, under *Stern*, a determination of "state law claims of abuse survivors against non-debtor parties" would exceed the bankruptcy court's jurisdictional reach.   This artificially constrained interpretation of *Stern* has no basis in principle or precedent.  UCC Memo at 11-12.

*Stern*, instead, merely reaffirmed the foundational principle of bankruptcy law that bankruptcy courts have constitutional authority to resolve matters that are "integral to the restructuring of the debtor-creditor relationship."  *Stern,* 564 U.S. at 497 (emphasis added, quoting *Langenkamp*, 498 U.S. at 44).  This authority does not turn on the nature of a claim in the abstract be it common law, statutory or otherwise.  Rather, the crucial inquiry is the claim's relationship to core Article I bankruptcy processes such as confirmation of a Chapter 11 plan.

In accordance with *Stern*, courts have continued to exercise jurisdiction over plans containing releases of third-party state law claims, where such releases are "integrally related" to the reorganization.  In *In re Charles Street African Methodist Episcopal Church of Boston,* 499 B.R. 66 (Bankr. D. Mass. 2013), for instance, the court confirmed a plan containing a third-party release.  The court noted that confirmation of a plan "[i]s not the mere adjudication of a single

claim by a creditor against a third-party guarantor but a unitary omnibus civil proceeding for the reorganization or adjustment of all obligations of the debtor and disposition of all the debtor's assets." *Id.* at 99. The *Charles Street* court held that, unlike the purely private dispute represented by the tortious interference claim in *Stern*, "the confirmation of a plan – including any third-party release it may propose – is a matter of 'public rights' that, under *Stern*, Congress may constitutionally assign to a non-Article III adjudicator." *Id.* The *Charles Street* court concluded that it "undoubtedly has jurisdiction to adjudicate the plan, even without recourse to its related-to jurisdiction." *Id.*

Numerous other courts throughout the country have reached the same conclusion. *See, e.g., In re MPM Silicones LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *2, 34 (S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015) (confirming, post-*Stern*, a chapter 11 plan which included a non-consensual third-party release, noting that "[t]he issues all involve fundamental aspects of the adjustment of the debtor/creditor relationship, and "clearly pertain to rights unique to bankruptcy law," and concluding that it "can issue a final order on [the third party release] within the confines of *Stern v. Marshall*, given that this is in the context of the confirmation of the plan, and pertains ultimately to the debtors' rights under the Bankruptcy Code."); *In re Linear Elect. Co*., 852 F.3d 313, 320 (3d Cir. 2017) (holding that bankruptcy courts have authority to resolve claims regarding state law construction liens where necessary to "determine whether the liens violated the automatic stay."); *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *10 (D.N.J. Sept. 12, 2014) (affirming the authority of a bankruptcy court to enter a sale order outside the claims allowance process permanently enjoining state law claims between non-debtors "based upon bankruptcy sale/marketplace necessities").

In other words, even if confirmation of the Archdiocese Plan adjudicated the third-party claims (which it does not), the Bankruptcy Court would have the constitutional authority to do so. Moreover, interpreting *Millennium Labs* as precluding the inclusion of a channeling injunction in a plan would upend decades of case law, including the seminal *Master Mortgage* case and the substantial body of case law discussed in Section I above.

Here, as detailed in Section I(C)(3) above, the channeling of the claimants' state law tort claims against the parishes is necessary and integral to a viable reorganization; without it, a confirmable plan will not be possible. The $156 million in the Archdiocese Plan will not be available and the Archdiocese's assets, as well as the assets of the parishes upon which its economic viability depends, will continue to be depleted and mired by the very <u>same</u> Tort Claims that gave rise to this bankruptcy case.

Moreover, in addition to the channeling injunction being integral to the restructuring process, the channeled claims themselves are squarely before the bankruptcy court in the form of the Tort Proofs of Claim and the parishes' contribution claims. Importantly, the *Stern* court did not disturb earlier Supreme Court decisions affirming bankruptcy court constitutional authority to resolve claims that are intertwined with the claims resolution process. In *Katchen v. Landy*, 382 U.S. 323 (1966), and *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam), the Supreme Court upheld the bankruptcy courts' authority to decide claims which the claimants contended should be resolved by Article III tribunals. Unlike the tortious interference claim in *Stern*, which was entirely independent of the defamation proof of claim to which it was a counterclaim, the claims in *Katchen* and *Langenkamp* were intertwined with the claimants' proofs of claim filed in the bankruptcy proceeding. As the *Katchen* court noted, once the claim in bankruptcy was addressed, "nothing remains for adjudication in a plenary suit" and "such a suit 'would be a

meaningless gesture.'" *Stern*, 564 U.S. at 496 (quoting *Katchen*, 382 U.S. at 334).   And in *Langenkamp*, the Court noted that, because of the claimant's filing of a proof of claim, "the ensuing preference action by the trustee" over which the bankruptcy court entered a final order "'become[s] integral to the restructuring of the debtor-creditor relationship.'" *Stern*, 564 U.S. at 497 (quoting *Langenkamp*, 498 U.S. at 44) (alteration in original)).

Here, the Parish Lawsuits involve the same allegations and circumstances and seek recompense for the exact same harm as those alleged in the Tort Proofs of Claim.   The complaints against parishes are replete with allegations relating to the Archdiocese, including that the parishes were under the Archdiocese's direct authority, control and province, and that the alleged perpetrator was employed by, an agent of, and under the Archdiocese's direct supervision, employ and control.   The parishes have each asserted contribution claims in the bankruptcy, asserting that the Archdiocese is responsible for all of these claims.

In other words, each facet of the Tort Claimants' claims against the parishes, including the allegations, the evidence relating thereto, the alleged harm, and the allocation of fault between the Archdiocese and the parish, is already squarely before the Bankruptcy Court and will be addressed in the claims resolution process.

Therefore, even if the channeling injunction constituted a final order on the parish claims (which it does not), such adjudication would be within the scope of the Bankruptcy Court's constitutional authority.   *See Stern*, 564 U.S. at 497 (distinguishing *Stern* from *Katchen and Langenkamp* on the ground that jurisdiction was appropriate in those cases because the claims were part of the claims allowance process, whereas, as the *Stern* bankruptcy court found, the *Stern* claim "raises issues of law entirely different from those raise[d] on the [proof of claim].").

## III.   UCC OBJECTION NO. 3 FAILS:   THE ARCHDIOCESE PLAN APPROPRIATELY TREATS CLASS 13 CLAIMS

### A.   The Archdiocese Plan does not determine whether Class 13 Claims are "allowed"

The UCC's third objection must suffer the same fate as its second objection because it relies upon the false premise that the Archdiocese Plan "<u>allows</u> and channels all Class 13 claims." UCC Memo at 14 (emphasis added). That is not the case.

Numerous Class 13 Claims were filed in this bankruptcy case. Thus, the Archdiocese Plan necessarily provides treatment for Class 13 claims. However, the Archdiocese Plan does not allow or disallow any claims. Whether a claim is allowed or disallowed is determined by the Bankruptcy Court in accordance with the Bankruptcy Code. Under section 502(a), for purposes of resolution, a claim or interest is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). No party in interest has formally objected to any Class 13 Claim. The Bankruptcy Court may also disallow a claim in accordance with other provisions of the Code, including section 502(e), if appropriate. Unless and until such claims are actually disallowed, they must be dealt with.

### B.   Channeling the Class 13 Claims is necessary to preserve insurance coverage

The treatment of Class 13 claims under the Archdiocese Plan is designed to preserve insurance coverage. If contribution or indemnity claims relating to Tort Claims are not preserved, a non-settling parish carrier could assert that the parishes violated the cooperation clause in their policies by acquiescing in the impairment of the non-settling insurer's subrogation claims against the Archdiocese. *See, e.g., Hoel v. Crum & Forster Ins. Co.*, 366 N.E.2d 901, 905 (Ill. App. Ct. 1977) ("The defendants would, of course, be substantially prejudiced if they could not be subrogated to a possible recovery from a third party for payments which they were required to make to their insured under the terms of their policy."); *Argiro v. Progressive Amer.*

*Ins. Co.*, 510 So. 2d 635, 635-36 (Fl. D. Ct. App. (3d) 1987) (insurer was prejudiced by waiver of subrogation rights in violation of cooperation clause). A material breach of the cooperation clause can void the policy. *Juvland v. Plaisance*, 96 N.W.2d 537 (Minn. 1959). If the non-settling insurers were successful in advancing an argument that waiving contribution rights voided coverage, there would ultimately be less total insurance coverage available for the benefit of the Tort Claimants.[16]

This treatment of Class 13 claims tracks the treatment of asbestos-related contribution and indemnity claims under the plan approved in the API bankruptcy case. *See* Third Amended Plan of Reorganization §§ 1.15, 1.75, 3.5, 12.3, *In re API, Inc.*, No. Bky 05-30073, ECF No. 492 (channeling liability for "Asbestos Claims," which include contribution, indemnity, and subrogation claims (sub-defined as "Indirect Asbestos Claims"), to the Trust). The UCC has not suggested any alternative treatment for these claims other than discharge. The treatment of these claims by the Archdiocese Plan is standard and appropriate.

## IV.    UCC OBJECTION NO. 4 FAILS: PARISHES CANNOT BE TREATED AS INSIDERS FOR VOTING PURPOSES

The UCC argues that the Archdiocese Plan cannot be confirmed because no non-insider class voted to accept the Archdiocese Plan. UCC Memo at 16-19. That is incorrect. Class 9 – made up of trade vendor claims – also voted in favor of the Archdiocese Plan. Regardless, Classes 3, 8, and 13 are not insiders of the Archdiocese and their votes all qualify as accepting classes under Section 1129(a)(10). The UCC's insider objection fails as a matter of law. At a minimum, the UCC's attempt to determine insider status at this juncture is premature.

---

[16] While the Archdiocese does not anticipate any non-settling insurers under its plan, the settlements have not yet been approved and it is appropriate to address this contingency in the Archdiocese Plan.

A.     **The parishes are not statutory insiders of the Archdiocese as a matter of law**

Section 101(31)(B) defines the term "insider" for cases in which the debtor is a corporation.[17] Section 101(31)(E) also includes "affiliate, or insider of an affiliate as if such affiliate were the debtor" as an insider. The Bankruptcy Code defines "affiliate" in part as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote [] by the debtor." 11 U.S.C. § 101(2)(B). The UCC alleges that the parishes are "insiders" of the Archdiocese based on the definition of affiliate. UCC Memo at 16.

The UCC's initial premise fails plainly under the circumstances of this case. Here, the concept of affiliation has not application because as non-profit religious entities, there are no "voting securities" or other parent-subsidiary economic interests at stake as between the Archdiocese and the parishes.

The UCC cites only one case, *In re Locke Mill Partners*, 178 B.R. 697 (Bankr. M.D.N.C. 1995), in support of its position that the parishes are affiliates of the Archdiocese. UCC Memo at 16-17. In *In re Locke Mill Partners*, a dispute arose as to whether a condominium association, the only claim in Class A-3 of the debtor's plan, was an insider. *Id.* at 698. The debtor designated four of the eight directors on the association's board. *Id.* at 699. Moreover, the directors designated by the debtor and its predecessor "established the agendas for the meetings of the [association] Board, consistently voted together as a block vote and <u>consistently initiated and prevailed on the matters of substance which were acted upon by the Board.</u>" *Id.* (emphasis

---

[17] Section 101(31)(B) provides that insiders of a debtor corporation include: "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; (vi) relative of a general partner, director, officer, or person in control of the debtor." The UCC does not allege that any class of creditors includes or is made up of these statutory insiders. The parishes do not qualify under any of these relationships.

40

added).  One of the association board directors testified at a hearing that he "could not recall a single instance in which the Board had voted down a proposal or motion brought forward by the directors . . . selected by the Debtor."  *Id.*  The facts of *Locke Mill Partners* are clearly distinguishable from those presented here.

The UCC attempts to draw a parallel by claiming that, by way of the Archbishop and Vicar General, the Archdiocese "controls 60 percent of the parish boards."  UCC Memo at 17. This is demonstrably untrue as applied to the plan process in this case.  The UCC's selective citation to the record of a hearing held on May 7, 2015, for the proposition that the Archdiocese controls 60 percent of parish board fails to address the full context of the statements made and the parishes' actual operations in relation to this bankruptcy case.  In fact, at that very same hearing, the Parish Group attorney made clear that neither the Archbishop nor the Vicar General have any say in such decisions:

> Because [the parish boards include the Archbishop and the Vicar General], the Archdiocese has agreed that the archbishop and the vicar general will have no say in anything to do with this bankruptcy case, so we are taking our direction from the parish priest, but more so from the lay trustees who are working with us for the most part.
>
> These people that are giving us direction are working for their parishes. Their focus is their parish, the people sitting in the pews. They are doing everything they can to make sure that their operations and the services they provide every day to their parishioners can continue, that' s their goal.

ECF No. 231 (Hr'g Transcript, May 7, 2015) at 15–16.

The Archdiocese also made clear to the court and the UCC that "the Archbishop and Vicar General will not exercise the rights of a director to vote on or participate in the consideration of bankruptcy issues that may come before a parish board during the pendency of this case."  ECF No. 172 (Archdiocese response to motion to appoint parish creditor committee) at 3.

41

There is no allegation that the Archbishop or Vicar General had any influence on any parish decisions when votes were cast.  Because the "determination of insider status should be made as of the time the vote is taken," there can be no debate that the parishes cannot qualify as affiliates or insiders for the determination of insider voting status.  *See In re Locke Mill Partners*, 178 B.R. at 702.

This Court has also recognized the independence and separate status of parishes by providing for the formation of a Parish Committee represented by separate, independent counsel. The great majority of parishes have also separately retained independent counsel in connection with this bankruptcy case.

Importantly, the UCC refers only to the statute setting forth the parameters for Archbishop and Vicar General involvement with parishes.  As has already been litigated in this case, the UCC's improper conflation of the Archbishop and Vicar General with the Archdiocese is "neither factually nor legally correct."  *In re Archdiocese of Saint Paul and Minneapolis*, 553 B.R. 693, 702 n.1 (Bankr. D. Minn. 2016), *aff'd* 562 B.R. 755 (D. Minn. 2016).  The UCC's claim that the parishes are statutory insiders necessarily fails as a matter of law.

### B.    The parishes and other non-debtor Catholic entities are not non-statutory insiders of the Archdiocese

The circumstances in this case do not plausibly suggest non-statutory insider status between the Archdiocese and the parishes.  Regardless of whether this court views the issue as a purely fact issue or mixed issue of law and fact, the UCC has not, and cannot, assert any facts establishing insider status.

In considering non-statutory insider status, courts examine whether: "(1) the closeness of [the creditor's] relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's

length." *In re The Village at Lakeridge, LLC*, 814 F.3d 993, 999 (9th Cir. 2016). Despite the UCC's contrary contention, this court "cannot assign non-statutory insider status to a creditor simply because it finds the creditor and debtor share a close relationship." *Id*. at 1001; *see also Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008).

The point of Section 1129(a)(10) is to ensure that the relevant creditor "cast a vote formed on the independent judgment of what will best serve his interests…" *In re Gilbert*, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989). For this reason, insider status should be determined at the time of voting, not at the time the debt arose. *See, In re Rexford Properties, LLC*, 557 B.R. 788 (C.D. Cal. 2016); *see also, e.g.*, *In re Featherworks Corp*., 25 B.R. 634, 640 (Bankr. E.D.N.Y. 1982) ("[T]his Court is persuaded that what determines the right to vote is the status of the creditor at the time the vote is taken, not at the time the debt arises.").

As noted, the UCC cannot meet the first element of the insider test merely by showing close relationship between debtor and creditor. Stated differently:

> "….the primary objective of Section 1129(a)(10)'s insider component is to forestall the voting of a creditor who is so beholden to or controlled by the debtor as to in effect be an alter ego of the debtor. Compare, *In re Blesi*, 43 B.R. 45, 48 (Bankr. D. Minn. 1984) (stating that this is the aim of the insider exclusion for purposes of trustee elections under Section 702(a)).

*Gilbert*, 104 B.R. at 210; *see also In re Hartley*, 52 B.R. 679, 690 (Bankr. N.D. Ohio 1985) (finding that facts alleged "were not enough to prove the [creditor] was a mere instrumentality or alter ego of [debtor]").

Most of the allegations in the UCC's current memorandum were taken directly from its failed motion for substantive consolidation. In fact, many of the factors identified by the Court in its ruling on the UCC's consolidation motion, including, for example, the absence of

commingling of assets and the existence of separate staff, property and bank accounts, preclude a finding of an alter ego relationship for voting purposes. ECF No. 739.[18]

Similarly, there is no evidence to suggest that the plan and voting process was conducted on anything other than an arm's length basis.  Again, the parishes are represented by separate counsel and by a separate committee.  There is nothing to suggest that the votes in this case were not properly authorized by each individual parish board. As acknowledged, the Archbishop and Vicar General played no role in parish voting on the Archdiocese Plan. There is no evidence suggesting that voting members of the parish classes did anything other than exercise independent judgment in voting on the Archdiocese Plan and that the vote reflects the best judgment and interests of the voting members of these classes.

Finally, the UCC's argument concerning the Archdiocese's alleged "protection" of parishes in response to the UCC's ill-conceived derivative standing motion has no bearing on the insider analysis and is demonstrably incorrect and has already been addressed by this court.  At the hearing on that motion, this Court stated that "the debtor's decision not to sue was justified" and further remarked that the Archdiocese's "ability to fund a plan depends on its viability and to the extent that you start sapping the assets in the cash reserves" by suing parishes "you're hurting yourself."  ECF No. 955 (Hr'g Transcript, January 12, 2017) at 100.  The Court also correctly noted that the Archdiocese "gets its money from the parishes and not only is there this problem with the parishes perhaps having an ability to pay, they have also already gone through a reluctance to pay as a result of this mess…."  *Id*. at 99-100.  This Court has determined that the

---

[18] *See, e.g.*, *In re Intelefilm Corp.*, 301 B.R. 327, 331-32 (Bankr. D. Minn. 2003) (corporate veil may not be pierced under Minnesota law absent evidence that the entities failed to maintain the integrity of separate existence and the entities were operated as a constructive fraud or in an unjust manner).

Archdiocese's actions with respect to avoidance actions were proper. *Id.*; *see also* ECF No. 948 (Order denying derivative standing motion).

The parishes and other voting members of Classes 3, 8, and 13 cannot be treated as non-statutory insiders."

## V.   UCC OBJECTION NO 5. FAILS: TRADE DEBT WAS APPROPRIATELY CLASSIFIED AS IMPAIRED

The UCC cited two cases in support of its contention that the Archdiocese Plan artificially impairs trade vendor claims: *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993) and *In re Kellogg Square Partnership*, 160 B.R. 343 (Bankr. D. Minn. 1993). UCC Memo at 19-21.  Both cases involved single asset real estate partnerships.  It appears that the debtors in these cases were organized as passive investment vehicles, that both debtors had few, if any, employees and that the asset owned by the respective debtors were in both cases subject to large (presumably non-recourse) mortgages.  In this sense, the two cases cited by the UCC did not involve a "business" of any sort. *See generally* David Gray Carlson, *Artificial Impairment & the Single Asset Chapter 11 Case*, 23 Cap. U. L. Rev. 339 (1974).

Obviously, this case involves a "real" debtor with many employees, an extremely active role in the community, and "real" debts unrelated to the Tort Claims (including trade debt and parish and other obligations).  The UCC has not cited to a single case in which a court has applied an artificial impairment theory to an organization, whether non-profit or not, with operations anything like the operations conducted by the Archdiocese.

Moreover, there is substantial doubt as to whether the artificial impairment theory in this context survived the 1994 amendments to the Bankruptcy Code, which, among other changes, created an "exception for 'cashed out' claims and interests" from the definition of

impairment.  As indicated in *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 32 (Bankr. D.

Kan. 2001), the amendment to Section 1124:

> ….suggests that even claims that are cashed out on the effective date of the plan
> can nevertheless be impaired within the meaning of § 1124.  Since the
> amendment, some courts continue to apply the doctrine of artificial impairment
> without addressing the effect of the 1994 amendments. But another line of cases
> that follows the solid analysis in *In re Atlanta-Stewart Partners* recognizes that
> with the deletion of the cash out exception, since classes that receive payment in
> full on the effective date of the plan are impaired, claims that are cashed out some
> time after the effective date must be impaired, as well…

*Id.* (citing *In re Atlanta-Stewart Partners*, 193 B.R. 79 (Bankr. N.D. Ga. 1996)).

This Court should follow *Valley View* and *Atlanta-Stewart*.

Even if applicable, the question of whether a plan artificially impairs a class of creditors

"for purposes of securing confirmation" is a fact issue to be determined at confirmation.  *In re*

*Windsor on the River Assocs.*, 7 F.3d at 132.  Courts in the Eighth Circuit have considered the

existence of artificial impairment based, in part, on whether the debtor has provided a plausible

or legitimate reason for the impairment or classification of such claims.  *See id.* at 133; *see also*

*In re Greenwood Point, LP*, 445 B.R. 885, 909 (Bankr. S.D. Ind. 2011) (holding class was not

artificially impaired because the debtor had a "good business reason to treat the claim as it did"

and stating "[t]he fact that the Debtor 'could' have drawn upon other funds to pay the claim in

full does not render the claim 'artificially impaired.'").

The flexibility in classifying and treating claims necessarily precludes the presumption

that artificial impairment is present. The Archdiocese made the prudent decision to defer

payment of certain claims that legitimately can be deferred.  As the Court has recognized in other

contexts, the Archdiocese generally does not have a legal right to funding from any source and

must depend on the support of the faithful.  Although the Archdiocese will be able to satisfy the

best interest test, the ultimate amount of cash that will be available remains somewhat uncertain.

Some or all of the Archdiocese's available cash will be needed to pay administrative expenses and current operating expenses at the time of confirmation.

The justification for the Archdiocese's effort to defer certain payments has only become more pronounced since the Archdiocese filed its first plan over a year ago in May 2016. Since that time, the UCC has caused the estate to incur huge professional fee obligations through its many ill-conceived and punitive attempts to punish the Archdiocese and other non-debtor Catholic entities. The Archdiocese has been required to expend enormous resources responding to the UCC's various motions, appeals, and fishing expeditions all while footing the bill for the UCC's aggressive (and, in many cases, overly aggressive) actions. It is also worth noting that the Archdiocese filed its amended plan shortly following entry of orders allowing interim compensation and reimbursement of expenses in the total amount of $4,143,702.90. *See* ECF Nos. 852-858, 882.

Even if the court determines that the impairment was not appropriate, the remedy imposed is simply to treat such creditors as unimpaired rather than to deny confirmation. The evidence will show, however, that it is prudent to defer payments to Class 9 claims and not an unfair manipulation because its "pre-confirmation revenues and post-confirmation resources are properly committed to current costs of operation and to other purposes under" the Archdiocese Plan.[19] *See In re Kellogg Square P'ship*, 160 B.R. at 361 (citations omitted). Class 9 claims are properly treated as impaired.

---

[19] To support its claim that "[t]here is no logical justification" for suspended payment of Class 9 claims, the UCC only cites to Exhibit B of the "Procedure for Requesting Counseling/Therapy Payment Assistance" in the Archdiocese Plan. UCC Memo at 20 (citing Archdiocese Plan at 131). It is unclear how this Exhibit supports, or even relates to, the UCC's argument. Accordingly, the Archdiocese reserves its right to readdress this argument at the appropriate time.

## VI.    UCC OBJECTION NO. 6 FAILS:    THE UCC HAS FAILED TO SHOW NON-COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

According to the UCC, the Archdiocese has failed to comply with the applicable provisions of the Bankruptcy Code by: (i) failing to conduct a sufficiently thorough review of potential avoidance actions, (ii) "obstructing" the UCC's ability to obtain access to information relating to avoidance claims, and (iii) refusing to disclose parish financial information.  UCC Memo at 21-24.  Each of these objections has been addressed in prior proceedings in this case and thus are without merit as a matter of law.

### A.    The Archdiocese's actions with respect to avoidance claims were appropriate

First, the UCC alleges that the Archdiocese failed to conduct an appropriate investigation of avoidance actions.  Although not clearly stated in its memorandum, the UCC appears to take the position that a debtor in possession is required to examine all of the debtor's bank records, ledgers and other business and account documents in order to identify avoidance claims, even if the debtor has made the strategic business decision to forego litigation.  The UCC appears to take the further position that the failure to pursue such an investigation is evidence of bad faith in the plan process, even in a case in which the Court has, essentially, confirmed the debtor's business judgment over the UCC's objection.

The UCC's objection is untenable on its face. The simple truth is that the Bankruptcy Code does not impose a minimum level of investigation with respect to avoidance actions.  Contrary to the UCC's suggestion, the appropriate level of investigation in a particular circumstance depends on the specific facts of the case. There is no requirement under the Bankruptcy Code that a trustee or debtor in possession continues its investigation once it determines in the reasonable exercise of the debtor's judgment that it would not be advisable for the estate to pursue litigation.

48

As applied to this case, the Archdiocese determined prior to the expiration of the statute

of limitations on avoidance claims that:

> ….pursuing such claims would be unwise and not in the best interest of the estate
> based on: (a) the weak merits of such claims, (b) the likely defenses, (c) the
> uncertainly and unlikelihood of recovery, (d) the time and expense to the estate,
> (e) the fact that the debtor relies on these entities for support and needs ongoing
> contributions to fund the debtor's ongoing operations under either plan, (f) the
> fact that the actions would create new creditors with claims against the estate, (g)
> the fact that any recovery on avoidance claims would be offset by the claims to be
> paid in full under either plan [see ECF No. 887], and (h) the fact that prosecution
> of avoidance claim for the delayed potential recovery of at most approximately
> $15 million (less attorney's fees) could endanger recoveries already embodied in
> the Archdiocese Plan including the Parish insurance settlements (over $13.7
> million), the Riley Fund settlement (over $1.2 million), and the GIF compromise
> (between $5-6 million) along with other compromise issues including waiver of
> certain parish claims. ..

ECF No. 930 at 10.

The Archdiocese bolstered its position by a supporting declaration of its Chief Financial

Officer in response to the UCC's failed derivative standing motion.   ECF No. 931.   That

declaration included over 100 pages of analysis, including a comprehensive and detailed

summary of the specific claims sought to be pursued by the UCC.   *Id.*   Finally, the comments

made by the Court at the hearing on January 12, 2017 provide additional support for the

Archdiocese's decision not to pursue avoidance claims in this case:

> There is no requirement in the bankruptcy code that a trustee or a debtor in
> possession bring every possible avoidance action.  All of them from 544, 547, 8,
> 9, whatever they are, all say the trustee may avoid.  It's a grant of right.  It is not a
> requirement that everyone – and no trustee does, no debtor in possession
> does.  There's discretion granted to the decision maker on that, subject to what the
> Eighth Circuit has told us in Racing Services.  We're sort of second guessing that
> judgment.

ECF No. 955 (Hr'g Transcript, January 12, 2017) at 96.   As indicated in Section IV(B) above,

the Court made specific reference to the Archdiocese's legitimate interest in maintaining good

relations with the parties whose financial support will be critical to its reorganization. *See id.* at

99.

This Court should decline the UCC's request to revisit its failed derivative standing

motion. *See* ECF No. 906. The UCC's objection fails as a matter of law.

### B.        The Archdiocese did not obstruct the UCC

Next, the UCC claims that the Archdiocese "actively" obstructed the UCC's ability to

investigate potential avoidance claims. UCC Memo at 22-23. This contention is baseless. There

is no question that the UCC conducted a thorough independent investigation, as evidenced by the

voluminous charts and documentation submitted by the UCC in support of its motion for

derivative standing. ECF Nos. 907, 908, 916 and 937. The derivative standing motion

ultimately filed by the UCC purported to cover several hundred separate transactions involving

over 100 potential defendants. The Archdiocese provided the UCC with access to the files,

records, bank statements and ledgers requested by the UCC in connection with its investigation

and spent well over 100 hours in responding to information requests made by the UCC in

connection with its derivative standing motion.

### C.        The Archdiocese acted appropriately with respect to non-debtor parish financial information

The UCC's remaining contention that the Archdiocese has wrongfully withheld parish

financial information is equally flawed. UCC Memo at 21-22. The Archdiocese has made it

clear from the beginning of this case that it is prepared to release any financial information in its

possession concerning the parishes with the consent of the parishes or authorized by order of this

Court. The parishes, however, have opposed the release of financial information, and stated that

they would hold the Archdiocese responsible for any release of information without their

consent.  In the meantime, for whatever reason, the UCC has failed to seek or obtain appropriate

relief from this Court.

Objection No. 6 is baseless and should be overruled on its face.

## VII.   UCC OBJECTION NO. 7 FAILS: THE UCC HAS FAILED TO SHOW A COLORABLE BASIS FOR ATTACKING THE ARCHDIOCESE'S GOOD FAITH IN FORMULATING AND PROPOSING ITS PLAN

### A.   Introduction

The UCC's original good faith objection was based, at least in part, on admittedly false

statements of fact.  *See* ECF No. 1088.  The UCC's attempt to save this objection through its

"supplement" fails because the objection is still based on contentions that: (i) are not actionable

as a matter of law; (ii) rely on arguments that were resolved by prior orders of this Court; (iii) are

immaterial and irrelevant as a matter of law; or (iv) are grounded on demonstrably false

allegations.  Given the facial, legal infirmity of this objection, it should be rejected as a matter of

law.

### B.   Prepetition Conduct

#### 1.   The alleged prepetition conduct is irrelevant to the good faith analysis under Section 1129(a)(3)

As a threshold matter, prepetition misconduct is not a cognizable basis for an objection to

plan confirmation.

> Unlike the somewhat nebulous good faith filing doctrine, § 1129(a)(3) is a specific predicate which requires that a plan be "proposed in good faith and not by any means forbidden by law."  Section 1129(a)(3)'s good faith test is more narrowly focused than the good faith filing doctrine, testing only "whether the debtor's conduct in formulating, proposing, and confirming a <u>plan</u> displays the requisite honesty of intention."  7 Collier on Bankruptcy ¶ 1112.07[6][b].  In narrowing this focus, courts do not consider the debtor's motives for filing their petition when determining whether the plan fulfills the good faith requirement of § 1129(s)(3).

*In re PPI Enters. (U.S., Inc.)*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) (emphasis in original).

The cases cited by the UCC do not challenge this basic tenet.  Two of the cases cited by

the UCC, *In re Reuter*, 427 B.R. 727, 770 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427 (B.A.P.

8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012) and *In re LeMaire*, 898 F.2d 1346, 1349 (8th

Cir. 1990), dealt with individuals, as opposed to corporate, bankruptcy proceedings, whose

claims could not be discharged in an individual Chapter 7 proceeding.  These cases have little, if

any, relevance here.  Instead,

> In evaluating whether a plan has been proposed in good faith, the focus of the
> inquiry is the plan itself, which must be viewed based on the totality of the
> circumstances surrounding the development and proposal of that plan.

*In re Am. Counsel Transp. Cos., Inc.*, 470 B.R. 478 (2012) (citation omitted); *see also In re

Madison Hotel Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984) (bankruptcy court not required to

conduct "an additional evidentiary hearing to determine if [debtor] originally filed its Chapter 11

petition for reorganization in good faith"); *In re SM 104 Ltd.*, 160 B.R. 202, 244 (Bankr. S.D.

Fla. 1993).

Accordingly, the UCC's reliance on an alleged "pattern of prepetition conduct" as the

cornerstone of its bad faith argument, UCC Memo at 25-26, is legally irrelevant and thus fails as

a matter of law.

**2.    The UCC's allegations do not support a lack of good faith in filing the
Archdiocese Plan**

It is clear that the UCC proposes to conduct discovery for transactions going back several

decades in order to attack a plan filed by the Archdiocese in 2016 as part of what appears to be a

continuing effort to harass the Archdiocese.  This Court should not countenance such conduct.

It is also clear that the UCC's allegations concerning the formation of various non-debtor

Catholic entities and the relationship between the Archdiocese and those entities represent a re-

hash of the allegations made by the UCC in support of its failed motion for substantive

consolidation. *See* ECF No. 631. Again, it is clear that the UCC now wishes to litigate a claim that did not survive a motion to dismiss. The UCC does not explain how this pre-petition conduct relates to the Archdiocese Plan. In the event that discovery becomes necessary or appropriate, the Archdiocese is prepared to establish that the UCC's claims are misplaced and that the underlying factual allegations are misstated or distorted. They certainly have no connection to the Archdiocese Plan.

The UCC has also alleged that the Archdiocese is somehow responsible for the diversion of approximately $7,800,000 of funds held in the AMBP. UCC Memo at 28. To put this in context, as indicated by the Archdiocese in its disclosure statement:

> In January 2014, the board of trustees provided participating employers with a 20% billing credit due to a large reserve fund which had accumulated over time, which resulted in a return to participating employers of approximately $7,800,000. Upon expiration of the credit in June 2015, the board of trustees authorized a reduction in premiums of 15%, resulting in a net increase in premiums of 5%. Premiums have remained constant since June 2015, and the AMBP notified participants in the Health and Dental Plans that there would be no premium increase throughout calendar year 2016.

Archdiocese Disclosure Statement at 19.

The UCC has glossed over this history and has ignored the rapid and unexpected increase in medical costs experienced by all parties during the last few years. As stated in the disclosure statement:

> The loss experience under the Health and Dental Plans changed dramatically following the Petition Date. The Archdiocese believes that this change, which was not fully anticipated as of the Petition Date, is attributable, at least in part, to general economic and market conditions, including general trends relating to healthcare costs.

*Id.* at 20.

Two additional points must be emphasized with respect to the UCC's criticism of the actions taken by the board of trustees of the AMBP:

First, the actions identified by the UCC, in fact, were taken by the AMBP's board of trustees, and not by the Archdiocese.  The UCC obviously recognizes the distinction between the AMBP board of trustees and the Archdiocese.  The stipulation filed by the Archdiocese with respect to the AMBP, for example, was executed by legal counsel for the independent trustees of the AMBP.  ECF No. 1059.  The Archdiocese did not have any prior knowledge of the stipulation and had no involvement in the negotiation of the stipulation.  It is more than a little disingenuous for the UCC to claim that the Archdiocese is not responsible for a stipulation with the AMBP, but is entirely responsible for the premium decisions approved by the board on whose behalf the stipulation was negotiated.

Second, as also indicated in the disclosure statement filed by the Archdiocese, "[o]nly approximately 5-7% of the funds held in the AMBP were contributed by the Archdiocese as a participant in the AMBP."  Archdiocese Disclosure Statement at 19.  The stipulation referenced above appears to reflect the appreciation of the enormous hardship that would be suffered by participants in the AMBP if the proceeds of the AMBP somehow are required to be transferred to a trust for the benefit of Class 6 creditors.[20]  Again, it is more than a little disingenuous for the UCC to claim that the Archdiocese acted in bad faith by not requiring that its plan of reorganization be funded on the backs of the 3,500 participants in the AMBP program.

Finally, UCC attacks the Archdiocese over its handling of the clergy abuse crisis.  Again, the UCC's allegations relate to conduct going back decades.  Although the UCC has withdrawn its false allegation that the Archdiocese's conduct resulted in a guilty plea, the UCC has not

---

[20] Although the stipulation also suggests that the UCC intends to seek recovery of those sums from the Archdiocese, which, presumably, would be forced to seek reimbursement of those amounts through increased parish assessments.  The stipulation appears to be perfectly circular in this regard.  The UCC's new modified plan includes the AMBP as one of the assets to be valued by the Bankruptcy Court, without specifying the nature of the asset to be valued.  ECF No. 1129 at Ex. C.

deviated from its apparent efforts to obtain retribution as opposed to fair compensation for the alleged prepetition conduct.

The fact is that the Archdiocese has acknowledged that clergy abuse is wrong, wherever and whenever committed.    The UCC ignores the extraordinary efforts undertaken by the Archdiocese to protect children.    These efforts are described in detail in the Archdiocese disclosure statement and include, among other things, the adoption in 2002 of a Charter for the Protection of Children and Young People, the establishment of a safe environment training program, the public disclosure and identification of offending clergy members, the appointment in 2014 of a new director of ministerial standards and safe environment and the adoption and implementation of leading, state-of-the-art child protection policies and protocols.    In addition, as also indicated in the disclosure statement, the Archdiocese entered into a separate agreement with JAA in 2014 in connection with the settlement of the Doe 1 litigation.    Finally, most recently, the Archdiocese has entered into various settlement agreements with the Ramsey County Attorney's Office to resolve both civil and criminal claims against the Archdiocese. Archdiocese Disclosure Statement at 18-21.

In short, the UCC's complaints with regard to prepetition conduct are without merit and are not relevant to a proper inquiry under Section 1129(a)(3)(c).

## C.    Postpetition Conduct

The UCC, of course, has also criticized certain aspects of the conduct by the Archdiocese during the pendency of this case.    Certain of these claims were or have been addressed in the foregoing section, including claims relating to the formation of certain non-debtor Catholic entities and the Archdiocese's relationship with those entities, and the claim "that the Debtor divested nearly $8,000,000 in cash that could have been used to pay creditor claims in the months immediately preceding its bankruptcy case."    UCC Memo at 31.    The Archdiocese has

also addressed the UCC's allegations relating to the alleged failure to thoroughly investigate potential avoidance claims.

The remaining allegations in the memorandum may be resolved in short order.

As a threshold matter, the Archdiocese recognizes its obligation to act in good faith in connection with all matters relevant to the administration of the case. At the same time, however, at least two of the claims asserted by the UCC—the Red Bull Crashed Ice event and the so-called "box of loot"—involve relatively small amounts, at least compared with a $156 million plan of reorganization. More importantly, the UCC's claims with respect to these items are misleading at best.

### 1.    Red Bull Crashed Ice

From at least 2012 to the present, the Archdiocese entered into a series of contracts with the promotors of the Red Bull Crashed Ice event providing for payment of $60,000 to $85,000 each year. Historically, the event has run from the steps of the Cathedral to city property adjacent to the Hayden Building. The event draws large crowds. The payments alleged by the UCC were intended to compensate the Cathedral for disruption to its operations and parking resulting from the event. These were not funds historically retained by the Archdiocese.

### 2.    "Box of Loot"

This objection, it appears, relates to a letter filed on the docket in June 2016 alleging the existence of several hundred thousand dollars' worth of jewelry and religious objects. *See* ECF No. 687. The Archdiocese conducted an investigation of the allegations made in the letter and provided the results of that investigation to the UCC, along with copies of the underlying appraisals, in June 2016. The UCC did not object to the adequacy of the information provided by the Archdiocese. The UCC's eleventh-hour allegations are misguided.

With regard to the UCC's other claims of postpetition misconduct:

### 1.     Sale of Property

This objection is perplexing, given that the UCC participated in the sale process and, in fact, retained its own real estate expert with approval of this court.  *See* ECF No. 223.  The real estate sales were approved by this Court upon proper hearing based on verified pleadings from the Archdiocese and its real estate experts NorthMarq Real Estate Services, LLC.  Again, it appears that the UCC wishes to second-guess or re-litigate prior proceedings in the case.  These transactions cannot support a bad faith objection as a matter of law.

### 2.     Insurance Settlements

The UCC next contends that the Archdiocese disregarded this Court's mediation order, negotiated "collusive, under-market settlements with its insurance carriers", and entered into such agreements "without creditor participation."  UCC Memo at 30.  As a matter of law, this grievance is not a proper basis for a plan objection.  "In determining whether a plan has been proposed in good faith, a court is not required to review negotiations to determine the reasons that a consensual plan was not proposed."  *In re Envirodyne Indus., Inc.*, Nos. 93 B 310, 93 B 312, 93 B 313, 93 B 314, 93 B 315, 93 B 316, 93 B 318 and 93 B 319, 1993 WL 566565, at *38 (Bankr. N.D. Ill. Dec. 20, 1993).  "There is no good faith bargaining requirement [under § 1129(a)(3)] in the sense of statutory 'duty to bargain in good faith' akin to that imposed under the labor laws in the Chapter 11 reorganization provisions."  *In re New Hampshire Elec. Coop., Inc.*, 138 B.R. 668, 670 (Bankr. D.N.H. 1992)).  "A plan has not necessarily been proposed in bad faith simply because a party does not like the treatment of its claims."  *In re Envirodyne Indus., Inc.*, 1993 WL 566565, at *38  (citing *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr. M.D. Fl. 1993); *In re Montgomery Court Apartments of Ingham Cty. Ltd.*, 141 B.R. 324, 330 (Bankr. S.D. Ohio 1992)).  Thus, this basis for the UCC's bad faith objection fails as a matter of law.

In any event, if necessary, the Archdiocese will demonstrate that the UCC's contention regarding the insurance settlements are demonstrably false. There was nothing collusive or unreasonable about these settlements. The UCC and JAA had every opportunity to negotiate different deals if such deals could be concluded. The settlements reached are fair, reasonable and completely above board.

First, settlement negotiations were conducted entirely under the auspices of one of Minnesota's most well regarded mediators, Hon. Arthur Boylan (ret.). The UCC and JAA were invited (in fact, ordered) to attend virtually every one of the more than 20 days of negotiation sessions that took place from March, 2015 to November, 2016. Second, the UCC and JAA both signed off on the amounts of settlements with five primary carriers. *See* UCC Disclosure Statement at 20 ("The UCC has indicated its consent to the dollar amounts reached in five of the settlements.") This fact alone shows that the UCC and JAA had every opportunity to fully participate.

It appears that the UCC and JAA's accusation is that the settlements reached with second-layer carriers CNA, AIG, Aetna/Travelers and Interstate are too low. The UCC and JAA, however, also fully participated in the negotiations with these four carriers. As the Archdiocese will show if necessary, after over a year of three-way negotiations, it became clear that the UCC and JAA were not interested in reaching settlements with these four carriers. At the same time, it was clear that these carriers were willing to pay very substantial sums – sums derived using the same method used to assess the appropriate amount that should be paid by the primary carriers, which were approved by the UCC and JAA. It was only after the Archdiocese realized that the UCC and JAA did not want to settle that the Archdiocese began to consider settling with these carriers even if the UCC and JAA did not bless the deals.

The Archdiocese did not, in short, conclude deals behind the backs of either the UCC or JAA. Rather, the Archdiocese made sure the UCC and JAA were aware of its intentions and gave them time to move negotiations with these carriers forward if they could, in which case the Archdiocese planned to stand down.

Finally, the UCC's recourse for its complaint regarding these settlements is to oppose approval of the agreements when the Archdioceses submits them for this Court's approval. As the Archdiocese will show, the settlement amounts are reasonable and far exceed the amounts paid by carriers in other diocesan and archdiocesan bankruptcies. This is especially true where the number of claims subject to dismissal, discussed at Section I(C)(5) above, is taken into account. The UCC and JAA's suggestion that they could strike larger settlements is belied by the fact that after a year and a half of negotiations in which they fully participated, they failed to conclude deals with those carriers. As far as litigating in the hope of obtaining more money, this would mean litigating not only with the carriers but also with all of the Tort Claimants, an expensive, painful and very time consuming process, with potentially worse results.[21]

In short, the settlement agreements will be addressed at the appropriate time and will be proven to be non-collusive, fair and reasonable and the best that could be achieved. The settlements show nothing more than the Archdiocese's great efforts to fully resolve this case.

---

[21] Of course, the UCC and JAA had already criticized the Archdiocese's first Plan of Reorganization in which claims against these carriers would be assigned to the Trust so that coverage with these carriers could be resolved through litigation – the same result the UCC Plan now seeks. *See, e.g.*, JAA Press Release May 26, 2016, *available at* http://www.andersonadvocates.com/Posts/News-or-Event/2119/Attorney-Jeff-Anderson-to-Respond-to-Archdiocese-of-Saint-Paul-and-Minneapolis-Bankruptcy-Plan-Filed-Today-.aspx

### 3. Disposable Resources

Finally, the UCC's allegation that the Archdiocese has failed to remit all of its disposable resources to its plan is addressed in more detail in Section VII.B below.  As set forth elsewhere, this allegation is untrue as a matter of fact and a misstatement of the applicable law.[22]

### D. Conclusion

As has become typical in this case, the UCC's claim of bad faith is long on invective and short on factual support and analysis.  Moreover, the UCC's allegations of bad faith ring more than a little hollow in light of a series of questionable and overly aggressive actions on the part of the UCC, including its recent decision to submit a "modified" plan despite the court's admonition against creating a "moving target."  The simple truth is that the conduct alleged by the UCC will not support a finding of bad faith within the meaning of Section 1129(a)(3).  The court should overrule the UCC's bad faith objection as a matter of law.

## VIII. UCC OBJECTION NO. 8 FAILS:  THE ARCHDIOCESE IS ENTITLED TO UTILIZE 11 U.S.C. § 1129(B) TO CONFIRM A PLAN OVER AN NON-CONSENTING CLASS'S OBJECTION

### A. The Archdiocese Plan is fair and equitable and the Archdiocese has complied with all requirements under Section 1129(b)(2)

Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met, then, notwithstanding an impaired class of claims that has not voted to accept the plan, the plan may still be confirmed so long as it does not discriminate unfairly and is "fair and equitable with respect to a class . . . of unsecured creditors."  11 U.S.C. § 1129(b)(1).  Section 1129(b)(2) provides that a plan is fair and equitable with respect to a class of unsecured

---

[22] This Court has previously indicated that the obligation of a chapter 7 trustee to collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest, 11 U.S.C. § 704(a)(1), is simply not applicable in a chapter 11 proceeding. ECF No. 1095 (Hr'g Transcript, June 15, 2017) at 27-28.

claims if (i) the plan provides that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of the claim , or (ii) it provides that the holder of any claim in a class junior to the claims or interests of that particular class will not receive or retain under the plan on account of such junior claim or interest in property. *See* 11 U.S.C. § 1129(b)(2)(B). Importantly, however, the "absolute priority rule" does not apply to non-profit debtors like the Archdiocese. *See, e.g.*, *Matter of Wabash Valley Power Assn.*, 72 F.3d 1305, 1318–19 (7th Cir. 1995); *In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890*, 265 F.3d 869, 873 (9th Cir. 2001). The UCC does not argue otherwise.

The UCC instead asserts that confirmation of the Archdiocese Plan would be unfair because Tort Claimants have not voted in favor of the plan. UCC Memo at 32-33. "As with many other provisions of 11 U.S.C. § 1129, satisfaction of [the 'fair and equitable'] requirement depends on specific facts." *In re Montgomery Court Apartments*, 141 B.R. at 346. The standard for a confirmation of a debtor's plan is flexible. *In re Spanish Lake Assocs.*, 92 B.R. 875, 878 (Bankr. E.D. Mo. 1988) ("Such flexibility was legislated into the Bankruptcy Code by the very fact that terms such as 'fair and equitable' resist precise definition."). Ultimately, the "fair and equitable" decision is within the court's discretion   *Id.* ("Thus, a plan which satisfies the standards set forth in § 1129(b)(2) may or may not be 'fair and equitable.'").  In deciding whether the Archdiocese Plan meets the standards set forth in Section 1129(b)(2), "the Court should view all inferences drawn from the underlying facts and matters contained in the Plan and the Disclosure Statement in a light most favorable to the [Archdiocese]." *Id.* at 877.

As a preliminary matter, the Class 6 vote tallies may be in doubt based on the misrepresentations made by the UCC and claimants' counsel in this case. *See* ECF No. 1086 at

3–5.   The Archdiocese has expressly reserved the right to seek a designation of votes under Section 1126(e) of the Bankruptcy Code.   In the meantime, most of the cases cited by the UCC are inapposite.

In *In re D & F Const. Inc.*, for example, the court noted that the debtor's plan was not fair and equitable as a result of imposing a negative amortization on a single loan.   865 F.2d 673, 675-76 (5th Cir. 1989).   This negative amortization would have forced the creditor to, in effect, "make a post-confirmation loan to the debtor for a period of twelve years."  *Id.*   There is nothing similar to that happening in the Archdiocese Plan with respect to Class 6 claimants.   In fact, the Plan provides a fair process by which Class 6 claimants would have their claims independently evaluated and paid.  *See supra* Sections I–III, VII.[23]   Despite the UCC's assertion, the value of Class 6 claims is not fixed and the trust established by the Archdiocese Plan includes a process for determining the reasonable value of these claims.   As detailed above, Class 6 claims should not be taken at face value.

While the UCC cites only to an unreported case from New Mexico for a list of factors to be considered in determining whether the "fair and equitable" standard has been met, that case specifically listed these factors for a determination under Section 1129(b)(1) "with respect to a dissenting class of <u>secured</u> creditors."  *In re Cottonwood Corners Phase V, LLC*, 2012 WL 566426, at *22 (Bankr. D. N.M. Feb. 17, 2012) (emphasis added).   In contrast, courts have recognized that some of the factors to be analyzed with respect to a dissenting <u>unsecured</u> creditor are:

(1) whether the statutory requirements of section 1129(b)(2) have been met;

(2) whether the length of time for proposed repayment is reasonable;

---

[23] These sections also address the UCC's unsupported arguments in this objection regarding the lack of good faith by the Archdiocese and the "collusive, under-market insurance settlements."

(3) whether the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations;

(4) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor; and

(5) whether other particular inequities are inherent in the plan, including special prejudice to a dissenting class arising from its particular circumstances.

*In re Renegade Holdings, Inc.*, 429 B.R. 502, 529 (Bankr. M.D.N.C. 2010) (new trial granted on other grounds) (citing *In re Montgomery Court Apartments*, 141 B.R. at 346).

Notably, the UCC does not address these factors, likely because examination of the Archdiocese Plan reveals compliance with each. At base, this determination is a fact issue that cannot be resolved at this time.

Additionally, despite the UCC's hyperbole, there is nothing to support the notion that that the Archdiocese is seeking to "undermine the rights of clergy abuse survivors." *See* UCC Memo at 34. The Archdiocese has devoted all of its available resources to equitably resolve all Class 6 claims. As detailed in the Archdiocese Disclosure Statement, the Archdiocese will fund the Plan Implementation Account with: (1) cash consisting of non-restricted cash accounts, the account established to hold the proceeds derived from the sale of Archdiocese properties during the course of this case, and the proceeds of the Riley Fund dispute; (2) cash from the sale of jewelry and other items not necessary for continued operations and that lack liturgical or historical value; (3) the assignment of Archdiocese interests in Ausmar and the residual Ward estate; (4) Archdiocese Settling Insurer contributions; (5) the GIF contribution; (6) contributions from Catholic Entities; and (7) $500,000 to establish a counseling fund. *See* Archdiocese Plan § 5.1. All told, the Trust will initially collect approximately $148 million in cash, plus allowed claims totaling $14.2 million in the Home liquidation. Any asset or cash kept by the Archdiocese will be necessary for the continued operation of the Archdiocese as a going concern.

The UCC has not presented any evidence that the Archdiocese has "minimized" assets available to satisfy claims. To the contrary, the Archdiocese has committed available assets to the Trust, maximized its insurance recoveries, and established a fair process for evaluating and paying all Class 6 claims. The alternative to a determination that the confirmation of the Archdiocese Plan over a Class 6 objection is fair and equitable is years of litigation likely resulting in many Class 6 claimants receiving nothing and leaving the Archdiocese wholly insolvent while potentially forcing parishes into bankruptcy.[24] As a result, this court should make a determination that the Archdiocese Plan is fair and equitable, thus allowing for "cram down" under Section 1129(b)(2).

> **B.    The best interest test does not require that the Archdiocese "contribute the liquidation value of its assets" as a condition to confirmation**

The UCC Memo alleges that the Archdiocese must "contribute the value of its assets" in support of its contention that the Archdiocese Plan may not be confirmed over the objection of Class 6 creditors. According to the UCC, "[i]f confirmed, the Debtor's Plan would permanently terminate the Debtor's liability for approximately $1.5 billion in clergy abuse claims and the Debtor's Plan does not even require the Debtor to contribute the liquidation value of its assets – as required by 11 U.S.C. § 1129(a)(7) – in exchange for such sweeping relief." UCC Memo at

---

[24] *See also* ECF No. 821 (Hr'g Transcript, November 10, 2016) at 57–58 for a discussion about the implications of not maximizing its insurance recoveries through global settlements with the Parishes and insurance companies:

> A go-it-alone plan with the Archdiocese only assets that invites years of litigation involving individual parishes who may or [may] not retain contribution indemnity claims against the Archdiocese but who presumably, for which presumably will continue to be members of the Catholic family, will continue to be part of the Archdiocese, whose assessments are necessary to fund the Archdiocese. A go-it-alone plan raises a specter of years of litigation and puts parishes, the Archdiocese and everybody else in an adverse relationship for probably many years.

34.  The UCC also alleges that the Archdiocese failed "to contribute the liquidation value of its assets" as a basis for its objection to the Archdiocese plan on good faith grounds.  *Id.*

The UCC has misstated the applicable test.  The statutory provisions cited by the UCC provides in relevant part as follows:

> With respect to each impaired class of claims or interests –
>
> (A)    each holder of a claim or interest of such class –
>
>    (i)    has accepted the plan; or
>
>    (ii)    will receive or retain under the plan an account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).

As the statutory language makes clear, Section 1129(a)(7)(A) does not require payment of <u>any</u> amount as part of the confirmation process.  Contrary to the UCC's suggestion, the Section 1129(a)(7) test is purely hypothetical.  *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 500 (D.N.J. 2005) ("The application of the best interests test … involves a <u>hypothetical</u> application of chapter 7 to a chapter 11 plan.") (emphasis added).  In other words, a bankruptcy court is required to "conjure up a hypothetical liquidation and distribution analysis" to determine compliance with Section 1129(a)(7).  *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 141 (D. Del. 2012) (same).

The Archdiocese submitted a thorough and detailed hypothetical liquidation analysis as part of the disclosure process.  Archdiocese Disclosure Statement at Ex. C.[25]  The UCC's original objection included a general allegation that the Archdiocese has failed to meet the best

---

[25] Given the paucity of authority in this area, the Archdiocese reserves argument on whether the best interest test is applicable under any circumstances, in light of the prohibition in Section 1112(c) on the conversion of a non-profit debtor without the consent of the debtor.

interest test.  ECF No. 1074 at 2.  The UCC's supporting memorandum, however, fails to provide any significant detail with respect to the legal basis for its objection.

The evidence to be submitted at confirmation will show compliance with the hypothetical test of Section 1129(a)(7) under any reasonable standard.  At the same time, any reasonable analysis of the best interest test should begin with a recognition  that "[l]iquidating a nonprofit enterprise is complicated and, in some instances, arguably prohibited by both the Bankruptcy Code and applicable nonprofit law…."  Andrew M. Troop, et al., *Reorganizing with Value but without Profit (or Equity); Select Confirmation Issus for Nonprofit Entities*, 19 Norton J. of Bankr. & Prac. 147, 154 (2010).  Indeed, the analysis becomes more difficult in the context of a church reorganization:

> For example, a religious nonprofit may have unique real property, such as a church, temple or cemetery, for which the forced liquidation value could be lower because of the property's limited alternative-use potential, or the restrictive zoning associated with the site.  Moreover, the intangible assets of some charitable or religious nonprofits, such as their ability to attract donations based on their "brand" or the "goodwill" associated with their charitable works (or unique intellectual property), may have a limited or nonexistent forced liquidation value due to the limited number of buyers and the asset's lack of market portability.  The end result is that many of the assets owned by a nonprofit could have a very low forced liquidation value for the purposes of the best-interest test, which, in turn, would lower the minimum distribution level a plan proponent would have to satisfy to obtain confirmation.  Thus, in a nonprofit's chapter 11 case, the best-interest test will likely be lowered due to the nature of the debtor and its assets.

Kavita Gupta, *Confirmation Issues Facing a Nonprofit Debtor*, Am. Bankr. Inst. J., Apr. 2012, at 32; *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202 (Bankr. W.D. Tex. 2008) (overruling a plan objection based on the best interest test and finding the testimony and evidence submitted by the plan proponent sufficient "considering the unique nature of the Debtor as a non-profit organization dependent on contributions that are voluntary and may be restricted, and of the Debtor's other assets").

Given the unique circumstances of this case, the Court should also consider the broader interests of creditors in applying the best interest test, as is required in connection with the best interest test of Chapter 9.  *See* 11 U.S.C. § 943(b)(7) ("the court shall confirm the plan if … the plan is in the best interest of creditors and is feasible").  Obviously, the language of the two sections is different.  However, the Archdiocese's situation in this regard is closer to a municipal bankruptcy proceeding than a typical Chapter 11 business reorganization.

As indicated in one of the leading cases in the area:

> [While the best interests of the creditors test is an elusive standard in Chapter 9], nevertheless the concept is not without meaning….  The concept should be interpreted to mean that the plan must be better than the alternative that creditors have.  In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds….  [The courts] must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case.

*In re Cty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Ca. 1996) (quoting 4 Collier on Bankruptcy, ¶ 943.03(7) (15th ed. 1995)).

Again, the Archdiocese Plan meets the requirements of Section 1129(a)(7) with or without regard to the broader interests of creditors and other parties interest. For the reasons suggested above, however, it is appropriate for this Court to consider the true alternatives to the Archdiocese Plan as part of the confirmation process.  As previously indicated, these alternatives include many years of speculative litigation, massive disruptions to the mission of the church, interference with the expectations of donors and the Faithful, and, presumably, additional Chapter 11 reorganization proceedings.  As a practical matter, it is difficult to imagine alternatives to the Archdiocese Plan that would be in the best interest of any party.

In sum, the best interests of creditors test does not require payment of any amount as part of the confirmation process and does not preclude confirmation of the Archdiocese Plan over the objection of Class 6 creditors.

## OTHER PLAN OBJECTIONS

### A.   Mortgage Lenders

As indicated in prior pleadings, two of the high schools located in the Archdiocese are subject to mortgages in favor of North American Banking Company (with respect to Totino-Grace High School), and Bremer Bank National Association (with respect to Benilde-St. Margaret High School).  The mortgage holders have filed objections to the Archdiocese Plan [ECF Nos. 1101 and 1103] on the grounds that the plan does not explicitly retain the mortgage liens, even though, as acknowledged by Bremer, the underlying property is not "dealt with in the plan." ECF No. 1103.

The Archdiocese has made it clear to the mortgage lenders that it intends and expects that the mortgages on the high schools will ride through the bankruptcy.  The Archdiocese, of course, has not challenged the mortgage liens during the pendency of this case.  In fact, any such challenge would be inconsistent with the assumption by the Archdiocese of the underlying leases.

In any event, the Archdiocese is prepared to file a supplemental Plan Document in accordance with Section 14.2 of the Archdiocese Plan to confirm its earlier representation and to eliminate any conceivable question as to its intention to preserve the mortgage lien on the high schools following confirmation.[26]  The Archdiocese has deferred filing the supplement pending

---

[26] Section 14.2 of the plan provides in relevant part as follows:  "Except as provided in the Plan or the confirmation order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and

the hearing scheduled for August 29 in light of this Court's prohibition on the filing of exhibits, affidavits or other evidence in support of its response. *See* ECF No. 1090.

The NABC and Bremer objections should be overruled on the basis of the representations referenced above and the supplement to be filed by the Archdiocese.

### B.      Deceased Claimant

The Estate of Nancy J. Galatowitsch (the "Estate") has objected to provisions of the plan dealing with the treatment of deceased claimants.   ECF No. 1105.   The Estate's objection implicates Section 4.2(a) of the Trust Distribution Plan, which provides, in relevant part:

> The Tort Claims Reviewer shall consider, before assessing the Tort Claim, whether the Tort Claimant has demonstrated, by a preponderance of the evidence, that: (1) the Abuse was perpetrated by a person for whose actions the Protected Parties are liable in whole or in part; and for all Tort Claims filed after the Claim Filing Date, (2) that the Tort Claimant's failure to timely file a proof of claim by the Claim Filing Date is excused under Minn. Stat. § 541.15 (or other applicable law suspending the limitations period, if any).   In order to be eligible for participation and claim liquidation under the TDP, each Tort Claimant must be alive as of the date of Plan Confirmation.

Archdiocese Plan at 111.

The Estate's objection should be overruled.   First, the objection and supporting memorandum were filed by Paul and Dennis Galatowitsch as "Pro Se litigants on behalf of the Estate of Nancy Joan Galatowitsch." ECF No. 1105.   The Archdiocese does not know if the pro se litigants, in fact, are attorneys.   If so, the attorneys have not been admitted in this proceeding. Alternatively, the Archdiocese is also unaware of any authority under which a non-attorney may act as a "pro se litigant" on behalf of a party in interest (in this case, the Estate of Galatowitsch).

The Estate's objection also fails on the merits.   Minnesota law does not recognize claims of the type asserted by the Estate following the death of the claimant.   *See* Minn. Stat. § 573.01

---

subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, claims, and interests of creditors, including successor liability claims."

(2016) ("a cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02"); *Beaudry v. State Farm Mut. Auto Ins. Co.*, 518 N.W.2d 11 (Minn. 1994) (uninsured motorist claim, filed against carrier three days before plaintiff's death, abated upon death of plaintiff along with her underlying claim against tortfeasor and did not survive as a contract claim), *abrogated on other grounds by Oanes v. Allstate Ins. Co.*, 617 N.W.2d 401 (Minn. 2000).

The result mandated by state law is fair and equitable under the circumstances. Compliance with the law ensures that any assets that would otherwise go the Estate will go to living claimants. The Estate's objection should be overruled.

### C.    Crosier Entities

The Crosier objection is based on general equitable considerations. ECF No. 1120. As such, the Archdiocese does not believe that the objection states a legal basis for entry of an order denying confirmation of the Archdiocese Plan. The Archdiocese, however, has been in discussions with counsel for the Crosier entities and believes that it is likely that the concerns expressed by these entities will be resolved following expiration of the claim deadline in the Crosier bankruptcy case and as part of the plan confirmation process in the Crosier case. The Archdiocese acknowledges the fiduciary obligations of the Crosier debtors and has agreed that it will not seek an order overruling the objection at this time, with a reservation of rights for all parties.

## <u>CONCLUSION</u>

For the forgoing reasons, this Court should overrule each of the UCC's and other plan objectors' objections to the Archdiocese Plan.

Respectfully submitted,

BRIGGS AND MORGAN

Dated:  August 4, 2017                          BY:     */e/ Richard D. Anderson*
                                                Richard D. Anderson (#2306)
                                                randerson@briggs.com
                                                Charles B. Rogers (#0130588)
                                                crogers@briggs.com
                                                Benjamin E. Gurstelle (#0389968)
                                                bgurstelle@briggs.com
                                                2200 IDS Center, 80 South 8th Street
                                                Minneapolis, MN 55402
                                                Telephone: (612) 977-8400
                                                Facsimile: (612) 977-8650

                                                Attorneys for the Archdiocese of Saint Paul
                                                and Minneapolis

8402588v18

71