# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:

Case No. 15-30125

The Archdiocese of Saint Paul and
Minneapolis,

Chapter 11

Debtor.

---

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE TO OBJECTIONS TO ITS CHAPTER 11 PLAN OF REORGANIZATION

---

# TABLE OF CONTENTS

I.   Response to the Archdiocese's Objections to the Committee's Plan [ECF 1118] .................4

   A.   Overview of the Committee's Plan ............................................................................4

   B.   The Committee's Plan was proposed in good faith.....................................................9

   C.   The Committee's Plan administers only the Debtor's property and rights.......................15

   D.   Bankruptcy courts have the authority to value estate assets and routinely do so in connection with confirmation proceedings................................................................18

   E.   The Committee's Plan provides adequate means for implementation .............................19

   F.   The Committee's Plan does not mandate liquidation of the Debtor's assets and, even if it did, it would be legally viable.........................................................................................22

   G.   The Committee did not fail to comply with applicable non-bankruptcy law concerning religious corporations ..............................................................................................35

   H.   Acceptances of the Committee's Plan were not obtained through improper solicitation .35

   I.   Home Insurance Company is protected from third party claims under the Committee's Modified Plan.........................................................................................................37

   J.   The Committee's Plan alleviates the Debtor's post-confirmation burdens while preserving insurance coverage. ................................................................................38

   K.   The Archdiocese raises several questions of fact that require discovery and expert testimony ...............................................................................................................42

   L.   The Debtor lacks standing to raise several of its objections ............................................43

II.   Response to the Parish Committee's Objections to the Committee's Plan [ECF 1113].......43

   A.   The Committee's Plan leaves intact the rights of the majority of non-abuse claimants ...43

   B.   The parish contribution and indemnity claims are disallowed, unimpaired, and discharged in accordance with the Bankruptcy Code ......................................................................48

   C.   The Committee's Plan only includes the Debtor's property and rights ...........................52

   D.   The Committee's Plan does not impair the parishes' rights under any insurance policies. 58

   E.   The ability and obligation of parishes to pay assessments is a factual issue ...................59

III.   Response to The Church of St. Patrick of Edina, Minnesota's Objections to the Committee's Plan [ECF 1116] ..................................................................................................................60

IV.   Response to Minnesota Department of Commerce [ECF 1108].......................................60

V.   Response to the High Schools Objections [ECF 1109].....................................................60

VI.   Response to Objections from North American Banking Company [ECF 1102] and Bremer Bank [ECF 1104 ] ..................................................................................................................61

VII.   Response to Saint Anne - Saint Joseph Hien [ECF 1117]..............................................61

VIII.   Many objecting parties lack the requisite standing to assert objections raised................61

A. General principles of standing ...................................................................................62

B. Objecting parties lack constitutional standing to assert many of their objections ............64

C. Many objections fail to satisfy prudential standing requirements as well........................64

D. Section 1109(b) regarding "party-in-interest" does not confer standing on the objecting insurers ............................................................................................................................67

IX. Response to Catholic Mutual Relief Society of America's ("Catholic Mutual") Objections [ECF 1111] ................................................................................................................................70

A. The Committee's Modified Plan resolves several of Catholic Mutual's objections.........70

B. The Committee's Plan does not unduly prejudice Non-Settling Insurers' pre-petition rights......................................................................................................................................70

C. The insurers' insistence on a settling insurer injunction violates their legal and contractual obligations and constitutes bad faith .....................................................................................71

D. Catholic Mutual lacks standing to raise several of its objections ....................................73

X. Response to Objections of Travelers Casualty and Surety Company, Hartford Accident and Indemnity Company, American Home Assurance Company, TIG Insurance Company, and Fireman's Fund Insurance Company ("Travelers et al. Objectors") [ECF 1110] ........................74

A. The Court has authority to address the validity of the transfer of insurance interests ......74

B. The Committee's Modified Plan resolves several of the Travelers et al. Objectors' objections..............................................................................................................................76

C. The Committee's Plan does not require the Debtor to breach its duty of cooperation .....78

D. Assignment of insurance proceeds arising from personal injury claims is permissible....80

E. The Committee's Plan and the Trust Agreement do not violate champerty and maintenance rules...............................................................................................................83

F. The Travelers et al. Objectors lack standing to raise several of its objections ................86

XI. Response to the LMI et al. Objectors' Objections to the Committee's Plan [ECF 1121].....86

A. The LMI et al. Objectors routinely mischaracterize and ignore provisions of the Committee's Plan.................................................................................................................86

B. The Committee's Modified Plan resolves many of the LMI et al. Objectors' concerns...93

C. The Bankruptcy Court can retain post-Effective Date jurisdiction..................................93

D. The LMI et al. Objectors lack standing to raise several of their objections ....................96

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") submits the following response to legal objections ("<u>Objections</u>") asserted against the Committee's *Second Amended Chapter 11 Plan of Reorganization* [ECF 890] (the "<u>Plan</u>")[1]:

## I.   Response to the Archdiocese's Objections to the Committee's Plan [ECF 1118]

### A.   Overview of the Committee's Plan

The Committee's Plan is straightforward and simple. It provides that creditors will receive at least the amount they would receive under a liquidation, in accordance with Section 1129(a)(7), while preserving and maximizing the creditors' ability to recover proceeds from the Debtor's liability insurance policies. The Committee's Plan otherwise complies with relevant provisions of the Bankruptcy Code while giving the Debtor control over its assets and operations.

#### 1.   *Structure of the Trust and the Debtor's rights under the Committee's Plan*

The Committee's Plan establishes a trust for the purpose of receiving, preserving, managing, and distributing assets to Class 6 and Class 7 claimants[2] pursuant to a Trust Distribution Plan. The Trust corpus includes the Debtor's interests in and rights to proceeds under, any Insurance Policies that might provide coverage for pending or future Abuse claims, as well as claims for breach of the policies, vexatious refusal to pay, bad faith, wrongful refusal to settle, and similar claims.[3] [ECF 890, § 1.1(sss).] Only the proceeds and certain claims are assigned to the Trust, not the Insurance Policies, and the Debtor retains all rights and interests in the Insurance Policies with respect to any non-Tort Claims. [*Id.*, §§ 1.1(sss), 10.1.] All non-

---

[1]     On August 1, 2017, the Committee filed its Modified Second Amended Chapter 11 Plan of Reorganization (the "<u>Modified Plan</u>"). [ECF 1129.]   The Objections reference the Committee's unmodified Plan, and many Objections are resolved through the Committee's modifications.
[2]     The Committee's Modified Plan treats Class 7 Claimants (Future Tort Claimants) the same as Class 6 Claimants. [ECF 1129, §§ 4.6, 4.7.]
[3]     All defined terms under Section 1.1 of the Committee's Plan are incorporated and used here.

debtors retain all rights and interests they have (if any) in the Insurance Policies. [ECF 890, § 1.1(sss); ECF 1129, § 10.2.]

The Trust does not assume the Debtor's liabilities with respect to the Class 6 and Class 7 Claims. [ECF 890, § 6.2(a).] Instead, the Debtor retains those liabilities until the Claims are discharged. [*Id.* at § 6.2(i)(4); ECF 1129, § 6.2(i)(4).] Post-confirmation litigation of Tort Claims is necessary to access coverage available under the Insurance Policies because the insurers assert that their indemnity obligations are triggered only by judgments or settlements with the insurers' consent. [*e.g.*, ECF 1121, at 35; ECF 1110, at 9.] Moreover, the language of the insuring agreements possibly obligates the insurers to provide indemnity coverage only with respect to the insured's obligation to pay damages on account of bodily injury. If the insured's obligation to pay damages is eliminated by discharge, release, transfer, or otherwise, the insurers could assert that they are not obligated to provide indemnity coverage.

The Committee's Plan therefore maintains the Debtor's liability to pay damages while simultaneously protecting the Debtor from post-confirmation financial exposure. If the insurers refuse to defend or indemnify the Debtor with respect to the assigned claims, the Trust will advance the Debtor's defense costs and funds for any settlements or judgments for the Class 6 and Class 7 Claims. [ECF 890, § 6.2(i)(4); ECF 1129, § 6.2(i)(4).] The Debtor is not discharged or released from liability for Class 6 and Class 7 Claims until such claims are settled with the Archdiocese or Reorganized Debtor and its insurers, or are fully adjudicated, resolved, and subject to Final Order. [ECF 890, §§ 6.2(a), 14.2(b).]

The Committee's Plan, which requires the Debtor to honor its obligations under the language of the insurance policies, thereby eliminates the risk of compromising insurance coverage and preserving the Debtor's interests.

2.    *Classification of Claimants and Distributions*

The Committee's Plan requires an independent reviewer (the "Tort Claims Reviewer") to determine whether each Tort Claimant is entitled to any distribution. [ECF 890, § 6.2(c).] Anyone determined by the Tort Claims Reviewer to be entitled to a distribution is considered a "Qualified Claimant." [*Id.*] The Tort Claims Reviewer will determine the amount of points that should be awarded to each Qualified Claimant under the terms of the Trust Distribution Plan, and will notify each Qualified Claimant of such determination. [*Id.*] To receive any distribution from the Trust, the Qualified Claimant must execute a Claim Resolution Agreement releasing any Settling Insurer from further liability on the claim and waiving any right of direct action against such Settling Insurer under Minn. Stat. § 60A.08, subd. 6. [ECF 890, § 6.2(c).] The Trust will make an immediate partial distribution to such Qualified Claimant upon receipt of the executed Claim Resolution Agreement, with each Tort Claimant sharing pro rata in accordance with his or her relative points. [*Id.*] The Qualified Claimant will not release the Debtor, Reorganized Debtor, any Non-Settling Insurer, or any other third party by executing the Claim Resolution Agreement or by accepting a distribution, and will retain the right to future distributions from the Trust and the right to litigate his or her claim against the Debtor. [*Id.*]

Within thirty days of being notified of his or her status as a Qualified Claimant and the number of his or her assigned points under the Trust Distribution Plan, the Qualified Claimant must elect to become either a Distribution Plan Claimant or a Litigation Claimant. [*Id.* § 6.2(d).] Distribution Plan Claimants and Litigation Claimants retain all rights they have against the Debtor, Reorganized Debtor, Non-Settling Insurers, or third parties, including the right to pursue a monetary judgment, and also any rights to future distributions from the Trust. [*Id.*] But a

Litigation Claimant who recovers a judgment or settlement on his or her Tort Claim will also receive an additional award from the Trust, as follows:

- If the Litigation Claimant recovers a judgment and no Non-Settling Insurer is implicated by the Litigation Claim, then the Trust will satisfy the judgment in the amount of the award plus reasonable attorney's fees and $500. [ECF 890, § 6.2(i)(1).]

- If a Non-Settling Insurer is implicated by the Litigation Claim, and a settlement is achieved *prior to* judgment, then the proceeds of such settlement must be turned over by the Tort Claimant to the Trust for further distribution as follows: the Trust will reimburse the Litigation Claimant for reasonable attorney's fees and costs and will then pay the Litigation Claimant up to the maximum amount awardable under the Trust Distribution Plan on that Litigation Claim, plus 15% of the total settlement, if the settlement is sufficient to pay such an amount. [*Id.* § 6.2(i)(2)(i).] The remainder will be paid to the Trust for distribution to Qualified Claimants. If the Non-Settling Insurer has paid such settlement sums to the Trust rather than to the Litigation Claimant directly, the Trust will follow the same procedure for payment of part of the settlement to the Litigation Claimant, again reserving the remainder to make additional distributions. [*See id.*] If the Non-Settling Insurer has no obligation to fund the judgment, or has refused to honor its indemnity obligation, the Trust will advance such funds to the Archdiocese for the settlement, and the distribution will proceed as otherwise set forth herein. [*Id.* §§ 6.2(i)(2)(i), 6.2(i)(4); ECF 1129, §§ 6.2(i)(2)(i), 6.2(i)(4).] The Trust will have the right to pursue the Non-Settling Insurer for any insurance proceeds that might have been owed and wrongfully refused.

- If a Non-Settling Insurer is implicated by the Litigation Claim, and the Litigation Claimant recovers a judgment or achieves a settlement *after* judgment, then the Litigation Claimant will receive reasonable attorney's fees and costs, and the total amount awardable for that Litigation Claim under the Trust Distribution Plan, plus 30% of the total judgment or settlement, if the settlement is sufficient to pay such an amount, with the remainder going to the Trust. [ECF 890, § 6.2(i)(2)(ii).] If the Non-Settling Insurer has no obligation to fund the judgment, or has refused to honor its indemnity obligation, the Trust will advance such funds to the Archdiocese for the judgment. [*Id.* § 6.2(i)(4); ECF 1129, § 6.2(i)(4).] The judgment should never be executed against the Archdiocese because the Trust will advance funding to the Archdiocese to pay it. The Trust will have the right to pursue the Non-Settling Insurer for any insurance proceeds that might have been owed and wrongfully refused. If the Non-Settling Insurer has an obligation to fund the judgment and honors it, then the judgment will be paid by the Non-Settling Insurer to the Litigation Claimant, who will then turn over the proceeds to the Trust for further distribution as set forth herein. [ECF 890, § 6.2(i)(2).]

- For all Litigation Claimants, the amount of any judgment will be reduced by the amount of any distributions already paid to that Claimant. [*Id.* § 6.2(g).]

Nothing within the Committee's Plan imposes any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay a judgment on any Class 6 or Class 7 Tort Claim. [ECF 890, § 6.2(j).] Any determination made by the Tort Claims Reviewer with respect to assessments and distributions are not binding on any insurer, have no collateral estoppel or res judicata effect, are not evidence of reasonableness in any coverage litigation, and do not trigger coverage under the policies. [ECF 890, § 6.2(g).] The Archdiocese and the Non-Settling Insurers retain any rights they have to object to and defend against any Tort Claims, to control the defense to any Tort Claims, and otherwise to compel each other to comply with all obligations under the Insurance Policies, including the insured's duty of cooperation. [*Id.* §§ 6.2(l)(2); 6.3(a).] Each Non-Settling Insurer retains all legal and factual defenses that may exist with respect to such Tort Claims, and all coverage defenses that might exist. [*Id.* §§ 6.2(l)(2), 6.3(a), (d), (e).]

Any failure by the Archdiocese to comply with its policy obligations to the insurers (including but not limited to its duty of cooperation), could void coverage for the Tort Claimants altogether. Thus, the Committee's Plan also exempts from any discharge, release, or injunction issued in connection with the bankruptcy any claim by the Trust that the Debtor and/or Reorganized Debtor breached obligations under the Insurance Policies. [*Id.* § 6.3(e).] Non-Settling Insurers' rights of contribution, indemnity, and/or subrogation—as against one another, any Settling Insurers, and any other potential tortfeasors—are preserved in full [ECF 890, § 8.10], with the one exception of any claims against Home Insurance Company, which is granted a Settling Insurer Supplemental Injunction in the Modified Plan to satisfy obligations under the Debtor's settlement agreement with the liquidator in Home Insurance Company's separate bankruptcy proceeding. [ECF 1129, § 14.2(c).]  The Non-Settling Insurers remain fully liable on account of all Class 6 and Class 7 Tort Claims. [ECF 890, § 6.3(a)(1)-(2).]

### B.    The Committee's Plan was proposed in good faith[4]

The Debtor argues that the Committee's Plan was not proposed in good faith. "[A] plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987), *overruled in part on other grounds, Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 387 (1993). Further, "the fact that a creditor proposes a liquidation plan is not evidence of bad faith." *Id.*

The Debtor offers a series of vague and unsubstantiated allegations in support of its good faith objection. [ECF 1118, at 52.] Other parties also object on good faith grounds,[5] and similarly assert vague, unsubstantiated, legally-unsupported, and often blatantly self-serving arguments to undermine the Committee's Plan by any means possible. To the extent the Committee was able to extract specific, substantive arguments from objections based on an alleged lack of good faith, the Committee responds as follows:

   1.    *The Committee's Modified Plan advances funds to the Debtor to defend against Tort Claimant lawsuits and there is a legitimate bankruptcy purpose for the Committee's indemnity provisions*

The Debtor argues that the Committee's Plan was proposed in bad faith because it leaves the Debtor without recourse to obtain defense costs or indemnification from the Trust. [ECF 1118, at 52.] The Committee's Plan formerly required the Trust to "advance or reimburse" the Debtor for reasonable attorney's fees and costs, and for any judgment or settlement, where Non-Settling Insurers have refused to do so [ECF 890, § 6.2(i)(4)], but the Plan has been modified to

---

[4]        This section responds the Debtor's objection 21.
[5]        Certain insurers argued that the Committee's Plan was not proposed in good faith. *See* App'x 1. The insurers lacked standing to do so. *See infra* Section VIII.C.2. Nevertheless, the substance of their arguments, to the extent it could be discerned, is addressed in this section.

require the Trust to "advance" such defense costs and judgments or settlements. [ECF 1129, § 6.1(a); 6.2(a); 6.2(i)(4).]

The Certain Insurers' ("LMI et al. Objectors") also claim that the Plan's indemnification of the Debtor is itself evidence of a lack of good faith. [ECF 1121, at 40–41.] In doing so, they misconstrue the terms of the Committee's Plan, which requires the Trust to advance defense costs and indemnify only if the Non-Settling Insurers have refused to do so. [ECF 890, §§ 4.6(b), 6.1(a), 6.2(a), 6.2(i)(4); ECF 1129, § 6.1(a); 6.2(a); 6.2(i)(4).] Indemnification of the Debtor serves the legitimate bankruptcy purpose of preserving the Debtor's post-confirmation assets and ongoing business interests. Notably, if any Non-Settling Insurer has refused to defend or indemnify the Debtor in violation of its contractual and legal obligations, it will be liable to the Debtor for breach of contract, and potentially liable for bad faith and extra-contractual damages, and the Trust will have the right to pursue recovery of all related damages. [ECF 890, § 6.1(a)–(b)(2).]

The fee advancement mechanism set forth in the Committee's Plan is reasonable and allows Tort Claimants to secure judgments or settlements. This is important because Non-Settling Insurers argue that Tort Claimants must obtain judgments or settlements to trigger coverage under some or all of the insurance policies. [ECF 1121, at 35; ECF 1110, at 9.]

2.    *The Committee's Plan contains a specific and feasible funding mechanism*

The Debtor argues that the Committee's Plan was proposed in bad faith because it "is premised on an unduly speculative and unenforceable funding mechanism." [ECF 1118, at 52.] This allegation is untrue, and it is addressed in detail below. *See infra* Section I.E.

3.  *The delayed discharge proposed by the Committee's Plan does not constitute a lack of good faith*

The Debtor and other objectors assert that the Committee's proposal to delay the discharge of Tort Claims evidences a lack of good faith. This allegation misunderstands or ignores the purpose of the provision. The delayed discharge is made necessary by the insurers' positions on coverage issues. As noted, the majority of insurers assert that they have no indemnity obligations until a Tort Claim is reduced to a judgment, or until there is a settlement with their consent.[6] [ECF 1121, at 35; ECF 1110, at 9.] Moreover, the insuring agreements of the policies arguably obligate the insurers to provide indemnity coverage only with respect to an insured's obligation to pay damages for bodily injury. If the insured has no obligation to pay such damages, the insurers would assert that they are not obligated to provide indemnity coverage.

The Debtor cites cases standing for the proposition that an insured's bankruptcy discharge does not release its insurer(s) from liability. The insurers, however, argue against the Committee's proposal to delay the Debtor's discharge precisely because they hope to use the Debtor's discharge to avoid their obligations. The insurers also conspicuously argue that this Court lacks authority to rule on whether insurance coverage is compromised by the provisions of a confirmed plan. [ECF 1110, at 9–10.][7] The Committee's Plan resolves these ambiguous legal

---

[6]      The insurers have not accurately described the law on this point. Under certain circumstances, the Non-Settling Insurers may also be obligated to fund a settlement entered into without consent. *See, e.g., Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) (where insurer declines coverage, insured may enter into settlement with claimant, regardless of consent or cooperation obligations under insurance policy). [*See also* ECF 890 § 6.3(b) (liability of the Archdiocese and/or Reorganized Debtor may also be determined by a settlement agreement which the Non-Settling Insurer has not consented to if it does not otherwise breach any duty of the Trust, Trustee, Archdiocese, or the Reorganized Debtor under the Insurance Policy or applicable law).]

[7]      If all Non-Settling Insurers are willing to agree in writing that they will not deny coverage for Class 6 and Class 7 Claims because the Archdiocese has been granted a discharge and that the Court has authority to dictate that the provisions of any confirmed plan approved by the Court cannot compromise insurance coverage, then perhaps certain provisions of the Committee Plan, including the delayed discharge, would be unnecessary. Otherwise, the delayed discharge feature must remain in the Committee's Plan to preserve the Debtor's insurance assets.

issues by delaying the Debtor's discharge, leaving no doubt that the insurers' coverage obligations will survive confirmation. The Debtor's concerns over a delayed discharge are addressed by the provisions in the Committee's Plan under which the Trust will advance defense costs and funding for settlements and for judgments in the event the Non-Settling Insurers fail or refuse to provide such funding. [ECF 890, § 6.2(i)(4); ECF 1129, § 6.1(a); 6.2(a); 6.2(i)(4).]

4. *The Committee's Plan reduces judgments obtained by Litigation Claimants in a manner proportionate to any distribution payments received*

The LMI et al. Objectors allege that the Debtor's assets that have been paid into the Trust will not "reduce the Debtor's liability." [ECF 1121, at 39.] The Plan provision cited does not actually have anything to do with the Debtor's direct liability to Tort Claimants – the provision relates only to obligations of the Archdiocese to its Insurers under the Insurance Policies.[8] Further, the insurers' objection is contrary to Plan provisions stating that any judgment in favor of a Litigation Claimant *will* be reduced by the amount of prior distributions to such Litigation Claimant. The Committee's Plan expressly provides that distributions will serve to reduce any judgment that might ultimately be awarded to a Litigation Claimant:

> The estimation of claims, assignment of points and payment of partial distributions does not impair a Litigation Claimant's rights to collect a judgment, including a judgment based on joint and several liability, against the Archdiocese, Reorganized Debtor, any Non-Settling Insurer or any other Person, but any such judgment awarded to a Litigation Claimant will be reduced by the amount of distributions already paid by the Trust to such Litigation Claimant on his or her Class 6 Claim(s).

[ECF 890 § 6.2(g).]

---

[8]     The provision cited by the LMI et al. Objectors, Section 6.3(a)(1), states that "the rights, duties and obligations of each Non-Settling Insurer and the Archdiocese or Reorganized Debtor under the Insurance Policies with respect to such Class 6 Claim are not impaired, altered, reduced or diminished by: (a) any distribution to Class 6 claimants pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan . . . ."

5.    *The Committee has a legitimate bankruptcy purpose for allowing suits against the Reorganized Debtor*

The LMI et al. Objectors allege that the Committee has no legitimate bankruptcy purpose for allowing suits against the Reorganized Debtor. [ECF 1121, at 39–40.] The LMI et al. Objectors further argue that no legitimate bankruptcy purpose exists for allowing Tort Claimants to recover distributions from the Trust *and* litigate their claims against the Archdiocese or Reorganized Debtor. [*Id.* at 41–42.]

The Plan provisions allowing litigation on the Tort Claims were proposed for the legitimate purpose of securing insurance coverage from the Non-Settling Insurers for the Tort Claims. The insurers contend that it is a necessary predicate to indemnity coverage that the Tort Claimants obtain judgments or secure settlements with the consent of the Non-Settling Insurers.[9] In order for the Tort Claimants to secure such judgments or settlements with consent, it will be necessary for the Tort Claimants to litigate their claims against the Archdiocese or Reorganized Debtor. The Committee's Plan effectively addresses this issue by requiring that the liability of the Archdiocese or Reorganized Debtor, and the amounts that they owe on any Class 6 Claim:

> [S]hall be determined by: (i) the amount of any court judgment obtained by the Class 6 claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Archdiocese, or the Reorganized Debtor to the Non-Settling Insurer under the respective Insurance Policy or applicable law.

---

[9]      Nearly all of the objecting insurers argued this position in their briefs. [*See* ECF 1121, at 35 ("Under applicable state law and the Certain Insurers' policies, there is no insurance coverage for 'claims'; coverage exists to indemnify only against judgments and reasonable settlements with the insurers' consent, and only after a final judgment finding such coverage exists"); ECF 1110, at 9 ("Some or all of the Insurance Policies contain conditions to the insurers' liability, including the establishment of the Archdiocese's liability by either a settlement consented to by the insurers or an actual trial.").]

[ECF 890, § 6.3(b).][10] In addition, the Committee's Plan does not leave the Archdiocese without any means to pay such judgments; instead, it provides that the Trust will advance funding for judgments if Non-Settling Insurers refuse to defend or indemnify the Archdiocese. [ECF 1129, § 6.1(a); 6.2(a); 6.2(i)(4).]

Further, the mechanism allowing Tort Claimants to recover distributions from the Trust and also litigate their claims provides incentive for Tort Claimants to become Litigation Claimants, thereby potentially increasing the amount of Trust Assets available to distribute to all Qualified Claimants through judgments or settlements with the Archdiocese, Reorganized Debtor, and Non-Settling Insurers. Plan provisions designed to maximize creditor recoveries serve a legitimate bankruptcy purpose. *See Toibb v. Radloff*, 501 U.S. 157, 163–164 (1991) (recognizing "maximizing the value of the bankruptcy estate" as a purpose of the Code); *Douglas v. Stamco*, 363 Fed. Appx. 100, 103 (2d Cir. 2010) (noting that the purpose of the Code is to "maximize the value of the assets and thereby maximize potential recovery to the creditors"). As previously noted, the Committee's Plan will reduce any judgment awarded to a Litigation Claimant by the amount the claimant already received from the Trust, so there will be no double recovery for Litigation Claimants. [ECF 890, § 6.2(g).]

Throughout this bankruptcy, the Committee has worked to maximize the return for creditors. The Committee proposed its Plan in continuation of that effort and in accordance with the purpose and requirements of the Bankruptcy Code. None of the Committee's actions deviated from its good faith efforts. The objectors fail to identify any specific provision or language in the

---

[10]    The Archdiocese's Plan also allows the Tort Claimants to sue the Archdiocese and other Protected Parties on the Tort Claims post-confirmation. [ECF 887, § 5.2(b)(2).] The only difference between the two plans in this regard is that the Archdiocese's Plan insulates the Archdiocese from any liability to pay on the judgments, instead purporting to make the Non-Settling Insurers solely liable for paying the judgments, whereas the Committee's Plan ensures that the Archdiocese remains fully liable on the judgments to avoid any potential argument by the Non-Settling Insurers that a discharge of the Debtor voids coverage.

Committee's Plan that evidences a lack of good faith, and the Committee therefore respectfully asks the Court to overrule all objections asserted on such grounds.

### C.    The Committee's Plan administers only the Debtor's property and rights[11]

The Debtor, along with other objecting parties, argues that the Committee's Plan requires the appropriation of property owned by non-debtor parties. [*See* ECF 1118, at 5, 9.] Nothing in the Committee's Plan requires the valuation or turnover of anything outside of the Debtor's bankruptcy estate. To avoid confusion, the Committee has modified its plan to clarify this point even further: "Under this Plan . . . the Bankruptcy Court will determine the liquidation value of the Debtor's interest in those assets identified on Exhibit C to this Plan." [ECF 1129, §5.2(b).] The Committee also provides the following response to the Debtor's objection:

1.    *The Committee's Plan requires only the transfer of the Debtor's interests in the AMBP and the GIF[12]*

The Committee's Plan only includes the Debtor's property interest in the AMBP and GIF funds. To the extent the Court determines that AMBP and GIF funds are held in trust for other Catholic entities, or constitute the property of a separate entity, such funds are not included in the Committee's Plan.[13]

2.    *The Committee's Plan requires only the transfer of excess workers' compensation deposit funds*

The Debtor argues that the Committee's Plan requires appropriation of a workers' compensation deposit that the Debtor does not have a right to retrieve. [ECF 1118, at 31–32.] The Debtor's assertion is inaccurate. The Committee's Modified Plan clarifies this issue by

---

[11]    This section responds to the Debtor's objections 2, 6, 9, and 17.
[12]    This section responds to the Debtor's objection 9.
[13]    The Committee and the AMBP entered into a stipulation clarifying this point with regards to AMBP funds. [ECF 1059.]

limiting the use of the deposit held by the Minnesota Department of Commerce to the portion constituting the Debtor's property. [ECF 1129, § 5.2(f).]

As detailed in the objection filed by the Minnesota Department of Commerce, as a self-insured entity the Debtor currently maintains a cash deposit of approximately $3.9 million to cover 110% of estimated future workers' compensation liabilities pursuant to Minn. Stat. § 79A.04, subd. 2. [ECF 1108, at 1.] Forms of security other than cash are allowed under the statute. *Id.* And, as acknowledged by the Department of Commerce: "The Debtor does have a right to the excess funds remaining in the custodial account, and this excess could be made available to pay the Debtor's creditors." *Id.* at 3. For almost two years, during the pendency of this case and while repeatedly expressing concerns over its access to cash, the Debtor elected not to retrieve $254,920 from its deposit despite the fact that it had permission to do so from the Department of Commerce. [*Id.* at 2.] Further, although the Debtor has also elected not to challenge the required amount of the deposit, such challenges can be raised. The Committee thus believes that the deposit amount may be too high and that, as a result, excess funds available to the Debtor may exceed $254,920.

The Committee hopes and expects to investigate the nature and extent of the Debtor's interest in the $3.9 million deposit through discovery. In any event, as the Committee's Plan makes clear, the Committee is not seeking to appropriate any portion of the fund to which the Debtor is not entitled. The Committee's Plan seeks access only to the Debtor's interest in the deposited funds (or the value thereof) for purposes of funding the Trust.

3. *The Committee's Plan transfers only the Debtor's rights to collect parish assessments to the extent such rights are* <u>*civilly*</u> *enforceable*[14]

Contrary to the Debtor's arguments, the Committee is not attempting to have Trust assume rights of collection that are based on religious doctrine. The Debtor and its parishes both argue that, despite the parishes' legal status as distinct entities and a recognized course of dealing with the Debtor that spans decades, the Debtor does not have a civilly-enforceable right to collect assessments. [ECF 1118, at 7, 40; ECF 1113, at 6–8.] Because relevant facts and information have not been disclosed to the Committee, it cannot assess with any certainty (let alone appropriate diligence) the conclusory assertion that parishes do not have any civilly-enforceable obligation to make assessment payments. *In re Catholic Bishop of Spokane*, 329 B.R. 304, 325 (Bankr. E.D. Wash. 2005) ("Fair and equitable treatment of all creditors requires application of civil law not only to determine their rights to recover from assets of the debtor, but to first define the interest of the debtor in those assets."). The mere assertion that parishes have no civil obligation to pay assessments does not justify the effective abandonment of a potentially valuable estate asset and it does not provide a basis to deem the Committee's Plan unconfirmable as a matter of law—particularly when the Committee's Plan expressly seeks the transfer of collection rights only to the extent they have a basis in civil law.

4. *Only legally viable avoidance actions will be transferred to the Trust*[15]

The Debtor and other objecting parties also argue that the Committee's Plan seeks to transfer non-existent, or legally inviable causes of action into the Trust. [ECF 1118, at 26–28; ECF 1113, at 23.] The Committee has no interest in transferring unenforceable or valueless rights to the Trust. To the extent, however, there are claims for which the statute of limitations has been tolled, or causes of action that remain viable for any reason, those claims should be

---

[14]     This section responds to the Debtor's objections 2 and 17.
[15]     This section responds to the Debtor's objection 6.

transferred under the Committee's Plan and the Trust should be allowed to assess their legal

viability independently. To address any ambiguity, the Committee has clarified the language of

its Plan with respect to this issue by adding the qualifying term "To the extent they exist" to the

transfer of avoidance action claims to the Trust. [ECF 1129, at § 5.2(e)(3).]

### D.    Bankruptcy courts have the authority to value estate assets and routinely do so in connection with confirmation proceedings[16]

The Debtor asserts that the "Bankruptcy Code does not authorize or require a bankruptcy

court to 'value' all of the assets of a debtor for the purposes of determining the amount to be

contributed by the debtor under a proposed reorganization plan" and that the Code provides no

mechanism for such a process. [ECF 1118, at 5.] Valuation hearings are a routine component of

Chapter 11 confirmation proceedings. *See, e.g.*, *In re Bush Indus., Inc.*, 315 B.R. 292, 298

(Bankr. W.D.N.Y. 2004); *In re Park Forest Dev. Corp.*, 197 B.R. 388, 396 (Bankr. N.D. Ga.

1996) ("Although valuation hearings can be tedious, the valuation of assets is often necessary to

define and protect the rights of the parties and is 'an integral part of the confirmation process

under Chapter 11.'") (citations omitted).

In fact, an accurate valuation is necessary for a plan proponent to prove compliance with

several Code requirements. *See, e.g.*, 11 U.S.C. § 1129(a)(7)(A)(ii) ("[Each non-accepting

creditor] will receive or retain under the plan . . . property of a value, as of the effective date of

the plan, that is not less than the amount that such holder would so receive or retain if the debtor

were liquidated . . . ."); 11 U.S.C. § 1129(b). To address the concerns raised by the Debtor,

however, the Committee's Modified Plan clarifies the valuation process as follows: "the

Bankruptcy Court will determine the liquidation value of the Debtor's interest in those assets

---

[16]    This section responds to the Debtor's objection 1.

identified on Exhibit C to this Plan at a valuation hearing prior to confirmation." [ECF 1129, § 5.2(b).]

The Debtor makes broad, unsupported assertions regarding the procedures by which the Code "contemplates" confirming plans of reorganization. [ECF 1118, at 6.] The sources of authority cited by the Debtor for its exposition do not actually discuss the Chapter 11 plan confirmation p or address a plan proponent's discretion to allow bankruptcy courts to value estate assets. Rather, in each case cited by the Debtor, the bankruptcy court simply disagreed with certain material terms of the proposed plan—primarily the interest rates and length of relevant loans—and required plan proponents to modify and resubmit proposed plans once they included the reviewing court's recommended provisions. *Baltimore Mergency Servs., II, LLC*, 334 B.R. 164, 171 (Bankr. D. Md. 2005); *In re Lockard*, 234 B.R. 484, 496 (Bankr. W.D. Mo. 1999); *In re Kain*, 86 B.R. 506, 520 (Bankr. W.D. Mich. 1988).

Section 1129(b)(6) clearly states that a plan may "include any other appropriate provision not inconsistent with the applicable provision of this title." 11 U.S.C. § 1129(b)(6). Nothing in the Code precludes the bankruptcy court from acting as the appropriate arbiter of the estate's value, and no objecting party has cited to a Code provisions inconsistent with the Court's ability and authority to determine the value of the Debtor's assets.

E.   **The Committee's Plan provides adequate means for implementation[17]**

As clarified in its modified version, the Committee's Plan provides an adequate means of implementation:

"Under this Plan, and in accordance with Section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court will determine the liquidation value of the Debtor's interest in those assets identified on Exhibit C to this Plan at a valuation hearing prior to confirmation. The Debtor will then transfer its assets or an amount equal to the liquidation value of those assets into the Trust. The Debtor may fund the

---

[17]   This section responds to the Debtor's objections 2 and 3.

Plan as it deems appropriate. For the avoidance of doubt, the Debtor's assets need not be sold or otherwise liquidated through this Plan. Instead those assets may be revested into the Reorganized Debtor (i.e., title to the assets can be maintained by the reorganized Archdiocese after the Effective Date).

[ECF 1129, § 5.2(b).]

Although the Committee relies on the liquidation of the Debtor's assets as a default means for implementation of its Plan, the Committee does not *mandate* any specific funding mechanism.[18] Instead the Committee's Plan leaves the Debtor with choices regarding how it would prefer to fund its objective obligations under the Code. The Debtor raises concerns over the fact that the Committee's Plan relies on obtaining the liquidation value of the Debtor's assets:

> The UCC Plan requires that the "value" of all Archdiocese assets be turned over to the Trust, either at confirmation or three years thereafter (with interest). The Archdiocese believes that this provision would, by definition, render the Archdiocese insolvent as of the date of confirmation.

[ECF 1118, at 7.][19]

First, the Debtor's argument is based on factual assumptions of value and insolvency that the Committee is entitled to investigate and challenge. Thus it is inappropriate to treat this objection as a purely "legal" objection at this stage of the proceedings. Second, if, as the Debtor contends, it cannot provide survivors of clergy sexual abuse with the liquidation value of its assets, it cannot reorganize under either plan before the Court. To be confirmed, a Chapter 11 plan must satisfy the requirements of 11 U.S.C. § 1129. Pursuant to 11 U.S.C. § 1129(a)(7), before any Chapter 11 plan can be confirmed, such plan must provide for the following:

---

[18]     The Committee's Plan does not "mandate" the Debtor to raise assessments, fundraise, or obtain a loan. Therefore, the objections raised on those bases should be overruled for misinterpreting the Committee's Plan's provision. [*See, e.g.,* ECF 1111, at 5; ECF 1118, at 10; ECF 1121, at 19.]

[19]     The Debtor supports its argument that the Committee's means of implementation is inadequate with cites to completely irrelevant legal authority. *See In re Am. Capital Equip., LLC.*, 688 F.3d 145, 156 (3d Cir. 2012) (ruling that the means of implementation was too speculative when the funding for the entire plan hinged on a successful outcome for the Debtor in pending litigation); *In re Valley Park Grp., Inc.*, 96 B.R. 16, 23 (Bankr. N.D.N.Y. 1989) (denying confirmation when the plan relied on overly optimistic sales projections with no basis to support analysis). Unlike those cases, here the Committee is funding its Plan with the assets in the Debtor's possession and valued by the Court at the time of confirmation.

(7)     With respect to each impaired class of claims or interests –

    (A)     each holder of a claim or interest of such class –

        (i)     has accepted the plan; or

        (ii)     will receive or retain under the plan on account of such claim or interests property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date…

By arguing that it cannot survive a transfer of the liquidation value of its assets into the Trust, even if provided a three-year window to do so, the Debtor is acknowledging that it cannot satisfy the express requirements of 11 U.S.C. § 1129(a)(7)(A)(ii) with respect to its own plan. Members of Class 6 collectively hold more than a billion dollars in claims, Class 6 is impaired, and Class 6 overwhelmingly rejected the Debtor's plan. As a result, under 11 U.S.C. § 1129(a)(7)(A)(ii), the Debtor is required to provide Class 6 with the same collective payment it would receive in a hypothetical Chapter 7 proceeding. Because the dollar value of Class 6 claims greatly exceeds the value of the Debtor's reported assets, Class 6 claimants would receive a pro rata share of the liquidation value of the Debtor's assets in a Chapter 7 proceeding. Accordingly, if the Debtor cannot satisfy the Committee's proposed means for implementation, it cannot satisfy Code-imposed funding obligations relating to its own plan either.

The Committee's proposed means for implementation does nothing more than impose the same obligation already imposed on the Debtor by 11 U.S.C. § 1129(a)(7). In fact, the Plan also provides the Debtor with three years' time to meet this obligation, and even allows the Debtor latitude to choose any reasonable alternative means for implementation that it would prefer. Should the Debtor decline the option to seek an alternative source of funding, then liquidation of the Debtor's assets will fund the Committee's Plan, leaving nothing speculative about the

Committee's means of implementation. The Committee's Plan provides an adequate means for implementation.

**F.   The Committee's Plan does not mandate liquidation of the Debtor's assets and, even if it did, it would be legally viable[20]**

The Debtor and other objectors argue that the Committee's means for implementation constitutes an improper *de facto* liquidation. [ECF 1111, at 6; ECF 1118, at 21–26.] The Debtor further asserts that the Committee is barred from proposing such a means for implementation either (i) pursuant to statutory provisions shielding non-profit entities from involuntary bankruptcies or conversions to administration under Chapter 7 of the Code, or (ii) because the Committee's means for implementation would infringe unduly on the Debtor's religious freedom rights. [ECF 1118, at 21–26.]

1.   *The Committee's Plan does not mandate the liquidation of estate assets*

The Debtor argues that it "cannot be forced to submit the value of all assets to a Trust because doing so would completely curtail the Archdiocese's ability to fund any of its core missions." [ECF 1118, at 23.] The Debtor's arguments appear designed to complicate a very simple issue and, ultimately, to sidestep an unavoidable requirement of the Code. As detailed above, the Committee's Plan does nothing more than hold the Debtor responsible for obligations otherwise imposed by the Code through Section 1129(a)(7). The Committee's Plan cannot be deemed unconfirmable as a matter of law for containing an *optional* provision for the means used by the Debtor to fulfill its statutory requirement.

2.   *The Committee's Plan would be legally viable even if it did mandate the liquidation of the Debtor's assets*

The Debtor argues that, because it is a non-profit, "this reorganization cannot be converted into a liquidation." [ECF 1118, at 19.] The Debtor's argument conflates two distinct

---

[20]      This section responds to the Debtor's objection 4.

concepts. Section 1112 imposes limitations on the conversion of a case from administration under Chapter 11 to administration under Chapter 7. 11 U.S.C. § 1112(a). Nothing in the Code, however, prevents the filing of a Chapter 11 liquidation plan in the voluntary bankruptcy of a non-profit entity. In fact, the Eighth Circuit has repeatedly allowed Chapter 11 liquidation plans against entities otherwise protected by Sections 303(a) and 1112(c). *See, e.g., Matter of Button Hook Cattle Co., Inc.*, 747 F.2d 483, 485 (8th Cir. 1984); *Hanson v. First Bank of S.D.,, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987), *overruled in part on other grounds, Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 387 (1993); *In re Tranel*, 940 F.2d 1168, 1171 (8th Cir. 1991).

The Debtor fails to disclose or address relevant precedent in its memorandum, and its attempt to distinguish the Eighth Circuit's *Button Hook* decision is ineffective. The debtors in *Button Hook* made identical arguments to those made by the Debtor here, relying on Sections 303(a) and 1112(c) to exempt them from the Chapter 11 liquidation plan proposed by their creditors. *Button Hook*, 747 F.2d at 485; *see also Matter of Jasik*, 727 F.3d 1379, 1381 (5th Cir. 1984). Notwithstanding such arguments, the Eighth Circuit concluded that "farmers are treated the same as other chapter 11 debtors in determining who can file a reorganization plan . . . including a liquidation plan."[21] *Button Hook*, 747 F.2d at 486. The Eighth Circuit specifically noted that nothing in the text or legislative history of the Code indicates a Congressional intent to the contrary. *Id.* at 485.

The Debtor argues that a different outcome is required in this case because, unlike the *Button Hook* debtor, it filed its plan within the exclusivity period. [ECF 1118, at 23.] The Debtor's only authority for this proposition is a case that was overturned by *Button Hook. See In*

---

[21]     The protection provided to non-profit entities under Sections 303(a) and 1112(c) of the Code is identical to the protection provided to farmers. 11 U.S.C. §§ 303(a), 1112(c).

*re Kehn Ranch, Inc.,* 41 B.R. 832, 833 (Bankr. D.S.D. 1984) (bankruptcy court decision issued

prior to *Button Hook*). Additionally, the Eighth Circuit has subsequently clarified that, if the

conditions of Section 1121(c) are not met, then the bankruptcy court should consider both the

debtor's plan *and* the creditor's liquidation plan. *Tranel*, 940 F.2d at 1171. In this case, there is

no argument that the Debtor met the requirement of filing a plan "*that has been accepted*" within

the exclusivity period. 11 U.S.C. § 1121(c)(3). There is thus no barrier to the Committee from

proposing its own plan of reorganization, including a liquidation plan. A Ninth Circuit B.A.P.

summarized these circumstances as follow:

> A farmer-debtor is not immune from the burdens imposed by filing bankruptcy.
> He may not comply only with those provisions which aid him but evade those
> which do not. Upon becoming a debtor the farmer accepts the benefits subject to
> the risks. To hold otherwise would limit a creditor's remedy to a motion to
> dismiss the bankruptcy. Creditors would then resort to state law remedies to
> satisfy their claims.

*In re Jorgensen*, 66 B.R. 104, 107 (B.A.P. 9th Cir. 1986). The Debtor argues that it should

receive special treatment without any statutory or judicial support for such treatment. The Code

and binding Eighth Circuit precedent apply Section 1121(c) to *all* debtors. The Debtor and other

objectors cannot identify a single case in which a non-profit has been exempted from Section

1121(c). This is unsurprising because such an exemption would undermine the purpose of the

Code, as explained by the *Jorgensen* court. The Court should reject the Debtor's baseless

argument that creditors are prohibited, as a matter of law, from filing a liquidation plan in a non-

profit Chapter 11 case.

> 3.    *Neither the First Amendment nor RFRA prevent the filing of a Chapter 11
>       liquidation plan in the voluntary bankruptcy of a religious entity*

In asserting that the Committee's Plan violates its religious freedom rights, the Debtor

again makes broad, unsupported statements. A disciplined review of appropriate analyses under

the First Amendment and The Religious Freedom Restoration Act ("RFRA") demonstrates that the Committee's Plan does not violate either protective scheme.

a.    The Committee's Plan does not violate the First Amendment

The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. 1, cl. 1. At its heart, the Establishment Clause prohibits laws requiring a person to accept a particular belief system or form of worship. *In re Roman Catholic Archbishop of Portland in Or.*, 335 B.R. 842, 851 (Bankr. D. Or. 2005). The longstanding Establishment Clause test considers whether the challenged statute: (1) has a secular purpose; (2) has a primary effect which neither advances nor inhibits religion; and (3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602 (1971). The Free Exercise Clause states that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. 1, cl. 1. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Employment Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotations and citations omitted).

The Committee's Plan, and the means of implementation it contains, do nothing more than hold the Debtor to its obligations under valid and neutral laws of general applicability. Section 1121 authorizes creditors to file a competing plan under circumstances like those present in this case and, as detailed in the preceding section, the Eighth Circuit has repeatedly interpreted Section 1121 as allowing creditors to file Chapter 11 liquidation plans—even against entities otherwise protected by Sections 303(a) and 1112(c). Section 1129(a)(7) requires all Chapter 11 debtors to pay non-accepting classes what they would have received in a hypothetical Chapter 7

proceeding. The Committee's means of implementation does nothing more than import and hold the Debtor accountable for the obligation codified by Congress in Section 1129(a)(7).

Sections 1121(c) and 1129(a)(7) of the Code constitute valid and neutral laws of general applicability because they apply generally to all Chapter 11 debtors with equal force. *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015) (provisions of the Bankruptcy Code are generally applicable provisions of law). Similarly, Sections 1121(c) and 1129(a)(7) do not (i) refer to any religious practice without a secular meaning discernable from the language or context; (ii) prohibit the practice of any religion; or (iii) single out any religious practice. *Id.* at 743–44 (citations omitted). Sections 1121(c) and 1129(a)(7) are thus neutral provisions of law.

Because Sections 1121(c) and 1129(a)(7) are neutral and generally applicable, they can be applied to religious practices even if not supported by a compelling governmental interest. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014). The Supreme Court has stated that:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

*United States v. Lee*, 455 U.S. 252, 261 (1982).

The bankruptcy court in *Spokane* applied this concept to a diocesan bankruptcy:

> It is not a burden on a religious organization which voluntarily seeks the protection of the bankruptcy laws to require it to treat its creditors in the same manner as any other debtor. It is not a burden on a religious organization to assess its rights vis-à-vis creditors on the same basis as any other debtor.

*In re Catholic Bishop of Spokane*, 329 B.R. 304, 325 (Bankr. E.D. Wash. 2005). The Debtor

chose to file for Chapter 11 protection and to subject itself to the requirements of the Bankruptcy

Code. The Debtor also allowed the exclusivity period to expire without an accepted plan, and,

thus, voluntarily opened itself to the possibility of a creditor plan. The Debtor is also subject to

the conditions of Section 1129(a)(7), which requires the Debtor to either (i) obtain creditor

acceptance of its plan (which the Debtor did not), or (ii) pay non-accepting creditors at least what

they would have received in a hypothetical Chapter 7. The Code applies equally to this Debtor

and it must treat its creditors in the same manner as any other debtor. Stated another way,

requiring this Debtor to comply equally with a statutory scheme of which it availed itself

voluntarily does not somehow create an undue burden simply because this Debtor happens to be

a religious organization.

Because the actual legal standard does not serve its purposes, the Debtor attempts to

execute a sleight of hand by conflating various First Amendment standards and citing to case law

that has nothing to do with the circumstances of this case. [ECF 1118, at 24–25.] Two cases cited

by the Debtor address the government's ability to interfere in internal church disputes. *Kedroff v.

St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)

(regarding an internal church dispute over the ownership of a cathedral); *Kreshik v. Saint

Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (same). A third case cited by the Debtor

overturned a city ordinance directly regulating religious practices. *Church of the Lukumi Babalu

Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (overturning city ordinance that attempted to

ban ceremonial animal sacrifices). The final case cited by the Debtor analyzes issues relating to

the Free Speech Clause of the First Amendment, and has nothing to do with the Establishment or

Free Exercise Clauses. *Thomas v. Collins*, 323 U.S. 516 (1945) (addressing the constitutionality of a law requiring labor organizers to secure permission to solicit members).

The Committee's Plan does not implicate issues relating to competing property interests within a religion, the government's direct regulation of religious practices, or free speech. The Committee Plan merely seeks to hold the Debtor to standards that apply equally to all other Chapter 11 debtors under the Bankruptcy Code—a statutory scheme that the Debtor *voluntarily* availed itself of by filing a Chapter 11 petition.

Circumstances present in this case do not implicate the protections of either the Free Exercise or Establishment Clause and the Debtor makes no meaningful attempt to explain its contention to the contrary. In fact, granting this Debtor immunity from requirements imposed equally on all Chapter 11 debtors under the Bankruptcy Code would itself raise grave Establishment Clause concerns. *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 18 (1947) (stating that "state power is no more to be used so as to handicap religions, than it is to favor them"); *Malicki v. Doe*, 814 So. 2d 347, 354 (Fla. 2002) (holding that religious institutions are subject to common law civil liability, stating "to hold otherwise and immunize the church defendants from suit could risk placing religious institutions in a preferred position over secular institutions, a concept both foreign and hostile to the First Amendment").

The Committee is simply exercising its statutory right to seek confirmation of a properly filed creditor plan—a statutory right that applies equally in all Chapter 11 cases regardless of a debtor's identity. The Committee's means of implementation falls within its statutory rights under Section 1121 and it imposes no requirements beyond those codified by Congress in Section 1129(a)(7). The Court should overrule objections that the Committee's means of implementation violates the First Amendment.

b.    The Committee's Plan does not violate RFRA

RFRA[22] states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). Subsection (b) provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at 2000bb-1(b).

i.    A government party is required to invoke RFRA

RFRA does not apply to the Committee's Plan because RFRA applies only in lawsuits to which the government is a party. The plain language of RFRA makes clear that the statute requires the government to be a party to any enforcement lawsuit. The statute creates a burden shifting test, allowing the government to substantially burden religious practice if it establishes a compelling interest and use of the least restrictive means. 42 U.S.C. § 2000bb-1(b) ("*Government* may substantially burden a person's exercise of religion only if *it* establishes. . .") (emphasis added). The statute's language clearly requires the government to participate in any relevant litigation to fulfill its burden under the established test.

Further, RFRA's judicial relief section states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government.*" 42 U.S.C. § 2000bb–1(c) (emphasis added).

---

[22]    RFRA is unconstitutional for a number of reasons including: 1) it violates the Establishment Clause; 2) it violates Due Process; 3) it violates separation of powers; 4) it violates Article 5 of the 14th Amendment; and 5) it isn't supported under any of Congress' powers. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997) (holding that RFRA violated Article 5's enforcement power as applied to state laws). *But see Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2772 (2014) (applying RFRA to federal law without determining whether it is a constitutional law. The *Hobby Lobby* parties did not raise the constitutionality of RFRA in their briefs).

RFRA's plain language has led nearly all reviewing courts to conclude that the statute applies only to government actors. *See, e.g.*, *Listecki*, 780 F.3d at 737 ("The plain language is clear that RFRA only applies when the government is a party."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) (relying on the language of RFRA to dismiss a plaintiff's RFRA claim against a private actor).[23]

RFRA's legislative history likewise makes clear that Congress intended the statute to apply only to governmental parties. Every example of a RFRA lawsuit included in the relevant Senate and House Reports involves either an actual or a hypothetical action in which the government is a party. *See* S.Rep. No. 103–111 [1993 U.S.C.C.A.N. 1892] (1993); H.R. Rep. 103–88 (1993). Similarly, RFRA's Report from the Committee on the Judiciary references the fact that the United States was founded by individuals seeking to practice religion "free from *Government* interference" and freedom from "*Government* actions singling out religious activities for special burdens." S. Rep. No. 103-111, at 4 (1993), 1993 U.S.C.C.A.N. 1892, 1894 (emphasis added). And in describing RFRA's purpose, the Report refers to "*government* actions," "only *governmental* actions," and "every *government* action." *Id.* at 8–9 (emphasis

---

[23]    The only notable exception to this line of precedent is *Hankins v. Lyght,* 441 F.3d 96 (2d Cir. 2006) (Sotomayor, J., dissenting). In *Hankins*, the Second Circuit held that RFRA applied to a private actor's enforcement action under the Age Discrimination in Employment Act of 1967 despite a strong dissent from then-Judge Sotomayor. *Id.* at 114–15 ("Where, as here, the government is not a party, it cannot 'go [ ] forward' with any evidence. In my view, this provision strongly suggests that Congress did not intend RFRA to apply in suits between private parties."). The Second Circuit has since retreated from its holding in *Hankins*. *Rweyemamu v. Cote,* 520 F.3d 198, 203–04  n. 2 (2d Cir. 2008) ("[W]e think the text of RFRA is plain . . . in that it requires *the government* to demonstrate that application of a burden to a person is justified by a compelling governmental interest.") (emphasis in original) (internal citation omitted). Although it appears in dicta, the Second Circuit's open departure from the decision in *Rweyemamu* has raised questions regarding the strength and legitimacy of the *Hankins* decision overall. *See*, *e.g.*, *McGill*, 617 F.3d at 411; *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 484 (Bankr. S.D.N.Y. 2015) (citing the *Rweyemamu* decision and holding that the plaintiff was not a "governmental or quasi-governmental actor, and hence, the RFRA does not appear to apply.").

added). Like the plain language of RFRA, the legislative history shows that Congress intended RFRA to extend only to governmental actors.

ii.   The Committee is not a governmental actor

RFRA limits the term "government" to include only "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb–2(1). The Committee does not fall under any part of this definition. *Listecki*, 780 F.3d at 737-41. Similarly, committees of unsecured creditors are not government actors under the Bankruptcy Code. Creditors' committees are not included in the Bankruptcy Code's definition of a "governmental unit." 11 U.S.C. § 101(27). Further, only "persons" may serve on creditors' committees and the Bankruptcy Code specifically excludes "governmental units" from its definition of "person," subject to a narrow exception for certain governmental entities in instances where they are acting in specific creditor roles. 11 U.S.C. § 1102; 11 U.S.C. § 101(41). The fact that committees of creditors are not deemed to be governmental entities or governmental actors under RFRA and the Bankruptcy Code only makes sense. Among other things:

- Most creditors' committees (like the one appointed in this case) are entirely comprised of private, individual creditors who became creditors as a result of private interactions with the debtor.

- Committees operate autonomously and are not subject to participation or oversight by any governmental entity. They elect their own chairperson(s), enact their own bylaws, enjoy an attorney-client relationship with the attorneys they employ and, just as any private party in any legal proceeding, they make decisions regarding strategy and actions to be taken in the case without governmental input.

- Committee expenses—including the fees and costs relating to all professionals that they employ—are paid by the bankruptcy estate and not by any governmental entity.

- Creditors' committees represent creditor constituencies and owe duties only to their constituencies. *See, e.g.*, *Smart World Techs., LLC v. Juno Online Servs.*, 423 F.3d 166, 175 n. 12 (2d Cir. 2005) ("[C]reditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate.").

- Creditors' committees are not beholden to any governmental actor. *Listecki*, 780 F.3d at 739.

The Committee is not a governmental party.

### iii.  The objectors have not met the burden imposed on them by RFRA

The Debtor has an affirmative burden under RFRA and it does not even address (let alone satisfy) that burden in its objection. As a result, even if the relevant facts and circumstances of this case invoked RFRA in the first instance (and they do not), the Court would have to disregard the Debtor's RFRA-based arguments until such time as the Debtor satisfied its threshold burden.

The Debtor, as the only objector with standing on this issue, has an affirmative burden to establish that the relief sought by the Committee will impose a "substantial burden" on one or more sincerely-held beliefs that constitute a central tenet of the Debtor's religious practice. *In re Young*, 82 F.3d 1407, 1418 (8th Cir. 1996); *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996) ("Under the RFRA, a plaintiff must establish, by a preponderance of the evidence, three threshold requirements to state a prima facie free exercise claim.") (citing *Thiry v. Carlson*, 78 F.3d 1491, 1494 (10th Cir.1996)). It is not enough that the government action in question would substantially burden a "philosophy" or a "way of life." *Young*, 82 F.3d at 1418. (citing *Werner v. McCotter*, 49 F.3d 1476, 1480 n. 1 (10th Cir. 1995)). The Eighth Circuit Court of Appeals has defined RFRA's "substantial burden" as follows:

> In order to be considered a 'substantial' burden, the governmental action must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'

*Young*, 82 F.3d at 1418 (quoting *Werner*, 49 F.3d at 1480).

The Debtor fails to identify *any* substantial burden on religious practice that would be imposed by the Committee's Plan. Instead, the Debtor offers only conclusory statements with no

reference to any specific burden. [ECF 1118, at 25.] In an earlier section the Debtor vaguely mentions an impact on "Catholics' and school children's ability to worship and study," but—especially considering it has repeatedly argued that the Debtor is separate and distinct from all individual parishes and schools—it is unclear how the Committee's Plan would have such an impact. [ECF 1118, at 24.]

The Debtor's assertion conspicuously sidesteps the threshold "substantial burden" question that is critical to any RFRA analysis and falls dramatically short of satisfying its burden under RFRA. The other parties asserting objections based on RFRA (each of whom lack standing) have likewise failed to identify any substantial burden on a central, sincerely-held religious belief that would result from the relief requested in the Committee's Plan.[24]

> iv. Protecting the rights of hundreds of sexually-abused children constitutes a compelling governmental interest

Even if RFRA applied, and the Debtor had met its affirmative burden, the Committee's Plan would be proper because it furthers one or more compelling governmental interests. The Committee's constituency is composed of more than 440 survivors of sexual abuse. Most of the survivors were abused when they were children. Ensuring the just and transparent administration of such survivors' claims through the proposed Plan will not only serve to protect creditor interests and uphold the integrity of the bankruptcy system, it will directly serve the interests of public policy and public safety.

It is difficult to imagine a legal proceeding that could more directly or profoundly implicate the well-established public policy of deterring future tortious conduct and, in turn, enhancing public safety (and the physical and psychological safety of children in particular). If the Committee's Plan is not allowed to proceed, the Debtor will have created a template for

---

[24]    The issue of substantial burden also requires inquiry into what the practices and beliefs are that are allegedly being burdened. This inquiry requires discovery.

religious organizations to commit torts with impunity by escaping liability through the bankruptcy process and using "religious freedom" to avoid the obligations that Congress uniformly imposed on debtors as a balance to the dramatic protections that bankruptcy affords. The Debtor should not be permitted to invoke bankruptcy protections without satisfying its corresponding duties to its largest and most vulnerable creditor class.

4.    *A creditor plan is the least restrictive means of protecting the compelling governmental interests at stake*

Under Sections 303(a) and 1112(c), a non-profit entity cannot be forced into bankruptcy involuntarily and its case cannot be converted to a Chapter 7. 11 U.S.C. §§ 303(a), 1112(c). Further, under Section 1121(c), a competing plan of reorganization cannot be filed until a year and half has passed after a debtor's initiates its Chapter 11 proceedings with no accepted plan. 11 U.S.C. § 1121(c). The ability of creditors to file a plan on their terms forces debtors to work with creditors to confirm a plan during the exclusivity period or face the risk of a creditor plan. The Debtor is arguing that, in addition to the Code's existing protections, it cannot be forced to take *any* actions over its objections, such as liquidating assets. The Debtor's theory leaves only two possible outcomes for a religious entity that voluntarily seeks bankruptcy relief: (i) all parties accept the terms of the Debtor's proposed plan with no leverage to force negotiation or compromise, or (ii) the case must be dismissed.

The Committee's Plan and means for implementation do nothing more than hold the Debtor to standards uniformly applied to Chapter 11 debtors under the Code. The Committee's Plan does not seek to regulate religious activity, interpose third party control or influence over church governance, or substantially burden any person's exercise of religion—it simply seeks fair payment for the Debtor's creditors in a manner consistent with Section 1129(a)(7). And by allowing the Debtor three years to fund Trust payments, and permitting the Debtor to fund

payments in any alternative manner it may choose, the Committee has created the least restrictive means possible for protecting the critical and compelling interests at stake in this case. Accordingly, even if RFRA applied in this case, the Committee were a government actor, and the Debtor had satisfied its threshold burden, the Committee's Plan would still be confirmable under RFRA's express terms.

### G. The Committee did not fail to comply with applicable non-bankruptcy law concerning religious corporations[25]

The Committee's Modified Plan clarifies that the Debtor maintains control over all decisions related to its employees and leadership:

- The Debtor *may* ~~shall~~ honor its post-Effective Date obligations with respect to inactive priests in accordance with the Archdiocese's prior practices. [ECF 1129, § 4.15.]

- Deletion of Class 16. [*Id.*, § 4.]

- In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on <u>Exhibit J</u>; provided, however, that the Archdiocese may unilaterally change Exhibit J by providing written notice to counsel for the Committee at least ten (10) days prior to the confirmation hearing, and the Committee shall submit a supplement to this Plan at least seven (7) days prior to the confirmation hearing evidencing the change to Exhibit J. [*Id.,* § 15.3.]

Objections asserting that the Committee's Plan improperly interferes with the Debtor's rights as a religious entity to choose its employees are thus addressed and moot.

### H. Acceptances of the Committee's Plan were not obtained through improper solicitation[26]

As a threshold matter, the Debtor lacks standing to raise issues related to solicitation, and its eighteenth objection—which argues that the votes cast by survivors were obtained through improper solicitation—should be disregarded. *See infra* Section VIII.C.1. Further, the Debtor's

---

[25]    This section responds to the Debtor's objection 17.
[26]    This section responds to the Debtor's objection 18.

eighteenth objection attempts to yet again dodge accountability toward clergy abuse survivors by avoiding the overwhelming repudiation of its own plan. [ECF 1118, 41–44.] The Debtor's objection is meritless and based almost exclusively on speculation and insinuation. Although the Debtor alleges a "pattern of misrepresentations" and "extrajudicial communications," and concludes that "[w]ithout a doubt, many representations made by the UCC and certain claimants' counsel in this case are mischaracterizations or misstatements of material fact," the Debtor does not quote a single alleged misstatement by the Committee or its professionals and openly admits that discovery will be necessary to determine the "precise content" of alleged (but unsupported) mischaracterizations. *Id.*

The Debtor bases its serious accusations of improper solicitation on:  (i) a press release issued by the Committee after the ballot deadline had expired; (ii) an allusion to inaccurate (and now corrected) characterizations of the Debtor's resolution of criminal charges—again made after the ballot deadline had expired; (iii) a quote from a StarTribune article apparently referencing the Committee's position on the requirement for parish contributions to obtain a channeling injunction; and (iv) a reference to the Committee's liquidation analysis, which was part of the Committee's court-approved disclosure statement. None of the above examples—the only examples provided by the Debtor in support of its objection—comes anywhere close to improper solicitation, *see In re Kellogg Square Partnership*, 160 B.R. 336, 339 (Bankr. D. Minn. 1993), and the Debtor should not be permitted to rely on speculation and insinuation to disenfranchise hundreds of survivors from their right to participate in plan-related proceedings.[27]

---

[27]     The Debtor's citation to *Kellogg*, and the related quote included by the Debtor in its objection, were taken so out of context as to risk misleading the Court. Judge Kishel included the quote used in the Debtor's brief only to reference the standard he was rejecting. *Kellogg*, 160 B.R. at 341. Judge Kishel instead adopted a standard that views "the court-approved disclosure statement as being a mechanism for insuring a *minimum quantum* of disclosure, rather than a court-enforced monopoly of disclosure." *Id.* Judge Kishel determined that an extrajudicial communication is allowable "so long as [it] does not contradict the court-approved disclosure statement, or contain

## I.   Home Insurance Company is protected from third party claims under the Committee's Modified Plan[28]

The Debtor argues that the Committee's Plan fails to provide an adequate means for implementation because it does not contain a channeling injunction protecting Home Insurance Company ("Home") and its liquidator from any further liability under the Home Policies. The Committee's Plan has been revised to provide for a Supplemental Injunction in favor of Home, protecting it from any liability with respect to Class 6 and Class 7 Claims as follows:

Pursuant to sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Home Insurance Company pursuant to that certain Settlement Agreement and Mutual Release, Exhibit G and pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Interests against Home Insurance Company with respect to a Class 6 Tort Claim or a Class 7 Tort Claim are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Home Insurance Company, its successors and assigns, with respect to such Interests with respect to the Class 6 Tort Claim or Class 7 Tort Claim, including:

(1)   Commencing or continuing in any manner any action or other proceeding against Home Insurance Company;

(2)   Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against Home Insurance Company;

(3)   Creating, perfecting, or enforcing any lien of any kind against Home Insurance Company;

(4)   Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Home Insurance Company; and

(5)   Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

[ECF 1129, § 14.2(c).]

---

mischaracterizations or misstatements of material fact that might unfairly influence solicitees." *Id.* The Debtor does not identify any such extrajudicial communications in its eighteenth objection.

[28]      This section responds to the Debtor's objection 7.

**J.   The Committee's Plan alleviates the Debtor's post-confirmation burdens while preserving insurance coverage.**

1.   *The Committee's Modified Plan addresses the Debtor's concerns regarding its continued liability[29]*

The Debtor incorrectly states that it may be required to use its own funds to pay defense costs because the Committee's Plan provides that the Trust will "advance or reimburse" defense costs.[30] [ECF 1118, at 13.] The Committee's Modified Plan resolves this concern by imposing an obligation on the Trust to "advance" defense costs if the defense is not provided or defense costs are not advanced by a Non-Settling Insurer. [ECF 1129, § 6.2(i)(4).] This modification also addresses the Debtor's concerns that insurers might make defense cost payments directly to the Trust, that there may be no defense cost coverage available at all under some insurance policies, that defense cost coverage might be delayed under others, and that there may be no coverage available for some components of defense costs. [ECF 1118, at 18–19.]

The Debtor also alleges that its assets are exposed to execution by Class 6 judgment creditors, because the Trust is not obligated to fund the satisfaction of judgments prior to execution. [ECF 1118, at 19–20.] In the Committee's Modified Plan, if all insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, the Tort Claimant "will sign a covenant not to execute against the Archdiocese's and/or Reorganized Debtor's assets (other than insurance policies or proceeds)." [ECF 1129, §6.2(i)(4).] Moreover, the Trust is now obligated to advance funds to satisfy any judgment. [*Id.*] The

---

[29]      This section responds to the Debtor's objection 3.
[30]      The Debtor is erroneously implying that the Trust would "*neither* advance *nor* reimburse" defense costs. The term "advance or reimburse" was intended to encompass the universe of payment options in light of the parties (*e.g.*, insurers, law firms, experts, vendors, Debtor and Trust) and billing features (*e.g.*, retainers, fronted expenses by vendors or law firms, vendor invoice and remittance involving law firms, law firm invoice and remittance involving the Debtor or the Trust).

Committee's Modified Plan therefore eliminates the Debtor's unjustified concern of execution prior to satisfaction.

> 2. *The Committee's treatment of the Debtor's liability preserves insurance coverage and ensures Debtor a "fresh start"*[31]

The Debtor alleges that the Committee's Plan assigns liability insurance proceeds and related claims against insurers to the Trust, but does not assign the liability for Class 6 and Class 7 Claims – which give rise to those insurance interests – to the Trust. [ECF 1118, at 44.] The Debtor additionally objects to its duty under the Committee's Plan to abide by its contractual obligations under relevant insurance policies, and to the delayed discharge of its liability. [ECF 1118, at 49.] The Committee has legitimate, insurance-related reasons for including each of these Plan features, which do not compromise the Debtor's fresh start.

The Committee's Plan does not assign liability for Class 6 and Class 7 Claims to the Trust because the liability insurance policies only provide coverage in respect of the insured's legal obligation to pay damages, and the Trust is neither an insured nor a tortfeasor. Relying on *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. Civ. 06-167, 2006 WL 1473004, at *3 (D. Minn. May 25, 2006), the Debtor argues that its liability and insured status could successfully be transferred to the Trust. [ECF 1118, at 47.] The feature of the plan in *A.P.I.* that transferred the debtor's liabilities to a trust, however, was specifically authorized by 11 U.S.C. § 524(g)(2)(B)(i), a provision of the Code pertaining only to the transfer of "liabilities" to a trust for damages caused by asbestos. 2006 WL 1473004, at *1. There is no similar provision of the Code concerning the transfer to a trust of liabilities for damages caused by sexual abuse.[32] Moreover, *A.P.I.* does not suggest that any plan involving a transfer of insurance proceeds to a

---

[31] This section responds to the Debtor's objection 3.

[32] *A.P.I., Inc.* is not an insurance coverage case, either. The provisions of the plan in that case were not tested in any subsequent insurance coverage action.

Trust *must* also transfer liability. Any such suggestion would be contradicted by Section 1123(a)(5), which expressly authorizes the Court to confirm a plan providing for the transfer of any estate property to any third party, regardless of any nonbankruptcy law to the contrary. 11 U.S.C. § 1123(a)(5).

*Gopher Oil Co. v. Amer. Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 763 (Minn. Ct. App. 1999), on which the Debtor relies, is also irrelevant. [ECF 1118, at 44.] *Gopher Oil* is not a bankruptcy case, does not involve transfers under Section 1123(a)(5) from a bankrupt-insured to a new entity, and does not stand for the proposition that a transfer of liabilities must necessarily follow the transfer of insurance policy interests. *Gopher Oil* does address "whether a nonassignment-without-consent clause is enforceable against a successor corporation that acquires a predecessor's assets and liabilities." 588 N.W.2d at 763 ("[The insurer] challenges the district court's ruling that the [successor corporation] is covered under the policies issued to [the predecessor corporation] because the policies included a provision that [the insurer] was not bound by an assignment of interest under the policy without its consent."). The *Gopher Oil* court ruled that the clause was not enforceable with respect to insurance interests bearing on losses that had already occurred. *Id.* at 763–64. Importantly, the court did not opine on the necessity or validity of the transfer of liabilities by corporate succession, but took that transfer as a given based on the case's facts. *Id.*

The Committee's Plan is entirely consistent with and authorized by *Gopher Oil*'s ruling, in that it provides for a post-loss transfer of insurance proceeds and related claims and causes of action. *See also Isles Wellness, Inc. v. Progressive Ins. Co.*, No. A09-0119, 2009 WL 2928548, at *3–4 (Minn. Ct. App. Sept. 15, 2009) (permitting the assignment of the rights to receive benefits under the policy); *see also Star-Windshield Repair v. W. Nat'l Ins. Co.*, 768 N.W.2d

346, 351 (Minn. 2009) (Anderson, J., concurring) (citing *Windey v. N. Star Farmers Mut. Ins. Co.*, 43 N.W.2d 99 (Minn. 1950)).

An immediate discharge is not necessary to ensure the Debtor receives a fresh start. Ultimately, the Debtor receives a discharge of liability and the benefit of injunctions. Until such discharge and injunctions are effective, the Trust advances defense costs and payments in satisfaction of any judgments, and those advances are coextensive with any expenses or liability. While the Debtor risks nothing if it gets a discharge and, in so doing, simultaneously compromises insurance coverage, the abuse survivors stand to lose everything. The Committee cannot risk agreeing to a plan that might later be found to eliminate all assets for hundreds of abuse survivors. The risks are not non-existent. Liability policies typically include language obligating the insurers to pay on behalf of the insured all sums that the insured shall become legally obligated to pay as damages because of bodily injury. If the insured Debtor is not "legally obligated to pay as damages" due to a discharge, then the insurers may not be obligated to provide coverage. *In re Hendrix*, 986 F.2d 195, 200 (7th Cir. 1993) ("Ordinarily a liability insurance policy obligates the insurance company to pay only those sums that the insured becomes legally obligated to pay as damages.  If by virtue of having been discharged . . . the insured has no legal obligation to pay damages, it is not obvious where the insurance company's liability comes from."); *see also In re Columbia Gas Transmission Corp.*, 219 B.R. 716, 720 (Bankr. S.D.W.V. 1998) ("First there is no coverage under the policy for Greiner's claims. The policy clearly and unambiguously states there is no coverage until TCO is 'legally obligated to pay' a sum. The precision of the policy language suggests the parties specifically contracted for this result."); *In re Lundberg*, 152 B.R. 316, 319 (Bankr. E.D. Okla. 1993) (holding discharge of

liability in bankruptcy eliminates liability insurance coverage: insurer is only liable if the insured

is liable, and insurer is not a "co-debtor or guarantor" under 11 U.S.C. § 524(d)).

While a court may eventually agree with the Debtor's arguments in favor of coverage

regardless of discharge, the Debtor can afford to be wrong, the creditors cannot. Refusing to take

such a risk is not sufficient grounds to reject the Committee's Plan.[33]

### K. The Archdiocese raises several questions of fact that require discovery and expert testimony[34]

The Debtor raises multiple objections on which it asserts the court can rule as a matter of

law, but such objections actually require the Court to make factual findings. At this point, the

Committee has not had an opportunity to conduct reasonable factual discovery or retain a

financial advisor. [ECF 588; 683; 811; 1046.]  The Committee expects and intends to address

questions regarding feasibility, unfunded mandates, administrative insolvency, and its liquidation

analysis at a later time, once it has been allowed access to necessary information and expertise to

properly analyze and respond to such issues. The Committee agrees with the Debtor that

objections regarding the Committee's liquidation analysis and solicitation are fact questions. The

Committee has therefore, in accordance with the Court's instructions, refrained from briefing

such issues. The Committee reserves its rights, however, to address such issues in future stages

of the confirmation process.

---

[33]    The Debtor also objects to its lack of discharge from Future Tort Claims, or from claims brought by the Trust as a result of the Debtor's violations of its obligations to the Insurers under its Insurance Policies. [ECF 1118, at 49.] The Committee's Plan has been modified to treat Future Tort Claims in a manner similar to Pending Tort Claims, resolving the Debtor's objection as to the Future Tort Claims. [ECF 1129, § 4.7.] The Debtor raises hypothetical concerns about pre-petition breaches of its insurance obligations to the Insurers, but has not identified any such breaches, or any Insurers who have denied coverage on that basis. The Committee's Plan provides for the Debtor to retain liability (to the Trust) for any post-petition breaches of the Insurance Policies because the Trust would otherwise have no recourse if the Debtor fails to comply with the terms of its Insurance Policies, including any duty of cooperation, which may void coverage altogether.

[34]    This section responds to the Debtor's objections 3, 5, 16, and 18.

L.    **The Debtor lacks standing to raise several of its objections**

The Debtor objects to the Committee's Plan on the basis of its treatment of Classes 3, 7, 12, 13, and 14. [ECF 1118, at 29–31, 32–38.] The Debtor is not a member of those creditor classes and does not have standing to raise the claims of third-parties. *See infra* Section VIII.C.1. The substance of the Debtor's objections on these issues is dealt with in response to the Parish Committee's objections. *See infra* Section II.A.

The Debtor also objects to the Committee's Plan on the basis that it allegedly misled creditors or involved improper solicitation. [ECF 1118, at 26–28, 41–44.] These objections represent generalized grievances that the Debtor does not have standing to raise. *See supra* Section VIII.C.2.

II.    **Response to the Parish Committee's Objections to the Committee's Plan [ECF 1113]**

A.    **The Committee's Plan leaves intact the rights of the majority of non-abuse claimants**[35]

Section 1124 provides that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124. Thus, so long as a creditor receives "everything to which the creditor would be entitled in a judgment entered immediately following the plan's effective date, the creditor is receiving treatment that, as required by section 1124(1), honors all the creditor's 'legal, equitable, and contractual rights.'" *In re Tex. Rangers Baseball Partners*, 434 B.R. 393, 406–07 (Bankr. N.D. Tex. 2010). The *Texas Rangers* court went on to explain that a creditor is

---

[35]    The Parish Committee objected to the Committee's Plan on grounds that it improperly impairs the rights of claimants in Classes 3, 13, and 14. This section addresses the Parish Committee's objection as it relates to Classes 3 and 14 and the Parish Committee's fifth objection as it relates to Class 13. Other objectors also allege the Committee's Plan improperly treats certain creditor classes as unimpaired, but each such party lacks standing to assert such arguments. *See* App'x 1.

unimpaired if, as of the plan's effective date, it would "be able thereafter to exercise all its rights *vis-à-vis* its debtor." *Id.* at 407. The impairment analysis does not consider the plan's treatment of the debtor's assets or the extent to which defaults might be cured post-petition to recreate the situation prior to the default. *Id.*; *In re Nickels Midway Pier, LLC*, 452 B.R. 156, 163–64 (D.N.J. 2011). The sole inquiry is whether the plan alters the "legal, equitable, and contractual rights" of the creditor against the debtor.

     1.    *Class 3, 8, and 14 claimants maintain all pre-petition rights*[36]

The Committee's Plan does not alter the legal, equitable, or contractual rights of Class 3, 8, or 14 claimants. The Plan requires the Reorganized Debtor to assume "all liabilities to Class [3/14] claimants on the Effective Date." [ECF 890, at 19, 23.] The Committee's Plan also provides that the Reorganized Debtor will administer the GIF and the AMBP (which relate to claims in Classes 3 and 14, respectively) "in accordance with the Archdiocese's prior practices." *Id.* Similarly, the Committee's Modified Plan requires the Reorganized Debtor to "assume the Archdiocese's participation in the Inter-Parish Loan Fund and all liabilities to Class 8 claimants on the Effective Date. The Reorganized Debtor will cause to be paid Class 8 claims in accordance with the Archdiocese's prior practices." [ECF 1129, § 4.8.]

The members of Classes 3, 8, and 14 are the only parties with standing to object to their treatment under the Plan. The Parish Committee's brief objection on the subject does not clarify how the Parish Committee believes the Committee's Plan alters the "legal, equitable, and contractual rights" of these class members. [ECF 1113, at 22–23.] The objection merely references the potential transfer of funds from the GIF and the AMBP to the Trust. Other objectors—all of whom lack standing on this issue—similarly fail to identify any alteration to the rights retained by the class members post-petition. [*See, e.g.*, ECF 1118, at 29–31, 32–35; ECF

---

[36]    This section responds to the Parish Committee's objection 5.

1111 at 6–7.] At best, the objectors focus on the transfer of funds from the GIF and the AMBP to

the Trust. The proposed transfer of funds does not, however, alter the creditors' rights against the

Debtor.[37] The plain language of the Committee's Plan makes clear that each claimant in Classes

3, 8, and 14 will retain its pre-petition rights against the Debtor after the Committee's Plan is

confirmed. The Court should thus overrule the various objections alleging that Classes 3, 8, and

14 should have been treated as impaired under the Committee's Plan.

2.   *Class 15 and 16 claimants maintain all pre-petition rights[38]*

Neither the Parish Committee nor any member of Classes 15 and 16 asserted an objection

to the Committee's Plan based on the treatment of Classes 15 or 16, but several objecting

insurers argue that Classes 15 and 16 should have been treated as impaired. [ECF 1111, at 6–7;

ECF 1121, at 37.] As set forth below, *infra* Section VIII, those objecting insurers lack standing to

object to the Committee's Plan on this basis, and therefore the Court should overrule their

respective objections based on their lack of standing alone. Even if such insurers are deemed to

have standing, however, the Court should still nevertheless overrule their objections because

their objections lack substantive merit.

Like claimants in Classes 3, 8, and 13, claimants in Classes 15 and 16 maintain all of

their pre-petition rights against the Debtor under the Committee's Plan. The Committee's

Modified Plan removes the distinction between credibly accused priests and other priests. As a

result, all former claimants in Classes 15 and 16 are now Class 15 claimants because Class 16

has been deleted. [ECF 1129, § 4.] In its own plan, the Archdiocese "disclaims any liability

---

[37]       The Committee is prepared to address the feasibility of the Reorganized Debtor's continued participation in and assumption of responsibility under the GIF and AMBP as a question of fact at the next stage in this confirmation process.

[38]       This responds to objections of various insurers as set forth in Appendix 1, which contains a chart of each party's objections, a reference to whether that party has standing for each objection, and the sections of the Committee's response that address that objection.

under civil law" to provide priest support payments. [ECF 887, at 30.] Therefore, the Class 15 claimants had no pre-petition civil rights that could be impaired by the Committee's Plan. Nevertheless, the Committee's Plan allows the Reorganized Debtor to honor all obligations to these claimants in accordance with prior practices. [*Id.* § 4.15.]

One of the objecting insurers, Catholic Mutual, argues that Class 15 is impaired because claimants in Class 15 receive no payment and retain no property under the Committee's Plan. [ECF 1111, at 6–7.] Catholic Mutual's assertion is simply inaccurate. Under the Committee's Plan, Class 15 claimants continue to receive any benefits they previously received from the Debtor, thus the Committee's Plan leaves any legal, equitable, or contractual rights that claimants in Class 15 may have against the Debtor completely unaltered. Catholic Mutual's argument conflates the financial payout that Class 15 claimants would receive under the Committee's Plan with how the plan treats the claimants' rights overall.

The rights of Class 15 claimants would be unaltered by the Committee's Plan. The Court should thus overrule the various objections claiming that Class 15 should have been treated as impaired. In the unlikely event that the Court determines that the treatment of Class 15 claimants is a legal bar to confirmation of the Committee's Plan, then the Debtor's Plan must also be deemed unconfirmable because it contains identical provisions.

3.    *Class 13 claimants are not impaired because their claims are statutorily disallowed* [39]

If the Bankruptcy Code itself limits the rights of a class, then the rights of claimants in that class are not impaired under § 1124(1). *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 205 (3d Cir. 2003); *In re W.R. Grace & Co.*, 475 B.R. 34, 161 (D. Del. 2012). Section 1124 clearly refers to a *plan's* treatment of the class of creditors' claims, not the Code's treatment of such claims.

---

[39]      This sections responds to the Debtor's objection 12.

Because Class 13 claimants' claims are *statutorily* disallowed, and not disallowed by the Committee's Plan, Class 13 is unimpaired. [*See* ECF 1112, at 14–16 (discussing Class 13's disallowance under Section 502(e)(1)(B)).] The Court should thus overrule the various objections asserting that the rights of claimants in Class 13 should have been treated as impaired by the Committee's Plan.

4.   *All Class 12 claimants receive equal treatment*[40]

The Committee's Modified Plan clarifies the treatment of Class 12 claimants and thus addresses the concerns raised by the Archdiocese, ECF 1118, at 37:

> (b) Treatment. The holders of Class 12 Claims shall receive payment of their Pro Rata share of the sum of up to $50,000 to be paid from the Plan Implementation Account as soon as practicable after all Class 12 Claims have been allowed or disallowed. In the event that the Class 12 Claims are less than $50,000, such excess amount shall be paid to the Trust for distribution to holders of Class 6 and Class 7 Claims.

[ECF 1129, § 4.12(b).]

5.   *Class 6 and Class 7 Claims will receive equal treatment under the Committee's Modified Plan* [41]

Through its plan modifications, the Committee addresses alleged unfair discrimination between Class 6 and Class 7 Claims. [ECF. 1118, at 34.] The Modified Plan provides for the Trust's assumption of all liability for "preserving, managing, and distributing Trust Assets to Class 6 *and Class 7* claimants." [ECF 1129, § 6.2(a) (emphasis added).] Class 7 claimants are now treated as "Beneficiaries" of the Trust, entitling them to the same treatment as holders of Class 6 Claims. [ECF 1129, at Ex. D § 1.5.] The Trust Agreement expressly provides that all Class 6 and Class 7 Claims will be evaluated by the Tort Claims Reviewer in accordance with the terms of the Trust Agreement and Trust Distribution Plan "in such a way that all holders of

---

[40]   This section responds to the Debtor's objection 14.
[41]   This sections responds to the Debtor's objection 15.

similar Class 6 and Class 7 Claims are treated in a substantially equivalent manner." [*Id.* at § 1.2.] With Class 6 and Class 7 Claims receiving equal treatment under the Modified Plan, the Committee has resolved any potential argument regarding unfair discrimination between such classes.

**B.    The parish contribution and indemnity claims are disallowed, unimpaired, and discharged in accordance with the Bankruptcy Code[42]**

1.    *Section 502(e)(1)(B) disallows the parishes' contribution and indemnity claims and Section 1141(d) discharges them*

The Parish Committee does not contest that Section 502(e)(1)(B) applies to the Class 13 parish indemnity and contribution claims, and counsel for the Parish Committee has previously noted that such claims are statutorily disallowed. [ECF 821, at 26.][43] The remaining question is thus whether such claims, once disallowed, are discharged by Section 1141(d).

The Parish Committee's analysis of the "plain language" of Section 1141(d) is anything but plain. Section 1141(d) states that a debtor is discharged from "*any* debt that arose before the date of such confirmation."[44] 11 U.S.C. § 1141(d) (emphasis added). The appropriate inquiry therefore is whether the Parish claims are "debts" that "arose before" the confirmation date. The answer is yes. The parish indemnity and contribution claims fall within the Code's definition of "debts" or "claims" and such claims arose pre-petition and prior to confirmation.

---

[42]    This section responds to the Parish Committee's objection 3.

[43]    The Committee also briefed the issue of disallowing the parish indemnity and contribution claims under Section 502(e)(1)(B) in its objections to the Debtor's Plan. [ECF 1112, at 14–16.]

[44]    The Parish Committee argues that the inclusion in the subsequent clause of Section 1141(d) of citations to certain groups of debt listed in Section 502 are demonstrative of Congress's intent to specifically exclude 502(e) claims from discharge. [ECF 1113, at 10–11.] This argument is without merit. First, if Congress had wished to specifically exclude 502(e) claims from discharge, it would have done so explicitly. Further, Section 1141(d)(1) refers to any debts that arose prior to plan confirmation, and then also references those claims that might arise *after* confirmation. For example, many contracts are rejected through a plan, therefore a claim due to the rejection of a contract – such as those described in Section 502(g) – is likely to arise post-confirmation. Congress did not need to specify that 502(e) claims were included in the discharge, because those claims fall under the first statement in Section 1141(d)(1): "any debt that arose before the date of such confirmation." The Parish Committee's analysis does not address that the parish indemnity and contribution claims are debts that arose before confirmation, but instead attempts to distract the Court with an analysis that disregards the plain language, extensive judicial authority, and legislative history and policy behind the Code.

a.    The parishes' indemnity and contribution claims are "debts" or "claims" under the Code's definitions

Section 101(12) defines "debt" as a "liability on a claim." 11 U.S.C. § 101(12). "Claim" is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, dispute, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). The definition of "claim" is intended to be very broad. *In re Chateaugay Corp.*, 112 B.R. 513, 520 (S.D.N.Y. 1990), *aff'd*, 944 F.2d 997 (2d Cir. 1991) (citing *Ohio v. Kovacs,* 469 U.S. 274, 279 & n. 3 (1985); *In re Robinson,* 776 F.2d 30, 34–35 (2d Cir. 1985), *rev'd on other grounds sub nom*; *Kelly v. Robinson,* 479 U.S. 36 (1986); and *In re Remington Rand Corp.,* 836 F.2d 825, 826 (3d Cir.1988)). Further, Congress's express intention was that "all legal obligations of the debtor, no matter how remote or contingent, [would] be able to be dealt with in the bankruptcy case." *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6266; S. Rep. No. 989, 95th Cong., 2d Sess., 21–22, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5807–08.

The parishes have asserted a right to payment against the Archdiocese, although contingent, unliquidated, and/or unmatured. Such rights fall squarely within the broad definition of a "claim" under the Bankruptcy Code.

b.    The parishes' claims arose pre-petition and prior to confirmation

"A claim, even a contingent claim, arises under the Bankruptcy Code at 'the time when the acts giving rise to the alleged liability were performed.'" *In re Chateaugay Corp.*, at 520. The Parish Committee implies that the parish indemnity and contribution claims did not "arise" under Minnesota law pre-petition or prior to confirmation. The citations offered, however, deal only with circumstances in which a claim "accrues" or "matures." *See Grothe v. Shaffer*, 232 N.W.2d

227, 232 (Minn. 1975). And the Bankruptcy Code's definition of "claim" clearly states that whether or not a right to payment has "matured," it is still a claim. 11 U.S.C. § 101(5); *see also In re Hanna*, 168 B.R. 386, 389 (B.A.P. 9th Cir. 1994) ("[S]o long as a prepetition triggering event had occurred, the claim was dischargeable regardless of when the claim for relief was ripe for adjudication.").

Applicable state law requires the same conclusion. Under Minnesota law, common liability amongst co-tortfeasors "arises the moment the tort is committed." *In re Individual 35W Bridge Litig.*, 786 N.W.2d 890, 897 (Minn. Ct. App. 2010), *aff'd,* 806 N.W.2d 811 (Minn. 2011) (citing *White v. Johnson,* 137 N.W.2d 674, 679 (Minn. 1965), *overruled on other grounds*). Minnesota law is consistent with bankruptcy law on this point as well. Bankruptcy courts have consistently held that "[s]o long as there is a pre-petition triggering event . . . the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication." *In re Chateaugay Corp.*, 112 B.R. at 522; *In re Hanna*, 168 B.R. 386, 389 (B.A.P. 9th Cir. 1994) ("Consequently, if a tort occurs prepetition, with the injury occurring postpetition, such claim is deemed to have arisen prepetition."); *In re W.R. Grace & Co.*, 446 B.R. 96, 122 (Bankr. D. Del. 2011) (ruling that contribution claims "arise as a contingent claim before the third party pays," and become liquidated or matured after payment is made); *Minneapolis, St. P. & S.S.M.R. Co. v. City of Fond Du Lac*, 297 F.2d 583, 585 (7th Cir. 1961) ("The right of contribution between joint tortfeasors arises at the time of the concurring negligent acts."). The parishes' indemnity and contribution claims, if they exist at all, arose when the sexual abuse occurred—pre-petition and prior to confirmation—and they are therefore dischargeable under Section 1141(d)(1).

Courts have acknowledged that this conclusion "may seem harsh, but it treats [the parishes] no worse than the debtor's other unsecured creditors, who equally are left holding the bag in the wake of the debtor's bankruptcy." *Route 21 Assocs. of Belleville, Inc. v. MHC, Inc., 486 B.R. 75, 98 (S.D.N.Y. 2012), subsequently aff'd sub nom. In re Lyondell Chem. Co., 542 Fed. Appx. 41 (2d Cir. 2013)* (citing *Dewsnup v. Timm*, 502 U.S. 410, 435 (1992) (Scalia, J., dissenting)). Allowing the parishes' disallowed claims to survive the bankruptcy would unfairly and unjustifiably provide the parishes with an opportunity to recover in full post-confirmation when other unsecured creditors, such as the abuse survivors, stand to receive only a small percentage of the value of their claims. *See Route 21*, 486 B.R. at 98 ("Stripped to their essence, [the creditor's] arguments to the bankruptcy court . . . are attempts to skip the line of creditors and get paid in whole dollars."). Such a result would be completely illogical given the Bankruptcy Code's express subrogation of such claims. 11 U.S.C. §§ 502(e)(1)(B); 509 (requiring that claims of codebtors be subrogated); *see also In re Charter Co.*, 862 F.2d 1500, 1503 (11th Cir. 1989).

### 2.    *The Plan's treatment of parish claims is not discriminatory*

The Parish Committee alleges that the parish indemnity and contribution claims receive unequal treatment under the Committee's Plan compared to the treatment of other contingent unsecured creditors, such as Classes 6, 7, and 11. [ECF 1113, at 18–19.] It is the Code however, not the Committee's Plan, that dictates the treatment of the parish indemnity and contribution claims. As described above, the Code subordinates the claims of co-debtors to those of other contingent claimants.[45] Additionally, the plain language of Section 502(e)(1) does not apply to circumstances in which the debtor is the guarantor of a loan, as is the case for Class 11 claims.

---

[45]    Certain Objections fail to recognize that contribution and indemnity claims are not given the "same priority" as other contingent claims, but are subordinated in priority by the Code. *See, e.g.*, 11 U.S.C. § 509.

Section 502(e)(1) addresses circumstance in which there is a claim for "reimbursement or contribution" from an "entity that is liable with the debtor." 11 U.S.C. § 502(e)(1). Class 11 claimants are secured lenders who have a direct claim against the Debtor as the guarantor of certain loans. [ECF 890, at 22.] Objections based on allegedly-improper disparate treatment of Class 11 and Class 13 claims would be accurate if Class 11 claimants were co-debtors on the Debtor's loans, but that is not the case. The Committee's Plan does nothing more than treat Class 13 claims in the manner prescribed by the Bankruptcy Code and, as a result, objections based on such treatment should be overruled.

## C.    The Committee's Plan only includes the Debtor's property and rights[46]

The Parish Committee, and many of the other objectors, inaccurately assert that the Committee's Plan mandates the turnover of third party property. [*See, e.g.*, ECF 1113, at 1–8.] Nothing in the Committee's Plan requires the turnover of anything outside of the Debtor's bankruptcy estate. To avoid confusion, the Committee has modified its plan to clarify this point even further: "Under this Plan . . . the Bankruptcy Court will determine the liquidation value of the Debtor's interest in those assets identified on Exhibit C to this Plan." [ECF 1129, §5.2(b).]

### 1.    *The AMBP and the GIF are the Debtor's property*[47]

The Committee's disclosure statement makes very clear that, if the Committee's Plan is confirmed, only the Debtor's interest in the GIF and the AMBP will be transferred into the Trust. [ECF 891, at 15.] The Committee's disclosure statement also makes clear that a dispute exists as to the extent of the Debtor's interest in such funds:

> The Debtor and Parish Committee contend that funds contributed to the GIF by non-debtor Catholic entities are held by the Debtor in trust and such funds are therefore not property of the bankruptcy estate. If the Bankruptcy Court

---

[46]      This section responds to the Parish Committee's objections 1, 2, and 6.
[47]      This section responds to the Parish Committee's objection 1.

determines that the Debtor and Parish Committee are correct, then the amount the Debtor is required to contribute to the Trust will be reduced accordingly. [*Id.*]

Despite the Committee's transparency on these issues, the Parish Committee argues that the Committee's Plan must fail as a matter of law because it would be categorically impossible for this Court to find that the Debtor has *any* interest in the GIF or the AMBP. [ECF 1113, at 5–6.] The Committee disagrees.

By its express terms, the Committee's Plan administers only the Debtor's interests in the AMBP and GIF funds. To the extent the Court determines those funds are held in trust for other Catholic entities, or are the property of a separate entity, such funds will not be included in the Committee's Plan.[48]

The parishes have the burden of establishing that the Debtor holds only legal title to the GIF and AMBP funds. *In re WEB2B Payment Sols., Inc.*, 815 F.3d 400, 405 (8th Cir. 2016); *see also 5 Collier on Bankruptcy,* ¶ 541.28 (16th ed. 2010) ("When property in the possession of a debtor is alleged to be held in trust by the debtor for a nondebtor . . . the burden rests upon the entity seeking to exclude the property from the estate to establish the existence of the claimed fiduciary relationship."). The fact that they have made an argument for two and half years is not a sufficient basis to deem the Committee's Plan unconfirmable as a matter of law. It is the AMBP and GIF participants' burden to establish ownership rights and they have failed to do so. Thus, contrary to arguments asserted by the Parish Committee and other objecting parties, the Debtor appears to have a material property interest in both the AMBP and the GIF.

---

[48]    The Committee and the AMBP entered into a stipulation clarifying this point with regards to AMBP funds. [ECF 1059.]

a.   The GIF funds are the Debtor's property

The Parish Committee drastically oversimplifies the standard imposed by Minnesota law for establishing an express trust. "An express trust requires: '(1) a designated trustee subject to enforceable duties, (2) a designated beneficiary vested with enforceable rights, and (3) a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interest of the beneficiary.'" *In re Web2B Payment Sols., Inc.*, 815 F.3d at 405 (quoting *In re Bush's Trust*, 81 N.W.2d 615, 620 (Minn. 1957)). Further, a trust's settlor must "demonstrate[], by external expression, the intent to create a trust" through "a definite, unequivocal, explicit declaration of trust." *Id.* (quoting *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 837 (Minn. 2005) and *In re Bren*, 284 B.R. 681, 697 (Bankr. D. Minn.2002)). "Express or technical trusts are formed by direct and positive acts of both parties manifested by some instrument in writing." *Id.*

Neither the Parish Committee nor any other party has identified any writing constituting a "definite, unequivocal, explicit declaration of trust" relating to the GIF. The only written documents that have been offered in support of the Parish Committee's position are informational brochures drafted and distributed by the Debtor. [ECF 483, at 10–42.] Nor has any party identified any direct and positive act(s) by the GIF participants to establish an express trust, or any "enforceable duties" or "enforceable rights." The GIF is not an express trust.

The Parish Committee next argues that the GIF is a resulting trust. [ECF 1113, at 4–5.] In support of its argument, the Parish Committee quotes the first sentence of the legal standard outlined in the *Web2B* decision, but conspicuously elects not to include subsequent language. As noted by the Parish Committee, a "resulting trust arises 'when one party makes a disposition of property under circumstances which raise[ ] a presumption that the party making the disposition does not intend the other party holding the interest in the property have the remaining beneficial

interest in it.'" [ECF 1113, at 4 (quoting *In re Web2B Payment Sols., Inc.*, 515 B.R. 716, 722 (D.

Minn. 2014), *aff'd sub nom. In re Web2B Payment Sols., Inc.*, 815 F.3d 400 (8th Cir. 2016))).] In

the same decision, however, Judge Doty outlined further requirements to create a resulting trust:

> '[T]he settlor, alone or together with the trustee, must properly manifest an
> intention to create a relationship that constitutes a trust.' 'The manifestation of
> intention requires an external expression of intention as distinguished from
> undisclosed intention,' and 'ordinarily requires that the intention be to create the
> trust at that time.' 'Vagueness or uncertainty with respect to possible purposes or
> beneficial interests tends to suggest that the transferor did not intend to create a
> trust.'

*Web2B*, 515 B.R. at 722 (citations omitted).

"To find a resulting trust 'circumstances must show with reasonable certainty or beyond

a reasonable doubt that a trust was intended to be created.'" *Web2B*, 815 F.3d at 407 (quoting

*Bond,* 691 N.W.2d at 837). The participants made no external expression of any intent —let

alone an intent to establish a trust—when transferring funds to participate in the GIF.

Accordingly, no resulting trust was created under Minnesota law.

Another factor courts consider significant in determining the existence of a trust is

whether the funds for the alleged beneficiary were commingled with the funds from other

potential beneficiaries. *Web2B*, 815 F.3d at 405; *In re LGI Energy Solutions, Inc. (I)*, 460 B.R.

720, 729 (BAP 8th Cir. 2011). The Parish Committee asserts that there was no commingling of

funds. [ECF 1113, at 4–5.] The Parish Committee's assertion has no basis in fact. The GIF is

comprised entirely of commingled funds from all of the individual participants.[49] Just like the

parties in *Web2B*, the GIF's participants agreed to have their contributions placed in a

commingled account with the contributions of the other participants. *Web2B*, 815 F.3d at 405–06

(quoting *LGI,* 460 B.R. at 729) ("Where 'the depositor of cash consents to commingling . . . the

---

[49]      Based on the Debtor's schedules and statement of financial affairs, as well as a review of the Debtor's
financials and accounts, all GIF assets are held in the same bank accounts on behalf of all participants. [ECF 92, at
92.]

relationship resulting from the transaction is not that of trustee and beneficiary . . . but that of debtor and creditor.'").[50] The GIF is not a resulting trust.

Contrary to the Parish Committee's assertion, the undisputed facts demonstrate that the GIF is not a trust—whether express or resulting—and that the participants will not be able to meet the high legal burden of establishing otherwise.

> b.    The AMBP funds are available to pay the Debtor's creditors

The AMBP trust agreement clearly provides that its funds are available to the Archdiocese's creditors in the event of the Archdiocese's bankruptcy:

> The Assets of the Trust shall be subject to claims of the Grantor's [Archdiocese's] general creditors only in the case the Grantor's bankruptcy or insolvency. The Grantor shall be considered "bankrupt" or "insolvent" if the Grantor is either unable to pay its debts when due or files for protection under the United States Bankruptcy Code. . . . Upon receipt of such notice . . . of the Grantor's bankruptcy. . . . [t]he Trustee shall discontinue payments to the Beneficiaries and shall hold the assets of the Trust for the benefit of the Grantor's general creditors.

[ECF 776, at 16.]

Under Minnesota law, the plain language of a trust agreement dictates its governance. *In re Pamela Andreas Stisser Grantor Tr.*, 818 N.W.2d 495, 502 (Minn. 2012) ("When the trust agreement is unambiguous, we will ascertain the grantor's intent from the language of the agreement, without resort to extrinsic evidence."). The Parish Committee does not cite to any legal authority to the contrary. The unambiguous language of the AMBP trust agreement makes the AMBP funds available to the Debtor's creditors. The Parish Committee attempts to explain away this express, clear language as a "documentary deficiency." [ECF 1113, at 5.] There is no justification under Minnesota law or otherwise to set aside the clear language of the AMBP. The

---

[50]    That the relationship between GIF participants and the Debtor is one of debtor and creditor is further reinforced by the participants' proof of claims in this case and acceptance of their classification as a class of creditors under both the Committee and Debtor's Plans.

AMBP agreement makes AMBP funds available to the Archdiocese's creditors and, as such, inclusion of such funds in the Committee's Plan is appropriate and in compliance with the Code.

The Parish Committee argues that the Committee's Plan must fail as a matter of law because it would be impossible for this Court to find that the Debtor has *any* interest in funds within the GIF or the AMBP. As a threshold matter, the Committee's Plan seeks only to transfer into a Trust those GIF and AMBP funds (or the value thereof) deemed to belong to the Debtor. Moreover, the GIF is not a trust and the AMBP's own, express terms make its funds available for the payment of the Debtor's creditors in the event of a bankruptcy. The Parish Committee's first objection should be overruled.

> 2.   *The Committee's Plan only transfers the Debtor's civil interest in collecting past due assessments[51]*

Contrary to the Parish Committee's arguments, the Committee is not attempting to have a creditors' trust assume rights of collection that are based on religious doctrine. The Debtor and its parishes both argue that, despite the parishes' legal status as distinct entities and a recognized course of dealing with the Debtor that spans decades, the Debtor does not have a civilly-enforceable right to collect assessments. [ECF 1118, at 7, 40; ECF 1113, at 6–8.] Because relevant facts and information have not been disclosed to the Committee, it cannot assess with any certainty (let alone appropriate diligence) the conclusory assertion that parishes do not have any civilly-enforceable obligation to make assessment payments. *In re Catholic Bishop of Spokane*, 329 B.R. 304, 325 (Bankr. E.D. Wash. 2005) ("Fair and equitable treatment of all creditors requires application of civil law not only to determine their rights to recover from assets of the debtor, but to first define the interest of the debtor in those assets."). The mere assertion that parishes have no civil obligation to pay assessments does not justify the effective

---

[51]      This section responds to the Parish Committee's objection 2.

abandonment of a potentially valuable estate asset and it does not provide a basis to deem the Committee's Plan unconfirmable as a matter of law—particularly when the Committee's Plan expressly seeks the transfer of collection rights only to the extent they have a basis in civil law.

    3.    *Only legally viable avoidance actions are transferred in to the Trust*[52]

The Parish Committee also argues that the Committee's Plan seeks to transfer non-existent, or legally inviable causes of action into the Trust. [ECF 1113, at 23.] The Committee has no interest in transferring unenforceable or valueless rights to the Trust. To the extent, however, there are claims for which the statute of limitations has been tolled, or causes of action that remain viable for any reason, those claims should be transferred under the Committee's Plan and the Trust should be allowed to assess their legal viability independently. To address any ambiguity, the Committee has clarified the language of its Plan with respect to this issue by adding the qualifying term "To the extent they exist" to the transfer of avoidance action claims to the Trust. [ECF 1129, at § 5.2(e)(3).]

### D.    The Committee's Plan does not impair the parishes' rights under any insurance policies.[53]

The Parish Committee alleges that the Committee's Plan may impair the parishes' "rights to the Debtor's insurance" for potential contribution claims the parishes may wish to bring against the Archdiocese. [ECF 1113, at 20–21.] The Parish Committee's objection is not well founded. The Committee's Plan does not transfer the rights and interests of non-Debtors, if any, under the Insurance Policies applicable to any Class 6 or Class 7 Claims. The Committee's Plan transfers only those "rights and interests of the Debtor and the Reorganized Debtor in Insurance Policies in respect of actual or potential coverage" for the Tort Claims. [ECF 890, § 1.1(ppp).] The Committee Plan does not contemplate "buybacks" or other "surrender" of any Insurance

---

[52]    This section responds to the Parish Committee's objection 6.
[53]    This section responds to the Parish Committee's objection 4.

Policies, let alone authorize the Trustee or the Insurers to include "buybacks" in their settlements when otherwise such provisions are prohibited by law.[54] If, as the Parish Committee asserts, the insurers cannot buy back their policies or surrender liability under their policies without parish consent, nothing in the Committee's Plan would authorize such an arrangement.

For the avoidance of doubt, the Committee Plan has been modified to include the following language:

> The rights of any non-Debtor in any Archdiocese Insurance Policies will not be transferred to the Trust. Except as otherwise provided in any Insurance Settlement Agreements or resulting from operation of law, nothing in the Plan, Confirmation Order, or any Plan Document will affect the rights of any non-Debtor insureds with respect to the Archdiocese Insurance Policies.

[ECF 1129, § 10.2.]

It has also been modified to include the following language:

> Unless specifically stated in the Plan, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, or the Confirmation Order shall be construed to prejudice the rights, actions, or claims of the Parishes and their respective insurers, against the Non-Settling Insurers and other entities potentially liable for Tort Claims.

[*Id.* § 14.4.]

In addition, the Committee Plan has been modified to eliminate any references to a Settling Insurer Supplemental Injunction. [*Id.* §§ 1.1, 6.3(a)(3).]

### E.    The ability and obligation of parishes to pay assessments is a factual issue[55]

Discovery is necessary to determine whether the parishes have a civil obligation to pay assessments. Further, the Parish Committee makes a blanket argument on behalf of all of the parishes regarding payment of future assessments. [ECF 1113, 23–24.] As has often been referenced throughout this case, each parish is a separately incorporated entity. Each parish also

---

[54]      Under a buyback agreement, the insurance company buys the policy back from the policyholder, which results in termination of the policy.

[55]      This section responds to the Parish Committee's objection 7.

has differing numbers of abuse claims against it and each parish is differently situated with respect to its ability to pay such claims. At the very least, discovery is necessary to substantiate the Parish Committee's conclusory assertion that ongoing litigation against a subset of parishes would categorically create universal feasibility issues with respect to the Committee's Plan.

Finally, the Parish Committee's purported argument with respect to the Committee's lack of good faith is not supported by substance or merit. The objectives and purposes of the Code have no relationship to parishes in their capacity as defendants in clergy abuse lawsuits.

## III. Response to The Church of St. Patrick of Edina, Minnesota's Objections to the Committee's Plan [ECF 1116]

The Church of St. Patrick of Edina ("St. Patrick's") objects on two grounds, both also raised by the Parish Committee or the Debtor. As an initial matter, St. Patrick's lacks standing to raise issues related to the *Debtor's* religious rights. *See infra* Section VIII.C.1. The substance of St. Patrick's objections is dealt with in the above responses to the Parish Committee and the Debtor. *See supra* Sections I.C.3, II.E.

## IV. Response to Minnesota Department of Commerce [ECF 1108]

The Minnesota Department of Commerce's objection is addressed in the response to the Debtor's objections. *See supra* Section I.C.2.

## V. Response to the High Schools Objections [ECF 1109]

The High Schools object to the Committee's Plan on the basis of its treatment of their leases. [ECF 1109.] The Committee's Plan does not actually impact their leases. All the Committee's Plan endeavors to do is identify value and, if necessary, liquidate the Debtor's interest in the real property relating to the High Schools. The extent of the Debtor's interest in the real property at issue and its value are factual issues that should be determined at the next stage of these proceedings and after discovery has been taken.

## VI.  Response to Objections from North American Banking Company [ECF  1102] and Bremer Bank [ECF 1104 ]

North American Banking Company and Bremer Bank objected to the Committee's Plan's lack of preservation of the banks' mortgages on Archdiocesan properties. [ECF 1102; ECF 1104.] The Committee's Modified Plan resolves the banks' objections as follows:

> **16.2 BANK MORTGAGES AND LIENS**
>
> **(a) North American Banking Company.** Notwithstanding anything to the contrary in this Plan, all liens and security interests granted by the Debtor in favor of North American Banking Company, including without limitation the lien evidenced by that certain Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated April 10, 2014, executed and delivered by the Debtor in favor of NABCo, shall remain in full force and effect.
>
> **(b) Bremer Bank.** Notwithstanding anything to the contrary in this Plan, all liens and security interests granted by the Debtor in favor of Bremer Bank, including without limitation the lien evidenced by that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement dated June 23, 2011, executed and delivered by the Debtor in favor of Bremer Bank, shall remain in full force and effect."

[ECF 1129, § 16.2.]

## VII. Response to Saint Anne - Saint Joseph Hien [ECF  1117]

The parish of Saint Anne – Saint Joseph Hien objected to the Committee's Plan's treatment of Class 8 (Inter-Parish Loan Fund) Claimants. The Committee's Modified Plan addresses Saint Anne's objection thoroughly by altering its treatment of Class 8 Claimants. As modified, the Committee's Plan preserves such claimants' pre-petition legal, equitable, and contractual rights. *See supra* Section II.A.1.

## VIII.  Many objecting parties lack the requisite standing to assert objections raised

The objectors bear the burden of establishing that they have standing to object to specific issues. *Delorme v. United States*, 354 F.3d 810 (8th Cir. 2004) (party invoking court's

jurisdiction must establish its standing). Parties-in-interest must establish that they have standing "to be heard under the bedrock principles that apply to *all* federal courts," and standing requirements limit their "statutory right to participate in the case under § 1109(b)." *In re A.P.I., Inc.*, 331 B.R. 828, 856 (Bankr. D. Minn. 2005)(emphasis in original). Not only do standing requirements apply in the context of plan confirmation, the need to establish standing is "*especially pronounced* in the area of objections to plan confirmation." *In re Myers*, 168 B.R. 856, 862 (Bankr. D. Md. 1994) (emphasis added).

### A.    General principles of standing

Under Supreme Court precedent, the standing requirement has two independent components. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1992); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). As a result, parties objecting to the Committee's Plan must have both constitutional *and* prudential standing to raise each of their objections. Additionally, special considerations apply to the standing analysis in the context of confirmation hearings.

#### 1.    *Constitutional Standing*

The constitutional "minimum" for standing flows from Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy constitutional standing requirements:  (i) a party must have suffered actual injury or show that such injury is imminent; (ii) the injury must be fairly traceable to the alleged wrongful conduct; and (iii) the requested relief must be likely to redress the injury alleged. *Id.* at 560–61; *Int'l Ass'n of Firefighters of St. Louis, Franklin & Jefferson Ctys., Local 2665 v. City of Ferguson*, 283 F.3d 969, 973 (8th Cir. 2002).

2.   *Prudential Standing*

Each objecting party must also show that three prudential considerations do not restrain the court from considering its objections. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1125 (8th Cir. 1999). A party lacks prudential standing where: (i) it is asserting a third party's rights; (ii) it alleges a generalized grievance rather than an injury particular to such party; or (iii) it asserts an injury outside the zone of interests the statute at issue was designed to protect. *Valley Forge*, 454 U.S. at 474; *Warth*, 422 U.S. at 489.

3.   *Additional Limits on Standing in Bankruptcy Cases*

Courts apply standing requirements particularly strict in bankruptcy cases. *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 641 n.2 (2d Cir. 1988); *see also A.P.I.*, 331 B.R. at 857 (noting that "the coordinated-but-patchwork structure of a plan thus merits, and even mandates," that courts analyze each objector's standing based on its specific stake in each issue it raises); *In re Evans Prod. Co.*, 65 B.R. 870, 874 (S.D. Fla. 1986) ("[Parties] have standing only to challenge those parts of a reorganization plan that affects their direct interests."). Strict adherence to standing principles in the bankruptcy context is necessary because bankruptcy cases involve "clouds of persons indirectly affected by the acts and entitlements of others [who] may buzz about, delaying final resolution of cases." *Matter of Deist Forest Prod., Inc.*, 850 F.2d 340, 341 (7th Cir. 1988); *see also A.P.I.*, 331 B.R. at 855. While it may serve the interests of certain objecting parties to delay and complicate these proceedings by any means possible, such parties are not permitted to use arguments belonging to other parties as a pretense for doing so.

**B.   Objecting parties lack constitutional standing to assert many of their objections**

Constitutional standing does not exist in the many instances in which objecting parties have objected to plan provisions that do not adversely impact their interests. *See In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999) (stating that an insurer's objections to confirmation "are limited to the plan provisions that allegedly affect its interests"). Many of the objections allege no injury at all, but simply reference the rights of third parties. A party whose rights are unimpaired has no right to object to confirmation. *In re Orlando Inv'rs, L.P.*, 103 B.R. 593, 596 (Bankr. E.D. Pa. 1989); *see also In re Mid-Valley, Inc.*, 305 B.R. 425 (Bankr. W.D. Pa. 2004). Similarly, in a large number of instances, the alleged impact on objectors' rights is not "fairly traceable" to this bankruptcy case or to the Committee's Plan. *See Lujan*, 504 U.S. at 560.

**C.   Many objections fail to satisfy prudential standing requirements as well**

   1.   *The objectors improperly assert rights of third parties*

A fatal problem with many of the objections is that they attempt to assert the rights of third parties. As the Second Circuit has held:

> The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing itself.

*Kane*, 843 F.2d at 644 (citations omitted). Courts uniformly reject attempts by one party to object to confirmation based on the rights of another party. *In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002) (litigants must assert their own rights rather than those of third parties); *First Cincinnati, Inc. v. Corbin*, 286 B.R. 49, 52–53 (B.A.P. 6th Cir. 2002) (finding insurance company lacked standing to assert third parties' rights); *In re Quigley Co., Inc.*, 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ("[A] 'party in interest' cannot assert third party rights defensively to defeat

confirmation even if confirmation would directly and adversely affect its own rights. Instead, the objecting party can only challenge the parts of the plan that directly implicate its own rights and interests."); *In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 647 (Bankr. E.D. Pa. 1991) (finding creditors lack standing to challenge those portions of reorganization plan that do not affect their interests); *Mid-Valley*, 305 B.R. at 428–29; *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 719 (Bankr. Del. 2002) (stating that it is a general principle of standing in bankruptcy that a party may assert only its own legal interests and not the interests of another); *Westwood Plaza Apartments*, 147 B.R. 692, 698 (Bankr. E.D. Tex. 1992) (finding creditors lack standing to challenge provisions of a plan that do not affect them); *In re Wonder Corp. of Am.*, 70 B.R. 1018, 1023 ("[N]o party may successfully prevent the confirmation of a plan by raising rights of third parties who do not object to confirmation . . . .").

In this case, objecting insurers have raised issues of solicitation, feasibility, classification, unfair discrimination, third-party releases, treatment of claimants under the Trust, the Debtor's religious freedom rights, and other issues that do not threaten (or even implicate) the insurers' rights. *See* App'x 1. The insurers do not have standing to raise these issues.

Similarly, the Debtor raises issues of solicitation and treatment of certain creditor classes, *see* App'x 1, and the Debtor does not have standing to raise such issues. *In re Evans Prods. Co.*, 65 B.R. 870, 875 (Bankr. S.D. Fla. 1986) ("It defies logic to allow the debtors . . . to raise the right of creditors in order to challenge the overall Plan . . . ."); *Matter of Snyder*, 56 B.R. 1007, 1011 (N.D. Ind. 1986) (ruling that creditors, not the debtor, had standing to object to the adequacy of a disclosure statement).

2.    *Objecting parties fail to allege an injury particular to them in support of many objections*

To the extent they allege an injury at all, the Debtor, objecting parishes, and objecting insurers allege, only a generalized grievance as opposed to an injury relating particularly to their rights and interests. As a result, each objecting party fails to satisfy the second requirement necessary for prudential standing with respect to many objections. *Valley Forge*, 454 U.S. at 474; *Warth*, 422 U.S. at 489.

For example, the Debtor objects to the Committee's Plan on grounds related to solicitation. [ECF 1118, at 26, 41–44.] These objections do not relate to the Debtor's rights and interests. Instead, they relate to the interests of creditors and other parties. Such objections are quintessential examples of what the Supreme Court calls *generalized grievances* because they have no relationship to any potential impact that confirmation of the Committee's Plan may have on the particular rights or interests of the Debtor. The Debtor thus cannot satisfy the second requirement of prudential standing with respect to its objections based on solicitation.

Many objections asserted by insurance companies similarly fail to satisfy the second requirement for prudential standing. Various insurers object to the Committee's Plan on grounds related to solicitation, due process, feasibility, and means of implementation [ECF 1110, at 2–4; ECF 1111, at 2–3, 5–6; ECF 1121, at 16–23, 25–26, 35–37], but those objections fail to identify a single potential, particular injury arising from purported failings of the Committee's Plan that relate to the rights and interests of such insurers.

3.    *The objecting insurers do not fall within the statutory zone of protection established by the Code's confirmation provisions*

Because objections to the Committee's Plan are based on federal statute, to satisfy the third prudential standing requirement, each objecting party must fall within the category of parties

that such statutory provisions were intended to protect. *Tippet v. Umpqua Shopping Ctr., Inc.*, 111 B.R. 303, 305 (B.A.P. 9th Cir. 1990); *In re Rimstat, Ltd.*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996) ("[T]o have standing to invoke a statute, you must be one of the persons whom the statute is intended to protect . . . ."); *see also Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 907 (8th Cir. 2002); *David v. Seidler (In re HST Gathering Co.)*, 125 B.R. 466, 467 (Bankr. W.D. Tex. 1991) (finding that objecting party lacked standing because "he is not within the zone of interests intended to be protected" under the Code).

The objecting insurers are not parties-in-interest whose rights are intended to be protected by the provisions of the Code governing confirmation. Because they do not have interests within the zone of protection, the objecting insurers lack standing to pursue their Objections.

## D.   Section 1109(b) regarding "party-in-interest" does not confer standing on the objecting insurers

The objecting insurers contend, as they have without success in other bankruptcy cases, that section 1109(b) grants them standing on all issues. This is not the case. Section 1109 merely provides, in relevant part, that:

> A party-in-interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). This broad "right to be heard" language does not confer standing on the objecting insurers to object to any issue related to the Committee's Plan.

As a threshold matter, the objecting insurers are not creditors or otherwise among the entities named in section 1109(b). It is true that section 1109's use of the word "including" suggests that the list of entities provided is not exclusive. *In re Newcare Health Corp.*, 244 B.R. 167, 170 (B.A.P. 1st Cir. 2000). Even assuming for the sake of argument, however, that the

Debtor's insurance companies are parties-in-interest, that classification alone does not give them standing to object to the Committee's Plan. Even parties-in-interest must satisfy the general requirements of the standing doctrine. *S. Boulevard, Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (Bankr. S.D.N.Y. 1997).

The Supreme Court has recognized that section 1109(b) does not vitiate the prudential standing doctrine. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A. (In re Hen House, Inc.)*, 530 U.S. 1, 8 (2000) ("[W]e do not read section 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties."). Consistent with the Supreme Court's requirements for prudential standing, the right to be heard as a "party-in-interest" under section 1109(b) does not authorize parties-in-interest to assert rights possessed solely by others. *See also In re Orlando Invs.*, 103 B.R. at 597; *EFL Ltd. v. Miramar Res., Inc. (In re Tascosa Petroleum Corp.)*, 196 B.R. 856, 862 (Bankr. D. Kan. 1996) (party lacks standing to object to contested matters and plan confirmation in which party had no interest of its own).

"All [section 1109(b)] means is that anyone who has a legally protected interest is entitled to assert that interest with respect to any issue to which it pertains." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992). "Thus, although section 1109(b) of the Code provides that a 'party in interest' may appear and be heard on any issue, a party claiming to be a party in interest must still satisfy the general requirements of the standing doctrine." *S. Boulevard, Inc,.* 207 B.R. at 61. "To have standing to invoke a statute, you must be one of the persons whom the statute is intended to protect." *In re Rimsat, Ltd.*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996) (quoting *James Wilson*, 965 F.2d at 168); *EFL Ltd.* 196 B.R. at 863–64 (holding that section 1109(b) did not convey prudential standing on objecting party); *In re Orlando Invs., L.P.*, 103 B.R. at 597

(right to be heard under Section 1109(b) does not include "the right to assert interests possessed solely by others"); *In re Keck, Mahin & Cate*, 241 B.R. at 596.

In briefing this issue, the objecting insurers conspicuously fail to reconcile their position with, or even cite to plainly relevant precedent from this district. In *A.P.I.*, Judge Kishel granted insurers standing to participate in confirmation, but "only insofar as the plan touche[d] on the relationship of indemnitor and indemnitee, under contract and applicable law." *A.P.I.* 331 B.R. at 861; *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 223 (3d Cir. 2004), *as amended* (Feb. 23, 2005). In other words, Judge Kishel held the insurers in the *A.P.I.* case to the standard articulated by the Supreme Court and the fundamental requirements of prudential standing. Rather than heed or distinguish Judge Kishel's decision, relevant U.S. Supreme Court precedent, and the requirements of prudential standing, the insurers opted instead to assert a wide range of objections that have nothing to do with their rights or interests in an attempt to defeat confirmation of the Committee's Plan by any means necessary.[56]

The objecting insurers, the Debtor, and the parishes (including the Parish Committee) cannot object to confirmation of the Committee's Plan based on the rights of others. The Court should therefore overrule the Objections where objectors lack the requisite standing. *See* App'x 1.

---

[56] For example, the objecting insurers raise objections on behalf of Class 15 and 16 claimants. [ECF 1111, at 6–7; ECF 1121, at 37–39.] To the Committee's knowledge, no claims were ever filed by claimants in either of these classes; therefore, if the insurers had not inappropriately acted on behalf of third-parties, those issues would never need to be briefed and discussed.

## IX. Response to Catholic Mutual Relief Society of America's ("Catholic Mutual") Objections [ECF 1111]

### A. The Committee's Modified Plan resolves several of Catholic Mutual's objections

While only voting creditors have standing to raise objections related to solicitation, *see infra* Section VIII, the Committee has addressed Catholic Mutual's concerns[57] regarding certain definitions as follows:

- The Committee's Plan has been revised to remove the definition of "Channeling Claim." [ECF 1129, at § 1.1.]

- The Committee's Plan has been revised to remove the definition of "Channeling Injunction" and to remove any references to "Channeling Injunction." [ECF 1129, at § 1.1.]

- The Committee's Plan has been revised to remove the definition of "Settling Insurer Supplemental Injunction" and any references to the same in § 6.3(a)(3). [ECF 1129, at § 1.1.]

- Exhibit D of the Committee's Plan has been revised to incorporate the same definitions as those used in the Committee's Modified Plan, and § 2.1 of the Trust Agreement has been amended to remove the reference to $34,500,000 in cash proceeds from Insurance Settlements. [ECF 1129, Ex. D.]

- The Committee's Plan has been revised to provide for an injunction in favor of Home Insurance Company applicable to any third-party claims by other insurers alleging contribution, indemnification, or subrogation under Home Insurance Company Policies (the "Home Insurance Company Supplemental Injunction"). [ECF 1129, §§ 1.1, 14.2(c).]

### B. The Committee's Plan does not unduly prejudice Non-Settling Insurers' pre-petition rights[58]

Catholic Mutual objects to Committee's Plan Section 6.3(a)(1), which provides that the Non-Settling Insurers retain any defenses except for any defense "(1) related to the transfer of the Transferred Insurance Interests to the Trust; (2) effected by operation of bankruptcy law as a result of confirmation; or (3) based on facts determined by the Bankruptcy Court in connection

---

[57]    Catholic Mutual objected to the "alleged inaccuracies and inconsistencies" in the Committee's Plan in its Objection 1.

[58]    This responds to Catholic Mutual's objection 3.

with confirmation." It is well-established that federal bankruptcy law preempts any insurance policy provision or state law purporting to prohibit assignment of insurance policy rights. *See In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 374, 378 (3d Cir. 2012) (holding that 11 U.S.C. §§ 1123(a)(5)(B) and 541(c)(1) operate to preempt anti-assignment provisions of insurance policies in the context of Chapter 11 bankruptcy proceedings); *In re Thorpe Insulation Co.*, 677 F.3d 869, 889-90 (9th Cir. 2012) (anti-assignment provisions barring transfer to a Trust were expressly preempted under 11 U.S.C. § 541(c)); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 94-95 (D. Del. 2006) (upholding determination that anti-assignment clauses in insurance policies are preempted by §§ 541(c)(1) and 1123(a)(5)(B)). Moreover, such non-reservation would occur by operation of law (e.g., by operation of issue or claim preclusion) even in the absence of any express provision of the Committee's Plan. Out of an abundance of caution, however, the references to any non-reserved defenses are deleted in the Committee's Modified Plan.

## C. The insurers' insistence on a settling insurer injunction violates their legal and contractual obligations and constitutes bad faith[59]

Catholic Mutual argues that, without any channeling injunction or Settling Insurer Supplemental Injunction, "it is improbable that any insurer would agree to settle with the Archdiocese or the Trust (post-confirmation)." This is not a legal objection to confirmation of the Committee's Plan; the Committee's Plan is feasible and confirmable without any injunctions in favor of Settling Insurers and non-debtors. Non-Settling Insurers have legal and contractual obligations to the Archdiocese and Reorganized Debtor to provide a defense and indemnity coverage for judgments or settlements. *Short v. Dairyland Ins. Co.*, 334 N.W.2d 384, 387 (Minn. 1983) ("[T]he insurer's right to control the negotiations for settlement must be subordinated to the purpose of the insurance contract—to defend and indemnify the insured within the limits of

---

[59]     This responds to Catholic Mutual's objection 2.

the insurance contract."). To the extent that the Non-Settling Insurers would impose additional conditions on coverage, including a channeling injunction or the Settling Insurer Supplemental Injunction, they act in breach of their legal and contractual obligations to the Archdiocese and Reorganized Debtor.

Moreover, insurer insistence on these extra conditions constitutes bad faith. If the Committee's Plan granted a Settling Insurer injunctive relief against claims of such Non-Settling Insurers, the Plan would take away the Non-Settling Insurers' rights to protect themselves by asserting claims against Settling Insurers, such as through claims of contribution, equitable subrogation and indemnity. The Non-Settling Insurers would surely cry foul and refuse to provide coverage if rights to pursue other responsible insurers were compromised by a channeling injunction or a Settling Insurer Supplemental Injunction.[60] *See, e.g.*, *Walls v. Amerisure Mut. Ins. Co.*, 343 F.3d 881, 885–86 (6th Cir. 2003) ("The provisions clearly require that insureds not release others from liability or waive [the insurer's] subrogation rights without [the insurer's] permission. By releasing [defendant] and his insurer, the plaintiffs breached these provisions."); *Schwickert, Inc. v. Winnebago Seniors, Ltd.*, 680 N.W.2d 79, 84–86 (Minn. 2004) (acknowledging policy language requiring the insured to protect the insurer's subrogation rights, but suspending that obligation where the insurer erroneously denied coverage and failed to defend).

Insurers routinely assert contribution, subrogation, and/or indemnity claims against one another for defense and indemnity expenses. Indeed, Catholic Mutual recently filed a contribution claim against Security Insurance Company of Hartford with respect to defense costs for 28 sexual abuse claims made against the Diocese of St. Cloud which overlap their policy

---

[60]     Non-Settling Insurers with potential claims against Home Insurance Company ("Home") will not suffer prejudice from the Committee's Plan's injunction against pursuing Home. Home is insolvent, in liquidation, and such claims are already barred by operation of law.

periods. *See* Complaint, *The Catholic Mut. Relief Soc'y of Am. v. Arrowood Indem. Co., et al.*,

Case No. 0:17-cv-03141 (D. Minn.) (filed on July 20, 2017). Insurers must comply with their

existing legal and contractual obligations to provide coverage to their insureds, and it is improper

for Catholic Mutual (or any other Non-Settling Insurer) to impose extra conditions in any event,

least of all conditions that might eliminate other insurance coverage to the detriment of the

Archdiocese, the Reorganized Debtor and/or the Trust.

### D.    Catholic Mutual lacks standing to raise several of its objections[61]

Catholic Mutual objects to the Committee's Plan on the basis of its treatment of Classes

7, 8, and 15. [ECF 1111, 4–7.] Catholic Mutual is not a member of those creditor classes and

does not have standing to raise the claims of third-parties. *See supra* Section VIII.C.1. The

substance of Catholic Mutual's objections on these issues is dealt with in response to the Parish

Committee's objections. *See supra* Section II.A.

Catholic Mutual also objects to the feasibility of the Committee's Plan and alleges the

Committee lacked good faith in proposing its Plan. [ECF 1111, 2–3, 5–6.] These objections

represent generalized grievances for which Catholic Mutual does not have standing. *See supra*

Section VIII.C.2. The substance of these objections addressed in the responses to the Debtor's

objections. *See supra* Sections I.A, II.D.

---

[61]    This section addresses Catholic Mutual's objections 4, 5, and 6.

X.  **Response to Objections of Travelers Casualty and Surety Company, Hartford Accident and Indemnity Company, American Home Assurance Company, TIG Insurance Company, and Fireman's Fund Insurance Company ("Travelers et al. Objectors") [ECF 1110]**

A.  **The Court has authority to address the validity of the transfer of insurance interests[62]**

The Travelers et al. Objectors assert that the Committee's Plan improperly requires the Court to issue an advisory opinion on the assignment of transferred insurance interests. [ECF 1110, at 5.] There is a case or controversy under Article III if the matter is actually disputed and resolution would affect the rights of the litigants. *See Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)); *Matter of Shondel*, 950 F.2d 1301, 1309 (7th Cir. 1991). Any court order finding the assignment valid and allowing the transfer to the Trust would affect the rights of litigants, and, therefore, would not be merely an advisory opinion. *In re Lazy Days' RV Center Inc.*, 724 F.3d 418, 422-23 (3d Cir. 2013) (holding that a bankruptcy court order declaring an anti-assignment clause to be invalid was not an advisory opinion because it affected the litigants' rights).

This is not, as the Travelers et al. Objectors suggest, a matter of determining the Debtor's contractual rights to assign policy proceeds under the Policies. The transfer is authorized by law regardless of any provisions in the Insurance Policies to the contrary. Minnesota nonbankruptcy law permits assignments of post-loss proceeds regardless of whether the policies purport to prohibit policy assignment. *See Star-Windshield Repair v. W. Nat'l Ins. Co.*, 768 N.W.2d 346, 350–351 n.6 (Minn. 2009); *Windey v. N. Star Farmers Mut. Ins. Co.*, 43 N.W.2d 99 (Minn. 1950). Also, a Debtor's rights under its insurance policies are property of the estate. *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004, at *2 (D. Minn. May 25, 2006) (stating that "API's asbestos insurance policies are part of API's estate"). For jurisdictions like

---

[62]      This section addresses Travelers et al. Objectors' objection D.

Minnesota that permit post-loss transfer of policy proceeds, there is no violation of an anti-assignment clause in the post-loss transfer of a debtor's insurance rights and interests to a trust. *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 313 (W.D. Pa. 2006). And even if Minnesota upheld the validity of anti-assignment clauses with respect to post-loss transfers of policy proceeds, 11 U.S.C. § 1123(a)(5)(B) would preempt any policy terms that would otherwise bar assignments. *In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 374, 378 (3d Cir. 2012). This provision of the Bankruptcy Code expressly authorizes transfer notwithstanding any contrary law: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B).

Because federal law expressly authorizes the issuance of a plan containing such transfer, the validity of that transfer is necessarily before the Court. By challenging the validity of the assignment on the merits in this Court, the Travelers et al. Objectors are also invoking the litigation process, raising actual controversies on the merits, and compelling the issuance of a ruling affecting the insurers' rights. [ECF 1110, at 11–12.][63]

Neither of the cases cited by the Travelers et al. Objectors suggests that this Court would be precluded from ruling that the assignment is a valid transfer under federal law and Minnesota state law. In *Sunflower Racing v. Mid-Continent Racing & Gaming Co.*, 226 B.R. 673, 694 (D. Kan. 1998), the court held only that it did not have authority to terminate contractual rights of a third party. In relevant part, the case only analyzed the scope of the court's ability "to grant non-

---

[63]     The Travelers et al. Objectors have not objected to an identical provision in the Archdiocese Plan. [ECF 887, § 5.1(c)(3) ("The Bankruptcy Court shall determine at the Confirmation Hearing (i) whether the assignment of the Transferred Insurance Interests provided for in this Section is valid, and (ii) whether such transfer or the Discharge and Injunctions set forth in Sections 13.2, 13.3, 13.5, and 13.6, or any other term of the Plan, void, defeat, or impair the insurance coverage issued by the Non-Settling Insurers."]

debtor discharges." *Id.* at 692–93. The case did not concern the issuance of advisory opinions or the validity of an assignment of the Debtor's property for the benefit of creditors. In *MFS Telecom, Inc. v. Motorola, Inc.*, 262 B.R. 893, 899 (D. Del. 2001), another case cited by the Travelers et al. Objectors, the Bankruptcy Court lacked authority to issue an injunction prohibiting a utility from terminating services due to the debtor's post-petition default where such termination rights were granted in another provision of the Code. Here, on the other hand, federal law authorizes the Court to confirm a plan providing for the transfer of the Debtor's assets, the insurance rights are part of the Debtor's assets, and state and federal law authorize this transfer regardless of any potential anti-assignment clause in the Travelers et al. Objectors policies. *In re Fed.-Mogul*, 684 F.3d at 374, 378. The Court, therefore, has clear authority to address the validity of the transfer in any plan confirmation.

**B.    The Committee's Modified Plan resolves several of the Travelers et al. Objectors' objections**

1.    *The provision of a Litigation Claimants' right to intervene is removed from the Committee's Modified Plan*

The Travelers et al. Objectors allege that the Committee's Plan improperly grants Litigation Claimants the right to intervene in the Insurance Coverage Adversary Proceeding.[64] The Litigation Claimants' right to join or intervene into the Insurance Coverage Adversary Proceeding is removed in the Committee's Modified Plan. [ECF 1129, at § 6.2(i)(5).]

2.    *Allowing the Trustee to object to claims does not preclude other parties from objecting*[65]

The Travelers et al. Objectors object to the Committee's Plan's Section 6.2(l)(1). The Travelers et al. Objectors incorrectly allege that this provision in the Committee's Plan prevents

---

[64]    This responds to the Travelers et al. Objectors' objection G.
[65]    This responds to the Travelers et al. Objectors' objection I.

insurers "from asserting their right to object to claims." [ECF 1110, at 11.][66] Allowing the Trustee to object to a Tort Claim does not preclude the Archdiocese, Reorganized Debtor, and/or their Non-Settling Insurers from also objecting to claims and controlling the Archdiocese's defense of the Tort Claims. In an abundance of caution, however, the Committee's Modified Plan explicitly states that the Trustee's right to object to a Tort Claim "will not affect or impair any right the Archdiocese, Reorganized Debtor and/or Non-Settling Insurer may have under the Insurance Policies or applicable law to object to such Class 6 claims." [ECF 1129, at § 6.2(l).]

3. *The Committee's Modified Plan removes reference to the Trustee initiating proceedings to judicially determine liability*[67]

In response to the Travelers et al. Objectors concern regarding the Trustee's ability to initiate a court proceeding to obtain a judicial determination of liability for insurance purposes, the relevant language has been removed from the Committee's Modified Plan. [ECF 1129, at § 6.2(l).]

4. *Advisory opinions regarding future defenses and policy conditions*[68]

The Travelers et al. Objectors object to Committee Plan's Section 6.2(l)(1), arguing that this Court cannot rule at the confirmation hearing on whether the insurance policy conditions are satisfied because such a ruling would be an advisory opinion. The Travelers et al. Objectors misconstrue this provision of the Committee's Plan, which merely authorizes the Trustee to initiate a court proceeding to obtain a judicial determination of the Archdiocese and/or Reorganized Debtor's liability.[69] Further, as discussed in response to the Travelers' et al.

---

[66]    Again, the Travelers et al. Objectors did not object to an identical provision in the Archdiocese's Plan. [ECF 887, § 5.2(m).] Actually, the Archdiocese Plan allows the Trust to take *exclusive* control of the objection process, while the Committee Plan does not.
[67]    This responds to the Travelers et al. Objectors' objection I.
[68]    This section addresses the Travelers et al. Objectors' objections E and H.
[69]    In stark contrast, the Archdiocese Plan (to which the Insurers have not objected) requires the Bankruptcy Court to determine at the confirmation hearing whether any Plan provision voids, defeats, or impairs coverage under the insurance policies. [ECF 887, § 5.1(c)(3).]

Objectors Objection D and Catholic Mutual Objection 3 (*see* discussion supra, Sections IX.B,

X.A), the Court has authority to determine the validity of any assignment of insurance interests

and rights at the confirmation hearing, and a court order upholding the validity of plan provisions

would not be advisory because any such order would affect the rights of litigants and is

authorized by federal bankruptcy law. Nevertheless, in an abundance of caution, the

Committee's Plan has been modified to delete this provision. [ECF 1129, § 6.2(l)(1).]

The Travelers et al. Objectors also object to the Committee Plan's provisions concerning

defenses that the Non-Settling Insurers do not retain, asserting that the Court would be issuing an

advisory opinion by confirming a Plan with such terms. [ECF 1110, at 6–7.] In an abundance of

caution, the Committee Modified Plan deletes all references to non-reserved defenses.

### C.    The Committee's Plan does not require the Debtor to breach its duty of cooperation[70]

The Travelers et al. Objectors allege that the Committee's Plan requires the Archdiocese

to breach its duty of cooperation to insurers by requiring cooperation with the Tort Claims

Reviewer and the Trustee in prosecuting claims against Non-Settling Insurers and in connection

with administration of the Trust Distribution Plan. [ECF 1110, 7–8.]

First, it is not a violation of the duty of cooperation for an insured to file a lawsuit against

its insurer. If it were, the insured *could never* prosecute a claim against its insurer. The

Reorganized Debtor will not violate any duty of cooperation by asserting its interests against

Non-Settling Insurers pursuant to the Committee's Plan Section 6.1(c)(1)(i).[71] The Travelers et

al. Objectors have not cited any authority supporting their counterintuitive position.

---

[70]     This responds to the Travelers et al. Objectors' objection F.

[71]     The Archdiocese's Plan contains very similar terms, requiring the Protected Parties to "assert their Interests against a Non-Settling Insurer" at the Trust's request, and to pay any recoveries to the Trust [ECF 887, § 5.1(c)(5)(i), (iv).]

Second, it is not a violation of the duty of cooperation to compel the Archdiocese and Reorganized Debtor to "reasonably cooperate with the Tort Claims Reviewer and the Trustee . . . in connection with any inquiries by either in the administration of the Trust Distribution Plan."[72] [ECF 890, at § 6.2(b).] This plan provision does not require the Archdiocese to cooperate with or provide information to the *Tort Claimants*, but instead to a Trust responsible for distributing insurance assets. The Tort Claims Reviewer and Trustee need information from the Archdiocese and/or Reorganized Debtor to determine whether a Qualified Claimant is entitled to a distribution under the Distribution Plan and, if so, to assign points to the Qualified Claimant pursuant to the Trust Distribution Plan. And an insured can jointly discharge its plan duties to participate in a claims review process and its duty to cooperate with the insurer. *See, e.g.*, *UNR Inds., Inc. v. Cont'l Ins. Co.*, No. 85 C 3532, 1992 WL 51708, at *4 (N.D. Ill. Mar. 6, 1992) (holding that an insured's duty to cooperate with its insurer compelled it to disclose documents and data generated through its participation in the claims review process). The Travelers et al. Objectors have not cited any authority supporting the proposition that providing information to the Tort Claims Reviewer and Trustee would violate a duty of cooperation.

Further, under the terms of the Committee's Plan, the Tort Claim Reviewer's and Trustee's determinations have no impact on the rights of the Non-Settling Insurers. [ECF 890, § 6.2(b) ("Under no circumstance shall the Tort Claims Reviewer's review of a Class 6 Claim or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer.").] The Committee's Plan further provides that the Tort Claims Reviewer's determinations "shall not constitute a determination of the Archdiocese's liability or damages for Class 6 Claims." [*Id.* § 4.6(b).] Because the Trust's determinations have no impact upon the rights of the Non-Settling Insurers, any information provided by the Archdiocese to the Trust

---

[72]      Once again, the Archdiocese's Plan contains the exact same language. [ECF 887, ¶ 5.2(b)(1).]

will not harm the interests of the Non-Settling Insurers or violate any duty of the insured not to concede liability. *Cf. In re A.P.I.*, 331 B.R. 828, 849-50 (Bankr. D. Minn. 2005) (consummation of the Debtor's plan would not violate insured's duty of cooperation where plan language required Debtor to continue to cooperate with and assist insurers in defending any claim pursued outside of Trust Distribution Procedure's claim estimation process). Moreover, under the Committee's Plan the Archdiocese and Reorganized Debtor will remain obligated to honor all their obligations to the Non-Settling Insurers, including their duties of cooperation.

Nevertheless, in an abundance of caution, the Committee's Plan has been amended to clarify that the Archdiocese and the Reorganized Debtor "shall not be required to act in any way that violates its contractual duty to cooperate with a Non-Settling Insurer." [ECF 1129, at § 6.2(b).]

### D. Assignment of insurance proceeds arising from personal injury claims is permissible

It is permissible under Minnesota law to assign, under the loss, the insured's rights in insurance policy proceeds and claims arising from an insurer's breach of contract and bad faith in failing to defend and/or indemnify for claims. *See Star-Windshield Repair v. W. Nat'l Ins. Co.*, 768 N.W.2d 346, 350 n.6 (Minn. 2009); *Windey v. N. Star Farmers Mut. Ins. Co.*, 43 N.W.2d 99 (Minn. 1950). This law does not change when the insurance contract claims arise from the insurers' obligations with respect to personal injury actions. This is an insured's assignment of contract-based rights and claims against the insurer, not the assignment of a Tort Claimant's personal injury claim against the insured.

The Travelers et al. Objectors cite *Leuthold v. Redwood County*, 288 N.W. 165 (Minn. 1939) and *National Union Fire Ins. Co. v. Grimes*, 153 N.W.2d 152 (Minn. 1967), for the proposition that "[p]ersonal injury claims are not assignable under Minnesota law." [ECF 1110,

11–12.] Perhaps this proposition is true, but the Committee Plan *does not* assign personal injury claims. Neither *Leuthold* nor *Grimes* addressed what the Committee Plan *does* assign to the Trust. That is, neither of those cases addressed the assignment of liability insurance policy proceeds, a breach of contract claim for liability insurance proceeds, a claim based on an insurer's misconduct in refusing to provide insurance coverage or extracontractual remedies arising from these sorts of claims. Moreover, both of those cases held the challenged claims were, in fact, proper and enforceable. In *Leuthold*, the Minnesota Supreme Court ruled that a contract-based claim against a debtor for failure to pay a debt owed was validly assigned and enforceable, and it effectively made the debtor pay twice on the same contract-based claim. 208 N.W. at 166-67. As the Minnesota Supreme Court noted in *Grimes*, "[n]o suit by an assignee is involved." 153 N.W.2d at 155. The Court merely ruled that a plaintiff/insurer that had provided first-party medical insurance benefits to its own insured, the defendant, could sue and recover from that defendant/insured for reimbursement based on a personal injury settlement paid by a tortfeasor. *Id.*

The Travelers et al. Objectors' brief also cites a string of cases from other jurisdictions for the proposition that "[w]here a personal injury claim is not assignable, the proceeds of such a claim are likewise not assignable.'" [ECF 1110, 12.] The objectors' cases, however, are easily distinguishable.   Unlike the Committee Plan, each of the objectors' cases involved the assignment of proceeds (1) by an injured person, and (2) before the injured person's claim giving rise to those proceeds was liquidated by settlement or judgment.[73] In contrast, the Committee's

---

[73]     *See S. Farm Bureau Cas. Ins. Co. v. Wright Oil Co.*, 454 S.W.2d 69, 72 (Ark. 1970) ("[A] survival assignment does not confer the power of assignment of an *unliquidated tort claim* for personal injuries.  It follows, of course, that we also reject the appellee's secondary argument that the proceeds of such a claim should be assignable *before judgment*, even though the cause of action itself is not.") (emphasis added); *Karp v. Speizer*, 647 P.2d 1197, 1198; *see also id.* at 1200 (citing *Allstate Ins. Co. v. Druke*, 576 P.2d 489, 491–92 ("Such an arrangement, *if made or contracted for prior to settlement or judgment*, is the legal requirement of an assignment and therefore unenforceable.") (emphasis added)); *McGhee v. Charley's Other Brother*, 391 A.2d 1289, 1293

Plan does not contemplate the *Tort Claimant's* assignment of his or her Tort Claims or the proceeds thereof to the Trust. Indeed, the object of the Committee Plan is to ensure that the Class 6 and Class 7 Claimants *receive from the Trust* (not assign to the Trust) distributions of estate assets in respect of their Tort Claims. In order to facilitate that distribution, the Committee's Plan involves the *Debtor's* assignment of the assets of the bankruptcy estate to the Trust. Those assets consist of insurance policy proceeds and insurance-related claims, but they also include non-insurance policy-related assets. To the extent that any Tort Claimants could ever have direct rights to the proceeds of the Debtor's insurance policy proceeds, those rights would only exist after judgment was entered or settlement was reached—*i.e.*, when their Claims were liquidated. This is entirely distinguishable from the circumstances in the cases on which the Insurers rely, in which tort claimants assign proceeds to claims against tortfeasors (not their insurers) prior to the point at which those claims are liquidated.

Moreover, federal bankruptcy law preempts any state law or policy provisions purporting to prohibit assignment of such claims for insurance proceeds, including claims that arise from bodily injury liability. *See, e.g.*, *In re Fed.-Mogul*, 684 F.3d at 374, 378 (holding that 11 U.S.C. §§ 1123(a)(5)(B) and 541(c)(1) preempt contractual prohibitions on assignment of insurance policy proceeds). Therefore, even if the law were as the Travelers et al. Objectors erroneously imply, the assignment would still be permissible. And again, the Travelers et al. Objectors chose

---

("Since the trust agreement transfers from Mozee to the Automobile Association a right to payment out of the proceeds of a settlement or judgment not yet received, in accomplishes exactly the same objective as contractual arrangements found to be void . . . Therefore the provision must be declared void because it contravenes the common law of this State."); *N. C. Baptist Hosps., Inc. v. Mitchell*, 362 S.E.2d 841, 843 (N.C. Ct. App. 1987) ("The specific question involved here is whether there is a difference between the assignment of a claim and the assignment of its proceeds. We believe that the more reasoned view is that *such proceeds are not assignable before judgment*.") (emphasis added); *Harvey v. Clemon*, 400 P.2d 87, 88–89, 90 (Wash. 1965) (citing Restatement Contracts § 547 ("An assignment of a claim against a third person . . .is illegal and ineffective if the claim is for . . . (d) damages for an injury . . . *unless the claim has been reduced to judgment*.") (emphasis added)).

not to object to the same Archdiocese Plan provisions transferring all the Archdiocese's rights in insurance policies with respect to the Tort Claims. [ECF 887, § 5.1(c).]

### E.    The Committee's Plan and the Trust Agreement do not violate champerty and maintenance rules[74]

The Travelers et al. Objectors argue that provisions of the Committee's Plan and the Trust Agreement violate 11 U.S.C. § 1129(a)(3) because they contravene Minnesota's prohibition on the related common law doctrines of champerty and maintenance. A contract between a "stranger to a lawsuit and a litigant by which the stranger pursues the litigant's claims as consideration for receiving part of any judgment proceeds" is champertous and void. *Maslowski v. Prospect Funding Partners LLC*, 890 N.W.2d 756, 763 (Minn. Ct. App. 2017), *review denied* (May 16, 2017). A contract is similarly void for maintenance when "assistance in prosecuting or defending a lawsuit [is] given to a litigant by someone who has no bona fide interest in the case." *Id.* The purpose behind these doctrines is to "prevent officious intermeddlers from stirring up strife and contention by vexatious or speculative litigation which would disturb the peace of society, lead to corrupt practices, and pervert the remedial process of the law." *Id.* (quoting *Huber v. Johnson*, 70 N.W. 806, 807 (Minn. 1897)). The Travelers et al. Objectors' argument fails because they cannot establish necessary elements of champerty or maintenance: (1) the Trust is not a stranger to the litigation; (2) the Trust does not profit from the litigation; and (3) the Plan serves proper purposes that promote, not thwart, valid public policy under the Code.

First, Travelers et al. Objectors contend that the Class 6 and Class 7 claimants play the role of the "litigant" and the Trust plays the role of "stranger" in the purported schemes of champerty and maintenance. As a matter of law, however, the Trust is not a stranger to the

---

[74]    This responds to the Travelers et al. Objectors' objection K.

litigation. The claimants are beneficiaries of the Trust and hold an equitable interest in the Trust assets or corpus. *United State v. O'Shaughnessy*, 517 N.W.2d 574, 577 (Minn. 1994) (noting that trust beneficiaries retain equitable interest in a trust). This equitable interest gives the Trust a *bona fide* interest in any litigation brought by the claimants affecting estate assets, which are also Trust assets. *Hannigan v. Italo Petrol. Corp. of Am.*, 178 A. 589, 592 (Del. Super. Ct. 1935) ("[I]f the person agreeing to prosecute a suit on the above terms *had any legal or equitable interest in the subject matter*, other than by the terms of the agreement under which the suit was brought, he was not a mere volunteer but an interested party, and was, therefore, not guilty of making a champertous agreement.") (emphasis added); *see In re Charlotte Com. Grp., Inc.*, B-01-52684 C-7W, 2002 WL 31055241, at *3 (Bankr. M.D.N.C Aug. 12, 2012) (finding a party-in-interest to the bankruptcy not a stranger and therefore an assignment to the party could not be champertous); *Johnson v. Wright*, 682 N.W.2d 671, 678 (Minn. Ct. App. 2004).

Moreover, the Committee's Plan does not contain any feature pursuant to which the Trust would pursue the claimants' claims against the Archdiocese. That is, the Plan does not provide for an assignment of the claimants' claims against the Archdiocese to the Trust, let alone any mechanism by which the Trust would pursue the Archdiocese. Instead, the Trust takes only an assignment of the Debtor's rights and interests in its Insurance Policies with respect to the Tort Claims, and 11 U.S.C. § 1123(a)(5)(B) expressly permits a transfer of such "property of the estate to one or more entities" regardless of "otherwise applicable nonbankrupcy law." [75]

Next, there is no champerty because the Travelers et al. Objectors did not attempt to, and cannot, demonstrate that the Trust profits from the arrangement. *See Johnson*, 682 N.W.2d at 678–79. As provided in the Distribution Agreement, the Trust is required to distribute estate

---

[75] 11 U.S.C. 1123(a)(5) would preempt any state law (including champerty and maintenance) prohibiting an assignment of what is actually transferred to the Trust. *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 366 (3d Cir. 2012).

assets including litigation proceeds, which are earned by the Tort Claimants themselves, to the claimants.[76] The Trust does not keep excess funds or gain any pecuniary benefit. Because the Trust does not seek "to profit from the victims' case," *Johnson*, 682 N.W.2d at 679, it cannot be champertous.

Finally, the Trust's purpose is plainly not to "stir up strife by vexatious or speculative litigation which would disturb the peace of society, lead to corrupt practices, and pervert the remedial process of the law." *Huber*, 70 N.W. at 807. Instead, the Trust serves the legitimate bankruptcy functions of (a) preserving estate assets; (b) gathering and maximizing those assets; and (c) distributing proceeds of those assets in an equitable manner, which are entirely consistent with the public policies promoted by the Bankruptcy Code. *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. Partn.*, 526 U.S. 434, 453 (1999) (discussing the purpose of the Bankruptcy Code); *In re Friedman's Inc.*, 738 F.3d 547, 561 (3d Cir. 2013) (validating purposes of maximizing estate assets for distribution to creditors in an equitable manner). Naturally, the Travelers et al. Objectors dislike the Committee's Plan and the Trust Agreement provisions because they eliminate arguments that the Travelers et al. Objectors otherwise would deploy to avoid their insurance obligations altogether, maximize the incentives and leverage available to optimize insurance-related estate assets, and ensure that the Class 6 and Class 7 claimants are able to recover at least minimal compensation in respect of horrific circumstances. But the pejorative labels of "champerty" and "maintenance" just do not fit,[77] and the Committee's Plan and Trust Agreement provisions do not violate 11 U.S.C. § 1129(a)(3). Travelers et al. Objectors' argument fails because the Trustee would not be an "officious intermeddler" to any

---

[76] The Insurers' assertion that the Trust would certainly deny the claims of the Distribution Claimants in order to encourage more litigation, in breach of the Trusts' fiduciary duties, is wild speculation and meritless.

[77] If the Committee's Plan is champertous, it necessarily follows that no other chapter 11 plan could assign insurance proceeds for the benefit of tort claimants. As a consequence, a major tool in the bankruptcy process would be dulled and chapter 11 cases moving forward would be hindered.

litigation between Tort Claimants and the Archdiocese and, therefore, the policy behind Minnesota's champerty prohibition is not implicated here.

### F.    The Travelers et al. Objectors lack standing to raise several of its objections[78]

The Travelers et al. Objectors objects to the Committee's Plan on the basis of its treatment of Class 7. [ECF 1110, at 4–5.] The Travelers et al. Objectors are not a member of that creditor class and do not have standing to raise the claims of third-parties. *See supra* Section VIII.C.1. The substance of the Travelers et al. Objectors' objections on these issues is dealt with in response to the Parish Committee's objections. *See supra* Section II.A.5

The Travelers et al. Objectors also object to the feasibility of the Committee's Plan and allege the Committee lacked good faith in proposing its Plan. [ECF 1110, 1–4.] These objections represent generalized grievances for which the Travelers et al. Objectors do not have standing. *See supra* Section VIII.C.2. The substance of these objections is addressed in the responses to the Debtor's objections. *See supra* Sections I.B.3, I.D, I.K.

## XI.  Response to the LMI et al. Objectors' Objections to the Committee's Plan [ECF 1121]

### A.    The LMI et al. Objectors routinely mischaracterize and ignore provisions of the Committee's Plan

1.    *The Committee's Plan transfers all rights to insurance proceeds with respect to Class 6 Claims*[79]

The LMI et al. Objectors incorrectly allege that the definition of "Transferred Insurance Interests" in the Committee's Plan "does not include the right to insurance coverage for the Class 6 Claims." [ECF 1121, at 15.] In fact, the definition of Transferred Insurance Interests in the Committee's Plan expressly encompasses "all rights and interests of the Debtor and the Reorganized Debtor in Insurance Policies in respect of actual or potential coverage for any Class

---

[78]      This section addresses the Travelers' Objectors' objections B and C.
[79]      This section responds to the LMI et al. Objectors' objection 10.

6 Claim." [ECF 890, at § 1.1(sss).] The definition further specifies that the Transferred Insurance

Interests includes:

> (i) the proceeds of such Insurance Policies, and (ii) all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 6 Claim, including but not limited to all claims and causes of action for breach of the Insurance Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorney's fees and costs.

[ECF 890, § 1.1(sss).]

While the Committee's Plan's original language was sufficient to affect a transfer of all

rights to insurance proceeds with respect to Class 6 Claims, the Committee has modified its plan

to clarify that "Transferred Insurance Interests" includes all claims for insurance coverage arising

from Class 6 and Class 7 Claims with the addition of the following language: "and all claims for

such proceeds." [ECF 1129, § 1.1(ppp).]

> 2. *The Committee's Plan solely transfers Tort Claim insurance proceeds to the Trust*[80]

The LMI et al. Objectors again incorrectly interpret the Committee's Plan by arguing that

the Plan purports to transfer insurance proceeds paid for non-Tort Claims to the Class 6

Claimants. [ECF 1121, at 16–17.] The Committee's Plan's definition of Transferred Insurance

Interests encompasses "all rights and interests of the Debtor and the Reorganized Debtor in

Insurance Policies in respect of actual or potential coverage *for any Class 6 Claim*." [ECF 890,

§ 1.1(sss) (emphasis added).] The Committee's Plan also defines "Class 6 Claims" to include all

"Pending Tort Claims." [ECF 890, § 4.6(a).] The Committee's Plan thus explicitly only transfers

the rights and interests pertaining to coverage for Tort Claims. The Committee's Plan also

clearly provides for the Archdiocese and Reorganized Debtor to otherwise retain contractual,

---

[80]     This section responds to the LMI et al. Objectors' objection 11.

legal, and equitable rights under their insurance policies in all respects, except the transfer of rights and interests related to Tort Claims. [ECF 890, § 10.1.] Therefore, the LMI et al. Objectors' allegation that the Plan transfers non-Tort proceeds to the Trust is baseless and should be overruled.

3.   *Only the Debtor and Reorganized Debtor's insurance interests are transferred under the Committee's Plan[81]*

The LMI et al. Objectors claim that certain provisions transfer the insurance rights of non-debtor insureds (*e.g.*, the parishes) to the Trust, again citing the definition of Transferred Insurance Interests. [ECF 1121, at 29–30.] In making this argument, the LMI et al. Objectors misconstrue the plain language of the Committee's Plan and omit critical portions of the definition they challenge. The definition of Transferred Insurance Interests encompasses only the "rights and interests of the *Debtor* and the *Reorganized Debtor* in Insurance Policies in respect of actual or potential coverage for any Class 6 Claim." [ECF 890, § 1.1(sss) (emphasis added).] To the extent that Parishes or other non-Debtors have rights arising under insurance policies or otherwise, those rights are not transferred. In an abundance of caution, however, the Committee has modified the language of its Plan as follows:

> The rights of any non-Debtor in any Archdiocese Insurance Policies will not be transferred to the Trust. Except as otherwise provided in any Insurance Settlement Agreements or resulting from operation of law, nothing in the Plan, Confirmation Order, or any Plan Document will affect the rights of any non-Debtor insureds with respect to the Archdiocese Insurance Policies.

[ECF 1129, § 10.2.]

4.   *Treatment of the GIF funds has no impact on the objecting insurers[82]*

The LMI et al. Objectors are not parties to the GIF, nor does the potential use of the GIF funds to pay creditors impact the LMI et al. Objectors or any other insurers. Thus, as a threshold

---

[81]   This section responds to the LMI et al. Objectors' objection 12.
[82]   This section responds to the LMI et al. Objectors' objection 15.

matter, the LMI et al. Objectors have no standing to object to the Committee's treatment of the GIF. *See supra* Section VIII. The LMI et al. Objectors also mischaracterize the transfer of GIF funds to the Trust as stripping non-debtors of their property. *See supra* Section III.C.1.

Finally, the Committee's Plan requires the Archdiocese to pay all retentions due to the Non-Settling Insurers, including under the London Market Insurers' ("LMI") policies. [ECF 890, § 5.2(c).] Pursuant to the insurance neutrality provision, nothing in the Plan would eliminate provisions of any LMI policies that require exhaustion of self-insured retentions. Thus potential use of GIF funds to pay creditors does not relieve the Archdiocese from any obligations under any insurance policies. [ECF 890, § 6.3(d).]

   5.   *The Committee's Plan does not bind Non-Settling Insurers*[83]

The LMI et al. Objectors assert that the Committee's Plan's Sections 6.2(a), 6.2(c), and 16.20 would bind Non-Settling Insurers in violation of 11 U.S.C. §§ 1129(a)(1) and 1141(a). Neither Section 6.2(a) nor 6.2(c) contain any language that reasonably could be construed as binding Non-Settling Insurers. Further, Section 16.20 merely ensures the succession of rights, as they exist, but does not alter those rights:

> The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

[ECF 890, § 16.20.]

Moreover, the Committee's Plan contains numerous sections *preserving* the rights of Non-Settling Insurers and providing that the Trust's assessments, assignments and distributions do not trigger coverage, bind the Non-Settling Insurers or otherwise prejudice any rights of the Archdiocese, Reorganized Debtor or Non-Settling Insurers to contest liability or damages in

---

[83]    This section responds to the LMI et al. Objectors' objection 25.

respect of any Tort Claims. [*See, e.g.*, ECF 890, §§ 6.1(b)(3), 6.2(b), 6.2(g), 6.2(j), 6.3(a), 6.3(b), 6.3(d).]

> 6. *The Committee's Plan requires indemnity coverage only for judgments and settlements*[84]

The LMI et al. Objectors allege that the Committee's Plan Section 6.1(b)(2) expands the Debtor's rights under the insurance policies by allowing recovery for "claims." They argue that "coverage exists to indemnify only against judgments and reasonable settlements with the insurers' consent, and only after a final judgment finding such coverage exists." [ECF 1121, at 35.] The LMI et al. Objectors misconstrue the terms of the Committee's Plan. Section 6.1(b)(2) actually says that "[t]he Trustee shall be entitled to all policy proceeds due by virtue of *a judgment or settlement* of a Class 6 Claim." (emphasis added).[85] It does not expand the Archdiocese's or Reorganized Debtor's rights under the policies. Section 6.1(b)(2) references "Class 6 Claim" (a defined term under Committee Plan Section 4.6(a)), but does not imply that Non-Settling Insurers will be liable without a judgment, a settlement consented to by the Non-Settling Insurers, or as otherwise allowed by state law.[86]

The LMI et al. Objectors also argue that the Plan would allow Class 6 Claimants to obtain double recoveries—distributions from the Trust plus judgments. Again, the LMI et al. Objectors have omitted important provisions directly contradicting their argument. Under the Committee's Plan, any judgment awarded to a Litigation Claimant "will be reduced by the

---

[84]       This section responds to the LMI et al. Objectors' objection 26.

[85]       [*See also* ECF 890, § 4.6(b) ("The Class 6 Claims will not be released or discharged against the Archdiocese or Reorganized Debtor until such claims are settled with the Archdiocese or Reorganized Debtor *and its Insurers* or are fully adjudicated, resolved *and subject to Final Order*.") (emphasis added).]

[86]       [*See also* ECF 890, § 6.3(b) ("the liability of the Archdiocese or Reorganized Debtor and the amount owed by the Archdiocese, Reorganized Debtor and any Non-Settling Insurer on any Class 6 Claim, shall be determined by: (i) the amount of any court judgment obtained by the Class 6 claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Archdiocese, or the Reorganized Debtor to the Non-Settling Insurer under the respective Insurance Policy or applicable law.").]

amount of distributions already paid by the Trust to such Litigation Claimant on his or her Class 6 Claim(s)." [ECF 890, § 6.2(g).] As a result, there can be no double recovery.

7.  *An insured may assign the right to insurance policy proceeds to a third party*[87]

Initially, the LMI et al. Objectors objected that the Committee's Plan's Section 6.1(b)(4) assigns rights under the policies in contravention of state law. [ECF 1076, at 27.] The Archdiocese makes a similar objection, claiming that the Committee's Plan improperly assigns to the Trust the right to pursue the Archdiocese's interests in insurance policies without also assigning the Archdiocese's liability. [ECF 1118, 45–46;] *see also supra* Section I.J. They are wrong. It is well-established in Minnesota that an insured may assign to a third party its right to insurance policy proceeds after a loss, without also assigning the insured's liability. *Isles Wellness, Inc. v. Progressive Ins. Co.*, No. A09-0119, 2009 WL 2928548, at *3–4 (Minn. Ct. App. Sept. 15, 2009) (permitting the assignment of the rights to receive benefits under the policy); *see also Star-Windshield Repair v. W. Nat'l Ins. Co.*, 768 N.W.2d 346, 351 (Minn. 2009) (Anderson, J., concurring) (citing *Windey v. N. Star Farmers Mut. Ins. Co.*, 43 N.W.2d 99 (Minn. 1950)). The Committee's Plan properly transfers to the Trust the rights to proceeds on Tort Claims and all claims and causes of action against the Non-Settling Insurers with respect to Tort Claims, regardless of whether the policies contain anti-assignment clauses. *Id.* Moreover, the LMI et al. Objectors are not objecting to the Archdiocese's Plan provisions providing for assignment of all rights and interests in the Archdiocese Insurance Policies with respect to Pending Tort Claims to the Trust. [ECF 887, § 5.1(c) (1).]

Apparently realizing their assignment objection is frivolous, the LMI et al. Objectors now claim that the Plan tries to confer upon the Trust the right to coverage for the Class 6 Claims without requiring the Trust to perform the duties of the insured, which the LMI et al. Objectors

---

[87]    This section responds to the LMI et al. Objectors' objection 27.

describe as conditions precedent to coverage. But this argument fares no better than the original.

Under the Committee's Plan, the Archdiocese and Reorganized Debtor retain all the duties and

obligations to the Non-Settling Insurers imposed by the insurance policies:

> Notwithstanding the assignment and transfer of the Transferred Insurance
> Interests to the Trust, the Archdiocese and Reorganized Debtor shall not be
> relieved of any duties or obligations under any Insurance Policies (except as
> provided to the contrary in any Insurance Settlement Agreement), and shall
> continue to perform such duties as required by such Insurance Policies and
> applicable law.

[ECF 890, § 6.3(e); *see also* §§ 6.1(b)(3), 6.2(a), 6.2(l); 6.3(a)(2).] The Archdiocese and

Reorganized Debtor must retain these duties towards the Non-Settling Insurers because the

insurance policies impose duties on the *insureds*, including the duty to cooperate in the defense

of the Tort Claims. If the Committee's Plan also purported to transfer all the insured's

obligations to the Trust, the Non-Settling Insurers would surely argue the transfer was

prohibited, in contrast to an ordinary and permissible assignment of post-loss insurance policy

proceeds. The Committee's Plan does not seek to transfer any more than what Minnesota law

clearly permits, while ensuring that all policy conditions precedent to coverage are also satisfied.

And under the Committee's Plan "[n]othing in the Plan, Confirmation Order or any Plan

Document shall impose any obligation on any Non-Settling Insurer to provide a defense for,

settle, or pay any judgment with respect to, any Class 6 Claim, or grant to any Person any right to

sue any Insurer directly, in connection with a Class 6 Claim or any Insurance Policy. Such rights

shall be determined by and in accordance with the terms of the Insurance Policies and applicable

law." [ECF 890, § 6.2(j).]

B. **The Committee's Modified Plan resolves many of the LMI et al. Objectors' concerns**

1. *The Committee's Plan only includes one insurance settlement*[88]

The LMI et al. Objectors allege that the Committee's Plan "presume[s] the existence of settlements with insurers," and that those presumed settlements will not come into effect. [ECF 1121, at 14.] None of the LMI et al. Objectors are party to a settlement agreement referenced in the Committee's Plan, and therefore they lack standing to raise this objection. *See supra* Section VIII. The Committee's Modified Plan clarifies that there is only one settling insurer: Home Insurance Company. [ECF 1129, at Ex. L.]

C. **The Bankruptcy Court can retain post-Effective Date jurisdiction**[89]

The LMI et al. Objectors contest the Bankruptcy Court's retention of post-Effective Date jurisdiction regarding "the assets of the Estate or of the Trust," and "disputes regarding the Archdiocese's, the Trustee's, and any Insurer's rights and duties in connection with defense of Litigation Claims." [ECF 1121, at 52.] In support of their objections, the LMI et al. Objectors assert that insurance disputes are non-core, related-to proceedings and that a bankruptcy court's post-confirmation related-to jurisdiction is extremely limited. [*Id.*] These assertions are contrary to current legal authority.

First, disputes regarding a debtor's pre-petition insurance contracts are "core proceedings over which the bankruptcy court has jurisdiction." *See, e.g., United States Lines, Inc. v. Am. Steamship Owners Mut. Prot. & Indem. Assn'n, Inc. (In re United States Lines, Inc*.), 197 F.3d 631, 638 (2d Cir. 1999) (holding that claims for declaration of coverage under insurance contracts were core when the resolution of such claims had a "direct impact on the core administrative functions of the bankruptcy court"); *In re Celotex Corp.,* 152 B.R. 667, 667–70

---

[88]   This section responds to the LMI et al. Objectors' objection 8.
[89]   This section responds to the LMI et al. Objectors' objection 32.

(Bankr. M.D. Fla. 1993) (finding the pre-petition insurance policies at issue to be "core" because the policies were the "linchpin" of the debtor's reorganization efforts). Such insurance disputes may still be core proceedings even when they are initiated post-confirmation. *See In re Prudential Lines*, 170 B.R. 222, 229 (S.D.N.Y. 1994).

Even if certain insurance disputes are not core matters, a bankruptcy court may still have "related-to" jurisdiction to hear them. *See* 28 U.S.C. § 1334(b) (federal district courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); *Celotex Corp. v. Edwards*, 514 U.S. 300, 307–08 (1995) ("Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth."). The LMI et al. Objectors cite only non-binding cases from outside the Eighth Circuit. [ECF 1121, at 52–53.] The Eighth Circuit has not adopted a distinct test for post-confirmation related-to jurisdiction.[90] The test in the Eighth Circuit for "related to" jurisdiction is "whether the outcome of the civil case 'could conceivably have any effect on the estate being administered in bankruptcy.'" *In re RFC & ResCap Liquidating Trust Litigation*, 17-cv-0203, 2017 WL 3129748 (D. Minn. July 21, 2017) (citing *Dogpatch Props., Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.)*, 810 F.2d 782, 786 (8th Cir. 1987)). The Eighth Circuit has further determined that such effects include "any matter that could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the estate." *Integrated Health Servs.*, 417 F.3d at 958. "Even a case that 'portends a mere contingent or tangential effect on a debtor's estate meets the broad

---

[90]    *See, e.g., Bergstrom Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166 (3d Cir. 2004) (determining that, at the post-confirmation stage, a claim must have a "close nexus" to the bankruptcy plan or proceeding). The Committee notes, however, that potential post-petition claims within the categories contemplated under the Committee's Plan's Sections 16.8(a)(6) and (18) would likely still pass the "close nexus" test as they affect the "interpretation, implementation, consummation, execution, or administration of the confirmed plan." *See Resorts*, 372 F.3d at 167.

jurisdictional test.'" *RFC*, 2017 WL 3129748 at *2 (quoting *In re Titan Energy, Inc.*, 837 F.2d 325, 330 (8th Cir. 1988)). Specifically, the Eighth Circuit has found that "[a]n action is related to the bankruptcy case if 'it affects the amount of property available for distribution or the allocation of property among creditors.'" *Luker v. Reeves (In re Reeves)*, 65 F.3d 670, 675 (8th Cir. 1995).

The resolution of disputes contemplated in Sections 16.8(a)(6) and 16.8(a)(18) of the Committee's Plan will affect the assets administered through the Debtor's bankruptcy and affect the amount of property available for distribution among creditors. The Plan (i) expressly preserves many of the Debtor's claims and transfers them to the Trust, and (ii) certain of the Debtor's creditors would share in any recovery on such claims. [*See* ECF 890, §§ 4.6, 4.7, 6.1.]

The claims at issue also involve the implementation and interpretation of the Plan. Section 16.8(a)(18), in fact, directly implicates disputes, rights, and duties of the Archdiocese, the Trustee, or any insurers in connection with defense of Litigation Claims. [*Id.* § 16.8(a)(18).] Accordingly, even if such future proceedings falling under Sections 16.8(a)(6) and (18) are not "core" proceedings, they fall squarely within the bankruptcy court's "related to" jurisdiction.

Finally, the LMI et al. Objectors' jurisdictional objection is at best premature. Regardless of plan provisions related to the bankruptcy court's retention of jurisdiction, the existence of related-to jurisdiction "must be determined case-by-case." *See In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005) (holding that when a debtor or trustee "commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists undiminished after plan confirmation"). As noted by the First Circuit Court of Appeals, "[t]he language of the

jurisdictional statute, 28 U.S.C. § 1334, is protean, and what is 'related to' a proceeding under title 11 in one context may be unrelated in another." *Id.*[91]

On their face, the jurisdictional provisions at issue do not seek to grant the Bankruptcy Court jurisdiction over matters that are outside the realm of those that "could conceivably have any effect" on the Debtor's estate. The Objection articulates no reason why the Court cannot exercise jurisdiction over such matters except to say that "they all involve a determination of rights under applicable state law." [ECF 1121, at 53.] The fact that future disputes may involve state law claims is an insufficient basis to deny a bankruptcy court's jurisdiction. Contrary to the insurers' implication, this Court is perfectly capable of resolving complex insurance disputes arising under state law and, in fact, bankruptcy courts regularly exercise post-confirmation jurisdiction over matters that involve state law claims as long as such matters fall within the scope of 28 U.S.C. § 1334. *See, e.g.*, *RFC*, 2017 WL 3129748 (finding related-to jurisdiction where a Trust brought indemnification, breach of contract, and breaches of warranties and representations claims). Objections based on the Court's alleged inability to retain jurisdiction after the Effective Date should be overruled.

### D.    The LMI et al. Objectors lack standing to raise several of their objections[92]

The LMI et al. Objectors object to the Committee's Plan on the basis of its treatment of Classes 3, 4, 7, 8, 9, 13, 14, 15, and 16. [ECF 1121, at 15–16, 23–25, 37–39.] The LMI et al. Objectors are not members of any such creditor classes and do not have standing to raise the claims of third-parties. *See supra* Section VIII.C.1. The substance of the LMI et al. Objectors'

---

[91]      "[W]e feel confident that there will be situations in which the fact that particular litigation arises after confirmation of a reorganization plan that will defeat an attempted exercise of bankruptcy jurisdiction. We are equally confident, however, that there are other situations in which the fact that particular litigation arises after confirmation of a reorganization plan will not defeat an attempted exercise of bankruptcy jurisdiction." *In re Boston Regl. Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005).

[92]      This section addresses the LMI et al. Objectors' objections 2–7, 16–24, 29–32.

objections on these issues is dealt with in response to the Parish Committee's objections. *See supra* Section II.A.

Additionally, the LMI et al. Objectors allege that the Committee's Plan is unfair due its payment of Tort Claimants "regardless of merit." [ECF 1121, at 45.] These objectors are not Tort Claimants and do not have standing to raise objections based on the rights of third-parties. *See supra* Section VIII.C.1. Further, the insurers' argument does not take account of the procedures established by the Trust Agreement, including but not limited to the Committee's proposed claims review process by a tort claims reviewer who would exercise his or her responsibilities independently of the Trustee. [ECF 890, at Ex. D, Ex. 1.]  Contrary to the assertions of the LMI et al. Objectors, persons asserting invalid claims will not receive distributions from the Trust under the Committee's Plan. [*Id.*]

The LMI et al. Objectors also challenge the legal validity of the Committee's Plan based on the constitutional rights of the Debtor and its parishes. [ECF 1121, at 19–23, 35–37, 42–43.] The LMI et al. Objectors do not have standing to object based on the constitutional rights of these third-parties. *See supra* Section VIII.C.1. The substance of the LMI et al. Objectors' objections on these issues is address in foregoing sections responding to similar objections raised by the Debtor and the Parish Committee. *See supra* Sections I.F.3 and II.C.1. The Committee could not ascertain the specific basis for the LMI et al. Objectors' argument that the Committee's Plan violates RFRA. [ECF 1121, at 49.] For the Committee's general analysis of the applicability of RFRA to its Plan, *see supra* Section I.F.3.

Finally, the LMI et al. Objectors object to the feasibility of the Committee's Plan and allege the Committee lacked good faith in proposing it. [ECF 1110, 1–4, 39–42.] These objections represent generalized grievances that the LMI et al. Objectors do not have standing to

assert. *See supra* Section VIII.C.2. The substance of these objections is addressed in the responses to the Debtor's objections. *See supra* Sections I.B.3, I.D, I.K.

For the reasons stated above, the Objections should be overruled.

Dated: August 4, 2017

*e/Robert T. Kugler*

Robert T. Kugler (#194116)
Edwin H. Caldie (#0388930)
Brittany M. Michael (#0397592)
**STINSON LEONARD STREET LLP**
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone:  (612) 335-1500
Facsimile:  (612) 335-1657
Email:  robert.kugler@stinson.com
Email:  edwin.caldie@stinson.com
Email:  brittany.michael@stinson.com

COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS

## APPENDIX 1

| Objector | # | Cite | Standing | Section of Committee's Brief Responding to Objection |
|---|---|---|---|---|
| Archdiocese [ECF 1118] | 1 | ECF 1118, at 4–7. | Yes | Section I.B; Section I.D |
| Archdiocese [ECF 1118] | 2 | ECF 1118, at 7–11. | Yes | Section I.C; Section I.E |
| Archdiocese [ECF 1118] | 3 | ECF 1118, at 11–21. | Yes | Section I.K; Section I.J ; Section I.D; Section II.C.1 |
| Archdiocese [ECF 1118] | 4 | ECF 1118, at 21–26. | Yes | Section I.F |
| Archdiocese [ECF 1118] | 5 | ECF 1118, at 26. | Yes | Section I.K |
| Archdiocese [ECF 1118] | 6 | ECF 1118, at 26–28. | Yes | Section I.C.4 |
| Archdiocese [ECF 1118] | 7 | ECF 1118, at 28–29. | Yes | Section I.I |
| Archdiocese [ECF 1118] | 8 | ECF 1118, at 29–31. | No | Section I.L; Section II.A.1 |
| Archdiocese [ECF 1118] | 9 | ECF 1118, at 31–32. | Yes | Section I.C.2 |
| Archdiocese [ECF 1118] | 10 | ECF 1118, at 32–33. | No | Section I.L; Section II.A.1 |
| Archdiocese [ECF 1118] | 11 | ECF 1118, at 34–35. | No | Section I.L; Section II.A.1 |
| Archdiocese [ECF 1118] | 12 | ECF 1118, at 35. | No | Section I.L; Section II.A.3 |
| Archdiocese [ECF 1118] | 13 | ECF 1118, at 36. | No | Section I.L; Section II.A |
| Archdiocese [ECF 1118] | 14 | ECF 1118, at 36–37. | No | Section I.L; Section II.A.4 |
| Archdiocese [ECF 1118] | 15 | ECF 1118, at 37–38. | No | Section I.L; Section II.A.5 |
| Archdiocese [ECF 1118] | 16 | ECF 1118, at 39. | Yes | Section I.K |
| Archdiocese [ECF 1118] | 17 | ECF 1118, at 39–41. | Yes | Section I.C.3; Section I.F; Section I.G |
| Archdiocese [ECF 1118] | 18 | ECF 1118, at 41–44. | No | Section I.L; Section I.H |
| Archdiocese [ECF 1118] | 19 | ECF 1118, at 44–49. | Yes | Section I.J |
| Archdiocese [ECF 1118] | 20 | ECF 1118, at 49–50. | N/A | No objection raised |
| Archdiocese [ECF 1118] | 21 | ECF 1118, at 50–52. | Yes | Section I.A |
| Bremer Bank [ECF 1104] | 1 | ECF 1104, at 2–4. | Yes | Section VI |
| Catholic Mutual [ECF 1111] | 1 | ECF 1111, at 2–3. | No | Section IX.A |
| Catholic Mutual [ECF 1111] | 2 | ECF 1111, at 3–4. | Yes | Section IX.C |
| Catholic Mutual [ECF 1111] | 3 | ECF 1111, at 4. | Yes | Section IX.A |
| Catholic Mutual [ECF 1111] | 4 | ECF 1111, at 4–5. | No | Section IX.D; Section II.A.5 |
| Catholic Mutual [ECF 1111] | 5 | ECF 1111, at 5–6. | No | Section IX.D; Section I.D |

| | | | | |
|---|---|---|---|---|
| Catholic Mutual [ECF 1111] | 6 | ECF 1111, at 6–7. | No | Section IX.D; Sections II.A.1–3 |
| High Schools [ECF 1109] | | | Yes | Section V |
| LMI, et al. [ECF 1121] | 1 | ECF 1121, at 14. | Yes | Committee could not ascertain basis for objection from objector's brief. |
| LMI, et al. [ECF 1121] | 2 | ECF 1121, at 15–16. | No | Section XI.D; Section II.A.3 |
| LMI, et al. [ECF 1121] | 3 | ECF 1121, at 16–18. | No | Section XI.D; Section I.K |
| LMI, et al. [ECF 1121] | 4 | ECF 1121, at 18–19. | No | Section XI.D; Section I.E |
| LMI, et al. [ECF 1121] | 5 | ECF 1121, at 19–23. | No | Section XI.D; Section I.F.3 |
| LMI, et al. [ECF 1121] | 6 | ECF 1121, at 23–24. | No | Section XI.D; Section II.B.2 |
| LMI, et al. [ECF 1121] | 7 | ECF 1121, at 24–25. | No | Section XI.D; Section II.A |
| LMI, et al. [ECF 1121] | 8 | ECF 1121, at 25–26. | Yes | Section XI.B |
| LMI, et al. [ECF 1121] | 9 | ECF 1121, at 27. | Yes | Committee could not ascertain basis for objection from objector's brief. |
| LMI, et al. [ECF 1121] | 10 | ECF 1121, at 27. | Yes | Section XI.A.1 |
| LMI, et al. [ECF 1121] | 11 | ECF 1121, at 27–29. | Yes | Section XI.A.2 |
| LMI, et al. [ECF 1121] | 12 | ECF 1121, at 29–30. | Yes | Section XI.A.3 |
| LMI, et al. [ECF 1121] | 13 | ECF 1121, at 30. | N/A | Withdrawn |
| LMI, et al. [ECF 1121] | 14 | ECF 1121, at 30. | N/A | Withdrawn |
| LMI, et al. [ECF 1121] | 15 | ECF 1121, at 30–35. | Yes | Section XI.A.4 |
| LMI, et al. [ECF 1121] | 16 | ECF 1121, at 35–37. | No | Section XI.D; Section II.C |
| LMI, et al. [ECF 1121] | 17 | ECF 1121, at 37. | No | Section XI.D; Section II.A.2 |
| LMI, et al. [ECF 1121] | 18 | ECF 1121, at 38–39. | No | Section XI.D; Section I.G |
| LMI, et al. [ECF 1121] | 19 | ECF 1121, at 39. | No | Section XI.D; Section I.B.4 |
| LMI, et al. [ECF 1121] | 20 | ECF 1121, at 39–40. | No | Section XI.D; Section I.B.5 |
| LMI, et al. [ECF 1121] | 21 | ECF 1121, at 40–41. | No | Section XI.D; Section I.B.3 |
| LMI, et al. [ECF 1121] | 22 | ECF 1121, at 41–42. | No | Section XI.D; Section I.B.5 |
| LMI, et al. [ECF 1121] | 23 | ECF 1121, at 42–43. | No | Section XI.D; Section I.F |
| LMI, et al. [ECF 1121] | 24 | ECF 1121, at 44–46. | No | Section XI.D |
| LMI, et al. [ECF 1121] | 25 | ECF 1121, at 46–47. | Yes | Section XI.A.5 |
| LMI, et al. [ECF 1121] | 26 | ECF 1121, at 47–48. | Yes | Section XI.A.6 |

| | | | | |
|---|---|---|---|---|
| LMI, et al. [ECF 1121] | 27 | ECF 1121, at 48–49. | Yes | Section XI.A.7 |
| LMI, et al. [ECF 1121] | 28 | ECF 1121, at 49. | Yes | Withdrawn |
| LMI, et al. [ECF 1121] | 29 | ECF 1121, at 49. | No | Section XI.D; Section I.F.3 |
| LMI, et al. [ECF 1121] | 30 | ECF 1121, at 50. | No | Section XI.D; Section I.C.2 |
| LMI, et al. [ECF 1121] | 31 | ECF 1121, at 50–51. | No | Section XI.D; Section I.G |
| LMI, et al. [ECF 1121] | 32 | ECF 1121, 51–53. | No | Section XI.D; Section XI.C |
| MN Dep't of Commerce [ECF 1108] | | ECF 1108, at 2–3. | Yes | Section IV; Section I.C.2 |
| North American Banking Company [ECF 1102] | | ECF 1102, at 1–2. | Yes | Section VI |
| Parish Committee [ECF 1113] | 1 | ECF 1113, at 1–6. | Yes | Section II.C.1 |
| Parish Committee [ECF 1113] | 2 | ECF 1113, at 6–8. | Yes | Section II.C.2 |
| Parish Committee [ECF 1113] | 3 | ECF 1113, at 9–20. | Yes | Section II.B |
| Parish Committee [ECF 1113] | 4 | ECF 1113, at 20–22. | Yes | Section II.D |
| Parish Committee [ECF 1113] | 5 | ECF 1113, at 22–23. | Yes | Section II.A |
| Parish Committee [ECF 1113] | 6 | ECF 1113, at 23. | Yes | Section II.C.3 |
| Parish Committee [ECF 1113] | 7 | ECF 1113, at 23–24. | Yes | Section II.D |
| Saint Anne - Saint Joseph Hien [ECF 1117] | | ECF 1117, at 1–3. | Yes | Section VII |
| St. Patrick [ECF 1116] | 1 | ECF 1116, at 2–6. | Yes | Section III; Section II.D |
| St. Patrick [ECF 1116] | 2 | ECF 1116, at 6–7. | Yes | Section III; Section I.C.3 |
| Travelers, et al. [ECF 1110] | A | ECF 1110, at 1–2. | No | Section X.F; Section I.B.3 |
| Travelers, et al. [ECF 1110] | B | ECF 1110, at 2–4. | No | Section X.F; Section I.E |
| Travelers, et al. [ECF 1110] | C | ECF 1110, at 4–5. | No | Section X.F; Section II.A.5 |
| Travelers, et al. [ECF 1110] | D | ECF 1110, at 5–6. | Yes | Section X.A |
| Travelers, et al. [ECF 1110] | E | ECF 1110, at 6–7. | Yes | Section X.B.4 |
| Travelers, et al. [ECF 1110] | F | ECF 1110, at 7–8. | Yes | Section X.C |
| Travelers, et al. [ECF 1110] | G | ECF 1110, at 8–9. | Yes | Section X.B.1 |
| Travelers, et al. [ECF 1110] | H | ECF 1110, at 9–10. | Yes | Section X.B.4 |
| Travelers, et al. [ECF 1110] | I | ECF 1110, at 10–11. | Yes | Section X.B.3 |
| Travelers, et al. [ECF 1110] | J | ECF 1110, at 11–12. | Yes | Section X.D |
| Travelers, et al. [ECF 1110] | K | ECF 1110, at 13–17. | Yes | Section X.E |