UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

                Debtor.

ORDER DENYING
CONFIRMATION OF THE
COMMITTEE OF UNSECURED
CREDITORS' PLAN DATED
AND FILED ON DECEMBER 19,
2016.

BKY 15-30125

At Minneapolis, Minnesota, December 28, 2017.

This case came on a hearing on August 29, 2017 on legal objections[1] to the second

amended plan filed by the committee of unsecured creditors. Appearances were noted on the

record.

For reasons stated below, confirmation of the committee's plan is denied.

## 1.  The High School Campuses

North American Banking Company and Bremer Bank make similar and legally identical

objections to confirmation of the committee's plan.  The debtor owns the properties upon which

Totino-Grace High School and Benilde-St. Margaret's High School are located.  Both properties

are subjected to long term leases with the respective high schools.  Both high schools have loans

which are secured by mortgages on the properties owned by the debtor.  While the debtor is not

liable for the mortgage debt, since the creditors' claims are secured by properties of the debtor,

both have allowable claims.  11 U.S.C. § 502(a).  Since their claims are secured by property of

---

[1] In order to save time and attorney's fees, a hearing was held to consider strictly legal issues.

the estate, the claims are secured.  11 U.S.C. § 506(a)(1).  Since the committee's plan makes no provision for these secured claims, its plan may not be confirmed and the objections of North American Banking Company and Bremer Bank are sustained.

### 2.  Contribution Claims of the Parishes

The parishes argue that the committee's plan improperly discharges their indemnification and contribution claims. The committee's plan provides that the parishes' contribution claims are disallowed and discharged.

The parishes filed proofs of claims that are based on, among other things, indemnification and contribution. The proofs of claims state:

> "[T]o the extent that claims have been, or will in the future be, asserted against the creditor for damages related to sexual abuse claims against clergy assigned to the creditor by the debtor, creditor asserts claims for indemnification and/or contribution against the debtor. Creditor's claims include, but are not limited to, reimbursement for the full amount of any damages incurred by the creditor as a result of the sexual abuse claims, as well as any attorneys' fees and costs incurred by the creditor in defending against such claims."

The parishes assert that under Minnesota law, because they may be subjected to common liability in the tort actions with the debtor, they hold rights to contribution against the debtor. They argue that this right arises when they pay more than their share of the common obligation to the tort claimants.

The Bankruptcy Code requires that a claim be disallowed when it is a claim for indemnification and contribution of an entity that is liable with the debtor and such claim is contingent as of the time of its allowance or disallowance. 11 U.S.C. § 502(e)(1)(B).  The parishes assert indemnification and contribution claims based on their potential joint liability with the debtor for sexual abuse claims. The expansive definition of a claim under section 101(5) certainly encompasses tort claims, regardless of whether they are contingent or unliquidated.

*Matter of Baldwin-United Corp.,* 55 B.R. 885, 891 (S. D. Ohio. 1985). The parishes hold claims

that are contingent as well as disputed and unliquidated. The parishes' indemnification and

contribution claims are subject to disallowance.

This interpretation is consistent with the Congressional policy that underlie the

Bankruptcy Code; "the bankrupt's (sic) estate should not be burdened by estimated claims

contingent in nature. Rather, the debtor should be expeditiously rehabilitated and reorganized,

thereby providing the bankrupt (sic) a fresh start, while simultaneously according fair treatment

to creditors by paying ascertainable claims as quickly as possible." *The Charter Co. v.*

*Independent Petrochemical Corp.*, (*In re The Charter co.*), 862 F.2d 1500, 1502 (11th Cir.

1989).

While the committee seems to assume that the parishes' claims have been disallowed,

section 502(a) provides that a claim is deemed allowed unless a party in interest objects.  11

U.S.C. § 502(a). There have been no objections filed to the parishes' claims. The parishes hold

allowed claims.

The parties disagree on whether the parishes' claims can be discharged. The parishes

argue that contribution claims under Minnesota law do not arise until the person entitled to the

contribution has sustained damage by paying more than his fair share of the joint obligation.

They argue that because they have not paid their share of the joint obligation, their claims of

contribution have not accrued or matured yet. Therefore, it is not a pre-petition debt. They argue,

for that reason, section 1141(d)(1) does not discharge their claims because their claims are not

based on pre-petition debts and also not among those debts specifically listed in section

1141(d)(1)(A).

Under the Bankruptcy Code, a claim is defined under section 101(5) as a "right to payment, whether or not such right is … contingent, matured, unmatured…" A claim is considered to arise at "the time when acts giving rise to the alleged liability were performed." *Lovett v. Honeywell, Inc.* (*In re Transportation Systems Intern*.), 110 B.R. 888, 894 (D. Minn. 1990) Aff'd, 930 F.2d 625 (8th Cir. 1991) (the court rejected the Third Circuit's holding in *Avellino & Bienes v. M. Frenville Co. Inc. et al.* (*In re M. Frenville Co., Inc.*), 744 F. 2d 332 (3rd Cir. 1984), where the Third Circuit court held a claim would not arise until the creditor's right to payment of the claim arose). The Third Circuit later reversed its position in *Jeld-Men, Inc. v. Gordon Van Brunt, et al.* (*In re Grossman's Inc.*), holding that a claim arises when an individual is exposed prepetition to a product or other conduct giving rise to an injury. 607 F. 3d 114 (3rd Cir. 2010).

The parishes' argument that their contribution claims did not arise pre-petition because it did not accrue or mature until they sustained damage by paying more than their fair share of joint obligations is simply wrong. The contribution claims arose pre-petition at the time the acts giving rise to the alleged liability occurred, when the sexual abuses occurred.

In fact, consistent with the Code, under Minnesota law, "common liability is created at the instant the tort is committed." *Bloomgren v. Marshall Mgmt. Services, Inc*., 483 N.W.2d 504, 506 (Minn. Ct. App. 1992) (Citing *White v. Johnson,* 137 N.W.2d 674, 679 (1965), *overruled in part by Tolbert,* 255 N.W.2d at 368 n. 11). The parishes' common liability with the debtor, the source for their contribution claims, arose pre-petition, when the sexual abuses occurred. The parishes' contingent claims whether matured or not are pre-petition rights to payment under the Code. *Olin Corp. v. Riverwood International Corp. (In re Manville Forest Products Corp.),* 209 F.3d 125, 128 (2nd Cir. 2000). The fact that the parties lack competent knowledge about the

scope of its potential liability does not place that liability outside of the definition of a "claim,"

that is what made the claim contingent. *Id*.

Additionally, the Title VII claim cases the parishes rely on are not helpful to their

argument. Courts have held that for the purpose of determining whether an employee's claim is

pre- or post-petition, Title VII claims arise at the time of termination, not at the time the

employee received a right to sue letter from the appropriate administrative agency. *McSherry v.*

*Trans World Airline, Inc*., 81 F.3d 739, 740 (8th Cir, 1996).

An entry of a confirmation order discharges all debts arising prior to the date of

confirmation. 11 U.S.C. § 1141(d)(1)(A); *U.S. Commodity Futures Trading Comm'n v. NRG*

*Energy, Inc.,* 457 F.3d 776, 779 (8th Cir.2006). The parish contribution claims arose before the

date of confirmation. Therefore, section 1141 properly discharges the parishes' indemnification

and contribution claims. *Olin Corp. v. Riverwood International Corp.*, 209 F. 3d at 129. Under

the committee's plan, the debtor would not receive a discharge for many years after

confirmation.

However, section 502(e) also provides that a claim for reimbursement or contribution that

becomes fixed after the commencement of the case shall be determined, and shall be allowed or

disallowed the same as if such claim had become fixed before the date of the filing of the

petition. 11 U.S.C. § 502(e)(2). Although I agree with the creditors' committee that the parishes'

indemnification and contribution claims are subject to discharge, to the extent that the parishes

eventually make payments to the tort creditors, their claims may be allowed. Therefore, if the tort

creditors sue the parishes for the sexual abuse claims and are successful, the parishes' claims

against the debtor will mature and the parishes will have the right to have their contribution

claims allowed. The objections of the parishes are sustained. The committee's plan fails to provide for these claims and cannot be confirmed.

### 3.  The Parishes' Interest in the Debtors' Insurance Policies

The parishes assert that their rights to indemnification and contribution against the debtor are covered by the debtor's insurance policies. They argue that the committee's plan proposes to impair their interest in the policies and transfer all of the debtor's interest in the policies to the trust. They argue that the plan violates Minnesota law because it allows the debtor's insurers to settle with the trust and buy back policies resulting in a complete release of those insurers from further liability for any claim arising from tort claims including the parishes' contribution claims without the parishes' consent or satisfaction of the parishes' claims.

Minn. Stat. § 60A.08, Subdiv. 6 preserves the insurer's contractual duties such as defenses and indemnification as the insured goes into bankruptcy. Minn. Stat. § 60A.08 (2017); *Hedback v. American Family Mutual Insurance Co.*, (*In re Mathews*), 207 B.R. 631 (Bankr. D. Minn. 1997). Subsection 14 of that statute restricts the insurer's ability to rescind, transfer or release a policy entirely when the insurer has knowledge of any claims against the insured that would remain unsatisfied due to the financial condition of the insured.

The committee's plan purports to transfer most if not all of debtor's insurance interests to the trust. The plan does not provide for the preservation of the parishes' indemnification and contribution claims to be paid by the insurers or from the trust. The plan makes reference to settling insurer's supplement injunction. This injunction was not defined in the plan but it appears to protect the settling insurers from further liability which may include the parishes' indemnification and contribution claims. The plan therefore essentially rescinds the policies without satisfying the indemnification and contribution claims once transferred to the trust. The

plan cannot impair the parishes' contractual rights under the policies without the parishes'

consent. *In re Forty-Eight Insulation, In.*, 133 B.R. 973, 980 (N.D. Ill. 1991). The committee's

plan failed to provide for the parishes' right in the transferred insurance policy.

### 4.  The Parishes' Other Claims

In addition to the indemnification and contribution claims, the parishes' claims consists

of several other components including their claims for overpayments of liability, medical and

dental insurance premiums. The committee's plan does not have any provisions explicitly

dealing with this part of the parishes' claims.

The plan creates three classes that appear to indirectly treat this aspect of the parishes'

claims. Class 8 includes claims against the debtor for outstanding deposits made to the Inter-

Parish Loan Fund or assessment overpayments made by parishes. The plan states that claimants

with these claims will be satisfied with credits against future assessment by the reorganized

debtor. Class 3 includes claims arising from or related to the collection and use of payments

made by such claimants to the debtor under the General Insurance Fund including claims arising

from the debtor's administration of the fund. The plan states that the reorganized debtor will

assume liabilities of this class. Class 14 includes claims held by Catholic entities[2] arising from or

related to the collection and use of payments made by such claimants to the debtor under the

Archdiocese Medical and Dental Plan. The plan states that the reorganized debtor will assume all

liabilities to this class. The plan treats all three classes as unimpaired and non-voting.

The plan's definition of the General Insurance Fun and the Archdiocese Medical and

Dental Plan refers to and incorporates the description in the debtor's disclosure statement. As

stated in the disclosure statement, the Archdiocese is the administrator of an insurance program

---

[2] Defined term that includes the parishes. (Section 1.1(q) of the Second Amended Chapter 11 Plan of Reorganization of the Official Committee of Unsecured Creditors of the Archdiocese of Saint Paul and Minneapolis).

known as GIF for the benefit of participants including the Archdiocese and non-debtor Catholic

entities to provide coverage at a lowest rate for liability insurance, property insurance and

workers' compensation insurances. The Archdiocese is also the sponsoring employer and a

participating employer with other non-debtor Catholic entities in a comprehensive major medical

and dental benefits plan known as AMBP. This plan covers about 3,500 employees of the

participating employers including clerical and maintenance personnel, teachers and other support

staff and dependents of these employees.

The plan proposes to take most, if not all the money from these funds and transfer it to

the trust. The claimants in these classes and their employees will then assert their claims against

the reorganized debtor which will have little available assets. These classes are clearly impaired.

A class of claims is unimpaired only if the plan leaves unaltered the legal, equitable or

contractual rights of the holders of such claims.  11 U.S.C. § 1124(1); *Windsor on the River

Assoc., Ltd. v. Balcor Real Estate Finance, Inc.* (*In re Windsor on the River Assoc., Ltd.*), 7 F. 3d

127, 130 (8th Cir. 1993). Any alteration of a creditor's rights, no matter how minor, constitutes

"impairment." *Id*.

Class 8 claims are impaired because the plan changes the claims to future credits of

uncertain time and source. See *In re Gandfather Mountain Ltd. Partnership*, 207 B.R. 475, 485

(Bankr. M.D.N.C. 1996) (holding that a deferred payment to creditors is considered an alteration

of legal rights).

For claimants in class 3 and 14, the plan directs the claimants to assert their claims

against the reorganized debtor when all or most of the money in these funds will be transferred to

the trust. The plan leaves these claimants with little or no assets from which they can satisfy their

claims, making the claims worthless. These classes are impaired and entitled to vote on the plan

in accordance to section 1129(a)(10). These classes did not vote on the plan and as such, the plan may not be confirmed.

Additionally, the Minnesota Department of Commerce points out that the GIF also consists of self-insured workers' compensation deposits for which Minnesota statute requires the debtor to maintain sufficient security in the form of cash deposit in an account assigned to the Commissioner of Management and Budget.  It argues that the debtor is not permitted to transfer the money from that account because the debtor does not have legal title or interest in the deposit.  It states that the plan's provision requiring the transfer of this fund to the trust will result in the debtor violating of Minnesota law.

The plan provision that proposes to transfer all or some of the money from the GIF to the trust, thereby denying employees their workers' compensation coverage, in violation of Minnesota law. Minn. Stat. § 79A.04, subdiv. 6 and 7; 79A.071, subdiv. 3 and 4 (2017).  For this reason, the plan may not be confirmed.

### 5.  <u>Improper Designation of Impaired Classes</u>

Certain insurers argue that the plan improperly designated claims in classes 3, 8, 13, 14, 15 and 16 as unimpaired when the claims are impaired. They argue this designation denied the claimants their right to vote on the plan in violation of section 1129(a)(8).

The improper designation and treatment of claims in classes 3, 8 and 14 are discussed above in section 4 and does not need repeating.

Class 15 consists of claims for support and maintenance of inactive non-credibly accused Archdiocesan priests. Class 16 includes claims for support and maintenance of inactive and active credibly accused Archdiocesan priests. The plan defines priests that are credibly accused as those who committed or alleged to have committed an act of abuse upon a tort claimant. The

plan states that because the debtor disclaimed the liability under civil law for class 15 claims, the holders of these claims do not receive distribution under the plan. But it also assigns liability of class 15 claims for post-effective date to the reorganized debtor. The plan states that the class 16 claimants' payments are forfeited to the trust.

It is not clear what is meant by the debtor disclaiming the liabilities under civil law for class 15 claims. There is no definition or explanation of such disclaimer of liability in the plan or the disclosure statement. If there are no legal or contractual obligations between the debtor and the priests to support and maintain the priests, then they have no claims and the classes and provisions dealing with these classes are meaningless. If the priests have filed proofs of claims, any party may object to them. If there is no legal obligation by the debtor to pay for the support and maintenance of the priest, the plan may not create such obligation. To the extent the debtor feels it has an obligation to support and maintain the priests, the committee's plan impermissibly interferes with the church's governance.

6.  **Insurance Coverage Issues**

a.  *Transferred Insurance Policies*

The debtor and certain insurers argue that the plan purports to assign proceeds of insurance policies to the trust and gives the trust standing to act in its own name or on behalf of the debtor to enforce any rights under the policies. They state that the definition for the transferred insurance interest in the plan does not include the insurance policies or the rights and responsibilities under the policies. They argue that this is a violation of Minnesota law and the Bankruptcy Code. They claim that proceeds of the policies can only go to the claimants for whose benefit such proceeds are paid.

They also argue that some of the policies are indemnity policies covering only the insured's and participating entities' actual payments after there is a finding of loss. By transferring the proceeds of these policies and paying the class 6 claimants, the insurers argue the plan increases the risk that the insurers agreed to and eliminated policy requirements without the consent of the insurers, the debtor or the non-debtor participants in violation of state law.  Also the transfer of the proceeds to the trust will deprive non-debtor entities of their interest in the insurance policies and the proceeds of the policies.

### i.    Insurance Policies in Bankruptcy

A bankruptcy estate includes all legal or equitable interests of the debtor in property as of the commencement of a bankruptcy case. 11 U.S.C. § 541(a)(1). The Supreme Court declared that section 541(a)(1) is broad and consist of properties of all description, including tangible or intangible property. *Whetzal v. Alderson*, 32 F.3d 1302, 1303 (8th Cir. 1994) (citing *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983)). State law governs the existence and extent of the debtor's legal and equitable interest in property. *Butner v. United States*, 440 U.S. 48, 54 (1979); *Ferris, Baker, Watts, Inc. v. Stephenson* (*In re MJK Clearing, Inc.*), 371 F. 3d 397, 401 (8th Cir. 2004). Once the debtor's interest in the property is determined, federal bankruptcy law dictates to what extent that interest is property of the estate and can be used toward the plan. *N.S. Garrott and Sons v. Uninion Planters National Bank* (*In re N.S. Garrott and Sons*), 772 F.2d 462, 466 (8th Cir. 1985).

A debtor's insurance policies and the debtor's right under the policies have generally been held to be property of the estate. *MacArthur Co. v. Johns-Manville Corp.,* (*In re Johns-Manville Corp. et al*), 837 F.2d 89, 92 (2nd Cir. 1988). The right of the debtor to assign its

insurance proceeds in satisfaction of a claim will generally be determined by applicable state law. *In re Baird*, 567 F. 3d 1207, 1213 (10th Cir. 2006).

In terms of liability insurance policies, the courts are in disagreement whether the proceeds of the policies are property of the estate. *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 509-511 (Bankr. D. Del. 2004). The cases are controlled by the language and scope of the policy at issue and are fact based analysis. *Id*. In addition to state law limitations, the outcome whether proceeds are property of the estate usually depends on the named insured under the liability insurance policy because the policies are held by insured as protection against claims that may be asserted against them. *Id*. (citing *In re Minoco Group Companies, Ltd*., 799 F.2d 517, 519 (9th Cir. 1986)).

For instance when the liability policy provides direct coverage to a debtor the proceeds of the policy is property of the bankruptcy estate. *Id*. Since the debtor is entitled to payment of the proceeds, the proceeds are property of the estate. However, when insurance policies owned by the debtor provide direct  coverage to directors' and officers' of the debtor, the proceeds of the insurance policy are not property of the bankruptcy estate because the proceeds are payable to the directors and officers not the debtor. *Id*. Additionally, when a liability insurance policy provides direct coverage to the debtor as well as the directors and officers, since the proceeds may be payable to the debtor they are property of the debtor's estate. *Id*.

In general, when the debtor is the owner of the insurance policy but doesn't have a right to the proceeds, the debtor cannot transfer the proceeds because the commencement of the bankruptcy case does not create such interest. 11 U.S.C. § 541(d); *First Fidelty Bank v. McArteer* (*In re McArteer*), 985 F.2d 114, 117 (3rd Cir. 1993). Such proceeds are not part of the bankruptcy estate. *Id*.

ii.   The law of Assignment of Insurance in Minnesota

Insurance policies are contracts and general principles of contract law apply unless there are statutory laws to the contrary. *Epland v. Meade Ins. Agency Associates, Inc.,* 564 N.W.2d 203, 207 (Minn. 1997). As a general rule, a party to a contract may assign all beneficial rights to another, without the consent of the other party to the contract in the absence of an express agreement to the contrary. *Id.*

Minnesota courts hold that an anti-assignment provision in a contract is valid and enforceable, thereby defeating an otherwise valid assignment. *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 270, 274 (Minn.2004). However, anti-assignment provisions in insurance policies have different treatment. An anti-assignment provision in an insurance policy is unenforceable with respect to a post-loss assignment, thereby making a post-loss assignment valid and enforceable. *Windey v. North Star Farmers Mut. Ins. Co.,* 231 Minn. 279, 283, 43 N.W.2d 99, 101–02 (1950). Allowing an insured to assign its right to the proceeds of an insurance policy after a loss has occurred does not hurt the insurer or increase its financial exposure because its obligation become fixed when the loss occurred. *Alpine Glass, Inc. v. Illinois Farmers Ins. Co.*, 2006 WL 3486996, at *2 (D. Minn. Dec. 4, 2006), *aff'd,* 643 F.3d 659 (8th Cir. 2011).

When an assignment at issue is pre-loss, the anti-assignment clause is valid and enforceable, making the assignment invalid and unenforceable. *Stand Up Multipositional Advantage MRI, P.A. v. Am. Family Ins. Co.*, 878 N.W.2d 21, 27 (Minn. Ct. App. 2016), *aff'd*, 889 N.W.2d 543 (Minn. 2017). However, an anti-assignment clause may forbid both the assignment of policy and the assignment of proceeds, as long as the anti-assignment

clause is sufficiently clear. *Life Rehab Services, Inc. v. Allied Prop. & Cas. Ins. Co.*, 616 F. Supp. 2d 924, 926 (D. Minn. 2007).

It is clear that before determining whether the insured can transfer the proceeds of the insurance policy, it is important to ascertain whether the insured consented to the transfer. Without the consent of the insured, here the debtor, to transfer of the proceeds or the policies, the proceeds may not be transferred.

Additionally, when the debtor holds only legal title in the property for the benefit of other non-debtor entities, those funds may not be part of the debtor's bankruptcy estate. 11 U.S.C. § 541(d). To determine whether the proceeds of these policies are property of the estate depends on, among others things, the type of policies and the policies' provisions governing the interests of the parties. *In re Allied Digital Techs., Corp.*, 306 B.R. at 509.

There are also obvious limitations in the policies. For instant, some of the tort claimants would not be covered because the tort occurred after a certain time where the debtor knew or should have known about the abusive nature of the particular priest. *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1396 (8th Cir. 1996). Moreover, even assuming that the assignment of the proceeds of the policies is appropriate, the litigation trust has no right against the insurance or proceeds of these policies. The tort claimants may be the proper transferees.

Therefore, the provisions of the plan that purport to transfer the proceeds of these policies to the trust without the consent of the debtor and the participating non-debtor entities violate state law.

As discussed earlier, the self-insured program such as the GIF and the AMBP programs provide coverage for excess loss for the debtor and the non-debtor entities as beneficiaries. The

transfer of proceeds of those programs will affect the property interest of non-debtor entities without their consent. The plan may not affect the interest of non-debtor entities without the consent of each party. Where there is more than one insured under a policy, the bankruptcy estate owns only the debtor's interest, not the co-insured's interest. Without the consent of the other co-insured non-debtor entities, the proceeds of the insurance may not transfer to the trust.

### b. *Channeling Injunction and The Home Insurance Company Settlement*

The debtor and the insurers object to the plan's provision that purports to transfer funds from the Home settlement agreement to the trust without the terms and conditions associated with such agreement. They argue that the settlement requires an injunction of claims against the debtor and contribution claims by non-settling insurers. Without such injunction, there is no settlement.

The debtor's disclosure statement provides that the debtor entered into a settlement agreement in New Hampshire court liquidation proceeding for all claims under the Home policies subject to the bankruptcy court's approval known as the Home settlement for $14.2 million in exchange for among other things, channeling injunction. The settlement agreement is therefore conditioned upon the court's approval of such contingencies.

The plan may not include, as the property of the debtor's estate property that the debtor does not own. 11 U.S.C. § 541(a)(1). Without the court's approval, the settlement agreement and the payments are ineffective. If the debtor as a party to the settlement agreement does not comply with the terms of the agreement, it loses the benefit of the funds. Without the inclusion of the channeling injunction, the debtor does not acquire the funds in the Home settlement. The plan may not include the funds in the Home settlement without complying with the terms of the settlement.

7. **Feasibility of The Plan**

The debtors, the parishes and the insurers object to the confirmation of the committee's

plan because it is not feasible. They argue that the plan transfers most if not all of the debtor's

assets to the trust, leaving the reorganized debtor with no assets but responsible for significantly

large financial obligations of all of the classes of creditors including the claimants in class 6

choosing to sue the reorganized debtor. They argue the confirmation of the committee's plan will

force the reorganized debtor to liquidate or require further financial reorganization.

Section 1129(a)(11) provides that the court shall confirm a plan only if confirmation is

not likely to be followed by the liquidation, or the need for further financial reorganization, of

the debtor, unless such further reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11);

*Prudential Insurance Co. v. Monnier et at.* (*In re Monnier Bros.),* 755 F.2d 1336, 1341 (8th Cir.

1985); *Chelsea State Bank v. Wagner et al.* (*In re Wagner*), 259 B.R. 694, 700 (B.A.P. 8th Cir.

2001). The feasibility test is firmly rooted in predictions based on objective facts, "whether the

things which are to be done after confirmation can be done as a practical matter under the facts."

*Clarkson et al. v. Cooke Sales and Services Co. et al.* (*In re Clarkson*), 767 F.2d 417, 420 (8th

Cir. 1985) (citing *Chase Manhattan Mtg. & Realty Trust v. Bergman et al.* (*In re Bergman*), 585

F.2d 1171, 1179 (2nd Cir. 1978)). Feasibility is therefore "contemplating the probability of

actual performance of the provisions of the plan." *Id.* Although the feasibility standard requires

reasonable assurance of success, such success need not be guaranteed. *Kane v. Johns-Mansville

Corp.* (*In re Johns-Mansville*) 843 F.2d 636, 649 (2nd Cir. 1988).

While typically this is a fact issue, on the face of the committee's plan, further

reorganization of the debtor would be necessary. The committee's plan requires the debtor to

obtain financing to fund the plan. This provision of the plan relies on unknown third-party

sources to provide the debtor with financing.  The plan does not provide adequate showing that such financing would likely occur. *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (finding that debtor's plan failed the feasibility test because it didn't contain sufficiently concrete assurance that the loan will close or that property will be appraised at a high enough value to provide the loan). The plan does not identify the amount or type of loan the debtor must obtain or the property to be used as collateral. As a practical matter, it is not reasonably likely that the committee's plan will be funded from the proposed financing. The plan is not feasible because it does not provide adequate means of funding. *In re Clarkson*, 767 F.2d at 420.

The plan also relies on funding the trust to pay class 6 claimants on revenue from future litigation between the class 6 claimants and the insurers. A plan is not be feasible where it success depends on "future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *In re Am. Capital Equip. et al, LLC*, 688 F.3d 145, 156 (3rd Cir. 2012). Litigation between claimants in class 6 and the insurers are at best speculative. Claimants must overcome numerous legal hurdles before they can even commence these actions. The plan provision that conditions the debtor's successful reorganization on speculative funding from future litigation renders the plan not feasible.

The committee's plan also relies on the debtor to do fundraising. The debtor is a non-profit religious organization. The plan may not depend on such funding scheme without an evidence of sufficiently firm commitment from its donors to contribute. *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, LLC*, (*In re Save Our Springs (S.O.S.) Alliance, Inc.*), 632, F.3d 168, 171 (5th Cir. 2011) (holding that a strong fundraising history and confidence the non-profit could raise the rest of the funds in the future without more specific evidence of commitment made the plan not feasible). Additionally, it is generally more difficult to raise

funds for a non-profit during bankruptcy than at other times, specifically where donors are hesitant to give for the purpose of paying off judgment or tort creditors. *Id*.

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors more under a proposed plan than the debtor can possibly attain after confirmation. *The Travelers Insurance Co. v. Pikes Peak Water Co.* (*In re Pikes Peak Water Co.*), 779 F.2d 1456, 1460 (10th Cir. 1985). The plan's reliance on fundraising to fund the trust is a visionary promise to creditors and not certain whether the debtor can attain such promise. The plan's provision relying on fundraising makes the plan not feasible. 11 U.S.C. § 1129(a)(11).

The committee's plan proposes to transfer most if not all of the debtor's property to the trust but leaves the reorganized debtor with the same obligation as it had pre-petition. The plan does not provide the debtor with reasonable prospect of success and the confirmation of this plan would inevitably be followed by the need for further financial reorganization of the debtor in violation of 11 U.S.C. § 1129(a)(11).

The plan also delays the debtor's discharge for an indefinite time. Its stated reason is that it believes the debtor's discharge may release the insurers from liability. This is not true. Minnesota law provides that every insurance policy in Minnesota is deemed to contain a language that the bankruptcy of the insured shall not relieve the insurer of any of its obligations under the policy. Minn. Stat. § 60A.08 Subd. 6 (2017). The plan has not met the feasibility requirement and cannot be confirmed.

8. **Parish Assessments**

      *a.  Collecting Unpaid Assessment*

The parishes, the debtor and the insurers object to the plan's provision that seeks to attach and turn over to the trust unpaid parish assessments. They argue that the obligation to pay assessments is governed by Canon Law and cannot be enforced by the plan or the court.

The committee has not identified any contractual or other legal relationship between the debtor and the parishes where nonpayment of the assessment is considered a default or breach. There are no rights identified by the committee that may be enforced in civil court. Because the parish assessments are not legal obligation controlled by contract or any other legally enforceable obligation, it may not be used to fund a plan.

      *b.  Increasing Parish Assessment*

The parishes, the debtors and the insurers also object to the plan's provision seeking to compel the debtor to assess the parishes at an increased rate to fund the trust. They argue the Canon Law authorizes the bishop to levy assessments against the parishes and cannot be compelled by court order.

As stated above, the committee failed to identify any civil authority to enforce this obligation. The plan may not enforce legal rights that do not exist.

9. **Discriminatory Treatment**

The debtor and the parishes argue the committee's plan discriminates among different classes without providing reasonable basis for such disparate treatment. They state that the plan discriminates between class 6 (current tort claimants) and class 7 (future tort claimants). They argue that the plan permits other contingent claims in class 11 to "ride through" the bankruptcy while the parish contribution claims in class 13 are discharged.

Unfair discrimination issue comes into play "only in a so-called cramdown situation, in which one or more impaired classes of creditors have rejected the plan, but all other confirmation requirements in section 1129(a) have been satisfied." *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

A court must determine that a plan does not unfairly discriminate against each class of claims that is impaired and has not accepted. 11 U.S.C. § 1129(b)(1). A plan discriminates unfairly "only if similar claims are treated differently without a reasonable basis for the disparate treatment." *In re Hoffinger Industries, Inc.*, 321 B.R. 498, 505 (Bankr. E.D. Ark. 2005). Section 1129(b) doesn't prohibit all discrimination, but only discrimination that is unfair. *In re 11, 111, Inc.*, 117 B.R. at 478.

There is a "four-part test that is followed by a large number of courts in assessing the 'fairness' of discrimination." *Id*. It consists of the following: (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against. *Id*.

   *a.   Class 6 vs. Class 7*

The plan provides that class 6 claimants (pending tort claims) will be paid through the trust whereas class 7 claimants (future tort claims) will assert their claims against the reorganized debtor, not paid by the trust. The debtor argues that class 6 and 7 claims are the same and the different treatment under the committee's plan is unfairly discriminates between the two classes.

Both class 6 and class 7 claimants are tort claims. First of all, "future tort claims" despite their name, are not future claims at all. They are current claims that have not been filed, for reasons that committee feels may entitle them to be retained and asserted notwithstanding their

failure to timely file a claim and the debtor's discharge. There is no basis provided for in the plan

or the disclosure statement for treating these classes differently or whether discrimination is

essential to confirmation or consummation of the plan. Under the plan, class 6 claimants and

class 7 claimants have very different remedies. While class 6 claimants benefit to collect their

payments from the trust, class 7 claimants are forced to assert claims against the reorganized

debtor with no or little property and no insurance coverage left after confirmation. Such

discrimination is not necessary for the debtor's reorganization. This is unfair treatment in

violation of section 1129(b).

b. *Class 11 vs. Class 13*

Claimants in class 11 are holders of guaranties executed by the debtor and the plan

provides that they remain unimpaired and ride through bankruptcy. Class 13 claimants hold

contribution and indemnity claims arising out of the debtor's tort liability and the plan provides

that they are disallowed and discharged, and will not receive any property under the plan.

Section 502 treats these classes differently. Section 502(e)(1) provides for disallowance

of claims for reimbursement or contribution by entities liable with the debtor. The section applies

only to entities that share liability with the debtor such as co-debtors, surities or guarantors. *Dant

Russell, Inc. et al. v. Burlington Northern Railroad Co.* (*In re Dant & Russell, Inc*) 951 F.2d 246,

248 (9th Cir. 1991). Claimants in class 11 hold claims that are guaranteed by the debtor. The

claimants in class 13, on the other hand, share joint liability with the debtor for the underlying

tort claims under which their contribution claims are based. As discussed above in detail, section

502(e)(1) disallows claims in class 13. There is no shared liability between the debtor and the

claimants in class 11. Section 502(e)(1) does not disallow the claims in class 11. These classes

are treated differently under section 502. It is not unfair discrimination to treat claimants in class

11 and class 13 differently.

10. **Other Arguments**

*a. Advisory Opinion*

Certain insurers argue that the committee's plan requires the court to issue improper

advisory opinion as to whether the assignment of the transferred insurance interests violates the

insurance policy, what defenses the insurers can raise in future litigation and whether the plan

satisfied condition in the insurance policies. They also argue that the court cannot declare the

rights and obligations of the parties in the context a confirmation hearing.

Article III of the U.S. Constitution limits the jurisdiction of the federal courts to deciding

'cases or controversy' and avoid rendering advisory opinions. *Flast v. Cohen*, 392 U.S. 83, 94

(1968).  The bankruptcy courts are units of the federal district courts and are also restricted by

cases and controversies requirement of the Constitution. 28 U.S.C. § 151; *In re Smith*, 409 B.R.

1, 3 (Bankr. D.N.H. 2009). Therefore, federal courts may adjudicate only actual and ongoing

cases and genuine controversies. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). A

party's request to adjudicate on a hypothetical fact situation is seeking an advisory opinion in

violation of the requirement of the Constitution. *Farm Credit Bank of St. Paul v. Halverson* (*In

re Solberg*), 125 B.R. 1010, 10223 (Bankr. D. Minn. 1991) (Citing *United Public Workers v.

Mitchell*, 330 U.S. 75, 89-91 (1947)).

The committee's plan requests that I decide certain actions proposed in the plan does

violates of the insurance policy, to limit the insurers to raising specific defenses in the future and

that the plan conforms to the insurance policies.  While it is odd to include such a request in a

plan, these requests don't require adjudication under hypothetical fact situations.

It really goes without saying that if a party raises an objection to confirmation, I will have to decide the objection as part of a confirmation hearing.

### b. Class 12 Unequal Treatment

The debtor argues that the plan's provision purports to provide better treatment for some of the claimants in class 12 over others in the same class is in violation of section 1123(a)(3).

Section 4.12 of the plan provides definition and treatment for 'other tort claims and unsecured claims.' These claims include allowed claims of Michael Schaefer and MP Schaefer, LLC, Jennifer Haselberger, any claim arising out of the rejection of an executory contract, and any unsecured claim that is not included in any class under this plan. Subsection 4.12(a) of the plan however provides inconsistent and confusing treatment of claims in this class. In one part it purports to assign liability to the trust pursuant to non-existing subsection 4.13(a)(1) and (2) of the plan. It also assigns liability to the reorganized debtor pursuant to another also non-existing subsection 4.13(a)(3) of the plan.

The cross references of non-existing subsections renders the treatment of the claims meaningless and confusing. The provision doesn't provide specific treatment of class of claims. It also does not provide for the same treatment of the claims in this class in violation section 1123(a)(3) and (4).

### c. Excessive Uncertainties and Contingencies

The committee's plan is replete with uncertainties and contingencies that will frustrate the debtor's effort to reorganize by subjecting it to endless litigations.  The plan poses numerous issues to be resolved by the court in litigation as part of the confirmation process. Some of these issues are:

(1)     determining the debtor's assets and value of those assets to transfer to the trust,

(2)     deciding whether the assignment of the transferred insurance interest proposed in

the plan is valid,

(3)     identifying defenses the non-settling insurers could raise in future litigation,

(4)     determining whether the plan satisfied conditions in the insurance policy, and

(5)     determining whether the appointment of the trust as the debtor's and the estate's

representative is valid.

The plan also anticipates litigation after confirmation. Some of the future litigation the

plan anticipates include:

(6)     Class 7 claimants suits against the reorganized debtor and non-settling insurers for

liability;

(7)     class 6 litigation claimant suit against the reorganized debtor and non-settling

insurers for liability;

(8)     the trust's suit against non-settling insurers with respect to the transferred

insurance interests;

(9)     the trust's suit against insurers to enforce any right, title or interest of the

Archdiocese and the reorganized debtor if the transferred insurance interests is

valid;

(10)    the trust's suit against non-settling insurers if the transferred insurance interest is

not valid;

(11)    the reorganized debtor's suit, at the request of the Trust, against non-settling

insurers to assert its interests;

(12) 'distribution claimants' in class 6 who chose to be paid and release the settling insurer can reserve all rights and claims to pursue suits against the reorganized debtor, third parties and non-settling insurers;

(13) litigation claimants will be deemed to have a right to intervene in the insurance coverage adversary proceeding;

(14) the trust's suit for breach of contract claim against the reorganized debtor when the reorganized debtor breaches its obligation under the insurance policies causing the trust to suffer damages;

(15) avoidance actions by the trust against any party; and

(16) determination of who are 'credibly accused priests'.

The purpose of reorganization in chapter 11 is to formulate a restructuring or reorganization plan that will enable the debtor to emerge from bankruptcy. Therefore, at a minimum, a plan of reorganization must stand for this purpose. The committee's plan proposes numerous future litigations that are never ending and delays the debtor's discharge and reorganization.  While the committee's plan would be a boon for lawyers, all this litigation will frustrate the creditors' legitimate rights and the possibility of the debtor to reorganize and challenge the basic tenant of the Code.

It is not clear whether the committee's plan is a plan of reorganization. It is definitely a plan of future litigation. This future litigation will unnecessarily prolong the bankruptcy case, waste the estate's resources, and delay payments to creditors, the debtor's discharge and the successful reorganization of the debtor. There is no reasonable likelihood that the plan will achieve a result consist with purpose of the Code which includes timely payments to creditors and the debtor's successful reorganization.

A plan must provide adequate means for its implementation. 11 U.S.C. § 1123(a)(5). Though the Code provides for non-exclusive lists for types of means of implementation, courts have held that a plan does not provide for adequate means for implementation when it does not afford a realistic and likely method to repay the debtor's creditors, a principle that has vital significance to the credibility of reorganization under chapter 11. *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1003 (E.D. Va. 1994). The plan must offer more than speculation about the source of funding for the plan to pay the debtor's creditors. *Id*. Indefinite plans will not allow the creditors reasonable means to assess whether the plan can achieve the results contemplated by the code. *Id*.

In addition to impermissibly relying on borrowing and fundraising, the committee's plan relies heavily on the success of future litigations to fund the plan and to pay some group of the creditors. Reliance on litigation is not a realistic method of repayment to creditors. *In re Am. Capital Equip*., 688 F.3d at 156. Litigation outcomes are uncertain and mere speculation and not reliable source of funding for a plan. *Id*. Accordingly, the plan fails to provide for adequate means of implementation.

CONCLUSION

Based on the foregoing, I conclude that the creditors committee's plan is unconfirmable

THEREFORE, IT IS ORDERED:  Confirmation of the creditors committee's plan dated and filed on December 19, 2016, is denied.

/e/ Robert J. Kressel
ROBERT J. KRESSEL
UNITED STATES BANKRUPTCY JUDGE