UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Bankruptcy Case No. 15-30125 |
| The Archdiocese of Saint Paul and Minneapolis, | Chapter 11 Case |
| Debtor. | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS**

BRIGGS AND MORGAN
Richard D. Anderson (#002306)
Charles B. Rogers (#130588)
Lauren E. Lonergan (#143443)
Benjamin E. Gurstelle (#0389968)
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
randerson@briggs.com
crogers@briggs.com
llonergan@briggs.com
bgurstelle@briggs.com
Telephone:  612-977-8400
Facsimile:  612-977-8650

STINSON LEONARD STREET
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Phillip J. Ashfield (#388990)
Brittany M. Michael (#397592)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
phillip.ashfield@stinson.com
brittany.michael@stinson.com
Telephone: 612-335-1500
Facsimile: 612-335-1657

Attorneys for The Archdiocese Of
Saint Paul and Minneapolis, Debtor and
Debtor in Possession

Attorneys for the Official Committee of
Unsecured Creditors for the
Archdiocese of Saint Paul and
Minneapolis

Dated: August 8, 2018

## DISCLOSURE STATEMENT

On January 16, 2015 (the "Petition Date"), the Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or the "Debtor") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs in accordance with the provisions of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Official Committee of Unsecured Creditors for the Archdiocese of Saint Paul and Minneapolis (the "UCC") and the Debtor (together the "Plan Proponents") seek confirmation of their Chapter 11 Plan of Reorganization (as it may be amended or modified, the "Plan").

Pursuant to Section 1125 of the Bankruptcy Code, the Plan Proponents submit this Disclosure Statement (the "Disclosure Statement") in connection with the Plan. Section 1125 of the Bankruptcy Code requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable stakeholder, typical of the Debtor's creditors, to make an informed judgment whether to accept or reject the Plan. Use of this Disclosure Statement for any other purpose is not authorized.

**THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE CONSIDERED TOGETHER.**

**NO REPRESENTATIONS CONCERNING THE ARCHDIOCESE, INCLUDING THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PLAN.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED THEREIN.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE ARCHDIOCESE AND OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AUDIT OR INDEPENDENT REVIEW EXCEPT AS SPECIFICALLY SET FORTH HEREIN. ACCORDINGLY, ALTHOUGH EVERY EFFORT HAS BEEN MADE TO BE ACCURATE, THE PLAN PROPONENTS CANNOT WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE ARCHDIOCESE OR ITS FINANCIAL CONDITION IS ACCURATE OR**

i

COMPLETE. BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE ARCHDIOCESE'S ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN. THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, PROVIDED THAT HISTORICAL FINANCIAL INFORMATION IS REPORTED AS OF MARCH 31, 2018, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

ALTHOUGH THE PLAN PROPONENTS' PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE PLAN PROPONENTS' PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE PLAN PROPONENTS FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLAN, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ALLOWED CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND RECOVERIES UNDER INSURANCE POLICIES.

140998376.7

10871473v1

**THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT.**

**HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting. To obtain, at your cost, additional copies of this Disclosure Statement please contact:

Richard Anderson
Briggs and Morgan, P.A.
2200 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402

iii

## I.     INTRODUCTION

The Disclosure Statement is provided to all of the Debtor's known creditors in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan. All holders of Claims are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

**THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR SUCH APPLICABLE DOCUMENT SHALL GOVERN.**

A copy of the Plan is enclosed with this Disclosure Statement.

Voting instructions are contained in the solicitation package accompanying each ballot.

## II.     PLAN OVERVIEW AND SUMMARY OF TREATMENT OF CLAIMS

### A.     Executive Summary

Since the entry of the Bankruptcy Court's December 28, 2017 order rejecting the plans proposed by the Archdiocese and the UCC, the Archdiocese, its carriers, parishes, and parish carriers have all agreed to substantially increase their contributions in a good faith effort to resolve the Tort Claims. Through this process, funding available to Tort Claimants was increased from $156 million to approximately $210 million. The UCC has agreed to recommend acceptance of the Plan.

Under the Plan, the Archdiocese's cash contributions will be combined with contributions from non-debtors such as the Archdiocese's settling insurance carriers and parishes and their insurers. As a requirement for these non-debtors' contributions, the Plan includes "channeling injunctions" that channel claims of Tort Claimants and other related claims against these contributing entities to the Plan Trust, which will distribute the contributions for the benefit of creditors as set forth in the Plan.

The sources of approximately $210 million available under the Plan are generally described below.

1.  **Contributions by the Archdiocese.** The Archdiocese has agreed to dedicate approximately $21,475,000 in cash and assets to fund the Plan. The Archdiocese has determined that these amounts represent all of the Archdiocese's available cash and saleable assets that are not needed for its core missions. This includes cash generated from the sale of real estate and other items as described in more detail below. The Archdiocese will also contribute $1 million to the Trust each year for a period of five years. The Archdiocese will also assign to the Trust its beneficial interest in the Estate of Austin Ward and its interest in any return of any portion of the workers' compensation fund deposit that the Archdiocese maintains with the State of Minnesota.

The Archdiocese will also contribute the net proceeds from the sale of land to three Catholic high schools as set forth in the Plan.

      2.   **Contributions by the Archdiocese Carriers**. The Archdiocese, the UCC, and counsel for Tort Claimants negotiated settlements with all thirteen Archdiocese insurance carrier groups. Twelve of the settlements resulted in cash payments by the carriers totaling $142,375,000 to be made within a few weeks after the Plan receives final court approval. In addition, the Archdiocese, the UCC, and counsel for Tort Claimants negotiated a settlement with the liquidator of the Home Indemnity Company ("Home"), which provides the Archdiocese with a $14.2 million approved claim in the Home liquidation proceeding. This claim will be assigned to the Trust upon confirmation. The Archdiocese has received an unsolicited offer to purchase the approved Home claim for at least $7.81 million. The Trustee can choose to sell the claim immediately or wait for payments over time. Should the Trustee chose to liquidate the claim immediately, the Archdiocese believes that he or she should be able to negotiate a purchase price of $7.81 million or more.

      The Archdiocese, counsel for Tort Claimants, and the UCC have spent years negotiating with the thirteen settling carriers. The settlements with these carriers represent the largest reported insurance settlement achieved in any diocesan or archdiocesan bankruptcy case to date. The Plan Proponents agree that the amounts of the settlements with these carriers are reasonable.

      3.   **Contribution from the GIF.** The General Insurance Fund ("GIF") will also contribute $6,000,000 to the Plan. This payment by the GIF assumes that all GIF participants, which include all Parishes and a number of other Catholic Entities, are entitled to payment of defense costs and settlements or judgments incurred in connection with the Tort Claims. These participants have agreed to the GIF's contribution of substantially all of its available assets in exchange for protections from further Tort Claims. The Archdiocese believes GIF is a trust for the benefit of all participants, thus would need to have been set aside to pay defense costs, settlements, and judgments for GIF participants if such participants were not receiving protection from Tort Claims under the Plan. The majority of funds in the GIF have been contributed by non-debtor Catholic entities, including Parishes. As noted below, these non-debtor Catholic entities take the position that the contribution to be made from the GIF constitutes additional consideration for the releases and channeling injunction set forth in the Plan.

      4.   **Contributions by Parishes and their carriers.** Through negotiations, parishes and their carriers have agreed to provide contributions totaling approximately $22,255,724. These settlements and the related contributions to the Plan are contingent on confirmation of the Plan, a buy-back of parish insurance policies, and the provision of a channeling injunction for the benefit of parishes and other insureds. The Parishes also make other contributions under the Plan that increase the amounts that will be available to Tort Claimants under the Plan. These contributions include waiving all claims against the Archdiocese, including claims related to the GIF, the AMBP, and contribution and indemnity claims against the Archdiocese. Also within ten days of the Confirmation Order becoming a Non-Appealable Order, the Archdiocesan Parishes shall assign to the Trust their claim in the liquidation proceeding of Home Insurance Company

-2-

(State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $1,500,000.

5. **AMBP Settlement**. The Archdiocese is the sponsoring employer in the Archdiocese of Saint Paul and Minneapolis Health and Dental Plans. The Archdiocese established a trust fund (the "AMBP") to receive premium payments from hundreds of participating employees. The UCC has contended that the AMBP is an asset of the estate and the AMBP and participating employees contest those allegations. The Archdiocese has negotiated a settlement with the AMBP whereby the AMBP will pay $4,000,000 to the Plan in exchange for a release of all claims asserting that trust assets are assets of the estate.

The Plan remains subject to receipt of the final approval of the Settling Insurers as to the Plan's terms, and finalization of the Insurance Settlement Agreements. It is the expectation of the UCC, Archdiocese, the Parish Committee, and counsel for certain Tort Claimants that such consent will be received and written settlement agreements finalized by the hearing on the Motion to Approve the Disclosure Statement or the Plan will be modified or withdrawn as appropriate.

## III.    BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE

### A.    Brief Overview of Chapter 11 Bankruptcy

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon filing a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides that all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business are stayed. The primary objective of a Chapter 11 reorganization is confirmation of a plan of reorganization. A bankruptcy "plan" sets forth the means for satisfying the claims of creditors of the debtor. The plan and a "disclosure statement" that contains information necessary to allow creditors, shareholders and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each impaired class has voted to accept the plan. Votes will be counted only with respect to claims: (1) that are listed on the Debtor's Schedules other than as disputed, contingent, or unliquidated, or (2) for which a proof of claim was filed on or before the deadline set by the court for the filing of proofs of claim. A vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order from the Court allowing such a claim for voting purposes.

### B.    History and Legal Structure of the Archdiocese

The Archdiocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law. Canon Law obligations, however, do not give rise to claims

140998376.7

10871473v1

under civil law. The secular embodiment of the Archdiocese is sometimes referred to as the Chancery Corporation. References to the "Archdiocese" or the "Debtor" are intended to refer to that secular embodiment of the Archdiocese. The Archdiocese is organized as a religious Diocesan Corporation under Minnesota Statutes Section 315.16.

The Archdiocese serves a geographical area consisting of 12 greater Twin Cities metro-area counties in Minnesota, including Ramsey, Hennepin, Anoka, Carver, Chisago, Dakota, Goodhue, Le Sueur, Rice, Scott, Washington, and Wright counties (the "Region"). Today, 428 priests and 182 deacons serve 187 parishes and approximately 825,000 individuals in the Region. The Archdiocese also currently employs approximately 140 fulltime equivalent employees, 25 of whom are priests.

As set forth in its Articles of Incorporation, the Archdiocese's general purpose is to manage the temporal affairs of the Church in the Region, and to promote spiritual, educational and other interests of the Church in the Region, including charitable, benevolent, eleemosynary, and missionary work. The Archdiocese's mission, as set forth on its website, is: "Making the name of Jesus Christ known and loved by promoting and proclaiming the Gospel in word and deed through vibrant parish communities, quality Catholic education, and ready outreach to the poor and marginalized."

The Archdiocese supports and serves 22 Catholic health care centers for the elderly or disabled, three Catholic hospitals, and two Catholic hospices. The Region is also home to two Catholic universities, a major seminary as well as a college seminary, and numerous vibrant ministry groups.

The Archdiocese also supports 90 Catholic schools in the Region, including 13 Catholic high schools (collectively, the "Schools"), with a total enrollment of over 30,000 students, 15% of which are not Catholic.

The Archdiocese maintains a number of departments, including Administration and Finance (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Catholic Education (responsibilities include leadership development and ensuring Catholic identity in schools), Development and Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage, Family and Life (responsibilities include marriage preparation, family programs, outreach to people with disabilities, youth and young adults, and efforts to promote the dignity of life from conception to death), Moderator of the Curia (responsibilities include administration of the ministries and services of the central corporation of the Archdiocese), Office of Parish and Clergy Services (responsibilities include clergy formation, vocations, chaplaincies, parish consultation, planning and leadership development support, and Latino ministry), Office of Communications (responsibilities include the Catholic Spirit, archdiocesan websites, social media and other communications which support local ministries), and the Office of Evangelization and Catechesis.

140998376.7

10871473v1

### C.    Events Leading to the Chapter 11 Filing

In May 2013, Minnesota enacted the Minnesota Child Victims' Act, Minn. Stat. § 541.073 (the "CVA"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse. The CVA allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages arising from the abuse, regardless of how long ago the abuse occurred. The CVA also provided a three-year window during which victims whose claims were time barred by the previous statute of limitations could bring civil suits against alleged abusers and the Archdiocese. This window expired May 25, 2016.

The CVA opened the door to a significant number of additional civil claims against the Archdiocese relating to clergy misconduct spanning a time period of more than half of a century.

As of the Petition Date, the Archdiocese remained subject to 21 pending sexual abuse civil actions, had received dozens of notices of additional claims relating to sexual abuse, and was subject to an investigation being conducted by the Ramsey County Attorney's Office. More than 400 sexual abuse claims have been asserted against the Archdiocese in this bankruptcy.

Sexual abuse claimants from across the country have obtained verdicts into the millions of dollars. Insurance coverage available to the Archdiocese does not cover the full amounts for the value of damages claimed by sexual abuse survivors in the cases pending against it. Some insurers have also raised certain coverage disputes.

Managing civil court litigation and coverage claims is a difficult and costly process. The pending civil litigation placed significant strain on the Archdiocese. The Archdiocese anticipated that this strain would only increase during the remaining term of the extended statute of limitations authorized by the CVA. In addition, the Archdiocese was concerned that too large a settlement with a select group of pending cases would leave the Archdiocese with insufficient assets to fairly compensate other claimants and creditors and would result in a disproportionate allocation of the limited funds available to the Archdiocese.

In addition, the Archdiocese has claims against it from non-debtor Catholic entities related to various insurance programs, as well as potential contribution and indemnity claims related to allegations of sexual abuse.

### D.    Purpose and Goals of this Chapter 11 Case

The Archdiocese seeks confirmation of its Plan so it may focus on its mission and to provide compensation to Tort Claimants.

140998376.7

10871473v1

## IV.    DEBTOR'S OPERATIONS

### A.    Sources of Revenue

As a religious non-profit organization, the Archdiocese has no significant ongoing for-profit business activities or business income. Instead, the Archdiocese's primary source of revenue is Parish assessments. Prior to the commencement of this Chapter 11 case, the Archdiocese implemented a number of cost-saving measures and achieved a budget reduction. The Archdiocese's reduced annual expenditures are approximately $17.9 million, exclusive of "special issues," i.e. attorney and professional fees and depreciation.

#### 1.    Parish assessments

Almost 75% of the support for the Archdiocese's missions comes from Parish assessments. The annual dollar amount of assessment revenue, however, fluctuates. Parish assessments are derived primarily from plate and envelope collections at the Parishes. Assessments are calculated and billed on a two-year lag which means that Parish financial results for two-years prior to the collection year form the basis for Parish assessment revenue. Parish assessments have been a relatively reliable source of income for the Archdiocese, but have declined or plateaued in recent years, reflecting the Parishes' own challenges to raise operating funds. Nevertheless, projections for the Plan assume collections and assessments will remain stable and the Archdiocese does not contemplate any drastic changes to assessment practices.

#### 2.    Catholic Services Appeal Foundation program revenue

Approximately 10% of Archdiocese revenue is generated annually in the form of donations from the annual Catholic Services Appeal. These donations are collected, held, and distributed by the Catholic Services Appeal Foundation (CSAF), an independent non-profit organization. Donations are distributed for the benefit of a prescribed group of Catholic organizations and Archdiocese ministries as outlined in the CSAF bylaws.

Like with Parish assessments, income from the annual appeal fluctuates and may decline as the Church encounters declining or flat attendance. For purposes of this disclosure statement, however, CSAF contributions have been projected to increase slightly post-confirmation.

#### 3.    Program revenues

Various Archdiocese departments generate revenue based on services provided to individuals, Parishes, priests, and other entities. These revenue-generating services include publication of the Catholic Spirit, which receives revenue through subscriptions and advertising, rent received from the residents at the Byrne residence, services performed by various Archdiocese program offices, and accounting services provided to Parishes. These services make up approximately 13% of the Archdiocese's annual revenue.

140998376.7

10871473v1

4.      Contributions

The Archdiocese is sometimes the recipient of contributions from individuals as gifts or as part of their wills or estates. These contributions may be either restricted to specific purposes or unrestricted donations to the Archdiocese depending on the language of the bequest. Contributions make up on average less than 1% of Archdiocese annual revenue. Contributions are completely at the discretion of those making donations. For purposes of the Plan, contributions are projected to increase slightly after confirmation.

5.      Administrative revenue

The Archdiocese performs accounting and other services for certain separate entities, including the AMBP, General Insurance Program, and pension plans. The Archdiocese bills those entities for such services. Revenue from those services is approximately $500,000 per year. These administrative revenue funds go into the Archdiocese's general operating account and are used to pay for the cost of providing such services, which are included in general Archdiocese operations and programs.

6.      Investment income

The remainder of the Archdiocese's income comes historically from miscellaneous sources including investment income. All Archdiocese-owned investment accounts were converted to cash upon the filing of the Chapter 11 case and the Archdiocese is not currently earning income on investments it holds. The Archdiocese receives a distribution from certain investment funds that are held by Catholic Community Foundation.

**B.      Ongoing Operations and Expenditures**

1.      Archdiocese operational programs

The Archdiocese advances its mission through its departments, which are listed in Section III.B.

The Archdiocese also has incurred special issues expenses, which are predominately payments to third-party professionals for services related to the Archdiocese's reorganization, including payments to counsel and advisors for the Archdiocese, counsel and advisors for the UCC, and counsel for the Parish Committee. Additionally, the Archdiocese has pursued its mission through the continued maintenance of various insurance and benefit programs described in more detail below.

2.      General Insurance Fund

The Archdiocese administers an Insurance Program for the benefit of participants at the Archdiocese and participating non-debtor Catholic entities. A schedule of participating entities

-7-

140998376.7

10871473v1

may be found at Schedule 1 to the Plan. The Insurance Program has operated continuously since 1980, providing various insurance coverages for the participating entities including liability insurance, property insurance, and workers' compensation insurance. Monies collected from participating entities for the Insurance Program are deposited into a General Insurance Fund Account (the "GIF Account").

The property and liability portion of the Insurance Program extends to general liability, employment practices, building and contents, burglary, personal property, student accident, auto, public library, and boilers. The GIF has in the past been used to resolve sexual abuse claims and is generally available to meet retentions that need to be paid as part of the various insurance programs for the Archdiocese and parishes from September 1, 1980 forward. This insurance is separate and distinct from other insurance policies that may provide coverage for abuse claims prior to 1980.

The GIF Account also pays certain workers' compensation claims. SFM Risk Solutions administers the claims subject to the Archdiocese workers' compensation program. The workers' compensation program has a retention of $500,000. Above such amounts, workers' compensation insurance coverage is provided by Workers' Compensation Reinsurance Association. Premiums for such insurance are paid from the GIF Account.

In addition to the GIF Account, in order to comply with Minnesota law, the Insurance Program's obligations with respect to the workers' compensation retention are backed by a deposit established by the Archdiocese with Bremer Bank as custodian for the benefit of the State of Minnesota Department of Commerce. The deposit was made by the Archdiocese under the terms of a Custodial Agreement entered into between the Bremer Bank, the Archdiocese, and the Commissioner of Commerce for the State of Minnesota on or about August 20, 2014. The March 31, 2018, balance of the deposit was approximately $3,942,172. The Custodial Agreement provides that the deposit is subject to turnover to the Commissioner upon certain specified events, including insolvency or a default by the Archdiocese in the payment and performance of its workers' compensation obligations. By its terms, the Custodial Agreement states that the Archdiocese shall have no right, title, or interest in the deposit. The Archdiocese has maintained the Custodial Agreement and deposit during the pendency of this bankruptcy case and will seek to reduce the deposit and contribute the excess amount to the Plan Trust.

The Archdiocese and the GIF engaged in various transactions between 1998 and 2012 consisting of advances and repayments of funds for operating expenses in lieu of additional premiums to the Parishes. Advances from the GIF to the Archdiocese do not appear on the financial statements attached to the Disclosure Statement because such advances are evidenced by a corresponding account payable.

The Plan outlines that certain monies from the GIF will be paid to the Trust to satisfy creditor claims and retentions. A $6,000,000 payment will be made, which will not invade the necessary reserve for the Insurance Program.

140998376.7

10871473v1

**Estimated GIF Contribution Analysis**

| | |
|---|---:|
| Cash Balances at 3-31-18 | $8,256,691 |
| April/May/June 2018 Net Forecasted Cashflow | 1,495,939 |
| July/Aug 2018 Net Forecasted Cashflow | (1,560,250) |
| Estimate of Outstanding Claims | (1,401,463) |
| Cash Balance at 8-31-18 | 6,790,917 |
| Operating Reserve | (790,917) |
| **Contribution Amount** | **$6,000,000** |

Based on the above projection, the cash balance at August 31, 2018, after a contribution of $6,000,000 would be approximately $790,917, which will enable the GIF to continue to operate with adequate cash to pay claims. The Archdiocese intends to continue the Insurance Program for the foreseeable future.

3.      Archdiocese Medical and Dental Benefit Plan

The Archdiocese is the sponsoring employer and a participating employer in the Archdiocese of St. Paul and Minneapolis Comprehensive Major Medical Health Care Plan and the Archdiocese of St. Paul and Minneapolis Dental Benefit Plan (collectively, the "Health and Dental Plans"). Other non-debtor Catholic entities have also elected to separately participate in the Health and Dental Plans. The Archdiocese has established a trust fund (the "Archdiocese Medical Benefits Plan" or "AMBP") to receive premium payments from the participating employers and participants in the Health and Dental Plans, and to pay Health and Dental Plan claims, Health Plan stop-loss insurance premiums, and other reasonable expenses associated with the administration of the Health and Dental Plans. The Health Plan stop-loss coverage protects the Archdiocese and the participating non-debtor Catholic entities from claims above a certain threshold. The premium for the stop-loss coverage is paid from the AMBP.

The AMBP is administered as an independent trust by a board of trustees. The current board includes two Parish representatives, a Catholic School representative, one lay representative, the Archbishop, and two or more members appointed by the Archbishop. The Health and Dental Plan currently provides insurance coverage to approximately 3,500 individuals. The individual beneficiaries of the Health and Dental Plan include clerical and maintenance personnel, teachers and other support staff, and the dependents of these employees.

The AMBP will contribute $4,000,000 to the Trust as part of the Plan in exchange for a release of all claims against the AMBP and its trustees. The amount is intended to reflect contributions by employers, not individual employees and the Archdiocese does not believe that this will impair the ability of the AMBP to pay claims. As part of the settlement, the Archdiocese agrees to a two-year freeze on parish assessment rates. The Archdiocese has also agreed to explore alternative trust and other structures for the AMBP and to solicit proposals from third party vendors for all of the administrative functions presently performed by the Archdiocese.

-9-

The Archdiocese seeks approval of the settlement as part of the Plan.

        4.        Priest Health and Dental Plan

Priests and seminarians obtain medical and dental benefits under a separate plan from the Archdiocese's lay Employees (the "Priest Health and Dental Plan"). The Priest Health and Dental Plan covers priests assigned to the Archdiocese, to Parishes, and to other non-debtor Catholic entities. Parishes and other non-debtor Catholic entities separately pay their applicable premiums. The benefits provided under the Priest Health and Dental Plan generally mirror the benefits provided under the Health and Dental Plans. The priest's benefits are provided from the Archdiocese, rather than the AMBP. In the ordinary course of its business, the Archdiocese increased medical rates for priests covered by the plan effective July 1, 2016. The Archdiocese does not contemplate any changes in the funding or contribution levels for the Priest Health and Dental Plan as a part of the Plan. **No priests credibly accused of sexual abuse currently receive benefits under this plan.**

        5.        Retirement and pension plans

The Archdiocese maintains three retirement plans. Layperson employees of the Archdiocese and of participating non-debtor Catholic entities are eligible to contribute to a tax-deferred annuity plan, which is also known as a 403(b) plan. Contributions to the 403(b) plan are made by employees at a rate selected by them and authorized by applicable law. Participating employers, including Parishes, make a discretionary contribution at the rate of up to 2.5% percent of eligible earnings. The Archdiocese deducts 403(b) plan contributions from participating lay employees' paychecks and these amounts, along with the employer contributions, are automatically deducted from the Archdiocese's bank account and forwarded to the plan administrator to be invested pursuant to the employees' directions. The Plan does not contemplate any changes in the funding levels or contributions for the 403(b) plan.

The Archdiocese also sponsors a pension plan for lay employees (the "Lay Employees' Pension Plan"). The Lay Employees' Pension Plan is funded entirely by the Archdiocese and participating non-debtor Catholic entities. The Lay Employees' Pension Plan has been frozen since 2011. However, the Archdiocese and other participating non-debtor employers continue to make contributions to the Lay Employees' Pension Plan for the benefit of those legacy obligations. The Archdiocese makes monthly contributions of approximately $23,000 to the Lay Employees' Pension Plan. Other participating entities contribute approximately $530,000 per month combined. The level of contribution was established in 2013 and has not changed. Contributions are made to a pension plan trust, and are held for the exclusive benefit of pension plan participants. The Plan does not contemplate any changes to the funding levels or contributions for the Lay Employees' Pension Plan.

The Archdiocese also sponsors a pension plan for priests (the "Priests' Pension Plan"). The obligations of the Priest's Pension Plan are funded by the Archdiocese and participating

parishes. The Archdiocese makes contributions to the Priests' Pension Plan of approximately $51,000 per month. **The Archdiocese is not currently making contributions into the Priests' Pension Plan for any priests credibly accused of sexual abuse.** Other participating non-debtor entities contribute approximately $261,000 per month. Contributions are set annually by the Priests' Pension Plan board of trustees, are made to a pension plan trust, and are held for the exclusive benefit of participants in the Priest's Pension Plan.

Historically, bishops were not included in the Priests' Pension Plan. As such, the Archdiocese established a reserve for former Archbishop Flynn for this purpose. The Archdiocese has a liability on its books for "Accrued Bishops Retirement Expense," which is adjusted each year based on the life expectancy of Archbishop Flynn. Archbishop Flynn's annual deferred compensation/pension is $27,360, plus insurance and out-of-pocket health care costs of $8,514. The Priests' Pension Plan was amended on April 17, 2010 to include bishops. The Plan does not contemplates any changes to the funding levels or contributions for the Priests' Pension Plan.

During the course of this case, the Archdiocese has continued to make all payments and contributions required to be made in connection with the retirement plans and Accrued Bishops Retirement Expense in the ordinary course of business.

6.      Other benefit programs

Eligible employees of the Archdiocese and non-debtor Catholic entities also utilize benefit programs described as follows. Eligible employees receive long-term disability ("LTD") and accidental death and dismemberment ("AD&D") insurance. LTD premiums are payable entirely by participating employees. The Archdiocese pays Mutual of Omaha Insurance Company approximately $45 per month per employee for AD&D insurance coverage premiums. Non-debtor Catholic entity employee premiums are paid by the respective non-debtor Catholic entities, not the Archdiocese.

The Archdiocese and participating non-debtor Catholic entities also offer eligible employees life insurance, at a total monthly charge to the Archdiocese of approximately $610, and the option to purchase supplemental life insurance coverage, currently provided by Unum. Employees participating in such optional insurance plans bear the premium costs associated with such coverage. This optional coverage costs the Archdiocese little to nothing to provide to eligible employees.

The Archdiocese also provides tuition assistance to eligible employees for any child enrolled in a Catholic school (grades kindergarten through 12) subject to an aggregate annual limit for all employees of $85,000.

Finally, as required by Canon Law, the Archdiocese provides payments to 18 priests for a

-11-

variety of reasons (the "Priest Support Payments"). Those who receive some form of Priest Support Payment include priests who are not assigned to a parish or whose parish or institution is not able to provide full financial support, those who are out of ministry while their suitability is under review, or those who are on a general leave of absence. This support may include housing, salaries, pension contributions, and other support benefits and payments, including medical, dental, and life insurance. Not all priests who receive some form of Priest Support Payment receive all of these benefits or payments. Priest Support Payments average approximately $4,800 per month per priest. **The Archdiocese is not currently making any such payments to priests credibly accused of sexual abuse.**

The Plan does not contemplate any changes to the Archdiocese's participation in these other benefit programs or obligations.

### 7.    Interparish Loan Fund

The Interparish Loan Fund was originally funded by parishes that had excess cash and were willing to deposit that cash for use by other parishes. The Interparish Loan Fund is listed as a separate liability and is tracked in a separate general ledger account in the Archdiocese's records and is being treated as an estate asset as part of the Archdiocese's general cash. The Plan contemplates addressing the claims of the participants with amounts owed from the Interparish Loan Fund through a system of offsets and credits as outlined in the Plan summary below. The Archdiocese does not contemplate any changes to the operation of the Interparish Loan Fund as part of the Plan.

### C.    Budget Summary

During the course of this case the Archdiocese has continued to provide the employee benefits described above, continued to make all contributions to such programs, and continued to pay administrative fees related to such employee benefits, all in the ordinary course of business.

The Archdiocese believes that it has reduced expenses as much as possible while still maintaining its essential missions. For the fiscal year ending June 30, 2018, the Archdiocese's annual program expenses, including payroll, insurance and other program premiums, operational costs, and related liabilities for each facet of its operations (exclusive of "special issues," i.e., attorney fees and professional fees, and depreciation) are estimated to be:

| | |
|---|---:|
| Clergy Services | $2,065,456 |
| Community Services | $30,252 |
| Catholic Education | $608,075 |
| Parish Services & Outreach | $1,510,962 |
| Central Services | $1,750,567 |
| Marriage & Family Life | $712,661 |
| Development & Stewardship | $450,361 |

140998376.7

10871473v1

| Moderator of the Curia | $285,253 |
|---|---|
| Communications | $1,722,611 |
| Finance | $2,599,687 |
| Latino Ministries | $450,406 |
| Chancellor and Archives | $884,684 |
| Evangelization | $233,651 |
| Metropolitan Tribunal | $994,828 |
| IT Services | $623,491 |
| Venezuelan Mission | $382,585 |
| Office of Worship | $180,378 |
| Bishops and Staff | $962,490 |
| Priest and Parish Support | $743,423 |
| Ministerial Standards | $675,869 |
| **Total** | **$17,867,690** |

The Archdiocese believes it cannot effectively eliminate any additional expenses and fulfill its missions and obligations. The projections of the Archdiocese's expected operating expenditures for the first five years after confirmation of the Plan, attached as **Exhibit D**, reflect the Archdiocese's belief that it will still be able to fulfill its educational, spiritual, and charitable mission by operating on a balanced budget supported by the continued generosity of the Catholic faithful and benefactors.

The Archdiocese's operating results from the Petition Date through March 2018 are attached as **Exhibit F**. The Archdiocese has also filed monthly operating reports with the Bankruptcy Court throughout the Chapter 11 case. These reports chart the Archdiocese's financial condition and performance during the course of the case.

## V.    DEBTOR'S ASSETS

The Archdiocese's property is generally comprised of: (1) real property, (2) personal property (including insurance policies), (3) beneficial interests, and (4) other unavailable assets. The Archdiocese has valued assets based on public records, independent appraisals, and assumptions and analysis provided by its financial advisor.

### A.    Real Property

1.    Property sold during this Chapter 11 case – converted to cash

Certain real property assets were sold during the pendency of this Chapter 11 case. The details of the sales of each of these properties are discussed further below. For purposes of describing the Debtor's assets, however, these properties have been converted to cash. The cash is currently being held in a segregated interest-bearing account pursuant to order of the Bankruptcy Court. As of March 31, 2018, total net cash proceeds were $8,793,603.

-13-

2.      Property in use for religious purposes

The Archdiocese owns real property located at 3045 Park Avenue in Minneapolis, Minnesota, which houses the Church of Gitchitiwaa Kateri. For its bankruptcy schedules, the Archdiocese stated the value of this property in accordance with the Hennepin county tax records estimate of $442,500. However, due to several issues with the property, the Archdiocese estimates that the actual salable or liquidation value of the property is much less. Based on a broker opinion of value prepared by Cushman & Wakefield NorthMarq on April 19, 2016, the Archdiocese estimates that the market value of this property is $185,000. The UCC has obtained a separate appraisal listing an estimated value of $460,000.

3.      Property leased to the others

The Archdiocese owns four parcels of real property that are currently leased to others. Each of these properties is subject to a long-term ground lease. The leases on the four parcels are respectively with the Cathedral of Saint Paul (the "Cathedral"), and Benilde-St. Margaret High School, Grace High School d/b/a Totino-Grace High School, and DeLaSalle High School (collectively, the "High Schools").

The Archdiocese negotiated terms for the sale of the Benilde-St. Margaret, Totino-Grace, and DeLaSalle properties to the tenant High Schools themselves. Under the term sheet negotiated between the parties, the schools will purchase the Archdiocese's fee interest in the properties for a collective payment of $4,000,000. The High Schools will be entitled to status as Protected Parties under the Plan. This School Sale Agreement and Settlement is further described below and in the Plan.

4.      Leasehold interests

The Archdiocese entered into a lease agreement as tenant with IAF Beacon I LLC on February 29, 2016 for the lease of office space to house the Archdiocese's staff and business operations (the "Lease"). The Bankruptcy Court approved the Lease on April 7, 2016.

**B.      Personal Property**

The Archdiocese has miscellaneous personal property. Besides cash proceeds from real estate sales, the primary personal property available to pay Chapter 11 expenses and make distributions to creditors are the Debtor's insurance settlements, insurance policies, other unrestricted cash assets, and cash in excess of reserves in the GIF.

1.      Insurance claims and settlements

As a result of extensive negotiations during the course of mediations, the Debtor, the UCC, counsel for Tort Claimants, and the Archdiocesan Settling Insurers agreed to settlement of claims against the Archdiocesan Settling Insurer Policies totaling $142,375,000. The total value

-14-

of these settlements will be contributed to the Plan under the terms of the Insurer Settlement Agreements. In addition, the Archdiocese negotiated a settlement with the liquidation of Home, which provides the Archdiocese with an approved claim of $14,200,000 in the Home liquidation proceeding.

2.      Cash

At the beginning of the Chapter 11 case, the Archdiocese converted its investment savings into cash in compliance with U.S. Trustee requirements. Some of that cash has been used by the Archdiocese to pay ongoing operating expenses during the pendency of this case. Under the Plan, the Archdiocese is contributing all of its cash except for working capital that is necessary for continued operations. The operating cash on hand identified in this Section is exclusive of the cash proceeds from the sale of certain Archdiocese real property being held in the segregated account.

a.      International Priest Fund and Board Designated Funds

The Archdiocese has reviewed documentation involving the International Priest Fund and other board-designated funds and determined that such funds should be available to general creditors as an asset of the estate. These funds had been used for specific purposes designated only by the Archdiocese's board. The Plan provides for distribution of these funds to the Trust.

b.      Donor-Restricted Cash and Investments

The Archdiocese contends that certain funds are donor-restricted,  meaning that these funds were given to the Archdiocese by a donor with specific donative intent that the funds be used only for a specific purpose outlined in the documents transferring the funds or assets to the Archdiocese.

c.      Perpetual Trusts

The Archdiocese is the beneficiary of certain perpetual trusts and bequests from individual wills. The bequests in these wills and trusts contain provisions restricting the use of the gifted assets for specific stated purposes. For that reason, although the Archdiocese is the named beneficiary of these certain trusts and wills, the assets are held by the Archdiocese for the benefit of others and may not, by operation of law, be used by the Archdiocese for its own purposes, including for purposes of funding a bankruptcy plan of reorganization.

d.      Riley Fund

The Archdiocese holds a trust fund (the "Riley Fund") under a Will executed by William C. Riley on September 16, 1929. The balance of the Riley Fund equaled $2,594,264.83 as of March 31, 2018.

-15-

The Plan includes a provision resolving a dispute between the Cathedral Corporation and the Archdiocese concerning ownership and entitlement to the Riley Fund. The settlement reached with the Cathedral Corporation regarding the Riley Fund will be incorporated into the Plan to be approved in accordance with Rule 9019 and as a part of confirmation. The Archdiocese believes that the resolution of this dispute is a reasonable and sound exercise of its business judgment.

The operative language of the Will provides:

> It is my wish that the gift to the Diocese of Saint Paul, which is made as a memorial to my father, and any and all sums which may be paid to the Diocese of Saint Paul under the conditions of my said will, as amended by this codicil, shall be held for the benefit of the Cathedral of Saint Paul and used and devoted for such purpose in connection with the said Cathedral of Saint Paul, as the Diocese of Saint Paul may deem best, but this expression of my wishes is in no respect to restrict or limit the character of the gift which is absolute to the Diocese of Saint Paul.

When the Will was executed there was no existing legal entity known as "the Cathedral of Saint Paul of the Roman Catholic Diocese of Saint Paul." The Cathedral Corporation became a separate corporate entity in 1995.

At the November 22, 1982 meeting of the corporate board of the Archdiocese, the Debtor authorized the placement of the Riley Trust "in an endowment fund at the Chancery for the benefit of the Cathedral, the income of which would be paid periodically to the Cathedral." The board determined that this "endowment in favor of the Cathedral will also satisfy any obligations to the Cathedral parish for the Cathedral School which was appropriated by the Archdiocese in 1977 for an Archdiocesan office building. At that time no other payments for the school were made to the Cathedral parish by the Archdiocese."

In accordance with this intent, the Archdiocese continued to make monthly distributions from the Riley Fund to the Cathedral Corporation, which has relied on the distributions to pay costs of improvements and other expenses in connection with the Cathedral. This practice was maintained by the Archdiocese on a continuous basis from at least 1995 to the Petition Date. On average, the monthly distribution from the Riley Fund to the Cathedral Corporation equaled $9,710.00 per month. The Riley Fund was designated as "board-designated funds" on the Archdiocese's financial statements and its schedules and statement of financial affairs in this bankruptcy case.

The Archdiocese ceased making distributions from the Riley Fund to the Cathedral Corporation following the Petition Date. Prior to that time, payments from the Riley Fund had been made for the exclusive benefit of the Cathedral for approximately 90 years. The Cathedral

-16-

Corporation objected to the termination of payments from the Riley Fund and demanded the return of the Riley Fund as property held by the Archdiocese in trust for the Cathedral Corporation. The Archdiocese disputed this contention on the basis of the language of the Will and the fact that the Cathedral Corporation did not exist as a legal entity until 1995.

After negotiations, in connection with the Plan, the Archdiocese and the Cathedral Corporation have agreed to resolve the dispute and any tort claims against the Cathedral upon payment by the Archdiocese to the Cathedral Corporation of an amount equal to the balance of the Riley Fund held by the Archdiocese as of the Effective Date. The balance of the Riley Fund will be paid by the Archdiocese to the Trust as a component of the distribution contemplated under Section 5.1 of the Plan, which payment shall be free and clear of any interest of the Cathedral Corporation.

The Cathedral Corporation's agreement to this settlement to pay the balance of the Riley Fund to the Trust is conditioned on the waiver of any and all claims and causes of action against the Cathedral Corporation.

3.      Accounts receivable

a.      Parish assessments receivable

As of March 31, 2018, the Archdiocese has accounts receivable from Parish assessments with a net book value of approximately $3,912,896. The Archdiocese believes that these assets are worth substantially less than as listed due to receivables that are uncollectable. The Archdiocese further believes that assessments receivable would be uncollectable in a liquidation. Parish assessments will continue to be collected and will be better utilized in the Debtor's reorganization as they will provide the primary means for the Debtor to continue its operations going forward.

b.      Other accounts receivable

The Archdiocese has accounts receivable based on subscriptions and advertisements in the Catholic Sprit, accounting services, priest benefit fund for medical and dental coverage, and CSAF funds. The Archdiocese also has loans receivable from four loans to separate Parishes. As with the assessment receivables, the Archdiocese believes that these assets are worth less than as scheduled due to similar collectability issues.

4.      Miscellaneous personal property

The Archdiocese has in its possession miscellaneous personal property that is of minimal value, is difficult to market for sale, or is necessary for the continued operations of the Archdiocese. This personal property consists primarily of miscellaneous religious vestments, jewelry, home furnishings, garage and print shop equipment, lawn care equipment, office equipment, and vehicles, as described in the Debtor's Schedules and Statement of Financial

-17-

Affairs. The equipment and vehicles are used primarily for the Archdiocese's operations including publication of the Catholic Spirit, maintenance of Archdiocese grounds, general office use, and travel to sites within the Archdiocese's region. The equipment and vehicles are necessary for the Debtor's reorganization and continued operations. Further, such equipment and vehicles have limited resale value because such equipment and vehicles may be outdated. The appraised value of the jewelry owned by the Archdiocese is $38,500, mostly attributable to a single sapphire and diamond ring donated to the Archdiocese. The Archdiocese is in the process of selling that ring and other personal property not necessary for the Archdiocese's operations and missions and with minimal historical or liturgical value. These proceeds will be contributed to the Trust.

### C.    Other Interests and Assets

#### 1.    Residual Ward Estate

The Archdiocese is one of several beneficiaries of the estate of Austin T. Ward. The Archdiocese's beneficial interest is the residuary of the estate after other administration, i.e., the assets left over after all other specific gifts and bequests have been made and all other claims and obligations of the estate have been satisfied. The value of the Archdiocese's interest in that estate is currently unknown because the estate remains unsettled. The Archdiocese will contribute its beneficial interest in the Residual Ward Estate to the Plan Trust.

#### 2.    Workers' Compensation Deposit

The Archdiocese maintains a deposit held by the Minnesota Department of Commerce (the "Department") relating to the Archdiocese's self-insurance requirements under Section 79A.04(s) of the Minnesota Statutes. By statute, the Archdiocese has no right or title to the deposit. The Archdiocese believes, however, that the deposit may be subject to reduction following confirmation of the Plan. The Archdiocese has agreed to cooperate with the Trustee to make a good faith effort to obtain the Department's consent to a reduction in the deposit following Plan confirmation. The balance of the deposit, if any, returned to the Archdiocese with the consent of the Department shall be promptly paid over to the Trust, as and to the extent such excess amounts are returned to the Archdiocese.

#### 3.    Clarey Oil Rights

The Archdiocese is the beneficiary of a will providing the Archdiocese a nominal fractional share interest in certain mineral rights in Colorado. The mineral rights are unexplored and the cost of doing so is prohibitive. The value of this asset is believed to be negligible and the Archdiocese has a booked value for this asset at $340. Nonetheless, the Archdiocese will contribute this asset toward the Plan Trust.

-18-

4.    Ausmar Development Co., LLC

The Archdiocese was included as a beneficiary in a will and received a 25% interest in Ausmar Development Co, LLC (Ausmar), which owns certain real property in Chanhassen, Minnesota. Prior to the Petition Date, Ausmar subdivided the property and marketed the lots for sale. All but two lots were sold prior to the Chapter 11 case. Property taxes have risen dramatically on the two remaining lots. The Archdiocese estimated its interest in the Ausmar assets as $365,775 based on taxable market value. The Archdiocese does not hold a controlling interest in Ausmar, and has not at any time held a direct ownership interest in Ausmar or the real estate and is not a party to the deed. St. Hubert parish, the owner of adjacent property, purchased the property on April 30, 2018. The purchase price was for an amount in excess of the appraised value. Certain representatives of the Archdiocese were required under parish corporate bylaws and canon law to consent to the purchase by St. Hubert's. Because the transaction did not include use or sale of estate property, the seller was not required to obtain court approval. The Archdiocese, however, did provide details of the proposed transaction to the Committees. The Committees did not object to the sale. The Archdiocese's estimated net share of sale proceeds is approximately $275,000. The Archdiocese will contribute this asset toward the Plan Trust.

### D.    Avoidable Transfers

The Debtor has investigated and does not believe that it has any colorable avoidable transfer claims worthy of pursuit. On December 29, 2016, the UCC moved for leave, standing, and authority to pursue avoidable transfer claims on behalf of the estate. The Bankruptcy Court denied that motion on January 12, 2017. The time to prosecute avoidance actions has subsequently expired. Therefore, no value may be obtained from avoidable transfer claims.

## VI.    THE CHAPTER 11 CASE

### A.    Commencement of the Chapter 11 Case

The Debtor commenced its case on January 16, 2015 (the "Petition Date"). The Debtor's case was assigned to the Honorable Robert J. Kressel, United States Bankruptcy Judge. Upon commencement of the Chapter 11 case, the automatic stay of Section 362 of the Bankruptcy Code enjoined the commencement or continuation of (a) collection efforts by creditors against the Debtor or to recover a claim against the Debtor by seeking to avoid a transfer of the Debtor's property, (b) enforcement of liens, if any, against assets of the Debtor, and (c) continued and additional claims against the Debtor.

After the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

140998376.7

10871473v1

**B.    Retention of Professionals**

1.    Debtor's professionals

Briggs and Morgan, P.A. was authorized to act as bankruptcy counsel to the Debtor. The Debtor retained additional professionals during the course of the Chapter 11 case, each for a specific purpose:

- BGA Management LLC d/b/a Alliance Management was retained as the Debtor's financial consultant;

- NorthMarq Real Estate Services, LLC d/b/a Cushman & Wakefield NorthMarq was retained as the Debtor's real estate broker and real estate leasing representative;

- Meier Kennedy and Quinn, Chartered was retained as the Debtor's ongoing ordinary course counsel;

- Fredrikson and Byron, P.A. was retained as special criminal defense counsel related to charges asserted by the Ramsey County Attorney;

- CliftonLarsonAllen LLP was retained to perform agreed-upon procedures for the Debtor to evaluate the status of financial and corporate records and to monitor internal controls; and

- Regnier Consulting Group, Inc. was retained to complete a loss reserve analysis of the workers' compensation program maintained through the General Insurance Fund.

The retention of each of these professionals was approved by the Bankruptcy Court.

2.    UCC professionals

Pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "UCC") to serve in the Debtor's case. The UCC consists of five individuals who hold Tort Claims against the Debtor. The UCC retained Stinson Leonard Street LLP to represent it. The UCC has performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors. The UCC also retained CB Richard Ellis as its real estate advisor, with respect to real property sales and lease transactions entered into by the Debtor.

140998376.7

10871473v1

3.      Parish Committee's professionals

Pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee also appointed an Official Committee of Unsecured Parish Creditors (the "Parish Committee") to serve in the Debtor's case. The Parish Committee consists of five representatives of Parishes who hold claims against the Debtor. The Parish Committee retained Manty & Associates to represent it. The Parish Committee has taken an active role in the Debtor's case. The Parish Committee also retained the law firm of Maslon LLP to act as its special insurance counsel.

## C.    Significant Events in the Bankruptcy Case

The Bankruptcy Court has entered several orders in this case, each of which is available from the clerk of the Bankruptcy Court.

1.      First-day motions

To administer the Archdiocese's bankruptcy estate and prevent interruption in business operations, the Debtor filed the following motions on the Petition Date, each of which was granted by the Bankruptcy Court:

- A motion to authorize the maintenance of the Archdiocese's protected insurance program (GIF);
- A motion to authorize the Archdiocese to file portions of Schedule F, the master mailing matrix, and other pleadings and documents under seal;
- A motion for modification of claim procedures;
- A motion to (a) authorize payment of prepetition wages, salaries, and employee deductions and expenses, (b) authorize payment of prepetition statutory unemployment compensation charges, (c) authorize continuation of participation in medical and dental health insurance programs (AMBP), (d) authorize priest support payments and international priest payments, (e) authorize payment of other benefit and retirement plan obligations, (f) authorize continuation of third party payroll, expense checks and fund transfers, and (g) finding compliance with the requirements of Rule 6003 and waiving the provisions of Rule 4001(a)(3); and
- A motion to authorize maintenance of existing bank accounts and business forms.

2.      Debtor's schedules and statements and monthly operating reports

The Archdiocese filed its schedules and statement of financial affairs on January 30, 2015, and subsequently amended the schedules and statements as appropriate. The Archdiocese's schedules were based on information compiled from several sources, including the Archdiocese's books and records. Because of the undetermined nature of the Tort Claims and the claims of the Parishes against the Archdiocese, the Archdiocese scheduled every known Tort Claimant and Parish claimant as contingent, disputed, and unliquidated.

-21-

The Archdiocese has also timely filed all monthly operating reports and other reports as required by the Bankruptcy Code, Bankruptcy Rules, and in compliance with U.S. Trustee guidelines. Each of these reports is available on the docket for this Chapter 11 case.

        3.        Claim Filing Deadline and notice publication

The Bankruptcy Code provides a procedure for each Creditor who believes it has a Claim against the Debtor to assert such a Claim so that the Creditor can receive distributions from the Debtor's estate. In this case, the last date to timely file claims was extended to August 3, 2015, nearly seven months after this Chapter 11 case was initially filed. After the claims filing due date was established, the Archdiocese undertook substantial efforts to widely publicize the due date, including publication in local and national newspapers, posting of the deadline notice at Parishes, and notices on the Archdiocese's and Bankruptcy Court's websites. Several months after these initial publication efforts, on July 16, 2015, the UCC moved to extend the time to timely file proofs of claim and argued that the claims filing due date should be extended through May 25, 2016 (which is the date that the statute of limitations window under the CVA closes). The Bankruptcy Court denied the UCC's motion and the claims filing due date was not extended.

No order has been entered establishing an Administrative Claims due date. The Debtor has generally been paying undisputed Administrative Claims in the ordinary course of business postpetition. However, upon establishment of an Administrative Claims due date, it is possible that additional Administrative Claims may be filed.

        4.        Future claims representative

The UCC filed a motion to appoint a legal representative for the interests of future abuse claimants on June 25, 2015 but later withdrew that motion. The Archdiocese then moved to appoint such a legal representative on September 17, 2015. The Bankruptcy Court denied the motion. A motion to reconsider was made, and Judge Michael R. Hogan was appointed future claims representative on February 9, 2017.

        5.        Property sales

As identified above, the Archdiocese sold most of its real property interests during the course of this Chapter 11 case, and now holds the sale proceeds in a segregated interest-bearing account pending further court order. The Plan also contemplates the sale of the Archdiocese's interests in real property leased to the High Schools. The sale and related settlement are described below.

        a.        The Hayden Center

During the course of this case, the Archdiocese sold certain real property located at 328 Kellogg Boulevard West in Saint Paul, Minnesota known as the "Hayden Center."   The

Archdiocese solicited multiple offers for the Hayden Center and received a purchase offer from the Minnesota Historical Society. No other offers were received. The Bankruptcy Court entered an order approving the sale on January 7, 2016. The sale closed on February 16, 2016, for a purchase price of $4,500,000.00. As part of the sale, the Archdiocese entered into a short-term lease with the Historical Society to allow the Archdiocese to retain its office space until it moved into its new offices. Net sale proceeds of $4,317,295.67 were deposited into an interest-bearing account maintained by Premier Bank to be held pending further court order.

### b.    The Chancery

The Archdiocese also sold certain real property located at 226 Summit Avenue and 230 Summit Avenue known as the "Chancery."  The Archdiocese obtained a stalking horse bid from United Properties in the amount of $2,750,000. The Archdiocese, with the participation of the UCC, conducted as an auction for the property on April 4, 2016. The Bankruptcy Court entered an order approving the sale of the Chancery on April 7, 2016. On April 14, 2016, the Archdiocese closed on the sale of the property to 1777 Bunker Lake Blvd NW LLC for $3,275,000. As part of the sale, the Archdiocese entered into a short-term lease with 1777 Bunker Lake Blvd to allow the Archdiocese to retain its office space on the property until it moved into its new office space. The parties also entered into a view easement agreement which limited the height of any structure built on the property in order to protect the views to and from the Cathedral of Saint Paul. Net sale proceeds of $3,181,855.44 were deposited into an interest-bearing account maintained by Premier Bank to be held pending further court order.

### c.    Hazelwood

The Archdiocese also sold certain residential real property located at 10310 295th Street West, Greenvale Township, Minnesota known as "Hazelwood." Hazelwood was placed on the residential real estate market for several months before a buyer emerged and a purchase agreement was negotiated. The Bankruptcy Court entered an order approving the Hazelwood sale on February 25, 2016. The Archdiocese closed on the sale on March 4, 2016. Net sale proceeds of $349,804.00 were deposited into an interest-bearing account maintained by Premier Bank to be held pending further court order.

### d.    The Dayton Property

The Archdiocese also sold certain commercial real property located at 244 and 250 Dayton Avenue in Saint Paul, Minnesota known as the "Dayton Property."  The Bankruptcy Court entered an order approving the Dayton property sale on July 14, 2016. The Archdiocese closed on the sale on August 11, 2016. Net sale proceeds of $876,109.57 were deposited into an interest-bearing account maintained by Premier Bank to be held pending further court order.

### e.    Sale of Schools

-23-

As identified above, the Archdiocese also has agreed to sell its fee interest in land, which is subject to long-term leases with the High Schools, to those schools in exchange for a lump sum payment of $4,000,000. The Plan Proponents view this sale as providing reasonable value.

The terms of the sale and settlement are described in the Plan summary below. The Archdiocese will seek Court approval of the sale under Rule 9019 and 11 U.S.C. § 363 at the Confirmation hearing.

6.      Lease for Archdiocese offices

Because the Archdiocese sold the real property where it housed its offices, the Archdiocese was required to make arrangements to lease new space. After an extensive search, the Archdiocese settled on a building located at 777 Forest Street, Saint Paul, Minnesota. The Archdiocese entered into a lease agreement as tenant with IAF Beacon I, LLC as landlord on February 29, 2016 with an initial term of 127 months commencing upon the Archdiocese moving into the premises following initial construction and fit-out work performed on the building (the "Lease"). The Bankruptcy Court authorized the Archdiocese to enter into the Lease on April 7, 2016. The Archdiocese anticipates a possible net savings in occupancy costs under the Lease.

7.      Ramsey County lawsuits and settlement

During the pendency of the Chapter 11 case, on June 3, 2015, the Ramsey County Attorney's Office ("RCAO") initiated a civil action against the Archdiocese petitioning the Ramsey County district court for an order that the Archdiocese show cause why it should not be subject to the jurisdiction of the Court for contributing to a child's need for protection or services. As discussed above, this civil claim was resolved through a settlement. The Archdiocese seeks to incorporate the civil settlement agreement into its Plan. The Bankruptcy Court approved the civil settlement on January 28, 2016.

The RCAO simultaneously initiated a criminal action against the Archdiocese based on the same alleged facts. The criminal complaint alleged three gross misdemeanor counts each of "contributing to the status as juvenile petty offender or delinquency" and "contributing to the need for protection or services." The RCAO dismissed that suit "in the best interests of justice" on July 20, 2016. In connection with the dismissal, the civil settlement was amended to have the record reflect that "Curtis Wehmeyer was a priest in this Archdiocese. The Archdiocese admits that it failed to adequately respond and prevent the sexual abuse of Victim 1, Victim 2, and Victim 3. The Archdiocese failed to keep the safety and wellbeing of these three children ahead of protecting the interests of Curtis Wehmeyer and the Archdiocese. The actions and omissions of the Archdiocese failed to prevent the abuse that resulted in the need for protection and services for these three children." In addition, the audit and oversight period was extended by an additional year, the Ramsey County Attorney designates a seat on the Ministerial Review Board (filled by Patty Wetterling),  Archbishop Hebda will participate directly in three restorative justice sessions as convened and determined by RCAO, the Director of Safe Environments role was strengthened, and ongoing counseling resources for Victim 1, Victim 2, and Victim 3, and

-24-

immediate family, if necessary. Compliance review hearings have occurred at six-month intervals, with the court determining that the Archdiocese is in substantial compliance with the settlement agreement.

### 8.    Rejection of Infor contract and settlement of claim

Prior to the Petition Date, the Archdiocese entered into a contract with Lawson Software, Inc. n/k/a Infor (US), Inc. for human resources management software and hosting services. On February 19, 2015, the Bankruptcy Court granted the Archdiocese's motion to reject this contract. Following rejection, the Archdiocese settled Infor's contract rejection damages claim. The settlement was approved on December 3, 2015.

### 9.    Assumption of Byrne Residence lease

Prior to the Petition Date, the Archdiocese was a tenant under a lease with the Saint Paul Seminary for a property known as the Byrne Residence. The Byrne Residence is used as a home for retired priests. The Byrne Residence is a critical part of the Archdiocese's mission in that, among other things, it is obligated under Canon Law to provide reasonable support to retired priests. The Archdiocese pays no rent under the lease, but pays operating expenses for the property. The Bankruptcy Court approved assumption on July 30, 2015.

### 10.    UCC motion for substantive consolidation

On May 24, 2016, the UCC filed a motion on its own behalf seeking to substantively consolidate the Archdiocese with numerous non-debtor entities including (i) all Parishes, (ii) all consolidated schools, (iii) the Catholic Community Foundation, (iv) the Francophone African Chaplaincy, (v) Segrado Corazon de Jesus, (vi) the Chaplaincy of Gitchitwaa Kateri, (vii) Newman Center and Chapel, (viii) the Catholic Finance Corporation, (ix) the Catholic Cemeteries, (x) Totino Grace High School, (xi) De La Salle High School, and (xii) Benilde-St. Margaret High School. The bankruptcy court dismissed the UCC's substantive consolidation motion for lack of authority under the Bankruptcy Code to order the relief requested and failure by the UCC to state a plausible claim for relief. The United States District Court for the District of Minnesota affirmed the bankruptcy court's ruling on appeal. The United States Court of Appeals for the Eighth Circuit also affirmed the ruling on appeal.

### 11.    UCC motion for derivative standing to pursue avoidance claims

The UCC filed a motion seeking authority and derivative standing to pursue avoidable transfer claims on December 29, 2016. The UCC conducted significant discovery with the Archdiocese's cooperation prior to filing the motion. The Bankruptcy Court denied the motion on January 12, 2017.

140998376.7

10871473v1

12.    Competing Plans of Reorganization

The Archdiocese and UCC previously submitted competing plans of reorganization, which were both voted on by creditors. After a preliminary hearing on legal objections to the respective plans, Judge Kressel denied confirmation of both plans.

**D.    Insurance Adversary Proceeding and Mediation**

1.    The Insurance Declaratory Judgment Action

On November 24, 2014, prior to the Petition Date, the Archdiocese initiated a civil lawsuit (the "Insurance Declaratory Judgment Action") in the Minnesota District Court against several insurance carriers, *i.e.*, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York ("CIC"), Fireman's Fund Insurance Company, as successor to Fireman's Fund Indemnity Company ("FFIC"), National Fire Insurance Company of Hartford ("National Fire"), TIG Insurance Company, as successor to International Insurance Company ("TIG"), Continental Casualty Company ("CCC"), Hartford Accident and Indemnity Company ("Hartford"), American Home Assurance Company ("American Home"), The Aetna Casualty and Surety Company, n/k/a Travelers Casualty and Surety Company, State Farm Fire and Casualty Company ("State Farm") Certain Underwriters at Lloyd's, London subscribing to Policies SL3721, SL3722, SL3723, ISL3115, ISL3116, ISL3117, ISL3675, ISL3613, ISL3614, and ISL3615, Bellefonte Insurance Company ("Bellefonte") and Northwestern National Insurance Company of Milwaukee, Wisconsin for its liability under SLC 5742 ("Northwestern National"), Excess Insurance Company a/k/a Excess Insurance Company Limited, Terra Nova Insurance Company Limited, Dominion Insurance Company, Sovereign Marine & General Insurance Company Limited a/k/a Sovereign Marine & General Insurance Company Limited, Stronghold Insurance Company Limited, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Sphere Drake Insurance PLC, CNA Reinsurance of London, Limited, Interstate Fire and Casualty Company ("Interstate"), 21st Century Centennial Insurance Company f/k/a Colonial Penn Insurance Company ("Colonial Penn"), seeking a declaration, *inter alia*, that with respect to each claim of clergy abuse that triggers one or more of the carriers' policy periods, that as to such claim of clergy abuse, each carrier has or will have upon satisfaction of any retained limit, a duty to indemnify the Archdiocese for damages paid in the form of verdicts, judgments, or settlement, and defense costs incurred in connection with the claims of clergy abuse, and that each primary carrier has a duty to defend and indemnify the Archdiocese in connection with such claims. The Archdiocese also asserted specific allegations as to several insurers and sought additional declaratory relief, as well as injunctive and other ancillary relief. The complaint was amended on January 16, 2015 to add The Catholic Mutual Relief Society of America ("Catholic Mutual") as a defendant. The Archdiocese also filed and pursued a claim in the Home's liquidation proceeding.

On January 16, 2015, the Insurance Declaratory Judgment Action was referred by United States District Court Judge Richard H. Kyle to the Bankruptcy Court for the District of Minnesota under 28 U.S.C. §§ 157 and 1334 for appropriate disposition as an adversary

-26-

proceeding. The adversary proceeding was opened in the Bankruptcy Court for the District of Minnesota as case number 15-03013.

On January 21, 2015, the Bankruptcy Court ordered that the Insurance Declaratory Judgment Action as well as the Tort Claimants participate in confidential mediation conducted by former Magistrate Judge Arthur J. Boylan. The Bankruptcy Court further ordered that all deadlines and proceedings in the adversary were suspended indefinitely.

2.      Confidential mediation process with Archdiocese insurers

The Debtor, counsel for Tort Claimants, the UCC, and all insurers for the Archdiocese have agreed to settlement terms with Archdiocese carriers as a result of three years of mediation.

3.      Insurance coverage issues

Coverage for Tort Claims. The Archdiocesan policies implicated by the Tort claims span the period from 1943 through 2016. The policies fall into two categories. The first consists of policies covering liability for bodily injury that takes place during the policy period and caused by an "accident."  Even if the claim is made years after the policy terminates, this type of policy covers the insured's liability so long as the claimant's bodily injury took place during the policy period. Policies of this type are commonly referred to as "occurrence-based" policies. The policies from 1943 to 1986 and 1987 to 1990 are all in this category.

The second category is composed of policies that provide coverage for claims made during the policy period based on injuries before or during the policy period. This type of policy is referred to as "claims made" coverage. The Archdiocese has "claims-made" coverage for the period 1986-1987 and 1990 onward. "Claims made" policies differ from "occurrence-based" policies in that, unlike "occurrence-based" policies, "claims made" policies cover claims made during the policy period even if the injury took place years before the policy incepted. Because the claim must be made during the policy period to trigger coverage, the only "claims made" policies covering revived claims against the Archdiocese are those in effect since the Child Victim Act was enacted. In other words, only the "claims made" policies in effect since May 2013 can be expected to respond to revived claims.

Policies During the Period 1943 to 1986. As explained above, the policies during the period 1945 to 1986 were all "occurrence-based" policies. For the early years, 1943 to 1952, the Archdiocese lacks copies of the policies themselves, but the Archdiocese has secondary evidence of the existence of the policies. For the period 1952 onward, the Archdiocese has copies of policies, with one notable exception described below.

For the period 1943 to 1946 the primary limits were $25,000 "per person" and $50,000 "per accident." From 1946 to 1964 the limits were $100,000 "per person" and $300,000 "per accident." From 1964 to 1967, the primary policy limits were $250,000 "per person" and $500,000 "per accident." From 1967 to 1973, the primary policy limits were $100,000 "per

-27-

person" and $300,000 "per occurrence." From 1973 to 1974, the primary limits were $300,000 "per occurrence." From 1974 to 1975, the primary limits were $500,000 "per occurrence." From 1975 to 1980, the primary limits were $500,000 "per occurrence."

Beginning in 1966 the Archdiocese carried not only primary insurance policies but also umbrella or excess policies. Generally, these upper layer policies provide coverage for bodily injury once the insured's liability (and in one case defense costs) exceeds the primary limits. Defense costs are paid by umbrella and excess carriers if the underlying policy's limits are exhausted, which occurs usually by payment of those limits for settlements or judgments.

The Archdiocese's umbrella or excess coverage for the period 1966 to 1986 varied from $3 million "per occurrence" to as much as $20 million "per occurrence" for a given year.

For all "occurrence" policies, the Plan Proponents believe that there are separate "occurrences" for each individual Tort Claimant and for each separate policy year in which such Tort Claimant was abused. This means that the "per occurrence" limits are the same as the "per person" limits and are triggered for every policy year in which the Tort Claimant was abused by a particular perpetrator. A number of the carriers, though not all, disagree and contend either that each perpetrator's abuse constitutes a single occurrence, regardless of the number of individuals he is alleged to have abused, or that there is a single occurrence consisting of the Archdiocese' generalized failure to protect claimants.

According to the carriers who assert that each perpetrator's conduct constitutes just one separate occurrence, if the policy limits are $100,000 "per occurrence" and two individuals were abused by the same person during one policy year and were adjudged entitled to $100,000 each, then the most the carrier would owe is $100,000 in total. Under the Plan Proponents' view, the carrier would owe $200,000. According to the carriers who assert there is a single occurrence regardless of the number of perpetrators or victims, under the foregoing example, even if there were 10 claimants abused by different perpetrators during one policy year and adjudged to be entitled to $100,000 each, the carrier would still owe only $100,000. The Plan Proponents' position is that under this scenario, the carrier would owe $1,000,000.

Certain carriers also contend that the "per person" and "per occurrence" limits for their three-year policies are the most that is available for all three years. In other words, if a person is abused in three different policy years and the limits are $100,000 "per person", the carrier would owe only $100,000 in total for the entire three-year policy. The Plan Proponents' view is that the carrier must pay the "per person" limits for each year, i.e., it must pay $300,000.

Some insurers also claim there is no "occurrence" (or in earlier policies an "accident"), and therefore no coverage exists at all, if the Archdiocese expected or intended the injury. Some carriers have denied coverage on this basis for some claims. But, in most cases, carriers have nevertheless agreed to defend the Tort Claims asserted against the Archdiocese.

-28-

Finally, beginning September 1, 1980 the Archdiocese as well as numerous other Catholic Entities, *i.e.*, those participating in the General Insurance Fund ("GIF") explained below, were covered under the so-called "Bishop's Plan." For the period September 1, 1980 to September 1, 1986 the Bishop's Plan consisted of a first layer of coverage issued by certain London market insurers ("LMI") whose policies contain a retention of $100,000 "per occurrence" per year including defense costs. The retention means that LMI was not responsible to pay either defense or settlements or judgments until the total of such amounts paid for an individual claim exceeded $100,000 per policy year. (Rather, the GIF is obligated to pay such retained amount.) Multiple insurers subscribed to each LMI policy and were only liable for their own shares. Insurers representing between 10 and 20% of each year are insolvent. Except for potentially one insolvent carrier, the time to submit claims to these insolvent carriers' liquidators has passed.

Also, the primary carrier for the period 1961 to 1967, Home, is insolvent and is the subject of a liquidation proceeding pending in New Hampshire state court. Home initially took the position that the time for the Archdiocese to file claims in the liquidation proceeding expired long ago (before the enactment of the Child Victim Act). The Archdiocese has negotiated a settlement with Home under which Home will accept the Archdiocese' claims as timely filed subject to various terms and conditions described below.

Although the New Hampshire liquidator agreed to treat the claims as timely filed, the Minnesota Insurance Guaranty Association ("MIGA") has not. MIGA is a quasi-Minnesota state agency set up to ensure that Minnesota insureds whose insurers become insolvent can still recover up to $300,000 per claimant. In addition to contending that the claims are untimely (despite New Hampshire's position), MIGA has contended that the Archdiocese had "net worth" in excess of the statutory maximum in the year before Home became insolvent, prohibiting MIGA from paying.

Finally, for the period 1974 to 1978 or 1979, the Archdiocese had two primary carriers, Aetna Casualty and Surety Company and State Farm Insurance Company. Both carriers' policies had limits of $500,000 "per occurrence". The Archdiocese has been unable to locate copies of the State Farm policies. The only evidence of the policy is a reference to it in the umbrella policies for the same years. State Farm has denied any responsibility based on various contentions.

<u>Policies after September 1, 1986</u>. The September 1, 1986-September 1, 1987 policies were "claims made" and cover only claims made during the policy period. In addition, the policies contain sex abuse-related exclusions. The insurance policies in place in which the abuse is alleged to have taken place during the period 1987 to 1990 are now exhausted.

Beginning on September 1, 1990 the Archdiocese was insured for certain liability for sexual misconduct under "claims-made" policies issued by Catholic Mutual Relief Society. Catholic Mutual's post-September 1, 1990 policies do not cover sexual abuse which began before September 1, 1990.

-29-

Catholic Mutual has raised various coverage defenses and limitations including lack of notice, certain exclusions, and various sub-limits that apply depending on when the abuse is alleged to have occurred.

Exhibit L(1) to the Plan identifies the Archdiocesan Settling Insurers. Exhibit L(2) identifies Parish Settling Insurers.

       4.      Insurance settlements

The Archdiocese has signed formal settlement agreements with two insurance companies, Home, and State Farm, and has reached settlements in principle with Catholic Mutual, ELAC, CNA (for CIC, National Fire, and CCC) ("CNA"), FFIC, TIG, Hartford, American Home, Travelers, Colonial Penn, LMI, and Interstate, which remain to be reduced to formal written agreements. Most of these settlements require a "policy buyback."  A "policy buyback" is a transaction in which an insurance carrier pays the insured to purchase the policy and all rights of any kind flowing from the policy. The purpose of a buyback is to ensure that neither insureds, nor anyone else who may have or claim to have rights arising from the policy, can assert such rights in the future. The transaction is made pursuant to Sections 363(b), (f), and (m) of the Bankruptcy Code. In addition, insurer settlements are conditioned on issuance of a channeling injunction protecting insurers and all insureds from pursuit of Tort Claims.

The settlement with the insolvent insurer, Home Insurance Company, provides the Archdiocese with an approved claim in the Home New Hampshire state court liquidation proceeding in the amount of $14,200,000 in exchange for a policy buy-back and a release of coverage for all claims under the Home policies, among other things. In addition to obtaining Bankruptcy Court approval of the settlement and the Plan, the settlement is not effective until approved by the court in Home's state liquidation proceeding pending in New Hampshire. Under the Plan, the Trust will then be entitled to receive distribution in the court of the Home liquidation proceeding. Further, after all contingencies are met and if the Trust so decides, the approved claim against the Home's liquidation estate may be sold to entities who buy such claims.

**E.      Lawsuits Against Parishes**

Prior to expiration of the CVA on May 25, 2016, numerous claimants against the Archdiocese and some other claimants filed state court civil lawsuits against Parishes where alleged abuse occurred. Many of these actions have been stayed by agreement of the parties pending outcome of this bankruptcy case. The Plan proposes that, as part of the global resolution of abuse claims, such claims and contribution claims by third parties against the Archdiocese, Parishes and certain other entities shall be channeled to the Trust to which the Plan proposes both the Archdiocese and Parishes contribute their rights to insurance policy recoveries.

**F.      Professional Expenditures in the Chapter 11 Case**

The total professional expenditures incurred in this case, as estimated through March 31, 2018, are set forth below:

1.      Professional expenditures so far

The table below lists the paid and estimated outstanding professional fees and expenses through March 31, 2018 incurred during this Chapter 11 case. Certain professionals received retainers prior to the Petition Date, which have been utilized to pay down professional fees incurred to date.

| Professional | Role | Fees/expenses allowed and paid | Fees/expenses allowed and not paid | Est. Additional Fees/expenses incurred through March 31, 2018 |
|---|---|---|---|---|
| **Debtor's Professionals** | | | | |
| Briggs and Morgan | Debtor's counsel | $3,956,176.25 | $1,779,980.46 | $3,000,109.58 |
| Meier, Kennedy & Quinn | Ordinary course counsel | $221,110.66 | $0.00 | $95,552.15 |
| Fredrikson & Byron | Special criminal defense counsel | $762,218.66 | $0.00 | $43,203.38 |
| Alliance Management | Financial advisor | $91,500.59 | $0.00 | $2,719.13 |
| Northmarq Real Estate Services | Real estate broker | $245,905.00 | $0.00 | $0.00 |
| CliftonLarsonAllen | AUP accounting | $24,571.10 | $0.00 | $0.00 |
| Regnier Consulting | Loss reserve analyst | $7,100.00 | $0.00 | $0.00 |
| **UCC's Professionals** | | | | |
| Stinson Leonard Street | UCC's counsel | $1,136,547.47 | $1,213,923.13 | $1,906,853.09 |
| CBRE, Inc. | Real estate consultant | $126,729.17 | $0.00 | $0.00 |

140998376.7

10871473v1

| Parish Committee's Professionals | | | | |
|---|---|---|---|---|
| Manty & Associates | Parish Committee's counsel | $150,757.04 | $132,086.13 | $145,701.34 |
| Maslon LLP | Special insurance counsel | $1,893,523.99 | $476,445.35 | $445,223.15 |

      2.      Expenditures if a Plan is not confirmed

If a plan is not confirmed, the Plan Proponents expect continuing protracted litigation on several fronts, and the contingencies in almost all of the settlement agreements would not be met and the immediate cash available under those settlements to fund the Plan would not be available.

If the Plan is not confirmed and trials on each individual Tort Claim are required, in the opinion of the Archdiocese, tens of millions of dollars in additional costs will be incurred. The Plan Proponents believe that resolution of these trials will take well over 10 years if the court system can accommodate 40 trials per year, with inevitable appeals and coverage lawsuits.

## VII.    DEBTOR'S NON-MONETARY UNDERTAKINGS FOR THE PROTECTION OF CHILDREN

As part of the Archdiocese's settlement with the Ramsey County Attorney's Office, the Archdiocese has agreed to implement and has already begun implementing additional protocols and procedures for the protection of children and to ensure additional oversight. Those additional protocols are incorporated into the Plan as Exhibit K. To reflect and implement the Reorganization Plan contemplated herein, and in furtherance of the goals of creating safe environments, the Debtor and the UCC will meet and confer regarding potential additions to the Ramsey County Agreement, including protocols and services.

140998376.7

10871473v1

### VIII.    SUMMARY OF THE PLAN

#### A.    Definition of Claims and Claim Treatment

All claims (other than Administrative Claims and Priority Tax Claims) are classified as follows for all purposes, including voting, confirmation of the Plan, and distributions pursuant to the Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3A | General Insurance Fund Claims | Impaired | Yes |
| 3B | Medical and Dental Benefit Claims | Impaired | Yes |
| 4 | Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan Claims | Unimpaired | No |
| 5 | Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan Claims | Unimpaired | No |
| 6 | Tort Claims Other Than Future Tort Claims | Impaired | Yes |
| 7 | Future Tort Claims | Impaired | Yes |
| 8 | Inter-Parish Loan Fund and Assessment Overpayment Claims | Impaired | Yes |
| 9 | Trade Vendors and General Unsecured Creditors | | |
| | -    Class 9A Convenience Claims | Impaired | Yes |
| | -    Class 9B | Impaired | Yes |
| 10 | Secured Claim of Premier Bank | Unimpaired | No |
| 11 | Guaranty Claims | Unimpaired | No |
| 12 | Haselberger Claim | Impaired | Yes |
| 13 | Abuse Related Contingent Claims | Impaired | Yes |
| 14 | Other Unsecured Claims | Impaired | Yes |
| 15 | Penalty Claims | Impaired | Deemed to Reject |
| 16 | Priest Support Payments | Unimpaired | No |

Consistent with Section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular Class only to the extent the Claim is within the description of the Class, and a Claim is classified in a different Class to the extent it is within the description of that different Class.

The treatment of each class of Allowed Claims under the Plan is set forth below:

-33-

1.      Priority Claims (Class 1)

A Class 1 Claim means an allowed claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim. Unless the holder of an allowed Class 1 Claim and the Archdiocese or Reorganized Debtor, as applicable, agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed claim (or as soon thereafter as is practicable).

2.      Governmental Unit Claims (Class 2)

A Class 2 Claim means an allowed claim of Governmental Units not otherwise addressed in the Plan. Unless the holder of an allowed Class 2 Claim and the Archdiocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed claim (or as soon thereafter as is practicable).

3.      General Insurance Fund and Archdiocese Medical and Dental Benefit Plan Claims (Class 3)

a.      Class 3A: General Insurance Fund Claims

A Class 3A Claim means the claims against the Archdiocese held by the entities listed on Schedule 1 to the Plan as GIF participants arising from or related in any way to the collection and use of contributions and premiums and other payments made by such claimants to the Archdiocese under the GIF, including any claims arising from the administration or sponsorship by the Archdiocese of the GIF.

The Archdiocese will assume its participation in the GIF for the continued benefit of Class 3A claimants. The Archdiocese will continue to sponsor the GIF and will cause to be paid claims, insurance premiums for coverage purchased by the GIF, and administrative expenses under the GIF to the extent of available funds in the GIF in accordance with prior practices, and the GIF Settlement described in the Plan.

b.      Class 3B: Medical and Dental Benefit Claims

A Class 3B Claim means the claims against the Archdiocese held by the entities listed on Schedule 1 to the Plan as AMBP participants arising from or related in any way to the collection and use of contributions and premiums and other payments made by such claimants to the AMBP, including any claims arising from the administration or sponsorship by the Archdiocese of the AMBP.

-34-

The Archdiocese will assume its participation in the AMBP for the continued benefit of Class 3B claimants. The Archdiocese will continue to sponsor the AMBP and will cause to be paid claims and administrative expenses under the AMBP to the extent of available funds in the AMBP in accordance with prior practices, and the AMBP Settlement described in the Plan.

4.      Archdiocese Priests' Pension Plan Claims (Class 4)

A Class 4 Claim means any claim against the Archdiocese for liability arising under the Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan. The Archdiocese, along with a number of other entities, participates in, and contributes to, the Archdiocese of Saint Paul and Minneapolis Priests' Pension Plan (the "Priest Plan"). The Archdiocese will assume its participation in the Priest Plan and will continue to meet its obligations under the Priest Plan as they become due. The Archdiocese will not make any payment with respect to any Claim filed in this Chapter 11 case with respect to Class 4 Claims.

5.      Archdiocese Lay Employees' Pension Plan Claims (Class 5)

A Class 5 Claim means any claim against the Archdiocese for liability arising under the Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan. The Archdiocese, along with a number of other entities, participates in, and contributes to, the Archdiocese of Saint Paul and Minneapolis Lay Employees' Pension Plan (the "Lay Plan"). The Archdiocese will assume its participation in the Lay Plan, and will continue to meet its obligations under the Lay Plan as they become due. The Archdiocese will not make any payment with respect to any Claim filed in this Chapter 11 case with respect to Class 5 Claims.

6.      Tort Claims Other Than Future Tort Claims (Class 6)

A Class 6 Claim means a Tort Claim other than a Future Tort Claim. A "Class 6 Claimant" shall mean a holder of a Class 6 Claim. The Plan creates a Trust to fund payments to Class 6 Claimants entitled to such payments under the Plan, Trust Agreement and Trust Distribution Plan. Class 6 Claimants' share of the Trust Assets as provided by the Trust Distribution Plan is the only amount, if any, they will be entitled to receive from the Protected Parties and Settling Insurer Entities. Distribution from the Trust does not preclude claims or recoveries by Tort Claimants against Persons who are not Protected Parties or Settling Insurer Entities for the liability of such Persons not attributable to the causal fault or share of liability of Protected Parties or Settling Insurer Entities under the Settling Insurer Entity Policies. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of causal liability or fault.

Except with respect to the Protected Parties and the Settling Insurer Entities, nothing in the Plan is intended to affect, diminish, or impair the rights of any Tort Claimant against any

-35-

Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis of his or her Tort Claim except that the rights of Tort Claimants against third-parties, including joint tortfeasors, does not include the right of Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Protected Party to any third-party based on the causal fault or share of liability of Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Tort Claim shall not be liable for any Protected Party's share of liability or fault. Under no circumstances will the reservation of such Tort Claimant's rights against any other Person impair the discharge, Channeling Injunctions, or Settling Insurer Supplemental Injunction with respect to any Protected Party, the Reorganized Debtor or Settling Insurer Entities.

The Protected Parties' and Settling Insurer Entities' liability for and obligation to pay, if any, Class 6 Claims shall be assigned to and assumed by the Trust. Each Class 6 Claim will be estimated solely for purposes of voting. The Protected Parties and the Settling Insurer Entities shall have no further liability in connection with Class 6 Claims.

No Class 6 Claimant shall receive any payment on any award unless and until such Class 6 Claimant has executed a written release, attached as <u>Exhibit E</u> to this Plan. Notwithstanding the foregoing, nothing in the Plan requires any Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party, and such Claims are reserved. But in no event may a Tort Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Parties' share of liability or fault. The release of these Class 6 Claims is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

       7.      Future Tort Claims (Class 7)

A Class 7 Claim means a Future Tort Claim. A "Class 7 Claimant" shall mean a holder of a Class 7 Claim. The Plan creates a Trust to fund payments to Class 7 Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. Class 7 Claimants' share of the Trust Assets as provided by the Trust Distribution Plan is the only amount, if any, they will be entitled to receive from the Protected Parties and Settling Insurer Entities. Distribution from the Trust does not preclude claims or recoveries by Tort Claimants against Persons who are not Protected Parties or Settling Insurer Entities for the liability of such Persons not attributable to the causal fault or share of liability of Protected Parties or Settling Insurer Entities under the Settling Insurer Entity Policies. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of liability or fault.

140998376.7

10871473v1

Except with respect to the Protected Parties and the Settling Insurer Entities, nothing in the Plan is intended to affect, diminish, or impair the rights of any Future Tort Claimant against any Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis of his or her Future Tort Claim except that the rights of Future Tort Claimants against third-parties, including joint tortfeasors, does not include the right of Future Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Protected Party to any third-party based on the causal fault or share of liability of Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Future Tort Claim shall not be liable for any Protected Party's share of liability or fault. Under no circumstances will the reservation of such Future Tort Claimant's rights against any other Person impair the discharge, Channeling Injunctions, or Settling Insurer Supplemental Injunction with respect to any Protected Party, the Reorganized Debtor, or Settling Insurer Entities.

The Protected Parties' and Settling Insurer Entities' liability for and obligation to pay, if any, Class 7 Claims shall be assigned to and assumed by the Trust. The Protected Parties and the Settling Insurer Entities shall have no further liability therefor. Class 7 Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 7 Claim pursuant to the factors in the Trust Distribution Plan.

Class 7 Claims will be solely determined by the Tort Claims Reviewer in accordance with the Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and Trust Assets.

No Class 7 Claimant shall receive any payment on any award unless and until such Class 7 Claimant has executed a written release, attached as Exhibit E to this Plan. Notwithstanding the foregoing, nothing in the Plan requires any Future Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or a Settling Insurer Entity and such Claims are reserved. But in no event may a Class 7 Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Future Tort Claim shall not be liable for any of the Protected Parties' share of liability or fault. The release of these Class 7 Claims is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

8.    Inter-Parish Loan Fund and Assessment Overpayment Claims (Class 8)

A Class 8 Claim means any claim against the Archdiocese for unpaid deposits made to the Inter-Parish Loan Fund (the "IPLF") and for Parish assessment overpayments made by any

-37-

Archdiocesan Parish prior to the Petition Date as set forth on Schedule 2 of the Plan. Unless otherwise agreed by an individual claimant and the Archdiocese:

(a)    An Archdiocesan Parish that owes assessments to the Archdiocese as of the Effective Date in an amount in excess of the claim of such Archdiocesan Parish in Class 8 will be entitled to a reduction in the balance of past due assessments payable by such Archdiocesan Parish in an amount equal to the amount of such parish's Class 8 Claim. Archdiocesan Parishes subject to this paragraph (1) will receive no other distribution in connection with such Class 8 Claim and will remain liable for the full amount of assessments due from and after the Effective Date and the balance of unpaid assessments as of the Effective Date, as reduced in accordance with this paragraph.

(b)    The claim of the Archdiocesan Parishes who hold Class 8 Claims in excess of the balance of assessments payable by such parish as of the Effective Date will be reduced by the amount of the unpaid assessment due by such Archdiocesan Parish, if any. The remaining balance of the Class 8 Claim will be satisfied by a credit against the assessments that would otherwise be due by such Archdiocesan Parish from and after the Effective Date. The credit contemplated in this paragraph will be applied on a quarterly basis against future assessments, as determined by the Archdiocese in accordance with its general practice in calculating assessments, until such time as the Class 8 Claim of such Archdiocesan Parish has been satisfied in full, without interest. By way of example, an Archdiocesan Parish with a Class 8 Claim (net of any past due assessments) in the amount of $500,000 shall not be required to pay post-Effective Date assessments to the Archdiocese until the Class 8 Claim has been satisfied in full through the credit and reduction contemplated in this paragraph (2).

The credit and reductions contemplated under this Section shall be noted by the Archdiocese in its assessment notice to Class 8 Claimants, which calculation shall be conclusive absent manifest error. Holders of Class 8 Claims shall have no interest in amounts payable to the Archdiocese by Archdiocesan Parishes obligated pursuant to deposits made under the Inter-Parish Loan Fund and shall have no interest in amounts payable to the Archdiocese by Archdiocesan Parishes who are liable to the Archdiocese for advances previously made under the Inter-Parish Loan Fund. The Archdiocese shall be entitled to deduct from any distribution to any holder of a Class 8 Claim any amounts payable by such Archdiocesan Parish to the Archdiocese.

9.    Trade Vendor Claims (Classes 9A and 9B)

Class 9A Claim (a "Class 9A Convenience Claim") means an allowed claim against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date, as set

-38-

forth on Schedule 3, that is: (i) in the amount of $1,000 or less, or (ii) reduced by the holder to $1,000 on the ballot. Class 9A Convenience Claims shall not include any claims classified and treated under any other class under the Plan. The holders of Class 9A Convenience Claims shall receive, directly from the Reorganized Debtor, payment in full of such allowed claim, without interest, within 30 days following the Effective Date. The Archdiocese estimates that the total payment to creditors in Class 9A will equal approximately $50,000.

A Class 9B Claim means any allowed claim against the Archdiocese for goods and services supplied to the Archdiocese prior to the Petition Date, as set forth on Schedule 3, that is: (i) in the amount in excess of $1,000, and (ii) has not been reduced to $1,000 by election on the ballot. Class 9B claims shall not include any claims classified and treated under any other class under the Plan. The holders of Class 9B Claims shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 9 Claim, without interest, in two equal installments. The first installment shall be due within 90 days following the Effective Date. The second installment shall be due and payable within 180 days following the Effective Date.

10.    Secured Claim of Premier Bank (Class 10)

Class 10 Claim means the claim of Premier Bank under the mortgage executed by the Archdiocese in favor of Premier Bank, as renewed on May 16, 2011, describing and encumbering the Cathedral of Saint Paul. The mortgage interest of the holder of the Class 10 Claim shall remain undisturbed and the holder of such claim may exercise any and all rights and remedies against the collateral referenced in such mortgage, available to the holder.

11.    Guaranty Claims (Class 11)

Class 11 Claims mean the guaranty claims arising out of the prepetition guaranties executed by the Archdiocese as described on Exhibit C to the Plan. The guaranty obligations in Class 11 shall remain undisturbed and the holders of such guaranties shall be entitled to exercise all legal rights and remedies available to such holders. Holders of Class 11 Claims shall be deemed to have waived any right to accelerate the underlying debt secured by such guaranty agreement solely as a result of the Archdiocese's financial condition at the commencement of this Chapter 11 case.

12.    Haselberger Claim (Class 12)

Class 12 Claim means, to the extent allowed, the claim of Jennifer Haselberger (Claim No. 668). The holder of the Class 12 Claim shall receive payment on their pro rata share of the sum of up to $50,000 to be paid from the Trust as soon as practicable after all Class 12 Claims have been allowed or disallowed.

13.    Abuse-related Contingent Claims (Class 13)

-39-

A Class 13 Claim means (i) claims for contribution, indemnity, or reimbursement arising out of or related to the Archdiocese's liability to pay or defend any Class 6 or Class 7 Claim, and (ii) the Claims of any insurers or other Persons who are subrogated to the Claims identified in the Plan. Claims in Class 13 shall be allowed or disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 13 Claims will receive no distribution under the Plan and will be channeled to the Trust. The treatment of Class 13 Claims shall include the release and certification procedures contemplated under Sections 4.6 and 4.7 above. The Plan does not allow Tort Claimants to collect that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Tort Claim shall not be liable for any Protected Party's share of liability or fault.

14.      Other Unsecured Claims (Class 14)

A Class 14 Claim means (1) any claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent, or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case or as to which the holder of such claim timely filed a claim. The holders of Class 14 Claims shall receive payment of their Pro Rata share of the sum of up to $10,000 to be paid from the Reorganized Debtor as soon as practicable after all Class 14 Claims have been allowed or disallowed.

15.      Penalty Claims (Class 15)

A Class 15 Claim means any Claim, other than a Tort Claim, against the Archdiocese, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Class 15 Claim. Holders of Class 15 Claims shall not receive or retain any property under the Plan on account of such Class 15 Claims.

16.      Priest Support Payments (Class 16)

A Class 16 Claim means any claim of any inactive Archdiocesan Priest for support or maintenance. The Archdiocese disclaims any liability under civil law for Class 16 Claims and holders of Class 16 Claims shall receive no distribution under the Plan on account of such claims. However, the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. Notwithstanding the fact that Class 16 Claims receive no distribution, the Archdiocese intends to honor its post-Effective Date obligations under Canon Law with respect to inactive priests in accordance with prior practices.

17.    Treatment of Unclassified Claims

a.    Administrative Claims

Each holder of an allowed Administrative Claim, excluding Professional Claims, against the Archdiocese shall receive, in full satisfaction, settlement, release, and extinguishment of such claim, an amount from the Reorganized Debtor equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such claim. Each holder of an allowed Professional Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such claim, an amount from the Trust equal to the allowed amount of such Professional Claim, unless the holder agrees in writing to other treatment of such claim and subject to the provisions of Section 5.2 of this Plan, except that the Trust shall assume and pay the allowed amount of any claim for substantial contribution or expenses under Section 503(b)(3) of the Bankruptcy Code made by a committee member, a committee professional, or an attorney for a Class 6 Claimant.

**Administrative Filing Deadline**. Except as otherwise set forth in the Plan, requests for allowance and payment of Administrative Claims must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court. Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such claims against the Archdiocese, the Reorganized Debtor, any Settling Insurer Entity (to the extent applicable), the Trust, or any of their property.

All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph shall control over any contrary deadline set forth in any requests for payment of Administrative Claims.

**Professional Claim Filing Deadline**. All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

Objections to Professional Claims must be filed and served no later than sixteen (16) days after the Professional Claim Filing Deadline (the "Professional Claim Objection Deadline").

-41-

Thereafter, the Professional Claim Objection Deadline may only be extended by an order of the Bankruptcy Court.

b.      Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid as soon as practicable by the Debtor or Reorganized Debtor, as applicable. After the Effective Date, the Trustee shall pay quarterly fees to the U.S. Trustee from the Trust until the Chapter 11 case is closed. In addition, the Reorganized Debtor shall file post-Confirmation Date quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate. The Reorganized Debtor shall remain responsible for any unpaid fees and reports.

c.      Priority Tax Claims

With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such claim in cash as soon as practicable after the Effective Date, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Archdiocese, as applicable, in writing, provided such treatment is no less favorable to the Archdiocese than the treatment set forth in clause (i) of this sentence.

**B.      Plan Implementation and Funding**

The Plan Proponents propose that the Plan be implemented and consummated through the means contemplated by Section 1123 of the Bankruptcy Code on and after the Effective Date.

The Plan will be funded from the sources and in the manner set forth in Section 5.1(b) of the Plan. In addition to the contributions described therein, the Catholic Entities, Other Insured Entities, and Seminaries will waive certain claims against the Archdiocese and Settling Insurer Entities, including the Related Insurance Claims and contribution and indemnity claims referenced in Sections 4.13 of the Plan.

Cash and other assets with an expected value of $210,290,724 (the "Settlement Amount") will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein.

a.      Debtor Cash Contribution

The Debtor will transfer $23,475,000 to the Trust Account within two business days after the Confirmation Order has become a Non-Appealable Order (the "Debtor Cash Contribution"). The Debtor Cash Contribution will be primarily comprised of funds from the following sources.

-42-

(1)     Cash from (a) non-restricted cash accounts held by the Archdiocese, (b) the account established to hold the proceeds derived from the sale of Archdiocese properties during the course of this Chapter 11 case, (c) the proceeds of the settlement of the Riley Fund dispute contemplated in Article IX, and (d) the proceeds from the sale of jewelry and other personal property.

(2)     The GIF Tort Claim Contribution Amount, in the total amount of $6,000,000, which shall be paid in accordance with the terms of the settlement contemplated in Article IX of the Plan.

b.     Debtor Assignment of Certain Assets

In addition to the Debtor Cash Contribution referenced above, the Debtor will assign to the Trust, and will pay over to the Trust, the proceeds of the interests referenced herein as and when such proceeds become available:

(1)     Ward Estate. The Archdiocese shall assign to the Trust its interest in the Estate of Austin Ward, including its interest in the net proceeds payable to the Archdiocese from the sale of property owned by Ausmar Development Company LLC.

(2)     Workers' Compensation Deposit.  The Archdiocese shall assign to the Trust its interest, if any, in any excess amount held by the Minnesota Department of Commerce (the "Department") relating to the Archdiocese's self-insurance requirements under Section 79A.04(s) of the Minnesota Statutes.  By statute, the Archdiocese has no right or title to the deposit. The Archdiocese believes, however, that the deposit may be subject to reduction following confirmation of the Plan. The Archdiocese agrees to cooperate with the Trustee to make a good faith effort to obtain the Department's consent to a reduction in the deposit following Plan confirmation. The balance of the deposit, if any, returned to the Archdiocese with the consent of the Department shall be promptly paid over to the Trust, to the extent such excess amounts are returned to the Archdiocese.

c.     Debtor Note

The Debtor will execute a note to the Trust for a total of $5,000,000, to be paid in annual installments of $1,000,000 per year, beginning 365 days following the Confirmation Date. The note shall not bear interest.

-43-

d.    AMBP Settlement

The AMBP Settlement Amount, in the total amount of $4,000,000, which shall be paid in accordance with the terms of the settlement contemplated in Article IX of the Plan, which will also constitute a portion of the contribution of Catholic Entities.

e.    Proceeds from High School Sales

Net proceeds from the $4,000,000 sale of real estate to the High Schools, in accordance with the terms of the settlement and sale contemplated in Article IX of the Plan.

f.    Archdiocese Home Liquidation Claim

The Archdiocese shall assign to the Trust within one business day of the Confirmation Order becoming a Non-Appealable Order its claim in the liquidation proceeding of The Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $14,200,000.

g.    Archdiocesan Settling Insurer Settlement Amounts

Each Archdiocesan Settling Insurer shall pay to the Trust the sums set forth in their respective Insurance Settlement Agreement (the "Insurance Settlement Amounts") within the time set forth in their respective Insurance Settlement Agreements. In addition, all rights to receive payment of the Insurance Settlement Amounts under the Insurance Settlement Agreement shall be assigned to the Trust.

h.    Cash Contributions of Catholic Entities, Seminaries, Parish Settling Insurers and Seminary Settling Insurers.

Within ten days of the Confirmation Order becoming a Non-Appealable Order, the Catholic Entities and the Seminaries shall each pay to the Trust their separately agreed-upon contribution amounts. Each Parish Settling Insurer and Seminary Settling Insurer shall pay to the Trust within thirty days of the Effective Date the amount required by its respective Insurance Settlement Agreement. The total amount that will be paid to the Trust by the Catholic Entities, the Seminaries, the Parish Settling Insurers, and the Seminary Settling Insurers is $22,255,724. The payment obligations of the Catholic Entities, the Seminaries, the Parish Settling Insurers, and the Seminary Settling Insurers are several, not joint. Each Parish Settling Insurer and Seminary Settling Insurer is only required to pay the amount required by its respective Insurance Settlement Agreement. Also within ten days of the Confirmation Order becoming a Non-Appealable Order, the Archdiocesan Parishes shall assign to the Trust their claim in the liquidation proceeding of Home Insurance Company (State of New Hampshire, Merrimack Superior Court, Docket No. 217-2003-EQ-00106) in the amount of $1,500,000.

-44-

i.      Further Contributions of the Catholic Entities, Seminaries and the Other Insured Entities

The contributions by the Catholic Entities, Seminaries and Other Insured Entities shall also include: (A) the consent to disallowance of all contribution and indemnity claims filed by such Catholic Entities and Other Insured Entities in this Chapter 11 case, all Class 3 Claims, any other claims against the Archdiocese, and all Related Insurance Claims, (B) consent of the Catholic Entities to the transfer of AMBP proceeds contemplated above, and (C) the consent of the Catholic Entities to the transfer the GIF proceeds as contemplated above. In consideration of the contributions referenced in subparagraph (vii) and this (viii), and in further consideration of the AMBP settlement and the GIF settlement referenced above and in Article IX, the Archdiocese agrees that it shall not increase the rate of assessments for Archdiocesan Parishes for a period of two (2) years following the Effective Date.

### C.      Other Settlements Embodied in the Plan

1.      Sale of High Schools

Confirmation of the Plan shall constitute (i) authorization for the conveyance by the Reorganized Debtor to the High Schools of the property interests described below  for a gross consideration of $4 million, (ii) approval of the High School Purchase Agreements referenced below, and (iii) authorization for the Archdiocese to execute such documents and instruments as may be required to consummate the proposed sales, including a restriction or condition requiring the real property to be used by the High Schools, their successor and assigns, for Catholic educational purposes unless waived, released or terminated by the Archdiocese (the "Conveyance"). The restriction will not be binding on current or future lienholders.

The interests to be conveyed include any and all interest the Archdiocese may have in the real property upon which each of the High Schools' campuses are located, together with any interest of the Archdiocese in any related fixtures, leases and other contracts and furniture and improvements used in the operation of the High Schools. The Conveyance shall be made under Section 363 and shall be free and clear of all liens, interests and encumbrances, except (i) all existing leases between the Archdiocese and each of the High Schools; (ii) mortgages of record; (iii) such liens and encumbrances as may be accepted by each of the High Schools in their sole discretion. The proposed aggregate purchase price of $4 million shall represent a net payment to the Archdiocese and shall not be subject to reduction or deduction for any operating, mortgage, title or other cost or expense.

The proposed sale shall be made the terms and condition set forth in the purchase and settlement agreements (the "High School Purchase Agreements") entered into between the High Schools and the Archdiocese. The High School Purchase Agreements shall include an allocation of the purchase price between the High Schools and shall include such other provisions, including a mutual release of claims, as may be agreed upon by the parties. The Conveyance

-45-

shall be by quit claim deed on an "as is," "where is" basis. The Archdiocese shall file the High School Purchase Agreements with the Court at least 21 days prior to the Confirmation Hearing.

The High Schools have required, as a condition to the purchase contemplated under the Plan, that the High Schools be included as Protected Parties under the Plan. In recognition of this requirements, the High School Purchase Agreements include a provision under which the appropriate High School may terminate its obligations under its High School Purchase Agreement in the event that this Plan is approved.

2.      AMBP Settlement

As stated above, ownership of certain monies in the AMBP is disputed. The Archdiocese and the trustees of the AMBP have agreed to resolve this dispute upon payment by the AMBP to the Archdiocese of the sum of $4,000,000 from the reserve accounts established under the AMBP. Amounts payable under this settlement represent a portion of the payments previously made by Catholic Entities to the AMBP and represent an additional contribution by the Catholic Entities, including Parishes, as participants in the AMBP. In consideration of this settlement, the Archdiocese agrees that it shall not increase the rate of assessments for parishes for a period of two (2) years following the Effective Date. This settlement shall be effective upon entry of the Confirmation Order. The payment shall represent a settlement and compromise of any and all claims of the Archdiocese, creditors of the Archdiocese in this case, any other party-in-interest, or the Estate to any amounts held in the AMBP.

In addition, to the extent permitted under applicable law, the Reorganized Debtor shall cooperate with the trustees of the AMBP following the Effective Date to convert the AMBP to a VEBA Trust (or similar trust mechanism). Notwithstanding anything to the contrary contained herein, neither the Archdiocese nor the trustees of the AMBP shall be required to enter into any trust or other arrangement that will require that the AMBP, or any successor trust mechanism, provide coverage for services or procedures contrary to the teachings of the Catholic Church. The Archdiocese, in cooperation with the trustees of the AMBP, reserves the right to seek the termination of the AMBP if the conversion of the AMBP is impossible or proves to be unreasonably expensive or impractical or in the event that it becomes impossible or impractical to maintain rates for the AMBP in an amount sufficient to pay future claims. The Archdiocese shall also reasonably cooperate with the trustees of the AMBP to investigate and pursue alternative mechanisms for administration of the AMBP and shall solicit proposals from qualified third party providers for such services.

3.      Riley Fund Settlement

The Archdiocese and the Cathedral of Saint Paul (the "Cathedral Corporation") have asserted competing claims to a trust fund (the "Riley Fund") created by William C. Riley under a will dated September 16, 1929. In order to facilitate confirmation of this Plan and to advance their respective missions, the Archdiocese and the Cathedral Corporation have agreed to the following settlement, which shall be effective once the Confirmation Order becomes a Non-

-46-

Appealable Order: In exchange for a release of any and all claims and Causes of Action against the Cathedral Corporation, the Cathedral Corporation shall waive its claim to the entire balance of the Riley Fund (approximately $2,594,264.83) (the "Riley Settlement Amount"). The Archdiocese, which currently holds the Riley Fund, shall pay the Riley Settlement Amount to the Trust within one business day of the Confirmation Order becoming a Non-Appealable Order. The release shall be immediately effective without further action once the Confirmation Order becomes a Non-Appealable Order. The Cathedral Corporation and the Archdiocese shall each retain their respective rights and obligations under the existing lease of the Cathedral of Saint Paul.

4.     GIF Settlement

Within one business day of the Confirmation Order becoming a Non-Appealable Order, the Reorganized Debtor will cause the GIF to pay $6,000,000 to the Trust (the "GIF Tort Claim Contribution Amount"). The Archdiocese has set participant premiums for the GIF for the period through June 30, 2019. The Archdiocese anticipates that premiums will be sufficient to pay all known claims and incurred but not reported claims (other than Tort Claims), plus administrative expenses, expenses related to maintaining workers compensation reserves and deposits, and premiums for reinsurance ("GIF Claims and Expenses") and the GIF Tort Claim Contribution Amount. The Archdiocese shall not alter premiums to the GIF prior to June 30, 2019, except to the extent necessary to pay GIF Claims and Expenses and the minimum GIF Tort Claim Contribution Amount. The GIF Tort Claim Contribution Amount will be deemed to be in satisfaction of claims of participants related to Tort Claims and as additional consideration for the Channeling Injunction set forth in this Plan. Any amount not required to be paid to the Trust under this subparagraph shall be held in the GIF for administration in accordance with prior practices. Except as provided herein, any claims related to the GIF, including any claims arising from prior contribution to the GIF, will be disallowed and receive no distribution.

**D.     Effect of Confirmation**

**1.     Discharge and Injunction**

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Archdiocese shall be discharged from any and all Claims that arose prior to the Effective Date, including all Tort Claims and Related Insurance Claims, and including interest, if any, on any of the foregoing, regardless of whether it is alleged to have accrued before or after the Petition Date (each a "Discharged Claim"). For the avoidance of doubt, "Discharged Claim" includes any disallowed claim. All Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection,**

-47-

or recovery by any manner or means of any judgment, award, decree, or order against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Archdiocese, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff right of contribution, indemnity, subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any action, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, the Plan or Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Plan. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

>     2.     **Channeling Injunction**

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurer Entities.**

>     In consideration of the undertakings of the Protected Parties and Settling Insurer Entities under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurer Entities, and pursuant to Section 105 of the Bankruptcy Code:

>     1.     any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

>     2.     all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurer Entities, including:

-48-

a.  **commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurer Entities or against the property of any of the Protected Parties or Settling Insurer Entities;**

b.  **enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurer Entities, or the property of any of the Protected Parties or Settling Insurer Entities, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurer Entities, or any other Person;**

c.  **creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurer Entities, or the property of the Protected Parties or the Settling Insurer Entities; and**

d.  **asserting, implementing or effectuating any Channeled Claim of any kind against:**

(1) **any obligation due any of the Protected Parties or Settling Insurer Entities;**

(2) **any of the Protected Parties or Settling Insurer Entities; or**

(3) **the property of any of the Protected Parties or Settling Insurer Entities.**

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section shall inure to the benefit of the Protected Parties and Settling Insurer Entities. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing

3.  **Exculpation and Limitation of Liability**

**From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any claim, Cause of Action or liability to any other Exculpated Party, to any holder of a claim, or to any**

-49-

other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and Filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Archdiocese and its officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

4.      **Settling Insurer Supplemental Injunction**

**Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurer Entities.**

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies or Interests in insurance policies from the Archdiocese, Other Insured Entities, Seminaries, and Catholic Entities pursuant to Section 363(f) of the Bankruptcy Code:

Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, other insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties or the Settling Insurer Entities, that directly or indirectly arise from, relate to or is in connection with any of the Settling Insurer Entity Policies, any Tort Claim, Related Insurance Claim, Class 3 Claims, Class 12 Claims, Class 13 Claims, Class 14 Claims, or Claim Nos. 502, 503, and 668 are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurer Entities, including:

a.      Commencing or continuing in any manner any action or other proceeding against the Settling Insurer Entities or the Protected Parties or the property of the Settling Insurer Entities or Protected Parties;

b.      Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurer Entities

-50-

**or Protected Parties or the property of the Settling Insurer Entities or Protected Parties;**

**c.       Creating, perfecting, or enforcing any lien of any kind against the Settling Insurer Entities or Protected Parties or the property of the Settling Insurer Entities or Protected Parties;**

**d.       Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurer Entities or Protected Parties or the property of the Settling Insurer Entities or Protected Parties; and**

**e.       Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

**All claims described in this Section shall be channeled to the Trust. This injunction shall not apply to any reinsurance claim.**

5.       **Insurance Settlement Agreement Injunctions**

**Any injunction, discharge, or release contained in an Archdiocese Insurance Settlement Agreements is (a) incorporated in all respects into this Plan by this express reference thereto, (b) deemed fully set forth in this Plan, (c) approved by the Bankruptcy Court, and (d) in addition to the injunctions, discharges, and releases expressly set forth in this Plan.**

6.       Timing

The injunctions, releases, and discharges to which any Settling Insurer Entity is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer(s) pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the Plan.

7.       No Bar on Certain Claims

Notwithstanding the foregoing, nothing in Article 14 of the Plan shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer Entity or (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy other than the Settling Insurer Entity Policies.

-51-

E.      **Child Protection Protocols**

The civil settlement agreement with the Ramsey County Attorney's Office and child protection protocol embodied therein, as amended in conjunction with the dismissal of the Ramsey County criminal action, is incorporated into the Plan and included as Exhibit K to the Plan, provided that the Ramsey County Attorney shall retain exclusive authority to enforce the agreement. To reflect and implement the Reorganization Plan contemplated herein, and in furtherance of the goals of creating safe environments, the Debtor and the UCC will meet and confer regarding potential additions to the Ramsey County Agreement, including protocols and services.

F.      **The Reorganized Debtor**

1.      Continued Existence

The Archdiocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Minn. Stat. Section 315.16 having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

2.      Vesting of Assets

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, claims, and interests of creditors, including successor liability claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Notwithstanding the foregoing, or any other provision of this Plan, confirmation of this Plan shall not disturb the mortgage or other lien interests of any party with a lien interest in real estate constituting part of the Reorganization Assets, including, without limitation, the mortgage interest of Bremer Bank, National Association in the property located at 2501 State Highway 100, St. Louis Park, Minnesota, and the mortgage interest of North American Banking Company in the property located at 1350 Gardena Avenue NE, Fridley, Minnesota, which interests (together with the interests in Class 10) shall be retained following confirmation of this Plan.

140998376.7

10871473v1

3.      Management of Reorganized Debtor

The Reorganized Debtor will continue to be managed by current management as set forth below. These individuals are familiar with the Debtor's affairs and operations and are well suited to continue the Debtor's mission. The persons proposed to serve as directors and officers of the Reorganized Debtor are identified in Exhibit J to the Plan and are as follows:

| Name | Title |
| --- | --- |
| Most Reverend Bernard A. Hebda | Archbishop |
| Most Reverend Andrew Cozzens | Auxiliary Bishop |
| Very Reverend Charles V. Lachowitzer | Moderator of the Curia |
| Joseph Kueppers | Chancellor for Civil Affairs |
| Thomas Mertens | Chief Financial Officer |
| John F. Bierbaum | Board of Directors – member |
| Peter Daly, M.D. | Board of Directors – member |
| Karen Rauenhorst | Board of Directors – member |
| Rev. Stephen Ulrick | Board of Directors – member |
| Brian Short | Board of Directors – member |

Compensation of officers will be in accordance with prepetition practices. Board members do not receive monetary compensation from the Archdiocese.

### G.      Assumption of Executory Contracts

On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court, and except as otherwise provided in the Plan or Confirmation Order, each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any cure payment shall be promptly paid by the Reorganized Debtor.

### H.      Other Plan Provisions

The Plan, enclosed, also contains additional provisions regarding the establishment, role, and structure of the Trust (Article 6); the Settling Insurers rights and responsibilities (Article 7); the estimation and assessment of Claims (Article 8); the other settlements included as part of the Plan (Article 9); the Reorganized Debtor's insurance policies (Article 10); the procedures for general claims administration (Article 11); distributions under the plan (Article 12); the effectiveness of the plan (Article 13); and other miscellaneous provisions (Article 17).

-53-

I.      **Rule 9019 Request;  1129(b) Confirmation Request**

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents requests approval of all compromises and settlements included in the Plan. In addition, through the Plan, the Archdiocese requests confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan.

## IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN;  VOTING REQUIREMENTS

In order for the Plan to be confirmed, all of the applicable requirements of Bankruptcy Code Section 1129 must be met. This includes, among other things, that the Plan: (i) is accepted by all impaired Classes, or if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of holders of Claims in each impaired Class.

### A.      Best Interests Test

The liquidation analysis attached as **<u>Exhibit C</u>** will show that if this case were converted to a Chapter 7 liquidation, unsecured creditors, including Tort Claimants, would receive payment far less than the payment currently provided for under the Plan. Further, to the extent Insurance Settlements are lost without a Plan, or to the extent a Chapter 7 trustee disavows the Insurance Settlements and continues litigation on claims objections, the recovery may be even lower.

1.      Legal standard for the Best Interests Test

Confirmation of a Plan generally requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To the extent the best interests test applies in this case, the Plan Proponents believe that the Plan is in the best interests of creditors.

2.      Hypothetical Chapter 7 liquidation scenario

In a hypothetical Chapter 7 liquidation, creditors would receive less than they will receive under the Plan.

A Chapter 7 liquidation would also very likely result in a delay in payments being made to creditors. Creditors will clearly benefit from the confirmation of the Plan.

-54-

### B.      Financial Feasibility

In order to confirm a plan, the Bankruptcy Code requires that a bankruptcy court find that confirmation of the plan is not likely to be followed by liquidation or the need to further financially reorganize the debtor (the "Feasibility Test"). For the Plan to meet this test, the Bankruptcy Court must determine there is a reasonable likelihood that the Reorganized Debtor will possess the working capital and other resources necessary to meet its obligations under the Plan. Based upon the Financial Projections attached as **Exhibit D** and the assumptions set forth therein, the Plan Proponents believe that the Archdiocese will be able to make all distributions required pursuant to the Plan and to fund its operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### C.      Acceptance by Impaired Class; 1129(b) Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a number of findings concerning the Plan and the Debtor, including that (a) the Plan classifies Claims in a permissible manner; (b) the Plan complies with applicable provisions of the Bankruptcy Code; (c) the Debtor complied with applicable provisions of the Bankruptcy Code; (d) the Debtor proposed the Plan in good faith and not by any means forbidden by law; (e) the disclosure required by § 1125 of the Bankruptcy Code has been made; (f) the Plan has been accepted by the requisite votes of Creditors in each Class (except to the extent that confirmation may still be available under § 1129(b) of the Bankruptcy Code); (g) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtor; (h) the Plan is in the "best interests" of all holders of Claims in an Impaired Class; and (i) all fees and expenses payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

The Plan Proponents believe that the Plan satisfies all the requirements of confirmation.

Section 1129(a) of the Bankruptcy Code requires that a class of Claims that is impaired under the Plan accept the Plan, subject to the exception contained in Section 1129(b) of the Bankruptcy Code.

A class of claims under a plan "accepts" the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the classes that actually vote on the plan. A claim that is not "impaired" under a plan is conclusively presumed to accept the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable, and contractual rights of the holders of claims in that class are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. The Bankruptcy Code allows for a plan to be confirmed even if rejected by an impaired class of claims. Under the provisions of Section 1129(b) of the Bankruptcy Code, the proponent of the plan may request that the plan be confirmed despite its rejection by an

-55-

impaired class. The court will confirm the plan if it (a) does not discriminate unfairly against a dissenting impaired class and (b) is fair and equitable with respect to that class.

The Bankruptcy Code identifies guidelines for determining whether a plan is fair and equitable to a given class of claims. For unsecured claims, a plan must provide that the creditors in the dissenting class receive or retain property of a value equal to the allowed amount of their claims or, failing that, no creditor of lesser priority, or shareholder, receives any distribution under the plan. In other words, equity interest holders would not receive or retain any property on account of their interest. The Plan Proponents believe that either this test does not apply or that it is satisfied under the Plan.

For secured claims, a plan must provide that the holders of such secured Claims retain the liens securing such claims to the extent of the allowed amount of such claims and that the holders of such claims receive on account of such claims a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property securing the lien. Under the Plan, the secured creditor will retain its liens to secure the full amount of its allowed secured claim and its interest and rights against its collateral will remain undisturbed.

In the event that the Bankruptcy Court refuses to impose a 1129(b) confirmation unless certain modifications are made to the terms and conditions of such non-consenting class's treatment under the Plan, the Plan Proponents reserve the right, without re-solicitation, to propose such modifications to such non-consenting class's treatment and to confirm the Plan, provided such modification does not result in complete extinguishment of the non-consenting class's Claim.

### D.  Certain Risk Factors

**ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND EXHIBITS) PRIOR TO DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN.**

**BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND, IN PARTICULAR, THE RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, CREDITOR RECOVERIES COULD BE LOWER THAN OTHERWISE DESCRIBED HEREIN. THE RISKS AND UNCERTAINTIES BELOW ARE NOT EXHAUSTIVE, BUT REPRESENT THE RISKS THAT THE PLAN PROPONENTS BELIEVE ARE MATERIAL. THERE MAY BE ADDITIONAL RISKS THAT THE PLAN PROPONENTS CURRENTLY CONSIDER NOT TO BE MATERIAL OR WHICH THE PLAN PROPONENTS ARE CURRENTLY UNAWARE.**

140998376.7

10871473v1

1.      Failure to satisfy vote requirement

In the event that sufficient votes are not received to confirm the Plan, the Plan Proponents may be forced to pursue an alternative Plan or dismissal of the case.

2.      Risk of non-confirmation

Even if all impaired classes accept or could be deemed to have accepted the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code lists requirements for confirmation, including (a) that the confirmation of the Plan not be followed by the need for a further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtor otherwise comply with applicable provisions of the Bankruptcy Code. Although the Plan Proponents believe the Plan will meet all applicable tests, there is no assurance that the Bankruptcy Court will reach the same conclusion.

3.      Non-consensual confirmation

Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan if at least one Impaired Class of Claims against the Debtor has accepted the Plan and, as to each Impaired Class of Claims that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

The Plan Proponents reserve the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all Impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided in the Plan.

4.      Appeal risk

If the Plan is confirmed, it is possible that one or more parties may appeal the order confirming the Plan and object to all or a part of the Plan, including the channeling injunctions and Trust Agreement contemplated in the Plan. This risk is lower in a consensual confirmation.

5.      Uncertainty of value

The value of Tort Claimants' rights to distributions from the Trust will depend in part on the risks outlined above and to the extent those risks materialize.

E.      **Certain Federal Income Tax Considerations**

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPT ESTATE ARE COMPLEX. THE**

-57-

**SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.**

**THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR HAVE THE PLAN PROPONENTS OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR ANY OTHER ENTITY OR PERSON. EACH HOLDER OF A CLAIM SHOULD CONSULT ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following summary is a general discussion of certain potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The Federal income tax consequences to any particular Creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

      1.      Tax consequences to Creditors

A creditor that receives cash in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim.

The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

The Plan Proponents anticipate that distributions to Tort Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax issues and cannot (and do no hereby) make any assurances or representations regarding the anticipate tax treatment of Tort Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

2.      Tax consequences to the Debtor

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Plan Proponents do not expect that the Plan will result in any significant Federal income tax consequences to the Debtor.

3.      Tax consequences to the Plan Trust

The Plan Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Plan Trust as a designated settlement fund or a qualified settlement fund.

The Plan Proponents express no opinion regarding whether the Plan Trust is a designated settlement fund or a qualified settlement fund. The Plan Proponents have not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Plan Trust is a designated settlement fund or a qualified settlement fund. Accordingly, each Creditor is urged to consult its own tax advisor regarding the characterization of the Plan Trust and the tax consequences of such characterization.

F.      **Solicitation of Votes**

The Plan Proponents are soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and receiving distributions. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

-59-

Solicitation Packages will include copies of (i) the Disclosure Statement and exhibits thereto, including the Plan (ii) the Disclosure Statement approval order, (iii) the notice of Disclosure Statement approval and confirmation hearing, (iv) the form of ballot, and (v) any other information required by the bankruptcy court.

Solicitation Packages will be sent to creditors by the Debtor and in the manner specified in the applicable order on solicitation procedures or as otherwise ordered by the Bankruptcy Court.

### G.    Voting Procedures

1.    Ballots

If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DEBTOR AT (651) 251-7732 OR THE UCC AT (612)335-1792. THE ARCHDIOCESE AND COUNSEL FOR THE ARCHDIOCESE AND THE UCC AND COUNSEL FOR THE UCC CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class.

**FACSIMILE, E-MAIL, OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

A ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted. You may not change your vote after the voting deadline passes.

-60-

To be counted, completed ballots must be mailed to the clerk of the Bankruptcy Court at the following address:

> Office of the Clerk of Court
> Attention: B. Montez
> U.S. Bankruptcy Court District of Minnesota
> 200 Warren E. Burger Federal Building and United States Courthouse
> 316 North Robert Street
> Saint Paul, Minnesota 55101

2.      Importance of your vote

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that Vote.

Only those Creditors who actually vote are counted for purposes of determining whether a class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

## X.    RECOMMENDATION AND CONCLUSION

**THE PLAN PROPONENTS HAVE EXPLORED VARIOUS ALTERNATIVE SCENARIOS AND BELIEVE THAT THE PLAN ENABLES THE HOLDERS OF CLAIMS TO REALIZE THE MAXIMUM RECOVERY UNDER THE CIRCUMSTANCES. THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND THAT THE PLAN SHOULD BE CONFIRMED. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN BY SO INDICATING IN THEIR BALLOTS AND RETURNING THEM AS SPECIFIED IN THE INSTRUCTIONS SET FORTH IN THE SOLICITATION PACKAGES.**

[Remainder of page intentionally left blank]

140998376.7

10871473v1

Signature Page to the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of
the Archdiocese of Saint Paul and Minneapolis

Respectfully submitted,

**The Archdiocese of Saint Paul and Minneapolis**

Dated: June _____, 2018

By: /_____
Thomas J. Mertens
Chief Financial Officer

**Briggs and Morgan, P.A.**

/e/ Richard D. Anderson_____
Richard D. Anderson (#2306)
Charles B. Rogers (#130588)
Benjamin E. Gurstelle (#0389968)
2200 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 977-8400
Facsimile: (612) 977-8650

Attorneys for the Archdiocese of Saint Paul
and Minneapolis

By: /_____
James Keenan
Chairman, Official Committee of Unsecured
Creditors of the Archdiocese of Saint Paul and
Minneapolis

*/e/ Robert T. Kugler*
Robert T. Kugler (#194116)
Edwin H. Caldie (#0388930)
Brittany M. Michael (#0397592)
**STINSON LEONARD STREET LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 335-1500
Facsimile:  (612) 335-1657

-2-

140998376.7

10871473v1

## LIST OF EXHIBITS

EXHIBIT A – [RESERVED]
EXHIBIT B – [PROPOSED] ORDER APPROVING DISCLOSURE STATEMENT [TO BE
SEPARATELY FILED ON DOCKET]
EXHIBIT C – LIQUIDATION ANALYSIS
EXHIBIT D – FINANCIAL PROJECTIONS
EXHIBIT E – [RESERVED]
EXHIBIT F – POST-PETITION OPERATING RESULTS