# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

Debtor.

Case No. 15-30125

Chapter 11

## FUTURE CLAIMS REPRESENTATIVE'S REPORT AND RECOMMENDATIONS

Michael R. Hogan, the Future Claims Representative ("FCR"), makes the following Report and Recommendations

I was appointed FCR on February 14, 2017 by the United States Bankruptcy Court for the District of Minnesota in the above-titled proceeding (the "FCR Order") (Dkt. 969). This proceeding seeks to reorganize the Archdiocese of Saint Paul and Minneapolis ("Debtor") under Chapter 11 of the United States Bankruptcy Code. It was filed to resolve approximately 444 child sex abuse claims.  On August 10, 2018, The Debtor and the Official Unsecured Creditors Committee filed their Second Amended Joint Chapter 11 Plan of Reorganization of the Archdiocese of Saint Paul and Minneapolis (the "Plan") (Dkt. 1223).  The Debtor seeks, in part, to provide a fund to compensate any Future Tort Claimants (as defined in the Plan) who may assert sexual abuse claims after confirmation of the Plan, who can satisfy the conditions for compensation under the Plan.

As the representative of Future Tort Claimants, and in accordance with the FCR Order, I have evaluated the likely number of sexual abuse claimants, if any, who might come forward

1

after a Plan is confirmed, and the likely value of the future claims they may assert against the

Debtor. Specifically, in a comprehensive effort to anticipate the number of Future Tort Claims

(as defined in the Plan) and determine the amount of a fair and appropriate Future Tort Claims

trust fund. I have, among other things:

1. Reviewed the experiences of other dioceses and religious orders that have reorganized under Chapter 11 of the Bankruptcy Code in response to large numbers of child sex abuse claims;

2. Reviewed the extensive outreach of principal claimants' counsel in Minnesota;

3. Reviewed the comprehensive actual notice and publication effort concerning possible claims, as proposed by the Debtor and ordered by the Bankruptcy Court;

4. Studied the pattern of claims, the timing of claims in relation to incidents of abuse, and the relative dates of incidents of abuse;

5. Considered the number and pattern of pre-petition claims, the number and pattern of claims filed since the bankruptcy petition was filed, and the number of claims filed since the last date established by the Bankruptcy Court for creditors to file claims;

6. Considered the efforts of the Debtor to encourage potential abuse claimants to file claims;

7. Considered the nature and allegations of the 444 proofs of claim filed in the Chapter 11 proceeding;

8. Considered the 2004 and 2011 reports by the John Jay College of Criminal Justice concerning sexual abuse of minors; and

9. Considered possible affirmative defenses available to the Debtor for future claims, but

which may not be available with regard to claimants with timely-filed claims in the

bankruptcy proceeding.

A number of sexual abuse lawsuits and claims were resolved sometime before the

bankruptcy petition was filed. 21 sexual abuse lawsuits and dozens of claims were pending

when the bankruptcy petition was filed, and 444 proofs of claims were filed after the

bankruptcy petition was filed. Approximately 40 of those proofs of claim were filed after the

last date allowed by the Bankruptcy Court to file claims in this proceeding.

Approximately 94% of the sexual abuse alleged by claimants here occurred from the

1950s through the 1980s.

In an April 1, 2015 Motion for an Order Establishing Deadlines for Filing Proofs of Claim:

Approving Proof of Claim Forms: Approving Form and Manner of Notice; and Approving

Confidential Procedure (Dkt. 161), the Debtor represented:

> "43.    [...] beginning more than a year preceding the Petition Date, the
> Archdiocese undertook a comprehensive review of thousands of clergy files I
> addition to public record searched to ascertain, among other things, the
> identities of potential Sexual Abuse Claimants and clergy members who have
> been accused of sexually abusing minors in the past. The Archdiocese submits
> that this extensive file review, coupled with the additional efforts outlined
> below, constitutes reasonably diligent efforts to identify "reasonably
> ascertainable" Sexual Abuse Claimants for purposes of providing actual notice to
> known creditors.
>
> 44.    Specifically, in December 2013, the Archdiocese hired Kinsale
> Management Consulting ("Kinsale"), a leading national expert, to review
> thousands of clergy files. Kinsale ultimately reviewed the personnel files of all
> clergy assigned to, or ministering in, the Archdiocese at any time from 1970 to
> the present, regardless of whether they were still in public ministry. All told,
> Kinsale reviewed a total of 3,333 clergy files before completing its work in April
> 2014. The purpose of the review was to identify Sexual Abuse Claimants and
> determine whether there were additional potential cases of sexual abuse or

other alleged misconduct against clergy members that required investigation by law enforcement, public disclosure or other action by the Archdiocese.

45.     Throughout this comprehensive review, the Archdiocese has issued news releases, participated in media interviews, published stories and editorials in *The Catholic Spirit*, sent information to parishes, other diocese and other Catholic institutions, and publicly disclosed on its website the identities of clergy members against whom sexual abuse accusations have been asserted in the past.

46.     In connection with Kinsale's work, the Archdiocese committed to making, and continues to make, prudent and ongoing public disclosures of the names, assignment histories, and current status of clergy members accused of sexual abuse of minors. This policy was implemented to, among other things, call public attention to reports of sexual abuse and assist other Sexual Abuse Claimants in finding the strength and resolve to come forward.

47.     This commitment, and the resulting disclosures were first announced and disseminated in the December 5, 2013 edition of *The Catholic Spirit* and on the Archdiocese's website. *See* http://thecatholicspirit.com/digital-edition/digital-edition-december-5-2013/.; *see also* http://safe-environment.archspm.org/news-events/disclosure-moves-us-forward-on-a-path-toward-healing/. *The Catholic Spirit* is published bi-weekly and is circulated to approximately 71,212 residents in and around the Region.

48.     To date, the Archdiocese has publicly disclosed sixty-five priests and three religious brothers against whom claims of sexual abuse of a minor have been asserted in the past. Of these men, fifty-nine have claims against them of sexual abuse of a minor within the Region. The remaining nine men are the subject of abuse of a minor outside the Region but traveled here or lived here without faculties or as a lay person. For each individual against whom such a claim has been made, including priests and brothers from other dioceses and religious orders, the Archdiocese has disclosed certain background and biographical information, including: (i) his year of birth and year of ordination; (ii) whether he is alive or deceased; (iii) if deceased, the year of his death; (iv) his prior assignments; (v) the date of his permanent removal from ministry; and (vi) for those who are alive, their present status with the Church (i.e. retired, prohibited from ministry or dismissed from the clerical state) and the city and state in which they reside.

49.     These disclosures are ongoing. As claims falling with this Archdiocese's disclosure policy are made known to the Archdiocese, whether from the review of clergy files by outside experts or otherwise, the Archdiocese adds the name of the clergy member to the disclosure section of its website, publishes the information in *The Catholic Spirit*, and disseminates the information to parishes, other dioceses and appropriate Catholic institutions. It further shares this information with the public by issuing and posting a news release.

50.     The Archdiocese's news releases and disclosures of accused clergy members are available to the public on a specifically established Archdiocesan website – SafeCatholicsSPM.org. A link to that website's disclosure page can be found at: http://safe-environment.archspm.org/accountability/clergy-disclosures/. Each disclosure is also published in *The Catholic Spirit*, both in print and electronically at: http://thecatholicspirit.com. Since the implementation of its disclosure policy, the Archdiocese has made five separate public disclosures in December 2013, February 2014, May 2014, October 2014 and February 2015. *Id*.

51.     Prior to each public disclosure of accused clergy members, the Archdiocese also disseminates advanced-notification letters to parishes, orders, and other dioceses where the accused clergy members held assignments to, among other things, alert these communities to the existence of the claims, assist Church leaders in communicating these accusations to parishioners, and encourage other claimants in the communities to come forward for assistance and healing. This practice was employed in each of the five public disclosures identified above.

52.     Also in connection with the Archdiocese's public disclosure of clergy accused of sexually abusing minors, Jeff Anderson & Associates P.A. ("JAA"), counsel for the majority of anticipated Sexual Abuse Claimants, has likewise held news conferences and publicized information regarding these men on its website. In many cases, these public disclosures include the Archdiocese's entire clergy file on the accused, redacted only to remove the personal identifying information of claimants, third parties, and other protected information such a [sic] psychological reports. *See, e.g.*, http://www.andersonadvocates.com/Minnesota-Document-Release.aspx. As detailed below, the Archdiocese's public disclosures regarding accused clergy and JAA's further release of information and files have been widely followed by local, and in some cases, national media, over the past 13 months.

53.     In connection with a settlement agreement in a civil litigation captioned *Doe 1 v. Archdiocese of St. Paul and Minneapolis and Diocese of Winona*, Court File No. 62-CV-13-4075 (Ramsey County District Court), the Archdiocese and JAA worked hand-in-hand to develop unprecedented child protection protocols and procedures ("Child Protection Protocols"). Among other key measures provided in the 17-part Child Protection Protocols, the Archdiocese committed to the continued public disclosure of claims of sexual abuse by clergy as well as those clergy deemed unsuitable for ministry under circumstances that arise, in whole or in part, out of accusations or risk of sexual abuse of a minor.

54.     At an October 13, 2014 news conference, JAA attorneys and church leaders stood side by side in announcing the Child Protection Protocols to the public. The new conference and the Child Protection Protocols have been widely disseminated in print, broadcast and web-based media in the Region.

55.     Since this public announcement, the Archdiocese has made additional public disclosures of accused clergy in accordance with the Child

5

Protection Protocols. On October 22, 2014, and again on February 11, 2015, these new disclosures were published on the Archdiocese's website and widely disseminated in local and regional print, broadcast and web-based media, as well as in print electronically in *The Catholic Spirit*. *See, e.g.*, http://thecatholicspirit.com/that-they-may-all-be-one/working-together-right-wrongs-whats-best/; *see also* http://www.archspm_news/archspm_news/statement-regarding-disclosure-additional-names-2/.

56.     On February 11, 2015, the Archdiocese and JAA also joined in the posting of information about all notices of claim served upon the Archdiocese in connection with this Chapter 11 case. http://www.archsp.org/archspm_news/statement-regarding-notices-claims/; *see also* http://www.andersonadvocates.com/Posts/News-or-Event/1952/17-Names-of-Clergy-Accused-of-Sexual-Abuse-or-Misconduct-with-Minors-Publicly-Released-For-the-First-Time-Today.aspx.

57.     In addition to the broad public disclosures and outreach efforts made by the Archdiocese and counsel for Sexual Abuse Claimants over the past 13 months, Sexual Abuse Claims asserted against the Archdiocese have been prominently covered in the secular media in the Region since September 2013. Leading local news and radio stations including Kare 11, WCCO News, KSTP, and MPR have widely covered the story for more than a year. MPR, for its part, has published approximately 200 stories relating to the archdiocese and Sexual Abuse Claims since September 2013. The Star Tribune and the Pioneer Press, have also extensively followed Sexual Abuse Claims against the Archdiocese. An MPR news investigation has committed to providing up-to-date information regarding issues relating to the Archdiocese and clergy sexual abuse on a separate section of its website at http://minnesotapublicradio.org/collections/catholic-church/.

58.     The commencement of this case was likewise broadly reported in media outlets throughout the Region and nationally, including in *USA Today*, the *New York Times*, the *LA Times* and NPR, among others. *See, e.g.*, http://www.usatoday.com/story/news/2015/01/16/st-paul-minneapolis-catholic-diocese-bankruptcy/21859809/ (USA Today, online edition); http://www.nytimes.com/aponline/2015/01/16/us/ap-us-church-abuse-minnesota.html?_r=0 (New York Times, online edition); http://touch.latimes.com/#section/-1/article/p2p-82553219 (LA Times, online edition); http://npr.org/blogs/thetwo-way/2015/01/16/377732977/archdiocese-of-st-paul-minneapolis-files-chapter-11 (NPR, online edition).

59.     There has also been widespread notice to Sexual Abuse Claimants through print, broadcast and web-based media regarding their ability to brings [sic] claims or lawsuits against the Archdiocese as a result of the significant outreach made prepetition by attorneys representing Sexual Abuse Claimants. This process of reaching out to Sexual Abuse Claimants began in earnest on or around May 25, 2013, with the enactment of the Minnesota Child Victims Act,

and continues in full force today. Examples of JAA's online commercials and advertisements reaching out to Sexual Abuse Claimants can be found at http://www.andersonadvocates.com/Child-Victims-Act.aspx.

60.     In addition to providing notice of the Chapter 11 case filing on all represented Sexual Abuse Claimants, on January 29, 2015, the Archdiocese also served notice of the case filing on an additional fifty-seven persons who, to the Archdiocesan records, may have Sexual Abuse Claims against the Archdiocese's knowledge, are not presently represented by counsel ("Unrepresented Potential Sexual Abuse Claimants"). *See* ECF No. 94. The Archdiocese identified the Unrepresented Potential Sexual Abuse Claimants for purposes of providing them notice of this Chapter 11 case through reasonable diligence, including an examination of its historical books and records and the results of the Kinsale file review.

61.     The Archdiocese believes that the extensive prepetition notifications and publicity combined with the notice provisions in this verified motion are more than sufficient to provide fair and adequate notice to Sexual Abuse Claimants of their rights to assert Sexual Abuse Claims by the Sexual Abuse Claims Bar Date. For more than thirteen months, the Archdiocese has actively investigated its files to determine the identities of Sexual Abuse Claimants and to publicly disclose accused clergy members through secular media, Catholic media, permanent website postings and information shared with parishes. Any Sexual Abuse Claimants identified through the Archdiocese's efforts have been provided actual notice of this case. Any other Sexual Abuse Claimants not identified by the Archdiocese have likely been advised of their rights to pursue claims against the Archdiocese through the intense publicity that has permeated print, broadcast and web-based media in and beyond the Region since the enactment of the Minnesota Child Victims Act."

In response to the motion, the court set August 3, 2015 as the last date to timely file a proof of claim and, among other things, ordered the following with regard to timing and form of notice to potential sex abuse claimants (Dkt. 188):

### "TIMING AND FORM OF NOTICE

10.     As soon as reasonably practicable after the entry of this order, the Clerk of Court shall give notice by united States mail, first-class postage prepaid, or by electronic means, the Non-Tort Claim Filing Deadline Notice (Ex. B) to (a) the United States Trustee for the District of Minnesota; (b) counsel to the committee of unsecured creditors; (c) all persons and entities that have filed a notice of appearance in this case; (d) all persons and entities included in the creditor mailing matrix on file in this case; and (e) all persons and entities that

have previously filed proofs of claim in this Chapter 11 case. The Non-Tort Filing Deadline Notice, the Publication Notice, and the Sexual Abuse Filing Deadline Notice shall include a reference to this court's website (www.mnb.uscourts.gov) where all claim forms shall be made available.

11.     As soon as reasonably practicable, but in any event no later than five business days after the entry of this order, the Archdiocese shall serve by United States mail, first-class postage prepaid, the Sexual Abuse Claim Filing Deadline Notice (Ex. C) and the Sexual Abuse Proof of Claim Form (Ex. A) on the United State Trustee, and on known Sexual Abuse Claimants who have:

(i)     Filed pending lawsuits against the Archdiocese alleging that they were sexually abused by employees or agents of the Archdiocese of by clergy previously assigned to the Archdiocese or any others for whom the Archdiocese may be liable;

(ii)     Provided to the Archdiocese under Minn. Stat. § 549.09 a written notice of claim of sexual abuse by employees or agents of the Archdiocese or by clergy previously assigned to the Archdiocese or any others for whom the Archdiocese may be liable;

(iii)     Contacted the Archdiocese to claim that they were sexually abused as a minor by employees or agents of the Archdiocese or by clergy previously assigned to the Archdiocese or any others for whom the Archdiocese may be liable;

(iv)     Are otherwise known to the Archdiocese to be a Sexual Abuse Claimant through reasonably-ascertainable records.

12.     The service of the Sexual Abuse Claim Filing Deadline Notice and Sexual Abuse Proof of Claim Form on Sexual Abuse Claimants shall be accomplished through such Sexual Abuse Claimants' attorneys, if previously identified as counsel for such Sexual Abuse Claimant in connection with a Sexual Abuse Claim, and directly on all other known potential Sexual Abuse Claimants that have been identified and located by the Archdiocese through reasonably diligent efforts.

13.     The service outlined above shall constitute service on all known creditors of the Archdiocese. All other creditors of the Archdiocese shall be deemed to be unknown for the purpose of service of notice of the Claim Filing Deadline.

14.     The archdiocese shall also provide notice of the Claim Filing Deadline established in this order by causing a copy of the Publication Notice (Ex. D) to be published as follows:

(i)     Publication four times in each of the following publications, with the first publication to occur within two weeks of the service of the claim filing deadline packages, the second publication to occur approximately three weeks after the first notice, the third publication to occur approximately three weeks after the second notice, and the fourth publication to occur approximately three weeks after the third notice:

- *National Publication*: USA Today – National Edition

- *Catholic Publications (and their respective websites)*:
  - National Catholic Reporter (National)
  - The National Catholic Register (National)
  - Catholic Spirit (Regional)
- *Local Publications (and the respective websites):*
  - Minneapolis Star Tribune
  - St. Paul Pioneer Press
  - The Minnesota Daily
  - Finance and Commerce
  - Duluth News Tribune
  - Post-Bulletin (Rochester)
  - St. Cloud Times
  - Brainerd Dispatch
  - Grand Forks Herald
  - Winona Daily News
  - Daily Journal (Fergus Falls)
  - Sentinel (Fairmont)
  - The Bemidji Pioneer
  - Crookston Daily News
  - The Free Press (Mankato)
  - Faribault Daily News
  - The Journal (New Ulm)
  - La Prensa de Minnesota (Spanish Language)
  - Hmong Times

(ii)    In addition to the Publication Notice, the Archdiocese will send copies of the Sexual Abuse Claim Filing Deadline Notice to the publications listed above and to the following:
  - The Associated Press of Minnesota
  - WCCO-AM
  - Minnesota Public Radio
  - KARE-TV
  - KMSP-TV
  - KSPR-TV
  - WCCO-TV
  - Each diocese in Minnesota

15.    The Archdiocese shall provide further notice of the Claim Filing Deadline by taking the following measures:

(i)    Within 3 business days of the entry of this order, the Archdiocese will post the component parts of the Sexual Abuse Claim Filing Deadline Package and the Non-Tort Claim Filing Deadline Package on the following public website: http://www.archspm.org/;

(ii)    Within 3 business days of the entry of this order, the Archdiocese will provide a copy of the Publication Notice and component parts of the Sexual Abuse Claim Filing Deadline Package to the Survivors Network of the Abused by

9

Priests and request that it post the same on its website at
www.snapnetwork.org;

  (iii) Within 3 business days of the entry of this order, the Archdiocese
will provide a copy of the Publication Notice and component parts of the Sexual
Abuse Claim Filing Deadline Package to Jeff Anderson and Associates P.A. and
the Noaker Law Firm LLC and request that they post the same on their respective
websites at www.andersonadvocates.com and http://noakerlaw.com;

  (iv) The Archdiocese will maintain a toll free number which may be
used by Sexual Abuse Claimants to ask questions or obtain copies of the Sexual
Abuse Claim Filing Deadline Package or parts thereof;

  (v) Within two weeks of the service of the Sexual Abuse Claim Filing
Deadline Package, the Archdiocese will provide a copy of the Publication Notice
and the Sexual Abuse Claim Filing Deadline Notice to the following
offices/entities and request that each recipient publicly post such notice until the
expiration of the Claim Filing Deadline: (a) the Minnesota Attorney General; (b)
the district attorney, the county court administrator, and sheriff's department
for each of the 12 counties comprising the Region as defined in the Affidavit of
the Charles v. Lachowitzer; (c) the Minnesota Department of Health's three
locations in the Region; (d) each hospital in the Region; and (e) each of the 187
parishes within the Region.

  (vi) The Archdiocese will send a letter to each parish and Catholic high
school in the Region requesting that such parish or Catholic high school display
the Publication Notice and Sexual Abuse Claim Filing Deadline Notice in a
prominent location within the church or school. The letter will also request that
the notices be published once a month in the parishes' weekly bulletins until the
Claim Filing Deadline. The letter will also request that each pastor, canonical
administrator, or parochial vicar remind parishioners of the availability of
information concerning the Claim Filing Deadline. The letter will also request
that parishes disseminate the Publication Notice and Sexual Abuse Claim Filing
Deadline Notice by email to their respective distribution lists. Finally, the letter
will request each Catholic high school at which a clergy member against whom a
substantiated claim of sexual abuse has been made had worked to draft a letter
to alumni providing notice of the case and Claim Filing Deadline.

  (vii) The Archdiocese will mail a copy of the Sexual Abuse Claim Filing
Deadline Notice to all licensed alcohol and addiction treatment centers in the
state of Minnesota, as identified by counsel for the committee of unsecured
creditors, and to: (1) persons identified by counsel for the committee of
unsecured creditors as licensed therapists presently working with sexual abuse
claimants; and (2) persons identified in claimant questionnaires completed as of
April 15, 2015 that identify providers of counseling or other treatment services
to sexual abuse claimants.

  (viii) The Archdiocese will post copies of the Sexual Abuse Claim Filing
Deadline Notice and Sexual Abuse Proof of Claim Form in Spanish and Hmong
translations on its website at http://information.archspm.org/ and will send

copies of the same documents to the Bankruptcy Clerk of Court to be posted on the website of the Bankruptcy Court for the District of Minnesota at http://www.mnb.uscourts.gov.

16.     Each request described in paragraph 15 (v) and (vi) above shall be on the Archdiocese's letterhead and signed by an officer of the Archdiocese. The request shall include a space at the bottom for the recipient to indicate whether it will comply with the request and a stamped self-addressed return envelope. The Archdiocese will report on compliance to the committee of unsecured creditors.

17.     In addition, the Clerk of Court shall post the Non-Tort Proof of Claim Form, the Sexual Abuse Proof of Claim Form, the Non-Tort Filing Deadline Notice, the Sexual Abuse Claims Filing Deadline Notice and the Publication Notice on the website for the United States Bankruptcy Court for the District of Minnesota by adding a link on the court's home page (www.mnb.uscourts.gov) to easily access filing deadline information."

The Archdiocese filed affidavits on June 23, 2015 and July 24, 2015 representing that the notice requirements of the above Order had been fulfilled (Dkt. 257, 310).

Jeff Anderson and Associates ("JAA") represents approximately 384 (or 86.5%) of the total abuse claimants in this proceeding. JAA has represented to me in writing that from May 2013 to May 2016, it

"made every effort to reach survivors of clergy sexual abuse in the state of Minnesota, including in the Archdiocese. This included an extensive media and advertising campaign consisting of:
- Continuous print outreach in dozens of publications across the state of Minnesota, including in the Twin Cities metro area;
- Online outreach advertising through Google ads, including display and text ads, and Facebook ads;
- Radio campaigns played on prominent stations across the state of Minnesota, including the Twin Cities metro area, with specific outreach aimed at the Claims Filing Deadline in the Archdiocese bankruptcy case and the end of the Minnesota Child Victims Act deadline;
- Social media campaign on Twitter and Facebook, including outreach and posts directed at the Archdiocese bankruptcy deadline and Minnesota Child Victims Act deadline;
- Video advertisements on YouTube; and
- Television, radio, and newspaper interviews.

JAA also conducted dozens of press conferences and disseminated dozens of news releases around the state and country during the Minnesota Child Victims Act, including approximately 60 based on the Archdiocese alone.

Further, JAA did a complete review of the firm files and made every effort to contact nearly every survivor who contacted [that] firm since the late 1980s. JAA also sent outreach letters to potential survivors based on school yearbooks, parish rosters, witness lists, and names provided by other survivors. The firm also reviewed dozens of perpetrator files obtained from the Archdiocese to obtain pertinent witness and survivor information. The majority of these files were released to the public during the Minnesota Child Victims Act, as well as the names of 91 perpetrators who worked in the Archdiocese."

These outreach efforts by the Debtor and principal claimants' counsel have been prodigious indeed, and may have been the most extensive in my experience working with several Catholic dioceses and orders. I do note that outreach to claimants was also extremely extensive in Montana, in part because there have been three similar recent overlapping Chapter 11 proceedings in that state, which has a dispersed and relatively low population.

Studies conducted by the John Jay College of Criminal Justice in 2004 and 2011 also provide support for the position that most claims against the archdiocese have already been brought. "The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002" ("the 2004 Report") includes the following statistical findings:

1. Over 70% of sexual abuse allegations were made within 30 years after the alleged abuse began.

2. 75% of the events of alleged sexual abuse occurred between 1960 and 1980. [In this proceeding, approximately 48% of abuse occurred between 1960 and 1980, but 94% of abuse occurred between 1950 and 1990. (See Exhibit 1)]

3. One-third of all sexual abuse allegations were made in 2002 and 2003 alone.

4. More abuse occurred in the 1970s than any other decade. [Also true in this proceeding.]

5. As estimated from the study data, 2.7% of all priests in religious ministry were accused of alleged sexual abuse.

6. 89.5% of all alleged abusers were born before 1950.

7. Only 5.5% of all alleged abusers committed their first offense at the age of 60 or older.

8. The average age of a priest at the first allegation of abuse was 39, and the median age was 35.

9. 149 priests with 10+ victims accounted for 26% of all incidents reported in the study. [In this proceeding, priests with 10+ victims accounted for 31% of all incidents reported and priests with 5+ victims account for 56% of all incidents reported. All those priests have long ago been permanently removed from ministry or have died.]

10. A precipitous decline in incidents of abuse by year of occurrence took place in 1985. [Also true here.]

"The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2010" ("the 2011 Report") contains, among other points, the following relevant findings:

1. Researchers could not point to one single cause, as neither celibacy nor homosexuality were the causes of the abuse. Social and cultural changes in the 1960s and 1970s manifested in increased levels of deviant behavior in the general society and also among priests.

2. The count of incidents per year increased steadily from the mid-1960s through the late-1970s, then declined in the 1980s and continues to remain low.

3. New reports (post-2002) have confirmed initial estimates that the distribution of incidents is stable.

4. At the time of the peak and subsequent decline in sexual abuse incidents, there was a substantial increase in knowledge and understanding in American society about victimization and the harm of child sexual abuse. Changes were made in statutes related to rape and sexual abuse of children and in reporting requirements of child abuse and neglect, an understanding of the cause of sexual offending advanced, and research related to the treatment of sexual abusers was expanded.

As noted, the allegations of initial abuse in this proceeding roughly follow the statistics in the John Jay reports. The allegations of initial abuse here by decade are as follows:

| | |
|---|---|
| 1940s - | 8 |
| 1950s - | 65 |
| 1960s - | 152 |
| 1970s - | 174 |
| 1980s - | 50 |
| 1990s - | 9 |
| 2000s - | 5 |
| 2010s - | 5 |

Future Tort Claims may be subject to affirmative defenses that are not applicable to claims filed by August 3, 2015, the last date set by the Bankruptcy Court for creditors to file proofs of claim, because of the aggregate nature of resolution of the timely-filed claims. These include the following:

1. Potential liability on the basis of negligence may require proof of foreseeability. The following type of questions could be posed: Would a prudent person see abuse as likely to occur, possibly from a 1960s or 1970s perspective? Would liability be imposed only after a finding of custody or control?

2. Would respondeat superior liability require a finding that abuse has been committed in the course and scope of a special relationship?

3. Would there be joint-and-several liability for acts of persons in other religious orders?

4. Would a finding of Archdiocese control be required for liability of the Archdiocese?

5. Were claimants fully compensated by awards from other religious orders?

6. Does the doctrine of laches limit certain claims?

7. Did claimants mitigate damages?

8. Is some evidence of claims excluded under the First Amendment to the United States Constitution?

9. Is there sufficient admissible evidence to allow the estate of a deceased claimant to pursue a claim on their behalf under Minnesota law?

10. Has a claimant filed a bankruptcy petition in the past, which may result in an abuse claim for damages constituting an asset of the bankruptcy estate?

The Chapter 11 sexual abuse cases filed by religious orders responding to large numbers of sexual abuse claims certainly have similarities, but they also have significant differences. I was a principal mediator for a similar proceeding concerning the Diocese of Portland several years ago, which was handled differently than this proposed settlement in that most of the money to pay claims was recovered through the settlement of ten insurance coverage cases

and each of approximately 150 abuse claims was settled individually. Although there was

substantial news coverage in that case, outreach by plaintiffs' counsel to prospective claimants

was less extensive than here. In addition, bankruptcy judges now often mandate broad public

outreach, as is true here. More appropriate recent comparisons in determining an amount to

be set aside for unknown claimants include:

1. The settlement of the Society of Jesus, Oregon Province, Chapter 11 proceeding, in
   which the future claims trust was for an amount representing approximately eight
   percent of the aggregate for filed claims;

2. In another example, the future trust fund for a similar proceeding in Alaska represented
   approximately five percent of the amount available for tort claimants;

3. The future trust fund for a similar proceeding in Helena, Montana represented
   approximately six percent of the claims trust;

4. The future trust fund for three similar Crosier entities in Minnesota represented
   approximately five percent of the amount available for tort claimants;

5. The future trust fund for a similar proceeding in Gallup, New Mexico was recommended
   to be approximately ten-and-a-half percent of the fund.

6. The future trust fund for a similar proceeding for the Diocese of Great Falls/Billings
   represented approximately 5% of the amount available for tort claimants.

I also note that, serving as Unknown Claims Representative (similar to "FCR" in this

proceeding), I recommended the size of the unknown claims reserve in the Helena, Gallup, and

Crosier, and Great Falls/Billings cases. I recommended a somewhat greater proportional reserve

for the Gallup proceeding because there were so few timely-filed claims from the several Native

American reservations in the diocese, and it was reasonable to conclude more would be filed. In addition, the statute of limitations in New Mexico was substantially different and more liberal than in the Crosier proceeding in Minnesota with regard to discovery guidelines.

This case is unique in several ways. First, there has been very extensive outreach to the possible claimant population.

The last-in-time priest abuse victims in this proceeding allege abuse by the same rogue priest in the 2009-2012 time period, of three related victims.

The next closest to last-in-time priest abuse victim alleges abuse in 1998. The other seven claimants in the 2000s and 2010s were either adults at the time of the alleged abuse or do not allege abuse by a priest or clergy.

The Minnesota Child Victims Act (Minn. Stat. § 541.073) provided a three-year window for child abuse victims with previously time-barred claims to sue their perpetrator and the institution that allowed the abuse to occur. That window closed on May 25, 2016. After that date, individuals abused while under the age of 18 are allowed to commence litigation for damages for sexual abuse, with two exceptions: 1) if the abuse victim was under 14 years of age when abused, the claim must be asserted before the victim reaches age 24; and 2) any claim for vicarious liability or respondeat superior must be commenced before the victim reaches age 24. Minn. Stat. § 541.073 Subd. 4.

Most of the claims in this proceeding involve a priest grooming a victim, then breaching the trust established by subjecting a victim to sexual abuse. This is horrific enough, but unfortunately a notable group of claims here involve physically aggressive sexual abuse. However, there are also a notable group of claims involving questionable or minor claims. The

presence of this latter group of claims is some evidence that outreach to possible claimants has indeed been thorough.

Comparing other religious order cases to the factors involved here indicates that it is unlikely that many compensable unknown claims will be filed in the future.

The Debtor's counsel estimates that approximately more than $190 million will be available to holders of tort claims upon the effective date of the Plan.

**Recommendations:**

I make the following recommendations with regard to establishing the future claims trust, the estimate of future claims, and other parameters. I specifically reserve the right to revise these recommendations and to modify them after full review of any changes to the Disclosure Statement and Plan containing the provisions concerning any such future claims trust.

1.      I recommend that the future claims trust fund be established in the range of three-to-five percent of the trust fund based on my work in other cases and circumstances of this case. I believe it is fair and appropriate for the future claims trust fund here to be in an amount that recognizes claims at the low end of that range because of the factors summarized above.

2.      Experience teaches that the settlement value of future claims may be substantially less than earlier-filed claims. However, giving future claimants the benefit of the doubt, and assuming the final count of timely-filed allowable claims herein is 444, and given other factors considered, an amount equal to three-to-five percent of the overall claims fund is a fair and appropriate number.

3.       I note the number of claimants who filed proofs of claim in this proceeding after the last date set by the Court to file a proof of claim is approximately ten percent of the number of claimants who filed by the last date set for a timely claim. If half of those late claims are compensable, which is a rough approximation from other cases, and in light of the especially broad and thorough outreach of the principal claimants' counsel, then three-to-five percent seems a reasonable expectation for future compensable claims.

4.       I recommend that the future claims trust fund be established in a trust similar in nature and substance to the trust fund established to pay timely-filed claims in an amount of no less than $7,000,000.

5.       I recommend that the adjudication of these claims be handled in the same manner and means, and by the same adjudicator, as is handling the adjudication of timely-filed claims, assuming that adjudicator is willing and able to serve.

6.       I further recommend that the trust be established and funded in a manner that safeguards the entire balance held in trust, and that the trust be established in a manner that gives the trustee discretion as far as distribution to any claimants determined by the adjudicator to be valid, in such a manner that equitably preserves the balance of the claims for the remainder of the term of the trust.

7.       Based upon my evaluation of previous future claims resolutions in other cases, I recommend that the trust have a termination date of six-to-eight years from the date of the establishment of the trust, assuming that the trust will be established under the terms of a confirmed Plan of Reorganization, and that the trustee has the discretion concerning the exact termination date of the trust during that six-to-eight-year period.

8.      I specifically reserve the right to modify these recommendations based upon

facts and circumstances brought to my attention, including any changes in the Disclosure

Statement and Plan, as well as any information provided by parties in interest in these cases,

including, but not limited to the Debtor, the Official Unsecured Creditors Committee, the

insurance carriers, the U.S. Trustee, or any other party in interest.

Respectfully submitted this 21st day of September, 2018.


MICHAEL R. HOGAN

# Exhibit 1

**ASPM Abuse Claims**

## START DATE OF ALLEGED ABUSE, BY DECADE

| 1940-1949 | 1950-1959 | 1960-1969 | 1970-1979 | 1980-1989 | 1990-1999 | 2000-2009 | 2010-Current |
|-----------|-----------|-----------|-----------|-----------|-----------|-----------|--------------|
| 8 | 65 | 152 | 174 | 50 | 9 | 5 | 5 |

