# RESTATED, AMENDED, AND SUPERSEDING SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Restated, Amended, and Superseding Settlement Agreement, Release, and Policy Buyback ("Agreement") is hereby made by, between and among the "Archdiocese Parties" (as defined below) and the "Insurer Entities" (as defined below).

## RECITALS

WHEREAS, the Archdiocese and Insurer Entities entered into a Settlement Agreement, Release and Policy Buyback which was fully executed on or about May 26, 2016 ("Original Agreement") and now desire to restate, amend and otherwise supersede the Prior Agreement in all respects;

WHEREAS, numerous individuals have asserted certain "Tort Claims" (as defined below) against the "Archdiocese" (as defined below);

WHEREAS, the "Insurer" (as defined below) or its predecessors issued, allegedly issued or may have issued certain insurance policies to the Archdiocese Parties or the Dominican Sisters of Sinsinawa doing business as Regina High School (the "Policies" as defined below);

WHEREAS, certain disputes between the Archdiocese Parties and the Insurer have arisen and/or may arise in the future concerning the Insurer's position regarding the nature and scope of its responsibilities, if any, to provide coverage to the Archdiocese Parties under the Policies in connection with Tort Claims (the "Coverage Disputes"), including those disputes at issue in the lawsuit captioned *Archdiocese of Saint Paul and Minneapolis v. The Continental Insurance Company, et al.*, Adversary Proceeding No. 15-3013 ("Coverage Suit");

WHEREAS, the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (Case No. 15-30125 (the "Reorganization Case") on January 16, 2015 (the "Petition Date");

WHEREAS, the Archdiocese and the Official Committee of Unsecured Creditors filed a Joint Chapter 11 Plan of Reorganization on June 28, 2018 and filed a Second Amended Plan of Reorganization on August 10, 2018 (Doc. 1223 of the Bankruptcy);

WHEREAS, through this Agreement, the Archdiocese Parties and State Farm, without any admission of liability or coverage or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes and all other disputes between and among them relating to the Coverage Disputes, the Policies, and/or the Tort Claims;

WHEREAS, this Agreement amends and entirely supersedes the Original Agreement, which Original Agreement is hereby agreed to be a nullity: this Agreement is the sole surviving settlement agreement between the Parties with respect to these matters;

1

WHEREAS, the Archdiocese Parties and the Insurer Entities, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes and all other disputes between and among them under the terms of this Agreement;

WHEREAS, through this Agreement, the Archdiocese Parties intend to provide the Insurer Entities with the broadest possible release and the broadest possible buyback with respect to the Policies and to provide that the Insurer Entities shall have no further obligations now or in the future to the Archdiocese Parties and no further obligations now or in the future under the Policies;

WHEREAS, as part of the compromise and resolution of such disputes, the Archdiocese Parties and the Insurer Entities wish to effect a sale of the Policies pursuant to 11 U.S.C. § 363; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the United States Bankruptcy Court for the District of Minnesota, the Archdiocese Parties and the Insurer Entities hereby agree as follows:

## 1.  DEFINITIONS

1.1   As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms not defined below or herein shall have the meanings given to them in the Bankruptcy Code or in the Plan, as applicable.

1.1.1   "Abuse" means (i) any actual or alleged sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in Minnesota Statutes § 541.073(1); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, intimidation, or misconduct.

1.1.2   "Archdiocese" means the Archdiocese of St. Paul and Minneapolis, which is the diocesan corporation formed pursuant to Minnesota Statutes Section 315.16 that is the public juridic person of the Roman Catholic Archdiocese of Saint Paul and Minneapolis, as now constituted or as it may have been constituted, and the Estate (pursuant to Section 541 of the Bankruptcy Code).

1.1.3   "Archdiocese Parties" means collectively the Archdiocese, including doing business as Regina High School, and any and all named insureds, insureds and additional insureds under the Policies (to the extent of and solely in their capacity as insureds), and Dominican Sisters of Sinsinawa solely in their capacity as operator of Regina High School; and in their capacity as such their respective insiders, subsidiaries, merged or acquired companies or operations, predecessors,

2

successors and assigns, and all of the foregoing Persons' past, present, and future members, shareholders, nuns, sisters, brothers, deacons, priests, other clergy, Persons bound by monastic vows, principals, teachers, staff members, boards administrations, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, professionals, volunteers, attorneys, and their successors and assigns. Nothing herein is intended to mean that the Archdiocese operated Regina High School, that the Policies were limited to Regina High School, or that such Persons are "employees" or agents of the Archdiocese or Sisters of Sinsinawa. Neither the Sisters of Sinsinawa nor any other religious order, diocese or archdiocese is an Archdiocese Party except to the extent that such entity is an Archdiocese Other Insured Entity.

1.1.4    "Bankruptcy Case Effective Date" means the date upon which the conditions in Section 13.1 of the Plan have been satisfied.

1.1.5    "Channeled Claim(s)" means any Tort Claim, Related Insurance Claim, or any other Claim against anyone who is a "Protected Person" or "Settling Insurer Entity" (within the meaning of the Plan) that directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, any Related Insurance Claim, any Class 13 Claims (within the meaning of the Plan), any Medicare Claim, and any claims covered by the Channeling and Supplemental Insurer Injunctions in Article XIV of the Plan.

1.1.6    "Claim" has the same meaning as that term is defined in Section 101(5) of the Bankruptcy Code.

1.1.7    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code which becomes a Non-Appealable Order.

1.1.8    "Effective Date" means the date on which the Agreement is executed by all of the Parties.

1.1.9    "Extra-Contractual Claim" means any Claim against any of the Insurer Entities based, in whole or in part, on allegations that any of the Insurer Entities acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; failure to act in good faith; violation of any express or implied duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of any of the Insurer Entities of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance. Extra-Contractual Claims include: (i) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Insurer Entities' handling of any Claim or any request for insurance coverage, including any request for coverage for any Claim, including any Tort Claim; (ii) any Claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Insurer

3

Entity Policies, or any contractual duties arising therefrom, including any contractual duty to defend any of the Protected Parties against any Claim, including any Tort Claims; and (iii) any Claim that directly or indirectly, arises out of, relates to, or is in connection with the conduct of the Insurer Entities with respect to the negotiation of this Agreement and the Plan. "Future Tort Claim" means any Tort Claim that was neither filed, nor deemed filed, by May 25, 2016, and is held by (i) an individual who was at the time of the Petition Date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4); (ii) an individual who experienced Abuse through and including the Effective Date and whose Claim is timely under Minn. Stat. § 541.073 subd. 2 as amended in 2013; (iii) an individual who has a Tort Claim that was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revises previously time-barred Tort Claims; or (iv) any other individual or class of individuals the Future Tort Claim Representative can identify that would have a Tort Claim on or prior to the Effective Date.

1.1.10 "Insurer" means State Farm Fire and Casualty Company.

1.1.11 "Insurer Entities" means the Insurer and its past, present and future parents, subsidiaries, affiliates, and divisions, each of their respective past, present, present and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies (to the extent of and in their capacities as insurers under the Policies), each of their respective past, present and future, directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators, and each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them (to the extent of and in their capacity as such).

1.1.12 "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

1.1.13 "Mediation Orders" means those orders issued by the mediator in the course of the mediation ordered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding.

1.1.14 "Non-Appealable Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and is final and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been sought, (a) appeal, certiorari,

4

review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard, or that granted certiorari, and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Non-Appealable Order".

1.1.15 "Parties" means the Archdiocese Parties and the Insurer Entities. "Party" in the singular refers to either the Archdiocese Parties or the Insurer Entities as determined by the context in which the word is used.

1.1.16 "Plan" refers to the Second Amended Joint Chapter 11 Plan of Reorganization of the Archdiocese of St. Paul and Minneapolis [Dkt No. 1223] and any amendments thereto.

1.1.17 "Person" means any individual, partnership or corporation, as contemplated by Section 101(41) of the Bankruptcy Code.

1.1.18 "Policies" means any and all known and unknown binders, certificates, or policies of insurance in effect on or before the Effective Date, that were issued or allegedly issued by the Insurer to the Archdiocese as named insured or under which the Archdiocese is allegedly or potentially an insured that actually, allegedly or could potentially afford coverage with respect to any Tort Claim, including purported State Farm Policy Nos. SM23839120 and 93-010482, and any policy issued or allegedly issued by the Insurer to Regina High School in which the Archdiocese may have been listed as an insured, named insured, additional insured, or otherwise, including as a d/b/a of or joint venturer/partner in, Regina High School; provided, however, that if a contract, binder, certificate or policy of insurance, that is not identified on any of Exhibit L(1)-A or Exhibit N to the Plan and was not issued or allegedly issued to the Archdiocese, insures or covers both the Archdiocese and any other Person, such contract, binder or policy of insurance, as applicable, is a "Policy" to the extent that it insures the Archdiocese, and if applicable, Sisters of Sinsinawa as to the operations of Regina High School, but not to the extent it insures or covers any other Person.

1.1.19 "Related Insurance Claim" means (i) any Claim by any Person against any Protected Party or a Settling Insurer Entity that, directly or indirectly, arises from, relates to, or is in connection with a Tort Claim, including any such Claim for defense, indemnity, contribution, subrogation, or similar relief or any direct action or claim, including an action or claim under Minn. Stat. § 60A.08, subd. 8; and (ii) any Extra-Contractual Claim.

1.1.20 "Reorganized Debtor" means the Archdiocese, on and after the Effective Date of the Plan.

11026014v4

1.1.21  "Settlement Amount" means the Settlement Amount (as defined below).

1.1.22  "Supplemental Settling Insurer Injunction" means the injunction imposed pursuant to Section 14.5 of the Plan.

1.1.23  "Tort Claim" means any Claim against any of the Protected Parties that arises out of, relates to, results from, or is in connection with, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Effective Date, including any such Claim that seeks monetary damages or any other relief, under any theory of liability, including vicarious liability; *respondeat superior*; any fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, supervision, retention or misrepresentation; any other theory based on misrepresentation, concealment, or unfair practice; contribution; indemnity; public or private nuisance; or any other theory, including any theory based on public policy or any acts or failures to act by any of the Protected Parties or any other Person for whom any of the Protected Parties are allegedly responsible, including any such Claim asserted against any of the Protected Parties in connection with the Reorganization Case. "Tort Claim" includes any Future Tort Claim.

1.1.24  "Tort Claimant" means the holder of a Tort Claim.

1.1.25  "Trust" means the trust created for the benefit of Tort Claimants in accordance with the Plan and Confirmation Order and the Trust Agreement (as defined in the Plan).

1.1.26  "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as may be amended, together with such additional documents as may be executed in connection with the Trust Agreement.

1.1.27  "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement.

1.1.28  "Trustee" means the Person appointed as Trustee of the Trust in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

## 2. THE REORGANIZATION CASE AND PLAN FOR REORGANIZATION

2.1  The Plan, Confirmation Order and any subsequent amendments thereto shall be in all respects consistent with this Agreement and shall not deprive the Insurer Entities of any right or benefit under this Agreement or otherwise adversely affect the Interests of the Insurer Entities under this Agreement

2.1.1   Future modifications may be made to such Plan but, to the extent such modifications affect the Insurer Entities' interests, such modifications may be made only if they are acceptable to the Insurer. The Insurer, however, shall not unreasonably withhold its consent to such modifications.

2.1.2   The Plan shall include a Channeling Injunction and Supplemental Channeling Injunction that, as they relate to the Insurer Entities, will be substantially in the form as provided in Sections 14.3 and 14.5 of the Plan and, pursuant to Section 105 of the Bankruptcy Code.

2.1.3   The Plan shall provide that this Agreement is binding on the Trust and that, before the Person appointed by the Bankruptcy Court to serve as the trustee of the Trust (the "Trustee") and that such Trustee shall be obligated to comply with all terms of the Plan applicable to the Trustee.

2.1.4   The Joint Plan shall provide: The Trust shall establish a "Medicare Holdback" and such Medicare Holdback shall consist of the proceeds of the Archdiocese Home Liquidation Claim (as described in Section 5.1(b)(2)(vi) of the Joint Plan). The Trust shall not distribute any portion of the Medicare Holdback until such time as the Medicare Procedures (defined below) are completed by the Trust.  The "Medicare Procedures" to be completed by the Trust are as follows: (a) immediately upon confirmation, the Trustee shall make a query to the Social Security Administration (the "SSA Query"), with respect to each Tort Claimant, to determine whether each Tort Claimant is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Eligible"); (b) within ten (10) calendar days after the Confirmation Date, the Trust shall provide to the Settling Insurers and, if requested, the Archdiocese, information sufficient to allow the Settling Insurers to perform their own SSA queries to the extent they wish to do so; (c) in the event that one or more Tort Claimants is/are identified through the SSA Query process as Medicare Eligible, the Trust shall complete a query to the Centers for Medicare and Medicaid Services ("CMS") for each such Tort Claimant to determine whether any payment ("Conditional Payment") made pursuant to Section 1395y(b)(2)(B) of the MSPA has been made to or on behalf of that Tort Claimant arising from or relating to treatment for Abuse; (d) if any Conditional Payment has been made to or on behalf of that Tort Claimant, the Trustee shall, within the time period called for by the MSPA, reimburse the appropriate Medicare Trust Fund for the appropriate amount, and submit the required information for that Tort Claimant to the appropriate agency of the United States government; and (e) upon resolution of all CMS inquiries or matters relating to Section 2.1.4(c) and (d) above, the Medicare Holdback shall be immediately available for distribution by the Trust.  The Trustee's obligation to make the reimbursements required by Section 2.1.4(d) above and to indemnify the Insurer Entities and the other Parties as provided herein with respect to Medicare Claims, Tort Claims, and Related Insurance Claims is not limited to the amount of the Medicare Holdback.  The Joint Plan shall continue to provide that:

11026014v4

2.1.4.1     It is the position of the Parties that none of the Parties nor the Trust will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the Trust, under the reporting provisions of MSPA or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("HHS") that the Trust and the Parties have no reporting obligations under MMSEA with respect to payments to the Trust by the Parties or payments by the Trust to claimants.   Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Eighth Circuit or the United States Supreme Court), or a letter from the Secretary of Health and Human Services confirming that the Parties have no reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to contributions the Parties have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Joint Plan, act as a reporting agent for the Parties, and shall timely submit all reports that would be required to be made by the Parties under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the Parties were determined to be "applicable plans" for purposes of MMSEA, or any of the Parties were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the Parties, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.1.4.2   If the Trust is required to act as a reporting agent for the Parties pursuant to the provisions of this Section 2.1.4, the Trust shall provide a written certification to each of the Parties within ten (10) business days following the end of each calendar quarter, confirming that all reports to CMS required by this Section 2.1.4. have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (b) any payments to a claimant who is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Beneficiaries") that the Trust did not report to CMS.

2.1.4.3   With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any Party, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable.   With respect to any such reports, the Trust shall reasonably undertake to remedy any issues

8

of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by any Party, provide the Parties copies of such resubmissions; provided, however, that the Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable. In the event the Trust is unable to remedy any issue of noncompliance, the provisions of this Section 2.1.4 shall apply.

2.1.4.4   If the Trust is required to act as a reporting agent for the Parties pursuant to the provisions of this Section 2.1.4, with respect to each Claim of a Medicare Beneficiary that was paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any Party, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information that may be necessary in the reasonable judgment of any Party to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any Party informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS. All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

2.1.4.5   If the Trust is required to act as a reporting agent for the Parties pursuant to the provisions of this Section 2.1.4, the Trust shall make the reports and provide the certifications required by this Section 2.1.4 until such time as Archdiocese, Catholic Entities, the Seminaries, and the Settling Insurers determine, in their reasonable judgment, that they have no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in this Section 2.1.4, and if any Party reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under this Section 2.1.4.

2.1.4.6   Section 2.1.4 is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the Parties are in fact "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

2.1.4.7   In the event that CMS concludes that reporting done by the Trust in accordance with this Section 2.1.4 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS

communicates to the Trust or any Party a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any Party a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to this Section 2.1.4, or other credible information, then each Party shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Party that elects to file its own reports such information as the electing Party may require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to this Section 2.1.4 without any redactions. The Parties shall keep any information they receive from the Trust pursuant to this Section 2.1.4. confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

2.1.4.8   Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section until Settling Insurers shall have provided their Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under Section 2.1.4.10 to the Settling Insurers for any penalty, interest, or sanction with respect to a Claim that may arise solely on account of the Settling Insurers' failure timely to provide their Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing herein relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each Archdiocese Party, Parish Party, Seminary Party, or Settling Insurer for any failure to report payments to Medicare eligible Tort Claimants on behalf of Persons who have supplied Medicare Reporting Numbers, if any exists.

2.1.4.9   In connection with the implementation of the Joint Plan, the Trustee shall obtain, prior to remittance of funds to Tort Claimants' counsel or the Tort Claimant, if pro se, in respect of any Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSPA relating to such Claim; otherwise the Trust shall withhold from any payment to the Tort Claimant funds sufficient to assure that any obligations owing or potentially owing under MSPA relating to such Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 2.1.4 to each Party, and permit reasonable audits by such Persons, no more often than quarterly, to confirm the Trust's compliance with this Section 2.1.4. For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 2.1.4 regardless of whether any Party elects to file its own reports under MMSEA pursuant to this Section 2.1.4.

2.1.4.10  The Trust shall defend, indemnify, and hold the Insurer Entities and the Archdiocese Parties harmless from any Medicare Claims and any Claims related to the Trust's obligations under this Section.

2.2    The Archdiocese contemplates that the Court will set a hearing on approval of the Disclosure Statement and will issue an order requiring service of the Disclosure Statement by the Archdiocese in accordance with Local Rule 3017-1 (a). The Archdiocese shall serve and file, at least 14 days prior to the hearing date on the adequacy of the Disclosure Statement, separate motions to approve (a) the notice and solicitation procedures outlined below (the "Solicitation Motion") and (b) the settlement, buyback and other transactions contemplated in this Agreement (the "Approval Motion"). The Solicitation Motion shall request a hearing in conjunction with the hearing on adequacy of the Disclosure Statement. Both the Solicitation Motion and the Approval Motion shall be served and filed in accordance with the local rules governing the service and filing of motions.

2.3    The Solicitation Motion shall request that the Court approve a form of notice, reasonably acceptable to the parties, providing notice of the hearing to approve the settlement agreement. The Archdiocese shall further request that the Court authorize service of the Approval Notice with the solicitation package relating to the Plan. The Archdiocese contemplates that the solicitation package will include, in addition to the Approval Hearing Notice, (a) an order approving the Disclosure Statement and scheduling a hearing on confirmation of the Plan, (b) a cover letter or letters, (c) a form of ballot, and (d) copies of the Disclosure Statement and Plan (which, if authorized by the Court, may be provided by CD or disk). Unless otherwise authorized by the Court, the solicitation package shall be served on the parties specified in Local Rule 3017 (b). The Archdiocese may also seek authorization to serve state court counsel representing one or more holder of a Tort Claim with a single master solicitation package. The Archdiocese shall also post notice of the hearing on confirmation of the Plan electronically on the reorganization website maintained by the Archdiocese at http://information.archspm.org/.

2.4    The Solicitation Motion shall also request that the Court approve a form of published notice containing such information and notices as may be reasonably requested by the Insurer Entities to provide notice of the hearings on Approval Motion and confirmation of the Plan. The Solicitation Motion shall request that the Court direct that published notice be provided in the legal notice section of USA Today, and outside the legal notice section of the Star Tribune, Pioneer Press, and the Catholic Spirit at least 14 days prior to the hearing on confirmation of the Plan.

2.5    In the Reorganization Case, the Archdiocese shall seek and obtain entry of a Non-appealable Order  in form and substance acceptable to the Insurer that: (i) approves the Plan pursuant to Section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction and Supplemental Settling Insurer Injunction; (iii) provides that this Agreement is binding on the Trust, the Reorganized Debtor, and any successors of the Trust or Reorganized Debtor; and (iv) provides substantially the same protections to the Insurer against Tort Claims that are afforded to other settling insurers under the Plan to the extent State Farm's circumstances are similar (the "Plan Confirmation Order").

11026014v4

2.5.1   The Plan Confirmation Order must be in all respects consistent with this Agreement and contain no provisions that diminish or impair the benefit of this Agreement to the Insurer Entities.

2.5.2   In seeking to obtain the Plan Confirmation Order, the Archdiocese must: (i) seek a confirmation hearing within a reasonable time; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.5.3   The form and manner of notice of the hearing to confirm the Plan and the form and manner of notice of the hearing as to the adequacy of the disclosure statement pertaining thereto are subject to advance approval by the Insurer, which approval cannot be unreasonably withheld.

2.5.4   Prior to entry of the Plan Confirmation Order, if the Bankruptcy Court lifts the stay pursuant to Section 362 of the Bankruptcy Code as to any Tort Claim for which the Insurer is alleged to owe a defense, then, absent a determination by any court that the Insurer owes no defense obligation, the Insurer will defend the Tort Claim under a complete reservation of rights, including, but not limited to, the right to file a declaratory action or to reopen the Coverage Suit, and to withdraw from the defense. The Archdiocese will stipulate to relief from the automatic stay so that, and solely to the extent that, Insurer can promptly file the declaratory action and seek a judicial declaration that it has no obligation to defend.  Any defense costs incurred by the Insurer in defending the Tort Claim will be deducted from the Settlement Amount, and the Insurer's liability for defense costs and all other payments will be capped at the Settlement Amount. For the avoidance of doubt, in the event that it is determined by a Non-Appealable Order that the Insurer owes no duty to defend, the Insurer will nevertheless pay the Settlement Amount less any defense costs incurred pursuant to this paragraph if there is a Non-Appealable Order confirming the Plan.  If the defense fees and costs incurred reach the Settlement Amount, then Insurer will automatically be relieved of any defense duty or obligation and can withdraw from the defense without further obligation to defend or indemnify the Archdiocese with respect to any claims then in suit or any others that may thereafter be brought. The Archdiocese shall make sure that the claims are otherwise defended and not defaulted.

2.6     The Archdiocese agrees that the Trust, the Plan and the Trust Distribution Plan shall provide that the assets in the Trust shall be the sole source of funds for payment of indemnity, defense fees and costs, and expenses relating to reimbursing the United States government for reimbursement obligations for Conditional Payments made pursuant to the MSPA applicable to any given Medicare Beneficiary and, after satisfaction thereof, to such Medicare Beneficiaries and other Beneficiaries, as well as all other expenditures and disbursements, as provided for in the Plan, Trust Agreement and Trust Distribution Agreement. Except for the payment of the Settlement Amount, the Insurer Entities shall not be obligated to make any other payments, including any payments to the Trust.

12

2.7     The Archdiocese will undertake all reasonable actions and cooperate with the Insurer, as applicable, in connection with its reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers.

2.8     From the date of execution of this Agreement, the Parties shall cease all litigation activities against each other in the Coverage Suit; provided, however, that each Party may take whatever steps that, in its sole judgment, are necessary to represent its Interests as long as it remains a party in the Coverage Suit. For example, if the Bankruptcy Court lifts the stay pursuant to Section 362 of the Bankruptcy Code as to any Tort Claim for which the Insurer is alleged to owe a defense, Insurer may reopen the Coverage Suit or file a separate declaratory action and seek a judicial determination that it owes the Archdiocese neither a duty to defend nor one to indemnify.

2.9     Within ten (10) days after the Insurer pays the Settlement Amount, the Archdiocese and the Insurer shall sign and file any necessary papers to effect a dismissal with prejudice of any and all claims asserted by any of the Parties against any of the other Parties.

2.10    Upon the Bankruptcy Case Effective Date, the Archdiocese shall use its best efforts to obtain the dismissal of other Claims, if any, against the Insurer by any other insurer in the Coverage Suit.

2.11    The Parties covenant not to sue each other until (a) the Bankruptcy Orders become Non-Appealable Orders, at which time this covenant is superseded by the releases provided in Section 4, or (b) the date on which this Agreement is terminated, with the exception that if the Bankruptcy Court lifts the stay pursuant to Section 362 of the Bankruptcy Code as to any Tort Claim for which the Insurer is alleged to owe a defense, Insurer may reopen the Coverage Suit or file a separate declaratory action in federal court as an adversary proceeding or proceeding related to the bankruptcy case, and seek a judicial determination that it owes the Archdiocese neither a duty to defend nor one to indemnify.

3.  **PAYMENT OF THE SETTLEMENT AMOUNT AND DISMISSAL OF COVERAGE SUITS**

3.1     Conditions Precedent. The Insurer's obligation to pay the Settlement Amount is conditioned on the Archdiocese obtaining the Approval Order, and a Plan Confirmation Order (together the "Bankruptcy Orders") and all of the Bankruptcy Orders becoming Non-Appealable Orders and the Plan becoming effective in accordance with Section 13.1 of the Plan.

3.2     In full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Insurer Entities free and clear of all Interests of any Person, the Insurer Entities shall pay to the Trust the sum of Five Million Dollars ($5,000,000) (the "Settlement Amount"), or such sum as remains after the payment of defense fees and expenses is deducted from the Settlement Amount,

as is provided for in Section 2.5.4 above, within ten (10) days after the Insurer receives written notice from the Archdiocese or the Trustee that confirms the Bankruptcy Orders are Non-Appealable Orders and provides directions as to transmission of the payment.

3.3     The Parties agree that (i) the Settlement Amount set forth in Section 3.2 is the total amount the Insurer Entities are obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Policies (including Channeled Claims, any reimbursement obligations for Conditional Payments under the MSPA, and any Related Insurance Claims) and the defense thereof; (ii) under no circumstance will the Insurer Entities ever be obligated to make any additional payments to or on behalf of anyone in connection with the Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Channeled Claims and any Related Insurance Claims; (iii) under no circumstance will the Insurer Entities ever be obligated to make any additional payments to or on behalf of the Archdiocese Parties or any Tort Claimants in connection with any policies of insurance issued or allegedly issued by the Insurer Entities with respect to any Claims that, directly or indirectly, arise out of, relate to, or are in connection with any Tort Claims insured or alleged to be insured under the Policies issued by the Insurer Entities, including any Channeled Claims and any Related Insurance Claims; and (iv) all limits of liability of the Policies issued or allegedly issued to the Archdiocese, including purported Policy Nos. SM23839120 and 93-010482, regardless of how the Policies identify or describe those limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount set forth in Section 3.2 is the full purchase price of the Policies.

> 3.3.1   The Parties agree and jointly represent that (i) the consideration to be provided by the Insurer Entities pursuant to this Agreement (including the Settlement Amount) constitutes a fair and reasonable exchange for the consideration granted to the Insurer Entities in this Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Parties to the Insurer Entities pursuant to this Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Archdiocese Parties in this Agreement (including the Settlement Amount). The Insurer Entities are not acting as volunteers in paying the Settlement Amount, and the Insurer Entities' payment of the Settlement Amount reflect potential liabilities and obligations to the Archdiocese of amounts the Insurer Entities allegedly are obligated to pay on account of any and all Claims.

## 4.  RELEASES AND SALE FREE AND CLEAR

4.1     Upon payment by the Insurer of the Settlement Amount pursuant to Section 3.2, the Archdiocese Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Entities and any of their reinsurers or retrocessionaires, solely to the extent of and in their capacity as such, from any and all past, present, and future Claims arising out of or in any way related to the Policies, including any Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims

or the Policies, including any Channeled Claims, Related Insurance Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case. This release specifically includes all future claims that are based in whole or in part on the Tort Claims, Future Tort Claims, the Policies, or any other binder, certificate, or policy of insurance issued by the Insurer.

4.2    As of the first day on which the Bankruptcy Orders are Non-Appealable Orders, the Insurer Entities hereby fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Parties from any and all past, present, and future Claims, including any Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims, Future Tort Claims, the Policies, including any Channeled Claims, Related Insurance Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case.

4.3    From and after the first day on which the Bankruptcy Orders are Non-Appealable Orders, as set forth in the Approval Order, the Insurer hereby buys back the Policies free and clear of all Interests of all Persons (as set forth in the Approval Order), including all Interests of the Archdiocese Parties, any other Person claiming coverage by, through, or on behalf of any of the Archdiocese Parties, any other insurer, and any Tort Claimant. This sale is pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Insurer is a good faith purchaser of the Policies within the meaning of Section 363(m) of the Bankruptcy Code, and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies and constitutes reasonably equivalent value. As set forth in the Approval Order, the releases in this Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws. As set forth in the Approval Order, upon entry of the Bankruptcy Orders as Non-Appealable Orders, the Policies shall be terminated and of no further force and effect. The Insurer's payment of the Settlement Amount constitutes the Insurer's full and complete performance of any and all obligations under the Policies, including any performance owed to the Archdiocese Parties, and exhausts all limits of liability of the policies issued or allegedly issued to the Archdiocese. All Interests the Archdiocese Parties may have had, may presently have, or in the future may have in the Policies are released pursuant to the terms of this Agreement. The Archdiocese Parties accept the Settlement Amount set forth in Section 3.2 in full and complete satisfaction of all the Insurer Entities' past, present, and future obligations arising from or in any way related to any of the Archdiocese Parties under the Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever, whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such claims arise from, relate to, or are in connection with the Channeled Claims, the Reorganization Case, or otherwise under the Policies.

4.4    Neither the releases set forth in this Section 4 nor any other provisions in this Agreement are intended to apply to or have any effect on the Insurer's right to reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover

losses arising under or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Insurer.

4.5     Neither the releases set forth in this Section 4 nor any other provisions in this Agreement are intended to apply to or have any effect on the rights of any Person, including any Parish or Religious Order, to insurance or recoveries under an insurance policy that is not a Policy.

## 5.   TERMINATION OF AGREEMENT

5.1     The Archdiocese or the Insurer may terminate this Agreement by providing ten (10) days written notice to the other Party if:

5.1.1     The Bankruptcy Court (a) dismisses the Reorganization Case, or converts the case to a case under Chapter 7 of the Bankruptcy Code; (b) does not approve this Agreement, the Channeling Injunction and the Supplemental Settling Insurer Injunction by entry of an order in form and substance acceptable to Insurer; or (c) denies approval of this Agreement, the Channeling Injunction or Supplemental Insurer Injunction, and any of the foregoing orders become Non-Appealable Orders;

5.1.2     The Effective Date does not occur within ninety (90) days of the Confirmation Order and Approval Order (as hereinafter defined) becoming Non-Appealable Orders;

5.1.3     The agreement of Insurer and the Archdiocese that the Archdiocese should seek dismissal of its Reorganization Case; or

5.1.4     The Archdiocese and Insurer agree in writing to the termination of this Agreement.

5.2     In the event termination occurs under Section 5.1 above, the Agreement will be void *ab initio*, including but not limited to the obligation to pay the Settlement Amount, and the Policies shall remain in full force and effect, with all rights, remedies and defenses held by Insurer being preserved by Insurer.

## 6.   REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1     The Parties separately represent and warrant as follows:

6.1.1     To the extent it is a corporation, including a non-profit or church corporation, or other legal entity, the Archdiocese has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

6.1.2    This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

6.2      The Archdiocese Parties represent and warrant that they have not and will not assign any Interests in the Policies or any other binder, certificate, or policy of insurance issued by the Insurer, other than assigning the proceeds to the Trust pursuant to the Plan.

6.3      The Insurer represents and warrants that it is not aware of any other policies of insurance that it issued to the Archdiocese that may provide coverage for the Tort Claims.

6.4      The person(s) executing this Agreement on behalf of the Archdiocese Parties represents and warrants that he/she has authority to execute this Agreement, and provide the releases in Section 4, on their behalf.

## 7.   ACTIONS INVOLVING THIRD PARTIES

7.1      For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Policies resulting from the purchase and sale thereof contemplated by this Agreement, the Archdiocese Parties hereby agree as follows:

7.1.1    From and after the first day on which the Bankruptcy Orders become Non-Appealable Orders, if any other insurer of the Archdiocese Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Insurer Entities as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of the Insurer Entities' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation of any of the Insurer Entities for any Claims or reimbursement obligations released or resolved pursuant to this Agreement, the Archdiocese Party(ies), as applicable, shall voluntarily reduce its or their judgment against such other insurer(s) to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against the Insurer Entities. To ensure that such a reduction is accomplished, from and after the Bankruptcy Case Effective Date, the Insurer Entities shall be entitled to assert this Section 7 as a defense to any action against them brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction in order to protect the Insurer Entities from any liability for the judgment or Claim. Moreover, from and after the Bankruptcy Case Effective Date if an insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against any of the Insurer Entities, such Claim may be asserted by the non-settling insurer as a defense against the Trust (under the Plan contemplated by the Agreement) in any coverage litigation (and the Trust may assert the legal and equitable rights of the Insurer Entities in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such insurer to the

17

Trust (or Archdiocese Parties) shall be reduced dollar for dollar by the amount so determined.

7.1.2   Unless this Agreement is terminated, the Insurer Entities shall not seek reimbursement for any payments they are obligated to make under this Agreement under theories of contribution, subrogation, indemnification, or other similar relief from any other insurer of the Archdiocese unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from the Insurer or any other insurer. The Archdiocese shall use its reasonable best efforts to obtain from all insurers with which it settles agreements similar to those contained in this Section 7; provided, however, that the failure of the Archdiocese, despite its reasonable best efforts, to obtain such an agreement from any insurer with which it settles will not be a basis to terminate this Agreement or excuse the Insurer Entities from performing their respective obligations hereunder, including payment of the Settlement Amount.

7.2   From and after the Bankruptcy Case Effective Date, the Trust and the Reorganized Debtor as provided in and subject to the terms of the Plan, shall defend, indemnify, and hold harmless the Insurer Entities with respect to any and all Claims relating to the Policies, including all Claims made by (i) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any of the Policies; (ii) any Person who has made, will make, or can make a Tort Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Policies. This indemnification includes Claims made by Persons over whom the Archdiocese does not have control, including any other Person who asserts Claims against or rights to coverage under any of the Policies. The Trust's obligations to defend, indemnify and hold harmless the Insurer Entities under this Section 7.2 shall not exceed the Settlement Amount set forth in Section 3.2. The Insurer Entities agree to notify the Trust as soon as practicable of any Claims identified in this Section 7.2. In defense of any such Claims, the Trust may settle or otherwise resolve a Claim without the prior consent of the Insurer Entities. In the event that any Claims identified in this Section 7.2 are likely to exceed the amounts of the Trust's indemnification obligation, the Insurer Entities may engage counsel of their choice at their own expense and the Trust and the Insurer will cooperate with each other in the defense of such claims. The Trust will not settle such claim without the consent of the Insurer Entities but such consent shall not be unreasonably withheld.

7.3   If any Person attempts to prosecute a Channeled Claim or Related Insurance Claim against any of the Insurer Entities following the Petition Date, then promptly following notice to do so from the Insurer Entities against whom the Claim is asserted, the Trustee will file a motion and supporting papers to obtain an order from the Court, pursuant to Bankruptcy Code §§ 362 and 105(a).

7.4   The Reorganized Debtor shall be obligated to defend, indemnify and hold harmless the Insurer Entities to the extent and subject to the provisions of the Plan.

## 8.   MISCELLANEOUS

8.1    If any proceedings are commenced to invalidate or prevent the enforcement or implementation of any of the provisions of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Procedures Motion, the Approval Motion, the Procedures Order, the Approval Order, the Plan, the Plan Confirmation Order, and the Reorganization Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

8.4    This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.5    This Agreement may be modified only by a written amendment signed by the Parties and with the written agreement of the UCC or Trust, and no waiver of any provision of this Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

8.6    By entering into this Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

8.7    This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession of liability, culpability, wrongdoing, or insurance coverage. The Mediation Orders shall remain in full force and effect after the Effective Date of this Agreement for the avoidance of doubt.  All related discussions, negotiations,

and all prior drafts of this Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.7, in (i) an action or proceeding to enforce the terms of this Agreement, including any use as set forth in any provision of Section 7, or (ii) any possible action or proceeding between the Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Entities' obligations under any of the Policies or any other binder, certificate, or policy of insurance issued by the Insurer, with respect to any Claims against the Insurer.

8.8    None of the Parties shall make any public statements or disclosures (i) regarding each other's rationale or motivation for negotiating or entering into this Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Insurer, including handling of or involvement in connection with the Tort Claims or the resolution of the Tort Claims.

8.9    Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties; provided, however, that the Archdiocese's rights and obligations may be assigned to the Trust pursuant to the Plan.

8.10    The Archdiocese Parties and the Insurer Entities have received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated at arm's length.

8.11    Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

8.12    All notices, demands, or other communication to be provided pursuant to this Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the Archdiocese Parties:

> Joseph F. Kueppers
> Chancellor for Civil Affairs
> Office of the Chancellor for Civil Affairs
> Archdiocese of Saint Paul and Minneapolis
> 222 Summit Avenue
> Saint Paul, MN 55102

11026014v4

and

With a copy to:

Charles B. Rogers and Lauren E. Lonergan
Briggs and Morgan, P.A.
Suite 2200
80 South Eighth Street
Minneapolis, MN 55402

If to the Insurer Entities:

State Farm Fire & Casualty Company
100 State Farm Parkway
Birmingham, AL 35209

With a copy to:

Leatha Wolter
Jeffrey Thompson
Meagher & Geer, P.L.L.P.
33 South Sixth Street, Suite 4400
Minneapolis, MN 55402

8.13    This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or other electronic image, which facsimile or other electronic image counterparts shall be deemed to be originals.

8.14    Nothing contained in this Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Entities that the Archdiocese Parties, or any other Person was or is entitled to any insurance coverage under the Policies or any other binder, certificate, or policy of insurance issued by the Insurer or as to the validity of any of the positions that have been or could have been asserted by the Archdiocese Parties, (ii) an admission by the Archdiocese Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Entities or any Claims that have been or could have been asserted by the Archdiocese Parties against the Insurer Entities, or (iii) an admission by the Archdiocese Parties or the Insurer Entities of any liability whatsoever with respect to any of the Tort Claims.

8.15    All of the Persons included in the definition of Insurer Entities, the Trust and the Trustee are intended beneficiaries of this Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Agreement, there are no third-party beneficiaries of this Agreement.

11026014v4

8.16   The Archdiocese Parties and the Insurer shall each be responsible for their own fees and costs incurred in connection with the Reorganization Case, this Agreement, and the implementation of this Agreement.

8.17   The following rules of construction shall apply to this Agreement:

8.17.1   Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17.2   References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

8.17.3   The wording of this Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The wording of this Agreement shall not be construed in favor of or against any Person.

8.17.4   The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

8.18   The Bankruptcy Court in the Reorganization Case shall retain exclusive jurisdiction to interpret, enforce and apply the provisions of this Agreement, which shall be construed in accordance with Minnesota law.

8.19   This Agreement and the Archdiocese's obligations under this Agreement shall be binding on the Archdiocese and the reorganized Archdiocese and shall survive the entry of the Plan Confirmation Order.

8.20   This Agreement shall be effective on the Effective Date.

8.21   This Agreement shall be interpreted, governed and enforced in accordance with Minnesota state law.

[Remainder of page left blank intentionally]

22

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of the ARCHDIOCESE OF ST.
PAUL AND MINNEAPOLIS
(as defined herein)**

By: _____

Date: _____ 8/27/2018 _____

Witness: _____

State Farm

11026014v3

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of INSURER ENTITIES (as defined herein)**

By: _Michelle Henley_

Title: _Claim Section Manager_

Date: _8/28/18_

Witness: _Jennifer Strickland_

State Farm

11026014v4