# RESTATED, AMENDED AND SUPERSEDING SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Restated, Amended and Superseding Settlement Agreement, Release, and Policy Buyback ("Agreement") is hereby made by, between and among the "Archdiocese" (as defined in Section 2.1.2 below) and the "Insurer Entities" (as defined in Section 2.1.14 below).

## RECITALS

WHEREAS, the Archdiocese and Insurer Entities entered into a Settlement Agreement, Release and Policy Buyback which was fully executed on September 27, 2017 ("Prior Agreement") and now desire to restate, amend and otherwise supersede the Prior Agreement in all respects;

WHEREAS, numerous individuals have asserted certain "Tort Claims" (as defined in Section 1.1.28 below) against the Archdiocese;

WHEREAS, the "Insurer" (as defined in Section 2.1.13 below) or its predecessors issued, allegedly issued or may have issued certain insurance policies to the Archdiocese Parties (the "Policies" as defined in Section 2.1.22 below);

WHEREAS, certain disputes between the Archdiocese and the Insurer have arisen and/or may arise in the future concerning the Insurer's position regarding the nature and scope of its responsibilities, if any, to provide coverage to the Archdiocese under the Policies in connection with the Tort Claims (the "Coverage Disputes");

WHEREAS, the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (Case No. 15-30125 (the "Reorganization Case") on January 16, 2015 (the "Petition Date");

WHEREAS, the Archdiocese Parties and the Insurer Entities, without any admission of liability or concession regarding the validity of the claims, positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes and all other disputes between and among them;

WHEREAS, through this Agreement, the Archdiocese Parties intend to provide the Insurer Entities with the broadest possible release and the broadest possible buyback with respect to the Policies and to provide that the Insurer Entities shall have no further obligations of any kind now or in the future to the Archdiocese Parties under the Policies or relating in any way to the Policies;

WHEREAS, as part of the compromise and resolution of such disputes, the Archdiocese and the Insurer Entities wish to effect a sale of the Policies pursuant to 11 U.S.C. § 363; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, intending to be legally bound, and subject to the approval of the United States Bankruptcy Court

1

for the District of Minnesota and any reviewing or appellate court, where allowed, the Archdiocese and the Insurer Entities hereby agree as follows:

## 1.    RESTATEMENT, AMENDMENT AND SUPERSEDING AGREEMENT

1.1     This Agreement restates, amends and otherwise supersedes the Prior Agreement in all respects.

## 2.    DEFINITIONS

2.1     As used in this Agreement, the following terms shall have the meanings set forth below.

2.1.1   "Abuse" means (i) any actual or alleged sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in Minnesota Statutes § 541.073(1); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, intimidation, or misconduct.

2.1.2   "Archdiocese" refers to the Archdiocese of St. Paul and Minneapolis, which is the diocesan corporation formed pursuant to Minnesota Statutes Section 315.16 that is the public juridic person of the Roman Catholic Archdiocese of Saint Paul and Minneapolis, as now constituted or may in future be constituted, including the reorganized Archdiocese, or as the Archdiocese may have been constituted, and the Estate (pursuant to section 541 of the Bankruptcy Code).

2.1.3   "Archdiocese Parties" means collectively the Archdiocese as defined herein and, in their capacity as such: (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies of the Archdiocese; (ii) any and all named insureds, insureds, and additional insureds under the Policies; (iii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions and acquired companies; (iv) each of the foregoing Persons' respective predecessors, successors and assigns; and (v) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iv), in their capacity as such. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Archdiocese or subject to its control.  An individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not an Archdiocese Party as to such Tort Claim, although this is not intended to preserve any right by such individual concerning the Policies in any respect. No religious order, diocese or archdiocese, other than the Archdiocese itself, is an Archdiocese Party, except to the extent

2

such religious order, diocese or archdiocese is an Other Insured Entity under the Joint Plan.

2.1.4 "Bankruptcy Plan Effective Date" means the date upon which the conditions in Article XIII of the Joint Plan have been satisfied.

2.1.5 "Catholic Entities" means the Archdiocesan Parishes and those Persons listed on Exhibit M of the Joint Plan.

2.1.6 "Channeled Claim" means any Tort Claim or any other Claim against any of the Protected Parties or the Insurer Entities for which coverage is provided or alleged to be provided under the Policies, and which directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, including Class 13 Claims and Related Insurance Claims.

2.1.7 "Claim" means any past, present or future claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

2.1.8 "Claim Filing Date" means August 3, 2015.

2.1.9 "Effective Date" means the date on which the Agreement is executed by all of the Parties.

2.1.10 "Extra-Contractual Claim" means any Claim against any of the Insurer Entities based, in whole or in part, on allegations that any of the Insurer Entities acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; failure to act in good faith; violation of any express or implied duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of any of the Insurer Entities of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance. Extra-Contractual Claims include: (i) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Insurer Entities' handling of any Claim or any request for insurance coverage, including any request for coverage for any Claim, including any Tort Claim, Class 3 Claim, or Class 12 Claim; (ii) any claim that, directly or indirectly, arises out of, relates to, or is in connection with the Policies or any contractual duties arising therefrom, including any

3

contractual duty to defend any of the Protected Parties against any Claim, including any Tort Claims, Class 3 Claim, or Class 12 Claim; and (iii) the conduct of the Insurer Entities with respect to the negotiation of this Agreement and the Joint Plan.

2.1.11 "Final Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been sought, (a) appeal, certiorari, review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard or that granted certiorari and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order."

2.1.12 "Future Tort Claim" means any Tort Claim that was neither filed, nor deemed filed, by May 25, 2016, and is held by (i) an individual who was at the time of the Petition Date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd.); (ii) an individual who was abused through and including the Effective Date and whose claim is timely under Minn. Stat. § 541.073 subd.2 as amended in 2013; (iii) an individual who has a Tort Claim that was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revises previously time-barred Tort Claims; or (iv) any other individual or class of individuals the Future Tort Claim Representative can identify that would have a Tort Claim on or prior to the Effective Date.

2.1.13 "Future Tort Claimant" means the holder of a Future Tort Claim, the estate of a deceased individual who held a Future Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Future Tort Claim, as the case may be. "Claimant" means the holder of a Claim.

2.1.14 "Insurer" means Employers Liability Assurance Corporation.

2.1.15 "Insurer Entities" means the Insurer and its past, present and future parents, subsidiaries, affiliates, and divisions, each of their respective past, present, present and future parents, subsidiaries, affiliates, holding companies,

4

merged companies, related companies, divisions and acquired companies, each of their respective past, present and future, directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators, and each of their respective predecessors, successors (such as, without limitation, OneBeacon America Insurance Company, Lamorak Insurance Company and Bedivere Insurance Company), assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them (to the extent of and in their capacity as such).

2.1.16 "Interests" means all liens, claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or other relief.

2.1.17 "Joint Plan" refers to the Joint Plan of Reorganization of the Archdiocese [ECF Doc. No. 1198 in the Reorganization Case] and any subsequent amendment thereto agreed to by the Insurer as provided herein.

2.1.18 "Mediation Orders" means those orders issued by the mediator in the course of the mediation ordered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding.

2.1.19 "Other Insured Entities" means any Person, including those entities listed on Exhibit N of the Joint Plan, insured or covered or allegedly insured under the Policies that were issued or allegedly issued to the Archdiocese, but only with respect to Tort Claims based on alleged Abuse that occurred in whole or in part during the effective periods of the Policies and only as to any Tort Claim covered or alleged to be covered under the Policies. Notwithstanding the foregoing, "Other Insured Entities" does not include the Archdiocese or the Catholic Entities.

2.1.20 "Parties" means the Archdiocese for itself and on behalf of the Archdiocese Parties, and the Insurer Entities. "Party" in the singular refers to either the Archdiocese Parties or the Insurer Entities as determined by the context in which the word is used.

2.1.21 "Pending Tort Claim" means any Tort Claim, other than a Future Tort Claim, including any Sexual Abuse Proof of Claim filed in this Chapter 11 case (form at Docket No. 188).

2.1.22 "Pending Tort Claimant" means the holder of a Pending Tort Claim, the estate of a deceased individual who held a Pending Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Pending Tort Claim, as the case may be.

2.1.23 "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship,

789934047.9

association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (i) "person" in section 101(41) of the Bankruptcy Code; or (ii) "entity" in section 101(15) of the Bankruptcy Code.

2.1.24 "Policies" means insurance policy nos. 618657 and 769213 issued by the Insurer to the Archdiocese as named insured, and policy no. E22-8501-032 issued to the Brothers of the Christian Schools (but only to the extent of coverage provided to the Archdiocese under that policy and not to the extent it provides coverage for any other Person including any religious order). For the avoidance of doubt, any policies issued to any entity other than the Archdiocese as a Named Insured, such as a parish, school or religious order, in which the Archdiocese is also an insured in any respect, are not within the definition of "Policies" used herein and are not subject to this Agreement except policy No. E22-8501-032 issued to Brothers of the Christian Schools which is included in the definition of "Policies" to the extent set forth above.    Further, for the avoidance of doubt, "Policies" does not include any workers' compensation liability insurance, medical or dental insurance, professional liability insurance, or directors, officers, or executive liability insurance, unless such actually or allegedly provide coverage for any Tort Claims.    Nor does "Policies" include any policies or Interests listed on Exhibit I to the Joint Plan except to the extent stated therein as to policy no. E22-8501-032.

2.1.25 "Protected Parties" means any of the Archdiocese Parties, the Reorganized Debtor, the High Schools, the Seminaries, the Annual Appeal, Catholic Youth Camp, Catholic Youth Center and the Catholic Entities and, solely to the extent of and in their capacity as such, their respective predecessors and successors, and all of the foregoing Persons' past, present, and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, volunteers, attorneys, professionals, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns; but an individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Protected Party for that Tort Claim. Protected Party also includes (a) the Other Insured Entities; and (b) solely to the extent of and in their capacity as such, the Other Insured Entities' respective predecessors and successors, and all of the foregoing Person's, past, present, and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, volunteers, attorneys, professionals, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns, but only for Tort Claims with respect to which the corresponding Other Insured Entity is an Other Insured Entity. For the avoidance of doubt, no religious order, diocese or archdiocese other than the Archdiocese itself is a Protected Party except to the extent the religious order, diocese or archdiocese is an Other Insured Entity. "Related Insurance Claim"

6

means (i) any Claim by any Person against any of the Insurer Entities or Protected Parties that, directly or indirectly, arises from, relates to, or is in connection with either of the Policies and a Tort Claim covered or alleged to be covered under such Policy, including any such Claim for defense, indemnity, contribution, subrogation, or similar relief or any direct action or claim under Minn. Stat. § 60A.08, subd. 8; and (ii) any Extra-Contractual Claim that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, including any such Claim that, directly or indirectly, arises out of, relates to or is in connection with the Insurer Entities' handling of any Tort Claim under the Policies.

2.1.26 "Reorganized Debtor" means the Archdiocese, on and after the Bankruptcy Plan Effective Date.

2.1.27 "Joint Plan" refers to the Joint Plan of Reorganization of the Archdiocese [ECF Doc. No. ___] in the Reorganization Case].

2.1.28 "Settlement Amount" means the Settlement Amount (as defined in Section 3.2 below).

2.1.29 "Tort Claim" means any Claim against any of the Protected Parties that arises out of, relates to, results from, or is in connection with, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Effective Date, including any such Claim that seeks monetary damages or any other relief, under any theory of liability, including vicarious liability; *respondeat superior*; any fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, supervision, retention or misrepresentation; any other theory based on misrepresentation, concealment, or unfair practice; contribution; indemnity; public or private nuisance; or any other theory, including any theory based on public policy or any acts or failures to act by any of the Protected Parties or any other Person for whom any of the Protected Parties are allegedly responsible, including any such Claim asserted against any of the Protected Parties in connection with the Reorganization Case. "Tort Claim" includes any Future Tort Claim.

2.1.30 "Tort Claimant" means the holder of a Tort Claim. A "Pending Tort Claimant" or a "Class 6 Claimant" is a holder of a Pending Tort Claim, and a "Future Tort Claimant" or a "Class 7 Claimant" is a holder of a Future Tort Claim.

2.1.31 "UCC" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 case, as such committee may be constituted from time to time.

## 3. THE REORGANIZATION CASE AND PLAN FOR REORGANIZATION

3.1     The Archdiocese and the UCC filed the Joint Plan on June 28, 2018.  The Joint Plan, as filed or amended, shall be in all respects consistent with this Agreement and shall not deprive the Insurer Entities of any right or benefit under this Agreement or otherwise adversely affect the Interests of the Insurer Entities under this Agreement.  The Insurer Entities have approved the form of the Joint Plan as it relates to the transactions contemplated under this Agreement. The Archdiocese shall not modify the terms of the Joint Plan as they relate to the transactions contemplated under this Agreement without the consent of the Insurer Entities, but such consent shall not be unreasonably withheld. Anything in this Section 2 to the contrary, it is not unreasonable for the Insurer Entities to withhold consent from any changes to the Joint Plan that adversely affect the Interests of any of the Insurer Entities.

3.1.1   The Joint Plan does and shall include a Channeling Injunction and Supplemental Channeling Injunction that, as they relate to the Insurer Entities, will be substantially in the form as provided in Articles 14.3 and 14.5 of the Joint Plan, pursuant to section 105 of the Bankruptcy Code, barring and permanently enjoining all Persons who have held or asserted, or may in the future hold or assert, Channeled Claims and Related Insurance Claims from taking any action, directly or indirectly, for purposes of asserting, enforcing, or attempting to assert or enforce, any Channeled Claim or Related Insurance Claim, and channeling such Channeled Claims and Related Insurance Claims to a trust or trusts established pursuant to the Joint Plan ("Trust") as the sole and exclusive source of payment of any such Channeled Claims and Related Insurance Claims, subject to the Joint Plan's indemnification provisions. Future modifications may be made to such Plan but, to the extent such modifications affect the Insurer Entities' interests, such modifications may be made only if they are acceptable to the Insurer.  The Insurer, however, shall not unreasonably withhold its consent to such modifications.

3.2     The Archdiocese or the UCC shall serve and file in accordance with the local rules governing the service and filing of a notice of motion (the "Approval Motion") pursuant to which the Archdiocese and the UCC will seek the entry of an order in form and substance acceptable to the Insurer Entities, entered by the Bankruptcy Court under sections 363(b) and (f) and 105(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004 and 9019, and under such other provisions as the Bankruptcy Court may order, assuming and approving this Agreement and authorizing the Parties to undertake the settlement and the transactions contemplated by this Agreement (the "Approval Order").  The Archdiocese and the UCC have served and filed a motion (the "Procedures Motion") that seeks the entry of an order, in form and substance acceptable to the Insurer Entities, approving the Procedures Motion and the procedures proposed therein for notice, service, and publication of the Approval Motion (the "Procedures Order").  The Approval Motion shall be filed sufficiently in advance of that date to allow the Archdiocese to comply with any applicable scheduling order.

3.3     The Archdiocese shall provide written notice of the Approval Motion in accordance with the local rules at least 14 days in advance of the hearing to (a) all Tort Claimants to the extent they are known by the Archdiocese, even if not scheduled or the

8

subject of a proof of claim by serving their counsel of record, or if pro se or
unrepresented at their last known address to the extent available after a reasonable search;
(b) the attorney for each Tort Claimant; (c) counsel for the UCC; (d) the Future
Claimants' Representative appointed by the Court on February 14, 2017 [ECF Doc. No.
969]; (e) all Persons who have filed notices of appearance in the Reorganization Case; (f)
all Persons known to have provided general or professional liability insurance to the
Archdiocese Parties that actually, allegedly, or might insure the Archdiocese and that
actually, allegedly, or might afford coverage for any of the Archdiocese Parties with
respect to any Tort Claim, after a reasonable search; and (g) all co-defendants and their
counsel (to the extent of record) in any pre-petition litigation brought by Tort Claimants
as to whom any claim for contribution or indemnity arose for purposes of statute of
limitations after January 16, 2013 at the last address shown on any filed appearance or, if
such co-defendant is proceeding pro se, then to the last address of record for such pro se
co-defendant.   The Archdiocese shall serve all claimants identified in Section 2.3(a)
above at the address shown on their proofs of claim or to their counsel of record or, if no
proof of claim was filed, then at the address on the Archdiocese's schedules.   The
Archdiocese shall also cause a notice of intent to seek entry of the Approval Order to be
published twice in the USA Today, Star Tribune, Pioneer Press, and The Catholic Spirit
in forms and at times as ordered by the Bankruptcy Court.

3.4     The Archdiocese shall request that the Approval Motion be heard on or before the
hearing on confirmation of the Joint Plan, with objections to the Approval Motion to be
served and filed on or before the deadline for filing objections to confirmation of the
Joint Plan in accordance with applicable procedural rules.

3.5     In the Reorganization Case, the Archdiocese shall seek and obtain entry of a Final
Order in form and substance acceptable to the Insurer that: (i) approves the Joint Plan
pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of
the Bankruptcy Code; (ii) contains the Channeling Injunction and Supplemental Insurer
Injunction; (iii) provides that this Agreement is binding on the Trust, the Reorganized
Debtor, and any successors of the Trust or Reorganized Debtor; and (iv) provides
substantially the same protections to the Insurer against Tort Claims that are afforded to
other settling insurers under the Joint Plan (the "Plan Confirmation Order").

   3.5.1   The Plan Confirmation Order must be in all respects consistent with this
   Agreement and contain no provisions that diminish or impair the benefit of this
   Agreement to the Insurer Entities.

   3.5.2   In seeking to obtain the Plan Confirmation Order, the Archdiocese must:
   (i) seek a confirmation hearing within a reasonable time; (ii) urge the Bankruptcy
   Court to overrule any objections and confirm the Joint Plan; and (iii) take all
   reasonable steps to defend against any appeal, petition, motion, or other challenge
   to the Bankruptcy Court's entry of the Plan Confirmation Order.

   3.5.3   The form and manner of notice of the hearing to confirm the Joint Plan
   and the form and manner of notice of the hearing as to the adequacy of the

789934047.9

disclosure statement pertaining thereto are subject to advance approval by the Insurer, which approval cannot be unreasonably withheld.

3.5.4   Prior to entry of the Plan Confirmation Order, if the Bankruptcy Court lifts the stay pursuant to section 362 of the Bankruptcy Code as to any Tort Claim for which the Insurer is alleged to owe a defense, then, absent a determination by any court that the Insurer owes no defense obligation, the Insurer will defend the Tort Claim under a complete reservation of rights, including, but not limited to, the right to file a declaratory action and to withdraw from the defense. The Archdiocese will stipulate to relief from the automatic stay so that, and solely to the extent that, Insurer can promptly file the declaratory action and seek a judicial declaration that it has no obligation to defend.  Any defense costs incurred by the Insurer in defending the Tort Claim will be deducted from the Settlement Amount, and the Insurer's liability for defense costs and all other payments will be capped at the Settlement Amount. For the avoidance of doubt, in the event that it is determined by a Final Order that the Insurer owes no duty to defend, the Insurer will nevertheless pay the Settlement Amount less any defense costs incurred pursuant to this paragraph if there is a Final Order confirming the Second Amended Plan.  If the defense fees and costs incurred reach the Settlement Amount, then Insurer will automatically be relieved of any defense duty or obligation and can withdraw from the defense without further obligation to defend or indemnify the Archdiocese with respect to any claims then in suit or any others that may thereafter be brought. The Archdiocese shall make sure that the claims are otherwise defended and not defaulted.

3.6   The Joint Plan shall provide that the assets in the Trust shall be used solely for payment of indemnity, defense fees and costs, professional fees, and expenses relating to reimbursing the United States government for reimbursement obligations pursuant to the Medicare Secondary Payers Act ("MSPA"), as well as all other expenditures and disbursements as provided for in the Joint Plan, Trust Agreement and Trust Distribution Agreement. Except for the payment of the Settlement Amount, the Insurer Entities shall not be obligated to make any other payments under or related to the Policies for the Tort Claims, including any payments to the Trust, nor shall the Insurer Entities be obligated to make any payments to any Claimant.  Only the Trust shall make any payments to any Claimant.  The Insurer Entities have approved the form of Trust Agreement and Trust Distribution Plan filed as Exhibit D to ECF Doc. No. 887 in the Reorganization Case. The Parties recognize that the Joint Plan contains detailed provisions respecting Medicare Reporting, at section 7.5.  For the avoidance of doubt, anything in this Agreement or any document in the Reorganization Case to the contrary, it is the position of the Parties that the Insurer Entities will have no reporting or other obligations in respect of any payments, settlements, resolutions, awards, or other claim liquidations, under the reporting provisions of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (the "Act"), or any similar statute or regulation, or any rules, regulations, or guidance issued in connection therewith.  The Trust shall follow all applicable governmental requirements and guidance as respects reporting, and shall report to the Insurer Entities whenever any governmental entity, including the Centers for Medicare & Medicaid Services, determines any reporting is noncompliant or deficient in any respect.  Nothing stated

herein implies or is an admission that the Insurer Entities have any obligations as respects reporting or otherwise as respects the Act or anything similar or related thereto. The Trust shall fully indemnify the Insurer Entities with respect to any Claim against them under the Act or anything similar or related thereto.

3.7    Within ten (10) days after the Insurer pays the Settlement Amount, the Archdiocese and the Insurer shall sign and file any necessary papers to effect a dismissal with prejudice of any and all claims asserted by any of the Parties against any of the other Parties relating to the Policies.

3.8    Within ten (10) days after the Insurer pays the Settlement Amount, the Archdiocese shall use its best efforts to obtain the dismissal of other Claims, if any, against the Insurer by any other insurer.

3.9    The Parties covenant not to sue each other with respect to the Policies until (a) the Bankruptcy Orders become Final Orders, at which time this covenant is superseded by the releases provided in Section 4, or (b) the date on which this Agreement is terminated, with the exception that if the Bankruptcy Court lifts the stay pursuant to section 362 of the Bankruptcy Code as to any Tort Claim for which the Insurer is alleged to owe a defense, Insurer may reopen the Coverage Suit or file a separate declaratory action in federal court as an adversary proceeding or proceeding related to the bankruptcy case, and seek a judicial determination that it owes the Archdiocese neither a duty to defend nor a duty to indemnify. For the avoidance of doubt, in no event will any future litigation in the Coverage Suit relieve the Insurer of its obligation to pay the Settlement Amount.

4.    **PAYMENT OF THE SETTLEMENT AMOUNT AND DISMISSAL OF COVERAGE SUITS**

4.1    <u>Conditions Precedent.</u> The Insurer's obligation to pay the Settlement Amount is conditioned on the Archdiocese obtaining the Approval Order and a Plan Confirmation Order (together the "<u>Bankruptcy Orders</u>"), and is further and additionally conditioned on all of the Bankruptcy Orders becoming Final Orders.

4.2    In full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Insurer Entities free and clear of all Interests of any Person, the Insurer Entities shall pay to a Trust the sum of $750,000 (the "<u>Settlement Amount</u>"), or such sum as remains after the payment of defense fees and expenses is deducted from the Settlement Amount, as is provided for in Section 2.6.4 above, within thirty (30) days after the Insurer receives written notice from the Archdiocese or the Trustee that confirms the Bankruptcy Orders are Final Orders and provides directions as to transmission of the payment.

4.3    The Parties agree that (i) the Settlement Amount set forth in Section 3.2 is the total amount the Insurer Entities are obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Policies (including Channeled Claims, any reimbursement obligations under the MSPA, and any Related Insurance Claims) and the defense thereof; (ii) under no circumstance will the Insurer Entities ever

789934047.9

be obligated to make any additional payments to or on behalf of anyone in connection with the Policies, including any payments in connection with amounts allegedly owed under the MSPA, and including any Channeled Claims and any Related Insurance Claims relating to the Policies; and (iii) all limits of liability of the Policies issued to the Archdiocese, regardless of how the Policies identify or describe those limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount set forth in Section 3.2 is the full purchase price of the Policies.

    4.3.1   The Parties agree and represent that (i) the consideration to be provided by the Insurer Entities pursuant to this Agreement (including the Settlement Amount) constitutes a fair and reasonable exchange for the consideration granted to the Insurer Entities in this Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Parties to the Insurer Entities pursuant to this Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Archdiocese Parties in this Agreement (including the Settlement Amount).  The Insurer Entities are not acting as volunteers in paying the Settlement Amount, and the Insurer Entities' payment of the Settlement Amount reflect potential liabilities and obligations to the Archdiocese of amounts the Insurer Entities allegedly are obligated to pay on account of any and all Claims.

## 5.   RELEASES AND SALE FREE AND CLEAR

5.1   Upon payment by the Insurer of the Settlement Amount pursuant to Section 3.2, the Archdiocese Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Entities and any of their reinsurers or retrocessionaires, solely to the extent of and in their capacity as such, from any and all past, present, and future Claims arising out of or in any way related to the Policies, including any Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims covered or alleged to be covered by the Policies, including any Channeled Claims, Related Insurance Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case and the Policies. This release specifically includes all future Claims that are based in whole or in part on the Tort Claims or Future Tort Claims covered or alleged to be covered by the Policies, or the Policies.

5.2   As of the first day on which the Bankruptcy Orders are Final Orders, the Insurer Entities hereby fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Parties from any and all past, present, and future Claims arising out of or in any way related to the Policies, including any Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims covered or alleged to be covered by the Policies, including any Channeled Claims, Related Insurance Claims, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case and the Policies. This release specifically includes all future Claims that are based in whole or in part on the Tort Claims or Future Tort Claims covered or alleged to be covered by the Policies, or the Policies.  The only exception to this release is the claim for indemnification set forth in 2.6 above.

78993404749

5.3     From and after the first day on which the Bankruptcy Orders are Final Orders, as set forth in the Approval Order, the Insurer hereby buys back the Policies free and clear of all Interests of all Persons (as set forth in the Approval Order), including all Interests of the Archdiocese Parties, any other Person claiming coverage by, through, or on behalf of any of the Archdiocese Parties, any other insurer, and any Tort Claimant. This sale is pursuant to sections 363(b) and 363(f) of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Insurer is a good faith purchaser of the Policies within the meaning of section 363(m) of the Bankruptcy Code, and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies and constitutes reasonably equivalent value. As set forth in the Approval Order, the releases in this Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws. As set forth in the Approval Order, upon entry of the Bankruptcy Orders as Final Orders, the Policies shall be terminated and of no further force and effect. The Insurer's payment of the Settlement Amount constitutes the Insurer's full and complete performance of any and all obligations under the Policies, including any performance owed to the Archdiocese Parties, and exhausts all limits of liability of the Policies. All Interests the Archdiocese Parties may have had, may presently have, or in the future may have in the Policies released pursuant to the terms of this Agreement. The Archdiocese Parties accept the Settlement Amount set forth in Section 3.2 in full and complete satisfaction of all the Insurer Entities' past, present, and future obligations arising from or in any way related to any of the Archdiocese Parties under the Policies.

5.4     Neither the releases set forth in this Section 4 nor any other provisions in this Agreement are intended to apply to or have any effect on the Insurer's right to reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Insurer.

5.5     Neither the releases set forth in this Section 4 nor any other provisions in this Agreement are intended to apply to or have any effect on the rights of any Person, including a Religious Order, to insurance or recoveries under an insurance policy that is not the Policies.

## 6.     TERMINATION OF AGREEMENT

6.1     The Archdiocese or the Insurer may terminate this Agreement by providing written notice to the other Party if: (i) the Bankruptcy Court issues a Final Order dismissing the Reorganization Case; or (ii) one or more of the conditions ("Termination Conditions") identified in Section 5.2 below occurs. Upon termination of this Agreement, this Agreement shall be void and of no effect, including the releases provided in Section 4, and the Parties shall retain all of their rights, defenses, and obligations with respect to the Policies and any other binder, certificate, or policy of insurance issued by the Insurer as if this Agreement never existed.

6.2     Termination Conditions for purposes of Section 5.1 of this Agreement are: (i) the failure of the Archdiocese, after a good faith effort, to obtain, by December 1, 2018, the

7899349479

Bankruptcy Orders; provided, however, that this date may be extended by the consent of both the Parties, which consent shall not be unreasonably withheld; or (ii) the agreement of the Insurer and the Archdiocese that the Archdiocese should seek dismissal of the Reorganization Case.

## 7.   REPRESENTATIONS AND WARRANTIES OF THE PARTIES

7.1   The Parties separately represent and warrant as follows:

7.1.1   To the extent it is a corporation, including a non-profit or church corporation, or other legal entity, it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

7.1.2   This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

7.2   The Archdiocese Parties represent and warrant that they have not and will not assign any Interests in the Policies, other than assigning the settlement proceeds to the Trust pursuant to the Joint Plan.

7.3   The Insurer Entities represent and warrant that they are not aware of any other policies of insurance that it issued to the Archdiocese that may provide coverage for the Tort Claims other than those listed in Exhibit L(3) to the Joint Plan.

7.4   The person(s) executing this Agreement on behalf of the Archdiocese Parties represents and warrants that he/she has authority to execute this Agreement, and provide the releases in Section 4, on their behalf.

## 8.   ACTIONS INVOLVING THIRD PARTIES

8.1   For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Policies resulting from the purchase and sale thereof contemplated by this Agreement, the Archdiocese hereby agrees as follows:

8.1.1   From and after the first day on which the Bankruptcy Orders become Final Orders, if any other insurer of the Archdiocese obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Insurer Entities as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of the Insurer Entities' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation of any of the Insurer Entities for any Claims or reimbursement obligations released or resolved pursuant to this Agreement, the Archdiocese Party(ies) or the Trust, as applicable, shall voluntarily reduce its or their judgment against such other insurer(s) to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against the Insurer Entities. To ensure that such a reduction is

14

accomplished, from and after the Bankruptcy Plan Effective Date, the Insurer Entities shall be entitled to assert this Section 7 as a defense to any action against them brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction in order to protect the Insurer Entities from any liability for the judgment or Claim.  Moreover, from and after the Bankruptcy Plan Effective Date, if a non-settling insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against any of the Insurer Parties, such Claim may be asserted as a defense against a Claim by the Archdiocese Parties or the Trust, as applicable, in any coverage litigation (and the Archdiocese Parties or the Trust, as applicable, may assert the legal and equitable rights of the Insurer Parties in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such non-settling insurer to the Archdiocese Parties or the Trust shall be reduced dollar for dollar by the amount so determined.

8.1.2    Unless this Agreement is terminated, the Insurer Entities shall not seek reimbursement for any payments they are obligated to make under this Agreement under theories of contribution, subrogation, indemnification, or other similar relief from any other insurer of the Archdiocese unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from the Insurer or any other insurer. The Archdiocese shall use its reasonable best efforts to obtain from all insurers with which it settles agreements similar to those contained in this Section 7; provided, however, that the failure of the Archdiocese, despite its reasonable best efforts, to obtain such an agreement from any insurer with which it settles will not be a basis to terminate this Agreement or excuse the Insurer Entities from performing their respective obligations hereunder, including payment of the Settlement Amount.

8.2    From and after the Bankruptcy Plan Effective Date, the Trust or Reorganized Debtor, to the extent provided in the Joint Plan, shall defend, indemnify, and hold harmless the Insurer Entities with respect to any and all Claims relating to the Policies, including all Claims made by (i) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under the Policies; (ii) any Person who has made, will make, or can make a Tort Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under the Policies. This indemnification includes Claims made by Persons over whom the Archdiocese does not have control, including any other Person who asserts Claims against or rights to coverage under the Policies. The Trust's obligations to defend, indemnify and hold harmless the Insurer Entities under this Section 7.2 shall not exceed the Settlement Amount set forth in Section 3.2. The Insurer Entities agree to notify the Trust  as soon as practicable of any Claims identified in this Section 7.2.  In defense of any such Claims, the Trust may settle or otherwise resolve a Claim without the prior consent of the Insurer Entities.  In the event that any Claims identified in this Section 7.2 are likely to exceed the amounts of the Trust indemnification obligation, the Insurer Entities may engage counsel of their choice at their own expense and the Trust and the Insurer will cooperate with each other in the defense of such claims.  The Trust will not

15

settle such claim without the consent of the Insurer Entities but such consent shall not be unreasonably withheld. If any Person attempts to prosecute a Channeled Claim or Related Contribution and Insurance Claim against any of the Insurer Entities following the Effective Date, then promptly following notice to do so from the Insurer Entities against whom the Claim is asserted, the Trustee will file a motion and supporting papers to obtain an order from the Court, pursuant to Bankruptcy Code §§ 362 and 105(a). The Reorganized Debtor and Trust's obligations to defend and indemnify the Insurer Entities under this Section 7.2, if any, as well as the Trustee and Debtor's rights with respect to defense or indemnity under this Section 7.2  shall be as provided in and limited by the Joint Plan.

9.    **MISCELLANEOUS**

9.1    If any proceedings are commenced to invalidate or prevent the enforcement or implementation of any of the provisions of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

9.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.

9.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Joint Plan, the Plan Confirmation Order, and the Reorganization Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

9.4    This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

9.5    This Agreement may be modified only by a written amendment signed by the Parties, and no waiver of any provision of this Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

9.6    By entering into this Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the

16

Parties with respect to matters outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

9.7     This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession of liability, culpability, wrongdoing, or insurance coverage. The Mediation Orders shall remain in full force and effect after the Effective Date of this Agreement for the avoidance of doubt.  All related discussions, negotiations, and all prior drafts of this Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.7, in (i) an action or proceeding to enforce the terms of this Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Entities' obligations under the Policies or any other binder, certificate, or policy of insurance issued by the Insurer, with respect to any Claims against the Insurer.

9.8     None of the Parties shall make any public statements or disclosures (i) regarding each other's rationale or motivation for negotiating or entering into this Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Insurer, including handling of or involvement in connection with the Tort Claims or the resolution of the Tort Claims.

9.9     Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties; provided, however, that the Archdiocese's rights and obligations may be assigned to the Trust pursuant to the Joint Plan.

9.10    The Archdiocese and the Insurer Entities have received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated at arm's length.

9.11    Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

9.12    All notices, demands, or other communication to be provided pursuant to this Agreement shall be in writing and sent by e-mail and Federal Express or other overnight

789934047.9

delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the Archdiocese Parties:

> Joseph F. Kueppers
> Chancellor for Civil Affairs
> Office of the Chancellor for Civil Affairs
> Archdiocese of Saint Paul and Minneapolis
> 777 Forest Street
> Saint Paul, MN 55106

> With a copy to:

> Charles B. Rogers and Lauren E. Lonergan
> Briggs and Morgan, P.A.
> Suite 2200
> 80 South Eighth Street
> Minneapolis, MN  55402

If to the Insurer Entities:

> Robert McCarthy
> Senior Vice-President, Direct Claims
> Resolute Management Inc.
> 1000 Washington Street
> Boston, MA 02118

> With a copy to:

> Brian Bendig
> Senior Vice-President and General Counsel
> Resolute Management Inc.
> 1000 Washington Street
> Boston, MA 02118

9.13   This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or other electronic image, which facsimile or other electronic image counterparts shall be deemed to be originals.

9.14   Nothing contained in this Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Entities that the Archdiocese Parties, or any other Person was or is entitled to any insurance coverage under the Policies or any other binder, certificate, or policy of insurance issued by the Insurer or as to the validity of any of the positions that have been or could have been asserted by the Archdiocese Parties, (ii) an admission by the Archdiocese Parties as to the validity of any of the positions or defenses

18

to coverage that have been or could have been asserted by the Insurer Entities or any Claims that have been or could have been asserted by the Archdiocese Parties against the Insurer Entities, or (iii) an admission by the Archdiocese Parties or the Insurer Entities of any liability whatsoever with respect to any of the Tort Claims.

9.15    All of the Persons included in the definition of Insurer Entities and the Trust and Trustee are intended beneficiaries of this Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Agreement, there are no other third-party beneficiaries of this Agreement.

9.16    The Archdiocese Parties and the Insurer shall each be responsible for their own fees and costs incurred in connection with the Reorganization Case, this Agreement, and the implementation of this Agreement.

9.17    The following rules of construction shall apply to this Agreement:

> 9.17.1  Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

> 9.17.2  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

> 9.17.3  The wording of this Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The wording of this Agreement shall not be construed in favor of or against any Person.

> 9.17.4  The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

9.18    The Bankruptcy Court in the Reorganization Case shall retain exclusive jurisdiction to interpret, enforce and apply the provisions of this Agreement, which shall be construed in accordance with Minnesota law.

9.19    This Agreement and the Archdiocese's obligations under this Agreement shall be binding on the Archdiocese and shall survive the entry of the Plan Confirmation Order.

9.20    This Agreement shall be effective on the Effective Date.

19

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of the ARCHDIOCESE
(as defined herein)**

By: _____

Date: _____

Witness: _____

20

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of INSURER ENTITIES (as defined herein)**

By: _Robert McC_____

Title: _Authorized Representative_

Date: _8/6/2018_____

Witness: _KMI9PL (Katrina Pusteika)_